IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 02-12152 (CGC)<br><br>(Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al.,<br><br>Plaintiffs and Counterclaim Defendants,<br><br>v.<br><br>JAEBAN (U.K.) LIMITED,<br><br>Defendant and Counterclaim Plaintiff. | Adversary No. 03-A-54271 (CGC) |

**REPLY IN SUPPORT OF BRACII'S MOTIONS FOR PARTIAL RECONSIDERATION
AND A FOUR-DAY EXTENSION OF TIME**

Plaintiff Budget Rent-A-Car International, Inc ("BRACII"), by its undersigned counsel, respectfully submits this Reply in support of its Motions for Reconsideration and for a Four-Day Extension of Time to File Its Motion for Reconsideration. In further support of its Motions, BRACII states as follows:

I. **BRACII'S MOTION FOR A FOUR-DAY EXTENSION OF TIME: MR. JAEBAN HAS FAILED TO JUSTIFY A REFUSAL TO REACH THE MERITS OF RECONSIDERATION.**

In opposing BRACII's Motion to Strike, Mr. Jaeban asked the Court to ignore the 75-day delay caused by Jaeban UK's refusal to participate in this case. It is ironic that Mr. Jaeban now asks the Court to treat BRACII's four-day delay (if time is computed under Fed. R.

Bankr. P. 9006(a)) as grounds for avoiding the merits of BRACII's Motion for Reconsideration. While Mr. Jaeban is entitled to take inconsistent positions, he has failed to respond to most of BRACII's arguments as to why a four-day extension should be granted.

As a further irony, Mr. Jaeban invokes a key reason why BRACII's Motion for Reconsideration should be considered before the case progresses any further. Without naming the doctrine, he argues that the substance of BRACII's Motion for Reconsideration is barred by "law of the case" principles. Opp. at 10 (arguing that the Court has already decided the anti-assignment issue).

Mr. Jaeban ignores the reality that, under the law of the case doctrine, BRACII may raise a clear error of law at any time prior to final judgment; his attempt to strike BRACII's Motion for Reconsideration is therefore pointless. "[F]ederal courts always retain discretion to reconsider issues already decided in the same proceeding." *NL Indus., Inc. v. Commercial Union Ins Co.*, 65 F.3d 314, 324 (3d Cir. 1995). The courts routinely cite a "clear error" as an exception to the law of the case doctrine, whether on a formally-denominated Motion for Reconsideration, *Proxim Inc. v. 3Com Corp.*, 2003 U.S. Dist. LEXIS 2556, at *3 (D. Del. Feb. 21, 2003) (cited by Mr. Jaeban), or otherwise. *E.g., United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 397 n.4 (3d Cir. 2003) (dicta) (law of the case is inapplicable if "the earlier decision was clearly erroneous and would create manifest injustice"); *NL Industries, Inc. v. Commercial Union Ins. Co.*, 65 F.3d at 324 ("need to correct a clear error or prevent manifest injustice").

BRACII's Motion for Reconsideration is entirely predicated on what it believes was a clear error in applying *Linden Gardens*. Mr. Jaeban offers no reason why the parties

should wait until a subsequent motion (*e.g.*, for summary judgment) or, after even greater expense, an appeal, when the issue can and should be resolved now.

Leaving efficiency to one side, Mr. Jaeban utterly fails to show prejudice from the extension of time sought by BRACII – a period that the Third Circuit has called "trivial." *In re Cendant Corp. Prides Litig.*, 311 F.3d 298, 300 (3d Cir. 2002). The so-called "prejudice" arises from the substance of the Motion for Reconsideration, not the four-day delay in filing, assuming *arguendo* that time must be computed under Fed. R. Bankr. P. 9006(a). *See Manus Corporation v. NRG Energy, Inc. (In re O'Brien)*, 188 F.3d 116, 127-128 (3rd Cir. 1999) (prejudice does not consist of the loss of an "advantageous litigation position").

In his heavy reliance on *Memorex Telex*, Mr. Jaeban also ignores the interlocutory nature of the May 25, 2004 Memorandum Opinion in this case. *Memorex Telex* involved the timeliness of a notice of appeal. Mr. Jaeban has not cited a single case holding that the Court lacks discretion to grant an extension of time *nunc pro tunc* to reconsider an interlocutory decision. There is strong reason to question whether *Memorex Telex* is even applicable to motions to reconsider interlocutory orders. Under the Third Circuit's "law of the case" decisions, as elsewhere, supervening decisions and new evidence are grounds for reconsideration. *E.g.*, *NL Industries, Inc. v. Commercial Union Ins. Co.*, 65 F.3d at 324. If *Memorex Telex* sets a final time limit for reconsideration, motions based on either of these grounds would be untimely unless filed within ten days as computed under Rule 9006(a) – effectively and impermissibly eliminating these grounds for reconsideration. This inconsistency is avoided if the District of Delaware's ten-day limit on motions for reconsideration, D. Del. Rule 7.1.5, is either treated as applying only to motions affecting a final judgment or if the Court has general discretion to modify the time limit.

Mr. Jaeban's Opposition is also ineffective because it addresses the wrong standard for granting an extension of time, even assuming that *Memorex Telex* governs the calculation of time here. Disregarding BRACII's argument to the contrary, Mr. Jaeban asserts that BRACII has failed to show "unique circumstances" under *Memorex Telex* and *Kraus v. Consolidated Rail Corp.*, 899 F.2d 1360 (3d Cir. 1990). Opp. at 4. BRACII's Motion for Reconsideration is *not* a motion to amend a judgment – there is no judgment – and the correct standard is "excusable neglect" under Fed. Bankr. R. 9006(b)(1)(2).[1]

By ignoring the "excusable neglect" standard, Mr. Jaeban has failed to rebut BRACII's showing that, faced with five different potentially applicable rules (BRACII Motion at 6), BRACII has met the standard. Mr. Jaeban has suffered no prejudice; both parties will instead be prejudiced if the applicability of *Linden Gardens* is not determined until later in this Court or on appeal. The delay in filing the motion was trivial, and BRACII has acted in good faith towards Mr. Jaeban and in confronting the five provisions at issue. Mr. Jaeban has failed to justify treating BRACII's four-day delay more harshly than Jaeban UK's 75-day delay in this matter.

## II. BRACII'S MOTION FOR RECONSIDERATION: MR. JAEBAN HAS FAILED TO SUPPORT THE COURT'S GROUNDS FOR DECISION; HIS NEW GROUNDS FOR UPHOLDING HIS ASSIGNMENT ARE NOT PLAUSIBLE.

### A. Mr. Jaeban's Failure to Support the Court's Reasoning

Faced with the clear import of *Linden Gardens*, Mr. Jaeban does not even discuss the reasoning in the May 25, 2004 Memorandum Opinion, let alone show that its reasoning is

---

[1] *Memorex Telex* relies on *New Castle County v. Hartford Acc. & Indem. Co.*, 933 F.2d 1162 (3d Cir. 1991), for the proposition that a motion for reconsideration is the "functional equivalent" of a motion to amend a judgment (Opp. at 4 n.1), so that the "unique circumstances" requirement applies. *New Castle County* states only that *"for purposes of the timeliness of an appeal,"* motions for reconsideration are treated as the "'functional equivalent' of a Rule 59(e) motion." 933 F.2d at 1177 (emphasis added). The context matters; there is no notice of appeal at issue here.

4

consistent with the House of Lords' judgments. He does not contest that the anti-assignment clauses reach the *type* of assignment at issue here: the post-insolvency assignment of a company's choses in action to another party. Nor does he contest the directive in *Linden Gardens* that anti-assignment clauses are to be broadly enforced, not limited in their scope. He also fails to discuss the post-*Linden Gardens* cases cited by BRACII enforcing anti-assignment clauses where, as here, choses in action were reassigned by insolvent corporate entities to their principals. *See* BRACII Motion for Reconsideration at 5-6 (citing *Bawejem Ltd v. MC Fabrications Ltd.*, [1999] BCLC 174, [1999] All E.R. (Comm.) 377 (C.A. 1998), and *Hendry v. Chartsearch Ltd.*, [1998] CLC 1,382, 1,391 (C.A. 1998)).

### B. *Linden Gardens* Holds that *Mr. Jaeban* Lacks Standing to Sue.

Apart from an unpersuasive effort to distinguish *Linden Gardens* on its facts (*see infra*), Mr. Jaeban directly engages BRACII's Motion only on a single point. In a one-paragraph argument (Opp. 11, ¶ 34), without citing any English authority, he asserts that BRACII lacks standing to invoke the anti-assignment clauses because the Umbrella Agreement and the IPLA have been assigned to Avis Europe plc. Mr. Jaeban, however, simply ignores the holding in *Linden Gardens* that, unless the assignee obtains the necessary consent required by an anti-assignment clause, the assignment is "ineffective to vest the contractual rights in the assignee," [1994] 1 A.C. at 109, even though BRACII cited this principle twice in its Motion (at 3, 7).[2] If Mr. Jaeban is not vested with his assignor's contractual rights, he has no basis for recovery. Under *Linden Gardens*, it is Mr. Jaeban who lacks standing.

---

[2] In keeping with *Linden Gardens*, Paragraph 12.2 of the IPLA provides that any prohibited assignment "constitutes a breach hereof and [shall] be void."

5

### C. Mr. Jaeban's New Theories Do Not Withstand Scrutiny.

Instead of support the reasoning of the Memorandum or responding to the remainder of BRACII's Motion, Mr. Jaeban offers two new alternative grounds for disregarding the anti-assignment clauses in the Umbrella Agreement and the IPLA.[3] Both fail completely.

#### 1. Under English Law and the Parties' Agreements, Mr. Jaeban and Jaeban UK are Separate Persons.

Mr. Jaeban devotes most of his Opposition to arguing for the first time that two of the anti-assignment clauses do not apply to him because he is also a party to the Umbrella Agreement and the IPLA and "BRACII treated Mr. Jaeban and Jaeban UK Limited as effectively one entity." Opp. at 5 (discussing the Umbrella Agreement), 7 (discussing the IPLA). This is also his primary basis for distinguishing *Linden Gardens. See* Opp. at 9-10. This assertion is demonstrably false, but it is useful to review the relevant legal principles before turning to the parties' agreements.

English law, like American law, strongly distinguishes between a shareholder and the limited liability company he owns.

> "A company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. **If the company has a cause of action, this is a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue.** No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204, 210."

*Johnson v Gore Wood & Co.*, [2001] 1 All E.R. 481, 528 (H.L. 2000) (Millett, J.) (emphasis

---

[3] Mr. Jaeban's reliance on new arguments now highlights his prior failure to submit a written argument on the anti-assignment issue and the reality that the parties did not fully join issue until this Motion.

6

added).[4]

The strict separation of an English limited liability company from a sole owner-proprietor dates back to at least 1897, see *Salomon v. A. Salomon & Co.*, [1897] A.C. 22 (H.L. 1897). The separation of a company from its shareholders has been repeated many times since then. "The company is a separate entity, distinct from the directors, employees and shareholders. The law has rightly insisted that the distinction should be duly observed." *Standard Chartered Bank v. Pakistan Nat'l Shipping Corp.*, [2003] 1 AC 959, 973 (H.L. 2002) (Rodger, L.J.).

Given these familiar principles, it is no surprise that the Court of Appeal rejected a prior attempt by a shareholder to evade an anti-assignment clause by claiming identity with his company. In *Bawejem Ltd. v. MC Fabrications Ltd.*, [1999] BCLC 174, [1999] All E.R. (Comm.) 377 (C.A. 1998), the assignee-former shareholder, like Mr. Jaeban, claimed that he should be treated as equivalent to the insolvent company (*i.e.*, that "the legal owner can be treated as transparent" in light of the assignment). [1999] 1 BCLC at 179. The Court of Appeal was dismissive. It held that, to the extent that the shareholder sued as assignee in the face of an anti-assignment clause, his position was "simply not arguable" under *Linden Gardens* and later decisions. *Id.* at 181.

Given the strong presumption under English law that a company and its shareholder are entirely different legal persons and precedent holding that an assignment to a shareholder is ordinarily prohibited by an anti-assignment clause, Mr. Jaeban fails to make a plausible case that, somehow, BRACII treated Mr. Jaeban and Jaeban UK as the same person so as to exempt him from conventional, all-encompassing anti-assignment clauses. Instead, the Umbrella Agreement and the IPLA are typical commercial documents that, in a typical way,

---

[4] English cases cited for the first time in this Reply are attached as Exhibit A.

distinguish between Jaeban UK and its principal shareholder. They certainly do not conflate Jaeban UK with Mr. Jaeban or otherwise provide any basis for ignoring *Bawejem*. And they do not permit Jaeban UK to assign its claims, but not its liabilities, to Mr. Jaeban.

      **a.**    **The Umbrella Agreement.** The Umbrella Agreement identifies Jaeban UK and "Ibraheim Mustafa Jaeban" as separate parties to its terms.[5] IPLA, Preamble, cls. 2, 3. The IPLA carefully and repeatedly distinguishes between Jaeban UK and Mr. Jaeban. *See id.*, cls. 1.4, 1.5, 2.1.2, 2.1.2.1, 2.1.3, 2.2, 2.6, 4.4. Mr. Jaeban's guarantee (Exhibit 6 to the Umbrella Agreement) also distinguishes between Jaeban UK (the "Licensee") and Mr. Jaeban.[6] Under Clause 2.2, for example, Jaeban UK and Mr. Jaeban agree "respectively" to indemnify BRACII (and BRACII-related parties) from third-party actions arising from conduct of "Jaeban or Mr. Jaeban."

In his Opposition, Mr. Jaeban completely ignores the first of the two anti-assignment clauses, Clause 2.6, which explicitly distinguishes between Jaeban UK and Mr. Jaeban. Clause 2.6 of the Umbrella Agreement, states:

> Each party agrees to procure that [sic], without prejudice to the provisions of Clause 4.3, its transferees and assignees, shall as a condition precedent to any transfer or assignment to them execute a document is such form as Budget may reasonably require by which such transferee or assignee effectively assumes all its assignor's and transferor's obligations and undertakings hereunder in favour of the other Parties hereto with effect from the date of assignment or transfer. The assigning or transferring party shall remain liable for his or its obligations hereunder prior to the date of such transfer or assignment. Transfer or assignment shall for the purposes of this Clause include sale, gift, contribution, assignment or other disposal.

---

[5] To avoid lengthening this Reply, BRACII respectfully refers the Court to Exhibit B to the Complaint, which includes both the Umbrella Agreement and the IPLA.

[6] If the Court were to credit Mr. Jaeban's argument that he and Jaeban UK are the same legal person under the Umbrella Agreement, then he is presumably liable for all of Jaeban UK's obligations to BRACII, despite the £500,000 limitation in his guarantee. Understandably, Mr. Jaeban does not make this argument.

Umbrella Agreement at p. 6.

Clause 2.6 unmistakably treats Jaeban UK and Mr. Jaeban as separate potential assignors in distinguishing between "his or its" obligations. Nothing in its text or the structure of the Umbrella Agreement suggests any basis for exempting Mr. Jaeban from its anti-assignment strictures. Instead, the parties agreed that the Umbrella Agreement was "designed to provide Budget with greater protection," not less. *Id.*, ¶ 1.7. Mr. Jaeban offers no plausible basis for rewriting any of the anti-assignment clauses to provide BRACII with less protection or to permit him to appropriate Jaeban UK's claims, but not its liabilities.

Although Mr. Jaeban at least mentions the Umbrella Agreement's *second* anti-assignment clause (Opp. at 5), he glosses over its language. In its blanket prohibition of assignments, it refers to multiples "parties" other than Budget, *i.e.*, Jaeban UK and Mr. Jaeban, that "shall not have the right" to assign their "interest in this Agreement without the prior consent of Budget." Umbrella Agreement at 8. Again, there is no credible reason why BRACII, having entered into the Umbrella Agreement to settle existing disputes with Jaeban UK and Mr. Jaeban (*see* cls. 2.1.2 and 2.1.3 (releases among the parties)), would nonetheless leave Jaeban UK and Mr. Jaeban free to determine what litigation advantage might be gained by assigning claims between Jaeban UK and Mr. Jaeban.

      **b.**    **The IPLA.** While the Umbrella Agreement was drafted to provide Budget with greater protection in its dealings with Jaeban UK and Mr. Jaeban, the IPLA is a BRACII form document that repeatedly distinguishes the "Licensee" from "Beneficial Owners" (here, Mr. Jaeban). *See* IPLA, ¶¶ 12.3 (BRACII's right of first refusal); 12.4 (death or incapacity of licensee); 12.7 (requiring guarantee from Beneficial Owners); 13.18 (defining Beneficial

9

Owners). Although the IPLA attached to the Complaint, is unsigned, Jaeban UK admitted in its Answer to the Complaint (at ¶ 14) that it was the licensee under the IPLA.[7]

Paragraph 12.2(a) of the IPLA provides that the "Licensee" may transfer "None of this Agreement." IPLA at 5. Under *Linden Gardens* and its progeny, "none of this agreement" is sufficient under English law to prohibit the transfer of any rights under the IPLA. "Licensee" refers to Jaeban UK – and no one else. Like the Umbrella Agreement, there is no exception made for assignments between the Licensee and a Beneficial Owner. Mr. Jaeban's attempts to find an exception where none is mentioned is also inconsistent with the other carefully delineated restrictions on the rights of a Beneficial Owner under the IPLA. *E.g.*, IPLA, ¶ 12.3 (granting BRACII a right of first refusal if a Beneficial Owner seeks to transfer its interest in the Licensee). As a matter of commercial practice and common sense, it is hardly likely that a licensor/franchisor, *in its form agreement*, would freely allow assignments between its licensee and its potentially litigious principal. *Cf. Linden Gardens*, [1994] 1 A.C. at 105 (noting importance of anti-assignment clauses in areas "pregnant with disputes").

It is therefore wishful thinking for Mr. Jaeban to declare that "it was the *clear* intention of the parties" that the anti-assignment provisions not apply to assignments from Jaeban UK to its shareholder, Mr. Jaeban. Opp. at 5 (emphasis added). He cites no cases to support the notion. The adjective "clear" is not evidence. Nor is the fact that BRACII reposed

---

[7] The Umbrella Agreement (cl. 1.5) provides that Jaeban UK and Mr. Jaeban will enter into new license agreements (note the plural), presumably because Mr. Jaeban, not Jaeban UK, was the licensee of the Wolverhampton territory under a prior license agreement. *See* Umbrella Agreement, Schedule 4 (listing Jaeban UK as the licensee for all other territories identified). There is no evidence that Mr. Jaeban ever executed a separate license agreement with respect to Wolverhampton. The only counterclaims in this action were filed by Jaeban UK, not by Mr. Jaeban based on a separate license agreement.

confidence in Jaeban UK *and* Mr. Jaeban.[8] *Id.* at 6, 7. Nor is the assertion that there is an unidentified "ambiguity" with respect to the prohibition against an assignment of its rights by Jaeban UK, *id.*, although an ambiguity would be inconsistent with the assertion of a "clear" intent on the preceding page of Mr. Jaeban's Opposition.[9]

These are his arguments, and they do not suffice. Like many proprietors before him, Mr. Jaeban accepted the advantages of separate incorporation and limited liability; he must live with its disadvantages as well.

### 2. *Linden Gardens* Applies with Full Force to this Assignment.

Because Mr. Jaeban cannot rewrite the three anti-assignment provisions to exempt Jaeban UK's transfer to him, he cannot escape the dictates of *Linden Gardens*. The other factual dissimilarities between this proceeding and *Linden Gardens* do not detract from the categorical, general rule announced by the House of Lords in favor of enforcing anti-assignment clauses as written.

It certainly makes no difference under *Linden Gardens* that Jaeban UK fortuitously remains a defendant in this action or that Mr. Jaeban happens to be a party to the agreements that repeatedly prohibited the assignment to him. (Since Jaeban UK is in receivership, the prejudice to BRACII is obvious.) *Linden Gardens* mandates that the courts must enforce, not rewrite, provisions setting forth the agreement of the parties as to how claims and counterclaims will be asserted. *Cf. Bawejem Ltd. v. MC Fabrications Ltd.*, [1999] BCLC

---

[8] Mr. Jaeban fails to cite English case law suggesting in any way that the IPLA should be treated as affording Mr. Jaeban the same rights as Jaeban UK. As noted above, Mr. Jaeban nowhere asserts that he therefore had the same obligations as Jaeban UK.

[9] If there were an ambiguity with respect to this provision of the IPLA, then the matter would be reserved for discovery were it not for the fact that the assignment is comprehensively prohibited by the two separate provisions in the Umbrella Agreement. Under English law, construction of an ambiguity against the drafter (*contra proferentem*) is a canon of last resort. *Aqua Design & Play Int'l Ltd. v. Kier Regional Ltd.*, [2002] EWCA Civ. 797, at ¶ 15 (C.A. 2002) (citing *Chitty on Contracts* (28th ed.)).

11

174, [1999] All E.R. (Comm.) 377 (C.A. 1998) (relying on *Linden Gardens* and invalidating assignment of claims by insolvent company to principal shareholder); *Hendry v Chartsearch Ltd.*, [1998] CLC 1,382, 1,391 (C.A. 1998) (same). As noted above, *Linden Gardens* stressed the importance and enforceability of anti-assignment clauses in business contexts "pregnant with disputes."

### B. Determination of the Proper Party Plaintiff Must Precede a Decision Whether a "Repudiatory Breach" Occurred.

Mr. Jaeban's other new argument fares no better. He claims that BRACII's alleged "repudiatory breach of the contract" is a basis for distinguishing *Linden Gardens* and holding that BRACII lacks standing to invoke the three anti-assignment provisions. Opp. at 10, 11. Leaving aside that Mr. Jaeban has not proven any such thing, *Linden Gardens* and progeny are fatal to this argument. Like Mr. Jaeban, the assignees in those cases claimed that the defendants had committed serious breaches of contract. Under *Linden Gardens*, the courts must first determine the proper party to pursue those claims, then determine whether the breach occurred – as the parties agreed in their contracts. Mr. Jaeban is not entitled to turn this process on its head.

### CONCLUSION

WHEREFORE, BRACII respectfully requests that the Court grant its Motions for a Four-Day Extension of Time and Partial Reconsideration, hold that the assignment of Jaeban UK's claims to Mr. Jaeban is invalid under *Linden Gardens* and the three anti-assignment provisions, and order such other and further relief as the Court deems just and proper.

Dated: July 9, 2004

| SIDLEY AUSTIN BROWN & WOOD LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
|---|---|
| Kenneth E. Wile<br>Bank One Plaza<br>10 S. Dearborn<br>Chicago, Illinois 60603<br><br>Counsel for Plaintiff Budget Rent A Car International, Inc. | /s/ *signature*<br><br>Robert S. Brady (Bar No. 2847)<br>Edmon L. Morton (No. 3856)<br>The Brandywine Building, 17th Floor<br>1000 West Street, P.O. Box 391<br>Wilmington, Delaware 19899-0391<br>(302) 571-6600 |