# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| BRAC GROUP, INC. ) | |
| (f/k/a Budget Group, Inc.), ) | |
| ) | Case No. 02-12152 (CGC) |
| Reorganized Debtor. ) | Jointly Administered |
| ) | |
| BRAC GROUP, INC. (f/k/a BUDGET ) | |
| GROUP, INC., *et al.*, ) | |
| ) | |
| Plaintiffs and Counterclaim Defendants, ) | |
| ) | Adversary No. 03-54271 (CGC) |
| v. ) | |
| ) | |
| JAEBAN (U.K.) LIMITED, ) | |
| ) | |
| Defendant and Counterclaim Plaintiff. ) | |

## MEMORANDUM OPINION

Robert S. Brady
Edmon L. Morton
Joseph A. Malfitano
Matthew B. Lunn
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

- and -

Larry J. Nyhan
Kenneth E. Wile
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
Attorneys for Plaintiff Budget Rent
    A Car International, Inc.

Brian A. Sullivan
Amy D. Brown
Werb & Sullivan
300 Delaware Ave., 10th Floor
Wilmington, DE 19801

Attorneys for Ibrahiem Jaeban, Assignee
    of Defendant Jaeban (U.K.) Limited

May 25, 2004

CASE, J.

## I. INTRODUCTION

Before this Court is Budget Rent-A-Car International, Inc.'s ("BRACII") Motion for Partial Reconsideration Based on Controlling English Decisions (the "Motion") (Docket No. 33), Mr. Ibrahiem Jaeban's ("Mr. Jaeban") opposition thereto, and BRACII's reply. BRACII seeks partial reconsideration of this Court's May 25, 2004 Memorandum Opinion and Order, specifically pages 13-14, with respect to the anti-assignment provisions in the Umbrella Agreement and the BRACII International Prime License Agreement (the "IPLA"). BRACII also has filed a Motion to File a Short Further Submission (the "Supplemental Motion") (Docket No. 48) to which Mr. Jaeban objects. The Court has reviewed those papers and the Supplemental Motion will be denied.

The issue before the Court in the Memorandum Opinion was BRACII's motion to "strike Jaeban's answer, affirmative defenses and counterclaims as a sanction for willful failure to participate in this proceeding." Applying the standard set forth by the Third Circuit in *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863 (3d Cir. 1984), the Court determined that dismissal was not an appropriate sanction and assessed other, less onerous standards.

The Court had to address the anti-assignment issue because if the assignment from the Jaeban UK receivers to Mr. Jaeban was ineffective under applicable English law, then the claims sought to be asserted here by Mr. Jaeban would remain with Jaeban UK. That entity remains in default under numerous orders of this Court and has failed to appear after having been ordered to do so on numerous occasions. Under *Poulis*, the drastic sanction originally sought by BRACII would be appropriate if directed at Jaeban UK rather than Mr. Jaeban. Thus, if the assignment is

2

invalid, this Court would give BRACII the relief it seeks and this litigation would effectively be at an end. The validity of the assignment was therefore critical to this Court's decision to deny the harsh sanctions sought by BRACII and therefore reconsideration may lie if the applicable legal standards are met.

II.    ANALYSIS

A.    **The Timeliness of the Motion**

Preliminarily, Mr. Jaeban argues that the Motion to Reconsider should be denied as untimely filed. On this point, he is technically correct. BRACII apparently applied the wrong standard in calculating when to file the motion to reconsider. Pursuant to D.Del. Rules 7.1.5, a party has ten (10) days following entry of the order to file a motion for reconsideration. BRACII miscalculated the time to file the motion because it relied on Fed.R.Civ.P. 6(a), which excludes weekend days and holidays in calculating response time. Under this rule the Motion was filed one (1) day early. However, Fed.R.Bankr.P. 9006(a) only excludes weekends and holidays if the motion is due in eight (8) days or less. Under this rule, the Motion was four (4) days late. After the time had run, BRACII filed a motion for a four (4) day extension to file the reconsideration motion.

However, the key issue is the standard to be applied in determining whether to grant the motion to extend and allow the matter to be considered on the merits. As BRACII points out, the Memorandum Decision was interlocutory and, in any event, neither an appeal nor a motion for leave to file appeal was filed within the ten days thereafter. Under these circumstances, the "unique circumstances" standard articulated in *Kraus v. Consolidated Rail Corp.*, 899 F.2d 1360 (3d Cir. 1990) is inapplicable here as there is no jurisdictional question in play. Rather, the

3

resolution lies within the discretion of the Court applying an excusable neglect standard. Applying that test, the Court finds that the delay is trivial, that there is no legally cognizable prejudice to Mr. Jaeban and that counsel for BRACII acted in good faith. Therefore, the Motion to Extend will be granted and the matter will be addressed on the merits.

### B.     The Standard for Reconsideration

The standard a party must meet to succeed on a motion for reconsideration is quite high: "'The purpose of a motion for reconsideration,' we have held, 'is to correct manifest errors of law or fact or to present newly discovered evidence.'" *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). The court should reconsider prior decisions or alter or amend judgments "if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [decided the matter]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe*, 176 F.3d at 677; *accord North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995); *Proxim Inc., v. 3Com Corp.*, 2003 U.S. Dist. LEXIS 2556, at *3 (D.Del. Feb. 21, 2003).

### C.     Is Reconsideration Appropriate?

BRACII argues that (1) the parties did not fully join the issue on the applicability of the anti-assignment clauses; (2) neither party disputes that English law applies; (3) the Court's expressed rationale for finding the assignment valid was not addressed by the parties; and (4) the Court failed to apply English law with respect to the anti-assignment provisions.

4

In opposition, Mr. Jaeban argues that (1) BRACII misinterprets the scope of the anti-assignment provisions because Mr. Jaeban is a party to the IPLA; (2) the provision of the IPLA and Umbrella Agreement were not breached because this is not an assignment of the license agreement but an assignment of a claim; and (3) the anti-assignment provision does not apply to the assignment between Jaeban UK and Mr. Jaeban.

The Court finds that reconsideration is appropriate here to determine whether it is necessary to correct a clear error of law by virtue of the Court's failure fully to discuss and apply applicable English law.

### D. English Law on Anti-Assignment Clauses

Under English law, the courts broadly enforce anti-assignment clauses; the House of Lords' decision in *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals, Ltd.*, [1994] 1 A.C. 85 (H.L. 1993) is the leading English case on the subject.[1] This case involved Stock Conversion's, owners of a leasehold, contract with M&H to remove blue asbestos from the property. Lenesta Sludge was the subcontractor approved to do the work. A clause in the contract provided that neither the employer nor the contractor could assign the contract without the other's consent. After completion of the work, more asbestos was discovered that arguably should have been removed by Lenesta; Stock Conversion thereafter entered into a second contract with Ashwell Construction. Some time later, Stock Conversion assigned to Linden Gardens its leasehold interest in the certain floors of the property, subject to a license back under which Stock Conversion continued to occupy one of the floors. After the assignment of interest

---

[1] This was an appeal of the lower courts's decision *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals, Ltd.*, [1992] 30 Con.L.R. 1 (C.A. 1992).

in the property to Linden Garden but before Stock Conversion disposed of its entire property interest to Linden Garden, Stock Conversion brought an action against Lenesta Sludge. The deed of assignment in favor of Linden Gardens purported to assign the right of action against Lenesta Sludge, and Linden Gardens was substituted as plaintiff in that action. *See Linden Gardens*, 1 A.C. at 99-100. The court noted that (1) Stock Conversion, who was a party to the contract with the defendants was no longer a party to the action; (2) the assignment of the benefit of the building contract was made without consent of the defendants; and (3) any breach of contract occurred before the assignment. *Id.* at 100.

The relevant preliminary issue before the court was whether "Stock Conversion's rights under the contracts [were] effectively assigned to Linden Gardens despite the fact that the assignment of the building contracts by Stock Conversion was prohibited by the terms of those contracts?" *Id.* at 100-101.

The contract clause provided that the "employer [Stock Conversion] shall not without the written consent of the contractor [M&H] assign this contract." *Id.* at 99. On appeal, the House of Lords reversed the lower court ruling that the assignment was effective to transfer to Linden Gardens the causes of action for existing breaches of contract and addressed the following issues:

(1) Does the contract clause prohibit assignment of the benefit of building contracts?

(2) Does the contract clause prohibit the assignment of accrued rights of action?

(3) Is a prohibition on assignment void as being contrary to public policy?

(4) Are the assignments effective to transfer the causes of action to the assignees?

*Id.* at 102.

At bottom, the decision found the restriction (1) was enforceable; (2) was applicable to accrued claims against the other contracting party (i.e., "fruits" of the contract) unless specifically set forth in the language of the restriction;[2] (3) was not against public policy; and (4) invalidated assignments made in contravention of its terms. *Id.* at 102-109.

Lower courts in later cases applied the *Linden Gardens* holding to assignments made by corporations to a holder of "debentures" (*Bawejem Ltd. v. M C Fabrications Ltd.*, [1999] BCLC 174, [1999] All E.R. (Comm.) 377 (C.A. 1998)) and to the equity owner of the assignor (*Hendry v. Chartsearch Ltd.*, [1998] CLC 1,382, 1,391 (C.A. 1998)) after the "trading relationship" between the original parties had ended and where consent had neither been obtained nor requested. No case has been cited upholding an anti-assignment prohibition where, as here, the assignor and the assignee were both parties to the original agreement with the party seeking to enforce the prohibition.

Two of Mr. Jacban's arguments in favor of the assignment may be summarily dismissed because of clear holdings in the above cited cases: 1) the restriction prohibits not only assignment of the whole contract but also of claims arising out of it (*Linden Gardens*) and 2) the restriction survives the termination of the business relationship (*Hendry*). The gist of the remaining arguments is that *Linden Gardens* and its progeny uphold only assignments to third parties, not assignments from one original party to another and that, in this case, BRACII treated Jaeban UK and Mr. Jacban as one and the same.

---

[2] "I accept that it is at least hypothetically possible that there might be a case in which the contractual prohibitory term is so expressed as to render invalid the assignment of rights to future performance but not so as to render invalid assignments of the fruits of performance. The question in each case must turn on the terms of the contract in question." *Id.* at 105.

The second argument does not withstand scrutiny for at least two reasons: (1) under applicable English law, the corporation and the individual are treated as separate entities, and 2) under these contracts, the two parties had two very different roles and sets of obligations, one as licensee and one as a limited guarantor. However, their respective roles under the contracts do have relevance to determining the final issue. Thus, the Court turns to that question–does the holding of *Linden Gardens* prohibit an assignment between parties to the original contract?

The English cases do not squarely answer this question. Here, while both Jaeban UK and Mr. Jaeban are both parties to the agreements, they are not co-licensees.[3] Their respective liabilities, and obligations, under the agreements are not coterminous. But there are aspects of the agreements that are enlightening.

The *Linden Gardens* decision emphasized the expectation of the parties that, in complicated contractual relationships, they will have to deal only with parties they have chosen. As Lord Browne-Wilkinson put it, "[i]n the context of a complicated building contract . . . the reason for including the contractual prohibition . . . must be that the contractor wishes to ensure that he deals, and deals only, with the particular employer with whom he has chosen to enter into the contract. Building contracts are pregnant with disputes." *Id.* at 105. He further stated that

> the existing authorities establish that an attempted assignment of contractual rights in breach of a contractual prohibition is ineffective to transfer such contractual rights. I regard the law as being satisfactorily settled in that sense. If the law were otherwise, it would defeat the legitimate commercial reason for inserting the contractual prohibition, viz., to ensure that the original parties to the contract are not brought into direct contractual relations with third parties.

---

[3] Mr. Jaeban personally was originally the licensee for Wolverhampton. That agreement was terminated under the Umbrella Agreement and a new license granted. It is unclear whether the new license was to Mr. Jaeban or to Jaeban UK but in any event it appears to represent a very small portion of the business.

*Id.* at 108. Were Mr. Jacban a true third party, or even merely an equity owner, English law clearly establishes that an assignment to him of the right to collect claims under the Jaeban UK contract, if not consented to by BRACII, would invalidate the assignment.

But, here, the situation is entirely different. Section 12.2 of the IPLA makes it crystal clear that, because of BRACII's "personal confidence" in Mr. Jaeban, his continuing ownership of Jaeban UK is a requirement of the contract. Indeed, a change in ownership without BRACII's consent is a breach that authorizes immediate termination of the <u>Jaeban UK license</u> by BRACII without notice. IPLA Section 11.4(n). Therefore, BRACII itself has made Mr. Jaeban's personal and continuing participation in the contractual relationship a *sine qua non* of its continuing vitality. As noted above, Lord Browne-Wilkinson succinctly stated that, in determining the scope of anti-assignment prohibition, the resolution of the "question in each case must turn on the terms of the contract in question." *Linden Gardens*, 1 A.C. at 105. Here, the contract so inextricably intertwines Mr. Jaeban with Jaeban UK **and** BRACII that it would be an overly mechanical and counter-intuitive application of the *Linden Gardens* rule to hold that the assignment to Mr. Jacban is invalid.[4] By virtue of the assignment, BRACII is in fact dealing with one of "the particular employer[s] with whom he has chosen to enter into the contract" and is

---

[4] This point is driven home by BRACII's apparent agreement that the **administrative receivers** of Jacban UK are now the appropriate parties with whom to litigate. Indeed, the thrust of BRACII's sanctions efforts have been against the receivers for their failure to cooperate, provide discovery, abide by scheduling orders, etc. The instigation of the receivership was itself a default under the agreement and nowhere do any of the documents suggest that BRACII consented to the receivers' appointment. Ironically, with Mr. Jaeban, BRACII is now seeking to refuse to deal with a party who was **obligated by BRACII** to remain affiliated with Jaeban UK rather than third parties involuntarily foisted upon it.

9

"ensure[d] that the original parties to the contract are not brought into direct contractual relations with third parties."

This Court is satisfied that, if presented with the question in this case, an English court of competent jurisdiction, taking into account the relevant authorities, would conclude that the terms of the contracts among these parties make clear that an assignment of Jaeban UK's rights to Mr. Jaeban would not be prohibited by the anti-assignment clauses.

### III. CONCLUSION

For the above reasons, the Motion to Reconsider will be denied. Mr. Jaeban is to submit an order under certification of counsel.

_____
Honorable Charles G. Case, II
United States Bankruptcy Judge