## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | Case No. 02-12152 (CGC) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al*, | |
| Plaintiffs, | 03-A-54271 |
| v. | |
| Jaeban (U.K.) Limited, *et al*, | |
| Defendants. | |

## BRACII'S MOTION TO COMPEL AND
## FOR LEAVE TO FILE A TWO-ITEM SUBPOENA ON HSBC BANK PLC

   Plaintiff Budget Rent-A-Car International, Inc ("BRACII"), by its undersigned counsel, respectfully moves the Court for the relief set forth below. Jaeban (U.K.) Ltd. ("Jaeban UK") waived the protections of the attorney-client privilege and the work product doctrine by failing, ever, to file a written response to Debtors' Joint First Document Request. BRACII also requests leave to file a two-item subpoena on HSBC Bank, plc. necessitated by the production of the "Credit Pack" document on August 3, 2004, the day before Mr. Jaeban's deposition.

## I.  BECAUSE NO OBJECTION TO THE FIRST DOCUMENT REQUEST HAS *EVER* BEEN FILED, ANY CLAIM OF PRIVILEGE HAS BEEN WAIVED.

   Before delivering documents to BRACII on August 25, 2004, the Jaeban UK Receivers pulled documents from the production based on the attorney-client privilege. Because Debtors' Joint First Request for Production (attached *infra* as Exhibit A) sought to cover all of

the claims and counterclaims filed in this adversary proceeding, a number of documents are likely to have been responsive to this Request, including documents reflecting or relating to the advice of Wragge & Co. that has already been disclosed to BRACII. At least one document appears to set forth the advice of Wragge & Co. partner Ian Weatherall that Jaeban UK's claims under the Umbrella Agreement and IPLA are without merit.

By failing to file a written objection of any kind, Jaeban UK waived its privilege claims. *E.g.*, *Eldaghar v. City of New York Dep't of Citywide Admin. Services*, 2003 U.S. Dist. LEXIS 19247, at *2-*3 (S.D.N.Y. 2003) (failure to file timely objection waived "any objections which a party might have to a request" (quotation omitted)) (citing numerous cases); *Cleveland Indians Baseball Co. v. United States*, 1998 U.S. Dist. LEXIS 1459, at *15-*16 (N.D. Ohio 1998) (the waiver rule "applies with equal force to all objections, including those based on attorney-client privilege or attorney work product"); *Schalk v. Teledyne, Inc.*, 1991 U.S. Dist. LEXIS 1974, *4 (W.D. Mich. 1991) ("the case law also makes it clear that Teledyne has waived the right to assert the attorney-client privilege"). Neither Jaeban UK nor Mr. Jaeban has ever sought to remedy this failure.

Mr. Jaeban has now shown himself able to cause the Jaeban UK Receivers to comply with their discovery responsibilities; the documents are therefore within his control. Both defendants should be ordered to produce all allegedly privileged documents in their possession that are responsive of the Joint First Document Request.

The most critical documents are those that reflect or are related to two documents that disclose the advice of Ian Weatherall of Wragge & Co. to Jaeban UK – advice that completely undermines Mr. Jaeban's case.

2

a.    On October 15, 2003, Mr. Weatherall wrote Jaeban UK's (then-prospective) receivers to set forth his advice that Jaeban UK remained bound by the Umbrella Agreement and IPLA because Jaeban UK had continued to operate as a BRACII franchisee. This advice confirms BRACII's ratification and waiver affirmative defenses; BRACII remained the counterparty of these agreements until they were assigned. The letter has now been twice disclosed – first to Jaeban UK's prospective receivers and now to BRACII.

b.    On January 30, 2004, Mr. Jaeban wrote an angry letter to the Receivers contesting Mr. Weatherall's advice that the allegations of breach of the Umbrella Agreement and IPLA in the Counterclaims are without merit. Mr. Jaeban states that he "does not agree with Mr. Weatherall . . . [with] reference to the claim against Budget International." He then proceeds to explain why BRACII "is in fundamental breach of the Franchiser's obligation" to refute Mr. Weatherall's as-yet unproduced letter. Mr. Weatherall's advice is consistent with his earlier opinion that Jaeban UK remained bound by the Umbrella Agreement and IPLA. Of potentially great significance to the consideration of testimony in this case, Mr. Jaeban also "invites Mr. Weatherall to elaborate on the comments on me in the document he provided."

These two documents are attached *infra* as Exhibits B and C.

Leaving Jaeban UK's failure to file a response to one side, Jaeban UK's disclosure of these two documents waived any privilege that attached to them. Under English law (which governs the substantive aspects of the attorney-client privilege here), disclosure of advice to an adversary waived any privilege. *See e g , Earle v Medhurst* (Unreported) (Q.B. 1985) (citing cases) (attached *infra* as Exhibit D). Disclosure of advice to an adversary also

3

waives the protection of the work product doctrine. *E g , Montgomery County v Microvote Corp* , 175 F.3d 296, 304 (3d Cir. 1999).  Given this additional waiver and the absence of any objection, BRACII is entitled at a minimum to a copy of the Weatherall letter to which Exhibit C responds – not least to explore whether Jaeban UK demanded a cure amount of US$4.5 million in good faith.  Mr. Jaeban presumably has his own copy of that letter (since Exhibit C is his response to it), and his copy of the Weatherall letter should be produced forthwith.

## II.    LEAVE SHOULD BE GRANTED TO SERVE A TWO-ITEM SUBPOENA ON HSBC BANK PLC.

BRACII also respectfully requests leave to serve a limited subpoena on HSBC Bank plc. ("HSBC").  (A copy of BRACII's proposed subpoena rider to HSBC is attached *infra* as Exhibit E.)  As explained in BRACII's Motion for Further Sanctions (at 8-9), Mr. Jaeban produced a copy of the "Credit Pack" – the Jaeban UK lender presentation that contradicts his case – for the first time on August 3, 2004, six weeks after the June 19, 2004 deadline set by the May 25, 2004 Opinion.

Leave can and should be granted as a sanction for Mr. Jaeban's failure to produce the document by June 19th, as provided in the Court's May 25th Opinion.  In the alternative, leave should be granted because BRACII has shown excusable neglect, the applicable standard under D. Del. R. 16.5. Rule 16.5 otherwise required BRACII, like Mr. Jaeban, to file its motion before the document discovery deadline, whether deemed June 19, 2004 or earlier.  *See* BRACII's Opposition to Mr. Jaeban's Motion for Order Reopening Limited Discovery.

*In re Cendant Corp. Prides Litig.*, 311 F.3d 298, 300 (3d Cir. 2002), sets out the criteria for determining "excusable neglect" – prejudice to the adverse party; length of the delay; reason for the delay; and the movant's good faith.  The reason for the delay is Mr. Jaeban's

4

failure to produce until August 2004 a document that should have been produced by Jaeban UK

in November 2003 and by Mr. Jaeban by June 19, 2004. Mr. Jaeban will be hard pressed to

challenge BRACII's good faith. There is *no* "legally cognizable" prejudice to Mr. Jaeban (*see*

September 14, 2004 Mem. Op. on Reconsideration at 4), both because the delay is the result of

Mr. Jaeban's own conduct and because BRACII can and will proceed with the other depositions

delayed by his failure to comply with the Court's May 25th order.[1] To minimize further any

delay, BRACII has limited the document rider to two requests (attached as Exhibit E *infra*).

  BRACII has a critical need for documents that will establish whether Jaeban UK

contradicted its claims in this action in dealing with a very important lender. Created at a time

when Mr. Jaeban claims that BRACII was in breach of its agreements with Jaeban UK in

multiple respects (*but see* Exs. B, C, *infra*), the document praises Jaeban UK's "partnership style

relationship" with BRACII and the BMS system for which Jaeban UK has refused to pay. *See*

Motion for Further Sanctions, Ex. G at 16.

  At his deposition, Mr. Jaeban repeatedly claimed that the Credit Pack is a "draft."

While the document speaks for itself, BRACII is entitled to learn in what form, if any, the

document was circulated. Mr. Jaeban was not forthcoming as to which lenders might have

received a Credit Pack during the period after the Umbrella Agreement and IPLA came into

effect, but BRACII is aware that Jaeban UK's working capital lender during the period was

---

[1] The delay from August 3, 2004 until filing is also due to Mr. Jaeban. BRACII sought to avoid filing separate motions on specific discovery issues since several other motions are currently pending before the Court. Although BRACII first challenged Mr. Jaeban's invocation of the English Data Protection Act 1998 on August 23, 2004 in light of its exemption of documents required in litigation, the parties did not reach tentative agreement on resolving this dispute until September 15, 2004, whereupon BRACII immediately filed this Motion on the two remaining issues.

HSBC Bank plc. (as successor to Midland Bank plc.).[2]

   For the foregoing reasons, BRACII respectfully requests that the Court grant BRACII leave to serve HSBC Bank plc with the document requests attached as Exhibit E in light of Defendants' failure to produce the Credit Pack prior to August 3, 2004.[3]

## CONCLUSION

   WHEREFORE, BRACII respectfully requests that the Court enter an Order (a) compelling Jaeban UK and Mr. Jaeban to produce all documents responsive to the Joint First Document Request that have been withheld based on a claim of privilege; (b) granting BRACII leave to serve its two-item subpoena on HSBC Bank, plc.; and affording BRACII such other and further relief as the Court deems just and proper.

Dated: September 15, 2004

               Respectfully submitted,

**SIDLEY AUSTIN BROWN & WOOD** LLP   **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Kenneth E. Wile
Bank One Plaza
10 South Dearborn Street        Robert S. Brady (Bar No. 2847)
Chicago, Illinois  60603        Edmon L. Morton (No. 3856)
(312) 853-7000           Matthew B. Lunn (No. 4119)
                The Brandywine Building, 17th Floor
                1000 West Street, P.O. Box 391
                Wilmington, Delaware  19899-0391
                (302) 571-6600

Counsel for Budget Rent-A-Car International, Inc.

---

[2] If Jaeban UK or Mr. Jaeban had produced the Credit Pack in a timely manner, BRACII would have demanded that Defendants identify additional lenders that received the Credit Pack. To avoid delay, BRACII seeks only to serve the single subpoena on HSBC.

[3] Mr. Jaeban's sole proffered reason for opposing BRACII's request, BRACII's opposition to his massive set of new document requests, is no reason at all.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et. al.*, | Case No. 02-12152 (CGC) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | |
| Plaintiffs, <br> v. | 03-A-54271 |
| Jaeban (U.K.) Limited, *et al.*, | |
| Defendants. | |

## CERTIFICATION OF KENNETH E. WILE, ESQUIRE
## IN SUPPORT OF BRACII'S MOTION TO COMPEL AND
## FOR LEAVE TO FILE A TWO-ITEM SUBPOENA ON HSBC BANK PLC

I am counsel of record for Plaintiff Budget Rent-A-Car International, Inc. in this

adversary proceeding. In support of the above-referenced motion (the "Motion"), I hereby

certify that I have contacted Delaware counsel to Mr. Jaeban and attempted to reach agreement

on the matters addressed in the Motion as required by D. Del. R 7.1.1. I also certify that,

pursuant to D. Del. R 16.5, I have provided a copy of the Motion to Compel to my client Budget

Rent-A-Car International, Inc.

Kenneth E. Wile

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al.[1], | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | |
| Plaintiffs,<br>v. | 03-A-54271 |
| Jaeban (U.K.) Limited, | |
| Defendants. | |

**JOINT FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO
JAEBAN (UK) LIMITED**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, as incorporated by

Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, Plaintiffs, the debtors and

debtors-in-possession in the above-captioned action, and Plaintiff-Intervenor, the Official

Committee of Unsecured Creditors, by their undersigned attorneys, hereby request that

---

[1]  The Debtors are the following entities: BRAC Group, Inc , Auto Rental Systems, Inc , BGI Airport Parking, Inc , BGI Shared Services, Inc , BGI Shared Services, LLC, BRAC Credit Corporation, BRAC Car Sales, Inc., BRAC Fleet Finance Corporation, BRAC Rent A Car Asia-Pacific, Inc., BRAC Rent A Car Caribe Corporation, BRAC Rent A Car Corporation, BRAC Rent-A-Car International, Inc , BRAC Rent A Car of Japan, Inc , BRAC Rent-A-Car of St. Louis, Inc , BRAC Rent-A-Car of the Midwest, Inc , BRAC Rent-A-Car Systems, Inc , BRAC Sales Corporation, BRAC Storage Corporation, BRAT Move Management, Inc , BRAT Relocation Services, Inc , BRAT TRS, Inc , BVM, Inc , Carson Chrysler Plymouth Dodge Jeep Eagle, Inc , Control Risk Corporation, Dayton Auto Lease Company, Inc , Directors Row Management Company, LLC, IN Motors VI, LLC, Mastering The Move Realty, Inc., Mosiant Car Sales, Inc , NYRAC Inc , Paul West Ford, Inc , Philips Jacobs Insurance Agency, Inc , Premier Car Rental LLC, Reservation Services, Inc , TCS Properties, LLC, Team Car Sales of Charlotte, Inc , Team Car Sales of Dayton, Inc , Team Car Sales of Philadelphia, Inc , Team Car Sales of Richmond, Inc , Team Car Sales of San Diego, Inc , Team Car Sales of Southern California, Inc , Team Fleet Services Corporation, Team Holdings Corp , Team Realty Services, Inc , The Move Shop, Inc , Transportation and Storage Associates, ValCar Rental Car Sales, Inc , Vehicle Rental Access Company, LLC, and Warren Wooten Ford, Inc

Defendant Jaeban (U.K.) Limited produce the following documents at the offices of Sidley

Austin Brown & Wood, 10 South Dearborn Street, Chicago, Illinois, 60302, within twenty days

of service:

### DEFINITIONS AND INSTRUCTIONS

          a.       This Request covers all documents and tangible things in your possession,

custody or control, including such documents and tangible things as are in the possession,

custody or control of your agents, representatives, and, unless privileged, your attorneys.

          b.       This Request is continuing in nature. If you discover additional

documents called for by this Request, then you are obligated promptly to supplement your

response.

          c.       Documents produced in response to this Request shall be organized and

designated to correspond to the categories in this request or produced as they are kept in the

usual course of business and identified as to the request and requests to which they are

responsive.

          d.       "BRACII" refers to Budget Rent a Car International, Inc.

          e.       "BTI" refers to BTI (UK) plc, a wholly-owned subsidiary of BRACII that

is the subject to an Order of Administration of the High Court of Justice, Chancery Division.

(BTI is identified in Jaeban's Counterclaims as BTI (UK) PK.)

          f.       "Debtors" refers to the debtors and the debtors in possession in the above-

captioned action and specifically includes BRACII. **The term also includes BTI.** In addition,

the term refers to the officers, directors, employees, attorneys and agents of the foregoing.

          g.       "Jaeban" refers to Jaeban (U.K.) Limited and its officers, directors,

employees, shareholders, agents, and attorneys.

      h.    "IPLA" refers to the March 5, 2001 International Prime License Agreement among Budget Rent A Car International and Jaeban (referred to as the ILPA in Jaeban's Counterclaims).

      i.    "Exhibit C Charges" refer to the categories of charges listed in the first column of Exhibit C of the Complaint in this adversary proceeding (a copy of which is attached for convenience). These charges include U.S. reservation charges, travel agent referrals, customer relations refunds, frequent flyer and international programs, interoffice charges, Royal Automobile Club subscriptions, BMS reservations and charges, airport concessions (for the airports identified in Exhibit C), other location rent charges, miscellaneous utility charges, telephone charges, royalty fees, yellow pages charges, miscellaneous charges, insurance, and cont cover and low value refunds.

      j.    The term "document" is used in the broadest sense and includes all written or graphic matter of every kind and description however produced or reproduced, whether draft or final, original or reproduction, all tangible things and any other data compilations from which information can be obtained or on which information may be stored, including but not limited to e-mails and other documents stored in tangible, electronic, mechanical or electric form or representation of any kind, including materials on or in computer tapes, disks and memories, back up copies and deleted files or files marked for overwriting on a computer or computer storage device or media whether located on site or off site. It includes all matter that relates or refers, in whole or in part, to the subject referred to in the Request, including, but not limited to, letters, correspondence, reports, e-mail, agreements, interoffice correspondence, notes, telegrams, minutes or records of meetings, notes of meetings, notes of telephone conversations, reports and/or summaries of investigations, expressions or statements of policy, opinions or reports of consultants, lists of persons attending meetings, drafts and revisions of drafts of any

documents, invoices, receipts, original preliminary notes, and electronic mail. If a document has been prepared in draft or in several copies, or several versions, even if only in electronic form, or additional copies have been made, or copies are not identical (or which by reason of subsequent modification of a copy by the addition of notations or other modifications, are no longer identical), then each non-identical copy is a separate document.

k.      The words "and" and "or" shall be construed conjunctively or disjunctively so as to bring within the scope of the document request as much information as possible. The plural shall include the singular and the singular shall include the plural.

l.      If you withhold any documents because of a claim of privilege or immunity, then identify the documents withheld and the precise privilege or protection claimed with sufficient specificity to permit a full determination of whether the claim of privilege or immunity is valid. For each document that you decline to produce on grounds of privilege, provide the following information: (a) the reason for withholding the document; (b) the date of the document; (c) the identity of its author(s), including the job title and description of each such person, and a current address and telephone number for each such person; (d) the identity of each person to whom the document was sent as well as the custodian of the document, the job title and description of each such person, and a current address and telephone number for each such person; and (e) the subject-matter of the document in sufficient detail to permit assessment of the asserted basis for withholding the document.

**m.      Time Period:** These Requests seek only documents that were created or reviewed by Jaeban on or after January 1, 2000 through the date of Jaeban's response.

4

## DOCUMENT REQUESTS

1.    All documents, created or requested by any person or entity, that place a value on the business (or any portion thereof) or the shares of Jaeban including, without limitation, all financial statements of Jaeban, whether draft or final.

2.    All documents that constitute minutes of meetings of the Jaeban Board of Directors or refer or relate to actions taken by the Jaeban Board of Directors including, without limitation, all resolutions, consents or other actions taken by the Jaeban Board of Directors.

3.    All documents that refer to a claim or claims by any Debtor against Jaeban or Mr. I.M. Jaeban or Jaeban against any Debtor, regardless of whether that claim has yet been asserted in the above-captioned adversary proceeding or the bankruptcy case. Such documents include, without limitation, Jaeban internal documents and all documents that refer to, relate to, or constitute communications among Jaeban and any third party including, without limitation, its lender(s) or internal or external accountants or auditors with respect to such claims. Notwithstanding the foregoing, this request does not seek documents created by Jaeban solely for use by its English or U.S. counsel and not shared with any other third party.

4.    All documents in Jaeban's possession, custody, or control that refer or relate to the granting or continuing existence of an Order of Administration by the High Court of Justice, Chancery Division with respect to BRACII or BTI.

5.    All documents that refer to, relate to, or constitute communications between Jaeban and Cendant Corporation or any of its affiliated entities, including, without limitation, Avis Europe plc and any affiliates thereof.

6.    All agreements between or among Jaeban, Mr. I.M. Jaeban and any of the Debtors (which have been defined to include BTI) including, without limitation, each of the agreements referenced in Paragraph 39 of Jaeban's Counterclaims.

5

7.    All documents created or reviewed by Jaeban in considering or deciding to enter into the IPLA, the March 5, 2001 Umbrella Agreement among Jaeban, Mr. I.M. Jaeban, and BRACII, or the March 5, 2001 Business Sale Agreement to purchase BTI business assets from BRACII. Such documents include, without limitation, all documents that Jaeban created or reviewed in analyzing the business of any of the Debtors and all internal communications that refer or relate to such materials.

8.    All other documents that refer or relate to negotiations between Jaeban or Mr. I.M. Jaeban and any of the Debtors with respect to the drafting, execution, or performance of any proposed or executed agreement with any of the Debtors.

9.    All general ledgers, computer databases, or other documents containing, reflecting, tabulating, or summarizing entries for any of the Exhibit C Charges (as defined above).

10.    All other documents that refer or relate to any or all of the Exhibit C Charges.

11.    Documents identifying the size of Jaeban's fleet of cars during each month from January 2001 to the present.

12.    All documents that refer or relate to Jaeban's affirmative defenses of estoppel or waiver.

13.    All documents that refer or relate to the alleged failure by any Debtor adequately to market the Budget brand, as set forth in Paragraph 37 of the Counterclaim.

14.    All documents that refer or relate to Debtors' alleged "failure to provide certain administrative functions required by the ILPA" set forth in Paragraph 44 of the Counterclaim.

6

15.    All documents that refer or relate to Debtors' alleged failure "to provide integrated service across critical territories as required by the ILPA" set forth in Paragraph 44 of the Counterclaim.

16.    All documents that refer or relate to the "various charges associated with the leasing of vehicles to" BRACII alleged in Paragraph 40 of the Counterclaim.

17.    All documents that refer or relate to BRACII's alleged failure to return vehicles in its possession to Jaeban.

18.    All documents that refer or relate to payments by any Jaeban customer to any Debtor (as defined above, including, without limitation, Budget Group, Inc. BRACII, or BTI) as to which Jaeban alleges that such payment was owed to Jaeban.

19.    All documents that refer or relate to payments by any party that were received by Jaeban but which relate to services rendered by any Debtor where all or any portion of such payment was not forwarded by Jaeban to the relevant Debtor.

20.    All documents that refer or relate to Jaeban's alleged damages or right of setoff or right of recoupment against Debtors.

Dated:  September 29, 2003

**SIDLEY AUSTIN BROWN & WOOD**

Larry J. Nyhan
Melville W. Washburn
Kenneth E. Wile
Bank One Plaza
10 S. Dearborn
Chicago, IL 60603

Counsel for Debtors and Debtors-in-Possession
BRAC Group, Inc., et al.

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**

_____

Robert S. Brady (Bar No. 2847)
Edmon L. Morton (No. 3856)
Joseph A. Malfitano (No. 4020)
Matthew B. Lunn (No. 4119)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6600

**BROWN RUDNICK BERLACK ISRAELS LLP**
Martin S. Siegel, Esq.
120 West 45th Street
New York, New York 10036
(212) 704-0100


Counsel for the Official Committee of Unsecured
Creditors

**ASHBY & GEDDES**

William Bowden (No. 2553)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

**EXHIBIT C**

## SUMMARY OF GROSS AMOUNTS OWED BY
## JAEBAN TO BRACII

| Description | Figure per BRACII - 2001 | Figure per BRACII - 2002 | Figure per BRACII - 2003 | Totals |
|---|---|---|---|---|
| US Reservation Charges | £41,954.46 | £77,519.60 | £4,870.59 | £124,344.65 |
| Travel Agents Referral Programme | £62,267.59 | £98,886.45 | £23,798.37 | £184,952.41 |
| Customer Relations Refunds | | £4,703.37 | £65.76 | £4,769.13 |
| Frequent Flyer & International Programmes etc | | £10,568.00 | £1,030.13 | £11,598.13 |
| Inter Office Charges General | £190,876.53 | £57,805.06 | | £248,681.59 |
| Inter Office Charges Oldbury / Corporate | See above | See above | See above | £0.00 |
| RAC - Subscriptions | £35,272.26 | £56,437.32 | | £91,709.58 |
| RAC - Other | | | | £0.00 |
| BMS - Reservations | £67,779.88 | £101,426.98 | £9,366.35 | £178,573.21 |
| BMS - Charges | | £76,793.62 | | £76,793.62 |
| Money paid to Jaeban | | £12,631.61 | | £12,631.61 |
| 2001 concessions | | | | £0.00 |
| Manchester Airport Concessions | £80,633.19 | £93,658.61 | | £174,291.80 |
| Birmingham Airport Concessions | | £108,198.77 | | £108,198.77 |
| Edinburgh Airport Concessions | | £80,613.56 | | £80,613.56 |
| Glasgow Airport Concessions | | £152,552.62 | | £152,552.62 |
| East Midlands Airport Concessions | | £7,196.85 | | £7,196.85 |
| Other Location Rent Charges | £72,080.78 | £141,254.54 | | £213,335.32 |
| Miscellaneous Utilities Charges | | £19,914.72 | | £19,914.72 |
| Telephone Charges | | £134,052.88 | | £134,052.88 |
| Royalty Fees (2003 estimated) | £210,640.22 | £638,301.48 | £94,007.00 | £942,948.70 |
| Yellow Pages 2001 | £22,224.07 | | | £22,224.07 |
| Yellow Pages 2002/3 | | £128,059.47 | £25,900.54 | £153,960.01 |
| Dun & Bradstreet Reports | | | | £0.00 |
| Miscellaneous Charges | £28,755.93 | £28,560.04 | £111.64 | £57,427.61 |
| Miscellaneous Adjustments | | | | £0.00 |
| 1st Quarter Fleet/Ford Bonus | | | | £0.00 |
| Insurance | | £1,267.16 | | £1,267.16 |
| Cont Cover and low value refunds | | £4,052.10 | | £4,052.10 |
| **Totals** | **£812,484.91** | **£2,034,454.81** | **£159,150.38** | **£3,006,090.10** |

9

# EXHIBIT B

Your reference

Our reference        ICW

*Copy to be passed to I.S.*

*MSC
15/10/03
^*

15 October 2003

M O'Connor
Senior Manager
RSM Robson Rhodes LLP
Chartered Accountants
Centre City Tower
7 Hill Street
Birmingham
B5 4UU

Reply to:
55 Colmore Row
Birmingham B3 2AS
DX 13036 Birmingham 1

3 Waterhouse Square
142 Holborn
London EC1N 2SW
DX 282 LDE

Dear Mick

## Jaeban (UK) Limited (the "Company")

Rond Point Schuman 9, bte 4
B-1040 Brussels
Belgium

T +44 (0) 870 903 1000
F +44 (0) 870 904 1099
mail@wragge.com
www.wragge.com

It is apparent that following our discussions with Zodiac on 13 and
14 October that Zodiac are not willing to continue to support the
Budget franchise in favour of the Company and also do not appear
willing to enter into any new franchise agreements with any other
corporate entity where Ibraheim Jaeban is involved.

Without the support of Zodiac it is not possible for you as potential
receiver to trade the Company as a going concern.

Ibraheim Jaeban has however mentioned to you that he might want
to trade through Newco or in his own name from various sites
currently operated by the Company. Whilst some of these sites
might ultimately be owned by Jaeban, in each instance the Company
does at present have a lease or tenancy rights in relation to the
business sites.

Ibraheim Jaeban argues that neither he or the Company are not
bound by the franchise agreements that he originally entered into
with Budget Rent-A-Car International Inc (BRACI) and is therefore
free to operate in his own capacity.

Having looked at the Umbrella Franchise Agreement and the
International Prime Licence Agreements, I disagree with Ibraheim
Jaeban's conclusions.

There is nothing within the structure of either of the above
agreements which has caused them to automatically determine on the
insolvency of BRACI or the UK business of BRACI. All of the

Wragge & Co LLP
is registered in
England and Wales as a
Limited Liability Partnership
Registered no OC304378

Registered office:
55 Colmore Row
Birmingham B3 2AS

Wragge & Co LLP
is regulated by
the Law Society
of England and Wales

A list of members of
Wragge & Co LLP
is open to inspection at
the registered office



In association with
Graf von Westphalen Bappert & Modest     www.westphalen-law.com
Berlin  Brussels  Dresden  Freiburg  Hamburg  Cologne  Leipzig  Munich  Vienna

*Nil Closept . 685 .*

automatic termination provisions relate to franchisees. Therefore, the agreement is arguably still in place.

In any event, even if my above analysis is incorrect, in my view the Company has continued to conduct business as if it is a franchisee of Budget. For example, its vans and office accommodation still carry the Budget logo. It could be said that the Company are seeking to argue that they can have all the benefit of the franchise agreement without any liabilities. I do not think that a Court would interpret matters in this way and are likely to conclude that even if the agreement was capable of termination on the insolvency of BRACI, it has effectively been held over and continued by the parties.

As a consequence, the restrictive covenants contained within the agreements are in my view effective.

As a consequence, the following clauses would need to be taken into account by Ibraheim Jaeban if he is to commence trading as a Newco.

Clause 1.3 prevents any sublicense without the consent of Budget.

Clause 2.3 limits the use of the Budget trademarks to acting in compliance with the franchise agreements. As a consequence there is potential for an intellectual property claim for infringement of this provision.

Clause 2.43 contains a covenant against directly or indirectly soliciting people who are customers of Budget for 2 years following termination.

Coupled to this clause, the Company cannot disclose any part of the operating manual to any person other than its employees.

Clause 11.9 prevents the Company and the Company's beneficial owners (i.e. Ibraheim Jaeban) for a period of 12 months after termination to be engaged or interested in any other vehicle rental business where it would compete with Budget.

Additionally, clause 12.6 imposes a nondisclosure and non-competition clause against all beneficial owners, directors and principal owners of the Company for the 2 years referred to within clause 11.9.

As a consequence of the above terms, if Ibraheim Jaeban or any other directors or beneficial owners of the Company commenced a business in competition to that of Budget, Budget would be entitled to bring proceedings against the relevant individuals for breach of covenant contained within the Franchise Agreements.

As a consequence in my view, you are not able to assist in your capacity as Receiver, Ibraheim Jaeban or any other director or beneficial owner in setting up any competing business. You would not be able to sell any assets or pass any information held by the Company to any Newco involving Ibraheim Jaeban. Clearly you cannot prevent Ibraheim Jaeban undertaking this task but if it could be demonstrated by Budget that you assisted then as Receiver there is a possibility that you could be personally liable as you have assisted in a breach of contract. You cannot rely upon ignorance as you have been informed about the terms of the franchise and agreements.

It does appear however that the non-competition clauses do not extend to employees of the Company provided they are not beneficial owners and therefore employees of the Company are not prevented from setting up in competition to Budget.

Should you require any further advice in relation to the content of the Franchise Agreements, please do not hesitate to contact me.

Yours sincerely


**Ian Weatherall**
**Direct dial : 0121 685 2787**
**e-mail: ian-weatherall@wragge.com**

# EXHIBIT C

Forth House
Isel
Cockermouth
Cumbria
CA13 9SA

Tel: 07973 256641
Fax: 01900 821654

**For the Personal Attention of**
**Mr M O'Connor**
RSM Robson Rhodes
Centre City Tower
7 Hill Street
Birmingham
B5 4UU

**By Fax and Post**

Friday, 30 January 2004

Dear Mick

Further to our meeting yesterday I would like to comment as follows;

1. I do not agree with Ian Weatherall of Wragge & Co we reference to the claim against Budget International. He has probably taken the Franchise Agreement on it's own without reference to the Operating Manuals as they have been referred to in the Franchise Agreement. They are in fundamental breach of the Franchiser's obligation by precedence and by the Operating Manual.

   Presentations were made with absolute determination that London Gatwick, London Heathrow and Standsted Airports continue to be operational under all circumstances. This can be verified by Jack Frazee and Terry Clarke of Budget. Jack Frazee as President of Budget International declared this fact in a public meeting.

   It is implied in the Operation Manuals that a One-Way system is crucial, as too are Central Billing and National Accounts. It is stated that the Marketing fund should be made up from 2.5% of the Licensee fees and should be spent solely on Marketing – this has not occurred.

   There are additional points, which have been provided to Wragge & Co from the Operating Manuals.

2. I would like Ian Weatherall of Wragge & Co to elaborate on his comments about me in the document he provided.

3. The Fiat issue.

   I would have hoped that by now you have read by now the summary given to Esther.

   The Fiat issue commenced in 2000 and therefore it is not recent. The point I would like to make is that these vehicles have been supplied by Fiat and returned to Fiat and have not been sold to anyone else by Jaeban.

   I would be happy to discuss all of the above points with you in more detail.

   Yours sincerely

**Mr I M Jaeban**

# EXHIBIT D

(Transcript:Nunnery)

Earle v Medhurst

Queen's Bench Division

*(Transcript:Nunnery)*

**HEARING-DATES:** 10 October 1985

10 October 1985

**COUNSEL:**

David Bean for the Plaintiff: John Foy for the Defendant

**PANEL:** Kennedy J

**JUDGMENTBY-1:** KENNEDY J

**JUDGMENT-1:**

KENNEDY J: In this action for damages for personal injuries the defendant now wishes to obtain discovery of two medical reports which came into existence in previous proceedings between the plaintiff and another defendant.

The history of the matter, insofar as it is relevant for present purposes, is as follows. The plaintiff, who is now 54 years of age, is a driving examiner. On the 30th July 1980 he was a passenger in a motor car driven by a lady named Vanessa Ralph when, according to the plaintiff, it was driven so jerkily that the plaintiff sustained a back injury. He instructed his present solicitors, Robin Thompson and Partners, and on the 11th August 1981 a writ was issued against Vanessa Ralph.

On the instructions of the plaintiff's solicitors a Mr Beavis, a consulting surgeon, then examined the plaintiff and when the Statement of Claim was served on the 11th November 1981 it was alleged that the plaintiff had sustained a whiplash injury to his neck which had previously been symptom-free.

At the time of service of the statement of claim the neck was alleged to be still troublesome and prognosis was said to be guarded.

The defendant, Vanessa Ralph, who instructed Messrs Stevensons as her solicitors and upon their instructions the plaintiff was examined by another surgeon, Mr Percy, a defence was served and in due course medical reports were exchanged between solicitors.

By February 1983 the plaintiff was back at work and on the 24th February 1983 he was a passenger in a car driven by Mr Medhurst when that car reversed into a wall, as a result of which the plaintiff claims that he suffered a further injury to his neck.

In November 1983 his action against Vanessa Ralph was settled, and on the 1st February 1984, at the request of his solicitors, he was again medically examined, this time by Dr Legg, whose opinion is that the plaintiff has suffered severe damage to his neck as a result of two whiplash injuries.

On the 3rd April 1984 the plaintiff issued his writ against Mr Medhurst and in the Statement of Claim which was served on the 16th May 1984 it was alleged that, as a result of the accident on the 24th February 1983, the symptoms in the neck from the previous accident on the 30th July 1980 have been severely aggravated.

Mr Medhurst instructed as his solicitors Messrs Joynson-Hicks and on the 28th June 1984 they served a Defence admitting liability. The plaintiff's solicitors then served a list of documents, which made no reference to the medical reports of Mr Beavis or Mr Percy, but by letter dated 18th March 1985 the plaintiff's solicitors added those reports to their list of documents in schedule 1, part 2. In other words, they admitted to possession of them but declined to produce them.

In his affidavit of the 22nd April 1985 Mr Usher, the solicitor acting on behalf of the plaintiff, admitted that the reports of Mr Beavis and Mr Percy are relevant in relation to the plaintiff's claim against Mr Medhurst, but he claimed them to be privileged. The defendant's solicitors, Messrs Joynson-Hicks, then challenged that claim before Master Creightmore on the 30th April 1985, but he refused to order disclosure of the two medical reports. They did not immediately appeal against that decision, but instead sought an order for discovery and production of the reports against Messrs Stevensons and/or Vanessa Ralph.

On the 10th September 1985 Master Turner refused to make that order and it is from that refusal that the defendant now appeals.

Mr O'Brien, on behalf of the defendant, also seeks leave to appeal out of time from the decision of Master Creightmore and I have given that leave. In my judgment, the defendant had reason for not appealing against the decision of Master Creightmore whilst he tried to obtain the same result, namely access to the medical reports of Mr Beavis and Mr Percy, by another means.

Accordingly, what follows is my judgment in relation to both of these appeals and I am giving it in open court at the request of the parties because it deals with a claim to privilege in respect of which they seems to be relatively little guidance to be obtained from the authorities.

Mr O'Brien submitted, and I accept, that for the purposes of discovery the two medical reports in question and the copies of them which have been made and exchanged really fall into four categories. First, there is the original report of Mr Beavis to the plaintiff's solicitors, which it is conceded was privileged when it was obtained and which, if it had not been disclosed, would, it is conceded, have remained privileged, even after the conclusion of the action. Second, there is the copy of that report sent by the plaintiff's solicitors to Messrs Stevensons.

The Defendant's present submission is that what was sent to Messrs Stevensons could no longer be covered by any form of privilege.

Third, there is the original report of Mr Percy obtained by Messrs Stevensons. The defendant asserts that any privilege attaching to that report can only be the privilege of Miss Ralph or her insurers, which each of them is prepared to waive.

Fourthly, there is the copy of Mr Percy's report, disclosed by Messrs Stevensons to the plaintiff's solicitors. as to this copy of Mr Percy's report, the defendant's present submission is that there can be no claim to privilege at all.

In relation to categories one and two, Mr Bean for the plaintiff submitted to me that the privilege which comes into existence when a medical report is obtained continues even when a copy is sent to the opposing party and that the copy is received subject to an implied undertaking which limits its disclosure.

As to categories three and four, the plaintiff's case is not that the report of Mr Percy is privileged but that it came into existence subject to an implied term that it would not be used by Messrs Stevensons for any purpose other than the conduct of the case on behalf of Miss Ralph, and that, as a matter of policy, the court should uphold that term, even in the face of an application for discovery in another action which raises issues in relation to which the contents of the report are admitted to be relevant.

So the first issue which I have to decide is whether a privileged document such as a medical report obtained by a plaintiff's solicitor in relation to his own client remains privileged once it is disclosed to the opposing party. In relation to this issue, counsel for the defendant invited my attention to five authorities, only the last of which is said by the plaintiff to be relevant.

The first was Spencely v Schulenburgh (1806) 103 ER 138, in which the Lord Ellenborough CJ originally declined to allow the plaintiff to call the defendant's attorney to produce a document which he had received from the plaintiff's attorney, but upon hearing further rargument he changed his mind and said:

"That the privilege was restricted to communications, whether oral or written, from the client to his attorney, and could not extend to adverse proceedings communicated to him as attorney in the cause from the opposite party, in the disclosure of which there could be no breach of confidence".

In Gore v Bowser (1851) 64 ER 1004, Sir James Parker VC, following the same line of reasoning, ruled that the plaintiff's solicitor must answer an interrogatory as to what had transpired at an interview between himself and the defendant.

In Sawyer v Birchmore (1835) 40 ER 218 the court followed Spenceley v Schulenburgh, holding that letters obtained by a solicitor from collateral quarters were not protected.

In Kennedy v Lyle, (1883) 23 ChD 387, the Court of Appeal upheld a claim to privilege by a defendant to an action to recover possession of real estate, who asserted that the information sought had only been obtained by his solicitors or their agents in and for purpose of defending his title. At p 404 Cotton LJ said:

"What is the ground on which all professional privilege is claimed? It is this -- that having regard to the technical nature of our law it is of the utmost importance that no layman should be in any way hindered from having the utmost freedom in communicating with his professional advisers, whether counsel or solicitors. There is also another principle, that no one is to be fettered in obtaining materials for his defence, and if he for the purpose of his defence obtains evidence, the adverse party cannot ask to see it before the trial.

He then went on to classify some of the authorities, saying, at p 405:

"The first class is referable to the principle that no communication made to a solicitor by or on behalf of the opposite party can be confidential".

In support of that principle, he cited Spenceley v Schulenburgh (1806) 103 ER 138 and four other cases, including Gore v Bowser (1851) 64 ER 1004.

That brings me to Goldstone v Williams Deacon & Co [1898] 1 Ch 47, the decision of Stirling J, on which the plaintiff in the present case places much reliance. The plaintiff in that case had been a defendant to an action for breach of trust and on her examination before an examiner there had been produced to her accounts prepared by the plaintiff's solicitors which she admitted to be correct. The action for breach of trust was then compromised and the depositions of Mrs Goldstone, to which the accounts were exhibited, were entered as read in the order of compromise.

The plaintiffs who had sued Mrs Goldstone then sued the bank, which sought production of the accounts and of the depositions. As to the accounts, production was resisted by the plaintiffs on the basis that they were privileged, having been prepared with a view to earlier litigation, that a document once privileged is always privileged unless the privilege is waived or lost, and that in the instant case the showing of the accounts to the witness was not an act which brought the privilege to an end, because the document never actually became public. It was not read in court, its contents were not noted by the examiner and the order approving the compromise was made ex parte in chambers.

The attention of the learned judge was invited to authorities which decided that notice of proceedings in open court were not privileged and must be produced, and he held that as the document in question was never effectually made public the privilege had not been waived, but, so far as I can ascertain, the argument that privilege had come to an end not because the accounts were made public but because they were shown to the opposing party was never considered by the learned judge.

During the course of argument, counsel for the plaintiffs does seem to have conceded that there had been a partial waiver of privilege, but he submitted that although the disclosure of the privileged document to an adversary may destroy the privilege to a certain extent it does not necessarily destroy it altogether. I confess that I do not understand what can remain of the privilege that attaches to a report or a set of accounts brought into existence for the purpose of impending litigation once there has been disclosre to an adversary. In my judgment there is nothing in the decision in Goldstone v Williams Deacon & Co [1898] 1 Ch 47, which compels me to find that the privilege which undoubtedly attaches to a medical report obtained by a plaintiff's solicitor in relation to his client continues to exist in relation to that report even after it has been disclosed to the defendant's solicitors and I decline so to find.

In my judgment the general principle which applies to medical reports as to other documents is that enunciated by Cotton LJ in the passage to which I have already referred, when he said that no communication made to a solicitor by or on behalf of the opposite party can be confidential.

I turn now to counsel for the plaintiff's argument in relation to the copy of the report of Mr Beavis which was sent to Messrs Stevensons. In this context I was invited to consider the decision of the House of Lords in Harman v Home Office, [1983] AC 280, [1982] 1 All ER 532, where a solicitor was held to have been in contempt of court because she had shown to a journalist after a trial documents which had been read out in court and which had been obtained from the Home

Office on discovery on the basis that they should not be used for any purpose other than the case in hand.

The House of Lords held that when a solicitor obtains upon discovery copies of documents belonging to his client's adversary he gives an implied undertaking to the court not to use the copies or allow them to be used for any purpose other than the proper conduct of the action on behalf of his client and that whether the document be admitted in evidence or not the undertaking continues.

The plaintiff's counsel submitted to me that the Harman v Home Office [1983] AC 280, [1982] 1 All ER 532, principle would apply to the copy of the report of Mr Beavis sent to Messrs Stevensons, and with that I agree, but the point is academic if, as I have found, the original of the report ceased to be a privileged document in the hands of the plaintiff's solicitors once it was disclosed. Ffurthermore, I am far from satisfied that there is anything in Harman v The Home Office which would prevent in an appropriate case an order for discovery being made against a solicitor in the position of Messrs Stevensons in relation to a copy of a medical report which remained in their hands. The whole object of the implied undertaking which the House of Lords found to exist is to prevent improper disclosure and it could hardly be said that disclosure pursuant to a court order would be improper.

As Mr O'Brien points out, a document often has to be disclosed even where the maker of the document has stipulated that it shall be private and confidential and refuses to authorise disclosure (see, for example, M'Corquodale v Bell [1876] 1 CP 471.

That brings me to the third category, which contains the original report of Mr Percy to Messrs Stevensons. The submission of the plaintiff in relation to that report relies, as I have already indicated, not on privilege but on public policy. It is said that the medical examination of the plaintiff by a doctor instructed on behalf of the defendant in a personal injury action is sui generis: it is something to which a plaintiff has to submit himself if he is to pursue his claim, but the invasion of his privacy should be as restricted as possible and the results of that invasion should only be used by or on behalf of the defendant who obtains the medical report for the limited purpose of defending the litigation in the course of which the report is obtained.

The report is held, it is submitted, subject to an implied undertaking similar to that which was found to exist in Harman's case and the restrictions which apply to the original in the hands of Messrs Stevensons should also apply to the copy which they supplied to the plaintiff's solicitors. They are restrictions which the court should uphold in any subsequent action and not breach by means of an order for discovery.

In my judgment, there is for present purposes nothing particularly unusual about the examination of a plaintiff in a personal injuries action by a doctor instructed by the defendants. If the action was in respect of a damaged house or a damaged motor car, the defendant would no doubt wish to have the affected property examined by an engineer and in each case the plaintiff would have to consent to some invasion of his privacy if the examination was to proceed.

Before me the defendants (in my view rightly) conceded that when a plaintiff in a personal injuries action agrees to submit himself to an examination by a doctor instructed by the defendant he does so upon the basis that his interest in the report which comes into existence as a result of that examination will be respected. The defendant will, of course, be free to make any proper use of the report in relation to the litigation which is then current, but he should not make any other use of it without the agreement of the plaintiff or an order of the court. However, I cannot accept the

submission that when, as the result of a second accident, the plaintiff sustains an injury to a part of his body which has already been injured in an earlier accident, so that it is material to know what his state was before the second accident occurred, and the solicitor who acted for the defendant in respect of a claim arising out of the earlier accident has in his possession a medical report which bears upon the issue which it is material to decide, public policy should prevent the court from ordering that the report be disclosed. If such an order is made, I do not believe that the proper interests of plaintiffs who submit themselves to examinations by doctors instructed by defendants will be in any way jeopardised and, in that the court will be better able to come to a proper conclusion in relation to the claim arising out of the second accident, the interests of justice will plainly be advanced.

That leaves only category four, the copy of Mr Percy's report which is in the hands of the plaintiff's solicitor. If, as I have indicated, the implied undertaking given by Messrs Stevensons when the original of the report was obtained would not prevent an order for discovery being made against them, the plaintiff's solicitors cannot be in any better position, and in my judgment there is nothing upon which they can rely in order to oppose discovery of their copy of Mr Percy's report.

Having given the defendant leave to appeal out of time against the order of Master Creightmore, I allow that appeal. That means that the plaintiff's solicitors must disclose the original report of Mr Beavis which they obtained in the form in which it was disclosed by them to Messrs Stevensons, and a copy of the report of Mr Percy which was supplied by Messrs Stevensons to them. I understand that the plaintiff's solicitors have both of those documents, in which event there is no need for any order against Messrs Stevensons or Miss Ralph and the appeal against the order of Master Turner will therefore be dismissed.

### DISPOSITION:

First appeal allowed, second appeal dismissed.

### SOLICITORS:

Robin Thompson & Partners: Joynson-Hicks

# EXHIBIT E

**EXHIBIT E**

**PROPOSED HSBC BANK, plc. DOCUMENT RIDER**

**DOCUMENT REQUESTS**

1.    All documents created after January 1, 2001 that constitute or refer to communications between HSBC and Jaeban UK, including, without limitation, all written correspondence and e-mails sent between the two companies.

2.    All documents created after January 1, 2001 that discuss or analyze the financial condition or business of Jaeban UK, including, without limitation, all credit analyses.