## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

| | |
|---|---|
| BRAC GROUP, INC. *et al.,* | : C.A. No. 05-259 (KAJ) |
| Debtors, | : Bankruptcy Case No: 02-12152 |
| | : Adversary No.: 03-54271 |
| Jaeban (U.K.) Limited, et al. | : |
| Appellant, | : |
| | : |
| | : |
| v. | : |
| | : |
| BRAC Group Inc., *et al.,* | : |
| Appellee | : |
| | : |

### APPELLANT'S OPENING BRIEF

Dated: May 26, 2005

WERB & SULLIVAN

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
300 Delaware Ave., 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111

Attorneys for Appellant
Ibrahiem Jaeban, as Assignee of
Jaeban (U.K.) Limited

i

**TABLE OF CONTENTS**

Page

I.    STANDARD OF REVIEW…………………………………………....1

II.   NATURE AND STAGE OF THE PROCEEDINGS...........…….…….…....2

III.  IDENTITIES OF THE PARTIES………………………….…….……....2

IV.   PRELIMINARY STATEMENT……………………………….……....3

V.    FACTUAL BACKROUND………………………………………4

VI.   SUMMARY OFARGUMENT………………………………………...11

VII.  ARGUMENT………………………………………………...12

A. The Bankruptcy Court's Reversible Errors……………………..…...12
    1.  Mr. Jaeban's Compliance with the First Requirement of the
    *May 25, 2004 Order*……………………………………………….13
        a.  The Wasted Trip to England……………………………….19
    2.  The Court Committed Error with regard to Mr. Jaeban's
    Compliance with the Second Requirement of the *May 25, 2004 Order*………..21
    3.  The Court Committed Error with regard to Mr. Jaeban's Compliance
    with the Third Requirement of the *May 25, 2004 Order*………………21
    4.  The Drastic Sanctions taken by the Bankruptcy Court were inappropriate…22
    5.  The Bankruptcy Court's Own Words Show Its Error…..………………...24
    6.  The Bankruptcy Court failed to address BRACII's
    lack of cooperation in the discovery process………………………..……26
    7.  The Bankruptcy Court Should Have Considered the Affidavits
    Attached to Mr. Jaeban's Motion for Reconsideration…………………….26
    8.  The Bankruptcy Court's Inexplicable Actions against Mr. Jaeban………….29

B. The Poulis Factors……………………………………………….30
    1. Mr. Jaeban's Personal Responsibility……………………………………31
    2. Prejudice to BRACII……………………………………………….33
        a. The Weatherall Letter……………………………………………34
        b. The Credit Pack Document…………………………………………35
        c.  The Receiver's Documents…………………………………………35
    3. Mr. Jaeban's History in these Proceedings………………………………35
    4. Whether Mr. Jaeban's Conduct was Willful or in Bad Faith………………37
    5. The Alternative of Lesser Sanctions……………………………………37
    6. The Meritoriousness of Mr. Jaeban's Claim……………………… ……37

CONCLUSION ……………………………………………………...38

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

| | |
|---|---|
| BRAC GROUP, INC. *et al.,*<br>Debtors, | :   C.A. No. 05-259 (KAJ)<br>:   Bankruptcy Case No: 02-12152<br>:   Adversary No.: 03-54271 |
| Jaeban (U.K.) Limited, et al.<br>          Appellant, | : |
| | : |
| | : |
| v. | : |
| | : |
| BRAC Group Inc., *et al.,*<br>          Appellee | : |
| | : |

## APPELLANT'S OPENING BRIEF

Dated: May 26, 2005

WERB & SULLIVAN

Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
300 Delaware Ave., 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111

Attorneys for Appellant
Ibrahiem Jaeban, as Assignee of
Jaeban (U.K.) Limited

i

# TABLE OF CONTENTS

                                                                    Page

I.     STANDARD OF REVIEW...............................................................1

II.    NATURE AND STAGE OF THE PROCEEDINGS.........…..................2

III.   IDENTITIES OF THE PARTIES.…..............................….............2

IV.    PRELIMINARY STATEMENT.…....................................…......3

V.     FACTUAL BACKROUND.…...........................................4

VI.    SUMMARY OFARGUMENT.…...................................11

VII.   ARGUMENT.…...........................................................12

   A. The Bankruptcy Court's Reversible Errors.…...........................12
       1.  Mr. Jaeban's Compliance with the First Requirement of the
       *May 25, 2004 Order*.…...............................................13
            a.  The Wasted Trip to England.…................................19
       2.  The Court Committed Error with regard to Mr. Jaeban's
       Compliance with the Second Requirement of the *May 25, 2004 Order*............21
       3.  The Court Committed Error with regard to Mr. Jaeban's Compliance
       with the Third Requirement of the *May 25, 2004 Order*...........................21
       4.  The Drastic Sanctions taken by the Bankruptcy Court were inappropriate...22
       5.  The Bankruptcy Court's Own Words Show Its Error..…......................24
       6.  The Bankruptcy Court failed to address BRACII's
       lack of cooperation in the discovery process.…........................………26
       7.  The Bankruptcy Court Should Have Considered the Affidavits
       Attached to Mr. Jaeban's Motion for Reconsideration.…..........................26
       8.   The Bankruptcy Court's Inexplicable Actions against Mr. Jaeban.…..........29

   B. The Poulis Factors.…................................................................30
       1. Mr. Jaeban's Personal Responsibility.…...................................31
       2. Prejudice to BRACII.…........................................................33
            a. The Weatherall Letter .…......................................34
            b. The Credit Pack Document.…..................................35
            c.  The Receiver's Documents.…..................................35
       3. Mr. Jaeban's History in these Proceedings.…...........................35
       4. Whether Mr. Jaeban's Conduct was Willful or in Bad Faith.….................37
       5. The Alternative of Lesser Sanctions.…...................................37
       6. The Meritoriousness of Mr. Jaeban's Claim.…...................... ......37

CONCLUSION .…...................................................................38

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                  <u>Page</u>

<u>Anchorage Associates v. Virgin Islands Board of Tax Review,</u>
922 F.2d 168, 177 fn 9 (3d. Cir. 1990)……………………………………………....……...24

<u>AWG Acquisition, LLC v. Fleming Cos.</u> (Del Civ Action No.
04-371-Honorable Sue L.Robinson, March 30, 2005)………………………………..1

<u>Burns v. MacMeekin (In re MacMeekin),</u> 722 F.2d 32 (3d Cir. 1983)…………22, 23, 39

<u>Curtis T. Bedwell & Sons v. International Fid. Ins. Co.,</u> 843 F. 2d 683 (3d. Cir 1988)…39

<u>DiGregorio v. First Rediscount Corporation,</u> 506 F.2d 781 (3d Cir. 1974)……………..40

<u>Donnelly v. Johns-Manville Sales Corp.,</u> 677 F.2d 339 (3d. Cir. 1982)…………………...22

<u>Farnese v. Bagnasco,</u> 687 F.2d 761 (3d Cir. 1982)…………………………………………1, 25

<u>Former Employees of Builders Square Retail Stores v.</u>
<u>Hechinger Investment Co. (In re Hechinger Investment Co.),</u>
298 F.3d 219 (3d Cir. 2002)………………………………………………………………..1

<u>Hamilton v. Everett Company, Inc.,</u> 104 F.R.D.106 (W.D. Pa. 1985)…………………..23

<u>Hammond Packing Co. v. State of Arkansas,</u> 212 U.S. 322, 53 L. Ed. 530 (1909)……..39

<u>Haraway v. National Association of Stock Car Racing, Inc.,</u>
213 F.R.D.161(D. Del. 2003)…………………………………………………………….. 23

<u>Hovey v. Elliott,</u> 167 U.S. 409, 42 L. Ed. 215, 17 S. Ct. 841 (1897)……………………38

<u>Kiewit E. Co., Inc. v. L&R Constr. Co., Inc.,</u> 44 F.3d 1194, 1204 (3d Cir. 1995)………28

<u>Madesky v. Campbell,</u> 705 F.2d 703 (3d. Cir. 1983)……………………………………24

<u>Manus v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),</u> 188 F.3d 116
(3d Cir.1999)……………………………………………………………………....…1, 25, 33

<u>Marco v. Accent Pub. Co.,</u> 969 F.2d 1547 (3d Cir. 1992)………………………………..1

<u>Max's Seafood Café ex. Rel Lou-Ann v. Quinteros,</u> 176 F.3d 669 (3d. Cir. 1999)…27, 28

<u>Mellon Bank, N.A. v. Metro Communications, Inc.,</u> 945 F.2d 635 (3d Cir. 1991)………1

National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 49 L.Ed. 2d
    747, 96 S.Ct. 2778 (1976)...................................................................30

Pension Benefit Guaranty Corp. v. Kaiser Aluminum Corp., 2005 U.S. Dist
    LEXIS 5106;(Del. Civ. Action No. 04-145- Honorable Joseph J. Farnan,
    March 30, 2005).............................................................................1


Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863 (3d.Cir 1984)......30, 31, 36, 37, 39

Proxim, Inc. v. 3COM Corp., et. al., C.A. No. 01-155-SL
    (2003 U.S. Dist. LEXIS 2556), dated February 21, 2003............................28, 29

Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,
    357 U.S. 197, 2 L. Ed. 2d 1255, 78 S. Ct. 1087 (1958).....................................38

In re United Artists Theatre Co., et al., Case No. 00-3514 (PJW) (2004 Bankr. LEXIS
    1258), dated August 25, 2004..........................................................28, 29

Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)......1

## STATUTES AND RULES

28 U.S.C. § 158 (a)......................................................................................1

Fed. R. Civ. P. 37...........................................................3, 11, 22, 37, 38, 39

## I. STANDARD OF REVIEW

Appellant seeks review of a sanctions order of the Bankruptcy Court dismissing his counterclaims with prejudice. Jurisdiction lies in this court to hear an appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). There is ample precedent for the proposition that a review of a sanctions order is undertaken pursuant to an "abuse of discretion" standard. See Farnese v. Bagnasco, 687 F.2d 761, 765 (3d Cir. 1982). A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts. Manus v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 188 F.3d 116, 122-23 (3d Cir. 1999), citing Marco v. Accent Pub. Co., 969 F.2d 1547, 1548 (3d Cir. 1992).

Furthermore, with mixed questions of law and fact, the appellate court must, however, accept the trial court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the court's choice and interpretation of legal precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 641 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981).

The District Court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis Bankruptcy Court opinions as cited in the following recent Delaware decisions. Former Employees of Builders Square Retail Stores v. Hechinger Investment Co. (In re Hechinger Investment Co.), 298 F.3d 219, 224 (3d Cir. 2002); AWG Acquisition, LLC v. Fleming Companies (Del. Civ. Action No. 04-371- Honorable Sue L. Robinson, March 30, 2005); Pension Benefit Guaranty Corp. v. Kaiser Aluminum

Corp., 2005 U.S. Dist LEXIS 5106; Del. Civ. Action No. 04-145- Honorable Joseph J. Farnan, March 30, 2005).

## II. NATURE AND STAGE OF THE PROCEEDINGS

Appellant Ibraheim Jaeban, as Assignee of Jaeban (U.K) Ltd., appeals the following orders entered in the United States Bankruptcy Court for the District of Delaware: **(1)** *Order* entered January 13, 2005 (D.I. 76) pursuant to the *Memorandum Opinion* dated December 14, 2004 (D.I. 73) and **(2)** *Memorandum Decision and Order* entered March 9, 2005 (D.I. 83) denying the Appellant's motion to reconsider the previous order.

## III.    IDENTITIES OF THE PARTIES

The original parties to the adversary proceeding were Debtors BRAC Group, Inc. et al. (f/k/a Budget Group, Inc. et al), and Jaeban (U.K.) Limited  (hereinafter "Jaeban U.K." or "the Company"). While all the Debtors were named as plaintiffs, the real plaintiff in interest is BRACII, a subsidiary of BRAC Group, Inc. and also a debtor in these bankruptcy cases.  During the course of the litigation, the Company was placed in administrative receivership in England, and some months later Ibrahiem Jaeban, the former principal officer of the Company negotiated for and took an assignment of its claims against BRACII.   After it assigned its claims to Appellant, the Company was not an active participant in the litigation. Appellant submits that the distinction between Jaeban U.K., the company, and Mr. Jaeban, an individual, is crucial to an understanding of the record and this appeal and is a distinction the Bankruptcy Court failed to make. The Orders appealed from apply to the dispute between Mr. Jaeban and BRACII.

## IV. PRELIMINARY STATEMENT

At the heart of this dispute on appeal is the timing of Mr. Jaeban's production of the following two sets of documents: (1) those at the former primary commercial location of **the Company**, known as "Welcome House"[1], and (2) those in the custody of the Company's Administrative Receiver in its English liquidation proceedings.  Mr. Jaeban and his attorneys were shocked and in disbelief when the Bankruptcy Court issued its *Memorandum Opinion* announcing its intention to dismiss his $4,500,000.00 claim against BRACII as a discovery sanction, despite the Bankruptcy Court's finding that it "cannot conclude on this record that Mr. Jaeban's conduct was in bad faith…" See *Memorandum Opinion* D.I. 73 at page 7 (the "Sanctions Opinion").  The Bankruptcy Court failed to consider or even mention Fed. R. Civ. P. 37, which governs the entry of sanctions for discovery disputes.   Despite Mr. Jaeban's compliance with the discovery schedule entered by the Bankruptcy Court in a May 25, 2004 Order, and in the face of extraordinary steps he has taken to have voluminous documents reviewed and produced to BRACII, the Bankruptcy Court entered the "ultimate sanction" of dismissal of Mr. Jaeban's claims.  Appellant asserts that the Bankruptcy Court applied incorrect legal standards in contravention of binding Third Circuit precedent, ignored the substantial evidence of Mr. Jaeban's (1) efforts to produce every relevant or requested documents, whether in his control or in the hands of a recalcitrant third party, the Company's Administrative Receiver, (2) efforts to schedule overseas the depositions of persons outside of his control, and (3) his attempts move the discovery process forward in order to reach the merits of the parties' multiple claims against each other.

---

[1] Despite its idyllic name, Welcome House is in fact a former gasoline service station converted into an auto rental location.

It is undisputed that Mr. Jaeban <u>did in fact produce</u> the documents in controversy; the issue before the Bankruptcy Court was whether he did so after a discovery deadline. In the *Sanctions Opinion*, the Bankruptcy Court failed to follow the body of Third Circuit decisions which express extreme reluctance to punish a party by dismissal and thereby deprive him of the opportunity of a hearing on the merits.

Importantly, the Bankruptcy Court's *Sanctions Opinion* contains crucial misstatements of record facts which are subject to judicial notice, and incorrectly identifies Mr. Jaeban as the target of a previous motion for sanctions, <u>when in fact the motion was directed to the Company prior to Mr. Jaeban's appearance in the proceeding</u>. The Bankruptcy Court's actions were fundamentally unjust and constituted reversible error.

## V. FACTUAL BACKROUND

Jaeban U.K. was Budget's largest United Kingdom franchisee, and operated several Budget rental locations in England and Scotland, including airport locations in Birmingham, Manchester, Edinburgh,and Glasgow.

On March 5, 2001, the Company and BRACII, which was formerly known as Budget Rent-A-Car International, Inc., had entered into several Umbrella Agreements, and an International Prime License Agreement ("IPLA"), whereby BRACII licensed the use of the "Budget" trademark to the Company. *Answer and Affirmative Defenses to Amended Complaint and Amended Counterclaim of Ibrahiem Jaeban* (the "Amended Counterclaim"), paragraph 46 (D.I. 42).   BRACII is an indirect subsidiary of BRAC Group, Inc., and was the franchisor of the "Budget" brand in the United Kingdom, Europe, the Middle East, and Africa. *Amended Complaint,* paragraph 2 (D.I. 40).   On

July 29, 2002, BRAC Group Inc. and related companies including BRACII filed

voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code. Id.,

paragraph 11.  On January 10, 2003, the Debtors filed *Debtors' Motion for Order*

*Pursuant to 11 U.S.C. Sections 105, 363, 365, 503, and 507* (D.I. 2413, Main Bankruptcy

Case) seeking approval of a sale of their car and truck rental assets in Europe, the Middle

East, and Africa and the assignment of related contracts to Avis Europe PLC (the "Sale

Motion").  As part of the *Sale Motion*, the Debtors listed amounts due on various contracts

("Cure Amounts") including the IPLA with the Company.  In connection with the *Sale*

*Motion*, the Company filed an objection (the "the Company Cure Objection") to the "0"

dollar cure amount listed in the Sale Motion, and alleged claims against BRACII of US

$4.5 Million Dollars (D.I. 2645, Main Bankruptcy Case).  On February 23, 2003 Chief

Bankruptcy Judge Mary F. Walrath entered an Order approving the proposed sale and

directing the Debtors to hold $4.5 million of the sale proceeds in escrow pending the

resolution of the Company's Cure Objection (the "Cure Escrow Order") (D.I. 2633, Main

Bankruptcy Case).  This Order permitted the Debtors to go forward with the sale of

substantially all of their remaining assets to Avis Europe PLC, and to assign franchise

and other contracts to Avis Europe PLC.

In response to *the Company's Cure Objection*, the Debtors, with BRACII as the

primary plaintiff, filed a Complaint on July 9, 2003 in an adversary proceeding in the

Bankruptcy Court, seeking an order compelling the Company to turn over amounts it

allegedly owed BRACII under the IPLA and overruling *the Company's Cure Objection*

(D.I. 1).  The Company, under Mr. Jaeban's direction retained the Delaware law firm of

Morris, Nichols Arsht & Tunnell and on August 22, 2003, filed its *Answer, Affirmative*

*Defenses and Counterclaims* (D.I. 6) denying that it owed any money to BRACII and asserting a counterclaim for the U.S. $4.5 million it was owed by BRACII. On September 29, 2003, BRACII served its *Joint First Request for Production of Documents to Jaeban (U.K.) Limited* (D.I. 11) (the "First Request for Production").

The Company retained one of the preeminent law firms in Birmingham, England, Wragge & Co., and the international accounting firm of Pricewaterhouse Coopers, to review the many boxes and cabinets of the Company's files in order to respond to the *First Request For Production*. Among the files that Wragge & Co. and Pricewaterhouse Coopers reviewed were what later in the litigation came to be known as the "Welcome House documents", approximately 83 boxes of documents located at the Company's former business location known as Welcome House. *Ibrahiem Jaeban's Response to BRACII's Motion for Further Sanctions and Other Relief,* (D.I. 57) *Ex. B*, paragraph 4 *(Affidavit of Ibrahiem Jaeban)* (the "First Jaeban Affidavit"). Wragge & Co. and Price Waterhouse Coopers had carefully reviewed the many files and identified documents for production from Welcome House and other files of the Company. Eleven large lever arch files[2] were produced by the Company to BRACII in October, 2003. Id. Unfortunately, the Company did not have the necessary funds for its continued operations and the Company was placed into Administrative Receivership by an order of the English Court dated October 20, 2003 (the "Administration Order").

Upon the entry of the Administration Order and the appointment of an Administrative Receiver to wind up the Company's affairs, Mr. Jaeban lost his ability to control any of the Company's positions or actions in the course in this litigation. *Ibrahiem Jaeban's Motion for Reconsideration of January 13, 2005 Order*, *Ex. C.*,

---

[2] Lever arch files are six inch hand-bound notebooks filled with documents.

paragraph 4, *(Second Affidavit of Ibrahiem Jaeban)* (the "Second Jaeban Affidavit"). As

of October 20, 2003, only the Receiver could provide direction and funding for the

Company's litigation effort and its Delaware attorneys.

The Administrative Receiver, whose primary duty under English law ran to the

Jaeban U.K. creditor that petitioned to have the Company placed in receivership[3], refused

to commit time or resources to the claims against BRACII. On November 26, 2003,

BRACII, after receiving the Company's documents in response to the *First Request for*

*Production*, served its *Joint Second Request for Production of Documents* (D.I. 16).

Prior to their withdrawal as counsel, Morris Nichols Arsht & Tunnell served *Jaeban*

*(U.K.) Limited's Responses to the Joint Second Request for Production of Documents* on

December 30, 2003 (D.I. 20). On that date, the Company also filed its *First Request for*

*Production of Documents* directed to BRACII. (D.I. 21).

The Company's Administrative Receiver is responsible for two important sources

of contention in these proceedings: (1) The Administrative Receiver refused until

August, 2004, to produce the Company's documents in response to BRACII's *Second*

*Joint Request for Production of Documents Directed to the Receiver*; and (2) the

Receiver refused to cooperate with the Company's attorneys, Wragge & Co. and Morris,

Nichols, Arsht & Tunnel with regard to the adversary proceeding below. *Response to*

*Motion for Sanctions, Exhibit A*, paragraph 1-9, *(Affidavit of Robert Wilcox)* ("Wilcox

Affidavit"); *Second Jaeban Affidavit*, paragraphs 3 & 4. This inaction on the part of the

Receiver caused Morris, Nichols, Arsht & Tunnel to withdraw from the case and is the

chief reason that BRAC filed its *First Motion to Strike the Counter-Claims of Jaeban*

*U.K.* See *Defendant's Response to Plaintiff's Motion to Strike Defendant's*

---

[3] Insolvency Act 1986.

*Counterclaims Due to Defendant's Refusal to Participate in This Proceeding, Ex. A,*
pages 1-5 (D.I. 30).

Because of the Administrative Receiver's recalcitrance and failure to participate
in the U.S. Bankruptcy Court, Morris Nichols Arsht & Tunnell sought leave to withdraw
as counsel for the Company, which leave the Court granted by Order dated January 12,
2004. As a result, the Company was without counsel in this proceeding after January 12,
2004 and has been without such counsel at all times since.

While the Company was without counsel, on February 3, 2004, BRACII filed its
*Motion to Strike Defendant's Counterclaims due to Defendant's Refusal to Participate in
this Proceeding* (D.I. 27) (the "Motion to Strike"). BRACII alleged in that motion that
the US$4.5 million in sale proceeds were being "held hostage by misconduct of
Defendant Jaeban U.K. Limited…in failing to obtain Delaware counsel, comply with the
Court's scheduling order, or advance this proceeding." *Motion to Strike*, page 1.

Because of his frustration with the inaction of the Administrative Receiver and his
belief that the Administrative Receiver's policies made it impossible for the Company to
effectively prosecute its claims, Mr. Jaeban negotiated with the Administrative Receiver
for an assignment of the Company's claims. *Second Jaeban Affidavit*, paragraph 4. On
February 19, 2004, Mr. Jaeban retained the Delaware law firm of Werb & Sullivan to act
on his behalf in connection with the contemplated assignment of claims, and on February
20, 2004, Mr. Jaeban and the Administrative Receiver executed a Deed of Assignment.
Id. Mr. Jaeban, who had directed the Company's proper participation in the proceeding
prior to the October 20, 2003 Order, directed Werb & Sullivan to prepare a defense to
BRACII's *Motion to Strike*. Id.

On March 1, 2004, Mr. Jaeban first appeared in the proceeding. Mr. Jaeban, as Assignee of Jaeban U.K., filed the *Response to Plaintiff's Motion to Strike*. (D.I. 30). On March 5, 2004, BRACII filed *Plaintiff's Reply In Support of it's Motion to Strike* (D.I. 31). The Bankruptcy Court held a hearing on the *Motion to Strike* and on May 25, 2004, it issued its *Memorandum Opinion* (the "May 25, 2004 Order") which, inter alia, declined to strike the counterclaims, upheld the validity of the assignment of claims to Mr. Jaeban, and set a schedule with regard to discovery (D.I. 32).[4]  In its *May 25, 2004 Order* the Bankruptcy Court imposed three requirements on Mr. Jaeban to be satisfied by June 18, 2004. Pursuant to the *May 25, 2004* Order, Mr. Jaeban was directed to:

1.      Provide documents in response to Plaintiff's Second Request for Production of Documents (served on November 18, 2004);

2.      Respond to concerns raised by Plaintiffs in a letter dated December 12, 2003, regarding apparent gaps in the Company's November production of documents.

3.      Schedule depositions of the Company's personnel and its Administrative Receiver. See May 25 Order, p.16. On June 8, 2004, BRACII filed its *Motion for Partial Reconsideration Based on Controlling English Decision*, (D.I. 33) requesting that the Bankruptcy Court reverse its prior ruling on the validity of the assignment to Mr. Jaeban. On June 25, 2004, Mr. Jaeban filed his *Objection to BRACII's Motion for Reconsideration Based on Controlling English Decisions* (D.I. 35).  After hearing oral argument from both sides, the Bankruptcy Court denied BRACII's request for reconsideration.

On July 19, 2004, BRACII filed its *Amended Complaint,* ( D.I. 40) which re-alleged its turnover claims against the Company and asserted a claim against Mr. Jaeban

---

[4] Mr. Jaeban's compliance with the requirements of the May 25, 2004 Order will be discussed at length herein.

individually, alleging that he had guaranteed certain debts of the Company.    On July 23,

2004, Mr. Jaeban filed his *Answer and Affirmative Defenses to Amended Complaint and*

*Amended Counterclaims of Ibrahiem Jaeban,* once again asserting claims against

BRACII  (D.I. 42).  BRACII answered the counterclaims on July 30, 2004  (D.I. 43).

Pursuant to the *May 25, 2004* Order, Mr. Jaeban and BRACII had a series of

approximately ten depositions to begin in Birmingham and London, England, on August

4, 2004.  Robert D. Wilcox of the firm of Werb & Sullivan traveled to England in his

capacity as counsel for Mr. Jaeban. Because of discovery disputes that arose in England,

BRACII cancelled the depositions.  Only Mr. Jaeban's deposition was begun, and even it

was not completed.

On August 23, 2004, Mr. Jaeban filed his *Motion to Extend Deadlines in Revised*

*Pre-trial Scheduling Order* (D.I. 47). On August 27, 2004 BRACII filed its *Motion for*

*Further Sanctions* (D.I.  50) (the "Motion for Sanctions") and Mr. Jaeban filed his

*Motion for Order Reopening Limited Discovery* (D.I. 51).  On September 14, 2004,

BRACII filed *BRAC Group's Objection to Mr. Jaeban's Motion for Order Reopening*

*Limited Discovery* (D.I. 56), and Mr. Jaeban filed *Ibrahiem Jaeban's Response to*

*BRACII's Motion for Further Sanctions and Other Relief* (D.I. 57).

The Bankruptcy Court conducted a hearing on the multiple discovery motions on

September 16, 2004 in Phoenix, Arizona.  On December 16, 2004, the Bankruptcy Court

entered its *Memorandum Opinion* which provided for the dismissal with Mr. Jaeban's

Counter-Claims (D.I. 73) (the "Sanctions Opinion"). On January 13, 2005, the

Bankruptcy Court entered an Order enforcing its December 16, 2004 *Memorandum Opinion*.[5] The January 13, 2005 Order is the subject of this appeal.    .

On January 24, 2005, Mr. Jaeban filed his *Motion for Reconsideration of January 13, 2005 Order and Memorandum Opinion in Support Thereof* (D.I. 78) (the "Motion for Reconsideration").   On March 9, 2005, the Court issued its *Memorandum Opinion and Order* which denied Mr. Jaeban's *Motion for Reconsideration* and which is also the subject of this appeal.

## VI. SUMMARY OF ARGUMENT

The Bankruptcy Court below made a number of reversible errors in dismissing Mr. Jaeban's claims. First, the Bankruptcy Court erred by entering sanctions after ignoring the undisputed fact that the record demonstrates Mr. Jaeban produced the Welcome House and Receiver's documents and otherwise complied with his discovery obligations.

Second, the Bankruptcy Court failed to either discuss or acknowledge the applicability of Fed. R. Civ. P. 37 to BRACII's discovery sanctions motion despite its undoubted application.

Third, and perhaps most importantly, the Bankruptcy Court dismissed Mr. Jaeban's claims as a sanction even though it did not determine that he acted in bad faith.

Fourth, the Bankruptcy Court dismissed Mr. Jaeban's claim without conducting a factual inquiry as to whether and how BRACII was prejudiced as a result of the alleged non-compliance.

---

[5] The Bankruptcy Court mistakenly carried its date of May 25, 2004 from its prior Opinion on its next Opinion issued on December 16, 2004.

Fifth, the Bankruptcy Court failed to distinguish between a previous motion against the Company and the sanctions motion filed against Mr. Jaeban. The Bankruptcy Court erred in repeatedly stating that BRACII's previous punitive motion was directed to "Mr. Jaeban", when it is a matter of court record that that motion was filed and argued at a time when Mr. Jaeban was not even a party to the action.

Sixth, having sought evidence as to Mr. Jaeban's actions, the Bankruptcy Court erred in not considering the crucial evidence contained in the affidavits attached to Mr. Jaeban's *Motion for Reconsideration*.

Finally, the Bankruptcy Court failed to recognize and apply established and binding Third Circuit Court of Appeals precedent regarding the standards for imposition of sanctions in the discovery context.

## VII. <u>ARGUMENT</u>

### A.    THE BANKRUPTCY COURT'S REVERSIBLE ERRORS

Appellant respectfully submits that the Bankruptcy Court below committed a number of reversible errors with regard to Mr. Jaeban's Compliance with the *May 25, 2004 Order*.

The record on appeal demonstrates that Mr. Jaeban fully complied with the June 18, 2004 deadline in the *May 25, 2004 Order*, and did so in a manner acceptable to BRACII as of that date. Even if he only substantially complied, the Bankruptcy Court committed error and abused its discretion by striking all of Mr. Jaeban's claims - the most severe possible sanction.

Even if the Bankruptcy Court was correct in entering some form of sanction, it failed to follow the directive of the Third Circuit Court of Appeals as enunciated in

12

<u>Poulis</u>, to enter a narrowly tailored and less restrictive appropriate sanction, instead of dismissing of all of Mr. Jaeban's claims. The Bankruptcy Court's *Sanctions Opinion* contains no finding of prejudice to BRACII, and the Bankruptcy Court erred in applying an incorrect legal standard in evaluating the "meritoriousness" of Mr. Jaeban's claim as required by <u>Poulis</u>.

Again, the Bankruptcy Court ignored the fact that Mr. Jaeban <u>did produce</u> the Welcome House documents and the Administrative Receiver's documents and committed error in clearly not comprehending the important fact that Mr. Jaeban's turnover in August, 2004 of the Welcome House boxes was not the first disclosure of the Welcome House documents.

### 1. Mr. Jaeban's Compliance with the First Requirement of the *May 25, 2004 Order*

As set forth above, Mr. Jaeban was instructed in the *May 25, 2004 Order* to provide responses to BRACII's *Second Joint Request for Production*. That request sought documents in the possession of the Company's Administrative Receiver. It is an undisputed fact that relevant documents were reviewed for disclosure, and where appropriate disclosed and delivered to BRACII on November 19, 2003. As such, Mr. Jaeban complied with the first requirement of the *May 25, 2004 Order*.

Mr. Jaeban did not simply delegate the responsibility for that compliance to his attorneys, and consulted with them extensively prior to June 18, 2004. *Second Jaeban Affidavit*, paragraphs 5-18. The record shows that Mr. Jaeban called Wragge & Co. on Wednesday June 9, 2004 because he was concerned about the nearness of the June 18 deadline and wanted to ensure that all documents were produced. <u>Id</u>., paragraph 6. As a result of Mr. Jaeban's instructions, two lawyers from Wragge & Co. spent two days re-

reviewing the Company's documents in order to identify whether there were any responsive documents. *Motion for Reconsideration,* Exhibit D, *Affidavit of Steven Allen* ("Allen Affidavit"), paragraph 13. One of those attorneys also spoke to the Administrative Receiver's representative, on or about June 9, 2004 to obtain access to the Receiver's documents. Id., paragraph 14.

On Thursday June 10, 2004, Mr. Jaeban attended a meeting with his English lawyers to review the status of the discovery. *Second Jaeban Affidavit*, paragraph 8. He also personally called Werb & Sullivan to discuss the matter. Id., paragraph 7.

On that same date, Mr. Jaeban called Mr. Mick O'Connor, the Receiver's representative, following the Wragge & Co. meeting. Mr. O'Connor informed Mr. Jaeban that the only documents held by the Receiver were either determined to be non-responsive or privileged documents, and that the bulk of the Jaeban UK papers were held at Welcome House. Id., paragraph 9.

On Monday June 14, 2004, Mr. Jaeban contacted his English Attorney Steven Allen, of Wragge & Co., and agreed to attend a further meeting on June 15, 2004. Id., paragraph 10. On June 15, 2004, Mr. Jaeban went to Wragge & Co.'s offices and met for three hours with his attorneys to discuss a Supplemental Schedule of Documents[6] and the responses to the December 12, 2003 letter. Id., paragraphs 11 and 13. Mr. Jaeban's lawyers were confident that they could meet the June 18, 2004 deadline for compliance. Id. On June 18, 2004, acting on Mr. Jaeban's instructions, his English Attorney Emma Carr contacted Mr. O'Connor of the Receiver's office again. *Allen Affidavit*, paragraph 17.

---

[6] That Supplemental Schedule of Documents, in the form provided to BRACII and with specific headings corresponding to those in the December 12, 2003 letter, is attached as Exhibit 1 to Mr. Jaeban's Affidavit.

Mr. Jaeban provided BRACII with a "Supplemental Schedule of Documents" on June 18, 2004. Brian A. Sullivan, Esquire (one of Mr. Jaeban's undersigned Delaware attorneys), also called BRACII's counsel, Kenneth Wile, Esquire, to discuss the issues in the December 12, 2003 letter. *Motion for Reconsideration*, Exhibit E, *Affidavit of Brian A. Sullivan* ("Sullivan Affidavit"), paragraphs 3 and 4.

These actions show why Mr. Jaeban reasonably believed, and believes today, that he did comply with the first requirement of the *May 25, 2004 Order*. These actions also show why the Bankruptcy Court erred and abused its discretion in sanctioning Mr. Jaeban's claim for his alleged failure to comply with the *May 25, 2004 Order*.

The Bankruptcy Court also erred by refusing to accept and acknowledge the fact that Mr. Jaeban could not possibly produce the Receiver's documents until after he and his attorneys' were able to obtain those documents from the Receiver.   Further, the Bankruptcy Court committed error by ignoring the following facts:

> (1)     BRACII never subpoenaed the documents from the Receiver;
>
> (2)     BRACII never filed a Motion to Compel Production of Documents from Mr. Jaeban, (even though it was directed to do so by the Bankruptcy Court)[7];
>
> (3)     BRACII itself produced important and significant documents late and on the eve of depositions in England and used by BRACII in the deposition process;

---

[7] The following colloquy took place between BRACII and the Bankruptcy Court at the Hearing on January 12, 2004:

> "   MR. WILE: Your Honor, if I may return to discovery for just one second.   Should we proceed by a Motion to Compel at this point with respect to documents and deposition dates?
>
>     THE COURT: It seems to me yes that one of two things will happen: Either the documents and the depositions will take place or you will be able to ask for a sanction that would render that not necessary. But you can only do that, I think, get that kind of a sanction in the context of a −of  a Motion to Compel as opposed to −or in the context of disobeying an Order to compel, frankly.  So you should proceed on that same basis." (emphasis added)

*Transcript of January 12, 2004 Hearing Before The Honorable Charles G. Case, p. 37-38 (Main Bankruptcy Case 02-12152 (MFW) D.I. 3795).*

15

(4) BRACII's production itself is lacking in a number of significant respects.

Lastly, the Bankruptcy Court makes a number of references in its Opinion that Mr. Jaeban was "under a microscope". *Sanctions Opinion*, p. 5. The Bankruptcy Court did not so inform Mr. Jaeban in its Order of May 25, 2004. Further, the Bankruptcy Court complains that Mr. Jaeban's attorneys did not inform the Court of the parties' apparent difficulties regarding discovery production. Id., p. 6. Again, the Bankruptcy Court did not make such a directive in its Order of May 25, 2004. The record on appeal shows parties had made a number of efforts between themselves and it appeared to Mr. Jaeban at the time that the parties were being cooperative with regard to the discovery process prior to BRACII derailing the depositions in England in August, 2004, several months after the June 18, 2004 deadline initially imposed by the Court in its Order of May 25, 2004.

In its *Memorandum Decision and Order* which denied Mr. Jaeban's Motion for Reconsideration, the Court stated that:

> The sanctions were imposed for Mr. Jaeban's overall carelessness in not only complying with this Court's instructions but also in failing to keep BRACII and this Court apprised of what he was in fact doing in a good faith attempt to comply. The record reflects that Mr. Jaeban failed to take seriously this Court's earlier warnings and elected, instead, to perhaps do as little as possible and blame his lack of diligence on Jaeban UK or the Receiver's representatives. *Memorandum Decision and Order,* Page 5.

Clearly, Mr. Jaeban was not "careless", much less acting in bad faith. Further, the Court erred because the record shows that Mr. Jaeban did keep BRACII carefully informed of his efforts to comply with the discovery rules, and did so in a manner

16

substantially similar to BRACII's own rolling production of documents. Here the Court

ignores (1) BRACII's cancellation of the depositions (without Court approval and in

violation of the Court's May 25, 2004 Order), and (2) ignored BRACII's late disclosure

of crucial documents on the eve of depositions (the Court in effect ignored BRACII's

violation of the *May 25, 2004 Order*). Further, in its Opinion the Bankruptcy Court is

clearly mistaken when it states:

> Further, the fact remains that Mr. Jaeban and Mr. Wilcox did not seem to
> seriously attempt contact with the Receiver until after the Court's June 18th
> discovery response deadline. Serious effort should have been done before the
> deadline. And, once it was done, documents were in fact turned over, a fact
> that significantly diminishes Mr. Jaeban's argument that he had no control
> over getting some of these documents. Apparently all it took was an email.
> *Sanctions Opinion, p.5.*

How the Bankruptcy Court could have mistakenly accepted BRACII's allegation

that "all it took was an email" is difficult to comprehend in light of the numerous steps

taken by Mr. Jaeban and the aggressive position taken by the Administrative Receiver. In

fact, serious efforts were taken by Mr. Jaeban before the deadline which are facts that the

Bankruptcy Court seems to have completely ignored.

Further, the Bankruptcy Court stated on page 5 of the *Sanctions Opinion*,

"Moreover, the documents ultimately disclosed, according to BRACII, were highly

relevant and necessitated additional discovery that should have occurred months earlier",

which is also a serious mistake. The Court ignored the acknowledgement by BRACII

itself that most of the supplemental disclosure had already been previously produced.

This is not true, however, with regard to the significant documents produced late by

BRACII on the eve of depositions, one of which was used by BRACII in the deposition

process.

17

Furthermore, the Bankruptcy Court made additional errors in its *Sanctions Opinion*, which originally struck Mr. Jaeban's claims. The Bankruptcy Court stated in the *Sanctions Opinion* that "these documents were not then actually produced until late August to BRACII", referring to the Welcome House documents. *Sanctions Opinion*, p. 4. The Bankruptcy Court ignored and refused to accept the clear evidence that these documents had been previously reviewed and responsive documents already produced. In fact, this was in effect a "re-disclosure" in an effort by Mr. Jaeban to continue the depositions which were ultimately unilaterally cancelled by BRACII. *Jaeban Affidavit*, paragraph 15. The Bankruptcy Court's ruling is incorrectly based on the premise that this was the first time these Welcome House documents had been disclosed to BRACII. The Bankruptcy Court also ignored the only reason that Mr. Jaeban decided to subsequently totally turn over to BRACII all of the Welcome House boxes of files was in a effort to save and continue the deposition process – crucial facts which were ignored by the Bankruptcy Court.

In footnote 2 on page 4 of the *Sanctions Opinion*, the Bankruptcy Court states, "If Mr. Jaeban were truly acting with an abundance of caution by turning these materials over, why did he not turn them over within the Court ordered timeline to avoid any potential discovery-related dispute with respect to them?" The Bankruptcy Court ignored the answer which was clearly explained in the record: because BRACII threatened and, in fact, did cancel the depositions while Mr. Jaeban's U. S. attorney was already in England for the depositions which were difficult, time consuming, and expensive to schedule.

Additionally, the Bankruptcy Court states also on page 4 of the *Sanctions Opinion*

that "the Defendants here faced the guillotine once previously for failing to follow Court orders on a number of issues." The Bankruptcy Court ignores, however, that it was <u>the</u> <u>Company</u> which was then under the control of the Administrative Receiver who for one limited period of time chose for financial reasons not to further fund the litigation in the U. S. proceedings. In fact, the Bankruptcy Court on page 5 of the *Sanctions Opinion* acknowledges that the failure to respond at that limited time was a result of the Administrative Receiver in England, over which Mr. Jaeban and Jaeban U.K. had no control.

Even more surprisingly, the Court ruled on page 5 of the *Sanctions Opinion* that it lacked Mr. Jaeban's record of what actions he took with respect to the Receiver and when. The Bankruptcy Court states that Mr. Jaeban did not keep the Bankruptcy Court informed of his actions (it is mistaken that Mr. Jaeban did not keep BRACII informed), especially when the *May 25, 2004* Order did not direct Mr. Jaeban to keep the Court informed—something, which he would have been happy to do and which would not have been difficult to accomplish.

### a. The Wasted Trip to England

There can be no doubt from the record that Mr. Jaeban complied with the requirement that he "schedule depositions of any Jaeban U.K. Limited personnel and its receiver". *May 25, 2004 Order,* p. 16. By agreement of the parties those depositions and the depositions of former BRACII personnel were set to begin in England on August 4, 2004. In England, BRACII's counsel raised the issue of the Receiver's documents with Mr. Jaeban's US Attorney, Robert Wilcox and English Counsel, Steven D. Allen. *Allen Affidavit*, paragraph 22; *Mr. Jaeban's Response to BRACII's Motion for Additional*

19

*Sanctions, Wilcox Affidavit*, paragraph 4. Neither Mr. Jaeban, Mr. Wilcox, nor Mr. Allen had been able to obtain access to the Receiver's documents. Id.

Mr. Wilcox then sought to resolve the issue with Mr. Wile by agreeing that Mr. Wilcox would once again seek access to the Receiver's documents. *Allen Affidavit*, paragraph 22. The agreed-upon approach to the Receiver was that Mr. Wilcox would in effect intercede between the Receiver and BRACII and undertake a review of the papers in order to determine whether the papers were responsive Id. If the Receiver would consent to such a review, it was agreed between Mr. Wilcox and Mr. Wile that Mr. Wilcox's inspection of the documents would not amount to a waiver of the Receiver's attorney client privilege with his English counsel Id.

On August 6, 2004 Mr. Jaeban directed Mr. Allen to again try to facilitate BRACII's access to the Receiver's documents. Mr. Allen (who by this time was with Mills & Reeve and representing Mr. Jaeban in place of Wragge & Co.) sent an e-mail to the Receiver's counsel at Wragge & Co. to once again demand access to the Receiver's documents and invoking paragraph 4 of the Deed of Assignment. Id., paragraph 25. The Receiver's counsel responded on August 6, 2004 by inquiring as to who was going to pay the Receiver's fees and costs of the Receiver's privilege review and the production. Id., paragraph 26. Despite the pendency of the Objections, Mr. Jaeban instructed Mills & Reeve to find out the costs of paying Wragge & Co. to undertake the review process on behalf of the Receiver. Id., paragraph 26. Wragge & Co advised that the cost would be £4000 plus VAT (about US $8,000.). The issue was resolved when Mr. Jaeban acceded to the Receiver's solicitors request for £4000 plus VAT to conduct the review, even though that fee appeared excessive. Id., paragraph 27.

The Bankruptcy Court is clearly incorrect on page 6 of its *Sanctions Opinion* when it states that Mr. Jaeban did not contact the Receiver until August 4th. The fact is Mr. Jaeban did everything but file a lawsuit against the Receiver, and ultimately prevailed over the Receiver who finally produced his documents.

### 2. The Court committed error with regard to Mr. Jaeban's Compliance with the Second Requirement of the May 25, 2004 Order

The *May 25, 2004 Order* also directed Mr. Jaeban to respond to BRACII's letter of December 12, 2003. The Bankruptcy Court was incorrect when it stated in its *Sanctions Opinion* that BRACII's renewed Motion "*stems from Mr. Jaeban's failure to comply with the Court's May 25, 2004 Memorandum Opinion...requiring Mr. Jaeban to respond by June 18, to BRACII's second document request and explain various gaps in his November responses to BRACII's document request". (Sanctions Opinion* p. 3*)*

In fact Mr. Jaeban did respond and address the issues in the December 12, 2003 letter on June 18, 2004. After Wragge and Co. had provided to Mr. Sullivan an e-mail dated June 17, 2004 which addressed line by line each of the queries raised by Mr. Wile in his letter of December 12, 2003, Mr. Sullivan had a conference with Mr. Wile on June 18, 2004. See *Motion for Reconsideration, Affidavit of Brian Sullivan*, paragraph 3.

Mr. Sullivan explained Mr. Jaeban's response to that letter on a detailed and line-by-line basis. Id. BRACII's Counsel was satisfied with the explanations and awaited the supplemental production of documents. Id. The actual documents were shipped to Counsel by Wragge and Co., which was agreeable to Counsel. Id. at paragraph 4. Accordingly, Mr. Jaeban complied with the June 18, 2004 deadline with regard to the issues in the December 12, 2003 letter.

### 3. The Court committed error with regard to Mr. Jaeban's Compliance with the Third Requirement of the May 25, 2004 Order

In compliance with the May 25, 2004 Order, the parties agreed to conduct depositions, which were scheduled in England for August, 2004. Mr. Jaeban and his attorneys went to significant expense and spent a great deal of time obtaining witnesses and scheduling approximately seven depositions to be conducted in the span of one week in early August, 2004. Robert D. Wilcox of the firm of Werb & Sullivan traveled to England in his capacity as counsel for Mr. Jaeban to participate in the depositions, which were subsequently cancelled by BRACII after just one day. As such, Mr. Jaeban complied with the third requirement of the May 25, 2004 Order.

**4. The Drastic Sanctions taken by the Bankruptcy Court were inappropriate**

Very importantly, the Bankruptcy Court itself acknowledges on page 7 in Section 2 of the *Sanctions Opinion* that "perhaps a new set of sanctions could be tailored to the same in the current context." The Bankruptcy Court, however, neglected its obligation under Poulis and instead levied the most severe sanctions possible.

The United States Court of Appeals for the Third Circuit has stated that "dismissal is a drastic sanction and should be reserved for those cases where there is a clear record of delay or contumacious conduct by the [party whose claim is subject to being dismissed]. Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 342 (3d. Cir. 1982). Because it deprives a litigant of his opportunity to present his case on its merits, the Court of Appeals has emphasized "the extreme nature of a dismissal with prejudice or a default judgment." Poulis, supra; Burns v. MacMeekin (In re MacMeekin), 722 F.2d 32, 35 (3d. Cir. 1983).

Federal Rule of Civil Procedure 37, ("Rule 37") entitled "Failure to Make Disclosure or Cooperate in Discovery; Sanctions" "authorizes various levels of

sanctions." <u>Hamilton v. Everett Company, Inc.</u>, 104 F.R.D. 106, 111 (W.D. Pa. 1985).

Rule 37(a) contemplates the filing of a motion for order compelling disclosure if it is not

forthcoming.  The docket reflects that BRACII never filed a motion to compel, despite

being specifically instructed to so by the Bankruptcy Court in connection with its

complaints about the Company  *Transcript of January 12, 2004 Hearing, p. 38* (No D.I.

#).

Rule 37 "authorizes court to impose a variety of sanctions for failure to obey

discovery orders…" <u>Burns,</u> 772 F.2d at 34.  This District Court has opined previously

that dismissal was not appropriate in a case where the "alternative of a strict compliance

deadline and monetary sanctions have not yet been imposed on [a party]." <u>Haraway v.</u>

<u>National Association of Stock Car Racing, Inc.</u>, 213 F.R.D. 161, 165 (D. Del. 2003)

(Plaintiff's failure to appear for his deposition and failure to obtain counsel for several

years did not justify dismissal under Fed. R. Civ. P. 41.)

Appellant submits that Rule 37 creates a set of procedures and a hierarchy of

increasingly severe sanctions available to the trial court to enforce its decisions, orders,

and the applicable rules of discovery.  This hierarchy is reflected in the structure of Rule

37(b)(2), which authorizes the Court to "make such orders in regard to the failure as are

just and among others the following:

> (A) An order that the matters regarding which the order was made or any other
> designated facts shall be taken to be established for the purposes of the action
> in accordance with the claim of the party obtaining the order;
> (B) An order refusing to allow the disobedient party to support or oppose the
> designated claims or defenses, or prohibiting that party from introducing
> designated matters in evidence;
> (C) An order striking out pleadings or parts thereof, or staying further
> proceedings until the order is obeyed, or dismissing the action or proceeding
> or any part thereof, or rendering a judgment by default against the disobedient
> party…

Nowhere in the Bankruptcy Court's *Sanctions Opinion* is there any recognition of, analysis of, or even <u>mention of</u>, the mandate of Rule 37. Appellant contends that the Bankruptcy Court ignored the requirements of Rule 37 altogether, especially given the Court of Appeals direction that "the consideration of alternative sanctions be made and set forth on the record." <u>Madesky v. Campbell,</u> 705 F.2d 703 (3d. Cir. 1983).

**5. The Bankruptcy Court's Own Words Show Its Error**

The Court of Appeals has instructed that "[t]he moving party seeking dismissal as a sanction has the burden of creating a record showing the appropriateness of this ultimate sanction and the [trial] court on that issue has the responsibility of making a determination on that issue…" <u>Anchorage Associates v. Virgin Islands Board of Tax Review</u>, 922 F.2d 168, 177 (3d. Cir. 1990). The Court of Appeals has also emphasized the need to have a "well-developed" record on appeal. <u>Farnese,</u> 687 F. at 765 ("If we are to carry out our appellate function…it is important to know why the district court thought that failure amounted to bad faith").

In contrast, the record in this case shows the Bankruptcy Court misstated the docket record in its *Sanctions Opinion* in several crucial ways. The *Sanctions Opinion* states:

> [t]he June 18 deadline was established, for lack of a better term, as a "second chance" for Mr. Jaeban to comply with BRACII's discovery requests, actively participate in the case and respond to BRACII's [first] motion for sanctions against Mr. Jaeban for "failing to obtain Delaware counsel, comply with the Courts scheduling order, or advance" the proceeding. The sanction BRACII sought in its original motion was dismissal of Mr. Jaeban's answer, affirmative defenses, and counterclaims.

*Sanctions Opinion,* p.5 (Bracketing and emphasis added).

These words of the Bankruptcy Court demonstrate "clear error" because the excerpt contains crucial factual errors which undoubtedly underlie the *Sanctions Opinion*.

First, the June 18 deadline to which the Bankruptcy Court referred is part of its *May 25, 2004 Order*. As of that date there had never been a motion for sanctions against Mr. Jaeban- the only motions seeking sanctions was *Plaintiff's Motion to Strike Defendant's Counterclaims Due to Defendant's Refusal to Participate in the Proceedings* (D.I. 27), which was filed before Mr. Jaeban appeared in the litigation. The *Motion to Strike* was directed against the Company during the period of the Administrative Receiver's control. The *Motion to Strike* did not accuse Mr. Jaeban of "failing to obtain Delaware counsel…" because he was not a party at the time. Further, the *Motion to Strike* did not seek "dismissal of Mr. Jaeban's answers, affirmative defenses, and counterclaims", again because that motion predated Mr. Jaeban's appearance. At the time it handed down the *Sanctions Opinion*, the Bankruptcy Court was clearly operating under the mistaken belief that the previous *Motion to Strike* was directed against Mr. Jaeban, when it was in fact directed to the Company. The Bankruptcy Court's consistent misinterpretation of facts that were part of the official court docket, and its mistaken adherence to those "facts", are an abuse of its discretion. See Manus, 188 F.3d at 122-23. This Court need only take judicial notice of the docket entries and the date on which Mr. Jaeban first appeared in the proceeding (March 1, 2004) to understand the need for a reversal of the Bankruptcy Court's *Sanctions Order*.

These errors form the conceptual framework for the Bankruptcy Courts' finding of a "history of dilatoriness" and his "personal responsibility". As the Court of Appeals has stated in the context of its review of a sanctions order, "[f]indings that are not based on evidence of record do not provide a proper basis for the trial court to exercise its discretion." Farnese, 687 F.2d at 765.

**6. The Bankruptcy Court failed to address BRACII's lack of cooperation in the discovery process**

Further, it is perplexing that Mr. Jaeban's alleged failure to produce documents which were objected to by Mr. Jaeban has resulted in his counterclaims being dismissed, whereas absolutely no sanction was applied by the Bankruptcy Court to BRACII where its own document production was questionable. The entirety of BRACII's disclosure consists of three lever arch files which consist of documents of little or no assistance in answering or responding to the detailed requests submitted by the Company.[8] In fact, of the 25 requests for documents made by the Company, BRACII objected to 24 of them. The Bankruptcy Court also disregarded that BRACII itself disclosed supplemental documents on August 2, 2004 (well after the June 18, 2004 deadline imposed by the Bankruptcy Court in its *May 25, 2004 Order*), none of which had previously been disclosed to the Company or Mr. Jaeban.

**7. The Bankruptcy Court Should Have Considered the Affidavits Attached to Mr. Jaeban's Motion for Reconsideration**

The Bankruptcy Court expressed an interest at the September 16, 2004 hearing in knowing what steps Mr. Jaeban took to comply with the *May 25, 2004 Order*.   During that oral argument, the Bankruptcy Court wanted to be informed of the timing of what was done by Mr. Jaeban vis-à-vis the Receiver in order to obtain the Receiver's documents. *Transcript of September 21, 2004 Hearing, p. 24* (D.I. # 77). This hearing was held in Phoenix, Arizona on an expedited basis at the request of BRACII and at the end of Judge Case's visiting tenure in Delaware.  The question of Mr. Jaeban's actions was placed to Mr. Jaeban's English attorney, Steven Allen, who along with BRACII's

---

[8] As opposed to the original 11 lever arch files, the supplemental lever arch files and the 85 Welcome House boxes produced by Jaeban.

English counsel was participating at the hearing by telephone, and who had been involved in Mr. Jaeban's efforts to comply. Unfortunately, the transcript shows the connection between the Phoenix Bankruptcy Court and England was not a good one, and the Court and Mr. Allen could not effectively communicate with each other. Id. at 28-31. Further, the Court stated in its *Sanctions Opinion* "the Court also finds lacking Mr. Jaeban's record of what actions he took with respect to the Receiver, and when." Id. at 5.

In an effort to address the Bankruptcy Court's concerns in this regard before the Bankruptcy Court, Mr. Jaeban set forth in detail in an affidavit the steps that he, his attorneys, and others took to comply with the discovery scheduling provisions of the Bankruptcy Court's Order of May 25, 2004. See *Motion for Reconsideration,* Exhibit C. The Bankruptcy Court ruled, however, in its March 4, 2005 *Memorandum Decision and Order*, that "Last, the Court agrees with BRACII that Mr. Jaeban's attempts to bolster his earlier arguments with new affidavits is not permitted on reconsideration. Motions for reconsideration are not meant to allow the disappointed party a second bite at the apple." Id. at 6.

In his *Reply Memorandum of Ibrahiem Jaeban in Support of Motion for Reconsideration* (D.I. 81), Mr. Jaeban explained to the Bankruptcy Court why it should have considered the affidavits attached to the Motion. See pages 3-4. Mr. Jaeban pointed this out to the Bankruptcy Court in the Max's Seafood Café decision, which held that:

> Although we have pointed out that "[courts] often take a dim view of issues raised for the first time in post-judgment motions," *Kiewit E. Co., Inc. v. L&R Constr. Co., Inc.*, 44 F.3d 1194, 1204 (3d Cir. 1995), in this case the issue that Jack-Mack sought to raise as a defense in its motion for reconsideration was so fundamental, i.e., that Jack-Mack had not come into being until more than six months after the last of Miraglia's contumacious acts, that it was not consistent with the wise exercise of discretion for the District Court to have declined even to consider it. As

27

we have previously emphasized, reconsideration is the appropriate means
of bringing to the court's attention manifest errors of fact or law.

Max's Seafood Café ex. Rel Lou-Ann v. Quinteros, 176 F.3d 669, 678 (3d. Cir. 1999).

More recently, both Chief Judge Robinson and Bankruptcy Court Judge Walsh in

the Delaware Bankruptcy Court considered and employed affidavits in connection with

orders granting motions for reconsideration. See Proxim, Inc. v. 3COM Corp., et. al.,

C.A. No. 01-155-SLR (2003 U.S. Dist. LEXIS 2556), dated February 21, 2003, and In re

United Artists Theatre Co., et al., Case No. 00-3514 (PJW) (2004 Bankr. LEXIS 1258),

dated August 25, 2004, both attached to Mr. Jaeban's *Motion for Reconsideration* (D.I.

76). In United Artists, a Chapter 11 debtor objected to a proof of claim filed by the

Florida Department of Revenue ("FDOR"). The FDOR filed a response, and at oral

argument represented that the Debtors did not cooperate in providing books and records

to the FDOR during the audit period so that an accurate determination of the tax

deficiency could be made. The Court denied the objection, and the debtor filed a motion

for reconsideration, attaching an affidavit from its director of tax which stated that the

debtor provided the FDOR with full access to the Debtors' books and records, and

produced a letter from a representative of the FDOR that predated the claim objection.

The court considered the affidavit and letter as relevant new evidence showing the United

Artists cooperated with the FDOR. United Artists, at 3.

Like the affidavit Judge Walsh considered in United Artists, BRACII has not

disputed Mr. Jaeban's supplemental affidavits, which are properly employed by Mr.

Jaeban in order to bring the Court's attention to manifest errors of fact. The United

Artists precedent provides more than an ample basis for this Court to consider those

affidavits.

Appellant submits that the Bankruptcy Court erred and should have considered

the affidavits propounded by Mr. Jaeban in support of his *Motion for Reconsideration*.
The Bankruptcy Court stated that it was clearly interested in this important information.
Further, the recitation of facts contained therein provided a complete record for the
Bankruptcy Court in order to make a fully informed and fair decision, which facts the
Bankruptcy Court incorrectly ignored.

### 8.   The Bankruptcy Court's Inexplicable Actions against Mr. Jaeban

Mr. Jaeban respectfully submits that the Bankruptcy Court took the following
number of inexplicable actions against Mr. Jaeban in this case:

1. It entered a partial judgment by default against the Company in February, 2004
when it was in administrative receivership in England and without counsel.

2. Permitted BRACII to file a late filed Motion for Reconsideration, which was
filed beyond the mandatory time deadline for such a Motion to be filed.

3. Allowed BRACII to serve significant production of documents late and on the
eve of depositions in violation of the *May 25, 2004 Order* with no consequences to
BRACII.

4. Dismissed Mr. Jaeban's claims to do to BRACII's *Motion for Sanctions*, when
BRACII failed to hold a single discovery conference or file a single motion to compel.
The Bankruptcy Court had previously directed BRACII to file a motion to compel, which
it failed to do.

5. Dismissed Mr. Jaeban's claims without entering a more narrowly tailored
sanction as required by <u>Poulis</u> and as requested by BRACII in its *Motion for Further
Sanctions*.

6. Ruled that Mr. Jaeban was under a microscope and failed to keep

the Court informed, without having so informed Mr. Jaeban that he was under a microscope or that he should keep the Court informed. The Bankruptcy Court mistakenly ruled that Mr. Jaeban failed to keep BRACII informed of the discovery process, which was a mistake fact.

7. The Bankruptcy Court appears to have used and quoted BRACII's Brief language on a number of occasions when the language was clearly not supported by the facts. One example is the quote that "all it took was an email" with regard to Mr. Jaeban's extreme difficulties in obtaining documents from the English Administrative Receiver.

8.    The Bankruptcy Court allowed BRACII to unilaterally cancel the depositions in England in violation of the May 25th Order without any consequences to BRACII.

## B. THE POULIS FACTORS

Finally, the Bankruptcy Court misevaluated the Poulis factors. As the Poulis Court stated, "we reiterate what other Courts have said on numerous occasions: that dismissals with prejudice or defaults are drastic sanctions, termed 'extreme' by the Supreme Court." Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 867-68 (3d.Cir 1984), citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976) (underlining added).

The Court of Appeals in Poulis directed a court contemplating sever sanctions to conduct an analysis of the following factors under the circumstances of the case: (1) The extent of the party's personal responsibility;

30

(2) The prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;

(3) A history of dilatoriness;

(4) Whether the conduct of the party or the attorney was willful or in bad faith;

(5) The effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and

(6) The meritorious ness of the claim or defense.

Appellant submits respectfully that the Bankruptcy Court's analysis of the Poulis factors was at best superficial. The Bankruptcy Court also misapplied the standards of Poulis, most significantly on the issues of prejudice to the opposing party and history of dilatoriness. Poulis, *supra*, at 868. Mr. Jaeban respectfully submits that his actions in these proceedings, and specifically his actions to comply with the Court's May Order, do not demonstrate "flagrant bad faith" justifying dismissal. Id.

### 1. Mr. Jaeban's Personal Responsibility

The Bankruptcy Court's finding of personal responsibility for the alleged misconduct was undoubtedly based upon its misstatement of the record regarding the prior *Motion to Strike* directed against the Company.

Further, Mr. Jaeban submits that the Bankruptcy Court misinterpreted the evidence of his personal actions to comply with the May 25, 2004 Order. As set forth above, and in his affidavit attached as Exhibit C to the *Motion for Reconsideration,* Mr. Jaeban took the following actions between May 25, 2004 and June 18, 2004:

1.    Personally paid $45,000 British Pounds (approximately $82,000.00 U.S. dollars[9]) to bring Wragge & Co. back into active involvement in the proceeding;

2.    Called Wragge & Co. on June 9, 2004 after not hearing from them about their efforts to meet the June 18, 2004 deadline;

3.    Retained Werb & Sullivan and paid it a retainer;

4.    Conducted at least two lengthy international calls (on June 9 and 10, 2004) with his American attorneys;

5.    Identified and caused to be produced additional documents as contained in the Supplemental Schedule of Documents in response to the December 12, 2003 letter;

6.    Met with Wragge & Co. attorneys on June 10 and 15 to, inter alia, review specific responses to the December 12, 2003 letter;

7.    Contacted Mr. O'Connor, the Receiver's representative regarding the Second Request;

8.    Personally reviewed the proposed answers to the December 12, 2003 letter. Additionally, acting on Mr. Jaeban's directions, his attorneys took the following additional steps to comply:

9.    Responded with an explanation to BRACII's Counsel regarding the questions raised in the December 12, 2003 letter, apparently to the satisfaction of Counsel;

10.    Provided BRACII on June 18, 2004 the Supplemental Schedule of Documents and shipped the Supplemental Documents to BRACII;

11.    Scheduled the depositions in England, traveled to England, prepared for and attempted to conduct the depositions;

[9] Calculated at 1.84 US Dollars per British pound on June 7, 2004, as published at "Historical Currency Exchange Rates", www.oanda.com.

12.    Attempted to resolve the document issues regarding the Receiver, despite the fact

that the Objections he had filed on behalf of Jaeban UK were still pending;

*Second Jaeban Affidavit,* paragraphs 1-18. These are not the actions of a recalcitrant or

contemptuous litigant and certainly do not demonstrate "flagrant bad faith". What cannot

be denied is that Mr. Jaeban made identifiable and serious efforts to comply with the *May

25, 2004* Order with regard to the Receiver.

## 2. Prejudice to BRACII

Nowhere in its *Sanctions Opinion* or in its March 9, 2005 *Memorandum Decision

and Order* did the Bankruptcy Court identify specific litigation prejudice to BRACII

from the alleged discovery non-compliance. Instead it said only: "BRACII is a post

confirmation debtor seeking to wind up its affairs.  Delay is necessarily undesirable."

*Sanctions Opinion,* page 7, numbered paragraph 2. Those statements, even if true, do not

constitute a finding of "prejudice" required to support a dismissal under Poulis.

"Prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a

"conclusion based upon facts in evidence.  Manus Corp. v. NRG Energy, Inc. (In re

O'Brien Evntl. Energy, Inc.) 188 F.3d 116 (3d Cir. 1999). There simply was no such

finding by the Bankruptcy Court.

In this context let it not be forgotten that Mr. Jaeban is accused of belatedly

producing the Welcome House and Receiver documents, not failing to ever produce

them.  At the time of the discovery dispute, trial was not impending, and in fact no trial

date was ever set by the Bankruptcy Court.  Whatever possible prejudice allegedly

existed could have been addressed through alternatives that did not require dismissal. It

was Mr. Jaeban that asked that discovery be reopened, both with regard to the BRACII-

Jaeban UK dispute and with regard to BRACII's claim on the personal guaranty.[10]
*Motion to Extend Deadlines in Revised Pre-Trial Scheduling Order* (D.I. 47). In
addition, there was no evidence before the Bankruptcy Court in this proceeding that the
BRAC estates were about to be closed, and that the further conduct of this proceeding
will delay closure. On the contrary, even if upheld, the *Sanctions Order* would not
terminate this lawsuit in the Bankruptcy Court, because of BRACII's personal guaranty
claim against Mr. Jaeban.

### a. The Weatherall Letter

As stated before, BRACII never proffered for the Bankruptcy Court a list of
documents from the Welcome House boxes that were alleged are significant, it failed to
identify anything of real significance. Instead, it BRACII attempted to place great weight
on English Attorney Ian Weatherall's letter was directed to a separate and unrelated
operational issue. See *Affidavit of Ian Weatherall,* attached as Exhibit H *to Ibrahiem
Jaeban's Motion for Reconsideration.* Mr. Weatherall, who previously represented Mr.
Jaeban, represented the Administrative Receiver at the time he wrote the letter. The
Weatherall letter to which BRACII attaches such significance was sent in response to a
request from the Administrative Receiver as to whether it was possible for Mr. Jaeban to
trade either under his own name or through a new limited company from various sites
previously operated by the Company Id., paragraph 3. Mr. Jaeban had suggested to the
Administrative Receiver that the insolvency of BRACII or the UK business of BRACII
had automatically terminated the restrictive covenants contained within the IPLA. Id. Mr.
Weatherall disagreed with that interpretation for the reasons stated in his letter. Id. The

---

[10] Mr. Jaeban filed a *Motion for Order Reopening Limited Discovery* (D.I. 51) on August 27,
2004.

letter <u>was limited to that single issue</u> as it related to Avis Europe PLC and did not address

the merits of either Jaeban UK or Mr. Jaeban's counterclaims in the adversary

proceedings. The letter does not suggest that Wragge & Co advised that the Company did

not have viable claims for breach of the Umbrella Agreement and the IPLA. <u>Id</u>.,

paragraphs 2-4.

### b. The Credit Pack Document

BRACII also inflated in the proceedings below the significance of the Credit Pack

Document. This credit information was prepared by ex-employees of BRACII based

upon information sent by BRACII to its franchise in 2001. Mr. Jaeban has testified under

oath that (i) he believes that it was prepared by an ex-BRACII employee, and (ii) that it

was never approved by him. Further, there is no evidence that it was ever sent to a third

party. It was a draft document and remained as such. In all of the searches of the

Welcome House documents, neither Mr. Jaeban nor BRACII has found any evidence that

this document was ever submitted to any third party. It is an insignificant document.

### c. The Receiver's Documents

BRACII was aware that the appointed Administrative Receiver had control of

some of the Jaeban U.K. documents after the appointment. As acknowledged in

BRACII's Motion and the supportive affidavit of its counsel, the Receiver initially

refused to disclose the documents pursuant to the request of Mr. Jaeban.[11]

### 3. Mr. Jaeban's History in these Proceedings

The Bankruptcy Court's analysis of this issue consists of one sentence: "While

there was previously no such history, now there clearly is." *Sanctions Opinion,* p.7. This

---

[11] Although that affidavit correctly states that the Administrative Receiver was unwilling to make documents available to Mr. Jaeban, which is still the case, the affidavit was incorrect in most areas. Mr. Jaeban specifically objects to the unfair and inaccurate statements concerning the events in England.

analysis by the Bankruptcy Court follows its mistaken statement that "BRACII sought in its original motion [the] dismissal of Mr. Jaeban's answers, affirmative defenses, and counterclaims for "failing to obtain Delaware counsel, comply with the Court's [original] scheduling order, or advance the proceeding". *Sanctions Opinion*, p. 5. It is a matter of docket record that the previous motion to strike was filed on February 3, 2004 and was directed against the Company, not Mr. Jaeban. This Court should not let a $4,500,000.00 sanction stand on the basis of such blatant error.

The Court of Appeals contemplates an analysis by the trial court of whether the party sought to be sanctioned has a "history of dilatoriness". Poulis, 747 F.2d at 868. There was never any suggestion that, prior to the. Administration Order, Mr. Jaeban caused any delay in these proceedings. After his appearance as a party in this proceeding on March 1, 2003 (D.I. 30), Mr. Jaeban, through counsel, (1) properly presented argument at the March 12, 2003 hearing, (2) responded in objection to BRACII's *Motion for Partial Reconsideration* of the *May 25, 2004 Order* (D.I. 35), and (3) argued at the July 15, 2004 hearing on that motion. Even, assuming arguendo that Mr. Jaeban produced documents after the discovery cutoff, doing so does not create a "history of dilatoriness" on his part. One alleged dilatory act cannot create such a history. When his actions between May 25, 2004 and June 18, 2004 are considered, the only reachable conclusion is that Mr. Jaeban does not have such a history with regard to discovery. Mr. Jaeban had worked to identify and locate witnesses for the depositions, consulted with his attorneys in England and the United States, attempted to obtain documents from the Administrative Receiver, produced supplemental documents, and had his attorneys contact BRACII's counsel. *Second Jaeban* Affidavit, paragraphs 1-16. He also spent

36

additional sums to conduct a privilege review that would only benefit the Company's Administrative Receiver. He appeared for his own deposition in a timely manner, and arranged for other deponents to appear for theirs.

### 4. Whether Mr. Jaeban's Conduct was Willful or in Bad Faith

The Bankruptcy Court could "not conclude that Mr. Jaeban's conduct was in bad faith but was willful." *Sanctions Opinion,* page 7 paragraph 4. It is clear that such a finding of willfulness was influenced by the Bankruptcy Court's misconceptions of fact and was based upon a misinterpretation of Mr. Jaeban's perceived inaction in attempting to comply with the *May 25, 2004 Order.* Such a finding of "willfulness" must be reversed for the multiple reasons set forth above.

### 5. The Alternative of Lesser Sanctions

The evidentiary record does not support sanctions, especially of the severity imposed in the Order. If the Bankruptcy Court was intent on imposing sanctions, Rule 37 identifies that there were alternatives to dismissal.

### 6. The Meritorious ness of Mr. Jaeban's Claim

Because of the sanctions, Mr. Jaeban has had no opportunity to present evidence to a trier of fact. The Bankruptcy Court found that the factor "was at best neutral for Mr. Jaeban and at worst slightly in favor of BRACII ". *Sanctions Opinion,* Page 8.

In reaching that conclusion, it is evident that the Court applied a standard inconsistent with Poulis. In Poulis, the Court of Appeals did "not purport to use summary judgment standards. A claim, or defenses, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery [by the party against whom sanctions are urged] or would constitute a complete defense." Id, at 869-

870. Under that standard, which is consistent with standard for consideration of a motion to dismiss or for judgment on the pleadings under Rule 12(b), Mr. Jaeban's Counterclaim would support a recovery and is to be considered meritorious. It is noteworthy that BRACII filed no motion attacking the merits or legal sufficiency of Mr. Jaeban's Counterclaim. Under any standard, Mr. Jaeban's Counterclaim has merit. Both parties to this litigation have asserted that they are owed money under the complex system of charges and credits between BRACII (as franchisor) and the Company (as franchisee). On a daily operating basis prior to BRACII's administration, the parties charged and credited, and engaged in continual attempts to reconcile the balances.

In fact, BRACII acknowledged in early 2003 that it owed the Company Limited a credit sum of 1.162,000,000 English Pounds for unpaid rental invoices. *Reply Memorandum of Ibrahiem Jaeban in Support of Motion for Reconsideration,* Exhibit C. (D.I. 81) This admission against interest by BRACII demonstrates beyond question under Poulis or under any other standard, that Mr. Jaeban has a meritorious claim.

### VIII. CONCLUSION

In the final analysis, the Bankruptcy Court's decision to enter its dismissal sanction is inconsistent with a long line of jurisprudence both before and after Poulis. In Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 2 L. Ed. 2d 1255, 78 S. Ct. 1087 (1958), the Supreme Court draw a clear distinction between all the other sanctions set forth in Rule 37 and the ultimate sanction of dismissal with prejudice. The Court said:

> The provisions of Rule 37 which are here involved must be read in light of the provisions of the Fifth Amendment that no person shall be deprived of property without due process of law, and more particularly against the opinions of this Court in *Hovey v. Elliott, 167 U.S. 409, 42 L.*

> *Ed. 215, 17 S. Ct. 841,* and *Hammond Packing Co. v. State of Arkansas,*
> *212 U.S. 322, 53 L. Ed. 530, 29 S. Ct. 370.* These decisions establish that
> there are constitutional limitations upon the power of courts, even in aid
> of their own valid processes, to dismiss an action without affording the
> party the opportunity for a hearing on the merits of his cause.
> 357 U.S. at 209.

Apart from the Bankruptcy Court's most obvious departure from the norm of cases

considering sanctions, that of failing to look to Rule 37 for guidance, the Bankruptcy

Court displayed no hesitation in entering the "ultimate sanction". The decisions

upholding a dismissal sanction after Poulis show common fact patterns in which the party

being sanctioned has ignored repeated court orders, entered after the filing of a proper

motion to compel. See, e.g. Curtis T. Bedwell & Sons v. International Fid. Ins. Co. ,843

F. 2d 683 (3d. Cir 1988)(sanctions upheld where party being sanctioned had ignored

several discovery order, lied about illness to avoid his own deposition, and had caused

others not to appear for deposition); Hamilton v. Everett, 104 F.R.D. 106 (W.D. Pa.

1985)(motion for sanctions denied after almost one year delay in answering

interrogatories, but granted after fourteen month delay, disregard of court order and the

imposition of monetary sanctions showed dilatoriness permeated all three methods of

discovery). Under no imaginably fair standard does the alleged misconduct by Mr. Jaeban

reach the level of those cases.

The Court of Appeals has also emphasized the need for a trial court to make

specific findings, as opposed to general comments, on the party's actions. See, Burns,

722 F.2d at 32 (findings of "undue delay of such a nature which constitutes inexcusable

neglect" by counsel and "conscious failure to comply" with discovery were not sufficient

for affirmance of dismissal sanction);

Instead, it is clear that the Bankruptcy Court sought to punish Mr. Jaeban. Where "the sanction invoked is more stern than is reasonably necessary" a "denial of due process" can result. DiGregorio v. First Rediscount Corporation, 506 F.2d 781 (3d Cir. 1974).

For all of the foregoing reasons, dismissal sanctions decision of the Bankruptcy Court cries out for reversal. Mr. Jaeban respectfully requests that this Court reverse the orders appealed from; remand this case back to the Bankruptcy Court so that Mr. Jaeban's counterclaims may be considered on the merits; direct the Bankruptcy Court to enter a modified scheduling order that is acceptable to the parties in light of the magnitude of the case, the complex issues before it, and the fact that Mr. Jaeban and much of the evidence are in England, with his former company still under the control of an Administrative Receiver; order that the cure amount continue to be held in escrow pending a determination on the merits by the Court below; and such other relief as this Court deems just and equitable.

Dated: May 26, 2005                    Respectfully Submitted,

                                       WERB & SULLIVAN

                                       /s/ Brian A. Sullivan
                                       Brian A. Sullivan (#2098)
                                       Robert D. Wilcox (#4321)
                                       Amy D. Brown (#4077)
                                       300 Delaware Ave., 13th Floor
                                       Wilmington, Delaware 19801
                                       Telephone: (302) 652-1100
                                       Facsimile: (302) 652-1111

                                       Attorneys for Ibrahiem Jaeban,
                                       Assignee of Defendant Jaeban U.K. Limited

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 26, 2005, I caused one copy of the foregoing document to be served upon the persons listed below in the manner indicated:

**E-MAIL  AND
FIRST CLASS MAIL:**

Kenneth E. Wile, Esq.
Sidley, Austin, Brown, &
Wood,  LLP
10 South Dearborn Street
Chicago,  IL  60603

**E-MAIL  AND
VIA HAND DELIVERY:**

Edmon L. Morton, Esq.
Joseph A. Malfitano, Esq.
Matthew B. Lunn, Esq.
Young, Conaway, Stargatt & Taylor, LLC
The Brandwyine Building, 17th Floor
1000 West Street, P. O. Box 391
Wilmington,  DE  19899-0391

/s/ Brian A. Sullivan
Brian A. Sullivan