**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

In re

BRAC GROUP, INC., *et al.*,

          Debtors.

Case No. 02-12152 (RB)

Bk. Adv. Proc. 03-54271 (RB)

---

BRAC GROUP, INC., *et al.*,

          Plaintiffs-Appellees,

v.

JAEBAN (U.K.) LIMITED,

          Defendant, and

IBRAHIEM JAEBAN,

          Defendant-Appellant.

Civil Action No. 05-259-KAJ

---

## BRIEF OF APPELLEE BUDGET RENT-A-CAR INTERNATIONAL, INC.

Kenneth E. Wile
Robert N. Hochman
SIDLEY AUSTIN BROWN & WOOD LLP
10 South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

Robert S. Brady (Bar No. 2847)
Edmon L. Morton (Bar No. 3856)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
1000 West Street, P.O. Box 391
Wilmington, Delaware  19899
(302) 571-6600

Counsel for Appellee Budget Rent-A-
Car International, Inc.

Dated:  June 17, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

ABBREVIATIONS ............................................................................1

STATEMENT OF APPELLATE JURISDICTION ...................................1

STANDARD OF REVIEW ..................................................................1

ISSUES PRESENTED.........................................................................2

SUMMARY OF ARGUMENT .............................................................2

FACTS AND PROCEDURAL HISTORY ...............................................4

    A.    The Dispute Between BRACII and Its Former Licensee, Jaeban UK ....................4

        1.    The Parties' Agreements. ...........................................................4

        2.    The Budget Bankruptcy, the Administration of BRACII, and the Establishment of the $4.5 Million Jaeban UK Cure Amount Reserve by BRACII. ...................................................................5

        3.    Commencement of the Adversary Proceeding. ...........................6

    B.    Jaeban UK's Discovery Misconduct.......................................................7

        1.    The Unkept Promise of Cooperation. .........................................7

        2.    BRACII's Partial Summary Judgment Motion............................8

        3.    BRACII's First Motion to Strike the Counterclaims, the Assignment of the Counterclaims, and the Receivers' Obligation to Cooperate with Mr. Jaeban. ....................................................9

    C.    The Bankruptcy Court's First Sanctions Order ......................................10

    D.    Mr. Jaeban's Violations of the First Sanctions Order.............................12

        1.    Mr. Jaeban's Failure to Produce the Receivers' Documents Until August 2004. ..........................................................................13

        2.    Mr. Jaeban's Failure to Produce Responsive Welcome House Documents – and the Later Production of 84 Boxes. ...............14

        3.    Late Production of the Credit Pack Document. ..........................15

        4.    Possible Misconduct in the November 2003 Document Production. ........16

5.    Mr. Jaeban's Further Misconduct with Respect to Jaeban UK Computers. ..................................................................................17

E.    Mr. Jaeban's Portrayal of BRACII's Document Production ...............................17

F.    Postponement of Further Depositions...................................................................18

THE DECISIONS ON APPEAL ...............................................................................................19

A.    The Second Sanctions Decision...........................................................................19

B.    The Bankruptcy Court's Denial of Reconsideration.............................................20

ARGUMENT ..............................................................................................................................21

I.    MR. JAEBAN WILLFULLY VIOLATED THE FIRST SANCTIONS ORDER. ..........21

A.    Mr. Jaeban's Violations ......................................................................................21

1.    The Three Failures to Produce Responsive Hard Copy Documents..........21

2.    Additional Willful Violations. ..................................................................22

B.    Mr. Jaeban's Excuses.........................................................................................22

1.    The Credit Pack Document...................................................................22

2.    The Welcome House Documents.............................................................23

3.    The Receivers' Documents ....................................................................24

a.    Evidence in the Record. ...............................................................24

b.    The Excluded Affidavits ...............................................................25

i.    The Bankruptcy Court Properly Excluded the Reconsideration Affidavits. ................................................25

ii.    The Reconsideration Affidavits Confirm Mr. Jaeban's Noncompliance. ...................................................27

4.    BRACII Did Not Acquiesce in Mr. Jaeban's Violations of the First Sanctions Order.......................................................................................29

II.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN ENFORCING THE TERMS OF THE FIRST SANCTIONS ORDER.............................29

1.    Personal Responsibility..........................................................................31

| | | |
|---|---|---|
| 2. | Prejudice to BRACII. | 33 |
| 3. | Dilatory Conduct. | 34 |
| 4. | Willful Conduct. | 35 |
| 5. | Effectiveness of Sanctions Other than Dismissal. | 36 |
| 6. | The Merits of the Assigned Counterclaims. | 36 |
| 7. | A Poulis Non-Factor:  BRACII's Conduct in Discovery | 37 |

III.    MR. JAEBAN'S ALLEGATIONS OF IMPROPRIETY AGAINST JUDGE CASE ARE FRIVOLOUS. ............................................................................. 37

CONCLUSION ............................................................................................................. 39

# TABLE OF AUTHORITIES

**CASES**

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,*
    229 F.3d 245 (3d Cir. 2000).................................................................................2, 24, 27

*Burtch v. Ganz (In re Mushroom Transp. Co.),*
    382 F.3d 325 (3d Cir. 2004).........................................................................................22

*Curtis T. Bedwell & Sons Inc. v. International Fid. Ins. Co.,*
    843 F.2d 683 (3d Cir. 1988)....................................................................................30, 33

*Degen v. United States,*
    517 U.S. 820 (1996)......................................................................................................30

*Digene Corp. v. Ventana Med. Sys.,*
    2004 U.S. Dist. LEXIS 12783 (D. Del. July 6, 2004) ...............................................26, 32

*Emerson v. Thiel Coll.,*
    296 F.3d 184 (3d Cir. 2002)....................................................................................30, 36

*eSpeed, Inc. v. Brokertec USA, L.L.C.,*
    2005 U.S. Dist. LEXIS 785 (D. Del. Jan. 11, 2005)........................................................25

*First Am. Bank of New York v. Century Glove, Inc.,*
    81 B.R. 274 (D. Del.),
    *aff'd,* 860 F.2d 94 (3d Cir. 1988) .....................................................................................1

*Floyd v. Black Swan Shipping Co.,*
    2002 U.S. Dist. LEXIS 13385 (E.D. Pa. July 18, 2002)..................................................30

*Garrison v. Town of Bethany Beach,*
    2001 U.S. Dist. LEXIS 8434 (D. Del. Apr. 11, 2001)......................................................26

*General Datacomm Indus. v. Arcara (In re General Datacomm Indus.),*
    2005 U.S. App. LEXIS 8634 (3d Cir. May 16, 2005) ........................................................2

*Glencore Int'l A.G. v. Metro Trading Int'l Inc.,*
    [1999] 2 Lloyds Rep. 632 (Queen's Bench Division
    (Commercial Court) Jul. 30, 1999) ................................................................................10

*Haraway v. National Ass'n For Stock Car Auto Racing, Inc.,*
    213 F.R.D. 161 (D. Del. 2003) ................................................................................30, 31

*Harsco Corp. v. Zlotnicki*,
    779 F.2d 906 (3d Cir. 1985),
    *cert. denied*, 476 U.S. 1171 (1986) ................................................................25

*Haugh v. Allstate Ins. Co.*,
    322 F.3d 227 (3d Cir. 2003) ........................................................................10

*Hicks v. Feeney*,
    850 F.2d 152 (3d Cir. 1988),
    *cert. denied*, 488 U.S. 1005 (1989) ..............................................................30

*Hoxworth v. Blinder, Robinson & Co.*,
    980 F.2d 912 (3d Cir. 1992) ....................................................................2, 22

*Interface Group-Nevada, Inc. v. Trans World Airlines, Inc.*
    *(In re Trans World Airlines, Inc.)*, 145 F.3d 124 (3d Cir. 1998) ..........................2

*International Fin. Corp. v. Kaiser Group Int'l Inc.*
    *(In re Kaiser Group Int'l Inc.)*, 399 F.3d 558 (3d Cir. 2005) ............................24

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*,
    1998 U.S. Dist. LEXIS 7750 (E.D. Pa. May 27, 1998),
    *aff'd*, 178 F.3d 1279 (3d Cir. 1999) ..........................................................23, 35

*Kopec v. Tate*,
    361 F.3d 772 (3d Cir.),
    *cert. denied*, 125 S. Ct. 453 (2004) ..............................................................24

*Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*,
    [1994] 1 A.C. 85 (H.L. 1993) ......................................................................11

*Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*,
    349 F.3d 1309 (11th Cir. 2003) ..................................................................25

*Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*,
    176 F.3d 669 (3d Cir. 1999) ........................................................................26

*Medforth v. Blake*,
    [2000] Ch. 86 (C.A.) ....................................................................................9

*Mindek v. Rigatti*,
    964 F.2d 1369 (3d Cir. 1992) ........................................................2, 29, 30, 36

*Mondesir v. Trans Union*,
    1999 U.S. Dist. LEXIS 15977 (E.D. Pa. Oct. 18, 1999) ..................................36

*National Grange Mut. Ins. Co. v. Sharp Equip. Co.*,
    2002 U.S. Dist. LEXIS 4096 (E.D. Pa. Mar. 5, 2002),
    *aff'd*, 2003 U.S. App. LEXIS 1121 (3d Cir. Jan. 17, 2003) .........................................36, 37

*Pelullo v. Schwartz*,
    1999 U.S. Dist. LEXIS 2916 (E.D. Pa. Mar. 16, 1999).......................................................35

*Poulis v. State Farm Fire & Cas. Co.*,
    747 F.2d 863 (3d Cir. 1984).................................................2, 19, 22, 30, 31, 34, 35, 36, 37

*Proxim Inc. v. 3Com Corp.*,
    2003 U.S. Dist. LEXIS 2556 (D. Del. Feb. 21, 2003) ......................................................26

*Schering Corp. v. Amgen, Inc.*,
    25 F. Supp. 2d 293 (D. Del. 1998).....................................................................................26

*Snyder v. Hi-Tech Elecs. Displays Inc.*,
    2004 U.S. Dist. LEXIS 24953 (D. Del. Nov. 24, 2004) ...............................................30, 38

*In re UA Theatre Co.*,
    2004 Bankr. LEXIS 1258 (Bankr. D. Del. Aug. 25, 2004) ...............................................26

*United States v. $1,322,242.58*,
    938 F.2d 433 (3d Cir. 1991)...............................................................................................30

*United States ex rel. Kusner v. Osteopathic Med. Ctr.*,
    1997 U.S. Dist. LEXIS 16585 (E.D. Pa. Oct. 21, 1997).....................................................35

*Ware v. Rodale Press, Inc.*,
    322 F.3d 218 (3d Cir. 2003)...........................................................1, 29, 30, 34, 37

*Washington Hosp. v. White*,
    889 F.2d 1294 (3d Cir. 1989)..........................................................................................2, 25

## STATUTES AND RULES

28 U.S.C. § 158(a) ....................................................................................................................1

Fed. R. Civ. P. 16(f) ................................................................................................................30

Fed. R. Civ. P. 37....................................................................................................................3, 9, 30

Bankr. D. Del. R. 9010-1(a)......................................................................................................9

D. Del. R. 85.3(d).......................................................................................................................9

**OTHER AUTHORITIES**

Insolvency Act 1986, § 44(1)(a) ....................................................................................................25

Appellee Budget Rent-A-Car International, Inc. ("BRACII"), by its undersigned counsel, respectfully submits this Brief in support of the decisions and orders entered by the United States Bankruptcy Court for the District of Delaware (Hon. Charles G. Case II, J., presiding).

## ABBREVIATIONS

1.  **"BA__"** refers to pages of the Appendix filed by BRACII in this appeal.

2.  The **"First Sanctions Order"** (BA Tab 1) is the Bankruptcy Court's May 25, 2004 Memorandum Opinion imposing a first set of sanctions on Mr. Jaeban.

3.  The **"Second Sanctions Decision"** (BA Tab 2) is to the December 14, 2004 Memorandum Opinion dismissing Mr. Jaeban's assigned counterclaims.

4.  The **"Reconsideration Order"** (BA Tab 3) is the March 4, 2005 Memorandum Decision and Order denying Mr. Jaeban's Motion for Reconsideration of the Second Sanctions Decision.

5.  **"Jaeban Br."** refers to Appellant Ibrahiem Jaeban's Opening Brief on appeal.

6.  **"Jaeban UK"** refers to Jaeban (U.K.) Limited, which assigned its counterclaims to Mr. Jaeban.

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 158(a) to hear Mr. Jaeban's appeal from the Bankruptcy Court's January 12, 2005 Order, which dismissed Mr. Jaeban's assigned counterclaims based on the Second Sanctions Decision and the Reconsideration Order. These sanctions orders are final orders under Section 158(a). *First Am. Bank of New York v. Century Glove, Inc.*, 81 B.R. 274, 277 (D. Del.), *aff'd*, 860 F.2d 94 (3d Cir. 1988).

## STANDARD OF REVIEW

The Bankruptcy Court's decisions to dismiss the counterclaims as a sanction and to exclude the affidavits that Mr. Jaeban submitted with his Motion for Reconsideration are reviewed for abuse of discretion.[1] *E.g., Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221-22 (3d

---

[1] Although acknowledging the abuse of discretion standard, Mr. Jaeban suggests that the Court of Appeals "effectively reviews" Bankruptcy Court opinions on a *de novo* basis that "inform[s]" this Court's

Cir. 2003) (sanctions); *Washington Hosp. v. White*, 889 F.2d 1294, 1303 n.14 (3d Cir. 1989) (exclusion of affidavits on reconsideration). The Bankruptcy Court's choice of sanctions is entitled to deference. *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992). The Bankruptcy Court's findings of fact supporting its decision to dismiss the counterclaims are reviewed for clear error. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 922 (3d Cir. 1992). Arguments raised by Mr. Jaeban for the first time on this appeal are deemed waived. *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000).

## ISSUES PRESENTED

1.    Did the Bankruptcy Court commit clear error in finding that Mr. Jaeban extensively violated the First Sanctions Order?

2.    Did the Bankruptcy Court abuse its discretion by dismissing Mr. Jaeban's counterclaims as a sanction for Mr. Jaeban's violations of the First Sanctions Order?

## SUMMARY OF ARGUMENT

On May 25, 2004, the Bankruptcy Court entered the First Sanctions Order, from which Mr. Jaeban has never appealed. The Order awarded monetary sanctions and, as a further sanction, required Mr. Jaeban to complete his document production by June 18, 2004. It also warned him that harsher sanctions would follow if he failed to comply. In its Second Sanctions Decision, the Bankruptcy Court found that Mr. Jaeban had pervasively violated the First Sanctions Order by failing to produce numerous responsive documents until more than six weeks after the deadline. Reviewing each of the factors in *Poulis v. State Farm Fire & Cas. Co.*, 747

---

review. Jaeban Br. 1. The Third Circuit has instead held that, while it conducts a plenary review of the *District Court's* appellate decision, the Court of Appeals (like this Court) reviews the *Bankruptcy Court's* discretionary decisions for abuse of discretion and findings of fact for clear error. *E.g.*, *General Datacomm Indus. v. Arcara (In re General Datacomm Indus.)*, 2005 U.S. App. LEXIS 8634, at *9 (3d Cir. May 16, 2005); *Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 145 F.3d 124, 130-31 (3d Cir. 1998).

F.2d 863, 868 (3d Cir. 1984), the Court also found that Mr. Jaeban's conduct was willful and that its lesser sanctions had been insufficient to compel compliance. The Court therefore dismissed Mr. Jaeban's assigned counterclaims. When Mr. Jaeban moved for reconsideration based on a repetition of his prior argument and affidavits that should have been submitted in opposition to BRACII's motion, the Court properly excluded the affidavits (which in reality demonstrate Mr. Jaeban's noncompliance) and reaffirmed that Mr. Jaeban's willful conduct warranted dismissal.

On appeal, Mr. Jaeban has not disputed the critical facts. Before the June 18th deadline, he (a) failed to review the 84 Welcome House boxes, the largest source of Jaeban UK documents, to fill in gaps in the prior production; (b) failed to use the cooperation clause in his Deed of Assignment to obtain documents from the Jaeban UK Receivers; and (c) failed to produce the Credit Pack document that explicitly contradicts his claims and requires further, time-consuming third-party discovery. The prejudice to any opponent, but especially a debtor winding up its affairs, is obvious.

Instead of addressing this record, Mr. Jaeban portrays a record that does not exist. His Opening Brief never acknowledges that the First Sanctions Order imposed any sanctions. He implies that he complied with BRACII's second document requests on November 19, 2003, but those requests were not even served until November 26, 2003. He accuses the Bankruptcy Court of ignoring the difference between himself and Jaeban UK, yet the Second Sanctions Decision takes account of the distinction in three different places. Second Sanctions Decision 5, 7, 8. These are only examples in a brief that often fails to cite the record on appeal.

Mr. Jaeban's legal arguments fare no better. Having entered a sanctions order, the Bankruptcy Court was not required to wait for a redundant Rule 37 motion before enforcing its warning of harsher sanctions. The Bankruptcy Court did not abuse its discretion in excluding

Mr. Jaeban's belated reconsideration affidavits. As if to demonstrate his indifference to his obligations, Mr. Jaeban argues that a litigant who fails to comply with a court's order (a *sanctions* order, on less) is under no obligation to inform the court promptly of his noncompliance. In short, the Bankruptcy Court's dismissal of Mr. Jaeban's counterclaims was not an abuse of discretion, but an imperative step to protect BRACII from a litigant who regards enforcement of a sanctions order as "inexplicable." *See* Jaeban Br. at 29-30.

## FACTS AND PROCEDURAL HISTORY

### A.    The Dispute Between BRACII and Its Former Licensee, Jaeban UK

The underlying case is a franchise dispute. BRACII, headquartered outside London, licensed the Budget Rent-A-Car® ("Budget") trademark to various licensees throughout Europe, the Middle East, and Asia, including Jaeban UK, collected trademark royalty fees, and provided services to Budget franchisees. Jaeban UK operated a number of Budget locations in the English Midlands, Northern England, and Southern Scotland. Mr. Jaeban was the controlling shareholder of Jaeban UK.

### 1.    The Parties' Agreements.

On March 5, 2001, BRACII, Jaeban UK, and Mr. Jaeban executed an "Umbrella Agreement" that settled existing disputes between the parties and was explicitly intended to govern their relationship thereafter.[2] Am. Compl., ¶ Ex. B. The Umbrella Agreement states that its provisions "are designed to provide Budget [BRACII] with greater protection" (cl. 1.7), and required BRACII, Jaeban UK, and Ibrahiem Jaeban to enter into "New License Agreements" with respect to each of Jaeban UK's locations "in the form of Budget's current IPLA" – BRACII's form International Prime License Agreement (the "IPLA") attached to the Umbrella Agreement. *See* Umbrella Agreement & cl. 1.5, 1.8.6. The Umbrella Agreement and IPLA

---

[2] The record contains one Umbrella Agreement, not "several" as Mr. Jaeban claims. *See* Jaeban Br. 4.

contain three anti-assignment clauses, *see* Umbrella Agreement, cls. 2.6, 4.3; IPLA, ¶ 12.2(a).

> **2.  The Budget Bankruptcy, the Administration of BRACII, and the Establishment of the $4.5 Million Jaeban UK Cure Amount Reserve by BRACII.**

BRACII and Jaeban UK proceeded to conduct business under the Umbrella Agreement. Like many travel-related companies, BRACII and other Budget entities suffered substantial losses after the September 11th attacks. On July 29, 2002, BRACII's parent, Budget Group, Inc. (now known as BRAC Group, Inc.), BRACII (a Delaware corporation), and other Budget companies filed voluntary petitions under chapter 11 in the Bankruptcy Court. As BRACII's financial condition deteriorated, BRACII sought an Order of Administration from the High Court of Justice in London. On January 14, 2003, the High Court issued an Order of Administration appointing Messrs. Gurpal Johal and Simon Freakley as Joint Administrators of BRACII for the purpose of winding up the company. First Sanctions Order 2; BA173.

On February 24, 2003, the Bankruptcy Court approved the sale by BRACII and certain affiliates of most of BRACII's assets, including its English car rental business, to Zodiac Europe, plc., an affiliate of Avis Europe plc ("Zodiac/Avis"). BA122. In connection with the sale, BRACII sought Jaeban UK's consent to the assumption of its agreements with BRACII by Zodiac/Avis. *See* BA127. BRACII's books and records showed that Jaeban UK owed BRACII £3,006,090.10; these amounts are itemized on Exhibit C to the Amended Complaint.

Through its solicitors at Wragge & Co. ("Wragges") in Birmingham, England, Jaeban UK asserted breach of contract claims by BRACII and did not consent to the assumption until BRACII set aside $4.5 million as a "Cure Amount" reserve in a restricted bank account pending the outcome of the parties' dispute.[3] *See* BA127. In the end, Zodiac/Avis did not

---

[3] Paragraph 13(b) of the Bankruptcy Court's Zodiac/Avis Sale Order sets forth the terms of the "cure process" that led to the creation of the $4.5 million escrow. BA117-19. The Sale Order did not require

assume the Jaeban UK agreements. *See* BA243. Although the Bankruptcy Court ordered the

release of the $4.5 million reserve in the Second Sanctions Decision, this portion of the Court's

decision has been stayed by agreement.

### 3.    Commencement of the Adversary Proceeding.

Although the Zodiac/Avis Sale Order promoted a prompt resolution of the parties'

claims (BA118), no settlement was reached. On July 9, 2003, BRACII filed an adversary

proceeding to recover the £3,006,090.10, the equivalent of approximately $5,471,084.[4]  On

August 22, 2003, Jaeban UK voluntarily submitted to the jurisdiction and governing rules of the

Bankruptcy Court when Thomas Briggs, Esq. and Morris, Nichols, Arsht & Tunnell ("Morris

Nichols") appeared as Delaware counsel on Jaeban UK's behalf. Jaeban UK responded by

denying liability and asserting counterclaims that mirrored its asserted "cure" rights. BRACII, in

turn, denied all liability to Jaeban UK.

In the current pleadings, Mr. Jaeban, as assignee, is seeking as much as $9.9

million before setoffs; Jaeban UK claimed a maximum amount of $4.5 million. BA46; BA107.

If BRACII can prove its $5,471,084 claim, he will need to prove damages in the same amount to

break even – and another $4,500,000 to net the Cure Amount. His counterclaims itemize only

£1,702,583.95 (= $3,098,702.78) in specific damages, leaving him with a potential lost profits

claim of nearly $7 million. BRACII is thus clearly entitled to discovery on Jaeban UK's

financial condition and prospects, the impact of the 9/11 attacks on those prospects, and Jaeban

UK's relations with its lenders as they reflect on Jaeban UK's conduct and financial condition.

---

an objecting licensee to establish the basis for the amount claimed.
[4] The website cited by Mr. Jaeban, www.oanda.com, lists an interbank "Historical Currency Exchange
Rate" on June 7, 2005 of £1.00 = $1.82.

**B.**    **Jaeban UK's Discovery Misconduct**

    **1.**    **The Unkept Promise of Cooperation.**

On September 23, 2003, BRACII and the BRAC Committee of Unsecured Creditors served Jaeban UK with a Joint First Request for Production of Documents (the "First Requests"). First Sanctions Order 5; *see* BA208-16. The First Requests encompassed the entire breadth of Jaeban UK's denials and counterclaims. Jaeban UK did not serve objections or other written responses of any kind on BRACII in response to the First Requests.

On October 20, 2003, a Jaeban UK secured creditor caused administrative receivers (the "Jaeban Receivers") to be appointed in England to act for Jaeban UK in a nonjudicial receivership. BA142. Following their appointment, Jaeban UK produced 2,363 pages of documents (plus lawyer correspondence) to BRACII on or about November 19, 2003.[5] First Sanctions Order 5; BA710-23. In England, the production was supervised by Wragges and Pricewaterhouse Coopers. BA391. This was a seriously incomplete production, as later events would show.

On November 26, 2003, BRACII served the Joint Second Request for Production on Jaeban UK (the "Second Requests"). BA218. The Second Requests sought documents related to the appointment of the Receivers, assets sales, and other relevant documents. No documents were produced in response to the Second Requests until the summer of 2004, as described below.[6] Jaeban UK, as Mr. Jaeban notes, did serve objections to the Second Requests on December 30, 2003.

---

[5] Mr. Jaeban claims inaccurately that this production took place in October 2003 (Jaeban Br. 6), and then, accurately, that it took place on November 19, 2003. *Id.* 13.

[6] Mr. Jaeban states that *he* complied with his obligations to respond to the Second Requests because documents were produced to BRACII on November 19th (Jaeban Br. 13) -- seven days before the Second Requests were served on November 26th. Perhaps Mr. Jaeban is implying that the documents produced before the Second Requests were served were also partially responsive to the Second Requests. His brief, as drafted, creates a very different impression, however.

In the meantime, BRACII's U.S. counsel and Morris Nichols attempted to move the case forward. The Court granted an agreed extension of the discovery schedule to require fact discovery to be completed by January 30, 2004. BA31. On December 12, 2003, BRACII's U.S. counsel wrote Thomas Briggs of Morris Nichols requesting deposition dates for Jaeban UK witnesses, including Mr. Jaeban, and itemizing, both generally and by request number, numerous gaps in the Jaeban UK production to date. BA97. BRACII noted that, "[i]n particular, Wragges sent only a minimal number of e-mails and internal memoranda related to the specifications in our document requests." *Id.* BRACII explicitly demanded "documents in the possession of Wragges and PwC." *Id.*

Mr. Briggs responded in a December 30, 2003 letter, promising that "Jaeban [UK] will produce documents as identified in its responses [to the Second Requests] next week." BA101. He also hoped to respond to the gaps identified by BRACII's letter and provide deposition dates by that week as well. A Wragges solicitor is copied on the Briggs letter. *See id.*

Through no apparent fault of Mr. Briggs, the promise of cooperation turned out to be false. Neither documents responsive to the Second Requests nor deposition dates were provided.[7] BA49. Citing nonpayment of fees, Morris Nichols withdrew from the case, leaving Jaeban UK without U.S. representation of any kind. BA53. By contrast, BRACII served objections and produced documents to Wragges, Jaeban UK's English counsel, by the discovery deadline of January 30, 2004. BRAC Group's Opposition to Mr. Jaeban's Motion for Order Reopening "Limited Discovery," 3.

### 2.    BRACII's Partial Summary Judgment Motion.

As Jaeban UK's participation ceased, BRACII sought relief from the Court. First,

---

[7] According to a later affidavit of Mr. Jaeban, Wragges had no intention of permitting these depositions. BA143 (Jaeban Aff., ¶ 9 (Wragges refused to agree to depositions because these were a "foreign concept" to English lawyers)).

BRACII sought partial summary judgment against Jaeban UK for £327,944.09 – the amount that Jaeban UK, while under Mr. Jaeban's control, had admitted was owed to BRACII. BRACII's counsel faxed Mr. Weatherall of Wragges a letter stating the briefing schedule and argument date. BA103. When no opposition was filed, Judge Case granted the Motion on February 4, 2004. First Sanctions Order 6. Mr. Jaeban now claims that this decision was "inexplicable" (Jaeban Br. 29), but offers no reason why Judge Case should not have granted an unopposed Motion.

> **3. BRACII's First Motion to Strike the Counterclaims, the Assignment of the Counterclaims, and the Receivers' Obligation to Cooperate with Mr. Jaeban.**

On February 3, 2004, BRACII filed a Motion to Strike based on Jaeban UK's failure to obtain Delaware counsel and complete nonparticipation in discovery. At the time, BRACII was entitled to dismissal based on the absence of Delaware counsel to represent Jaeban UK, D. Del. R. 85.3(d); Bankr. D. Del. R. 9010-1(a) and did not file a separate motion under Rule 37.

Shortly before the deadline for Jaeban UK's response, on February 20, 2004, Jaeban UK assigned its counterclaims, but not its liabilities, to Mr. Jaeban. Jaeban Br. 8; BA165 (Deed of Assignment). Although his brief does not mention the purchase price, Mr. Jaeban paid only £5,000 (plus VAT) in upfront money for an assignment of a counterclaim allegedly worth $4,500,000.[8] *Id*, Cl. 1.4. Mr. Jaeban also agreed to share 10% of any eventual recovery and to release a license claim against Jaeban UK's depleted estate. The Deed of Assignment released

---

[8] In virtually giving away the counterclaims for an upfront payment of less than 1%, the Receivers evidently concluded that the counterclaims were without value. Although administrative receivers are appointed at the behest of an English company's secured creditor, they are obligated to look out for the interests of all of the company's creditors and take reasonable steps to preserve its assets. *See* BA174 (Affidavit of Patrick H.M. Corr, Esq., citing *Medforth v. Blake*, [2000] Ch. 86 (C.A.)). BRACII has submitted cited English decisions in its compendium of unpublished federal decisions.

the Jaeban Receivers from liability.

The Deed of Assignment contains another critical provision – a cooperation clause granting Mr. Jaeban the right to obtain Jaeban UK documents. Clause 4.1 required Jaeban UK, acting by its Receivers, to cooperate with Mr. Jaeban by:

> "deliver[ing] to the Assignee any and such further instruments and documents and promptly take all such further action as the Assignee [m]ay reasonably deem desirable to obtain the full benefit of the assignment contained herein."

On March 2, 2004, Mr. Jaeban's new Delaware counsel filed an opposition to BRACII's Motion to Strike, arguing that Mr. Jaeban should be treated as entirely distinct from Jaeban UK and that no sanctions should be awarded. Mr. Jaeban's Opposition promised that "Jaeban was and is able to *fully* cooperate and move forward with his claims." BA137 (emphasis added). In its Reply Memorandum (BA151), BRACII argued that Mr. Jaeban stood in the shoes of Jaeban UK under English and U.S. law, *see, e.g., Glencore Int'l A.G. v. Metro Trading Int'l Inc.*, [1999] 2 Lloyds Rep. 632, 645 (Queen's Bench Division (Commercial Court) Jul. 30, 1999); *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 231 (3d Cir. 2003), and should be subject to the same sanctions as Jaeban UK for Jaeban UK's total failure to participate. BRACII also argued that the assignment to Mr. Jaeban violated the anti-assignment provisions in the Umbrella Agreement and IPLA.

### C. The Bankruptcy Court's First Sanctions Order

On May 25, 2004, Judge Case issued the First Sanctions Order. The Court delineated the separate roles of Jaeban UK and Mr. Jaeban. Judge Case agreed with Mr. Jaeban that the assignment was valid; that dismissal against Jaeban UK was not appropriate at that time; and that Mr. Jaeban had not engaged in willful misconduct or bad faith as of the First Sanctions

Order.[9] *See* First Sanctions Order 11-14.

The Court nonetheless imposed monetary and other sanctions on Mr. Jaeban as assignee of Jaeban UK, although Mr. Jaeban's Brief never acknowledges that sanctions were imposed. As these sanctions, including a strict discovery deadline, reflect, Judge Case was not willing entirely to excuse Mr. Jaeban from the consequences of Jaeban UK's conduct. In Section IV, entitled "Sanctions to be Imposed," Judge Case ordered that "Mr. Jaeban is to:

    a.    Provide documents in response to Plaintiffs' Second Requests for Production of Documents (served on November 26, 2003);

    b.    Respond to concerns raised by Plaintiffs in a letter dated December 12, 2003 regarding apparent gaps in Jaeban's November production of documents."

as well as schedule depositions. First Sanctions Order, Section IV, ¶ 3. Judge Case also ordered, as a monetary sanction, that BRACII could deduct its £327,000 partial summary judgment and its attorneys fees and costs "from October 20, 2003 to the present" from the $4,500,000 in restricted funds set aside to cover the Cure Amount reserve. *Id.*, ¶¶ 1-2. The Court concluded by warning that Mr. Jaeban's failure:

"to meet this deadline [June 18, 2004] will result in an order prohibiting Mr. Jaeban from introducing into evidence (or using in any other way) any documents not so produced and prohibiting testimony from any witnesses not produced for deposition. *This is without prejudice to BRAC[II] seeking other sanctions that may be appropriate under the circumstances after the discovery period has elapsed.*"

First Sanctions Order 16 (emphasis added). Mr. Jaeban was indeed on notice that his conduct was, indeed, "under the microscope." Second Sanctions Decision 5.

The parties thereafter agreed to a Revised Pre-Trial Scheduling Order that

---

[9] On BRACII's Motion for Reconsideration, premised on *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1994] 1 A.C. 85 (H.L. 1993), the Court reaffirmed its ruling in Mr. Jaeban's favor that the anti-assignment provisions were inapplicable, but rejected his attempt to preclude the motion due to BRACII's "trivial" delay in filing its nonjurisdictional motion four days late. Sep. 14, 2004 Mem. Op. (D.I. 55).

provided for completion of depositions by August 23, 2004, but did not extend Mr. Jaeban's time

to comply with the document discovery deadline set in the First Sanctions Order. BA180. (The

parties did agree to extend the date from June 18, 2004 to June 21, 2004 for the documents that

Mr. Jaeban agreed to produce.) While a conscientious litigant would have raised any concerns in

the parties' Revised Pre-Trial Scheduling Order, the Order makes no mention of additional

document discovery from BRACII. *See* BA180. Nor did Mr. Jaeban seek additional document

discovery when the parties agreed that BRACII could file an Amended Complaint to add a claim

against Mr. Jaeban on his £500,000 personal guarantee.

**D.   Mr. Jaeban's Violations of the First Sanctions Order**

Pursuant to the First Sanctions Order, Mr. Jaeban produced one lever arch file

(*i.e.*, notebook) of additional documents to BRACII by the agreed deadline of June 21, 2004 and

proceeded to schedule depositions. *See* BA375. Neither Mr. Jaeban nor his counsel disclosed to

BRACII or the Court that there were responsive documents that had not been produced by the

deadline.[10]

The parties' U.S. counsel flew to England at the end of July 2004 to begin

depositions. By the end of the second day of Mr. Jaeban's deposition on August 5, 2004,

BRACII had learned that Mr. Jaeban had violated the First Sanctions Order in at least three

respects.[11]   A large volume of documents – many responsive, some containing critical binding

admissions -- was eventually produced later that month. Yet, to this day, Mr. Jaeban has never

complied fully with the First Sanctions Order, as described below. Due to Mr. Jaeban's conduct,

---

[10] Mr. Jaeban claims that his Delaware counsel explained this June 21st production to BRACII's counsel "on a detailed and line-by-line basis." Jaeban Br. 21, citing "Motion for Reconsideration, *Affidavit of Brian Sullivan*, paragraph 3." *See* BA450. Even if Mr. Sullivan's affidavit, which the Bankruptcy Court excluded on reconsideration, were considered, it provides no details of his conversation with BRACII's counsel. *See id.*, ¶ 3.

[11] Mr. Jaeban claims to have been deposed for one day, Jaeban Br. 22, but was in fact deposed for two days. *See* BA187.

the expensive deposition trip to England was indeed "wasted," to use Mr. Jaeban's term. *See*

Jaeban Br. 19.

**1.    Mr. Jaeban's Failure to Produce the Receivers' Documents Until August 2004.**

During the first week of August 2004, Mr. Jaeban's U.S. counsel, Robert Wilcox,

informed BRACII's counsel that the Jaeban Receivers still had many files containing documents

responsive to BRACII's two requests for production of documents that the Jaeban U.K.

Receivers had never produced to BRACII. BA203 (Wile Aff., ¶ 3). On August 9, 2004,

BRACII's counsel repeated its demand for immediate production of these files in a letter to Mr.

Jaeban's U.S. counsel. *Id.*, ¶ 6 & Ex. D (BA222).

On August 13, 2004, BRACII's counsel was finally permitted to review 20 lever

arch files of the Receivers' documents (*i.e.*, a production twice the size of Jaeban UK's

November 2003 production), in Birmingham. BA203 (Wile Aff., ¶ 7). The production included

numerous responsive documents, although communications with Jaeban UK's lenders remained

lacking. *See* Reply Mem. in Support of BRACII's Motion for Further Sanctions, BA429-30

(Wile Reply Aff., ¶ 3 (listing categories of responsive documents), BA203 (Wile Aff., ¶ 7). The

Receivers finally delivered copies of documents selected by BRACII's counsel twelve days later,

on August 25, 2004 (*id.*, ¶ 8), two days after the deadline by which depositions were to be

completed.

While many of the Receivers' documents cast significant light on Jaeban UK's

finances, among other matters, two letters directly contradict the Counterclaims.

a.    An October 15, 2003 letter from Ian Weatherall of Wragges to Michael
O'Connor of RSM Robson Rhodes LLP. Mr. Weatherall, acting for
Jaeban UK, concludes that, although BRACII is insolvent, Jaeban UK
both is and has continued to act as if it is bound by its BRACII franchisee
agreements. This advice contradicts Mr. Jaeban's position, set forth in the
letter and in this case, that neither he nor Jaeban UK "were bound by the

13

> franchise agreements." In the letter, Mr. Weatherall accurately describes
> Mr. Jaeban as "seeking to argue that they can have all the benefit of the
> franchise agreement without any liabilities."

b.   A January 15, 2004 letter from Mr. Jaeban to the Receivers contesting Mr.
     Weatherall's apparent advice to the Receivers that the allegations of
     breach of the Umbrella Agreement and IPLA in the Counterclaims are
     without merit.

BA243; BA247. It is apparent that the October 15, 2003 letter should have been included in the

November 2003 production. Mr. Jaeban has never produced his copy of the Weatherall letter to

which his letter responds.[12] There is no evidence in the record that Mr. Jaeban or his counsel

invoked the plain words of the Cooperation Clause in the Deed of Assignment to obtain these

documents from the possession of the Jaeban Receivers prior to the deadline set by the First

Sanctions Order.

### 2.   Mr. Jaeban's Failure to Produce Responsive Welcome House Documents – and the Later Production of 84 Boxes.

On August 5, 2004, BRACII also learned that Mr. Jaeban had failed to produce to

BRACII responsive documents under his control at Welcome House, Jaeban UK's former

headquarters in Oldbury, England. BA204 (Wile Aff., ¶ 10). Mr. Jaeban subsequently caused

his counsel to dump 84 boxes of documents and a whiteboard to the London office of Sidley

Austin Brown & Wood LLP on August 11, 2004. *Id.*, ¶ 11. Mr. Jaeban and his counsel made no

effort to identify responsive documents, leaving BRACII's U.S. and London counsel at Sidley

Austin to spend 65 hours (and BRACII to incur significant expense) culling through and

cataloguing these documents. BA440 (Taylor Reply Aff., ¶ 2).

Many of the boxes should never have been sent, and it was Mr. Jaeban's

responsibility to have produced responsive documents by the June 18th deadline seven weeks

earlier. Buried in the 84-box production, however, were significant documents bearing on, for

---

[12] BRACII's Motion to Compel (D.I. 59) was pending when the Counterclaims were dismissed.

14

example, Jaeban UK's financial condition, Zodiac/Avis's decision not to keep Jaeban UK as a

licensee, and BRACII's BMS computer system for which Jaeban UK, at Mr. Jaeban's direction,

refused to pay fees as detailed in Exhibit C to the Amended Complaint. *See generally* BA430

(Wile Reply Aff., ¶ 3 (listing categories of relevant documents)).

### 3.    Late Production of the Credit Pack Document.

Mr. Jaeban made a supplemental production of a lever arch file of documents to

BRACII at BRACII's U.S. counsel's hotel on August 3, 2004, the day before Mr. Jaeban's

deposition began. (This file is in addition to the *other* lever arch file produced on June 21,

2004.) These documents apparently came from the files of Wragge & Co. *See* BA205-06 (Wile

Aff., ¶ 19).

This production included the Credit Pack document (BA249) – a presentation by

Jaeban UK to lenders *See id.*, ¶ 20. The Credit Pack is plainly responsive and important – it

vividly contradicts Mr. Jaeban's claims of material breaches of contract by BRACII, typified by

its statement that Jaeban UK's "strengths" included a "partnership style relationship" with

BRACII and its extolling of the "New BMS system enabling real time management of the

business" (BA265), as to which Jaeban UK refused to pay charges. Am. Compl., Ex. C. No

explanation has been given why it was not produced earlier, when BRACII could have promptly

sought discovery from Jaeban UK's lenders to explore their receipt of this or any similar

documents.

On appeal, Mr. Jaeban claims that "this credit information was prepared by ex-

employees of BRACII based upon information sent by BRACII to its franchise in 2001." Jaeban

Br. 35. Mr. Jaeban makes this and other claims about the Credit Pack without a single citation to

the record (*see id.*), and there is no evidence in the record that BRACII prepared this document

as his brief implies. On its face, as the copy in the record (BA249) shows, the document was

prepared by Jaeban UK to discuss its finances and prospects. Even Mr. Jaeban does not claim that the document is nonresponsive, irrelevant, or not required to have been produced by the deadline in the First Sanctions Order.

### 4.    Possible Misconduct in the November 2003 Document Production.

Judge Case was satisfied that the foregoing violations of the First Sanctions Order were sufficient grounds to strike Mr. Jaeban's Counterclaims. *See infra*. He therefore did not reach other compelling grounds for dismissal urged by BRACII in the Bankruptcy Court.

In the first place, there is no evidence in either the admitted or excluded affidavits that Jaeban UK or Mr. Jaeban, prior to the November 2003 production or the deadline set by the First Sanctions Order, caused Wragges or PwC to make the necessary effort to download all responsive Jaeban UK e-mails. Very few e-mails were produced to BRACII in the November 2003 production, even though this was a key "gap" identified in the December 12, 2003 letter (BA97) to Jaeban UK's counsel.

During Mr. Jaeban's deposition in August 2004, Mr. Jaeban's U.S. counsel heightened BRACII's concerns. Mr. Wilcox informed both Mr. Wile and Mr. Wile's London colleague, Phillip Taylor, that, in preparing the earlier production, PwC may have performed its own "relevance" determination in deciding which documents to produce to BRACII. BA205 (Wile Aff., ¶ 16); BA441 (Taylor Reply Aff., ¶ 3). Of course, Jaeban UK never filed objections to the First Requests that would justify any sort of screening of responsive documents by PwC. The gaps in the November 2003 production (*e.g.*, the Credit Pack) support the conclusion of a failure to comply. Mr. Jaeban's counsel have never squarely denied that a "relevance" screening occurred or explained what procedures were used, despite BRACII's insistence on clarification. *See* BA391 (Wilcox Aff., ¶ 9 (affidavit denying only that production was "improper")); BA226 (August 10, 2004 letter from Steven Allen claiming supervision of the production by Morris

16

Nichols – even though no written response was served by that firm– but failing to state what occurred).

**5.    Mr. Jaeban's Further Misconduct with Respect to Jaeban UK Computers.**

When Mr. Jaeban opposed BRACII's Motion for Further Sanctions, he did not disclose to the Bankruptcy Court that he had initiated a search of Jaeban UK's former e-mail system to determine if responsive e-mails had not yet been produced. *See* BA430-31(Wile Reply Aff., ¶¶ 5-6). At some point after August 11th, when BRACII first learned of the effort, Mr. Jaeban's professionals obtained access to at least one e-mail server.

Since August 2004, Mr. Jaeban has refused to tell BRACII whether any e-mail servers were no longer available for review or reveal the results of the one review that did occur. Instead, on December 7, 2004, his U.S. counsel threatened BRACII with sanctions if it raised the issue with the Bankruptcy Court. BA628. Yet, in his February 15, 2005 Reply Memorandum in Support of Reconsideration, Mr. Jaeban states that (a) the review was "accomplished in November 2004" and reviewed by his English counsel "in early December 2004" and (b) his English counsel sent Mr. Jaeban's U.S. counsel "a disk" on December 15, 2005 (the day before the Second Sanctions Decision was docketed). Mr. Jaeban does not state that the "disk" was empty, and he has never sent a copy of the disk or its contents to BRACII. *See generally* BA699-700.

**E.    Mr. Jaeban's Portrayal of BRACII's Document Production**

At intervals in his brief, Mr. Jaeban alludes to BRACII's document production while omitting most of the critical facts. As noted above, Jaeban UK served a set of document requests on BRACII on January 2, 2004. BRACII served timely objections and delivered documents to Wragges. The parties' agreed fact discovery deadline expired on January 30,

2004. Mr. Jaeban has never filed a motion to compel with respect to that production.

Indeed, although Mr. Jaeban took his assignment of the Counterclaims on February 20, 2004, he did not seek to reopen the fact discovery deadline at that time.[13] Nor did he seek to reopen document discovery from BRACII when (a) Judge Case imposed the June 18, 2004 document discovery deadline on Mr. Jaeban alone or (b) when the parties agreed that BRACII could file an Amended Complaint in July to add the personal guarantee claim against Mr. Jaeban. Mr. Jaeban waited until August 27, 2004 to file his "Motion for Reopening Limited Discovery."

Mr. Jaeban is correct that BRACII supplemented its document production prior to the start of Mr. Jaeban's deposition. *See* BA206 (BRACII produced "the equivalent of a lever arch file" of documents). BRACII did so even though it was not the subject of an order compelling supplementation.[14]

### F.    Postponement of Further Depositions

As the document issues mounted, BRACII and Mr. Jaeban's Delaware counsel eventually reached agreement that all depositions should be postponed until the issues were resolved.[15] *See* BA240. Mr. Jaeban eventually filed a motion to extend the time period based on "unanticipated discovery and logistical issues" embodying that agreement without any complaint against BRACII (BA182), and BRACII concurred in this portion of Mr. Jaeban's Motion as agreed. BA284.

---

[13] His counsel at Wragges already had the documents. Until Mr. Allen joined Mills & Reeve in July 2004, Wragges represented Mr. Jaeban, Jaeban UK, and its Administrative Receivers. *See* BA533-38.

[14] Mr. Jaeban complains for the first time on appeal that BRACII used "documents" from this production at Mr. Jaeban's deposition – but has neither included the transcripts nor shown any prejudice.

[15] Mr. Jaeban initially insisted that the Terry Clark deposition proceed on August 9th (BA430 (Wile Reply Aff., ¶ 4); BRACII refused to proceed until the missing documents were produced. *See* BA224 & n.1.

## THE DECISIONS ON APPEAL

### A.    The Second Sanctions Decision

In light of the impact of Mr. Jaeban's violations of the First Sanctions Order on discovery, BRACII filed its Motion for Further Sanctions on August 27, 2004. After the motion was fully briefed, Judge Case held a one-hour argument on September 21, 2004. BA477-517 (hearing transcript). The transcript may reflect that Mr. Allen's telephone connection was "not a good one" (Jaeban Br. 27; *see* BA506), but Mr. Allen presented a 2½ page argument on the Receivers' documents (BA504-06; *see also* BA507-08), not discussed in Mr. Jaeban's brief. Judge Case issued his decision 12 weeks later, on December 14, 2004, but Mr. Jaeban chose not to submit any supplemental materials in the interim.

In the Second Sanctions Decision (at 8), Judge Case concluded that, "First Jaeban UK and now Mr. Jaeban, as assignee of this claim, have been given a more than adequate opportunity to pursue it vigorously and consistent with the Court's directive and failed to do so." The Court relied on Mr. Jaeban's failure to produce the Jaeban UK documents in the Receivers' possession, the Welcome House documents, and the Credit Pack document by the deadline in the First Sanctions Order. *Id.* 3-4. The Court catalogued and dismissed Mr. Jaeban's excuses, noting, *inter alia,* that Mr. Jaeban should have apprised the Court and BRACII if he was unable to comply with the deadline set by the First Sanctions Order. *Id.* 6. The Court was emphatic that the First Sanctions Order had put Mr. Jaeban "under the microscope" for discovery compliance (*id.* 5) and that he had failed to comply at his peril.

As relief, the Court dismissed Mr. Jaeban's assigned Counterclaims and ordered release of the $4.5 million Cure Amount reserve maintained by BRACII. Judge Case discussed each of the factors set forth in the Third Circuit's *Poulis* decision, *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). While BRACII discusses each *Poulis* factor below,

Judge Case's overarching theme was unmistakable: "[T]here is no basis to believe that Mr. Jaeban will abide by [a new set of sanctions] any more than he has abided by the previous ones." On January 12, 2005, the Court entered an agreed form of Order overruling Jaeban UK's cure objection, releasing the $4.5 million in BRACII funds, and dismissing the counterclaims.

**B.      The Bankruptcy Court's Denial of Reconsideration**

On January 24, 2005, Mr. Jaeban filed a Motion for Reconsideration. Instead of identifying a clear error in the record, Mr. Jaeban violated the standards for reconsideration by presenting arguments that were "a regurgitation of what he already presented to the Court in response to BRACII's motion for sanctions." Reconsideration Order 4. Dismissing these arguments, the Court restated its conclusion that "Mr. Jaeban failed to take seriously this Court's earlier warnings and elected, instead, to do as little as possible and blame his lack of diligence on Jaeban UK or the Receiver's representatives." *Id.* 5.

The remainder of Mr. Jaeban's motion relied on a brand-new round of affidavits, including a second affidavit from Mr. Jaeban and, for the first time, affidavits from Brian Sullivan, Steven Allen, and Ian Weatherall.[16] The Bankruptcy Court excluded the affidavits, holding that "Mr. Jaeban's attempt to bolster his earlier arguments with new affidavits is not permitted on reconsideration. Motions for reconsideration are not meant to allow the disappointed party a second bite at the apple." *Id.* 6. The Court did allude to the core contention in these affidavits – the limited contact with the Receivers prior to the First Sanctions Order deadline. *See id.* 5. The Court reiterated that (a) Mr. Jaeban should have apprised BRACII and the Court if he was unable to comply with the First Sanctions Order deadline and (b) a "[s]erious effort" proved to be sufficient to cause the Jaeban Receivers to produce their responsive

---

[16] The vast majority of Mr. Jaeban's affidavit references his opening brief are to the second round of affidavits, not affidavits originally considered by the Bankruptcy Court in granting BRACII's Motion.

documents. *Id.*

Mr. Jaeban nowhere discloses in his brief that Judge Case granted him partial

relief. The Court revised its decision by permitting Mr. Jaeban to take discovery to defend

against BRACII's personal guarantee claim to the extent of Mr. Jaeban's defenses.[17] *See id.* 5-6.

## ARGUMENT

**I.    MR. JAEBAN WILLFULLY VIOLATED THE FIRST SANCTIONS ORDER.**

### A.    Mr. Jaeban's Violations

#### 1.    The Three Failures to Produce Responsive Hard Copy Documents.

The Bankruptcy Court found that Mr. Jaeban repeatedly violated the terms of the

First Sanctions Order by producing the Receivers' documents, the Welcome House documents,

and the Credit Pack after the June 18, 2004 deadline set in the First Sanctions Order. It is

undisputed that:

a.    BRACII was not allowed to review the Jaeban UK documents produced by the Jaeban Receivers until August 13, 2004 and did not receive copies until August 25, 2004. These documents included the Weatherall and Jaeban letters "questioning the underpinnings of Mr. Jaeban's claims." Second Sanctions Decision 8.

b.    Mr. Jaeban did not deliver the 84 boxes (and whiteboard) from Welcome House to BRACII until August 11, 2004 and put BRACII to the expense of culling responsive documents from these boxes.

c.    Mr. Jaeban did not produce the Credit Pack document until August 3, 2004, the day before the beginning of his deposition.

Mr. Jaeban's only response is to dispute to the significance (*i.e.*, not the

responsiveness) of these documents, even impermissibly going outside the record with respect to

---

[17] Except to the extent that Mr. Jaeban contests the validity of BRACII's demand on his guaranty, Am. Answer and Counterclaims, ¶ ¶ 29, 41, no additional discovery will occur. Mr. Jaeban has no other defense to the £327,944.09 partial summary judgment; the partial summary judgment eliminated any defenses. (The dismissal of his counterclaims has the same effect.) BRACII represents to the Court that it will not purse the remaining £172,055.91 – the cost of pre-trial proceedings and trial would certainly exceed this amount.

the Credit Pack, for example. Judge Case twice made the only point that matters: Mr. Jaeban does not deny that he failed to produce relevant, responsive documents before the deadline set by the First Sanctions Order.

### 2.    Additional Willful Violations.

The Bankruptcy Court found the violations listed above more than sufficient to dismiss Mr. Jaeban's counterclaims. Mr. Jaeban's additional violations, continuing to the present, further refute the claims in his Opening Brief that he has complied with the First Sanctions Order. These violations were willful and prejudicial, were fully briefed in the Bankruptcy Court, and provide additional grounds for affirmance because the reviewing court looks to the entire trial court record in reviewing a *Poulis* analysis. *Hoxworth*, 980 F.2d at 920, 922 (supporting district court's findings with additional evidence in the record). *See, e.g., Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 344 (3d Cir. 2004) (Court of Appeals can affirm on additional grounds raised by appellee in the trial court).

*First*, Mr. Jaeban and his counsel have refused to tell BRACII whether PwC (or Wragges) conducted an impermissible "relevance" review, based on its own criteria of "relevance," in the absence of any objection by Jaeban UK. *Second*, Mr. Jaeban has failed to explain why he did not promptly complete, or at least report on the results of, the e-mail server review. Mr. Jaeban had the results by "early December," but did not report the results or provide BRACII or the Court with the disk sent from England. *Third*, Mr. Jaeban has refused to report on the whereabouts of any other Jaeban UK e-mail servers.

### B.    Mr. Jaeban's Excuses

### 1.    The Credit Pack Document.

Mr. Jaeban has not offered any excuse for his failure to produce the Credit Pack extolling Jaeban UK's relationship with BRACII. Both its provenance and how anyone could

deem it nonresponsive (or even irrelevant) are unresolved mysteries, even if Mr. Jaeban believes

he can undermine this Jaeban UK document.

### 2.    The Welcome House Documents.

Mr. Jaeban's excuse is that Jaeban UK (through its agents, the Receivers) had

already produced documents from Welcome House to BRACII in November 2003. "[T]he

Bankruptcy Court . . . committed error in clearly not comprehending the important fact that Mr.

Jaeban's turnover in August 2004 of the Welcome House boxes was not the first disclosure of

the Welcome House documents."[18]  Jaeban Br. 13.

The Court was aware of the prior production (Second Sanctions Decision 6) and

committed no error.  The First Sanctions Order required Mr. Jaeban to "fill in the gaps."  The

First Sanctions Order did not allow Mr. Jaeban to choose which gaps he would like to fill or skip,

so that he could avoid expense while claiming $4.5 million to $9.9 million from BRACII.  *Cf.*

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, 1998 U.S. Dist. LEXIS 7750, at *11 (E.D. Pa.

May 27, 1998) (litigant not entitled to decide "what type and amount of discovery" is sufficient

for his adversary), *aff'd*, 178 F.3d 1279 (3d Cir. 1999).

For Mr. Jaeban to have complied with the First Sanctions Order's command to

"fill in the gaps," he would have had to review the November 2003 production and the Welcome

House documents to determine whether all responsive documents (such as documents bearing on

Jaeban UK's financial condition, its relations with Zodiac/Avis, and agreements with BRACII)

had been produced.  The First Sanctions Order also commanded him to review these documents

for compliance with the Second Requests, directed to ***Jaeban UK*** (*i.e.*, not the Jaeban Receivers)

---

[18] Mr. Jaeban claims in his brief that Wragges and PwC had "carefully reviewed" these documents before
the "October, 2003" production to BRACII.  Jaeban Br. 6 (citing Jaeban 1st Aff., ¶ 4).  Not only does Mr.
Jaeban's brief cite the wrong production date, but the cited paragraph does not describe the review.  The
responsive documents produced in August 2004 prove otherwise.

(*see* BA218), which were served *after* the first Welcome House production.[19] He did not do so

and inflicted the expense on BRACII seven weeks after the First Sanctions Order deadline. *See*

Taylor Reply Aff., ¶ 2.

3.    **The Receivers' Documents**

a.    **Evidence in the Record.**

In opposing BRACII's Motion for Further Sanctions, Mr. Jaeban failed to offer

any plausible explanation why he did not comply with the deadline. Accordingly, the Court

found

> "lacking Mr. Jaeban's record of what actions he took with respect to the Receiver
> and when. It appears, from the record Mr. Jaeban has provided, that he and his
> counsel did not contact the Receiver until after the June 18th deadline had already
> passed. Paragraph 4 of Mr. Wilcox's affidavit indicates that he and Mr. Jaeban did
> not contact the receiver until August 4. And, once this contact was made, Mr.
> Jaeban had the documents produced nearly a week later to BRACII on August 12."

Second Sanctions Decision 5. Mr. Jaeban does not refute the Court's analysis of the record

before it on BRACII's Motion.[20] His silence is an admission that Judge Case accurately

understood the record before him. *See Kopec v. Tate*, 361 F.3d 772, 775 n.5 (3d Cir.) (an issue is

waived unless raised in appellant's opening brief), *cert. denied*, 125 S. Ct. 453 (2004).

Mr. Jaeban does make one untenable assertion applicable to both the Motion for

Further Sanctions and his Motion for Reconsideration. He claims for the first time on appeal that

BRACII was required to subpoena the Receivers. Because he did not make this argument in the

Bankruptcy Court, it is waived. *Buncher Co. v. Official Comm. of Unsecured Creditors of*

*GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000). *See International Fin. Corp. v.*

---

[19] Although Jaeban UK filed objections to the Second Requests, Mr. Briggs also promised a production.
BA101. In addition, Mr. Jaeban has made no effort to show that the responsive documents not produced
until August were covered by the objections to the Second Requests.

[20] Oddly, he quotes the Court's analysis in its Reconsideration Opinion (at 5) as the Court's analysis in its
Second Sanctions Decision. *See Jaeban Br. 17.*

*Kaiser Group Int'l Inc.(In re Kaiser Group Int'l Inc.)*, 399 F.3d 558, 565 (3d Cir. 2005) (arguments not raised in bankruptcy court are waived; exception exists for jurisdictional arguments).

Moreover, this is a frivolous argument because the documents belonged to Jaeban UK, not the Jaeban Receivers. Under Section 44(1)(a) of the Insolvency Act 1986, *available at* http://www.insolvencyhelpline.co.uk/insolvency-act/ia1986.htm, the Receivers are merely agents of Jaeban UK. Both the First and Second Requests were directed to Jaeban UK and the Receivers' documents were responsive to both.

## b.     The Excluded Affidavits

### i.     The Bankruptcy Court Properly Excluded the Reconsideration Affidavits.

To a remarkable degree, Mr. Jaeban places his hopes on the second round of affidavits that he did not submit until his Motion for Reconsideration. Unless these are admitted, much of his appeal collapses, given his reliance on the reconsideration record.[21] The result of this gambit is to compel the Court to choose between admitting the affidavits or rejecting his appeal out of hand.

Judge Case's decision to exclude the affidavits on reconsideration is reviewed for abuse of discretion. *E.g.*, *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1317 n.7 (11th Cir. 2003); *Washington Hosp. v. White*, 889 F.2d 1294, 1303 n.14 (3d Cir. 1989). The rule in the Third Circuit on belated submissions is clear and has been repeated many times. "Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985), *cert.*

---

[21]  None of the five references to the first set of affidavits in the Opening Brief discuss his efforts to comply with the June 18th deadline after the First Sanctions Order was entered. *See* Jaeban Br. 6, 7, 20.

*denied,* 476 U.S. 1171 (1986).[22] As this Court has recognized:

> "[A] motion for reargument may not be used by the losing litigant as a vehicle to supplement or enlarge the record provided to the Court and upon which the merits decision was made unless 'new factual matters not previously obtainable have been discovered since the issue was submitted to the Court.'"

*Digene Corp. v. Ventana Med. Sys.,* 2004 U.S. Dist. LEXIS 12783, at *4-*5 (D. Del. July 6, 2004) (internal citation omitted).

Although Mr. Jaeban cited *Harsco* in his Motion for Reconsideration (at 2), he ignored its contents and did not offer a single justification for the belated offer of the affidavits – even though four months elapsed between the oral argument and the Court's decision. Not a single fact attested in the affidavits occurred after the argument of BRACII's Motion. *Harsco* and the numerous cases citing its principle require their exclusion.

Mr. Jaeban's Opening Brief also fails to offer any excuse for waiting to see the Bankruptcy Court's decision before offering the affidavits. Instead, he cites *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros,* 176 F.3d 669 (3d Cir. 1999); *Proxim Inc. v. 3Com Corp.,* 2003 U.S. Dist. LEXIS 2556 (D. Del. Feb. 21, 2003); and *In re UA Theatre Co.,* 2004 Bankr. LEXIS 1258 (Bankr. D. Del. Aug. 25, 2004). Only *Max's Seafood* is an appellate decision. The Third Circuit relied in part on the appellant's reasonable belief that "there was no need to raise its incorporation date as a defense," 176 F.3d at 678, and reversed on the basis of a single, clear fact – appellant's lack of incorporation on the relevant date. Here, Mr. Jaeban knew to put every allegation he could muster before the Bankruptcy Court when it considered BRACII's motion,

---

[22] *See, e.g., eSpeed, Inc. v. Brokertec USA, L.L.C.,* 2005 U.S. Dist. LEXIS 785, at *3 (D. Del. Jan. 11, 2005); *Garrison v. Town of Bethany Beach,* 2001 U.S. Dist. LEXIS 8434, at *7-*8 (D. Del. Apr. 11, 2001) (movant failed to explain "why the [lawyer's] affidavit could not be procured earlier."); *Schering Corp. v. Amgen, Inc.,* 25 F. Supp. 2d 293 (D. Del. 1998) (rejecting evidence known to movant two weeks prior to prior hearing).

and his proffered facts ultimately damage his position, as discussed *infra*.[23]

On appeal, for the first time, Mr. Jaeban offers two additional arguments that he waived by not raising below. *Buncher Co.* They are also futile excuses for his noncompliance. First, Mr. Jaeban claims that the four new reconsideration affidavits were merely a response to an invitation of the Bankruptcy Court at the September 21, 2004 oral argument. Jaeban Br. 12, 26. The Court assuredly was not inviting Mr. Jaeban to wait until after the Court's decision four months later to answer its questions.

Mr. Jaeban's other new argument is that Mr. Allen had a bad telephone connection to the Court. *Id.* at 27. That connection did not stop Mr. Allen from speaking to the subject. *See* Tr. 28-32. If the alleged facts were important, surely Mr. Jaeban's U.S. counsel would have been prepared to address them – and they would have been in the affidavits that Mr. Jaeban submitted in opposition to BRACII's Motion beforehand or in a supplemental submission *before* Judge Case decided the motion.

None of these arguments shows that Judge Case abused his discretion. Instead, they confirm that Mr. Jaeban did not appreciate the seriousness of his violations of the First Sanctions Order until after BRACII's Motion was granted. This is further proof of Mr. Jaeban's inability to understand his obligations, as the Bankruptcy Court found.

### ii.    The Reconsideration Affidavits Confirm Mr. Jaeban's Noncompliance.

For all of his reliance, the belated affidavits ultimately hurt, not help, Mr. Jaeban. They show that nearly all of the alleged efforts identified in Mr. Jaeban's excluded evidence began on June 9, 2004, only nine days before the Court's deadline. *See, e.g.,* Motion at 10-11.

---

[23] *Proxim* and *UA* did not review an exercise of discretion on appeal. Both involved cases where evidence was belatedly used to refute an assertion of fact by the other party. Here, the facts regarding Mr. Jaeban's failure to produce the Receivers' documents before June 18th are entirely within Mr. Jaeban's control.

In purporting to give a fuller picture of Mr. Jaeban's efforts, they confirm that neither he nor his counsel made any effort to look for the missing Jaeban UK e-mails, despite BRACII's emphasis on that "gap" in its December 12, 2003 letter. Nor do they provide a competent excuse for his failure to review the Welcome House documents.

Mr. Jaeban's principal reason for submitting the affidavits is to show that efforts were made to contact the Receivers, but they are more enlightening for what they do not show. They do not show that either he or his counsel at Wragges invoked the Deed of Assignment or the powers of the Bankruptcy Court to insist on disclosure of the Jaeban UK documents. They also do not show Mr. Jaeban's counsel apprising BRACII or the Court of what form these efforts took. The reports of the response of the Receivers are hearsay, but, if they are accurate, than Mr. Jaeban and his counsel at Wragges knew or should have known that it was specious for the Receivers to claim that the documents were nonresponsive or entirely privileged; Morris Nichols had promised a document production the previous December. Mr. Jaeban, above all, knew that the Receivers had his letter protesting Mr. Weatherall's assessment of the merits of the Counterclaims that they produced to BRACII *after* a privilege review.[24] His counsel knew or should have known that documents showing that the Umbrella Agreement and IPLAs were still in force were responsive. Both Mr. Briggs' December 30th letter and Jaeban UK's responses to the Second Requests promised documents (*see* BA470-72), yet Mr. Jaeban and Wragges seem to have accepted the Receivers' assertions (assuming *arguendo* they were made).

Above all, the new affidavits do nothing to undermine the Bankruptcy Court's bedrock finding: once Mr. Jaeban *and* his U.S. counsel contacted the Receivers, the documents were readily produced. Reconsideration Order 5. Mr. Jaeban attempts to take the sting out of

---

[24] And, like Mr. Jaeban (BA247), BRACII would like Mr. Weatherall "to elaborate on his comments about me [*i.e.*, Mr. Jaeban] in the document he provided."

Judge Case's comment, "Apparently, all it took was an email" (Reconsideration Order 5), by complaining that it was plagiarized from BRACII's memorandum (Jaeban Br. 30), but this was eminently fair use.[25]  The Bankruptcy Court's finding was absolutely correct, not clearly erroneous.

### 4.    BRACII Did Not Acquiesce in Mr. Jaeban's Violations of the First Sanctions Order.

Mr. Jaeban does repeat an argument that he did raise below and that did not impress the Bankruptcy Court.  Mr. Jaeban again maintains that BRACII somehow acquiesced in Mr. Jaeban's violations of the First Sanctions Order because BRACII did not protest when Mr. Sullivan informed BRACII's U.S. counsel that Wragges would be sending an additional arch lever file of documents before the June deadline.  In fact, Mr. Sullivan's transmittal e-mail merely listed the documents produced at that time.  *See* BA541 (Sullivan Aff., ¶4 (e-mail "contained the list of supplemental documents.").

At bottom, this argument pretends that noncompliance is compliance.  BRACII could not acquiesce in what it was not told.  BRACII was not told that Mr. Jaeban was not going to produce the Credit Pack and had refused to review the Welcome House documents and to invoke the Cooperation Clause with the Receivers.  Nor did Mr. Jaeban disclose his failure to look for more e-mails.  The evidence shows not acquiescence but, at best, Mr. Jaeban's indifference to his obligations as found by the Bankruptcy Court.

## II.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN ENFORCING THE TERMS OF THE FIRST SANCTIONS ORDER.

As Mr. Jaeban acknowledges (Jaeban Br. 1), the Bankruptcy Court's decision to

---

[25] Mr. Jaeban may complain that the e-mail in question came from Mr. Allen, not U.S. counsel.  Mr. Allen's reconsideration affidavit makes clear that he had no understanding of why the production was required in response to *both* of BRACII's document requests.  *See* BA533-38.  Mr. Wilcox obviously did understand, because the documents were promptly produced once he intervened.  *See* BA536-37 (Allen Reconsideration Aff., ¶¶22-27).

dismiss the assigned Counterclaims is reviewed only for abuse of discretion. *E.g., Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221-22 (3d Cir. 2003); *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992). The scope of review is "extremely narrow" and "great deference" is given to the trial court's decision in light of its direct contact with the parties. *Id.* at 1373 (internal citation and quotation marks omitted). *See Ware*, 322 F.3d at 222 ("standard of review is deferential."). Reviewing courts have looked to the trial court's overall judgment using the *Poulis* factors. It is not necessary that every *Poulis* factor support dismissal or be "weighed equally." *Haraway v. National Ass'n For Stock Car Auto Racing, Inc.*, 213 F.R.D. 161, 164 (D. Del. 2003) (citing cases).

Where, as here, the claimant has violated an existing order, not just the discovery rules, dismissals are readily upheld or imposed. *See Emerson v. Thiel Coll.*, 296 F.3d 184, 191 (3d Cir. 2002); *Mindek*, 964 F.2d at 1374-75; *United States v. $1,322,242.58*, 938 F.2d 433, 440 (3d Cir. 1991); *Hicks v. Feeney*, 850 F.2d 152, 156 (3d Cir. 1988), *cert. denied,* 488 U.S. 1005 (1989); *Curtis T. Bedwell & Sons Inc. v. International Fid. Ins. Co.*, 843 F.2d 683, 693-94 (3d Cir. 1988). In *Hicks*, for example, dismissal was upheld based on plaintiff's failure to attend his deposition. In *Mindek*, the plaintiffs had failed to file a pre-trial narrative statement. In *Haraway* (cited by Mr. Jaeban), this Court refused to dismiss a complaint because lesser sanctions had not been tried, but warned that "[f]urther failure by plaintiff to prosecute this action will result in dismissal with prejudice." 213 F.R.D. at 166.

Mr. Jaeban has certainly not cited a case holding that a litigant who violates a previous *sanctions* order is entitled to an opportunity to do so.[26] Here, Judge Case imposed

---

[26] Because the Court has the inherent power to enforce an existing sanctions order, BRACII was not required to file a superfluous Rule 37 motion, *see Degen v. United States*, 517 U.S. 820, 827 (1996); *Floyd v. Black Swan Shipping Co.*, 2002 U.S. Dist. LEXIS 13385, at *2-*4 (E.D. Pa. July 18, 2002), especially since the First Sanctions Order was itself an order to compel discovery. (A motion to compel

lesser sanctions, was met with willful noncompliance, and dismissed the counterclaims in the manner contemplated by *Haraway*. But dismissal occurred only after the Court discussed each of the six *Poulis* factors.

### 1.    Personal Responsibility.

Both in granting BRACII's Motion for Further Sanctions and denying Mr. Jaeban's Motion for Reconsideration, Judge Case rejected Mr. Jaeban's claim, repeated several times on appeal, that any delays were the fault of the Receiver. Second Sanctions Decision 6; Reconsideration Order 5. The failure to produce the Welcome House documents and the Credit Pack (and the failure to answer questions about the November 2003 production, the whereabouts of Jaeban UK's other e-mail servers, and the results of the e-mail review) are clearly Mr. Jaeban's responsibility.

Judge Case's summation in his Reconsideration Opinion is well-founded:

> "[T]he sanctions against Mr. Jaeban were not simply for one or two failures to comply or produce certain information, which he characterizes as events beyond his control. The sanctions were imposed for Mr. Jaeban's overall carelessness in not only [not] complying with this Court's instructions but also in failing to keep BRACII and this Court apprised of what he was in fact doing in a good faith attempt to comply. The record reflects that Mr. Jaeban failed to take seriously this Court's earlier warnings and elected, instead, to perhaps do as little as possible and blame his lack of diligence on Jaeban UK or the Receiver's representatives."

Reconsideration Order 5. This discussion is sufficient to cover all of the *Poulis* factors, except for the merits. It is also well grounded in the record, not the clear error that Mr. Jaeban must show.

---

would have resulted in precisely the same relief afforded by the First Sanctions Order.) Even if the First Sanctions Order were a scheduling order, not a sanctions order, trial courts have the power to impose sanctions, including dismissal, for violations of scheduling orders. *See* Fed. R. Civ. P. 16(f); *Snyder v. Hi-Tech Elecs. Displays Inc.*, 2004 U.S. Dist. LEXIS 24953, at *11-*12 (D. Del. Nov. 24, 2004). Nor did Mr. Jaeban raise this argument in opposition to BRACII's Motion for Further Sanctions or in support of his Motion for Reconsideration.

Mr. Jaeban argues as a separate ground for reversal (*see* Jaeban Br. 24-25) and in his discussion of *Poulis* (*id.* 31) that the Bankruptcy Court committed clear error because it confused Mr. Jaeban's conduct with the prior conduct of the Jaeban UK Receivers that led to the First Sanctions Motion. He ignores both the contents of the Second Sanctions Decision and the Reconsideration Order, as well as his own status as assignee.

In reality, Judge Case's Second Sanctions Decision carefully distinguished the conduct of Jaeban UK before the First Sanctions Order from Mr. Jaeban's misconduct in failing to comply with that Order. In his general discussion, the Court expressly recognized that the First Sanctions Motion was based on prior misconduct that "was a result of the Administrative Receiver in England, over which Mr. Jaeban and Jaeban UK had no control." Second Sanctions Decision 5. The Court's "dilatoriness" finding is even more explicit: "While there previously was no such history, now there clearly is." *Id.* 7. The Court's opinion concludes by noting the noncompliance by "[f]irst Jaeban UK and now Mr. Jaeban, as assignee." *Id.* 8. Mr. Jaeban does not have a good faith basis for this argument.

Mr. Jaeban's true complaint is that the First Sanctions Order treated Mr. Jaeban as Jaeban UK's assignee, not a stranger to the litigation. Not only did Mr. Jaeban fail to appeal or seek reconsideration, but Judge Case exercised reasonable discretion in holding that Mr. Jaeban could not purchase a purported $4.5 million claim for £5,000 (plus VAT) in upfront money and entirely escape the consequences of the misconduct of the party in whose shoes he now stands.

Mr. Jaeban's other argument is to repeat from his Motion for Reconsideration a litany of facts of what steps he did take (or allegedly took). He presented this list for the first time on reconsideration based on his excluded affidavits. *See* Jaeban Br. 32-33 (citing Jaeban reconsideration affidavit). Not only were these affidavits properly excluded, *see Digene Corp.*,

but they are no answer to Judge Case. Mr. Jaeban may have paid Wragges its back fees, for example, and made one misleading and incomplete production of documents before the First Sanctions Order deadline. But a litigant seeking as much as $9.9 million in damages was required to comply fully with the First Sanctions Order. For the reasons in Judge Case's two opinions, Mr. Jaeban's noncompliance is fully his responsibility.

### 2.    Prejudice to BRACII.

The Bankruptcy Court made two findings on prejudice. First, that "BRACII is a post-confirmation debtor seeking to wind up its affairs. . . . This issue has now been pending a year." Second, "there is no basis to believe that Mr. Jaeban will abide by those rules [*i.e.*, a new set of sanctions] any more than he has abided by the previous ones." Second Sanctions Decision 7.

As to the first finding, Mr. Jaeban complains that the Bankruptcy Court was required to explain in greater detail the prejudice to the BRACII, although not disputing that BRACII is a "debtor seeking to wind up its affairs." Judge Case was not obligated to spell out the obvious; the hope of BRACII's proven creditors of even a somewhat prompt resolution of this dispute is now a distant memory. By scheduling depositions in England without complying with the document production deadline in the First Sanctions Order, Mr. Jaeban has joined Jaeban UK in massively delaying this case and increasing its expense to BRACII. Since its first Motion to Strike (at ¶¶ 19-22, 37), BRACII has complained repeatedly that the combined delaying tactics of Jaeban UK and its assignee have improperly prevented disbursement of the $4,500,000 Cure Amount reserve to creditors who have not violated any court orders.

Mr. Jaeban has simply ignored the second finding. *See* Jaeban Br. 33-35. Given Mr. Jaeban's multiple violations of the First Sanctions Order, this finding is precisely accurate, not clearly erroneous. BRACII will continue to be severely prejudiced if it must litigate against

a claimant who refuses to comply with the discovery rules, the reconsideration rules, or the rules governing briefs on appeal. In *Curtis T. Bedwell & Sons, Inc.,* 843 F.2d at 693-94, the Third Circuit affirmed a dismissal sanction and held that the delay in providing information and the "costs in obtaining court orders" were sufficient to support the District Court's finding of prejudice.[27]

### 3.    Dilatory Conduct.

Mr. Jaeban's multiple failures to comply with the First Sanctions Order amply support Judge Case's conclusion that Mr. Jaeban "clearly" has a history of dilatory conduct. Second Sanctions Decision 7. As noted, Mr. Jaeban has compounded that history since BRACII filed its motion by failing to disclose (a) what transpired in the November 2003 production, (b) the whereabouts of the missing computers, and (c) the results of the single e-mail server review. Mr. Jaeban's argument about all of the steps he allegedly did take rests principally on his excluded affidavit (Jaeban Br. 35-37, citing "Second Jaeban Affidavit"), and does not speak to his refusals to comply.

In fact, the history of dilatory conduct dates from December 2003, when Jaeban UK ceased compliance (*e.g.,* by promising documents and refusing to transmit them). The £5,000 assignment of the counterclaims to Mr. Jaeban may have forestalled a dismissal, but it did not give Mr. Jaeban a "fresh start" to engage in dilatory conduct while standing in the shoes of his assignor for all other purposes. The First Sanctions Order distinguishes between Mr. Jaeban and Jaeban UK, but only because Mr. Jaeban had not personally ignored the Bankruptcy Court's orders and deadlines. *See* First Sanctions Order 8. Having repeatedly violated the First Sanctions Order as Jaeban UK's assignee, Mr. Jaeban has no credible grounds for complaint that

---

[27] "'[P]rejudice' for the purpose of *Poulis* analysis does not mean 'irremediable harm,' the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy is sufficiently prejudicial." *Ware,* 322 F.3d at 222.

his conduct is viewed as the perpetuation of Jaeban UK's delaying tactics. To BRACII and its creditors, it is all unnecessary and unfair delay.

### 4.    Willful Conduct.

Judge Case found that, while Mr. Jaeban's conduct was not in bad faith, "it is fair to conclude it is willful. No reasonable explanation has been given why the Court-ordered deadlines were ignored, particularly in light of the prior motion. Mr. Jaeban clearly had knowledge of the consequences and failed to act." The Court's factual recitation is amply supported by the record. Under *Poulis*, "self-serving" behavior is sufficient to show willful conduct. *E.g.*, *JMJ Enters.*, 1998 U.S. Dist. LEXIS 7750, at *11, *quoting United States ex rel. Kusner v. Osteopathic Med. Ctr.*, 1997 U.S. Dist. LEXIS 16585, at *25 (E.D. Pa. Oct. 21, 1997). Here, Mr. Jaeban sought to minimize the expense of compliance – to the ultimate expense of BRACII's unpaid creditors. He failed to press the Receivers for production of documents that he knew or should have known would damage his case. The absence of the Credit Pack remains unexplained. The Court's finding that Mr. Jaeban "failed to take this Court's earlier warnings seriously" is certainly not clearly erroneous.

Mr. Jaeban argues for the first time on appeal that the Bankruptcy Court should not have relied on this failure to keep the court apprised of his actions. Jaeban Br. 19. In *Pelullo v. Schwartz*, 1999 U.S. Dist. LEXIS 2916, at *33 (E.D. Pa. Mar. 16, 1999), the District Court upheld the Bankruptcy Court's finding of willful conduct based in part on the claimant's "failure to request additional time in which to respond to the outstanding discovery." *See Poulis*, 747 F.2d at 868 ("If compliance is not feasible, a timely request for an extension should be made to the court."). Mr. Jaeban's position amounts to the frivolous proposition that he was *not* required to inform the Court promptly if he could not comply with its orders.

### 5.    Effectiveness of Sanctions Other than Dismissal.

The record amply supports the Court's conclusion that "[a]lternative sanctions have been assessed, apparently without effect. There is little basis to conclude that the result would be different this time around." Second Sanctions Decision 7. The First Sanctions Order not only set the June 18, 2004 deadline, but allowed BRACII to deduct £327,944.09 plus attorneys fees from the Cure Amount reserve (First Sanctions Order 15-16), yet Mr. Jaeban was not moved to conduct the full document and e-mail search that the First Sanctions Order required.

Mr. Jaeban's inadequate two-sentence response is that no sanctions are warranted and the Court and BRACII should otherwise refer to the sanctions in Rule 37. Jaeban Br. 37. Rather than acknowledge that the First Sanctions Order was a sanctions order (*see id.*), Mr. Jaeban refuses to explain why a lesser sanction now will be "effective" under *Poulis* when the imposition of monetary sanctions and threat of harsher sanctions in the First Sanctions Order failed to secure Mr. Jaeban's compliance. Here, as in *Mindek v. Rigatti*, 964 F.2d at 1374, a dismissal sanction is necessary to ensure that other litigants, undeterred like Mr. Jaeban by lesser sanctions, will not be "tempted to such conduct in the absence of such a deterrent."

### 6.    The Merits of the Assigned Counterclaims.

The merits of the parties' claims are typically "neutral and not dispositive" if the claimant's allegations are "facially meritorious." *See, e.g., Emerson v. Thiel Coll.*, 296 F.3d at 191. Where the merits are a neutral factor, they are no obstacle to dismissal. *See, e.g., id.*; *Poulis*. When the claimant has made binding admissions against his interest, however, those admissions need not be ignored. *National Grange Mut. Ins. Co. v. Sharp Equip. Co.*, 2002 U.S. Dist. LEXIS 4096, at *29-*30 (E.D. Pa. Mar. 5, 2002) (relying in part on binding admissions), *aff'd*, 2003 U.S. App. LEXIS 1121 (3d Cir. Jan. 17, 2003). *See Mondesir v. Trans Union*, 1999

36

U.S. Dist. LEXIS 15977, at *5-*6 & n.2 (E.D. Pa. Oct. 18, 1999) (it is "difficult conscientiously to characterize a claim as meritorious" where plaintiff had not disputed admission contradicting his claims).

As in *National Grange*, Judge Case had good reason to note the two letters (BA243; BA247) reflecting binding legal advice "questioning the underpinnings of Mr. Jaeban's claims." Second Sanctions Decision 8. He therefore concluded that the merits factor is "at best neutral for Mr. Jaeban and at worst slightly in favor of BRACII." *See id.* Even if *Poulis* shielded Mr. Jaeban from these admissions, Mr. Weatherall's advice made no difference to the outcome. This was the only factor that was neutral or weighed only "slightly" against Mr. Jaeban. The remaining factors all weighed heavily against him and in favor of dismissal of the counterclaims; there was no factor in his favor.

### 7. A *Poulis* Non-Factor: BRACII's Conduct in Discovery.

One factor that *Poulis* does not consider is the conduct of the other party in discovery. *See Ware*, 322 F.3d at 224 (Court of Appeals would not look at disputes over "ancillary matters" in deciding whether trial court abused its discretion under *Poulis*); *National Grange Mut. Ins. Co. v. Sharp Equip. Co.*, 2002 U.S. Dist. LEXIS 4096, at *30 (discussing defendant's cross-motion for sanctions separately from the *Poulis* factors). Mr. Jaeban fails to cite a single case under *Poulis* that does so.[28]

## III.  MR. JAEBAN'S ALLEGATIONS OF IMPROPRIETY AGAINST JUDGE CASE ARE FRIVOLOUS.

Mr. Jaeban's final "Reversible Error" is his barely-veiled claim that Judge Case somehow acted irrationally or from an improper motive. Mr. Jaeban cites eight different

---

[28] Even if Mr. Jaeban were permitted to add his own *Poulis* factor, the evidence shows Mr. Jaeban's inaction with respect to BRACII's document production, not a reason for him to escape dismissal, as discussed above. His failure to file a motion to compel against BRACII speaks for itself.

"inexplicable actions" that have met with his displeasure. Jaeban Br. 29-30. Needless to say, Mr. Jaeban did not raise this issue below. He has never appealed Actions Nos. 1, 2, and 8. Actions Nos. 3-7 are aspects of the Court's decision to strike Mr. Jaeban's Counterclaims.

Some of this is frivolous in its details. It was not "inexplicable" for the Court to grant an unopposed motion for partial summary judgment – a motion predicated on an admission by Jaeban UK while still controlled by Mr. Jaeban. (*See* Action No. 1.) Mr. Jaeban himself moved to extend the deadline for depositions -- and BRACII could hardly go forward until Mr. Jaeban completely remedied his violations of the First Sanctions Order. (*See* Action No. 8.) Action No. 4 ("Dismissed Mr. Jaeban's claims to do to BRACII's *Motion for Sanctions . . .*") is indecipherable.

Focusing on these details, however, misses the main point that this is a baseless attack on a conscientious judge. Judge Case's "inexplicable" bias against Mr. Jaeban was absent when the Court: (a) upheld the assignment of Jaeban UK's counterclaims to Mr. Jaeban in the face of three anti-assignment clauses; (b) refused to grant BRACII's first Motion to Strike and imposed only limited sanctions on Mr. Jaeban; and (c) revised its Second Sanctions Decision on reconsideration to permit further discovery from BRACII.

The record shows not bias by the Bankruptcy Court but Mr. Jaeban's readiness to blame others for the consequences of his own conduct, be it the Receivers (Reconsideration Order 5) or Judge Case. Mr. Jaeban "obviously feels himself aggrieved," *see Snyder*, 2004 U.S. Dist. LEXIS 24953, at *14, but, as in *Snyder*, this is not an excuse for willful failures to obey the court. The Bankruptcy Court was clearly correct, not clearly in error, in finding "there is no basis to believe" that Mr. Jaeban will ever abide by the rules. Second Sanctions Decision 7.

## CONCLUSION

The Bankruptcy Court had ample grounds to find that Mr. Jaeban had flouted the First Sanctions Order and that lesser sanctions had been proven ineffective. Its decision to dismiss Mr. Jaeban's assigned Counterclaims and release the $4.5 million in restricted funds to BRACII's creditors should be affirmed.

Dated: June 17, 2005

Respectfully submitted,

**SIDLEY AUSTIN BROWN & WOOD** LLP

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Kenneth E. Wile
Robert N. Hochman
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Robert S. Brady (Bar No. 2847)
Edmon L. Morton (Bar No. 3856)
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899
(302) 571-6600

Counsel for Appellee Budget Rent-A-Car International, Inc.