# EXHIBIT 5

LEXSEE 2005 U.S. APP. LEXIS 8634

## IN RE: GENERAL DATACOMM INDUSTRIES, INC., Debtor; GENERAL DATACOMM INDUSTRIES, INC., Appellant v. JAMES R. ARCARA, FREDERICK R. CRONIN, ROBERT S. SMITH, and THOMAS L. THOMPSON, Appellees.

### No. 04-1710

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*2005 U.S. App. LEXIS 8634; Bankr. L. Rep. (CCH) P80,285*

**December 15, 2004, Argued**
**May 16, 2005, Filed**

**SUBSEQUENT HISTORY:** As Amended May 20, 2005. The Name of this Case has been Corrected by the Court June 8, 2005.

**PRIOR HISTORY:** [*1] On Appeal from the United States District Court for the District of Delaware. (D.C. No. 02-cv-01373). District Judge: Honorable Kent A. Jordan. *Gen. Datacomm Indus. v. Arcara (In re Gen. Datacomm Indus.), 309 B.R. 848, 2003 U.S. Dist. LEXIS 24789 (D. Del., 2003)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant debtor corporation sought review of a judgment from the United States District Court for the District of Delaware affirming the bankruptcy court's holding that appellees, former long-term senior executives of the debtor, were "retired employees" under *11 U.S.C.S. § 1114* and were therefore entitled to retiree benefits. The judgment also affirmed the denial of the debtor's *11 U.S.C.S. § 365* motion to reject the employees' benefit plan.

**OVERVIEW:** Four years prior to filing its Chapter 11 bankruptcy petition, the debtor approved an employee benefit plan for the executives that covered long term care insurance and health insurance. Within one month of filing the bankruptcy petition, the debtor notified the executives that their employment and their benefit plan would be terminated at the end of the month. The debtor then filed a motion to reject the benefit plan pursuant to *11 U.S.C.S. § 365*. The court affirmed the judgment. The court held that the deliberate and involuntary termination of the executives, who met all qualifications for retirement and were on verge of retirement, could not deprive the executives of the procedural protections of *11 U.S.C.S. § 1114*. Therefore, the executives were "retired employees" within the meaning of § 1114. The debtor could not escape its obligations under the benefit plan by arguing that the executives were terminated rather than retired because the debtor prevented the executives from voluntarily retiring. As a result, the executory agreement providing benefits for retirees could not be rejected pursuant to *11 U.S.C.S. § 365*.

**OUTCOME:** The court affirmed the judgment.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN1] Exercising the same standard of review as the district court, the appellate court reviews the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof.

*Bankruptcy Law > Executory Contracts*
[HN2] See *11 U.S.C.S. § 365*(a).

*Bankruptcy Law > Chapter 11 (Reorganization) > Debtors in Possession*
*Bankruptcy Law > Examiners & Trustees > Duties*
*Pensions & Benefits Law > Employee Benefit Plans*

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

[HN3] *11 U.S.C.S. § 1114* was enacted to protect the interests of retirees of Chapter 11 debtors. Section 1114 prohibits a debtor in possession or a trustee from unilaterally modifying or terminating retirement benefits unless (1) the court orders modification or (2) the trustee and the authorized representative of the retired employees agree to modification. *11 U.S.C.S. § 1114*(e)(1). Prior to filing an application seeking court-imposed modification, the trustee must engage in good faith negotiations with the authorized representative of the trustee regarding the proposed modification, and must provide the authorized representative with relevant information to allow for fair evaluation of the proposal. *11 U.S.C.S. § 1114*(f)(1). Only after the foregoing requirements have been met, and such good-faith negotiations have occurred, is the court empowered to grant the modification motion, if, among other things, modification is necessary to permit reorganization of the debtor. *11 U.S.C.S. § 1114*(g). Accordingly, a debtor in possession or the trustee must continue to pay retiree benefits unless modification of such payments has been ordered by the court or the trustee and the authorized representative of the retired employees have agreed to such modification. *11 U.S.C.S. § 1114*(e)(1).

*Bankruptcy Law > Chapter 11 (Reorganization) > Debtors in Possession*
*Bankruptcy Law > Examiners & Trustees > Duties*
*Pensions & Benefits Law > Employee Benefit Plans*
[HN4] See *11 U.S.C.S. § 1114*(e)(1).

*Bankruptcy Law > Examiners & Trustees > Duties*
*Pensions & Benefits Law > Employee Benefit Plans*
[HN5] See *11 U.S.C.S. § 1114*(f)(1).

*Bankruptcy Law > Examiners & Trustees > Duties*
*Pensions & Benefits Law > Employee Benefit Plans*
[HN6] See *11 U.S.C.S. § 1114*(g).

*Bankruptcy Law > Chapter 11 (Reorganization) > Debtors in Possession*
*Bankruptcy Law > Examiners & Trustees > Duties*
*Pensions & Benefits Law > Employee Benefit Plans*
[HN7] See *11 U.S.C.S. § 1114*(a).

*Contracts Law > Contract Conditions & Provisions > Conditional Duties Generally*
*Contracts Law > Contract Conditions & Provisions > Conditions Precedent*
[HN8] Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform.

*Bankruptcy Law > Executory Contracts*
[HN9] The United States Court of Appeals for the Third Circuit set forth the controlling definition of "executory contract" in Sharon Steel: An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other. The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed. The determination of what constitutes a material breach under the Sharon Steel definition is governed by relevant state law.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Contracts Law > Performance > Discharges & Terminations*
[HN10] An uncured material breach by one party discharges other party's duty under a contract. Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision.

*Bankruptcy Law > Chapter 11 (Reorganization) > Debtors in Possession*
*Bankruptcy Law > Examiners & Trustees > Duties*
*Pensions & Benefits Law > Employee Benefit Plans*
[HN11] The deliberate and involuntary termination of an employee on the verge of retirement, where the employee has otherwise met all qualifications for retirement, cannot deprive such an employee of the procedural protections of *11 U.S.C.S. § 1114.*

*Bankruptcy Law > Practice & Proceedings > Appeals*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*
[HN12] Generally, barring exceptional circumstances, like an intervening change in the law or the lack of representation by an attorney, the appellate court does not review issues raised for the first time at the appellate level. Arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in the appellate court absent exceptional circumstances (for example, the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues).

COUNSEL: Joseph A. Malfitano, Esq., Joel A. Waite, Esq., Michael R. Nestor, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; John B. Sherman, Esq. (Argued), Weisman Celler Spett & Modlin, P.C., New York, New York, Counsel for Appellant.

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

Eric G. Waxman III, Esq., Daniel M. Kolko, Esq. (Argued), Phillips Nizer LLP, Garden City, New York; Christopher S. Sontchi, Esq., Ricardo Palacio, Esq., Ashby & Geddes, Wilmington, Delaware, Counsel for Appellees.

**JUDGES:** BEFORE: NYGAARD and GARTH, Circuit Judges * and POLLAK, District Judge. Pollak, J., concurring.

    * Honorable Louis H. Pollak, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation

**OPINIONBY:** GARTH

**OPINION:** GARTH, Circuit Judge:

Both the Bankruptcy and District Courts here held that Appellees James R. Arcara, Frederick R. Cronin, Robert S. Smith and Thomas L. Thompson (collectively, the "Appellees") - former long-term senior executives of Appellant General Datacomm Industries Inc. and its affiliates ("DataComm")    [*2]    - were "retired employees" within the meaning of *11 U.S.C. § 1114* and were therefore entitled to their retiree benefits. *Section 1114 of the United States Bankruptcy Code* ("Bankruptcy Code") affords certain procedural protections to "retired employees" of Chapter 11 debtors. *See 11 U.S.C. § 1114(a), (e)*. When applicable, these procedural protections are held to override the provisions of *11 U.S.C. § 365*, which generally allow a debtor in possession, subject to the court's approval, to reject any executory contract of the debtor in order to relieve the estate of onerous and burdensome future obligations. *See 11 U.S.C. § 365(a)*.

The questions presented in this appeal are: (1) whether the term "retired employees," as contemplated by *§ 1114*, encompasses the concept of "forced retirement," at least in situations where, as here, employees on the verge of voluntary retirement are strategically and deliberately terminated without cause by a debtor; and (2) if so, may DataComm's executory agreement providing benefits for retirees be rejected pursuant to *11 U.S.C. § 365*. [*3] As stated, both courts rejected DataComm's attempt to terminate or otherwise modify the Appellees' retiree benefits without first complying with the mandates and procedural requirements of *§ 1114*.

We hold that involuntary termination of employees on the verge of retirement cannot deprive such employees of the procedural protections of *§ 1114*. Accordingly, the District Court did not err in affirming the Bankruptcy Court's order, which denied rejection of DataComm's agreement to provide such benefits.

I.

A.

The material facts on appeal are not in dispute. On or about September 4, 1997, the Board of Directors of DataComm approved a "Benefit Agreement for Long Term Senior Executive Officers and Other Senior Level Employees" (the "Benefit Plan"). DataComm originally entered into the Benefit Plan with Appellees Arcara, Cronin, and Smith. Thompson, the remaining Appellee, was added as an Eligible Executive n1 subsequent to the establishment of the Benefit Plan.

    n1 Eligible Executives included the individuals designated in the Benefit Plan (*i.e.*, Arcara, Cronin, Johnson), as well as any other senior corporate officer elected to the office of Senior Vice President or any higher office, and any other senior level employee of DataComm designated by the Board of Directors as an Eligible Executive who had been employed by the company for more than 25 years, and was 60 years of age or older. Benefit Plan P 2(a).

[*4]

The Benefit Plan provided for two discrete forms of benefits. First, DataComm was required to pay the annual premiums of up to $ 7,000 for Long Term Care insurance coverage for the lifetime of each Eligible Executive and his spouse ("Long Term Care Benefits"). n2 Second, the Benefit Plan also provided that, upon retirement, each Eligible Executive and his spouse would receive, at DataComm's sole cost, a lifetime continuation of the health insurance benefits that DataComm was then furnishing to the Eligible Executive ("Retirement Health Benefits"). n3

    n2 "Long Term Care: Effective upon approval by the Board of Directors of this Plan, the Corporation shall pay the annual premiums of up to an annual maximum amount of $ 7,000 (the 'cap'), for Long Term Care insurance coverage in the amount specified in Schedule A to the Plan, for each Eligible Executive and his or her spouse for the remainder of their respective lives." Benefit Plan P 3.

    As more fully explained in note 13 *infra*, DataComm has waived the argument that the

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

Long Term Care Benefits are not "retiree benefits" within the meaning of § 1114. Thus, while the issue has been raised in this appeal, we neither consider nor decide it here. [*5]

n3 "Retirement Health Benefits: Upon an Eligible Executive's retirement, the Eligible Executive and his or her spouse shall thereafter receive for the remainder of the lives of the Eligible Executive and his or her spouse, a continuation of the health insurance benefits the Corporation was then furnishing the Eligible Executive, at the Corporation's sole cost." Benefit Plan P 4.

The Benefit Plan listed at least five actions which, if taken by Eligible Executives, would lead to discharge and loss of all benefits. It essentially provided that DataComm, in its sole judgment, could effectively terminate all benefits thereunder if, among other things, the Eligible Executive violated any confidentiality agreement; disclosed any proprietary information; refused cooperation with DataComm in litigation; directly or indirectly became employed by, or purchased stock of a competitor; brought suit against DataComm (except as to claims relating to the Benefit Plan); or disparaged the company. Benefit Plan P 6. n4 Aside from the grounds for terminating benefits specified in Paragraph 6 of the Benefit Plan, [*6] DataComm reserved no other right to rescind or amend the Benefit Plan.

n4 Paragraph 6 provides:

In the event in the sole judgment of the Board of Directors of the Corporation, an Eligible Executive or his or her spouse directly or indirectly, (i) becomes employed by or performs consulting or other services to, or becomes a director of, or makes or retains any investment in or loan to, a competitor of the Corporation (*provided* the foregoing shall not be deemed a breach if the eligible executive was unaware such entity was a competitor *provided* he or she promptly divests himself or herself of any such investment upon learning of such event and *further provided* the foregoing

shall not apply to an investment in securities listed on a national securities exchange or NASDAQ where the aggregate investment is less than $ 10,000), or, (ii) violates any confidentiality or similar agreement with the Corporation or discloses or uses any confidential or proprietary information of the Corporation other than on behalf of the Corporation, or (iii) institutes or otherwise participates or assists in any litigation or proceedings against or on behalf of the Corporation, its officers or directors, (other than with respect to claims under this Plan or for salaries or fees owed by the Corporation for services actually rendered), or (iv) refuses to reasonably cooperate at the Corporation's expense, with the Corporation in the prosecution or defense of any litigation or proceeding, or (v) uses, communicates, publishes or otherwise transmits, in any manner whatsoever, negative comments regarding the Corporation or otherwise disparages the Corporation, its products, services, officers or directors, then, in any such event, the Board of Directors may terminate the status of such person as an Eligible Executive hereunder and all benefits hereunder for such Eligible Employee and his or her spouse shall terminate.

Benefit Plan P 6.

[*7]

B.

On November 2, 2001, DataComm filed for relief under Chapter 11 of the Bankruptcy Code, and pursuant to *Sections 1107* and *1108* of the Bankruptcy Code, DataComm continued to possess its properties and manage its businesses as debtor(s) in possession. Thereafter, on November 19, 2001, DataComm advised the Appellees that they would be terminated on November 30, 2001, and that the Benefit Plan would be terminated on that same date.

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

Ten days later, on November 29, 2001, DataComm filed its motion with the Bankruptcy Court to reject the Benefit Plan pursuant to *Section 365 of the Bankruptcy Code* (the "365 Motion"). A day later, on November 30, 2001, the Appellees were formally terminated. DataComm concedes that the termination was without cause. At the time of their termination, the Appellees were all over 65 years of age: Thompson was 71, Cronin was nearly 70, Smith was over 68, and Arcara was near 67.

The Appellees objected to the 365 Motion, claiming that the Benefit Plan qualified for treatment under *§ 1114 of the Bankruptcy Code*, and that DataComm was therefore required to comply with [*8] the procedural requirements of that statute before terminating or modifying the Benefit Plan. The Bankruptcy Court conducted a hearing on April 25, 2002 to determine whether *§ 365* or *§ 1114* governed the Benefit Plan. The Bankruptcy Court held that *§ 1114* governed, and entered an Order denying DataComm's motion to reject the Benefit Plan. The Bankruptcy Court stated that "in the event . . . [DataComm] seeks to terminate or otherwise modify any of the benefits of [the Appellees] provided for in the [Benefit Plan] . . . [DataComm] shall be required to first comply with the mandates and procedural requirements of *11 U.S.C. § 1114*."

The District Court affirmed the decision of the Bankruptcy Court, essentially holding that the Appellees were retirees within the meaning of *§ 1114* because DataComm's action in terminating the Appellees the day after it purported to reject the Benefit Plan constituted a "forced retirement". This timely appeal followed.

II.

The Bankruptcy Court had jurisdiction under *28 U.S.C. § § 157(b)* and *1334*. The District Court had appellate jurisdiction pursuant to *28 U.S.C. § 158(a)(1)*, [*9] and we have jurisdiction under *28 U.S.C. § § 158(d)* and *1291*. [HN1] Exercising the same standard of review as the District Court, "we review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *Interface Group-Nevada v. TWA (In re TWA), 145 F.3d 124, 130-31 (3d Cir. 1998)* (citing *In re Engel, 124 F.3d 567, 571 (3d Cir. 1997); Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1223 (3d Cir. 1995)*). Inasmuch as the parties agree that there are no relevant facts in dispute, our review is limited to the legal determinations of the Bankruptcy Court as affirmed by the District Court. We will thus employ a *de novo* review of those legal determinations.

III.

*Section 365(a) of the Bankruptcy Code* provides: [HN2] "Except as provided in *sections 765* and *766* of this title and in subsections *(b)*, *(c)*, *and (d)* of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *11 U.S.C. § 365(a)*. (The exceptions [*10] noted in *§ 365* have no relevance in this case).

On the other hand, [HN3] *section 1114 of the Bankruptcy Code* "was enacted to protect the interests of retirees of chapter 11 debtors." 7 Collier on Bankruptcy, P 1114.02[1] (15th ed. 2002). That section prohibits a debtor in possession or a trustee from unilaterally modifying or terminating retirement benefits unless (1) the court orders modification or (2) the trustee and the authorized representative of the retired employees agree to modification. *11 U.S.C. § 1114(e)(1)*. n5 Prior to filing an application seeking court-imposed modification, the trustee must engage in good faith negotiations with the authorized representative of the trustee regarding the proposed modification, and must provide the authorized representative with relevant information to allow for fair evaluation of the proposal. *Id. § 1114(f)(1)*. n6 Only after the foregoing requirements have been met, and such good-faith negotiations have occurred, is the court empowered to grant the modification motion, if, among other things, modification is necessary to permit reorganization of the debtor. *Id. § 1114(g)*. n7 Accordingly, [*11] a debtor in possession or the trustee must continue to pay retiree benefits unless modification of such payments has been ordered by the court or the trustee and the authorized representative of the retired employees have agreed to such modification. *Id. § 1114(e)(1)*. n8

n5 *11 U.S.C. § 1114(e)(1)* provides:

[HN4] *Notwithstanding any other provision of this title,* the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any *retiree benefits*, except that-

(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments

after which such benefits as modified shall continue to be paid by the trustee.

(emphasis added). [*12]

n6 *11 U.S.C. § 1114(f)(1)* provides:

[HN5] Subsequent to filing a petition and prior to filing an application seeking modification of the *retiree benefits,* the trustee shall-

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are

treated fairly and equitably . . .

(emphasis added).

n7 *11 U.S.C. § 1114(g)* provides:

[HN6] The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that--

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities . . . ,

[*13]

n8 *See note 5 supra* for the statutory text of *§ 1114(e)(1).*

The procedural protections of *§ 1114* apply to "retiree benefits," which are defined with reference to the class of persons entitled to the benefits, *i.e.,* "retired employees." n9 As we have indicated, the overarching question here is whether the provisions of *§ 1114* apply to the Benefit Plan. Stated differently, the question is whether the Appellees constitute "retired employees" for purposes of invoking the protections of the statute.

Case 1:05-cv-00259-KAJ    Document 13-2    Filed 06/17/2005    Page 8 of 21

Page 7

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

n9 *Section 1114(a)* defines "retiree benefits" as:

[HN7] payments to any entity or person for the purpose of providing or reimbursing payments for *retired employees* and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title

(emphasis added).

[*14]

DataComm's main contention on appeal is that Appellees never retired, but rather were still employed and were terminated as employees without cause. As such, DataComm argues, the provisions of *§ 1114*, which accord protection only to "*retired employees*," never come into play here, leaving *§ 365* (permitting rejection of executory contracts) as the only operative statute. We are persuaded that this contention elevates form over substance, and is thus unavailing and unacceptable. n10

n10 DataComm also argues that the provisions of *§ 1114* do not apply here because Appellees were not retired at the time the 365 Motion [to reject DataComm's retirement Benefit Plan] was filed. As we stated, Appellees were terminated the day *after* the filing of the 365 Motion. While it is, of course, true that only retired employees can invoke the protections of *§ 1114*, *see, e.g. In re Crafts Precision Indus., Inc., 244 B.R. 178, 184 (1st Cir. B.A.P. 2000)* ("The legislative history of [*§ 1114*] clearly reveals that the statute is intended to benefit *retirees* specifically.") (emphasis added), we believe that this argument suffers from multiple flaws. First, it ignores the fact that DataComm had notified Appellees of their imminent termination prior to filing the 365 Motion. The argument, then, that the Appellees were still employed and not retired for purposes of determining the application of *§*

*1114* we regard as specious. Such a result contravenes basic norms of fairness and undermines the purposes of *§ 1114*, which "was enacted to protect the interests of retirees of Chapter 11 debtors." 7 Collier on Bankruptcy, P 1114.02[1] (15th ed. 2002).

Second, it rests upon a faulty premise. DataComm's contention here is that the relevant date for determining the applicability of *§ 1114* is the date when the rejection of the Plan would have become effective, which in this case would be either the date immediately prior to the petition date, November 2, 2001, or, at the very latest, the filing date of the 365 Motion, November 29, 2001. This contention fails for a few reasons. Even assuming, without deciding, that the rejection of an executory contract under *§ 365(a)* becomes effective upon the filing of the motion, *but see Thinking Machs. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.), 67 F.3d 1021, 1028 (1st Cir. 1995)* ("We hold that a rejection of a nonresidential lease under *section 365(a)* becomes legally effective only after judicial approval has been obtained."), that merely begs the question of whether *§ 365* governs the Benefit Plan in the first place. If, as Appellees maintain, *§ 1114* applies, then DataComm's 365 Motion was ineffective, and the decisive date of any rejection, however defined, could not occur until after the requirements of *§ 1114* have been satisfied.

Accordingly, we reject DataComm's contention that Appellees were still employed, rather than retired, albeit involuntarily, at the filing of the 365 Motion and therefore outside the protective ambit of *§ 1114*.

[*15]

Moreover, as a contractual matter, we note that DataComm cannot escape its obligations under the Benefit Plan by arguing that Appellees were terminated rather than retired. As the District Court held, "retirement was the condition precedent to the Appellees' receipt of certain benefits under the [Plan], and [DataComm] prevented the Appellees from voluntarily retiring by discharging them without cause." The Benefit Plan explicitly and unambiguously states that only the particular proscribed actions by an Eligible Executive could result in the justifiable forfeiture of retirees' benefits. We believe that the District Court's reasoning was sound here - the intent of both DataComm and the Appellees was that the Appellees would receive the retirement benefits of the Plan unless they were terminated for cause. They were not. *See* 13 Williston on

Case 1:05-cv-00259-KAJ    Document 13-2    Filed 06/17/2005    Page 9 of 21

Page 8

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

Contracts § 39:3 (4th ed.) [HN8] ("Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform. . . .").

*Section 365*, when it applies, allows DataComm to terminate executory [*16] contracts, with the bankruptcy court's approval, notwithstanding any contractual obligations thereunder. *See, e.g., In re Spectrum Info. Techs., Inc., 190 B.R. 741, 745-46 (Bankr. E.D.N.Y. 1996).* At issue then, is whether Congress intended the term "retired employees" in § 1114 to encompass the concept of "forced retirement."

In contending that "forced retirement" does not implicate the provisions of § 1114, DataComm relies heavily on a *reductio ad absurdum.* According to DataComm, the District Court's holding, taken to its logical conclusion, means that § 1114 would apply to a retirement health benefit when DataComm discharged an employee without cause at the age of 25.

Recognizing that the employees affected here were all over the age of 65 (Arcara 66; Smith 68; Cronin 70; Thompson 71), and were purposefully discharged only one day after DataComm filed its 365 Motion, we can only conclude that DataComm's action was taken deliberately and was designed to thwart the purposes of § 1114. Therefore, accepting the concept of "forced retirement" does not and cannot lead to the absurd result posited by DataComm that an employee could be retired at age 25 if discharged [*17] without cause. The contours of such a concept as "forced retirement" may receive appropriate interpretation, when it occurs, by a case-by-case development. What matters here is that the particular facts of this case are compelling enough to warrant the application of such a concept.

As the record reflects, the Appellees were on the verge of retirement, n11 receiving a minimal paycheck for "basically hanging around." Tr. of Bankr. Hearing at 27. They were founders and long-term senior executives of DataComm, and each was of retirement age and was qualified to warrant entitlement to the benefits prescribed by DataComm's Benefit Plan, which was designed to compensate *long-term* senior level employees. *See* Benefit Plan P 2a. As such, our holding in no way countenances the 25 year old "horrible" scenario envisaged by DataComm.

n11 We note that under the *Employee Retirement Income Security Act of 1974*, the age of "normal retirement" is sixty-five. *Hlinka v. Bethlehem Steel Corp., 863 F.2d 279, 281 n.3 (3d Cir. 1988)* (citing *29 U.S.C. § 1002(24)*).

[*18]

Under the circumstances presented here, to allow DataComm to deliberately interfere with Appellees' retirement benefits would operate to frustrate and nullify the objectives of § 1114, which, as we have stated, was "enacted to protect the interests of retirees of Chapter 11 debtors." 7 Collier on Bankruptcy, P 1114.02[1] (15th ed. 2002).

IV.

We address one final issue - an issue not raised or initially briefed by the parties. At oral argument, we asked the question whether the Benefit Plan was an executory contract for purposes of § 365 (which involves *only contracts* that are executory in substance and which are not "trumped" by § 1114) and so could be considered by the Bankruptcy Court for rejection on an appropriate application. If the Benefit Plan *was not executory,* § 365 would have no application as it could not be rejected under that section. We requested supplemental briefing on the question. After reviewing the parties' submissions, we are satisfied that the Benefit Plan is indeed an executory contract.

[HN9] We set forth the controlling definition of "executory contract" in *Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36 (3d Cir. 1989):* [*19] "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Id. at 39* (citations and internal quotations omitted).

The crucial issue for determining whether the instant Benefit Plan was executory is whether the *Appellees* had *material* obligations that remain unperformed at the time the bankruptcy petition was filed. *See In re Columbia Gas System Inc., 50 F.3d 233, 240 (3d Cir. 1995)* ("The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed.") (citations omitted). Thus, our focus is on the restrictive covenant obligations of the Appellees, *i.e.,* their obligations, set forth in Paragraph 6 of the Benefit Plan (see note 4 *supra*). Paragraph 6, among other things, requires Eligible Executives: to not compete; to maintain confidentiality; to refrain from instituting litigation; to agree to participate in litigation initiated by Datacomm; and to refrain from negative [*20] publicity.

While we have held that the determination of what constitutes a material breach under the *Sharon Steel* definition is governed by relevant state law, *In re Columbia Gas System Inc., 50 F.3d at 240 n.10,* we need not look beyond the Benefit Plan itself to make that

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

determination. The Benefit Plan expressly defines certain acts or events as constituting material breaches of the contract. It states that:

in the event in the sole judgment of the Board of Directors of the Corporation, an Eligible Executive or his spouse directly or indirectly [fails to comply with any of the covenants set forth in Paragraph 6], then, in any such event, the Board of Directors may terminate the status of such person as an Eligible Executive hereunder and all benefits hereunder for such Eligible Employee and his or her spouse shall terminate.

Benefit Plan P 6 and note 4 *supra*. n12 Thus, if an Eligible Executive breached one of those provisions, it would excuse the future performance of DataComm. By contractual definition, therefore, such obligations are material. *See generally Restatement (Second) of Contracts § 237* [*21] (1981) [HN10] (uncured material breach by one party discharges other party's duty under contract); *see also* 23 Williston on Contracts § 63:3 (4th ed.) ("Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision."). We are thus satisfied that the Appellees' obligations are material, and that the Benefit Plan is an executory contract.

n12 Our dissenting colleague has discussed the issue of "materiality" at length, but he has made no reference to the very terms of the Benefit Plan itself. It is that Plan, as we have stated, which defines the "materiality" of the Appellees' obligations - it explicitly provides that the failure of an Eligible Executive to comply with the covenants of Paragraph 6 excuses the future performance of DataComm. We are satisfied that the parties intended the provisions of Paragraph 6 to be material. No further analysis is therefore required. As such, the dissenting opinion's analysis, while perhaps thorough, substitutes its own views on materiality for what the parties explicitly and formally agreed to as being "material" and vital to their contract.

We also find the dissent's reliance on *In re Columbia Gas Sys., Inc., 50 F.3d 233 (3d Cir. 1995),* to be misplaced. That case stands for the proposition that where the remaining obligations in a contract are mere conditions, not duties, a contract cannot be considered executory for

purposes of § 365. The distinction between conditions and duties, essential to the holding in *In re Columbia Gas Sys.,* is simply inapposite here.

[*22]

V.

We conclude that [HN11] deliberate and involuntary termination of an employee on the verge of retirement, where the employee has otherwise met all qualifications for retirement, cannot deprive such an employee of the procedural protections of § 1114. We therefore hold that the DataComm Appellees are "retired employees" within the meaning of § 1114. This being so, DataComm's Benefit Plan providing retirement benefits to such employees was an executory agreement and could not be rejected pursuant to § 365. Accordingly, we will affirm the judgment of the District Court in favor of the Appellees. n13

n13 DataComm raises an additional issue for the first time on appeal - whether § 1114 applies to the Long Term Care Benefits in particular and, if it does not, whether DataComm can sever them for purposes of proceeding under § 365. DataComm's position is that the Long Term Care Benefits did not qualify as "retiree benefits" since they were payable during Appellees' employment. DataComm offers no exceptional circumstances to excuse its failure to raise this argument in the Bankruptcy Court and the District Court. *Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 142 (3d Cir. 2001)* [HN12] ("Generally, barring exceptional circumstances, like an intervening change in the law or the lack of representation by an attorney, this Court does not review issues raised for the first time at the appellate level.") (citations omitted); *Brown v. Philip Morris Inc., 250 F.3d 789, 799 (3d Cir. 2001)* ("Arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in this Court absent exceptional circumstances (e.g., the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues).") (citations omitted). Indeed, it appears that DataComm became aware of the argument only after the District Court alluded to the legal issue in its order affirming the Bankruptcy Court. Although DataComm's Reply Brief claims that the District Court held that § 1114 is not applicable to the Long Term Care Benefits contained in Paragraph 3 of the Benefit

Case 1:05-cv-00259-KAJ    Document 13-2    Filed 06/17/2005    Page 11 of 21

Page 10

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

Plan, it appears that DataComm has misstated the District Court's action. In fact, the District Court, in footnote 8 of its unpublished opinion, stated that it would not address the issue because it had not been raised by DataComm. We, too, express no opinion on this matter, as it has clearly been waived.

[*23]

**CONCURBY:** Pollak

**CONCUR:** Pollak, J., *concurring*

I concur in the court's judgment in all but one small particular. n14 But I do not join the court's opinion.

> n14 The judgment of the Bankruptcy Court, affirmed by the District Court and now by this court, denies the motion filed by DataComm under *11 U.S.C. § 365*. This I agree with. The Bankruptcy Court's judgment also enjoins DataComm from modifying appellees' Benefit Plan without following the procedures called for by *11 U.S.C. § 1114*. Since, as this opinion explains, I am of the view that *§ 1114* does not cover appellees, I would strike that portion of the Bankruptcy Court's judgment.

I arrive at substantially the same end-point as the court - i.e., I agree with the court that the Bankruptcy Court and the District Court were right in disallowing DataComm's proposed rejection of appellees' Benefit Plan. But I arrive at the same destination via a different route: I do not agree with the court that *11 U.S.C. § 1114* protects the appellees from DataComm's intended unilateral rejection of the Benefit Plan; in my view, appellees are not protected by *§ 1114* because they were not "retired employees" - the category of persons sheltered by *§ 1114* - at the time DataComm undertook to terminate the Benefit Plan. However, I conclude that DataComm could not reject the Benefit Plan pursuant to *11 U.S.C. § 365*, because that provision authorizes rejection of an "executory contract" and, in my view, the Benefit Plan was not an executory contract.

I.

The court affirms that portion of the Bankruptcy Court order requiring DataComm to abide by the provisions of *11 U.S.C. § 1114*, [*24] which provides procedural safeguards against modification of benefits for "retired employees." Adverting to the purpose of *§ 1114*, which was "enacted to protect the interests of retirees of Chapter 11 debtors," 7 Collier on Bankruptcy,

P 1114.02[1] (15th ed. 2002), and pointing to appellees' termination without cause, the court holds that appellees ought to be considered retirees within the meaning of *§ 1114*. The court's argument in favor of treating appellees as, in effect, constructive "retirees" cannot fail to strike a sympathetic chord. Nonetheless, I am not persuaded that appellees can properly be deemed as coming within the category of individuals protected by the statute.

*Section 1114* is entitled, "Payment of insurance benefits to *retired employees*," *id.* (emphasis added), signifying that it is the status of the employee, and not the nature of the benefit, that determines the scope of *§ 1114*. The wording of *§ 1114* cannot be said to give definitive guidance on whether, to claim *§ 1114*'s protections, employees must have retired by the date that their employer files for bankruptcy or, alternatively, whether they must have retired by the date upon which the debtor [*25] seeks to terminate retiree benefits. n15 The relevant point for purposes of this appeal, however, is that appellees had not retired by either date: appellees were employees of DataComm when DataComm filed under Chapter 11, and they remained employees until they were dismissed one day *after* DataComm filed its 365 motion seeking to terminate the Benefit Plan.

> n15 Some of the statutory language can be said to support the view that the drafters had in mind scenarios in which, after filing for bankruptcy, an employer undertakes to reduce, or entirely abrogate, benefits of employees who had retired *prior* to the bankruptcy filing. Thus, *§ 1114(l)* provides:
>
>> This section shall not apply to any retiree, or the spouse or dependents of such retiree, if such retiree's gross income *for the twelve months preceding the filing of the bankruptcy petition* equals or exceeds $ 250,000, unless such retiree can demonstrate to the satisfaction of the court that he is unable to obtain health, medical, life, and disability coverage for himself, his spouse, and his dependents who would otherwise be covered by the employer's insurance plan, comparable to the coverage provided by the employer *on the day before the filing of a petition under this title.*
>
> *11 U.S.C. § 1114(l)* (emphasis added). A similar perspective is to be found in the legislative

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

history; see Senate Report 100-119's statement that the "bill requires that such benefits, *provided to retired employees*, their spouses and dependents pursuant to a plan in effect at the time of [sic] a Chapter 11 proceeding is commenced, will *continue to be paid* when the employer *providing* those benefits files ... a petition under Chapter 11 of the Bankruptcy Code, until or unless a modification is agreed to by the parties or ordered by the court." S. Rep. No. 100-119, at 3 (1988), *reprinted in* 1988 U.S.C.C.A.N. 683, 685 (May 26, 1988) (emphasis added).

On the other hand, it is not clearly apparent that Congress would have had any policy reason to exclude from the protection of § 1114 employees who had retired after the debtor-employer filed for bankruptcy but before it moved to jettison its retirement-benefits liabilities.

[*26]

To be sure, the court does not argue that appellees had in fact retired by either date. Instead, it adopts the District Court's argument, which relies on the prevention doctrine, and concludes that appellees are constructive retirees who ought thus to receive § 1114's protections. The prevention doctrine states that "it is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." 5 Williston, Contracts 677, at 224 (3d ed. 1961); *see also Apalucci v. Agora Syndicate, 145 F.3d 630, 634 (3d Cir. 1998)* ("when one party to a contract unilaterally prevents the performance of a condition upon which its own liability depends, the culpable party may not then capitalize on that failure."). The court argues that, since retirement was the condition precedent to receipt of benefits, and since DataComm willfully thwarted fulfillment of this condition when it dismissed appellees (who were at or near retirement age) on the day after DataComm filed its 365 Motion, appellees ought to be considered "retirees" [*27] within the meaning of § 1114.

While the pedigree and wisdom of the prevention doctrine are unquestionable, the conclusion that the court draws from it - namely, that § 1114 ought to extend to appellees - is unwarranted. The prevention doctrine entails that, where one party to a contract takes an action that prevents the other party from being able to fulfill a condition precedent to that contract, the first party may not use its own action as a mechanism for avoiding performance of its contractual obligations. The prevention doctrine does not entail that, as a result of the first party's culpable obstruction, that party is not entitled to avoid performance of its obligations for *any* reason. There may well be reasons other than the failure of the condition precedent that would allow the first party to withdraw permissibly from the duties it contracted to perform.

Applying the prevention doctrine here signifies that DataComm could not use the fact that appellees had not retired as a ground for withdrawing from its obligation to pay retiree benefits, since DataComm, by firing appellees, prevented them from retiring on the day of their dismissal or at any subsequent time. On the [*28] basis of the prevention doctrine, then, the Benefit Plan remained in place despite appellees' non-retirement. But there might have been other reasons lending support for DataComm's asserted entitlement to withdraw. (Indeed, DataComm claims that § 365 provides one such reason.) Thus, the prevention doctrine does not lead to the conclusion that appellees are (or ought to be treated as) retirees or the conclusion that § 1114 ought to apply to appellees. The prevention doctrine can do no more than return the parties to the situation that existed prior to appellees' dismissal. Since, for the reasons advanced above, that situation cannot be characterized as one in which appellees had retired, the prevention doctrine does not afford appellees the protections of § 1114.

In sum, § 1114 applies only if the beneficiaries of the agreement in question have retired before their employer seeks to terminate or otherwise modify that agreement. Since that is not the situation here, I conclude that § 1114 is inapplicable.

II.

The court finds that § 1114 applies to appellees and trumps 11 U.S.C. § 365. Accordingly, the court holds that the protections conferred by § 1114 [*29] prohibit rejection of the Benefit Plan pursuant to § 365, and require compliance with the terms of § 1114 prior to any modification of the Plan. I agree that DataComm may not reject the Benefit Plan, but I rest this conclusion on the ground that the Benefit Plan was not an "executory contract," and hence fell outside the coverage of § 365. n16

> n16 *See 11 U.S.C. § 365* ("The trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.").

An executory contract is "'a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a

Case 1:05-cv-00259-KAJ    Document 13-2    Filed 06/17/2005    Page 13 of 21

Page 12

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

material breach excusing the performance of the other.'" *Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39 (3d Cir. 1989)* (citing V. Countryman, Executory Contracts in Bankruptcy: Part I, *57 Minn. L. Rev. 439, 460 (1973)*). [*30] Thus, for purposes of ascertaining the nature of the Benefit Plan, the relevant question is whether the obligations enumerated in Paragraph 6 of the Plan, which requires that the Plan's beneficiaries forbear from competing with or disparaging the company, are *material*.

State law determines whether breach of a contract provision is material. *See, e.g., Fineman v. Armstrong World Indus., 980 F.2d 171 (3d Cir. 1992)*. Delaware, where the underlying dispute arose, incorporates the test of materiality found in the Restatement. *See BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del. Ch. 2003)*; *SLMsoft.com, Inc. v. Cross Country Bank, 2003 Del. Super. LEXIS 112, 51-52 (Del. Super. Ct. 2003)*. To define "materiality," the Restatement provides a list of "circumstances" deemed to be "significant" in an assessment of "whether a failure to render or to offer performance is material," *Restatement (Second) of Contracts § 241*:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can [*31] be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Id.*

Taking these circumstances one by one, I conclude that the balance of considerations lies on the side of non-materiality:

> a) *Benefit reasonably expected from the agreement*: While DataComm likely expected adherence to the restrictions

encompassed in Paragraph 6, it would have harbored this expectation prior to and independent of the Benefit Plan. Some of the obligations contained in this Paragraph simply incorporate prior agreements - for example, the confidentiality agreements in clause (ii) n17 - and it would be these earlier agreements that justified the expectation. Other obligations are so intertwined with the executives' pre-existing duties of [*32] good faith and loyalty - e.g., forbearance from investing in a competitor (clause (i)) or disparaging the company (clause (iii)) - that, here too, DataComm's expectation would not have been rooted in the Benefits Plan. In sum, since DataComm would have received the benefit flowing from appellees' performance of these obligations independent of the Benefit Plan, it does not make sense to consider that performance a benefit that DataComm reasonably expected from the agreement. Or, to put the point in the terms the Restatement uses, performance of the obligations was not a benefit *of* the agreement.

> b) *Adequacy of Compensation*: The Restatement states that "the second circumstance, the extent to which the injured party can be adequately compensated for his loss of benefit (Subsection (b)), is a corollary of the first." *§ 241 cmt. c.* For the reasons set forth in the previous paragraph, [*33] then, this circumstance also does not support a finding of materiality.

> c) *Forfeiture*: The Benefit Plan permits DataComm to terminate the Plan's benefits in the face of an eligible executive's breach of Paragraph 6; it does not state that termination will automatically follow. The fact that an executive could fail to comply with one of the restrictions in Paragraph 6 and still continue to receive the benefits package further supports a finding that the restrictions are not material.

> d) *Likelihood of cure*: In describing this circumstance, the Restatement states that "the fact that the injured party already has some security for the other party's

Case 1:05-cv-00259-KAJ    Document 13-2    Filed 06/17/2005    Page 14 of 21

Page 13

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

performance argues against a determination that the failure is material." § 241 cmt. e. Here, DataComm would have had some security for the executives' adherence to Paragraph 6: Again, some of the obligations contained there (e.g., obligations of confidentiality) hinge upon prior agreements, breach of which may entail penalties rooted in those agreements. Similarly, legal sanctions for breach of the duty of loyalty would motivate adherence to some of the other restrictions (e.g., those against competition and disparagement). [*34]

e) *Good faith and fair dealing*: The Restatement states that "adherence to the standards stated in Subsection (e) is not conclusive, since other circumstances may cause a failure to be material in spite of such adherence. Nor is non-adherence conclusive, and other circumstances may cause a failure not to be material in spite of such non-adherence." § 241 cmt. f. In other words, this is a less probative consideration than the others. In the absence of an actual breach of Paragraph 6 by any of the appellees, the implications of this consideration for the materiality of the appellees' obligations would be purely speculative.

n17 Clause (ii) of Paragraph 6 references "violat[ions] of any confidentiality or similar agreements with the Corporation ..."

In sum, the circumstances supporting a finding of materiality do not appear to be present here.

More generally, we can distill from the Restatement's list the defining feature of materiality - *viz.*, the connection between materiality and consideration. More to the point, the Restatement will deem one party's obligation material where it serves as consideration for the other party's promised performance. Compare *Frank Felix Assocs. v. Austin Drugs, 111 F.3d 284, 289 (2d Cir. 1997)* ("Under New York law, for a breach of a contract to be [*35] material, it must go to the root of the agreement between the parties.") (citation omitted). Thus, the first element of § 241 of the Restatement is "the extent to which the injured party will be deprived of the benefit which he reasonably expected," and "the benefit which he reasonably expected" is the consideration that the contract provides,

§ 241; see also § 241 cmt. b ("Since the purpose of the rules stated in § § 237 and 238 is to secure the parties' expectation of an exchange of performances, an important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange (Subsection (a)). If the *consideration* given by either party consists partly of some performance and only partly of a promise (see *Comment a to § 232*), regard must be had to the entire exchange, including that performance, in applying this criterion.") (emphasis added); § 81 ("In most commercial bargains the consideration is the object of the promisor's desire and that desire is a material motive or cause inducing the making of the promise, and the reciprocal desire of the promisee for [*36] the making of the promise similarly induces the furnishing of the consideration."). Cf. *id.* at § 162 cmt. c. ("a misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent ... [or] if the maker knows that for some special reason it is likely to induce the particular recipient to manifest his assent."). Indeed, the Reporter's notes to the chapter of the Restatement containing § 241 explain that the term "failure of performance," when used in that chapter, see, e.g., id. at § 237, n18 replace the term "failure of consideration." See *Restat. (2d) Contracts, ch. 10, Introductory Note*. In sum, a party's obligation to perform or forbear will be material if it functioned as consideration, or as the reason inducing the other party's entry into the contract.

N18 *Section 237* qualifies the phrase "failure of performance" with the word "material." See *id.* ("it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured *material failure* by the other party *to render any such performance* due at an earlier time.") (emphasis added). *Section 241* also pertains to material failures of performance (i.e., what were formerly referred to as "failures of consideration"), although its language is somewhat more elaborate. See § 241 (describing "whether a failure to render or to offer performance is material.").

[*37]

It seems improbable that the obligations contained in Paragraph 6 functioned in some significant way as consideration for the benefits conferred by the Benefit Plan. The appellees' obligations are set forth in the Benefit Plan in a manner that appears to make them subsidiary to the Plan's central purpose. More specifically, the bulk of this eight-paragraph contract is

Case 1:05-cv-00259-KAJ    Document 13-2    Filed 06/17/2005    Page 15 of 21

Page 14

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

devoted to setting forth DataComm's obligations (Paragraphs 3, 4 and 7), describing the benefits that the eligible executives will receive (Paragraphs 3 and 4), and specifying the protections available to these executives in the event that DataComm undergoes a change in control (Paragraph 5). n19 Paragraph 6 is the only paragraph addressing the executives' obligations; it sets forth a list of restrictions on the eligible executives' conduct, but it does so by embedding this list within a provision stating that DataComm may terminate the benefits of an executive who fails to fulfill one of these obligations. This placement of appellees' obligations suggests that appellees' forbearance is not what motivates or compensates DataComm's performance. Instead, the Plan memorialized a promise by DataComm to furnish its long-standing [*38] executives with certain benefits.

> n19 The remaining paragraphs specify the names of the eligible executives (Paragraph 1), define terms used in the Plan (Paragraph 2), permit DataComm to terminate an executive's benefits in the event that he violates a restriction described in the Agreement (Paragraph 6), and provide for the severability of any provision deemed unenforceable (Paragraph 8).

Indeed, the Plan's preamble amply supports this reading, as it contains language signifying that the purpose of the Plan is to compensate appellees for their past years of service to DataComm. *See* App. at 44 ("WHEREAS, the Corporation desires to provide to certain of its employees (the "Eligible Executives") with [sic] certain additional benefits *based upon their many years of service to the Corporation*") (emphasis added). The preamble makes no mention of an intent to secure appellees' compliance with the restrictive provisions of Paragraph 6, or to otherwise bind appellees in any way. The real crux of the agreement, [*39] then, is a commitment undertaken by DataComm to reward appellees' past consideration.

Finally, Third Circuit precedent further supports a finding that the obligations set forth in Paragraph 6 are not material. In *Enterprise Energy Corp. v. United States (In re Columbia Gas Sys.), 50 F.3d 233 (3d Cir. 1995)*, this court appealed to the Restatement to evaluate materiality:

> In order to determine the materiality of the class members' obligations, we turn first to basic contract principles. There is a distinction in the law between failure of a condition and a breach of a duty: 'Non-

occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.' *Restatement (Second) of Contracts § 225(3)* (1981). This distinction between a condition and a duty (or promise) is important here. The Restatement makes clear that while 'a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for [*40] damages.' *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106, 460 N.E.2d 1077, 1081-82, 472 N.Y.S.2d 592 (N.Y. 1984)* (citing *Restatement (Second) of Contracts § 225*).

*50 F.3d at 241* (footnotes omitted). n20 *Columbia Gas* greatly clarifies the nature of appellees' obligations under the Benefit Plan. Paragraph 6 permits DataComm to terminate an executive's benefits should that executive have been found to have violated one of the listed restrictions. In other words, a breach by one of the appellees would excuse continued performance by DataComm. However, such a breach would not, by itself, n21 subject the "nonfulfilling" executive to liability for damages. Accordingly, the appellees' obligations should be seen as conditions, and not duties. And, "if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of *§ 365* because no material breach could occur." *Id. at 241*.

> n20 As the *Columbia* court noted, "the Restatement has dropped the term 'condition precedent' in favor of simply stating it as 'condition.' E. Allen Farnsworth, 2 Farnsworth on Contracts § 8.2, at 349 (1990)." *50 F.3d at 241 n. 15.* [*41]

> n21 The confidentiality agreements cited in the Plan or the doctrine of loyalty might have subjected an executive who breached his duty of confidentiality or loyalty to liability, but this consequence would have emerged from a legal relationship that existed independent of the relationship forged by the Plan.

2005 U.S. App. LEXIS 8634, *; Bankr. L. Rep. (CCH) P80,285

For the foregoing reasons, I conclude that the Benefit Plan was not executory. Since *section 365* permits rejection only of those contracts that are executory, I would affirm denial of appellants' 365 Motion on the ground that *section 365* does not apply to the contract at issue. Accordingly, I concur in judgment of the court, subject to the small reservation noted in footnote 1, *supra*.

# **EXHIBIT 6**

LEXSEE 2001 U.S. DIST. LEXIS 8434

**GLENA D. GARRISON, Plaintiff, v. TOWN OF BETHANY BEACH, Defendant.**

**C.A. No. 99-451-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 8434*

**April 11, 2001, Decided**

**DISPOSITION:** [*1] Garrison's Motion for Reconsideration (D.I. 43) DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After defendant city was awarded summary judgment in a discrimination suit, plaintiff individual moved for reconsideration.

**OVERVIEW:** An individual sued a city after receiving a right to sue letter from the Equal Employment Opportunity Commission (EEOC). The court granted the city summary judgment. The individual's motion for reconsideration was denied. The individual alleged that (1) the court wrongly assumed that the individual knew he did not need a right to sue letter to file a complaint against the town, (2) the court incorrectly stated that the individual was represented by an attorney throughout his interaction with the EEOC, (3) the court did not consider certain telephone records, (4) the court mistakenly found that the town had notice of the lawsuit before July 16, 1999, and (5) the record showed that the individual did not know when he received his entire file from the EEOC. The court rejected all five grounds offered by the individual to support his motion. In each instance, the court found that the grounds were merely a rehash of arguments presented to the court earlier. The individual did not offer the court any instances that established that the court misunderstood his arguments or materially misapprehended the record.

**OUTCOME:** Plaintiff's motion for reconsideration was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN1] Motions for reconsideration should be granted sparingly. In the United States District of Delaware, motions for reconsideration are only granted if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning but of apprehension. Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision.

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN2] Motions for reconsideration should not be used to rehash arguments already briefed. A guiding principle in applying the limitations on reargument under U.S. Dist. Ct., D. Del., R. 7.1.5 is that a motion for reargument will only be allowed when it is patently clear the judge has committed error. Any lesser constraint would only serve to encourage a never ending polemic between litigants and the court. Thus, it follows that grant of reargument should be denied where the proponent simply rehashes materials and theories already briefed, argued, and decided.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN3] The end period on the statute of limitations is not when an employer receives notice of a lawsuit but rather when it is filed with the court.

**COUNSEL:** For GLENA D. GARRISON, plaintiff: Barbara H. Stratton, Knepper & Stratton, Wilmington, DE.

For TOWN OF BETHANY BEACH, defendant: Scott A. Holt, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

On March 2, 2001, the court issued a memorandum opinion granting an informal motion for summary judgment brought by the defendant, The Town of Bethany Beach ("the Town") (D.I. 41). The court subsequently entered judgment in favor of the Town (D.I. 42). The plaintiff, Glenda D. Garrison timely moved for reconsideration on March 12, 2001 (D.I. 43). The Town filed an answering brief (D.I. 45) and Garrison waived filing a reply brief (D.I. 46). n1 Since the court did not misunderstand Garrison's arguments, overlook facts which would alter its decision, or materially misapprehend the record, it will deny Garrison's motion for reconsideration.

> n1 The court notes that the parties dispute whether the Local Rules provide for reply briefs in motions for reconsideration (D.I. 47 and 48). *Compare* Local Rule 7.1.2 *with* Local Rule 7.1.5. The court declines to rule on the issue since Garrison did not actually file a reply brief in this case.

[*2]

As the cases Garrison cites demonstrate, [HN1] motions for reconsideration should be granted "sparingly." *See Karr v. Castle, 768 F. Supp. 1087, 1090 (D. Del 1991).* In this district, motions for reconsideration are only granted if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning but of apprehension. *See, e.g., Schering Corp. v. Amgen, Inc., 25 F. Supp. 2d 293, 295 (D. Del. 1998); Brambles USA, Inc. v. Blocker, 735 F. Supp. 1239, 1240 (D. Del 1990)* (citing *Above the Belt, Inc v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99 (E.D. Va. 1983));* see also *Karr, 768 F. Supp. at 1090* (citing same). Moreover, even if the court had committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp., 988 F. Supp. 424, 445 (D. Del 1998).*

Furthermore, [HN2] motions for reconsideration "should not be used to rehash arguments already briefed." *See Dentsply Int'l, Inc. v. Kerr Manu Co., 42 F. Supp. 2d 385, 419 (D. Del. 1999).* [*3] A guiding principle in applying the limitations on reargument under Local Rule 7.1.5 is that a motion for reargument will only be allowed when it is patently clear the judge has committed error. Any lesser constraint would only serve to encourage "a never ending polemic between litigants and the Court [sic]." *See Shering Corp., 25 F. Supp. 2d at 295.* Thus, "it follows that grant of reargument should be denied where the proponent simply rehashes materials and theories already briefed, argued, and decided." *See id.*

Garrison offers five grounds to support his position that the court should reconsider its grant of summary judgment. First, the court wrongly assumed that Garrison knew he did not need a right to sue letter to file a complaint against the Town. Second, the court incorrectly stated that Garrison was represented by an attorney throughout his interaction with the Equal Employment Opportunity Commission (the "E.E.O.C."). Third, in deciding the motion for summary judgment, the court did not consider certain telephone records. Fourth, the court mistakenly found that the Town had notice of Garrison's lawsuit before July 16, 1999. Fifth, the record shows that [*4] Garrison does not know when he received his entire file from the E.E.O.C. Since the court has no wish to restate its reasoning for its decision, it will confine itself to explaining why the above mentioned bases are inadequate for reconsideration.

In his first ground for relief, Garrison attempts to find ambiguity in his deposition testimony through attorney argument. To support his position, Garrison highlights his statement that "I could acquire an attorney even without the letter" to suggest that although he knew he could hire a lawyer, he did not know he did not need a right to sue letter to file suit. *See D.I. 44 at 8; see also Garrison v. Town of Bethany Beach, 131 F. Supp. 2d 585, 2001 WL 214050, at *2, n.7 (D. Del. 2001).* The next sentence, however, states, "If I just took it upon myself to hire an attorney, *file suit* against the Town, *I wouldn't have needed the letter* and let or him do whatever they needed to do." *See id.* (emphasis added). Contrary to Garrison's contentions, the court believes this statement unambiguously establishes the fact that Garrison not only knew he did not need a right to sue letter to hire an attorney, but [*5] also that he could file suit against the Town as well. Since the court already considered -- and rejected -- Garrison's argument, this ground in inappropriate for reconsideration.

Second, Garrison proffers both new and old evidence to suggest that the court incorrectly assumed that Garrison was represented by counsel prior to April

2001 U.S. Dist. LEXIS 8434, *

19, 1999. Although the affidavit by Garrison's attorney is improper (and will not be considered), Garrison's deposition testimony does suggest that he did not hire an attorney prior to April, 1999. This discrepancy, however, is immaterial and hardly serves as the basis for the grant of a motion for reconsideration. First, the court is not aware of a pro se exception for parties seeking a right to sue letter from E.E.O.C. n2 Second, there is no dispute that Garrison consulted with an attorney prior to April 19, 1999, whether or not he actually hired one. n3 Even if the court was incorrect in its assertion of when Garrison hired an attorney, this fact is immaterial to the resolution of the motion and would not alter the court's initial decision. n4

n2 On the contrary, the court's experience is that most claimants before the E.E.O.C. are pro se. Regardless of whether Garrison retained counsel or not, it was his responsibility, not that of the Town or the E.E.O.C. to ensure he properly received his right to sue letter. [*6]

n3 Garrison stated that he consulted with an attorney prior to October 21, 1998. There is no record evidence, however, that he did not speak with an attorney until April, 1999. On the contrary, the deposition testimony of his co-worker, John Boyer, reveals that he and Garrison discussed getting money together to hire an attorney to sue the Town. Later in his deposition, Boyer states that he believed that "after you got the letter, we had, I guess, 90 days to come up with the money." Garrison may not use this passage to suggest that he did not know he could sue without a right to sue letter. First, this statement is a surmise of Garrison's thoughts by another. Second, Boyer later states in his deposition that he did not file suit because he did not feel like it, rather than because of a lack of awareness of a time limit. At minimum, the record shows that, at some point, Garrison contacted an attorney prior to April, 1999.

n4 As the court noted in its memorandum opinion, there were other bases for its decision that Garrison does not challenge. *See Garrison, 2001 WL 214050,* at *4, n.10.

[*7]

The third basis of Garrison's motion is that the court "misunderstood" the facts since it "adopted an interpretation of facts advanced by the Town, not

Garrison." In contrast to Garrison's assertions, the court did consider Garrison's errata sheet to his November 5, 1999 deposition, his telephone records, his January 12, 2000 affidavit and DeCoursey's December 16, 1999 affidavit. The court did not wholesale adopt Garrison's interpretation of the events since the telephone records do not demonstrate what he claims they do. On the contrary, the telephone records merely state when Garrison called various E.E.O.C. employees and the length of the calls rather than indicate the substance of the conversations. The court believes that the timeline of events proffered by Garrison's attorney is based on an assumption of what transpired, not record evidence of what actually happened. n5 Furthermore, the telephone records to not show calls from the E.E.O.C. to Garrison; the interpretation Garrison's attorney offers may not be the complete picture. n6 Although Garrison spends much time again attempting to convince the court that the telephone records demonstrate a genuine issue of material fact, [*8] the court has already considered this argument and rejected it.

n5 For example, the telephone records indicate that Garrison called DeCoursey on March 15, 2000. This is not inconsistent with the court's statement that DeCoursey and Garrison spoke at the "end of February or the beginning of March" and told him that he did not need a right to sue letter to file suit.

n6 As Garrison admits in his deposition, DeCoursey returned some of his calls. It is not for the court to guess the substance of these conversations. Instead, it must rely on record evidence.

Garrison's fourth ground for reconsideration is unavailing for two reasons. First, it relies on additional evidence offered after the court already ruled on the motion for summary judgment without explaining why the affidavit could not be procured earlier. n7 Second, it is irrelevant. Even if the Town knew of Garrison's impending lawsuit prior to July 16, 1999, the fact remains that he did not file a complaint with the court until July 16, 1999 (D.I. 1). [*9] Contrary to Garrison's assertions, [HN3] the end period on the statute of limitations is not when the employer receives notice of a lawsuit but rather when it is filed with the court. n8 The issue before the court was when *Garrison* had notice of his right to sue and when he chose to exercise it, not what the Town knew and when it knew it. Therefore, Garrison's fourth ground does not merit reconsideration by the court.

2001 U.S. Dist. LEXIS 8434, *

n7 On the contrary, the affidavit filed by Garrison's attorney describes events which happened well before the onset of this action. That the evidence was not submitted at that time speaks to its materiality to the issue on summary judgment; if Garrison's attorney considered the timing of her retention material, she presumably would have highlighted it in her brief. In any event, even if the court were to consider the affidavit, it would not change its ruling.

n8 Garrison does not dispute that the Town did not have a copy of the final complaint against it prior to July 16, 1999.

Garrison's final [*10] ground for relief is his claim that he does not know when he received his file from the E.E.O.C. Not only is this an inappropriate basis for reconsideration (the court already discussed it in its ruling), but there is no record evidence to support his assertion. There is no dispute that the E.E.O.C. file was postmarked as mailed on April 8, 1999. As the court noted in its opinion, in the absence of evidence to the contrary, the court must presume Garrison received the file three days after it was sent. In response, Garrison states that he "does not know" when he received the E.E.O.C. file. This is not sufficient evidence for him to overcome the presumption of mailing. The court already addressed -- and dismissed -- the argument that since his right to sue letter was at the end of his "voluminous" E.E.O.C. file the court should overlook evidence of its actual receipt by Garrison. The court declines to revisit this issue.

Garrison's motion for reconsideration does not present the court with any instances that establish that it misunderstood his arguments or materially misapprehended the record. Garrison's arguments

illustrate exactly what motions for reconsideration are not supposed [*11] to be; he offers nothing more than a rehash of arguments and identification of facts that invite the court to explain anew its ruling. Furthermore, Garrison had notice that his arguments about his interaction with the E.E.O.C. would not change the court's result. As the court stated in its memorandum opinion "even if the court were to overlook the oral notice Garrison received regarding the issuance of his right to sue letter and the attendant rights, the record demonstrates that Garrison actually received a copy of his right to sue letter on or about April 8, 1999." *See Garrison, 2001 WL 214050, at *5.* Since the receipt of the right to sue letter prior to April 18, 1999 is -- at the end of the day -- not in dispute, n9 the court will not reconsider its grant of summary judgment in favor of the Town. Garrison's remedy, if any, must come from the Third Circuit.

n9 By "not in dispute" the court does not suggest that Garrison agrees with this date. Rather, as mentioned above, the court finds that Garrison has not proffered sufficient evidence to overcome the presumption of receipt of his E.E.O.C. file within three days of April 8, 1999.

[*12]

Therefore, IT IS HEREBY ORDERED that:

1. Garrison's Motion for Reconsideration (D.I. 43) is DENIED.

Dated: April 11, 2001

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE