# EXHIBIT 7

4 of 4 DOCUMENTS

GLENCORE INTERNATIONAL AG v METRO TRADING INTERNATIONAL INC
ITOCHU PETROLEUM CO (S) PTE LTD AND SINGAPORE PETROLEUM CO AND
BANQUE TRAD-CREDIT LYONNAIS (FRANCE) SA (THIRD PARTY); METRO
TRADING INTERNATIONAL INC v ITOCHU PETROLEUM CO (S) PTE LTD AND
BANQUE TRAD-CREDIT LYONNAIS (FRANCE) SA (THIRD PARTY)

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

*[1999] 2 Lloyd's Rep 632*

**HEARING-DATES:** 30 July 1999

30 July 1999

**CATCHWORDS:**

Practice -- Jurisdiction -- Stay of action -- Contracts for sale of cargo of oil contained exclusive English jurisdiction clause -- Plaintiffs claimed against defendants in conversion -- Bank brought proceedings in Paris to recover proceeds of sale -- Third party proceedings brought in England against bank -- Whether proceedings involved same parties and same cause of action -- Whether English or French Court first seised of action -- Whether bank bound by exclusive jurisdiction clause -- Whether proceedings should be stayed -- Civil Jurisdiction and Judgments Act, 1982, Schedule, arts 17, 21, 22.

**HEADNOTE:**

The first defendant (Metro) provided storage facilities for oil products in vessels stationed off Fujairah and also acted as an oil trader in its own right.

In October, 1997 Metro entered into a contract with the 37th defendant (Itochu) for the sale of six cargoes of bunker fuel delivery to be made at the rate of one each month from November, 1997 to April, 1998, inclusive. On Jan 21, 1998 Metro entered into a contract with the 38th defendants (SPC) for the sale of a single parcel of bunker fuel for delivery in February, 1998. The contracts were on very similar terms. Each was subject to English law and included an exclusive English jurisdiction clause. Each contract also provided for payment to be made by telegraphic transfer to Metro's nominated bank account against invoice and shipping documents or letter of indemnity for missing documents and also obliged the buyers to issue a purchase and payment undertaking to Metro's nominated bank.

Vigour loaded at Fujairah towards the end of January, 1998. Bills of lading in respect of the cargo were issued to the order of the third party Banque Trad-Credit Lyonnais (France) SA (the bank) which had been financing Metro's business operations and to which Metro had assigned the proceeds from oil resales.

In early 1998 Metro collapsed and went into liquidation.

The goods were delivered in Singapore during the first half of February, 1998. Shortly after, on Feb 27, 1998 the plaintiffs (Glencore) began proceedings in England against Metro and the owners of certain vessels seeking delivery up of oil products alleged to be in their possession and damages for conversion and breach of contract.

On Mar 24, 1998 the bank commenced two actions in Paris, one against Itochu, Metro and the owners and operators of Vigour, and one against SPC, Metro and the owners and operators of Vigour. In those actions the bank sought to recover from Itochu and SPC or Metro the amounts due under the contracts of sale relating to the cargoes on Vigour.

[1999] 2 Lloyd's Rep 632

On Sept 30, 1998 Glencore obtained leave to join Itochu and SPC as defendants to its action and to serve them out of the jurisdiction. On Nov 12, 1998 Metro issued a writ against Itochu seeking payment of the price of the goods due under the contract.

On Mar 12, 1999 Itochu served third party proceedings on the bank in Metro's action seeking declaratory relief as a means of ensuring that the bank was bound by the Court's decision in those proceedings and that third party notice which was subsequently ordered to stand as third party notice against the bank in Glencore's action.

The bank applied to stay Itochu's third party proceedings in the Glencore and Metro actions to enable the issues to be determined in Paris.

SPC applied for a stay of Glencore's action against it to enable the issues between them to be decided in Paris and Itochu applied for a stay of Metro's and Glencore's actions against it pending the outcome of the proceedings in Paris, in the event that the bank was successful in staying the third party proceedings.

Itochu and SPC protested the jurisdiction of the Paris Court on the ground that the bank as assignee was bound by the exclusive jurisdiction clauses in their contracts and on the ground that the Court should decline jurisdiction under art 22 of the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (the Brussels Convention) which was enacted by the Civil Jurisdiction and Judgments Act, 1982.

The bank argued that art 21 applied and since the third party proceedings involved the same cause of action and were between the same parties as the proceedings brought by the bank in France and the French Court was the Court first seised of the proceedings the English proceedings should be stayed.

-- Held, by QB (Com Ct) (MOORE-BICK, J), that (1) the requirement of identity of parties was satisfied to the extent that the same parties were joined in both actions; the same cause of action arose between the same two parties in two sets of proceedings in that the bank and Itochu were parties to each of the English actions as well as one of the bank's actions in France so that this aspect of art 21 was satisfied as far as the bank and Itochu were concerned (see p 637, col 1);

(2) although the relief which Itochu sought against the bank was declaratory, the factual basis of its claim was the delivery by Metro of the cargo on board Vigour and its commercial arrangements with Metro and the bank which culminated in its giving the letter of undertaking; the legal basis of its claim rested on the rights and liabilities of Metro and the bank under the contract of sale and the letter of undertaking; in the French proceedings the bank's claim to recover the price was based on the same facts and depended on the same rules of law so that there could be little doubt that the cause was the same (see p 638, col 1);

(3) the object of the proceedings was to ensure that as between the bank and Itochu the bank was bound by a decision on whether Metro had title to the goods sold and delivered under the contract; if that were to be answered differently in different proceedings it would lead to mutually exclusive judgments; both sets of third party proceedings between the bank and Itochu involve both the same cause of action and the same object as the proceedings between them in France (see p 638, col 2; p 639, col 1);

-- The Maciej Rataj, [1995] 1 Lloyd's Rep 302, Gubisch Maschinenfabrik KG v Giulio Palumbo, [1987] ECR 4861 and Haji-Ioannou v Frangos, [1999] 2 Lloyd's Rep 337, considered.

(4) for the purposes of the bank's application under art 21 it was necessary to determine which Court was first seised of the third party proceedings between the bank and Itochu, not of proceedings between other parties; the French Court was seised of the proceedings between the bank and Itochu in June, 1998, well before Itochu served the bank with its third party proceedings in England; and on the face of it art 21 required the English Court to stay the third party proceedings in favour of the French Court (see p 640, col 1);

-- Fox v Taher, [1997] IL Pr 441, applied.

(5) a good arguable case required less than proof on the balance of probabilities, but had to nonetheless be strong enough to justify retaining the action in England rather than declining jurisdiction in favour of the Court first seised in accordance with art 21 (see p 642, col 2);

(6) the letter of Nov 6, 1992 which appeared to record the terms on which the bank was financing Metro was sufficient to lend strong support to the submission that the arrangements were intended to effect an assignment by Metro to the bank of the price due under the sale contract; there was nothing in the evidence to suggest that undertakings given

[1999] 2 Lloyd's Rep 632

by the buyers were intended to create independent contracts between themselves and the bank rather than simply confirm that the buyers would make the payment in the manner called for under the contract; there was at least a good arguable case that the only serious dispute between the bank and Itochu was whether the bank was entitled to recover from Itochu as assignee of Metro (see p 644, cols 1 and 2);

(7) "parties" in the first sentence of art 17 meant the parties to the original contract but it did not necessarily follow that an assignee was free to ignore the exclusive jurisdiction clause; that depended on whether he was someone who could properly be treated as having agreed to the clause (see p 644, col 2);

(8) the ordinary rule was that an assignee of a chose in action under English law could not be better off than the assignor and so took the chose assigned to him together with any restrictions attaching to it including an exclusive jurisdiction clause; and to hold that an assignee was bound by an exclusive jurisdiction clause would not undermine the principles on which the Convention was based including art 17 (see p 645, col 2);

(9) there was a good arguable case that the bank was aware in general terms of the terms on which Metro did business; it was open to the Court to hold that provided the agreement of the original parties to the inclusion of an exclusive jurisdiction clause was clearly established as required by art 17, an assignee of a debt arising under that contract was likewise bound by that clause; and since it was not disputed that the contract between Metro and Itochu contained such a clause, there was a good arguable case that the bank as assignee of Metro was bound by the exclusive jurisdiction clause in that contract when seeking to recover the price; and Itochu was entitled to succeed by virtue of art 17 which overrode art 21 (see p 646, col 1);

-- The Tilly Russ, [1985] 1 QB 931, and Continental Bank NA v Aeakos Compania Naviera SA [1994] 1 Lloyd's Rep 505, applied.

(10) an action which involved a dispute which fell within the scope of art 21 did not as a result cease to be related to other pending proceedings if the conditions of art 22 were satisfied; it was not seriously disputed that all three actions had from the outset been related actions within the meaning of art 22; unlike art 17, arts 21 and 22 were essentially procedural in nature, and unlike art 21, art 22 merely gave the Court second seised a discretion to stay the proceedings before it; it did not make the imposition of a stay mandatory and it would be wrong to treat art 22 as if it imposed a binding duty on the French Court to stay the bank's proceedings (see p 647, col 1);

(11) were it not for the exclusive jurisdiction clause, the right course would be to stay the third party proceedings under art 21 pending a decision by the French Court on the matter of its jurisdiction and the desirability of imposing a stay or declining jurisdiction under art 22; however the Court was bound to give effect to the exclusive jurisdiction clause in the sale contract and a stay of Itochu's third party proceedings in the Glencore action must be refused;.the third party proceedings between Itochu and the bank in Metro's action raised the same issues and a stay of those proceedings would be refused (see p 647, cols 1 and 2);

(12) SPC applied to stay the proceedings brought against it by Glencore under art 21, SPC having previously joined Glencore as a third party to the action brought against it by the bank in France; the proceedings in France involved the same cause of action because they were intended to lead to a final decision on Glencore's right to recover against SPC in respect of wrongfull interference with the cargo carried on Vigour; art 21 applied to the case and the proceedings must be stayed (see p 647, col 2; p 648, col 1);

(13) Itochu applied for a stay of Metro's action in the event that the proceedings between itself and the bank continued in France; since the third party proceedings were to continue in England the basis of this application fell away; and insofar as the proceedings continued in England, appropriate steps would be taken to ensure that the issues affecting Itochu, Glencore and the bank were decided in the way which ensured that all parties were heard and bound by the outcome (see p 648, cols 1 and 2);

(14) Itochu's application to stay Glencore's action was made to guard against the possibility that the bank might persuade the Court to stay the third party proceedings; in those circumstances Itochu would clearly wish to have the claim stayed; but as the third party proceedings must be allowed to continue there were no grounds for staying that claim (see p 648, col 2).

**CASES-REF-TO:**
Airbus Industrie GIE v Patel, (HL) [1998] 1 Lloyd's Rep 631; [1999]] AC 119;
Canada Trust Co v Stolzenburg (No 2), (CA) [1998] 1 WLR 547;

[1999] 2 Lloyd's Rep 632

Continental Bank NA v Aeakos Compania Naviera SA, (CA) [1994] 1 Lloyd's Rep 505; [1994] 1 WLR 588;
Dresser UK Ltd v Falcongate Freight Management Ltd, (CA) [1991] 2 Lloyd's Rep 557; [1992] 1 QB 502;
Firswood Ltd v Petra Bank, CA Dec 13, 1995, unreported;
Fox v Taher, (CA) [1997] IL Pr 441;
Gerling Konzern Speziale Kreditversicherungs-AG v Amministrazione del Tesoro dello Stato, [1983] ECR 2503;
Grupo Torras SA v Sheikh Fahad Mohammed Al-Sabah, (CA) [1996] 1 Lloyd's Rep 7; [1995] 1 Lloyd's Rep 374;
Gubisch Maschinenfabrik KG v Giulio Palumbo, [1987] ECR 4861;
Haji-Ioannu v Frangos, (CA) [1999] 2 Lloyd's Rep 337;
Maciej Rataj, The [1995] 1 Lloyd's Rep 302; [1994] ECR 1-5439;
Overseas Union Insurance Ltd v New Hampshire Insurance Co, [1992] 1 Lloyd's Rep 204; [1992] 1 QB 434;
Partenreederei MS Tilly Russ v Haven & Vervoebedrijf Nova NV (The Tilly Russ), [1985] 1 QB 931;
Sarrio SA v Kuwait Investment Authority, (HL) [1998] 1 Lloyd's Rep 129; [1999] 1 AC 32;
Shamia v Joory, [1958] 1 QB 448;
Toepfer International GmbH v Societe Cargill France, (CA) [1998] 1 Lloyd's Rep 379.

### INTRODUCTION:

This was an application by the third party Banque Trad-Credit Lyonnais (France) SA (the bank) to stay third party proceedings brought against them by Itochu Petroleum Co (S) Pte Ltd (Itochu) in the action brought by the plaintiffs, Glencore International SA, against inter alia the defendants Metro Trading International, Itochu Inc and Singapore Petroleum Co claiming the recovery of the proceeds of sale in respect of cargoes of oil carried on the vessel Vigour and sold by Metro to Itochu and SPC; the bank also applied to stay Itochu's third party proceedings in the action brought by Metro against Itochu. SPC applied for a stay of Glencore's action against it and Itochu applied to stay the action brought by Glencore and Metro against it.

### COUNSEL:

Mr Richard Southern for Glencore; Mr Dominic Kendrick, QC and Mr David Allen for Itochu; Mr Michael Beloff, QC and Miss Geraldine Andrews for SPC; Mr Andrew Smith, QC for the third party bank; Mr Simon Mortimore, QC and Mr James Turner for Metro.

### PANEL: MOORE-BICK J

### JUDGMENTBY-1: MOORE-BICK J

### JUDGMENT-1:

MOORE-BICK J: Introduction

I have before me five applications in two actions which form part of the extensive litigation arising out of the collapse in early 1998 of Metro Trading International Inc ("Metro"). While it carried on business Metro provided storage facilities for oil products in vessels stationed off Fujairah and also acted as an oil trader in its own right. Following its collapse a number of companies which had delivered products to Metro for storage have claimed title to the stocks which remained in Metro's possession. In some cases they have asserted that oil products which Metro had sold and delivered to third parties were their property and have made claims against the buyers in conversion. The applications now before me are made in two actions which relate to a cargo of heavy fuel oil carried on board the vessel Vigour from Fujairah to Singapore in February, 1998. Two further actions have been commenced in the Tribunal de Commerce in Paris by Banque Trad-Credit Lyonnais ("the bank") which is seeking to recover the price due under the contracts of sale under which the cargo on Vigour was sold by Metro to two buyers in Singapore, Itochu Petroleum Co (S) Pte Ltd ("Itochu") and Singapore Petroleum Co Ltd ("SPC"). It is the existence of the concurrent proceedings in England and France which has given rise to the present applications which all concern, directly or indirectly, the question whether the issues which they raise should be determined here or in France.

In order to set the present applications in context it is necessary to describe briefly the events which have given rise to them. In October, 1997 Metro entered into a contract with Itochu for the sale of six cargoes of bunker fuel, delivery to be made at the rate of one each month from November, 1997 to April, 1998 inclusive. On Jan 21, 1998 Metro entered into a contract with SPC for the sale of a single parcel of bunker fuel for delivery in February, 1998. The

[1999] 2 Lloyd's Rep 632

contracts were on very similar terms: each was subject to English law and included an exclusive English jurisdiction clause. Each contract also provided for payment to be made by telegraphic transfer to Metro's nominated bank account against invoice and shipping documents or letter of indemnity for missing documents and also obliged the buyers to issue a purchase and payment undertaking to Metro's nominated bank.

Vigour loaded at Fujairah towards the end of January, 1998. Bills of lading in respect of the cargo were issued to the order of the bank which had been financing Metro's business operations. On Feb 12, 1998 the bank's Singapore branch asked Itochu to give an undertaking that it would pay the invoice price of the goods to the bank for the account of Metro in accordance with the terms of the contract. Later that day Itochu sent a telex to the bank giving the undertaking requested. At the bank's request a similar undertaking had already been given by SPC on Feb 2, 1998 in respect of the price due under its contract with Metro. I shall refer to these as the letters of undertaking. The goods were delivered in Singapore during the first half of February. Shortly after, on Feb 27, 1998, Glencore International AG ("Glencore") began proceedings in England against Metro and the owners of certain vessels seeking delivery up of oil products alleged to be in their possession and damages for conversion and breach of contract. The writ, to which neither Itochu nor SPC were parties at that time, was served on Metro on Mar 4, 1998. Meanwhile, on Mar 3, 1998 an order had been made by Mr Justice Tuckey appointing receivers to get in and preserve the property and receivables of Metro pending the outcome of the proceedings in this country. Steps were also taken to wind up Metro in Greece where a Mr Grigoriadis was appointed as liquidator by the First Instance Court of Athens on Mar 26, 1998.

On Mar 24, 1998 the bank, which had been represented before Mr Justice Tuckey when the receivership order was made but had not been made a party to it, commenced two actions in Paris, one against Itochu, Metro and the owners and operators of Vigour, and one against SPC, Metro and the owners and operators of Vigour. In those actions the bank sought to recover from Itochu and SPC or Metro the amounts due under the contracts of sale relating to the cargoes on Vigour. The liquidator has intervened in those proceedings seeking a stay of the actions pending a decision on the enforcement of the winding up order in France. It is now accepted that the evidence points irresistibly to the conclusion that the French Courts became seised of those proceedings on June 10, 1998 when the originating process was lodged at the Court following service on the defendants.

As far as the parties now before the Court are concerned, no further steps of any significance were taken in any of the proceedings until Sept 30, 1998 when Glencore obtained leave to join Itochu and SPC as defendants to its action and to serve them out of the jurisdiction. Shortly after that, on Nov 3, 1998, SPC applied to join Glencore, the receivers and the liquidator as third parties to the bank's action against it in Paris, and a few days after that, on Nov 12, 1998, the receivers themselves issued a writ in this country in the name of Metro against Itochu seeking payment of the price of the goods due under the contract. Glencore's amended writ was served on SPC on Mar 9, 1999 but was not served on Itochu until Apr 28, 1999. Metro's proceedings were served on Itochu rather earlier, certainly before the beginning of March, 1999 because on Mar 12, 1999 Itochu served third party proceedings on the bank in Metro's action seeking declaratory relief as a means of ensuring that the bank was bound by the Court's decision in those proceedings. That third party notice was subsequently ordered to stand as third party notice against the bank in Glencore's action. Unlike Itochu, SPC has not brought any third party proceedings against the bank in this country. Itochu and SPC are protesting the jurisdiction of the Tribunal de Commerce on the grounds that the bank is bound by the exclusive jurisdiction clauses in their contracts with Metro and on the grounds that the Court should decline jurisdiction under art 22 of the Brussels Convention.

In summary, therefore, the position is this:

(a) In England

(i) Glencore is suing Itochu and SPC in conversion;

(ii) the receivers are suing Itochu (but not SPC) in the name of Metro for the price of the goods;

(iii) Itochu has made third party claims against the Bank in both actions;

(b) in France

(i) the Bank has sued Itochu and SPC for the price of the goods;

(ii) SPC (but not Itochu) has made third party claims against Glencore and Metro.

It is in these circumstances that the following applications come before the Court:

[1999] 2 Lloyd's Rep 632

1. An application by the bank to stay Itochu's third party proceedings in the Glencore action to enable the issues between them to be determined in Paris;

2. a similar application by the bank to stay Itochu's third party proceedings in the Metro action;

3. an application by SPC for a stay of Glencore's action against it to enable the issues between them to be decided in Paris;

4. an application by Itochu, in the event that the bank succeeds in its application to stay the third party proceedings, for a stay of the receivers' action against it pending the outcome of the proceedings in Paris;

5. an application by Itochu, on a similar basis, for a stay of Glencore's action against it.

All the parties now before the Court wish to ensure that there is only one set of proceedings between them relating to the cargo carried on Vigour, but the bank and SPC want them to be held in France, whereas Itochu, Glencore and the receivers want them to be determined in England. This is, therefore, a battle about jurisdiction and it is common ground that it must be decided in accordance with the rules laid down in arts, 17, 21 and 22 of the Brussels Convention. The claims made by Metro (by the receivers) and Glencore are essentially quite straightforward: Metro claims the price of the goods sold to Itochu and SPC; Glencore claims the value of the gods in conversion, having indicated that it regards the price at which Metro sold to Itochu and SPC as sufficient evidence of that value. In one sense, therefore Itochu and SPC are seeking to adopt the role of interpleaders between these two claimants although the position is complicated by the fact that each of them claims to be entitled to raise a set-off against the amount due under its contract with Metro. The position of the bank is less straightforward. Mr Andrew Smith, QC who appeared on its behalf on these applications said that its primary case is that the letters of undertaking gave rise to new and directly enforceable contracts with the buyers under which they became bound to pay it the price of the goods due under their contracts. Alternatively, the bank says that the terms of the contracts and the letter of undertaking in each case operated as an assignment to it of the debt due to Metro. This is something to which I shall have to return at a later stage in connection with the question whether the bank's claim is subject to the exclusive jurisdiction clause in the two sale contracts, but it was common ground that the issue of title to the cargo carried on Vigour lies at the heart of all the claims. It is essential for Glencore to establish that it had title to the oil in order to support a claim in conversion, and it was accepted that neither Metro nor the bank could recover the price if Metro did not have title to the oil which it sold and delivered to SPC and Itochu. It was also common ground that if all the proceedings in France and England are related actions within the meaning of art 22 of the Convention, this Court was first seised of one of those related actions, namely, Glencore's action in which the writ was served on Metro at the latest by early March, 1998.

The bank's applications

It is convenient to begin by considering the bank's applications to stay the third party proceedings brought by Itochu. These were based on art 21 of the Convention which provides as follows:

Where proceedings involving the same cause of action and between the same parties are brought in the courts of different Contracting States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established. Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

Three questions therefore arise: (a) are the proceedings between the same parties; (b) if so, do they involve the same cause of action; (c) if so, were the French Courts or the English Courts first seised of the proceedings?

At one time there was some uncertainty as to the precise degree of coincidence of parties which was necessary in order to bring a case within art 21, but those doubts have now been resolved by the decision of the European Court in The Maciej Rataj, [1995] 1 Lloyd's Rep 302; [1994] ECR 1-5439. The Court pointed out in par 32 of its judgment that arts 21 and 22 are intended to prevent parallel proceedings before the Courts of different Contracting States so as to avoid conflicting decisions and that therefore art 21 must be read as applying whenever there is identity of parties to the two actions. It continued as follows:

Consequently, where some of the parties are the same as the parties to an action which has already been started, art 21 requires the second court seised to decline jurisdiction only to the extent to which the parties to the proceedings pending before it are also parties to the action previously started before the court of another Contracting State; it does not prevent the proceedings from continuing between the other parties.

Admittedly that interpretation of art 21 involves fragmenting the proceedings. However, art 22 mitigates that disadvantage. That article allows the second Court seised to stay proceedings or to decline jurisdiction on the ground that the actions are related, if the conditions there set out are satisfied.

It follows that the requirement of identity of parties is satisfied to the extent that the same parties are joined in both actions, whether or not other parties have been joined in one or both of the actions. In other words, it is necessary to ask oneself whether the same cause of action arises between the same two parties in two sets of proceedings. In the present case it is clear that this aspect of art 21 is satisfied as far as the bank and Itochu are concerned since both of them are parties to each of the English actions as well as one of the bank's actions in France.

The second question concerns identity of cause of action. The English text of the Convention in common with the German and Irish texts refers simply to the same "cause of action", but other texts refer to two distinct elements, in the French text, for example, cause and objet. In Gubisch Maschinenfabrik KG v Giulio Palumbo, [1987] ECR 4861 the European Court held that all language versions must be construed as embracing both concepts. The concept of cause has not given rise to much difficulty in this case since it was accepted in the light of the authorities that it refers to the factual basis of the claim and the rules of law on which it is based. In other words, this element of art 21 is satisfied if the proceedings have the same factual basis and turn on the application of the same rules of law. The precise meaning of objet in this case was more controversial. Mr Smith drew my attention to the fact that in the English report of Gubisch the expression "subject matter" is used to translate the word objet, thereby suggesting that the Court is concerned with content of the claim, or the "petitum" as it was put in some of the submissions to the Court. He submitted, therefore, that the expression "end in view" which is used in later cases cannot be understood as meaning the general aim of the parties in bringing the proceedings. However, it is important to note that the choice of the expression "subject matter" in that case appears to have been that of the translator (see the note on p 4863 of [1994] ECR) and that the Court was not directly concerned with the distinctions which Mr Smith was seeking to make. The question which arose in Gubisch was whether an action to enforce a contract for the sale of goods had the same objet as an action for its rescission or discharge. The Court held that they did. One action was brought to give effect to the contract, the other to deprive it or effect. The question whether the contract was binding lay at the heart of the two actions and so fell to be decided in both (see par 16 of the judgment).

The Court returned to the question in The Maciej Rataj where the issue arose in the context of claims by owners of cargo for damage to goods and claims by the shipowners for declarations of non-liability. In par 41 of its judgment the Court held that:

The "object of the action" for the purposes of art 21 means the end action has in view.

Accordingly it held that two actions had the same object when the first sought a declaration that the plaintiff was not liable for damage as claimed by the defendants while the second sought to have the plaintiff in the first action held liable for causing loss and ordered to pay damages. That was because the issue of liability was again central to both actions and the fact that the plaintiff in the second action claimed damages did not alter the principal object of the action. The expression "end in view" might be said to be a little different from "subject matter of the action", but in the light of some of the parties' submissions in the present case it is worth noting that the Court in that case referred to the end the action has in view rather than the end the parties have in view. As far as I am concerned, however, authoritative guidance on the principles to be derived from Gubisch and The Maciej Rataj is now to be found in Haji-Ioannou v Frangos, [1999] 2 Lloyd's Rep 337 where, having considered the earlier authorities the Court held that actions have the same object if they have the same end in view, adopting the principle as formulated in The Maciej Rataj. If there is any distinction, therefore, between the expressions to be found in Gubisch and The Maciej Rataj (which I doubt) it is clear that "end in view" is to be preferred.

In Haji-Ioannou v Frangos the claimant alleged that the principal defendant had embezzled a very large sum of money which had been entrusted to him for specific purposes. Criminal proceedings were brought against the defendant in Greece to which the claimant joined a civil claim to recover a trivial sum by way of "moral damages" for harm done to the claimant's reputation by the defendant's action. That claim was directed against the defendant personally. In his action in England the claimant asserted a beneficial interest in the funds entrusted to the defendant and in the assets which those funds had been used to acquire. The Court of Appeal considered that the same facts and rules of law formed the basis of both proceedings, even though in England the claimant was asserting that the same underlying agreement gave rise to different obligations and different legal remedies. However, unlike the claim in Greece, the claim in England was not a simple personal claim for the recovery of money, but involved a proprietary claim against funds and assets in the hands of the defendant. The actions were therefore held to have different objects

[1999] 2 Lloyd's Rep 632

for the purposes of art 21. That did not depend on the end which the claimant had in view, but upon the nature of the actions themselves.

On the basis of these authorities Mr Smith submitted that in the present case both the cause and the objet of Itochu's proceedings against the bank in England are the same as those of the bank's proceedings against Itochu in France. There can be little dispute as far as the cause is concerned. Although the relief which Itochu seeks against the bank is declaratory, the factual basis of its claim is the delivery by Metro of the cargo on board Vigour and its commercial arrangements with Metro and the bank which culminated in its giving the letter of undertaking. The legal basis of its claim rests on the rights and liabilities of Metro and the bank under the contract of sale and the letter of undertaking. In the French proceedings the bank's claim to recover the price is based on the same facts and depends on the same rules of law. The position is less clear, however, in relation to the objets of the two sets of proceedings. In France the purpose of the bank's action is to recover the price of the goods from Itochu; in England, it may be said, the purpose of Itochu's third party proceedings is to bring the bank, Metro and Glencore into direct opposition to each other in order to avoid multiplicity of proceedings and to ensure that they are all bound by the same judgment.

The concept of "the end the action has in view" is one which is not always easy to define with precision as the present applications demonstrate. In one sense the bank's action to recover the price due under the sale contract does not have the same end in view as Itochu's third party proceedings which merely seek to ensure that the bank is bound by the decisions made in Glencore's action. However, both actions raise the same issues of fact and law relating to the ownership of the oil which is accepted to be the key to Itochu's liability, whether to the bank or Glencore. A decision in the present action that Itochu was liable to Glencore because Metro had no title to the oil would, if binding on the bank, necessarily mean that Itochu was not liable to the bank or to Metro. Equally, a decision in the French proceedings that Itochu was liable to the bank would be inconsistent with any right of Glencore to recover damages for conversion in these proceedings or, for that matter, any right of Metro to recover the price, since it was not suggested that Itochu could be liable to make payment both to the bank and to Metro.

Much was made in argument of the fact that the third party proceedings are intended to operate as interpleader proceedings, but that is not really a true description of their nature. Interpleader proceedings under O 17 of the Rules of the Supreme Court (preserved by CPR Part 50) are a creature of statute. They provide a means by which a party who is faced with competing claims to a debt or other property and who does not himself claim any interest in the subject matter in dispute can obtain relief by putting the subject matter at the disposal of the Court. The Court determines the issues to be tried between the rival claimants and the interpleading party takes no further part in the proceedings. The procedure thus enables the Court to create an artificial lis directly between the claimants in substitution for their respective claims against the original defendant. In the present case Itochu's third party notices, although not framed in quite this way, seek to ensure that the bank is bound by the Court's decision on questions of law arising between Itochu and Glencore which would affect its right to recover under the letter of undertaking. This is exactly the kind of relief which was expressly envisaged by O 16, r 1(1)(c) and is now subsumed within CPR Part 20.2(1)(b). Although it may achieve some of the practical benefits of interpleader proceedings in that it ensures that the defendant is not bound by mutually inconsistent judgments, it is intended to result in a final decision which binds both parties and affects their mutual rights and obligations. Thus in the present case the object of the proceedings is to ensure that as between the bank and Itochu the bank is bound by a decision on whether Metro had title to the goods sold and delivered under the contract which lies at the very heart of the bank's claim. If that were to be answered in different ways in different proceedings it would lead to mutually exclusive judgments. Whatever may have been Itochu's broader objective in bringing the third party proceedings, therefore, they raise the question of its liability to the bank as effectively as does the bank's own action in France.

In both Gubisch and The Maciej Rataj the European Court emphasized that the object of arts 21 and 22 is to prevent parallel proceedings which might give rise to irreconcilable judgments and this in my view is the fundamental principle which must be borne in mind when deciding whether two sets of proceedings have the same end in view in the sense required by art 21. It cannot be enough that they are both concerned with the same facts and the same rules of law since both of these are subsumed in the concept of cause: see Haji-Ioannou v Frangos. However, the concept of objet relates to the end which the action has in view, not the object which the claimant had in mind in bringing the proceedings. In The Maciej Rataj the fact that the issue of liability for damage to cargo was central to both actions and that the judgments would overlap entirely in relation to that issue appears to have been a sufficient basis for holding that the two actions had the same objet. In Haji-Ioannou v Frangos, on the other hand, the fact that one action was concerned purely with rights against the defendant personally whereas the other was concerned with establishing the claimant's rights against property meant that the actions had different ends in view. In the present case the central issues

in both sets of proceedings are whether Metro or Glencore had title to the cargo loaded on board Vigour and which of them is entitled to recover from Itochu. In each case judgment in the action will determine the rights and obligations of Itochu, Glencore and Metro as between each other in a manner which will bind them all. The position is thus much closer to that which arose in The Maciej Rataj than that which existed in Haji-Ioannou v Frangos. I am persuaded, therefore, that both sets of third party proceedings between the bank and Itochu involve both the same cause of action and the same object as the proceedings between them in France.

Finally there is the question of which Courts were first seised. The French Courts were seised of proceedings between the bank and Itochu on June 10, 1998. Under English law the Court becomes seised of proceedings for the purposes of arts 21 and 22 at the time when the writ or other originating process is served on the defendant: see Dresser UK Ltd v Falcongate Freight Management Ltd, [1991] 2 Lloyd's Rep 557; [1992] 1 QB 502. That rule is easily applied when there is only one defendant, but what is the position when there are two or more defendants? In Grupo Torras SA v Sheikh Fahad Mohammed Al-Sabah, [1995] 1 Lloyd's Rep 374 at p 419 Mr Justice Mance held that arts 21 and 22 postulated a single date of first seisure in relation to each set of proceedings. That answer may have much to commend it in terms of its practical consequences, but in the light of the subsequent decision of the European Court in The Maciej Rataj it is difficult to see that it can be sustained. When Grupo Torras came before the Court of Appeal ([1996] 1 Lloyd's Rep 7) some time after the European Court had given judgment in The Maciej Rataj, the Court considered at length how art 21 operated in the context of proceedings against multiple defendants. Lord Justice Stuart-Smith delivering the judgment of the Court said at p 21, col 1:

The appellants argued that art 21, as construed in the Zelger and The Maciej Rataj judgments, requires the question of definite pendency to be answered party by party. The subject matter of the article is the lis between the relevant pairs of parties; when did that lis become definitively pending? The answer that the question will receive will depend on which lis one is asking about. The logical force of this submission is compelling and it is clearly supported by the authorities.

The respondents, in that case had argued for what was described as a more pragmatic approach leading to the submission that --

. . . the relevant date for art 21 (and art 22) is the first date upon which it can be said that any defendant has been served.

After discussing the rival contentions, however, the Court decided that it was unnecessary on the facts of that case to rule on the submission.

Although a pragmatic approach to questions of this kind has its attractions, it is necessary to bear in mind that the Convention represents what is intended to be a coherent set of rules for regulating the exercise of jurisdiction by the Courts of the Contracting States. Sometimes the rules work in what might be considered a less than perfect way, as Lord Goff pointed out in Airbus Industrie GIE v Patel, [1998] 1 Lloyd's Rep 631 at p 636, cols 1 and 2; [1999] 1 AC 119 at pp 131-132, but I do not think that that provides a very sure basis on which to adopt a pragmatic approach in preference to one which is consistent with authority and principle. Moreover, the pragmatic approach to arts 21 and 22 of the kind which was urged on the Court in the Grupo Torras case can be very difficult to reconcile with the language of the Convention. For example, in this case the Court was seised of Glencore's action against Metro in early March, 1998 at a time when Itochu was not a party to the action at all, let alone a party which had been served with the proceedings. In those circumstances it would strike me as anomalous to hold that the Court was somehow seised of proceedings against Itochu at a time when it was not a party to the action in any sense and might never have become one. Whatever the attractions of such an approach, however, the decision of the European Court in The Maciej Rataj is authority for the proposition that for the purposes of art 21 the Court must examine the case by reference to the position of individual defendants, even though that may give rise to some fragmentation of proceedings. This issue was again raised before the Court of Appeal in Fox v Taher, [1997] IL Pr 441, but was not the subject of decision since the majority (Lord Justice Morritt and Lord Justice Leggatt) decided the case on other grounds. However, it was considered by Lord Justice Brooke who held that it would run counter to the guidance given by the European Court in The Maciej Rataj to say that the Court was seised of the proceedings as a whole as soon as originating process was served on one of the parties. He said:

I would accept the submission made by counsel for the appellants in the Court of Appeal in the Grupo Torras case: the answer to the question "when did the relevant lis between the relevant parties become definitively pending?" will depend upon which lis one is asking about. In the present case the lis between the plaintiff and the defendants whom

[1999] 2 Lloyd's Rep 632

Mr Aikens and Mr Briggs represent would have become definitively pending at the time their clients were served with the English proceedings and not before.

I would respectfully adopt that reasoning and it follows in my view that for the purposes of the bank's application under art 21 it is necessary to determine which Court was first seised of proceedings between the bank and Itochu, not of proceedings between other parties. Logically the principle established in Dresser v Falcongate must also apply to third parties so that the Court is seised of the proceedings between the defendant and the third party only when the third party notice is served. In the present case the French Courts were seised of proceedings between the bank and Itochu in June, 1998, well before Itochu served the bank with its third party proceedings in this country. That being so, on the face of it art 21 requires this Court to stay the third party proceedings here in favour of the Tribunal de Commerce in Paris.

Mr Dominic Kendrick, QC on behalf of Itochu put forward two answers to that; first, that the bank was bound by the exclusive jurisdiction clause in the contract for the sale of the oil and that therefore on the authority of Continental Bank NA v Aeakos Compania Naviera SA, [1994] 1 Lloyd's Rep 505; [1994] 1 WLR 588 the Court must disregard arts 21 and 22 entirely; alternatively, that all the actions in England and France are related within the meaning of art 22 and that therefore this Court as the Court first seised of one of the related actions should retain jurisdiction pursuant to art 22, including jurisdiction over the third party proceedings which now form part of that action.

Before considering whether art 17 applies at all to the bank's claim against Itochu it is necessary to turn back again for a moment to art 21. In its present form that article requires any Court other than the Court first seised to stay the proceedings before it of its own motion until such time as the jurisdiction of the Court first seised is established. By its very terms, therefore, it contemplates the possibility that a challenge may be made to the jurisdiction of the Court first seised and requires the Court seised second to await the outcome of that challenge. No distinction is made between different grounds of challenge to the jurisdiction of the Court first seised, so on the face of it, even in a case where the claim is being made to enforce a contract which contains an exclusive jurisdiction clause in favour of the Court seised second, art 21 would seem to require that Court to allow a challenge to the jurisdiction of the Court first seised to be decided by that Court before allowing the action to proceed before it. Similarly, if there is a dispute, as there is in this case, whether the parties have agreed upon the jurisdiction of the Court seised second, art 21 appears to require that issue to be left to the determination of the Court first seised, at any rate where it forms the basis of the challenge to the jurisdiction of that Court. If on the correct view of the matter the parties have agreed that the Court seised second shall have jurisdiction, and if, as one must assume, the Court first seised applies the Convention correctly, that Court will stay the action to enable it to proceed before the Court seised second. That procedure may be somewhat cumbersome and time-consuming, especially in a case where the existence of an exclusive jurisdiction clause in favour of the Court seised second is reasonably clear. Sometimes, however, as in this case, there is a real dispute whether the parties are bound by an exclusive jurisdiction clause, and the process just described might be said to be the only way of paying proper regard to the principles laid down by the Convention and of ensuring that jurisdictional disputes are resolved in an orderly way.

Mr Michael Beloff, QC on behalf of SPC, whose submissions on this part of the application were adopted by Mr Smith, drew my attention to Overseas Union Insurance Ltd v New Hampshire Insurance Co, [1992] 1 Lloyd's Rep 204; [1992] 1 QB 434 in which the European Court had to consider the operation of art 21 in a case where concurrent proceedings were brought in England and France under a reinsurance treaty between New Hampshire as reinsured and various reinsurers. The French Court was first seised of proceedings brought by New Hampshire, but its jurisdiction was challenged by the reinsurers. The reinsurers brought proceedings in England, but at first instance New Hampshire obtained a stay of the action under art 21 pending a decision by the French Court on the issue of its jurisdiction. The reinsurers appealed on the grounds that the English Court could not take that step without first establishing that the French Court had jurisdiction over the proceedings before it, which it contended was not the case. The Court of Appeal referred a number of questions to the European Court, one of which was whether in those circumstances the Court could and should investigate the jurisdiction of the French Court when considering whether to grant a stay.

In par 20 of its judgment the European Court observed that there was nothing in the documents before it to suggest that the main proceedings fell within an exclusive head of jurisdiction laid down in the Convention, in particular art 16. It continued as follows:

21. In the case of a dispute over which it is not claimed that the Court second seised has exclusive jurisdiction, the only exception to the obligation imposed by art 21 of the Convention on that Court to decline jurisdiction is where it stays proceedings, an option which it may exercise only if the jurisdiction of the Court first seised is contested.

[1999] 2 Lloyd's Rep 632

22. . . . the objective of the provision, which is to avoid negative conflicts of jurisdiction, may be achieved without the Court second seised examining the jurisdiction of another Court.

23. Moreover, it should be noted that in no case is the Court second seised in a better position than the Court first seised to determine whether the latter has jurisdiction. Either the jurisdiction of the Court first seised is determined directly by the rules of both Courts and may be interpreted and applied with the same authority by each of them, or it is derived, by virtue of art 4 of the Convention, from the law of the state of the Court first seised, in which case that Court is undeniably better placed to rule on the question of its own jurisdiction.

. . .

25. . . . the only other possibility available, as an alternative solution, to the Court second seised which should normally decline jurisdiction, is to stay the proceedings if the jurisdiction of the Court first seised is contested. However, it cannot itself examine the jurisdiction of the Court first seised.

Two points may be made about that decision. The first is that the form of art 21 then in force gave the Court seised second a discretion to stay the proceedings, but did not make a stay mandatory and did not say in what circumstances the power could properly be exercised. By its judgment, therefore, the Court filled that lacuna in the Convention by making it clear that the Court seised second cannot decide the jurisdiction of the Court first seised and should stay the proceedings before it until the Court first seised has decided the question of its jurisdiction. The second is that the Court expressly refrained from ruling on the case where the main proceedings fall within an exclusive head of jurisdiction, in particular art 16, and did not give a clear indication whether art 17 should be regarded as an example of an exclusive head of jurisdiction.

In Continental Bank v Aeakos the defendant brought an action against the plaintiff bank in Greece under a loan agreement which contained an English jurisdiction clause. The bank brought proceedings in England for an injunction to prevent the defendant from pursuing its action in Greece. The defendant applied to the Court in England for, inter alia, an order staying the bank's action under art 21 or art 22 of the Convention. Mr Justice Gatehouse dismissed those applications and granted an injunction to prevent the defendant from pursuing its action in Greece. The Court of Appeal held that the jurisdiction clause in the loan agreement obliged the defendant to submit disputes to the English Court and in the light of that considered the effect of art 17 of the Convention and in particular its relationship to arts 21 and 22. Mr Justice Gatehouse had held that the proceedings did not involve the same causes of action and were not related within the meaning of art 22, but that in any event art 17 entitled the bank to succeed. The Court of Appeal did not find it necessary to consider the effect of arts 21 and 22 because art 17 took precedence. Lord Justice Steyn giving the judgment of the Court said at p 510, col 2; p 596E:

. . . Article 17 has mandatory effect. When art 17 applies it follows that the jurisdiction agreement prorogates (confers) jurisdiction on the courts of the contracting state chosen by the parties, and that the jurisdiction agreement deprives the courts of any other contracting states of jurisdiction . . . There is no discretionary power in the Convention itself to override the conclusive effect of an exclusive jurisdiction agreement which conforms with the requirements of art 17. It follows that if art 17 applies its provisions take precedence over the provisions of arts 21 and 22. (My underlining).

Mr Beloff submitted that the decision in Continental Bank v Aeakos could be distinguished in this case because since that case was decided there has been a change in the language of art 21 which makes it clear that whenever there are concurrent proceedings involving the same parties and the same cause of action the Court seised second must stay the proceedings if there is a challenge to the jurisdiction of the Court first seised. In France both Itochu and SPC have challenged the jurisdiction of the Court and therefore, he submitted, this Court must stay the proceedings here, at least until that challenge is resolved. Under those circumstances the Court should not embark on the question whether the bank is bound by an exclusive jurisdiction clause which is a question for the French Court to decide in the context of determining the challenge to its jurisdiction. That approach, he submitted is not only dictated by the language of art 21 as it now stands, but is consistent with the approach of the European Court in Overseas Union v New Hampshire. Mr Kendrick and Mr Southern, on the other hand, submitted that the decision is binding on this Court notwithstanding the subsequent change in the wording of art 21. The Court must rule on the issue of the exclusive jurisdiction clause and, if it finds that the bank is bound by it, refuse to stay the proceedings here under either art 21 or art 22.

The decision in Continental Bank v Aeakos has been the subject of some academic criticism, but I am persuaded that it remains binding on me. It is quite true that there has been a change in the language of art 21 since that case was decided. As then in force art 21 simply gave a Court other than the Court first seised a discretion to stay the

[1999] 2 Lloyd's Rep 632

proceedings if the jurisdiction of the Court first seised was contested. However, the change only serves to clarify the course which the Court seised second should take when there is a challenge to the jurisdiction of the Court first seised. It makes it clear that in the ordinary way that Court cannot determine the jurisdiction of the Court first seised, but in my judgment it goes no further than that. To that extent, it reflects the decision of the European Court in Overseas Union v New Hampshire, but it does not deal with the question of the relationship between art 21 and those articles which provide for exclusive jurisdiction which the Court deliberately left open in that case. It is important to note that Overseas Union v New Hampshire was cited to the Court of Appeal in Continental Bank v Aeakos so that the Court was well aware of the principles which the European Court had formulated in relation to the Court's duty under art 21 which are now reflected in the new form of that article. In my judgment Mr Kendrick was right in saying that the ratio of Continental Bank v Aeakos is to be found at p 511, col 1; p 596G at the end of the passage I cited earlier. My conclusion on this question is reinforced by a dictum of Lord Justice Phillips in Toepfer International GmbH v Societe Cargill France, [1998] 1 Lloyd's Rep 379 at p 386, col 2 that the Court of Appeal itself would have been bound by the decision in Continental Bank v Aeakos to hold that art 17 overrides arts 21 and 22. In these circumstances I do not propose to deal with the interesting arguments advanced by Mr Beloff as to exactly what the European Court had in mind when it referred in Overseas Union v New Hampshire to "an exclusive head of jurisdiction". I must, however, mention briefly one further point made by Mr Smith, namely, that an exclusive jurisdiction agreement between two parties neither of whom is domiciled in a Convention state, and which therefore falls within the third sentence of art 17, is not fully effective to confer exclusive jurisdiction on the chosen Court so as to override the operation of art 21. This submission, were it well-founded, would make it necessary to enquire more closely into the domicile of Metro. This is a matter of some controversy which has not been fully explored in evidence, but it is unnecessary to say any more about it because I am satisfied that the argument is not sound. The third sentence of art 17 is quite clear in its terms: in such a case the Counts of other Contracting States shall have no jurisdiction unless the chosen Courts have declined it. I can see no support, therefore, for the argument that art 17 operates in any different way when the Court is concerned with an agreement of that kind.

I turn next, therefore, to consider whether the bank is bound by the exclusive jurisdiction clauses in the contracts between Metro and Itochu and SPC respectively. For this purpose it becomes necessary to look again at the ways in which the bank seeks to put its claim. Although it has not yet formulated its case with any precision, its primary argument is said to be that it is entitled to sue in each case on an independent contract with the buyer arising out of the letter of undertaking given pursuant to its contract with Metro. The bank's alternative case is that it became entitled to sue as assignee of Metro. Mr Smith also suggested, somewhat tentatively, that the bank might have a claim under the principle applied in Shamia v Joory, [1958] 1 QB 448.

It is unnecessary and indeed inappropriate at this stage in the proceedings for the Court to make any definitive ruling on issues which form part of the substantive dispute between the parties. It is sufficient, therefore, for a claimant who seeks to establish jurisdiction under art 17 of the Convention to satisfy the Court that there is at least a good arguable case that the dispute between the parties is governed by an exclusive jurisdiction clause which satisfies the requirements of that article: see Canada Trust Co v Stolzenberg (No 2), [1998] 1 WLR 547 per Lord Justice Waller at p 559. In a case such as the present a good arguable case requires less than proof on the balance of probabilities, but must nonetheless be strong enough to justify retaining the action here rather than declining jurisdiction in favour of the Court first seised in accordance with art 21.

The undertaking which Itochu gave to the bank was in the following terms:

We . . . hereby confirm having entered into a contract-with Metro Trading International Inc for the purchase of the following commodity:

. . .

We further undertake, to the extent we are obliged to do so under our contract with Metro Trading International Inc to effect payment of this cargo in US Dollars by TT exclusively to Banque Trad Credit Lyonnais (France) SA Paris for account of Metro Trading International Inc value 30 days after B/l date or 15 days after NOR whichever later, (B/l date or NOR date to be counted as day zero) against presentation of seller's commercial invoice and full set of original shipping documents made available at loading port.

It was common ground that this undertaking was given pursuant to the contract of sale, but two slightly different versions of the sale contract came into existence, one dated Oct 2, 1997 and one dated Oct 13, 1997. The first of these identified the bank as the payee bank; the second simply referred to "sellers' nominated bank". I do not myself think that much turns on this difference between the two sets of terms, but since the point was the subject of debate I think it

right to say that in my view there are three pointers towards the conclusion that the document dated Oct 13, 1997 represents the terms on which the parties ultimately agreed. The first is that there are manuscript notations on the earlier document which suggest that it may have been subject to further discussion. The second is the fact that the telex of Oct 13 is later in time, which itself suggests that it represents a later stage in the negotiations. The third is a small change to the payment terms in cl 8 (from "bill of lading date to count as day one" to "bill of lading date to count as day zero") which is reflected in Itochu's letter of undertaking which itself was clearly intended to reflect the terms of cl 8 of the sale contract as finally agreed.

It is necessary at this point to return for a moment to the nature of the dispute between the bank and Itochu. Mr Kendrick submitted that the undertaking did not give rise to an independent contract between Itochu and the bank but that the contract of sale and the undertaking, together with the arrangements previously made between the bank and Metro, gave rise to an assignment of the price by Metro to the bank. He pointed to the fact that the contract of sale required Itochu to give the undertaking, that payment to the bank was to be made for the account of Metro and that payment would be made exclusively to the bank. That analysis was certainly consistent with the limited evidence then available of the commercial arrangements between Metro and the bank and avoided the difficulty of identifying the basis on which the bank, which had already financed the purchase of the cargo and taken possession of the bills of lading by the time it sought the undertaking, acquired enforceable rights against Itochu under a separate contract contained in the letter of undertaking. Apart from anything else, it was difficult to see what consideration the bank could have provided for any such contract.

It is fair to say that these submissions were originally based on rather flimsy material because at the hearing the evidence of the arrangements between Metro and the bank remained rather sketchy. In his first affidavit sworn on May 13, 1999 Mr Nelson of Wilde Sapte, the bank's solicitors, stated that the bank had financed the procurement of the cargo which was carried on Vigour, but said nothing more about the nature of its relationship with Metro or the precise arrangements by which Metro was to repay the bank. M Erik Schmill, the bank's French lawyer, wrote a letter dated June 4, 1999 dealing with the question of jurisdiction. In it he said that the bank would contend that the letter of undertaking gave rise to an independent contract between Itochu and the bank which did not contain a jurisdiction clause of any kind, but he said very little about the factual basis of that argument. He did, however, refer in a rather broad way to financial arrangements between the bank and Metro under which the bank acquired the right to receive an undertaking from the buyer and the right to receive bills of lading made out to its order.

In his second affidavit which was sworn on June 23 Mr Nelson took the matter one stage further. He said that the bank had provided financial services to Metro under which it agreed to finance purchases of oil cargoes against Metro's undertaking to ensure that advances would be repaid through the proceeds of sale of the oil to third parties. One aspect of the arrangement, none of which, he said, had been reduced to writing, was that the bank would receive bills of lading made out to its order which it would release against payment of the price. At the time that explanation of the position struck me as a little curious, because if the bank's security for the repayment of the advance was to be a right to receive payment from the buyer, one would have expected it to have reached some agreement with Metro giving it a legal right to recover the price due under the sale contract, probably by way of an assignment of the proceeds of the contract. However, at that stage the bank's evidence was clearly directed to showing that it had never been aware of the jurisdiction clause in the sale contract and Mr Nelson was unable to shed any more light on that aspect of the relationship.

The bank's evidence, given through M Schmill, was that it had only recently become aware that the terms on which Metro sold to its customers included an English jurisdiction clause. That surprises me. I should have thought that a bank which was financing the purchase of cargoes of oil on a regular basis for a long period of time and which relied on receiving payment from the buyers to recover the advances it made to Metro would have taken the trouble to inform itself of the terms on which Metro was selling to its own customers which might have a direct bearing on its own right to recover the price. Be that as it may, the bank must have known precisely what arrangements it had with Metro, but at the time of the hearing they still remained largely unexplained. That was the subject of some criticism by other parties and after the conclusion of the argument I received from Wilde Sapte, the bank's solicitors, a letter enclosing a copy of a letter dated Nov 6, 1992 written by Metro Bunkering and Trading Co, to the bank which is said to record the terms on which the bank was financing Metro. It includes the following paragraph:

2. The proceeds from the resale of oil financed by yourselves as above shall be assigned in your favour. To this purpose, we shall draw on our buyers, in your favour, a bill of exchange irrevocably payable at your offices . . .

We have furthermore duly noted that your financing of our purchases is expressly subject to the irrevocable assignment in your favour of the proceeds from oil resales.

. . .

For the performance of these purchase/sale operations, we hereby expressly and irrevocably authorise you to collect the proceeds from the relevant trade operations . . .

It is difficult to understand how a document of this importance could have been overlooked by the bank once it had decided to give evidence of any kind, albeit through its lawyers, of the nature of its arrangements with Metro, and no explanation for the omission was forthcoming. However, in saying that I wish to make it clear that I am not criticizing Mr Nelson or Wilde Sapte who appear to have taken proper steps to bring this document to my attention and that of the other parties once it was put into their hands, I should be surprised if this were the only document in the bank's possession which bears on the question, but it is sufficient in my view to lend strong support to Mr Kendrick's submission that the arrangements were intended to effect an assignment by Metro to the bank of the price due under the sale contract. By contrast there is nothing in the evidence now before me to suggest that undertakings given by the buyers were intended to create independent contracts between themselves and the bank rather than simply confirm that the buyers would make the payment in the manner called for under the contract. A claim founded on the principle applied in Shamia v Joory seems on this evidence to be equally unlikely. In the light of the evidence which is now available, therefore, I am satisfied that there is at least a good arguable case that the only serious dispute between the bank and Itochu is whether the bank is entitled to recover from Itochu as assignee of Metro.

That being so, it immediately raises the question whether the bank as assignee of the price is bound by the exclusive jurisdiction clause in the contract of sale.

The opening sentence of art 17 reads as follows:

If the parties, one or more of whom is domiciled in a Contracting State, have agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.

Mr Kendrick submitted that in the case where the claimant sues as an assignee art 17 is satisfied if the parties to the original contract entered into an exclusive jurisdiction agreement in relation to the legal relationship represented by the obligation the benefit of which has been assigned to him. Mr Smith, however, submitted that by its very language art 17 requires that there be actual agreement between the parties to the dispute before the Court and that it is not possible, therefore, for an exclusive jurisdiction clause to become binding on a party who derives his claim from one of the original contracting parties, such as an assignee, so as to satisfy the requirements of art 17 without his informed consent. He submitted that since the bank was at all material times unaware of the existence of the exclusive jurisdiction clause, art 17 is not satisfied in this case.

I can see much to commend the proposition that an assignee of a debt or any other chose in action who derives his right from one of the parties to the agreement should be bound to bring proceedings in the country agreed upon by the original parties to the contract, but this is not a question to which art 17 is expressly directed. Not surprisingly, perhaps, it assumes that the parties to the dispute are the original parties to the contract. To that extent I would agree with Mr Smith that the word "parties" in the first sentence of art 17 means the parties to the original contract, but for the same reason I do not think that it necessarily follows that an assignee is free to ignore the exclusive jurisdiction clause. That depends on whether he is someone who can properly be treated as having agreed to the clause. In Gerling Konzern Speziale Kreditversicherungs-AG v Amministrazione del Tesoro dello Stato, [1983] ECR 2503 the European Court had to consider whether a third party to a contract of insurance which was expressed to be made for the benefit of the policy holder and certain third parties including the claimant could rely on the exclusive jurisdiction clause in the policy. The Court held that the requirement that the agreement between the original parties should be in writing was intended to ensure that their consent to its terms was clearly demonstrated. It did not, however, require similar formalities on the part of the third party where the clause was made for his benefit and he sought to rely on it in proceedings against the insurer. In reaching that conclusion the Court placed reliance on the fact that art 12 of the Convention contemplates agreements governing the jurisdictions in which policyholders and beneficiaries can bring actions against insurers and considered that since the insurer has already given his consent to being sued in the agreed jurisdictions, to require the beneficiary to sign the terms to signify his agreement would be a pointless restriction.

The decision in Gerling only goes part of the way, however. The plaintiff in that case was not suing as an assignee; the Court appears to have approached the question on the basis that he had an independent right to claim under the

policy. As such, the only question was whether he could rely on the jurisdiction clause which formed part of that contract without having signed the policy himself. The problem in the present case is rather different since the bank's claim against Itochu derives from Metro's rights under the contract. A case rather nearer to the present is The Tilly Russ, [1985] 1 QB 931 where the Court had to consider whether the holder of a bill of lading who was not an original party to the contract of carriage was bound by the exclusive jurisdiction clause. The Court emphasized that the requirements of art 17 must be strictly construed since their purpose is to ensure that the consent of the parties to a derogation from the ordinary rules of the Convention is clearly and precisely demonstrated. However, in relation to the position of a third party holder of the bill the Court expressed itself in this way:

24. In so far as a jurisdiction clause incorporated in a bill of lading is valid under article 17 of the Convention as between the shipper and the carrier, and in so far as a third party, by acquiring the bill of lading, has succeeded to the shipper's rights and obligations under the relevant national law, the fact of allowing the third party to remove himself from the compulsory jurisdiction provided for in the bill of lading on the ground that he did not signify his consent thereto would be alien to the purpose of article 17, which is to neutralise the effect of jurisdiction clauses that might pass unnoticed in contracts.

25. In fact, in the circumstances outlined above, acquisition of the bill of lading could not confer upon the third party more rights than those attaching to the shipper under it. The third party holding the bill of lading thus becomes vested with all the rights, and at the same time becomes subject to all the obligations, mentioned in the bill of lading, including those relating to the agreement on jurisdiction.

In my view this goes a long way towards answering the present problem. The ordinary rule is that an assignee of a chose in action under English law cannot be better off than the assignor and so takes the chose assigned to him together with any restrictions attaching to it, including an exclusive jurisdiction clause. That approach is entirely consistent with the decision in The Tilly Russ, although that case was concerned with the transfer of rights and obligations which occurs where a bill of lading is indorsed to a third party. Moreover, I do not think that to hold that an assignee is bound by an exclusive jurisdiction clause would undermine the principles on which the Convention is based including art 17. The assignee of a debt, as a recipient of rights, but not of obligations, will always be the claimant in an action between himself and the debtor and the agreement will not therefore derogate from his right under the Convention to be sued in the Courts of his own country of domicile when he is a defendant. For his part the debtor has agreed to be sued in the chosen jurisdiction and has therefore agreed to any such derogation. However, it is necessary to mention one more authority to which my attention was drawn by Mr Smith, namely, Firswood Ltd v Petra Bank, (CA, Dec 13, 1995, unreported). In that case the defendant was sued by the plaintiff bank in its capacity as assignee both of a debt and of the obligation which the defendant owed to the original creditor as guarantor of that debt under a guarantee which contained an English jurisdiction clause. The Court held that the Convention did not apply to the case because there was in fact no claim being made under the guarantee, but it did nonetheless consider the question whether, if there had been such a claim, the bank as assignee of the creditor's rights would have been bound by the jurisdiction clause. Lord Justice Schiemann, with whom Lord Justice Waite and Lord Justice Russell agreed, considered that the case fell within the principles on which Gerling and The Tilly Russ were decided because the parties to the guarantee contemplated assignment, there was no disadvantage to the guarantor in being sued by the assignee rather than the assignor, and because there would be nothing unreasonable in holding the assignee bound by a jurisdiction clause of which he had knowledge and which was clearly set out in the agreement the benefit of which was assigned to him. Mr Smith submitted that this last factor was critical. The Court was not saying, he submitted, that the assignee was bound simply because the agreement giving rise to the chose assigned to him contained an exclusive jurisdiction clause but because he was actually aware of the existence of that clause at the time he accepted the assignment. By contrast the bank in the present case did not know that the contracts of sale contained exclusive jurisdiction clauses and so should not be held to have become bound by them.

In the evidence filed on its behalf the bank has stated that although it was aware of the existence and nature of the sale contracts it was not aware that they contained exclusive jurisdiction clauses in favour of this country. Mr Kendrick criticized the evidence filed on behalf of the bank, and with some justification. Moreover, the emergence at a very late stage in the circumstances described earlier of the letter setting out the terms on which the bank agreed to finance Metro makes me even more cautious about accepting at face value its assertion that it was completely unaware of the terms on which, as it now appears, Metro regularly did business. In my view there is a good arguable case, notwithstanding what M Schmill says, that the bank was aware in general terms of the terms on which Metro did business. However, I do not think it necessary to rest my decision on that ground because I am unable to accept Mr Smith's submission that the dicta of Lord Justice Schiemann in Firswood Ltd v Petra Bank go so far as to hold that an assignee of a debt is bound by an

[1999] 2 Lloyd's Rep 632

exclusive jurisdiction clause only if he has actual notice of that clause when he takes the assignment. It is apparent that the Court in that case was seeking to apply the principles to be found in Gerling and The Tilly Russ to the facts of the case then before it, but the judgment of the European Court in The Tilly Russ does not suggest that its decision rested upon actual knowledge of the jurisdiction clause on the part of the holder of the bill of lading. Rather, par 25 suggests that he became bound simply by virtue of becoming the holder of the bill. In my judgment it is open to this Court to hold that provided the agreement of the original parties to the inclusion of an exclusive jurisdiction clause is clearly established as required by art 17, an assignee of a debt arising under that contract is likewise bound by the clause. That in my judgment follows from the decisions of the European Court to which I have referred and accordingly, since it was not disputed that the contract between Metro and Itochu contained such a clause, I am satisfied that there is a good arguable case that the bank as assignee of Metro is bound by the exclusive jurisdiction clause in that contract when seeking to recover the price.

In my judgment, therefore, Itochu is entitled to succeed by virtue of art 17 which in accordance with the decision in Continental Bank v Aeakos overrides art 21. However, Mr Kendrick had an alternative argument based on art 22. He submitted that all three actions in which Itochu is currently involved in this country and in France are related actions within the meaning of art 22 and that this Court as the Court first seised should therefore retain jurisdiction over the whole of the proceedings. It should do so, he submitted, despite the fact that the subsequent joinder of Itochu by Glencore and the commencement of third party proceedings by Itochu against the bank may have given rise to a lis between the bank and Itochu falling within art 21 in respect of which the Court in France was first seised. In effect, he was submitting that in a case of this kind involving multiple parties and multiple actions art 22 should be construed as overriding art 21 because the object underlying art 22 is to avoid fragmentation of proceedings and the risk of irreconcilable judgments which would be undermined by staying the third party proceedings. The party by party approach reflected in the judgment of Lord Justice Brooke in Fox v Taher could, he submitted, work well enough in simple cases, but not in multi-party litigation of the kind now before the Court. Mr Kendrick submitted that such an approach would not be inconsistent with The Maciej Rataj where the Court held that all the claims should be determined in Rotterdam, even though the English Courts were first seised of claims between the shipowners and one group of claimants.

In The Maciej Rataj there were three groups of claimants: (1) the Rotterdam cargo interests, (2) Phillip Brothers Ltd ("Phibro"), and (3) the Hamburg cargo interests. On Nov 18, 1988 the owners began proceedings in Rotterdam against groups (1) and (3) seeking a declaration of non-liability. On Sept 18, 1989 the owners began similar proceedings in the Netherlands against group (2). Meanwhile, on Sept 15, 1989 groups (2) and (3) had each brought an action in rem against Maciej Rataj. Groups (2) and (3) also brought actions against the shipowners in the Netherlands on Sept 29 and Oct 3, 1989 respectively. As far as the dispute between the owners and group (2) (Phibro) was concerned, the English Courts were first seised by a matter of a few days. The proceedings between Phibro and the owners were, however, related to the earlier proceedings begun by the owners against groups (1) and (3). The owners sought to have the English proceedings stayed so that the dispute could be decided in the Netherlands. The Advocate General (Mr Tesauro) was of the opinion that art 22 applied in that case because the same issues of fact arose in both the English proceedings and the proceedings in the Netherlands. The Court agreed with that view, holding that the word "irreconcilable" is used in different senses in arts, 22 and 27(3).

In my judgment the decision in The Maciej Rataj supports Mr Kendrick's submission to this extent, namely, that an action which involves a dispute which falls within the scope of art 21 does not as a result cease to be related to other pending proceedings if the conditions of art 22 are satisfied. It was not seriously disputed before me that all three actions with which I am concerned are and have from the outset been related actions within the meaning of art 22. In my view that must be so. Article 22 is to be construed in a broad common sense manner as applying whenever there is sufficient similarity of issues to render it expedient for the actions to be determined together: see Sarrio SA v Kuwait Investment Authority, [1998] 1 Lloyd's Rep 129; [1999] 1 AC 32. From the outset all these actions raised in one form or another the question of title to the cargo on board Vigour. The question then arises of how the Court should apply the two articles in a case such as the present. The problem arises partly because of the manner in which the proceedings have developed and the order in which issues have been joined between the different parties. The French Court was clearly first seised of the lis between the bank and Itochu, but the English Court was first seised of the action in which the same lis later arose as a result of the issue of the third party proceedings. There are two possible courses open to the Court in these circumstances: stay the third party proceedings under art 21 on the grounds that the French Court must decide whether to stay the action before it under art 22 to enable all the issues to be decided together in England; or refuse a stay on the grounds that it would be a waste of time and money to grant one since the French Court has a duty to stay the action before it (see the commentary at p 41 of the Jenard Report). Although the pragmatic approach has its

attractions, it is in my view precluded by the reasoning of the European Court in Overseas Union New Hampshire and by the terms of art 21 itself. Unlike art 17, arts 21 and 22 are essentially procedural in nature and unlike art 21, art 22 merely gives the Court second seised a discretion to stay the proceedings before it; it does not make the imposition of a stay mandatory. That being so, I think it would be wrong for me to treat art 22 as if it imposed a binding duty on the French Court to stay the bank's proceedings and wrong for me to take a step which appeared to pre-empt a decision by the French Court relating to the exercise of its own jurisdiction. In my judgment, were it not for the exclusive jurisdiction clause, the right course would be to stay the third party proceedings under art 21 pending a decision by the French Court on the matter of its jurisdiction and the desirability of imposing a stay or declining jurisdiction under art 22. However, for the reasons given earlier, I consider that I am bound to give effect to the exclusive jurisdiction clause in the sale contract and that a stay of Itochu's third party proceedings in the Glencore action must be refused. The third party proceedings between Itochu and the bank in the receivers' action raise the same issues and it follows, therefore, that a stay of those proceedings must also be refused.

SPC's application

It is possible to deal with SPC's application more shortly in the light of the conclusions which I have already reached. SPC has applied to stay the proceedings brought against it by Glencore under art 21 of the Convention, SPC having previously joined Glencore as a third party to the action brought against it by the bank in France. Mr Southern for Glencore submitted that the two sets of proceedings do not involve the same cause of action and that in any event the English Courts were first seised of what were from the outset related proceedings and should therefore refuse a stay.

The first of these submissions is based on the nature of the two sets of proceedings. In England Glencore is claiming damages for wrongful interference with its property; in France, Mr Southern submitted, SPC is making no claim at all. It has merely done what is necessary to ensure that Glencore is bound by the outcome of the bank's action without itself asserting any claim or seeking any other kind of relief. In effect it is seeking relief of the kind previously provided for by O 16, r 1(1)(c), now CPR Part 20.2(1)(b). Mr Beloff submitted that that is irrelevant. He pointed out that art 21 does not require there to be a claim, merely that there be proceedings between the same parties involving the same cause of action as that has been defined by the European Court. For the reasons I have already given, I think that the proceedings in France do involve the same cause of action because they are intended to lead to a final decision on Glencore's right to recover against SPC in respect of wrongful interference with the cargo carried on Vigour. Accordingly, art 21 applies to this case and, subject to Mr Southern's alternative submission, the proceedings must be stayed, at least until the French Court has ruled on the question of its jurisdiction and the desirability of staying the proceedings before it or declining jurisdiction under art 22. Since there is no contract of any kind between SPC and Glencore, there is no question of the application of art 17.

Mr Southern's alternative argument was based on the fact that the English Court was first seised of proceedings in the form of Glencore's action which are related to the proceedings now pending in France between SPC and Glencore. He submitted that it would be absurd for the Court to stay the proceedings between Glencore and SPC under art 21 if it were clear, as he submitted it was, that the French Court ought to stay the whole of the proceedings before it in order to enable the disputes to be determined in England. He submitted that in order to avoid that difficulty art 21 should be interpreted as simply having no application in a situation of the kind which arises in this case. This is essentially the same argument as that which was put forward by Mr Kendrick and undoubtedly has some attraction from a practical point of view, especially in a case such as this where the rest of the proceedings will continue in this country. However, for the reasons I have given I do not think that the course which Mr Southern urged upon me is one which I am free under the Convention to adopt. It follows, therefore, that Glencore's proceedings against SPC must be stayed pending a decision by the French Court on the question of jurisdiction. In those circumstances it is unnecessary for me to consider other possible bases advanced by Mr Beloff on which the Court might order a stay.

Itochu's applications

At present Itochu is facing three claims in two different jurisdictions. It is naturally concerned to limit both the risk of inconsistent judgments and the costs which are liable to be incurred as a result of multiple proceedings. It has therefore applied for a stay of the receivers' claim in the event that the proceedings between itself and the bank continue in France. In the light of my decisions on the bank's applications, however, the third party proceedings will continue here in England and therefore the basis for this application falls away. Insofar as the proceedings continue in this jurisdiction I have no doubt that appropriate steps will be taken to ensure that the issues affecting Itochu, Glencore and the bank are decided in a way which ensures that all parties are heard and bound by the outcome. The position of the receivers is rather different in as much as they have no independent claim to the fund represented by the proceeds of the

[1999] 2 Lloyd's Rep 632

sale of the oil. Their task is simply to get in the receivable which that fund represents and to hold it to the order of the Court. There are no grounds for staying the receivers' action at this stage and insofar as there are issues between the receivers and Itochu which have to be resolved that will have to be the subject of further directions. However, I think they can be considered more effectively on another occasion in the wider context of the Metro litigation as a whole.

Itochu's application to stay Glencore's action was made to guard against the possibility that the bank might persuade the Court to stay the third party proceedings. In those circumstances Itochu would clearly wish to have the claim against it stayed to avoid fragmentation of proceedings. However, since I have held that the third party proceedings must be allowed to continue here, there are no grounds for staying that claim.

**SOLICITORS:**

Clyde & Co; Thomas Cooper & Stibbard; Herbert Smith; Wilde Sapte; Norton Rose.

# **EXHIBIT 8**

LEXSEE 1998 U.S. DIST. LEXIS 7750

**JMJ ENTERPRISES, INC. v. VIA VENETO ITALIAN ICE, INC.**

**CIVIL ACTION No. 97-CV-0652**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1998 U.S. Dist. LEXIS 7750*

**May 27, 1998, Decided**
**May 27, 1998, Filed**

**DISPOSITION:** [*1] Defendant's Renewed Motion for Judgement GRANTED. JUDGMENT ENTERED in this matter in favor of Defendant Via Veneto Italian Ice, Inc. and against Plaintiff JMJ Enterprises, Inc.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant company filed a complaint against appellee ice corporation for breach of contract, detrimental reliance, and intentional interference with existing and prospective business relations. The company failed to respond to the ice corporation's interrogatory on damages and the ice company filed a renewed motion for judgment.

**OVERVIEW:** The ice corporation's interrogatory on damages asked the company to set forth the dollar amount of alleged damages, the factual basis for the damages, calculations used to compute the damages, and a description of damages. The court held that in light of the purposes of discovery, the company's response was as useful as if it had not responded at all. Its answer did nothing to narrow the issues or provide a fair opportunity to respond to the claim. The company should have listed each of its claimed out-of-pocket expenses and the specific documents which evidenced that those expenses were incurred. The company did not provide data that it relied on in computing its estimate of profits. The company's counsel's failure to provide information on damages was willful. The failure to answer the interrogatory prejudiced the ice company's ability to defend against the company's claims and it was part of a pattern of dilatory conduct. Pursuant to *Fed. R. Civ. P.*

*37(b)(2)(C)*, the company's claims were dismissed as the only appropriate sanction.

**OUTCOME:** The court granted the ice corporation's renewed motion for judgment and dismissed the company's claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery Methods > Interrogatories*
[HN1] The discovery process is designed to make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent possible. Discovery is also intended to narrow and clarify the issues in dispute. Interrogatories are ineffective unless parties live up to their duty to provide true, explicit, responsive, complete, and candid answers to discovery requests.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN2] *Fed. R. Civ. P. 37(b)(2)(C)* states: If a party fails to obey an order to provide or permit discovery the court in which the action is pending may make such orders in regard to the failure as are just, and among others an order dismissing the action or proceeding.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN3] A client cannot always avoid the consequences of the acts or omissions of its counsel.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN4] Time limits imposed by the rules and the court serve an important purpose for the expeditious

1998 U.S. Dist. LEXIS 7750, *

processing of litigation. A history by counsel of ignoring these time limits is intolerable.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN5] Willfulness involves intentional, self-serving or strategic behavior.

COUNSEL: For JMJ ENTERPRISES INC., PLAINTIFF: SHONA K. GIBSON, DANIEL J. DUGAN, SPECTOR, GADON AND ROSEN, P.C., KELLY R. RAUSCH, ESQ., KELLY RAE RAMSDELL, PHILA, PA USA.

For VIA VENETO ITALIAN ICE INC., DEFENDANT: CARY L. FLITTER, SCOTT F. WATERMAN, LUNDY, FLITTER & BELDECOS, P.C., NARBERTH, PA USA.

JUDGES: JAMES McGIRR KELLY, J.

OPINIONBY: JAMES McGIRR KELLY

OPINION: MEMORANDUM AND ORDER

J. M. KELLY, J.

May 27, 1998

Presently before the Court is Defendant Via Veneto Italian Ice, Inc.'s ("Via Veneto") Renewed Motion for Judgment. For the reasons stated below, Defendant's motion is Granted.

BACKGROUND

Plaintiff JMJ Enterprises, Inc. ("JMJ") filed this case claiming breach of contract, detrimental reliance and intentional interference with existing and prospective business relations. JMJ seeks damages in "the range of $ 500,000.00 to $ 10,000,000.00." The history of the party's business relationship is set out in this Court's April 15, 1998, Memorandum and Order, and will not be repeated here. The unfortunate history of this litigation, however, is at the center of Via Veneto's present motion.

On August 20, 1997, Via Veneto filed a Motion to Compel self-executing disclosures and answers to interrogatories. JMJ did not respond. On September 10, 1997, the Court granted Via Veneto's [*2] Motion to Compel.

On September 19, 1997, Via Veneto filed a Motion to Compel the deposition of a representative of JMJ pursuant to Rule 30(b)(6). JMJ did not respond. On October 9, 1997, the Court granted Via Veneto's Motion to Compel and subsequently ordered JMJ to pay the Defendant's costs for bringing the motion. *Fed. R. Civ. P. 37(a)(4)*.

On November 12, 1997, Via Veneto filed a Motion to Strike Non-Responsive Answers and to Compel Complete Answers to its Interrogatories and Request for Production of Documents. JMJ did not respond. On December 5, 1997, the Court granted Via Veneto's Motion and again ordered JMJ to pay the Defendant's costs in bringing the Motion.

On December 15, 1997, JMJ's counsel filed "Objections to the Imposition of Sanctions." A hearing was held on January 15, 1998. JMJ's counsel offered no real reason for her failure to respond to Via Veneto's discovery requests and motions. She stated that over two thousand documents had been produced and that Via Veneto had been supplied with adequate discovery materials, but she did not explain the reason for her repeated failure to respond to discovery requests and motions. Counsel for Via Veneto pointed out that while [*3] JMJ produced some documents, they failed to identify which documents were responsive to certain interrogatories. JMJ's counsel could not explain this failure. I refused to vacate the orders imposing sanctions.

As part of the Court's September 10, 1997 Order, JMJ was directed to provide information on their damage claims in response to Via Veneto's Interrogatory 15. JMJ responded "To be supplied." n1 This response was one of the reasons for the November 12, 1997 motion to compel. The Court's December 5, 1997 Order directed JMJ to answer, inter alia, Interrogatory 15 "within ten (10) days or be barred from introducing evidence at trial sought by said interrogatories." JMJ's response was "See Expert Report."

n1 The September 10, 1997 Order directed JMJ to respond within 15 days. JMJ served its responses on September 30, 1997.

JMJ's expert report on damages has a history of its own. Pursuant to this court's Standing Order on Pretrial and Trial Procedures, JMJ should have forwarded any expert reports to Via Veneto [*4] by September 1, 1997 (90 days before the close of discovery). On September 30, 1997, in response to Via Veneto's request for any expert reports, JMJ stated that it "has not retained any expert witness to date, and will supply such information as and when it becomes available." As of December 5, 1997, JMJ had not produced an expert report. The Court ordered that any expert reports were to be filed within ten days. JMJ filed its expert report on damages on December 15, 1997.

On April 15, 1998, I granted Via Veneto's Motion to Disallow Plaintiff's Expert Report and Bar Plaintiff From Presenting Expert Evidence, but denied its Motion for

Summary Judgment. Despite Via Veneto's request, I did not bar the expert report as a sanction for JMJ's conduct during discovery. The report was excluded because it lacked a sufficient basis in fact and because it was unreliable.

On April 21, 1998, Via Venetto filed a Motion for Reconsideration of Denial of Summary Judgment or In the Alternative Motion in Limine. Via Veneto contended that because JMJ's only response to its interrogatory requesting evidence of damages was "See Expert Report," and because the expert report had been excluded, there [*5] was no evidence of damages in the case.

On May 18, 1998, I denied Via Veneto's Motion for Reconsideration. While JMJ's failure to answer Via Veneto's interrogatory on damages was improper, I decided that a prompt answer would cure any prejudice. I ordered JMJ to respond to the interrogatory on damages within twenty-four hours of receiving the Court's order. This short deadline was necessary because trial was scheduled for May 26, 1998.

While the parties raised the issue of the timeliness of JMJ's response, the Court will not quibble over a few hours. What is important is the substance of JMJ's response.

DISCUSSION

A. Sufficiency of Interrogatory Response

[HN1] The discovery process is designed "to make a trial 'less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent possible.'" *Hansel v. Shell Oil Corp., 169 F.R.D. 303, 305 (E.D. Pa. 1996)* (citing *United States v. Procter & Gamble, 356 U.S. 677, 683, 2 L. Ed. 2d 1077, 78 S. Ct. 983 (1958))*. Discovery is also intended "to narrow and clarify the issues in dispute." *Hansel 169 F.R.D. at 305* (citing *Hickman v. Taylor, 329 U.S. 495, 501, 91 L. Ed. 451, 67 S. Ct. 385 (1947))*. Interrogatories are [*6] ineffective unless parties live up to their duty to "provide true, explicit, responsive, complete, and candid answers" to discovery requests. *Hansel, 169 F.R.D. at 305.*

Via Veneto's interrogatory on damages asks JMJ to: "set forth: (a) The dollar amount of Plaintiff's alleged damages." JMJ responded: "Plaintiff claims damages, including out-of-pocket expenses and lost profits, in the range of $ 500,000 to $ 10,000,000, plus punitive damages." Subpart (b) asks for the factual basis for the figure set out above. JMJ responded with four paragraphs describing its efforts under the alleged contract and mentioning some of the expenses its principals incurred. Subpart (c) asks for "all calculations, including

alternative calculations, employed by you to arrive at the answers set forth above." JMJ responded: "Out-of-pocket expenses were added up" and that lost profits were determined by multiplying projected sales by a net profit figure. Subpart (d) requested "[a] description of each and every element of such damages and harm allegedly sustained." JMJ responded: "See response to subparts (b) and (c), above."

Considered in light of the purposes of discovery, JMJ's response is as useful [*7] as if it had not responded at all. The response that Plaintiff claims damages "in the range of $ 500,000 to $ 10,000,000, plus punitive damages" is outrageous. This answer does nothing to narrow the issues or provide the Defendant with a fair opportunity to respond to the claim.

JMJ should have listed each of its claimed out-of-pocket expenses and the specific documents which evidence that those expenses were incurred. Instead, JMJ generally discussed some of the expenses and stated "out-of-pocket expenses were added up." Yet, JMJ's answer does not even provide the sum of that calculation.

With respect to lost profits, JMJ responded: "lost profits were determined by first analyzing the number of cartons of water ice per truckload, taking into account the purchase and resale price of the cartons and the expenses associated with the ordering and shipment of product. Based on that data, profit of $ 10,000 per truckload is the conservative estimate for JMJ. JMJ then projected the number of cartons of water ice they were likely to sell over the 12-year life of the agreement, based on JMJ's actual sales during 1995 and 1996."

None of the data that JMJ relied on to arrive at its estimate [*8] of $ 10,000 profit per truckload is revealed. The projections referred to, and any evidence that might support them, are also not revealed. The answer goes on to state that the range of JMJ's claimed lost profits is affected by a number of variables. The answer does not, however, specify how much profits JMJ claims that it lost under each hypothetical scenario. In fact, as with its response relating to expenses, JMJ never specifies an amount of claimed lost profits.

JMJ's answer, considered as a whole, is evasive and incomplete. Rule 37(a)(3) states that such an answer "is to be treated as a failure to . . . answer." *Fed. R. Civ. P. 37(a)(3).*

B. Sanction for Misconduct During Discovery

[HN2] Rule 37(b)(2) states: "If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among

others . . . (C) An order . . . dismissing the action or proceeding." *Fed. R. Civ. P. 37(b)(2)(C).* In *Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863, 868 (3d Cir. 1984),* the Third Circuit set out a six part balancing test to be applied in situations where the Court is considering [*9] dismissal as a sanction for discovery abuses. The Court is to consider: (1) the extent of the *party's* personal responsibility; (2) the *prejudice* to the adversary caused by the failure to . . . respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith*; (5) the effectiveness of *alternative sanctions*; and (6) the *meritoriousness* of the claim or defense. Id.; see also *Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1148 (3d Cir. 1990).*

### 1. The *Party's* Personal Responsibility

There is little evidence to indicate that the principals of JMJ contributed to the discovery abuses in this case. At the oral argument of this motion, Via Veneto's counsel suggested that JMJ's counsel call his clients, who were present, to explain the interrogatory answers they verified. JMJ's counsel failed to act on this suggestion or respond to it in any way. Nevertheless, giving the most favorable inferences that can be given to the Plaintiffs on this issue, "[HN3] a client cannot always avoid the consequences of the acts or omissions of its counsel." *Poulis, 747 F.2d at 868.*

### 2. *Prejudice* [*10] to the Adversary

The failure to provide information on damages prejudices Via Veneto's ability to defend against JMJ's claims. Via Veneto has the right to question JMJ's claimed expenses and lost profits. It has the right to know what JMJ will claim as damages and what it intends to offer in support of those claims. Via Veneto needs this information to prepare for cross examination and the presentation of its case. The importance of the evidence of damages is demonstrated by Via Veneto's repeated attempts to obtain it. See *Bedwell v. International Fidelity Ins. Co., 843 F.2d 683, 694 (3d Cir. 1988).* Via Veneto would be seriously prejudiced if it were forced to react to each element of damages as it is raised at trial.

### 3. *History* of Dilatoriness

"[HN4] Time limits imposed by the rules and the court serve an important purpose for the expeditious processing of litigation. . . . A history by counsel of ignoring these time limits is intolerable." *Poulis, 747 F.2d at 868.* As detailed above, there is an extensive history of dilatory conduct in this case. The conduct of JMJ's counsel necessitated motions to compel initial disclosures, the deposition of a corporate representative [*11] under Rule 30(b)(6) and responses to interrogatories and discovery requests. JMJ's counsel did not even respond to the motions to compel.

### 4. Whether the Attorney's Conduct Was *Willful* or in *Bad Faith*

I have reluctantly come to the conclusion that the conduct of JMJ's counsel was willful. JMJ was afforded an opportunity, on the eve of trial, to correct its prior failure to provide information on damages. JMJ's response, that it claims damages "in the range of $ 500,000 to $ 10,000,000, plus punitive damages" indicates a willful refusal to provide a meaningful response to Via Veneto's interrogatory.

"[HN5] Willfulness involves intentional, self-serving or strategic behavior." *United States v. Osteopathic Medical Ctr. Of Philadelphia, 1997 U.S. Dist. LEXIS 16585,* No. 88- *CV-9753, 1997 WL 666295* (E.D. Pa. Oct. 23, 1997). JMJ has repeatedly explained its conduct in discovery by contending that Via Veneto has been provided with sufficient information to present its case. In other words, JMJ has decided what type and amount of discovery is appropriate, without regard for the Federal Rules of Civil Procedure or the Orders of this Court.

### 5. The Effectiveness of *Alternative Sanctions*

Alternative [*12] sanctions are not appropriate in this case. The conduct of JMJ's counsel was unaffected by two previous monetary sanctions. See November 14, 1997 Order (imposing $ 647.00 sanction for failure to designate representative for Rule 30(b)(6) deposition); December 5, 1997 Order (imposing $ 250.00 sanction for failure to properly respond to interrogatories and document requests). There is no reason to believe that a monetary sanction would compel JMJ's counsel to fulfill its discovery obligations.

Exclusion of evidence is impractical in this case. JMJ failed to provide key evidence on damages. This failure affects its contract, detrimental reliance and tort claims. Exclusion of the Plaintiff's damages evidence would be tantamount to dismissal. Therefore, dismissal is the only appropriate sanction.

### 6. The *Meritoriousness* of the Claim

"A claim will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff." *Poulis, 747 F.2d at 869-70.* Other than a claim for attorney's fees, JMJ's claims survived a Motion for Summary Judgment. For purposes of this analysis, JMJ's claims are meritorious.

1998 U.S. Dist. LEXIS 7750, *

**CONCLUSION** [*13]

After weighing the factors set out by the Court of Appeals, I am satisfied that dismissal is appropriate in this situation. The principals of JMJ apparently had meritorious prima facie claims and they may not be responsible for the discovery abuses in this case. Nevertheless, their counsel repeatedly failed to answer an appropriate interrogatory. JMJ's answer in response to the Court's Order was woefully inadequate. JMJ's counsel's failure to provide information on damages was willful. The failure to answer the interrogatory prejudiced Via Veneto's ability to defend against JMJ's claims and it was part of a pattern of dilatory conduct.

Dismissal is a sanction of last resort. This case has reached the unfortunate stage where dismissal is the only appropriate sanction. Pursuant to Rule 37(b)(2)(C), JMJ's claims are dismissed. *Fed. R. Civ. P. 37(b)(2)(C)*.

ORDER

AND NOW, this 27th Day of May, 1998, upon consideration of Defendant's Renewed Motion for Judgement and Plaintiff's response, and for the reasons stated above and the reasons stated in court, Defendant's motion is GRANTED.

JUDGMENT is ENTERED in this matter in favor of Defendant Via Veneto Italian Ice, Inc. and against [*14] Plaintiff JMJ Enterprises, Inc. This case is closed.

BY THE COURT:

JAMES McGIRR KELLY, J.