# **EXHIBIT 9**

1 of 4 DOCUMENTS

LINDEN GARDENS TRUST LTD

RESPONDENT

AND

LENESTA SLUDGE DISPOSALS LTD AND OTHERS

APPELLANTS

ST. MARTINS PROPERTY CORPORATION LTD

RESPONDENTS

AND ANOTHER

AND CROSS-APPELLANTS

AND

SIR ROBERT MCALPINE LTD. (formerly

APPELLANT

SIR ROBERT MCALPINE AND SONS LTD)

AND CROSS-RESPONDENT

[HOUSE OF LORDS]

*[1994] 1 AC 85*

**HEARING-DATES:** 8, 9, 10, 11, February 30, 31, March 22 July 1993

22 July 1993

**CATCHWORDS:**

Building - Contract - Assignment - Prohibition on assignment without consent - Whether assignment valid - Entitlement to damages for breach - Standard Form of Building Contract, Private Edition with Quantities, 1963 ed. (July 1975 rev.), cl. 17(1)

**HEADNOTE:**

In the first case the lessee of part of a building entered into a contract with the second defendants in the J.C.T. standard form, 1963 ed. (July 1975 rev.) n1 to remove blue asbestos from the premises. Clause 17(1) provided: "The employer shall not without written consent of the contractor assign this contract." The second defendants subcontracted the work to the first defendant. After the work was completed more asbestos, which should have been removed, was found in the building. In February 1985 the lessee contracted, on similar terms, with the third defendants to remove the asbestos, and on 1 April assigned its leasehold interest to the plaintiff. On 3 July 1985 the lessee issued a writ seeking damages for negligence and breach of contract. By an assignment dated 14 January 1987 the lessee assigned to the plaintiff its rights of action as pleaded and rights incidental to the leasehold interest. The second defendants were not asked to, and did not, consent to that assignment. Subsequently more asbestos was found in the premises and further work was undertaken at the plaintiff's expense. On the preliminary issues being directed to be tried in the action, the

[1994] 1 AC 85

official referee held that the assignment was ineffective and that the plaintiff could not recover the cost of removing the asbestos. The Court of Appeal, reversing that decision, held that the assignment was effective and that the plaintiff could recover damages.

In the second case the first plaintiffs began a development including shops, offices and flats. On completion of the development they were to be granted a 150-year lease of the site by the local authority. In 1974 they entered into a building contract with the defendants incorporating J.C.T. standard form,

n1 J.C.T. Standard Form, 1963 ed. (July 1975 rev.), cl. 17: see post, p. 99D-E.

1963 ed. (July 1972 rev.), clause 17 of which was in terms identical to the corresponding clause in the first appeal. By an assignment dated 25 March 1976 the first plaintiffs assigned, for full value, to the second plaintiffs, all their interests in the property and the full benefit of all the contracts and engagements. The defendants did not consent to that assignment. In 1981 part of the development was found to be defective and remedial works cost about oe800,000. In an action by the plaintiffs issues similar to those in the first appeal arose. The official referee held that the assignment was ineffective and that the first plaintiffs were only entitled to nominal damages. The Court of Appeal held, by a majority, that the assignment was invalid but, unanimously, that the first plaintiffs were entitled to substantial damages.

On appeal by the second defendants in the first case and the defendants in the second and cross-appeal by the second plaintiffs in the second case:-

Held, allowing the appeal in the first case and dismissing the appeal and cross-appeal in the second case (1) that on the true construction of the contracts the wording of clause 17(1) effectively prohibited the assignment by the employer, without the contractor's consent, of the benefit of the contract and the assignment of any chose in action; that since a party to such a contract might have a genuine commercial interest in ensuring that his contractual relations with the party he had selected were preserved, there was no reason for holding a contractual prohibition on assignment to be contrary to public policy; and that, accordingly, the purported assignments of contractual rights were ineffective to vest any such rights in the assignee (post, pp. 95C-E, G-H, 96B-C, 98F-G, 103E-G,106C-D, 107D-E, 109B-C).

In re Turcan (1888) 40 Ch.D. 5, C.A. and Helstan Securities Ltd. v. Hertfordshire County Council [1978] 3 All E.R. 262 considered.

(2) That, since the development in the second case was, to the knowledge of the parties, likely to be occupied or purchased by third parties, damage to a subsequent owner was foreseeable; that in view of the specific contractual provision that rights of action were not assignable without the defendants' consent, the parties could properly be treated as having entered into the contract on the basis that the first plaintiffs would be entitled to enforce against the defendants contractual rights on behalf of those third parties who would suffer from defective performance of the contract but were unable to acquire rights under it; and that, accordingly, the first plaintiffs were entitled to substantial damages for any breaches of the contract by the defendants (post, pp. 95C-E, G-H, 96B-C, 98F-G,114G-115B, F-G).

Dunlop v. Lambert (1839) 6 Cl. & F. 600, H.L.(E.) and The Albazero[1977] A.C. 774, H.L.(E.) considered.

Decision of the Court of Appeal (1992) 57 B.L.R. 57 varied.

## INTRODUCTION:

APPEALS AND CROSS-APPEAL from the Court of Appeal.

LINDEN GARDENS TRUST LTD. V.

LENESTA SLUDGE DISPOSALS LTD. AND OTHERS

This was an appeal by the second defendants, McLaughlin and Harvey Plc. ("M. & H."), by leave of the Court of Appeal, from an order dated 13 February 1992 of that court (Nourse and Staughton L.JJ. and Sir Michael Kerr) allowing an appeal by the plaintiffs, Linden Gardens Trust Ltd. ("Linden Gardens"), from an order dated 9 October 1990 of Judge John Loyd Q.C., sitting in the Queen's Bench Division on official referee's business. In Linden Gardens' action for damages for, inter alia, negligence and breach of contract, on the trial of the preliminary issues (1) whether Linden Gardens were entitled, by virtue of the deed of assignment dated 14 January 1987 made between Stock Conversion and

[1994] 1 AC 85

Investment Trust Plc. ("Stock Conversion") and Linden Gardens, to recover damages against the defendants in respect of the various causes of action and heads of loss pleaded (a) where the loss was incurred by

Stock Conversion prior to the assignment (b) or where the loss was incurred by Linden Gardens subsequent to the assignment; and (2) whether Stock Conversion was precluded from lawfully assigning rights of action to Linden Gardens against M. & H. by clause 17(1) of the contract dated 19 July 1979 and made between Stock Conversion and M. & H., the judge held that the assignment to Linden Gardens was not effective and that Linden Gardens could not recover the cost of work executed after the date of the assignment.

ST. MARTINS PROPERTY CORPORATION LTD. AND ANOTHER V.

SIR ROBERT MCALPINE LTD.

This was an appeal by the defendant, Sir Robert McAlpine Ltd. (formerly Sir Robert McAlpine & Sons Ltd.) ("McAlpine"), from an order dated 13 February 1992 of the Court of Appeal (Nourse L.J. and Sir Michael Kerr, Staughton L.J. dissenting in part), whereby (a) the court allowed in part the appeal of the first plaintiff, St. Martins Property Corporation Ltd. ("Corporation"), against the judgment dated 29 January 1991 and an order dated 4 February 1991 (staying Corporation's action against McAlpine) of Judge Bowsher Q.C., sitting in the Queen's Bench Division on official referee's business; (b) dismissing the appeal by the second plaintiff, St. Martins Property Investments Ltd. ("Investments"), against the judge's order dated 29 January 1991 and (c) removing the stay on Corporation's action against McAlpine. On similar preliminary issues as in the Linden Gardens case the court held by a majority that the assignment was invalid and that at the date of the assignment there was no accrued causes of action which could be assigned. The court unanimously held that Corporation was entitled to substantial damages for breach of contract.

Investments cross-appealed.

The facts are stated in the opinion of Lord Browne-Wilkinson.

**COUNSEL:**

Sydney Kentridge Q.C. and Justin Fenwick for M. & H. Contractual obligations cannot be assigned by one party to the contract without the consent of the other party: Nokes v. Doncaster Amalgamated Collieries Ltd. [1940] A.C. 1014. Thus, there is no need to prohibit assignment of a contractual obligation by the terms of the contract. But where it is possible to perform the obligation vicariously, it is also possible to prohibit the contractor from assigning it. [Reference was made to Liddy v. Kennedy (1871) L.R. 5 H.L. 134 and Arthur v. Mackinnon (1879) 11 Ch.D. 385.] Prohibitions against assignment are not contrary to public policy: see Paiges v. Van Ryn Gold Mines Estates Ltd., 1920 A.D. 600 and Duke of Portland v. Baird and Co. (1865) 4 Macph. 10.

Generally contractual rights are assignable, so that a contract with A can be read as a contract with A and his assigns. The exceptions are cases where rights are made unassignable, where rights are of a personal nature, and where the contract itself prohibits assignment: see Chitty on Contracts, 26th ed. (1989), pp. 883, 886-887, paras. 1413, 1416 and Keating on Building Contracts, 4th ed. (1978), pp. 331, 332; 5th ed. (1991), pp. 536, 539.

An assignment in breach of a covenant prohibiting assignment is effective to vest the remainder of the term in the assignee: Old Groveburg Manor Farm Ltd. v. W. Seymour Plant Sales and Hire Ltd. (No. 2) [1979] 1 W.L.R. 1397. The reason is that it is an interest in land which is assigned. Assignments which have been held to be contractually binding as between assignor and assignee, despite an express prohibition, were cases where the issue was between assignors and assignees. Such assignments are not effective to give the assignees rights against the other party to the original contract: Tom Shaw and Co. v. Moss Empires Ltd. (1908) 25 T.L.R. 190.

A claim for damages under a contract must be related to the obligation of which there has been a breach. Where the claim is for damages for defective performance or non-performance, the benefit of the right to sue for breach cannot fall into a different class from the right to call for performance: Photo Production Ltd. v. Securicor Transport Ltd. [1980] A.C. 827. This is particularly true of building contracts where the remedy of specific performance is regarded as exceptional.

The assignment was bad and gave Linden Gardens no rights. Alternatively, since the assignor has suffered no damage, Linden Gardens is not entitled to any damages.

[1994] 1 AC 85

John Dyson Q.C. and Anthony Speaight for Linden Gardens. Clause 17(1) does not prohibit the assignment of causes of action arising out of the contract. Alternatively, clause 17(1) merely prohibits sub-contracting by the employer of his obligations under the contract and prohibits the assignment of the employer's right to require performance. The first limb of clause 17(2), which supports the first construction, means that the contractor shall not sub-contract the whole of the works without consent: see Keating on Building Contracts, 4th ed., p. 331; Hudson's Building and Engineering Contracts, 10th ed. (1970), p. 734 and Wallace, Building and Civil Engineering Standard Forms (1969), p. 81.

The words "assign this contract" should bear the same meaning in clause 17(1) and clause 17(2). The true construction of clause 17(1), therefore, is that the employer shall not delegate his obligations by sub-contracting them. Alternatively, clause 17(1) prohibits the assignment of the benefit of the contract, i.e., the right to require performance by the contractor of his contractual obligations: see Helstan Securities Ltd. v. Hertfordshire County Council [1978] 3 All E.R. 262; Reed Publishing Holdings Ltd. v. Kings Reach Investments Ltd. (unreported), 25 May 1983; Court of Appeal (Civil Division) Transcript No. 231 of 1983 and Professor Goode's note, "Inalienable Rights?" (1979) 42 M.L.R. 553.

Even if the assignment was executed in breach of clause 17(1) it is nonetheless valid and effective both as between Linden Gardens and Stock Conversion and as between Linden Gardens and M. & H. It is a chose in action which is property and prima facie assignable: Paiges v. Van Ryn Gold Mines Estates Ltd., 1920 A.D. 600. Prohibitions against assignment are contrary to public policy and can never have the effect of rendering an assignment in breach of the prohibition ineffective. Alternatively, in order to have the effect of rendering assignments ineffective, a prohibition should clearly provide that there is no power to

assign by stating that the chose in action is "unassignable" or "non-transferable." [Reference was made to Sacks v. Neptune Meter Co. (1932) 258 N.Y.S. 254.] The prohibition in clause 17(1) is merely an undertaking not to assign. Breach of the undertaking may sound in damages but cannot render an assignment nugatory. [Reference was made to Williams v. Earle (1868) L.R. 3 Q.B. 739 and Tom Shaw and Co. v. Moss Empires Ltd., 25 T.L.R. 190.]

Humphrey LLoyd Q.C. and David Westcott for Corporation and Investments. Corporation and Investments adopt the submissions of Linden Gardens.

Foreseeability is a question of fact: R. and H. Hall Ltd. v. W. H. Pim (Junior) and Co. Ltd. (1928) 33 Com.Cas. 324. Assignment in the legal sense does not mean sub-contracting and should not be limited to rights of action for failure to perform. If that is right and rights of action have not arisen at the time of assignment they may arise in the future and will be covered by the assignment. In clause 17(1) and clause 17(2) the word "assign" should be given the same meaning. "Assignment" means delegation but the clause does not simply mean delegation. Duke of Portland v. Baird and Co., 4 Macph. 10 and Paiges v. Van Ryn Gold Mines Estates Ltd., 1920 A.D. 600 are distinguishable as the public policy considerations there applicable were different.

Richard Fernyhough Q.C. and Marcus Taverner for McAlpine. Where a contract by its nature is personal or non-assignable, that quality should apply to its performance as well as non-performance. The benefit of the contract will be assignable if that makes no difference to the discharge of the obligation under the contract: see Chitty on Contracts, pp. 886-887, para. 1416; Tolhurst v. Associated Portland Cement Manufacturers (1900) Ltd. [1903] A.C. 414 and Fitzroy v. Cave [1905] 2 K.B. 364. The applicable principle of public policy is that parties are free to enter into such contracts as they intend to make: Southway Group Ltd. v. Wolff (1991) 57 B.L.R. 33.

Kentridge Q.C. in reply. Historically, the common law favoured freedom of alienation of property, and a lease was treated as having the quality of property. Nonetheless in due course covenants not to assign leases were recognised: see Holdsworth, A History of English Law, 2nd ed., vol. III (1914), pp. 83, 85; vol. VII (1937), p. 281 and Whitehall Court Ltd. v. Ettlinger [1920] 1 K.B. 680.

On the other hand personal actions for breach of contract or tort were non-assignable: Holdsworth, vol. VII, pp. 520, 531-532. But in modern law a chose in action arising from breaches of contract is assignable: Trendtex Trading Corporation v. Credit Suisse [1980] Q.B. 629. This historical difference makes covenants in leases misleading as an analogy.

In a commercial contract a party is entitled to chose the party with whom he wishes to enter into the contract: Photo Production Ltd. v. Securicor Transport Ltd. [1980] A.C. 827.

[1994] 1 AC 85

In the United States, courts regularly give effect to non-assignable contracts and hold that stipulations against assignment of contracts are valid and must be enforced: see City of Omaha v. Standard Oil Co. (1898) 75 N.W. 859; Portuguese-American Bank of San Francisco v.

Welles (1916) 242 U.S. 7; Allhusen v. Caristo Construction Corporation (1952) 103 N.E.2d 891 and Mingledorff's Inc. v. Hicks (1974) 209 S.E.2d 661.

An assignment of a contract is an assignment of all its benefits: Ogdens Ltd. v. Weinberg (1906) 95 L.T. 567. [Reference was made to Borland's Trustee v. Steel Bros. & Co. Ltd. [1901] 1 Ch. 279.]

Dyson Q.C. replied on the new authorities.

LLoyd Q.C. replied.

[LORD KEITH OF KINKEL. Their Lordships do not wish to hear the Linden Gardens appeal any further. Counsel in that appeal are released.]

Richard Fernyhough Q.C. and Marcus Taverner for McAlpine. The loss for which Corporation is seeking to recover damages from McAlpine was suffered by a third party, i.e. Investments, as a result of a breach by Corporation of the building contract or, more particularly, the implied obligation to obtain McAlpine's consent. The loss, being a legal liability to a third party for breach of an implied term in an assignment, is too remote to be recoverable by way of damages for breach of contract: see Hadley v. Baxendale (1854) 9 Exch. 341; Victoria Laundry (Windsor) Ltd. v. Newman Industries Ltd. [1949] 2 K.B. 528 and C. Czarnikow Ltd. v. Koufos [1969] 1 A.C. 350. The loss was not within the reasonable contemplation of the parties when they entered into the contract: H. Parsons (Livestock) Ltd. v. Uttley Ingham & Co. Ltd. [1978] Q.B. 791.

Humphrey LLoyd Q.C. and David Westcott for Corporation. The fact that Corporation may not have suffered a loss is irrelevant. Substantial damages for breach of contract may be recovered by a plaintiff even where he has not had the work done and is not actually out of pocket: see Dodd Properties (Kent) Ltd. v. Canterbury City Council [1980] 1 W.L.R. 433 and British Westinghouse Electric and Manufacturing Co. Ltd. v. Underground Electric Railways Co. of London Ltd. [1912] A.C. 673. This is an exception to the general rule that damages should be assessed at the date when the cause of action arises and that the measure of damages is the cost of reinstatement in the case of defective building works: East Ham Corporation v. Bernard Sunley & Sons Ltd. [1966] A.C. 406.

Damages may be recovered even if the loss has been or will be made good by others: Jones v. Stroud District Council [1986] 1 W.L.R. 1141. Damages are not payable as compensation but for the loss inflicted by the wrongdoer: see Design 5 v. Keniston Housing Association Ltd. (1986) 34 B.L.R. 92 and Newton Abbot Development Co. Ltd. v. Stockman Bros. (1931) 47 T.L.R. 616. The cost of remedial work may be set up as a defence to a claim against the employer by a contractor. If McAlpine had sued for the balance of the contract price Corporation would have been able to defend the claim on the basis of abatement or set-off: Mondel v. Steel (1841) 8 M. & W. 858 and Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd. [1974] A.C. 689.

The owner of a property damaged by violation of law is not prevented from pursuing his claim against the wrongdoer by parting with the property to another: G.U.S. Property Management Ltd. v.

Littlewoods Mail Order Stores Ltd., 1982 S.L.T. 533, 538. This rule applies to contract as well as negligence: see Donnelly v. Joyce [1974] Q.B. 454; Slater v. Hoyle & Smith Ltd. [1920] 2 K.B. 11; William Bros. v. Ed. T. Agius Ltd. [1914] A.C. 510 and Rodocanachi, Sons & Co. v. Milburn Bros. (1886) 18 Q.B.D. 67. Wertheim v. Chicoutimi Pulp Co. [1911] A.C. 301 does not establish a principle to the contrary. It is no answer to Corporation that it had no interest in the property at the date of breach. It was entitled to proper performance of the contract and was entitled to damages for its breach: Woodar Investment Development Ltd. v. Wimpey Construction U.K. Ltd. [1980] 1 W.L.R. 277. [Reference was also made to Joyner v. Weekes [1891] 2 Q.B. 31; Monarch Steamship Co. Ltd. v. Karlshamns Oljefabriker (A/B) [1949] A.C. 196 and Jackson v. Horizon Holidays Ltd. [1975] 1 W.L.R. 1468.]

If property or right of property is not assignable a person may nevertheless become a trustee of that property or right for the benefit of the putative assignee: In re Turcan (1888) 40 Ch.D. 5. If the assignment is only to become effective on the assignor obtaining the consent of a third party and that consent is not sought, the agreement is one the performance of which by the assignor will be compelled by the assignee by decree in equity: see Torkington v. Magee [1902] 2 K.B. 427; Holroyd v. Marshall (1862) 10 H.L.Cas. 191 and Spellman v. Spellman [1961] 1 W.L.R. 921. Thus, the requirements for a constructive trust are satisfied: see Warner Bros. Records Inc. v. Rollgreen Ltd. [1976] Q.B. 430.

[1994] 1 AC 85

The Albazero [1977] A.C. 774 established that there are exceptions to the general rule that only actual loss can be recovered, and that one of the exceptions is that, where it is the common expectation of the parties that the subject matter of the contract may be transferred after the contract and before the breach, the original party is to be treated as having entered into the contract for the benefit of all persons who may acquire an interest in the subject matter of the contract and is entitled to recover as damages the actual loss sustained by any one of those persons. Dunlop v. Lambert(1839) 6 Cl. & F. 600 was distinguished in The Albazero on the ground that the law and practice had changed. [Reference was also made to Obestain Inc. v. National Mineral Development Corporation Ltd. [1987] 1 Lloyd's Rep. 465 and Pan Atlantic Insurance Co. Ltd. v. Pine Top Insurance Co. Ltd. [1988] 2 Lloyd's Rep. 505.]

Fernyhough Q.C. in reply. The object of damages awarded to a plaintiff for loss suffered by him is to give him compensation for the damage, loss or injury that he has suffered. Where there has been a breach of contract but the plaintiff has suffered no loss he is entitled only to recover nominal damages: see McGregor on Damages, 15th ed. (1988), pp. 7, 249, paras. 9, 397. Once the plaintiff has proved that he has suffered a loss caused by a breach of contract, the measure of damages to which he is entitled is the sum of money which will put him in the same position as he would have been in if he had not sustained the wrong: Livingstone v. Rawyards Coal Co. (1880) 5 App.Cas. 25, 39. Where the breach of contract is the rendering of defective performance by the builder under a building contract, the basic loss is the diminution

in value of the plaintiff's property: McGregor on Damages, p. 26, para. 39. In such cases the plaintiff's loss is measured by the cost to him of reasonable repairs necessary to effect reinstatement: East Ham Corporation v. Bernard Sunley & Sons Ltd. [1966] A.C. 406. Where it is not reasonable to carry out repairs, the diminution in the value of the plaintiff's propery is the appropriate measure of damages: see Keating on Building Contracts,5th ed., pp. 202-203. In such cases the plaintiff's loss is the damage to his interest in the property: Obestain Inc. v. National Mineral Development Corporation Ltd. [1987] 1 Lloyd's Rep. 465. Thus a plaintiff may only recover damages in respect of his own losses caused by a breach of contract. He may not recover the losses of any other party even where under the contract part of the consideration was expressed to be payable to the named third party: see Woodar Investment Development Ltd. v. Wimpey Construction U.K. Ltd. [1980] 1 W.L.R. 277 and Forster v. Silvermere Golf and Equestrian Centre Ltd. (1981) 125 S.J. 397.

Exceptionally, a plaintiff may recover damages in respect of losses sustained by a third party where he entered into the contract as agent or trustee for the third party: Lloyd's v. Harper (1880) 16 Ch.D. 290. In such cases the plaintiff is bound to account to the third party. He may also recover such damages where, in a commercial contract concerning goods, it is in the contemplation of the parties that proprietary interests in the goods may be transferred before any breach of contract occurs, and it is the intention of the parties that the plaintiff is entering into the contract for the benefit of all persons who may acquire an interest in the goods before they are damaged: The Albazero [1977] A.C. 774. Any such intention is negatived in the present case by the express prohibition against assignment of the benefit of the contract.

Where the defendant is in breach of contract the measure of damages payable is not usually affected by the actual losses incurred by the plaintiff as a result of having entered into contracts with third parties either before or after the date of contract. Thus, losses made good by insurance or pension moneys may be recovered: see Bradburn v. Great Western Railway Co. (1874) L.R. 10 Ex. 1 and Parry v. Cleaver [1970] A.C. 1.

In sale of goods cases the common law developed the rule that the buyer's loss in cases of non-delivery or delivery of defective goods was measured by the market price of the goods at the place of delivery. Exceptionally, the fact that the plaintiff has entered into a contract with a third party is relevant in assessing the measure of damages to which the plaintiff is entitled: Hadley v. Baxendale, 9 Exch. 341 and British Westinghouse Electric and Manufacturing Co. Ltd. v. Underground Electric Railways Co. of London Ltd. [1912] A.C. 673. No such principle is applicable to freight charges: Colonial Bank v. European Grain and Shipping Ltd. [1989] A.C. 1056.

Corporation has suffered no loss and can recover only nominal damages. It owned no proprietary interest in the property when the breach occurred. Thus it has suffered no loss or damage to its own property. Nor has any other interest which the law recognises been damaged. It may not recover the loss to Investments: see The Albazero

[1977] A.C. 774 and Obestain Inc. v. National Mineral Development Corporation Ltd. [1987] 1 Lloyd's Rep. 465. Newton Abbot Development Co. Ltd. v. Stockman Bros., 47 T.L.R. 616 is distinguishable in this respect. [Reference was made to Acsim (Southern) Ltd. v. Danish Contracting and Development Co. Ltd. (1989) 47 B.L.R. 55.]

[1994] 1 AC 85

Corporation cannot recover as trustee for Investments under a constructive trust arising on the failure to transfer to Investments rights under the building contract. A constructive trust cannot arise where an express trust could not subsist. An express trust cannot subsist unless equity will grant a decree of specific performance to enforce it: Central Trust and Safe Deposit Co. v. Snider [1916] 1 A.C. 266. Similarly, a constructive trust cannot arise on the failure of an agreement to convey property unless the court of equity would grant specific performance of the agreement: Holroyd v. Marshall, 10 H.L.Cas. 191.

Their Lordships took time for consideration.

22 July.

**PANEL:** Lord Keith of Kinkel, Lord Bridge of Harwich,Lord Griffiths, Lord Acknerand Lord Browne-Wilkinson

**JUDGMENTBY-1:** LORD KEITH OF KINKEL

**JUDGMENT-1:**

LORD KEITH OF KINKEL: . My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Browne-Wilkinson, and also that prepared by my

I agree entirely with the reasoning which leads Lord Browne-Wilkinson to the conclusion that the appeal in the Linden Gardens case must be allowed, and the cross-appeal by St. Martins Property Investments Ltd. dismissed.

As regards the appeal by McAlpines in which St. Martins Property Corporation Ltd. are respondents I would dismiss that for the reasons given by Lord Browne-Wilkinson, and not upon the broader grounds favoured by Lord Griffiths. I have much sympathy with the view that where a building contractor is in breach of his contract he should not be relieved of liability to pay substantial damages for his breach merely by reason that the other contracting party had no proprietary interest in the works at the time when the breach occurred. There is much force in the analysis that the party who contracted for the works to be done has suffered loss because he did not receive the performance he had bargained for and in order to remedy that has been required to pay for the defects to be put right by another builder. However, the matter was not fully explored in argument before your Lordships, and the possible effects upon other forms of commercial contract remain uncertain. While in some future case the view expressed by my noble and learned friend, Lord Griffiths, may well prevail, the present case can be disposed of in favour of the respondents without the necessity of deciding upon its correctness.

**JUDGMENTBY-2:** LORD BRIDGE OF HARWICH

**JUDGMENT-2:**

LORD BRIDGE OF HARWICH: . My Lords, for the reasons given in the speech of my noble and learned friend, Lord Browne-Wilkinson, I would allow the appeal in the Linden Gardens case and dismiss both the appeal and the cross-appeal in the St. Martins case. I would also answer the questions raised by the preliminary issues in each case in the terms proposed by my noble and learned friend and make the orders for costs which he proposes.

In the McAlpine appeal I am much attracted by the broad principle favoured by my noble and learned friend, Lord Griffiths, but am content for the purpose of the present proceedings to adopt the narrower ground for dismissal of the appeal on which Lord Browne-Wilkinson rests his decision.

**JUDGMENTBY-3:** LORD GRIFFITHS

**JUDGMENT-3:**

LORD GRIFFITHS: . My Lords, I have had the advantage of reading the speech of Lord Browne-Wilkinson and agree that for the reasons he gives the first appeal should be allowed. In the second appeal I agree that for the reasons given by my Lord, St. Martins Property Investments Ltd. ("Investments") have no claim against Sir Robert McAlpine and Sons Ltd. ("McAlpine"). I also agree that for reasons which I can state quite shortly, St. Martins Property

[1994] 1 AC 85

Corporation Ltd. ("Corporation") are entitled to recover substantial damages from McAlpine. Accordingly the appeal in the Linden Gardenscase must be allowed and the cross-appeal by St. Martins Property Investments Ltd. dismissed.

McAlpine have successfully resisted Corporation's claim to have assigned the benefit of the contract to Investments. It follows that throughout the performance of the contract McAlpine owed to Corporation a contractual duty to build the podium deck of sound materials and with all reasonable skill and care. Upon the assumption that McAlpine broke this contractual duty the normal measure of damages in such circumstances is the cost of remedying the defect in the building: see East Ham Corporation v. Bernard Sunley & Sons Ltd. [1966] A.C. 406. If the cost of remedying the defect in the podium deck was oe800,000 Corporation would in my opinion be entitled to recover that sum from McAlpine.

It is however submitted that two factors prevent this normal and just result of McAlpine's breach of contract. The first ground upon which McAlpine resists the claim is that Corporation had transferred their building lease to Investments before the podium deck was built and thus had no proprietary interest in the property when the breach occurred. The second is that for financial reasons beneficial to Corporation and Investment, Investment reimbursed Corporation for the money that they paid for the repairs to the podium deck.

In my view neither of these considerations provide McAlpine with a defence to Corporation's claim. I cannot accept that in a contract of this nature, namely for work, labour and the supply of materials, the recovery of more than nominal damages for breach of contract is dependent upon the plaintiff having a proprietary interest in the subject matter of the contract at the date of breach. In everyday life contracts for work and labour are constantly being placed by those who have no proprietary interest in the subject matter of the contract. To take a common example, the matrimonial home is owned by the wife and the couple's remaining assets are owned by the husband and he is the sole earner. The house requires a new roof and the husband places a contract with a builder to carry out the work. The husband is not acting as agent for his wife, he makes the contract as principal because only he can pay for it. The builder fails to replace the roof properly and the husband has to call in and pay another builder to complete the work. Is it to be said that

the husband has suffered no damage because he does not own the property? Such a result would in my view be absurd and the answer is that the husband has suffered loss because he did not receive the bargain for which he had contracted with the first builder and the measure of damages is the cost of securing the performance of that bargain by completing the roof repairs properly by the second builder. To put this simple example closer to the facts of this appeal - at the time the husband employs the builder he owns the house but just after the builder starts work the couple are advised to divide their assets so the husband transfers the house to his wife. This is no concern of the builder whose bargain is with the husband. If the roof turns out to be defective the husband can recover from the builder the cost of putting it right and thus obtain the benefit of the bargain that the builder had promised to deliver. It was suggested in argument that the answer to the example I have given is that the husband could assign the benefit of the contract to the wife. But what if, as in this case, the builder has a clause in the contract forbidding assignment without his consent and refuses to give consent as McAlpine has done. It is then said that neither husband nor wife can recover damages; this seems to me to be so unjust a result that the law cannot tolerate it.

The principal authority relied upon by McAlpine in support of the proposition that the contracting party suffers no loss if they did not have a proprietary interest in the property at the time of the breach was The Albazero[1977] A.C. 774. The situation in that case was however wholly different from the present. The Albazero was not concerned with money being paid to enable the bargain, i.e. the contract of carriage, to be fulfilled. The damages sought in The Albazero were claimed for the loss of the cargo, and as at the date of the breach the property in the cargo was vested in another with a right to sue it is readily understandable that the law should deny to the original party to the contract a right to recover damages for a loss of the cargo which had caused him no financial loss. In cases such as the present the person who places the contract has suffered financial loss because he has to spend money to give him the benefit of the bargain which the defendant had promised but failed to deliver. I therefore cannot accept that it is a condition of recovery in such cases that the plaintiff has a proprietary right in the subject matter of the contract at the date of breach.

The second ground upon which the recovery of damages is resisted is that Investments in fact reimbursed Corporation for the money they spent on the repairs. But here again in my view who actually pays for the repairs is no concern of the defendant who broke the contract. The court will of course wish to be satisfied that the repairs have been or are likely to be carried out but if they are carried out the cost of doing them must fall upon the defendant who broke his contract. Authority for this is to be found in Jones v. Stroud District Council [1986] 1 W.L.R. 1141. The case in fact was one in tort and not contract but the principle of whether or not it is a defence if someone else has paid for work for

[1994] 1 AC 85

which the defendant would otherwise be liable must apply to both tort and contract. The claim was for damages to a building which had

suffered damage as a result of the defendant's negligence. In giving judgment Neill L.J. said, at p. 1150:

"The plaintiffs failed to provide any documents relating to the work (of repairs) carried out by Marlothian Ltd. and there is no evidence that the plaintiffs have paid or are liable to pay any sum to Marlothian in respect of that work. It was submitted on behalf of the plaintiffs, however, that if the repairs were necessary and were carried out it was not to the point that the plaintiffs had not proved that they had paid for the repairs themselves. Our attention was drawn to The Endeavour (1890) 6 Asp.M.C. 511, where repairs to a vessel were carried out but before paying for them the plaintiff had gone bankrupt. It was there argued that the plaintiff could not claim the cost of the repairs because the sums recovered would only go to swell the creditors' funds. This argument was rejected and it was said, at p. 512: 'If somebody out of kindness were to repair the injury and make no charge for it, the wrongdoer would not be entitled to refuse to pay as part of the damages the cost of the repairs to the owner.' In my judgment, on the facts of this case this submission is correct."

There are many cases where a tortfeasor's liability has been temporarily discharged by payment by a third party on behalf of the plaintiff. A very common example occurs in personal injury cases where the cost of medical treatment is borne by a relative; but that has never been seen as a reason why that sum should not ultimately be paid by the defendant if he is found liable for the injuries. The law regards who actually paid for the work necessary as a result of the defendant's breach of contract as a matter which is raised inter alios acta so far as the defendant is concerned.

It will be seen that my reasons for holding that Corporation can recover damages are essentially those canvassed in the speech of Lord Browne-Wilkinson in the introduction to that part of his speech dealing with Corporation's claim for damages. Whilst I always welcome and find the views of academic writers most helpful, I am prepared even without the benefit of their views to adopt the direct route to the award of damages to Corporation.

## JUDGMENTBY-4: LORD ACKNER

### JUDGMENT-4:

LORD ACKNER: . My Lords, for the reasons given in the speech of my noble and learned friend, Lord Browne-Wilkinson, I would allow the appeal in the Linden Gardens case and dismiss both the appeal and the cross-appeal in the St. Martins case. I would also answer the questions raised by the preliminary issues in each case in the terms proposed by my noble and learned friend and make the orders for costs which he proposes.

## JUDGMENTBY-5: LORD BROWNE-WILKINSON

### JUDGMENT-5:

LORD BROWNE-WILKINSON: . My Lords, these appeals and cross-appeal arise in two separate actions which raise similar issues. In broad terms, those issues are, first, what is the effect of a contractual provision which prohibits a party from assigning the benefit of a contract and, second, can a building owner recover substantial damages for breach of

a building contract if he has parted with the property. The appeals relate to preliminary issues directed to be tried in both actions. As the cases have proceeded, certain of those issues have become irrelevant. I propose therefore to state shortly the facts of each case, then deal with the matters which fall for decision by this House and, at the end, indicate the answers which should in my view be given to the questions posed by the preliminary issues which have been directed.

The facts in the Linden Gardens case

In 1979 Stock Conversion and Investment Trust Plc. ("Stock Conversion") were the owners of a leasehold interest in the third to sixth floors inclusive of 130 Jermyn Street, London S.W.1. On 19 June 1979 Stock Conversion entered into a building contract with the second defendants, McLaughlin and Harvey Plc. ("M. & H.") under which M. & H. were to remove blue asbestos from the property.

[1994] 1 AC 85

The contract was in the Joint Contract Tribunal Standard Form of Building Contract for use with Approximate Quantities, Private Edition, 1963 ed. (revised to July 1975) with amendments. Clause 17 of the contract provided as follows:

"(1) The employer shall not without the written consent of the contractor assign this contract. (2) The contractor shall not without the written consent of the employer assign this contract, and shall not without the written consent of the architect (which consent shall not be unreasonably withheld to the prejudice of the contractor) sublet any portion of the works. Provided that it shall be a condition in any subletting which may occur that the employment of the subcontractor under the subcontract shall determine immediately upon the determination (for any reason) of the contractor's employment under this contract."

Lenesta Sludge Disposals Ltd., the first defendants, were the nominated subcontractors for the removal of the asbestos. They are of no significance in these appeals and I mention them only to explain their presence in the title to the action.

Practical completion of the works to be carried out by M. & H. took place on 25 March 1980. Subsequently, more asbestos which should have been removed by M. & H. was found in the premises. In February 1985 Stock Conversion entered into a contract with Ashwell Construction Co. Ltd. (the third defendant) for the removal of such asbestos: such contract also contained a covenant against assignment. Practical completion of the second contract took place in August 1985, and the cost was borne by Stock Conversion.

Meanwhile, on 1 April 1985 Stock Conversion assigned to Linden Gardens Trust Ltd. ("Linden Gardens") its leasehold interest in the third, fifth and sixth floors of the property, subject to a licence back under which Stock Conversion continued to occupy the third floor. In December 1986 Stock Conversion surrendered its licence of the third floor and assigned its leasehold interest in the fourth floor to Linden Gardens. It is not suggested that Stock Conversion received anything less than the full market value of its leasehold interest or that any

allowance was made in the price for the possibility that there might still be asbestos in the building.

This action was started on 3 July 1985 when Stock Conversion (which then still had an interest in the building) issued a writ against Lenesta Sludge as sole defendant.

Following the disposal by Stock Conversion of its whole interest in the property to Linden Gardens, on 14 January 1987 Stock Conversion executed a deed of assignment in favour of Linden Gardens. The deed of assignment recited that Stock Conversion had agreed with Linden Gardens to assign to them Stock Conversion's rights of action as pleaded in the High Court proceedings and incidental to the leasehold interest in the premises in consideration of oe1 and provided as follows:

"In pursuance of the said agreement and in consideration of the sum of One pound (oe1) (the receipt of which sum the assignors hereby acknowledge) the assignors hereby assign to the assignees, (a) all their rights of action as pleaded in the said proceedings or otherwise against Lenesta Sludge Disposal Ltd.; (b) all other rights of action currently vested in the assignors which are or were incidental to their leasehold in the said premises."

M. & H. did not, as was required by clause 17(1) of the building contract, consent to such assignment: it is this lack of consent which is the basis of the problems which arise.

In 1987 and 1988 yet more asbestos was found in the premises. Further work was undertaken to remove this asbestos, the cost of which was borne by Linden Gardens. It is not asserted that Stock Conversion is under any liability to Linden Gardens to bear any part of these costs.

By a series of amendments, the action has been reconstituted: Linden Gardens has been substituted for Stock Conversion as the plaintiff; Lenesta Sludge remains as first defendant; M. & H. have been joined as second defendant; Ashwell Construction is the third defendant.

In the action as now constituted, Linden Gardens, as assignee, claims damages for breach by each of the defendants of their respective building contracts. The crucial points to be noticed are these. First, Stock Conversion which was the only party in a direct contractual relationship with each of the defendants is not a party to the action. Second, the purported assignment of the benefit of the building contract by Stock Conversion to Linden Gardens was made without the consent of the defendants. Third, any breach of contract by M. & H. occurred before Stock Conversion parted with its interest in the premises. Fourth, since Stock Conversion obtained from Linden Gardens the full market price for its

[1994] 1 AC 85

interest in the premises on the assumption that the asbestos had been eradicated, Stock Conversion was not out of pocket by reason of the breaches save to the extent that it paid for the further works done in 1985.

The preliminary issues in this action were therefore directed to two questions. First, were Stock Conversion's rights under the contracts effectively assigned to Linden Gardens despite the fact that assignment of the building contracts by Stock Conversion was prohibited by the terms of those contracts? If so, second, could Linden Gardens as

assignee recover damages for the cost of removing the asbestos after the date of the assignment, which cost was incurred not by Stock Conversion but by Linden Gardens?

Judge John Loyd Q.C. held that the assignment to Linden Gardens was ineffective and that, in any event, Linden Gardens could not recover for the cost of work executed after the date of the assignment: (1990) 52 B.L.R. 93. The Court of Appeal (Nourse and Staughton L.JJ. and Sir Michael Kerr) (1992) 57 B.L.R. 57 reversed the judge on both points. The Court of Appeal held that the assignment was effective to transfer to Linden Gardens the causes of action for subsisting breaches of contract by M. & H. and Ashwell Construction and that the assignee could recover such damages as Stock Conversion could have recovered had there been no assignment. M. & H. appeal to this House. Ashwell Construction has not appealed.

The facts in the St. Martins case

In 1968 the first plaintiffs, St. Martins Property Corporation Ltd. ("Corporation") began to develop a site at King Street, Hammersmith, London. The development was to include shops, offices, and flats. On 17 May 1968, Corporation entered into a written agreement with the local authority whereby, upon completion of the development, Corporation would be entitled to the grant of a 150-year lease of the site.

On 29 October 1974 Corporation entered into a building contract with Sir Robert McAlpine and Sons Ltd. ("McAlpine") which incorporated the Joint Contracts Tribunal, Standard Form of Building Contract, Private Edition with Quantities, 1963 ed. (July 1972 rev.). Clause 17 of such contract was, for all practical purposes, in terms identical to those in clause 17 in the Linden Gardens case.

Corporation is a wholly owned subsidiary of St. Martins Holdings Ltd. which is itself wholly owned by the State of Kuwait. In the mid-1970s a scheme was implemented for tax reasons whereunder all the property interests of the State of Kuwait were to be vested in another wholly owned subsidiary of St. Martins Holdings Ltd., the second plaintiff, St. Martins Property Investments Ltd. ("Investments"). Pursuant to that scheme a deed of assignment dated 25 March 1976 was executed under which Corporation for full value assigned to Investments all Corporation's interests in the property under the agreement with the local authority of 17 May 1968. It further purported to assign to Investments:

"the full benefit of all the contracts and engagements whatsoever entered into by the assignor and existing at the date hereof for the construction of and completion of the development."

As in the Linden Gardens case, the consent of McAlpine's to the assignment of the benefit of the building contract was neither sought nor given. No notice of the assignment was given to McAlpine until 10 years later on 3 March 1986.

At the time of the assignment there were no subsisting relevant breaches of the building contract. In November 1976 Investments

appointed Corporation to be its agent to manage the property and the development. Practical completion of the works took place in 1980.

In 1981 part of the development, the podium deck, was found to be leaking. It is alleged that this is due to breaches of contract by McAlpine occurring after the date of assignment to Investment. Remedial works have been carried out at a cost of some oe800,000 plus VAT which, although originally paid by Corporation, has been recovered by Corporation from Investments.

In the action Corporation and Investments sue McAlpine for breach of contract. The following points should be noted. First, as in the Linden Gardenscase, no consent to the assignment was obtained. Second, unlike the Linden Gardens case the breaches of contract all took place after the date of the assignment, that is to say at a time when Corporation had no interest in the property. Third, unlike the Linden Gardenscase, the original contracting party, Corporation, is a party to the action and is claiming substantial damages notwithstanding that Corporation is not out of pocket as a result of the McAlpine breaches.

[1994] 1 AC 85

Therefore the main issues which arise in this case are first, whether notwithstanding clause 17 of the building contract the assignment to Investments was effective. Second, whether Corporation is entitled to substantial damages for breach of contract. Judge Bowsher Q.C. held that the assignment to Investments was ineffective and that Corporation was only entitled to nominal damages. The appeal to the Court of Appeal was heard at the same time as the appeal in the Linden Gardens case. The Court of Appeal held by a majority (Staughton L.J. dissenting) that the assignment was invalid, the case differing from the Linden Gardens case in that, at the date of the assignment, there were no accrued causes of action which could be assigned. However the Court of Appeal held unanimously that Corporation was entitled to substantial damages. McAlpine appeal and Investments cross-appeal to this House.

The issues

The two cases therefore raise, or potentially raise, the following issues. (1) Does clause 17(1) of the building contracts prohibit the purported assignment of the benefit of the building contracts? (2) Does clause 17(1) prohibit the assignment of causes of action for breaches of contract subsisting at the date of the assignments? (3) Is a prohibition on assignment void as being contrary to public policy? (4) Even if the assignments were validly prohibited, were they effective to vest causes of action in the assignees? (5) If so, what is the measure of damages recoverable by the assignees? (6) If the assignments are ineffective, can the original contracting party recover substantial damages?

I will deal with these issues in turn, save that on the view I take of the case issue (5) does not arise since the assignments were invalid and ineffective to vest any cause of action in the assignees.

(1) Does clause 17 prohibit the assignment of the benefit of building contracts?

Staughton L.J. (dissenting on this point) held that on its true construction clause 17 did not prohibit the assignment by the employer of the benefit

of the building contract. It was urged before your Lordships on behalf of Linden Gardens and Investments that his views were correct.

The argument runs as follows. On any basis, clause 17 is unhappily drafted in that it refers to an assignment of "the contract." It is trite law that it is, in any event, impossible to assign "the contract" as a whole, i.e. including both burden and benefit. The burden of a contract can never be assigned without the consent of the other party to the contract in which event such consent will give rise to a novation. Therefore one has to discover what the parties meant by this inelegant phrase. It is said that the intention of the parties in using the words "assign this contract" is demonstrated by clause 17(2) which prohibits both the assignment of the contract by the contractor without the employer's consent and the sub-letting of any portion of the works without the consent of the architect. In clause 17(2), the contractor is only expressly prevented from sub-letting "any portion of the works." Yet it must have been the party's intention to limit the contractor's rights to sublet the wholeof the works. Accordingly, the words in clause 17(2) "assign this contract" have to be read as meaning "sublet the whole of the works." If that is the meaning of the words "assign this contract" in clause 17(2) they must bear the same meaning in clause 17(1), which accordingly only prohibits the employer from giving substitute performance and does not prohibit the assignment of the benefit of the contract.

Like the majority of the Court of Appeal, I am unable to accept this argument. Although it is true that the phrase "assign this contract" is not strictly accurate, lawyers frequently use those words inaccurately to describe an assignment of the benefit of a contract since every lawyer knows that the burden of a contract cannot be assigned: see, for example, Nokes v. Doncaster Amalgamated Collieries Ltd. [1940] A.C. 1014, 1019-1020. The prohibition in clause 17(2) against subletting "any portion of the works" necessarily produces a prohibition against the subletting of the whole of the works: any subletting of the whole will necessarily include a subletting of a portion and is therefore prohibited. Therefore there is no ground for reading the words "assign this contract" in clause 17(1) as referring only to subletting the whole. Decisively, both clause 17(1) and (2) clearly distinguish between "assignment" and "subletting:" it is therefore impossible to read the word "assign" as meaning "sublet." Finally, I find it difficult to comprehend the concept of an employer "subletting" the performance of his contractual duties which consist primarily of providing access to the site and paying for the works.

Accordingly, in my view clause 17(1) of the contract prohibited the assignment by the employer of the benefit of the contract. This, by itself, is fatal to the claim by Investments (as assignee) in the St. Martinscase.

(2) Does clause 17(1) prohibit the assignment of accrued rights of action?

[1994] 1 AC 85

The majority in the Court of Appeal drew a distinction between an assignment of the right to require future performance of a contract by

the other party on the one hand and an assignment of the benefits arising under the contract (e.g. to receive payment due under it or to enforce accrued rights of action) on the other hand. They held that clause 17 only prohibited the assignment of the right to future performance and did not prohibit the assignment of the benefits arising under the contract, in particular accrued causes of action. Therefore, in the Linden Gardens case, where all the relevant breaches of contract by the contractors pre-dated the assignment, an assignment to Linden Gardens of the accrued rights of action for breach was not prohibited. In contrast, in the St. Martinscase, where all the breaches of contract occurred after the date of the assignment, the majority of the Court of Appeal held that it was a breach of clause 17 to seek to transfer the right to future performance.

This distinction between assigning the right to future performance of a contract and assigning the benefits arising under a contract was largely founded on a Note entitled "Inalienable Rights?" by Professor R. M. Goode (1979) 42 M.L.R. 553 on Helstan Securities Ltd. v. Hertfordshire County Council [1978] 3 All E.R. 262. In that case a contract contained a clause prohibiting the contractor from assigning the contract "or any benefit therein or thereunder." The contractors assigned to the plaintiffs the right to a liquidated sum of money then alleged to be due to the contractors under the contract. Croom-Johnson J. held that the plaintiffs, as assignees, could not sue the employers to recover the sum of money.

In his Note, Professor Goode rightly pointed out that where a contract between A and B prohibits assignment of contractual rights by A, the effect of such a prohibition is a question of the construction of the contract. There are at least four possible interpretations, viz., (1) that the term does not invalidate a purported assignment by A to C but gives rise only to a claim by B against A for damages for breach of the prohibition; (2) that the term precludes or invalidates any assignment by A to C (so as to entitle B to pay the debt to A) but not so as to preclude A from agreeing, as between himself and C, that he will account to C for what A receives from B: In re Turcan (1888) 40 Ch.D. 5; (3) that A is precluded not only from effectively assigning the contractual rights to C, but also from agreeing to account to C for the fruits of the contract when received by A from B; (4) that a purported assignment by A to C constitutes a repudiatory breach of condition entitling B not merely to refuse to pay C but also to refuse to pay A.

Professor Goode then expressed the view that construction (2) (being the Helstan case itself) was permissible and effective but that construction (3) to the extent that it purported to render void not only the assignment as between B and C but also as between A and C was contrary to law.

I am content to accept Professor Goode's classification and conclusions, though I am bound to say that I think cases within categories (1) and (4) are very unlikely to occur. But Professor Goode's classification provides no warrant for the view taken by the majority of the Court of Appeal in the present case: he does not discuss or envisage a case where a contractual prohibition against assignment is to be construed as prohibiting an assignment by A to C of rights of future performance but does not prohibit the assignment by A to C of "the

fruits of performance" e.g., accrued rights of action or debts. Professor Goode only draws a distinction between the assignment of rights to performance and the assignment of rights under the contract in two connections: first, in dealing with the effect of a prohibited assignment as between the assignor and the assignee (in categories (2) and (3)): secondly, in dealing with contracts for personal services. In the latter, he rightly points out that, although an author who has contracted to write a book for a fee cannot perform the contract by supplying a book written by a third party, if he writes the book himself he can assign the right to the fee - the fruits of performance. He expressly mentions that such right to assign the fruits of performance can be prohibited by the express terms of the contract.

However, although I do not think that Professor Goode's article throws any light on the true construction of clause 17, I accept that it is at least hypothetically possible that there might be a case in which the contractual prohibitory term is so expressed as to render invalid the assignment of rights to future performance but not so as to render invalid assignments of the fruits of performance. The question in each case must turn on the terms of the contract in question.

The question is to what extent does clause 17 on its true construction restrict rights of assignment which would otherwise exist? In the context of a complicated building contract, I find it impossible to construe clause 17 as prohibiting only the assignment of rights to future performance, leaving each party free to assign the fruits of the contract. The reason for including the contractual prohibition viewed from the contractor's point of view must be that the contractor wishes to ensure that he deals, and deals only, with the particular employer with whom he has chosen to enter into a contract. Building contracts are pregnant with disputes: some employers are much more reasonable than

[1994] 1 AC 85

others in dealing with such disputes. The disputes frequently arise in the context of the contractor suing for the price and being met by a claim for abatement of the price or cross-claims founded on an allegation that the performance of the contract has been defective. Say that, before the final instalment of the price has been paid, the employer has assigned the benefits under the contract to a third party, there being at the time existing rights of action for defective work. On the Court of Appeal's view, those rights of action would have vested in the assignee. Would the original employer be entitled to an abatement of the price, even though the cross-claims would be vested in the assignee? If so, would the assignee be a necessary party to any settlement or litigation of claims for defective work, thereby requiring the contractor to deal with two parties (one not of his choice) in order to recover the price for the works from the employer? I cannot believe that the parties ever intended to permit such a confused position to arise.

Again, say that before completion of the works the employers assigned the land, together with the existing causes of action against the contractor, to a third party and shortly thereafter the contractor committed a repudiatory breach? On the construction preferred by the Court of Appeal, the right to insist on further performance, being unassignable, would have remained with the original employers whereas

the other causes of action and the land would belong to the assignee. Who could decide whether to accept the repudiation, the assignor or the assignee?

These possibilities of confusion (and many others which could be postulated) persuade me that parties who have specifically contracted to prohibit the assignment of the contract cannot have intended to draw a distinction between the right to performance of the contract and the right to the fruits of the contract. In my view they cannot have contemplated a position in which the right to future performance and the right to benefits accrued under the contract should become vested in two separate people. I say again that that result could have been achieved by careful and intricate drafting, spelling out the parties' intentions if they had them. But in the absence of such a clearly expressed intention, it would be wrong to attribute such a perverse intention to the parties. In my judgment, clause 17 clearly prohibits the assignment of any benefit of or under the contract.

It follows that the purported assignment to Linden Gardens without the consent of the contractors constituted a breach of clause 17. The claim of Linden Gardens as assignee must therefore fail unless it can show that the prohibition in clause 17 was either void as being contrary to public policy or, notwithstanding the breach of clause 17, the assignment was effective to assign the chose in action to Linden Gardens.

(3) Is a prohibition on assignment void as being contrary to public policy?

It was submitted that it is normally unlawful as being contrary to public policy to seek to render property inalienable. Since contractual rights are a species of property, it is said that a prohibition against assigning such rights is void as being illegal.

This submission faces formidable difficulties both on authority and in principle. As to the authorities, in In re Turcan, 40 Ch.D. 5, a man effected an insurance policy which contained a term that it should not be assignable in any case whatever. He had previously covenanted with trustees to settle after-acquired property. The Court of Appeal held that although he could not assign the benefit of the policy so as to give the trustees the power to recover the money from the insurance company, he could validly make a declaration of trust of the proceeds which required him to hand over such proceeds to the trustees. This case proceeded, therefore, on the footing that the contractual restriction on assignment was valid. In Helstan Securities [1978] 3 All E.R. 262 Croom- Johnson J. enforced such a prohibition. In Reed Publishing Holdings Ltd. v. Kings Reach Investments Ltd. (unreported), 25 May 1983; Court of Appeal (Civil Division) Transcript No. 231 of 1983, the Court of Appeal had to consider an application to join as a party to an action an assignee of the benefit of a contract which contained a prohibition on such assignment. One of their grounds for refusing the application was that by reason of the prohibition the assignment was of no effect.

In none of these cases was the public policy argument advanced. But they indicate a long-term acceptance of the validity of such a prohibition which is accepted as part of the law in Chitty on Contracts, 26th ed. (1989), vol. 1, p. 883, para. 1413. We were referred to a decision of the

Supreme Court of South Africa, Paiges v. Van Ryn Gold Mines Estates Ltd., 1920 A.D. 600 in which it was expressly decided that a term prohibiting a workman from assigning his wages was not contrary to public policy. In Scotland a covenant against assigning a lease of minerals (which was treated simply as a contract) was held not to infringe public policy: Duke of Portland v. Baird and Co. (1865) 4 Macph. 10. We were referred to certain cases in the United States, but they give no unequivocal guidance.

[1994] 1 AC 85

In the face of this authority, the House is being invited to change the law by holding that such a prohibition is void as contrary to public policy. For myself I can see no good reason for so doing. Nothing was urged in argument as showing that such a prohibition was contrary to the public interest beyond the fact that such prohibition renders the chose in action inalienable. Certainly in the context of rights over land the law does not favour restrictions on alienability. But even in relation to land law a prohibition against the assignment of a lease is valid. We were not referred to any English case in which the courts have had to consider restrictions on the alienation of tangible personal property, probably because there are few cases in which there would be any desire to restrict such alienation. In the case of real property there is a defined and limited supply of the commodity, and it has been held contrary to public policy to restrict the free market. But no such reason can apply to contractual rights: there is no public need for a market in choses in action. A party to a building contract, as I have sought to explain, can have a genuine commercial interest in seeking to ensure that he is in contractual relations only with a person whom he has selected as the other party to the contract. In the circumstances, I can see no policy reason why a contractual prohibition on assignment of contractual rights should be held contrary to public policy.

To avoid doubt, I must make it clear that I have been considering only the validity of a restriction which prohibits assignments which have the effect of bringing the assignee into direct contractual relations with the other party to the contract. I have not been considering Professor Goode's category (3), i.e. an attempt by contractual term to prevent one party making over the fruits of the contract to a third party. Professor Goode expresses the view that if the prohibition seeks to prevent the assignor from binding himself to pay over such fruits to the assignee, such prohibition is pro tanto void. I express no view on that point.

(4) Are the assignments (although prohibited) effective to transfer the causes of action to the assignees?

It was submitted that, even though the assignments were in breach of clause 17, they were effective to vest the causes of action in the assignees, i.e. Professor Goode's category (1). This argument was founded on two bases: first, the decision in Tom Shaw and Co. v. Moss Empires Ltd.(1908) 25 T.L.R. 190; second, the fact that an assignment of a leasehold term in breach of a covenant against assignment is effective to vest the term in the assignee.

In the Tom Shaw case an actor, B., was engaged by Moss Empires under a contract which prohibited the assignment of his salary. B.

assigned 10 per cent. of his salary to his agent, Tom Shaw. Tom Shaw sued Moss Empires for 10 per cent. of the salary joining B. as second defendant. Moss Empires agreed to pay the 10 per cent. of the salary to Tom Shaw or B. as the court might decide i.e. in effect it interpleaded. Darling J. held, at p. 191, that the prohibition on assignment was ineffective: it could "no more operate to invalidate the assignment than it could to interfere with the laws of gravitation." He gave judgment for the plaintiffs against both B. and Moss Empires, ordering B. to pay the costs but making no order for costs against Moss Empires.

The case is inadequately reported and it is hard to discover exactly what it decides. Given that both B. and Moss Empires were parties and Moss Empires was in effect interpleading, it may be that the words I have quoted merely indicate that as between the assignor, B., and the assignee Tom Shaw, the prohibition contained in the contract between B. and Moss Empires could not invalidate B.'s liability to account to Tom Shaw for the moneys when received and that, since B. was a party, payment direct to Tom Shaw was ordered. This view is supported by the fact that no order for costs was made against Moss Empires. If this is the right view of the case, it is unexceptionable: a prohibition on assignment normally only invalidates the assignment as against the other party to the contract so as to prevent a transfer of the chose in action: in the absence of the clearest words it cannot operate to invalidate the contract as between the assignor and the assignee and even then it may be ineffective on the grounds of public policy. If on the other hand Darling J. purported to hold that the contractual prohibition was ineffective to prevent B.'s contractual rights against Moss Empires being transferred to Tom Shaw, it is inconsistent with authority and was wrongly decided.

In the Helstan Securities case [1978] 3 All E.R. 262 Croom-Johnson J. did not follow the Tom Shaw case and held that the purported assignment in breach of the contractual provision was ineffective to vest the cause of action in the assignee. That decision was followed and applied by the Court of Appeal in the Reed Publishing Holdings case, 25 May 1983: see also In re Turcan, 40 Ch.D. 5.

Therefore the existing authorities establish that an attempted assignment of contractual rights in breach of a contractual prohibition is ineffective to transfer such contractual rights. I regard the law as being satisfactorily settled in that sense. If the law were otherwise, it would defeat the legitimate commercial reason for inserting the contractual

[1994] 1 AC 85

prohibition, viz., to ensure that the original parties to the contract are not brought into direct contractual relations with third parties.

As to the analogy with leases, I was originally impressed by the fact that an assignment of the term in breach of covenant is effective to vest the term in the assignee: Williams v. Earle (1868) L.R. 3 Q.B. 739, 750; Old Grovebury Manor Farm Ltd. v. W. Seymour Plant Sales and Hire Ltd. (No. 2) [1979] 1 W.L.R. 1397. However, Mr. Kentridge in his reply satisfied me that the analogy is a false one. A lease is a hybrid, part contract, part property. So far as rights of alienation are concerned a lease has been treated as a species of property. Historically the law treated interests in land, both freehold and leasehold, as being capable

of disposition and looked askance at any attempt to render them inalienable. However, by the time of Coke covenants against the assignment of leases had been held to be good, because the lessor had a continuing interest in the identity of the person who was his tenant: Holdsworth, A History of English Law, 2nd ed., vol. III (1914), p. 85 and vol. VII (1937), p. 281. The law became settled that an assignment in breach of covenant gave rise to a forfeiture, but pending forfeiture the term was vested in the assignee. In contrast, the development of the law affecting the assignment of contractual rights was wholly different. It started from exactly the opposite position, viz., contractual rights were personal and not assignable. Only gradually did the law permitting assignment develop: Holdsworth, vol. VII, pp. 520-521 and 531 etc. It is therefore not surprising if the law applicable to assignment of contractual rights differs from that applicable to the assignment of leases.

Therefore in my judgment an assignment of contractual rights in breach of a prohibition against such assignment is ineffective to vest the contractual rights in the assignee. It follows that the claim by Linden Gardens fails and the Linden Garden action must be dismissed.

(5) What is the measure of damages recoverable by the assignee?

In view of my decision on the earlier issues, this issue does not arise for determination. I mention it only to explain that the Court of Appeal considered that the assignee was entitled to recover what the assignor could have recovered had there been no assignment. On that basis Staughton L.J. (who had held that the assignees in both actions could sue) had to consider what the assignors could have recovered.

(6) What is the measure of damages in the claim by Corporation?

McAlpine accept that, since the attempted assignment by Corporation of its rights under the contract to Investments was ineffective, Corporation has retained those rights and is entitled to judgment against McAlpine for any breach of contract. But, McAlpine submits, Corporation is only entitled to nominal damages. Corporation has suffered no loss: it had parted with its interest in the property (and therefore with the works when completed) before any breach of the building contract; moreover Corporation received full value for that interest on its disposal to Investments. Therefore, it is said, neither of the plaintiffs has any right to substantial damages: Investments has incurred damage (being the cost of rectifying the faulty work) but has no cause of action; Corporation has a cause of action but has suffered no loss. If this is right, in the words of my noble and learned friend, Lord Keith of Kinkel in G.U.S. Property Management Ltd. v. Littlewoods Mail Order Stores Ltd., 1982 S.L.T. 533, 538, "the claim to damages would disappear . . . into some legal black hole, so that the wrongdoer escaped scot-free."

The Court of Appeal was able to avoid this result by reason of the continuing liability on Corporation to indemnify Investments against the cost of remedying the defects. McAlpine accepted, and still accept, that Corporation is liable to Investments in damages for Corporation's breach

of contract in failing to obtain the consent of McAlpine to the assignment of the benefit of the building contract. The measure of the damages payable by Corporation to Investments for such breach would be the cost of remedying the defects since, if the assignment had been valid, Investments could have recovered such cost from McAlpine. Therefore, the Court of Appeal held, Corporation have suffered substantial loss by reason of McAlpine's breach, such loss being the liability to indemnify Investments.

Attractive as this argument is, Mr. Fernyhough for McAlpine has satisfied me that it is erroneous because the damage being claimed is too remote. The loss so identified as having been suffered by Corporation flows from the attempt by Corporation to assign the benefit of the building contract in breach of clause 17 of the contract. However the rule in Hadley v. Baxendale (1854) 9 Exch. 341 is formulated, in my judgment it is impossible to say that such damage arose naturally according to the usual course of things, or was in the contemplation of, or foreseeable by, McAlpine, or that McAlpine ought to have realised that such damage was "not unlikely." The contract for the breach of which

[1994] 1 AC 85

damages are sought expressly prohibited Corporation from making such assignment. One party to a contract cannot be liable for damages flowing from the doing of an act by the other party which the contract itself expressly forbids.

It is therefore necessary to consider Mr. Fernyhough's principle argument in some detail. He starts from the well known proposition that the measure of damages is generally

"that sum of money which will put the party who has been injured, or who has suffered, in the same position he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation:" per Lord Blackburn in Livingstone v. Rawyards Coal Co. (1880) 5 App.Cas. 25, 39.

Since, before the date of any breach of contract by McAlpine, Corporation had disposed of all its interest in the property on which the building works were carried out, Corporation has suffered no loss. Corporation received the full value of the property from Investments. The measure of damages for defective performance of a building contract is the diminution in value of the plaintiff's property, which diminution is usually properly reflected by the cost of carrying out the repairs necessary to effect reinstatement: East Ham Corporation v. Bernard Sunley & Sons Ltd.[1966] A.C. 406. Since at the date of breach Corporation did not own the property, Corporation suffered no loss by any diminution in its value nor could Corporation carry out any works of reinstatement. Therefore, it is said, Corporation has suffered no loss.

Mr. Fernyhough accepted that central to his argument is the fact that at the date of breach Corporation no longer owned the property. He distinguished the decision in Newton Abbot Development Co. Ltd. v. Stockman Bros. (1931) 47 T.L.R. 616 on that ground. In that case the plaintiffs, as developers, had contracted with the defendants as contractors for the construction of a number of houses. After completion of the works, the plaintiffs had sold the houses to individual purchasers at a

profit. Thereafter defects due to faulty construction by the defendants appeared in the houses. The plaintiffs, although under no legal liability to do so, had remedied these defects. They were held entitled to recover from the defendants not the cost of effecting the remedial work but the difference between the value of the houses as they ought to have been completed and their actual value as in fact completed. Mr. Fernyhough explains this case on the basis that, although in fact the plaintiff suffered no commercial loss, they were the owners of the houses at the date of breach and therefore entitled to the diminution in value of that property, the sale on by the plaintiffs being irrelevant as res inter alios acta. In support of the proposition that only nominal damages are recoverable by a plaintiff who has parted with ownership of the property at the date of breach, Mr. Fernyhough further relied on two cases concerned with breach of contract for the carriage of goods, The Albazero [1977] A.C. 774 and Obestain Inc. v. National Mineral Development Corporation Ltd. [1987] 1 Lloyd's Rep. 465.

This is a formidable, if unmeritorious, argument since it is apparently soundly based on principle and is supported by authority. In The Albazero the plaintiffs chartered the defendant's vessel for the carriage of oil. The carriage was covered by a bill of lading which named the plaintiffs as consignees. In the course of the voyage the vessel and cargo became a total loss. However on the day before that loss, the plaintiffs endorsed the bill of lading to a third party: the property in the goods and the right to sue the defendants were thereby vested in the third party. The plaintiffs, although having no property in the goods at the date of breach of the contract of carriage, sued the defendants for the full value of the goods. This House held that the plaintiffs were not entitled to substantial damages. Lord Diplock treated the general rule as being clear: a party who has no property in the goods at the date of breach has suffered no loss. However he recognised that there were exceptions to this general rule and I will consider those exceptions later.

Notwithstanding the apparent logic of Mr. Fernyhough's submission, I have considerable doubts whether it is correct. A contract for the supply of goods or of work, labour and materials (a supply contract) is not the same as a contract for the carriage of goods. A breach of a supply contract involves a failure to provide the very goods or services which the defendant had contracted to supply and for which the plaintiff has paid or agreed to pay. If the breach is discovered before payment of the contract price, the price is abated by the cost of making good the defects: see as to sale of goods Mondel v. Steel (1841) 8 M. & W. 858 and Sale of Goods Act 1979, section 53(1); as to building contracts Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd. [1974] A.C. 689. Mr. Fernyhough accepted that this right to abatement of the price does not depend on ownership by the plaintiff of the goods and it would be odd if the plaintiff's rights arising from breach varied according to whether the breach was discovered before or after the payment of the price. No such similar principle of abatement applies to freight charges: the freight charges have to be paid in full leaving the consignor to bring a separate action for damages for breach of the contract of carriage:

Colonial Bank v. European Grain and Shipping Ltd. [1989] A.C. 1056, 1067-1068.

[1994] 1 AC 85

In contracts for the sale of goods, the purchaser is entitled to damages for delivery of defective goods assessed by reference to the difference between the contract price and the market price of the defective goods, irrespective of whether he has managed to sell on the goods to a third party without loss: Slater v. Hoyle & Smith Ltd. [1920] 2 K.B. 11; see also as to non-delivery William Bros. v. Ed. T. Agius Ltd. [1914] A.C. 510. In those cases the judgments contained no consideration of the person in whom the property in the goods was vested although it appears that some of the subcontracts had been made prior to the breach of contract.

If the law were to be established that damages for breach of a supply contract were not quantifiable by reference to the beneficial ownership of goods or enjoyment of the services contracted for but by reference to the difference in value between that which was contracted for and that which is in fact supplied, it might also provide a satisfactory answer to the problems raised where a man contracts and pays for a supply to others, e.g., a man contracts with a restaurant for a meal for himself and his guests or with a travel company for a holiday for his family. It is apparently established that, if a defective meal or holiday is supplied, the contracting party can recover damages not only for his own bad meal or unhappy holiday but also for that of his guests or family: see Jackson v. Horizon Holidays Ltd. [1975] 1 W.L.R. 1468 as explained in Woodar Investment Development Ltd. v. Wimpey Construction U.K. Ltd. [1980] 1 W.L.R. 277, 283-284, 293-294, 297, 300-301.

There is therefore much to be said for drawing a distinction between cases where the ownership of goods or property is relevant to prove that the plaintiff has suffered loss through the breach of a contract other than a contract to supply those goods or property and the measure of damages in a supply contract where the contractual obligation itself requires the provision of those goods or services. I am reluctant to express a concluded view on this point since it may have profound effects on commercial contracts which effects were not fully explored in argument. In my view the point merits exposure to academic consideration before it is decided by this House. Nor do I find it necessary to decide the point since, on any view, the facts of this case bring it within the class of exceptions to the general rule to which Lord Diplock referred in The Albazero.

In The Albazero Lord Diplock said [1977] A.C. 774, 846:

"Nevertheless, although it is exceptional at common law that a plaintiff in an action for breach of contract, although he himself has not suffered any loss, should be entitled to recover damages on behalf of some third person who is not a party to the action for a loss which that third person has sustained, the notion that there may be circumstances in which he is entitled to do so was not entirely unfamiliar to the common law and particularly to that part of it which, under the influence of Lord Mansfield and his successors, Lord Ellenborough and Lord Tenterden, had been appropriated from the law merchant.

"I have already mentioned the right of the bailee, which has been recognised from the earliest period of our law, to sue in detinue or trespass for loss or damage to his bailor's goods although he cannot be compelled by his bailor to do so and he is not himself liable to the bailor for the loss or damage: The Winkfield [1902] P. 42. Nevertheless, he becomes accountable to his bailor for the proceeds of the judgment in an action by his bailor for money had and received. So too the doctrine of subrogation in the case of insurers, which was adopted from the law merchant by the common law in the eighteenth century, involved the concept of the nominal party to an action at common law suing for a loss which he had not himself sustained and being accountable to his insurer for the proceeds to the extent that he had been indemnified against the loss by the insurer. In this instance of a plaintiff being able to recover as damages for breach of contract for the benefit of a third person a loss which that person had sustained and he had not, the insurer is entitled to compel an assured to whom he has paid a total or partial indemnity to bring the action. A third example, once again in the field of mercantile law, is the right of an assured to recover in an action on a policy of insurance upon goods the full amount of loss or damage to them, on behalf of anyone who may be entitled to an interest in the goods at the time when the loss or damage occurs, provided that it appears from the terms of the policy that he intended to cover their interests."

In addition, the decision in The Albazero itself established a further exception. This House was concerned with the status of a long-established principle based on the decision in Dunlop v. Lambert (1839) 6 Cl. & F. 600 that a consignor of goods who had parted with the property in the goods before the date of breach could even so recover substantial damages for the failure to deliver the goods. Lord Diplock, identified, at p. 847, the rationale of that rule as being:

"The only way in which I find it possible to rationalise the rule in Dunlop v. Lambert so that it may fit into the pattern of the English law is to treat it as an application of the principle, accepted also in relation to policies of insurance upon goods, that in a commercial contract concerning goods where it is in the contemplation of the parties that the proprietary interests in the goods may be transferred from one owner to another after the contract has been entered into and before the breach which causes loss or damage to the goods, an original party to the contract, if such be the

[1994] 1 AC 85

intention of them both, is to be treated in law as having entered into the contract for the benefit of all persons who have or may acquire an interest in the goods before they are lost or damaged, and is entitled to recover by way of damages for breach of contract the actual loss sustained by those for whose benefit the contract is entered into."

In The Albazero it was held that the principle in Dunlop v. Lamberno longer applied to goods consigned under a bill of lading because both the property in the goods and the cause of action for breach of the contract of carriage passes to the consignee or endorsee by reason of the

consignment or endorsement; therefore, since the consignee or endorsee will in any event be entitled to enforce the contract direct there is no ground on which one can impute to the parties an intention that the consignor is entering into the contract for the benefit of others who will acquire the property in the goods but no right of action for breach of contract.

However, this House was careful to limit its decision to cases of carriage by sea under a bill of lading, leaving in force the principle in Dunlop v. Lambert in relation to other contracts for the carriage of goods where such automatic assignment of the rights of action for breach does not take place. Lord Diplock, after the passage referring to the exceptions which I have already quoted, said, at pp. 846-847:

"My Lords, in the light of these other exceptions, particularly in the field of mercantile law, to the general rule of English law that apart from nominal damages the plaintiff can only recover in an action for breach of contract the actual loss he has himself sustained, I do not think that the fact that the rule which is generally accepted was laid down by this House in Dunlop v. Lambert, 6 Cl. & F. 600 would add one more exception would justify your Lordships in declaring the rule to be no longer law. Nor do I think that the almost complete absence of reliance on the rule by litigants in actions between 1839 and 1962 provides a sufficient reason for abolishing it entirely. The development of the law of negligence since 1839 does not provide a complete substituted remedy for some types of loss caused by breach of a contract of carriage. Late delivery is the most obvious example of these. The Bills of Lading Act 1855 and the subsequent development of the doctrine laid down in Brandt v. Liverpool, Brazil and River Plate Steam Navigation Co. Ltd. [1924] 1 K.B. 575, have reduced the scope and utility of the rule in Dunlop v. Lambert. . . where goods are carried under a bill of lading. But the rule extends to all forms of carriage including carriage by sea itself where no bill of lading has been issued, and there may still be occasional cases in which the rule would provide a remedy where no other would be available to a person sustaining loss which under a rational legal system ought to be compensated by the person who has caused it. For my part, I am not persuaded that your Lordships ought to go out of your way to jettison the rule."

In my judgment the present case falls within the rationale of the exceptions to the general rule that a plaintiff can only recover damages for his own loss. The contract was for a large development of property which, to the knowledge of both Corporation and McAlpine, was going to be occupied, and possibly purchased, by third parties and not by Corporation itself. Therefore it could be foreseen that damage caused by a breach would cause loss to a later owner and not merely to the original contracting party, Corporation. As in contracts for the carriage of goods by land, there would be no automatic vesting in the occupier or owners of the property for the time being who sustained the loss of any right of suit against McAlpine. On the contrary, McAlpine had

specifically contracted that the rights of action under the building contract could not without McAlpine's consent be transferred to third parties who became owners or occupiers and might suffer loss. In such a case, it seems to me proper, as in the case of the carriage of goods by land, to treat the parties as having entered into the contract on the footing that Corporation would be entitled to enforce contractual rights for the benefit of those who suffered from defective performance but who, under the terms of the contract, could not acquire any right to hold McAlpine liable for breach. It is truly a case in which the rule provides "a remedy where no other would be available to a person sustaining loss which under a rational legal system ought to be compensated by the person who has caused it."

Mr. Fernyhough submitted that it would be wrong to distort the law in order to meet what he described as being an exceptional case. He said that this was a one-off or exceptional case since the development was sold before any breach of contract had occurred and there was an express contractual prohibition on assignment. He submitted that to give Corporation a right to substantial damages in this case would produce chaos when applied to other cases where the contractors have entered into direct warranties with the ultimate purchasers of the individual parts of a development. I am not impressed by these submissions. I am far from satisfied that this is a one off or exceptional case. We are concerned with standard forms of building contracts which prohibit the assignment of the benefit of building contracts to the ultimate purchasers. In the prolonged period of recession in the property market which this country has experienced many developments have had to be sold off before completion, thereby producing the risk that the

[1994] 1 AC 85

ownership of the property may have become divided from the right to sue on the building contract at a date before any breach occurs. As to the warranties given by contractors to subsequent purchasers, they will not, in my judgment, give rise to difficulty. If, pursuant to the terms of the original building contract, the contractors have undertaken liability to the ultimate purchasers to remedy defects appearing after they acquired the property, it is manifest the case will not fall within the rationale of Dunlop v. Lambert, 6 Cl. & F. 600. If the ultimate purchaser is given a direct cause of action against the contractor (as is the consignee or endorsee under a bill of lading) the case falls outside the rationale of the rule. The original building owner will not be entitled to recover damages for loss suffered by others who can themselves sue for such loss. I would therefore hold that Corporation is entitled to substantial damages for any breach by McAlpine of the building contract.

(7) The answer to the preliminary issues

Linden Gardens case

The preliminary issues directed were as follows:

"(1) Are the plaintiffs entitled by virtue of the deed of assignment pleaded at paragraph 1F. of the amended statement of claim to recover damages against the defendants in respect of the various causes of action and heads of loss pleaded (a) where the loss was

incurred by Stock Conversion prior to the said deed of assignment, (b) where the loss was incurred by the plaintiffs subsequent thereto? "(2) Were Stock Conversion precluded from lawfully assigning rights of action to the plaintiffs against second defendants by clause 17(1) of contract dated 19 July 1979 made between Stock Conversion and the second defendants? . . ."

Logically these questions should be posed in the opposite order. If, as I would hold, the benefit to the rights of action were not effectively assigned to Stock Conversion at all, there can be no question of the defendants being liable to Stock Conversion for any loss whenever the breach occurred. I would therefore answer question 2 "Yes" and question 1 "Does not arise."

I would accordingly allow this appeal with costs both here and below.

The St. Martins case

The issues in this case are rather more complex and I will so far as necessary explain each issue.

"1. Was the benefit of the contract dated 29 October 1974 between the first plaintiff (Corporation) and the defendant (McAlpine) validly assigned by the first plaintiff to the second plaintiff (Investments)?"

This is straightforward: the answer is "No."

"2. Was there an implied term in the deed of assignment dated 25 March 1976 and in the agency agreement dated 1976 and 1983 as pleaded in paragraph 7 and 7A of amended statement of claim?"

The statement of claim alleges that there were implied terms under which Corporation undertook to obtain McAlpine's consent to the assignment (paragraph 7) or to enforce the building contract for the benefit of Investments (paragraph 7A). Since these points would only be relevant if, contrary to my view, Corporation could claim damages by reference to obligations undertaken in the deed of assignment by Corporation to Investment, I would answer this issue "Does not arise."

"3. On the assumption that the matters pleaded in paragraph 8 of the statement of claim are correct then (a) Does the second plaintiff (Investments) have a valid claim against the defendants for damages, other than nominal damages, for breach of the contract dated 29 October 1974 as pleaded in paragraph 10 of the statement of claim? (b) Does the first plaintiff (Corporation) have a valid claim against the defendant for damages, other than nominal damages, for breach of the contract dated 29 October 1974 as pleaded in paragraph 11 of the statement of claim? (c) Does the first plaintiff (Corporation) have a valid claim for damages other than nominal damages for breach of the contract dated 29 October 1974 as pleaded in paragraph 12 of the statement of claim?"

Questions (a) and (b) are self-explanatory. I would answer them (a) "No" (b) "Yes." Question (c) raises the question whether Corporation can claim damages as constructive trustee for Investments or because of Corporation's liability to Investment under terms implied

[1994] 1 AC 85

in the deed of assignment. Since in my judgment Corporation is entitled to substantial damages in any event, I would answer question (c) "Does not arise," although, as I have explained, I would if necessary have answered it "No."

I would therefore dismiss the appeal by McAlpine and the cross-appeal by Investments, save that the order of the Court of Appeal be varied by substituting the answers to the issues which I have indicated.  McAlpine's must pay the costs of the appeal to this House and Investments the costs of its own cross-appeal.

## DISPOSITION:

Appeal in Linden Gardens case allowed with costs in House of Lords and below with interest on Court of Appeal costs from 14 February 1992.

Appeal and cross-appeal in St. Martins case dismissed with costs.

Costs on cross-appeal incurred by McAlpine to be paid by Investments.

## SOLICITORS:

Solicitors: Masons; Jaques & Lewis; Glovers; Stephenson Harwood.

A. R.

(c)2001 The Incorporated Council of Law Reporting for England & Wales