# **EXHIBIT 10**

1 of 2 DOCUMENTS

Medforth v Blake and others

COURT OF APPEAL (CIVIL DIVISION)

*[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [1999] 29*
*EG 119, [1999] 2 EGLR 75*

**HEARING-DATES:** 24, 26 May 1999

26 May 1999

**CATCHWORDS:**

Mortgage -- Receiver -- Receiver's duties to mortgagor -- Mortgagee appointing receivers over mortgaged property -- Receivers managing business carried on at mortgaged property -- Whether receivers owed mortgagor a duty of care in managing mortgaged business.

**HEADNOTE:**

M owned a pig-farming business which was financed by loans from a bank, secured by a charge over M's farm. The bank appointed receivers over the mortgaged property, and the latter managed the farm business under a power contained in the charge. M was dissatisfied with the management of the business, alleging in particular that the receivers had failed to obtain freely available discounts on feed. Accordingly, he commenced proceedings against the receivers, contending, inter alia, that they had owed him a duty of care in managing the farm business. On the trial of a preliminary issue, the receivers contended that they had owed M no duty beyond one of good faith. That contention was rejected by the judge who held that receivers owed mortgagors an equitable duty of care in managing a mortgaged business. The receivers appealed.

Held -- Where a receiver managed mortgaged property, his duties to the mortgagor and anyone else interested in the equity of redemption were not necessarily confined to a duty of good faith. Rather, in exercising his powers of management, the receiver owed a duty to manage the property with due diligence, subject to his primary duty of attempting to create a situation where the interest on the secured debt could be paid and the debt itself repaid. Thus although due diligence did not oblige the receiver to continue a business at the mortgaged property, it did require him to take reasonable steps to manage it profitably if he did choose to continue that business. Such a duty, like the duties owed by a mortgagee to the mortgagor, was imposed by equity. Accordingly, in the instant case the judge had been correct to hold that the receivers owed an equitable duty of care in managing the mortgaged business, and the appeal would be dismissed.

Re B Johnson & Co (Builders) Ltd [1955] 2 All ER 775, Downsview Nominees Ltd v First City Corp [1993] 3 All ER 626 and Yorkshire Bank plc v Hall [1999] 1 All ER 879 considered.

Per curiam. A receiver cannot be in breach of his duty of good faith to the mortgagor in the absence of some dishonesty, improper motive or element of bad faith.

**NOTES:**

For receivers of mortgaged property, see 32 Halsbury's Laws (4th edn) paras 742-748.

**CASES-REF-TO:**
China and South Sea Bank Ltd v Tan [1989] 3 All ER 839, [1990] 1 AC 536, [1990] 2 WLR 56, PC.

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

Cuckmere Brick Co Ltd v Mutual Finance Ltd [1971] 2 All ER 633, [1971] Ch 949, [1971] 2 WLR 1207, CA.
Donoghue (or M'Alister) v Stevenson [1932] AC 562, [1932] All ER Rep 1, HL.
Downsview Nominees Ltd v First City Corp [1993] 3 All ER 626, [1993] AC 295, [1993] 2 WLR 86, PC.
Gaskell v Gosling [1896] 1 QB 669, CA; rvsd [1897] AC 575, [1895-9] All ER Rep 300, HL.
Johnson (B) & Co (Builders) Ltd, Re [1955] 2 All ER 775, [1955] Ch 634, [1955] 3 WLR 269, CA.
Kennedy v de Trafford [1897] AC 180, [1895-9] All ER Rep 408, HL.
Knight v Lawrence [1993] BCLC 215.
McHugh (decd) v Union Bank of Canada [1913] AC 299, PC.
National Bank of Greece SA v Pinios Shipping Co No 1, The Maira [1990] 1 All ER 78, [1990] 1 AC 637, [1989] 3 WLR 1330, HL.
Tomlin v Luce (1890) 43 Ch D 191, CA.
Tse Kwong Lam v Wong Chit Sen [1983] 3 All ER 54, [1983] 1 WLR 1349, PC.
Yorkshire Bank plc v Hall [1999] 1 All ER 879, CA.

**CASES-CITED:**
AIB Finance Ltd v Debtors [1998] 2 All ER 929, CA.
American Express International Banking Corp v Hurley [1985] 3 All ER 564.
Bolam v Friern Hospital Management Committee [1957] 2 All ER 118, [1957] 1 WLR 582.
Caparo Industries plc v Dickman [1990] 1 All ER 568, [1990] 2 AC 605, HL.
Cook v Thomas (1876) 24 WR 427.
Farrar v Farrars Ltd (1888) 40 Ch D 395, CA.
Gomba Holdings v Homan [1986] 3 All ER 94, [1986] 1 WLR 1301.
Hedley Byrne & Co Ltd v Heller & Partners Ltd [1963] 2 All ER 575, [1964] AC 465, HL.
Henderson v Merrett Syndicates Ltd, Hallam-Eames v Merrett Syndicates Ltd, Hughes v Merrett Syndicates Ltd, Arbuthnott v Feltrim Underwriting Agencies Ltd, Deeny v Gooda Walker Ltd (in liq) [1994] 3 All ER 506, [1995] 2 AC 145, HL.
Hughes v Williams (1806) 12 Ves Jun 493, 33 ER 187.
Huish v Ellis [1995] BCC 462.
Marriott v Anchor Reversionary Co (1861) 3 De GF & J 177, 45 ER 846.
Morgan v Lloyds Bank plc [1998] CA Transcript 399.
National Bank of Australia v United Hand in Hand and Band of Hope Co (1879) 4 App Cas 391, PC.
Nye Saunders & Partners (a firm) v Alan E Bristow (1987) 37 BLR 92, CA.
Palk v Mortgage Services Funding plc [1993] 2 All ER 481, [1993] Ch 330, CA.
Palmer v Barclays Bank Ltd (1972) 23 P & CR 32.
Parker-Tweedale v Dunbar Bank plc (No 1) [1990] 2 All ER 577, [1991] Ch 12, CA.
Potter's Oils Ltd, Re [1986] 1 All ER 890, [1986] 1 WLR 201.
Price (RA) Securities v Henderson [1989] 2 NZLR 257, NZ CA.
Quarrell v Beckford (1816) 1 Madd 269, 56 ER 100.
R v Board of Trade, ex p St Martin Preserving Co Ltd [1964] 2 All ER 561, [1965] 1 QB 603, DC.
R v Campbell [1997] 1 Cr App Rep 199, CA.
R v Parker [1997] Crim LR 760, CA.
Reliance Permanent Building Society v Harwood-Stamper [1944] 2 All ER 75, [1944] Ch 362.
Rich (Marc) & Co AG v Bishop Rock Marine Co Ltd, The Nicholas H [1995] 3 All ER 307, [1996] AC 211, HL.
Shamji v Johnson Matthey Bankers Ltd, Johnson Matthey Bankers Ltd v Shamji, Johnson Matthey Bankers Ltd v Arya Holdings Ltd [1991] BCLC 36, CA.
Standard Chartered Bank Ltd v Walker [1982] 3 All ER 938, [1982] 1 WLR 1410, CA.
Warner v Jacob (1882) 20 Ch D 220.
Williams v Natural Life Health Foods Ltd [1998] 2 All ER 577, [1998] 1 WLR 830, HL.
Wolff v Vanderzee (1869) 20 LT 350.

**INTRODUCTION:**

    The second and third defendants, James Kenneth Reese Jones and Michael Hore, the receivers of property charged to Midland Bank plc by the plaintiff mortgagor, Douglas Medforth, appealed from the decision of Judge McGonigal on 20 November 1998, sitting as a judge of the High Court in the Queen's Bench Division, whereby, on the trial of a preliminary issue, he held, inter alia, that the receivers had owed Mr Medforth an equitable duty of care in exercising

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

their power of management over a pig-farming business carried on at the mortgaged property. The first defendant, James Peter Blake, had also been a receiver of the mortgaged property, but died before the appeal. The facts are set out in the judgment of Sir Richard Scott V-C.

**COUNSEL:**

P Smith QC and L Anderson for the appellants; P Hamlin and T Watkin for Mr Medforth.

**JUDGMENT-READ:**

Cur adv vult 26 May 1999. The following judgments were delivered.

**PANEL:** SIR RICHARD SCOTT V-C, SWINTON THOMAS, TUCKEY LJJ

**JUDGMENTBY-1:** SIR RICHARD SCOTT V-C

**JUDGMENT-1:**

SIR RICHARD SCOTT V-C: The issue on this appeal is whether a receiver and manager of a pig-farm, appointed by a mortgagee, owes any duty to the mortgagor, over and above a duty of good faith, as to the manner in which he conducts the pig farming business. The appeal is from the judgment of Judge McGonigal given on 20 November 1998 on a preliminary issue.

The proprietor of the pig-farming business is Mr Medforth, plaintiff in the action and respondent in this court. The judge described Mr Medforth as 'a pig farmer on a very large scale'. In April 1982 Mr Medforth had 2,000 sows which, by February 1984, had increased to 3,000 sows. He had also 120 boars and 11,000 weaners, or thereabouts. In 1985 the turnover of the business was over £ 2m. These figures demonstrate the scale of the business.

In order to finance this business, Mr Medforth had borrowing arrangements with his bankers, Midland Bank plc. His borrowings were secured by two agricultural charges, both dated 13 July 1982, and made under the provisions of the Agricultural Credits Act 1928. One was to secure his current account overdraft; the other was to secure his indebtedness on a loan account. They were in identical terms.

Each charge entitled the bank to appoint receivers of the property subject to the charge and provided that the receivers should have power, inter alia:

'(a) To take possession of collect and get in any property hereby charged . . . (b) to carry on manage or concur in carrying on and managing the business of the Farmer and . . . to raise or borrow any money that may be required upon the security of the whole or any part of the property hereby charged; (c) to sell or concur in selling all or any of the property hereby charged . . . (g) to do any such other acts and things as may be considered to be incidental or conducive to any of the matters or powers aforesaid and which he or they lawfully may or can do as Agent for the Farmer.'

Each charge provided also that --

'any Receiver or Receivers so appointed shall be deemed to be the Agent of the Farmer and the Farmer shall be solely responsible for his or their acts or defaults and for his or their remuneration.'

By February 1984 Mr Medforth's indebtedness to the bank exceeded £ 800,000. The bank, on 21 February 1984, appointed Mr Blake and Mr Jones, partners in Robson Rhodes, chartered accountants, 'to be the Receivers of all the property comprised in the said Charge(s) with all the powers conferred on a Receiver thereby.' The appointments expressly said that 'the Receivers shall be the Agents of the Farmer who alone shall be responsible for their acts and defaults.'

On 1 May 1987, following Mr Blake's retirement, another Robson Rhodes partner, Mr Hore, was appointed receiver in his place. Mr Blake has since died. The defendants named in the title to these proceedings are Mr Blake, Mr Jones and Mr Hore. The action against Mr Blake has presumably abated, but nothing turns on that. They, or, more accurately, Mr Jones and Mr Hore are the appellants on this appeal.

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

After their appointment the receivers exercised their power to carry on the farming business. Their accounts for the period 22 February 1984 to 30 April 1985 showed a net profit of £ 251,836. That profit was applied in reduction of Mr Medforth's secured overdraft. The next trading year appears to have been less successful. A net loss was incurred. The secured overdraft was reduced to £ 23,896 but the receivers' own overdraft rose to £ 106,498.

A very substantial element in the trading costs consisted of the cost of feed for the pigs. In the first accounting period sales of pigs produced £ 2,473,171 and, out of the total cost of sales of £ 1,359,513, the cost of feed stuff comprised £ 1,193,919.

In September 1988, by which time Mr Medforth's secured indebtedness to the bank was £ 537,944-odd, the bank entered into new financial arrangements with him under which the secured indebtedness was repaid. The receivers were then discharged.

Mr Medforth was dissatisfied with the manner in which the receivers had carried on the farming business. He had a number of complaints, of which only one remains relevant. His complaints led to the commencement of proceedings in February 1990. The one remaining issue relates to the arrangements made by the receivers for the purchase of feed for the pigs.

The receivers, as Mr Medforth had done when he had been running the pig farm, purchased their supplies mainly from two sources. One was the BOCM group of companies, in particular, United Agricultural Merchants Ltd; the other was Dalgety Agriculture Ltd (Dalgety). As to this, Mr Medforth's pleaded case included the following allegations: (i) that BOCM and Dalgety offered, or were willing to allow, discounts to large-scale purchasers such as the receivers; (ii) that Mr Medforth had, prior to the appointment of the receivers, bought pig feed from BOCM and Dalgety to a value of between £ 10,000 and £ 15,000 a week, upon which weekly discounts of about £ 1,000 a week had been allowed; (iii) that the receivers purchased pig feed exclusively from BOCM and Dalgety; (iv) that the obtaining of discounts from feed suppliers was normal commercial practice and, in any event, that Mr Medforth had frequently reminded the receivers of the availability and importance of discounts; and (v) that the receivers had made no attempt to obtain any discount from either BOCM or Dalgety until early 1988.

The amended statement of claim alleged that, in conducting the farm business, the receivers had owed Mr Medforth a duty of care and that their failure to request or obtain the discounts was a breach of that duty. In the alternative, if the receivers' only duty to Mr Medforth was a duty of good faith, it was accepted that the receivers' failure to do anything about the discounts was not a result of any deceit or of any conscious or deliberate impropriety, but nonetheless it was alleged that the failure was a breach of that duty.

The receivers, in their amended defence, contended that they owed Mr Medforth only a duty to exercise their powers in good faith and denied that their failure to do anything about the discounts constituted a breach of that duty.

The pleadings dealt also with Mr Medforth's other complaints against the receivers but, as I have said, each of those has, for one reason or the other, fallen by the wayside and I need not complicate this judgment by referring to them.

The trial of the action was due to start in September 1998 but the parties asked for the issue whether the receivers owed Mr Medforth a duty of care or simply a duty of good faith in their conduct of the pig farming business to be dealt with as a preliminary issue. They asked that the trial date be vacated and that the trial be relisted after the court had dealt with the appeal from the judge's decision on the preliminary issue. An appeal on the issue was apparently regarded as inevitable. The judge agreed to the request and expedited the hearing of the preliminary issue.

The formulation of the preliminary issue was:

'Assuming that the Plaintiff can prove the facts pleaded in the Amended Statement of Claim and Reply: (1) Did the Defendants in the course of the receivership of the Plaintiff's farm owe to the Plaintiff only a duty of good faith when -- (a) exercising their powers of sale; and/or (b) exercising their powers of managing the business; and/or (c) otherwise acting (if there is such a case) in the factual circumstances alleged in the Amended Statement of Claim and Reply? (2) If the Defendants owed only a duty of good faith in cases (a) and/or (b) above (and (c) if appropriate), what is the nature and meaning of good faith in those cases? (3) If the Defendants' duties in cases (a) and/or (b) (and (c) if appropriate) are not limited to good faith, did the Defendants owe to the Plaintiff in those cases where it is not so limited a duty of care (whether in equity or at common law) and what is the standard and scope of such duty in the factual circumstances alleged in the Amended Statement of Claim and Reply?'

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

In a judgment running to some 60 pages and containing a careful analysis of the relevant cases, the judge expressed the following conclusions on the preliminary issue: (i) that the receivers, when exercising their power of sale, owed Mr Medforth, over and above a duty of good faith, an equitable duty of care; (ii) that the standard of that duty of care was the standard of a reasonably competent receiver; (iii) that no sensible distinction could be drawn between the exercise of a power of sale and the exercise of a power to manage a business, that the power to manage was ancillary to the power of sale and that the equitable duty of care was applicable to both.

These conclusions answered paras (1) and (3) of the preliminary issue and made para (2) irrelevant. But the judge dealt with para (2) none the less. He held that if the evidence showed that the receivers acted in a wholly unreasonable way in failing to seek discounts, the failure would be a breach of their duty of good faith.

In their notice of appeal the receivers contend that the answers that ought to be given to the questions posed by the preliminary issues are:

'(1) The Defendants . . . owed to the Plaintiff the following duties: (a) a duty when exercising their power of sale to take reasonable steps to obtain a reasonable price for the property to be sold; (b) a duty when exercising their powers of managing the business to act only in good faith; (c) a duty when otherwise acting (if there is such a case) only to act in good faith in the factual circumstances alleged in the Amended Statement of Claim and Reply. (2) The nature or meaning of good faith in the context of the Defendants' duties to the Plaintiff means that fraud or deliberate or wilful misconduct is required to constitute a breach of the duty. (3) The standard and scope of the duty at (a) above . . . is irrelevant because the Defendants were not exercising their power of sale'.

Mr Peter Smith QC, counsel for the receivers, has, in some very interesting submissions both in written form and orally, made a sustained attack on the proposition that a receiver of mortgaged property owes to the mortgagor any duty other than a duty of good faith. He accepts, of course, that this court, in Cuckmere Brick Co Ltd v Mutual Finance Ltd [1971] 2 All ER 633, [1971] Ch 949 held that a mortgagee, when exercising his power of sale, owes a duty to the mortgagor to take reasonable care to obtain a proper price. He reserves the right, however, to contend in a higher court that the Cuckmere case was wrongly decided. In any event, he argued, the rule ought to be applied only to mortgagees and ought not to be applied to receivers. Provided there was no lack of good faith, a receiver who sold mortgaged property at a price lower than that which reasonable steps to obtain a proper price would have achieved had, it was submitted, no liability to the mortgagor.

Mr Smith accepted, too, that a mortgagee in possession would be accountable to the mortgagor on a footing of wilful default -- that is to say the mortgagee must be treated as having received sums that he would have received if he had managed the property with due diligence. The facts pleaded regarding the receivers' failure to obtain discounts on the price of the pig feed disclose, I would think, a failure to manage the business with due diligence. So, if the failure had been that of a mortgagee in possession, the mortgagee would be accountable for the lost discounts. But Mr Smith insists that if the failure is that of a receiver managing the mortgaged business, the receiver has no liability to the mortgagor in the absence of a lack of good faith.

Mr Smith did accept that a receiver managing the mortgaged business might well owe a duty of care to the mortgagee who had appointed him. If a receiver's failure to manage the business with due diligence has led to an insufficiency of assets to meet the secured debt, the failure might represent a breach of that duty and expose the receiver to an action in damages by the mortgagee. But, if there is a sufficiency of assets, the failure will have caused the mortgagee no loss. The loss will have been suffered by the mortgagor. Unlike the mortgagee, however, and provided the receiver has acted in good faith, the mortgagor will have no remedy against the receiver.

The proposition that, in managing and carrying on the mortgaged business, the receiver owes the mortgagor no duty other than that of good faith offends, in my opinion, commercial sense. The receiver is not obliged to carry on the business. He can decide not to do so. He can decide to close it down. In taking these decisions he is entitled, and perhaps bound, to have regard to the interests of the mortgagee in obtaining repayment of the secured debt. Provided he acts in good faith, he is entitled to sacrifice the interests of the mortgagor in pursuit of that end. But if he does decide to carry on the business why should he not be expected to do so with reasonable competence? The present case, if the pleaded facts are established, involves the failure of the receivers to obtain discounts that were freely available. Other glaring examples of managerial incompetence can be imagined. Suppose, the receivers had decided to carry on the business but had decided, through incompetence and not for any dishonest reason, that the pigs need not be fed or watered more than once a week, and, as a result, a number of pigs had died. The receivers would, I suppose, be in trouble with the Royal Society for the Prevention of Cruelty to Animals but, if Mr Smith is right, although they might be liable to the mortgagee they would have no liability to the mortgagor. Or suppose, that, as may well be the case, it is

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

common practice to inoculate weaners against diseases to which pigs are prone but the receivers decided to save money by dispensing with inoculations, with the result that a number of the weaners contracted disease and died and that the rest had to be slaughtered. If Mr Smith is right, the receivers would have no liability to the mortgagor whose business they had, by incompetence, ruined. It is accepted that, if the mortgagee had gone into possession and carried on the business similarly incompetently, the mortgagee would have been accountable to the mortgagor for the loss caused to the mortgagor by the incompetence. But, it is submitted, not so the receivers.

Mr Smith has sought to justify this proposition both by reference to the historical origin of receiverships and by reference to authority.

As to historical origin, the position prior to Lord Cranworth's Act (23 & 24 Vict c 145), enacted in 1860, was that a mortgagee had no power to appoint a receiver unless he had expressly stipulated for it in the mortgage. If he did appoint a receiver, not having stipulated for any power to do so, the receiver was the mortgagee's agent and, in taking possession of the mortgaged property, rendered the mortgagee, his principal, liable to account to the mortgagor on the footing of wilful default. Mortgagees, in order to avoid the disadvantages of becoming mortgagees in possession, began to insist on a contractual provision requiring the mortgagor to appoint a receiver at the request of the mortgagee, with the receiver being directed to apply the income of the mortgaged property in paying the interest on the secured debt and any surplus to the mortgagor. All directions given to and powers conferred on the receiver were, in form if not in substance, given and conferred by the mortgagor whose agent the receiver became. This practice was given statutory recognition, first in the 1860 Act (ss 11 and 17 to 23) and, later, in the Conveyancing Act 1881 (s 24). The relevant statutory provisions are now contained in s 109 of the Law of Property Act 1925 (see generally the explanation given by Rigby LJ in Gaskell v Gosling [1896] 1 QB 669 in his dissenting judgment later upheld in the House of Lords ([1897] AC 575, [1895-9] All ER Rep 300)).

Mr Smith pointed out that the main reason for the development of the system under which the receiver is appointed by the mortgagee but is treated none the less as the agent of the mortgagor, is to enable the mortgagee to avoid becoming a mortgagee in possession while enjoying the advantages of his nominee, the receiver, displacing the mortgagor from control of the mortgaged property and from the receipt of the income derived from it. He argued that if the receiver is held to owe obligations to the mortgagor that go beyond duties of good faith, the advantages intended to be derived by mortgagees from the receivership system will be undermined. They will be undermined, he said, because if the receiver is held to owe the mortgagor the same sort of obligations as a mortgagee in possession would owe, there will be no advantage to the mortgagee in avoiding being a mortgagee in possession. I am unable to accept these arguments.

If receivers who decide to carry on a mortgaged business do owe a duty to the mortgagor to do so with reasonable competence, I do not follow how that could adversely affect the mortgagee. If the receivers are in breach of that duty they will be answerable to the mortgagor. Mr Smith suggested that the mortgagee would then have to indemnify the receivers. Why should they do so? If a mortgagee, on appointing a receiver, has undertaken to indemnify the receiver against any claims for default made against the receiver by the mortgagor, that undertaking might have to be honoured. But, if mortgagees choose to give indemnities to guard receivers against the consequences of the receivers' defaults, that is their affair. It is no reason at all for contending that the system of receivership is being undermined. In any event, Mr Smith accepted that a failure on the part of a receiver to show reasonable competence in his management of the mortgaged property would probably constitute a breach of a duty owed by the receiver to the mortgagee who had appointed him. A mortgagee would hardly be likely to give a contractual undertaking to indemnify a receiver against the consequences of conduct which constituted a breach of the receiver's duty to the mortgagee.

Mr Smith argued that the mortgagee might have given instructions to the receiver as to the manner in which the receiver should manage the business that was to be carried on. He argued that an action by the mortgagor based upon a complaint that the receiver had been managing the business in that manner would entitle the receiver to look to the mortgagee for an indemnity. It is difficult to deal with a submission of this sort otherwise than by reference to particular facts. A mortgagee who has appointed a receiver has no general right to instruct the receiver as to how or when to exercise the powers that have been conferred on the receiver. The mortgagee retains his own powers as mortgagee. He does not, for example, lose his power to sell by appointing a receiver with a power of sale. The receiver, on appointment, exercises his powers as agent for the mortgagor. Paragraphs 3(g) and (h) of the agricultural charges in the present case so provide. So does s 109(2) of the 1925 Act. If a mortgagee establishes a relationship with the receiver he has appointed under which the receiver exercises his powers in accordance with instructions given by the mortgagee, I can see the force of an argument that if the receiver is liable to the mortgagor then so will the mortgagee be liable. But this begs the question whether or not it is right that the receiver should be liable to the mortgagor. Take the present case

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

as an example. Suppose that the reason why the receivers had done nothing to obtain the freely available discounts was that the Midland Bank, the mortgagee, had instructed them not to do so. The proposition that the law should refrain from holding the receivers liable to the mortgagor because to do so would lead to liability being imposed also on the mortgagee and that that would, in effect, be treating the mortgagee as a mortgagee in possession does not seem to me to make any sense. I agree that, on the supposed facts, if the receivers were liable to the mortgagor, the mortgagee would be liable too. And why not? If the mortgagee chooses to instruct the receivers to carry on the business in a manner that is a breach of the receivers' duty to the mortgagor, it seems to me quite right that the mortgagee, as well as the receivers, should incur liability. This conclusion does not in the least undermine the receivership system. What it might do is to promote caution on the part of mortgagees in seeking to direct receivers as to the manner in which they (the receivers) should exercise their powers. I would regard that as salutary.

For these reasons, Mr Smith's reliance on the history of receiverships as justifying the exoneration of receivers from any duty to mortgagors other than that of good faith, falls, so far as I am concerned, on stony ground.

Let me now turn to the three authorities on which Mr Smith particularly relied. They were Re B Johnson & Co (Builders) Ltd [1955] 2 All ER 775, [1955] Ch 634, Downsview Nominees Ltd v First City Corp [1993] 3 All ER 626, [1993] AC 295 and Yorkshire Bank plc v Hall [1999] 1 All ER 879.

Re B Johnson & Co (Builders) Ltd was a decision of the Court of Appeal. The issue was whether a receiver and manager, who had been appointed under a debenture, was an 'officer' of the company for the purposes of s 333(1) of the Companies Act 1948. A second issue, assuming that the receiver/manager was an 'officer', was whether a case of misfeasance had been disclosed. On the first issue the court held that the receiver/manager was not an 'officer' for s 333 purposes. The court dealt, also, with the second issue although its finding on the first issue had made that unnecessary.

In dealing with the first issue, Evershed MR emphasised that the receiver/manager --

'is not managing on the company's behalf but is managing in order to facilitate the exercise by him, for the mortgagees, of the mortgagees' power to enforce the security.' (See [1955] 2 All ER 775 at 780, [1955] Ch 634 at 646.)

It is I think, important, whenever considering the exercise by receivers of their powers, to bear in mind the point made by Evershed MR. The receivers' main function is to assist the mortgagee in obtaining payment of the secured debt. Evershed MR commented ([1955] 2 All ER 775 at 780, [1955] Ch 634 at 647):

'. . . it is elementary that a mortgagee seeking to realise his security has no duty of care to see that there is as much as possible left over for those who are interested in what is called the "equity".'

This statement of principle has been qualified, but not invalidated, by Cuckmere Brick Co Ltd v Mutual Finance Ltd [1971] 2 All ER 633, [1971] Ch 949, a case to which I will return. On the second point, Evershed MR analysed the pleaded complaints against the receiver/manager as constituting no more than 'charges of mere negligence' (see [1955] 2 All ER 775 at 784, [1955] Ch 634 at 652). A case of mere negligence could not, he held, be prosecuted under s 333.

Both Jenkins and Parker LJJ agreed with Evershed MR that the receiver/manager was not an 'officer' for s 333 purposes. Jenkins LJ, in doing so, made remarks about the nature of a receiver/manager's duty on which Mr Smith relies. After stating that 'the primary duty of the receiver is to the debenture-holders and not to the company', Jenkins LJ continued:

'The whole purpose of the receiver and manager's appointment would obviously be stultified if the company could claim that a receiver and manager owes it any duty comparable to the duty owed to a company by its own directors or managers . . . He is under no obligation to carry on the company's business at the expense of the debenture-holders. Therefore he commits no breach of duty to the company by refusing to do so, even though his discontinuance of the business may be detrimental from the company's point of view. Again, his power of sale is, in effect, that of a mortgagee, and he therefore commits no breach of duty to the company by a bona fide sale, even though he might have obtained a higher price and even though, from the point of view of the company, as distinct from the debenture-holders, the terms might be regarded as disadvantageous. In a word, in the absence of fraud or mala fides (of which there is not the faintest suggestion here), the company cannot complain of any act or omission of the receiver and manager, provided that he does nothing that he is not empowered to do, and omits nothing that he is enjoined to do by the terms of his appointment. If the company conceives that it has any claim against the receiver and manager for breach of some duty owed by him to the company, the issue is not whether the receiver and manager has done or omitted to do anything which it would be wrongful in a manager of a company to do or omit, but whether he has exceeded or abused or wrongfully omitted to use the special powers and discretions vested in him pursuant to the contract of loan constituted

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

by the debenture for the special purpose of enabling the assets comprised in the debenture-holders' security to be preserved and realised. That seems to me to be an issue wholly outside the scope of s 333.' (See [1955] 2 All ER 775 at 790-791, [1955] Ch 634 at 661-663.)

This was not a reserved judgment and it is important to be clear about the object of Jenkins LJ's remarks. He was distinguishing the duties of a receiver/manager from those of a director/manager in order to explain why s 333 applied only to the latter. Mr Smith is, however, entitled to point to the sentence commencing 'In a word, in the absence of fraud or mala fides . . .' as supporting his submissions.

Downsview Nominees Ltd v First City Corp [1993] 3 All ER 626, [1993] AC 295 was a Privy Council decision on an appeal from the Court of Appeal of New Zealand. The judgment of the board was given by Lord Templeman. He made clear his view that such duty as a receiver/manager owed to the mortgagor was, like the duty owed by the mortgagee, a duty imposed by equity. It was not a duty in tort. It was not attributable to the application of the Donoghue (or M'Alister) v Stevenson 'neighbour' principle (see [1932] AC 562, [1932] All ER Rep 1). This was important because the first instance judge, Gault J, had held that 'the proposition that a receiver will not be liable in negligence so long as he acts honestly and in good faith no longer represents the law of New Zealand . . . a receiver owes a duty to the debenture holders to take reasonable care in dealing with the assets of the company' and the Court of Appeal had held that 'if there were any duties on the part of the . . . receiver to a subsequent debenture holder, they would have to be based in negligence' (see [1993] 3 All ER 626 at 633, [1993] AC 295 at 310). Lord Templeman did not disagree that the receiver owed duties to the subsequent debenture holder but insisted that they were duties arising in equity and were not common law duties of care. In the result, Gault J's monetary award against the receiver and in favour of the subsequent debenture holder was upheld, but placed on a different jurisprudential basis.

Lord Templeman cited with approval the passage from Jenkins LJ's judgment in Re B Johnson & Co (Builders) Ltd that I have cited and said ([1993] 3 All ER 626 at 637, [1993] AC 295 at 315):

'The general duty of care said to be owed by a mortgagee to subsequent incumbrancers and the mortgagor in negligence is inconsistent with the right of the mortgagee and the duties which the courts applying equitable principles have imposed on the mortgagee. If a mortgagee enters into possession he is liable to account for rent on the basis of wilful default; he must keep mortgage premises in repair; he is liable for waste. Those duties were imposed to ensure that a mortgagee is diligent in discharging his mortgage and returning the property to the mortgagor. If a mortgagee exercises his power of sale in good faith for the purpose of protecting his security, he is not liable to the mortgagor even though he might have obtained a higher price and even though the terms might be regarded as disadvantageous to the mortgagor. Cuckmere Brick Co Ltd v Mutual Finance Ltd [1971] 2 All ER 633, [1971] Ch 949 is Court of Appeal authority for the proposition that, if the mortgagee decides to sell, he must take reasonable care to obtain a proper price but is no authority for any wider proposition. A receiver exercising his power of sale also owes the same specific duties as the mortgagee. But that apart, the general duty of a receiver and manager appointed by a debenture holder, as defined by Jenkins LJ in Re B Johnson & Co (Builders) Ltd [1955] 2 All ER 775 at 790-791, [1955] Ch 634 at 661-663, leaves no room for the imposition of a general duty to use reasonable care in dealing with the assets of the company. The duties imposed by equity on a mortgagee and on a receiver and manager would be quite unnecessary if there existed a general duty in negligence to take reasonable care in the exercise of powers and to take reasonable care in dealing with the assets of the mortgagor company.'

As a Privy Council case, the Downsview Nominees case is not binding but, as Mr Smith submitted, is a persuasive authority of great weight. But what did it decide as to the duties owed by a receiver/manager to a mortgagor? It decided that the duty lies in equity, not in tort. It decided that there is no general duty of care in negligence. It held that the receiver/manager owes the same specific duties when exercising the power of sale as are owed by a mortgagee when exercising the power of sale. Lord Templeman cited with approval the Cuckmere Brick case test, namely that the mortgagee must take reasonable care to obtain a proper price. So, a receiver/manager when selling must take reasonable care to obtain a proper price. In so deciding, Lord Templeman departed from the proposition to be found in Jenkins LJ's judgment in the Johnson case.

In Yorkshire Bank plc v Hall [1999] 1 All ER 879 at 893 Robert Walker LJ reviewed a mortgagee's duty to his mortgagor. He referred to China and South Sea Bank Ltd v Tan [1989] 3 All ER 839, [1990] 1 AC 536, National Bank of Greece SA v Pinios Shipping Co No 1, The Maira [1990] 1 All ER 78, [1990] 1 AC 637 and the Downsview Nominees case and then said:

'Those cases together establish or reaffirm that a mortgagee's duty to the mortgagor or to a surety depend partly on the express terms on which the transaction was agreed and partly on duties (some general and some particular) which

equity imposes for the protection of the mortgagor and the surety. The mortgagee's duty is not a duty imposed under the tort of negligence, nor are contractual duties to be implied. The general duty (owed both to subsequent incumbrancers and to the mortgagor) is for the mortgagee to use his powers only for proper purposes and to act in good faith . . . The specific duties arise if the mortgagee exercises his express or statutory powers . . . If he exercises his power to take possession, he becomes liable to account on a strict basis (which is why mortgagees and debenture holders operate by appointing receivers whenever they can). If he exercises his power of sale, he must take reasonable care to obtain a proper price'.

These remarks apply, in my view, equally to the exercise by a receiver of a receiver's powers.

The Cuckmere Brick test can impose liability on a mortgagee notwithstanding the absence of fraud or mala fides. It follows from the Downsview Nominees case and Yorkshire Bank plc v Hall that a receiver/manager who sells but fails to take reasonable care to obtain a proper price may incur liability notwithstanding the absence of fraud of mala fides. Why should the approach be any different if what is under review is not the conduct of a sale but conduct in carrying on a business? If a receiver exercises this power, why does not a specific duty, corresponding to the duty to take reasonable steps to obtain a proper price, arise? If the business is being carried on by a mortgagee, the mortgagee will be liable, as a mortgagee in possession, for loss caused by his failure to do so with due diligence. Why should not the receiver/manager, who, as Lord Templeman held, owes the same specific duties as the mortgagee when selling, owe comparable specific duties when conducting the mortgaged business? It may be that the particularly onerous duties constructed by courts of equity for mortgagees in possession would not be appropriate to apply to a receiver. But, no duties at all save a duty of good faith? That does not seem to me to make commercial sense nor, more important, to correspond with the principles expressed in the bulk of the authorities.

In the Cuckmere Brick case [1971] 2 All ER 633 at 646, [1971] Ch 949 at 969 the Court of Appeal held that a mortgagee when exercising his power of sale owed a duty to the mortgagor 'to take reasonable precaution to obtain the true market value of the mortgaged property at the date on which he decides to sell it'. This is firmly established now as a duty in equity.

In Tse Kwong Lam v Wong Chit Sen [1983] 3 All ER 54 at 60, [1983] 1 WLR 1349 at 1356, a Privy Council decision on an appeal from the Court of Appeal of Hong Kong, the board held that a sale by a mortgagee to a company in which the mortgagee was interested 'can only be supported if the mortgagee proves that he took reasonable precautions to obtain the best price reasonably obtainable at the time of sale'. The same, applying what Lord Templeman said in the Downsview Nominees case about specific duties, would apply to a receiver. This is not consistent with the notion that a receiver owes only a duty of good faith.

In Tomlin v Luce (1890) 43 Ch D 191 the Court of Appeal held a mortgagee liable to second mortgagees for any loss occasioned by the insertion in auction particulars of a misstatement. Cotton LJ (at 194) said that 'the first mortgagees are answerable for any loss which was occasioned by the blunder made by their auctioneer at the sale'. A receiver in similar circumstances would similarly have been liable.

Knight v Lawrence [1993] BCLC 215 was a case in which a receiver of mortgaged properties which were tenanted failed to serve on the tenants the notices which were necessary to put in motion rent review procedures. As a result the opportunity to obtain increases in the rent was lost. The mortgagor successfully sued the receiver in negligence. It is, I think, now established that the mortgagor ought to have sued on a duty of care owed in equity rather than on a tortious duty of care. But the distinction is an immaterial one. The extent of the duty of care, whether in equity or at common law, depends on all the circumstances of the case. What standard of conduct in all the circumstances does the law require of the receiver in managing the mortgaged properties? Browne-Wilkinson V-C held that the circumstances imposed on the receiver a duty of care in regard to the service of the rent review notices. There can be no doubt but that if a mortgagee in possession had failed to serve the notices he would have been accountable to the mortgagor for the loss caused by the default. Browne-Wilkinson V-C said this about the receiver:

'In my judgment [the receiver] had a total misapprehension about the functions of a receiver. He regarded himself as being there to do what he was told by his appointor . . . provided he discharged what they told him to do he had discharged his functions. He was, in his own eyes, nothing but a rent collector. That, to my mind, is an unhappy misapprehension of the functions of a receiver . . . it is one of the first functions of a receiver in a case like this to get solicitors or others to review the position of the rent review clauses, and to take such steps as are necessary to ensure that the reviews take place.' (See [1993] BCLC 215 at 223.)

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

There is, in my judgment, no difficulty whatever in regarding the passage I have cited as expressing correctly the duty imposed by equity on the receiver in the circumstances in which the receiver found himself. The duty was, in my opinion, owed both to the mortgagee and to the mortgagor. Each had an interest in the value of the mortgaged property being safeguarded by the service of the rent review notices.

McHugh (decd) v Union Bank of Canada [1913] AC 299 concerned a chattel mortgage of a herd of horses on a ranch about 55 miles from Calgary. The mortgagee bank took possession of the horses and drove them to Calgary for sale. But they were driven so hurriedly, without being allowed sufficient time to feed, that they lost condition and some of them died. On the taking of the mortgage account the mortgagor sought to charge the mortgagee with damages for his negligent want of care of the horses. The trial judge found negligence proved and assessed the damages to be allowed to the mortgagor in the mortgage account. The Privy Council upheld his decision. There was no suggestion of fraud or mala fides. Suppose a receiver had been appointed and the receiver had managed the drive to Calgary in the same way as the mortgagee had done and with the same result. Mr Smith's submissions would excuse the receiver from any liability for his negligence.

Mr Smith has submitted that to hold a receiver liable to the mortgagor for anything more than a breach of a duty of good faith would require a number of established authorities on the law of mortgages to be torn up and thrown away. He instanced Kennedy v de Trafford [1897] AC 180, [1895-9] All ER Rep 408. This was a case where the mortgagors were two tenants in common. The mortgagees, in exercise of their power of sale, sold to one of the two. The trustee in bankruptcy of the other tenant in common applied to the court to have the sale set aside. He claimed, alternatively, damages against the mortgagees for negligence in the exercise of the power of sale. The report of the case in the House of Lords shows that the trustee's main complaint was that the purchaser from the mortgagees had been one of the two mortgagor tenants in common. It was argued that this individual stood in a fiduciary relationship to his co-tenant and was disqualified from purchasing. It was argued, also, that the sale had been at an undervalue. The House of Lords dealt with the case peremptorily. Counsel for the respondents was not called on. Judgment was delivered at once. Lord Herschell, in rejecting the argument based on sale at an undervalue said:

'. . . if a mortgagee in exercising his power of sale exercises it in good faith, without any intention of dealing unfairly by his mortgagor, it would be very difficult indeed, if not impossible, to establish that he had been guilty of any breach of duty towards the mortgagor. Lindley L.J., in the Court below, says that "it is not right or proper or legal for him either fraudulently or wilfully or recklessly to sacrifice the property of the mortgagor." Well, I think that is all covered really by his exercising the power committed to him in good faith. It is very difficult to define exhaustively all that would be included in the words "good faith", but I think it would be unreasonable to require the mortgagee to do more than exercise his power of sale in that fashion. Of course, if he wilfully and recklessly deals with the property in such a manner that the interests of the mortgagor are sacrificed, I should say that he had not been exercising his power of sale in good faith. My Lords, it is not necessary in this case to give an exhaustive definition of the duties of a mortgagee to a mortgagor, because it appears to me that, if you were to accept the definition of them for which the appellant contends, namely, that the mortgagee is bound to take reasonable precautions in the exercise of his power of sale, as well as to act in good faith, still in this case he did take reasonable precautions.' (See [1897] AC 180 at 185, [1895-9] All ER Rep 408 at 411.)

The other members of the House agreed.

Mr Smith submits that the Cuckmere Brick case is inconsistent with Lord Herschell's statements of principle in Kennedy v de Trafford. He reserves the right to contend in a higher court that the Cuckmere Brick case was wrongly decided. In my judgment, Kennedy v de Trafford did not lay down as an inflexible principle that the only duty owed by a mortgagee when selling was a duty of good faith. Lord Herschell's remarks about the difficulty of proving any breach of duty in a case where no want of good faith could be alleged show that he was leaving open the possibility of a case where, on the facts, that difficulty could be overcome.

Moreover, in my view, it is inappropriate to treat expressions of principle delivered ex tempore, by no matter how august a judge, as if they were of statutory effect. One of the great virtues of the common law duty of care is its inherent flexibility and its scope for development and adjustment in order to meet the changing requirements of society. Principles of equity, we were all taught, were introduced by Lord Chancellors and their deputies, the Vice-Chancellors sitting in the Chancery Courts, in order to provide relief from the inflexibility of common law rules. The equity of redemption was a Chancery invention, introduced in order to ensure that a conveyance by way of mortgage remained a security for the repayment of money whether or not the date fixed for repayment and reconveyance had passed. The duties imposed on a mortgagee in possession, and on a mortgagee exercising his powers whether or not in possession,

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

were introduced in order to ensure that a mortgagee dealt fairly and equitably with the mortgagor. The duties of a receiver towards the mortgagor have the same origin. They are duties in equity imposed in order to ensure that a receiver, while discharging his duties to manage the property with a view to repayment of the secured debt, nonetheless in doing so takes account of the interests of the mortgagor and others interested in the mortgaged property. These duties are not inflexible. What a mortgagee or a receiver must do to discharge them depends upon the particular facts of the particular case. A want of good faith or the exercise of powers for an improper motive will always suffice to establish a breach of duty. What else may suffice will depend upon the facts. Tse Kwong Lam v Wong Chit Sen [1983] 3 All ER 54, [1983] 1 WLR 1349 is a very good example. The fact that the mortgagee had an interest in the purchasing company placed the mortgagee under an obligation to show that a proper price had been obtained. This was an obligation more onerous than would otherwise have been required. It is true that Lord Herschell in Kennedy v de Trafford expressed the duty on the mortgagee in terms much less onerous than the terms in which Salmon LJ expressed the duty in the Cuckmere Brick case. That does not make the two cases inconsistent with one another. The facts that constituted the mortgagors' complaints were different. And the duty in equity appropriate to have been owed by a mortgagee selling in 1888 is not necessarily of the same weight as the duty appropriate to have been owed by a mortgagee selling in 1967. Equity is at least as flexible as the common law in adjusting the duties owed so as to make them fit the requirements of the time.

I do not accept that there is any difference between the answer that would be given by the common law to the question what duties are owed by a receiver managing a mortgaged property to those interested in the equity of redemption and the answer that would be given by equity to that question. I do not, for my part, think it matters one jot whether the duty is expressed as a common law duty or as a duty in equity. The result is the same. The origin of the receiver's duty, like the mortgagee's duty, lies, however, in equity and we might as well continue to refer to it as a duty in equity.

In my judgment, in principle and on the authorities, the following propositions can be stated.

(1) A receiver managing mortgaged property owes duties to the mortgagor and anyone else with an interest in the equity of redemption.

(2) The duties include, but are not necessarily confined to, a duty of good faith.

(3) The extent and scope of any duty additional to that of good faith will depend on the facts and circumstances of the particular case.

(4) In exercising his powers of management the primary duty of the receiver is to try and bring about a situation in which interest on the secured debt can be paid and the debt itself repaid.

(5) Subject to that primary duty, the receiver owes a duty to manage the property with due diligence.

(6) Due diligence does not oblige the receiver to continue to carry on a business on the mortgaged premises previously carried on by the mortgagor.

(7) If the receiver does carry on a business on the mortgaged premises, due diligence requires reasonable steps to be taken in order to try to do so profitably.

In my judgment, Judge McGonigal's answers to the preliminary issue were, with one or two minor qualifications, in accordance with principle and correct. The minor qualifications are as follows.

(i) The judge held that a receiver's power to manage a business was ancillary to the power of sale. I do not think it is. I would agree that in many cases, a receiver will manage a business in order to bring the mortgaged property to a state in which the business can then be sold as a going concern. But the power to manage is, in my view, independent of the power to sell. A receiver can manage a business for the purpose of generating profits from which the secured debt can be discharged. The management of the business does not have to be ancillary to an intended eventual sale. But I agree that in the management of the business an equitable duty of care is owed.

(ii) I do not think that the concept of good faith should be diluted by treating it as capable of being breached by conduct that is not dishonest or otherwise tainted by bad faith. It is sometimes said that recklessness is equivalent to intent. Shutting one's eyes deliberately to the consequences of what one is doing may make it impossible to deny an intention to bring about those consequences. Thereapart, however, the concepts of negligence on the one hand and fraud or bad faith on the other ought, in my view, to be kept strictly apart. Equity has not always done so. The equitable doctrine of 'fraud on a power' has little, if anything, to do with fraud. Lord Herschell in Kennedy v de Trafford [1897]

[2000] Ch 86, [1999] 3 All ER 97, [1999] 3 WLR 922, [1999] 2 BCLC 317, [

AC 180, [1895-9] All ER Rep 408 gave an explanation of a lack of good faith that would have allowed conduct that was grossly negligent to have qualified notwithstanding that the consequences of the conduct were not intended. In my judgment, the breach of a duty of good faith should, in this area as in all others, require some dishonesty or improper motive, some element of bad faith, to be established.

Finally, although I am not sure that it is strictly an answer to a question posed by the preliminary issue, in my judgment the facts pleaded in the amended statement of claim and reply would, if proved, and in the absence of any answer pleaded in the amended defence other than denial, constitute a breach by the receivers of the duty they owed in equity to Mr Medforth.

I would dismiss this appeal.

**JUDGMENTBY-2:** SWINTON THOMAS LJ

**JUDGMENT-2:**

SWINTON THOMAS LJ: I agree with judgment of Sir Richard Scott V-C.

**JUDGMENTBY-3:** TUCKEY LJ

**JUDGMENT-3:**

TUCKEY LJ: I also agree.

**DISPOSITION:**

Appeal dismissed. Leave to appeal to the House of Lords refused.

**SOLICITORS:**

Dibb Lupton Alsop, Leeds; Drivers, York.

# EXHIBIT 11

LEXSEE 2002 U.S. DIST. LEXIS 4096

### NATIONAL GRANGE MUTUAL INSURANCE CO., Plaintiff v. SHARP EQUIPMENT CO. OF READING and KOREY BLANCK, Defendants; SHARP EQUIPMENT CO. OF READING and KOREY BLANCK, Plaintiffs v. NATIONAL GRANGE MUTUAL INSURANCE CO., Defendant

### Civil Action No. 01-0628, Civil Action No. 01-1184

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### *2002 U.S. Dist. LEXIS 4096; 52 Fed. R. Serv. 3d (Callaghan) 579*

### March 1, 2002, Decided
### March 4, 2002, Filed; March 5, 2002, Entered

**PRIOR HISTORY:** [*1] Adopting Magistrate's Document of January 24, 2002, Reported at: *2002 U.S. Dist. LEXIS 6217.*

**DISPOSITION:** Magistrate's Report and Recommendation was approved and adopted. Defendants Sharp Equipment Co. of Reading's and KoreyBlanck's Objections were denied and overruled. Plaintiff's Supplemental Motion for Sanctions was granted. Defendants Equipment Co. of Reading's and Korey Blanck's Cross-Motion for Sanctions was granted. All counterclaims alleging breach of contract and bad faith, if any, in the case National Grange Mutual Insurance Co. v. Sharp Equipment Co. of Reading and Korey Blanck (No. 01-0628) were dismissed with prejudice. Sharp Equipment Co. of Reading and Korey Blanck v. National Grange Mutual Insurance Co. (No. 01-1184) was dismissed and closed.

### CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff insurance company sought a declaratory judgment that defendants, an equipment company and its president, failed to comply with the terms of an insurance policy. In a separate but consolidated action defendants sued plaintiffs alleging a breach of contract and bad faith. Defendants objected to the magistrate judge's recommendation granting the insurance company's motion for sanctions resulting in dismissal of defendant's case.

**OVERVIEW:** The insurance company filed its action seeking a declaration that defendants failed to comply with the terms of the policy by not cooperating in the adjustments of its loss claims and by not providing requested documentation. The discovery between entailed great delays, motions to compel, and court-imposed sanctions. In addition, the president's conduct during his deposition testimony was deliberately outrageous. He refused to answer questions based on the kind of chair he was sitting in, and engaged in multiple delay tactics in direct violation of a court order. After review of the deposition video, the court found the president's uncooperative, combative, and untruthful behavior supported the magistrate's recommendation. The record showed that the insurance company and its counsel acted fairly and in good faith at all times during the discovery period. For example, they kept a calm and polite demeanor throughout the president's deposition.

**OUTCOME:** The magistrate judge's recommendation was approved. Defendant's case was dismissed with prejudice and all the counterclaims in the insurance company's case alleging breach of contract or bad faith were dismissed with prejudice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Magistrates > Pretrial Orders*
[HN1] Pursuant to *28 U.S.C.S. § 636*(b)(1)(B), a magistrate judge may issue proposed findings, of fact

2002 U.S. Dist. LEXIS 4096, *; 52 Fed. R. Serv. 3d (Callaghan) 579

and recommendations on case-dispositive motions such as a motion for involuntary dismissal. After a timely objection, a district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of a magistrate's judge's disposition to which specific written objection has been made. *Fed. R. Civ. P. 72(b)*. A district judge need conduct a new hearing only in his discretion or where required by law. U.S. Dist. Ct., E.D. Pa., R. 72.1.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN2] See *Fed. R. Civ. P. 37(b)(2)*.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN3] *Fed. R. Civ. P. 37* should not be construed to authorize dismissal of a complaint because of a petitioner's noncompliance with a pretrial production order when it is established that failure to comply is due to inability, and not willfulness, bad faith, or any fault of the petitioner.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN4] In the context of a sanction, dismissal is a drastic remedy and it should be reserved for those cases where there is a clear record of delay or contumacious conduct by a plaintiff. There are six factors to be examined to determine whether a trial court has abused its wide discretion in dismissing a case. (1) the extent of a party's personal responsibility; (2) the prejudice to an adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of a party or an attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of all of alternative sanctions; and (6) The meritoriousness of the claim or defense. A trial court does not have to examine all of the factors to warrant a dismissal.

**COUNSEL:** For NATIONAL GRANGE MUTUAL INSURANCE COMPANY, PLAINTIFF (01-CV-0628, 01-CV-1184): MICHAEL R. NELSON, NELSON, LEVINE, DELUCA AND HORST, LLC, CHESTER F. DARLINGTON, BLUE BELL, PA USA.

For SHARP EQUIPMENT COMPANY OF READING PA, KOREY BLANCK, DEFENDANTS (01-CV-0628, 01-CV-1184): MICHAEL J. FIORILLO, FIORILLO LAW OFFICES, TREMONT, PA USA.

For MICHAEL LAZARCHICK, MOVANT (01-CV-0628, 01-CV-1184): DOLORES M. TROIANI, TROIANI/KIVITZ, L.L.P., DEVON, PA USA.

**JUDGES:** Franklin S. Van Antwerpen, U.S.D.J.

**OPINIONBY:** Franklin S. Van Antwerpen

**OPINION:**

### MEMORANDUM AND ORDER

**March 1, 2002**

#### 1. Introduction

We have referred discovery issues in these cases to a magistrate judge. Before the Court are written objections to Magistrate Judge Arnold C. Rapoport's Report and Recommendation of January 24, 2002, recommending that we should deny Sharp Equipment Co. of Reading's ("Sharp Equipment") and Korey Blanck's cross-motion for sanctions and grant National Grange Mutual Insurance Company's ("National Grange") motion for sanctions, resulting in the dismissal of the Sharp Equipment v. National Grange (No. 01-1184) case and the counterclaims alleging breach of contract and bad faith, if any, in [*2] the National Grange v. Sharp Equipment (No. 01-0628) case. Sharp Equipment and Korey Blanck, the president and sole shareholder of Sharp Equipment, filed objections on February 2, 2002.

For the reasons stated below, after a hearing and presentation of oral argument on February 14, 2002 and conducting a complete de novo review, the Magistrate Judge's Report and Recommendation will be Approved and Adopted. We find there have been repeated, prejudicial, and wilful delays in document discovery, answering interrogatories, and Mr. Blanck's depositions. As sanctions for this, the case of Sharp Equipment v. National Grange (No. 01-1184) will be dismissed with prejudice and the all counterclaims in the case National Grange v. Sharp Equipment (No. 01-0628) alleging breach of contract or bad faith, if any, will be dismissed with prejudice.

#### 2. Procedural History

National Grange filed a declaratory judgment action against Sharp Equipment and Mr. Blanck, Sharp Equipment's president and sole shareholder, on February 7, 2001, seeking a declaration that Sharp Equipment and Mr. Blanck failed to comply with the terms of an insurance policy by not cooperating in the adjustments [*3] of its loss claims and by not providing requested documentation and not sitting for an examination under oath. On March 13, 2001, National Grange removed to this Court a two-count Complaint (No. 01-1184) alleging breach of contract and bad faith filed on our about February 16, 2001 in the Court of Common Pleas of Berks County, Pennsylvania by Sharp Equipment and Mr. Blanck. These cases were consolidated on June 5, 2001 under the action captioned National Grange v. Sharp Equipment and Korey Blanck, No. 01-628. n1

2002 U.S. Dist. LEXIS 4096, *; 52 Fed. R. Serv. 3d (Callaghan) 579

n1 The factual background of this case arose out of three claims of loss submitted by Sharp Equipment to its general business insurer, National Grange.

On or about December 10, 1999, in the process of demolishing a second story structure at Sharp Equipment's Reading, Pennsylvania facility, rain invaded an uncovered structure, causing damage to the building and Sharp Equipment's inventory.

On August 24, 2000, Sharp Equipment submitted a claim to National Grange for an alleged theft at Sharp Equipment.

Less than one month later, Sharp Equipment reported a third loss to National Grange for a bathtub overflow of a third floor tenant in the building owned by Sharp Equipment.

While both parties allege a breach of the terms of the insurance policy and a bad-faith failure to cooperate in the assessment of these three losses, we have not factored in any pre-litigation conduct in our evaluation of the cross-motions for sanctions presently before the Court.

[*4]

## 1. Discovery Between National Grange and Sharp Equipment

On March 26, 2001, we issued an order referring all discovery problems to Magistrate Judge Arnold C. Rapoport. On April 3, 2001, National Grange served it Rule 26 Initial Disclosures on Sharp Equipment and Mr. Blanck. On April 10, 2001, National Grange served its first set of Interrogatories and Requests for Production of Documents on Sharp Equipment. On April 18, 2001 and May 9, 2001, counsel for National Grange wrote to Sharp Equipment's counsel regarding non-receipt of the disclosures. National Grange then filed a May 21, 2001 Motion to Compel production of responses. A May 25, 2001 letter from Sharp Equipment's counsel explained that the delay in sending these responses was due to the need to obtain a report and related documents from Sharp Equipment's accountant. On May 30, 2001, Sharp Equipment provided responses to the Requests for Admissions and some documents, but no formal responses were provided for the Interrogatories or the Requests for Production. Sharp Equipment agreed to produce the remaining information on May 31, 2001. National Grange therefore withdrew its Motion to Compel and cancelled the scheduled [*5] teleconference

with the Court. On June 1, 2001, Sharp Equipment served its Initial Disclosures on National Grange.

Cooperation was not forthcoming from Sharp Equipment, and accordingly National Grange filed another Motion to Compel on June 4, 2001, seeking responses to the original Interrogatories and Requests for Production of Documents. On June 6, 2001, Sharp Equipment's attorney provided the excuse that his office had received two sets of Interrogatories (one set for Sharp Equipment and one set for Korey Blanck) and, under the mistaken belief that they were duplicates, did not send the Interrogatories on behalf of Sharp Equipment. Counsel further claimed that Interrogatories had been forwarded to Sharp Equipment, but Mr. Blanck was on vacation. He also indicated that the responses had been received in his office, were being typed, and would be forwarded to counsel for National Grange.

On June 12, 2001, a teleconference was held with Magistrate Judge Rapoport regarding the pending Motion to Compel. Magistrate Judge Rapoport ordered Sharp Equipment to respond to the Interrogatories and Requests for Production on or before June 20, 2001. On June 21, 2001, Sharp Equipment's attorney [*6] again wrote to National Grange's attorney, stating that he was in possession of five boxes of materials which would be forwarded shortly after review and copying. n2 National Grange's attorney wrote two letters, on June 26 and July 7, 2001 regarding the status of these boxed documents and requesting further information on when these materials would be forwarded. Neither Sharp Equipment nor its attorney responded to the letters, and on July 12, 2001, National Grange filed a Motion for Sanctions against Sharp Equipment for its failure to comply with the Magistrate Judge Rapoport's June 12 Order. In response, Sharp Equipment's counsel claimed that he brought the requested information to a deposition on July 10, 2001 but that counsel for National Grange never arrived at the deposition because of car trouble. He also received the Motion for Sanctions on July 12, 2001 and immediately advised National Grange's attorney that he was forced to send the documents via United Parcel Service.

n2 Counsel for Sharp Equipment stated that the office manager was out on maternity leave and that she was solely responsible for the files. At oral argument before us on February 14, 2002, counsel for Sharp Equipment and Mr. Blanck stated that the office manager was out sick. Counsel for National Grange asserted that this excuse of the office manager being sick had never been mentioned before.

Case 1:05-cv-00259-KAJ   Document 13-5   Filed 06/17/2005   Page 18 of 28

Page 4
2002 U.S. Dist. LEXIS 4096, *; 52 Fed. R. Serv. 3d (Callaghan) 579

Whether this statement about the office manager's pregnancy, maternity, or illness is truthful is irrelevant. Mr. Blanck has maintained that Sharp Equipment has had no employees since at least 1992 and that this office manager was an independent contractor who only worked part time. In light of these assertions, we see no reason why Sharp Equipment could not at least bring in another independent contractor to help with discovery compliance.

[*7]

Another teleconference was held on July 23, 2001 with Magistrate Judge Rapoport regarding National Grange's Motion for Sanctions. Magistrate Judge Rapoport then ordered Sharp Equipment to produce all documents by July 25, 2001. On July 25, 2001 Sharp Equipment produced some documents but had still not properly complied with the July 23, 2001 Order. Accordingly, on August 9, 2001, Magistrate Judge Rapoport entered an Order granting National Grange's July 12, 2001 Motion for Sanctions and awarding National Grange attorney's fees in the amount of $ 520.00.

On September 10, 2001, counsel for National Grange wrote yet again to Sharp Equipment's counsel outlining all the deficiencies in the prior document productions. Some of the deficiencies included failing to provide bank statements, tax forms, disbursement letters, and invoices. Again, Sharp Equipment failed to even answer the letter, let alone produce the missing documents. Furthermore, Sharp Equipment still had not made the sanction payment in accordance with Magistrate Judge Rapoport's Order of August 9, 2001. Accordingly, National Grange's counsel again wrote to Sharp Equipment's counsel on September 22, 2001, regarding the missing [*8] documents and the status of the sanction payment per the Court's Order of August 9, 2001. On September 26, 2001, Sharp Equipment, finally answering the September 10 correspondence, provided more documents, but even this response was still incomplete

On October 16, 2001, National Grange's counsel again wrote to Sharp Equipment's counsel outlining the numerous insufficiencies in the documents. On November 26, 2001, Magistrate Judge Rapoport held another hearing to deal with this issue and ordered that (1) National Grange supply a list of the missing documents to Sharp Equipment on or before November 28, 2001, (2) Sharp Equipment respond on or before December 5, 2001, and (3) if Sharp Equipment failed to respond, sanctions would be imposed in the amount of $ 500 per day, continuing through the period of non-compliance. n3 National Grange submitted its list to

Sharp Equipment, and Sharp Equipment supplied some documents it determined were responsive to the requests, but also answered that it did not have many of the requested documents.

n3 On December 4, 2001, Mr. Blanck sent impermissible, *ex parte* correspondence to Magistrate Judge Rapoport. It was forwarded, unread, to counsel for Sharp Equipment that same day.

[*9]

## 2. Discovery Issues Between National Grange and Mr. Blanck

While the discovery between National Grange and Sharp Equipment entailed great delays, motions to compel, and court-imposed sanctions, the tale of discovery in this case does not stop there. In addition to the long history of discovery between National Grange and Sharp Equipment, there is also discovery between National Grange and Mr. Korey Blanck.

### 1. Interrogatories and Requests for Production

On April 23, 2001, National Grange served Interrogatories on Mr. Blanck. On May 29, 2001, Mr. Blanck submitted unsigned responses to the Interrogatories propounded on him. On September 7, 2001, National Grange served Requests for Production of Documents on Mr. Blanck. Mr. Blanck did not respond and on October 19, 2001, National Grange filed a Motion to Compel answers to those Requests. On October 19, National Grange also received Mr. Blanck's responses, in the form of objections on the basis that the Requests were burdensome, irrelevant and harassing, and that Mr. Blanck was not a party to this case. Because Mr. Blanck did not object to the Requests within 30 days of September 7, when they were served upon him, Mr. Blanck [*10] had waived his ability to object pursuant to *Fed. R. Civ. P. 33(b)*. Furthermore, Mr. Blanck was estopped from arguing that he was not a party to this case since he answered the Complaint and provided responses to Interrogatories. National Grange requested that Magistrate Judge Rapoport enter an order granting the letter Motion to Compel and ordering Mr. Blanck to respond on or before October 24, 2001, without objection. Counsel for Mr. Blanck sought a Protective Order, claiming that much of the document requests were irrelevant. In an October 22, 2001 teleconference, Magistrate Judge Rapoport denied the request of a protective order and Ordered Mr. Blanck to respond to the Requests for Production of Documents without objection on or before October 29, 2001.

### 2. Mr. Blanck's Depositions

#### a. October 22, 2001

On October 22, 2001, Mr. Blanck was deposed as the *Fed. R. Civ. P. 30(b)(6)* deponent of Sharp Equipment. n4 He was asked several questions regarding material issues which he either refused to answer, would not answer completely, or his counsel advised him not to answer. For example, counsel for National Grange asked Mr. Blanck if he ever tendered a proof of loss for Sharp [*11] Equipment's loss of business claim. In response, Mr. Blanck stated "I need to speak to my counsel." Subsequently, Sharp Equipment's counsel objected and informed Mr. Blanck that there was a question on the table. Mr. Blanck responded "I don't care." Blanck Dep., 10/22/01 at 99-101.

n4 He is the only employee of Sharp Equipment, its president, and sole shareholder

Mr. Blanck also testified that, in his opinion, National Grange committed bad faith by not performing in accordance with the terms of its insurance policy. Id. at 127. Mr. Blanck stated that National Grange acted in bad faith by breaching the terms of the policy. Counsel then asked which terms were breached. Mr. Blanck responded that he would need to see the policy. Id. at 131. Counsel for National Grange handed Mr. Blanck a copy of the policy and asked him to point out which terms were breached. Mr. Blanck responded that he was not comfortable because the lighting was poor and he was sitting in a "1950's chair." Id. Counsel for National [*12] Grange said he could take all the time he wanted to read the document in the deposition room at the Berks County Bar Association, but Mr. Blanck refused. Id at 133. The deposition was adjourned when the parties could not resolve the dispute.

On October 26, 2001, National Grange filed a letter Motion for Sanctions or in the Alternative, a Motion to Compel, against Sharp Equipment and Mr. Blanck. Magistrate Judge Rapoport held a hearing on November 26, 2001, and at its conclusion, Ordered that any requested relief be filed, in motion form, by November 29, 2001. By Order dated December 3, 2001, Magistrate Judge Rapoport partially granted National Grange's motion to compel and Ordered Mr. Blanck to completely respond to deposition questions regarding bad faith.

Mr. Blanck's deposition resumed on December 9, 10, and 14, 2001. While finally agreeing to answer National Grange's questions regarding bad faith, Mr. Blanck continued to provide evasive responses. His answers consisted largely of reading, verbatim, entire portions of the insurance policy and claiming that National Grange's failure to pay his claims or properly investigate his loss constituted bad faith. At the December 14, 2001 deposition, [*13] Mr. Blanck walked out at approximately 5:30 p.m., refusing to answer any further questions. Counsel for Mr. Blanck and Sharp Equipment stated that he was under the perception that the deposition was only scheduled until 5:00 p.m. and that Mr. Blanck had other business appointments. Counsel for National Grange asked if they would consent to extend the discovery period past the December 15, 2001 deadline, and counsel for Mr. Blanck and Sharp Equipment refused.

On December 26, 2001, National Grange filed a Supplemental Motion for Sanction, seeking dismissal of all of Korey Blanck's and Sharp Equipment's counter-claims alleging bad faith and breach of contract, if any, in the case National Grange v. Sharp Equipment Co. (No. 01-0628) and the dismissal of Sharp Equipment Co. v. National Grange (No. 01-1184) in its entirety as sanctions for Mr. Blanck's conduct during the December 9, 10, and 14 depositions and his refusal to answer questions regarding bad faith allegations as per Magistrate Judge Rapoport's Order of December 3, 2001. In addition, National Grange's Supplemental Motion for Sanctions alleged that Mr. Blanck provided false and misleading testimony in his October 22, 2001 deposition [*14] in that (1) he testified on October 22 that his personal tax returns were in order (p. 43), but admitted on December 9 that he had not filed a personal tax return since 1984 and (2) he testified untruthfully that he could not remember specific instances where he testified under oath, but on December 9, it came to light that he had filed a lawsuit alleging bad faith against Liberty Mutual Insurance Co. 10/22/01 at 10-13, 12/09/01 at 14-16.

Sharp Equipment and Mr. Blanck filed a cross-motion for sanctions on December 7 2001, stating that there is personal animus against Mr. Blanck and that counsel for National Grange deliberately tried to annoy, embarrass and oppress Mr. Blanck. In support of this motion, Sharp Equipment and Mr. Blanck claim that throughout the October 22, 2001 deposition, opposing counsel laughed at his response to questions and was uncooperative with his request to review the insurance policy in a more comfortable environment.

On January 24, 2002, Magistrate Judge Rapoport issued his Report and Recommendation resolving the cross-motion for sanctions. He denied Sharp Equipment's and Korey Blanck's cross-motion for sanction. Furthermore, Magistrate Judge Rapoprt recommended [*15] granting National Grange's Supplemental Motion for Sanctions, dismissing all counterclaims alleging bad faith and breach of contract, if any, in the National Grange v. Sharp Equipment Co. (No. 01-0628) case and dismissing the Sharp Equipment Co. v. National Granve (No. 01-1184) case in its entirety.

We held oral argument on Sharp Equipment's and Mr. Blanck's objections to the Report and Recommendation on February 14, 2002. For the reasons stated below, due to the outrageous conduct of Mr. Korey Blanck at his depositions and the refusal of Sharp Equipment and Mr. Blanck to comply with the December 3, 2001 Order, the Report and Recommendation of the Magistrate Judge must be approved and adopted in its entirety.

### 3. Standard of Review

[HN1] Pursuant to *28 U.S.C. § 636*(b)(1)(B), a magistrate judge may issue proposed findings, of fact and recommendations on case-dispositive motions n5 such as a motion for involuntary dismissal. After a timely objection, "the district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate's judge's disposition to which specific [*16] written objection has been made. . ." *Fed. R. Civ. P. 72(b)*. The district judge need conduct a new hearing only in his discretion or where required by law. Local Rule 72.1.

> n5 Although discovery is usually a pretrial matter under *28 U.S.C. § 636*(b)(1)(A), we believe the Magistrate Judge acted properly in proceeding under *28 U.S.C. § 636*(b)(1)(B) because his sanctions have the effect of dismissing one of the cases before us.

### 4. Discussion n6

> n6 To the extent that our findings of fact may be taken as conclusions of law, they are meant to be so taken. To the extent that our conclusions of law may be taken as findings of fact, they are meant to be so taken.

### 1. Review of Factual Findings

After reviewing the record, we find that all recommended factual findings by Magistrate Judge Rapoport [*17] should be adopted in their entirety. In addition, we have reviewed ten videotapes of Mr. Blanck's depositions on December 9, 10, and 14, 2001. n7 These tapes proved to be quite helpful in evaluating the issues at hand and enable us to make the additional finding that Mr. Blanck was deliberately evasive and combative throughout the entire three days, particularly in answering the questions regarding his claims that National Grange acted in fad faith. We found the last

forty-five minutes of the December 14, 2001 deposition rise to the level of being outrageous. Despite the fact that Magistrate Judge Rapoport specifically ordered Mr. Blanck to fully respond to these questions, Mr. Blanck refused to answer specific questions except by reading entire (and often irrelevant) passages of the insurance contract and making blanket assertions that National Grange did not abide by the terms of the policy. He became combative when questions were posed to test his ability to read an insurance contract or when counsel for National Grange attempted to gather specific information about particular instances of bad faith. Also, we find that Mr. Blanck's behavior during these bad faith questions was a [*18] deliberate attempt to avoid answering questions and to stall and delay the proceedings until the December 15 deadline. While such conduct should never take place in any deposition, the conduct is particularly outrageous in light of a specific order by Magistrate Judge Rapoport to answer the very same question that caused the adjournment of the October 22, 2001 dispute. n8 Furthermore, just before the December 14 deposition ended, counsel for National Grange voiced specific, important questions that still had to be posed regarding bad faith, including injuries or damage brought about by the bad faith and whether Mr. Blanck or Sharp Equipment was seeking to recover for bad faith actions of people other than National Grange and its employees and agents. 12/14/01 at 367-368.

> n7 We did not view the first two hours of the December 10, 2001 deposition, because this portion was missing from the video record.

> n8 There is no video record of the October 22, 2001 deposition.

We further find that counsel for National [*19] Grange was never abrasive or abusive to Mr. Blanck and that they kept a calm and polite demeanor throughout, despite his uncooperative and often combative responses. Several times, Mr. Blanck accused counsel of smirking or laughing at him. Though only Mr. Blanck can be seen on the video, counsel for National Grange stated for the record that no one was smirking at him. We have no reason to doubt these statements. Furthermore, given the nature of Mr. Blanck's responses, we find that an occasional smirk or chuckle is certainly excusable.

With regard to Mr. Blanck's personal income taxes, we find that the October 22 testimony that all of his personal income tax returns since 1992 were "in order" was a deliberate attempt to hide the fact that he has filed no income tax returns since 1984. Because of this conduct National Grange was forced to expend resources trying to obtain these non-existent returns. We are deeply

2002 U.S. Dist. LEXIS 4096, *; 52 Fed. R. Serv. 3d (Callaghan) 579

troubled by Mr. Blanck's explanation under oath that his income tax returns were in order because he has had no personal income since 1984. On December 9, Mr. Blanck testified at length about numerous sales of cars and sports memorabilia since 1984 and that he realized significant [*20] profits on these sales, thus making his claim that he had no personal income impossible to credit. n9 Even if Mr. Blanck did somehow honestly believe that he had no obligation to file tax returns for the past 17 years, his testimony that his tax returns were "in order" is still false and anyone answering the questions in good faith would disclose the fact that there were no tax returns at all.

> n9 After reviewing the questions and answers regarding Mr. Blanck's personal income tax returns, we feel that we have a duty to order the clerk to send a copy of this memorandum to the U.S. Attorney. In addition to Mr. Blanck's failure to file any income tax return since 1984, Mr. Blanck claims that Sharp Equipment has had no employees since 1992 (the date of incorporation), but only independent contractors, despite the fact that he has sought recovery under the "Employee Dishonesty" provision of his insurance contract and claimed that he had to fire employees as a result of the flood loss of December 1999.

Finally, we [*21] make a factual finding that Mr. Blanck's accusation that Darlene Grevelding, an adjuster for National Grange, backdated a letter and stuffed it in the record so as to make it appear that National Grange was prompt in responding to the claim to be completely unsupported by the record. We cannot allow such an unfounded, unsupported accusation of fraudulent conduct to factor into our analysis of the cross-motions for sanctions.

### 2. Review of Legal Conclusions

We find that the legal analysis in the Report and Recommendations is correct and that Magistrate Judge Rapoport correctly applied the appropriate legal standards as mandated by the Rules of Civil Procedure and controlling precedent of the Supreme Court and the Third Circuit. They are thus approved and adopted and summarized herein.

### 1. Standard

*Rule 37(b)(2) of the Federal Rules of Civil Procedure* provides in part that:

> [HN2] If a party. . .fails to obey an order to provide or permit discovery. . .

the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following. . .

> (C) An order striking out pleadings or parts thereof, or staying further proceedings until [*22] the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

[HN3] Rule 37 should not, however, "be construed to authorize dismissal of [a] complaint because or petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not willfulness, bad faith, or any fault of petitioner." *National Hockey League v. Metro. Hockey Club, 427 U.S. 639, 640, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976),* quoting *Societe Internationale v. Rogers, 357 U.S. 197, 202, 2 L. Ed. 2d 1255, 78 S. Ct. 1087.*

The Third Circuit takes the position that [HN4] dismissal is a "drastic" remedy and that it "should be reserved for those cases where there is a clear record of delay or contumacious conduct by the plaintiff." *Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 866,* quoting *Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 342 (3d Cir. 1982).* The Third Circuit has laid out six factors to examine to determine whether a trial court has abused its wide discretion in dismissing a case. [*23]

> (5) The extent of the party's personal responsibility;

> (6) The prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;

> (7) A history of dilatoriness;

> (8) Whether the conduct of the party or the attorney was willful or in bad faith;

> (9) The effectiveness of sanctions other than dismissal, which entails an analysis of all of alternative sanctions; and

> (10) The meritoriousness of the claim or defense.

*Poulis, 747 F.2d at 868.* While a trial court does not have to examine all of these factors to warrant a dismissal, Magistrate Judge Rapoport did carefully examine all of these factors, and we also have done so.

*Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 919 (3d Cir. 1992).*

### 1. The Poulis Factors

### 1. The Extent of the Party's Personal Responsibility

Magistrate Judge Rapoport examined the proferred excuse behind Sharp Equipment's numerous discovery delays, including the maternity leave of an office worker, counsel mistakenly believing that the two sets of interrogatories were identical, and the need to obtain a report and related documents from its accountant. We agree [*24] with Magistrate Judge Rapoport's conclusion that the responsibility for the document production delays lies primarily with Sharp Equipment and Korey Blanck personally. None of these excuses were made until after deadlines had not been met and thus Sharp Equipment and Mr. Blanck should be held responsible for failure to seek an extension of time or to make alternate arrangements. In addition, Mr. Blanck has still not submitted a signed copy of his interrogatories, though his attorney has signed it. n10

> n10 Answers to interrogatories must be signed by the person making them and only objections are to be signed by the attorney. *FRCP 33(b)(2).*

One additional and important factor is that all of the evasive, untruthful, delaying, and combative responses to deposition questions were supplied by Mr. Korey Blanck, the president and sole shareholder of Sharp Equipment Company. As his outrageous conduct during his depositions is the primary reason for the pending motion for sanctions, we weigh this factor very strongly [*25] in favor of dismissing Sharp Equipment's and Mr. Blanck's claims and counter-claims.

### 2. Prejudice to the Adversary

We agree with Magistrate Judge Rapoport's determination that there has been monetary and temporal prejudice to National Grange by the conduct of Sharp Equipment and Korey Blanck. The discovery process has been delayed over and over again, through absolutely no fault of National Grange. Furthermore, National Grange has had to file five motions to compel and three motions for sanctions, simply to gain routine discovery to which it is clearly entitled. Also, National Grange had to spend resources seeking the non-existent personal tax returns which Mr. Blanck falsely stated were "in order."

However, more important than monetary expense and time delays is that, to date, National Grange is still unable to evaluate the claims against it. Mr. Blanck and Sharp Equipment have accused National Grange of acting in bad faith, a very serious accusation. Yet Mr. Blanck's evasive and combative responses have prevented National Grange from ever learning what these alleged bad faith actions are, how they have harmed either Sharp Equipment or Mr. Blanck, or whether actions of others [*26] not associated with National Grange are being grouped in to the accusations of bad faith.

In light of the monetary and temporal delay to National Grange, combined with its inability to evaluate the claims against it, we find that this factor weighs strongly in favor of granting the motion for sanctions and dismissing the claims against National Grange.

### 1. History of Dilatoriness

We fully adopt Magistrate Judge Rapoport's conclusions that Mr. Blanck's and Sharp Equipment's history of dilatoriness in complying with discovery deadlines and orders weighs in favor of granting the motion for sanctions and dismissing the claims against National Grange. We further note that, even when Sharp Equipment or Mr. Blanck gave excuses for the delays and failure to meet the deadlines, such as the maternity leave of the office manager, these excuses were not even given until well after the deadlines had already passed. This history of dilatoriness goes well beyond routine delays that often arise during the discovery period. Even after Magistrate Judge Rapoport's second Order to Compel on June 12, 2001, Sharp Equipment did not provide the documents. Even more outrageous is the fact that after [*27] Magistrate Judge Rapoport granted the first motion for sanctions, there was no production or payment of the sanctions award for two months and the production was still incomplete. Accordingly, we weigh this factor in favor of granting the motion for sanctions.

### 2. Bad Faith of the Party or Attorney

We find that the failures of counsel for Sharp Equipment and Mr. Blanck throughout the discovery period were due to the conduct of his clients.

After reviewing the record and viewing the videotaped depositions, we find that Mr. Blanck's evasiveness, dishonesty, and combativeness were deliberate and in bad faith and we attribute this conduct to him and the corporation of which he is president and sole shareholder. Accordingly we weigh this factor strongly in favor of granting the motion for sanctions. n11

> n11 We note that even if Mr. Blanck's lengthy responses to the bad faith questions were made in good faith and that he honestly believed

he was giving a cooperative answer (a proposition we find to be wholly unsupported by the record), our overall decision in this matter would not change. Under any reading of the record, Mr. Blanck's responses caused extensive delay, and the fact that neither he nor counsel would consent to continuing the December 14 deposition or extending the discovery period would warrant sanctions and dismissal of the case. This is especially true in light of Judge Rapoport's specific order to answer the questions regarding bad faith.

[*28]

### e. Effectiveness of Other Sanctions

We approve and adopt Judge Rapoport's conclusions that no other sanction would be effective. We appointed a Magistrate Judge to oversee the situation but it did not remedy the discovery problems. Sharp Equipment has already paid an award of costs and fees for failure to comply with discovery orders, yet the dilatory conduct continued. Furthermore, after the adjournment of the October 22 deposition, Judge Rapoport specifically ordered Mr. Blanck to respond to questions about bad faith. Mr. Blanck deliberately disobeyed this order by providing evasive, misleading, combative and delaying answers to the questions and by ending the December 14 deposition without agreeing to continue the questioning at a later date. We are fully convinced that another award of monetary relief or an order to compel would do nothing to remedy the situation, given Mr. Blanck's history of flaunting court orders. Accordingly, we weigh this factor in favor of granting the motion for sanctions.

### 6. The Meritoriousness of the Claim

We approve and adopt Judge Rapoport's conclusion that the record does not support a finding of bad faith or breach of contract on the [*29] part of National Grange. In addition, Mr. Blanck was questioned at length about the business practices of Sharp Equipment and whether it is or has been a profitable company. Mr. Blanck testified that the majority of the inventory is acquired with cash and that there are no records of these purchases. Accordingly, we find that it would be virtually impossible for Sharp Equipment or Mr. Blanck to prove damages. n12

n12 In addition to the lack of factual support for the claims, it must be noted that Mr. Blanck has submitted numerous claims against insurance companies, including the recent claim against Liberty Mutual which was the subject of unsuccessful litigation by Mr. Blanck. In that

case, a counter-claim was filed against Mr. Blanck for insurance fraud.

We make a further finding that even if Sharp Equipment and Mr. Blanck had a provable case of breach of contract and/or bad faith, we would give that little weight in light of the fact that the conduct of Sharp Equipment and Mr. Blanck has made it impossible [*30] for National Grange to have a fair opportunity to evaluate the claims against it and defend itself.

### 7. Balancing

We approve and adopt Magistrate Judge Rapoport's conclusion that the balancing of the Poulis factors leads to a determination that sanctioning Sharp Equipment and Mr. Blanck by dismissing their claims is the only fair and effective remedy for the unacceptable behavior throughout the discovery period. We recognize the extreme nature of this sanction, but Sharp Equipment and Mr. Blanck have brought it upon themselves. A litigant cannot assert claims against another party and simultaneously refuse to provide information to which the other party is entitled. Furthermore, the blatant disregard for numerous court orders cannot be tolerated by this or any court.

### 3. Cross-Motion for Sanctions

We approve and adopt Magistrate Judge Rapoport's determination that Sharp Equipment's and Korey Blanck's cross-motion for sanctions must be denied. The record shows that National Grange and its counsel have acted fairly and in good faith at all times during the discovery period.

### 5. Conclusion

Based upon our evaluation of the record, the Report and Recommendation [*31] of Magistrate Judge Rapoport must be approved and adopted in its entirety. National Grange's motion for sanctions must be granted, and all counterclaims alleging breach of contract and bad faith, if any, in the case National Grange v. Sharp Equipment Co. (No. 01-0628) must be dismissed and the case Sharp Equipment Co. v. National Grange (No. 01-1184) must be dismissed in its entirety.

An appropriate order follows. n13

n13 There is a pending discovery dispute between National Grange and Sharp Equipment's public adjuster, Mike Lazarchick of State Public Adjusting. It is our understanding that, in light of the dismissal of Sharp Equipment's and Korey Blanck's claims, this dispute has become moot.

2002 U.S. Dist. LEXIS 4096, *; 52 Fed. R. Serv. 3d (Callaghan) 579

ORDER

AND NOW, this 1st day of March, 2002, consistent with the foregoing opinion, it is hereby ORDERED as follows:

(1) The Report and Recommendation of Magistrate Judge Arnold C. Rapoport, filed January 25, 2002, is APPROVED and ADOPTED;

(2) Sharp Equipment Co. of Reading's and Korey [*32] Blanck's Objections, filed February 5, 2002, are DENIED and OVERRULED;

(3) National Grange Mutual Insurance Co.'s Supplemental Motion for Sanctions, filed December 26, 2001, is **GRANTED**;

(4) Sharp Equipment Co. of Reading's and Korey Blanck's Cross-Motion for Sanctions, filed December 7, 2001, is **DENIED**;

(5) All counterclaims alleging breach of contract and bad faith, if any, in the case National Grange Mutual Insurance Co. v. Sharp Equipment Co. of Reading and Korey Blanck (No. 01-0628), are **DISMISSED** with prejudice;

(6) The case Sharp Equipment Co. of Reading and Korey Blanck v. National Grange Mutual Insurance Co. (No. 01-1184) is **DISMISSED** in its entirety with prejudice, and **CLOSED**; and

(7) As explained in Footnote 9, the **CLERK OF THE COURT** is **ORDERED** to send a certified copy of the foregoing memorandum to the **UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF PENNSYLVANIA**.

BY THE COURT:

Franklin S. Van Antwerpen, U.S.D.J.

# **EXHIBIT 12**

LEXSEE 2003 U.S. DIST. LEXIS 2556

**PROXIM INCORPORATED, Plaintiff, v. 3COM CORPORATION, SYMBOL TECHNOLOGIES, INCORPORATED, WAYPORT INCORPORATED, and SMC NETWORKS, INCORPORATED, Defendants.**

**C.A. No. 01-155-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 2556*

**February 21, 2003, Decided**

**DISPOSITION:** [*1] Defendants' motions to preclude damages from accruing during stay denied. Plaintiff's motion for reconsideration granted and court's previous order precluding damages from accruing during stay with respect to defendant Symbol vacated in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner brought suit against defendants, a customer and businesses, alleging infringement of several patents. The court granted intervenor corporation's motion for leave to intervene. The court entered a stay and ordered that the owner was precluded from collecting damages from the customer that accrued during the stay. The businesses moved to preclude damages from accruing during the stay. The owner moved for reconsideration.

**OVERVIEW:** The owner argued that the customer would have suffered no harm as a result of the stay since it was indemnified against any infringement damages by the corporation. Furthermore, the owner argued that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. The customer admitted that it had an indemnification agreement with the corporation but argued that the corporation had not agreed to full indemnification and that the indemnification agreement was only as good as the corporation's ability and willingness to pay for any potential damages. The court found that the fact that the customer was indemnified against potential damages mitigated its claim of harm resulting from the stay. The customer's ability to enforce its agreement with the corporation was separate from the litigation. The businesses merely stated that they were not receiving and had not received any indemnification from the corporation related to the litigation. The court concluded that the businesses failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

**OUTCOME:** The businesses' motion to preclude damages from accruing during the stay was denied. The owner's motion for reconsideration was granted and the court's previous order precluding damages from accruing during the stay with respect to the customer was vacated in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN1] The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice.

**COUNSEL:** For PROXIM INCORPORATED, plaintiff: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For 3COM CORPORATION, defendant: Dale R. Dube, Blank Rome LLP, Wilmington, DE.

For SYMBOL TECHNOLOGIES, INC., defendant: Andre G. Bouchard, Karen L. Pascale, Bouchard, Margules & Friedlander, Wilmington, DE.

For WAYPORT INCORPORATED, defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

For SMC NETWORKS INCORPORATED, defendant: Richard K. Herrmann, Blank Rome LLP, Wilmington, DE.

For SYMBOL TECHNOLOGIES, INC., counter-claimant: Andre G. Bouchard, Karen L. Pascale, Bouchard, Margules & Friedlander, Wilmington, DE.

For PROXIM INCORPORATED, counter-defendant: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For 3COM CORPORATION, counter-claimant: [*2] Dale R. Dube, Blank Rome LLP, Wilmington, DE.

For WAYPORT INCORPORATED, counter-claimant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM ORDER**

**I. INTRODUCTION**

On March 8, 2001, plaintiff Proxim brought this suit against defendants 3COM, Symbol Technologies ("Symbol"), Wayport and SMC Networks ("SMC") alleging infringement of several patents owned by plaintiff related to wireless networks. (D.I. 1) On December 12, 2001, Intersil Corporation moved for leave to intervene as a co-defendant in the case. (D.I. 78) After finding that the thrust of the present litigation was directed against the Intersil PRISM chip set, the court granted Intersil's motion to intervene. (D.I. 106) Given the fact that Intersil was also a respondent in an action brought before the ITC by plaintiff related to the same technologies, the court was required to stay this action pursuant to *28 U.S.C. § 1659.* (Id.)

In addition to entering the stay, the court concluded that it would be unfair to allow damages to accrue against defendant Symbol given that Symbol was merely a customer [*3] and user of Intersil's PRISM chip set and was not a party to the ITC action. Thus, the court further ordered that plaintiff would be precluded from

collecting damages from Symbol that resulted from any alleged infringing conduct during the stay. (Id.)

Presently before the court are defendants 3COM, SMC and Wayport's motions to preclude damages from accruing during the stay and plaintiff's motion for reconsideration of the court's order precluding damages from accruing with respect to Symbol. (D.I. 107, 108, 110)

**II. STANDARD OF REVIEW**

[HN1] The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Cafe ex-rel. *Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).* Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. See id.

**III. DISCUSSION**

In its May 30, 2002 order entering the stay, the [*4] court was mindful of the concerns posed by Symbol in its papers opposing the stay. Namely, Symbol was not a party to the ITC action and, therefore, would not have an opportunity to defend itself in that forum. Furthermore, Symbol would be subjected to the uncertainty of conducting business with the impending litigation hanging over it. Given these concerns, the court concluded that in the interests of equity, damages should not be allowed to accrue against Symbol during the stay and pendency of the ITC action. In their motions, defendants 3COM, Wayport and SMC argue that they are in the same situation as Symbol and should be afforded the same protections.

In its motion for reconsideration, plaintiff argues that Symbol would suffer no harm as a result of the stay since it is indemnified against any infringement damages by Intersil. (D.I. 110 at 5) Furthermore, plaintiff argues that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. Given the indemnification argument, the court ordered the parties to submit briefing regarding any indemnification agreements they had with Intersil related to this litigation. (D.I. 117) [*5]

In response to this order, Symbol admits that it has an indemnification agreement with Intersil but argues that Intersil has not agreed to full indemnification and, furthermore, Intersil's indemnification agreement is only as good as Intersil's ability and willingness to pay for any potential damages. (D.I. 118) The court finds this

2003 U.S. Dist. LEXIS 2556, *

argument unpersuasive. The terms of Symbol's indemnification agreement with Intersil and its concerns about Intersil's willingness or ability to satisfy its obligations are irrelevant to the inquiry in the present case. The fact that Symbol is indemnified against potential damages in the current case mitigates its claim of harm resulting from the stay. Symbol's ability to enforce its agreement with Intersil is separate from this litigation and, therefore, the court's order precluding damages from occurring during the stay (D.I. 106) is vacated in part.

Defendants 3COM, Wayport and SMC merely state that they are not receiving and have not received any indemnification from Intersil related to this litigation. (D.I. 119) Plaintiff argues that these responses do little to address the indemnification issues. In particular, plaintiff argues that 3COM and SMC [*6] "undoubtedly have contracts with Intersil that address indemnification and warranties applicable to Intersil's PRISM chipset." (Id. at 3) Furthermore, under the U.C.C., 3COM and SMC likely have warranty and indemnification claims. In their responding affidavits, neither 3COM nor SMC discuss whether or not they have demanded indemnification or whether they have a right to seek indemnification under their purchase agreements with Intersil. With respect to Wayport, plaintiff argues that Intersil "has already stated that its counsel is defending Wayport here at the expense of another defendant involved in other litigation against Proxim." (Id. at 4) Given the vagueness of defendants 3COM, SMC and Wayport's responses, the court concludes that they have failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

## IV. CONCLUSION

At Wilmington, this 21st day of February, 2003, for the reasons stated;

IT IS ORDERED that:

1. Defendants 3COM and SMC's motion to preclude damages from accruing during the stay (D.I. 107) is denied.

2. Defendant Wayport's motion to preclude damages from accruing during the stay (D.I. 108) [*7] is denied.

3. Plaintiff's motion for reconsideration (D.I. 110) is granted and the court's previous order precluding damages from accruing during the stay with respect to defendant Symbol (D.I. 106) is vacated in part.

Sue L. Robinson

United States District Judge