# **EXHIBIT 13**

LEXSEE 2004 U.S. DIST. LEXIS 24953

**RICHARD SNYDER, Plaintiff, v. HI TECH ELECTRONIC DISPLAYS INC., Defendant.**

**Civil Action No. 02-29-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 24953*

**November 24, 2004, Decided**

**DISPOSITION:** Complaint dismiss with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Pro se plaintiff franchisee failed to cooperate with defendant franchisor's counsel or to otherwise prepare for a final pretrial conference as required by *Fed. R. Civ. P. 16* and U.S. Dist. Ct., D. Del., R.16.1, and the court had to determine what sanctions to impose.

**OVERVIEW:** A franchisee sued a franchisor on claims arising under state and federal law. At the franchisee's request, the court granted three extensions of the discovery deadline, rescheduled the trial date, and scheduled a second pretrial conference. The franchisor's counsel sent the franchisee e-mails offering to assist the franchisee to prepare for the pretrial conference and warning the franchisee that the court would not be able to try the franchisee's case if the franchisee did not identify witnesses and documents. The court also warned the franchisee that he would waive his position if he did not participate in preparing for the pretrial conference. The franchisee did not conduct discovery and did not prepare for pretrial. The court found that there were indications that the amount in controversy was insufficient for diversity jurisdiction, and that the complaint was insufficient for federal question jurisdiction. However, because the franchisor did not challenge subject matter jurisdiction, the court found that it had sufficient jurisdiction to impose the *Fed. R. Civ. P. 37(b)(2)* sanction of denying the franchisee the opportunity to support his claims.

**OUTCOME:** The court dismissed the franchisee's complaint with prejudice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Pretrial Conferences*
[HN1] *Fed. R. Civ. P. 16(d)* requires the court to hold a final pretrial conference as close to the time of trial as reasonable under the circumstances. *Fed. R. Civ. P. 16(e)* provides that the conference be memorialized by a final pretrial order that shall control the subsequent course of the action and which is only to be modified to prevent manifest injustice.

*Civil Procedure > Trials > Pretrial Conferences*
[HN2] Under U.S. Dist. Ct. D. Del., R. 16.1(d), the parties are required to cooperate with one another in the preparation of a proposed pretrial order which must cover a number of specified topics, including, among other things, a statement of facts that are admitted and require no proof; a statement of issues of fact that remain to be litigated; a statement of issues of law which any party contends remain to be litigated, and a citation of authorities relied upon by each party; a list of pre-marked exhibits; and the names and addresses of all witnesses a party intends to call to testify either in person, or by deposition. .

*Civil Procedure > Trials > Pretrial Conferences*
[HN3] Proper functioning of the court requires adherence to the rules pertaining to final pretrial preparations.

*Civil Procedure > Trials > Pretrial Conferences*
[HN4] See *Fed. R. Civ. P. 16(f)*.

2004 U.S. Dist. LEXIS 24953, *

*Civil Procedure > Sanctions > Discovery Misconduct*
*Civil Procedure > Sanctions > Misconduct & Unethical Behavior*
*Civil Procedure > Trials > Pretrial Conferences*
[HN5] In *Fed. R. Civ. P. 16(f)*, the sanctions cross-referenced in *Fed. R. Civ. P. 37(b)(2)* include an order denying a party the opportunity to support its claims.

*Civil Procedure > Sanctions > Discovery Misconduct*
*Civil Procedure > Sanctions > Misconduct & Unethical Behavior*
[HN6] The United States Court of Appeals for the Third Circuit has adopted a six-factor test for determining the appropriateness of a sanction that dismisses a litigant's claims. That court will be guided by the manner in which a trial court balanced the following factors, and whether the record supports its findings: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Civil Procedure > Sanctions > Misconduct & Unethical Behavior*
[HN7] A party cannot be permitted to turn even a legitimate dispute into a petulant vendetta that wastes everyone else's time.

*Civil Procedure > Dismissal of Actions > Involuntary Dismissal*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*
[HN8] A court lacking subject matter jurisdiction cannot enter a dismissal on the merits.

**COUNSEL:** [*1] For RICHARD SNYDER, Plaintiff, Pro Se, Rehoboth, DE.

For HI TECH ELECTRONIC DISPLAYS INC., Defendant: Elwood T. Eveland, Jr., The Eveland Law Firm, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

   **MEMORANDUM ORDER**

Introduction

   This case springs from a basic contract dispute and a franchise relationship gone sour, in which $ 250 separated the parties in their efforts to settle for a sum of approximately $ 3,000. *See infra* at 6. The pro se plaintiff "alleges breach of contract, unfair and deceptive trade practices, fraudulent conduct, misrepresentation, and violations of Federal Franchise Law, and the *RICO Statutes*." (Docket Item ["D.I."] 1 at P 7.) Unfortunately, the plaintiff has pursued his claims with only sporadic attention, which is in sharp contrast to his apparently constant anger at the defendant and its counsel. The matter is set for a two-day jury trial beginning in less than two weeks, on December 6, 2004. Because the plaintiff has failed to participate in the preparation of this case for trial, after a direct and unmistakable warning that he must do so and after being given an additional month in which [*2] to do so, I am ordering that the case be dismissed with prejudice.

Background

   The Complaint in this case was filed on January 11, 2002, seeking in exces of $ 100,000 in damages. (D.I. 1) Following denial of the defendant's motion to dismiss (D.I. 20), an Amended Complaint was filed on February 23, 2003 (D.I. 24). An amended scheduling order was entered (D.I. 43), requiring the parties to file their pretrial order by September 8, 2004, in preparation for trial to begin on October 6, 2004. n1 The Magistrate Judge then undertook to assist the parties by mediating their dispute. (D.I. 36.)

      n1 The original scheduling order had been entered on October 16, 2003. (D.I. 33.) The First Amended Scheduling Order was entered on April 22, 2004 (D.I. 43), following an April 21, 2004 teleconference with the court in which the plaintiff and the defendant both requested, after the original discovery cutoff had passed, for additional time to take discovery. (*See* D.I. 42 at 4.)

   The efforts of the Magistrate Judge appeared [*3] to be successful. The parties advised that they had settled the case and I, in turn, requested on July 29, 2004, that a stipulation of dismissal be filed by August 16, 2004. (*See* D.I. 46.) Unfortunately, on August 16, 2004, I did not receive a stipulation of dismissal. I received instead a copy of the July 29th letter I had sent to the parties with a note from the plaintiff handwritten across the bottom, saying, "Please advise Judge Jordan that Counsel has Renged [sic] on an offer to settle. Plaintiff is filing Rule 11 Sanctions." (D.I. 47; original emphasis.) I then held a conference call with the parties on September 2, 2004, in

an effort to put the case back on track for trial, so that the matter could be finally resolved. (See D.I. 51.) n2

> n2 Docket Item 51 is the transcript of the September 2, 2004 teleconference.

During the teleconference, I told the plaintiff that a motion for sanctions was not in order and that it was important to focus on the merits of the dispute so that the parties [*4] could resolve it once and for all. (*See id.* at 2-4.) I then asked the parties about their preparations for trial. The defendant, through counsel, stated its readiness to proceed to trial. (*Id.* at 5.) The plaintiff asked for an additional thirty days for discovery (*id.*), even though the already extended discovery cutoff, that had been set with the parties' input, had passed more than three months before. n3 (*See* D.I. 33.) I granted the plaintiff's request to extend the discovery cutoff and to continue the trial from October 6, 2004 to December 6, 2004, and set the pretrial conference for October 14, 2004. n4 The plaintiff expressed a desire to forego the pretrial conference, but I explained to him that a pretrial conference was necessary and that he would be required to submit proposed jury instructions and voir dire in preparation for the conference. (D.I. 51 at 8-9.)

> n3 This was the second time the plaintiff asked that an expired discovery deadline be extended for his benefit. *See supra* n.1.

> n4 The pretrial conference had to be set several weeks ahead of the trial date to accommodate the plaintiff's personal schedule. (*See* D.I. 51 at 7-8, 10.)

[*5]

The October 14th pretrial conference did not turn out as planned. Rather than preparing for the conference, as I had instructed him and as is required by *Federal Rule of Civil Procedure 16* and Local Rule 16.4, the plaintiff decided to send an acrimonious e-mail to defense counsel. n5 Among other things, the e-mails exchanged between the parties included an August 31 offer from defense counsel that stated: "You may wish to call me for assistance in preparing your side for the pre-trial -- I have indicated to the court that I will assist." There is also an October 6, 2004 e-mail from defense counsel to plaintiff stating, *inter alia,* "you were supposed to get back to me with your contributions to the pre-trial. ...If I do not receive your input on the pret-tiral, I will file it as it is, that is as I sent it to you. *If you do not identify witnesses and documents, I assume the court will not be able to try your case, and it will be dismissed.*

Please let me hear from you." (Emphasis added.) The plaintiff's response to that e-mail, in its entirety, was, "as indicated, we are sending in a Rule 11 motion for sanctions. There is no excuse for your behavior ... No wonder the world hates [*6] lawyers." Declining to respond in kind, defense counsel sent a later e-mail to the plaintiff saying simply, "I have to file the pretrial with the court in one hour. If you have any input, please send it to me." The plaintiff did not send anything to defense counsel for inclusion in the pretrial order (*see* D.I. 55) and instead filed a "Motion for Sanctions. Request for Continuance". (D.I. 56.)

> n5 Defense counsel attached the e-mails to an October 8, 2004 letter (D.I. 53) explaining the delay in filing an incomplete form of pretrial order.

During the pretrial conference on October 14th, I asked the plaintiff why he thought he needed a continuance. (Tr. at 3.) n6 He responded, "I think this whole procedure has led to a new low between the actions of counsel. I think he has got a perverse attitude towards myself. And although I have repeatedly offered to settle with him and actually made, and virtually signed my life away in his office at the conclusion of a deposition, he refused to pay the money on the terms [*7] that we agreed to." (*Id.*) I then advised the plaintiff that we would get to his sanctions motion later but that I was trying to focus on his need for a continuance. (*Id.* at 4.) Undeterred, the plaintiff said that he "would like to make one final offer to [defense counsel]. That is, if he would pay me a cashier's check for the amount of money which he purportedly was going to pay me ..., and if he would make a contribution of $ 250 to any charity that the Judge might suggest, I will consider the matter closed." (*Id.*) I indicated that the parties were free to continue settlement discussions, if they wished (*Id.* at 4-5), and again asked about the continuance. The plaintiff responded that he wanted an additional thirty days for discovery, "and the other dates are fine." (*Id.* at 5.) Counsel for the defendant did not object and I granted the additional time for discovery. (*Id.* at 6; D.I. 57.) I denied the motion for sanctions as not well-founded in fact or law. (Tr. at 10-11; D.I. 57.)

> n6 References to "Tr." are to the transcript of the October 14, 2004 pretrial conference.

[*8]

Most importantly, I explicitly and emphatically reiterated to the plaintiff his responsibility to participate

in the pretrial process so that the matter could be properly tried. I stated:

> This is important, Mr. Snyder, because if I understood correctly the pretrial order information sent to me by [defense counsel], you did not submit any part of that pretrial submission. You need to do that, because under the rules of this Court, if you don't particpate in that process, you can be held to have waived positions that you may want to take at trial.

> In fairness -- see, I have to give you some leeway because you are here representing yourself, and I will do that. But in fairness to the defense, I can't just throw the rule book out the window. So if you don't submit anything in the pretrial order, and then you come in and say, wait a second, I wanted to talk about that here, and the defense gets up and says, they didn't say that, we are getting sandbagged, I have to say to them, you are right, and you [the plaintiff] don't get to talk about that, Mr. Snyder. I am sure you don't want that to happen.

> So I will give this the extra 30 days. Then I will give you a week, one week past [*9] that to talk to each other and exchange whatever information is necessary so that I get what the rules require, which is a joint pretrial submission that both parties have participated in the preparation of.

> So that will fall due on the 13th of November.

> I will expect that to be filed. And since this is a jury trial, I am going to expect agreed-upon jury instructions, and voir dire questions, that is questions that you want to have asked to the ... potential jurors, when they come in before they are selected. ... In short, I'm giving you another crack at this pretrial order and the jury instructions and the special voir dire.

(Tr. at 6-8.)

The 13th of November came and went without the parties filing the submissions required. On November 22, 2004, I received a letter from defense counsel, stating:

> I am filing this letter with the pre-trial order, jury instructions, jury

interrogatories and voir dire, in order to explain the circumstances since our meeting with the court, and to, once again, document my efforts at obtaining Mr. Snyder's side of the pre-trial. Mr. Snyder has still provided no information to date. After the last attempted pre-trial conference, I wrote to [*10] Mr. Snyder, to continue to obtain Mr. Snyder's assistance in completing the pre-trial, notify him that he had not yet filed discovery and that I would answer it if he sent it (even at this late date), and to renew contact on the issue of settlement. The only response I have received is Mr. Snyder's faxed note, on the bottom of my letter, which was sent at 6:25 p.m. Friday, November 19.

(D.I. 59.) Attached to the letter from defense counsel is a letter dated October 23, 2004, that he had sent to the plaintiff, offering to settle the matter for $ 2,750. Which, apparently, is exactly or approximately the amount that had been negotiated last Summer as sufficient to settle the case. (*See* D.I. 59.) The plaintiff's handwritten note across the bottom of the October 23rd letter reads in its entirety: "You send me $ 3,000 and I will quit."

Discussion

[HN1] *Rule 16 of the Federal Rules of Civil Procedure* requires the court to hold a final pretrial conference "as close to the time of trial as reasonable under the circumstances." *Fed.R.Civ.P. 16(d)*. The Rule further provides that the conference be memorialized by a final pretrial order that "shall control the subsequent course of [*11] the action" and which is only to be modified "to prevent manifest injustice." *Fed.R.Civ.P. 16(e)*. [HN2] Under this court's local rules, the parties are required to cooperate with one another in the preparation of a proposed pretrial order which must cover a number of specified topics, including, among other things, "[a] statement of facts that are admitted and require no proof"; "[a] statement of issues of fact that remain to be litigated"; "[a] statement of issues of law which any party contends remain to be litigated, and a citation of authorities relied upon by each party"; "[a] list of pre-marked exhibits"; and "the names and addresses of all witnesses a party intends to call to testify either in person, or by deposition". Local Rule 16.4(d).

[HN3] Proper functioning of the court requires adherence to the rules pertaining to final pretrial preparations. The seriousness of the parties' obligations in that regard are highlighted by *Rule 16(f)*, which reads:

2004 U.S. Dist. LEXIS 24953, *

[HN4] If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared [*12] to participate in the conference, or if a party or party's attorney fails to participate in good faith, the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D).

[HN5] The sanctions cross-referenced in *Rule 37(b)(2)* include an order denying a party the opportunity to support its claims. *See Fed.R.Civ.P. 37(b)(2)(B)*. As the Advisory Committee Notes to *Rule 16* observe, "courts have not hesitated to enforce [the Rule] by appropriate measures." Adv. Comm. Notes to 1983 amendment (discussing addition of *subsection (f)* and citing *Link v. Wabash R. Co., 370 U.S. 626, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962)* as follows: "district court's dismissal under *Rule 41(b)* after plaintiff's attorney failed to appear at a pretrial conference upheld"). Under the circumstances of this case, dismissal is the appropriate sanction.

[HN6] The United States Court of Appeals for the Third Circuit has adopted a six-factor test for determining the appropriateness of a sanction that dismisses a litigant's claims. The Court stated in *Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863 (3d Cir. 1984)*: [*13]

We will be guided by the manner in which the trial court balanced the following factors, ... and whether the record supports its findings: (1) the extent of the *party* 's personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense.

*Id.* at 868 (original emphasis).

In this case, the plaintiff is representing himself and is entirely responsible for his actions and inaction. The prejudice to his adversary is manifest. Defense counsel has had to expend time and resources in the unavailing effort to communicate with and obtain cooperation from the plaintiff. If the matter were permitted to go forward without dismissal, it would only mean further delay in resolving a matter that has been repeatedly delayed. The dilatoriness of the plaintiff is likewise clear. Despite the repeated warnings [*14] from defense counsel and from me about the consequences of failing to participate in the pretrial process, the plaintiff has simply refused to cooperate. He obviously feels himself aggrieved. He obviously dislikes the defendant and its attorney, intensely. He obviously believes he is owed money. But whether or not he has any basis in fact for his feelings is now irrelevant. [HN7] He cannot be permitted to turn even a legitimate dispute into a petulant vendetta that wastes everyone else's time. The tone of his communications evidences the willfulness of his refusal to comply with the rules and instructions of this court. I do not believe any other sanction would be sufficient under these circumstances. As noted, I have explained to the plaintiff more than once already, and defense counsel has endeavored to do the same, that a failure to participate in the pretrial process can eliminate one's rights. The plaintiff appears to simply not care, and now he must face the consequences. Finally, I have serious doubts about the meritoriousness of some of the plaintiff's allegations, including those relating to the federal claims he has asserted.

That last point raises an unusual problem. Given that [*15] the sum of approximately $ 3,000 appears to be what is at stake now, and given that the parties have not discussed RICO or federal franchise laws in the pretrial order, there is a real doubt that subject matter jurisdiction could be sustained in this case. That doubt raises the conundrum of whether it is more suitable to hold that there is no subject matter jurisdiction, because the plaintiff failed to sustain it with any proffered proof or argument, and therefor dismiss the case without prejudice, or, on the other hand, to assume that the pleaded basis for subject matter jurisdiction does exist and dismiss the case with prejudice as a sanction for failure to cooperate in preparing the case for trial. I believe dismissal with prejudice is the more proper result.

The plaintiff alleged violations of state contract law in terms that appeared to be aimed at meeting the prerequisites of diversity jurisdiction. He also invoked, in a general way, federal RICO and franchise statutes. However, because the plaintiff refused to properly participate in the pretrial process and, it seems, did not even take the discovery that he twice sought extensions

to obtain, and because the defendant did not [*16] challenge subject matter jurisdiction in any meaningful way, n7 it would have been left to the court to figure out whether either federal question or diversity jurisdiction could have been sustained, based upon the evidence proffered and the authorities cited in the proposed pretrial order. The Third Circuit has noted that [HN8] a court lacking subject matter jurisdiction cannot enter a dismissal on the merits. *Ray v. Eyster (In re Orthopedic "Bone Screw" Prods. Liab. Litig.), 132 F.3d 152, 156 (3d Cir. 1997)* ("The question we face here is whether the inherent power to sanction extends in a case, over which the court lacks subject matter jurisdiction, to permit the court to impose a sanction which will be dispositive of the merits of the case. We think not.") However, taking the approach of determining that the plaintiff's jurisdictional allegations cannot be sustained at this point because of his failure to provide evidence or argument in a submission for the pretrial order would have the perverse effect of rewarding the plaintiff for his recalcitrance. A more cooperative plaintiff, one who provided some proof to sustain jurisdictional allegations but was nevertheless derelict [*17] in other respects and thereby subject to dismissal as a sanction, would be in a worse position than a plaintiff who, like the one at bar, simply refused to cooperate at all.

n7 The defendant stated in the form of pretrial order it submitted only that jurisdiction is contested, but provided no reasons or authorities in support of that generalized statement.

Consequently, I will continue to liberally construe the plaintiff's pro se pleading and to accept the plaintiff's own jurisdictional allegations, despite his lack of cooperation in providing any evidentiary or legal support for them in the course of pretrial proceedings, and will dismiss his claims with prejudice. *Cf. Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 300 n.4 (3d Cir. 2002)* (facial attack to subject matter jurisdiction requires court to accept complaints allegations as true). No other court should be required to go through the colossal waste of time that has been foisted on this one, both in the many hours that the magistrate [*18] judge spent trying to assist the parties to achieve a settlement and in the several conferences I have held with the parties in person and on the telephone in an effort to bring this matter to trial, not to mention in preparing this Order.

Accordingly, for the reasons set forth, it is hereby ORDERED that the Amended Complaint (D.I. 24) is DISMISSED with prejudice.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

November 24, 2004

Wilmington, Delaware

# **EXHIBIT 14**

8 of 14 DOCUMENTS

## IN THE MATTER OF LEONARD A. PELULLO v. FRED SCHWARTZ and ADORNO & ZEDER, P.A.

### CIVIL ACTION NO. 98-5526

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1999 U.S. Dist. LEXIS 2916*

**March 16, 1999, Decided**
**March 16, 1999, Filed, Entered**

**DISPOSITION:** [*1] Bankruptcy Court's Order dated March 6, 1998, dismissing the Trustee's Adversary Proceeding AFFIRMED. Bankruptcy Court's Order dated August 26, 1998, denying the Trustee's motion for reconsideration, AFFIRMED. Defendants' motion to strike certain portions of the Trustee's brief DISMISSED AS MOOT.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant trustee sought review of a decision from the United States Bankruptcy Court for the Eastern District of Pennsylvania that dismissed appellant's advisory proceeding that alleged appellee attorneys breached a fiduciary duty, committed negligence and malpractice, and asserted promissory estoppel and detrimental reliance.

**OVERVIEW:** Appellant trustee challenged the bankruptcy court's dismissal of his advisory proceeding against appellee attorneys that alleged breach of fiduciary duty, negligence/malpractice, and promissory estoppel/detrimental reliance. The appellate court affirmed the decision of the bankruptcy court. The bankruptcy court was within its discretion in dismissing the adversary proceedings at bar because dismissal was pursuant to a consent order freely entered into by appellant. Further, appellees were entitled to dismissal of the instant civil complaint because they were unduly disadvantaged by debtor's assertion of his U.S. Const. amend. V privilege in refusing to comply with appellees' discovery requests that were necessary for their defense preparation. Debtor's blanket U.S. Const. amend. V

invocation was an abuse of the privilege. Debtor failed to make timely objections to individual discovery requests and there was no evidence that the majority of appellees' discovery requests tended to incriminate debtor. There was no indication that appellees' requested discovery was made in bad faith, and debtor had a history of failing to timely comply with court orders.

**OUTCOME:** The appellate court affirmed a bankruptcy court decision that dismissed appellant trustee's adversary proceeding against appellee attorneys. Debtor unjustly and to appellees' disadvantage invoked his Fifth Amendment privilege in response to all of appellees' discovery requests. There was no proof that appellees' discovery requests incriminated debtor or were made in bad faith.

**LexisNexis(R) Headnotes**

*Civil Procedure > Dismissal of Actions*
*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN1] A defendant is entitled to dismissal of a civil complaint where the plaintiff places the defendant at an undue disadvantage by raising his U.S. Const. amend. V privilege to refuse to respond to discovery that is necessary to enable the defendant to prepare a defense to the civil complaint.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
[HN2] A bankruptcy judge may only enter appropriate orders and judgments, subject to review under *11*

1999 U.S. Dist. LEXIS 2916, *

*U.S.C.S. § 158,* of core proceedings arising under Title 11 of the Bankruptcy Code, or arising in a case under Title 11. *28 U.S.C.S. § 157*(b)(1). In a non-core proceeding, a bankruptcy judge may enter appropriate orders and judgments, subject to review under § 158, only if the parties consent. *28 U.S.C.S. § 157*(c)(2). Without the consent of the parties in a non-core proceeding, the bankruptcy court must submit proposed findings of fact and conclusion of law to the district court, which enters final judgment. § 157(c)(1). A proceeding is "core" if it invokes a substantive right provided by Title 11 or if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case.

**Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review**
[HN3] Findings of fact may not be set aside unless clearly erroneous.

**Civil Procedure > Appeals > Reviewability**
[HN4] As a general rule, parties to a consent judgment cannot appeal that judgment.

**Bankruptcy Law > Practice & Proceedings**
**Civil Procedure > Dismissal of Actions**
[HN5] In adversary proceedings in bankruptcy cases, the rules of discovery under the Federal Rules of Civil Procedure apply. *Fed. R. Bankr. P. 7026-7037.* Failure to respond to discovery posed under Rules 7033 and 7034 permits imposition of sanctions under Rule 7037. Under Rule 7037, a bankruptcy court may dismiss an action or proceeding for failure to comply with discovery orders. *Fed. R. Civ. P. 37(b)(2)(C).*

**Civil Procedure > Dismissal of Actions**
[HN6] The following factors govern a determination of whether to impose the sanction of dismissal: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal; and (6) the meritoriousness of the claims. Not all of such factors need be satisfied in order to dismiss a complaint. Instead, the decision must be made in the context of the district court's extended contact with the litigant.

**Civil Procedure > Appeals > Standards of Review > Abuse of Discretion**
**Bankruptcy Law > Practice & Proceedings > Appeals**
[HN7] Sitting as a court of appeal, an United States District Court must review an United States Bankruptcy Court's decision for abuse of discretion.

**Bankruptcy Law > Examiners & Trustees**
[HN8] A trustee's lack of responsibility for his counsel's dilatory conduct is not dispositive, because a client cannot always avoid the consequences of the acts or omissions of its counsel.

**Bankruptcy Law > Practice & Proceedings**
**Civil Procedure > Discovery Methods > Requests for Production & Inspection**
**Constitutional Law > Procedural Due Process > Self-Incrimination Privilege**
[HN9] A Trustee's difficulties communicating with a bankrupt due to the bankrupt's assertion of his U.S. Const. amend. V privilege regarding discovery requests does not relieve the trustee of his duty to submit timely responses asserting his inability to comply on this ground. *Fed. R. Civ. P. 34(b).* The bankrupt bears personal responsibility for any failure to meet discovery deadlines.

**Constitutional Law > Procedural Due Process > Self-Incrimination Privilege**
[HN10] The privilege against self-incrimination may be raised in civil as well as in criminal proceedings and applies not only at trial, but also during discovery. Unlike the rule in criminal cases, however, reliance on U.S. Const. amend. V in civil cases may give rise to an adverse inference against the party claiming its benefits. Use of the privilege in a civil case may therefore carry some disadvantages for the party who seeks its protection. A trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment and the effects that an invocation of the privilege against self-incrimination will have in a civil suit depends to a large extent on the circumstances of the particular litigation. Potential for exploitation and abuse of U.S. Const. amend. V privilege must be evaluated when considering the adversary's entitlement to equitable treatment, and when weighing the unfair prejudice that might result from an invocation of U.S. Const. amend. V.

**Constitutional Law > Procedural Due Process > Self-Incrimination Privilege**
[HN11] It is the initial responsibility of the court to determine whether the invocation of a U.S. Const. amend. V privilege is justified. The protection provided by U.S. Const. amend. V must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself - his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified and

1999 U.S. Dist. LEXIS 2916, *

to require him to answer if 'it clearly appears to the court that he is mistaken. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Civil Procedure > Discovery Methods > Interrogatories*
*Civil Procedure > Discovery Methods > Requests for Production & Inspection*
*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN12] If a litigant wishes to assert his U.S. Const. amend. V privilege in response to interrogatories or requests for production of documents, he must assert timely objections in response to individual discovery requests. *Fed. R. Civ. P. 33(a)* and *34(b)*.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN13] The assertion of the U.S. Const. amend. V privilege may sometimes disadvantage a party. In the civil context, where, systemically, the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding. In other words, while a trial court should strive to accommodate a party's U.S. Const. amend. V interests, it also must ensure that the opposing party is not unduly disadvantaged.

*Civil Procedure > Disclosure & Discovery*
[HN14] Discovery time limits imposed by the rules and the court serve an important purpose for the expeditious processing of litigation. If compliance is not feasible, a timely request for an extension should be made to the court. A history by counsel of ignoring these time limits is intolerable.

*Civil Procedure > Joinder of Claims & Parties*
[HN15] A claim will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by a plaintiff.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN16] The standard of review of a bankruptcy judge's denial of a motion for reconsideration is whether the bankruptcy judge abused his discretion.

COUNSEL: For LEONARD A. PELULLO, DEBTOR: ALLEN B. DUBROFF, PHILA, PA USA.

For DAVID A. EISENBERG, APPELLANT: PAUL B. MASCHMEYER, PHILA, PA USA. THOMAS J. MAIRORINO, CIARDI, MASCHMEYER & KARALIS, P.C., PHILADELPHIA, PA USA. JAMES T. HEENEY, ANATOLY WAISER, FRANK AGOSTINO, HACKENSACK, NJ USA.

For FRED SCHWARTZ, ADORNO & ZEDER, P.A., DEFENDANTS: MARK J. PACKEL, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. BRIAN P. ZIDEK, DUANE, MORRIS AND HECKSCHER, PHILA, PA USA.

For FRED SCHWARTZ, ADORNO & ZEDER, P.A., APPELLEES: MARK J. PACKEL, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. BRIAN P. ZIDEK, DUANE, MORRIS AND HECKSCHER, PHILA, PA USA.

For DAVID A. EISENBERG, TRUSTEE: PAUL B. MASCHMEYER, PHILA, PA USA. THOMAS J. MAIRORINO, CIARDI, MASCHMEYER & KARALIS, P.C., PHILADELPHIA, PA USA. JAMES T. HEENEY, ANATOLY WAISER, FRANK AGOSTINO, HACKENSACK, NJ USA.

FREDERIC R. BAKER, ESQUIRE, Pro se, [*2] PHILADELPHIA, PA USA.

JUDGES: RAYMOND J. BRODERICK, J.

OPINIONBY: RAYMOND J. BRODERICK

OPINION: MEMORANDUM

Broderick, J.

March 16, 1999

In November 1995, Leonard Pelullo ("Pelullo") filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Thereafter, Pelullo filed an adversary proceeding (the "Adversary Proceeding") against Fred Schwartz and the law firm of Adorno & Zeder (the "Defendants"). The Bankruptcy Court had jurisdiction over the Adversary Proceeding pursuant to *28 U.S.C. § 1334*(b); *28 U.S.C. § 157;* Eastern District of Pennsylvania Local Rules of Civil Procedure 1.1.1(d); Standing Order dated July 25, 1984 (as amended by Order dated November 8, 1990). Pelullo's bankruptcy case was subsequently converted to a Chapter 7 proceeding. David A. Eisenberg, Esquire, was appointed as trustee for Pelullo's bankruptcy estate (the "Trustee"), and he was substituted as the plaintiff in the Adversary Proceeding. See *11 U.S.C. § 323* (trustee is

1999 U.S. Dist. LEXIS 2916, *

representative of estate and has capacity to sue and be sued.)

On March 6, 1998, the Bankruptcy Court entered an order dismissing the Adversary [*3] Proceeding, and on August 26, 1998, the Bankruptcy Court denied the Trustee's motion for reconsideration of that order. Presently before this Court is an appeal of those orders brought by the Trustee.

Also pending before this Court is a motion by the Defendants (Appellees in the instant appeal), to strike certain portions of the Trustee's brief before this Court. For the reasons stated below, the judgment of the Bankruptcy Court will be affirmed. Consequently, the Defendants' motion to strike certain portions of the Trustee's brief will be dismissed as moot.

## The Adversary Complaint

According to the Complaint in the Adversary Action, Leonard A. Pelullo, the Debtor in this bankruptcy case, was incarcerated pursuant to certain jury verdicts in United States of America v. Leonard A. Pelullo, No. 91-60, Eastern District of Pennsylvania (the "Criminal Action"). As of the date the Complaint was filed, four trials had occurred in the Criminal Action. According to the Complaint, in each of the four trials, the Government alleged that Pelullo had converted a $ 114,000 wire transfer from a subsidiary of the Royale Group, Ltd. in order to repay a personal loan. In support [*4] of these allegations, the Government offered the testimony of two FBI Agents who claimed that during an interview with the FBI, Pelullo had admitted using the wire transfer to repay the personal loan.

According to the Complaint, Defendant Schwartz was in attendance at that FBI interview because Defendant Schwartz and his law firm, Defendant Adorno & Zeder, had agreed to serve as Pelullo's legal counsel in connection with the FBI interview and the Government's pre-indictment investigation in the Criminal Action. Defendant Schwartz no longer represented Pelullo at the time of his criminal trials. The Complaint alleges that Defendant Schwartz repeatedly promised Pelullo and/or his trial lawyers that he would testify that Pelullo did not admit during the FBI interview that he had used the wire transfer to repay a personal loan. However, the Complaint alleges, Schwartz failed to testify at the trials, and intentionally evaded and hid from service of witness subpoenas. As a result, according to the Complaint, Pelullo was deprived of the exculpatory evidence that Schwartz would have provided at the trials.

The Complaint in the Adversary Proceeding alleges three causes of action under state [*5] law: one count of breach of fiduciary duty, one count of negligence/malpractice, and one count of promissory estoppel/detrimental reliance.

## The Adversary Proceeding in the Bankruptcy Court

On May 20, 1997, the Bankruptcy Court entered a pretrial order in the Adversary Proceeding setting a discovery deadline of July 21, 1997. Defendants' counsel served Pelullo with their first set of interrogatories and first set of requests for production on June 10, 1997, and Pelullo's responses to these interrogatories and requests for production were due on July 10, 1997. However, on June 26, 1997, Pelullo's case was converted to a Chapter 7 proceeding, and the Trustee, along with Trustee's counsel, were appointed. Pelullo had not responded to the Defendants' discovery requests as of the date of the conversion, and on August 25, 1997, Defendants served a copy of the discovery requests on the Trustee. The Trustee's responses to these discovery requests were due on September 24, 1997.

On November 6, 1997, Defendants had not received any responses to their discovery requests and they contacted the Trustee in writing, requesting the outstanding discovery. On November 20, 1997, having [*6] still received no responses, the Defendants filed a motion to compel discovery. On December 2, 1997, the Bankruptcy Court conducted a conference call with Defendants and the Trustee. The Bankruptcy Court did not extend the deadline for responding to the outstanding discovery requests, nor did the Bankruptcy Court issue an order compelling responses to those requests.

On December 11, 1997, Defendants again contacted the Trustee seeking responses to the original discovery requests no later than January 2, 1998. Defendants received no response to this letter, and on January 7, 1998, the Defendants filed a second motion to compel discovery and for imposition of sanctions.

On January 15, 1998, the Bankruptcy Court conducted a hearing to consider the Defendants' second motion to compel. At that hearing, the Bankruptcy Court approved a consent order jointly submitted by the Trustee and the Defendants ("Consent Order") which required, in part, that "the Trustee shall serve full and complete answers to the Defendants' First Set of Interrogatories on counsel for the Defendants on or before February 3, 1998." Further, the Consent Order provided that "if the Trustee fails to comply with this [*7] Order, this adversary proceeding shall be dismissed with prejudice upon notice to the Court of the Trustee's failure to comply with this Order."

On February 4, 1998, having not received any response to the discovery requests, the Defendants filed a praecipe and certification for dismissal of the Adversary Proceeding, seeking dismissal of the Adversary

1999 U.S. Dist. LEXIS 2916, *

Proceeding as provided in the Consent Order. However, in an ex-parte letter to the Bankruptcy Court dated February 3, 1998, the Trustee requested an additional thirty-day extension of the Consent Order's February 3, 1998 deadline. The letter claimed that Pelullo's recent movement from one prison facility to another prevented Pelullo from having access to his legal documents and prevented preparation of any meaningful discovery responses. The Trustee stated that "while compliance [with the Consent Order] at this time is impossible, a modest deadline extension would allow Pelullo an opportunity to provide full and fair disclosure." On February 19, 1998, the Bankruptcy Court granted the extension, and the revised deadline for providing responses to the discovery requests was March 5, 1998.

On March 6, 1998, the Defendants still had received [*8] no response to the discovery requests. They filed a second praecipe and certification for dismissal of the Adversary Proceeding. On March 6, 1998, the Bankruptcy Court, in accordance with the Consent Order, entered an order dismissing the Adversary Proceeding with prejudice. The Bankruptcy Court noted that "the Trustee did not file any request for a further extension beyond March 5, 1998 -- the very date sought by the Trustee, and approved by me on 2/19/98 -- namely, 30 day extension from the deadline ordered on 1/15/98."

On March 14, 1998, the Trustee filed a motion for reconsideration, asking the Bankruptcy Court to vacate its order dismissing the Adversary Proceeding. In his motion for reconsideration, the Trustee raised for the first time the fact that the Debtor, Leonard Pelullo, intended to exercise his Fifth Amendment privilege against self-incrimination in response to the Defendants' discovery requests. In support of this assertion, the Trustee submitted the Certification of Allen Dubroff, Esquire, an attorney for Pelullo, who stated that he had "conferred with Mr. Pelullo and he has informed me that he asserts his Fifth Amendment right against self-incrimination, and accordingly, [*9] at this time, will not be responding to Defendants' interrogatories and requests for production of documents." This Certification of Allen Dubroff, Esquire, is dated February 27, 1998. The Trustee also submitted a letter from Richard A. Ripley, another of Pelullo's criminal attorneys, advising Pelullo to assert his Fifth Amendment privilege in connection with the discovery requests in the Adversary Proceeding. This letter is dated March 2, 1998. In his motion for reconsideration, the Trustee also sought a stay of discovery in the Adversary Proceeding.

On August 26, 1998, the Bankruptcy Court denied the motion for reconsideration, specifically outlining the reasons for the entry of the order dismissing the Adversary Proceeding, and finding that "the trustee has not established that reconsideration is necessary due to an intervening change in controlling law, the availability of new evidence not previously available or to correct a clear error of law or prevent manifest injustice." Moreover, the Bankruptcy Court noted, "case law supports the proposition that [HN1] a defendant is entitled to dismissal of a civil complaint where the plaintiff places the defendant at an undue disadvantage by [*10] raising his Fifth Amendment privilege to refuse to respond to discovery that is necessary to enable the defendant to prepare a defense to the civil complaint, *Serafino v. Hasbro, Inc., 82 F.3d 515, 518-19 (1st Cir. 1996),* and we find this body of law equally applicable to the case before us."

**Jurisdiction and Standard of Review**

[HN2] Title *28 U.S.C. § 157*(b)(1) provides that a bankruptcy judge may only enter appropriate orders and judgments, subject to review under section 158, for "core proceedings arising under title 11, or arising in a case under title 11..." In a non-core proceeding, a bankruptcy judge may enter appropriate orders and judgments, subject to review under § 158, only if the parties consent. § 157(c)(2). Without the consent of the parties in a non-core proceeding, the bankruptcy court must submit proposed findings of fact and conclusion of law to the district court, which enters final judgment. § 157(c)(1).

A proceeding is "core" if it "invokes a substantive right provided by title 11 or if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *Torkelsen v. Maggio (In re the Guild and Gallery Plus, Inc.),* [*11] *72 F.3d 1171, 1178 (3rd Cir. 1996)* (citation omitted); see also *28 U.S.C. § 157*(b)(2). The claims raised in the Adversary Complaint, as heretofore discussed, are clearly non-core, since they neither invoke a right provided by Title 11 nor could they arise only in the context of a bankruptcy case. The claims depend solely on state law and could proceed outside of the bankruptcy court.

However, it is also clear from the Consent Order entered into by both the Trustee and the Defendants that all parties consented to the Bankruptcy Court's entering final judgment in this case, in the event that the Trustee did not meet the discovery deadlines set in the Consent Order. See *In re Lease-A-Fleet, Inc., 1992 U.S. Dist. LEXIS 5785, 1992 WL 81326* (E.D.Pa.); *In re Westbrook, 123 B.R. 728, 730 (Bankr.E.D.Pa. 1991).* Therefore, pursuant to *28 U.S.C. § 157*(c)(2), this Court sits as an appellate court and has plenary review of questions of law. [HN3] Findings of fact may not be set aside unless clearly erroneous. See *Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94, 99 (3rd Cir. 1988).*

1999 U.S. Dist. LEXIS 2916, *

## Issues on Appeal

The Trustee presents the following issues for appeal:

1. Whether the Bankruptcy [*12] Court's dismissal of this adversary proceeding was in error;

2. Whether the Bankruptcy Court's denial of Plaintiff's Motion for Reconsideration under *F.R.Civ.P. 59(e)* constituted an error;

3. Whether the Bankruptcy Court failed to consider Plaintiff's Motion for Reconsideration under *F.R.Civ.P. 60(b)*;

4. Whether Plaintiff's Motion for Reconsideration should have been granted under *F.R.Civ.P. 60(b)(1)* and (b)(6);

5. Whether the Bankruptcy Court's conclusion that Plaintiff has asserted Fifth Amendment privilege against self-incrimination is an error;

6. Whether debtor's temporary assertion of his Fifth Amendment privilege against self-incrimination entitles Defendants to dismissal with prejudice;

7. Whether the Bankruptcy Court's denial of Plaintiff's Motion for Reconsideration constitutes an abuse of discretion.

## The Dismissal Order

The Bankruptcy Court was well within its discretion in dismissing the Adversary Proceeding. To begin, the Bankruptcy Court dismissed the Adversary Proceeding pursuant to the Consent Order into which the Trustee had freely entered. That Consent Order explicitly provided that the Adversary Proceeding would be dismissed in the event [*13] the Trustee failed to respond to the outstanding discovery requests by March 5, 1998, which is precisely what happened. The Bankruptcy Court noted in its dismissal order that it was dismissing the Adversary Proceeding in accordance with the terms of the Consent Order. [HN4] As a general rule, parties to a consent judgment cannot appeal that judgment. See, e.g., *Anderson v. White, 888 F.2d 985, 991 (3rd Cir. 1989)*.

It is clear that the Bankruptcy Court acted entirely within its discretion in dismissing the Adversary Proceeding pursuant to the terms of the Consent Order.

Nonetheless, out of an abundance of caution, this Court will undergo a thorough analysis of the Bankruptcy Court's decision to dismiss the Adversary Proceeding, and this Court will evaluate the merits of the Fifth Amendment issues raised by the Trustee. Such an analysis likewise reveals no abuse of discretion on the part of the Bankruptcy Court.

[HN5] In adversary proceedings in bankruptcy cases, the rules of discovery under the Federal Rules of Civil Procedure apply. See e.g., *Fed.R.Bankr.P. 7026-7037*. Failure to respond to discovery posed under *Fed.R.Bankr.P. 7033 & 7034* permits imposition of sanctions under [*14] Fed.R.Bankr.P. 7037. See, e.g., *Fed.R.Civ.P. 33(b)(5)*; *Fed.R.Civ.P. 37(a)(2)(B)*. Under *Fed.R.Bankr.P. 7037*, a bankruptcy court may dismiss an action or proceeding for failure to comply with discovery orders. See *Fed.R.Civ.P. 37(b)(2)(C)*: see also *Burns v. MacMeekin (In re MacMeekin), 722 F.2d 32, 34 (3d Cir. 1983)*(holding that "dismissal with prejudice is the ultimate sanction for failure to comply with discovery orders").

[HN6] The following factors govern a determination of whether to impose the sanction of dismissal: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal; and (6) the meritoriousness of the claims. *United States of America v. One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d 433, 439 (3rd Cir. 1991); Poulis v. State Farm Fire & Casualty Co., 747 F.2d 863, 868 (3rd Cir. 1984).*

The Third Circuit has also provided the [*15] following guidance with regard to the application of these Poulis factors:

> ...Poulis did not provide a magic formula whereby the decision to dismiss or not to dismiss a plaintiff's complaint becomes a mechanical calculation easily reviewed by this Court. As we have already recognized, not all of the Poulis factors need be satisfied in order to dismiss a complaint. See *C.T. Bedwell & Sons, Inc. v. Int'l. Fidelity Ins. Co., 843 F.2d 683, 696 (3rd Cir. 1988)*. Instead, the decision must be made in the context of the district court's extended contact with the litigant.

1999 U.S. Dist. LEXIS 2916, *

*Mindek v. Rigatti, 964 F.2d 1369, 1373 (3rd Cir. 1992).*

[HN7] Sitting as a court of appeal, this Court must review the Bankruptcy Court's decision for abuse of discretion. *One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d at 439; Poulis, 747 F.2d at 870.* In doing so, this Court will address the Poulis factors seriatim.

1. The extent of the party's personal responsibility. The Trustee was substituted as the Plaintiff in the Adversary Proceeding upon conversion of Pelullo's bankruptcy to a Chapter 7 proceeding, and is therefore [*16] the "party" in question. See *11 U.S.C. § 323.* There appears nothing in the record to suggest that the Trustee himself, as opposed to his attorneys, is personally responsible for the persistent failure to meet discovery deadlines. However, the Court notes that the Trustee, while represented by attorneys, is himself an attorney, and was thus aware of the need to respond to discovery requests, and of the consequences of failing to do so. [HN8] Furthermore, even assuming the Trustee bore no personal responsibility, his "lack of responsibility for [his] counsel's dilatory conduct is not dispositive, because a client cannot always avoid the consequences of the acts or omissions of its counsel." *Poulis, 747 F.2d at 868* (citing *Link v. Wabash Railroad, 370 U.S. 626, 633, 82 S. Ct. 1386, 1390, 8 L. Ed. 2d 734)(1962)).*

[HN9] Moreover, the Trustee's difficulties communicating with Pelullo due to Pelullo's assertion of his Fifth Amendment privilege did not relieve the Trustee of his duty to submit timely responses asserting his inability to comply on this ground. *One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d 433, 439; Fed.R.Civ.P.* [*17] *34(b).*

Finally, even if this Court were to treat Pelullo as the real party in interest in the Adversary Proceeding, Pelullo also bears personal responsibility for the failure to meet the discovery deadlines. Specifically, his assertion of his Fifth Amendment privilege, under the circumstances discussed below, does not justify the failure to respond in any form to the Defendants' discovery requests.

In *SEC v. Graystone, 25 F.3d 187, 190 (3rd Cir. 1994),* the Third Circuit held:

> [HN10]
> The privilege against self-incrimination may be raised in civil as well as in criminal proceedings and applies not only at trial, but during the discovery process

as well. Unlike the rule in criminal cases, however, reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits. *Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810, 821 (1976).* Use of the privilege in a civil case may, therefore, carry some disadvantages for the party who seeks its protection.

*SEC v. Graystone Nash, Inc., 25 F.3d 187, 190 (3rd Cir. 1994).* The Third Circuit further held that in connection with the use of a Fifth Amendment [*18] privilege in a civil case, "[a] trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment," and that "the effects that an invocation of the privilege against self-incrimination will have in a civil suit depends to a large extent on the circumstances of the particular litigation." *Id. at 192.* The Court in Graystone also noted that the potential for exploitation and abuse of the Fifth Amendment Privilege must be evaluated when considering the adversary's entitlement to equitable treatment, and when weighing the unfair prejudice that might result from an invocation of the Fifth Amendment. *Id. at 190.*

In *Hoffman v. U.S., 341 U.S. 479, 486, 95 L. Ed. 1118, 71 S. Ct. 814 (1951),* the United States Supreme Court held that [HN11] it is the initial responsibility of the court to determine whether the invocation of a Fifth Amendment privilege is justified:

> [the] protection [provided by the Fifth Amendment] must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer... The witness is not exonerated from answering merely [*19] because he declares that in so doing he would incriminate himself -- his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, ... and to require him to answer if 'it clearly appears to the court that he is mistaken.'... To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it

1999 U.S. Dist. LEXIS 2916, *

cannot be answered might be dangerous because injurious disclosure could result.

*Hoffman, 341 U.S. 479 at 486, 95 L. Ed. 1118, 71 S. Ct. 814* (internal citations omitted).

Having reviewed the Defendants' interrogatories and requests for production of documents which Pelullo has refused to answer, this Court has determined that Pelullo's blanket invocation of the Fifth Amendment to justify his complete failure to respond to any of the Defendants' discovery requests is an abuse of the Fifth Amendment privilege in this civil action instituted by Pelullo. To begin, [HN12] the law is clear that if a litigant wishes to assert his Fifth Amendment privilege in response to interrogatories or requests for production [*20] of documents, he must assert timely objections in response to individual discovery requests. *Fed.R.Civ.P. 33(a), 34(b); One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d 433, 439.* Furthermore, while several of the Defendants' interrogatories call for responses which might tend to incriminate Pelullo (i.e. requesting information regarding Pelullo's relationships and business dealings with Anthony DiSalvo and Nicodemo Scarfo), it is clear to this Court that there is no evidence, in the context of this civil action which Pelullo instituted, that a responsive answer to the vast majority of the Defendants' discovery requests might in any way tend to incriminate Pelullo. This Court specifically finds that there is no justification for Pelullo's claiming his Fifth Amendment privilege in relation to the following interrogatories and requests for production of documents:

1. State the dates the law firm of Adorno & Zeder, P.A. represented the Plaintiff and describe the scope of each such representation, including a description of the matters that Adorno & Zeder, P.A. were instructed to provide representation and counsel on behalf [*21] of the Plaintiff.

2. State the dates Fred Schwartz represented the Plaintiff and describe the scope of each such representation, including a description of the matters Fred Schwartz was instructed to provide representation and counsel on behalf of the Plaintiff.

3. State the dates of trials referenced in paragraphs 8 and 12 of the Complaint.

****

7. State each and every fact upon which you base your allegations in paragraph 9 of the Complaint. In addition, identify all witness and documents you relied on in making these allegations.

8. State each and every fact upon which you base your allegation in paragraph 11 of the Complaint that Fred Schwartz "admitted that Pelullo did not state during the [FBI interview] that the Wire Transfer was sued [sic] to repay the DiSalvo loan." In addition, identify all witness and documents you relied on in making these allegations.

9. State each and every fact upon which you base your allegation in paragraph 12 of the Complaint that Fred Schwartz repeatedly promised you and/or your "trial lawyers" that he would attend the trials and testify on your behalf. In addition, identify all documents and witnesses you relied on in making this allegation [*22] and identify each of your "trial lawyers."

10. State each and every fact upon which you base your allegations in paragraph 13 of the Complaint that Fred Schwartz refused to attend each of the trials in the [Criminal Action] to testify regarding his knowledge of the statements made during the [FBI interview]. In addition, identify all documents and witness you relied on in making these allegations.

11. State each and every fact upon which you base your allegations in paragraph 13 of the Complaint that Fred Schwartz represented to you and your trial lawyers that he would be present at certain locations to accept service of a witness subpoena. In addition, identify all documents and witnesses you relied on in making this allegation and identify each of your "trial lawyers."

12. State each and every fact upon which you base your allegations in paragraph 13 of the Complaint that Fred Schwartz "intentionally evaded and hid from service" of witness subpoenas. In addition, identify all documents and witnesses you relied on in making this allegation.

1999 U.S. Dist. LEXIS 2916, *

13. Identify all persons or companies that made or attempted service of a subpoena upon Fred Schwartz and indicate when such service was [*23] made or attempted, the locations and the result.

14. Set forth, in detail, the "exculpatory evidence" that Fred Schwartz would have provided in the [Criminal Action] as alleged in paragraph 14 of the Complaint. In addition, identify all documents and witnesses you relied on in making this allegation.

****

16. State each and every fact upon which you base your allegation in paragraph 16 of the Complaint that Fred Schwartz "violated the attorney/client privilege between Schwartz and Pelullo by providing information to the U.S. Government and other parties that is protected by the attorney/client privilege and/or work product doctrine." In addition, identify all documents and witnesses you relied on in making this allegation and identify the representatives of the U.S. Government and the "other parties" discussed in paragraph 16 of the Complaint.

17. Identify all counsel who represented the Plaintiff in connection with any of the trials or appeals in the [Criminal Action].

18. State each and every fact upon which you base your allegation in paragraph 27 of the Complaint that you relied upon Fred Schwartz's representations and or promises to your detriment in preparing for and/or [*24] conducting the trials in the [Criminal Action]. In addition, identify all documents and witnesses you relied on in making this allegation.

19. State each and every fact upon which you base your allegation in paragraphs 20, 24, and 28 of the Complaint that you have incurred legal fees and expenses of $ 2,500,000 through the four trials and three appeals associated with the [Criminal Action] and identify any and all documents concerning or relating to the foregoing.

20. State each and every fact upon which you base your allegation in paragraphs 20, 24, and 28 of the Complaint that you have "been forced to forfeit to the United States Government in assets with a value in excess of $ 8,000,000" and identify any and all documents concerning or relating to the forgoing. In addition, identify the assets that you allege were forfeited to the United States government.

22. State each and every fact upon which you base your allegation in paragraphs 20, 24, and 28 of the Complaint that you have lost income in excess of $ 5,000,000 and identify any and all documents concerning or relating to the foregoing.

23. State each and every fact upon which you base your allegation in paragraphs 20, [*25] 24, and 28 of the Complaint that default judgments in excess of $ 50,000,000 have been entered against you and identify any and all documents concerning or relating to the foregoing.

****

26. With respect to each expert you have consulted (or expect to consult) in the preparation of your case, and whom you expect to call as an expert witness during the trial of this Complaint [provide certain information regarding the expert's background and opinions.]

27. To the extent not provided in the answer to the preceding interrogatory, identify each other witness you intend to call at trial, and as to each provide [information about the witness's background and their expected testimony.]

28. Identify all exhibits that you intend to and/or will introduce at the trial of this adversary proceeding.

29. Identify all individuals who provided information used to answer these interrogatories, and as to each individual provide the following information: a. name; b. interrogatory or interrogatories for which information was provided; and c. current or last known address if such individual is not the Plaintiff.

1999 U.S. Dist. LEXIS 2916, *

30. Identify the date you answered these interrogatories.

Requests for Production [*26] of Documents:

1. Produce all documents which are identified in response to the interrogatories set forth above or which provide information upon which the Plaintiff has relied in answering the foregoing interrogatories.

2. Produce all exhibits which the Plaintiff expects to offer in evidence or have identified at trial.

3. Produce all documents which the Plaintiff contends support the allegations contained in Plaintiff's Complaint.

4. Produce all documents evidencing or reflecting the dates either of the Defendants represented the Plaintiff and/or the scope of such representation, including, but not limited to, engagement and retainer letters.

5. Produce all documents constituting, evidencing, summarizing or reflecting any verbal or written communications between Plaintiff and either of the Defendants.

****

7. Produce all indictments of the Plaintiff.

****

11. Produce all post-trial motions, pleadings, and other documents filed by the Plaintiff in connection with the [Criminal Action].

12. Produce all appellate briefs filed by the Plaintiff in connection with the [Criminal Action].

****

There can be no question that Pelullo's blanket assertion of his Fifth [*27] Amendment privilege in refusing to respond to all of the Defendants' discovery requests is an abuse of the privilege, especially in view of the fact that he is required to give specific answers to specific questions. *One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d 433, 439; Fed.R.Civ.P. 34(b).* As to the majority of the Defendants' interrogatories and requests for production of documents,

this Court has found that there is nothing in the questions themselves nor in the context in which they were asked which would suggest that responsive answers could in any way tend to incriminate Pelullo. Thus, Pelullo's use of the Fifth Amendment privilege provides no justification for Pelullo's or the Trustee's failure to provide discovery responses in compliance with the Consent Order entered into by the Trustee and the Defendants, and issued by the Bankruptcy Court.

Moreover, even if Pelullo's invocation of his Fifth Amendment privilege was valid in connection with a few of the Defendants' discovery requests, it may nonetheless "carry some disadvantages" and must be balanced against "the adversary's entitlement to equitable treatment," [*28] as has been previously noted. *Graystone, 25 F.3d 187, 190, 192.* Assuming for the sake of argument now that Pelullo's invocation of his Fifth Amendment privilege was valid in connection with a few of the Defendants' discovery requests, and having weighed the equitable interests of the Defendants to obtain information related to the claims against them, there is no question that Pelullo's assertion of his privilege does not absolve Pelullo or the Trustee of their responsibility for their repeated failure to respond to most of the Defendants' discovery requests.

In *Serafino v. Hasbro, Inc., 82 F.3d 515 (1st Cir. 1996),* the First Circuit held that a district court's dismissal of a case was proper where the plaintiff asserted his Fifth Amendment privilege in a civil action, which resulted in the defendants being unable to obtain information which was central to the case against them -- information which could not be obtained from any other source. The First Circuit stated:

[HN13]
The Supreme Court has indicated that the assertion of the privilege may sometimes disadvantage a party... We think that in the civil context, where, systemically, the parties are on a somewhat equal [*29] footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding. In other words, while a trial court should strive to accommodate a party's Fifth Amendment interests, ... it also must ensure that the opposing party is not unduly disadvantaged.... After balancing the conflicting interests, dismissal may be the only viable alternative.

*Id. at 518* (internal citations omitted). In Serafino, the First Circuit upheld the District Court's findings that the information requested, and which the plaintiff

refused to supply on Fifth Amendment grounds, was central to the defendants' defense; that there was no effective substitute for the plaintiff's answers; and that there was no adequate alternative remedy to dismissal.

In the instant Adversary Proceeding, Pelullo, who brought the action in the first instance, has asserted his Fifth Amendment privilege and refused to respond to all discovery requests made by the Defendants. There is no question that the requested information is central to the Defendants' defense in the Adversary Action, and it is also clear that most of the information requested could only be provided by [*30] Pelullo. Thus, Pelullo's broad assertion of his Fifth Amendment privilege cannot justify Pelullo's or the Trustee's conduct in the Bankruptcy Court, and does not absolve the Trustee and Pelullo of responsibly to respond to discovery in connection with the vast majority of the discovery requests wherein this Court has determined, based on the implications of the questions and the setting in which they were asked, that a responsive answer could in no way tend to incriminate Pelullo.

Finally, this Court notes that unlike in Graystone or Serafino, the Bankruptcy Court did not dismiss the Adversary Proceeding as a result of Pelullo's assertion of his Fifth Amendment rights. Indeed, the Fifth Amendment issue was first raised by the Trustee in his motion for reconsideration of the Bankruptcy Court's dismissal order, which was based on entirely different grounds. Pelullo's assertion of his Fifth Amendment privilege was offered by the Trustee after his case was dismissed as a justification for his failure to respond timely to the Defendants' discovery requests. As the Third Circuit noted in One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight [*31] Cents, under remarkably similar circumstances: "both claimants simply ignored all discovery requests, ignored the court's order compelling discovery, and apparently never mentioned [one of the claimant's] Fifth Amendment privilege in relation to the discovery requests until after the claims had been dismissed.... Thus, the Fifth Amendment provides no justification for the claimant's conduct in the district court." *938 F.2d 433, 439*.

2. Prejudice to the adversary. There has been prejudice to the Defendants as a result of the Trustee's repeated failure to respond to discovery requests and to obey the Bankruptcy Court's order. The proceeding was delayed, and the Defendants were required to move to compel discovery twice. See *One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d at 440; Poulis, 747 F.2d at 868*. The Defendants "encountered lack of cooperation from the plaintiff in areas where the plaintiff should

cooperate under the spirit of the federal procedural rules." *Poulis, 747 F.2d at 868*.

3. A history of dilatoriness. As discussed in the chronology of events recounted above, the Trustee in this case repeatedly [*32] violated discovery deadlines, both those prescribed by *Fed.R.Civ.P. 33(a)* and *34(b)*, and those imposed by the Bankruptcy Court. The Trustee failed to respond to requests to provide discovery prior to the filing of the motions to compel, and the Trustee flagrantly disobeyed the Bankruptcy Court's orders compelling discovery. See *One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents, 938 F.2d at 440*. [HN14] "Time limits imposed by the rules and the court serve an important purpose for the expeditious processing of litigation. If compliance is not feasible, a timely request for an extension should be made to the court. A history by counsel of ignoring these time limits is intolerable." *Poulis, 747 F.2d at 868*.

Furthermore, while not relying on this fact in deciding this case, this Court notes that the Trustee has a history of dilatoriness with this Court that extends beyond the instant appeal. Specifically, this Court dismissed another Adversary Proceeding in this same bankruptcy case which had been withdrawn from the Bankruptcy Court and which was being prosecuted by the Trustee. That Adversary Proceeding was dismissed because of the Trustee's [*33] failure over many months to respond to a motion to dismiss, despite an order from this Court to do so. The Court notes that the law firm which represented the Trustee in that case also represented the Trustee in the Adversary Proceeding below and in the instant appeal.

4. Whether the attorney's conduct was willful or in bad faith. While there is nothing in the record directly to suggest that the Trustee or the attorneys representing him acted in "bad faith" in failing to respond to discovery requests from September of 1997 until March of 1998, there is also nothing in the record to excuse the Trustee's failure to answer those discovery requests with regard to which this Court has determined there was no basis for taking the Fifth Amendment. There is also nothing in the record to excuse the Trustee's failure to request additional time in which to respond to the outstanding discovery. Furthermore, as heretofore discussed, a response to all of the Defendants' discovery requests by a plea of the Fifth Amendment, without answering each question, was an abuse of the privilege.

5. Alternative sanctions. After repeatedly failing to respond to the Defendants' discovery requests, in violation [*34] of both the Federal Rules of Civil Procedure and the Bankruptcy Court's orders, the Trustee entered into a Consent Order in which he specifically

agreed that the case should be dismissed if he failed to respond to the outstanding discovery requests as ordered by the Bankruptcy Court. Therefore, regardless of what alternative sanctions may have been available to the Bankruptcy Court, there can be no question that the sanction of dismissal was appropriate, particularly given that this Court has found, based on the implications of the question and the setting in which it was asked, that a responsive answer to the vast majority of the discovery requests could in no way tend to incriminate Pelullo.

6. Meritoriousness of the claim. [HN15] "A claim ... will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff...." *Poulis, 747 F.2d at 869-70.* This Court will not speculate on the meritoriousness of the claims in the Adversary Proceeding given that the other Poulis factors weigh so heavily in favor of dismissal.

The Poulis factors strongly support the Bankruptcy Court's decision to dismiss the Trustee's claims in the [*35] Adversary Proceeding. The Bankruptcy Court soundly exercised its discretion in dismissing the Adversary Proceeding, and this Court will therefore affirm the Dismissal Order of March 6, 1998.

**The Reconsideration Order**

[HN16] The standard of review of a bankruptcy judge's denial of a motion for reconsideration is whether the bankruptcy judge abused his discretion. *Marta Group, Inc. v. County Appliance Co., Inc., 79 B.R. 200, 205 (E.D.Pa. 1987); see also North River Insurance Company v. Cygnet Reinsurance Company, 52 F.3d 1194, 1203 (3rd Cir. 1995); Lorenzo v. Griffith, 12 F.3d 23, 26 (3rd Cir. 1993).* The Bankruptcy Court was clearly within its discretion in denying the Trustee's Motion for Reconsideration, regardless of whether that motion was considered pursuant to *Fed.R.Civ.P. 59(b)* or *Fed.R.Civ.P. 60(b).*

**Defendants' Motion to Strike**

Finally, the Defendants have brought a motion to strike certain portions of the Trustee's brief before this Court. Because all issues in this appeal have been resolved in favor of the Defendants, and because this Court will affirm the judgments of the Bankruptcy Court, the Defendants' motion to strike certain portions [*36] of the Trustee's brief will be dismissed as moot.

For the reasons stated above, the order of the Bankruptcy Court dated March 6, 1998, dismissing the Trustee's Adversary Proceeding, will be affirmed. Likewise, the order of the Bankruptcy Court dated August 26, 1998, denying the Trustee's motion for reconsideration, will also be affirmed. The motion by the Defendants to strike certain portions of the Trustee's brief will be dismissed as moot.

An appropriate Order follows.

**ORDER**

AND NOW, this 16th day of March, 1999; for the reasons set forth in this Court's accompanying memorandum of this date;

**IT IS ORDERED:** The Order of the Bankruptcy Court dated March 6, 1998, dismissing the Trustee's Adversary Proceeding, is **AFFIRMED**;

**IT IS FURTHER ORDERED**: The Order of the Bankruptcy Court dated August 26, 1998, denying the Trustee's motion for reconsideration, is **AFFIRMED**;

**IT IS FURTHER ORDERED:** The Defendants' motion to strike certain portions of the Trustee's brief is **DISMISSED AS MOOT**.

**RAYMOND J. BRODERICK, J.**

# EXHIBIT 15

LEXSEE 2004 BANKR. LEXIS 1258

Re: United Artists Theatre Company, et al.

Case No. 00-3514 (PJW)

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE

*2004 Bankr. LEXIS 1258*

August 25, 2004, Decided

**DISPOSITION:** United Artists Theater Company's motion for reconsideration was granted and claim of Florida Department of Revenue was disallowed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A chapter 11 debtor objected to the proof claim filed by the Florida Department of Revenue (FDOR), arguing that the statute of limitations for filing an assessment had elapsed. The court denied the objection; the debtor filed a motion for reconsideration.

**OVERVIEW:** The debtor argued the FDOR's claim was time-barred under Fla. Stat. Ann. § (95.0913)(a) (2004). The FDOR asserted that the timely filed proof of claim, based on an estimate of taxes owed, constituted an assessment and was therefore filed within the statutory period. Pursuant to *Fla. Stat. Ann. § 212.12(5)(b)*, an estimate could serve as an assessment if the taxpayer failed or refused to make its records available for inspection so that no audit or examination could be made. The court had initially held that the debtor failed to cooperate in the LDOR's tax audit. However, in support of its motion for reconsideration, the debtor provided proof that it had in fact cooperated with the FDOR. Therefore, the FDOR's proof of claim did not fall within the exception of § 212.12(5)(b) that permitted an estimate to serve as an assessment.

**OUTCOME:** The motion for reconsideration was granted and the FDOR's claim was disallowed.

**LexisNexis(R) Headnotes**

*Tax Law > State & Local Tax > Administration & Proceedings*
[HN1] See *Fla. Stat. Ann. § 95.091(3)(a)* (2004).

*Tax Law > State & Local Tax > Administration & Proceedings*
[HN2] In Florida, the statutory time period for assessment of taxes can be extended by consensual written agreement. Under *Fla. Stat. Ann. § 213.23*, the executive director of the Florida Department of Revenue may enter into agreements with taxpayers which extend the period during which an assessment may be issued.

*Tax Law > State & Local Tax > Administration & Proceedings*
[HN3] See *Fla. Stat. Ann. § 212.12(5)(b)*.

**COUNSEL:** [*1]  Co-Counsel to Reorganized Debtors: James H.M. Sprayregen, James W. Kaph, III, Ryan S. Natick, Kirkland & Ellis LP, Chicago, IL. Laura Davis Jones, Christopher J. Lhulier, Wilmington, DE.

Counsel for the State of Florida Department of Revenue: Frederick F. Rudzik, Assistant General Counsel, Florida Department of Revenue, Tallahassee, FL.

**JUDGES:** Peter J. Walsh, United States Bankruptcy Judge.

**OPINIONBY:** Peter J. Walsh

**OPINION:** Dear Counsel:

This ruling is with respect to the motion for reconsideration (Doc. # 1724) filed by debtor United Artists Theatre Company ("United Artists"). United

2004 Bankr. LEXIS 1258, *

Artists objected to the proof claim filed by the Florida Department of Revenue (the "FDOR"). On March 23, 2004 I issued a letter indicating my inclination to permit the claim. Furthermore, I asked for additional briefing regarding the classification of the claim, if allowed. In response, United Artists filed a "Notice of Debtors' Response and Motion for Reconsideration of the Court's Ruling Regarding Claim Number 1686 Filed by the Florida Department of Revenue." For the reasons discussed below, the Court will grant United Artists motion and disallow the FDOR's claim.

### BACKGROUND

On January 8, 1998 the [*2]  FDOR issued a "Notification of Intent to Audit Books and Records" of United Artists. The audit period was December 1992 to June 1998. The audit commenced on October 19, 1998. The FDOR was unable to complete the audit within the statutory period and, as a result, several voluntary extensions were granted resulting in a December 31, 2001 audit deadline by which the FDOR had to issue a final assessment.

On September 5, 2000, United Artists filed voluntary petitions for relief in this Court under chapter 11 of title 11 of the United States Code, *11 U.S.C. § § 101 et seq.* The deadline for a governmental entity to file a proof of claim was March 5, 2001. The FDOR filed a claim on January 23, 2001, within the period of the first extension deadline, in the amount $ 12,208,241.40, representing use taxes. The total consisted of an unsecured claim of $ 2,923,513.79 and a priority claim of $ 9,284,727.61. The claim clearly stated at the top under the heading "claim comment text": "AUDIT BASED ON ESTIMATE PENDING REVIEW OF BOOKS AND RECORDS".

United Artists objected to the claim on March 16, 2001 and the FDOR filed a response on April 12, 2001. On November 8, 2002, the [*3]  FDOR filed an amended proof of claim, whereby the claim was reduced to $ 2,497,591.57 (the unsecured claim being $ 581,523.84 and the priority claim being $ 1,916,067.73). A "Notice of Proposed Assessment" was issued on November 25, 2002. United Artists filed a protest to the assessment on December 19, 2002 based on the statute of limitations for assessment, claiming that the notice was served after the deadline. The protest was rejected by the FDOR on May 23, 2003. The FDOR asserts that the timely filed proof of claim in this Court constituted an assessment and was therefore filed within the statutory period.

### DISCUSSION

*Section 95.091(3)(a)* of the Florida Statutes states in relevant part:

[HN1] The Department of Revenue may determine and assess the amount of any tax, penalty, or interest due under any tax . . .   which it has the authority to administer:

> 1.a. Within 3 years after the date the tax is due, any return with respect to the tax is due, or such return is filed, whichever occurs later.

*Fla. Stat. Ann. § 95.091(3)(a)* (West 2004).

[HN2] The statutory time period for assessment can be extended [*4] by consensual written agreement. See *Fla. Stat. Ann. § 213.23* ("The executive director of the department . . . may enter into agreements with taxpayers which extend the period during which an assessment may be issued. . . ."). Here, the statutory period was extended on three separate occasions, whereby the final expiration date was set for December 31, 2001.

The issue raised in this case is whether the proof of claim constituted an assessment. n1 Pursuant to Florida statute *section 212.12(5)(b)* an estimate can serve as an assessment

> n1 According to *Florida Statute section 213.015*, Florida taxpayers are entitled to certain rights. With regard to an audit and assessment, that section states in relevant part:
>
> > The right to obtain simple, nontechnical statements which explain the reason for audit selection and the procedures, remedies, and rights available during audit, appeals, and collection proceedings, including, but not limited to, the rights pursuant to this Taxpayer's *Bill of Rights* and the right to be provided with a narrative description which explains the basis of audit changes, proposed assessments, assessments, and denials of refunds; identifies any amount of tax, interest, or penalty due; and states the consequences of the taxpayer's failure to comply with the notice.
>
> *Fla. Stat. Ann. § 213.015(5).*

2004 Bankr. LEXIS 1258, *

[*5] [HN3]

> In the event any dealer or other person charged herein fails or refuses to make his or her records available for inspection so that no audit or examination has been made of the books and records of such dealer or person, . . . then, in such event, it shall be the duty of the department to make an assessment from an estimate based upon the best information then available to it. . . . Then the department shall proceed to collect such taxes, interest, and penalty on the basis of such assessment which shall be considered prima facie correct, and the burden to show the contrary shall rest upon the dealer, seller, owner, or lessor, as the case may be.

*Fl.a. Stat. Ann. § 212.12 (5)(b).*

In my March 23, 2004 letter, I concluded, based on the representations made by the FDOR's counsel at the September 11, 2003 oral argument, that since "the Debtors were not cooperating in providing books and records, so [] an accurate determination of the tax deficiency could not be established." (Doc. # 1722 at 3.) Therefore, I found that the proof of claim was sufficient to satisfy the standards of an assessment and, consequently the assessment was timely.

The [*6] motion for reconsideration filed by United Artists, however, presented new evidence showing that United Artists cooperated with the FDOR and therefore the estimate should not serve as an assessment under *section 212.12(5)(b)*. United Artists included an affidavit from Debra S. Liller, Director of Tax and subsequently Vice President of Tax for United Artists, which stated that "Debtors provided these Department of Revenue representatives with full access to Debtors' books and records." (Doc. # 1724, Aff. at 2.) Furthermore, United Artists provided a letter, dated July 10, 2001, from a representative of the FDOR to Ms. Liller, that states: "If further information is needed, I will contact you at that time." (Doc. # 1724, Aff., Ex. C.)

This evidence is directly contrary to the FDOR counsel's representations at the September 11, 2003 hearing. In its response to the motion for reconsideration, the FDOR did not dispute United Artists contention that they complied with the FDOR's requests during the audit period. Moreover, when presented with the issue at a June 9, 2004 hearing, the FDOR's counsel could not provide any specific facts regarding United Artists' alleged failure to cooperate. [*7] As a result, I find that the FDOR's proof of claim does not fall within the exception of *section 212.12(5)(b)* that permits an estimate to serve as an assessment. Therefore, the assessment was not timely filed and as a result the claim Will be disallowed.

**CONCLUSION**

For the reasons discussed above, the Court will grant United Artists' reconsideration motion and deny the claim of the FDOR.

Very truly yours,

Peter J. Walsh

**ORDER**

For the reasons set forth in the Court's letter ruling of this date, United Artists Theater Company's motion for reconsideration (Doc. # 1724) is **GRANTED** and the claim of the Florida Department of Revenue is **DISALLOWED** by reason of the objections (Doc. # 1036 and 1704) by United Artists Theater Company.

Peter J. Walsh

United States Bankruptcy Judge

Dated: August 25, 2004

# **EXHIBIT 16**

LEXSEE 1997 U.S. DIST. LEXIS 16585

**UNITED STATES ex rel. KUSNER, Plaintiff, v. OSTEOPATHIC MEDICAL CENTER of PHILADELPHIA, et al., Defendants.**

**CIVIL ACTION NO. 88-9753**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 16585*

**October 21, 1997, Decided**
**October 23, 1997, Filed**

**DISPOSITION:** [*1] Motions to dismiss for lack of prosecution GRANTED and COMPLAINT of plaintiff United States ex rel. Kusner DISMISSED WITH PREJUDICE.

**COUNSEL:** For UNITED STATES, ex rel. KUSNER, PLAINTIFF: MICHAEL S. BOMSTEIN, PINNOLA & BOMSTEIN, PHILADELPHIA, PA USA. PAUL D. INGLESBY, HEPBURN, WILLCOX, HAMILTON, & PUTNAM, PHILA, PA USA.

For OSTEOPATHIC MEDICAL CENTER of PHILADELPHIA, PHILADELPHIA COLLEGE OF OSTEOPATHIC MEDICINE, HOSPTIAL OF THE PHILADELPHIA, COLLEGE OSTEOPATHIC MEDICINE, ROBERT MEALS, M.D., DEFENDANTS: NORMAN E. GREENSPAN, BLANK ROME COMISKY & MCCAULEY, PHILADELPHIA, PA USA.

**JUDGES:** LOWELL A. REED, JR., J.

**OPINIONBY:** LOWELL A. REED, JR.

**OPINION: MEMORANDUM**

**Reed, J.**

**October 21, 1997**

This case, for various reasons to be analyzed below, has had anything but a smooth, speedy, and efficient sojourn through the legal process in the Eastern District of Pennsylvania. The complaint, filed in December 1988, contains underlying factual allegations occurring in the early 1980s. Not surprisingly, almost nine years after the filing of the complaint, defendants move to dismiss the complaint for lack of prosecution pursuant to *Federal Rule of Civil Procedure 41(b)* (Document No. 32). [*2] This pending motion, along with all responses of parties thereto, and after a hearing before the Court on this issue, and post-hearing briefs submitted by the parties, is to be resolved by the Court today. For the following reasons, it will be granted.

Relator David Kusner ("Kusner") has brought this *qui tam* action pursuant to the False Claims Act, *31 U.S.C. § § 3729-3733* against defendants Osteopathic Medical Center of Philadelphia, the Philadelphia College of Osteopathic Medicine, Hospital of the Philadelphia College of Osteopathic Medicine, PCOM Radiology Associates, OMCP Radiology Associates, and Robert Meals, M.D. ("Dr. Meals") and (collectively "defendants"). This Court has jurisdiction pursuant to *28 U.S.C. § 3732*(a).

**I. PROCEDURAL BACKGROUND**

The procedural background of this case has been previously recited in a Memorandum by this Court dated May 28, 1996 (Document No. 27), which I will briefly repeat here. Kusner commenced this action by simultaneously filing a complaint and a motion to seal the record and docket on December 23, 1988. The motion to seal the record and docket was promptly granted. The government declined to enter appearance and Kusner was permitted [*3] to proceed with the action under *31 U.S.C. § 3730*(b)(4)(B). Kusner filed a motion to unseal the record and docket of this case on May 24, 1989. For unknown reasons, this motion was

never ruled on. Approximately two years later, having apparently assumed that the record and docket were no longer under seal, Kusner served the complaint on all defendants. None of the defendants responded to the complaint, so Kusner requested and received entries of default against them. Kusner never moved for entry of default judgment and there was no activity on the docket until over three and one-half years later.

In May 1995, new counsel entered his appearance on behalf of Kusner and, through an *ex parte* letter to the Court, sought guidance as to how he should handle subpoenaing documents in light of the sealed record and docket. In response to this letter, the Court unsuccessfully conducted a search for the record in this case. A second search was conducted in 1996, at which time approximately one-half of the original documents filed in this case were found. Pursuant to Local Rule of Civil Procedure 39.3(c), the other documents of record were reconstructed from copies supplied by Kusner. [*4]

Kusner then filed a second motion to unseal the record. On March 11, 1996, the Court granted the motion to unseal the record, ordered that the complaint be served on all defendants, and vacated the entry of default.

Defendants subsequently moved to dismiss the complaint, *inter alia,* for lack of prosecution. In my Memorandum dated May 28, 1996, this Court concluded that, at that time, only one of six Poulis factors, n1 *i.e.,* history of dilatoriness, weighed in favor of dismissal. This Court found that the two-year delay in this case between the filing of the first motion to unseal the record and docket in March 1989 and the filing of a praecipe to issue alias summons in May 1991, and then another three and a-half year delay between the final entry of default in September 1991 and the appearance of a new attorney on behalf of Kusner in May 1995, constituted a history of dilatoriness. Because only one factor weighed in favor of dismissal for lack of prosecution, and because the factual record was incomplete, this Court declined to dismiss the complaint at that time. In conjunction with that ruling, this Court ordered that all discovery related to the issue of lack of prosecution [*5] n2 should proceed to the right of defendants to file an appropriate motion addressing this issue if the record should so support. See Order of May 28, 1996 (Document No. 26).

n1 The Poulis factors will be discussed in more detail infra Part II.

n2 The Order additionally permitted discovery related to the issue of subject matter jurisdiction.

Pursuant to the Court's Order and after the completion of discovery, defendants filed another motion to dismiss for lack of prosecution. Kusner filed an appropriate response. After studying the filings of the parties at length, the Court was concerned that certain issues were not adequately addressed. Consequently, a hearing and oral argument were scheduled and took place before the Court on July 24, 1997 and August 26, 1997, in which Kusner himself, and others, testified. Now, in light of the hearing and oral argument, the evidentiary record, and the post-hearing briefs and exhibits filed by the parties, the Court is confident that this arsenal of information [*6] is sufficient for resolving the motion for dismissal for lack of prosecution.

## II. DISCUSSION

A district court may in its discretion dismiss a suit that a plaintiff has failed to prosecute. See *Link v. Wabash R.R., 370 U.S. 626, 629-30, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962).* While a court should be reluctant to apply this drastic sanction, see *Titus v. Mercedes Benz of N. Am., 695 F.2d 746, 749 (3d Cir. 1982),* "the power to invoke [the] sanction [of dismissal] is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts." *Link, 370 U.S. at 629-30.* Because of the severity of the sanction of dismissal, it is "reserved for those cases where there is a clear record of delay or contumacious conduct by the plaintiff." *Titus, 695 F.2d at 749* (internal quotations omitted). Before me is such a case.

The Court of Appeals for the Third Circuit has set forth six factors to be weighed in determining whether to dismiss a claim for lack of prosecution: (1) the extent of the party's personal responsibility, (2) prejudice to the adversary, (3) history of dilatoriness, (4) willful or bad faith conduct on the part of the litigant [*7] or the attorney, (5) efficacy of alternative sanctions, and (6) meritoriousness of the claim or defense. *Poulis v. State Farm Fire Cas. Co., 747 F.2d 863, 867-68 (3d Cir. 1984);* see also *United States v. USX Corp., 68 F.3d 811, 819-20 (3d Cir. 1995); Dunbar v. Triangle Lumber and Supply Co., 816 F.2d 126, 128 (3d Cir. 1987).*

### A. Personal Responsibility

The evidence shows that Kusner made efforts to monitor his case and made persistent attempts to find an attorney to represent him in this matter. While the Court sympathizes with any frustration Kusner undoubtedly encountered through these efforts, he cannot escape responsibility for protracting this litigation spanning almost a decade.

1997 U.S. Dist. LEXIS 16585, *

Kusner was initially represented by the law firm of Hepburn, Wilcox, Hamilton & Putnam ("Hepburn"). Jeffrey Pettit ("Pettit"), formerly an attorney at Hepburn, testified that, shortly after the motion to unseal the record and serve the complaint was filed in 1989, he called the Deputy Clerk of this Court several times to inquire as to the status of the motion. (8/26/97 Tr. at 8). Pettit testified that the Deputy Clerk never responded to his inquiries. (8/26/97 Tr. at 8). During [*8] this time, Pettit testified that Kusner called him to inquire about the status of the case. (8/26/97 Tr. at 8). On one occasion, Kusner suggested to Pettit that Kusner himself would call the Deputy Clerk. (8/26/97 Tr. at 9). Kusner testified that he called and spoke with the Deputy Clerk on two occasions. (8/26/97 Tr. at 80); (Dep. of Kusner at 42-43). Kusner also testified that he visited the Clerk's Office of the courthouse and viewed the microfiche records of the case, only to discover the case was no longer listed. (8/26/97 Tr. at 81). Neither Pettit nor Kusner took any further action at that time and offered no explanation of their inactivity therein.

When Pettit left the Hepburn firm in May 1990, a debate ensued as to whether Kusner's case would remain with Hepburn or be transferred to Pettit's new firm, as each firm wanted the other to handle the matter. Pettit testified that his new law firm lacked the resources to take Kusner's case. Pettit further testified that he advised Kusner, in light of Hepburn's reluctance to further pursue the case, to find a new attorney. (8/26/97 Tr. at 10-11).

During this time period, Kusner testified that he spoke with Hepburn attorneys [*9] either via the telephone or in face-to-face meetings regarding the status of his case and that he continually tried to push the firm to move forward with it. (Dep. of Kusner at 61, 64-65, 77-78). On November 25, 1991, the Hepburn firm sent a letter to the Deputy Clerk, noting that it could not locate in its records a motion to unseal the record and docket nor did it have any indication that such motion was actually filed, and requesting that the Deputy Clerk send a copy of the motion to unseal the record and docket if one had been filed. (Pl. Exh. 6).

Kusner wrote two letters to Hepburn in August and September 1992 inquiring as to the status of his case and pushing Hepburn to move forward with it. (Pl. Ex. 2). Soon thereafter, the Hepburn firm formally withdrew its representation of Kusner in this matter. (Pl. Ex. 4).

From September 1992 through May 1995, Kusner sought representation from numerous attorneys. He spoke with approximately sixteen attorneys about representing him in this matter, of which he visited the offices of approximately a dozen. (8/26/97 Tr. at 75); (Dep. of Kusner at 82, 88). n3 Many of these attorneys

took considerable time, up to one month or more, to review [*10] the case file. (8/26/97 Tr. at 76-77, 79).

n3 Kusner specifically names several of these attorneys in his deposition and at the hearing, yet it is not necessary to repeat them here.

Since the time Pettit left the Hepburn firm until 1995, Kusner maintained frequent contact with Pettit on an informal basis and updated him as to the status of this case and his efforts to find a new attorney. Pettit suggested names of potential attorneys for Kusner to contact. (8/26/97 Tr. at 17).

Despite any confusion that surrounded the case once Pettit left the Hepburn firm, and despite the endeavors of Kusner to prod the Hepburn firm to further pursue the case, and despite the efforts of Kusner to find a new attorney to represent him in this matter, I find that Kusner remains ultimately responsible for the delay in prosecuting his case. This is not a case where the attorney failed to file a timely motion or otherwise betrayed an unwitting client. Nor is this a case where a client failed to appear at his scheduled deposition [*11] or refused to answer interrogatories. In those scenarios, the blame may be clearly attributed to the appropriate individual. Our case, however, is more nebulous. Here, the case languished due to various circumstances, including the unwillingness of the Hepburn firm to pursue the case and the subsequent search for a new attorney, rather than a specific individual's blameworthy acts or omissions. n4

n4 These circumstances also include the fact that, for reasons still not known, the record could not be found and had to be reconstructed and this Court never ruled upon the motion to unseal the record filed by Kusner in 1989. It is conceivable that, had this Court ruled on that motion, the ensuing delay may never have occurred. However, any suggestion that the Court caused the delay by not ruling on this motion is belied by the fact that there is no evidence in the record that this motion had been properly filed or came to this Court's attention in the first place. In fact, an attorney from the Hepburn firm stated that, based on his investigation, no motion to unseal the record was ever filed. See Pl. Exh. 4; Pl. Exh. 6.

While there is evidence that Kusner and Pettit telephoned the Deputy Clerk to inquire as to the case's status with respect to the motion to unseal the record, there is no evidence that they

followed up the phone calls with any formal written correspondences or filings to the Court. In November 25, 1991, after Pettit left Hepburn, an attorney from Hepburn wrote the Deputy Clerk. Pl. Exh. 6. That letter requested a copy of the motion if one had actually been filed. Although this Court regrets, on an administrative level, any lack of response to their inquiries, mere phone calls court personnel, without more, will not alleviate the responsibility of Kusner to safeguard the diligent prosecution of his case.

[*12]

It is unfortunate for Kusner that his case was entangled in an ostensible web of internal strife at the Hepburn firm with respect to which law firm, the Hepburn firm or Pettit's new law firm, should represent him in this matter. Yet, the fact remains that Kusner freely and willingly chose the Hepburn firm to represent him. At any point, Kusner could have terminated his relationship with the firm, yet he did not. In fact, it was Hepburn, and not Kusner, who eventually withdrew formally from their attorney-client relationship. See Pl. Ex. 4 (9/23/92 Letter of Hepburn); Pl. Ex. 2 (chronology). "[Kusner] voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link, 370 U.S. at 633-34;* see *Poulis, 747 F.2d at 868.*

It is also unfortunate for Kusner that his tenacity in finding an attorney to represent him in this matter was fruitless until 1995. However, all of Kusner's inquiries to and contact with attorneys, no matter how persistent and how frequent, does not change the fact that his case remained stagnant.

During the intervening years between 1989 and 1995, [*13] Kusner not once protected the record for his case or informed defendants as to the status of the case. There is no evidence of any formal correspondence or filing with the Court explaining the delay, or requesting that the case be stayed until a new attorney had been found, or asking for extensions. Nor is there any evidence that Kusner contacted defendants at any point to make defendants aware of the status of the case. Defendants thus had no knowledge of the progress, or lack thereof, of the case. And, as mentioned above, this is not the case of an unwitting client betrayed by his attorney. To the contrary, Kusner has demonstrated a legal acumen far beyond an average layperson. n5 He was aware of the lack of progress of his case as demonstrated by his periodic inquiries to the Hepburn firm as well as his inquiries at the Clerk's Office and to the Deputy Clerk. Moreover, he was also aware that

inefficient prosecution of his claim could be cause for dismissal. See Def. Ex. 5. n6

> n5 See Dep. of Kusner at 27-30 (demonstrating Kusner's knowledge of *qui tam* actions); Dep. of Kusner at 32-34 (acknowledging that Kusner had been hired as an "amateur paralegal" by the Hepburn firm). [*14]

> n6 In a letter dated March 12, 1993 to Kusner from Pettit, Pettit states, in pertinent part:

> > . . . I have also included a squib on the Pennridge Electric case in Montgomery County which was dismissed because of lack of activity for 4 1/2 years. The part that concerns me the most is the statement that one of the important factors is prejudice to the defendant which may be presumed from the delay. You might wish to share this with [attorneys at Hepburn] in your efforts to persuade them to move on your cases.

> Def. Exh. 5

For these reasons, I conclude that Kusner must accept significant personal responsibility for the dilatory manner in which his case has been prosecuted. Therefore, this factor weighs in favor of dismissal.

B. Prejudice to the Adversary

A lengthy delay may cause prejudice because of the "irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on an opposing party." *Adams v. Trustees of N.J. Brewery Employees' Pension Trust Fund, 29 F.3d 863, 874 (3d [*15] Cir. 1994)* (quotations and citations omitted). All of these prejudices are present here.

Kusner claims that defendants engaged in a practice of overstating the number of patients and the type of procedures used in the treatment of patients, thereby creating excessive billing. Kusner has in his possession billing forms that were submitted by defendants to a billing agency to generate a bill and records of names of

new patients from the period prior to his discharge in 1981. (7/24/97 Tr. at 91-92). He also has tapes of conversations with individuals purportedly evidencing the billing practices. (8/26/97 Tr. at 92). n7 However, this evidence pre-dates this cause of action and thus is not helpful to proving Kusner's claim. n8

> n7 It is possible that the passage of time during this litigation may affect the overall quality of the tapes, further prejudicing defendants. Kusner recognizes such a possibility when he states "I hope the tapes are still in playable condition, it's obviously 17 years." (8/26/97 Tr. at 92).

> n8 In my earlier Memorandum, I noted that Kusner had conceded that the six year statute of limitations under the False Claims Act bars his claim to the extent that it is based on violations that were allegedly committed before December 23, 1982. (Document No. 27 at 17).

[*16]

Defendants assert a defense based on a "front-end" billing process, also called "front-loading," and a reconciliation process. Dr. Meals, one of the defendants in this case, instituted this practice after attending a seminar given by Dr. Luther W. Brady explaining this billing method. (7/24/97 Tr. at 19). n9 This process consisted of billing for services not yet performed, ostensibly for purposes of efficiency. In this process, once a patient's course of treatment was established, including number of visits and type of treatment to be administered, the patient was billed in advance. These bills were then submitted to the appropriate government agency under the Medicare and Medicaid programs for reimbursement. If it subsequently turned out that the actual visits or number of treatments given were less than the amount billed for, Dr. Meals directed his office assistant, Beatrice Iannitto ("Iannitto"), to periodically correct and "reconcile" this over billing. (7/24/97 Tr. at 19).

> n9 Kusner submits a letter of Dr. Brady in which Dr. Brady denies advocating billing for services not rendered. See Pl. Exh. 8. However, that letter further states that Dr. Robert Bogardus of the University of Oklahoma was actively presenting seminars explaining front end loading billing procedures and Dr. Meals may have learned about this procedure from Dr. Bogardus. Pl. Exh. 8. As such, this letter does not refute the statements of defense counsel at the hearing that

Dr. Meals learned about this billing procedure at a seminar, albeit not from Dr. Brady.

> Kusner also submits another letter written by his attorney, Michael S. Bomstein, to Dr. Bogardus. See Pl. Exh. 9. This letter apparently relates to an earlier conversation that occurred between Mr. Bomstein and Dr. Bogardus regarding billing practices. This letter, written by counsel for Kusner, is neither a deposition nor an affidavit, nor does it constitute in any way any reliable testimony of Dr. Bogardus. Thus, it serves little, if any, evidentiary value regarding proper billing procedures advocated by Dr. Bogardus.

[*17]

Defendants argue that in order to defend the claim against excessive and false billing, they need three types of evidence: (1) billing records, (2) patient/clinical records, and (3) reconciliation records or testimony. Defendants maintain that they have suffered significant prejudice due to the difficulty, if not impossibility, in obtaining these records as the alleged false billing practices arose as far back as fourteen years ago. I find that these original records are essential to make a proper evaluation and defense of the claim and that they are now unavailable, lost or destroyed.

Outside billing companies used by defendants have not retained the records from this period. For instance, Springfield Associates, a billing agency, disposed of records every two years, and as of 1990, had no records prior to 1988. (7/24/97 Tr. at 72). Also, Professional Medical Services, the billing agency in 1982 and 1983, was subsequently acquired by a company called Mediface. (7/24/97 Tr. at 74-75). Mediface currently has a seven-year retention policy. Therefore, there is a strong likelihood that the records from the period in question no longer exist. Counsel for both parties have been unable [*18] to obtain any relevant billing records from Blue Cross/Blue Shield. (7/24/97 Tr. at 75-76). Finally, Kusner was unable to obtain any records from the federal government. (7/24/97 Tr. at 113).

Defendants themselves no longer retain billing records from 1983. Allegheny Hospital, which had ultimately acquired the assets of the Hospital of the Philadelphia College of Osteopathic Medicine, also has a retention policy of seven years. (7/24/97 Tr. at 76).

I find that the evidentiary record demonstrates an absence of actual billing or patient records dating from the early 1980s. Defendants are prejudiced because they are not able to utilize the actual records to defend Kusner's claim.

With respect to the reconciliation process, the only staff person in charge of reconciling the overstated bills was Iannitto. At the hearing, defense counsel represented to the Court that Iannitto is currently seriously ill and no longer has any recollection of the "front-end loading" and the "reconciliation" process. (7/24/97 Tr. at 77-78, 80). n10 Thus, the dimming of Iannitto's memory over such a period of time, as well as her potential unavailability due to her illness, prejudices defendants. n11 See [*19] *Heinzeroth v. Golen, 1990 U.S. Dist. LEXIS 17661, No. 84-2407, 1990 WL 238354,* at *3 (E.D. Pa. Dec. 28, 1990).

n10 Iannitto had been deposed and was questioned directly about billing practices, including front loading and reconciliations thereto, in relation to separate litigation in state court.

In a letter to this Court dated August 25, 1997, counsel for both parties stated their "reluctance to intrude upon Mrs. Iannitto's privacy, particularly in light of her failing health." (8/25/97 Letter). Defendants' counsel had spoken to a physician, Dr. Pickins of Holy Redeemer Hospital, treating Iannitto for her cancer, regarding her availability for further interrogation. Dr. Pickins stated that she "while sometimes lucid, uses narcotics to control her pain," "is unlikely to survive the year," and is "probably not strong enough to be deposed, if at all, for more than 30-45 minutes." (8/25/97 Letter).

n11 The dimming of memories is not limited to Iannitto, but other potential witnesses, including Kusner himself. (See 8/26/97 Tr. at 96) (Kusner stated, when responding to questions about Iannitto's deposition regarding billing practices, "Over an 18-year time period, times tend to meld together a little bit").

[*20]

In an effort to offset the absent billing records, Kusner offers his handwritten columnar document of information compiled by him personally. This document is based on statistics of the number of treatments reported by defendants to the Delaware Valley Hospital Council ("Council") and on a document by Iannitto listing new patients treated during that period. According to Kusner, this compilation supports an inference that billing was excessive in January, February, and March of 1980 due to a discrepancy between the number of actual patients treated and the number of treatments being reported. (7/24/97 Tr. at 97). Kusner admits that

constructing a similar document for the years 1982 forward is only possible if similar records of patients actually treated, like that of Iannitto's, exist, and that Kusner has no knowledge of whether such documents exist. (7/24/97 Tr. at 98). However, Kusner argues that an expert statistician could compare the information from patient records with reports from the Council to show over billing and make a reasonable projection of damages of over billing in other pertinent periods. n12 Defendants counter this argument by presenting the affidavit of Joel L. [*21] Telles, vice president of the Council, who attests that the Council "does not have data and does not produce reports with billing information or summaries for specific patents [sic]." (Aff. of Telles at P 2). Telles further states that he did not believe the records could be used to determine whether or not the bills were accurately prepared because they contain "inconsistencies" and other "data integrity issues." (Aff. of Telles at PP 2).

n12 Kusner cites several cases where courts have allowed a statistical extrapolation to demonstrate overpayments. Those cases are distinguishable, however, because they all involve, in some form or another, *actual* billing records from which extrapolations of overpayment were made. See, e.g., *Ratanasen v. California Dep't of Health Servs., 11 F.3d 1467, 1468 (9th Cir. 1993)* (calculation of overpayment based on patient files and audited claims for payments); *Yorktown Med. Lab., Inc. v. Perales, 948 F.2d 84, 86-87 (2d Cir. 1991)* (extrapolating from sample of total number of overcharged claims for audited period); *Illinois Physicians Union v. Miller, 675 F.2d 151, 152 (7th Cir. 1982)* (auditing a sample of 353 records randomly selected from a total of 1,302 records for the audit period, and extrapolating overpayment for the 353 cases to the total number of cases); *Mile High Therapy Ctrs., Inc. v. Bowen, 735 F. Supp. 984, 985 (D. Colo. 1988)* (extrapolating overpayments from audit to the total claims submitted).

In our case, there was never any audit conducted of billing or patients records during the time period the alleged violations occurred. In short, there are no actual billing or patient records from which Kusner could even use to extrapolate from and to estimate overpayments.

[*22]

Allowing Kusner to prove his claim using this kind of evidence, where records are essentially recreated

1997 U.S. Dist. LEXIS 16585, *

through expert testimony, instead of actual billing records, forces defendants to defend the claim in a way they would not have had to if the case been prosecuted in a timely fashion. Had the case been prosecuted in a more timely fashion, the greater the likelihood that actual billing records would exist. This alone prejudices defendants, especially in light of the additional costs incurred when countering expert testimony. Even if Kusner fully discloses his expert testimony or he somehow locates adequate documentation of patient records from the year 1982 forward, n13 defendants cannot now properly and fully develop a defense.

n13 Subsequent to the hearing, counsel for Kusner sent a flurry of correspondences to this Court requesting that this Court postpone its decision on the outstanding motion to dismiss for lack of prosecution due to the possibility that Kusner had located actual billing records. (Document No. 42). This Court denied the request in recognition that the Court was presently in the decisionmaking process and the reliability of the evidence remains uncertain. (Document No. 41). Moreover, the Court rejected the request because there was no good cause shown why this evidence was not discovered previously. Kusner and his counsel were on notice that the lack of billing records could prejudice defendants since September 9, 1996, when defendants filed their supplemental motion to dismiss for lack of prosecution. Yet, they waited until after hearing on this motion in July and August 1997, to further attempt to locate the billing records.

[*23]

In the absence of actual billing records and patient records dating from the early 1980s, n14 and given the uncertainty of constructing such records using the Council's information, and given the scanty, if any, recollection of Iannitto, I conclude that this factor weighs heavily in favor of dismissal. n15

n14 Although Kusner argues that defendants became aware earlier, it was clear that by 1991 defendants became aware of the lawsuit when they were served with the complaint. Thus, by 1991, defendants were on notice of the claim and theoretically could have begun collecting the appropriate billing and patient records or at least attempted to prevent their destruction. In light of the seven-year retention policies described earlier, defendants could have begun in 1991

attempting to protect records from 1984 onward, but not earlier.

The complaint of Kusner alleges that the conduct complained of, particularly the billing practices of Dr. Meals, took place "until at least 1983, and, it is averred, beyond that date." Complaint P 17. In my earlier Memorandum, I concluded that Kusner sufficiently pled that the alleged fraudulent scheme at issue continued past 1983. (Document No. 27 at 18).

Kusner argues that defendants could not be prejudiced by nonexistent billing records after 1984 because defendants were aware in 1991 that the billing records were at issue. While there is some merit to this argument, I am persuaded that defendants are prejudiced by the delay. Kusner's argument does not account for the nonexisting billing records in 1983 or the dimming of memories of potential witnesses. Also, the relevant billing records at issue here would presumably have been for the time period during which Dr. Meals was associated with PCOM Radiology Associates ("PCOM"). The Court does not know the length of Dr. Meals' tenure at PCOM. Billing records outside the period of Dr. Meals' association with PCOM are not likely to be pertinent to the claim alleged. [*24]

n15 There is no evidence whatsoever that defendants deliberately destroyed billing and patient records at any time with an eye toward litigation.

C. History of Dilatoriness

The conclusion in my earlier Memorandum that this factor weighs in favor of dismissal remains unchanged. (Document No. 27 at 15). I will not revisit it here.

D. Wilfulness or Bad Faith

The evidentiary record contains no facts or allegations demonstrating "'contumacious behavior'" on the part of Kusner or the Hepburn firm. See *Adams v. Trustees, N.J. Brewery Employees' Pension Trust Fund, 29 F.3d 863, 875 (3d Cir. 1994)* (quoting *National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976)*. In *National Hockey,* the Supreme Court of the United States affirmed the dismissal of a case for lack of prosecution by the district court after plaintiffs failed to answer interrogatories despite extensions and broke promises and commitments to the court. Id. Unlike in *National Hockey,* there is no

1997 U.S. Dist. LEXIS 16585, *

instance here of flagrant noncompliance with Court orders on the part of Kusner or his attorneys. [*25] Thus, I will not impute any bad faith on either for the delay in prosecution of this suit.

Willfulness involves intentional, self-serving or strategic behavior. Id. at 875-76. The Court remains perplexed as to the failure of the Hepburn firm to proceed diligently with Kusner's case, especially in light of Kusner's repeated attempts to prod the firm forward. Even more disconcerting is the withdrawal of the Hepburn firm from its representation of Kusner after failing to prosecute the case diligently. The conduct of the Hepburn firm appears to be professionally irresponsible, n16 and thus the Court's willingness to weigh this factor in favor of dismissal is strong. However, there was no testimony given by representatives of the Hepburn firm at the hearing nor is there adequate evidence showing that Hepburn's conduct was intentional or self-serving. Therefore, I find that this Poulis factor in relation to the Hepburn firm is, at best, neutral.

> n16 Rule 1.3 of the Rules of Professional Conduct requires a lawyer to "act with reasonable diligence and promptness in representing a client."

[*26]

In terms of Kusner, I find that his efforts to contact the Deputy Clerk, to prod the Hepburn firm forward, and to seek new counsel would ordinarily be antithetical to any conclusion that Kusner acted with willful delay in the prosecution of his case. However, where, as here, Kusner is conciously aware for several years that no one is attending to his litigation in the Court or interacting with the defendants, it is tempting to infer that Kusner has crossed the line from careless dilatoriness to willful behavior. While I do not cross this line, I conclude that this Poulis factor is neutral or weighs, albeit slightly, against dismissal.

### E. Effectiveness of Other Sanctions

I have considered alternative sanctions. I could charge Kusner for the costs incurred by defendants related to the delay, require Kusner to comply with an expedited or limited discovery schedule, or impose evidentiary restrictions on Kusner. However, none of these alternatives would cure the prejudice to defendants for having to defend the claim without the existence of actual billing and patient records, nor would these alternatives serve to alert the dimming memories of potential witnesses. Thus, this [*27] factor weighs in favor of dismissal.

### F. Meritoriousness of the Claim

A claim "will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff . . . ." *Poulis, 747 F.2d at 870.* This standard is moderate. *Adams, 29 F.3d at 876.* Although there is a more full record before the Court due to the discovery taken thus far in this case, the meritoriousness of a the claim must be evaluated on the basis of the facial validity of the pleadings and not on summary judgment standards. Id.; *Scarborough v. Eubanks, 747 F.2d 871, 874 (3d Cir. 1984).*

In my Memorandum of May 28, 1996, I concluded that, accepting the well-pleaded allegations of the complaint as true as required in a motion to dismiss stage, the merits of Kusner's claim were sufficient to weigh against dismissing the instant action. (Document No. 27 at 16). Having previously reached this conclusion and in light of the moderate standard afforded to this factor, I cannot now say that the claim of Kusner is not "meritorious." n17

> n17 When a prima facie defense appears stronger than the claim, the "meritorious" factor should be weighed in favor of the defendant. *Poulis, 747 F.2d at 863.* In their answer to the complaint, defendants assert five affirmative defenses: (1) Plaintiff fails to state a claim upon which relief may be granted; (2) Plaintiff's claims is barred by laches; (3) Plaintiff's claim is barred by the statute of limitations; (4) Plaintiff's claim is barred by failure to comply with procedural requirements; (5) Plaintiff's claim is barred by lack of prosecution; and (6) the Court lacks subject matter jurisdiction to adjudicate this matter. Answer PP 18-23. In my Memorandum of May 28, 1996, I denied part of the motion to dismiss concluding that this Court did have jurisdiction, that dismissal was inappropriate for violations of procedural requirements, that the equitable defense of laches was not available, and that the statute of limitations did not bar the claim in whole, though certain time periods were barred. Therefore, the only two affirmative defenses remaining are failure to state a claim upon which relief may be granted and lack of prosecution. The failure to state a claim defense, as stated, is conclusory and not pleaded with specificity to constitute a stronger prima facie case than the claim of Kusner. While the lack of prosecution defense is afforded considerable weight for purposes of deciding this motion to dismiss, for the limited purpose of this Poulis

factor, it remains a conclusory statement which can be given no force.

[*28]

I will say, however, that the inability of counsel to locate any of the actual billing and patient records on which the alleged fraudulent acts are premised makes it more unlikely that Kusner will ultimately prevail. This sentiment is further echoed by the inescapable fact that numerous attorneys declined to represent Kusner in this matter. See, e.g., Pl. Exh. 4 (9/23/92 Letter of Hepburn to Kusner ("In short, we are not willing to go forward with the Quit Tam matter because we do not believe the case has merit."); Pl. Exh. 5 (Letter of Thompson) (declining to take case given that "many of the essential documents have apparently been lost or destroyed").

I conclude that, while the merits of the claim are facially valid forcing me to weigh this factor in favor of Kusner, at this stage of the case, which is well beyond the pleadings stage, the claim has doubtful merit.

## III. CONCLUSION

For the foregoing reasons, I will grant the motion to dismiss for lack of prosecution in favor of defendants and against Kusner. Four of the six Poulis factors weigh in favor of dismissal. While the claim of Kusner may have been facially meritorious though no longer so and while [*29] the conduct of Kusner or his attorneys was not willful or in bad faith, I note that the scales of the blind justice, though shifting in favor of Kusner ever so slightly for these two Poulis factors, in the end come to rest commandingly in favor of dismissal.

An appropriate Order follows.

## ORDER

**AND NOW**, 21st day of October, 1997, upon consideration of the motion of defendants to dismiss the complaint for lack of prosecution pursuant to *Federal Rule of Civil Procedure 41(b)* (Document No. 32), and all responses of parties thereto, and after a hearing before the Court on this issue, and for the reasons stated in the foregoing memorandum, it is hereby **ORDERED** that the motions to dismiss for lack of prosecution is **GRANTED** and the **COMPLAINT** of plaintiff United States ex rel. Kusner is **DISMISSED WITH PREJUDICE.**

This is a final Order.

**LOWELL A. REED, JR., J.**