## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRAC GROUP, INC. (f/k/a BUDGET | ) | Chapter 11 |
| GROUP, INC., *et al.*, | ) | |
| | ) | Case No. 02-12152 (CGC) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| BRAC GROUP, INC. (f/k/a BUDGET | ) | |
| GROUP, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | Adversary No. 03-54271 (CGC) |
| | ) | |
| JAEBAN (U.K.) LIMITED, | ) | |
| | ) | |
| Defendant and Counterclaim Plaintiff. | ) | |
| | ) | |

## MEMORANDUM OPINION

Robert S. Brady
Edmon L. Morton
Joseph A. Malfitano
Matthew B. Lunn
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

- and -

Larry J. Nyhan
Kenneth E. Wile
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

Attorneys for Debtors and Debtors-in-Possession

Brian A. Sullivan
Amy D. Brown
Werb & Sullivan
300 Delaware Ave., 10th Floor
Wilmington, DE 19801

Attorneys for Ibrahiem Jaeban, Assignee
of Defendant Jaeban (U.K.) Limited

May 25, 2004

BA1

**CASE, J.**

## I.    INTRODUCTION

Debtors, including BRAC Rent-A-Car International, Inc. ("BRACII"),[1] sued Jacban

(U.K.) Limited ("Jaeban"), a Budget licensee in the United Kingdom, to resolve outstanding

issues on "cure" amounts under an assumed executory contract and for affirmative relief. Jacban

counterclaimed. BRACII now seeks to strike Jaeban's answer, affirmative defenses and

counterclaims as a sanction for wilful failure to participate in this proceeding. (Docket No. 27).

## II.    FACTS

### A.    Background

Debtors filed their respective voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code on July 29, 2002. Shortly thereafter, on August 22, 2002, Debtors and

Cherokee entered into an agreement of sale of Debtors' North American assets (the "Cherokee

ASPA"). This sale excluded Debtors' business in Europe, the Middle East and Africa

("EMEA"). The sale was approved on November 8, 2002, and closed on November 22, 2002.

On January 7, 2003, BRAC began insolvency proceedings in England and an

administrator was appointed on January 14, 2003. BRACII is a U.S. company, a direct

subsidiary of BRAC Rent-A-Car Corporation, and an indirect subsidiary of BRAC Group, Inc.

### B.    The BRAC/Jaeban Agreements

Pursuant to an Umbrella Agreement dated May 5, 2001, which included an International

Prime License Agreement (the "IPLA"), BRAC (as licensor) agreed to license the Budget

trademark to Jaeban in return for certain royalties and other payments (airport concessions, rent,

---

[1]    All plaintiffs will be collectively referred to as "BRAC."

BA2

insurance, and customer complaints for the years 2001, 2002 and 2003[2]). Mr. Ibrahiem Jaeban ("Mr. Jaeban"), a principal of Jaeban, signed a personal guarantee in the amount of £500,000 in favor of BRAC arising out of obligations of Jaeban to BRAC.

C.    The Sale to Avis Europe plc

On January 10, 2003, Debtors entered into an agreement with Avis Europe plc ("Avis") to sell its EMEA assets, including the assignment of its license and related agreements with Jaeban. BRAC sent notice of the proposed assumption and assignment to Jaeban, citing £0 owing as a "cure amount" and an unspecified amount of damages owed by Jaeban to BRAC for breach of contract. Jacban objected on the grounds that BRAC owed it a net amount "not to exceed $4.5 million." The sale was approved on February 23, 2003 and closed on March 11, 2003, and included the assumption of the Jaeban contract by BRAC and its assignment to Avis. At the time of closing, the Jacban "cure" amount was unresolved; therefore, BRAC put $4.5 million in escrow to secure payment of the maximum amount claimed by Jaeban.

D.    The Adversary Proceeding

1.    The Filing of the Adversary Proceeding

On July 9, 2003, BRAC filed this adversary proceeding against Jaeban seeking an order compelling Jacban to turn over the amounts due under the IPLA in the amount of £3,006,009.10, plus interest and costs (approximately $5.4 million, U.S. dollars) (£812,484.91 for 2001; £2,034,454.81 for 2002; and £159,150.38 for 2003), overruling Jaeban's objection that BRAC owes net cure amounts, and releasing to BRAC the amounts held in escrow.

---

[2]    Set out in the Budget Operating Manual and incorporated in Article III of the IPLA, p. 13.

3

BA3

Jaeban answered and counterclaimed on August 22, 2003, denying all substantive allegations of the complaint, and asserting various affirmative defenses, including that BRAC may not recover its claim to the extent that Jaeban (1) has a right to set off; (2) has a right of recoupment; (3) has paid/satisfied the amount allegedly owed; (4) was required to cover for BRAC's breaches; and (5) has suffered consequential and incidental damages and lost profits.

Jaeban asserted the following Counterclaims: Counterclaim I alleges that BRAC breached the ILPA by failing to (1) adequately market the Budget trademark, (2) perform administrative functions, and (3) provide integrated services across critical territories; Counterclaim II alleges that BRAC failed to remit payment mistakenly made to them but owed to Jaeban in the amount of £49,724.47; and Counterclaim III alleges that BRAC provided a guaranty to Jaeban, whereby BRAC, as primary obligor, guaranteed the obligation of BRAC's subsidiary BTI (U.K.) Plc ("BTI") for leasing vehicles. Jaeban alleges it leased vehicles to BTI for which BTI owes it at least £351,180.82. In addition, Jaeban asserts damages of £70,000 arising out of BTI's alleged failure to return the vehicles. Thus, Jaeban's damage claim is £470,904.49 plus unspecified general damages.[3]

BRAC denies owing any amount to Jaeban, and asserts the following affirmative defenses: (1) BRAC's right to set off exceeds the full amount of Jaeban's claim; (2) BRAC's right to recoupment exceeds Jaeban's claim; (3) any valid claims have been paid or satisfied by BRAC; and (4) Jaeban cannot recover because BRAC was required to cover for Jaeban's breaches.

---

[3]    Jaeban's alleged entitlement to £4.5 million is not further specified beyond this general claim.

4

BRAC served its First Request for Production of Documents to Jaeban on September 23, 2003. The parties agreed to extend the response deadline to November 3, 2003.[4] BRAC alleges that Jaeban provided an incomplete set of documents. Jaeban counters that it listed 2,500 pages of documents (10 lever arch files) in its original disclosures and forwarded the documents to BRAC on November 17, 2003.

On November 26, 2003, BRAC served its Second Request for Production of Documents on Jaeban, due January 5, 2004. Jaeban indicated that it would provide documents and deposition dates, but did not. BRAC alleges that Jaeban did not respond in writing to the Second Request for Production of Documents; however, Jaeban claims to have responded on December 30, 2003. January 30, 2004 was the discovery deadline.

### 2. The January 12, 2004 Hearing

Up to this point, Jaeban had been represented by Delaware counsel Morris, Nichols, Arsht & Tunnell and the matter was proceeding fairly routinely. However, the landscape changed on October 20, 2003, when, due to Jaeban's own financial difficulties, an Administrative Receiver was appointed by its secured creditors.[5] On January 7, 2004, Delaware counsel for Jaeban moved to withdraw, on the grounds that Jaeban had "failed substantially to fulfill its obligations regarding the firm's services." The Motion stated that the U.K. solicitors, Wragge & Company, would continue to represent Jaeban. At a hearing on January 12, 2004, the withdrawal motion was granted and Jaeban was directed to retain Delaware counsel. In addition, BRAC advised the Court that by January 16, 2004, it would file a Motion for Partial Summary

---

[4]    This extension arose from the appointment of the Administrative Receiver described *infra*.

[5]    The appointment of an Administrative Receiver is a non-judicial procedure permitted under applicable English law.

5

Judgment seeking an allegedly agreed upon amount. Jacban was ordered by the Court to file a response to the motion by January 30, 2004, advised that failure to file a response would be taken as consent to the relief requested, and further advised that a response by U.K. counsel would not be acceptable. (Transcript p. 36). Mr. Allen, a U.K. solicitor with Wragge & Company, attended the hearing telephonically and stated that he understood the terms of the orders issued to Jaeban.

BRAC's counsel inquired if they should proceed by a Motion to Compel with respect to documents and depositions. The Court responded "yes . . . one of two things will happen: Either the documents and deposition will take place or you will be able to ask for sanctions [to] render that not necessary. But you can only . . . get that kind of sanction in the context of . . . disobeying an Order to compel, frankly. So, you should proceed on that same basis. . . . [T]hey're still entitled to their due process that comes from motion [practice] and discovery disputes and I think that would be the best way to proceed." (Transcript p. 37 - 38).

Although, BRAC filed a Motion for Partial Summary Judgment which was set for hearing on February 4, 2004, it did not file a Motion to Compel.

### 3.     The February 4, 2004 Hearing

The Motion for Partial Summary Judgment was unopposed. Consistent with the directions of the Court on January 12, 2004, the motion was granted. Mr. Allen, the U.K. solicitor for Jaeban, attended the hearing telephonically. He informed the Court that Jacban was still in the hands of the Administrative Receiver, that few funds remained, and that this matter is being assigned to a third party. (Transcript p. 44).

At the February 4, 2004, hearing, BRAC stated that, on February 3, 2004, it had filed a Motion for Sanctions seeking to strike Jaeban's Counterclaims – the basis for its cure objection

6

thereby allowing the escrow account to be released. (Transcript p. 50). The Court ordered Jaeban to respond, through Delaware counsel, to the Motion for Sanctions, and set a March 10, 2004 hearing and stated that failure to respond could lead to the motion being granted for lack of opposition. (Transcript p. 48 - 49).

At the hearing, the Court made it clear that it had not yet reviewed the Motion for Sanctions. The Motion asks the Court to strike Jacban's answer, affirmative defenses and counterclaims for "failing to obtain Delaware counsel, comply with the Court's scheduling order, or advance this proceeding." The specific offensive acts are:

a. Failure to obtain Delaware counsel; and

b. "Repudiation" of the Revised Scheduling Order setting January 30, 2004, as the deadline for completion of discovery.

Debtors contends there are no sanctions other than dismissal that can adequately address these failures by Jaeban, relying primarily upon *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984).

4.    Jaeban Assigns its Counterclaims

On February 20, 2004, the Jacban Receiver purportedly assigned its claim against BRAC to Mr. Jaeban, the former Managing Director and principal shareholder in Jaeban. Mr. Jaeban paid £5,000 (plus VAT), 10% of any settlement, waived certain claims, and completely indemnified the Receiver for any loss. Although Mr. Jaeban was assigned Jacban's claim, he has not assumed Jaeban's liability to BRAC. Mr. Jaeban thereafter retained Delaware counsel and opposed the Motion to Strike on the grounds that the counsel issue had now been resolved and

7

that the six *Poulis* factors, as applied to Mr. Jaeban as assignee, did not support the "drastic" remedy of dismissal.

Mr. Jaeban argues that the Jaeban's failure to actively participate in this litigation was not Jaeban's fault. According to Mr. Jaeban, once the Administrative Receiver was appointed for Jaeban in October 2003, control of Jaeban lay with the Receiver, who under English law only owes a duty to the charge holder responsible for their appointment (i.e., the creditor, Close Invoice Finance Limited) and not other potential creditors. Over the first few months of the appointment of the Administrative Receivers, Jaeban and its U.S. counsel lacked any authority or direction from the Administrative Receivers to proceed with the case. In fact, U.S. counsel ultimately withdrew from the case because it was made clear to counsel that the Receiver would probably not be pursuing the case or that counsel would not be paid for its work.

Ultimately, in early 2004, the Administrative Receiver for Jaeban decided to assign the Jaeban counterclaims to Mr. Jaeban. Mr. Jaeban states he is ready to proceed with this case and has hired Delaware counsel for that purpose. Based on this factual history, therefore, Mr. Jaeban contends that dismissal of Jaeban's answer and counterclaims is unwarranted.

Such a drastic sanction "should be reserved for those cases where there is a clear record of delay or contumacious conduct" by the offending party. *See Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 866 (3d Cir. 1984) (citing *Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 342 (3d Cir. 1982)). According to Mr. Jaeban, neither he nor Jaeban engaged in any wrongful conduct. The failure to participate in the case, respond to discovery, and comply with Court orders was the result of the Administrative Receiver in England, over which Jaeban and Mr. Jaeban had no control.

8

BA8

BRAC replied, arguing that the true defendant, Jaeban, has yet to respond to the Motion to Strike, that Mr. Jaeban has no standing to file an objection because the assignment is invalid,[6] and that even if the assignment is valid, Mr. Jaeban is legally bound by his assignor's conduct.

The Motion was heard on the March 10, 2004, calendar, at which time it was taken under advisement.

### III.   DISCUSSION

BRAC now seeks an order striking Jaeban's Answer, Affirmative Defenses and Counterclaims as a sanction for Jaeban's failure to obtain Delaware counsel, comply with the Court's scheduling order, or otherwise advance this adversary proceeding.

BRAC seeks sanctions under a variety of legal theories, including Rules 37(b)(2)(C), 41(b) and 16(f) of the Federal Rules of Civil Procedure and 11 U.S.C. § 105(a). The Debtors also urge that sanctions should be awarded under D. Del. R. 1.3(a) and 85.3(d) against Jaeban for its failure to maintain Delaware counsel, as directed by the Court. BRAC seeks the harshest possible sanctions against Jaeban—complete dismissal of Jaeban's answer, affirmative defenses and counterclaims.

Clearly, there has been a failure on the part of Jaeban to prosecute this case in a responsible way. The issue presented is not whether sanctions of some sort are appropriate but rather whether the drastic sanction of dismissal is proper remedy. The holding in *Poulis* clearly states that dismissal is a sanction of last resort and should be issued only in cases of "flagrant bad faith" by the offending party. *Id.* at 868. The Third Circuit has enumerated six nonexclusive

---

[6]     There are three anti-assignment provisions in the various contracts between the parties: (1) Umbrella Agreement Clause 4.3; (2) Umbrella Agreement Clause 2.6; and (3) IPLA paragraph 12.2(a).

factors to consider in determining whether to impose the ultimate sanction:

> 1. the extent of the party's personal responsibility;
> 2. the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;
> 3. a history of dilatoriness;
> 4. whether the conduct of the party or the attorney was willful or in bad faith;
> 5. the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and
> 6. the meritoriousness of the claim or defense.

*Id.* at 868 (original emphasis omitted). Here, while there has been misconduct, it is a stretch to

label it "flagrant." The defense and prosecution of this case by Jaeban got caught up in a

proceeding over which neither this Court nor Jaeban itself had any control. An administrative

receivership under English law is, to the U.S. lawyer's eye, an odd proceeding because it

materially affects a debtor's rights and interests without any judicial oversight or due process.[7]

Up until the time of the receivership, the litigation was proceeding normally and no threats (or at

least certainly no motions) of sanctions had been made. Thus, there has been no personal

misconduct by either Defendant Jaeban itself or Mr. Jaeban as principal or, later, as assignee.

Any "fault" for the delays and failures to respond and comply, if that is how it should be

characterized, lies with the Administrative Receiver and not Jaeban, which in practical terms

effectively ceased to exist as an independent entity once it went into receivership.

Prior to receivership, Jaeban did appropriately participate in the proceedings. Similarly,

Mr. Jaeban now seeks to participate upon assignment to him of the claims. Nothing in the case

---

[7]    A secured creditor with a floating charge is given the unilateral right under the loan documents to appoint a receiver who will take possession of the borrower's assets when the creditor itself determines that there has been a default. The procedure has been largely abolished, other than for existing loan documents and certain capital market transactions. See http://www.insolvency.gov.uk/reform.htm

BA10

indicates that counsel for Jaeban or Mr. Jaeban has engaged in any willful misconduct or bad faith.

However, Debtors argue that by the assignment (even assuming it to be valid), Mr. Jaeban stands in the shoes of the assignor and cannot stand on better legal footing than the assignor would. While this proposition may be generally true, the argument assumes that this Court would have agreed with Debtors to dismiss the answer, affirmative defenses and counterclaims as a sanction against Jaeban and/or the Administrative Receiver if they were in fact present before this Court. While not pleased with the fact that the Receiver failed to communicate forthrightly with Debtors and inform them it needed time to decide whether to pursue the matter, assign it or do otherwise, the Court does not find that the Receiver's conduct was in bad faith as spelled out in *Poulis* or that the facts of this case satisfy any of the other elements of *Poulis* justifying dismissal as the appropriate sanction. The reality is that the hiatus between the beginning of "radio silence" and the assignment was relatively short. And, because of the unusual circumstances of the receivership, attributing any bad acts to the assignee here would be manifestly unfair.

Debtors' argument that it is has been "prejudiced by the continuing segregation of $4,500,000 of their funds in escrow" is underwhelming. As Debtors acknowledge, the funds are in escrow and are not being diminished in any way. Beyond having to wait for these funds and to suffer delay in this case, no other prejudice has been alleged.

Perhaps more importantly, there are other, less drastic sanctions available. Debtors recognize that sanctions are available under Rules 16(f), 37(a), (b), and (g) of the Federal Rules of Civil Procedure, which permit a court to award as sanctions the reasonable expenses incurred,

11

BA11

including attorney's fees, as a result of a party's failure to obey a scheduling or pretrial order (Rule 16(f)), to comply with a discovery order (37(b)), or to participate in the framing of a discovery plan (37(g)).[8]

Finally, Rule 37(a)(4) expressly requires Debtors to file a motion to compel before the sanction of dismissal can be invoked. Debtors never filed a motion to compel, despite this Court's clear instruction to the Debtors to do so. Rules 16(f) and 37(b) counsel against sanctions where the failure to comply was "substantially justified or that other circumstances make an award of expenses unjust." The Court returns to the fact that the problems suffered here were the result of a unique situation whereby the administrative receivership left Jaeban (and now Mr. Jaeban) without any real course of action until the assignment of the counterclaims. In the end, Debtors are complaining about the failures of the Administrative Receiver for Jaeban; it makes no argument that Mr. Jaeban failed to comply with the Court's orders or actively sought to delay these proceedings.

The issue that remains, however, is whether the assignment was valid. BRAC argues it was not. BRAC and Jaeban's business relationship was one of licensor and licensee, respectively, under two separate agreements — an Umbrella Agreement and an International Prime License Agreement. Under these agreements, Debtors agreed to license the Budget trademark to Jaeban in return for certain royalties and other payments, such as airport concessions, rent, insurance and customer complaints. Within those agreements, there are three different anti-assignment clauses upon which the Debtors rely. Clause 4.3 of the Umbrella Agreement provides that "[t]he parties to this Agreement other than Budget shall not have the

---

[8]     The nature of the sanctions to be imposed will be set forth *infra*.

right to assign or otherwise dispose of this Agreement or their interest in this Agreement without prior written consent of Budget." Clause 2.6 of the Umbrella Agreement similarly provides that "[e]ach party agrees to procure that, without prejudice to the provisions of Clause 4.3, its transferees and assignees, shall as a condition precedent to any transfer or assignment to them execute a document in such form as Budget may reasonably require by which such transferee or assignee effectively assumes all its assignor's and transferor's obligations and undertakings hereunder in favour of the other Parties hereto with effect from the date of assignment or transfer." And, last, Paragraph 12.2(a) of the International Prime License Agreement provides that "[n]one of this Agreement, the Beneficial Ownership of Licensee or Licensee's BRAC business, or any company within the Group of which Licensee is a member, may be voluntarily, involuntarily, directly or indirectly sold, actually or contingently, assigned or otherwise transferred by Licensee . . ., without the prior written consent of Budget in accordance with this Agreement."

The anti-assignment provisions are not applicable to the situation here. The most obvious problem is that these anti-assignment provisions apply to the assignment of the agreements themselves; the underlying purpose is to allow the Debtors to control who may use its trademarks and under what terms. However, a review of the Deed of Assignment of Claim Against BRAC Group Inc., between Jaeban and Mr. Jaeban, expressly assigns only Jaeban's *claims* to Mr. Jaeban and not any of the actual provisions or rights and obligations under the licensing agreements: "[T]he Assignor will, subject to the terms of this Deed, assign to the Assignee its claim against BRAC Group Inc, et al . . . and the benefits and proceeds arising from such claim." While Debtors contend otherwise, the Court does not agree. Mr. Jaeban is not seeking to step

13

BA13

into Jaeban's shoes under these agreements and become Debtors' UK licensee.

And, of course, that would be impossible as Debtors no longer own the assets that would be licensed, having sold them over a year ago. The fundamental purpose of the anti-assignment clauses no longer exists. To enforce those clauses now would exalt form over substance. Therefore, to summarize how the *Poulis* factors apply to this case:

1.    The current holder of the claim, Mr. Jaeban, is not personally responsible for the delays and failures to abide by the discovery schedule. Under these circumstances, the actions of the Receiver should not be attributed to Jaeban or to him.

2.    The prejudice to BRAC is minimal. If Debtors prevail, they will receive the funds in escrow which are fully protected. Debtors' claims against Jaeban (which have not been assumed by Mr. Jaeban) will be protected as set forth below.

3.    The assignee has no history of dilatoriness and the inaction of the Receiver occurred during a relatively limited time period.

4.    Neither Jaeban nor Mr. Jaeban has acted in bad faith. The facts are not sufficient to support a finding of bad faith on the part of the Receiver. For example, Mr. Allen, the U.K. solicitor, did appear at hearings and explain the status of the receivership and the reasons for failure to comply.

5.    There are other sanctions that will adequately protect the interests of BRAC.

6.    There is no record on the meritoriousness of the claim of Jaeban. This factor is in BRAC's favor.

Under *Poulis*, therefore, dismissal is not an appropriate sanction.

BA14

## IV.    Sanctions to be Imposed

The issue remains how to get this matter to conclusion and what sanctions are appropriate for the failure to comply with the existing discovery schedules. The Court has wide discretion in this area.

1.    BRAC already has a judgment against Jaeban for approximately £328,000 plus remaining unliquidated claims. The separation of Jaeban's claim against BRAC (assigned to Mr. Jaeban) and the liability of Jaeban to BRAC (not assumed by Mr. Jaeban) should not prejudice BRAC's rights. Therefore, Mr. Jaeban's further participation in this proceeding shall be expressly conditioned upon BRAC's ability to offset its current judgment, and any future judgment, against any affirmative recovery obtained by Mr. Jaeban, as assignee, against BRAC. Further, Mr. Jaeban's affirmative recovery will be limited to a maximum of the $4.5 million currently in escrow, less the amounts set forth in this order. Therefore, BRAC is entitled to the immediate release of the dollar equivalent of its existing judgment from the escrow and Jaeban's maximum potential recovery shall be reduced accordingly. This is without prejudice to BRAC's ability to assert any such claim affirmatively against Jaeban in the event the counterclaims are unsuccessful and it is thereafter otherwise entitled to the full release of the escrow.

2.    BRAC is entitled to its attorney's fees and costs incurred specifically in this matter from October 20, 2003 to the present. Upon submitting a detailed statement of such fees under certification of counsel, and approval by the Court, BRAC is entitled to the immediate release of an amount equal to such fees and

15

BA15

costs from the escrow and Jaeban's maximum potential recovery shall be reduced accordingly. This is without prejudice to BRAC's ability to assert any such claim affirmatively against Jaeban in the event the counterclaims are unsuccessful and it is thereafter otherwise entitled to the full release of the escrow.

3.   The discovery cutoff is extended from January 30, 2004 to June 18, 2004. By that time, Mr. Jaeban is to:

    a.   Provide documents in response to Plaintiffs' Second Requests for Production of Documents (served on November 26, 2003);

    b.   Respond to concerns raised by Plaintiffs in a letter dated December 12, 2003 regarding apparent gaps in Jaeban's November production of documents;

    c.   Schedule depositions of any Jaeban personnel and the Jaeban Receiver.

Failure to meet this deadline will result in an order prohibiting Mr. Jaeban from introducing into evidence (or using in any other way) any documents not so produced and prohibiting testimony from any witnesses not produced for deposition. This is without prejudice to BRAC seeking other sanctions that may be appropriate under the circumstances after the discovery period has lapsed.

The Court will conduct a final scheduling conference on June 21, 2004 at 10:30 a.m. in Wilmington, Delaware.

It is so ORDERED.

May 25, 2004

_____
Charles G. Case, II
United States Bankruptcy Judge

16

BA16