## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | |
| Plaintiffs and Counterclaim Defendants, | 03-A-54271 |
| v. | |
| Jaeban (U.K.) Limited, | |
| Defendant and Counterclaim Plaintiff. | |

### PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S COUNTERCLAIMS DUE TO DEFENDANT'S REFUSAL TO PARTICIPATE IN THIS PROCEEDING

Plaintiffs, including Debtor Budget Rent-A-Car International, Inc. ("BRACII"), by their undersigned attorneys, hereby respectfully request that the Court strike Defendant's Answer, Affirmative Defenses and Counterclaims in order to release from escrow the $4,500,000 of Plaintiffs' funds held hostage by misconduct of Defendant Jaeban (U.K.) Limited ("Jaeban") in failing to obtain Delaware counsel, comply with the Court's scheduling order, or advance this proceeding.[1] In support of their Motion, Plaintiffs state as follows:

---

[1] Due to Jaeban's pervasive refusal to participate in this adversary proceeding, Plaintiffs bring this Motion under the following: Fed. R. Civ. P. 16(f), 37(b)(2)(C), and 41(b); D. Del. R. 1.3(a), 1.3(b), and 85.3(d); Bankr. D. Del. R.

BA33

## INTRODUCTION

**The Adversary Proceeding and Jaeban's Receivership**[2]

1.      Plaintiffs filed this action on July 9, 2003 to recover at least £3,006,090 owed by Jaeban (U.K.) Limited ("Jaeban") to Budget Rent A Car International, Inc. ("BRACII"), an amount shown as due and owing on BRACII's books and records. At all relevant times, Jaeban was a BRACII licensee headquartered near Birmingham, England.

2.      On August 22, 2003, Jaeban voluntarily submitted to the jurisdiction of this Court by answering the Complaint and asserting counterclaims.[3]  Thomas Briggs, Esq. and the Wilmington, Delaware firm of Morris, Nichols, Arsht & Tunnell ("Mor Nichols") filed an appearance on behalf of Jaeban.

3.      On September 23, 2003, BRACII and Plaintiff-Intervenor Official Committee of Unsecured Creditors filed an Answer denying Jaeban's counterclaims in all material respects.

4.      On October 20, 2003, Jaeban went into receivership in England.  John Whitfield and Gerald Smith (the "Jaeban Receivers") were appointed as administrative receivers in a nonjudicial receivership under the Insolvency Act 1986 by Jaeban's secured creditor, Close Invoice Finance Limited.

---

1001-1(b) and 9010-1(a); 11 U.S.C. § Section 105(a); and the provisions of the February 26, 2003 Order (the "Avis Sale Order") approving the sale of certain assets of BRAC Rent-A-Car Corporation and BRACII to Avis Europe plc.

[2] Unless otherwise noted, the facts stated in this Motion have been adopted from Plaintiffs' Motion for Partial Summary Judgment and exhibits, which set forth the basis for these assertions.

[3] Jaeban, through its principal, I.M. Jaeban, had previously expressed its desire to participate in the cure process established in connection with the Avis Sale Order. Mr. Jaeban's February 19, 2003 fax to counsel seeking to have Jaeban's claims "dealt with through the Cure Process" is attached *infra* as Exhibit A.

2

BA34

5.    Following the appointment of the Jaeban Receivers, Plaintiffs agreed to allow Jaeban a two-week period until November 3, 2003 to consider its position in this proceeding without having to participate in discovery.

**Jaeban's Failure to Prosecute:  Refusal to Retain U.S. Counsel**

6.    Between November 3, 2003 and December 17, 2003, on three occasions, Plaintiffs' counsel asked Mr. Briggs of Morris, Nichols whether he and his firm would continue to represent Jaeban in this proceeding.  Affidavit of Kenneth E. Wile, ¶ 2.[4]

7.    On December 17, 2003, during a telephonic hearing, the Court directed Jaeban's English solicitors from Wragge & Co. and Delaware counsel from Morris Nichols to resolve the identity of Jaeban's Delaware counsel.

8.    Jaeban never complied with that direction.  Instead, on January 7, 2004, Morris Nichols moved to withdraw from its representation of Defendant due to Jaeban's non-payment of the firm's fees.[5]

9.    The Court considered Morris Nichols' Motion to Withdraw at a hearing on January 12, 2004.  Jaeban's solicitors at Wragge & Co. did not to participate in this hearing by telephone, although they were invited to do so by Plaintiffs' counsel.  *See* Wile Aff., ¶ 3.

10.    During the hearing, Thomas Briggs of Morris Nichols stated to the Court that the Jaeban Receivers and their counsel had repeatedly refused to return Mr. Briggs' phone calls regarding payment of fees and retention of new counsel.[6]  At the hearing, the Court granted

---

[4] A copy of Mr. Wile's Affidavit is attached as Exhibit B.
[5] A copy of the Morris Nichols Motion to Withdraw is attached as Exhibit C.
[6] January 12, 2004 Hearing Transcript at 35.  A copy of the transcript is attached as Exhibit D

WP3:969407 1

59519 1001

the motion to withdraw and determined that Jaeban had not arranged for substitute counsel to be present in the courtroom.

11.    In discussing Plaintiffs' Motion for Partial Summary Judgment, the Court ordered that "substitute counsel has to be obtained in time to file the response [to the Motion] by the 30th" – i.e., by January 30, 2004. Ex D at p. 36.

12.    In violation of the Court's Order, Jaeban has not retained new Delaware counsel and did not file a response by January 30, 2004 to Plaintiffs' Motion.

**Jaeban's Refusal to Provide Witnesses and Documents**

13.    On December 17, 2003, the Court granted Plaintiffs' Motion to revise the Scheduling Order in this adversary proceeding. The revised Order directed that all fact discovery be completed by January 30, 2004. Jaeban has never sought an extension of this date – an extension that Plaintiffs would vigorously oppose.

14.    Since December 17th, Jaeban has disregarded the Court-ordered January 30, 2004 discovery cutoff. In particular, Jaeban has failed to:

    a.    Provide any documents in response to Plaintiffs' Second Requests for Production of Documents (served on November 26, 2003);

    b.    Respond to concerns raised by Plaintiffs in a letter dated December 12, 2003 regarding apparent gaps in Jaeban's November production of documents;[7] and

    c.    Schedule depositions of any Jaeban personnel and the Jaeban Receivers, despite the repeated requests of Plaintiffs' counsel and Plaintiffs' offer to hold the depositions in London. *See* Ex. E.

Wile Aff., ¶ 4.

---

[7] A copy of Mr. Wile's December 12, 2003 letter is attached as Exhibit E.

WP3:969407 1

59519 1001

**BA36**

15.    In disregarding the discovery cutoff, Jaeban was fully aware of its obligations to Plaintiffs. On December 30, 2003, Jaeban's prior Delaware counsel, Thomas Briggs, wrote Plaintiffs' counsel *promising* to produce documents in response to Plaintiffs' Second Requests for Production of Documents during the week of January 5, 2004 and "hoping" to provide Plaintiffs with deposition dates and a response to Plaintiffs' concerns about the prior document production during that same week.[8] Mr. Wile and Mr. Briggs had repeatedly discussed the scheduling of depositions in England since October 2003. Wile Aff., ¶ 8.

16.    As noted, Jaeban failed to honor any of the undertakings set forth in Mr. Briggs's letter and instead forced Mr. Briggs and his firm to withdraw.

17.    Following the withdrawal of Jaeban's Delaware counsel on January 12, 2004, Plaintiffs' counsel faxed a letter on January 14, 2004 to Mr. Weatherall, Jaeban's Birmingham solicitor urging Jaeban to retain new Delaware counsel as soon as possible and provide the promised witnesses and documents in advance of the January 30, 2004 fact discovery cutoff.[9] The letter informed Mr. Weatherall that Plaintiffs would seek sanctions if the witnesses and documents were not produced in a timely manner. Mr. Weatherall did not respond to this letter. Wile Aff., ¶ 10.

18.    As of the close of fact discovery under the Revised Scheduling Order, Jaeban has produced *no* witnesses, a single, seemingly incomplete set of documents, a one-sentence non-responsive statement of damages under D. Del. R. 9.4,[10] and a set of pre-receivership Rule 26(a) disclosures listing the witnesses that Jaeban has refused to produce.

---

[8] A copy of Mr. Briggs's letter is attached as Exhibit F.

[9] A copy of Mr. Wile's letter to Mr. Weatherall is attached as Exhibit G.

[10] A copy of Jaeban's Rule 9.4 statement is attached as Exhibit H. In reality, Jaeban did not comply with D Del. R.

59519 1001

**BA37**

**The $4,500,000 Cure Amount Held in Escrow Due to Jaeban's Counterclaims**

19.    On February 24, 2003, Judge Walrath entered the Avis Sale Order under Sections 105(a), 363, and 365 of the Code.  The Order approved a sale of most of BRACII's assets to Avis Europe plc.[11]

20.    Under the asset purchase agreement, Avis Europe agreed to assume BRACII's agreements with Jaeban.  In return, pursuant to Paragraph 13(b) of the Sale Order, Debtors agreed to escrow $4,500,000 as the amount claimed by Jaeban as necessary to cure BRACII's alleged breaches of its agreements with Jaeban in excess of any setoff rights of Debtors.[12]  As noted in Plaintiffs' Motion for Partial Summary Judgment, Debtors placed $4,500,000 in an escrow account, where it remains until further action of this Court.

21.    Paragraph 13(b) of the Sale Order provides that, if the parties to an "Unresolved Cure Objection" (such as Debtors and Jaeban) are unable to resolve the objection, the Debtors or "the non-debtor objecting party may request that the Court establish a schedule to resolve such objection."  By filing this adversary proceeding to recover the £3,000,000 owed by Jaeban, Plaintiffs invoked this provision.

## ARGUMENT

22.    Jaeban is engaged in a transparent effort to hold the $4,500,000 escrow hostage.  Its actions (and inaction) show neither a belief in its claims nor a willingness to obey its

---

9.4, which required Jaeban to itemize the unliquidated damages claimed in its pleading.  Exhibit H instead merely repeats Mr. Jaeban's claim in Exhibit A, *infra*, that Jaeban's damages do not exceed the $4,500,000 cure amount. Jaeban did serve a document request on December 30, 2003 – prior to Morris Nichols' withdrawal.  Plaintiffs have served a written response on and produced documents to Jaeban's English solicitors at Wragge & Co.

[11]  A copy of the Avis Sale Order is attached as Exhibit I.

6

59519 1001

**BA38**

obligations in this Court.  The goals of the Bankruptcy Code do not include affording a foreign litigant leverage against the Debtors' estates and their creditors when that litigant repudiates its obligations.  Given Jaeban's unwillingness to pay for Delaware counsel, it is safe to assume that monetary sanctions – to be enforced in England – will serve no purpose.

**I.    Sanctions for Failure to Maintain Delaware Counsel**

23.    Rule 85.3(d) of the District of Delaware Local Rules requires Jaeban to have Delaware counsel in this proceeding.[13]  Failure to obtain Delaware counsel subjects the offending party to sanctions under D. Del. R. 1.3(a).  Rule 1.3(a) sanctions include, but are explicitly not limited to, attorney's fees (which would be useless here).

24.    The requirement of Delaware counsel is not only mandatory, but especially important where, as here, the litigant and its counsel are located outside of the United States and are unfamiliar with the Court's rules.  Moreover, as this case demonstrates, an overseas litigant with assets beyond the reach of this Court is more likely to be indifferent to its obligations to the Court and the other litigants.

25.    In keeping with the applicable rules and customary practice, this Court twice directed Jaeban to ensure that it had retained Delaware counsel that would participate in this proceeding.  During the December 17, 2003 telephonic status hearing, the Court directed Jaeban to confirm its retention of Delaware counsel by no later than the January 12, 2004 status

---

[12] These agreements were submitted to the Court as exhibits to Plaintiffs' Motion for Partial Summary Judgment

[13] Under Bankr. D. Del. Rule 1001-1(b), the Rules of the District of Delaware apply to proceedings in this Court unless they conflict with the provisions of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure  D. Del. R. 85.3(d), however, is explicitly made applicable to this proceeding by Bankr. D. Del. R. 9010-1(a).

7

BA39

hearing. At the January 12, 2004 status hearing, the Court directed Jaeban to obtain Delaware counsel by January 30, 2004.[14]

26.    Jaeban's indifference to its obligations can be seen it its treatment of Morris Nichols. Jaeban failed to pay the firm's fees and, according to Mr. Briggs' statements at the January 12th hearing, refused even to return phone calls regarding fees or the retention of substitute counsel. *See also* Ex. C. (Motion to Withdraw). Moreover, Jaeban's Birmingham solicitors did not attend the January 12th hearing by telephone, even though Jaeban knew that Delaware counsel had moved to withdraw. This conduct also demonstrates why an award of attorney's fees as a lesser sanction would be pointless.

27.    Jaeban's conduct can only be understood as a recognition that its claims are not worth even a minimal investment. To recover an amount in excess of Plaintiffs' claims for £3,000,000 based on BRACII's books and records, Jaeban must show that Debtors could have, but did not, "adequately market the Budget brand" from March 2001 through February 2003 so that Jaeban would have earned over $4,000,000 in additional profits. *See* Answer, Affirmative Defenses and Counterclaims, ¶¶ 37, 44. Given the September 11, 2001 attacks and their effect on airline, car rental, and other travel-related companies, the claim is frivolous.

28.    In addition to the awarding sanctions under Del. R. 1.3(a), federal trial courts have "broad authority to . . . dismiss a case for failure to obey pre-trial orders." *Robson v. Hallenbeck*, 81 F.3d 1, 2 (1st Cir. 1996). That authority arises under Rule 41(b) of the Federal Rules of Civil Procedure, but also under the Court's sanctioning powers under Section 105(a) of

---

[14] In serving Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs notified Jaeban's English solicitors of the Court's direction

59519 1001

**BA40**

the Code, 11 U.S.C. §105(a). *See, e.g., In re Rainbow Magazine, Inc.*, 77 F.3d 278, 284 (9th Cir. 1996); *In re Courtesy Inns, Ltd.*, 40 F.3d 1084, 1089-90 (10th Cir. 1994).

   29. By failing either to maintain its existing Delaware counsel or retain substitute counsel, Jaeban has disobeyed the Court and Rule 85.3(d).[15] Jaeban has also violated the Revised Scheduling Order, which certainly presumed that Jaeban would maintain Delaware counsel who would advance the case and attend depositions.

   30. There is no remedy for these violations short of dismissing Jaeban's counterclaims. Any sanction (including attorney's fees) that has the practical effect of preserving Jaeban's claims would merely further Jaeban's strategy of delaying distribution of the $4,500,000 escrow to the Debtors' estates and *bona fide* creditors -- without having to expend funds to litigate those claims. Jaeban's counterclaims should be dismissed due to its failure to maintain counsel.[16]

## II. Jaeban's Repudiation of the Revised Scheduling Order

   31. While Jaeban's failure to maintain Delaware counsel is reason enough for sanctions, its complete disregard of the fact discovery cutoff provides equally ample grounds under Rules 16(f) and 41 of the Federal Rules of Civil Procedure and District of Delaware Local Rule 1.3(a).

   32. Under Rule 16(f) of the Federal Rules of Civil Procedure (made applicable to this proceeding by Fed. R. Bankr. P. 7016), failure to obey a discovery scheduling order may,

---

[15] In *Courtesy Inns*, the Court of Appeals noted that the bankruptcy court "could have applied its local rule to dismiss Courtesy's petition because it had no attorney representative." 40 F.3d at 1090.

[16] Jaeban's misconduct amply justifies an order striking its answer and affirmative defenses as well. If the Motions for Sanctions and Partial Summary Judgment are granted, Plaintiffs *may* be able to protect their rights against Jaeban in England without any need to proceed further in this Court. Plaintiffs reserve all of their rights in his regard.

9

in the Court's discretion, result in a sanctions order under Fed. R. Civ. P. 37(b)(2)(C) striking the disobedient party's pleadings or entering a judgment by default. District of Delaware Local Rule 1.3(a) sets forth an equally applicable provision authorizing sanctions if a party fails to abide by an order of the Court.

33.     Judge Walrath originally set a fact discovery cutoff of December 12, 2003. As a courtesy to Jaeban (and its then-Delaware counsel) in light of the appointment of the Jaeban Receivers on October 20, 2003, Plaintiffs agreed to a six-week extension to January 30, 2004.

34.     The discovery deadline has now passed; Jaeban's repudiation of its obligations is now a matter of record. Despite repeated requests by Plaintiffs before and after the withdrawal of Morris Nichols (*see* Wile Aff., ¶ 8 & Exs. E and G), Jaeban has failed to produce a single witness for deposition. It has not produced a single document in response to Plaintiffs' Second Request for Production of Documents. It has not responded to Plaintiffs' concerns that Jaeban's first production of documents was incomplete.

35.     The striking of Jaeban's counterclaims is fully consistent with the Third Circuit's six-factor test for striking pleadings as a sanction under Rule 37(b)(2)(C). As first set forth in *Poulis v. State Farm Fire & Cas Co* , 747 F.2d 863 (3d Cir. 1984), these factors are:

     a.    The noncomplying "*party's* personal *responsibility*."

     b.    The "*prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery;"

     c.    A "*history* of dilatoriness;"

     d.    Conduct that was "*willful* or in *bad faith*;"

     e.    The "effectiveness of . . . *alternative sanctions*;"

10

BA42

f.    The "*meritoriousness* of the claim or defense."

*Id.* at 868 (italics in the original).

36.    In *Poulis*, the Third Circuit affirmed the dismissal of a case in which plaintiffs had failed to respond to interrogatories or file a pre-trial statement. Similarly, in *Subar, Inc. v. Precision Plastics, Inc.*, 1997 U.S. Dist. LEXIS 12352 (E.D. Pa. August 14, 1997), the District Court applied the *Poulis* factors to dismiss a counterclaim where, *inter alia*, a corporate defendant failed to obtain new counsel after dismissing its initial counsel.

37.    In this instance, all of the *Poulis* factors support striking Jaeban's counterclaims. (a) Jaeban's failure to comply with discovery is its fault and certainly not the fault of its former Delaware counsel. (b) Plaintiffs are prejudiced by the continuing segregation of $4,500,000 of their funds in escrow. (c) Apart from the one, probably incomplete, production of documents, Jaeban has been dilatory in all meaningful respects since the appointment of the Receivers. (d) Jaeban's conduct in refusing to maintain Delaware counsel and cooperate is a bad faith attempt to obtain leverage from the escrow account without any evident belief in its claims or intent to prosecute the action. (e) As noted above, an award of monetary sanctions (or any other sanction that leaves the escrow in place) will be ignored by Jaeban. (f) Jaeban's claim to monies in excess of what it owes to BRACII is utterly implausible; the claim assumes that Jaeban would have enjoyed extraordinary profits during the period in which the September 11th attacks devastated the travel industry.

### III.    Sanctions Are Necessary to Implement the Terms of the Sale Order

38.    Under Paragraph 23 of the Avis Sale Order, the Court retained jurisdiction to "interpret, implement, and enforce the provisions of this Order." *See* Ex. I.

11

39.   By agreeing to participate in the cure process (*see* Exhibit A, *infra*) and by voluntarily submitting to the jurisdiction of this Court when it answered the Complaint, Jaeban warranted that it would cooperate in the cure process and abide by the Court's orders regarding retention of counsel and discovery. By repeatedly violating its obligations, Jaeban has forfeited its right to proceed with its claim to the cure amount held in escrow. This Court has ample authority under Section 105(a) of the Code to take note of these violations, protect the Debtors' estates, and redress Jaeban's abuse of the protections provided by the Sale Order.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order striking Jaeban's Answer, Affirmative Defenses and Counterclaims and granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  February 3, 2004

Respectfully submitted,

**SIDLEY AUSTIN BROWN & WOOD LLP**

Larry J. Nyhan
Kenneth E. Wile
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Robert S. Brady (Bar No. 2847)
Edmon L. Morton (No. 3856)
Joseph A. Malfitano (No. 4020)
Matthew B. Lunn (No. 4119)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6600

Counsel for Debtors and Debtors-in-Possession
BRAC Group, Inc., et al.

12

WP3:969407 1

59519 1001

**BA44**

**Exhibit A**

BA45

Welcome House
999 Wolverhampton Road
Oldbury West Midlands B69 4RJ
Phone: 0121 544 2219
Fax: 0121 544 8817



**jaeban**

*Self Drive, Contract
Hire, Direct Auto Sales*

# Fax

| To: | Robert S Brady - Young Conaway Stargatt & Taylor |
|---|---|
| Fax: | 001 302 576 3283 |
| To: | Larry J Nyhan – Sidley Austin Brown & Wood |
| Fax: | 001 312 853 7036 |
| To: | Suaheel Kirpalani – Milbank, Tweed, Hadley & McCloy |
| Fax: | 001 212 530 5219 |
| To: | Office of the United States Trustee for the District of Delaware |
| Fax: | 001 302 573 6497 |
| To: | Harold Marcus – Brown Rudnick Berlack Israels |
| Fax: | 001 617 856 8201 |
| To: | Simon Freakley – Kroll, Buchler, Phillips |
| Fax: | 0207 029 5001 |

| From: | I M Jaeban (Director) – Jaeban UK Limited |
|---|---|
| Date: | 19th February 2003 |
| Subject: | BRAC GROUP, INC (f/k/a Budget Group, Inc.) et al
Case No 02-12152 (MFW) |

X Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Dear Sirs,

We refer to our Notice of Objection dated 13th February 2003. It has been suggested by a recipient that our claim could be interpreted as amounting to more than US $4.5 million. We wish to make clear that after set-off we do not consider that our claim amounts to more than US $4.5 million and we therefore seek to have it dealt with through the Cure Process.

Yours faithfully,

I M Jaeban
Director

BA46

**Exhibit B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | |
| Plaintiffs and Counterclaim Defendants, v. | 03-A-54271 |
| Jaeban (U.K.) Limited, | |
| Defendant and Counterclaim Plaintiff. | |

| | | |
|---|---|---|
| COUNTY OF COOK | ) | |
| | ) ss. | |
| STATE OF ILLINOIS | ) | |

### AFFIDAVIT OF KENNETH E. WILE

KENNETH E WILE, being duly sworn, deposes and says:

1.    I am a member of the Illinois and New York bars and a counsel in the Chicago office of Sidley Austin Brown & Wood LLP. I am one of the attorneys representing the Debtors in the above-captioned adversary proceeding against Jaeban (UK) Limited ("Jaeban").

2.    Between November 3, 2003 and December 17, 2003, on at least three separate occasions, I asked Jaeban's counsel, Thomas Briggs of Morris, Nichols, Arsht & Tunnell, whether he and his firm would continue to represent Jaeban in this proceeding.

**BA48**

3. Prior to the January 12, 2004 status hearing in this proceeding, I asked my Delaware co-counsel at Young, Conaway, Stargatt & Taylor to contact Jaeban's principal solicitor at Wragge & Co., Ian Weatherall, to invite him to participate by telephone at the January 12th hearing.

4. As of the close of fact discovery in this proceeding on January 30, 2004 and as of the date of this affidavit, Jaeban has failed to:

    a. Provide any of the documents sought by Plaintiffs' November 26, 2003 Second Requests for Production of Documents;

    b. Respond to concerns raised by Plaintiffs in my December 12, 2003 letter regarding gaps in Jaeban's November 2003 production of documents; and

    c. Schedule depositions of any Jaeban personnel and the Jaeban Receivers, despite my repeated requests to Plaintiffs' counsel requesting these depositions.

5. Exhibit A to Plaintiffs' Motion for Sanctions (the "Motion") is a true and correct copy of I.M. Jaeban's February 19, 2003 fax to counsel in this Chapter 11 proceeding declaring Jaeban's intention to participate in the cure process.

6. Exhibit C to the Motion is a true and correct copy of the Motion to Withdraw of Morris Nichols Arsht & Tunnel that the Court granted on January 12, 2004.

7. Exhibit D to the Motion is a copy of the transcript of January 12, 2004 hearing.

8. Exhibit E to the Motion is a true and correct copy of my December 12, 2003 letter to Mr. Briggs. As this letter reflects, after discovery commenced, I repeatedly discussed with Mr. Briggs holding the depositions of Jaeban personnel in England.

9. Exhibit F to the Motion is a true and correct copy of Mr. Briggs's December 30, 2003 letter to me.

2

10.     Exhibit G to the Motion is a true and correct copy of a letter that I wrote and caused to be faxed to Ian Weatherall, Jaeban's Birmingham, England solicitor, on January 14, 2004. Mr. Weatherall has not responded to this letter.

11.     Exhibit H to the Motion is a true and correct copy of Jaeban's D. Del. R. 9.4 statement which was enclosed with Mr. Briggs's December 30, 2003 letter.

12.     Exhibit I to the Motion is a true and correct copy of the Court's February 24, 2003 Order approving the sale of certain of Debtors' assets to Avis Europe plc.

_____
Kenneth E. Wile

Sworn to before me this
2nd day of February, 2004

_____
Notary Public

```
"OFFICIAL SEAL"
MICHELE ILENE RUIZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/1/2007
```

3

BA50

**Exhibit C**

**BA51**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Case No. 02-12152 (MFW) |
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | (Jointly Administered) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, | ) ) ) | |
| Defendant. | ) ) | |

## MOTION TO WITHDRAW

The law firm of Morris, Nichols, Arsht & Tunnell ("Morris Nichols") hereby moves the Court for an Order permitting it to withdraw as counsel for defendant, Jaeban (UK), Ltd. (the "Defendant"). In support of this motion, Morris Nichols states as follows:

1.    The grounds for this motion are that the Defendant has failed substantially to fulfill its obligations regarding the firm's services, and has been given reasonable warning that the firm would withdraw unless Defendant's obligations were fulfilled.

2.    Morris Nichols has agreed to take all steps necessary to the extent reasonably practicable to protect Defendant's interests, including assisting Defendant in finding other counsel and surrendering papers and property to which the client is entitled.

BA52

3.    Defendant is represented by Wragge & Co., its counsel in the United Kingdom. Wragge & Co. intends to continue to represent Defendant in connection with this proceeding.

4.    Morris Nichols has conferred with counsel for plaintiffs and informed plaintiffs that it will be filing the instant motion.

For the foregoing reasons, Morris Nichols respectfully requests entry of an order in the form attached as Exhibit A permitting it to withdraw as counsel for Defendants.

MORRIS, NICHOLS, ARSHT & TUNNELL

R. Judson Scaggs, Jr. (#2676)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200

January 7, 2004

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.),<br><br>          Debtors.<br><br>IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.),<br><br>          Plaintiffs,<br><br>       v.<br><br>JAEBAN (U.K.) LIMITED,<br><br>          Defendant. | Chapter 11<br><br>Case No. 02-12152 (MFW)<br><br>(Jointly Administered)<br><br><br>Adversary No. A-03-54271 |

### ORDER GRANTING WITHDRAWAL

The law firm of Morris, Nichols, Arsht & Tunnell ("Morris Nichols") having filed a motion to withdraw as counsel for the defendant, and the Court having found good cause therefor;

IT IS HEREBY ORDERED this ___ day of _____, 2004, that:

1. Morris Nichols' motion to withdraw is granted;

2. Morris Nichols' appearance on behalf of Defendant is hereby withdrawn.

_____
United States Bankruptcy Judge

**BA54**

**Exhibit D**

BA55

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .        Chapter 11
                                    .
Brac Group, Inc.,                   .
                                    .
       Debtor.                      .        Bankruptcy #02-12152 (CGC)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                      Wilmington, DE
                      January 12, 2004
                        2:10 p.m.

              TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE CHARLES G. CASE
            UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtor:                Matthew A. Clemente, Esq.
                               Sidley Austin Brown & Wood
                               Bank One Center
                               10 South Dearborn Street
                               Chicago, IL 60603

                               Kenneth Wile, Esq.
                               Sidley Austin Brown & Wood
                               Bank One Center
                               10 South Dearborn Street
                               Chicago, IL 60603

                               Larry Nyhan, Esq.
                               Sidley Austin Brown & Wood
                               Bank One Center
                               10 South Dearborn Street
                               Chicago, IL 60603

                               Edmon L. Morton, Esq.
                               Young Conaway Statgatt
                               & Taylor, LLP
                               The Brandywine Bldg.
                               1000 West Street-17th Fl.
                               Wilmington, DE 19801

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

BA56

2

```
 1    For The Official Committee:    William P. Bowden, Esq.
      of Unsecured Creditors         Ashby & Geddes
 2                                   222 Delaware Ave.-17th Fl.
                                     Wilmington, DE 19899
 3
                                     Harold J. Marcus, Esq.
 4                                   Brown Rudnick Berlack
                                     & Israels
 5                                   One Financial Center
                                     Boston, MA 02111
 6
      For Cendant Corporation:       Anthony W. Clark, Esq.
 7                                   Skadden Arps Slate
                                     Meagher & Flom, LLP
 8                                   One Rodney Square
                                     Wilmington, DE 19899
 9
      For Ace USA Companies:         Linda M. Carmichael, Esq.
10                                   White & Williams, LLP
                                     824 N. Market Street-Ste. 902
11                                   Wilmington, DE 19801

12    For Jaeban:                    Thomas Briggs, Esq.
                                     Morris Nichols Arsht
13                                   & Tunnell
                                     1201 N. Market st.
14                                   Wilmington, DE 19899

15    For U.K. Adminsitrators:       Mark Collins, Esq.
                                     Richards Layton & Finger
16                                   One Rodney Square
                                     Wilmington, DE 19801
17
      Audio Operator:                Brandon J. McCarthy
18
      Transcribing Firm:             Writer's Cramp, Inc.
19                                   6 Norton Rd.
                                     Monmouth Jct., NJ 08852
20                                   732-329-0191

21    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
22

23

24

25
```

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    THE CLERK: All rise. The United States Bankruptcy

2  Court for the District of Delaware is now in session, the

3  Honorable Charles G. Case presiding.

4    THE COURT: Good afternoon. Please be seated.

5    MR. MORTON: Good afternoon, Your Honor. Ed Morton

6  from Young Conaway on behalf of the Debtor's, Brac Group, Inc.,

7  et al. We'll be going today, Your Honor, by the Amended Notice

8  of Agenda that was forwarded to your Chambers. I'm not sure if

9  Your Honor has a copy. If not I have an extra that I can --

10    THE COURT: I do.

11    MR. MORTON: Thank you, Your Honor. As Your Honor

12  will see, the -- probably the first matter that comes

13  numerically on the docket is the Notice of Hearing to Consider

14  the Approval of the Disclosure Statement. There is a status

15  presentation that has been prepared for Your Honor, but since

16  several of the matters in that presentation, not the least of

17  which we'll scheduling, relate also to the Jaeban Status

18  Conference that's at the end. What I would propose to do is to

19  go through the brief uncontested matters we have to the extent

20  there even needs to be a presentation and then take up those

21  matters at the end of the hearing, if that's acceptable.

22    THE COURT: All right.

23    MR. MORTON: Thank you, Your Honor. Turning to

24  matters number 10 and 11 on the agenda, these are two motions

25  to which there was no objection and a Certificate of No

4

1  Objection had been filed prior to the filing of this agenda.  I
2  certainly have forms of order with me to the extent Your Honor
3  has not already signed those motions.

4      (Pause in proceedings)

5      THE COURT:  You're so far away.

6      (Laughter)

7      THE COURT:  Every time I come I'm in a different
8  courtroom.  I've not signed them.  I'm looking -- what I have
9  here is the Order Approving the Rejection of Certain Unexpired
10  Leases --

11      MR. MORTON:  Your Honor --

12      THE COURT:  -- which is not that one.

13      MR. MORTON:  Sir, that relates to matter number 13.
14  We did file a certification late on that one merely because we
15  had given one party additional time to review the motion.  That
16  party did not object and therefore it is also uncontested.

17      THE COURT:  Well, if you have other -- hold on --
18  here's the C.N.O. -- binder.  We're talking now about Veronica
19  Nichols, correct?

20      MR. MORTON:  That's correct, Your Honor.

21      THE COURT:  Yes, I do have that.

22      (Pause in proceedings)

23      THE COURT:  Okay.

24      MR. MORTON:  Your Honor, the next matter would be our
25  365(d)(4) Extension Motion.  Again, that -- there were no

1   objections filed to that motion and it should be contained in
2   the C.N.O. binder that Your Honor is holding.
3       (Pause in proceedings)
4           THE COURT:  I've signed the order.
5       MR. MORTON:  Thank you, Your Honor.  That brings us to
6   matters 12 and 13.  Again, merely because of the objection
7   deadlines related to certain Parties-in-Interest, these matters
8   were the subject of later file certifications.  I believe, Your
9   Honor, as you've mentioned that you have the certification on
10  the matter of number 13.
11      (Pause in proceedings)
12          THE COURT:  Yes, I do.
13      (Pause in proceedings)
14      MR. MORTON:  Your Honor, matter number 12 is a matter
15  by the Committee.  I'll let Mr. Bowden present that.
16      (Pause in proceedings)
17      MR. BOWDEN:  Your Honor, good afternoon.  For the
18  record, Bill Bowden of Ashby & Geddes for the Creditors
19  Committee.  Your Honor, just an introductory matter as well,
20  with me at counsel table is Hal Marcus from the Brown Rudnick
21  Berlack Israels firm, as well.  Your Honor, item 12 was the
22  Committee's Application to Supplement the Engagement of Linda
23  Burch.  No objections were filed and served.  Ms. Harrison on
24  behalf of the United States Trustee had asked for an extension
25  of time, which obviously we had no problem giving her, and has

6

1    not objected.  We filed a Certification of Counsel last

2    Wednesday, I believe.  I don't know if it made it into the

3    C.N.O. binder or not.  If not, Your Honor, assuming Your Honor

4    has no questions, I have a Form of Order with me.

5            THE COURT:  I did not see it in the C.N.O. binder.

6            MR. BOWDEN:  Your Honor, may I approach with the Form

7    of Order?

8            THE COURT:  Yes, please.

9            MR. BOWDEN:  Thank you.

10       (Pause in proceedings)

11            THE COURT:  I've signed the order.

12            MR. BOWDEN:  Thank you, Your Honor.

13       (Pause in proceedings)

14            MR. MORTON:  Your Honor, I believe then this would be

15   an appropriate time to circle back to the disclosure statements

16   portion of the hearing.  Mr. Nyhan of the Sidley Austin Brown &

17   Wood firm is here to present that matter.

18       (Pause in proceedings)

19            MR. NYHAN:  Good afternoon, Your Honor.

20            THE COURT:  Hello Mr. Nyhan.  Nice to see you.

21            MR. NYHAN:  Nice to see you.  It's a pleasure to be in

22   front of Your Honor again, all though I must confess that the

23   ambient climate has deteriorated significantly since the last

24   hearing I attended.

25            THE COURT:  I just assumed that you waited until the

7

1   weather was like Chicago before you came to Delaware.

2       (Laughter)

3       MR. NYHAN: Your Honor, but for the urgence of the

4   Committee, I'd be more than happy to do that.

5       (Laughter)

6       MR. NYHAN: Your Honor, what we'd like to do today, if

7   it's acceptable to the Court is provide a brief overview of

8   where we have been and where we are going with this case and

9   then suggest a timetable for getting to disclosure and

10  ultimately confirmation. And then briefly address -- excuse

11  me, the objections that have been filed, how we intend to

12  address those, recognizing that we are not asking the Court to

13  rule on any objections today, but rather will request that the

14  disclosure statement hearing itself be adjourned and that it be

15  taken up in a -- in a few weeks.

16      (Pause in proceedings)

17      THE COURT: Please proceed.

18      MR. NYHAN: Thank you, Your Honor. This case, Your

19  Honor, was filed on July 29th of 2002. Shortly -- actually

20  prior to the initiation of the case, the company's -- Budget

21  Rent-A-Car had engaged investment bankers and embarked upon a

22  program to either find a source of capital in order to effect

23  an internal reorganization or alternatively to find a buyer so

24  that the assets could be monetized for the benefit of the

25  Creditors of the company. Prior to the filing, Budget had

8

1  progressed significantly in sale negotiations with Cendant

2  Corporation in an acquisition subsidiary called Cherokee.  And

3  after the Petition was filed, and after financing was put in

4  place, pursued essentially an auction based upon a stalking

5  horse bid promoted by Cendant and Cherokee.  Cendant and

6  Cherokee agreed to purchase -- to acquire all of Budget's

7  operations in the United States, Canada, the Caribbean, Latin

8  America and Asia Pacific.  As the deal was ultimately

9  structured, Cherokee and Cendant agreed to assume $2.8 billion

10  of Fleet debt, about $420,000,000 of Secured Pre-Petition bank

11  debt, $75,000,000 in Debtor-in-Possession financing,

12  substantially all trade claims, employee claims, tort claims --

13  there is a dispute, I don't mean to suggest that there isn't a

14  dispute is to the scope of that assumption, but in general,

15  operating liabilities of the company were assumed.  In

16  addition, Cendant agreed to pay and did in fact pay

17  $110,000,000 in cash, plus an additional $40,000,000 in

18  transaction costs, that is, they agreed to help the company

19  defray approximately $40,000,000 in transaction costs.  And

20  they assumed over 7,000 executory contracts.  That transaction,

21  Your Honor, was approved by Judge Walrath and closed on

22  November 22 of '02.  Cendant did not acquire the operations of

23  Budget, which are commonly referred to -- or were referred to

24  as E.M.E.A. or Europe, Middle East, Africa and parts of Asia.

25  Those operations continued subsequent to the closing.  As part

BA63

9

1  of the transaction with Cendant, a license was negotiated

2  pursuant to which the Budget Estate was entitled to continue

3  using the Budget trademark and trade name in those regions for

4  a significant period of time.  We then embarked upon a program

5  to either devise an internal reorganization for E.M.E.A. or

6  find a buyer.  Creditor pressure in Europe forced us to take

7  the step of initiating in January of 1903 -- 1903 -- 2003, in

8  administration in the High Court in London for BRAC, that's

9  Budget Rent-A-Car International.  BRAC is a U.S. corporation,

10  but was the international holding company for the Budget Group.

11  And as such, owned the stock of the various corporations that

12  carried on business throughout, in the U.K. throughout Europe,

13  throughout E.M.E.A.  Working together with the Administrator,

14  Simon Freekley and Urpul Sind, who were appointed by the High

15  Court as Administrators in the administration of BRAC and with

16  the Creditors Committee, we jointly negotiated a sale of the

17  European operations to Avis Europe.  That transaction was

18  ultimately approved by this Court, by the Administrators.  It

19  called for the acquisition of the operating assets in Europe,

20  as well as the licensing agreement for 20 mile -- excuse me --

21  $20,000,000 cash U.S., plus the assumption of considerable

22  amount of liabilities.  That sale was approved in late February

23  of '02 -- excuse me -- '03, Your Honor.  After closing the Avis

24  Europe sale transaction, the parties focused on bringing a

25  conclusion to the case, and in particular a Plan of

1   Reorganization.  The principal issue -- there are some

2   litigation issues, for example, there is a significant claim

3   against the Sixth company in Germany, known as the Sixth

4   Litigation.  That has been prosecuted in Germany and sustained

5   a judgment against the Sixth and we're in the appeal process at

6   this point.  But by and large the assets of the Budget Group --

7   or what was formerly known as the Budget Group, have now been

8   monetized and the principal issues preventing the filing and

9   consummation of a plan, have been the issue of allocating the

10  value that's been received in these transactions as between, on

11  the one hand, the U.S. Creditor Body, and on the other, the

12  Administrators representing the interests of the U.K.

13  Creditors.  Settling those issues prove more difficult than

14  people had originally expected.  They are complicated, for

15  example, the allocation of purchase price is in dispute, both

16  with respect to the Cendant transaction and in that respect,

17  because the -- part of the operations acquired by Cendant,

18  specifically Latin America and Australia, were owned by BRAC

19  and therefore, the value allocable to those, that portion of

20  the sale is claimed by the BRAC Estate.  Conversely, the

21  license which BRAC enjoyed for international operations was

22  owned by the U.S. Budget -- BRAC Estate and therefore, the

23  Creditors in the U.S. laid claim to some portion of the value

24  paid by Avis Europe in respect of the sale of E.M.E.A.  There

25  was also significant in our company claims between the Estates,

11

1   questions about how much of the post-petition financing, which

2   was supported on the backs largely of US Creditors, should have

3   been borne by the UK and the BRAC Estate, and then finally,

4   disputes over who was entitled to whatever value was realized

5   from the <u>Sixth Litigation</u>. As Your Honor is aware, the

6   Disclosure Statement and Plan that we filed left those issues

7   unresolved with the expectation and hope that there would be a

8   resolution between the Administrator and the US Creditors

9   Committee and I'm happy to report to the Court today that as of

10  the end of last week, an agreement has in fact been reached and

11  at the conclusion of my comments, I will yield the podium to

12  Counsel for the Administrator, Mr. Collins and Counsel for the

13  Committee, Mr. Marcus to brief the Court on the salient

14  features of that settlement. But suffice it to say that the

15  principal obstacle, at least from our perspective, of moving

16  forward with this Plan has now been resolved. We will of

17  course, Your Honor, amend the Plan and Disclosure Statement to

18  reflect the terms of the settlement. It is our understanding

19  that the Committee and the Administrator have agreed or that

20  the settlement should proceed to hearing with dispatch and

21  therefore, before I turn to the objections that have been

22  raised at the Disclosure Statement and put it in context for

23  the Court, what we will request at the conclusion of today's

24  hearing is that we be given a time line along the following

25  lines. It is our expectation that a Motion to Approve the

12

1    settlement will be filed on Wednesday or Thursday of this week.

2    We also fully expect that we will be in a position to file an

3    Amended Disclosure Statement with some technical amendments to

4    the Plan by July -- excuse me -- January 25th.  Those

5    amendments, we think, will in substantial part, resolve the

6    objections that are pending against the Disclosure Statement.

7    And we would request, subject obviously to the Court's

8    availability, that we be provided with a hearing in early

9    February, preferably around the 4th or 5th of February, to

10   consider both the adequacy of the disclosure and the propriety

11   of the settlement that has been negotiated involving the

12   allocation issues.  If I may, Your Honor, what I would propose

13   to briefly discuss the nature of the objections that are --

14   have been filed and how we propose to resolve them to help fill

15   in the context for the time line that I've requested.

16        (Pause in proceedings)

17        MR. NYHAN:  Your Honor, we have prepared a brief

18   summary -- that is the Debtors have prepared a brief summary

19   sheet which reflects our summary of what the different

20   objections contained and include as exhibits, all of the

21   objections as well as the Plan and Disclosure Statement.  If I

22   may approach it may be helpful to the Court?

23        THE COURT:  Thank you.

24        (Pause in proceedings)

25        MR. NYHAN:  The summary page, Your Honor, should be

1  the first page in the binder and I would propose simply to walk

2  through the principal objections in order. Your Honor will

3  note, we have divided the responses into Roman number I,

4  Objections and then on the second page Roman number II,

5  Responses. I don't intend to spend much time on the second

6  category because those are principally letters that had been

7  received. They have not been filed with the Court. We will --

8  we do propose to file all of them with the Court and we are

9  going to respond with correspondence to these individuals. The

10 vast majority of the letters really identify claims that these

11 individuals are asserting against the Estate, rather than

12 dealing with anything having to do with the objection -- excuse

13 me -- adequacy of disclosure. We intend to determine whether

14 their claims have in fact been scheduled and if not inform

15 them. But if they have been inform them of that, if they have

16 not inform them of that fact, as well as the bar date and the

17 purpose of the Disclosure Statement hearing. I would like to

18 direct my -- but each one of those letters is included in the

19 binder for the Court to review if Your Honor wishes to.

20     (Pause in proceedings)

21        MR. NYHAN: Let me turn then, if I might, to the first

22 objection, which is the objection lodged by the Commonwealth of

23 Pennsylvania and it's a fairly straightforward objection. The

24 Commonwealth asserts what we understand to be a priority tax

25 claim. Their objection challenges the failure to -- or the --

14

1　their interpretation of the Plan, that the penalty associated

2　with that claim will not be paid under the Plan. Your Honor,

3　we intend to deal with that objection two ways. First, it's

4　really a Plan objection, it's not a Disclosure Statement

5　objection. But second, we are going to clarify the Plan to the

6　extent that they intend to assert a penalty as a non-priority

7　claim. We are going to make it clear that any objection to the

8　allowability of that claim will be handled in the claim

9　objection process and will be -- not be foreclosed -- excuse me

10　-- by the Plan.

11　　　(Pause in proceedings)

12　　　MR. NYHAN: The second set of objections were lodged

13　by the Insurance Company of North America. This is an

14　insurance company who believes, we think, that they have

15　insurance policies -- extant insurance policies and have

16　questioned the treatment of their insurance policies under the

17　Plan. They have also raised general disclosure objections.

18　We're a little bit puzzled about this particular claim, Your

19　Honor. We have reviewed our records -- or I should say are in

20　the process of reviewing them. We do know that this is -- we

21　did have policies for calendar years 1987 through 1992 with

22　this insurance company. These policies were primarily for

23　workman's comp and auto liability claims-made policies. They

24　involved upfront premiums and retrospective premiums.

25　According to our records, the last policy year expired in 1993

1  and we paid what we understood to be a final retrospective

2  premium in 2002 and obtained a release of a letter of credit.

3  So we do not understand that this insurance company is a

4  Creditor or that we have any continuing relationship with them,

5  but we do intend to get to the bottom of this when their

6  counsel can provide us with additional information.  And if,

7  and to the extent a policy remains live, we will deal with that

8  appropriately through either the schedule of assumed contracts

9  or reflecting the fact that we are not assuming the agreement.

10  We'll simply get to the bottom of it.

11       (Pause in proceedings)

12       MR. NYHAN:  The third objection, Your Honor, is from

13  the Paella Properties Group.  Their objection is fairly

14  straightforward.  Under the Plan, the North American -- the

15  U.S. Estates are to be substantively consolidated and they

16  have, Paella has requested further disclosure concerning facts

17  that are relevant to substantive consolidation.  We do intend

18  to amend the Disclosure Statement to add additional

19  information, but we have also provided to counsel to Paella all

20  the information that he has requested that is in our custody

21  and we will continue to cooperate with them pending the further

22  hearing on this.  Hopefully we can resolve this objection

23  completely.

24       THE COURT:  All right.

25       MR. NYHAN:  The final objection, Your Honor, is filed

1  by Cendant and Cherokee.  And that -- there are several

2  components of that.  The first is that the Disclosure Statement

3  fails to adequately address litigation that is pending between

4  the Estate and Cherokee.  That litigation involves a number of

5  issues, one of which is Cendant's claim or -- excuse me --

6  Cherokee's claim that they are owed roughly $3.6 million as an

7  administrative priority claim.  We agree that's an issue.  We

8  will amend our disclosure to fully disclose the fact of the

9  litigation and the issues that are involved.  They've also

10  objected that we have not discussed the litigation in so far as

11  it pertains to the dispute between the Estate and Cherokee over

12  who has responsibility for a number of personal injury claims

13  and a number of employee-related liability claims.  The

14  litigation that -- in that litigation, the Debtors maintain

15  that Cherokee assumed most of these obligations in connection

16  with their acquisition of the North American operations.

17  Cherokee in turn has denied that they've assumed them, or at

18  least assumed all of them and obviously that litigation will

19  proceed in its normal course.  The issue for disclosure, we

20  think, is to number 1, make clear to all the Creditors in the

21  Estate the fact and contours of the litigation and second to

22  make clear to those persons who may be Personal Injury

23  Claimants that there is a dispute, that what their treatment --

24  - their actual treatment at the end of the day will turn or may

25  turn on the resolution of that dispute and that to the extent

1  that Cherokee disputes the assumption of a particular personal

2  injury claim or employee liability claim, we will make it clear

3  that those Creditors will be asked to vote in the Class of

4  General Unsecured Creditors.  So, we believe that we can

5  adequately resolve these objections -- that portion of the

6  objections through improved disclosure.  The next point raised

7  by Cherokee is the suggestion that the Plan as drafted imposes

8  upon Cherokee a third-party release, that is, imposes upon

9  Cherokee a release of claims in favor of third-parties.  That

10  was not our intent and we will clarify the Plan accordingly.

11  Similarly, Cherokee has -- contends that the Plan as presently

12  drafted affects a discharge of Cherokee's claims under the

13  Asset Purchase Agreement.  Again, that was not the intent and

14  I'm sure that we can come up with language which will satisfy

15  them that that is not the effect of the Plan.  Cherokee and

16  Cendant also claim that the plan can not be confirmed because

17  they -- their administrative priority claim, 3.6 million may be

18  greater than that.  They assert that the Plan contemplates that

19  that claim will be estimated and that it can not as a matter of

20  law be estimated.  And we would propose to modify the Plan and

21  Disclosure Statement to reflect the fact that their objection

22  to an estimation is preserved, that is confirmation the Plan

23  will not preclude them from arguing that if we ever decide that

24  it is appropriate to try to estimate a claim.  Hopefully we'll

25  never get there.  And finally, Cherokee --

18

1     THE COURT: What does their proposed or alleged

2 administrative priority claim arise out of?

3     MR. NYHAN: It arises out of certain obligations under

4 the Asset Purchase Agreement, which Cherokee believes the

5 Estates should have borne and Cherokee paid those obligations.

6 So they believe that in effect it -- without getting technical

7 on the contract itself, I would liken it to -- an adjustment to

8 the purchase price. Incidentally, Your Honor, the Debtors have

9 asserted in that litigation that Cherokee owes the Estate a

10 number slightly in excess of $2,000,000, I believe. So that

11 litigation is fairly right, but at least in terms of the

12 identification of the issues.

13     (Pause in proceedings)

14     MR. NYHAN: The final point raised by Cherokee is a

15 request or demand that their -- the disputed claim reserve for

16 their administrative claim be segregated separately from other

17 disputed claim reserves. While we don't think they're entitled

18 to that, we don't have any problem providing for that. So we

19 will amend the Plan accordingly. Again, Your Honor, I'm not --

20 it's not my expectation that we're going to argue these or that

21 Your Honor will resolve any of these. We do, though, believe

22 that the vast majority of the objections that have been filed

23 will be resolved by the amendments that I've suggested both to

24 the Plan and the Disclosure Statement. With that, Your Honor,

25 I would respond to whatever questions the Court might have and

19

1   then subject to identifying a schedule, turn the podium over to

2   the Committee and the Administrator and to the extent Your

3   Honor would be interested in the terms of the settlement that

4   they've reached.

5        THE COURT: All right, thank you.

6        (Pause in proceedings)

7        MR. MARCUS: Good afternoon, Your Honor. Harold

8   Marcus from Brown Rudnick Berlack & Israels on behalf of the

9   Creditors Committee. We'd like to summarize, if I could,

10  somewhat general terms of the settlement that has been reached

11  between the U.K. Administrators and the U.S. Creditors

12  Committee of Budget. Basically the terms are as follows: The

13  Cendant sale proceeds will be allocated 100% to the U.S.

14  Estates. The Avis Europe sale proceeds will be allocated 100%

15  to the BRAC Estate. The first million dollars of what we refer

16  to as Jaeban cure proceeds, which return to the Estates will be

17  in fact allocated to the U.S. Estates with a balance of the

18  roughly $4.5 million cure account allocated to the BRAC Estate.

19  The Sixth Litigation proceeds that Mr. Nyhan referred to a few

20  minutes ago will be allocated as follows: The first million

21  dollars to the BRAC Estate, with the balance shared 50/50

22  between the U.S. and BRAC Estates. The U.K. Administrators,

23  however, will have sole authority to settle or resolve the

24  Sixth Litigation. In addition, certain accrued and unpaid

25  professional fees will be shared by the Estates. Roughly

1   $3,000,000 of U.S. administrative expense and priority claims

2   will be paid by the BRAC Estate.  These relate, Your Honor, to

3   the period of time subsequent to the filing of the U.S.

4   bankruptcy case of BRAC and prior to the commencement of the

5   U.K. administration case for BRAC.  And finally there is a

6   waiver of claims binding against these Estates -- mutual

7   releases that will be entered into.  So, the Creditor's

8   Committee, Your Honor, is indeed pleased that the parties have

9   reached a settlement.  We do anticipate filing as quickly as we

10  can this week, a Motion to Approve the settlement.  I might

11  add, Mr. Nyhan remarked at the very beginning of the hearing

12  that the Committee is pushing on the Debtor to keep things

13  moving.  Indeed the Committee is concerned about the cost of

14  keeping this liquidation case operating, so to speak.  There is

15  a huge cost factor.  We're very supportive of having as early a

16  disclosure -- substantive Disclosure Statement hearing and Plan

17  confirmation if possible.  I hope the Court will keep that in

18  mind as we discuss the specific dates that Mr. Nyhan has

19  proposed.  I certainly appreciate and understand the logic of

20  the proposed dates.  There is still a few items to deal with

21  before we have that substantive hearing, but nonetheless we do

22  need to move this case on.  Thank you.

23         THE COURT:  Thank you.  Anybody else?

24      (Pause in proceedings)

25         MR. CLARK:  Good afternoon, Your Honor.  Tony Clark of

21

1   Skadden Arps for Cendant and Cherokee acquisition.  Just

2   briefly, I'm not going to argue, our objection has been filed.

3   I do want to state for the record that the summary, and I

4   understand what Mr. Nyhan was giving was just a summary and not

5   a verbatim explanation of what our objection is, but the

6   summary doesn't include everything that's in our objection, but

7   I assume we'll talk about it more and deal with it further

8   before we come before Your Honor for a substantive hearing on

9   the Disclosure Statement.  So I'm just going to reserve our

10   rights.

11          THE COURT:  Thank you.

12          MR. CLARK:  Thank you, Your Honor.

13      (Pause in proceedings)

14          MS. HARRISON:  Good afternoon, Your Honor.  Margaret

15   Harrison, Office of the United States Trustee.  I had been

16   granted an extension of time to object to the Disclosure

17   Statement until the settlement had been reached and the

18   modifications had been made.  So I just wanted to preserve my

19   rights to object to the Disclosure Statement as modified.

20          THE COURT:  Thank you.

21          MR. NYHAN:  I concur with both of those, Your Honor.

22   Your Honor, I should note that in proposing the date that I

23   did, I recognize that we do have an Omnibus Hearing scheduled

24   for February 17th here and that if we depart from that -- if

25   it's possible to depart from that, it may be necessary to

22

1  proceed with a hearing in a different venue and if the parties

2  are all prepared to do that if that is something that works for

3  Your Honor.

4          THE COURT: The answer is I don't know. That's what

5  I've been typing up here while you all have been talking. I've

6  been making some inquiries. And frankly, what I would like to

7  understand is what difference the two weeks makes? I had this

8  conversation with some folks in another case recently and I

9  know their answer was $15,000,000 or something like that and so

10  that had a -- made an impression on me because of the burn rate

11  of that particular debtor. But, it is -- it is difficult to

12  schedule Delaware cases in Arizona competing with the Delaware

13  -- excuse me, with the Arizona docket, which in the last few

14  months has become more crowded than it has been in a while.

15  Perhaps, since the time that you were in Arizona on a regular

16  basis, Mr. Nyhan, when it was quite crowded. So, I do want to

17  ask the question every time, to have counsel tell me why is it

18  -- why does the two weeks matter? Because when I'm here I can

19  give you my full attention and not worry about the fact that

20  you may be bumping up against something else that I've already

21  scheduled or without having to make other kinds of

22  arrangements.

23          MR. NYHAN: I appreciate that, Your Honor. Let me

24  turn that over to the Committee, but say that two -- make two

25  comments. First, certainly it is not our expectation that were

1   we to depart from our normal practice for purposes of this one

2   hearing, which we don't expect to be an evidentiary hearing or

3   a lengthy hearing for that matter, that we would not -- we

4   would depart only for purposes of that hearing in order to move

5   more quickly to confirmation, with every expectation that

6   confirmation would be here when Your Honor is available.

7   Second, I will say that the Committee has endeavored to move

8   this case forward. Let me state it differently. All parties

9   have moved -- endeavored to move the case forward. There have

10  been many issues that people have had to grapple with in order

11  to move it across the goal line. But the Committee has been

12  sensitive to the delay and has been consistent in their request

13  that things move forward and we will do whatever we can -- we -

14  - the Debtor, to accommodate their desire to get it there.

15         MR. MARCUS: The specific answer, Your Honor, is that

16  the two weeks could mean, you know, as much as $600,000 or

17  $700,000 just based upon the burn rate of professional fees

18  running roughly 1-2, 1-3 a month. Now granted some of that

19  consisted of litigation preparation and we now have a proposed

20  settlement with the U.K. Administrators. However, there's

21  still the Cendant issues that are outstanding including

22  litigation -- potential litigation and certainly negotiations

23  and work on the Cendant matters. It's not -- I can't tell you

24  it's $15,000,000. On the other hand, for this Committee, with

25  -- in a case where of course there's no operating business,

1    just a pot of money that's dissipating, the two weeks strike,

2    the Committee as extremely significant.

3        THE COURT:  But on the other hand, the fact that there

4    are two more weeks doesn't mean that every professional has to

5    write down another 8.0 on their sheet everyday.  Presumably,

6    some of the professionals who are paid on a monthly basis, the

7    financial professionals -- are their financial professionals

8    who are still being paid on a monthly basis in this case?

9        MR. MARCUS:  There have been yes, Your Honor.  I --

10        THE COURT:  Are there still at this point is what I'm

11    saying?

12        MR. NYHAN:  Well not for the Debtor, Your Honor.

13        MR. MARCUS:  Jefferies of -- the financial advisor for

14    the Committee has been paid thusly, but won't be going forward.

15        THE COURT:  So, just to follow up on the analogy of

16    the other case, I mean, there was an actual 3/4 of a million

17    dollars a day operating burn rate that was creating, you know,

18    over 21 days, a $15,000,000 loss.  That was a significant

19    issue.  But, it doesn't sound like that's really happening in

20    this case.

21        MR. MARCUS:  No, this is a different situation, Your

22    Honor.  But, the fees have been -- have been significant in the

23    context -- moreover the context includes, you know, I'd say

24    months of negotiations and it's taken a long and hard road to

25    get to this point, Your Honor.  We certainly would like to do

25

1  everything we can to, you know, keep up the momentum and get

2  these matters resolved as quickly as we can, subject to your

3  calendar and schedule. Thank you.

4        THE COURT: Okay. Right, so you do have a full

5  fledged schedule proposal, Mr. Nyhan?

6        (Pause in proceedings)

7        MR. NYHAN: Well, Your Honor, I have one, it's a

8  question of which piece of paper I have it on. Your Honor, we

9  were not contemplating going beyond the scheduling a hearing

10  for the approval of disclosure and approval of the settlement

11  motion that will be filed within the next couple of days. So

12  our proposal would be to schedule a hearing during the week

13  around the 4th, 5th or 6th of February with a view towards --

14  we are told by the Committee and the Administrator that the

15  settlement motion can be filed or will be filed by Wednesday or

16  Thursday of this week. Assuming a 20 day notice period on that

17  motion, a hearing in -- during that first week of February --

18  perhaps the second week of February would be adequate. We will

19  be in a position to file an Amended Plan and Disclosure

20  Statement addressing the changes that I alluded to earlier by

21  the 25th of January, so parties will have ample opportunity to

22  look at that before the resumed hearing. With respect to

23  confirmation, we would hold off on any request until we

24  conclude the hearing on the approval of the Disclosure

25  Statement.

1      THE COURT:  Well, I know that the 5th and 6th are not

2  possible.  The 4th may be possible.  I just don't know what my

3  calendar is in Arizona, that's why I've sent an e-mail to see

4  if I can find out.  The 5th I'm traveling and the 6th I'm out

5  of the state.  Then but I'm back the next week, the week of the

6  9th and then the week of the 16th is when I'm here.  I can't

7  commit to give you the 4th until I get a response --

8      MR. NYHAN:  Understood, Your Honor.

9      THE COURT:  -- and if -- I understand that the issue

10 is you'd like to do this as quickly as possible.  That is a

11 fairly aggressive schedule in the sense that -- I take it it

12 assumes that you are going to resolve all of the outstanding

13 objections, the most significant one appears to be the Cendant

14 objection.  But resolve it from the standpoint of disclosure,

15 not from the standpoint of actually resolving the underlying

16 merits.

17      MR. NYHAN:  That is correct, Your Honor.

18      THE COURT:  And then deal with whatever issues may be

19 raised by the United States Trustee once the Amended Disclosure

20 Statement is in place.  So, I wish I could give you a more

21 definitive answer than that.  If we kick over into the next

22 week, the first available time is during the week of the 9th.

23 Should we try to find it during the week of the 9th and come to

24 Arizona or should we just wait until the 16th?  My goal is to

25 be as accommodating as possible, but I must tell you then that

27

1   I've had a couple of weeks recently where the bulk of my time

2   in Arizona has been spent on Delaware cases and has created a

3   real serious problem in terms of actually doing my real job,

4   which is the 3,000 cases I have in Arizona.

5       (Laughter)

6           THE COURT:  And so I'm sensitive to that and any --

7   and frankly, what that means is that if something goes haywire

8   where I have something that an emergency comes up or if there

9   is a hearing that goes too long, I'll give precedence to that

10  over the Delaware cases and then meanwhile we've had a bunch of

11  counsel who've traveled who are there and if we can't fit it in

12  that day or if we have to wait until the next day, it ends up

13  not necessarily being that good.  This is not an ideal

14  situation, obviously and would be better, as much fun as I have

15  here, for Congress to create some more judgeships so that we

16  don't have to do this.  But it's the reality that we're all

17  dealing with.

18          MR. NYHAN:  Your Honor, if I may have an opportunity

19  to confer with the Committee.

20          THE COURT:  All right.

21      (Pause in proceedings)

22          MR. MARCUS:  Your Honor, we would like to shoot for

23  the 4th, if your schedule permits once you hear back from your

24  Court.  The second choice would be to have the hearing on the

25  9th if your schedule permits.  And we do believe each week is

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

**BA82**

28

1  significant here.

2      THE COURT:  The 9th or the week of the 9th?

3      MR. MARCUS:  The week of the 9th.  As early as

4  possible in that week, Your Honor.

5      THE COURT:  Right.  Well, we will just have to get

6  back to you on that.

7      MR. MARCUS:  Okay.  Thank you.

8      THE COURT:  But I assume that will not change

9  anybody's efforts to get the amendments and the Motion to

10 Approve done.  The only problem is the question of noticing and

11 what the notice says when it goes out.

12     MR. NYHAN:  That is correct, Your Honor.

13     THE COURT:  Okay.

14     MR. NYHAN:  Your Honor, that is all we had on those

15 matters.  If I may then turn it over -- I believe there are a

16 couple other matters on the agenda.  Thank you.

17    (Pause in proceedings)

18     THE COURT:  Now, let me just -- before we leave that,

19 let me make sure I understand what we're actually looking for

20 here.  What is your expectation in terms of the needed time for

21 a hearing?

22     MR. NYHAN:  Your Honor, I would hope it would be very

23 brief, but candidly I think that we should assume that it is --

24 we should have two hours -- a minimum of two hours booked for

25 it, because if there is going to be argument, if there are

1  going to be objections, I don't think it's prudent to plan on

2  less.

3        THE COURT:  Now, is that both for the settlement and

4  the disclosure hearing?

5        MR. NYHAN:  Yes, Your Honor.  I don't expect, and I

6  look to my colleagues, but I don't expect that the settlement

7  will take long at all.  We really anticipate no objections to

8  that.

9        THE COURT:  So the real issue is going to be the --

10        MR. NYHAN:  The Disclosure Statement.

11        THE COURT:  -- the Disclosure Statement.

12        MR. NYHAN:  That's correct.

13        THE COURT:  All right.

14      (Pause in proceedings)

15        THE COURT:  Okay.

16        MR. WILE:  Good afternoon, Your Honor.  Kenneth Wile

17  on behalf of Brac and the other Debtors to address the Jaeban

18  Adversary Proceeding which we discussed on the phone, back

19  before Christmas.  And sadly, I'm here to tell you we have

20  stepped backwards rather than forwards.  Not only do we still

21  not have any dates for depositions in the U.K. and that's where

22  I believe all the depositions will take place.  And not only do

23  we not have the documents that were promised for last week, but

24  we have just received a motion which the Court may have seen in

25  which counsel for Jaeban here in Delaware, Morris Nichols firm

1   has asked to withdraw because Defendant has failed

2   substantially to fulfill its obligations.  So that leaves us

3   frustrated and fighting off delay as best we can.  We did have

4   a couple of conversations with U.K. counsel.  At first it

5   appeared we were on the same page, that was on the day of our

6   last conference and then last Wednesday in a conference that my

7   English colleague more or less compelled from the other side

8   without discussing -- without disclosing our discussion of the

9   merits, we were furnished with a request for another 30 day

10  standstill, which we obviously declined.  We were told that the

11  principals would meet over in the U.K. today.  They haven't.  I

12  learned just coming into the Courtroom that allegedly there was

13  going to be a meeting on Thursday.  I would hope there would be

14  a meeting on Thursday, but I hope the Court will forgive the

15  little bit of skepticism on our part until that occurs.  That

16  being the case, we have no choice but to move forward as

17  quickly as we possibly can.  We do have a Motion for a Partial

18  Summary Judgment for a turnover order essentially ready to go

19  save only for an affidavit of U.K. law.  The parties have been

20  discussing a settlement -- I'm sorry, a hearing date -- we'd

21  like to make that hearing date also the hearing date for our

22  motion.  It's a very simple, straightforward motion and the

23  motion would be critical because if the Court decides the

24  motion has merit my colleagues in the U.K. and their clients

25  can go in and finally protect Brac's interest over in the U.K.

1  because as we speak, the receivers of Jaeban are fairly close

2  to having sold off most of their assets.  So that we plan on

3  filing no later than Friday.  And then, we're still left with

4  the outstanding discovery and we would like, at best,  an

5  ammunition or worse rather ammunition from the Court that we

6  have deposition dates and that we have the documents disclosed

7  by Friday.  Now, ordinarily that would be extraordinary since

8  Delaware counsel has moved to withdraw.  But, I think as their

9  motion reflects, all the work has been done by the U.K.  We've

10  had some difficulty getting perhaps the solicitors and perhaps

11  their clients to focus in the U.K. and I think rigorous

12  deadlines might help us resolve the case, or at the very least,

13  protect the necessary interest of the Debtor and the Estate.

14      THE COURT:  Well, a proposed date let's say of

15  February 4th, is that what you're saying?

16      MR. WILE:  That would be fine by us, Your Honor.

17      THE COURT:  For a -- for a hearing on a Motion for

18  Summary Judgment that has not yet been filed, certainly would

19  not comport in my District with local rules regarding

20  necessary time periods for motions for summary judgement.

21      MR. WILE:  I'll look to my colleagues, but I think in

22  Delaware all things are possible.

23      (Laughter)

24      THE COURT:  Frankly it does strike me that if we're

25  responding to a Motion for Summary Judgment that's being filed

32

1  against an entity where local counsel is now seeking to

2  withdraw, I understand why that would be desirable from your

3  standpoint, but it seems to me perhaps a bit overreaching.

4        MR. WILE:  Well the problem we face, Your Honor, we

5  face the same, I think, even graver exigency then the other

6  aspects of the case present because assets are being sold off

7  and if we can be delayed long enough then the receivers of the

8  Defendant will have one less set of problems with which to

9  deal.  Obviously, we'd be grateful for whatever the earliest

10 date the Court considers to be appropriate.  We're well aware

11 that there needs to be a change of counsel and there will be,

12 you know, some limited amount of U.S. law issues under the Code

13 to be addressed.  Perhaps the best thing is simply for us to

14 get the motion on file and then find out what opposing counsel

15 thinks he, she or they need.  But, we really are facing some

16 distress here in protecting our rights over in the U.K.  And it

17 may well have been that our December conference call -- we were

18 -- we may have misinterpreted what we were told.  But in any

19 event we have it ready to go.  I have in fact -- my portion is

20 already drafted and we want to get it on file and perhaps it

21 would only be fair for me to have a conference -- conversation

22 with substitute counsel and then we can perhaps bring that to

23 the Court's attention --

24        THE COURT:  Do we know where the Defendant is with

25 regard to substitute counsel?

1    MR. WILE:  No, Your Honor.

2    THE COURT:  I think I'm going to find out right now.

3    (Laughter)

4    MR. WILE:  Absolutely.

5    MR. BRIGGS:  Tom Briggs of -- Tom Briggs of Morris,

6    Nichols, Arsht & Tunnell, Your Honor.  Unfortunately I don't

7    have much more to add in terms of where we are with substitute

8    counsel.  Our efforts to contact Jaeban and Jaeban receivers

9    have been largely unsuccessful over the last couple of weeks,

10   especially since we filed our motion last Wednesday.  So, I'm

11   not sure where they stand in terms of getting substitute

12   counsel.

13   THE COURT:  Well perhaps one way to deal with this is

14   not to grant your motion.  And that's a serious comment.

15   MR. BRIGGS:  I would suggest, Your Honor, we undertook

16   the representation of Jaeban last August.  Since then, our firm

17   has not been paid one single dollar.  We have sent them

18   numerous e-mails and telephone calls trying to get this issue

19   resolved.  And in fact we have not formally been retained by

20   the Jaeban receivers, which I believe is a different animal

21   than Jaeban itself.  So, I'm not sure that we even represent

22   the receivers at this point.  And we would like to withdraw

23   from representing Jaeban because it is becoming a burden,

24   especially if Budget intends to file a Motion for Summary

25   Judgment or Partial Summary Judgment or if discovery gets moved

34

1  forward, obviously this is going to increase the cost

2  significantly, which would increase burdens of Morris Nichols.

3       THE COURT:  Okay.  Now, refresh my recollection, I

4  don't believe there is a pending judicial procedure here.  Is

5  that correct or am I wrong about that?

6       MR. WILE:  I'm sorry, pending --

7       THE COURT:  In England, in U.K.?

8       MR. WILE:  Receivers have been appointed as such, but

9  no there's no actual law suit or adversary filed.

10       THE COURT:  These are the classic U.K. --

11       MR. WILE:  Administrative receivers under the

12  Insolvency Act, Your Honor.

13       THE COURT:  So there is no Court to Court

14  communication that could take place that might put a little

15  fear of God in the folks on the other side through a U.K. Judge

16  because it sounds like there's no UK Judge who's assigned over

17  this receivership?

18       MR. WILE:  Sadly no, Your Honor.

19       THE COURT:  Okay.  Anybody else wish to weigh in in

20  connection with this matter?  Tell me what your Motion for

21  Summary Judgment will look like.

22       MR. WILE:  Glad to, Your Honor.  During extensive

23  discussions -- I'm sorry, Your Honor, let me back up half a

24  step to what the claim is.  Our claim is for 3,000,000 pounds,

25  which is based entirely on what the books at Brac showed where

1  due and owing from Jaeban, which is a franchisee that covered

2  the north of England and certain parts of Scotland and there

3  are books.  In the course of the discussions, many of which

4  were settlement discussions, but in the course of those

5  discussions, counsel for Jaeban, who are still the U.K.

6  solicitors in the case, sent us a calculation.  It's not marked

7  without prejudice or anything else, and it listed at the end of

8  the day taking some fairly wild discounts, that even after

9  taking those discounts, 328,000 pounds were due and owing to

10 Brac.  At this point we'd like to come in and move for partial

11 summary judgement and a turnover order.  And that's in an

12 amount which would in turn transform Brac into a proper

13 Creditor of Jaeban and they can deal with the receivers

14 accordingly.  Their interest would then have to be considered

15 along with everyone else's.

16      THE COURT:  Is there any procedure you are aware of in

17 the U.K. for any kind of an effective prejudgment remedy being

18 asserted in the U.K. that can be used to freeze assets or

19 prevent the dissipation of assets?

20      MR. WILE:  I hesitate to commit malpractice beyond

21 mentioning the Insolvency Act, but I have colleagues who know

22 the answer to that.  I believe the answer is no because we've

23 been asking ourselves over and over as the delay has become

24 more manifest, is there anything we can do in the U.K.?  So far

25 this has been the best, but I will certainly ask my colleagues

36

1  again.

2        THE COURT:  Okay, anybody else?

3        ALL:  (No verbal response).

4        THE COURT:  When do you think you can get this filed

5  by?

6        MR. WILE:  Friday, Your Honor.

7        THE COURT:  Friday is -- let me look here, 16th?

8        THE CLERK:  The 16th.  The 16th, Your Honor.

9        THE COURT:  The 16th.

10     (Pause in proceedings)

11        THE COURT:  Okay.  I'll assume that you're going to

12  file this by Friday the 16th.  I'll set the response date for

13  two weeks later, January 30.  In the event we set the hearing

14  for the 4th, I will make a reply due noon on the 3rd.  I'll

15  require that the 30th -- well, I'll put it this way.  I'll

16  grant the Motion to Withdraw of the current counsel.  The

17  notice will be -- that will be sent out will indicate that

18  substitute Delaware counsel has to be obtained in time to file

19  the response by the 30th.  Failure to file a response by the

20  30th will be taken as consent to the entry of a motion -- of

21  the order granting the partial summary judgement.  And that a

22  response filed only by U.K. counsel will not be considered.  In

23  the event the hearing is set for the week of the 9th, we'll

24  make the reply date instead the 5th of February and will have

25  the hearing at the same time that we're currently scheduled.

1   And I should say there's always the possibility that the

2   hearing will be here in Delaware during the week of the 16th

3   because I don't have current access to my Court calendar, for

4   either the 4th or the week of the 9th and I just don't know

5   whether or not there's time set aside for that -- time I can

6   set aside for it. But that's sort of the working arrangement

7   and staff here in Delaware will be in contact with you with

8   regard to what the exact date is.

9          MR. WILE: Your Honor --

10         THE COURT: It does seem to be that that's number one,

11  an aggressive schedule, but number two, I'm taking -- counsels

12  vows here to me at face value that there is an emergency

13  created here by the fact that apparently there is no incentive

14  on the side of Jaeban to move this along. And that there's no

15  adequate basis for creating an incentive under applicable U.K.

16  law. Other than getting a judgment, which you can presumably

17  domesticate in the U.K. and if -- and then seek to enforce as a

18  judgment Creditor rather than as a Prejudgment Creditor. So

19  based upon all of that, I've set that schedule.

20         MR. WILE: Your Honor, if I may return to discovery

21  for just one second. Should we proceed by a Motion to Compel

22  at this point with respect to documents and deposition dates?

23         THE COURT: It seems to me yes that one of two things

24  will happen: Either the documents and the depositions will

25  take place or you will be able to ask for a sanction that would

38

1  render that not necessary.  But you can only do that, I think,

2  get that kind of a sanction in the context of a -- of a Motion

3  to Compel as opposed to -- or in the context of disobeying an

4  Order to compel, frankly.  So, you should proceed on that same

5  basis.  Now I take it that what you're talking about is not

6  necessary to the Motion for Partial Summary Judgment --

7       MR. WILE:  Correct, Your Honor.

8       THE COURT:  -- because what you're relying upon,

9  basically, is their admission that they owe at least that

10  amount of money --

11       MR. WILE:  Exactly.

12       THE COURT:  -- and you're motion is going to be,

13  "Grant us judgment at least for that amount of money without

14  prejudice, the fact that we think we can prove you owe us

15  more."

16       MR. WILE:  And it will less than ten pages, Your

17  Honor.

18       THE COURT:  Okay.  So I think -- they're still

19  entitled to their due process that comes from the motion

20  practicing and discovery disputes and I think that would be the

21  best way to proceed.  Okay?

22       MR. WILE:  Thank you, Your Honor.

23       THE COURT:  Anything else on that?

24       MR. BRIGGS:  Your Honor, I do have here a Proposed

25  Form of Order.

1    THE COURT:  I'm not surprised.

2    (Laughter)

3    (Pause in proceedings)

4    MR. BRIGGS:  Thank you, Your Honor.

5    (Pause in proceedings)

6    THE COURT:  I just want to ask for the record, I want

7    to make sure that there is nobody else in the Courtroom

8    representing -- or on the telephone representing the interests

9    of Jaeban, other than the Morris Nichols firm, whom I've just

10   signed the order?  In other words, there's no proposed new

11   counsel who is here who has been asked by the client to be at

12   this hearing?

13   ALL:  (No verbal response).

14   THE COURT:  I'll note the non-appearance of any

15   additional counsel.

16   MR. MORTON:  I believe those were all the matters that

17   were scheduled by the Debtor's today.

18   THE COURT:  All right.  Thank you.  We'll be in touch

19   with regard to scheduling the other matter.

20   ALL:  Thank you, Your Honor.

21   (Court adjourned)

22

23

24

25

BA94

40



1                 CERTIFICATION
    I certify that the foregoing is a correct transcript from the
2   electronic sound recording of the proceedings in the above-
    entitled matter.

3

4     _____             1-29-04
    Signature of Transcriber         Date

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

**BA95**