# EXHIBIT E

BA242

Your reference

Our reference        ICW

*Copy to be passed to I.S.*

*MSC 15403*

15 October 2003

M O'Connor
Senior Manager
RSM Robson Rhodes LLP
Chartered Accountants
Centre City Tower
7 Hill Street
Birmingham
B5 4UU

Reply to:
55 Colmore Row
Birmingham  B3 2AS
DX 13036 Birmingham 1

3 Waterhouse Square
142 Holborn
London EC1N 2SW
DX 282 LDE

Rond Point Schuman 9, bte 4
B-1040 Brussels
Belgium

T +44 (0) 870 903 1000
F +44 (0) 870 904 1099
mail@wragge.com
www.wragge.com

Wragge & Co LLP
is registered in
England and Wales as a
Limited Liability Partnership
Registered no. OC304378

Registered office:
55 Colmore Row
Birmingham  B3 2AS

Wragge & Co LLP
is regulated by
the Law Society
of England and Wales

A list of members of
Wragge & Co LLP
is open to inspection at
the registered office

Dear Mick

**Jaeban (UK) Limited (the "Company")**

It is apparent that following our discussions with Zodiac on 13 and 14 October that Zodiac are not willing to continue to support the Budget franchise in favour of the Company and also do not appear willing to enter into any new franchise agreements with any other corporate entity where Ibraheim Jaeban is involved.

Without the support of Zodiac it is not possible for you as potential receiver to trade the Company as a going concern.

Ibraheim Jaeban has however mentioned to you that he might want to trade through Newco or in his own name from various sites currently operated by the Company. Whilst some of these sites might ultimately be owned by Jaeban, in each instance the Company does at present have a lease or tenancy rights in relation to the business sites.

Ibraheim Jaeban argues that neither he or the Company are not bound by the franchise agreements that he originally entered into with Budget Rent-A-Car International Inc (BRACI) and is therefore free to operate in his own capacity.

Having looked at the Umbrella Franchise Agreement and the International Prime Licence Agreements, I disagree with Ibraheim Jaeban's conclusions.

There is nothing within the structure of either of the above agreements which has caused them to automatically determine on the insolvency of BRACI or the UK business of BRACI. All of the



in association with
www.westphalen-law.com
Graf von Westphalen Bappert & Modest
Berlin  Brussels  Dresden  Freiburg  Hamburg  Cologne  Leipzig  Munich  Vienna

WRAGGE2 #4151661 v1 [ICW][DCR]

automatic termination provisions relate to franchisees. Therefore, the agreement is arguably still in place.

In any event, even if my above analysis is incorrect, in my view the Company has continued to conduct business as if it is a franchisee of Budget. For example, its vans and office accommodation still carry the Budget logo. It could be said that the Company are seeking to argue that they can have all the benefit of the franchise agreement without any liabilities. I do not think that a Court would interpret matters in this way and are likely to conclude that even if the agreement was capable of termination on the insolvency of BRACI, it has effectively been held over and continued by the parties.

As a consequence, the restrictive covenants contained within the agreements are in my view effective.

As a consequence, the following clauses would need to be taken into account by Ibraheim Jaeban if he is to commence trading as a Newco.

Clause 1.3 prevents any sublicense without the consent of Budget.

Clause 2.3 limits the use of the Budget trademarks to acting in compliance with the franchise agreements. As a consequence there is potential for an intellectual property claim for infringement of this provision.

Clause 2.43 contains a covenant against directly or indirectly soliciting people who are customers of Budget for 2 years following termination.

Coupled to this clause, the Company cannot disclose any part of the operating manual to any person other than its employees.

Clause 11.9 prevents the Company and the Company's beneficial owners (i.e. Ibraheim Jaeban) for a period of 12 months after termination to be engaged or interested in any other vehicle rental business where it would compete with Budget.

Additionally, clause 12.6 imposes a nondisclosure and non-competition clause against all beneficial owners, directors and principal owners of the Company for the 2 years referred to within clause 11.9.

As a consequence of the above terms, if Ibraheim Jaeban or any other directors or beneficial owners of the Company commenced a business in competition to that of Budget, Budget would be entitled to bring proceedings against the relevant individuals for breach of covenant contained within the Franchise Agreements.

As a consequence in my view, you are not able to assist in your capacity as Receiver, Ibraheim Jaeban or any other director or beneficial owner in setting up any competing business. You would not be able to sell any assets or pass any information held by the Company to any Newco involving Ibraheim Jaeban. Clearly you cannot prevent Ibraheim Jaeban undertaking this task but if it could be demonstrated by Budget that you assisted then as Receiver there is a possibility that you could be personally liable as you have assisted in a breach of contract. You cannot rely upon ignorance as you have been informed about the terms of the franchise and agreements.

WRAGGE2 #4151681 v1 [ICW][DCR]

It does appear however that the non-competition clauses do not extend to employees of the Company provided they are not beneficial owners and therefore employees of the Company are not prevented from setting up in competition to Budget.

Should you require any further advice in relation to the content of the Franchise Agreements, please do not hesitate to contact me.

Yours sincerely

**Ian Weatherall**
Direct dial : 0121 685 2787
e-mail: ian-weatherall@wragge.com

WRAGGE2:#4151881 v1 [[CW]][DCR]

BA245

# EXHIBIT F

BA246

Forth House
Isel
Cockermouth
Cumbria
CA13 9SA

Tel: 07973 256641
Fax: 01900 821654

**For the Personal Attention of**
**Mr M O'Connor**
RSM Robson Rhodes
Centre City Tower
7 Hill Street
Birmingham
B5 4UU

**By Fax and Post**

Friday, 30 January 2004

Dear Mick

Further to our meeting yesterday I would like to comment as follows;

1. I do not agree with Ian Weatherall of Wragge & Co we reference to the claim against Budget International. He has probably taken the Franchise Agreement on it's own without reference to the Operating Manuals as they have been referred to in the Franchise Agreement. They are in fundamental breach of the Franchiser's obligation by precedence and by the Operating Manual.

   Presentations were made with absolute determination that London Gatwick, London Heathrow and Standsted Airports continue to be operational under all circumstances. This can be verified by Jack Frazee and Terry Clarke of Budget. Jack Frazee as President of Budget International declared this fact in a public meeting.

   It is implied in the Operation Manuals that a One-Way system is crucial, as too are Central Billing and National Accounts. It is stated that the Marketing fund should be made up from 2.5% of the Licensee fees and should be spent solely on Marketing – this has not occurred.

   There are additional points, which have been provided to Wragge & Co from the Operating Manuals.

2. I would like Ian Weatherall of Wragge & Co to elaborate on his comments about me in the document he provided.

3. The Fiat issue.

   I would have hoped that by now you have read by now the summary given to Esther.

   The Fiat issue commenced in 2000 and therefore it is not recent. The point I would like to make is that these vehicles have been supplied by Fiat and returned to Fiat and have not been sold to anyone else by Jaeban.

   I would be happy to discuss all of the above points with you in more detail.

Yours sincerely

**Mr I M Jaeban**

BA247

# EXHIBIT G

# Jaeban (UK) Limited
# Credit Pack

This document is confidential and intended only for the use of the recipient to whom it has been delivered, and those others within that person's organisation whose position involves assessing and/or processing the proposals contained herein.

BA249

# Contents

| Section Number | Section Title | Page Number |
|---|---|---|
| 1 | Executive Summary | 2 |
| 2 | History and Background | 4 |
| 3 | Market and Competition | 6 |
| 4 | Strategy and Business Development | 8 |
| 5 | Management and Organisation | 14 |
| 6 | SWOT Analysis | 16 |
| 7 | Financial Analysis | 17 |

# Appendices

| Appendix Number | Appendix |
|---|---|
| (i) | Location List |
| (ii) | Latest Management Accounts |
| (iii) | Annual Accounts |
| (iv) | Forecasts |
| (v) | Current Facilities |
| (vi) | Marketing brochures |

1

**BA250**

## 1.  Executive Summary

As largest UK franchisee of the Budget Rent A Car Group, the world's third largest vehicle rental operator, Jaeban (UK) Limited has grown consistently and profitably over the last ten years, and was well positioned in 2001 to take advantage of the Budget's change in distribution strategy

The company currently operates in twenty franchise territories that cover four major UK cities as well as presence in four airports, and has the rights to four further territories

The company's growth in 2001 brought with it a series of new challenges.  These challenges were the primarily the change in the operating methodology to cope with many more locations, as well as managing airport locations for the first time. This was made more difficult by the fact that the acquired sites had in some cases been suffering from a lack of resource and the client base was severely depressed and in some of the rental locations were unsuitable

The events of September 11th had an immediate an adverse impact on inbound business at the newly acquired airport locations, but through prompt defleeting of risk vehicles the downside was minimised.

Despite all these events the company made a net profit in 2001, and started the turnaround of the beleaguered ex corporate locations.  On revenue of £11,415k a profit of £161k was generated.

Future prospects are bright with the improved network.  The forecast for 2002, as shown in appendix (iv), predicts rental revenue of £16,516k and a pre-tax profit of £445k, which represents a return on revenue of about 3%.

After the first four months of 2002 the rental revenue is 10% down on forecast , but the profit is just £23k behind forecast.

The management team are confident that the action to generate new business and rebuild the revenue base of the old corporate locations is working.  This has been achieved through:

- Retaining existing accounts
- Winning inbound tour operator business at the airports
- Ensuring that the efforts of the local and national sales teams are coordinated

The opportunity for future growth is good through unleashing the full potential of the sites acquired in 2001 and developing the additional territories that it owns the rights to.  These territories include Coventry, Bolton and Carlisle whose geographic location is all adjacent to existing territories.

2

BA251

The projection for 2003, excluding the undeveloped territories, is for revenue of £17,279k and a pre-tax profit of £818k. This represents a margin of 5%.

The other keys to achieving the plans will be through the strengthening of the infrastructure of the company. This is being done through the bringing in of the appropriate expertise in the fleet and financing areas together with the upgrading of the front office rental system and the introduction of a new accounting package.

BA252

## 2.    History and Background

### History

The Jaeban group first entered the vehicle rental market place in February 1986 acquiring its first franchise from Budget Rent a Car International. This original franchise was for the Wolverhampton territory.

A period of growth happened and further franchises were added as follows

| | |
|---|---|
| Telford | 1988 |
| Kidderminster | 1989 |
| West Bromwich | 1992 |

All the locations added during this period of growth were green field sites and were developed through strong local marketing activity.

In the mid 1990's the territories of Leicester and Nottingham were acquired.

The ambitions of the management to expand the group were further met when a number of opportunities were presented as BRACII, the master franchise holder, reviewed its distribution strategy in Europe. This followed a period starting in 1999 where BRACII acquired a number of franchises to run corporately. BRACII had operated a high growth strategy and won a great deal of low margin business and grown the fleet rapidly. This strategy was not profitable and this drove the decision to review its distribution strategy. A number of locations that it had acquired corporately were made available for franchising and the Jaeban group as a financially strong operator was the preferred bidder to take advantage of this opportunity,

The territories of Birmingham and Manchester were the first of the locations added in 2001, with the acquisition of Birmingham allowing an integrated and unrestricted approach to the management of the Midlands territories. The previous licensee of the Birmingham territory had done little to develop the franchise.

In April 2001 further locations were acquired in Huddersfield, Dewsbury, Workington and Warrington. The latter two having a ready-made source of business in the major account with British Nuclear Fuels.

Edinburgh and Glasgow franchises were acquired in June 2001 adding a further four locations including two major airports.

As can be seen in *Figure 1* below the business grew consistently over the ten years, and the impact of the franchise acquisitions in 2001 can be clearly seen

BA253

when revenue nearly doubled.  Further growth is forecast and this can be seen in
*figure 1.*



*Figure 1*
*Jaeban UK Revenue Growth*

Throughout the period of growth the company has always operated profitably and
has always ensured that profits are reinvested in the business, which has seen
the net worth of the company continually grow.

The Jaeban group also has the rights to the further franchise territories that
include the following

- Coventry
- Bolton
- Carlisle

The rights for these territories were acquired as part of the 2001 acquisitions and
are all undeveloped territories.  These territories will be developed as and when
suitable rental premises can be identified for those areas.  These territories
border and complement the current operations.  The revenue from these
locations is not included in the forecast in the appendix.

5

BA254

3.    **Market and Competition**

The Budget Rent A Car system is one of the largest global operators of car rental, ranking number three behind Hertz and Avis, and is the largest vehicle rental franchise organisation.

Budget operates in nearly 120 countries and has more than 3,200 locations including 900 airport locations.   Budget's worldwide fleet size averages over 300,000 vehicles.

The UK system of Budget Rent A Car is represented in 128 UK locations, of which 14 are the major airport hubs

As the largest franchise operator of the Budget brand in the UK and having a major airport presence the competition and market place for the Jaeban group needs to be assessed at both a national and local level.

### 3.1    Nationally

The vehicle rental market has remained fiercely competitive over the last ten years and the consolidation in the market place has seen an increase in the number of larger rental operators.  This increase can be seen in the number of larger players in the market.  A recent survey conducted by Fleet News of the top twenty operators can be seen in *Figure 2* below



*Figure 2*
*UK Market Share of top 20 operators by fleet size*
*Based on Fleet News Survey, April 2002*

This chart reflects the current state of the rental companies, but probably is not a true reflection of the daily rental market.   Two of the top three companies Northgate and TLS both operate in the contract hire sector and their numbers

6

BA255

include a large number of short-term contracts, which cannot be deemed to be daily rental.

The other major players in the more traditional daily rental sector have remained remarkably unchanged with the exception of the entrance of Enterprise. However within the daily rental market place there is a great deal of differentiation. The major brands offer a broader range of services and have strong networks that attract both the corporate and private renters.

The differentiators that can be looked at in respect of the type of car rental activities are as follows:

- International system
- Airport presence
- One way rentals
- Strong national networks
- Ability to handle National accounts
- International reservation handling
- Full range of vehicles (Cars, Vans & Trucks)
- New and high quality fleet
- Internet booking

As part of the Budget Rent A Car system, the Jaeban group is placed at the top end of the market, and is able to offer it's customers all of the above services.

It is also worth noting that Jaeban would appear in the list of the top twenty rental companies as a stand alone operation.

## 3.2    Locally

With the strength of an international brand behind the company, which supports with brand awareness, marketing and national accounts sales generation, the Jaeban group is free to market extensively within its own territories.

As can be seen in the revenue growth of the business, one of the major strengths of the Jaeban group is local marketing. The main competitors within the existing territories are TLS, Europcar, Burntree, National and Northgate. In addition there are a number of smaller, localised operators who tend to confine themselves to the smaller/cheaper end of the market.

7

4.    **Strategy and Business Development**

Keeping a mix of local, national and international business remains important to the group. It is the policy of the group that no one customer should account for more than seven percent of the group revenue.

Having the presence at the airports gives access to large numbers of inbound tourists as well as the corporate renters. This is aligned to the strong local presence that the group has.

4.1    **Sales and Marketing**

The Jaeban approach is to leverage the strength of a global system whilst maintaining a local presence. The message it endeavours to deliver is

## "Small to care, big to cope"

The business has a good mix of local and national business and has built relationships with a number of national accounts, for example BNFL and the Army. These relationships also extend to major local accounts such as the University of Nottingham, where the relationships have extended for many years based on the level of local support and the continuity of staff at the various locations.

The other advantage that the company offers is the ability to be flexible in pricing and the staff is focused on maximising the revenue per unit. Mangers and staff are treated as partners, with the benefit that they operate their branches with a focus on profit.

As can be seen in *Figure 3* below the revenue base is mixed between cars vans and trucks. Cars account for just over three quarters of the revenue, but a good base of commercial vehicles underpins it. There is less seasonality in the commercial vehicle revenue stream. Where seasonality does have an impact is in the car rentals, where corporate rentals are reduced in summer periods, but is replaced by the inbound holiday rentals.

The sales team headed by Dianne Doncaster, work closely with the National Sales team of Budget to ensure the most effective use of the resource to develop business for both Jaeban and the system.

8



*Figure 3*
*Mix of business by fleet type*
*Based on Qtr 1, 2002 Revenue*

The local sales team also work closely with the office managers who are seen as the first line sales staff. When not dealing with clients directly, branch managers will devote time to following up existing clients who may not have spent recently to identify if there is an issue and to try to generate business. The current sales team is two, but a further two telesales staff are being recruited to complement this team. The focus of all the sales staff is split between winning new business and ensuring that existing clients are maintained and continue to spend. Jaeban believe that they have a very high level of customer loyalty and a better than average retention rate for the industry.

The group also operate a reservations team to ensure that the larger local and national clients have one point of contact for their entire vehicle rental needs.

### 4.2    Airport strategy

The airport strategy is very driven from the basis that prior to acquisition the territories had not received the requisite amount of resource and required to be built up from a very low base.

The current mix of business between airport and the rest is shown in *Figure 4* below.

The focus has been to rebuild the client base by ensuring an adequate supply of the appropriate vehicles is made available and that the airports are not "blacked out" on the reservations system.

This has also been achieved through staff training and motivation to encourage "upselling" and the winning of walk up business.

BA258



*Figure 4*
*Airport percentage of business*
*Based on Qtr 1, 2002 Revenue*

Significantly following the events of September 11th the airport concessions have been renegotiated downwards.

Further efforts have been focused on signing deals with a number of tour operators and wholesalers who will generate a supply of renters, primarily into the tourist markets, such as Edinburgh. Deals were signed with Holiday Europe and Holiday Autos. These deals will generate a number of longer length rentals primarily during the summer season, which complements the drop off in the corporate rentals business during the holiday season.

Relationships are being built with a number of airlines and there is an increase in the number of low cost airline operators at the Jaeban airports, which again will increase the opportunities for Jaeban to profit from the independent traveller who is searching for value for money. The franchisor, BRACII also negotiates international airline arrangements, and apart from participating with most airlines in some way, more specific arrangements exist for the particular benefit of Jaeban with Emirates, British European and Buzz.

Importantly for those airports where there are off airport facilities, these sites have been converted into rental locations and not just delivery and collection points. This allows the sites to focus on the lucrative airport areas which have a high number of businesses operating with in them. This strategy also generates revenue to cover the fixed costs of operating on airport.

BA259

### 4.3    Fleet

The primary fleet strategy is to obtain the best price on the best quality products that meet the customer's requirements.

Currently Jaeban runs a fleet that is predominantly Ford, but will also run other quality marques such as Mercedes, Toyota, Nissan and Fiat.

All fleet negotiations are conducted by the Managing Director, with analytical support being provided by the Asset Manager. The relationship with the manufacturers is a strength of Jaeban and the Managing Director works closely with BRACII to leverage the strength of the Budget UK network as can be evidenced by the high level of discount.

The fleet will be obtained with a balanced strategy between risk and programme. Programme vehicles are where a manufacturer or larger dealer group buys the vehicle back at the end of the rental period. The risk vehicle is where the residual risk at disposal rests with Jaeban. Risk vehicles are however seen as opportunities, and through the careful selection and timing of these vehicles will lead to a lower holding cost than for programme vehicles. One of the most important factors with risk vehicles is the ability to react more quickly to adverse trading conditions such as the events of September 11th. Programme vehicles have fixed holding periods whereas risk does not.

The average holding periods are as follows:

- Cars        Four to nine Months
- Vans        Twelve to eighteen Months
- Trucks      Eighteen to twenty four months

As part of the need to manage the disposal process an experienced remarketing manager, in Linda Mitchell, has been recruited to focus on the defleeting of risk vehicles. The role of Linda will be to focus on the managing the disposal process for those risk vehicle to minimise the depreciation and reduce the sales pipeline time at defleet. This will be achieved by pre selling vehicles wherever possible and by careful selection and timing of bringing vehicles on fleet.

Daily control of utilisation is key to ensure that fleet is distribution is most efficient, and the BMS system facilitates the management of this. Daily processes include a physical check of all vehicles not on rent.

The group also has its own bodyshop, at West Bromwich, with two paint ovens where it carries out reconditioning of around fifty percent of the turnbacks. This helps control the cost of turnbacks and ensures that any sales vehicles are presented as the best in the market.

BA260

The group also operates mobile servicing units.

### 4.4    Premises

The property strategy has generally been to obtain high profile premises close to the motorway networks and services. The premises will generally have secure parking for vehicles not on rent. The premises at West Bromwich and Wolverhampton have facilities for service and maintenance. West Bromwich also has a body shop on site. The body shop is used to reduce the turnback and reconditioning costs of vehicles.

City centre sites will be close to the stations and the main sources of business.

Sites with a large commercial fleet also have some facilities for customer parking which provides an element of loyalty.

The premises are currently all leased, although the premises at Wolverhampton, Telford and West Bromwich are owned by Ibrahiem Jaeban personally and he leases them to the company.

### 4.5    Funding

As the business has grown the demand for vehicle finance has also increased. To cope with this growth additional resource has been recruited to focus on the control of funding and the appropriate assets. The strategy will be to develop a smaller number of business partners who can provide the type of products and facilities that are required by a growing business. This will also mean that more business will be passed to the smaller number of partners and the facilities will be constantly in use.

The funding will also be matched to the profile of the vehicle and will structured to recognise and manage the funder's risk in the vehicle. With the use of the BMS system and the level of manufacturer support, we believe that this represents a secure asset for lending against.

### 4.6    Insurance

Insurance has been a focus over the last few years and premiums have been under severe pressure. The Jaeban group strategy has been to renegotiate the terms and charging methodology. The group left the Budget franchise scheme and have renegotiated their own scheme.

The key change was to move away from a percentage of revenue to a fixed charge per rental day and only where the client is not insuring on their own insurance.

12

BA261

Careful customer qualification and proactive management of claims have also ensured that the loss ratios of the Jaeban group continue to remain good.

This also means that there are no hidden costs for "upselling".

### 4.7    Infrastructure

As the business grew in 2001 the infrastructure was strengthened with the recruitment of a Financial Controller and investment in the front desk operating system as well as the accounting system.

Both systems were significantly upgraded in 2001 with an all new front desk rental system called BMS introduced. This has strengthened the control of the business, as it is operates across all the locations and allows the rental and fleet activity to be controlled from any office including head office. This has meant that the integrity of fleet control has continued to strengthen.

The accounting system was also changed and a superior Sage system was implemented to cover all the accounting.

BA262

## 5.    Management and Organisation

The corporate structure is simple, with all trading conducted through Jaeban (UK) Limited. The only other group company is North West Rentals, which is used as a vehicle for the disposal of vehicles leased by Jaeban (UK) Limited. I M Jaeban wholly owns both companies.

The management structure is as follows



People are seen to be one of the strengths of the Jaeban team. The established locations have had a number of long serving staff and branch managers, and for the locations acquired in 2001 a great deal of energy has been placed on bringing the new staff into the Jaeban culture. The main focus of the culture is a customer focused philosophy.

The profiles of the key members of the management team are as follows.

### Ibrahiem Jaeban, Managing Director

An entrepreneur, Ibrahiem purchased his first Budget franchise in 1986, having identified an opportunity and has been instrumental in driving the business forward.

Managing Director and founder of the Jaeban UK rental group.

### Andrew Rees, Non Executive Director

Andrew is a qualified lawyer, and was a Senior Partner for, and headed the Corporate Services department of Eversheds.

### Gail Webb, Director of Operations

Joined the company in 1986 as the branch manager for the original Wolverhampton office. Has been involved in the successful growth of the company and is very experienced in all aspects of vehicle rental. Her particular strengths are business development and local marketing. Promoted to Operations Director in 2000.

14

BA263

**Anthony Guest FCCA, Director of Finance & Company Secretary**

Trained and qualified as an accountant with Kidsons Birmingham from 1974 to 1981  Joined Bristol Street Motors as Chief Accountant and became Finance Director in 1985. At the time BSM was the largest Ford dealership in the world. Left in 1986 and joined Autolease Ltd as FD.  Appointed FC of Leasing companies within the parent company Britax, which included Jessups Vehicle Contracts and a leasing and dealership operation in Holland.  Left after company was acquired by Standard Chartered Bank to take up role as Finance Director for Jaeban UK Ltd in early 2001.

**Linda Mitchell MIMI, Re Marketing Manager**

Linda joined Jaeban in May this year, having come from Global Remarketing, where she spent two years as remarketing manager.  Prior to that Linda gained a number of years experience in business development at Motor Auctions Leeds.

Before that seven years as auction centre manager for various locations for Manheim (formerly CMA).

**Dianne Doncaster, Sales Manager**

Dianne has worked within the Budget system for eight years, having spent time working for the Jaeban group as a sales person before spending a number of years working for the Budget national sales team.  She rejoined the group as Sales Manager just over a year ago.

Previously Dianne had worked for Hertz.

**Stephen Bailey MBA ACMA, Asset Manager**

Qualified as a Chartered Management Accountant in 1984, Stephen gained an MBA in 1995 from the Henley Management College. He has fifteen years of fleet and finance experience behind him, with the majority being gained at Budget Rent a Car International, where his role included fleet financing for the licensee network

More recently Stephen has been the Finance Director of a number of recruitment companies and was involved in the successful restructuring and selling of one of those companies.

BA264

## 6.    SWOT Analysis

This section is intended to give an analysis of the various strengths, weaknesses opportunities and threats of the group.

### 6.1    Strengths

- Established track record of profitability in varied economic conditions
- Strong relationships with vehicle manufacturers and dealers enabling favourable buying terms
- Customer focused philosophy implanted throughout the workforce
- Partnership style relationship with the franchisor
- New BMS system enabling real time management of the business

### 6.2    Weaknesses

- Capacity of some of the premises for rental operations
- Inability to capitalise on commercial opportunities due to constraints of traditional credit lines.
- Legacy of business mix at acquired locations

### 6.3    Opportunities

- Capitalise on the economies of scale of the increased number of locations
- Allow good staff to be kept by increasing opportunities for them and improving career prospects
- Develop the vacant territories for which the franchise rights are already owned
- Able to attract and afford a stronger and more focused management
- Growth of the low cost airlines
- Further development of and improvement of the quality of earnings of acquired territories.

### 6.4    Threats

- Another September 11th impact on the economy
- The financial position of the Budget Group in the USA
- Changes in customer trends towards rental, and changes in profile such as increases in one way rentals
- Strengthening of sterling and its impact on inbound tourism

16

BA265

7.    **Financial Analysis**

This section is intended to highlight the salient points of the financial performance of the company and indicate how it is funded.

Detailed financial statements can be found in the appendices to this pack, including the following

- Statutory Accounts, appendix (iii)
- Latest management accounts, appendix (ii)
- 2002 Forecast/Plan, appendix (iv)
- Current Facilities, appendix (v)

Historically the company has experienced profitable growth since inception and this can be demonstrated in *figure 5* below where the shareholders funds have been tracked since 1993.



Figure 5
*Shareholder funds growth*
*1993 to 2001*

This continuing reinvestment of profits in the business is seen as a key part of the success of the business.

The margins of the business remain a key focus and one of the goals of the management is to get the margins back to the level they were for the years 1995 to 1998, at above 8.0%.    As can be seen from the results the 2001 ended at 1.5%, and the forecasts for 2002 and 2003 have the target margin at 2.69% and 4.73% respectively.    These conservative numbers reflect the time and effort required to turn around the old corporate locations in a competitive market place.

Performance for the first four months of 2002 as seen in the management accounts is slightly behind plan.    Rental revenue is 9.9% down on the plan for the

BA266

year cumulatively, but the forecast loss for the first four months is just £23k short of the planned figure of £370k.

Looking at the rental revenue more closely, analysing the first quarter of 2002, between the performance of both the existing branches and those added in 2001. Due to changes in the accounting for fuel recharges the analysis has been carried out at before fuel recharge. This shows that the revenue for the original six branches is 10.9% behind plan, whilst the 2001 acquisitions are 16.4% behind. Looking at this more closely Manchester accounts for about a third of the overall shortfall, with Workington and Edinburgh Airport also showing a significant variance. This reflects the market conditions where corporate spend has been tightened and budgetary control is very much in existence. Reservations build for the next few months looks optimistic and it is hoped that the revenue shortfall can be recovered. Despite this revenue shortfall control of the fleet and expenses have meant that the profit performance is not materially different from plan

Funding remains an issue that needs to be addressed and adequate facilities are required to ensure that the business needs are met in 2002. Projected peak fleet is 2,999 vehicles, and based on a £10,000 per unit cost and allowing for finance charges (benchmark 20% of capital value of vehicle) and an allowance of 5% for fleet rotation this gives a peak requirement of £37.8 million. Current revolving facilities are £30.95 million, however this is not fully flexible and certain lines do not allow all manufacturers product to be financed.

Working capital is funded by way of bank overdraft at present, but this is currently being reviewed with a view to introducing confidential invoice discounting to provide a more flexible funding arrangement that will grow with the business in the medium term.

BA267

## Appendix (i)

### Location List

| Location | Date Added |
|---|---|
| Wolverhampton | 1986 |
| Telford | 1998 |
| West Bromwich | 1989 |
| Kidderminster | 1992 |
| Leicester | 1995 |
| Nottingham | 1997 |
| Birmingham City & Airport | March 2001 |
| Manchester City & Airport | March 2001 |
| Huddersfield | April 2001 |
| Dewsbury | April 2001 |
| Warrington | April 2001 |
| Glasgow City & Airport | June 2001 |
| Edinburgh City & Airport | June 2001 |

19

BA268

# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:   BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 02-12152 (CJC) |
| | ) | |
| IN RE:   BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) | (Jointly Administered) |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | Adversary No. A-03-54271 |
| | ) | |
| JAEBAN (U.K.) LIMITED, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| IBRAHIEM JAEBAN | | |
| Defendants and Counterclaim Plaintiffs | | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF IBRAHIEM JAEBAN'S
FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
DIRECTED TO PLAINTIFFS/COUNTERCLAIM DEFENDANTS**

        Pursuant to Rule 34 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7034 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Defendant/Counterclaim Plaintiff Ibrahiem Jaeban hereby requests that plaintiffs/counterclaim defendants BRAC Group, Inc. (f/k/a Budget Group, Inc), *et al.* produce for inspection and copying the documents described below at the offices of Werb & Sullivan, 300 Delaware Avenue, 13th Floor, Wilmington, Delaware 19801 within thirty (30) days of the date of service hereof.

## DEFINITIONS

1.    "Debtors," "you" or "yours" shall mean the debtors and debtors in possession in the above-captioned action and their predecessors, successors, parents, past or present subsidiaries, affiliates and each of their officers, directors, employees, agents, consultants, accountants, attorneys and anyone else acting on their behalf or otherwise subject to their control.

2.    "Mr. Jaeban" shall mean Ibrahiem Jaeban, and his employees, agents, consultants, accountants, attorneys and anyone else acting on his behalf or otherwise subject to his control.

3.    "Jaeban" or "Jaeban U.K." shall mean Jaeban (U.K.) Limited and its predecessors, successors, parents, past or present subsidiaries, affiliates and each of its officers, directors, employees, agents, consultants, accountants, attorneys and anyone else acting on its behalf or otherwise subject to its control.

4.    "Amended Complaint" shall mean the Amended Complaint filed on or about July 19, 2004 in this adversary proceeding.

5.    "Answer" shall mean the Answer and Affirmative Defenses to Amended Complaint and Amended Counterclaims of Ibrahiem Jaeban filed on or about July 23, 2004 in this adversary proceeding.

6.    "Petition Date" shall mean July 29, 2002.

7.    "BTI" shall mean BTI (UK) plc, a wholly-owned subsidiary of Budget Rent A Car International, Inc.

8.    "IPLA" shall mean the International Prime License Agreement among Budget Rent A Car International, Inc. and Jaeban, dated March 5, 2001.

2

BA271

9.     "Document" or "documents" shall have the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7034 of the Federal Rules of Bankruptcy Procedure Court, and shall include, without limitation, any writing, recording, photograph, computer data base, data bank or other item containing information of any kind or nature, however produced or reproduced, whatever its origin or location, and regardless of the form in which such information exists or is maintained.

10.     "Communication" shall mean any transmission of information, the information transmitted, and any process by which information is transmitted, including both oral and written communications.

11.     The phrases "refer to" or "relate to" shall mean directly or indirectly reflecting, containing, pertaining, indicating, showing, concerning, constituting, evidencing, describing, discussing or mentioning.

12.     The terms "and" or "or" shall mean and include both the conjunctive and the disjunctive.

INSTRUCTIONS

1.     This request for production of documents shall be deemed to be a request for all such documents, whether prepared by or for Debtors or by any other party or any other person, which documents are in Debtors' possession, or in the possession, custody or control of Debtors' attorneys, accountants, consultants, receivers, employees, agents, or anyone acting on behalf of Debtors.

2.     Each document is to be produced with all non-identical copies and drafts thereof, in its entirety, without abbreviations or redactions.

3

3.    Documents shall be produced as kept in the ordinary course of business, or segregated by document request to which they respond.

4.    If any responsive document is to be withheld or redacted under a claim of attorney-client privilege, work product immunity or any other privilege or immunity, each such document must be identified on a privilege log, which shall be produced contemporaneously with the non-privileged documents called for by these requests, and which shall include: (a) the document number; (b) the document date; (c) the document type; (d) the author(s) of the document; (e) the recipient(s) of the document; (f) a specific description of the subject matter of the document; and (g) a designation of the privilege claim.

5.    If a document called for by a request is known to have existed but cannot be located now, identify the document and state: (a) whether the missing document has been in your possession, custody or control; (b) where the missing document was last known to be and the date when the document was last known to be in such location; (c) in whose possession, custody or control the document may be found; or (d) where applicable whether and when the document was destroyed.

6.    This request for documents shall be deemed continuing so as to require prompt supplemental responses in accordance with Federal Rule of Civil Procedure 26(e) made applicable to this proceeding by Rule 7026 of the Federal Rules of Bankruptcy Procedure.

## DOCUMENTS TO BE PRODUCED

REQUEST NO. 1    All financial statements, profit and loss statements, forecasts, and other financial and accounting documents identifying or referring to the annual revenue of BRACII or BTI for the years 1999 through 2003, including any such document prepared for BRAC Group, Inc.

4

BA273

REQUEST NO. 2    All documents that constitute, refer to or relate to communications among the Debtors relating to the marketing, business development, and business disposition and asset disposal strategies pursued, or intended to be pursued by BRACII and BTI during the years 1999 through 2003, including any proposed or possible sale outside the ordinary course of business of all or part of BRACII or BTI.

REQUEST NO. 3    All documents that constitute, refer to or relate to communications relating to the appointment (including the conclusion or termination of the appointment) of Jack Frazee to a position with BRACII or BTI, including all documents relating to the business strategies or tactics he was instructed to, intended to, or did pursue during his tenure at BRACII or BTI.

REQUEST NO. 4    All documents that relate to a claim or claims by any Debtor against Jaeban UK or Mr. Jaeban, including all documents that relate to, refer to, or constitute a communication to a third party relating to such claim or claims. Without limitation, such documents would include all documents that relate to any of the categories of claims listed in that "Summary of Agreed and Disputed Items" identified and produced previously. Without limitation, such third parties include Avis Europe plc, Cendant Corporation, and any Administrative Receiver or Receiver for BTI or BRACII.

REQUEST NO. 5    All documents that relate to a claim or claims by Jaeban or Mr. Jaeban, against any Debtor or BTI, including all documents that relate to, refer to, or constitute a communication to a third party relating to such claim or claims. Without limitations, such third parties include Avis Europe plc and Cendant Corporation.

REQUEST NO. 6    All agreements between Mr. Jaeban and any Debtor.

5

REQUEST NO. 7    All documents that constitute, refer to, or relate to any communications among any or all of the following individuals, whether or not sent through one or more intermediate parties, relating to Jaeban or Mr. Jaeban:

| | | |
|---|---|---|
| a. Sanford Miller | f. James Cohen | k. Anthony Guest |
| b. Jack Frazee | g. Andrew Doncaster | l. Frank Cortez |
| c. Terry Clark | h. Ibrahiem Jaeban | m. Doug Sawer |
| d. David Handley | i. Paul Champken | n. Roddy Graham |
| e. Trevor Sutherland | j. Andrew Rees | |

REQUEST NO. 8    All general ledgers, computer databases, or other documents that contain, reflect, tabulations or summarizing entries for any charge listed on an Exhibit to the Amended Complaint in this proceeding.

REQUEST NO. 9    All general ledgers computer databases, or other documents containing, reflecting, tabulations or summarizing entries for any charge, amount due, payable, receivable or amount listed on that letter dated January 23, 2003 (Exhibit No. 31 to the deposition of Mr. Jaeban), and any amounts posted to any general ledger since the date of the letter.

REQUEST NO. 10    All documents that refer to or relate to assessment, computation, collection (including non-collection) of royalties by BRACII or BTI from any of the ten largest (by turnover volume) U.K. Budget franchisees or U.K. Budget licensees during the years 1999 through 2003. Without limitation, such documents include document that refers to or relates to any actual or proposed "royalty holiday".

REQUEST NO. 11    All documents relating to (a) claims by BTI against BRACII during the years 2000 through 2003, and also (b) claims by BRACII against BTI during the years 2000 through 2003.

6

REQUEST NO. 12    All documents which constitute, relate to, or refer to any communication relating to any contemplated or actual purchase, lease or sale of any assets, including the U.K. Master Franchise, either (a) by BRACII or BTI to Jaeban or Mr. Jaeban, or (b) by Jaeban or Mr. Jaeban to BTI or BRACII. Without limitation, such documents would include documents relating to the leasing of vehicles by BTI from Jaeban.

REQUEST NO. 13    All documents relating to any decision to seek administration of BTI.

REQUEST NO. 14    All documents to any decision to seek Administration of BRACII.

REQUEST NO. 15    All documents that relate to any assessment, opinion or review of the level of performance, accuracy, or functionality of any BMS computer system.

REQUEST NO. 16    All documents relating to any entitlement of any Debtor to collect amounts due to BTI.

REQUEST NO. 17    All documents relating to the collection (including the non-collection) during BTI's Administration of amounts due or alleged to be due to BTI from U. K. licensees, U. K. franchisees, Republic of Ireland licensees and Republic of Ireland franchisees.

REQUEST NO. 18    All documents relating to the collection (including the non-collection) during BRACII's Administration of amounts due or alleged to be due to BRACII from U. K. licensees, U. K. Franchisees, Republic of Ireland licensees and Republic of Ireland franchisees, other than Jaeban.

REQUEST NO. 19    All documents relating to communications between or among the Debtors relating to the assertion of any claim, or right to assert any claim, under any alleged personal guarantee of Mr. Jaeban. Without limitation, such documents include any

7

document    relating    to    any    communication    between    any    Debtor    and
Avis Europe plc and its subsidiaries and any communication between any Debtor and Cendant
Corporation.

     REQUEST NO. 20    All documents referring to or relating to Jaeban's financial
condition, prospects, or projections for the years 1999 through 2003.

     REQUEST NO. 21    All documents relating to the financial condition of Jaeban
during the years 1999through 2003.

     REQUEST NO. 22    All documents relating to the personnel levels of BRACII
during the years 1999 through 2203. Such documents include "U. K. Corporate Operations
Headcount and Personnel Related Costs" and similar reports.

     REQUEST NO. 24    All documents relating to the level and strategy of
BRACII's marketing expenditures for the years 1999 through 2003.

     REQUEST NO. 25    That document entitled "Resolutions Needed to Complete
Recovery" believed to have been prepared by BRACII in July 2001, and any versions thereof.

August 20, 2004.

               Werb & Sullivan

               Brian A. Sullivan (#2098)
               Robert D. Wilcox (#4321)
               Amy D. Brown (#4077)
               300 Delaware Ave., 13th Floor
               Wilmington, DE 19801
               (302) 652-1100

               *Attorneys for Ibrahiem Jaeban*

8

BA277

## CERTIFICATE OF SERVICE

I hereby certify that on  August 20, I caused one copy of the foregoing

document to be served upon the persons listed below in the manner indicated:

**VIA FIRST CLASS MAIL:**

Kenneth E. Wile, Esq.
Sidley, Austin, Brown, &
 Wood, LLP
10 South Dearborn Street
Chicago, IL 60603
Facsimile: (312) 853-7036

**VIA HAND DELIVERY:**

Edmon L. Morton, Esq.
Joseph A. Malfitano, Esq.
Matthew B. Lunn, Esq.
Young, Conaway, Stargatt & Taylor,  LLP
The Brandwyine Building, 17th Floor
1000 West Street, P. O. Box 391
Wilmington, DE  19899-0391

/s/ Brian A. Sullivan
Brian A. Sullivan

BA278

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: ) | Chapter 11 |
| ) | |
| BRAC GROUP, INC. (F/K/A ) | Case No. 02-12152 (CJC) |
| BUDGET GROUP, INC., ET AL., ) | |
| ) | Jointly Administered |
| Debtors. ) | |
| ......................................................) | |
| ) | |
| IN RE: BRAC GROUP, INC. (F/K/A ) | |
| BUDGET GROUP, INC., ET AL.), ) | |
| ) | |
| Plaintiffs and Counterclaim Defendants, ) | |
| ) | Adversary No. A-03-54271 |
| v. ) | |
| ) | |
| JAEBEN (U.K) LIMITED, | |

and

IBRAHIEM JAEBAN

Defendants and Counterclaim Plaintiffs

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that, on the 20th day of August, 2004, a copy of

Defendant's First Request For Production of Documents Directed to Plaintiffs/ Counterclaim

Defendants was served on the following counsel at the address listed below and in the manner

indicated:

**VIA FIRST CLASS MAIL**
Kenneth E. Wile, Esquire
Sidley, Austin, Brown, & Wood, LLP
10 South Dearborn Street
Chicago, IL 60603

**VIA HAND DELIVERY:**
Edmon L. Morton, Esq.
Joseph A. Malfitano, Esq.
Mattthew B. Lunn, Esq.
Young, Conaway, Stargatt, &
Taylor, LLP
The Brandywine Bldg., 17th Floor
1000 West Street, PO Box 391
Wilmington, DE 19899-0391

WERB & SULLIVAN

By: /s/ Amy D. Brown
Brian A. Sullivan (No. 2098)
Amy D. Brown (No. 4077)
300 Delaware Avenue, 13th Floor
P.O.Box 25046
Wilmington, DE 19801
Telephone: (302) 652-1100
Telecopier: (302) 652-1111

Attorneys for IBRAHIEM JAEBAN, as
assignee for JAEBAN (U.K) LIMITED.

Dated: August 20, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on  August 20, I caused one copy of the foregoing

document to be served upon the persons listed below in the manner indicated:

**VIA FIRST CLASS MAIL:**                    **VIA HAND DELIVERY:**

Kenneth E. Wile, Esq.                        Edmon L. Morton, Esq.
Sidley, Austin, Brown, &                     Joseph A. Malfitano, Esq.
  Wood, LLP                                  Matthew B. Lunn, Esq.
10 South Dearborn Street                     Young, Conaway, Stargatt & Taylor, LLP
Chicago, IL  60603                           The Brandywine Building, 17th Floor
Facsimile:  (312) 853-7036                   1000 West Street, P. O. Box 391
                                             Wilmington, DE  19899-0391

/s/ Brian A. Sullivan
Brian A. Sullivan

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
BRAC GROUP, INC., et al.,[1]              )    Case No. 02-12152 (CGC)
(f/k/a Budget Group, Inc.)                )
                                          )    (Jointly Administered)
                        Debtors.          )

### AFFIDAVIT OF SERVICE

STATE OF DELAWARE        )
                         ) SS
NEW CASTLE COUNTY        )

     Thomas J. Hartzell, being duly sworn according to law, deposes and says that he is employed by the law firm of Young Conaway Stargatt & Taylor, LLP, attorneys for BRACII, and that on the 27th day of August 2004, he caused a copy of the attached pleading to be served, as indicated, to those parties on the attached service list.

                                      Thomas J. Hartzell

SWORN TO AND SUBSCRIBED before me this 27 day of August 2004.

                             Notary Public

ANGELA M. COLSON
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Aug 31, 2007

---

[1] The Debtors are the following entities: BRAC Group, Inc., Auto Rental Systems, Inc., BGI Airport Parking, Inc., BGI Shared Services, LLC, BRAC Credit Corporation, BRAC Car Sales, Inc., BRAC Fleet Finance Corporation, BRAC Rent A Car Asia-Pacific, Inc., BRAC Rent A Car Caribe Corporation, BRAC Rent A Car Corporation, BRAC Rent-A-Car International, Inc., BRAC Rent A Car of Japan, Inc., BRAC Rent-A-Car of St. Louis, Inc., BRAC Rent-A-Car of the Midwest, Inc., BRAC Rent-A-Car Systems, Inc., BRAC Sales Corporation, BRAC Storage Corporation, BRAT Move Management, Inc., BRAT Relocation Services, Inc., BRAT TRS, Inc., BVM, Inc., Carson Chrysler Plymouth Dodge Jeep Eagle, Inc., Control Risk Corporation, Dayton Auto Lease Company, Inc., Directors Row Management Company, LLC, IN Motors VI, LLC, Mastering The Move Realty, Inc., Mosiant Car Sales, Inc., NYRAC Inc., Paul West Ford, Inc., Philips Jacobs Insurance Agency, Inc., Premier Car Rental LLC, Reservation Services, Inc., TCS Properties, LLC, Team Car Sales of Charlotte, Inc., Team Car Sales of Dayton, Inc., Team Car Sales of Philadelphia, Inc., Team Car Sales of Richmond, Inc., Team Car Sales of San Diego, Inc., Team Car Sales of Southern California, Inc., Team Fleet Services Corporation, Team Holdings Corp., Team Realty Services, Inc., The Move Shop, Inc., Transportation and Storage Associates, ValCar Rental Car Sales, Inc., Vehicle Rental Access Company, LLC, and Warren Wooten Ford, Inc.

WP3:793109.1                                                              59519.1001

**BA282**

## SERVICE LIST
## BRACII
### 8/27/2004

Messrs. John Whitfield & Gerald Clifford Smith
Administrative Receivers of Jaeban (UK) Limited
c/o RSM Robson Rhodes LLP
7 Hill Street, Centre City Tower
Birmingham, B5 4UU UK
*Federal Express (International)*

Steve Allen, Esq.
Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham B16 8PE, England
Counsel for Jaeban UK Limited
*Federal Express (International)*

Mark D. Collins, Esq.
Rebecca Booth, Esq.
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(Counsel for Joint Administrators of BRAC)
(Rent-A-Car International, Inc.)
*Hand Delivery*

Larry J. Nyhan, Esq.
Kenneth Wile, Esq.
Sidley Austin Brown & Wood
10 South Dearborn Street, BankOne Plaza
Chicago, IL 60603
(Co-counsel for BRACII)
*First Class Mail*

Brian A. Sullivan, Esq.
Robert D. Wilcox, Esq.
Werb & Sullivan
300 Delaware Avenue, 10th Floor
P.O. Box 25046
Wilmington, DE 19899
(Counsel for Ibrahiem Jaeban)
*Hand Delivery*

Ian Weatherall, Esq.
Wragge & Co. LLP
55 Colmore Row
Birmingham B3 2AS, England
(Counsel for Ibrahien Jaeban)
*Federal Express (International)*

**BA283**