# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| -------------------------------------------------) | |
| ) | |
| In re: ) | **Chapter 11** |
| ) | |
| **BRAC GROUP, INC. (f/k/a BRAC Group,** ) | **Case No. 02-12152 (CJC)** |
| **Inc.), et al.,** ) | **(Jointly Administered)** |
| ) | |
| Debtors. ) | |
| ) | |
| -------------------------------------------------) | |
| ) | |
| **BRAC GROUP, INC. (f/k/a BRAC Group,** ) | |
| **Inc.), et al.,** ) | |
| ) | |
| Plaintiffs and Counterclaim Defendants, ) | **Adv. No. 03--54271** |
| ) | |
| v. ) | |
| ) | |
| **JAEBAN (U.K.) LIMITED,** ) | |
| **And** ) | |
| **IBRAHIEM JAEBAN** ) | |
| ) | |
| Defendants and Counterclaim Plaintiffs. ) | |
| ) | |
| -------------------------------------------------) | |

## IBRAHIEM JAEBAN'S RESPONSE TO BRACII'S MOTION FOR FURTHER SANCTIONS AND OTHER RELIEF
### (RE: Docket Item No. 50)

COMES NOW Ibrahiem Jaeban ("Mr. Jaeban") and objects to BRACII's Motion For Further Sanctions And Other Relief Due To Mr. Jaeban's Multiple Failures to Comply With The Court's May 25, 2004 Order, as follows:

52

## STATEMENT OF FACTS

1.      In its May 25, 2004 Order on BRACII's Motion to Strike the

Counterclaims of Jaeban U.K.[1], this Court imposed three requirements on Mr. Jaeban to

be satisfied by June 18, 2004.  Pursuant to the May 25, 2004 Order, Mr. Jaeban was

directed to:

        a.     Provide documents in response to Plaintiff's Second Requests for
               Production of Documents (served on November 18, 2004);

        b.     Respond to concerns raised by Plaintiffs in a letter dated December
               12, 2003, regarding apparent gaps in Jaeban's November
               production of documents.

        c.     Schedule depositions of any Jaeban personnel and the Jaeban
               Receiver.

May 25th Order, ¶ 3.

Mr. Jaeban submits that he has fully complied with the directives of the May 25, 2004

Order.

2.      In order to comply with the first and second requirements of the May 25,

2004 Order, Mr. Jaeban produced an additional lever arch file of supplemental documents

on or about June 18, 2004.

3.      In response to the second requirement of the May 25, 2004 Order, Mr.

Jaeban provided its response to Plaintiff's letter dated December 12, 2003.

4.      In response to the third requirement, Mr. Jaeban's attorneys consulted with

BRACII's attorneys and agreed that the depositions of former Jaeban U.K. personnel

would take place in England in August.  Accordingly, counsel for both parties traveled to

England at the beginning of August to prepare for and commence the depositions.  Once

---

[1]  For reference herein,  Jaeban (UK) Limited is referred to as "Jaeban UK" and Ibrahiem Jaeban is referred
to as "Mr. Jaeban."

2

BA375

in England, disputes arose as to whether further documents produced by each party were allegedly responsive to the requests. Despite Mr. Jaeban's best efforts to produce all documents, including documents which he believes were not responsive, BRACII called off the depositions in England.

5.     BRACII's complaints regarding production of documents can be summarized in three categories:

        a.     documents that were in the possession of the Receiver;

        b.     the Welcome House documents; and

        c.     Mr. Jaeban's supplemental production of documents on August 3, 2004.

6.     The summary of Mr. Jaeban's response to BRACII's allegations is as follows:

        a.     The Receiver's files have never been in the custody, possession or power of Mr. Jaeban. The papers belong to the Administrative Receivers and deal with the administration of the company after their appointment. Mr. Jaeban requested that the Receiver produce his files to BRACII, but the Receiver initially refused. Affidavit of Robert D. Wilcox, Paragraph 4. The Wilcox Affidavit is attached hereto as "Exhibit A." It was only through the efforts of Jaeban and his attorneys that the Receiver ultimately made the documents available to the parties. Id., Paragraphs 4-7.

        b.     Mr. Jaeban's decision to produce the remaining Welcome House Documents was not based upon a belief that they were responsive to the requests, but was undertaken to avoid a discovery dispute. Affidavit of Ibrahiem Jaeban,

BA376

Paragraph 4. The Jaeban Affidavit is attached hereto as "Exhibit B." They were

only produced by Mr. Jaeban to BRACII without being again reviewed by Mr.

Jaeban's attorneys as a serious good-faith effort by Mr. Jaeban to attempt to

continue the deposition process in England. BRACII has confirmed that the

majority of the documents are "routine business records of limited relevance"[2]

and despite being asked to do so have failed to identify the other "significant

documents" it has allegedly found. Id., Paragraph 5. The Jaeban UK agreements

with BRACII and its former subsidiary BTI discovered by BRACII's lawyers are

standard form documents generated by BRACII  virtually identical to the

agreements produced by Jaeban UK in its initial October 3, 2003 discovery. Id.

     c.    Both parties made supplemental production in early August 2004,

including BRACII. Wilcox Affidavit , Paragraph 3. BRACII should not be heard

to complain when it also made supplemental production. Further, most of the

documents had already been previously produced to BRACII unlike the BRACII

documents that had not previously been disclosed to Mr. Jaeban. These

categories of documents are discussed in further detail below.

### The Receiver's Documents

BRACII has been aware that the appointed Receiver had control of some of the

Jaeban U.K. documents after the appointment.[3] As BRACII acknowledged in its

Motion, the Receivers initially refused to disclose the Receiver's files. That refusal came

despite Mr. Jaeban's request that the Receiver make them available. . Wilcox Affidavit,

---

[2] See BRACII's Motion For Further Sanctions And Other Relief Due To Mr. Jaeban's Multiple Failures to
Comply With The Court's May 25, 2004 Order, Paragraph 12 (hereinafter the "Motion".)
[3] See letter from Mr Wile dated  December 12 2003 referring to documents sought from the Receivers,
attached hereto as Exhibit "C".

BA377

Paragraphs 4-7. It is more than disingenuous for BRACII to argue that Mr. Jaeban should

have let BRACII know of the existence of the documents in the hands of the Receivers,

of which it was already aware.

BRACII incorrectly argues that the Deed of Assignment "required the Receivers

(and thus, their counsel) to assist Mr. Jaeban, who is fully able to learn the facts." See

Motion, fn 5. The Deed of Assignment contains the following language, which is

inapplicable to the production of documents for the purposes of any litigation:

> 4    Further Assurance
> 4.1    The Assignor agrees to provide the Assignee with all reasonable
> assistance to enable the Assignee to obtain full benefit of the assignment
> contained herein. In particular, the Assignor agrees to at any time and
> from time to time . . . up to the earlier of : three months from the date
> hereof, and the Receivers or either of them ceasing to act as administrative
> receivers of the Assignor, upon the written request of the Assignee and at
> the assignee's cost, it will promptly and duly execute and deliver to the
> Assignee any and all such further instruments and documents and
> promptly take all such further action as the Assignee ay reasonably deem
> desirable for it to obtain the full benefit of the assignment contained
> herein.

February 20, 2004 Deed of Assignment of Claim Against BRACII Group, Inc. A copy of
        the Deed of Assignment of Claim is attached hereto as "Exhibit F."

The purpose of Clause 4.1 is simply to enable Mr. Jaeban, as Assignee, to obtain

the benefit of the assignment by requiring the Assignor to cooperate with the deliverance

of any documents that would enable him to do so. It is boilerplate assignment language

that is not intended to require the Receivers to cooperate or assist Mr. Jaeban with

responding to BRACII's discovery requests, as evidenced by the Receiver's

unwillingness to cooperate with the production of documents.

Although BRACII is correct that Jaeban UK never filed objections to the Joint

First Request for Production of Documents, the request for discovery of the Receiver's

papers was contained in the Joint Second Request for Production of Documents dated November 26, 2003 to which the Receiver filed a timely objection on December 30,2003.

With regard to the October 15, 2003 Letter from Ian Weatherall, this matter has been addressed by Mr. Jaeban in his Objection to BRACII's Motion to File a Short Further Submission in Support of its Motion for Partial Reconsideration in Light of a Newly-Produced Document, filed September 7, 2004 (D.I.. #53). As set forth in Mr. Jaeban's Objection, the Weatherall Letter never addresses any issue relating to assignment, even though BRACII implies that the Weatherall Letter is somehow an admission that the Jaeban (U.K.) Ltd. claim could not be assigned by Jaeban U.K. to Mr. Jaeban.

### Welcome House Documents

Mr. Jaeban's production of the documents from Welcome House represents an attempt to avoid a discovery dispute that would derail the deposition process. Mr. Jaeban's efforts are now being used against him by the Plaintiffs, who appear more interested in achieving a tactical advantage than in addressing the merits of the claims.

Mr. Jaeban believes that he complied with the Court's May 25, 2004 Order, when he responded to Mr. Wile's letter of December 12, 2003, and provided his supplemental production of documents to BRACII on about June 14, 2004. The remaining Welcome House documents are 83 boxes of documents that Mr. Jaeban believed are not responsive to the Plaintiff's requests. The initial document production made by the Receiver came from the documents at Welcome House. Nevertheless, when it became apparent that BRACII would not proceed with the depositions in England as scheduled, Mr. Jaeban

BA379

made the determination to provide the 83 boxes to BRACII. Jaeban Affidavit, Paragraph
4.

Mr. Jaeban's good faith is demonstrated by the fact that the boxes were provided to
BRACII *before* Mr. Jaeban's U.S. attorneys had the opportunity to review the files.[4] Id.,
paragraph 6. In fact, BRACII acknowledges the non-relevance of most of the documents
in Section 12 of its Motion where it states that "most of these documents were routine
business records of limited relevance." Mr. Jaeban's reasoning for providing discovery of
these documents is set out in a letter from Steve Allen at Mills & Reeve to Ken Wile of
August 9, 2004. While all other material correspondence has been exhibited to BRACII's
motion this letter was not included.[5]

BRACII refers to Jaeban U.K. Agreements with BRACII and its former
subsidiary, BTI, that were contained in the boxes. These are documents that BRACII
should already have copies of – certainly there is no surprise or prejudice here. Jaeban
U.K. Ltd. had already disclosed an Umbrella Agreement and an International Prime
License Agreement in its October 3, 2003 initial responses. Jaeban Affidavit, Paragraph
5. Mr. Jaeban believes that these documents are standard BRACII forms which provide
no surprise to BRACII. Id.

BRACII also refers to "other significant documents" which it has supposedly
discovered in the Welcome House documents. Counsel for Mr. Jaeban requested from
BRACII a list of any such "other significant documents". As of the time of the
submission of this Brief, that list has not been provided. Jaeban Affidavit, Paragraph 5,

---

[4] While Jaeban UK's English attorneys, Wragge & Co., had reviewed the boxes more than six months
earlier for the first response, Mr. Jaeban's English attorneys did not again review the boxes prior to Mr
Jaeban turning them over to BRACII.
[5] See August 9 2004 letter, attached hereto as Exhibit "D."

BA380

Mr. Jaeban should have the opportunity to review the list of documents that BRACII believes are significant.

It is correct that certain documents have been retained at Welcome House on the advice of Mr. Jaeban's UK lawyers that their discovery may breach the Data Protection Act 1998 . BRACII appears to rely on paragraph 35 of the Act which provides an exception to a refusal to disclose in circumstances where disclosure is "required" or "necessary" under any enactment, rule of law or order of the court. It is Mr. Jaeban's position that these documents are non-responsive documents and thus are not "necessary". BRACII were first provided with the opportunity of inspecting the remaining documents held at Welcome House in August 2004 on a "without prejudice" basis in order to satisfy themselves whether the documents were responsive. That offer has since been repeated but rejected by BRACII.[6]

### Denial of Alleged Discovery Misconduct
### in the Receiver's Initial Document Production

Mr. Jaeban disagrees with BRACII's allegation that during the week of August 2, 2004, Mr. Jaeban's U.S. and English counsel also informed BRACII that the Receiver might not have made a proper initial document production in November 2003. Instead, Mr. Jaeban submits that counsel explained that Wragge & Co. had conducted the initial discovery review, including a review of the Welcome House documents, with the assistance of Price Waterhouse Coopers, and notes that Wragge & Co. undertook the review of the documents under the direction of Jaeban U.K.'s former U.S. counsel Morris, Nichols, Arsht & Tunnell. Wilcox Affidavit, Paragraph 9. Wragge & Co. employed Price Waterhouse Coopers in order to assist in the review of the documents and

---

[6] See, correspondence dated August 12, 2004 and September 10, 2004 from Mr. Jaeban's English counsel to BRACII, attached hereto as "Exhibit E."

8

to assist in Wragge's review of spreadsheets and other such accounting information. Mr. Jaeban believes that he has produced all of the documents that are responsive to the BRACII request and has otherwise complied with the Court's May 25, 2004 Order. Accordingly, Mr. Jaeban submits that there has been absolutely no misconduct on his part Further, given the fact that BRACII has now (1) had access to 83 boxes of documents from Welcome House and (2) been offered the opportunity to inspect the remaining documents on a "without prejudice" basis, Mr. Jaeban has done everything in his power to facilitate BRACII's access to all discoverable information. BRACII has not demonstrated any misconduct on the part of Mr. Jaeban, nor proven any prejudice as a result of the Receiver's inaction.

### The August 3 Supplemental Production

**Mr.** Jaeban made a supplemental production of documents to BRACII on August 3, 2004. In its continued efforts to delay these proceedings and avoid getting to the merits of the case, BRACII continues to complain about this supplemental production even though it acknowledges in its own motion that BRACII also produced additional documents to Mr. Jaeban in August 2004. See Motion, footnote 6. BRACII itself, therefore, produced supplemental documents on the eve of the depositions. Furthermore, BRACII fails to acknowledge that a majority of the documents in the August 3, 2004, supplement were already disclosed in Mr. Jaeban's supplemental disclosure of June 18, 2004.[7]

Mr. Jaeban disputes the limited relevance of the Credit Pack which was to his knowledge an un-circulated draft document which was never approved by him. BRACII

---

[7] The Wile Affidavit acknowledges that "some documents in the file were duplicates". Wile Affidavit, paragraph 20.

BA382

seems to be greatly over emphasizing in its Motion the importance and bearing of this document

## Mr. Jaeban's Request for Production of Documents from BRACII

This matter is addressed in Mr. Jaeban's Motion for Order Reopening Limited Discovery, filed on August 27, 2004 (D.I. #51).

## I. THE COUNTERCLAIMS SHOULD NOT BE STRICKEN

For a second time in this case, both this Court and Mr. Jaeban must suffer the cries of BRACII asking for the Court to strike the claims of Mr. Jaeban. BRACII cites no persuasive case law for its proposition and, in fact, ignores the Poulis factors[8] which were fully developed and briefed in the last BRACII Motion to Strike. BRACII's lack of argument and simply mentioning the request for such a serious sanction almost in passing is telling. There is absolutely no basis to strike the claims of Mr. Jaeban and Mr. Jaeban requests that this Court admonish BRACII with regard to such cavalier motion practice in the future.

## II. THE ESCROW SHOULD NOT BE ELIMINATED

---

[8]    In determining whether it should dismiss a claim, the court must balance the following "*Poulis* Factors" under the circumstances of the case:

      (1) the extent of the party's personal responsibility;
      (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;
      (3) a history of dilatoriness;
      (4) whether the conduct of the party or the attorney was willful or in bad faith;
      (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and
      (6) the meritoriousness of the claim or defense.

*Poulis v. State Farm Fire & Casualty Co.,* 747 F.2d 863, 868 (3d Cir. 1984)..

BA383

Judge Walrath required the establishment of the escrow as pat of the cure process pursuant to the Debtors' sale of assets and assignment of contracts to Avis Europe plc. The Debtors have had the benefit of their sale to Avis and they should not now be able to wriggle out of one of the conditions of the sale—the Jaeban escrow. BRACII is looking for any reason, other than the merits of the case, to seek to end this litigation, either by multiple requests for striking claims or disposing of the escrow. BRACII should recognize that the escrow was established pursuant to Order by Judge Walrath as a condition of the sale. BRACII should not now be heard to ask this Court to undue the Court's prior Order.

Neither of the cases cited by BRACII in this regard have anything to do with overruling a prior Sale Order which established the Escrow. They go simply to the ability of the Court to levy sanctions, the ability of which is not questioned by the parties. Further, BRACII continues to complain about Mr. Jaeban's alleged delays and lack of interest in advancing the case, all of which is denied by Mr. Jaeban. It is BRACII, not Mr. Jaeban, that continues to engage in motion practice, instead of attempting to proceed to the merits of the case. It was BRACII who cancelled the depositions in England, not Mr. Jaeban. Mr. Jaeban submits that there is no question that this Court should honor Judge Walrath's prior Order in this regard and that the escrow should remain in place as previously ordered as a condition of the sale.

## III.    MR. JAEBAN'S RESPONSES TO BRACII'S REQUESTS FOR ADDITIONAL RELIEF

### a.    Mr. Jaeban has Already Explained the Wragge & Co. and PriceWaterhouse Coopers' Document Review Process

Mr. Jaeban has already explained the initial document production process as required by the May 25, 2004 Order. This argument has already been addressed in the previous section entitled Denial of Alleged Discovery Misconduct in Jaeban UK's Initial Document Production, *supra*. Therefore, BRACII is not entitled to any further explanations with regard to the document production process.

> **b.    Mr. Jaeban's Request for Production of Documents Served on August 20, 2004.**

As noted above, this matter is addressed in Mr. Jaeban's Motion for Order Reopening Limited Discovery, filed on August 27, 2004 (D.I. #51).

> **c.    BRACII Should Not be Awarded Fees Incurred in Flying Counsel to England and in Filing this Motion**

This Court should not order Mr. Jaeban to compensate BRACII for costs for BRACII's Counsel traveling to England. Mr. Jaeban was ready to proceed with all of the depositions and it was BRACII that terminated the deposition process. Mr. Jaeban's conduct ably demonstrates his desire to allow the deposition process to proceed. Further, the trip was obviously beneficial to BRACII in that it had the opportunity to review additional documents and to consult with and prepare witnesses. Further, Mr. Jaeban was placed to the same expense of having its U.S. counsel travel to England only to learn once over there that the deposition process was going to be called off by BRACII. Lastly, since Mr. Jaeban has demonstrated to the Court herein that sanctions are not appropriate and should not be levied, therefore BRACII's requests for fees in preparing and bringing this Motion should be denied as well.

**BA385**

## CONCLUSION

It is unfortunate that the Receiver failed to properly prosecute the litigation earlier in this case, and that the "air" surrounding discovery was poisoned before Mr. Jaeban took the assignment of Jaeban (U.K.) Limited's claims. Since that time, and especially since August 1, 2004, Mr. Jaeban and his counsel have done their best to "clear the air" in order to address the merits of this case, which Mr. Jaeban believes favor him. He has taken all reasonable steps to ameliorate Plaintiffs' counsel's concerns about discovery, and is frustrated that those efforts have only resulted in the motion at bar. Accordingly, Mr. Jaeban submits that there has been no misconduct on his part with regard to the Court's Order and his good faith compliance with the May 25 Order's edicts regarding production of documents. Quite frankly, since Mr. Jaeban has provided access to all of the remaining Welcome House Documents, other than those subject to the Data Protection Act of 1998, it is not clear whether information exists that would assuage Plaintiffs. The May 25 Order required Mr. Jaeban to respond to those concerns, and certainly carried with it a requirement that the response be given in good faith. Mr. Jaeban submits that he has discharged that obligation, used his best efforts to address the Plaintiffs concerns, and shown nothing but respect for the Court and the litigation process. The imposition of sanctions in such an instance would be inappropriate, unfair, and unjust.


WHEREFORE, Mr. Jaeban requests that BRACII's Motion be denied and requests such other and further relief as is just and equitable.

BA386

Respectfully submitted

Dated: September 14, 2004

WERB & SULLIVAN

/s/ Brian A. Sullivan
Brian A. Sullivan (#2098)
Robert D. Wilcox (#4321)
Amy D. Brown (#4077)
300 Delaware Ave., 13th Floor
Wilmington, Delaware 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111

Attorneys for Ibrahiem Jaeban

BA387

# EXHIBIT A

BA388

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BRAC GROUP, INC. (f/k/a BRAC Group, Inc.), et al., | Case No. 02-12152 (CJC) (Jointly Administered) |
| Debtors. | |
| BRAC GROUP, INC. (f/k/a BRAC Group, Inc.), et al., | |
| Plaintiffs and Counterclaim Defendants, | Adv. No. 03--54271 |
| v. | |
| JAEBAN (U.K.) LIMITED, and IBRAHIEM JAEBAN | |
| Defendants and Counterclaim Plaintiffs. | |

## AFFIDAVIT OF ROBERT D. WILCOX

I, Robert D. Wilcox, being competent to testify in this matter, state as follows:

1.      I am an attorney admitted to practice in the States of Delaware and Florida, and the federal courts therein. I am associated with the Delaware firm of Werb & Sullivan on an "Of Counsel" basis. The Werb & Sullivan firm is counsel of record for Ibrahiem Jaeban.

2.      On July 30, 2004 I traveled to England for the taking of a number of depositions of former Jaeban (U.K.) Limited personnel, BRACII personnel, and third party witnesses. The depositions were scheduled to begin on August 4, 2004.

1

BA389

3.     On August 2, 2004, I received a supplemental document production from Plaintiff's counsel. On August 3, 3004, on Mr. Jaeban's behalf I made a supplemental production of documents to Plaintiffs' counsel. That production was undertaken to avoid a delay in the depositions, and some of the documents I delivered to Plaintiffs' counsel were duplicates of what had been previously produced to the Plaintiffs.

4.     On or about August 5, 2004, both Mr. Jaeban's English counsel and I contacted the Receiver's counsel and specifically urged the Receiver to make his records available to Plaintiffs' counsel, and secondarily, to Mr. Jaeban. Our efforts were at first rebuffed, as the Receiver took the position that the files contained no relevant documents and would not be disclosed because portions were privileged. The Receiver stated also that he had no funds available to allow his counsel to conduct a privilege review. The Plaintiffs' counsel made it immediately and unequivocally clear that the Plaintiffs would immediately seek relief from the Court if it did not receive the requested access.

5.     After significant discussions over at least two days, Mr. Jaeban's English counsel and I were able to broker a compromise in which I would review the Receiver's files to determine whether they were exempt from disclosure as not being responsive to any document request. In return, Plaintiffs' counsel agreed that the disclosure of potentially privileged communications or attorney work product to Mr. Jaeban's counsel could not be considered a waiver of the Receiver's privilege. The Receiver agreed to that compromise.

6.     During my review of the Receiver's files, I telephoned Plaintiffs' counsel to inform him that, while the vast majority of the Receiver's files were of little practical value, some did relate to the financial condition of Jaeban (U.K.) Limited. Plaintiffs' counsel reiterated his position that he was entitled to review the documents, and Mr. Jaeban did not object to that access or seek to impede it. The problem remained of

2

convincing the Receiver of how he could provide Plaintiffs' counsel with access to the files without waiving the Receiver's privilege. Mr. Jaeban subsequently agreed, in an attempt to avoid disruption of the deposition process, to pay the Receiver's attorneys to conduct a privilege review for the Receiver. The Receiver's attorneys requested the sum of Four Thousand pounds to conduct such a review, and after some discussion, Mr. Jaeban agreed.

7.      The Receiver's attorney's conducted that review and, it is my understanding that Plaintiffs' counsel reviewed the Receiver's files on or about August 12, 2004.

8.      After the Plaintiffs complained in early August about the prior production and the August 3 production, Mr. Jaeban made the decision to deliver to Plaintiffs' counsel, on an expedited basis, the remaining entirety of the Welcome House documents. The intent was to allow Plaintiffs' counsel to review the remaining "raw" documents without any intervening selection process.

9.      I disagree with BRACII's allegation that during the week of August 2, 2004, Mr. Jaeban's English counsel and I informed Plaintiff's counsel that Jaeban U.K. might not have made a proper initial document production in November 2003. Mr. Jaeban's English counsel, in my presence, explained that Wragge & Co. had conducted the initial discovery review with the assistance of Price Waterhouse Coopers, and that Wragge & Co. undertook the review of the documents under the direction of former U.S. counsel for Jaeban (U.K.) Limited.

(This space intentionally left blank.)

3

**BA391**

Further Affiant Sayeth Not.

_Robert Wilcox_
Robert D. Wilcox

Signed and Sworn Before me this 14 ~~13th~~ day of September, 2004

In Duval County, Florida

Notary Public



VICTOR S. FANDRICH
MY COMMISSION # DD 126944
EXPIRES: June 18, 2006
Bonded Thru Budget Notary Services

Sworn to and subscribed before me this _14_ day of _Sept_. _2004_

_Victor A. Fandrich_
Signature of Notary Public

Personally Known _____ or Produced ID _✓_
Type of Identification Produced _____
FL DC# W422-764-57-333-0

4

BA392

# EXHIBIT **B**

BA393

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a BRAC Group, Inc.), et al., | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| | |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | 03-A-54271 |
| Plaintiffs and Counterclaim Defendants, | |
| v. | |
| Jaeban (U.K.) Limited, | |
| Defendants and Counterclaim Plaintiff. | |

## AFFIDAVIT OF IBRAHIEM JAEBAN

IBRAHIEM JAEBAN, being duly sworn, deposes and says:

1. I am the former Managing Director and principal shareholder in Jaeban (UK) Limited (in administrative receivership) ("Jaeban UK") and my address is Forth House Farm, Isel, Near Cockermouth, Cumbria, United Kingdom, CA13 9SA. I am the assignee of Jaeban by virtue of a deed of assignment dated 20 February 2004. I make this affidavit at the request of my US lawyers to deal with the issue of any remaining documents held at Welcome House, the former offices of Jaeban in response to the Plaintiff's Motion for further sanctions and other relief.

2. To the best of my knowledge and belief, I believe that following the submission of the 83 boxes of documents and whiteboard to BRACII on 11 August 2004, all that remains in Welcome House are several thousand rental agreements and related payment records. The individual rental agreements are the agreements signed by

1

BA394

each customer when renting a vehicle and include sensitive information such as the customer's name, address and bank/credit card details. I am aware that my UK lawyers are concerned that disclosure of these agreements may breach the Data Protection Act 1998 and that there is legal argument on this from lawyers for both parties. It was in order to find a way through this argument and to allow the deposition process to continue that my lawyers in August 2004 proposed to BRACII's lawyers that they attend Welcome House on a "without prejudice" basis to satisfy themselves that the documents were non-responsive. I understand that there was no response to that proposal which was subsequently repeated in a letter from Steve Allen of Mills & Reeve to Mr Wile of 12 August 2004. I have seen the response to that letter from Mr Wile dated 13 August 2004 and note that he appears to ignore the offer made.

3.  I understand that Mr Allen wrote to Phillip Taylor a colleague of Mr Wile on 10 September 2004 repeating the offer to which a response has now been received. I am informed Mr Wile is insistent that the documents are copied and sent to his London office which would potentially be a breach of the Data Protection Act. My compromise suggestion was designed to avoid that problem. The Court will therefore appreciate why I feel particularly aggrieved that Mr Wile now seeks to use the existence of these remaining documents as a means of striking out my claim.

4.  I would also wish to state on oath that, in early August 2004, I provided instructions to send over the 83 boxes of documents to Mr Wile in London not because I believed that the documents were responsive but because I was concerned that failure to do so would completely derail the deposition process. It is unfair of Mr Wile to suggest that I have done anything myself to delay that process. I continue to have confidence in the exercise carried out by Jaeban (U.K.) Limited's former solicitors Wragge & Co assisted by PriceWaterhouseCoopers which was conducted in accordance with advice received from Morris Nicholls Arsht & Tunnel. This initial document review included a review of all the Welcome House documents.

5.  I note in the BRACII Motion that it is confirmed that most of the documents were routine business records of limited relevance. They refer to Jaeban agreements with BRACII and its former subsidiary and "other significant documents". I had hoped that BRACII would have identified these other documents as my US lawyers requested, but they have failed to do so. The Jaeban UK agreements with BRACII and its former

subsidiary are standard form documents generated by BRACII, one copy of which was disclosed by Jaeban in its 3 October 2003 initial disclosures.

6. I delivered the Welcome House documents to BRACII's lawyers on 11 August 2004. I did this prior to having the documents reviewed by my attorneys.



_____
Ibraheim Jaeban

Sworn before me this
14th day of September 2004

Notary Public  JOHN  RICHARD  MARK  CHAUDION
NOTARY  PUBLIC
UI INGDUNDABE,
GUILFORD, LANDBAN
U.K.

Page 3 of 3.

BA396

# EXHIBIT C

BA397

# SIDLEY AUSTIN BROWN & WOOD LLP

| BEIJING | . BANK ONE PLAZA | LOS ANGELES |
|---|---|---|
| BRUSSELS | 10 S DEARBORN STREET | NEW YORK |
| CHICAGO | CHICAGO, ILLINOIS 60603 | SAN FRANCISCO |
| DALLAS | TELEPHONE 312 853 7000 | SHANGHAI |
| GENEVA | FACSIMILE 312 853 7036 | SINGAPORE |
| HONG KONG | www.sidley.com | TOKYO |
| LONDON | FOUNDED 1866 | WASHINGTON, D C |

WRITER'S DIRECT NUMBER
(312) 853-2081

WRITER'S E-MAIL ADDRESS
kwlie@sidley com

December 12, 2003

**VIA FAX (302-658-3989)**

Thomas W. Briggs, Esq.
Morris, Nichols, Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
Wilmington, DE 19899-1347

Re:     <u>BRAC Group, Inc., et al., v. Jaeban (U.K.), Ltd.,</u>
        <u>Adv. No. 03-A-54271 (Bankr. D. Del.)</u>

Dear Tom:

   Since Morris Nichols remains (and, we hope, will continue as) Jaeban's Delaware counsel of record, I am writing to raise two separate discovery topics.

   1. **UK Depositions:** We are likely to depose most or all of the following witnesses associated with Jaeban in addition to the two Receivers:

I. M. Jaeban
Paul Champken
Steve Downing
Anthony Guest
Simon Poyner
Andrew Rees
Trevor Sutherland

Please check on their availability during the weeks of January 12th and 19th. We would like these depositions to occur at our offices in London; there are likely to be London depositions as well.

   2. **Jaeban Documents Produced To Date.** While Wragges has already produced a moderate number of (mostly responsive) documents to date, we are concerned that the production is not complete. In particular, Wragges sent only a minimal number of e-mails

SIDLEY AUSTIN BROWN & WOOD LLP IS AN ILLINOIS LIMITED LIABILITY PARTNERSHIP PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

SIDLEY AUSTIN BROWN & WOOD LLP                    CHICAGO

Thomas W. Briggs, Esq.
December 12, 2003
Page 2

and internal memoranda related to the specifications in our document requests. Because Jaeban did not object to any of the requests in a timely manner, it has no grounds under the Federal Rules for withholding documents that we have sought. Please note that, consistent with the Federal Rules, we have sought documents within Jaeban's possession, custody, or control; these include documents in the possession of Wragges and PwC, who are agents of Jaeban (and, now, of the Receivers).

Turning to the specific requests, please note the following apparent deficiencies. This is not an exhaustive list, and it remains Jaeban's responsibility to comply in full.

No. 1:      The document production includes a set of the 2002 financial statements, but this request is broader in requiring documents and drafts of documents that reflect on the overall value of Jaeban, including current and prior financial statements dating back to January 1, 2000.

No. 2:      The Wragges production does not include any responsive documents (e.g., minutes and Board resolutions).

No. 3:      This request sought, *inter alia*, documents discussing Mr. Jaeban's views of the demands and counterdemands that have now been brought in the adversary proceeding. Experience suggests that there will usually be e-mails and internal memoranda that discuss these claims. Some documents might arguably be privileged; if so, we are entitled to a privilege list.

No. 4:      We expected to see more documents referring to the Orders of Administration. At the risk of understatement, the altered status of BRACII and BTI were not insignificant matters to Jaeban.

No. 5:      Wragges has produced some responsive documents, but we would have expected to have seen much more.

Nos. 7-8:      We do not seem to have any of the background documents (emails, memoranda, and the like) that Jaeban used in deciding to enter into the IPLA, the Umbrella Agreement, or other agreements.

Nos. 12-20:    These requests seek documents that relate to Jaeban's contentions. Needless to say, any documents that have not been produced are unlikely to be admitted at trial. We want to be certain, however, that Jaeban has produced all documents that relate to these claims, whether or not these are documents on which Jaeban intends to rely at trial.

Many thanks for your help. Please call with any questions.

SIDLEY AUSTIN BROWN & WOOD LLP                    CHICAGO

Thomas W. Briggs, Esq.
December 12, 2003
Page 3

                                        Sincerely yours,

                                        Kenneth E. Wile

cc:    Martin Siegel

       Patrick Corr
       Phillip Taylor

**BA400**

# EXHIBIT **D**

**BA401**

Your reference: PHMC/PDT/19447/30270
Our reference: BSZA/4006615-0001-0
Document number: bsza11bsza.doc

Direct line: +44(0)121 456 8343
Direct fax: +44(0)121 456 8476
steven.allen@mills-reeve.com



# MILLS
## &
# REEVE

Sidley Austin Brown & Wood
DX 580
LONDON CITY

9 August 2004

For the attention of Ken Wile

Fax no: 0121 456 8476

Dear Mr Wile

### Re: BRAC Group, Inc: Case No. 02-12152 (MFW) (Jointly Administered): Adversary 03-A-54271

As you are aware we have been instructed by Mr Ibraheim Jaeban to assist Werb & Sullivan our client's US Attorneys, in relation to the above proceedings.

I write to record our disappointment with the Debtors' decision not to permit the deposition of Mr Terry Clark to go forward today as previously agreed and scheduled by mutual consent.

As the Debtors and my client agreed and recognised on Wednesday 4 August 2004, Mr Clark's deposition needed to be held today and tomorrow because of Mr Clark's foreign travel schedule on behalf of his new employer.

As a result of the Debtor's decision on Friday not to permit Mr Clark's deposition it now appears that the exigencies of Mr Clark's schedule will not permit the parties to depose him on Mr Wilcox's current trip to England. The stated and disclosed purpose of that trip was the taking of depositions including Mr Clark's. Mr Jaeban will undoubtedly face additional expense as a result of the Debtors' decision.

We believe that it was inappropriate for the Debtors to change the agreed upon scheduling of Mr Clark's deposition and even at this late date we request that the Debtors reconsider and reverse that decision.

The Debtors' actions with regard to Mr Clark make Mr Jaeban's compliance with Judge Case's most recent Scheduling Order a practical impossibility and the responsibility for that non-compliance as it relates to the completion of the UK depositions by 23 August 2004 must fall entirely upon the Debtors.

It would obviously be inequitable for the Debtors to assert such a deadline with regard to any deposition in this proceeding, and I understand that you have informed Mr Wilcox that you will not take such a position.

**BA402**

Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham
B16 8PE

Tel: +44(0)121 454 4000
Fax: +44(0)121 456 3631
DX: 707290 Edgbaston 3
info@mills-reeve.com

Birmingham Cambridge London Norwich

Mills & Reeve is regulated by the Law Society
A list of partners may be inspected at any of
our offices

www.mills-reeve.com

The Debtors' stated reason for the adjournment of Mr Clark's deposition was their alleged lack of access to documents from Mr Jaeban and/or the Administrative Receivers of Jaeban UK Limited. We shall be dealing with this issue in separate correspondence.

Mr Wilcox has worked diligently to ensure the Debtors have access to all relevant and non-privileged documents, even though there is no pending discovery request directed to Mr Jaeban. Further, in an attempt to avoid a disruption of the agreed upon deposition schedule, Mr Jaeban offered to gather all documents from Welcome House and deliver them on Saturday to you in London "without prejudice" to our client's contention that all such pertinent documents have been disclosed. The Debtors declined that offer.

Additionally, our client worked extensively last week to dispel any discovery dispute between the Debtors and the Administrative Receivers of Jaeban UK Limited. Mr Jaeban initially requested and subsequently demanded, that the Administrative Receivers produce all requested non- privileged documents, even though Mr Wilcox has advised that the Administrative Receiver's files are without question extremely limited materially to Mr Clark's deposition.

It is our view that the parties could have easily, expeditiously and efficiently proceeded with Mr Clark's deposition thereby making substantial progress without prejudicing either parties right to continue or re-open the deposition if the Debtors' stated purpose was to avoid a telephone deposition of Mr Clark, we perceive that their actions have created the opposite scenario under which a telephone deposition would be the parties only option unless US Counsel were to return to England at considerable resultant expense.

We ask the Debtors' to reverse their position and we expressly reserve all our client's rights should the Debtors not do so.

We also view the Debtor's current position as a departure from the policy of adversarial co-operation that we believed the Debtors' had adopted and which our client had instructed us to pursue on his behalf.

Please confirm that the Debtors' will reconsider their blockage of Mr Clark's deposition and I look forward to your prompt response on that issue.


Yours sincerely


**Steven Allen**
Partner

cc Patrick Corr
    Philip Taylor

BA403

# EXHIBIT E

BA404

12-AUG.'04 (THU) 18:08    MILLS & REEVE    FAX:0121 456 3631    P.002

Your reference:
Our reference: BSZA/4006615-0001-0
Document number: bsza19bsza.doc

Direct line: +44(0)121 456 8943
Direct fax: +44(0)121 456 3631
steven.allen@mills-reeve.com

# MILLS
# REEVE

Sidley Austin Brown & Wood
DX 580
London City

12 August 2004

For the attention of Ken Wlle/Phil Taylor/Patrick Corr

Dear Mr Wlle

**Re: BRAC Group, Inc: Case No. 02-12152 (MFW) (Jointly Administered): Adversary 03-A-54271**

Thank you for your letter of 11 August 2004.

**BRACII's Discovery Non-compliance**

I am greatly disappointed that you have failed to address in any substantive form my client's concerns with regard to the BRACII documents and belated additional discovery from BRACII.

It is in our view inconceivable that the entirety of BRACII's disclosure in these proceedings consist of the three lever arch files sent to Wragge & Co on 20 January 2004 and the one lever arch file of documentation belatedly disclosed on 2 August 2004. Your continuing pre-occupation in correspondence with issues concerning my client's discovery and your admission that you only have a *"few more"* documents to produce only reinforces my client's concerns that you are intent on following your own agenda on discovery rather than properly addressing the serious inadequacies of your own clients' position.

I am also disappointed that you have in your letter adopted a heading *"The unanswered questions"* whilst ignoring the questions that we properly raised in my letter of 10 August 2004. By way of reminder these were as follows:

1. Please advise when the documents produced on 2 August 2004 came into your possession;

2. Please advise what other documents are in your possession;

3. Please advise what specific attempts have been made by the Debtors in complying with their disclosure obligations as stated in the Federal Rules of Bankruptcy Procedure. I note that the Debtors' Initial Disclosures refer to the fact that *'additional documents in those categories may be in the possession of BRACII's counsel, its US affiliates, or other parties but have not been located to date. Investigation continues'*;

Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham
B16 8PE

Tel: +44(0)121 454 4000
Fax: +44(0)121 456 3631
DX: 707290 Edgbaston 3
info@mills-reeve.com

Birmingham Cambridge London Norwich
Mills & Reeve is regulated by the Law Society
A list of partners may be inspected at any
of our offices

www.mills-reeve.com

**BA405**

4.   Please confirm that the documents first requested by Jaeban UK Limited in June
2003 will be disclosed by the date specified in my letter.

There are further questions that we wish to raise with you regarding the Debtors' discovery,
however, please respond to the above questions as a matter of urgency. Additionally please
confirm that the Records Custodian at BRACII shall be available for a telephone deposition
next week. We believe that this will assist us in understanding better the efforts of BRACII to
respond to our client's documents production request.

### My client's alleged "unanswered questions"

I repeat that the disclosure process conducted in September/October 2003 by Wragge & Co
and PriceWaterhouseCoopers was undertaken under the advice and guidance of Morris
Nicholls Arsht & Tunnell. I fail to see the relevance of your continuing concerns with regard
to this process given the delivery to you yesterday of 79 boxes of documents and
whiteboard. I am instructed that you now have all the documents from Welcome House with
the exception of documents that my client is satisfied come within the ambit of the Data
Protection Act 1998. Irrespective of this I understand that you were invited to attend at
Welcome House on a "without prejudice" basis to satisfy yourself as to the responsiveness
or otherwise of the balance of documents held there.

The only outstanding point that needs to be addressed is the issue of the Jaeban UK Limited
computers which as I mentioned to you in my e-mail of yesterday is being investigated and I
will revert back to you shortly on this issue. This is of course "without prejudice" to our
contention that CD's containing responsive documents have already been disclosed.

Transcending all of this however is your assumption which, with the utmost respect, must be
a self-serving one, that all of the documents recently disclosed to you are responsive
documents. Both you and Phil Taylor have been told on numerous occasions throughout the
past week that the documents recently sent to you, have been sent not on the basis that
they are responsive, but on the basis that so much time was being spent by you during the
deposition process on this issue that to disclose practically the entirety of the contents of
Welcome House would be the only basis that the parties might move on to discuss the
material issues in this case. It has not escaped our attention that your correspondence
(which includes e-mail) appears intent on suggesting otherwise, concentrating as it does on
the number of boxes and documents sent to you.

One can be forgiven for thinking that your tactics here are to create the impression of your
receiving an unreasonably large amount of responsive documents such that the deposition
process could not proceed. I hope that I am wrong in this respect, however, you should be
aware that we are alive to that possibility and in this context we reserve the right to produce
this and our previous correspondence to Judge Case in response to any motion you choose
to file.

Further, I believe that it is somewhat of a "leap" in the interpretation of the Order of 25 May
2004 to allege that the production of documents by my client in good faith and in the spirit of
co-operation that we have tried to engender between the parties is somehow in breach of
the order that my client respond to your letter of 12 December 2003. My client has of course
fully complied with that order his US Attorneys' having responded to your letter within the
time imposed by Judge Case.

### The Credit Pack Document

2

I do not share your view of the importance of a document which our preliminary investigation suggests was an uncirculated draft. I do, however, welcome and appreciate your retraction of the very serious allegation contained in your letter of 9 August 2004 and am happy to consider this particular aspect of the matter as closed.

Finally, I would very much welcome a cooperative approach to the issue of discovery going forward and I would certainly encourage you to contact Rob Wilcox or Brian Sullivan in this regard. I would hope that you would agree that this case needs to move forward from overbearing and expensive discovery disputes and motion practice to the merits of the case.

Yours sincerely

Steven Allen
Partner

3

BA407

Your reference: PHMC/PDT/19447/3020
Our reference: BSZA/4006615-0001-0
Document number: bsza63lbsza.doc

Direct line: +44(0)121 456 8343
Direct fax: +44(0)121 456 3631
steven.allen@mills-reeve.com



# MILLS & REEVE

Sidley Austin Brown & Wood
DX 580
LONDON CITY

10 September 2004

For the attention of Philip Taylor
Also sent by DX

Dear Mr Taylor

### Re: BRAC Group, Inc: Case No. 02-12152 (MFW) (Jointly Administered): Adversary 03-A-54271

I have received a copy of BRACII's motion for further sanction dated 27 August 2004.

Whilst I do not wish to become involved in the substantive response as this is being handled by my client's US Attorneys, I feel that I must respond to paragraph 14 of the motion which deals with those documents still retained at Welcome House.

I enclose a further copy of my letter of 12 August 2004. On page 2 paragraph 3 of that letter I refer to the fact that Mr Wile was invited to attend at Welcome House on a "without prejudice" basis to satisfy himself as to the responsiveness or otherwise of the balance of documents held there. There is no mention of this proposal in either the motion itself or Mr Wile's affidavit. Whilst I am sure that this was inadvertently omitted from Mr Wile's summary of events, its absence in the context of BRACII's motion is material.

In relation to the Data Protection Act 1998 (paragraph 14 of the motion), the motion wholly fails to address the key issue of whether the outstanding documents held at Welcome House are *"required"* or *"necessary"* to be disclosed under any rule of law or by order of the court. The documents will only come within those categories if they are responsive documents that either fall to be disclosed under rule 734 of the Rules of Bankruptcy Procedure or by specific order of the court. This leads us back to the question of determining whether any of the documents fall into either of these categories. It is Mr Jaeban's case that the documents are neither material nor responsive.

The simple way of resolving this issue is for BRACII to accept my client's invitation to inspect the remaining documents held at Welcome House and we are disappointed that no response has been received from your firm to date.

Perhaps you could please explain why you have not responded to this suggestion.

Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham
B16 8PE

Tel: +44(0)121 454 4000
Fax: +44(0)121 456 3631
DX: 707290 Edgbaston 3
info@mills-reeve.com

Birmingham Cambridge London Norwich

Mills & Reeve is regulated by the Law Society
A list of partners may be inspected at any of
our offices

www.mills-reeve.com

BA408

Yours sincerely

**Steven Allen**
Partner

Enc

cc  Ken Wile
    Brian Sullivan
    Rob Wilcox

2

# EXHIBIT F

DATED 20 FEBRUARY 2004

JAEBAN (UK) LIMITED
(in administrative receivership)                    (1)

IBRAHIEM JAEBAN                                     (2)

---

DEED OF ASSIGNMENT

OF CLAIM AGAINST

BRAC GROUP INC et al

---



Wragge & Co LLP is a Limited Liability Partnership

**Birmingham London Brussels**

Tel +44 (0)870 903 1000   Fax +44 (0)870 904 1099   mail@wragge.com   www.wragge.com

**THIS DEED OF ASSIGNMENT** is made on ......*20 FEBRUARY*...., 2004 and made

**BETWEEN:**

(1)     **JAEBAN (UK) LIMITED** (in administrative receivership) (company registered number 01984294) c/o RSM Robson Rhodes, Centre City House, 7 Hill Street, Birmingham B5 4UU (the "**Assignor**") acting by its administrative receivers **John Neville Whitfield** and **Gerald Clifford Smith** of **RSM Robson Rhodes LLP**, Centre City Tower, 7 Hill Street, Birmingham, B5 4UU (the "**Receivers**");

(2)     **IBRAHIEM JAEBAN** of Forth House Farm, Isel, Near Cockermouth, Cumbria, CA13 9SA (the "**Assignee**")

**WHEREAS:**

(A)     The Receivers were appointed administrative receivers of the Assignor by an appointment dated 20 October 2003 pursuant to a debenture dated 6 August 2003 made between the Assignor and Close Invoice Finance Limited.

(B)     The parties to this Deed have agreed, in light of the administrative receivership of the Assignor, that the Assignor will, subject to the terms of this Deed, assign to the Assignee its claim against BRAC Group Inc, et al (formerly known as Budget Group Inc) and the benefits and proceeds arising from such claim.

**NOW THIS DEED WITNESSES** as follows:

1       **Interpretation**

1.1     Clause headings are inserted for convenience of reference only and shall be ignored in the interpretation of this Deed.

1.2     In this Deed, unless the context otherwise requires:

(a)     references to clauses and the schedule are to be construed as references to the clauses of this Deed of Assignment;

(b)     references to (or to any specified provision of) this Deed or any other document shall be construed as references to this Deed, that provision or that document as in force for the time being and as amended in accordance with the terms thereof or, as the case may be, with the agreement of the relevant parties;

(c)     words importing the plural shall include the singular and vice versa.

1.3     "**Claim**" means such right, title and interest (if any) as the Assignor may have to a claim against BRAC Group Inc (formerly known as Budget Group Inc) and other companies as specifically described in United States Bankruptcy Court District of Delaware case number 02-12152 (CGC);

1.4     "**Purchaser Price**" means the sum of £5,000 plus VAT.

BA412

**2    Assignment**

2.1    In consideration of the Assignee agreeing to the conditions described in clauses 2.2, 2.3 and 2.4 and of the Assignee paying the Purchase Price in accordance with clause 3.4 and the amount described in clause 2.3, the Assignor hereby agrees to assign to the Assignee absolutely, unconditionally and irrevocably such right, legal and beneficial title and interest as it has (if any) in the Claim.

2.2    The Assignee acknowledges that it shall be responsible for all costs (other than the Receivers' legal costs and the costs of the Receivers' other agents incurred prior to the date hereof), claims and expenses and administration issues arising in respect of the Claim including those which may have arisen prior to the date of this Deed of Assignment. In relation to legal costs, the Assignee shall be responsible for its own legal costs incurred in pursuing the Claim and also for any costs (whether adverse costs or otherwise) awarded against it or any third party as a consequence of pursuing the Claim. Without prejudice to the generality of the foregoing the Assignee agrees fully and effectually to indemnify and keep indemnified the Assignor and each of the Receivers from and against all claims losses proceedings damages sums and expenses from time to time paid or payable incurred or suffered by the Assignor and/or each of the Receivers or any of them in respect of any claims in relation to the Claim whether arising directly or indirectly from it.

2.3    The Assignee agrees that in respect of any sums payable to it (or to any successors in title of the Assignee or to any third party to whom the Assignee subsequently assigns its interest in the Claim) by any other party to the Claim (whether such sums are payable following judgment by the court or settlement by the parties involved) (the "**Settlement Sum**") the Assignee will pay to the Assignor within 7 days of receipt an amount equal to 10% of the amount representing the total Settlement Sum less costs and expenses necessarily incurred by the Assignee in pursuing the Claim (to the extent that such costs and expenses are payable by the Assignee). Pending such payment to the Assignor such amounts shall be held on trust by the Assignee for the benefit of the Assignor.

2.4    The Assignee agrees to waive any claim or right to payment it might have under, or in connection with, a licence granted by it in the Assignor's favour in relation to property at 999 Wolverhampton New Road, Oldbury, Warley, West Midlands.

2.5    In default of payment on its due date of any sum payable hereunder to the Assignor or the Receivers or either of them the Assignee shall pay interest to the Assignor or the Receivers as the case may be on the amount outstanding for the time being at the rate of 6% per annum above the base rate of Barclays Bank PLC for the time being in force from the date on which such sum became due until payment of such sum in full.

2.6    This Assignment takes effect on and from the date hereof.

**3    Completion**

3.1    Completion of the assignment hereby agreed shall take place on the date hereof at the offices of the Receivers' solicitors or such other place as the parties shall agree whereupon:

BA413

3.2    The Assignee shall deliver to the Receivers who shall receive the same on behalf of the Assignor a duplicate of this Agreement duly executed by the Assignee.

3.3    The Assignor shall deliver to the Assignee a duplicate of this Agreement executed by the Assignor.

3.4    The Purchase Price shall be paid by the Assignee to the Receivers who shall receive the same on behalf of the Assignor on or before 31 March 2004.

4    **Further Assurance**

4.1    The Assignor agrees to provide the Assignee with all reasonable assistance to enable the Assignee to obtain full benefit of the assignment contained herein. In particular, the Assignor agrees that at any time and from time to time up to the earlier of: three months from the date hereof; and the Receivers or either of them ceasing to act as administrative receivers of the Assignor, upon the written request of the Assignee and at the Assignee's cost, it will promptly and duly execute and deliver to the Assignee any and all such further instruments and documents and promptly take all such further action as the Assignee may reasonably deem desirable for it to obtain the full benefit of the assignment contained herein.

4.2    Within 21 days of the date of this agreement, the Receivers and the Assignor agree to deliver up to the Assignee all relevant and necessary documentation to enable the Assignee to obtain the full benefit of the assignment contained herein.

5    **Limitation on Liability**

5.1    The parties hereto hereby agree that neither the Receivers nor either of them nor their firm nor their staff employees agents or advisors shall incur any personal liability under this Assignment or under or in relation to any associated arrangements whether such liability would arise under statute or otherwise howsoever.

5.2    No claim may be brought against the Assignor under or in connection with this Assignment unless such claim is formulated and made within one year of the date hereof and either the amount payable in respect of such claim are instituted by the Assignee and served on the Assignor within such period.

5.3    The Assignee shall not be entitled to set off any claims it might have against the Assignor or the Receivers against any moneys payable to the Assignor or the Receivers pursuant to the provisions of this Assignment but such moneys shall be paid forthwith in full to the Assignor or the Receivers upon the same being due without set off counterclaim or any other deduction of any nature.

6    **Counterparts**

6.1    This Assignment may be executed in any number of counterparts and by the different parties to this Deed on separate counterparts, each of which when executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

7    **Governing Law and Jurisdiction**

7.1  This Deed shall be governed by and construed in accordance with English law and any disputes arising hereunder shall be subject to the exclusive jurisdiction of the English Courts.

IN WITNESS whereof the parties hereto have caused this Assignment to be duly executed as a Deed the day and year first above written.

EXECUTED as a DEED                    )
By JOHN NEVILLE WHITFIELD             )
as Joint Administrative Receiver (without   )
personal liability) for and on behalf of    )
JAEBAN (UK) LIMITED                    )
in the presence of:

Witness Signature: V Whitfield .......................

Witness Name: VICTORIA WHITFIELD ...

Witness Address: 24 HARTNELL CLOSE ..

Witness Occupation: CUSTOMER SERVICE PROFESSIONAL .


EXECUTED as a DEED by                 )
IBRAHIEM JAEBAN                      )
In the presence of:

Witness Signature: ...................................

Witness Name: ......................................

Witness Address: ...................................

Witness Occupation: .................................

WEAGGTG 84341277 v2 [IQW]

## 7     Governing Law and Jurisdiction

7.1     This Deed shall be governed by and construed in accordance with English law and any disputes arising hereunder shall be subject to the exclusive jurisdiction of the English Courts.

**IN WITNESS** whereof the parties hereto have caused this Assignment to be duly executed as a Deed the day and year first above written.

**EXECUTED** as a DEED                    )
By                                        )
as Joint Administrative Receiver (without )
personal liability) for and on behalf of  )
**JAEBAN (UK) LIMITED**                    )
in the presence of:

Witness Signature: ...................................

Witness Name: ...................................

Witness Address: ...................................

Witness Occupation: ...................................


**EXECUTED** as a DEED by                 )
**IBRAHIEM JAEBAN**                        )
In the presence of:

Witness Signature: ......_Jaebn_...................

Witness Name: .....Rebecca...Jaebas...

Witness Address: ..Faith House..Tyben..Isel

Witness Occupation: ...Accounts...Clerk...

WIACGE2 #4341277 v2 [JQW]