IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | Case No. 02-12152 (CGC) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | |
| Plaintiffs, | 03-A-54271 |
| v. | |
| Jaeban (U.K.) Limited, *et al* , | |
| Defendants. | |

REPLY MEMORANDUM IN SUPPORT OF
BRACII'S MOTION FOR FURTHER SANCTIONS AND OTHER RELIEF

Plaintiff Budget Rent-A-Car International, Inc ("BRACII"), by its undersigned

counsel, respectfully submits this Reply Memorandum in support of its Motion for Further

Sanctions and Other Relief.

In his Response, Mr. Jaeban offers no excuse for his multiple failures to complete

document discovery to BRACII by June 18, 2004, as the Court required. Instead, Mr. Jaeban

treats the Receivers' documents as unimportant and the Welcome House documents as

nonresponsive. These statements are false. His proposed new document requests made clear his

intent to drive up BRACII's costs and delay trial; he does not discuss their contents. He has

failed to level with the Court and BRACII as to whether the November 2003 production was

handled improperly and failed to disclose his current efforts to determine whether there remain

yet more documents to be produced.

66.

Mr. Jaeban deliberately ignored the Court's warning that failure to comply with its Order would lead to more serious consequences. Because lesser sanctions have not worked, the Counterclaims should be dismissed or, at a minimum, the $4.5 million escrow should be eliminated.

## ARGUMENT

### I.    MR. JAEBAN'S RESPONSE FURTHER DEMONSTRATES HIS WILLFUL REFUSAL TO COMPLY WITH THE COURT'S MAY 25TH ORDER.

#### A.    The Receivers' Documents

There is no evidence that Mr. Jaeban made any effort to obtain responsive documents from the files of the Jaeban UK Receivers by June 18th or at any time until his U.S. counsel arrived in England and realized the extent of Mr. Jaeban's noncompliance. According to Mr. Wilcox's affidavit, he did not contact the Jaeban UK Receivers regarding Jaeban UK documents until August 5, 2004. Wilcox Aff., ¶ 4.

Sanctions are uniquely appropriate for this conduct. To determine by June 18th whether responsive documents existed, Mr. Jaeban's solicitors at Wragge & Co. ("Wragges") need only have consulted Jaeban UK's (and its Receivers') solicitors . . . at Wragges. We have not been informed of any impediment why Wragges could not, at a minimum, have informed Mr. Jaeban's U.S. counsel or BRACII by the Court-ordered deadline what documents, whether created before or after the receivership, were withheld.

Mr. Jaeban seeks to diminish his noncompliance by asserting that the Jaeban UK documents in the Receivers' possession were not within Mr. Jaeban's "power" (Response at 3). Adopting a "hide in plain sight" approach, Mr. Jaeban quotes the provision in the Deed of Assignment that in reality required the Receivers to cooperate by

> "deliver[ing] to the Assignee [Mr. Jaeban] any and such further instruments and documents and promptly take all such further action as

2

BA418

> the Assignee [m]ay reasonably deem desirable to obtain the full benefit of
> the assignment contained herein."

Jaeban Response at 5 (quoting Deed of Assignment). Calling this language "boilerplate", *id.*,

does not change its plain meaning: the Deed of Assignment required Jaeban UK to produce the

documents that Mr. Jaeban needs. Under the Court's May 25th Order, it was indeed "desirable",

if Mr. Jaeban had any real interest in obeying the Court's Order, to obtain the documents

responsive to BRACII's request.

The proof, of course, is that the Receivers were willing to produce documents

within one week of Mr. Wilcox's phone call once Mr. Jaeban paid for a privilege review (*see*

Wilcox Aff., ¶¶ 6-7).[1] Further proof that Mr. Jaeban could obtain these documents, as discussed

in greater detail below, is that Mr. Jaeban's English counsel is currently conducting a search for

Jaeban UK's e-mail systems -- which are also presumably the property of Jaeban UK.

Mr. Jaeban's attempts to minimize the significance of the Receivers' documents

fly in the face of the two documents showing why the Receivers were willing to sell the

Counterclaims for £5,000 in upfront money. He does not even discuss his January 30, 2004

letter contesting Mr. Weatherall's dim view of Jaeban UK's claims under the Umbrella

Agreement and IPLA. *See* Motion for Further Sanctions, Ex. F. If BRACII had obtained Mr.

Jaeban's letter refuting Mr. Weatherall by June 18th, it might have successfully compelled by

now production of Mr. Weatherall's letter explaining why Jaeban UK's claims lack merit.[2] While

Mr. Jaeban's Response mentions Mr. Weatherall's October 15, 2003 letter (*id.*, Ex. E), he ignores

its importance in conceding BRACII's ratification defense.

---

[1] Under the Insolvency Act 1988, Jaeban UK remains the owner of its property; the Administrative Receivers are merely agents of Jaeban UK in all respects. *See* Insolvency Act 1986, § 44(1)(a).

[2] For the reasons set forth in BRACII's Motion to Compel (Docket No. 59), BRACII is entitled to a copy of the Weatherall letter because Jaeban UK never objected to the Joint First Request for Production. In the alternative, BRACII respectfully requests that the Court require production of this letter from Mr. Jaeban as part of the sanctions awarded on this Motion.

BA419

While these are the two most important documents produced from the Receivers' files, BRACII copied numerous other documents from the over 20 lever arch files that were finally made available. Among these documents are (a) documents detailing the financial condition of Jaeban UK during the relevant period (e.g., corporate tax computations; schedules prepared by the Receivers; an independent business analysis; (b) documents detailing the relationship between Jaeban UK and Zodiac Rent a Car Limited ("Zodiac"), Avis Europe plc's affiliate, following the sale of BRACII's assets; and (c) documents commenting directly on this adversary proceeding. Wile Reply Aff., ¶ 2 (attached *infra* a Exhibit A). Yet another Receiver document (attached *infra* as Exhibit B), says of Mr. Jaeban, "I don't believe him."

In short, Mr. Jaeban has provided no excuse for failing to make this production within the Court's deadline. His attempt to minimize its importance is belied by the documents themselves, even those that do not throw the basis for the escrow and the counterclaims into very serious question.

**B.    The 84 Boxes of Welcome House Documents**

Mr. Jaeban takes a similar approach to the Welcome House documents -- ignoring his own noncompliance and minimizing the importance of the documents withheld. This is not the approach of a candid litigant who should be excused for his noncompliance with an Order warning of sanctions for noncompliance.

As with the Receivers' documents, Mr. Jaeban's Response admits his inaction in failing to turn over responsive documents by June 18th:

> "While Jaeban UK's English attorneys, Wragge & Co., had reviewed the boxes more than six months earlier for the first response, Mr. Jaeban's English attorneys did not again review the boxes prior to Mr. Jaeban turning them over to BRACII [on August 11, 2004]."

Jaeban Response 7 n.4. In other words, both Mr. Jaeban and Wragge & Co. (which was still

4

acting for Mr. Jaeban until Mr. Allen left the firm *after* June 18th) knew of the Welcome House

documents and failed to review them before the June 18th deadline. For reasons known only to

Mr. Jaeban, the May 25th Order did not apply to these documents.

      Mr. Jaeban's excuse for not reviewing the Welcome House documents, the alleged

lack of responsive documents, is false. In addition to the BRACII-Jaeban UK agreements that

Mr. Jaeban admits were among the 84 boxes produced (Jaeban Response at 7), the Welcome

House production included not merely responsive, but significant documents on a number of

topics, including the following:

- a.    The Business Sale Agreement with BTI (BRACII's former subsidiary) whereby Jaeban UK purchased numerous sites in connection with the Umbrella Agreement.

- b.    A set of Jaeban UK management accounts and forecasts in 2001 (which are relevant both to the merits and Mr. Jaeban's fanciful damage claims).

- c.    Several documents regarding Jaeban UK's Edinburgh and Glasgow airport sites, including Jaeban UK's executed contracts that were previously produced in incomplete form.

- d.    Key documents regarding Jaeban UK's failed relationship with Zodiac.

- e.    Correspondence with certain lenders regarding Jaeban UK's credit limits.

- f.    At least one document and a whiteboard concerned with the contested BMS computer system.

Wile Reply Aff., ¶ 3. BRACII has of course been prejudiced by Defendants' failure to produce

these in November 2003 or even June 2004. For example, BRACII could have used the time to subpoena

the lenders identified in the newly produced correspondence.[3]

      Mr. Jaeban's belated "compliance" in fact added to the burden on (and expense

incurred by) BRACII. By delivering 84 boxes and a whiteboard without attempting to identify

---

[3] For the reasons set forth in BRACII's Motion to Compel and for Leave to File a Two-Item Subpoena, BRACII is now seeking to file only a single lender subpoena to avoid adding to the delay created by Mr. Jaeban.

BA421

which documents were responsive, Mr. Jaeban successfully forced BRACII to spend money on a team of Sidley London associates and trainees (and Mr. Wile) as they spent over 65 hours culling responsive documents and cataloguing the production.[4]  Affidavit of Phillip Taylor, ¶ 2 (attached *infra* as Exhibit C).  Moreover, while Mr. Jaeban and his counsel were uninterested in identifying responsive documents, they obviously *did* review boxes in order to withhold documents under the English Data Protection Act 1998.[5]

If Mr. Jaeban and or Wragges had any interest in complying with the May 25th Order, they would have identified potentially responsive documents and made them available to BRACII by June 18th.  Mr. Jaeban's pretense that the 80+ boxes had no responsive documents (other than, of course, the documents he admits were responsive, *see* Jaeban Response at 7) is a further reason for sanctions, not an excuse for avoiding them.  *Cf. Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (court should not extend a discovery deadline if it would "reward the indolent and the cavalier").

### C.     Mr. Jaeban's Oppressive New 25 Document Requests

The litigant who made BRACII's lawyers spend over 65 hours searching the Welcome House boxes is the same litigant who served the 25 overbroad document requests in late August discussed in BRACII's Motion for Further Sanctions (at 9-10, 14-15).  Mr. Jaeban couldn't be bothered to defend these requests.  His Response (at 10) refers the Court to his

---

[4] It is bizarre for Mr. Jaeban to complain that BRACII is responsible for the delay caused by the postponing of the depositions in August.  This amounts to blaming the victim; BRACII could not proceed blindly with depositions of witnesses who could not be summoned to the United States faced with two large productions of documents and the uncertainty whether the November 2003 production was tainted. In any event, with the exception of one witness, Mr. Jaeban's U.S. counsel agreed to the postponement. Wile Reply Aff., ¶ 4.

[5] This review has led to a multi-week farce in which Mr. Jaeban's English counsel refused to identify which documents were withheld following the review that allegedly did not occur.  While the parties have finally agreed on a procedure for resolving this issue, it has taken far too long for Mr. Jaeban's counsel to take a position on whether the documents are responsive (in which case any objection is frivolous under the litigation exemption in Section 35 of the Act) or nonresponsive.

Motion for Order Reopening Limited Discovery, but that Motion nowhere discusses the specific contents or the burden and expense of the new (and almost *un*limited) discovery sought or he additional subpoenas he might like to file.[6]  His Motion to reopen discovery is relevant only in showing that his counsel paid little or no attention to BRACII's document production until some point after June 18th.

        As explained in BRACII's Response to Mr. Jaeban's Motion, leave should be denied given his failure even to identify, let alone meet, the applicable standard for the relief that he seeks.  The point on BRACII's Motion for Further Sanctions is Mr. Jaeban's utter indifference to his responsibilities to the Court and to BRACII in seeking a lengthy delay for these documents.

### D.    Jaeban UK's Discovery Misconduct

        BRACII has saved the discovery misconduct issue for last because it is the most egregious.  To review: Mr. Jaeban's counsel told *both* Kenneth Wile and Phillip Taylor, counsel for BRACII, that PriceWaterhouseCoopers ("PwC") may have selected documents for production based on someone's notion of "relevance" -- and thus may not have produced responsive documents despite the absence of a written objection to the Joint First Document Request.[7]  Both Mr. Wilcox (at ¶ 3) and Mr. Jaeban (at ¶ 4) affirm Wragges was involved in the document review leading up to the November 2003 production.

        Either Jaeban UK produced all responsive documents in 2003 or it did not.  We

---

[6] The night before the filing of this Reply, Mr. Jaeban tacitly admitted that the requests are improper by suddenly sending an e-mail offering a discovery conference on their overbreadth.  Because the requests are a basis for sanctions and any further document discovery of BRACII is untimely, BRACII declined to participate in this last-minute gamesmanship.

[7] Motion for Further Sanctions, Ex. A, ¶ 16.  Mr. Wilcox does not deny that the conversation occurred. He instead (at ¶ 9) denies admitting that "that Jaeban UK might not have made a proper initial document production."  To eliminate any doubt, BRACII's English solicitor, Phillip Taylor, also affirms that Mr. Wilcox' informed BRACII's counsel on August 4th that PwC may have culled documents according to PwC's own notions of "relevance".  Taylor Aff., ¶ 3.

BA423

know from the limited supplemental production in June 2004 (Mr. Jaeban's sole effort at timely compliance with the May 25th Order), from the Welcome House documents, from the Receivers' documents discussed above (including Mr. Weatherall's October 15, 2003 letter), and the lever arch file (including, among other interesting documents, the Credit Pack) produced on August 3, 2004 that it did not.

       For six weeks, Mr. Jaeban has refused to tell BRACII and now this Court whether PwC conducted a proper review in accordance with the Federal Rules of Civil Procedure. He could easily do so. His refusal to do so not only merits serious sanctions, but continues to leave the impression that BRACII has been prejudiced in ways it will never know.

       Since Wragges was involved in the production, it knows the answer to the question. Mr. Jaeban's current English solicitor was associated with Wragges until July 2004. Both as a former client of Wragges and under the terms of the Deed of Assignment quoted above, Mr. Jaeban is entitled to an answer -- and no affidavit has been submitted indicating an unwillingness by Wragges to provide that answer. It is not unduly cynical to suggest that, if Mr. Jaeban had an answer favorable to his cause to give, he would have given it already -- and eliminated the issue.

       Although Mr. Jaeban could have revealed what procedure PwC used, he cannot reveal, because he does not know, the extent of the prejudice to BRACII. There is the obvious prejudice to BRACII from the dribbling out of significant documents six to eight months later. More troubling are any documents that BRACII may never see because they were not produced in November 2003 and cannot be produced now. BRACII notes as examples the absence of *any* correspondence discussing Jaeban UK's troubled financial condition with its lenders (the Credit Pack speaks to Jaeban UK's supposed strengths and allegedly was not sent), the scarcity of documents discussing the impact of September 11th on Jaeban UK, and the scarcity of documents

8

discussing the potential insolvency of BRACII or the appointment of its Administrators as examples.

Mr. Jaeban has not disclosed to the Court that his English solicitor has initiated an as-yet-uncompleted search of Jaeban UK's former e-mail system to determine if it contains responsive emails that have not been produced.[8] *See* Wile Reply Aff., ¶¶ 5-6. Whatever the search eventually discloses months after the June 18th deadline, the decision to conduct the search confirms Mr. Jaeban's inability to assure BRACII and the Court that no significant documents were lost. Since BRACII does not have access to Jaeban UK's systems and files beyond what has been (belatedly) provided to it, Mr. Jaeban bears the burden of showing the absence of prejudice and has shown he is unable to do so.

This issue should have been disclosed to BRACII and resolved by June 18th. Even leaving the yet-more-belated e-mail search to one side, Mr. Jaeban has violated his duty of candor to the Court to explain what occurred. He should not be allowed to benefit from his conduct.

## II.    MR. JAEBAN'S CONDUCT FULLY JUSTIFIES THE SEVERE SANCTIONS PREVIOUSLY HELD IN ABEYANCE.

Courts readily impose harsh sanctions on litigants who have been warned previously that future noncompliance will have harsh consequences. In *Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 46 (1st Cir. 2002) (citations omitted), the First Circuit noted:

> "Although dismissal ordinarily should be employed only when a plaintiff's conduct is extreme, disobedience of court orders, in and of itself, constitutes extreme misconduct (and, thus, warrants dismissal). This principle applies with undiminished force to scheduling orders."

---

[8] BRACII first learned of this effort on August 11, 2004 as a result of a misdirected e-mail from Mr. Jaeban's English counsel (Wile Reply Aff., ¶ 5) and has been awaiting the results ever since. As a courtesy to counsel, BRACII did not raise this process in its Motion. BRACII was surprised by Mr. Jaeban's failure to disclose the process himself in his Response and by his assertions (a) the Receivers were unwilling to cooperate with Mr. Jaeban and (b) he "continue[s] to have confidence" in the 2003 document production (Jaeban Aff., ¶ 4), despite commissioning an expert to discover what was not produced.

9

The Court of Appeals affirmed dismissal of plaintiff's complaint where the plaintiff gave "insufficient justification for his failure to comply. *Id.* at 47.

Mr. Jaeban's principal response is to pretend he has done nothing wrong. The facts are otherwise. He nowhere shows that he attempted to comply with the June 18th deadline with respect to any of these issues. His treatment of the November 2003 production issue falls far short of good faith and he has not dispelled the appearance of probable prejudice. His proposed new document requests were designed to create further delay. Although Mr. Jaeban now extols his belated compliance on the Receivers' and Welcome House documents, he has created precisely the delay and prejudice to BRACII that the May 25th Order was intended to prevent.

Accordingly, and as the Court may have anticipated, BRACII is indeed "seeking other sanctions that may be appropriate under the circumstances after the discovery period has lapsed." May 25th Order at 16. Lesser sanctions have not worked; the June 18th deadline for Mr. Jaeban to *complete* document discovery was itself such a sanction and Mr. Jaeban did not find it worthwhile to comply. Moreover, there is no longer any reason to shield Mr. Jaeban from the consequences of his assignor's previous violations of the Court's Orders. The Court's unwillingness to do so was predicated on the absence of misconduct by Mr. Jaeban. *Id.* at 10. Given Mr. Jaeban's multiple failures to comply with the May 25th Order, that reason has now vanished.

This Court has ample discretion to strike counterclaims that Jaeban UK's own counsel did not believe to have merit. The power to strike them and the Court's broad powers under 11 U.S.C. § 105(a) necessarily include the power to eliminate the $4.5 million escrow (set

10

BA426

up on a meritless claim) as a lesser sanction. Any milder sanction will reward Mr. Jaeban for his conduct.

## CONCLUSION

Wherefore, BRACII respectfully requests that the Court enter an Order striking Jaeban UK's Counterclaims or, in the alternative, eliminating the $4.5 million escrow account and awarding BRACII the additional relief sought by its Motion and such other and further relief as the Court deems just and proper.

Dated: September 18, 2004

Respectfully submitted,

**SIDLEY AUSTIN BROWN & WOOD LLP**

Kenneth E. Wile
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Robert S. Brady (Bar No. 2847)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

Counsel for Debtors and Debtors-in-Possession BRAC Group, Inc., *et al.*

11

BA427

**Exhibit A to Reply**

BA428

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | Case No. 02-12152 (CGC) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al*, | |
| Plaintiffs, v. | 03-A-54271 |
| Jaeban (U.K.) Limited, *et al.*, | |
| Defendants. | |

### REPLY AFFIDAVIT OF KENNETH E. WILE

KENNETH E WILE, being duly sworn, deposes and says:

1.    I am a member of the Illinois and New York bars and a counsel in the Chicago office of Sidley Austin Brown & Wood LLP ("Sidley"). I am one of the attorneys representing Budget Rent-A-Car International, Inc. ("BRACII") and the other Debtors in the above-captioned adversary proceeding against Jaeban (UK) Limited ("Jaeban UK") and Mr. Ibrahiem Jaeban.

2.    Among the documents I asked to be copied during my document review at the office of the Jaeban UK Receivers are (a) documents detailing the financial condition of Jaeban UK during the relevant period (e.g., corporate tax computations; schedules prepared by the Receivers; an independent business analysis); (b) documents detailing the relationship

BA429

between Jaeban UK and Zodiac Rent a Car Limited ("Zodiac"), Avis Europe plc's affiliate,

following the sale of BRACII's assets; documents commenting directly on this adversary

proceeding; and the document attached as Exhibit B to BRACII's Reply Memorandum.

      3.     Among the documents that my Sidley London colleagues copied from the

August 2004 Welcome House production are the following significant documents:

a.     The Business Sale Agreement with BTI (BRACII's former subsidiary) whereby Jaeban UK purchased numerous sites in connection with the Umbrella Agreement.

b.     A set of Jaeban UK management accounts and forecasts in 2001 (which are relevant both to the merits and Mr. Jaeban's fanciful damage claims).

c.     Several documents regarding Jaeban UK's Edinburgh and Glasgow airport sites, including Jaeban UK's executed contracts that were previously produced in incomplete form.

d.     Key documents regarding Jaeban UK's failed relationship with Zodiac.

e.     Correspondence with certain lenders regarding Jaeban UK's credit limits.

f.     At least one document and a whiteboard concerned with the contested BMS computer system.

      4.     Although Robert Wilcox, Mr. Jaeban's U.S. counsel, disagreed with the

postponement of the Terry Clark deposition, he later agreed with me during a telephone

conversation that all other depositions should be postponed.

      5.     I first learned that Mr. Jaeban had commissioned a search of Jaeban UK's

e-mails systems through an e-mail that Mr. Allen misdirected to my colleague Phillip Taylor and

me on August 11, 2004 and a subsequent e-mail from Mr. Allen claiming litigation privilege but

explaining the process and reserving the right to claim that BRACII had not been prejudiced.

Copies of these e-mails are attached as Exhibit A, *infra*.

      6.     During the week of September 13, 2004, I have twice confirmed with Mr.

2

**BA430**

Jaeban's counsel that this process is continuing.  I also informed them that BRACII would refer

to this process in its Reply.

Kenneth E. Wile

Sworn to before me this
18th day of September, 2004

Notary Public

My Commission expires
Oct. 30, 2007
Cook Co. Illinois

3

BA431

**Exhibit A to Wile Affidavit**

BA432

FW: Jaeban

## Wile, Kenneth E.

**From:**    Taylor, Phillip D.
**Sent:**    Friday, September 17, 2004 4:59 PM
**To:**      Wile, Kenneth E.
**Subject:** FW: Jaeban


-----Original Message-----
**From:** Steven Allen [mailto:Steven.Allen@mills-reeve.com]
**Sent:** 11 August 2004 09:57
**To:** 'kwile@sidley.com'
**Cc:** 'ptaylor@sidley.com'
**Subject:** FW: Jaeban

I have not received from your London office the undertaking requested in my letter of 10 August
The papers from Welcome House are in a van waiting to be delivered however I must have the necessary
undertaking as you are receiving original documents  This is a standard undertaking in the UK and should not
cause you any difficulties.

  -----Original Message-----
  **From:**  Steven Allen
  **Sent:**  11 August 2004 09:22
  **To:**    'john.f.tracey@uk.pwcglobal.com'
  **Subject:**    Jaeban

John

I have been persuaded by Ian Weatherall to act for Mr Jaeban in his claim against BRACII.

The right of action was assigned to him by the Receiver on 20 February 2004. Ian will continue to act for the
Receiver.

There are two areas where I am likely to need your assistance (1) the Report following on from the process
undertaken in March 2003 and (2) the possibility of your computer buffs extracting date from the old Jaeban (UK)
computers.

Please clarify your position on fees  Mr Jaeban has been advised that any fees for work undertaken by M&R must
be paid up front. I have told him that that would also be the case for PWC. The issue is whether (1) you are
prepared to get involved in this again? (2) if so how much will you require on account of costs? (3) in relation to
any outstanding fees from Jaeban UK are you prepared to accept that Mr Jaeban and Jaeban UK are separate
entities and not hold him responsible for Jaeban UK's debt?

Please let me know asap.

regards

**Steve Allen**
Partner
Mills & Reeve gain
Tel: +44(0)121 456 8343


9/18/2004

BA433

mailto:steven.allen@mills-reeve.com
http://www.mills-reeve.com

This email is confidential and privileged. If you are not the intended
recipient please accept our apologies; please do not disclose, copy,
or distribute information in this email nor take any action in reliance
on its contents: to do so is strictly prohibited and may be unlawful.
Please inform us that this message has gone astray before deleting
it. Thank you for your co-operation.

Mills & Reeve Solicitors, offices at:

Birmingham: 54 Hagley Road, Edgbaston, Birmingham B16 8PE.
Cambridge: Francis House, 112 Hills Road, Cambridge CB2 1PH.
Norwich: 1 St James Court, Whitefriars, Norwich NR3 1RU.
London: Bankside House, 107-112 Leadenhall Street, London EC3A 4AF.

Mills & Reeve is regulated by the Law Society.

A list of Partners may be inspected at any of the above addresses.

Visit our web site at: http://www.mills-reeve.com

This message has been checked for viruses by the Mills & Reeve
screening system.

9/18/2004

BA434

## Wile, Kenneth E.

| | |
|---|---|
| **From:** | Steven Allen [Steven.Allen@mills-reeve.com] |
| **Sent:** | Wednesday, August 11, 2004 10:20 AM |
| **To:** | 'ptaylor@sidley.com' |
| **Cc:** | 'kwile@sidley.com' |
| **Subject:** | Jaeban |

It would appear that I have in error forwarded to you a confidential e-mail protected by litigation privilege I assume that you will have read the e-mail. I want to make it clear that we are not currently clear as to whether the old Jaeban UK computors are available for interrogation. Enquiries are being made with the Receivers. I have asked PWC for a quotation in sending their computer experts in to extract data should the computers be available for inspection. This is of course without prejudice to Mr Jaeban's contention that all computer data pertaining to this dispute has been extracted and included in discovery to date.

Steve Allen
Partner
Mills & Reeve
Tel: +44(0)121 456 8343
mailto:steven.allen@mills-reeve.com
http://www.mills-reeve.com

---

This email is confidential and privileged. If you are not the intended
recipient please accept our apologies; please do not disclose, copy,
or distribute information in this email nor take any action in reliance
on its contents: to do so is strictly prohibited and may be unlawful.
Please inform us that this message has gone astray before deleting
it. Thank you for your co-operation.

Mills & Reeve Solicitors, offices at:

Birmingham: 54 Hagley Road, Edgbaston, Birmingham B16 8PE.
Cambridge: Francis House, 112 Hills Road, Cambridge CB2 1PH.
Norwich: 1 St James Court, Whitefriars, Norwich NR3 1RU.
London: Bankside House, 107-112 Leadenhall Street, London EC3A 4AF.

Mills & Reeve is regulated by the Law Society.

A list of Partners may be inspected at any of the above addresses.

Visit our web site at: http://www.mills-reeve.com

BA435

Jaeban                                                                Page 2 of 2

This message has been checked for viruses by the Mills & Reeve
screening system.

9/18/2004

**Exhibit B to Reply**

**Richard Wallace**
09/03/04 10:33          To: Mick O'Connor/Birmingham/Robson Rhodes
                        cc:
                        Subject: Jaeban property

Mick

and file note

Ibrahelm indicates that his solicitors should be in funds within the next 48 hours and that there should be exchange of contracts this week. I don't believe him.

He also asked if the Close second charge on his home could be removed - I was not aware that there was one and said I would refer the matter to you.

Regards

Richard

**Exhibit C to Reply**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | Case No. 02-12152 (CGC) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), *et al.*, | |
| Plaintiffs, | 03-A-54271 |
| v. | |
| Jaeban (U.K.) Limited, *et al.*, | |
| Defendants. | |

### REPLY AFFIDAVIT OF PHILLIP TAYLOR

I, PHILLIP TAYLOR, of 25 Basinghall Street, London EC2V 5HA,

hereby make oath and say:

1.      I am qualified as a solicitor in England and Wales.  I am associated

with Sidley Austin Brown & Wood and practise in the Firm's London office.

2.      At Kenneth Wile's request, I assembled a team of associates and

trainee solicitors to review the contents of 84 boxes which I understand were produced by

Mr. Jaeban from Welcome House.  According to the timekeeping records I have

reviewed, it took the team (along with myself and Mr. Wile) in aggregate more than 65

hours to review the contents of the boxes, catalogue such contents, and identify the most

significant documents for Mr. Wile and I to review.

3.      On August 4, 2004, in Birmingham, England, Mr. Jaeban's U.S. counsel, Robert Wilcox, informed Mr. Wile and I that Jaeban (U.K.) Limited had employed PriceWaterhouseCoopers ("PwC") to conduct the document review that apparently led to the production of documents to Budget Rent-a-Car International, Inc. ("BRACII") in November 2003. During that conversation, Mr. Wilcox informed Mr. Wile and I that PwC may have applied their own criteria as to relevance when selecting documents for production to BRACII.

Sworn before me:

Solicitor.

at:

## CERTIFICATE OF SERVICE

I, Edmon L. Morton, Esquire, hereby certify that I am not less than 18 years of age, and that on September 18, 2004, I caused a copy of the foregoing to be served upon the parties identified on the attached service list in the manner indicated thereon.

Date: September 18, 2004

Edmon L. Morton (No. 3856)

**BA442**

**SERVICE LIST**
**BRACII**
**9/18/2004**

Messrs. John Whitfield & Gerald Clifford Smith
Administrative Receivers of Jaeban (UK) Limited
c/o RSM Robson Rhodes LLP
7 Hill Street, Centre City Tower
Birmingham, B5 4UU UK
*Federal Express (International)*

Steve Allen, Esq.
Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham B16 8PE, England
Counsel for Jaeban UK Limited
*Federal Express (International)*
*E-mail: steven.allen@mills-reeve.com*

Mark D. Collins, Esq.
Rebecca Booth, Esq.
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(Counsel for Joint Administrators of BRAC)
(Rent-A-Car International, Inc.)
*Hand Delivery*
*E-mail: bsullivan@werbsullivan.com &*
*bsull3aol.com*

Larry J. Nyhan, Esq.
Matthew A. Clemente, Esq.
Sidley Austin Brown & Wood
10 South Dearborn Street, BankOne Plaza
Chicago, IL 60603
(Co-counsel for BRACII)
*Federal Express*
*E-mail: kwile@sidley.com*

Office of the United States Trustee
844 King Street, Suite 2313
Lock Box 35
Wilmington, DE 19801
*Hand Delivery*

Brian A. Sullivan, Esq.
Werb & Sullivan
300 Delaware Avenue, 10th Floor
P.O. Box 25046
Wilmington, DE 19899
(Counsel for Ibrahiem Jaeban)
*Hand Delivery*
*E-mail: bsullivan@werbsullivan.com &*
*bsull3aol.com*

Ian Weatherall, Esq.
Wragge & Co. LLP
55 Colmore Row
Birmingham B3 2AS, England
(Counsel for Receivers of Jaeban)
*Federal Express (International)*
*E-mail: ian_weatherall@wragge.com*

Chambers of The Honorable Charles G. Case II
United States Bankruptcy Judge
U.S. Bankruptcy Court - District of Arizona
2929 N. Central Avenue, 9th Floor
Courtroom #6
Phoenix, AZ 85012
*Federal Express*