23

1   has withheld documents for, in fact there was a pending

2   objection to that document request that was never addressed

3   by BRACII.  BRACII has never held a discovery conference on

4   that issue.  The objections, and I believe they are before

5   the Court, the objections were that they were overbroad and

6   burdensome.  BRACII never did anything to address those

7   concerns.  For them to come back in now and say that somehow

8   Mr. Jaeban even though he spent $8,000 to have the receiver

9   produce those documents, somehow did not comply with the

10  Court's direction in the May 25th order is not correct.

11          THE COURT:  Well, what exactly happened from a

12  timing standpoint prior to June 18th?

13          MR. WILCOX:  Well, I believe Mr. Allen is on the

14  telephone, and he probably --

15          THE COURT:  The suggestion -- Mr. Wile's suggestion

16  is that there was the May 25th order that set a June 18

17  deadline and that it was well after June 18 before Mr. Jaeban

18  or his counsel kind of got geared up to even look for some of

19  the stuff.  I think, you know, that to put a gloss on it,

20  that's really what he's saying, and what's your response to

21  that?

22          MR. WILCOX:  Well, Your Honor, I believe without

23  going into attorney/client privilege issues, Wragge and Co.

24  conducted a document review in response to Mr. Jaeban's

25  request.  I believe that's what was produced in what I will

24

1  call the supplemental document production. With regard to

2  the receiver, the receiver took the position from the date of

3  the May 25th order up until August 25th -- August 1st, that

4  he had no responsive documents. We were not in a position --

5  Mr. Jaeban was not in a position to overrule the receiver on

6  that particular issue. Mr. Jaeban --

7          THE COURT: Presumably the receiver had the

8  contractual obligation to cooperate with Mr. Jaeban; correct?

9  Under the deed of assignment, that was part of the deal.

10         MR. WILCOX: Well, I think that's open to

11  interpretation, Your Honor. I will say as a practical

12  matter, Mr. Jaeban did not have the ability to compel the

13  receiver to produce documents.

14         THE COURT: I wasn't saying that. I wasn't saying

15  that he had the right to compel him or control him

16  necessarily, but the receiver did have a contractual

17  obligation under the deed of assignment to cooperate. The

18  receiver could not take the position without breach of

19  contract that this is none of my affair, I'm not going to

20  even bother. What you're suggesting is that the receiver's

21  position was, Sure, I'd be glad to cooperate if I had

22  something but I don't have anything.

23         MR. WILCOX: He took that position, and then he

24  also took the position that some of those documents are

25  privileged and could expose the receivers to personal

25

1    liability.

2         THE COURT:  So, notwithstanding the contractual

3    obligation to cooperate, the receiver nevertheless said,

4    Well, this is too close to home.  I'm not going to give you

5    the documents.

6         MR. WILCOX:  And this was addressed when we

7    traveled there in August.  I mean, we really had -- the

8    receiver really put everybody in an impossible position

9    because he took the position, first of all, that there was a

10   pending objection to the document request.  Secondly, that

11   the documents that he had were not responsive to the document

12   request, and then we said, Well, we would like you to make

13   the documents available just to assuage the plaintiffs and

14   take that issue away so we can continue with the depositions.

15   The receiver's position at that point was, We can't do that

16   without a privilege review and by the way, we have no money

17   to pay for a privilege review, and we saw this with the

18   receiver not only in connection with Mr. Jaeban, but in the

19   actual receiver's files, which I viewed relatively briefly

20   and I believe Mr. Wile also reviewed.  There was

21   correspondence in which the receiver basically said, Under

22   English law, I have no responsibility to produce documents to

23   any third party.  Now, may he have had a purely contractual

24   ability that Mr. Jaeban could enforce, you know, after filing

25   a complaint and a trial?  We're not happy with the receiver's

BA501

26

1   position because my client, Mr. Jaeban, continues to be

2   prejudiced by the receiver's actions in this case. There is

3   absolutely no doubt about that, and much of what we're trying

4   to do with regard to discovery and otherwise is an attempt to

5   take away that prejudice. To the extent that there was

6   prejudice to BRACII, we tried to take away that prejudice,

7   Your Honor. We think that the course that the --

8           THE COURT: Well, is there anybody -- We have

9   somebody for the estate administrator, that's the BRACII

10  estate administrator.

11          MR. WILCOX: That's right.

12          THE COURT: We don't have anybody for the receivers

13  on the phone here.

14          MR. WILCOX: That's right.

15          THE COURT: I guess I don't quite understand how

16  the receivers can in effect sell this cause of action through

17  this deed of assignment to Mr. Jaeban, get paid for it, and

18  have as part of the consideration or part of the agreement,

19  this contractual obligation to cooperate and then simply say,

20  Well, sorry, we're not going to do it.

21          MR. WILCOX: Well, let me go back, Your Honor.

22  First of all he took the position there was a pending

23  objection to the discovery requests, and it had never been

24  addressed. Secondly, he took the position --

25          THE COURT: Hadn't taken an objection by whom?

27

1    Where?

2            MR. WILCOX:  By the receiver filed by Morris,

3    Nichols, as one of their relatively -- near the end of their

4    tenure of the case.  So, if we --

5            THE COURT:  Notwithstanding the order that I had

6    subsequently issued that said, produce the documents.

7            MR. WILCOX:  Well, that -- It's not clear to me,

8    Your Honor, whether you were essentially overruling the

9    objections that had never been -- that had never been

10   addressed between counsel.  Mr. Jaeban requested that the

11   receiver produce documents and conduct a review, the

12   receiver's response was, I have conducted review.  My

13   documents are not responsive to the request.  Okay?  Did Mr.

14   Jaeban potentially have a contractual cause of action that he

15   could have sued the receiver?  He might, he might have, and

16   he may have that today.  But that doesn't change the question

17   of Mr. Jaeban's good faith because as a practical matter, and

18   I can tell you this from personal experience, the receiver

19   was incredibly difficult to deal with.

20           THE COURT:  Well, I have not committed to memory

21   all of the papers that are in front of me, so, remind me

22   again the timing of what was done by Mr. Jaeban viz-a-viz the

23   receiver to get the receiver to produce these documents prior

24   to the June 18 deadline?

25           MR. WILCOX:  Perhaps Mr. Allen could address this

28

1   in more complete detail.  My understanding is, and I have

2   been told this, is that Mr. Jaeban went --

3          THE COURT:  Why don't we do this?  Why don't I ask

4   Mr. Allen.  Are you there, Mr. Allen?

5          MR. ALLEN (TELEPHONIC):  I am, Your Honor.

6          THE COURT:  Is this a matter as to which --

7          MR. ALLEN (TELEPHONIC):  Mr. Jaeban was . . .

8   (microphone not recording) --

9          THE COURT:  Mr. Allen, Mr. Allen, we're having a

10  very difficult time understanding you.  I think you're

11  partially breaking up so like half of a word is missing.  Are

12  you on a speaker phone?

13         MR. ALLEN (TELEPHONIC):  I'm not on a speaker

14  phone, Your Honor . . . (microphone not recording).

15         THE COURT:  All right.  Sounds a little better.

16  I'm sorry, will you start again, because none of us here were

17  able to understand what you were saying.

18         MR. ALLEN (TELEPHONIC):  Your Honor, the position

19  was that Mr. Jaeban as asking the receiver's representative

20  within Wragge and Co., John Whitborough (phonetical) who was

21  the representative of the receiver, to advise whether or not

22  any documents within the receiver's papers were responsive

23  documents to the joint second request.  At that stage,

24  certainly, Your Honor, it was not the impression given that

25  we just may have given a wrong impression, but, Your Honor,

**BA504**

29

1   we were not under the impression certainly either as

2   representatives of Mr. Jaeban, and certainly the receiver was

3   not aware that the order of the 25th of May overruled Jaeban

4   U.K.'s objection at that stage for the disclosure of the

5   receiver's papers.  The receiver, therefore, was saying that

6   they only had an obligation to cooperate insofar as they had

7   any documents pertaining to the responses by Morris, Nichols,

8   which effectively said that no documents would be produced

9   unless they were non-privileged documents that referred or

10  related to the adversary proceedings or an issue in the

11  adversary proceedings.  Your Honor, the position taken by

12  Wragge and Co. was that there were no responsive documents,

13  and, Your Honor, that is still the position taken by them,

14  and indeed, it is contested as far as the receiver is

15  concerned and there is no representative from the receiver

16  here, but it's certainly my knowledge from my discussions

17  with them and indeed Mr. Jaeban contests that the documents

18  that Mr. Wile says are responsive documents are not

19  responsive documents because they do not relate to the

20  adversary proceedings.  The documents that he has produce

21  relate to an entirely different matter as I understand Mr.

22  Sullivan has dealt with and Mr. Wilcox has dealt with in

23  their response.  Those documents relate to an inquiry by the

24  receiver as to whether or not Mr. Jaeban should he want to be

25  allowed to set up an independent company which might possibly

BA505

30

1   compete with Zodiac, not BRACII. We're talking here about

2   Zodiac. After the assignment of the IPLA agreements and

3   agreements to Zodiac. So, Mr. Jaeban was asking for whether

4   or not there were any documents that would comply with the

5   responses that were being put in by Jaeban U.K. Limited, and

6   he was told there were not and therefore, there was no

7   obligation to comply with any terms of the agreement. Your

8   Honor --

9          THE COURT: Let me ask you this question -- Mr.

10  Allen -- Mr. Allen, let me ask you this question: To what

11  extent was this issue having to do with the pendency of the

12  objection to the document request brought to the attention of

13  BRACII's counsel prior to the June 18 deadline?

14         MR. ALLEN (TELEPHONIC): Your Honor, I can't hear

15  the question. I'm sorry.

16         THE COURT: Well, here's what I'm concerned about.

17  I set a June 18 deadline in my May 25 order. I must tell you

18  I did not address or think about the --

19         MR. ALLEN (TELEPHONIC): Your Honor, the line is

20  terribly bad. I can't actually hear . . . (microphone not

21  recording).

22         THE COURT: Well, let me try again. Is that

23  better?

24         MR. ALLEN (TELEPHONIC): No.

25         THE COURT: Well, I will say it then for other

**BA506**

31

1  counsel and maybe somebody else can answer my question. When

2  I set the June 18th deadline in my May 25 order for the

3  production by Mr. Jaeban as in effect a sanction being

4  imposed at the request or based upon the motion to strike

5  that had been filed by BRACII, I did not consider that there

6  may be outstanding objections. I don't recall that the

7  papers at that time made that point. If they did, I didn't

8  consider it. I can just tell you that honestly. So, I

9  didn't build into my order any mechanism for resolving any

10  pending objections that may have been put on the table by

11  Morris, Nichols before it withdrew. Now, having said that,

12  the question is, to what extent was that issue brought to the

13  attention of BRACII's counsel prior to the time of the

14  expiration of the June 18 deadline? I would think that if

15  I'm Mr. Jaeban's counsel and I'm not getting documents from

16  the receiver because the receiver is not willing to produce

17  them because of these pending objections that have not yet

18  been ruled on by the Court, then I'm going to make that known

19  to BRACII before I find myself up against the June 18

20  deadline or I would think I'm going to file an emergency

21  motion with the Court saying I need to have that date

22  extended because we're trying to get the documents from the

23  receiver, but the receiver's not cooperating because of these

24  unresolved objections. Now, did any of that happen? Let me

25  ask Mr. Wilcox --

32

1    MR. ALLEN (TELEPHONIC): Well, Your Honor, no,

2    because Mr. Jaeban was told by the receiver's representatives

3    that there were no responsive documents.

4    THE COURT: Well, let me ask this question.

5    Perhaps I'll ask Mr. Wilcox. Number one, can you answer my

6    question, Mr. Wilcox, and number two, at what point prior to

7    June 18 did Mr. Jaeban's counsel advise BRACII's counsel that

8    the receiver said there were no responsive documents or that

9    it would not produce documents until such time as the

10   objection was resolved?

11   MR. WILCOX: I'm not aware of any discussions in

12   that regard, as a matter of candor with the Court.

13   THE COURT: And doesn't that just make the

14   situation worse? Doesn't that foster this environment in

15   which we find ourselves now arguing over who has complied and

16   who hasn't complied when there was, I think everybody would

17   agree, a firm deadline that was set in the May 25th order by

18   me. And the reason I set the deadline was as an optional

19   kind of relief that I thought was consistent with what Mr.

20   Jaeban was asking for, which was, give us some more time here

21   to produce these documents. I'm now in the driver's seat.

22   I've taken over. I have the deed of assignment. I can do

23   these things. I have a contractual obligation or contractual

24   arrangement with the receiver where they will produce the

25   documents. So then nothing happens, and then there's radio

1  silence up until June 18th and now surprisingly, BRACII is

2  unhappy.

3  MR. SULLIVAN (TELEPHONIC): Let me -- This is Brian

4  Sullivan, Your Honor. Let me just try to aid the Court in

5  whatever way I can. I was communicating with both Wragge and

6  Company and Ken Wile with regard to the supplemental document

7  production and trying to communicate what we were expecting

8  and when we were expecting it, and there was a fair amount of

9  communication between Ken Wile and myself, and I believe to

10  the best of my recollection, Judge and Ken, that I was

11  informing Mr. Wile that the receiver would not produce

12  documents. I don't believe that anybody at that point, Your

13  Honor, was focused on the objection as much as number one,

14  the receiver taking the position that he would not produce

15  them, and I hope I'm correct, Ken, but I think we all knew

16  that as both the June 18th date approached and also the date

17  for the depositions in August and also, Your Honor, shortly

18  at about that time the receiver's position that the documents

19  were not responsive so we apologize if we did not focus on

20  the objection as maybe we should have, and if the Court

21  believes that we should have come in and extended the date in

22  the middle of the fur flying we also apologize for that.

23  That might have helped, but I will say that there was a vast

24  amount of communication between the parties as to what was

25  happening and what wasn't happening. So we were not aware of

34

1   the strong position that the depositions wouldn't go forward.

2   There's no doubt that BRACII knew they didn't have the

3   receiver's documents when they went over to England for the

4   depositions.  There's no doubt about that.  So I hope that

5   that information helps the Court.

6          THE COURT:  All right.  Well, unfortunately we're

7   running out of time, so we need to kind of move through this

8   and wrap it up as quickly as possible.  All right, Mr.

9   Wilcox?

10         MR. WILCOX:  Thank you, Your Honor.  We don't

11  believe that sanctions are appropriate here.  We certainly

12  don't believe that striking a counterclaim is an appropriate

13  remedy.  We don't believe that the abolition of the escrow

14  agreement -- There's really no -- The worst I think that can

15  be said about Mr. Jaeban is that he was not able to produce

16  the documents as quickly as the Court would have liked.

17  There's no -- We think he made a good effort.  We think he

18  produced -- did the supplemental production in a timely

19  fashion.  So we do not -- just for the record, let me be

20  clear, we do not accept that he -- We do not accept the

21  plaintiffs' position that he failed to comply with the order.

22  But what frustrates us is that when we made -- Every time

23  we've made an attempt to address the concerns, without taking

24  a hyper-technical approach to discovery, we've ended up with

25  increased problems, and we believe that we have produced far

**BA510**

1    more documents than the plaintiffs have in this case. That's

2    really not an issue for the motion for sanctions. We also

3    feel that the plaintiffs have engaged in what can only be

4    described as character assassination. The inclusion of e-

5    mails from the receiver on totally unrelated topics have no

6    business in the reply. The reply also raises a number of new

7    issues. Let me address also Mr. Wile's inclusion of Mr.

8    Allen's e-mail regarding the computer system. That's an

9    attempt to address a discovery issue and resolve a problem.

10   In the plaintiffs' hands it sounds like -- they're trying to

11   make it sound like we're concealing information. We never

12   concealed information. Those are the directions from our

13   client because, quite frankly, we think the merits are in our

14   favor in this case.

15           THE COURT: All right. Let me just ask you briefly

16   before you sit down, Mr. Wilcox, to address your motion to

17   reopen discovery.

18           MR. WILCOX: Thank you, Your Honor. We address in

19   our motion that a document request was served upon BRACII a

20   long time ago. They filed an objection. The receiver didn't

21   follow up on it, and, granted, we did not conduct a discovery

22   conference. But basically, if I may characterize the

23   plaintiffs' position, it's that we don't have the documents

24   that were sold to AVIS. The vast majority of the documents

25   were sold to AVIS. The computer system was sold to AVIS. As

1    a result, Your Honor, we have three Lever Arch files --

2    excuse me, now four due to the supplemental production that

3    occurred in England. I'm trying to take away the prejudice

4    to Mr. Jaeban from the receiver's lack of follow-up on the

5    plaintiffs' position that they don't have the documents.

6    We're just trying to get the documents. Unfortunately the

7    plaintiffs no longer have them. We're trying to get them

8    from the party that does have them. Additionally, Your

9    Honor, the plaintiffs filed an amended complaint in July

10   asserting a new claim against Mr. Jaeban on a personal

11   guarantee. That came after the expiration of the discovery

12   period. Mr. Jaeban has had no opportunity to take any

13   discovery, document requests, interrogatories, depositions,

14   whatever with regard to that. Obviously we're extremely

15   concerned about that, and it's crucial that the Court allow

16   him the opportunity to take discovery to defend himself on a

17   $900,000 claim.

18            THE COURT: Okay, thank you. Mr. Wile, you have

19   about two minutes.

20            MR. WILE: I know I have to be as quick as

21   possible. Let me begin with receiver's documents. I really

22   am startled by what I've heard because most of what we wanted

23   and the most interesting documents produced were in response

24   to our first document request. Mr. Jaeban's letter of 30

25   January, I do not agree with the Ian Weatherall of Wragge and

1   Co. with reference to the claim against Budget International.

2   And it goes on from there.  That is responsive to our first

3   set of requests, and by the way, the receivers are in fact

4   agents of Jaeban U.K.  The prior one establishes a

5   ratification defense.  There's other financial information

6   that was responsive to our first document request, and I just

7   don't understand why they weren't produced, and it's

8   certainly news to me that they could have been produced.  I

9   simply don't recall.  I did have a number of conversations

10  with Brian Sullivan.  I frankly, for better and for worse,

11  simply recall him telling me that.  I'm certainly not saying

12  that that's not the case, I just have to candidly tell the

13  Court, I don't have any recollection of it, and I know my

14  colleagues have not reminded me of it, but again, I didn't

15  minute every phone call that was there.  Back to Welcome

16  House for just a second.  In terms of trying to resolve the

17  credibility dispute between Mr. Wilcox and Mr. Taylor and --

18  I like Mr. Wilcox.  I don't like being in this position.  I

19  think the best way to resolve it is to look at what Mr.

20  Jaeban in fact has done, and I dare say if there weren't a

21  problem with that November 2003 production then Mr. Jaeban is

22  a smart entrepreneur, and I strongly doubt he would be paying

23  for a compute expert unless there was a problem to be

24  addressed and just to reiterate what we said was said was in

25  fact said on that score.  Turning to the motion for

38

quote/unquote "limited discovery", not only do Mr. Jaeban's document requests, which seek the moon and the sun, speak for themselves, interestingly only served after we made very strong challenges to their document production, but it took Mr. Jaeban until his reply, as opposed to say for example our discovery conference to bring up the guarantee. The guarantee was attached to both the original complaint and the amended complaint. He's always known about the guarantee, but the critical point here, Your Honor, is that they're the same facts. Secondary liability over the same liability. That's what the discovery's been about, and I can only tell the Court that, you know, Mr. Jaeban and his counsel waited more than six months after the assignment to suddenly discover that our document production was not all that they wanted and they certainly haven't cited a case and in my searches I could not find a case which said you can sleep on your rights for six months, suddenly wake up, after you've already consented to a pleading, but not selected to change the schedule and seek additional documents, and we do believe, not only as a matter of the excusable neglect standard, which they neglected to mention, but as a matter of sanctions as well, that allowing them to reopen discovery now would, as I cautioned in my -- said, rather, excuse me, in my opening remarks would reward them for complete indifference to June 18th, and with respect to our first document request,

**BA514**

39

1   I think it's clear that there was complete inaction before
2   June 18th with respect to the one Lever Arch file.  I hope I
3   haven't spoken too quickly, Your Honor.
4           THE COURT:  All right.  I will re-read all of these
5   filings.  I will issue an order as promptly as I can.  I am
6   not comforted that the parties have made every effort in this
7   case to move along to get to the merits in a thoughtful way.
8   I am always suspicious when everybody on both sides thinks
9   everything is so clear, which means to me that they are not
10  looking at things at all from the other person's perspective,
11  and that's true in both cases here, but rather have a clear
12  and righteous view of the world that may not be so clear upon
13  inspection.  I will take a close look again at the pleadings.
14  I will issue an order.  I will also advise you that upon
15  issuance of that order, it's my intention to have this case
16  transferred to a new judge who is Judge Jack Peterson out of
17  the District of Montana or such other judge as the Chief
18  Judge of the District of Delaware, Judge Walrath will
19  designate, and the reason for that is that my own -- you all
20  know, my own authorization to serve in Delaware on a resident
21  basis expired this month, and my ability to -- or my
22  authorization to serve in Delaware on a non-resident basis
23  will expire in December, and so to get this case to trial, it
24  will take somebody else.  I tell you that, because once I
25  issue my ruling on this, and of course that will all be a

BA515

40

1  matter of record that the new judge can review, but one never

2  knows what the new judge's opinion may be or approach to

3  these kinds of issues. So it's often better to make sure

4  that they don't get addressed if you want to actually get to

5  have the matter resolved. Be that as it may, that's what I'm

6  going to do in this case. I'll issue an order as soon as

7  possible. As you see, I've got boxes of documents, counsel

8  in the room, I'm in trial all day. I'm in trial all morning

9  tomorrow. I'm on an airplane gone for about ten days, so I

10 don't think you'll hear from me until the first week in

11 October at the earliest unless I can find some sleepless time

12 on an airplane to think about this. I apologize for that

13 delay but it's the best I can do.

14        MR. WILE: Your Honor, I think there's one issue on

15 which Mr. Wilcox and I do agree which is we greatly

16 appreciate the Court's effort throughout what has not always

17 been an easy case for any of us.

18        THE COURT: All right, so all three matters will be

19 deemed submitted. Sounds like the first matter is unopposed

20 except to the extent that the ruling on the motion for

21 sanctions may have an impact upon the scheduling of the

22 depositions. All right. With that, we're adjourned, thank

23 you.

24        ALL: Thank you, Your Honor.

25        (Whereupon at 9:09 a.m. the hearing in this matter

BA516

41

1    was concluded for this date.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15        I, Elaine M. Ryan, approved transcriber for the

16    United States Courts, certify that the foregoing is a correct

17    transcript from the electronic sound recording of the

18    proceedings in the above-entitled matter.

19

20    *Elaine M. Ryan*                          1-18-05
      Elaine M. Ryan
21    2801 Faulkland Road
      Wilmington, DE 19808
22    (302) 683-0221

23

24

25

BA517

# EXHIBIT C

BA518

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------ ----------)
                                                     )
In re                                                )    Chapter 11
                                                     )
BRAC GROUP, INC. (f/k/a BRAC Group,                  )    Case No. 02-12152 (MFW)
Inc.), et al.,                                       )
                                                     )
        Debtors.                                     )    (Jointly Administered)
                                                     )
------------------------------------------------------)
                                                     )
BRAC GROUP, INC. (f/k/a Budget Group,                )    03-A-54271
Inc.), et al.,                                       )
                                                     )
   Plaintiffs and Counterclaim Defendants,           )
                                                     )
v.                                                   )
                                                     )
Jaeban (U.K.) Limited,                               )
                                                     )
   Defendants and Counterclaim Plaintiff.            )
                                                     )
------------------------------------------------------)
```

### SECOND AFFIDAVIT OF IBRAHIEM JAEBAN

IBRAHIEM JAEBAN, being duly sworn, deposes and says:

1.  I am the former Managing Director and principal shareholder in Jaeban (UK) Limited (in administrative receivership) ("Jaeban UK") and my address is Forth House Farm, Isel, Near Cockermouth, Cumbria, United Kingdom, CA13 9SA. I am the assignee of Jaeban by virtue of a deed of assignment dated February 20, 2004. I make this affidavit in support of the Motion for Reconsideration of the Memorandum Opinion dated December 14, 2004.

2.  I respectfully deny that I did nothing between the May 25, 2004 Memorandum Decision and June 18, 2004 to comply with the Orders of this Honorable Court. In fact I took substantial steps to comply with the May 25, 2004 Order as set forth below.

BA519

3. As I understood it, the May 25, 2004 Memorandum Decision ordered me to (a) respond to Plaintiff BRACII's Second Request for Production of Documents and (b) to respond to concerns raised by Plaintiffs in a letter dated December 12, 2003, regarding alleged gaps in Jaeban UK Limited's November production of documents.

4. As the Court is aware, after Jaeban (UK) Limited was placed in Administrative Receivership on October 20, 2003, I ceased to have any control over it. It was not until the cause of action was assigned to me on February 20, 2004 that I was in a position to direct the actions of Jaeban UK Limited's attorneys. By the date of the assignment, BRACII had already filed its Motion to Strike and Jaeban UK Limited's response was required to be served on February 23, 2004. I immediately negotiated terms of retainer with Wragge & Co LLP and as soon as that had been agreed I instructed them to retain Delaware Counsel. Werb & Sullivan were instructed on February 24, 2004. An extension of time was negotiated with BRACII's lawyers to respond to the Motion by March 1, 2004 and the hearing took place March 10, 2004. I was advised by Wragge & Co LLP following the hearing that it would be unwise to incur further costs in the event that BRACII's Motion was successful and therefore no further action was taken on behalf of the Defendant until the Memorandum Opinion was handed down on May 25, 2004.

5. Immediately after I received a copy of the Memorandum Opinion I contacted Wragge & Co LLP and instructed them to take all steps necessary to comply with the terms of the Order. I was informed that this would require payment of all outstanding invoices to date and the sum of £45,000.00 on account of costs. Although this was a large sum of money, I managed to send a cheque to Wragge & Co LLP for this sum on June 7, 2004. I also had to make arrangements to place Werb & Sullivan in funds. I did this in order to ensure that I could proceed as soon as possible to comply with the Memorandum Opinion.

6. I contacted Wragge & Co LLP on June 9, 2004, as I was worried that the June 18, 2004 deadline was fast approaching and I hadn't heard anything from them since I placed them in funds on June 7, 2004. I received a telephone call back from Craig Loweth an Associate at Wragge & Co LLP who informed me that Emma Carr and Keith Gamble from his office were working on (a) a response to the concerns raised by BRACII in their letter of December 12, 2003 and (b) contact was being made with the Administrative Receivers (for whom Wragge & Co LLP also acted) with regard to BRACII's Second Request for Production of Documents. I was also assured that

**BA520**

Wragge & Co LLP were in regular contact with Werb & Sullivan as the process continued. It was agreed that I would attend their offices at 4pm June 10, 2004 to go through the December 12, 2003 letter with them and to review the work that they had done to date.

7.  On June 9, 2004, I also participated in a one hour conference call with my American attorneys, Brian A. Sullivan and Robert Wilcox to discuss Jaeban UK Limited's position in the litigation and also the discovery issues.

8.  I attended a meeting on June 10, 2004 at Wragge & Co., LLP which was also attended by Craig Loweth, Emma Carr and Keith Gamble. At the meeting I was taken through the December 12, 2003 Letter and I gave instructions on each and every point raised in that letter. I was asked to carry out a search for further documents. I was also told that Emma Carr of Wragge & Co LLP had contacted the Administrative Receivers about the Joint Second Request but that the Administrative Receivers were unable to help unless they received a request for specific documents. I was concerned about this response and informed the meeting that I would speak to Mr. O'Connor personally about this. Mr. O'Connor worked for the Administrative Receivers and was in charge of their operations. Craig Loweth also said that he would speak to Ian Weatherall, a Partner at Wragge & Co LLP (who represented the Receivers) about the Receivers files as he was concerned about issues of privilege. During the meeting we also had a conference call with my U.S. attorneys, Brian Sullivan and Robert Wilcox. I cannot remember how long the meeting lasted but I do remember that it was a long one.

9.  After the meeting on June 10, 2004, I spoke to Mr. O'Connor who informed me that the only documents held by him were either non-responsive or privileged and that the only pertinent documents to the request were likely to be held at Welcome House. I told him that the Welcome House documents had been reviewed by Wragge & Co LLP and PriceWaterhouseCoopers. Based upon that fact I believed we were already in compliance with the May 25, 2004 order as it related to those documents.

10. I spoke to Steven Allen (then an Associate at Wragge & Co LLP) on June 14, 2004 for a report on progress in complying with the June 18, 2004 order. It was agreed that I would attend a further meeting at Wragge & Co LLP on June 15, 2004 to review progress and also to discuss the BRACII Motion for Partial Reconsideration which

BA521

had recently been served. In the meantime, I had carried out an extensive search and found some further documents. I was to bring these with me to the meeting.

11. The meeting on June 15, 2004 was attended by Steve Allen, Craig Loweth and Keith Gamble. I took the lawyers through the further documentation that I had found. A Supplemental Schedule of Documents was being prepared in response to the First Joint Request. These would be ready to be sent to Brian Sullivan on June 17, 2004 with a response to each and every query in the Plaintiff's December 12, 2003 letter. I was taken through that letter again and agreed to each response. I was informed that an approach would be made to Jaeban UK Limited's auditors, BDO Stoy Hayward LLP, for responsive documents held in their files and that other accounts requested by the Plaintiffs had been ordered from Companies House but that my lawyers were confident that they would be able to comply with the June 18, 2004 deadline. The meeting lasted 3 hours.

12. In the meantime it was my understanding that discussions were on going between Wragge & Co and the Administrative Receiver's representatives with regard to the Second Joint Request. It was also my understanding that because Jaeban UK Limited's lawyers had served a timely objection to the Second Joint Request on December 30, 2004 that the Receiver's lawyer was of the opinion that the documentation did not have to be disclosed. Whilst I understand that there is now some debate as to whether the Order of May 25, 2004, overruled the Jaeban UK objection no such ambiguity or debate was mentioned to me at the material time. It is for that reason that no documents were produced in response to the Second Joint Request.

13. I attach as exhibit one a copy of the Supplemental Schedule of Documents served by my lawyers on June 18, 2004. I understand that the documents themselves were couriered to the Plaintiff's lawyers in both the US and the UK immediately thereafter.

14. Had there not been direct communication between the lawyers about the Receivers documents, it would have been obvious to BRACII from perusing the schedule and inspecting the documents that there were little or no responsive documents to the Second Joint Request contained therein. No correspondence was received from the Plaintiffs about this until after the arrival of Mr. Wile to the UK for the depositions.

BA522

15. It is important for this court to understand that in 2003 I had previously instructed Wragge & Co. and Pricewaterhouse to review all the documents at Welcome House in order to determine if there were any documents responsive to the First Joint Request for Production of Documents. Documents were produced from Welcome House by Wragge & Co in response.

16. I wish to answer the Judge's question at footnote number 2 on page 4 of the Memorandum Opinion. The reason why I did not send all the Welcome House documents to the Plaintiffs to avoid any potential discovery related disputes at first instance was because both Wragge & Co LLP and Morris Nicholls Arsht and Tunnell advised Jaeban UK Limited that it had properly complied with its discovery obligations in a correct and timely manner.

17. When I instructed my attorneys to deliver the entire set of 84 boxes to BRACH in August 2004, I did so in an effort to save and continue the deposition process.

18. I firmly believe that my actions show that I did my utmost and at great personal expense to comply with the May 25 Order under difficult circumstances. To the extent that the Court believes that I did not fully comply, I ask the Court to accept my apologies and to accept that I used my best endeavors to comply.



Ibraheim Jaeban

Sworn before me this

24th day of January 2005

Notary Public

BA523

**EXHIBIT "1"**

BA524

**Supplemental Schedule of Documents held by Jaeban UK Limited in relation to proceedings in the US Bankruptcy Court for the District of Delaware – Case No. 02-12152 (MFW)**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| **Further Accounting Information** | | | | |
| 21 | Jaeban (UK) Limited - Balance Sheet | Copy | As at 30/11/00 | 2372 – 2373 |
| 21 | Jaeban (UK) Limited – Profit and Loss Account | Copy | As at 31/12/00 | 2374 – 2379 |
| 21 | Jaeban (UK) Limited – Audited Accounts | Copy | Year ended 31/12/00 | 2380 – 2389 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 28/02/01 | 2400 – 2403 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 30/04/01 | 2404 – 2407 |
| 21 | Jaeban (UK) Limited – Draft Accounts | Copy | As at 31/12/01 | 2408 – 2429 |
| 21 | Jaeban (UK) Limited – Audited Accounts | Copy | As at 31/12/01 | 2430 – 2450 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 31/05/01 | 2451 – 2455 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 31/12/01 | 2456 – 2459 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account – with Forecast | Copy | As at 31/12/01 | 2460 – 2463 |
| 21 | Jaeban (UK) Limited 1st Quarter 2002 – Trading Account | Copy | Undated | 2464 – 2466 |
| 21 | Jaeban (UK) Limited – Forecast Balance Sheet | Copy | 01/02 to 12/02 | 2467 – 2470 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account – with Forecast | Copy | As at 28/02/02 | 2471 – 2472 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account – with Forecast | Copy | As at 30 April 2002 | 2473 – 2476 |

BA525

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 21 | Jaeban (UK) Limited Budgeted Profit & Loss Account | Copy | 01/02-12/02 | 2477 - 2487 |
| 21 | Jaeban (UK) Limited Scotland Profit and Loss Account Year 1 | Copy | Undated | 2488 |
| 21 | 2000 Rental Operations – airport locations only | Copy | 01/04/03 | 2489 – 2490 |
| 21 | BTI – airport locations only (all locations attached) | Copy | Undated | 2491 - 2492 |
| 21 | Budget Adjusted Projections | Copy | Undated | 2493 – 2495 |
| 21 | Summary of Airport Locations and Revenue – (prior to reclassification). | Copy | Undated | 2496 – 2499 |
| 21 | Budget – summary of rental operations historical and projected KPI's. | Copy | Undated | 2500 |
| 21 | Summary of airport locations and rental headquarter results. | Copy | Undated | 2501 – 2505 |
| 21 | Jaeban (UK) Limited – Independent Business Review | Original | 28/03/04 | 2506 – 2560 |
| **UK Operating Bulletins EMEA** | | | | |
| 22 | UK133 | Copy | 14/11/02 | 2561 – 2562 |
| 22 | UK134 | Copy | 22/11/02 | 2563 |
| 22 | UK136 | Copy | 03/12/02 | 2564 |
| 22 | UK139 | Copy | 17/12/02 | 2565 |
| 22 | UK120 | Copy | 01/07/02 | 2566 |
| 22 | UK123 | Copy | 21/08/02 | 2566A – 2566B |
| 22 | EMA Reservation Charges | Copy | 26/04/02 | 2567 – 2571 |
| 22 | UK126 | Copy | 23/09/02 | 2572 |
| 22 | UK127 | Copy | 25/09/02 | 2573 |
| 22 | UK130 | Copy | 22/10/02 | 2574 |

BA526

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|-----|---------------------|----------------|-------|----------|
| 22 | UK133 | Copy | 14/11/02 | 2575 |
| 22 | UK135 | Copy | 22/11/02 | 2576 |
| 22 | UK134 | Copy | 22/11/02 | 2577 – 2578 |
| 22 | UK141 | Copy | 16/01/03 | 2579 |
| 22 | UK140 | Copy | 16/01/03 | 2580 |
| **Budget Action Bulletin** | | | | |
| 23 | Notice of Change to UK Operating Manual | Copy | 03/08/01 | 2581 |
| **Jaeban (UK) Limited - correspondence with NatWest & HSBC Banks** | | | | |
| 24 | Letter from NatWest Bank to I Jaeban | Original | 25/02/02 | 2626 - 2627 |
| 24 | Letter from HSBC to I Jaeban | Original | 18/04/02 | 2628 |
| 24 | Letter from HSBC to I Jaeban | Original | 31/05/02 | 2629 - 2630 |
| 24 | Letter from HSBC to I Jaeban | Original | 09/04/02 | 2631- 2635 |
| 24 | Letter from HSBC to the Directors | Original | 03/09/02 | 2636 - 2648 |
| 24 | Letter from HSBC to I Jaeban | Original | 04/09/02 | 2649 |
| 24 | Letter from HSBC to I Jaeban | Original | 09/04/02 | 2650 - 2651 |
| 24 | Letter from HSBC to the Directors | Original | 09/04/02 | 2652 |
| 24 | Letter from HSBC to I Jaeban | Original | 18/04/02 | 2653 - 2658 |
| **Jaeban (UK) Limited – correspondence with BAA Retail** | | | | |
| 25 | Fax from BAA Retail to Jaeban (UK) Limited | Original | 09/08/02 | 2659 |
| 25 | Fax from BAA Retail to Budget | Copy | 28/06/01 | 2660 |
| 25 | Fax from BAA Retail to Budget | Copy | 28/06/01 | 2661 |
| **Correspondence between Jaeban (UK) Limited and Budget** | | | | |
| 26 | Letter IM Jaeban to D Sawyer | Copy | 04/02/99 | 2662 |
| 26 | Letter IM Jaeban to D Sawyer | Copy | 27/04/99 | 2663 – 2664 |

**BA527**

| Tab | Document Description | Copy/Original | Dated | Page Nos |
|---|---|---|---|---|
| 26 | Letter IM Jaeban to D Sawyer | Copy | 24/06/99 | 2665 |
| 26 | Letter IM Jaeban to Justin Shaw | Copy | 25/08/99 | 2666 – 2669 |
| 26 | Letter IM Jacban to Justin Shaw | Copy | 27/09/99 | 2670 |
| 26 | Letter Doug Sawers to IM Jaeban | Original | 18/10/99 | 2671 – 2673 |
| 26 | Letter IM Jaeban to Doug Sawer | Copy | 19/10/99 | 2674 - 2676 |
| 26 | Letter IM Jaeban to Doug Sawer | Copy | 10/01/00 | 2677 |
| 26 | Letter IM Jaeban to Terry Clark | Copy | 21/03/00 | 2678 |
| 26 | Letter Justin Shaw to IM Jaeban | Copy | 23/03/00 | 2679 – 2680 |
| 26 | Letter Justin Shaw to IM Jaeban | Copy | 14/04/00 | 2681 – 2683 |
| 26 | Letter IM Jaeban to Justin Shaw | Copy | 03/05/00 | 2684 – 2688 |
| 26 | Letter IM Jaeban to D Sawyer | Copy | 12/05/00 | 2689 – 2692 |
| 26 | Budget Organisational Announcement | Copy | 18/05/00 | 2693 – 2694 |
| 26 | Budget Organisational Announcement | Copy | 02/06/00 | 2695 – 2697 |
| 26 | Fax IM Jaeban to Roddy Graham | Copy | 08/06/00 | 2698 |
| 26 | Letter IM Jaeban to Roddy Graham | Original | 20/06/00 | 2699 – 2700 |
| 26 | Letter IM Jaeban to Sandy Miller | Copy | 03/08/00 | 2701 – 2705 |
| 26 | Fax IM Jaeban to Roddy Graham and Terry Clark | Copy | 30/08/00 | 2706 |
| 26 | Fax IM Jaeban to Sandy Miller | Copy | 13/10/00 | 2707 |
| 26 | Letter IM Jaeban to P Mitchell | Copy | 15/02/01 | 2708 – 2709 |
| 26 | Fax IM Jaeban to P Mitchell | Copy | 19/07/01 | 2710 – 2712 |
| 26 | Letter IM Jaeban to Terry Clark | Copy | 14/08/01 | 2713 – 2714 |
| 26 | E-mail from Pam Elbro to Paul Mitchell | Copy | 21/08/01 | 2715 – 2716 |
| 26 | Fax from Steve O'Brian to IM Jaeban | Copy | 25/10/01 | 2717 – 2720 |
| 26 | E-mail Steve Downing to Paul Champken | Copy | 16/01/02 | 2721 – 2725 |

BA528

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 26 | E-mail Trevor Sutherland/IM Jaeban | Copy | 19/02/02 | 2726 |
| 26 | Budget to Jaeban (UK) Limited | Copy | 21/03/02 | 2727 – 2730 |
| 26 | Budget EMEA Bulletin | Copy | 04/04/02 | 2731 |
| 26 | "Heads of Agreement" | Original | 18/04/02 | 2732 – 2737 |
| 26 | Letter Terry Clark to IM Jaeban | Copy | 29/04/02 | 2738 – 2739 |
| 26 | E-mail Jack Frazee to Vicky Waterfield | Copy | 01/07/02 | 2740 – 2741 |
| 26 | Letter Budget to BRAC Wolverhampton | Original | 18/07/02 | 2742 |
| 26 | EMEA Communication | Original | 30/07/02 | 2743 – 2745 |
| 26 | Letter/E-mail IM Jaeban to Terry Clark | Copy | 09/08/02 | 2746 |
| 26 | Letter James Cohen to Jaeban (UK) Limited | Copy | 08/10/02 | 2747 – 2748 |
| 26 | Letter Trevor Sutherland to IM Jaeban | Original | 11/10/02 | 2749 |
| 26 | E-mail from Budget to IM Jaeban | Copy | 10/01/03 | 2750 – 2751 |
| 26 | EMEA Communication | Copy | 17/01/03 | 2752 |
| 26 | Budget E-mail to IM Jaeban | Copy | 28/01/03 | 2753 |
| 26 | Budget E-mail to IM Jaeban | Copy | 07/02/03 | 2754 |
| 26 | Budget E-mail to IM Jaeban | Copy | 12/02/03 | 2755 |
| 26 | E-mail Matt Bond of Kroll to IM Jaeban | Copy | 18/03/03 | 2756 – 2757 |
| 26 | Letter IM Jaeban to Des McCann | Copy | 04/09/03 | 2758 |
| 26 | Fax Des McCann to IM Jaeban | Original | 25/09/03 | 2759 |
| 26 | Letter IM Jaeban to Sandy Miller | Copy | 13/10/00 | 2760 |
| 26 | E-mail from Trevor Sutherland to IM Jaeban | Copy | 07/02/02 | 2761 – 2762 |
| 26 | E-mail From Trevor Sutherland to Derek Harris | Copy | 19/02/02 | 2763 |
| 26 | Budget "Action Bulletin" sent to Jaeban | Copy | 23/07/02 | 2764 |

BA529

| Tab | Document Description | Copy/Original | Dated | Page Nos |
|---|---|---|---|---|
| 26 | Budget "Action Bulletin" sent to Jaeban | Copy | 18/07/02 | 2765 – 2768 |
| 26 | E-mail – Terry Clark sent to Jaeban | Copy | 30/07/02 | 2769 – 2771 |
| 26 | Fax Dave Handley to Paul Champken | Copy | 07/11/01 | 2772 - 2773 |
| 26 | E-mail – Steve Downing to Jaeban | Copy | 16/01/02 | 2774 – 2776 |
| **Correspondence Jaeban (UK) Limited and AVIS Europe** | | | | |
| 27 | Letter AVIS Europe to IM Jaeban | Original | 13/03/03 | 2777 – 2781 |
| **Internal Jaeban (UK) Limited – Memoranda** | | | | |
| 28 | Martin Dobbing to Ibraheim Jaeban | Copy | 20/06/00 | 2782 – 2785 |
| 28 | Martin Dobbing to Ibraheim Jaeban | Copy | 10/08/00 | 2786 – 2789 |
| **Budget - UK News Marketing** | | | | |
| 29 | Memo | Copy | 01/10/01 | 2790 – 2791 |
| 29 | Memo | Copy | 07/09/01 | 2792 – 2796 |
| 29 | Memo | Copy | 15/06/01 | 2797 – 2802 |
| 29 | Memo | Copy | 26/07/01 | 2803 |
| 29 | Memo | Copy | 05/07/01 | 2804 – 2806 |
| 29 | Memo | Copy | 15/06/01 | 2807 – 2812 |
| 29 | Memo | Copy | 03/07/01 | 2813 – 2814 |
| 29 | Memo | Copy | 29/01/99 | 2815 – 2818 |
| 29 | Memo | Copy | 01/04/99 | 2819 – 2820 |
| 29 | Memo | Copy | 04/03/99 | 2821 – 2824 |
| 29 | Memo | Copy | 06/04/99 | 2825 – 2827 |
| 29 | Memo | Copy | 08/03/99 | 2828 – 2831 |
| 29 | Memo | Copy | 16/03/00 | 2832 – 2835 |
| 29 | Memo | Copy | 15/04/99 | 2836 – 2839 |

**BA530**

| Tab | Document Description | Copy/Original | Dated | Page Nos |
|---|---|---|---|---|
| 29 | Memo | Copy | 30/01/01 | 2840 – 2841 |
| 29 | Memo | Copy | 25/05/99 | 2842 – 2844 |
| 29 | Memo | Copy | 15/12/99 | 2845 – 2847 |
| 29 | Memo | Copy | 16/02/98 | 2848 – 2851 |
| 29 | Memo | Copy | 03/06/99 | 2852 – 2853 |
| 29 | Memo | Copy | 08/06/99 | 2854 – 2868 |
| 29 | Memo | Copy | 01/02/00 | 2869 – 2870 |
| 29 | Memo | Copy | 04/05/99 | 2871 – 2873 |
| 29 | Memo | Copy | 10/06/99 | 2874 – 2877 |
| **Documents received from BDO Stoy Hayward (Auditors for Jaeban (UK) Limited)** | | | | |
| 30 | Management Accounts prepared by Jaeban (UK) Limited | Copy | 6 months to 30/06/03 | 2878 - 2881 |
| 30 | Management accounts prepared by Jaeban (UK) Limited | Copy | Year to 31/12/02 | 2882 - 2885 |
| 30 | Draft Accounts | Copy | Year ended 31/12/01 | 2886 – 2911 |
| 30 | Draft Accounts | Copy | Year ended 31/12/00 | 2912 - 2932 |

BA531

# EXHIBIT D

BA532

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------)
                                                             )
In re                                                        )    **Chapter 11**
                                                             )
**BRAC GROUP, INC. (f/k/a BRAC Group,**                      )    **Case No. 02-12152 (MFW)**
**Inc.), et al.,**                                           )
                                                             )
          Debtors.                                           )    **(Jointly Administered)**
                                                             )
-------------------------------------------------------------)
                                                             )
**BRAC GROUP, INC. (f/k/a Budget Group,**                    )    03-A-54271
**Inc.), et al.,**                                           )
                                                             )
    **Plaintiffs and Counterclaim Defendants,**              )
                                                             )
**v.**                                                       )
                                                             )
**Jaeban (U.K.) Limited,**                                   )
                                                             )
    **Defendants and Counterclaim Plaintiff.**               )
                                                             )
-------------------------------------------------------------)

### AFFIDAVIT OF STEVEN DAVID ALLEN

STEVEN DAVID ALLEN, being duly sworn, deposes and says:

1. I am qualified as a solicitor in England and Wales. I am a partner in law firm Mills &
   Reeve of 54, Hagley Road, Birmingham, B16 8PE representing Ibraheim Jaeban, the
   assignee of Jaeban UK Limited by virtue of a deed of assignment dated 20 February
   2004. I make this affidavit in support of my client's Motion for Reconsideration of the
   Memorandum Opinion dated December 14, 2004.

2. The May 25, 2004 order imposed three requirements on Mr Jaeban to be satisfied by 18
   June 2004. These were as follows:

   2.1 Provide documents in response to BRACII's Second Request for Production of
       Documents.

BA533

2.2 Respond to concerns raised by BRACII in its letter dated December 12, 2003 alleging gaps in Jaeban UK's November 2003 production of documents.

2.3 Schedule depositions of any Jaeban UK personnel and the Jaeban Receiver.

It is alleged that Mr. Jaeban has failed to comply with (1) & (2). (3) is uncontroversial, as all parties acknowledge the scheduling of the depositions.

3. I confirm that Mr Jaeban took numerous specific actions to comply with the May 25, 2004 Order.

4. The BRACII First Joint Request did not contain a request for disclosure of the Receivers' documents. It could not have done given that the Administrative Receivers were appointed on 20 October 2003 and the First Joint Request was served earlier on 29 September 2003.

5. The request for disclosure of the papers relating to the receivership was in fact made in the Second Joint Request served on 25 November 2003. Jaeban UK served a timely objection 30 December 30, 2003 on the grounds that the request was;

*"overly broad, unduly burdensome and seeks documents or information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence".*

6. I note that at the 30 September 2004 hearing Judge Case stated that he was not aware of Jaeban UK Limited's objections to the Second Request when he made the order of 25 May 2004 requiring Mr Jaeban to produce the documents. At that time I was an Associate at Wragge & Co LLP. We did not believe that the Order overruled the Objection.

7. On the date of service of the Second Joint Request, Mr Jaeban had no authority to provide instructions to Wragge & Co to respond as Jaeban UK Limited was then in the hands of the Administrative Receivers for whom Wragge & Co now acted. As I have stated previously the Receiver did address the issue of the Second Joint Request served

BA534

by BRACII and instructed Morris Nicholls Arsht and Tunnell to serve a formal objection to the Second Joint Request .

8. Mr Jaeban could not address the questions raised in the Second Joint Request until the proceedings were assigned to him on February 20, 2004.

9. By the date of assignment BRACII had already filed their Motion to Strike and Jaeban UK's response was required to be served on February 23, 2004. Mr Jaeban immediately instructed Wragge & Co to retain Delaware Counsel and accordingly Werb & Sullivan were appointed. Werb & Sullivan managed to obtain an extension from BRACII's US Attorneys to respond by 23 February 2004.

10. In the meantime I can confirm that Mr Jaeban was negotiating with Wragge & Co to agree terms of retainer with them. These terms were agreed on 24 February 2004. Detailed instructions on the BRACII motion were sent to Werb & Sullivan on 25 February 2004. Werb & Sullivan subsequently obtained another extension with the agreement of BRACII Counsel to respond by 1 March 2004. The hearing of the BRACII motion took place on March 10, 2004. The judgment was handed down on 25 May 2004.

11. Once the Order had been made Mr Jaeban instructed Wragge & Co to take all necessary steps to comply with the terms of the Order. Wragge & Co required the sum of £45,000.000 (GBP) (approximately $82,000.00 USD) to continue to act. This sum was raised by Mr Jaeban and paid over to Wragge & Co on 9 June 2004.

12. Mr Jaeban called Wragge & Co concerned about the nearness of the June 18 deadline for disclosure on 9 June 2004.

13. Emma Carr and Keith Gamble from Wragge & Co spent two days going through Jaeban UK documents in order to identify whether there were any responsive documents. This would appear to have been on or about June 9 and 10, 2004.

14. Emma Carr spoke to Mick O'Connor, the Receiver's representative on June 9, 2004.

15. Mr Jaeban attended a meeting at Wragge & Co on 10 June 2004 in relation to the May 25, 2004 Order.

BA535

16. Mr Jaeban subsequently spoke to Mick O'Connor after the 10 June 2004 meeting . Mr O'Connor informed him that the only documents held by the Administrative Receiver were privileged documents and that the bulk of the Jaeban UK papers were held at Welcome House.

17. Emma Carr spoke to Mick O'Connor on June 18, 2004 confirming the Receiver's previous position.

18. Mr Jaeban attended another meeting at Wragge & Co on 16 June 2004 to review compliance with the terms of the May 25, 2004 Order.

19. The Supplemental Schedule of Documents served on BRACII Counsel on June 18, 2004 was intended to be a response to the December 12, 2003 letter written by BRACII Counsel. This is apparent from the headings in the Supplemental Schedule, for example the first numbered paragraph in the December 12, 2003 letter, requested documents and drafts of documents that reflected the overall value of Jaeban UK Limited, including current and prior financial statements dating back to January 1, 2000. The Supplemental Schedule disclosed draft and actual accounts dating back to November 30, 2000 which were the earliest accounts that could be traced. Mr Jaeban's US Counsel were instructed in respect of each and every issue raised by the December 12, 2003 letter, responses which I understand were discussed between Mr Wile and Mr Sullivan.

20. The schedule represented a substantial number of hours work by Wragge & Co paid for by Mr Jaeban in compliance with the Order of May 25, 2004. Further, on the instructions of Mr Jaeban, the documents themselves were photocopied and couriered to BRACII's Counsel in the US and in London immediately following service of the Schedule. I cannot find a follow up letter from BRACII complaining that Mr Jaeban failed to address the issues in their December 12, 2003 letter.

21. In my respectful submission, it is obvious from looking at that schedule that none of the documents requested in the Joint Second Request were included in the categories. That being the case BRACII's Counsel flew to England at the very least with the knowledge that production of these documents had not yet taken place.

22. To my knowledge the first time BRACII's Counsel raised the issue of the Receivers documents after service of Mr Jaeban's Supplemental Schedule was in a conversation with myself and Mr Wilcox  August 5, 2004 before the second day of Mr Jaeban's

bsza/80779332_1.doc/24 Jan 2005                    4

depositions. It was certainly apparent to me that BRACII's Counsel would not hesitate to derail the deposition process. For this reason, it was agreed with BRACII's Counsel that Mr Wilcox would inspect the documents and that his doing so would not amount to a waiver of privilege. The purpose of this would be determine whether the papers might be responsive to the Second Request. I thought that irrespective of the Jaeban UK objection, that this co-operative attitude might entice BRACII's Counsel to concentrate on the deposition process.

23. By this time I had left Wragge & Co having accepted an invitation to join the partnership of Mills & Reeve Solicitors. Mr Jaeban continues to instruct me at that firm.

24. Wragge & Co, continuing to act for the Receiver refused permission for Mr Jaeban himself to review the files and therefore the review was undertaken by Mr Wilcox. Unfortunately, Mr Wile belatedly made it clear that he was not prepared to rely on Mr Wilcox's assessment of the responsive nature of these documents.

25. On the instructions of Mr Jaeban Mills & Reeve sent an e-mail to Wragge & Co on 6 August 2004 invoking paragraph 4 of the Deed of Assignment requiring the Assignor to provide all reasonable assistance to enable the Assignee to obtain the full benefit of the assignment.

26. Wragge & Co responded on August 6, 2004 enquiring who was going to pay the Receivers costs of attending to any disclosure. Mr Jaeban instructed Mills & Reeve to find out the costs of Wragge & Co undertaking the process on the same date. Wragge & Co advised that the cost would be £4000 plus VAT. On the August 9, 2004 Mills & Reeve wrote to Ken Wile stating as follows (inter alia)

*"Additionally, our client worked extensively last week to dispel any discovery dispute between the Debtors and the Administrative Receivers of Jaeban UK Limited. Mr Jaeban initially requested and subsequently demanded, that the Administrative Receivers produce all requested non-privileged documents, even though Mr Wilcox has advised that the Receiver's files are without question limited to Mr Clark's deposition".*

27. The issue was resolved when Mr Jaeban acceded to the Receiver's solicitors request for £4000 plus VAT to conduct their review for privileged documents even though the fees quoted by Wragge & Co appeared excessive. Mr Jaeban appeared willing to pay any amount simply in order to ensure that the deposition process was not aborted. Wragge &

BA537

Co also agreed at the request of Mr Jaeban to allow Mr Wile to inspect the documents. Mr Wile was notified that he should contact Ian Weatherall at Wragge & Co to arrange for an inspection of the papers by e-mail from Mills & Reeve sent on 11 August 2004.

28. Mr Wile therefore has now had access to the Receivers papers which appear to have produced no documents that would have materially affected the depositions going forward. BRACII have therefore suffered no prejudice. In his Reply Memorandum, BRACII pours scorn on this allegation relying principally on the exchange of correspondence between Ian Weatherall and Mr Jaeban as *"showing why the Receivers were willing to sell the Counterclaims for £5,000 upfront money"*. This is not correct and Ian Weatherall has signed an affidavit stating so.

29. It is also untrue to say that Mr Jaeban did not respond to the letter dated December 12, 2003. On June 17, 2004 I wrote to Brian Sullivan for Mr Jaeban addressing line by line each of the queries raised by Ken Wile in his December 12, 2003 letter. This letter, as I have mentioned previously was also accompanied with by a schedule of further disclosure. This was to comply with the June 18, 2004 deadline.

30. With respect, the impression given to the court that Mr Jaeban was somehow indifferent to the 25 May 2004 order cannot be further from the truth.

Steven David Allen

Sworn before me this
24th day of January 2005

Notary Public

**Andrew Manning Cox**
**55 Colmore Row**
**Birmingham B3 2AS**
**England**
**Notary Public**



**BA538**

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:  BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Case No. 02-12152 (CJC) |
| IN RE:  BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | (Jointly Administered) |
| Plaintiffs and Counterclaim Defendants, | ) ) | |
| v. | ) ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, and IBRAHIEM JAEBAN, | ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) | |

**AFFIDAVIT OF BRIAN A. SULLIVAN**

| | | |
|---|---|---|
| STATE OF   DELAWARE | ) ) | to wit: |
| COUNTY OF NEW CASTLE | ) | |

Brian A. Sullivan, being duly sworn deposes and says:

1.  I am a partner in the firm of Werb & Sullivan. I make this affidavit in support of my client's Motion for Reconsideration of the Order dated January 13, 2005.

2.  On June 17, 2004, I received an e-mail from Wragge & Co. which addressed line by line each of the questions raised by BRACII's counsel in his letter of December 12, 2003.

3.   On June 18, 2004  I had a conversation with BRACII's counsel wherein I explained our responses to the letter of December 12, 2003.  Counsel appeared satisfied with the explanations I gave him.

4. After that conversation, I sent an e-mail to BRACII's counsel which contained the list of respective supplemental documents. I arranged for Wragge & Co. to ship the supplemental documents directly to BRACII's counsel, which was agreeable to him.

5. BRAC did not object to the responses to the December 12, 2004 letter prior to Robert Wilcox's traveling to England on July 31, 2004 for the depositions agreed upon by the parties, or subsequent thereto.

Further affiant sayeth not.

_____
Brian A. Sullivan

Subscribed and sworn to before me this 24th day of January, 2005.

_____
Notary Public

My Commission Expires: N/A

**AMY D. BROWN**
**Attorney at Law**
**Notary Public pursuant to**
**29 Del.C. § 4323(a)(3)**

**BA541**

# EXHIBIT F

BA542

Your reference: PHMC/PDT/19447/30270
Our reference: BSZA/4006615-0001-0
Document number: bsza11bsza.doc

Direct line: +44(0)121 456 8343
Direct fax: +44(0)121 456 8476
steven.allen@mills-reeve.com



# MILLS & REEVE

Sidley Austin Brown & Wood
DX 580
LONDON CITY

9 August 2004

For the attention of Ken Wile

Fax no: 0121 456 8476

Dear Mr Wile

### Re: BRAC Group, Inc: Case No. 02-12152 (MFW) (Jointly Administered): Adversary 03-A-54271

As you are aware we have been instructed by Mr Ibraheim Jaeban to assist Werb & Sullivan our client's US Attorneys, in relation to the above proceedings.

I write to record our disappointment with the Debtors' decision not to permit the deposition of Mr Terry Clark to go forward today as previously agreed and scheduled by mutual consent.

As the Debtors and my client agreed and recognised on Wednesday 4 August 2004, Mr Clark's deposition needed to be held today and tomorrow because of Mr Clark's foreign travel schedule on behalf of his new employer.

As a result of the Debtor's decision on Friday not to permit Mr Clark's deposition it now appears that the exigencies of Mr Clark's schedule will not permit the parties to depose him on Mr Wilcox's current trip to England. The stated and disclosed purpose of that trip was the taking of depositions including Mr Clark's. Mr Jaeban will undoubtedly face additional expense as a result of the Debtors' decision.

We believe that it was inappropriate for the Debtors to change the agreed upon scheduling of Mr Clark's deposition and even at this late date we request that the Debtors reconsider and reverse that decision.

The Debtors' actions with regard to Mr Clark make Mr Jaeban's compliance with Judge Case's most recent Scheduling Order a practical impossibility and the responsibility for that non-compliance as it relates to the completion of the UK depositions by 23 August 2004 must fall entirely upon the Debtors.

It would obviously be inequitable for the Debtors to assert such a deadline with regard to any deposition in this proceeding, and I understand that you have informed Mr Wilcox that you will not take such a position.

Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham
B16 8PE

Tel: +44(0)121 454 4000
Fax: +44(0)121 456 3631
DX: 707290 Edgbaston 3
info@mills-reeve.com

Birmingham Cambridge London Norwich

Mills & Reeve is regulated by the Law Society
A list of partners may be inspected at any of
our offices

www.mills-reeve.com

**BA543**

The Debtors' stated reason for the adjournment of Mr Clark's deposition was their alleged lack of access to documents from Mr Jaeban and/or the Administrative Receivers of Jaeban UK Limited. We shall be dealing with this issue in separate correspondence.

Mr Wilcox has worked diligently to ensure the Debtors have access to all relevant and non-privileged documents, even though there is no pending discovery request directed to Mr Jaeban. Further, in an attempt to avoid a disruption of the agreed upon deposition schedule, Mr Jaeban offered to gather all documents from Welcome House and deliver them on Saturday to you in London "without prejudice" to our client's contention that all such pertinent documents have been disclosed. The Debtors declined that offer.

Additionally, our client worked extensively last week to dispel any discovery dispute between the Debtors and the Administrative Receivers of Jaeban UK Limited. Mr Jaeban initially requested and subsequently demanded, that the Administrative Receivers produce all requested non- privileged documents, even though Mr Wilcox has advised that the Administrative Receiver's files are without question extremely limited materially to Mr Clark's deposition.

It is our view that the parties could have easily, expeditiously and efficiently proceeded with Mr Clark's deposition thereby making substantial progress without prejudicing either parties right to continue or re-open the deposition if the Debtors' stated purpose was to avoid a telephone deposition of Mr Clark, we perceive that their actions have created the opposite scenario under which a telephone deposition would be the parties only option unless US Counsel were to return to England at considerable resultant expense.

We ask the Debtors' to reverse their position and we expressly reserve all our client's rights should the Debtors not do so.

We also view the Debtor's current position as a departure from the policy of adversarial co-operation that we believed the Debtors' had adopted and which our client had instructed us to pursue on his behalf.

Please confirm that the Debtors' will reconsider their blockage of Mr Clark's deposition and I look forward to your prompt response on that issue.


Yours sincerely


**Steven Allen**
Partner

cc Patrick Corr
   Philip Taylor

BA544

EXHIBIT G

BA545

## Brian Sullivan

| | |
|---|---|
| **From:** | Brian A. Sullivan [bsullivan@werbsullivan.com] |
| **Sent:** | Friday, June 18, 2004 2:46 PM |
| **To:** | 'kwile@sidley.com' |
| **Cc:** | 'ian_weatherall@wragge.com'; 'steven_allen@wragge.com'; 'craig_loweth@wragge.com' |
| **Subject:** | Jaeban/BRAC |

Ken,

Attached is a list of the responsive supplemental documents which you should receive from Wragge & Co by Monday, if not sooner. Regards.

Brian A. Sullivan, Esquire
WERB & SULLIVAN
300 Delaware Avenue, 10th Floor
P.O. Box 25046
Wilmington, Delaware 19899
For Courier: 19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
E-Mail: bsullivan@werbsullivan.com

CONFIDENTIALITY NOTICE

UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW [Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)]

This message is being sent by Werb & Sullivan, a law firm. It is intended exclusively for the individuals and entities to which it is addressed. This communication, including any attachments, may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of this message.



Supplemental
Schedule of Docum...

**BA546**

**Supplemental Schedule of Documents held by Jaeban UK Limited in relation to proceedings in the US Bankruptcy Court for the District of Delaware – Case No. 02-12152 (MFW)**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| **Further Accounting Information** | | | | |
| 21 | Jaeban (UK) Limited - Balance Sheet | Copy | As at 30/11/00 | 2372 – 2373 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 31/12/00 | 2374 – 2379 |
| 21 | Jaeban (UK) Limited – Audited Accounts | Copy | Year ended 31/12/00 | 2380 – 2389 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 28/02/01 | 2400 – 2403 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 30/04/01 | 2404 – 2407 |
| 21 | Jaeban (UK) Limited – Draft Accounts | Copy | As at 31/12/01 | 2408 – 2429 |
| 21 | Jaeban (UK) Limited – Audited Accounts | Copy | As at 31/12/01 | 2430 – 2450 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 31/05/01 | 2451 – 2455 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account | Copy | As at 31/12/01 | 2456 – 2459 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account – with Forecast | Copy | As at 31/12/01 | 2460 – 2463 |
| 21 | Jaeban (UK) Limited 1st Quarter 2002 – Trading Account | Copy | Undated | 2464 – 2466 |
| 21 | Jaeban (UK) Limited – Forecast Balance Sheet | Copy | 01/02 to 12/02 | 2467 – 2470 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account – with Forecast | Copy | As at 28/02/02 | 2471 – 2472 |
| 21 | Jaeban (UK) Limited - Profit and Loss Account – with Forecast | Copy | As at 30 April 2002 | 2473 – 2476 |

**BA547**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 21 | Jaeban (UK) Limited Budgeted Profit & Loss Account | Copy | 01/02-12/02 | 2477 - 2487 |
| 21 | Jaeban (UK) Limited Scotland Profit and Loss Account Year 1 | Copy | Undated | 2488 |
| 21 | 2000 Rental Operations – airport locations only | Copy | 01/04/03 | 2489 – 2490 |
| 21 | BTI – airport locations only (all locations attached) | Copy | Undated | 2491 - 2492 |
| 21 | Budget Adjusted Projections | Copy | Undated | 2493 – 2495 |
| 21 | Summary of Airport Locations and Revenue – (prior to reclassification). | Copy | Undated | 2496 – 2499 |
| 21 | Budget – summary of rental operations historical and projected KPI's. | Copy | Undated | 2500 |
| 21 | Summary of airport locations and rental headquarter results. | Copy | Undated | 2501 – 2505 |
| 21 | Jaeban (UK) Limited – Independent Business Review | Original | 28/03/04 | 2506 – 2560 |

**UK Operating Bulletins EMEA**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 22 | UK133 | Copy | 14/11/02 | 2561 – 2562 |
| 22 | UK134 | Copy | 22/11/02 | 2563 |
| 22 | UK136 | Copy | 03/12/02 | 2564 |
| 22 | UK139 | Copy | 17/12/02 | 2565 |
| 22 | UK120 | Copy | 01/07/02 | 2566 |
| 22 | UK123 | Copy | 21/08/02 | 2566A – 2566B |
| 22 | EMA Reservation Charges | Copy | 26/04/02 | 2567 – 2571 |
| 22 | UK126 | Copy | 23/09/02 | 2572 |
| 22 | UK127 | Copy | 25/09/02 | 2573 |
| 22 | UK130 | Copy | 22/10/02 | 2574 |

**BA548**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 22 | UK133 | Copy | 14/11/02 | 2575 |
| 22 | UK135 | Copy | 22/11/02 | 2576 |
| 22 | UK134 | Copy | 22/11/02 | 2577 – 2578 |
| 22 | UK141 | Copy | 16/01/03 | 2579 |
| 22 | UK140 | Copy | 16/01/03 | 2580 |
| **Budget Action Bulletin** | | | | |
| 23 | Notice of Change to UK Operating Manual | Copy | 03/08/01 | 2581 |
| **Jaeban (UK) Limited - correspondence with NatWest & HSBC Banks** | | | | |
| 24 | Letter from NatWest Bank to I Jaeban | Original | 25/02/02 | 2626 - 2627 |
| 24 | Letter from HSBC to I Jaeban | Original | 18/04/02 | 2628 |
| 24 | Letter from HSBC to I Jaeban | Original | 31/05/02 | 2629 - 2630 |
| 24 | Letter from HSBC to I Jaeban | Original | 09/04/02 | 2631- 2635 |
| 24 | Letter from HSBC to the Directors | Original | 03/09/02 | 2636 - 2648 |
| 24 | Letter from HSBC to I Jaeban | Original | 04/09/02 | 2649 |
| 24 | Letter from HSBC to I Jaeban | Original | 09/04/02 | 2650 - 2651 |
| 24 | Letter from HSBC to the Directors | Original | 09/04/02 | 2652 |
| 24 | Letter from HSBC to I Jaeban | Original | 18/04/02 | 2653 - 2658 |
| **Jaeban (UK) Limited – correspondence with BAA Retail** | | | | |
| 25 | Fax from BAA Retail to Jaeban (UK) Limited | Original | 09/08/02 | 2659 |
| 25 | Fax from BAA Retail to Budget | Copy | 28/06/01 | 2660 |
| 25 | Fax from BAA Retail to Budget | Copy | 28/06/01 | 2661 |
| **Correspondence between Jaeban (UK) Limited and Budget** | | | | |
| 26 | Letter IM Jaeban to D Sawyer | Copy | 04/02/99 | 2662 |
| 26 | Letter IM Jaeban to D Sawyer | Copy | 27/04/99 | 2663 – 2664 |

**BA549**

| Tab | Document Description | Copy Original | Dated | Page Nos. |
|-----|--------------------|--------------|-------|-----------|
| 26 | Letter IM Jaeban to D Sawyer | Copy | 24/06/99 | 2665 |
| 26 | Letter IM Jaeban to Justin Shaw | Copy | 25/08/99 | 2666 – 2669 |
| 26 | Letter IM Jaeban to Justin Shaw | Copy | 27/09/99 | 2670 |
| 26 | Letter Doug Sawers to IM Jaeban | Original | 18/10/99 | 2671 – 2673 |
| 26 | Letter IM Jaeban to Doug Sawer | Copy | 19/10/99 | 2674 - 2676 |
| 26 | Letter IM Jaeban to Doug Sawer | Copy | 10/01/00 | 2677 |
| 26 | Letter IM Jaeban to Terry Clark | Copy | 21/03/00 | 2678 |
| 26 | Letter Justin Shaw to IM Jaeban | Copy | 23/03/00 | 2679 – 2680 |
| 26 | Letter Justin Shaw to IM Jaeban | Copy | 14/04/00 | 2681 – 2683 |
| 26 | Letter IM Jaeban to Justin Shaw | Copy | 03/05/00 | 2684 – 2688 |
| 26 | Letter IM Jaeban to D Sawyer | Copy | 12/05/00 | 2689 – 2692 |
| 26 | Budget Organisational Announcement | Copy | 18/05/00 | 2693 – 2694 |
| 26 | Budget Organisational Announcement | Copy | 02/06/00 | 2695 – 2697 |
| 26 | Fax IM Jaeban to Roddy Graham | Copy | 08/06/00 | 2698 |
| 26 | Letter IM Jaeban to Roddy Graham | Original | 20/06/00 | 2699 – 2700 |
| 26 | Letter IM Jaeban to Sandy Miller | Copy | 03/08/00 | 2701 – 2705 |
| 26 | Fax IM Jaeban to Roddy Graham and Terry Clark | Copy | 30/08/00 | 2706 |
| 26 | Fax IM Jaeban to Sandy Miller | Copy | 13/10/00 | 2707 |
| 26 | Letter IM Jaeban to P Mitchell | Copy | 15/02/01 | 2708 – 2709 |
| 26 | Fax IM Jaeban to P Mitchell | Copy | 19/07/01 | 2710 – 2712 |
| 26 | Letter IM Jaeban to Terry Clark | Copy | 14/08/01 | 2713 – 2714 |
| 26 | E-mail from Pam Elbro to Paul Mitchell | Copy | 21/08/01 | 2715 – 2716 |
| 26 | Fax from Steve O'Brian to IM Jaeban | Copy | 25/10/01 | 2717 – 2720 |
| 26 | E-mail Steve Downing to Paul Champken | Copy | 16/01/02 | 2721 – 2725 |

**BA550**

| Tab | Document Description | Copy Original | Dated | Page Nos |
|-----|---------------------|---------------|-------|----------|
| 26 | E-mail Trevor Sutherland/IM Jaeban | Copy | 19/02/02 | 2726 |
| 26 | Budget to Jaeban (UK) Limited | Copy | 21/03/02 | 2727 – 2730 |
| 26 | Budget EMEA Bulletin | Copy | 04/04/02 | 2731 |
| 26 | "Heads of Agreement" | Original | 18/04/02 | 2732 – 2737 |
| 26 | Letter Terry Clark to IM Jaeban | Copy | 29/04/02 | 2738 – 2739 |
| 26 | E-mail Jack Frazee to Vicky Waterfield | Copy | 01/07/02 | 2740 – 2741 |
| 26 | Letter Budget to BRAC Wolverhampton | Original | 18/07/02 | 2742 |
| 26 | EMEA Communication | Original | 30/07/02 | 2743 – 2745 |
| 26 | Letter/E-mail IM Jaeban to Terry Clark | Copy | 09/08/02 | 2746 |
| 26 | Letter James Cohen to Jaeban (UK) Limited | Copy | 08/10/02 | 2747 – 2748 |
| 26 | Letter Trevor Sutherland to IM Jaeban | Original | 11/10/02 | 2749 |
| 26 | E-mail from Budget to IM Jaeban | Copy | 10/01/03 | 2750 – 2751 |
| 26 | EMEA Communication | Copy | 17/01/03 | 2752 |
| 26 | Budget E-mail to IM Jaeban | Copy | 28/01/03 | 2753 |
| 26 | Budget E-mail to IM Jaeban | Copy | 07/02/03 | 2754 |
| 26 | Budget E-mail to IM Jaeban | Copy | 12/02/03 | 2755 |
| 26 | E-mail Matt Bond of Kroll to IM Jaeban | Copy | 18/03/03 | 2756 – 2757 |
| 26 | Letter IM Jaeban to Des McCann | Copy | 04/09/03 | 2758 |
| 26 | Fax Des McCann to IM Jaeban | Original | 25/09/03 | 2759 |
| 26 | Letter IM Jaeban to Sandy Miller | Copy | 13/10/00 | 2760 |
| 26 | E-mail from Trevor Sutherland to IM Jaeban | Copy | 07/02/02 | 2761 – 2762 |
| 26 | E-mail From Trevor Sutherland to Derek Harris | Copy | 19/02/02 | 2763 |
| 26 | Budget "Action Bulletin" sent to Jaeban | Copy | 23/07/02 | 2764 |

**BA551**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 26 | Budget "Action Bulletin" sent to Jaeban | Copy | 18/07/02 | 2765 – 2768 |
| 26 | E-mail – Terry Clark sent to Jaeban | Copy | 30/07/02 | 2769 – 2771 |
| 26 | Fax Dave Handley to Paul Champken | Copy | 07/11/01 | 2772 - 2773 |
| 26 | E-mail – Steve Downing to Jaeban | Copy | 16/01/02 | 2774 - 2776 |
| **Correspondence Jaeban (UK) Limited and AVIS Europe** | | | | |
| 27 | Letter AVIS Europe to IM Jaeban | Original | 13/03/03 | 2777 – 2781 |
| **Internal Jaeban (UK) Limited – Memoranda** | | | | |
| 28 | Martin Dobbing to Ibraheim Jaeban | Copy | 20/06/00 | 2782 – 2785 |
| 28 | Martin Dobbing to Ibraheim Jaeban | Copy | 10/08/00 | 2786 – 2789 |
| **Budget - UK News Marketing** | | | | |
| 29 | Memo | Copy | 01/10/01 | 2790 – 2791 |
| 29 | Memo | Copy | 07/09/01 | 2792 – 2796 |
| 29 | Memo | Copy | 15/06/01 | 2797 – 2802 |
| 29 | Memo | Copy | 26/07/01 | 2803 |
| 29 | Memo | Copy | 05/07/01 | 2804 – 2806 |
| 29 | Memo | Copy | 15/06/01 | 2807 – 2812 |
| 29 | Memo | Copy | 03/07/01 | 2813 – 2814 |
| 29 | Memo | Copy | 29/01/99 | 2815 – 2818 |
| 29 | Memo | Copy | 01/04/99 | 2819 – 2820 |
| 29 | Memo | Copy | 04/03/99 | 2821 – 2824 |
| 29 | Memo | Copy | 06/04/99 | 2825 – 2827 |
| 29 | Memo | Copy | 08/03/99 | 2828 – 2831 |
| 29 | Memo | Copy | 16/03/00 | 2832 – 2835 |
| 29 | Memo | Copy | 15/04/99 | 2836 – 2839 |

**BA552**

| Tab | Document Description | Copy/ Original | Dated | Page Nos |
|---|---|---|---|---|
| 29 | Memo | Copy | 30/01/01 | 2840 – 2841 |
| 29 | Memo | Copy | 25/05/99 | 2842 – 2844 |
| 29 | Memo | Copy | 15/12/99 | 2845 – 2847 |
| 29 | Memo | Copy | 16/02/98 | 2848 – 2851 |
| 29 | Memo | Copy | 03/06/99 | 2852 – 2853 |
| 29 | Memo | Copy | 08/06/99 | 2854 – 2868 |
| 29 | Memo | Copy | 01/02/00 | 2869 – 2870 |
| 29 | Memo | Copy | 04/05/99 | 2871 – 2873 |
| 29 | Memo | Copy | 10/06/99 | 2874 - 2877 |
| **Documents received from BDO Stoy Hayward (Auditors for Jaeban (UK) Limited)** | | | | |
| 30 | Management Accounts prepared by Jaeban (UK) Limited | Copy | 6 months to 30/06/03 | 2878 - 2881 |
| 30 | Management accounts prepared by Jaeban (UK) Limited | Copy | Year to 31/12/02 | 2882 - 2885 |
| 30 | Draft Accounts | Copy | Year ended 31/12/01 | 2886 – 2911 |
| 30 | Draft Accounts | Copy | Year ended 31/12/00 | 2912 - 2932 |

**BA553**

# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a BRAC Group, Inc.), et al., | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | 03-A-54271 |
| Plaintiffs and Counterclaim Defendants, | |
| v. | |
| Jaeban (U.K.) Limited, | |
| Defendants and Counterclaim Plaintiff. | |

AFFIDAVIT OF IAN WEATHERALL

IAN WEATHERALL, being duly sworn, deposes and says:

1.  I am qualified as a solicitor in England and Wales. I am a partner in the law firm Wragge & Co LLP of 55, Colmore Row, Birmingham, B3 2AS. I was the supervising partner for Jaeban UK Limited in these adversary proceedings when I wrote a letter to Mick O'Connor, Senior Manager with RSM Robson Rhodes LLP on October 15, 2003. This letter and Mr Jaeban's reply are referred to and exhibited at "B" and "C" to BRACII's Motion to Compel dated September 15, 2004. and referred to in the Memorandum Opinion of Charles G. Case II United States Bankruptcy Judge dated December 14, 2004.

2.  In its Motion to Compel, BRACII refers to these two documents as *"critical"* documents based on their understanding that my letter of October 15, 2003

BA555

*"completely undermines Mr Jaeban's case".* I disagree with that interpretation of my letter.

3. The letter arose out of advice I was asked to provide to Mr O'Connor as to whether it was possible for Mr Jaeban to trade either under his own name or through a new limited company ("Newco") from various sites then operated by Jaeban UK Limited. Mr Jaeban had suggested to Mr O'Connor that the insolvency of BRACII or the UK business of BRACII had automatically terminated the restrictive covenants contained within the International Prime License Agreement ("IPLA"). I disagreed with that interpretation for the reasons stated in my letter. My letter was limited to that single issue and did not address the merits of either Jaeban UK or Mr Jaeban's counterclaims in the adversary proceedings.

4. I do not understand how BRACII can interpret the letter as evidence of my alleged *"dim view of Jaeban UK's claims under the Umbrella Agreement and IPLA"* (see their Reply Memorandum dated September 18, 2004) when it is plain that my letter was not intended, nor did it, refer to the Adversary Proceedings. For these reasons it would be manifestly unjust for the court to conclude that my letter questions *"the underpinnings of Mr Jaeban's case".*

Ian Weatherall

Sworn before me this
21st day of January 2005

Notary Public

**Andrew Manning Cox**
**55 Colmore Row**
**Birmingham  B3 2AS**
**England**
**Notary Public**



**BA556**