## Wile, Kenneth E.

| | |
|---|---|
| **From:** | Wile, Kenneth E. |
| **Sent:** | Friday, December 03, 2004 3:33 PM |
| **To:** | 'Brian Sullivan' |
| **Cc:** | Rob Wilcox (E-mail); 'steven.allen@mills-reeve.com'; 'anthony.minnis@mills-reeve com'; Corr, Patrick; Taylor, Phillip D.; Edmon L. Morton (E-mail) |
| **Subject:** | RE: Jaeban |

Brian:

As you requested, I have waited until today to respond to your e-mail.

**1. Persistent Failure to Answer Whether All E-Mail Servers Have Been Found and to Identify Witnesses.** I first asked Rob Wilcox, while we were both in England in August, whether Mr. Jaeban or his counsel have had access to all of Jaeban UK's e-mailer servers (or other sources of e-mails) in light of the small number of e-mails produced to BRACII by Mr Allen's predecessor firm. I've now had to ask in writing three times, as I have also had to ask who has material knowledge about the whereabouts of Jaeban UK's e-mail servers and files. Please provide a response in writing by Tuesday, December 7th, or we will assume that Mr. Jaeban declines to respond.

**2. Failure to Produce Documents Promptly after November 22nd.** Mr. Allen was to have reviewed newly-retrieved documents on November 22nd, yet we are not to see them until an unidentified date after December 9th, 2½ weeks later. Since Mills & Reeve has the prior document production (and since Thanksgiving is not a British holiday), it's not clear why there has been this further delay. Above all, it is your responsibility as Delaware counsel, not your client's or Mr. Allen's, to ensure that *all* responsive documents are produced to us promptly.

I would like to know by Tuesday:

a) the volume of e-mails and the type and volume of other documents that have been reviewed by Mills & Reeve since the September 21st argument on BRACII's second motion for sanctions; and

b) when I can expect to have the documents in-hand in Chicago. (We'll gladly pay the postage.)

By the time the documents are produced, BRACII will also require your assurance that there has been full compliance with the Joint First Request for Production and the unobjected portions of the Joint Second Request.

I recognize that the foregoing will require you to contact Mills & Reeve on Monday or Tuesday. (For that reason, Messrs. Allen and Minnis are copied on this e-mail.) Since the second sanctions argument (in which Rob Wilcox assured the Court that Mr. Jaeban was working diligently on these issues) took place almost 2½ months ago, we have certainly been patient, as your last e-mail recognized. Absent real compliance now, however, we will apprise the Court of the lack of it

Regards.

Ken

Kenneth E Wile
Sidley Austin Brown & Wood LLP
Bank One Plaza
Chicago, Illinois 60603
312-853-2081
312-853-7036 (fax)
kwile@sidley.com

-----Original Message-----
From: Brian Sullivan [mailto:bsullivan@werbsullivan.com]
Sent: Tuesday, November 30, 2004 1:52 PM
To: kwile@sidley.com
Cc: steven.allen@mills-reeve.com; rdwilcox@mindspring.com;
anthony.minnis@mills-reeve com; Morton, Edmon
Subject: Jaeban

1

BA626

Ken,

I have received and glanced at your letter. I am busy preparing for an
oral argument in our State Supreme Court in Dover tomorrow, which will
usurp all of my time for the next two days. I am also committed again
on Thursday. I had intended sending an email to you on Friday, after
Steve Allen returns to the office. He and I have missed each other due
to our schedules and not communicated much since the week before
Thanksgiving.

Nevertheless, I understand that Mills-Reeve now has possession of the
Jaeban U.K. computer and is able now to finally access the files. Steve
Allen intends to review these files with Mr. Jaeban on Thursday,
December 9, 2004 in order to determine whether there are any documents
which have not be previously produced. I will also ask Steve to address
your more specific questions early next week to the extent they can be
answered prior to the review on the 9th. If necessary we can address
this further on Friday when Steve and I are both available, but I wanted
to reply as soon as possible and again acknowledge your patience.
Regards.

Brian


Brian A. Sullivan, Esquire
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P. O. Box 25046
Wilmington, Delaware 19899
For Courier:   19801
Telephone:   (302) 652-1100
Facsimile:    (302) 652-1111
E-Mail: bsullivan@werbsullivan.com <mailto:bsullivan@werbsullivan.com>

2

**BA627**

## Wile, Kenneth E.

| | |
|---|---|
| From: | Brian Sullivan [bsullivan@werbsullivan.com] |
| Sent: | Tuesday, December 07, 2004 12:00 PM |
| To: | KWile@sidley.com |
| Cc: | steven.allen@mills-reeve.com; anthony.minnis@mills-reeve.com; EMorton@ycst.com |
| Subject: | Jaeban/BRAC |

Dear Ken,

Not for the first time in this case, we take great exception to your e-mail of Friday, December 3, 2004. Perhaps most importantly, you have again attempted to instruct me on my "responsibility as Delaware Counsel." We are well aware of our responsibilities as Delaware Counsel. You have done this on numerous occasions in this case, not only in writing, but during some of our conversations over the months. Please do not let it happen again.

Next, simply because you send an e-mail with bolded statements such as "persistent failure to answer" and "persistent failure to produce", does not make it so. We strenuously disagree with your allegations.

We echo the points raises in Mr. Allen's response. Further, we note that your recent barrage of correspondence ignores the information provided to you that the computer is scheduled to be re-reviewed by Mills-Reeve on December 9, 2004.

Further, it seems to me that you continue to ignore Judge Case's comment at the last Hearing that the parties in this case hear and see only what they want to hear and see. Your recent e-mail is a further example of that phenomenon. Your correspondence also ignores your client's failure to do anything more than baldly assert that the relevant information is outside its control, notwithstanding its own clear ability to request and compel production of that information.

Further, when Rob Wilcox was in England, he asked you to confirm whether you have any objection to our contacting Terry Clark, potential witness. To date, you persist in ignoring this request. Accordingly, we intend to pursue such contact.

Further, if Judge Cases's decision comes down as we anticipate it will, we intend to move for fees in defense of the second unwarranted Motion. We also will be very aggressive in defending any third such unwarranted Motion and would seek fees. Please govern yourself accordingly.


Brian A. Sullivan, Esquire
Robert W. Wilcox, Esquire
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
For Courier: 19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
E-Mail: bsullivan@werbsullivan.com

CONFIDENTIALITY NOTICE
UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW [Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)] This message is being sent by Werb & Sullivan, a law firm. It is intended exclusively for the individuals and entities to which it is addressed. This communication, including any attachments, may contain information that is proprietary, privileged, confidential or otherwise

1

BA628

legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of this message.

BA629

Re: Jaeban                                                                    Page 1 of 2

## Wile, Kenneth E.

| | |
|---|---|
| **From:** | Steve Allen [steve.allen@mills-reeve.com] |
| **Sent:** | Tuesday, December 07, 2004 11:39 AM |
| **To:** | 'Wile, Kenneth E ' |
| **Cc:** | 'Brian Sullivan'; 'rdwilcox@mindspring.com'; 'emorton@wcst.com'; 'pcorr@sidley.com' |
| **Subject:** | Re: Jaeban |

Mr Wile:

As you very kindly copied me into your e-mail to Brian Sullivan I am sure that you would not object to my responding on Mr Jaeban's behalf.

First, having been at the receiving end of a succession of applications by your firm aimed at disposing of Mr Jaeban's claim without addressing its merits, your e-mail was received here with little surprise but with some disappointment. We had hoped that following the comments of Judge Case at the September 21st hearing that such tactics on the part of your firm would cease. Yet it is quite apparent based on our previous experience that your e-mail has been written as a precursor to yet another application.

Second, it is clearly inappropriate for you to criticise my client for lack of discovery in circumstances where the entirety of your client's discovery production consists of three lever arch files containing documents of little or no assistance in answering the detailed requests submitted by Jaeban UK Limited. I note that you have consistently failed to address this issue in correspondence even though my predecessor firm first raised it with your firm in June 2003. We note in particular that the computer records of BRACII remain unavailable to our client and that you refused my 12 August 2004 request to schedule a telephone deposition with the Records Custodian at BRACII in order that we might gain a better understanding of your efforts to respond to Mr Jaeban's document production request

On the issue of my client's alleged "failure to produce documents", you have of course now had the opportunity of perusing all responsive documents held by my client. Indeed, I recall that part of your complaint at the September 21st hearing was the volume of documentation received by your firm. Having exhausted this argument I note that you now turn your attention to alleged failings on the part of my client to produce e-mails from the Jaeban computer.

I can confirm that the person who has most knowledge about the location of the Jaeban computer files is Mr Jaeban.

I can confirm that Wragge & Co assisted by PWC extracted computer files from the Jaeban server and that these have already been disclosed to you as part of an extensive document production In view however of your request, my firm has obtained the computer of Paul Champken who was the Accountant at Jaeban UK for the material period. As Brian Sullivan informed you on Friday I intend to review the contents of this computer with Mr Jaeban on Thursday in order to identify whether it contains any relevant documents responsive to your request. If it does and these documents were not previously disclosed in Jaeban UK Limited's disclosure they will be promptly sent to you. In the meantime I would remind you that most of the material and responsive documents sought by you will be held on the Hemel computer in the possession of your client. Perhaps you would care to advise me of what steps have been taken by your firm to provide this server for inspection. I would also remind you that it is both your and your client's responsibility to make certain that all non-privileged requested documents have been provided

Yours sincerely

**Steve Allen**
Partner

2/2/2005                                                                      **BA630**

Re: Jaeban

Mills & Reeve
Tel: +44(0)121 456 8343
mailto:steve.allen@mills-reeve.com
http://www.mills-reeve.com

---

This email is confidential and privileged. If you are not the intended
recipient please accept our apologies; please do not disclose, copy,
or distribute information in this email nor take any action in reliance
on its contents: to do so is strictly prohibited and may be unlawful.
Please inform us that this message has gone astray before deleting
it. Thank you for your co-operation.

Mills & Reeve Solicitors, offices at:

Birmingham: 54 Hagley Road, Edgbaston, Birmingham B16 8PE.
Cambridge: Francis House, 112 Hills Road, Cambridge CB2 1PH.
Norwich: 1 St James Court, Whitefriars, Norwich NR3 1RU.
London: Bankside House, 107-112 Leadenhall Street, London EC3A 4AF.

Mills & Reeve is regulated by the Law Society.

A list of Partners may be inspected at any of the above addresses.

Visit our web site at: http://www.mills-reeve.com

This message has been checked for viruses by the Mills & Reeve
screening system.

**BA631**

## Wile, Kenneth E.

| | |
|---|---|
| **From:** | Wile, Kenneth E. |
| **Sent:** | Wednesday, December 08, 2004 2:29 PM |
| **To:** | Brian Sullivan (E-mail) |
| **Cc:** | Rob Wilcox (E-mail); 'steve allen@mills-reeve com'; Corr, Patrick; Taylor, Phillip D ; Edmon L Morton (E-mail) |
| **Subject:** | Jaeban UK Adversary Proceeding |

Brian:

Thank you for that portion of Steve Allen's e-mail of yesterday (a) disclosing that it is Mr Champken's computer that is being reviewed and (b) stating that Ibrahiem Jaeban is the witness most knowledgeable about Jaeban UK's computers

Unfortunately, neither your e-mail of yesterday nor Steve's addressed the question I now must ask for a fifth time: are there Jaeban UK computers or e-mail servers that are no longer available to be searched (and, if so, what became of them)? Please respond.

With respect to the accusations and threats in the two e-mails, I note that your prior e-mails thanked me for my patience on three separate occasions I waited a full month after the second sanctions argument even to raise these issues on October 20, 2004 It is now 2½ months after the argument and 3½ months after Rob Wilcox and I began discussing the question of missing computers and e-mails -- which was first raised with Wragge & Co in December 2003

Finally, BRACII has not impeded your access to Terry Clark, a long-time friend of Mr Jaeban's, and does not seek to do so now

Regards

Ken

Kenneth E. Wile
Sidley Austin Brown & Wood LLP
Bank One Plaza
Chicago, Illinois 60603
312-853-2081
312-853-7036 (fax)
kwile@sidley.com

1

BA632

## Wile, Kenneth E.

| | |
|---|---|
| **From:** | Steve Allen [steve.allen@mills-reeve.com] |
| **Sent:** | Thursday, December 09, 2004 3:07 AM |
| **To:** | 'Wile, Kenneth E.'; Brian Sullivan (E-mail) |
| **Cc:** | Rob Wilcox (E-mail); Corr, Patrick; Taylor, Phillip D.; Edmon L. Morton (E-mail) |
| **Subject:** | RE: Jaeban UK Adversary Proceeding |

Mr Wile:

Please have the courtesy to respond to the issues raised in my e-mail to you of Tuesday

Yours sincerely

**Steve Allen**
Partner
Mills & Reeve
Tel: +44(0)121 456 8343
steve.allen@mills-reeve.com
http://www.mills-reeve.com

-----Original Message-----
**From:** Wile, Kenneth E. [mailto:KWile@Sidley.com]
**Sent:** 08 December 2004 20:29
**To:** Brian Sullivan (E-mail)
**Cc:** Rob Wilcox (E-mail); 'steve.allen@mills-reeve.com'; Corr, Patrick; Taylor, Phillip D.; Edmon L. Morton (E-mail)
**Subject:** Jaeban UK Adversary Proceeding

Brian.

    Thank you for that portion of Steve Allen's e-mail of yesterday (a) disclosing that it is Mr Champken's computer that is being reviewed and (b) stating that Ibrahiem Jaeban is the witness most knowledgeable about Jaeban UK's computers.

    Unfortunately, neither your e-mail of yesterday nor Steve's addressed the question I now must ask for a fifth time: are there Jaeban UK computers or e-mail servers that are no longer available to be searched (and, if so, what became of them)? Please respond.

    With respect to the accusations and threats in the two e-mails, I note that your prior e-mails thanked me for my patience on three separate occasions   I waited a full month after the second sanctions argument even to raise these issues on October 20, 2004. It is now 2½ months after the argument and 3½ months after Rob Wilcox and I began discussing the question of missing computers and e-mails -- which was first raised with Wragge & Co. in December 2003

    Finally, BRACII has not impeded your access to Terry Clark, a long-time friend of Mr Jaeban's, and does not seek to do so now

    Regards

    Ken

**BA633**

Kenneth E Wile
Sidley Austin Brown & Wood LLP
Bank One Plaza
Chicago, Illinois 60603
312-853-2081
312-853-7036 (fax)
kwile@sidley.com

Sidley Austin Brown & Wood LLP mail server made the following annotations on 12/08/2004, 02:28:28 PM
----------------------------------------------------------------------

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

---

This email is confidential and privileged. If you are not the intended
recipient please accept our apologies; please do not disclose, copy, or distribute information in this email nor take any action in reliance
on its contents: to do so is strictly prohibited and may be unlawful.
Please inform us that this message has gone astray before deleting it. Thank you for your co-operation.

Mills & Reeve Solicitors, offices at:

Birmingham: 54 Hagley Road, Edgbaston, Birmingham B16 8PE.
Cambridge: Francis House, 112 Hills Road, Cambridge CB2 1PH.
Norwich: 1 St James Court, Whitefriars, Norwich NR3 1RU.
London: Bankside House, 107-112 Leadenhall Street, London EC3A 4AF.

Mills & Reeve is regulated by the Law Society.

A list of Partners may be inspected at any of the above addresses.

Visit our web site at: http://www.mills-reeve.com

This message has been checked for viruses by the Mills & Reeve screening system.

## Wile, Kenneth E.

| | |
|---|---|
| **From:** | Brian Sullivan [bsullivan@werbsullivan.com] |
| **Sent:** | Friday, December 10, 2004 8:49 AM |
| **To:** | kwile@sidley.com |
| **Cc:** | steven.allen@mills-reeve.com; anthony.minnis@mills-reeve.com; Robert D Wilcox |
| **Subject:** | Jaeban/BRAC |

Ken,

I understand and am informed that the review of the primary Jaeban computer commenced yesterday at Mills-Reeve. Steve Allen has indicated that he should be able to provide a report of the review by the end of next week and maybe sooner. I send this as a matter of courtesy and to keep you informed and do not anticipate the necessity of a response. It would be helpful if you would please respond to the information requested by Steve. Thanks for your consideration. Regards.

Brian A. Sullivan, Esquire
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P.O. Box 25046
Wilmington, Delaware 19899
For Courier: 19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
E-Mail: bsullivan@werbsullivan.com

CONFIDENTIALITY NOTICE
UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW [Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)] This message is being sent by Werb & Sullivan, a law firm. It is intended exclusively for the individuals and entities to which it is addressed. This communication, including any attachments, may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of this message.

**BA635**

**Exhibit F to Opposition**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11
                                          .
BRAC GROUP, INC., et al,                  .    Case No. 02-12152(CGC)
(f/k/a Budget Group, Inc.)                .    Jointly Administered
                                          .
        Debtors.                          .    March 10, 2004 (2 p.m.)
                                          .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

BA637

2

1          THE CLERK:  All rise . . . (microphone not

2  recording.)

3          THE COURT:  Good afternoon.  Please be seated.

4          MR. MORTON:  Good afternoon, Your Honor.  Ed Morton

5  from Young Conaway Stargatt & Taylor on behalf of the

6  debtors, BRAC Group, Inc., et al.  Turning to the second

7  updated notice of agenda that was filed recently, Your Honor,

8  and turning to the matters that were listed as going forward,

9  we're happy to report that most of the matters on today's

10  calendar have either been adjourned or resolved, and it looks

11  like we only have one actual contested item going forward

12  today.  Matter number 7, Your Honor is the motion of David

13  Burhman for relief from the automatic stay.  That matter is

14  being adjourned, by way of brief background, Your Honor.  As

15  Your Honor is aware, at this point in the case, many of the

16  liabilities of the debtors were assumed by Cherokee as part

17  of the asset stock sale that was conducted earlier in the

18  case.  Judge Walrath, prior to your involvement in the case,

19  entered an order which provided modified relief from the

20  automatic stay for certain of the personal injury and other

21  tort claims that were clearly assumed by Cherokee, and

22  Cherokee actually consented to the entry of the order in that

23  regard.  This particular claim is one that -- that the

24  debtors believe is contained on that order, and we are

25  adjourning the motion so that the claimant has time to

FORM FED-25 ® PENGAD • 1-800-631-6989

3

1   satisfy itself that -- that the relief it seeks has already

2   been granted by the Court.   Moving to matter number 8, Your

3   Honor, that is the motion to strike certain portions -- I'm

4   sorry -- to strike the entirety of the Jaeban answer in the

5   adversary proceeding.   That is the one remaining contested

6   matter for today, so I would propose that we take that up at

7   the end and allow the other uncontested matters to be

8   cleared.   If that's acceptable to Your Honor.

9           THE COURT:   That's fine.

10          MR. MORTON:   Matters 9 and 10, Your Honor, are both

11  being adjourned on consent of the parties.   I believe there

12  is one representation that counsel to Ms. Benner has to make

13  on the record for that to happen, and I'll cede the podium to

14  her.

15          MS. MILLER:   Good afternoon, Your Honor.   Kathleen

16  Miller on behalf of Anne Benner and other family members.

17  Ms. Benner and her family have the group petition tort claim.

18  Previously we did get relief from the Court prior to the

19  order that Mr. Morton just mentioned for them to proceed.

20  There appears to be a dispute between Cherokee and Budget

21  whether or not this was an assumed liability.   The case is

22  proceeding in State Court, and that's why we filed our

23  adversary proceeding, to have a determination as to whose

24  liability it is.   We really don't care, we just need to know

25  one way or the other before trial occurs in November.   Some

BA639

4

1   things have been happening, and this issue may get resolved

2   consensually, and that's why we've agreed to adjourn the pre-

3   trial conference to next month.  If not, then we can set a

4   scheduling order.  With that, I agreed that we would make a

5   representation on the record -- and that's why we filed the

6   adversary proceeding here -- is that the issue of whether or

7   not the Benner claim was an assumed claim would be decided by

8   this Court, if it's not resolved.  And there will be no

9   action taken in the State Court, discovery or any other

10  action, with regard to that issue.  We won't take any

11  discovery, the issue won't be presented to the Court, the

12  State Court, that's all for this Court to determine if that's

13  necessary.

14          THE COURT:  All right.  Thank you.

15          MR. ANTOSZYK:  Peter Antoszyk, counsel of the

16  Creditor's Committee, Your Honor.  Just to follow up on those

17  comments.  Just by way of information, we believe we've

18  reached resolution with Cendant on a whole host of issues.

19  This, the Benner claim, just being but a vital part of it,

20  and, therefore, we hope to be presenting to this Court a

21  resolution of an adversary proceeding pending between us and

22  the estates in the next week or so.

23          THE COURT:  Thank you.

24          MR. MORTON:  Your Honor, if there are no more

25  representations to be made on those matters, I believe that

**BA640**

5

1    takes us to matter number eight, which is the motion to

2    strike in the Jaeban proceeding.

3        THE COURT:  Well before we get to that, do we need

4    to make any record at all on 1 through 6?  Number 1 has been

5    resolved or will be withdrawn?

6        MR. MORTON:  Your Honor, these -- most of the

7    matters pending here -- in matters 1 through 6, are motions

8    for relief from stay.  In many instances they are either one,

9    subject to the still remaining and yet apparently close to

10   resolved matter between Cherokee and Budget as to whom the

11   responsible party would be, and thus whether or not we would

12   consent to relief from stay in that regard.  Or, they are of

13   the second variety, which is the one I just described to Your

14   Honor earlier, where claimants are merely satisfying

15   themselves that that they indeed have the relief that they

16   have already -- that the Court has already granted them

17   relief and that they're moving forward.  Thank you, Your

18   Honor.

19       MR. WILE:  Good afternoon, Your Honor.  Kenneth

20   Wile for plaintiffs with respect to the motion to strike,

21   and since we were last in front of the Court complaining of

22   the gamesmanship of the other side, I'm afraid we've

23   encountered even more in the form of what purports to be a

24   five thousand pound assignment of the counterclaims, but not

25   the defense, to Mr. Jaeban, the former principal of Jaeban

6

1  (U.K.) Limited. We take strenuous exception to that. We

2  think that there is not a competent response on file, and by

3  far the fairest, and certainly the fastest result, is to

4  grant our motion. Turning first to simply where we stand

5  procedurally. There is no opposition on file by any party in

6  this action. Mr. Jaeban's opposition goes out of its way,

7  for reasons that are touched on in our reply, to make it

8  clear he's only appearing as assignee of Jaeban (U.K.). Mr.

9  Jaeban, as far as I know, and we've been checking, has not

10  filed a motion to intervene or even an appearance in this

11  action. And under the case we've cited, and just as a matter

12  of general common sense, if you want to appear in an opposing

13  motion you need to intervene, subject yourself to the

14  jurisdiction of the Court and make it fair. That simply

15  hasn't happened. Jaeban (U.K.), contrary to the Court's

16  instruction at our last hearing in Phoenix, and that

17  direction is in fact noted in Mr. Jaeban's opposition, was to

18  have filed by Monday, February 23rd. There was no response

19  from Jaeban (U.K.) at all. So we think by far, the easiest

20  and for that matter the fairest result is simply to dismiss

21  this and not have to worry about the myriad issues that I --

22  to which I now have to turn. I don't want to suggest by the

23  number of issues that there is any justice in this case

24  proceeding, because all of them, in fact, are further reasons

25  why this ought to all come to an end, finally in the last

7

1   hundred days after we last had any cooperation or

2   participation by the defendant and counterclaim plaintiff in

3   this action.  Turning quickly, and I don't want to

4   recapitulate too much what's in our reply, Mr. Jaeban stands

5   in the shoes of his assignor.  That's black letter law under

6   the law of the United Kingdom, and we cited a case for that.

7   We all know that it's black letter law over here.  There's

8   nothing about this case, in our view, that makes that any

9   different, and more to the point, since the principal

10  question is probably under U.K. law, we have submitted an

11  affidavit from Mr. Core, who is a solicitor, practices in

12  this area in the United Kingdom.  Mr. Jaeban, for whatever

13  reason, did not submit an affidavit from his solicitors, who

14  I gather are now representing both him and Jaeban (U.K.), an

15  interesting situation I would think.  And the law is he

16  basically is stuck with the misconduct of Jaeban (U.K.),

17  which he does not dispute, and really there's not much point

18  of it, because we've been discussing it in the last few

19  hearings.  If that's not sufficient in and of itself -- Your

20  Honor, I'm sorry, I should point out there's really no effort

21  in his opposition to explain why he should be free of what

22  his assignor did.  If that's not sufficient in and of itself,

23  then I'd like to quickly run through the six coolest factors,

24  and again, I want to avoid going into too much detail.  We've

25  covered personal responsibility before, but I would like to

BA643

8

1  detail the prejudice to my clients, which is by no means

2  ameliorated by this five thousand pound assignment.  There's

3  $4.5 million in escrow.  And the clock continues to tick.

4  Somewhat analogously there's a confirmation hearing due to

5  occur on April 7th.  We are nowhere near the resolution of

6  this action.  In fact, the assignment makes it all too likely

7  this will become a truly protracted proceeding.  In honor of

8  our friends from the United Kingdom, I'm inclined to mention

9  Jarndice (phonetical) and Jarndice.  It won't take quite that

10  long, but it's clearly going take much longer than it would

11  have before.  We've already had to spend money on motion

12  practice.  We're now stuck with the following lovely

13  situation in which in order to get discovery from the other

14  side, if in fact they're going to give it to us, we have to

15  rely on a cooperation clause.  The cooperation clause is with

16  Jaeban (U.K.) and its receivers, and I would respectfully

17  submit to the Court that if Jaeban (U.K.) was willing utterly

18  to disregard this Court's orders repeatedly and to disregard

19  the Court rules, I suspect that Mr. Jaeban, even if he has

20  the best of intentions, would have no better luck than we've

21  had heretofore.  The amount of procedural confusion that we

22  now face by virtue of this somewhat phony assignment only

23  makes matters worse, and there I would like to read into the

24  record footnote three of the opposition.  In the event that

25  the Court denies plaintiff's motion -- again these are Mr.

9

1   Jaeban's words -- Jaeban requests -- and I assume that's Mr.

2   Jaeban -- requests that the scheduling order be extended and

3   modified. No particular time given. Further, the

4   distinction between the claims against Jaeban Limited, which

5   is probably headed from receivership to insolvency, and the

6   claims of the assignee, Mr. Jaeban, will have to be made.

7   Your Honor, I've tried with the best of faith to figure out

8   what exactly that means. I don't know. I don't look forward

9   to our joint efforts to try to resolve what that means. And

10  beyond that, the number of additional motions we'll have to

11  face, starting with the fact that the assignment, as we've

12  argued and shown in our reply, is in fact invalid. And I

13  find it somewhat surprising, given that we are up here on a

14  sanctions motion where bad faith is already at issue and not

15  in any meaningful sense denied that Mr. Jaeban chose not to

16  raise the existence of the three, count them, three anti-

17  assignment provisions in the umbrella agreement, and the

18  licensing agreement that existed between Jaeban (U.K.) and

19  Mr. Jaeban, for that matter, and plaintiffs. It's simply not

20  mentioned at all. It's left to us to bring up the issue.

21  The language is clear. We have Mr. Core's affidavit,

22  attesting that, in fact, the Court in the United Kingdom

23  would, in fact, enforce those provisions, and we've heard

24  nothing from Mr. Jaeban, and I submit the time to have heard

25  that would have been in his opposition, and not in any

1   further proceedings following this hearing.  Returning to the

2   coolest factors dilatory, and as we've discussed far too many

3   times, because we've had to, not only has Jaeban's bad faith

4   -- Jaeban (U.K.)'s bad faith a matter of public record, but

5   Mr. Jaeban is not entirely without fault in this as well.

6   Not least because he's the one who made the decision not to

7   pay us the three hundred and twenty eight thousand pounds

8   which we were owed back in May of 2003 and which now stands

9   out there as a turnover order with which Jaeban (U.K.) has

10  told us they will not comply.  And as an aside, it's not

11  clear to me how this case an ever go forward unless there is

12  compliance.  We're also troubled that Mr. Jaeban didn't

13  disclose the fact of his personal guarantee.  It remains our

14  view that that's an action that should take place in the

15  United Kingdom where his assets are located, but that has all

16  kinds of implications if, in fact, we're going to go forward

17  here.  You know, a key determination in cases like this tends

18  to be, you know, is there an effective remedy?  Well, Mr.

19  Jaeban's response is, well you have the three hundred and

20  twenty eight thousand pound turnover order.  And then we turn

21  to Exhibit D to our reply which is the letter from his

22  solicitors telling us that in course there will be no

23  compliance with the three hundred and twenty eight thousand

24  dollar immediate turnover order, because there are

25  insufficient assets.  And as we've noted in our reply, when

11

1   there really is no financial wherewithal, or no ready

2   financial wherewithal on the other side, no remedy, short of

3   dismissal, is effective. Finally, on meritoriousness of

4   claim, I mean, usually that's a neutral factor, because

5   usually, as one of the cases points out, if you haven't pled

6   the elements sufficiently, the claim would have been gone on

7   that basis. Here, by virtue of the assignment, we now have

8   the question whether Mr. Jaeban has standing. There are the

9   three anti-assignment provisions. It only takes one,

10  actually, because the two -- the two smaller ones that are

11  for much less than the three million pound claim, as to which

12  there will now be a default, because Jaeban (U.K.) is not

13  here to answer in its own name. And it just sort of points

14  to the overall silliness towards which we were headed unless

15  this is brought rather to a quick end. And last, but not

16  least, we did mention deterrence. And we're troubled that

17  there's been an attempt by both sides of the assignment

18  transaction to evade the consequences of what's already

19  occurred here. We don't think that it's appropriate for

20  parties located anywhere in the world to simply say that the

21  orders of this Court and the rules of Court are of no import,

22  and if trouble looms, they can escape liability with an

23  assignment for a token amount and an indemnity. We have just

24  a general concern that, you know, an assignment of this type,

25  throwing this up at the last minute, that the Court ought to

12

1   be sanctioning -- or rather, the Court should not be

2   sanctioning a last minute assignment as a way of avoiding

3   sanctions.  And the Supreme Court in the NHL decision, which

4   both parties have cited, have stress deterrents, and the fact

5   that merely a promise of a brighter day is not a sufficient

6   reason when there are ample reasons in the record for

7   granting a motion like this, and that, respectfully, is what

8   we believe ought to occur here.  Thank you.

9           THE COURT:  Do we have counsel here for Jaeban?

10          MR. SULLIVAN:  Yes, Your Honor.  Good afternoon,

11  Your Honor.  Brian Sullivan, Werb & Sullivan, for Mr. Jaeban,

12  the assignee of Jaeban (U.K.) Limited.  And on the phone,

13  Your Honor, from England is Mr. Steven Allen from the Wragg

14  and Company law firm.  I hope you can hear me okay.  And he

15  has previously addressed the Court, Your Honor.  We filed our

16  response, Your Honor, on March 1st to the motion to strike.

17  Debtor's counsel has vociferously argued to strike the claims

18  of Jaeban, but we know, Your Honor, from the governing

19  precedent that dismissal is a drastic sanction that is

20  reserved for extreme cases, Your Honor.  This is not one of

21  those cases, and we believe that dismissal is not

22  appropriate.  The debtor in this case has thrown everything

23  at Jaeban, including the kitchen sink, in its zealous efforts

24  to get the case dismissed, Your Honor.  But what the debtor

25  fails to acknowledge, and we believe Your Honor will, is that

13

1   the delay in this case was caused by intervening

2   circumstances, circumstances that were beyond Jaeban's

3   control, Your Honor.

4           THE COURT: Now, when you're talking about Jaeban,

5   I want to be clear here. You're representing, I take it, Mr.

6   Jaeban. When you're talking about Jaeban as --

7           MR. SULLIVAN: Well --

8           THE COURT: -- Mr. Jaeban, or Jaeban (U.K.), or

9   some other Jaeban entity?

10          MR. SULLIVAN: I'm referring to Mr. Jaeban. I will

11  try to use that when I'm referring to him, and Jaeban (U.K.)

12  when I'm referring to Jaeban Limited, but sometimes I think

13  that their interests are probably identical since he is the

14  assignee, Your Honor.

15          THE COURT: Well, let's -- let's just talk before

16  you get too far into this --

17          MR. SULLIVAN: Sure.

18          THE COURT: -- about the assignment.

19          MR. SULLIVAN: Okay. Sure.

20          THE COURT: Putting aside, for the moment, and just

21  for the moment, these issues of the effectiveness of the

22  assignment because of the contractual anti-assignment

23  clauses, what is your view of what was actually assigned?

24  And what was not assigned? What does your client, Mr.

25  Jaeban, hold, and for what is he potentially liable?

14

1      MR. SULLIVAN:  I might ask Mr. Allen, if he could,

2  Your Honor, to address that, but I believe he has all of the

3  rights with regard to the claims and the counterclaims that

4  Jaeban (U.K.) Limited had.  It may be a question, Your Honor,

5  of English law that I haven't had a chance to get to yet.

6      THE COURT:  Well, what about --

7      MR. SULLIVAN:  As to --

8      THE COURT:  -- what about the issue with regard to

9  the escrow?  What, if any, rights or obligations does he have

10 with regard to the escrow?

11     MR. SULLIVAN:  I believe he has the same claims to

12 the escrow that Jaeban (U.K.) did, Your Honor, by virtue of

13 the assignment.

14     THE COURT:  Well, and the debtor here seeks -- has

15 claims against the escrow.

16     MR. SULLIVAN:  Okay.

17     THE COURT:  What I'm trying to understand is --

18 let's say I were to let him come into the case as assignee.

19     MR. SULLIVAN:  Yes, sir.

20     THE COURT:  And on the merits I were to decide in

21 favor of the debtor.  What would be the debtor's remedy at

22 that point?

23     MR. SULLIVAN:  Maybe Mr. Allen again could help me,

24 because I have only been involved for several weeks and have

25 focused primarily on this motion.  But I believe that if you

15

1   were to deny Mr. Jaeban's claims and award the debtor its

2   claims, that it would be able to get control of the escrow

3   account but maybe Mr. Allen could back me up on that.   I

4   don't think that the --

5           MR. ALLEN (TELEPHONIC):  Your Honor --

6           MR. SULLIVAN:  Let me just preface my comment, Mr.

7   Allen.

8           THE COURT:  Just hold on -- just hold on a second,

9   Mr. Allen.  Just a minute.

10          MR. SULLIVAN:  Sorry.  That was my fault.  But I

11  just wanted to preface it that we don't intend, nor do we

12  think that the assignment, Your Honor, is going to interfere

13  with Your Honor's ability to deal effectively with this case,

14  and we'll do everything within our power to make sure that it

15  doesn't.

16          THE COURT:  Well, I understand that.  I understand

17  your offer of good faith.  What I'm trying to understand is

18  --

19          MR. SULLIVAN:  Why don't -- go ahead.

20          THE COURT:  What the debtor wants, to quote from

21  its motion, is to strike the debtor's answer, affirmative

22  defenses, and counterclaims in order to release from escrow

23  the $4.5 million of plaintiff's funds held hostage by

24  misconduct of defendant Jaeban (U.K.) Limited.  Okay?  So,

25  what they're seeking to do is to get the $4.5 million.  What

16

1    I'm trying to understand is the party or the entity that I

2    arguably have in front of me or that you're trying to get in

3    front of me, which is Mr. Jaeban as assignee of Jaeban (U.K.)

4    Limited, is that party, Mr. Jaeban as assignee, able to

5    deliver the $4.5 million to the plaintiff, assuming, number

6    one, that I were not to strike it at this point, and number

7    two, that I were to grant your standing, and number three,

8    that you would eventually intervene, and number four, that

9    the anti-assignment clauses were not effective, and so on, at

10    the end of the day, if the debtor is correct on the merits,

11    do you deliver the $4.5 million to the debtor?

12        MR. SULLIVAN:  I believe we could, Your Honor.

13    That's my understanding of the assignment.  And I -- frankly,

14    I think that the debtor is making more of the assignment then

15    needs to be made.  We've looked at Federal Rule 25, which

16    talks about the assignment of causes of actions, and I think

17    it controls.  And it simply says --

18        THE COURT:  Controls over a contractual limitation

19    on assignment?

20        MR. SULLIVAN:  Well, that's a separate matter, Your

21    Honor.  But just in terms of the validity of the assignment,

22    and the party before you, it simply says that the assignee

23    stands in the shoes of the assigning party, and that the

24    Court may require a motion to substitute, but I do not think

25    it's mandatory.

17

1    THE COURT: Well, maybe I didn't understand this

2 very well. But I -- I read the assignment as transferring to

3 Jaeban -- Mr. Jaeban as assignee certain rights without

4 necessarily transferring certain obligations. And that's

5 what I'm trying to understand, is whether or not the

6 obligations went with the rights under the assignment that

7 was executed. One of the obligations being that in the event

8 of an adverse ruling to turn over, without further ado, the

9 $4.5 million escrow.

10    MR. SULLIVAN: Again, I believe that the answer to

11 that is in the affirmative, but maybe we can hear what Mr.

12 Allen has to say, Your Honor.

13    THE COURT: Do you have a point of view on that Mr.

14 Allen?

15    MR. ALLEN (TELEPHONIC): Your Honor, on that issue,

16 it's my understanding that . . . (microphone not recording)

17 was intended to ensure that Mr. Jaeban would be in a position

18 to stand effectively in the shoes of Jaeban (U.K.) Limited

19 with respect of, certainly, it's obligations. I would need

20 to take advice from colleagues on the specifics in relation

21 to that.

22    THE COURT: Well, we are today at a hearing which

23 has presented the question whether or not the answer of

24 Jaeban (U.K.) and it's affirmative defenses and counterclaims

25 should be stricken, for all purposes. The defense that's

1  being presented against that motion is that now we have Mr.

2  Jaeban here standing in the shoes of the defendant, Jaeban

3  Limited, that it really wasn't his fault, that it was the

4  intervention of the administrative receivership that caused

5  all of the delays and so on, and that now he basically is

6  ready to proceed.  Now, as I understand that's kind of where

7  we are today.

8         MR. SULLIVAN:  Correct, Your Honor.

9         THE COURT:  And that's their basis of the defense.

10  Now, I just asked what I thought was a direct question, which

11  is, Can Mr. Jaeban deliver, if he is unsuccessful in his

12  defense, if I were to allow it to continue?  And the second

13  question is demonstrate that to me.  And what I've gotten,

14  respectfully, from both counsel is it's my understanding that

15  that was the intention of this.  Which is not much, frankly,

16  on what seems to me to be a pretty important question.  So,

17  that's why I'm asking the question as directly as I can.

18         MR. SULLIVAN:  Might we suggest, Your Honor, if we

19  cannot answer it now, that we can answer it after argument

20  today.

21         THE COURT:  Well --

22         MR. SULLIVAN:  If that's --

23         THE COURT:  You know, I thought -- you know, I

24  thought today was the O.K. Corral, frankly.  And, you know,

25  the guns were blazing today, and that we were --

FORM FED-25  ®  PENGAD • 1-800-631-6989

19

1    MR. SULLIVAN:  They are, Your Honor, but we tried

2    to get up to speed on a relatively complex case as quickly as

3    we could, probably less than two weeks, and we focused on

4    filing the answer to the motion.  But this is a question that

5    we didn't realize that the Court was going to have such

6    interest in, and while I believe the answer is yes, we would

7    certainly be willing to expediently, post argument --

8         THE COURT:  I guess here's what I'm trying to under

9    --

10        MR. SULLIVAN:  Okay.

11        THE COURT:  And I am asking, and I want somebody to

12   tell me, that if I misunderstand what is going on here,

13   because I am not as intimately involved, obviously, in this

14   as any of you, but if I misunderstand, I want somebody to

15   tell me --

16        MR. SULLIVAN:  We'll do our best.

17        THE COURT:  -- about what I -- to restate the

18   obvious.  The administrative receivers for Jaeban (U.K.) have

19   up until this time ignored what's been going on.  They've

20   chosen to do that.  They now have chosen, instead, to give an

21   assignment of something to Mr. Jaeban in consideration of a

22   relatively modest payment and told Mr. Jaeban he can go out

23   and assert the counterclaims, defend the action, and proceed.

24   Now, as far as I can tell, that still does not affirmatively

25   put Jaeban (U.K.) or the administrative receivers in a

BA655

20

1    position where they are subject to jurisdiction such that if

2    there was an order saying deliver the $4.5 million, that they

3    would do so.  And so I say --

4        MR. SULLIVAN:  I believe --

5        THE COURT:  -- does that mean that Mr. Jaeban is

6    now the one who's in the position to do so?  And what I get

7    is an answer that says, It's my understanding that that was

8    the intention.  Now it doesn't strike me as an unusual

9    question, because what you're trying to do is to stop what

10   would otherwise be, you know, to use a metaphor, a stake in

11   the heart, by coming in and saying, Well, you don't have to

12   put a stake in the heart, because here we are.  And I'm

13   trying to understand who is here and with what.  Now --

14       MR. ALLEN (TELEPHONIC):  Well, Your Honor, if I

15   could make the comment.  I'm not familiar with U.S. law on

16   the specific issue of what Jaeban (U.K.) would need to do to

17   release the 4.5 million, and, therefore, I can't answer

18   questions as to what Mr. Jaeban can do.  All I can say is

19   that my understanding, Your Honor, is that Mr. Jaeban can do

20   exactly what Jaeban (U.K.) Limited could do.  If I understood

21   what Jaeban (U.K.) Limited's responsibilities were in

22   relation to what they had to do administratively to release

23   the 4.5 million in the event of the debtor's success, then I

24   could answer the question.

25       THE COURT:  Well, let me ask you this question.

21

Where is this escrow?  Describe the escrow to me.  Do you

know, Mr. Allen?  I see Mr. Wile standing up.  He wants to --

he wants to educate me.

MR. WILE:  Yes, Your Honor.  I think there's a key

fact here I need to explain.

MR. SULLIVAN:  Sure.  Please.

THE COURT:  All right.  I'm going to let Mr. Wile

talk for a moment.  So, I'm saying, if I'm misunderstanding

something, I want somebody to tell me.

MR. WILE:  That's why I was bobbing up and down,

Your Honor.  Not something I ordinarily do in an argument.

I'll try to be uncharacteristically brief.  The $4.5 million

escrow is held at the request of the plaintiffs, the debtors,

at a bank in Chicago to compensate Mr. Jaeban for the claimed

4.5 million US in damages that are there.  And all he need

simply do is lose and that gets released.  But I took the

Court's question to be what becomes of our affirmative claim,

and I took some discomfort, obviously excruciatingly shared

by us, that Mr. Jaeban gets all the benefits and none of the

burdens.  We have a three million dollar -- I'm sorry -- a

three million pound, it's a 5.4 million claim against Jaeban

(U.K.).  I think it's fair to assume, and I'd love to hear

otherwise, that Mr. Jaeban wants nothing to do with that

entire liability.  He has enough on his hands with the

guarantee that he has given.  I do not understand him to have

22

1   assumed that liability. The deed of assignment is an

2   interesting document, somewhat difficult to read.

3           THE COURT: Yeah. Let's -- you are getting --

4           MR. WILE: Right, exactly --

5           THE COURT: -- too long. Let me just --

6           MR. SULLIVAN: -- but that would be the complete

7   explanation.

8           THE COURT: Let me just then back up a little bit.

9           MR. WILE: Okay.

10          THE COURT: There's four and a half million dollars

11  --

12          MR. WILE: Right.

13          THE COURT: -- held in an escrow in a bank in

14  Chicago, a bank in the US.

15          MR. WILE: Yes.

16          THE COURT: Did you say Chicago?

17          MR. WILE: I believe they're the same, Your Honor.

18          THE COURT: I know. They're not co-terminus, but

19  they do -- the one does include the other.

20          MR. WILE: Only in our minds, Your Honor.

21          MR. SULLIVAN: That's right.

22          THE COURT: And that's there -- and that's

23  basically the debtor's money --

24          MR. WILE: Yes.

25          THE COURT: -- that's being held, in effect, to

23

1   protect claims that were brought against it by Jaeban.  In

2   addition to that, you have your claim for $3 million, plus

3   you have this three hundred and eighty four thousand dollar

4   -- thousand pound turnover order that was entered last time

5   --

6       MR. WILE:  Correct.

7       THE COURT:  -- that would -- that are claims

8   against, affirmatively against Jaeban (U.K.); right?

9       MR. WILE:  That's correct, Your Honor.

10      THE COURT:  So, in the best of all worlds, the

11  debtor gets its four and a half million dollars back, and

12  gets a judgment for $3 million, or pounds, whichever it is,

13  against Jaeban (U.K.), and gets paid.  So, it puts its four

14  and a half million that was its money and it gets three

15  million more.

16      MR. WILE:  That would be wonderful, Your Honor, but

17  since we have been told by Wragg and Company --

18      THE COURT:  They say -- I'm talking about that's

19  the best of all worlds.

20      MR. WILE:  When this case began, yes, absolutely.

21      THE COURT:  And what you say you have been told by

22  the solicitors is, you know, get all the judgments you want

23  against us, because --

24      MR. WILE:  Right.

25      THE COURT:  -- we don't have any money, and we're

24

1  not going to pay you.

2          MR. WILE:  Yeah.

3          THE COURT:  Or stand in line, or something similar

4  to that.

5          MR. WILE:  Exhibit D to our reply, Your Honor.

6          THE COURT:  Right.  So, as far as the release of

7  the escrow is concerned, that's not something, you're telling

8  me, over which Jaeban (U.K.), or anybody, has any control; or

9  is it?  For example, does the escrowee need some kind of

10  affirmative letter from solicitors for Jaeban (U.K.) saying

11  you can now release it, or does it simply need an order of

12  the Court saying, You lose, release the money?

13          MR. WILE:  Well, prior to the assignment, a letter

14  from Jaeban (U.K.) might be fine, but as someone who

15  represents banks for a living, I can imagine some discomfort

16  because of the confusion that's been created here.  So to be

17  entirely candid to the Court, it may well be that an order

18  would be necessary or a waiver by all the appropriate

19  parties.

20          THE COURT:  But an order would do it.

21          MR. WILE:  An order would certainly do it.  Yeah.

22          THE COURT:  Okay.  All right.  Thank you.

23          MR. SULLIVAN:  And I think, Your Honor, if I --

24          THE COURT:  I guess my -- The question I was trying

25  to state earlier was I didn't understand the mechanics of the

25

1    escrow, and I thought maybe there was something that Jaeban

2    had to do. But there is an affirmative claim. Now, is Mr.

3    -- Mr. Jaeban is not assuming that liability; correct?

4        MR. SULLIVAN: That's probably another question for

5    Mr. Allen, sir. If you don't mind.

6        THE COURT: He's not assuming the liability. Is

7    he, Mr. Allen?

8        MR. ALLEN (TELEPHONIC): Your Honor the . . .

9    (microphone not recording) point two of the agreement says

10   that the assignee agrees to fully and effectively . . .

11   indemnify the assignor, and each of the receivers . . . and

12   expenses . . . the assignor in respect to . . . the claims.

13   That's clause 2.2 of the agreement.

14       THE COURT: So that indemnity would only arise to

15   the extent that there was a payment made by the receivers; is

16   that right?

17       MR. ALLEN (TELEPHONIC): Um --

18       THE COURT: In other words, if a judgment -- let's

19   assume a judgment of three million pounds was rendered

20   against Jaeban (U.K.), and that was sought to be enforced and

21   no payments were actually made. There was a judgment, but no

22   payments were actually made. Then, they would have suffered

23   no loss, and there would be no obligation to indemnify the

24   receivers. It's not as if, however, Mr. Jaeban is taking it

25   and saying, If we lose, you can come after me personally.

26

1    He's not doing that; is he?

2         MR. ALLEN (TELEPHONIC): Your Honor, I'd need seek

3    clarification of the terms of this -- of this wording. It's

4    my understanding that Mr. Jaeban was going to stand in the

5    shoes of Jaeban (U.K.) Limited. If I could stand down for

6    ten or fifteen minutes, I could seek clarification of that.

7         THE COURT: Well, let me see -- where is --

8         MR. SULLIVAN: The assignment is attached to the

9    plaintiff's reply, Your Honor.

10        THE COURT: Right. I'm just trying to -- need of

11   assignment of claim. Well, as I read this, what is going on

12   is that for five thousand pounds plus ten percent of any

13   affirmative recovery, Mr. Jaeban is getting an assignment of

14   the right to assert the claim against BRAC or BRAT, whoever

15   it is against and has agreed to indemnify the receivers to

16   the extent they suffer any loss. And that's about the sum

17   and substance of it. And so, he has the right to pursue the

18   claim, but to the extent there is a damage award, if they

19   have to pay it, they can seek it back from him, but I don't

20   see where there is any liability that he has undertaken vis-

21   a-vis the debtor directly. That's how I read this. I don't

22   know if that's --

23        MR. SULLIVAN: I understand the Court's question.

24        THE COURT: Is that -- okay. So I think we've beat

25   that subject enough. What about the anti-assignment --

27

1          MR. SULLIVAN:  But I don't know that that's fatal

2     to our position, Your Honor.

3          THE COURT:  What about the anti-assignment

4     provisions in the contract?  In which --

5          MR. SULLIVAN:  Again, Your Honor, the -- those were

6     only raised in a reply which we effectively read for the

7     first time Monday morning.  But I will say that it's my

8     understanding that -- and I believe it's acknowledged in the

9     debtor's motion that the contracts have been assigned to Avis

10    or Zodiac.  So I don't think that the debtor really has any

11    standing to raise the issue of breach of contract if they're

12    no longer a party to the contract, Your Honor.

13         THE COURT:  Well, except that the claims that are

14    being asserted here are claims arising under that same

15    contract, aren't they?

16         MR. SULLIVAN:  That's true.  And maybe Zodiac would

17    have the opportunity to complain, if they chose, but I don't

18    think the debtor does, Your Honor.

19         THE COURT:  All right.  Well we'll see what the

20    debtor has to say about that.  Go ahead, I interrupted you

21    some time ago.

22         MR. SULLIVAN:  That's fine, Your Honor.  And some

23    of the facts that you've obviously read in papers and thought

24    about this and I'll try to move through some of the more

25    mundane points of the argument.  I also was going to make the

28

1  Court aware that the insolvency of Jaeban (U.K.) was

2  obviously not a trivial matter for Mr. Jaeban, who is the

3  principal of the company. It's an unfortunate fact of life

4  for him. This was his business, and I believe that the

5  receivership, and the probable insolvency is in no large --

6  no small part, rather, due from the fallout of the Budget

7  insolvency. So, this is a serious matter for Mr. Jaeban, and

8  not something that he is taking lightly, Your Honor. Your

9  Honor, we set forth in our papers all of the action that

10  Jaeban (U.K.) took prior to the appointment of a

11  receivership. That includes the filing of the answer and the

12  counterclaim, responding to the first request for the

13  production of documents, responding to the second request for

14  production of documents, filing the initial disclosures, and

15  several without prejudice meetings. Not insignificantly,

16  Your Honor, Jaeban (U.K.), prior to the receivership,

17  employed both Wragg and Company and the independent auditing

18  firm of PricewaterhouseCoopers in order to review dozens and

19  dozens of boxes of files in order to comply with requests for

20  production of documents. And in fact, twenty five hundred

21  pages of documents were produced by Jaeban (U.K.) prior to

22  the receivership. I believe it took three days for the

23  representatives of Wragg and PricewaterhouseCoopers in order

24  to make that disclosure. It was only after the receivership,

25  Your Honor, that Jaeban was temporarily unable to participate

29

in these proceedings, and the delay, Your Honor, was

relatively short, it was a month at most, maybe two months

after significant litigation was already in place. Also,

Your Honor, the papers have brought forth that -- what

happened is that the secured creditor of Jaeban is the

charging party who placed Jaeban (U.K.) into receivership,

and the receivers, Your Honor, have a primary duty to look

out only for the creditor that they're trying to collect the

debt for. So the receivers, really, I don't believe they had

any disrespect for this Court. I think the costs were a

concern, but I don't believe that this proceeding was the

focus of their duties or their responsibilities.

THE COURT: Well, that's fine. I mean, they can

focus on whatever they want to, but I mean, there are

consequences when you don't focus. And that's the point of

what the plaintiff is trying to say here.

MR. SULLIVAN: I think that the analogy that I drew

in our papers, Your Honor, was that, you know, the debtors

filed for Chapter 11, they get a six to an eight month

breathing spell, and here we have a receivership appointed,

and we have a one month delay, and certainly no intentional

misconduct on the part of Mr. Jaeban or Jaeban (U.K.) in

complying with this Court's orders, and I just tried to

enunciate everything that they had done prior to the

intervention of the receivership.

1    THE COURT: How do you calculate this only as a one

2   month delay?

3    MR. SULLIVAN: I believe that there was a hearing

4   on January 12th and another one on February 4th, and at the

5   February 4th hearing, Your Honor, that is when you ordered

6   that Jaeban had to obtain new Delaware counsel by February

7   23rd, and respond to the motion. Which, as soon as they

8   could hurry up and get the assignment taken care of -- which

9   was rushed, I'm sure, under the circumstances, in order to

10  comply -- we did -- we contacted Mr. Wile, and he was good

11  enough to give us an additional one week. But for all

12  intents and purposes, Jaeban complied -- Mr. Jaeban complied

13  with your order, Your Honor, that he obtain new Delaware

14  counsel by February 23rd and that he file his response by

15  then. If I may, Your Honor, there are a couple of points

16  that I think are important. First of all, back at the

17  January hearing, you know, the debtor keeps complaining about

18  what Jaeban (U.K.) didn't do. There are some things that the

19  debtor hasn't done in this action as well, and I think you

20  made note of them at the January 12th hearing. I think most

21  important of those was that in order and before the debtor

22  seek a motion for sanctions, that it file a motion to compel.

23  You directed the debtor to do that, the debtor's counsel

24  agreed that they would do that, and they haven't filed a

25  motion to compel. And if they did file a motion to compel,

31

Your Honor, it would only be directed primarily at the depositions, because we did produce the documents. Debtor's counsel has written a letter asking for more documents based on what they've expected to see, but as I mentioned twenty five hundred documents were produced. And the debtor's second round of discovery, Your Honor, went mostly, I believe, to documents regarding the receivership, which I believe they could have obtained from the receiver. They certainly had the ability to do so. They're complaining about the depositions having not taken place, but no depositions have been noticed, Your Honor. I will concede that there were some communications, but no depositions were noticed, no motions to compel. And despite the Court's direction, the debtor is now complaining because of this short delay.

THE COURT: Well, what I understood from the papers was that the Jaeban side took the position that, Why do we have to bother with depositions because this is not something we do in England. Until we exchange witness statements, we don't get to the point where we really ever talk about depositions.

MR. SULLIVAN: That was a point that was raised, Your Honor, and I think that in conjunction with the receivership and the confusion and Wragg and Company worried about whether they were going to get paid, because of the

32

receivership, that some communications broke down. Wragg's
initial impression was, you know, What do you mean
depositions? We don't know what they are. And I just
believe that that's when communications broke down. There
was -- you know, Tom Briggs at Morris Nichols has been
cooperative with us in the transition of this case, Your
Honor. He holds no animosity towards his former client, and
his motion was filed, I believe, on January 5th, and granted
on January 12th. So that was a very quick exit for the
former attorneys. Again, a lot happened quickly, Your Honor.
The transcript that I referred to Your Honor, where Your
Honor directed the debtor to file was on page 37 and 38, and
I won't read it to the Court, but -- I also mentioned how we
have complied with the order of February 23rd to appear and
file the response. We also mentioned, Your Honor, how the
debtor has already had the benefit of the granting of a
partial summary judgment motion, which, in effect, was a
sanction that was previously entered. And if we're talking
about prejudice, I think there's very little prejudice for
the debtor here. The escrow's been there, I believe, for one
year in accordance with Judge Walrath's order. And a month
or two delay, I think the consequence is minimal to the
debtor in terms of actual prejudice. The prejudice to Mr.
Jaeban has been significant. He's had to pay new counsel to
get up to speed quickly on a fairly complicated case and also

BA668

1    to respond to a motion for sanctions that we don't think is

2    appropriate.  And those costs are not insignificant to Mr.

3    Jaeban, Your Honor.  So we believe that Mr. Jaeban is already

4    suffering enough at the hands of the debtor.  I was going to

5    quickly just go through some of the Boulis (phonetical)

6    standards, Your Honor, just very briefly.  The most important

7    one where I think the debtor does not meet its burden has to

8    do with the extent of personal responsibility, either by the

9    party or their attorneys.  And that's the primary point of

10   the Boulis case.  Neither Mr. Jaeban nor Jaeban (U.K.) has

11   any personal responsibility in this matter, for this short

12   delay, Your Honor.

                THE COURT:  I think the debtor's position on that

13   -- and I hear your response -- is that all he holds at this

14   point is an assignment of whatever the interest was of Jaeban

15   (U.K.), which was in the hands of the receivers.  So that,

16   you know, he's not a holder in due course, in a sense.  He

17   doesn't take it washed away from whatever claims or defenses

18   may exist because of that.  So, he is saddled with whatever

19   misdeeds they may have done.

                MR. SULLIVAN:  But Jaeban (U.K.) had no misdeeds.

20   It was complying up until the appointment of the

21   receivership, and Mr. Jaeban has complied as soon as he got

22   the assignment.  So if there are any misdeeds and any delay

23   it was only caused by the receiver, Your Honor.  And I don't

24

25

FORM FED-25 ® PENGAD · 1-800-631-6989

34

1    think it would be fair to saddle Mr. Jaeban, the assignee,

2    with the equivalent of his creditors.  It was really the

3    creditor -- the receiver is the equivalent of the creditor --

4    and the creditor has very little interest in this proceeding.

5    To saddle the assignee with that alleged bad faith I don't

6    think is fair, Your Honor.

7         THE COURT:  Okay.  I understand that point.

8    Anything else?

9         MR. SULLIVAN:  Just the other standards, Your

10   Honor.  There's been no bad faith or no willful misconduct.

11   Just quickly some of the -- I'd like to tell you what we can

12   do, Your Honor, in order to move this case along.  We're

13   willing to agree to a deposition schedule that's acceptable

14   to the Court and to the debtor.  We would probably like to

15   take some of our own depositions.  We're willing to -- I've

16   recommended to Wragg and Company that we respond to some of

17   the documents requested in the second request for production

18   of documents, even though they mostly relate to the

19   receivership, Your Honor.  So we do stand before the Court

20   ready to proceed promptly as you direct, and you're certainly

21   welcome to set remedies in the event that there's a problem

22   going forward.  But I doubt that there will be.  Just some of

23   the quotes from both the Boulis case and the National Hockey

24   case.  This is certainly not truly egregious conduct, Your

25   Honor.  It's not contumacious conduct.  Contumacious is

FORM FED 25 ® PENGAD • 1-800-631-6989

35

defined by Webster as willfully stubborn or other disobedient

conduct, punishable as contempt of court. There's no

flagrant bad faith and no -- certainly no callous disregard

for this Court's orders, Your Honor. So we respectfully

request that the order be denied, and that you would set a

new scheduling order. Thank you, Your Honor.

MR. ALLEN (TELEPHONIC): Your Honor, can I make an

additional point in relation to the assignment?

THE COURT: All right. Mr. Allen.

MR. ALLEN (TELEPHONIC): Your Honor, we are

concerned about the issue of the fact that, in a sense, Mr.

Jaeban appears to have taken the benefit of the right of

action without a corresponding burden. Having looked through

the agreement and looking through the file here, it's

apparent that Mr. Jaeban has a personal guarantee in respect

to the debt of Jaeban (U.K.) Limited, so he was exposed in

any event to the debts of Jaeban (U.K.) Limited, and,

therefore, there would be no reason to put that specific

provision in this assignment.

THE COURT: Well, when you say he has a personal

guarantee of the debts of Jaeban (U.K.) Limited, tell me

precisely what you mean. You mean a generalized guarantee?

MR. ALLEN (TELEPHONIC): It's a generalized

guarantee, Your Honor. There were some -- I think there is

some specific restrictions on it, which we agreed directly

36

1 with Budget. I think those relate to acts that Mr. Jaeban is

2 not responsible for. But those benefit . . . (microphone not

3 recording) the guarantee, which I think Mr. Wile has referred

4 to showing his written submissions to the Court. There is

5 clearly a general embracing obligation of Mr. Jaeban in

6 respect to the debts of Jaeban (U.K.) Limited. There is an

7 agreement in place, signed by Mr. Jaeban, which is annexed to

8 the umbrella agreement and the international prior license

9 agreement, which are the two contracts that Budget are

10 relying on. So it's not correct to say that Mr. Jaeban did

11 not have a personal liability or exposure in relation to this

12 case.

13   MR. SULLIVAN: I don't know that Mr. Allen made

14 clear that --

15   THE COURT: Make sure you speak up into the

16 microphone so that we can hear too.

17   MR. SULLIVAN: I'm not sure that I heard Mr. Allen

18 say -- my understanding is that the guarantee is limited to

19 five hundred thousand pounds. I just wanted to make sure.

20   THE COURT: All right. So there's a five hundred

21 thousand dollar pound -- excuse me -- five hundred thousand

22 pound guarantee in favor of the debtor arising out of

23 obligations owed by Jaeban to the debtor. Everybody agree

24 with that? Okay.

25   MR. ALLEN (TELEPHONIC): Your Honor, I just think

1  Mr. Wile may well be right. It may have been five hundred

2  thousand.

3         THE COURT: Right. Everybody seems to agree on

4  that. Okay. Mr. Wile? Do you have anything further?

5         MR. WILE: I wish it were otherwise, Your Honor,

6  but I'm afraid we have to sort through those things that

7  aren't worthy of responses as opposed to those that are: Let

8  me start at the beginning. I haven't heard any explanation

9  of how Mr. Jaeban is here. Jaeban (U.K.) still hasn't

10 appeared. I think that's settled in the record. I still

11 think, given all the confusion that has been attempted to be

12 created -- not intentionally, of course, just because of the

13 situation that Mr. Jaeban and Jaeban (U.K.) and the receivers

14 find themselves in, I think that's the simplest solution

15 here. I think the Court already understands, but let me make

16 the argument anyway. Mr. Jaeban's standing matters, because

17 the next thing we get to do, and spend more money on, is to

18 file a motion for summary judgment. Because in order for him

19 to appear as assignee, and that's what it says on his

20 opposition, then he doesn't have standing.

21         THE COURT: Well, what about -- what about Rule

22 25(c) which says, In the case of any transfer of interest,

23 the action may be continued by or against the original party

24 unless the Court, upon motion, directs the person, to whom

25 the interest is transferred, to be substituted in the action,

38

1    or joined with the original party.

2         MR. WILE:  The short answer, Your Honor, which we

3    actually touched on, I think, in our brief, was that Mr.

4    Jaeban is assuredly an indispensable party under Rule 19

5    because there's a dispute over the assignment.  And we're

6    faced with a unique situation, which Rule 25 certainly didn't

7    anticipate, where Jaeban (U.K.) wants to fade away into

8    nothing as through liquidation.  And if I heard Mr. Allen

9    correctly, I think what he said is Mr. Jaeban's only willing

10   to be liable on his guarantee and does not take on the full

11   liability that's there.  So, therefore, we would have to

12   pierce through, because as far as I can tell, Jaeban (U.K.)

13   has not responded to our motion, and at a minimum its answers

14   and affirmative defenses ought to be stricken.  In any event,

15   I don't see how in justice and good faith, we can go forward

16   without Mr. Jaeban.  And let's be clear here, Your Honor, I

17   mean, from the fact that not even an appearance has been

18   filed --

19         THE COURT:  Excuse me.  How you can go forward

20   without Mr. Jaeban or without Jaeban (U.K.)?

21         MR. WILE:  Well, let me start with Mr. Jaeban.  Mr.

22   Jaeban conspicuously has not appeared yet because if he did,

23   then we'd have to face the question -- face the dilemma of

24   whether this is a compulsory counterclaim.  So, we'd have to

25   sue him here knowing that all of his assets are in the U.K.

1  Which is where we would much prefer to sue him when this case

2  is brought --

3          THE COURT:  You're not talking about Mr. Jaeban as

4  assignee who is trying to appear --

5          MR. WILE:  No.

6          THE COURT:  -- today.

7          MR. WILE:  Exactly.  But, no.  But, I mean, it adds

8  to the confusion and the need for him to be here.

9          THE COURT:  Now, was he originally sued?

10         MR. WILE:  No.  We couldn't, because we looked very

11 carefully and determined that he did not have minimum

12 contacts.  So, we were unable to sue him here.  If we could

13 have done it from day one, it might have been the most

14 efficient way to proceed.  Given the mess that we're now in,

15 we respectfully submit that it's not the most efficient way

16 to proceed.  We think the thing to do is bring this to an

17 end, and then do whatever is appropriate in the U.K.  But in

18 any event, his standing very much becomes an issue, because

19 Jaeban (U.K.) is evidently not going to be with us much

20 longer notwithstanding it's promise on behalf it's

21 receivership.

22         THE COURT:  Well, what if the -- what if there was

23 an order that said that I would allow the substitution of Mr.

24 Jaeban under the assignment only on the condition that he

25 fully substituted and was -- and took on not only the

40

1  benefits, but also the burdens?

2          MR. WILE:  The complete burdens up to three million

3  --

4          THE COURT:  Exactly.

5          MR. WILE:  -- three million pounds?  Well, we

6  thought about that, Your Honor.

7          THE COURT:  Well, I'm just saying --

8          MR. WILE:  Yeah.

9          THE COURT:  -- I mean, in effect, an order -- if I

10  were to say, Yes, you've got two choices here Mr. Jaeban.

11  Either this is going to be stricken or if you want to play,

12  you've got to play with the whole deck.  That could be the

13  order.  Now, that would solve the problem, or at least it

14  would address the problem of whether or not there were

15  minimum contacts, and you could get jurisdiction over him,

16  because basically he would then voluntarily submit to

17  jurisdiction through this assignment, or he would say, Well,

18  no, in that case, I really don't want to.  In which case I

19  would enter the order that you're asking me to do.

20          MR. WILE:  And, Your Honor, we are -- we face what

21  I believe, respectfully, is a Catch 22.  My guess is if he

22  has sufficient assets, he'll say no, and if he doesn't, he'll

23  say yes.  And I don't know that we're much -- we certainly

24  would prefer that to proceeding forward without that.

25          THE COURT:  Well, it's like any claim, though,

41

1    against somebody who may be insolvent. That's what we have

2    in this case from the debtor's standpoint. There are lots of

3    people who are left holding the bag.

4         MR. WILE: Yes. Well, considering we are a hundred

5    days past the last bit of discovery cooperation, and I think

6    Mr. Sullivan clarified himself, we didn't get a response to

7    documents -- a response to our second request, that would

8    still leave us with the $4.5 million escrow, which is now

9    improperly held hostage. If he wants to take on the

10   liability and foursquare his rights to the escrow, which I

11   think that would certainly be fairer, and that would be real

12   relief --

13        THE COURT: Well, but if he took -- I mean, the

14   escrow is there, presumably, to protect Jaeban (U.K.);

15   correct?

16        MR. WILE: Correct.

17        THE COURT: So, if he took on and basically was

18   substituted in the stead of Jaeban (U.K.), not only on the

19   side of whatever benefits there would be in terms of the

20   claim that would be against the escrow, but also in terms of

21   any liability in terms of the claim by the plaintiff for the

22   debtor back against Jaeban (U.K.). I don't see how it would

23   be fair to say, Well, yes, we'll let you take on all of the

24   liabilities, but you can't proceed against the escrow. Since

25   the escrow was there originally to protect his assignor.

1      MR. WILE:  With all respect, Your Honor, if we were

2  simply here on a motion to intervene, I would agree with the

3  Court.  We're here on a motion to dismiss.

4      THE COURT:  I understand that, and you don't have

5  to keep reminding me of --

6      MR. WILE:  Sorry, Your Honor.

7      THE COURT:  -- of your view of how we're here.  I'm

8  trying to understand what would be the impact if I were to

9  structure something in the way that I'm talking about now.

10 And as I said to somebody in the hearing earlier, I'm making

11 this up as I go along.  So, nobody should think that -- that

12 this is necessarily what I'm going to do.  I'm trying to get

13 your reaction to what would happen if that's what the nature

14 of the order was.

15     MR. WILE:  Well, there's a further element that I

16 think would have to go along with that, and believe me, we

17 certainly regard that as far from ideal, which is there is

18 the immediate turnover order that's out there.  That

19 assuredly is binding, and we did not file a contempt motion,

20 conscious that we've already inflicted more motion practice

21 than we wanted to on the Court, because we were told, Jaeban

22 (U.K.) doesn't have any money.  But if somebody is out there,

23 and wants to pursue these counterclaims, it seems to me

24 that's a contempt that would have to be purged as a door

25 opening measure before they can go forward and given his

43

1    guarantee that wouldn't be entirely inappropriate either.

2           THE COURT:  Now, the three hundred thousand --

3    three hundred and eighty four thousand, I think is the

4    number, on the turnover order, again was precisely for what

5    obligation?

6           MR. WILE:  Okay.  Three hundred -- I think it's

7    three hundred and twenty eight thousand pounds, although --

8           THE COURT:  Whatever.  Okay.

9           MR. WILE:  And Mr. Sullivan's agreeing with me.

10   Mr. Sullivan, Mr. Allen's colleague at Wragg and Co.,

11   admitted that that amount was due and owing back in May of

12   2003.  And we --

13           THE COURT:  This is -- this is part of the same

14   claim?

15           MR. WILE:  Absolutely.

16           THE COURT:  This is where you got the partial

17   summary judgment on that amount because everybody -- because

18   there was essentially a concession on the part of the

19   defendant that they owed that amount.

20           MR. WILE:  Well, characteristically they simply

21   said nothing, but, yes.

22           THE COURT:  Okay.  So, it's not a separate claim,

23   it's just --

24           MR. WILE:  That is --

25           THE COURT:  -- part -- it's the partial summary

**BA679**

44

1    judgement of the overall claim.

2        MR. WILE:  It's three million pounds less three

3    hundred and twenty eight thousand pounds, Your Honor.

4    Absolutely.

5        THE COURT:  Okay.  All right.  So your point would

6    be, Okay, if we're going to have something like that, at the

7    least, the three hundred and twenty eight thousand pounds

8    should be paid.

9        MR. WILE:  Absolutely, Your Honor.

10       THE COURT:  Now, their argument would be, Well,

11   wait a minute, you know, we have -- we have a claim in excess

12   of that.  And your argument would be, Well, that's fine,

13   you've got the protection of the escrow.  So if, in fact,

14   your claim is in excess of that, you can collect it against

15   the escrow.

16       MR. WILE:  We would happily reduce the escrow to

17   three -- the equivalent of three hundred and twenty eight

18   thousand pounds, Your Honor, yes.  That would certainly be

19   the case.

20       THE COURT:  Well and that's, of course, one way to

21   do that.  I mean, one way to accomplish what you're saying is

22   to purge the turnover would simply be to take the three

23   hundred and twenty eight thousand pounds out of the four and

24   a half million dollar escrow and just reduce it and pay that

25   money back to -- to the plaintiff.  Why wouldn't that work?

1    MR. WILE:  I'm not sure that giving out the order

2    -- the short answer is that's something I had not thought of,

3    Your Honor.  The short answer is I simply don't know.

4        THE COURT:  Well, here's --

5        MR. WILE:  I'm sorry.  May I consult with my

6    colleague?  Yeah.  Well, you're in essence paying us out of

7    our money, Your Honor.  Brain cramp on my part, I apologize.

8    It's our money.

9        THE COURT:  Well, yes.  I understand that, that I'm

10   paying you out of money that you put up to protect them.

11       MR. WILE:  Right.  And it doesn't have its intended

12   effect, I think of -- where I think the Court seems to be

13   headed, respectfully, which is --

14       THE COURT:  I'm not headed anywhere, Mr. Wile.  I'm

15   just -- I'm just asking.

16       MR. WILE:  I have been presumptuous.  I apologize

17   for that, Your Honor.  But it seems to me that they should be

18   paying from their money and not out of ours.

19       THE COURT:  Okay.  Anything else?

20       MR. WILE:  Just leaving aside, again, individual

21   complaints that could properly be made against what Mr.

22   Sullivan had to say, I think we -- we see before us an

23   unending series of hearings like this, I fear.  We have a

24   motion to join Mr. Jaeban, you know, as an indispensable

25   party, a contempt motion, a summary judgment motion, and so

46

1   forth, all the while, trying to proceed with discovery and

2   I'm sure with the -- certainly the best intentions here in

3   Delaware. But that's only gotten worse and worse, and

4   frankly I can't tell the Court that I can necessarily produce

5   everybody now I could have produced back in November and

6   December. November 25th, I think, is about the date when

7   cooperation completely ceased. As far as personal

8   responsibility, we did cover that in our brief. I find it

9   risible, however, that Jaeban (U.K.) is not responsible for

10  its conduct, and I don't get the point about Jaeban (U.K.)'s

11  attorneys and attorney conduct here. It is, in fact, bad

12  faith as a matter of law in the Third Circuit to cause your

13  attorneys to -- to disappear. And I really do fear that we

14  will lose any deterrent effect if we just let this one slip

15  by when someone who could have purchased the claim earlier,

16  is certainly very close to his assignor, is able to waltz in

17  and in essence protect his guarantee and his assets in the

18  U.K. by dragging this out long after I think it should have

19  been put to bed respectfully.

20          THE COURT: Now, what about the argument that was

21  made by Mr. Sullivan that the debtor doesn't have the

22  standing to enforce the anti-assignment clauses because it no

23  longer is a party to the contract?

24          MR. WILE: Thank you, Your Honor. I should have

25  covered that, and that does point out why it would have been

47

1    nice to have heard about this beforehand.  And certainly --

2        THE COURT:  His argument, he didn't hear about your

3    anti-assignment until the reply.

4        MR. WILE:  I know, I understand that.  But the

5    anti-assignment provisions -- I understand Mr. Sullivan has

6    done everything he possibly could to get up to speed as his

7    predecessor did.  But the anti-assignment provisions are not

8    unknown in other places, Your Honor, which is why we would

9    have liked to have known.  The short answer is, these claims

10   arise as of the date they were filed, and as of the date that

11   the escrow occurred, and as of the time of the claims.  There

12   was no right of assignment.  That's my short answer.  If the

13   Court would like, I'm happy -- and if that concerns the

14   Court, I'm happy to address it further.  But I would like --

15       THE COURT:  You can just address it as much as you

16   want.  If that's enough for you, that's enough for me.

17       MR. WILE:  In terms of on my feet, Your Honor, I

18   think that's the most obvious answer is they take this claim

19   as they find it.  And that's subject to the various

20   restrictions that are in the documents that created the

21   claim.

22       THE COURT:  All right.  Anything else?

23       MR. WILE:  No, Your Honor.

24       MR. CORE (TELEPHONIC):  Your Honor, it's Patrick

25   Core from . . . (microphone not recording), actually from

48

London.  I swore an affidavit that was filed.  Can I make one

comment with your permission on the assignment and draw the

Court's attention to two specific provisions?

          THE COURT:  All right.  Go ahead.

          MR. CORE (TELEPHONIC):  First of all, in the

umbrella agreement, on paragraph -- bear with me two seconds

-- 42.6.

          THE COURT:  Am I looking in the assignment?

          MR. CORE (TELEPHONIC):  I'm looking at the umbrella

agreement.

          MR. WILE:  Your Honor, that would --

          MR. CORE (TELEPHONIC):  . . . (microphone not

recording) papers, maybe Mr. Wile can help us with that.

          MR. WILE:  Absolutely.  May I approach the bench?

It's an exhibit to our complaint and to our motion for

partial summary judgment, and I was wary of inflicting yet

more paper.

          THE COURT:  All right.  Just give me a second here

Mr. Core.

          MR. CORE (TELEPHONIC):  Of course.

          THE COURT:  All right.  I'm looking at it.

          MR. CORE (TELEPHONIC):  Okay.  That talks about the

conditions that must attach to any assignment which is . . .

(microphone not recording) by BRAC.  And the agreement goes

on to provide at 4.3 on page 8 of the same document, Your

49

1   Honor.  The parties to this agreement, other than Budget

2   shall not have the right to assign or otherwise dispose of

3   this agreement.  And then -- sorry, Your Honor, if I can then

4   take you to the license agreement, and in particular to

5   paragraph 12.1, which is at page 56 of the license agreement.

6           THE COURT:  All right.

7           MR. CORE (TELEPHONIC):  Budget may assign, or

8   otherwise deal with the rights and obligations of this

9   agreement without any consent from the licensee.  I wasn't

10  sure whether Mr. Wile had made the point . . . (microphone

11  not recording) very well, but I just wanted to make sure that

12  the representation was made on behalf of Jaeban about the

13  fact that BRAC was in breach of the contract.  There is

14  specific provision in the contract to allow the assignment

15  without reference to the licensee, subject only to insuring

16  that anyone who takes benefit of or takes on the obligation,

17  which obviously reflect the terms of the agreement agreed

18  with Avis.  And that's why we had the escrow account, to make

19  sure that if there are any liabilities was the -- was BRAC --

20  was the contractor on this agreement so they . . . were

21  provided for.  And if I may, Your Honor, I want to make one

22  more point of the U.K.'s position regarding the indemnity

23  factor you considered a few moments ago.  It is established

24  as a matter of English law that Mr. Jaeban has agreed to give

25  an indemnity to the assignor, being the company, being Jaeban

1   (U.K.).  Then we as a creditor, we being BRAC, as a creditor

2   of Jaeban will not have the full benefit of that indemnity.

3   Because any recovery . . . the indemnity by Jaeban (U.K.) in

4   receivership -- in liquidation I should say, will be

5   available for distribution to the general body of creditors

6   after costs.  But we will not take directly the benefit of

7   that indemnity.  And I think that may be relevant to the

8   possible item that you were making or one of the

9   possibilities that you were exploring where you may require,

10  or may consider requiring as a term of any order allowing Mr.

11  Jaeban to participate in this proceeding that he actually

12  stands in the shoes, and is personally liable.  I would say

13  it's very important.  Because from our point of view . . .

14  that relying on the indemnity . . . one, we have an

15  appropriate contract issue we have to deal with, and

16  secondly, we would only have a claim to participate in any

17  recovery under the indemnity.  We wouldn't have direct access

18  to the money.

19           THE COURT:  All right.

20           MR. CORE (TELEPHONIC):  (Microphone not recording).

21           THE COURT:  All right.  Thank you, Mr. Core.  All

22  right, I'll issue an order on this matter, as soon as

23  possible.

24           MR. WILE:  Thank you.

25           THE COURT:  The matter will be submitted.

51

1      MR. WILE:  Thank you.

2      MR. SULLIVAN:  Thank you, Your Honor.

3      THE COURT:  Anything else on our calendar for BRAC

4  today.

5      MR. MORTON:  That concludes the debtors matters,

6  Your Honor.

7      THE COURT:  All right.  Then we're adjourned.

8      MR. MORTON:  Thank you, Your Honor.

9      (Whereupon at 3:10 p.m. the hearing in this matter

10  was concluded for this date.)

11

12

13

14

15

16

17

18      I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  *Elaine M. Ryan*                          5-04-04
    Elaine M. Ryan

24  2801 Faulkland Road
    Wilmington, DE 19808

25  (302) 683-0221

BA687

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BRAC GROUP, INC., et al., | ) | Case No. 02-12152 (CGC) |
| (f/k/a Budget Group, Inc.) | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.) et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | **Adv. No. 03-54271** |
| | ) | |
| JAEBAN (U.K.) LIMITED, et al. | ) | |
| | ) | |
| Defendants | ) | |

## AFFIDAVIT OF SERVICE

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) SS |
| NEW CASTLE COUNTY | ) |

    Melissa L. Bertsch, being duly sworn according to law, deposes and says that she is employed by the law firm of Young Conaway Stargatt & Taylor, LLP, attorneys for BRACH, and that on the 4th day of February 2005, she caused a copy of the attached **Memorandum in Opposition to Mr. Jaeban's Motion for Reconsideration** to be served, as indicated, upon the parties on the attached service list.

_[signature]_
Melissa L. Bertsch

SWORN TO AND SUBSCRIBED before me this _4th_ day of February 2005.

_[signature]_
Notary Public

**JUNE L. WELCH
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Aug. 23, 2007**

WP3:793109 6

59519 1001

**BA688**

## SERVICE LIST
## BRACII
### 2/4/2005

Messrs. John Whitfield & Gerald Clifford Smith
Administrative Receivers of Jaeban (UK) Limited
c/o RSM Robson Rhodes LLP
7 Hill Street, Centre City Tower
Birmingham, B5 4UU UK
*Federal Express (International)*

Mark D. Collins, Esq.
Rebecca Booth, Esq.
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(Counsel for Joint Administrators of BRAC)
(Rent-A-Car International, Inc.)
*Hand Delivery*

Ian Weatherall, Esq.
Wragge & Co. LLP
55 Colmore Row
Birmingham B3 2AS, England
(Counsel for Receivers of Jaeban)
*Federal Express (International)*
*& Electronic Mail*

Steve Allen, Esq.
Mills & Reeve
54 Hagley Road
Edgbaston
Birmingham B16 8PE, England
Counsel for Jaeban UK Limited
*Federal Express (International)*
*& Electronic Mail*

Brian A. Sullivan, Esq.
Robert D. Wilcox, Esq.
Werb & Sullivan
300 Delaware Avenue, 10th Floor
P.O. Box 25046
Wilmington, DE 19899
(Counsel for Ibrahiem Jaeban)
*Hand Delivery*
*& Electronic Mail*

Kenneth E. Wile, Esq.
Sidley Austin Brown & Wood
10 South Dearborn Street, BankOne Plaza
Chicago, IL 60603
(Co-counsel for BRACII)
*First Class Mail*
*& Electronic Mail*

**BA689**