## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al.[1], | Case No. 02-12152 (CGC) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | |
| Plaintiffs, | 03-A-54271 |
| v. | |
| Jaeban (U.K.) Limited and Ibrahiem Jaeban, | |
| Defendants. | |

### AMENDED COMPLAINT

Plaintiffs, the debtors and debtors-in-possession in the above-captioned action,

(collectively, the "Debtors"), including BRAC Rent-A-Car International, Inc. (f/k/a Budget Rent-

A-Car International, Inc.) ("BRACII"), a Debtor herein and subject to administration

proceedings in the United Kingdom, by their undersigned attorneys, allege as follows:

---

[1] The Debtors are the following entities: BRAC Group, Inc , Auto Rental Systems, Inc , BGI Airport Parking, Inc , BGI Shared Services, Inc , BGI Shared Services, LLC, BRAC Credit Corporation, BRAC Car Sales, Inc , BRAC Fleet Finance Corporation, BRAC Rent A Car Asia-Pacific, Inc , BRAC Rent A Car Caribe Corporation, BRAC Rent A Car Corporation, BRAC Rent-A-Car International, Inc , BRAC Rent A Car of Japan, Inc , BRAC Rent-A-Car of St  Louis, Inc , BRAC Rent-A-Car of the Midwest, Inc , BRAC Rent-A-Car Systems, Inc , BRAC Sales Corporation, BRAC Storage Corporation, BRAT Move Management, Inc., BRAT Relocation Services, Inc., BRAT TRS, Inc , BVM, Inc , Carson Chrysler Plymouth Dodge Jeep Eagle, Inc , Control Risk Corporation, Dayton Auto Lease Company, Inc , Directors Row Management Company, LLC, IN Motors VI, LLC, Mastering The Move Realty, Inc , Mosiant Car Sales, Inc , NYRAC Inc., Paul West Ford, Inc , Philips Jacobs Insurance Agency, Inc , Premier Car Rental LLC, Reservation Services, Inc , TCS Properties, LLC, Team Car Sales of Charlotte, Inc , Team Car Sales of Dayton, Inc., Team Car Sales of Philadelphia, Inc., Team Car Sales of Richmond, Inc , Team Car Sales of San Diego, Inc , Team Car Sales of Southern California, Inc , Team Fleet Services Corporation, Team Holdings Corp , Team Realty Services, Inc , The Move Shop, Inc , Transportation and Storage Associates, ValCar Rental Car Sales, Inc , Vehicle Rental Access Company, LLC, and Warren Wooten Ford, Inc

JA1101

## NATURE OF THE ACTION

1.    The Debtors bring this adversary action for an order pursuant to section 542 of the Bankruptcy Code (a) compelling Defendant Jaeban (U.K.) Limited ("Jaeban UK") to turn over immediately the amounts due under the Umbrella Agreement and IPLA (as defined below) in the amount of £3,006,090.10, plus interest and costs, (b) overruling Jaeban UK's Objection (as defined below), and (c) ordering Mr. Jaeban to turn over immediately the £500,000 owed to BRACII under his Personal Guarantee (the "Guarantee").

## THE PARTIES

2.    Plaintiff BRACII is incorporated in the State of Delaware and has its international headquarters in Hemel Hempstead, England.  BRACII is a Debtor in the above captioned bankruptcy cases and, since January 14, 2003, has been in administration following the granting of an administration order by the High Court of Justice, Chancery Division, in London, England.  Gurpal Singh Johal has been appointed administrators for BRACII.  BRACII is a direct subsidiary of BRAC Rent a Car Corporation (f/k/a Budget Rent a Car Corporation), a Delaware Corporation ("BRACC") and an indirect subsidiary of BRAC Group, Inc. (f/k/a Budget Group, Inc.), also a Delaware corporation.

3.    Defendant Jaeban UK is incorporated in the United Kingdom.  On information and belief, Jaeban UK is currently under the control of administrative receivers in the United Kingdom.

4.    Defendant Ibrahiem Jaeban is a citizen and resident of the United Kingdom.  Mr. Jaeban purports to be the assignee of the counterclaims of Jaeban UK in this proceeding.

JA1102

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1336.

6.    This adversary proceeding has been brought in accordance with Rule 7001(1), (7), and (9) of the Federal Rules of Bankruptcy Procedure.

7.    Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409.

8.    On February 13, 2003, Jaeban UK submitted itself to the *in personam* jurisdiction of this Court by filing an objection (the "Objection") to the cure amount listed in Debtors' Motion for order pursuant to 11 U.S.C. Sections 105, 363, 365, 503 and 507. See Exhibit A [Docket #2645]. Jaeban UK's Objection purported to assert certain claims under the IPLA, which is the subject of this Complaint.

9.    On or about March 1, 2004, Mr. Jaeban submitted to the *in personam* jurisdiction of this Court by filing with this Court, in his own name, a response to Plaintiffs' Motion to Strike Defendant's Counterclaims. In addition, Mr. Jaeban claims to have taken a valid assignment of Jaeban UK's counterclaims in this action, although BRACII disputes this claim.

10.    This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

## STATUS OF THE CASE AND BACKGROUND OF THE RELIEF REQUESTED

11.    On July 29, 2002, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

12.    The Debtors are continuing in possession of their properties and are operating and maintaining their businesses as debtors in possession pursuant to §§ 1107(a) and

3

1108 of the Bankruptcy Code. On August 8, 2002, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

13.   On or about August 22, 2002, the Debtors entered into an Asset and Stock Purchase Agreement ("ASPA") with, *inter alia*, Cherokee Acquisition Corporation (n/k/a Budget Rent A Car System, Inc.) and Cendant Corporation, pursuant to which Cherokee agreed to purchase substantially all of the Debtors' assets (excluding the Debtors' business conducted in Europe, the Middle East and Africa (the "EMEA Operations")) and assume certain of the Debtors' liabilities (the "North American Sale"). By its terms, however, the ASPA excluded and did not transfer BRACII's right to make claims against or seek recovery from any person.

14.   The Debtors subsequently filed with this Court a motion seeking, among other things, approval of the ASPA. On November 8, 2002, this Court entered an order, which, among other things, approved the ASPA. On November 22, 2002, the North American Sale closed. In connection with the North American Sale, BRACC entered into a license agreement with Cherokee for the use of the "Budget" trademark in the EMEA Operations.

15.   Prior to the closing of the EMEA Sale (defined below), the Debtors' car rental business outside of North America was operated through debtor BRACII and certain of its debtor and non-debtor subsidiaries. In connection with the proposed EMEA Sale, BRACII filed a petition for administration with the High Court of Justice, Chancery Division, in London, England on January 7, 2003 (the "UK Administration"). On January 14, 2003, the English court appointed the UK Administrators as administrators of BRACII's insolvency proceedings.

16.   On January 10, 2003, the Debtors filed a motion seeking approval of a sale of the Debtors' remaining car and truck rental assets in Europe, the Middle East and Africa ("EMEA Sale") to Avis Europe plc pursuant to that certain Asset Purchase Agreement by and

4

among BRACC, BRACII, the UK Administrator, Budget Rent-A-Car España S.A., Budget

Deutschland GmbH, Business Rent a Car GmbH, Zodiac Europe plc and Avis Europe plc (the

"APA"). On February 24, 2003, this Court entered an order approving the APA, and the EMEA

Sale closed on March 11, 2003.

17.    On March 5, 2001, BRACII, Jaeban UK, and Mr. Jaeban signed an

Umbrella Agreement, attached as Exhibit B, which included, among other things, an

International Prime License Agreement (the "IPLA") among BRACII, Jaeban UK, and Mr.

Jaeban, whereby BRACII agreed to license the Budget trademark to Jaeban UK in return for

certain royalty and other payments.

18.    In addition to the royalty payments by Jaeban UK to BRACII, the IPLA

contemplates expenditures by both licensor-BRACII and licensee-Jaeban UK.

## COUNT I (AGAINST JAEBAN UK)

19.    Beginning no later than June 2002, BRACII has expended considerable

resources and devoted significant time to reconciling amounts under the IPLA. Despite these

efforts, BRACII and Jaeban UK have been unable to agree on a reconciliation of Jaeban UK's

account under the IPLA. At issue are payments owed by Jaeban UK for, among other things,

royalties, airport concessions, rent, insurance, and customer complaints during the calendar years

2001, 2002 and 2003.

20.    As part of the sale process regarding the EMEA Operations, BRACII

notified Jaeban UK that Jaeban UK was owed £0 under the IPLA, and that in fact Jaeban UK

owed a net amount to BRACII. Jaeban UK responded with the Objection, which disagreed with

BRACII's analysis. In the Objection, Jaeban UK asserts that BRACII owes a net cure amount to

Jaeban UK.

5

21.    Despite ongoing negotiations between BRACII and Jaeban UK representatives in 2002 and 2003, Jaeban UK declined BRACII's proposed reconciliations for net amounts owed during 2001-2003, and the parties have been unable to agree on any setoff amounts to which Jaeban may be entitled. According to BRACII's books and records, and as the attached records indicate, Jaeban UK owes to BRACII a gross amount of not less than £812,484.91 for amounts payable to BRACII pursuant to the IPLA in 2001. For 2002, Jaeban UK owes a gross amount of not less than £2,034,454.81 for amounts payable to BRACII pursuant to the IPLA. For 2003, Jaeban UK owes an estimated gross amount of not less than £159,150.38 for amounts payable to BRACII pursuant to the IPLA. See Exhibit C, *infra*.

22.    In sum, for 2001 through 2003, Jaeban UK owes BRACII a total gross amount of not less than £3,006,090.10. Jaeban UK has persisted in its refusal to turn over such monies to Debtors.

23.    On February 4, 2004, this Court entered its Order Granting Partial Summary Judgment. The Court's Order required that Jaeban UK immediately pay BRACII the sum of £327,944.09 plus interest from May 2, 2003. Jaeban UK has failed and refused to pay BRACII this amount.

24.    The monies owed by Jaeban UK to BRACII, including, but not limited to, the amount of the February 4, 2004 judgment, are a matured debt that is property of the Debtors' estate.

## COUNT II (AGAINST MR. JAEBAN)

25.    Debtors incorporate and reallege the allegations in Paragraphs 1 through 23, *supra*, as if fully set forth herein.

6

26.   On or about March 5, 2001, as consideration for BRACII agreeing to enter into, *inter alia*, the Umbrella Agreement and the IPLA, Mr. Jaeban executed a Personal Guarantee in favor of BRACII. Mr. Jaeban's Personal Guarantee is Schedule 6 of the Umbrella Agreement. A true and correct copy of the Personal Guarantee is attached to the Amended Complaint as Exhibit D.

27.   In his Personal Guarantee, Mr. Jaeban agreed that, on written demand from BRACII, he would make good any default by Jaeban UK under the Umbrella Agreement and IPLA and pay all sums which may become payable as a result of a default under those agreements up to the amount of £500,000.

28.   As shown by the facts alleged above, Jaeban UK has defaulted on its obligations to BRACII and owes BRACII an amount well in excess of £500,000 including, without limitation, the February 4, 2004 judgment amount against Jaeban UK of £327,944.09 plus interest from May 2, 2003.

29.   On July 13, 2004, BRACII delivered to Mr. Jaeban's solicitors at Wragge & Co. in Birmingham, England a written demand that he pay BRACII the £500,000 owed to BRACII under his Personal Guarantee.

30.   Mr. Jaeban has failed and refuses to comply with BRACII's demand.

31.   This money is property of the Debtors' estate and is owed to BRACII pursuant to a matured debt payable by Mr. Jaeban under his Personal Guarantee.

WHEREFORE, the Debtors respectfully request that the Court enter an Order (a) requiring Jaeban UK to turn over the money listed on Exhibit C, as well as interest and the cost of bringing this action, (b) overruling Jaeban UK's Objection, (c) requiring Mr. Jaeban to turn

7

over £500,000 to BRACII as well as interest and the cost of bringing this action, and (d)

affording Debtors such and other and further relief as the Court deems just and proper.

Dated:  July 15, 2004

**SIDLEY AUSTIN BROWN & WOOD LLP**

Larry J. Nyhan
Kenneth E. Wile
Bank One Plaza
10 S. Dearborn
Chicago, IL 60603

Counsel for Debtors and Debtors-in-Possession
BRAC Group, Inc., et al.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Robert S. Brady (Bar No. 2847)
Edmon L. Morton (No. 3856)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6600

8

JA1108

# EXHIBIT A

13-02-2003  16:31  FROM:JAEBAN UK LTD 0121 544 8817        TO:0013128537036        P:1/5

Welcome House
999 Wolverhampton Road
Oldbury West Midlands B69 4RJ
Phone: 0121 544 2219
Fax: 0121 544 8817



**jaeban**
Self Drive, Contract
Hire, Direct Auto Sales

# Fax

No of Pages : 5

| To: | Robert S Brady – Young Conaway Stargatt & Taylor |
|---|---|
| Fax: | 001 302 576 3283 |
| To: | Larry J Nyhan – Sidley Austin Brown & Wood |
| Fax: | 001 312 853 7036 |
| To: | Susheel Kirpalani – Milbank, Tweed, Hadley & McCloy |
| Fax: | 001 212 530 5219 |
| To: | Office of the United States Trustee for the District of Delaware |
| Fax: | 001 302 573 6497 |
| To: | Harold Marcus – Brown Rudnick Berlack Israels |
| Fax: | 001 617 856 8201 |
| To: | Simon Freakley – Kroll, Buchler, Phillips |
| Fax: | 0207 029 5001 |

| From: | A Rees (Director) – Jaeban UK Limited |
|---|---|
| Date: | 13th February 2003 |
| Subject: | BRAC GROUP, INC (f/k/a Budget Group, Inc.) et al Case No 02-12152 (MFW) |

X Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Dear Sirs,

Please find attached our formal objection, hard copy to follow.

Yours faithfully,

A Rees
Director



**jaeban**
*Self Drive, Contract
Hire, Direct Auto Sales*

13th February 2003

In re:

BRAC GROUP, INC (f/k/a Budget Group, Inc.) et al
Case No. 02-12152 (MFW)

This notice is an Objection as referred to in the document headed

"Debtors' motion for order pursuant to 11 U.S.C. Sections 105, 363, 365, 503 and 507"

this company being a counter-party in receipt of an Assumption and Assignment Notice containing notification of a purported "Cure Amount" to which we object.

It is also a response to a *Licencee Confirmation Letter* if the document we have received purporting to be such is held to be valid.

*The basis of our objection is that the Debtors owe us sums in excess of the US $2,250,000.00 we have already claimed is due to us whereas the stated Cure Amount is "O", and the Debtors have even indicated that their records show that this company owes them monies, which is manifestly erroneous and incapable of substantiation.*

Further, we maintain that they are, and some time ago indicated in writing that we considered them to be, in material breach of their obligations under our International Prime Licence Agreements ("IPLA's"), in relation to which breaches we have reserved our position in writing and continue to do so.

The basis of this assertion and the specific grounds therefor, are as follows:-

1. The Debtors have failed to undertake appropriate marketing activities to promote the Budget brand, as evidenced by their admission and waiver of marketing fund levy since April 2002, whereas in fact such failure has had a detrimental effect on and cost to this company in particular, but also to the body of Licencees as a whole, which far exceeds the waived levy. Our loss of revenue on national account customers amounts to over £300,000.00 pa.

   A list of some such lost customers is attached as Annexure A.

2. The Debtors have failed to provide *integrated service cover across key territories*, specifically the major London airports and certain central sites, which has adversely impacted our business and damaged the goodwill of the brand in respect of which royalty payments are claimed by the Debtors. To quote the Debtors Motion
   "maintenance of a comprehensive European network is essential to the preservation of franchise royalty....and the value of EMEA Operations". The damage caused by the Debtors includes (without limitation) the following:-


**Budget.**
Car and Van Rental

Head Office
Jardon (UK) Ltd, Welcome House, 800 Wolverhampton Road, Oldbury, West Midlands B69 4LU
Branches throughout Central England, North of England, Scotland and associated airports
Tel: 0121 544 2219 (Administration)  Fax: 0121 544 8817 (Administration)
Tel: 0121 552 2200 (Reservation)




**BVRLA**

2.1    the loss of nation-wide and international account customers due to the non-availability of fleet at the so-called "Gateway" airports and other strategic locations operated by the Debtors corporately (as distinct from through franchised management).

2.2    the denial of the opportunity for us to undertake one-way bookings on an economic basis due to the closure of Debtor operating locations at the gateway airports, despite us being obligated for a period to continue taking one-way bookings. Instead of reserving a portion of the fleet at these airports for return to our territories in accordance with previous practice, the Debtors hired our vehicles for local use forcing us to retrieve them by transporter at additional cost of £50 per vehicle and loss of rental opportunity for up to three days at a time.

2.3    The loss on resale of vehicles we provided as a dedicated fleet to the Debtors to enable them to continue operating at the gateway airports when their own financial facilities were insufficient to sustain the size of fleet required. The losses incurred as a result of the Debtors being excluded from the airports for non-payment of rent to the British Airports Authority are £850,000.00. We believe such exclusion was as a result of negligent mismanagement by senior officers of Debtors, and that in the circumstances of our agreement to provide fleet constitutes breach of a duty of care. Full and accurate details per unit can be provided if required.

3.    The Debtors have failed to provide certain administrative functions in accordance with their obligations under the IPLA's either to a reasonable standard of competence, or at all. Specifically, the provision of central billing services to franchisees and national account customers has been unreliable, inaccurate and misleading for a number of years. We accept that in March 2001 we waived our claims in respect of defaults prior thereto and seek recompense only in respect of damage suffered since then. The gross revenue booked through the BCI system (ie the networked business for which we paid the Debtors royalty and other payments) in respect of our territories fell from an annualised level of more than £6,000,000.00 pa in 2001 to less than £1,500,000.00 in year ended 31st December 2002. More recently, the withdrawal of the voucher system for international travellers has resulted in a downturn in the levels of inbound bookings which has caused us additional loss, full details of which are being prepared.

4.    The failure by the debtors to secure adequate funding for their corporate fleet has resulted in the loss to us of bonus payments from vehicle manufacturers in respect of volume discounts. In accordance with established practice and their duties to act in the best interests of the community of franchises as a whole, the Debtors customarily procured vehicles at prices based on minimum volumes to be taken over the course of a financial year. The shortfall on bonus payments we should have received during year 2002 had the Debtors fulfilled their arrangements with motor manufacturers, together with our own inability to achieve targets due to the decline in the business volume,

JA1112

occasioned by the default of the Debtors amounts to £1,700,000.00 in 2002 compared to 2001.

5.  We have incurred professional and related costs associated with the Debtors breach of contract and its consequence on our business which we seek to recover from the Debtors in the sum of £50,000.00.

By way of this Objection we preserve to the fullest permissible extent our rights in respect of those matters.

Signed for and on behalf of Jaeban (UK) Limited

............................ A. M. Reed

Director

Please confirm receipt.

## ANNEXURE A

Pearl Assurance

Countrywide Vehicle Rentals

Nestle

Powergen

UTC

GKN

Emirates

Hardy Spicer

The Wolversey Group

LK Tools Ltd

Cleansway

Carlson Wagon Business Travel

BTI Hogg Robinson Business Travel

Brush Electrical

Remploy

Scottish Power

Portman Travel Group

Albright and Wilson

IT Net Ltd

JA1114

19-02-2003  16:02  FROM:JAEBAN UK LTD 0121 544 8817          TO:0013025763263          P:1/1

Welcome House
999 Wolverhampton Road
Oldbury West Midlands B69 4RJ
Phone: 0121 544 2219
Fax: 0121 544 8817



**jaeban**
Self Drive, Contract
Hire, Direct Auto Sales

# Fax

| To: | Robert S Brady - Young Conaway Stargatt & Taylor |
|---|---|
| Fax: | 001 302 576 3283 |
| To: | Larry J Nyhan – Sidley Austin Brown & Wood |
| Fax: | 001 312 853 7036 |
| To: | Susheel Kirpalani – Milbank, Tweed, Hadley & McCloy |
| Fax: | 001 212 530 5219 |
| To: | Office of the United States Trustee for the District of Delaware |
| Fax: | 001 302 573 5497 |
| To: | Harold Marcus – Brown Rudnick Berlack Israels |
| Fax: | 001 617 856 8201 |
| To: | Simon Freakley – Kroll, Buchler, Phillips |
| Fax: | 0207 029 5001 |

| From: | I M Jaeban (Director) – Jaeban UK Limited |
|---|---|
| Date: | 19th February 2003 |
| Subject: | BRAC GROUP, INC (f/k/a Budget Group, Inc.) et al<br>Case No 02-12152 (MFW) |

X Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Dear Sirs,

We refer to our Notice of Objection dated 13th February 2003.  It has been suggested by a recipient that our claim could be interpreted as amounting to more than US $4.5 million.  We wish to make clear that after set-off we do not consider that our claim amounts to more than US $4.5 million and we therefore seek to have it dealt with through the Cure Process.

Yours faithfully,

I M Jaeban
Director

JA1115

# EXHIBIT B

DATED    5TH    MARCH    2001

(1)    BUDGET RENT A CAR INTERNATIONAL INC

(2)    JAEBAN (U.K.) LIMITED

(3)    MR I.M. JAEBAN

---

# UMBRELLA AGREEMENT

---

# EVERSHEDS

Senator House
85 Queen Victoria Street
London EC4Y 4JL
Tel: 020 7919 4500
Fax: 020 7919 4919

N:\paulm\Umbrella.doc477132_3

JA1117

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | RECITALS, DEFINITIONS AND SCHEDULES | 1 |
| 2. | ADDITIONAL PROVISIONS | 3 |
| 3. | BREACH AND TERMINATION – ADDITIONAL PROVISIONS | 6 |
| 4. | MISCELLANEOUS | 8 |

Schedules

| | |
|---|---|
| 1. | AGREED AMENDMENTS TO NEW LICENSE AGREEMENTS |
| 2. | COMPENSATION PROVISIONS |
| 3. | GROUP STRUCTURE OF JAEBAN |
| 4. | EXISTING LICENSE AGREEMENTS |
| 5. | INTERNATIONAL PRIME LICENSE AGREEMENT |
| 6. | PERSONAL GUARANTEE |

N:\paulm\Umbrella.doc477132 J

JA1118

This Agreement is made the  5  day of March 2001

**BETWEEN:**

(1)      **BUDGET RENT A CAR INTERNATIONAL, INC.,** a private company incorporated under the laws of Delaware, USA ("**Budget**"), and

(2)      **JAEBAN (U.K.) LIMITED** a private company incorporated under the laws of England and Wales with its registered office at 70 Willenhall Road, Wolverhampton WV1 2HJ ("**Jaeban**"), and

(3)      **IBRAHEIM MUSTAPHA JAEBAN** of Newbridge Cottage, Forton Road, Newport, Shropshire TF10 8BU ("**Mr Jaeban**")

1.      **RECITALS, DEFINITIONS AND SCHEDULES**

1.1      The Recitals shall be regarded as an operative part of this Agreement.  All Schedules to this Agreement are incorporated herein by reference and are to be read as if they are a part of this Agreement.

1.2      The Parties now agree subject to the provisions of this Agreement that on the date hereof:

1.3      Jaeban will purchase from BTI (UK) Plc the business, undertaking and assets of BTI (UK) Plc carried on at the Locations (as defined below) pursuant to the Business Sale Agreement (as defined below);

1.4      the existing license agreements of Jaeban and Mr Jaeban as listed in Schedule 4 ("the Existing License Agreements") shall be terminated in accordance with Clause 2.1;

1.5      Budget shall enter into:

1.5.1      new license agreements with Jaeban and Mr Jaeban in place of the Existing License Agreements for the same Licensed Territories; and

1.5.2      license agreements for the Locations and the New Territories (as defined below),

(together "the New License Agreements") in the form of Budget's current IPLA (as defined below) which in relation to the New License Agreements for the Locations will incorporate the Agreed Amendments (as defined below).  Mr Jaeban shall execute a personal guarantee in respect of the New

JA1119

License Agreements in the amended form set out at Schedule 6 of this Agreement and not in the standard form set out at Schedule 9 of the IPLA;

1.6 Jaeban will operate the Concessions (as defined below) on Budget's behalf for the period the Concession Agreements remain in force (including any renewal thereof) or until Jaeban enters into new concession agreements directly with Birmingham Airport and/or Manchester Airport, pursuant to and in accordance with the New License Agreements for the Locations. Licensee shall if required by Budget negotiate with Birmingham Airport and/or Manchester Airport for the grant of a new concession agreement prior to expiry of the respective Concession Agreements;

1.7 that in view of the scale of the expansion in the UK of the BRAC businesses of the Jaeban Group Companies (as defined below) Budget requires to strengthen certain provisions in the New License Agreements, which together with the provisions in this Agreement are designed to provide Budget with greater protection.

1.8 Definitions

Throughout this Agreement and the Schedules hereto:

1.8.1 The "Agreed Amendments" shall mean the provisions set out in Schedule 1.

1.8.2 "BTI (UK) PLC" a public limited company incorporated under the laws of England and Wales;

1.8.3 "Business Sale Agreement" shall mean the business sale agreement between BTI (UK) PLC and Jaeban of even date hereto;

1.8.4 "Concession Agreements" shall mean Budget's concession agreements for the operation of car rental services at Birmingham International Airport and Manchester Airport with Birmingham International Airport Limited and Manchester Airport Plc and dated 11 March 1999 and 22 September 1997 respectively;

1.8.5 "Concessions" shall mean Budget's concessions at Birmingham International Airport and Manchester Airport under the Concession Agreements;

JA1120

1.8.6   "**IPLA**" shall mean the form of International *Prime* License Agreement attached hereto as Schedule 5;

1.8.7   "**Jaeban Group Company(ies)**" shall mean Jaeban and any body corporate which is its parent or the direct or indirect subsidiary of Jaeban including intermediary holding companies and any affiliate. For the purposes of this Agreement, this shall not include any companies which are not connected in any way with self-drive vehicle rental or other related activities;

1.8.8   "**Locations**" shall mean Budget's locations at Birmingham International Airport including the Polyhire Site and Airport Backup at Elmdon Trading Estate, Birmingham City, Manchester Airport and Airport Backup at 1B Ringways Industrial Estate and Manchester City as more particularly described in the Business Sale Agreement;

1.8.9   "**New Territories**" shall mean the licensed territories of Tamworth, Coventry, Stockport and Bolton;

1.8.10  Where the word "**including**" or "**include**" is used, it shall be deemed to mean "including without limitation".

1.9   Defined terms shall have the meanings attributed to them in the New License Agreements unless otherwise expressly defined herein for the purposes of this Agreement, and in the event of conflict the express definition herein shall prevail.

1.10  In the event of any conflict between the terms of this Agreement and those of the Existing License Agreements or the New License Agreements, this Agreement shall prevail save that in the event of any conflict between the terms of this Agreement, the New License Agreements for the Locations and the Concession Agreements, the Concession Agreements shall prevail.

2.   **ADDITIONAL PROVISIONS**

The Parties agree that, subject to the conditions set out herein, the following shall also have effect at and from the date hereof:

2.1   The Existing License Agreements shall terminate subject to the following terms:

JA1121

2.1.1    the parties shall pay to each other on the date hereof all fees and charges due under the Existing License Agreements up to 31 December 2000. All fees and charges due for the period from 1 January 2001 to the date hereof shall be calculated and paid within 90 days of the date hereof;

2.1.2    Jaeban and Mr Jaeban respectively shall on behalf of themselves and their successors and assigns release and forever discharge Budget and its parent, subsidiaries and affiliates (and their respective officers, directors, shareholders, employees, agents, predecessors, successors and assigns) from:

    2.1.2.1    any and all claims, debts, liabilities, demands, obligations costs, expenses, actions, of every nature, character and description, known and unknown, which Jaeban or Mr Jaeban now or in the future owns or holds by any reason of any matter, cause or thing whatsoever occurred, done, omitted, or suffered to be done prior to the date hereof; and

    2.1.2.2    any and all claims, debts, liabilities, demands, obligations, costs, expenses, actions and causes of action of every nature, character and description, known or unknown, which may exist or arise out of the Existing License Agreements between Jaeban or Mr Jaeban and Budget;

2.1.3    Budget shall on behalf of itself and its parent company, subsidiaries and affiliates (and their respective officers, directors, shareholders, employees, agents, predecessors, successors and assigns) ("**Related Parties**") release and forever discharge Jaeban and Mr Jaeban and their successors and assigns from any and all claims, debts, liabilities, demands, obligations, costs, expenses, actions, of every nature, character and description, known and unknown, which Budget or its Related Parties now or in the future owns or holds by any reason of any matter, cause or thing whatsoever occurred, done, omitted, or suffered to be done prior to the date hereof under the Existing License Agreements.

For the avoidance of doubt, Jaeban and Mr Jaeban shall not be released from any and all claims, debts, liabilities, demands,

JA1122

obligations costs or expenses incurred or suffered by Budget or its Related Parties arising from actions brought by any third party by any reason of any matter, cause or thing whatsoever occurred, done, omitted, or suffered to be done by Jaeban or Mr Jaeban prior to the date hereof under the Existing License Agreements and Jaeban and Mr Jaeban respectively agree to indemnify and keep indemnified Budget and its Related Parties on demand against all such costs and expenses;

2.2 Jaeban and Mr Jaeban shall comply with any and all provisions of the Existing License Agreements which are intended to survive the termination thereof, save in respect of the following obligations and rights which shall not apply on account of Jaeban and Mr Jaeban entering into the New License Agreements and which are contained in:

2.2.1 Paragraph 9.02 (Telephone Number) of each of the New Form Existing License Agreements;

2.2.2 Paragraph 12.05 (Obligations of Licensee on Termination) of each of the New Form Existing License Agreements and the Old Form Existing License Agreements;

2.2.3 Paragraph 12.06 (Power of Attorney) of each of the New Form Existing License Agreements;

2.2.4 Paragraph 12.08 (Pre and Post Termination Restrictions) of the New Form Existing License Agreements and Paragraph 12.10 of the Old Form Existing License Agreements.

For the purposes of this Clause 2.2, New Form Existing License Agreements means the Existing License Agreements having the Licensed Territories of Kidderminster, Stoke on Trent and Nottingham and "Old Form Existing License Agreements" means the Existing License Agreements having the Licensed Territories of Telford/Shrewsbury, West Bromwich & Walsall and Wolverhampton

2.3 The Parties each agree that they shall not bring any claim for damages against the other in connection with the termination of the Existing License Agreements and pursuant to Clause 2.1.

2.4 The Parties to this Agreement agree that all future grants of franchise rights (if any) to a Jaeban Group Company, in addition to those granted for the

N:\paulm\Umbrella.doc477132_3          5

Locations shall be governed by and subject to the terms of this Agreement including the provisions set out in the Agreed Amendments unless otherwise agreed in writing. Jaeban shall procure that any Jaeban Group Company shall when entering into future license agreements with Budget simultaneously enter into this Agreement and shall thereafter be bound by its terms.

2.5     For the avoidance of doubt this Agreement shall bind the successors, heirs and personal representatives of the Parties.

2.6     Each party agrees to procure that, without prejudice to the provisions of Clause 4.3, its transferees and assignees, shall as a condition precedent to any transfer or assignment to them execute a document in such form as Budget may reasonably require by which such transferee or assignee effectively assumes all its assignor's or transferor's obligations and undertakings hereunder in favour of the other Parties hereto with effect from the date of assignment or transfer. The assigning or transferring party shall remain liable for his or its obligations hereunder prior to the date of such transfer or assignment. Transfer or assignment shall for the purposes of this Clause include sale, gift, contribution, assignment or other disposal.

2.7     The parties hereto other than Budget shall procure that any other company which becomes a Jaeban Group Company shall execute this Agreement immediately after its/their formation and by Deed of Adherence (or such other document as Budget may reasonably require) assume all obligations expressed or implied to be or become obligations of Jaeban, or other Jaeban Group Companies as if they had been an original signatory.

2.8     Where an agreement or undertaking herein is expressed to be given or agreed by Jaeban, and/or other Jaeban Group Companies, without prejudice to their own agreement or undertaking, the other Jaeban Group Companies which are parties to this Agreement now agree to procure that Jaeban and such other Jaeban Group Company comply with and perform their obligations under or arising from the agreement or undertaking in question and, in the case of agreements to be entered into or action to be taken in the future, to procure that the relevant Jaeban Group Company does so.

3.      **BREACH AND TERMINATION – ADDITIONAL PROVISIONS**

3.1     Jaeban agrees to be liable to Budget for any and all of Jaeban's, Mr Jaeban's and any Jaeban Group Company's breaches of contract, tort or other

JA1124

liabilities towards Budget whether under or in connection with this Agreement, the agreements contemplated by this Agreement (including the New License Agreements and any future license agreements, guarantees and undertakings entered into pursuant hereto) and duly executed amendments thereof, and/or in the event Budget exercises its termination rights hereunder and/or under any of the New License Agreements or any future license agreements, as amended in accordance herewith, or any of them, and/or otherwise, without prejudice to Jaeban's and its shareholders' continuing potential liability in respect of liabilities or acts or omissions giving rise to liabilities which occurred prior to the date hereof. To the extent that Mr Jaeban undertakes any obligations personally under this Agreement his liability in relation thereto shall be limited by the terms of the personal guarantee to be entered into on the date hereof provided that Budget may require Mr Jaeban to enter into an additional or replacement personal guarantee if license agreements for additional licensed territories are granted to Jaeban by Budget in the future.

3.2    The parties recognise and have now (acknowledging in particular Recital 1.7) agreed after careful negotiation that in the event of lawful termination by Budget of any of the arrangements constituted by this Agreement, the New License Agreements and any future license agreements pursuant to the terms thereof and bearing in mind the likely damage to Budget, Budget Rent a Car Corporation, their businesses, other BRAC businesses and the Network, both in the UK and internationally, Budget shall receive an Immediate Compensation Payment (which payment when made shall suspend the obligation to pay further Service Fees/Royalties, Marketing Fund Fees and contributions pursuant to any of such agreements pending the later assessment of any additional compensation and damages by an arbitrator as provided herein) as a genuine pre-estimate on account of Budget's likely initial loss of Service Fees following termination of any of the arrangements constituted by this Agreement, the New License Agreements and any future license agreements, and an award of additional damages (if any are found due) in accordance with the mechanisms and guidance set out in Schedule 2 which may also increase the compensation payable in respect of lost service and other payments described above.

3.2.1    The parties further agree that the provisions of Schedule 2 shall govern the calculation and payment of compensation to Budget without prejudice to any other remedies available to Budget.

JA1125

3.2.2    Budget further reserves its right in all situations to apply for injunctive relief, specific performance or any other equitable remedy to require the performance of, or restrain the breach of, this Agreement, the New License Agreements and any future license agreements and any of the arrangements to be entered into pursuant to this Agreement.

3.2.3    The payment of such compensation shall be without prejudice to any other remedies Budget may have under this Agreement, the New License Agreements and any future license agreements.

3.3    Jaeban and the other parties hereto for themselves and on behalf of all present and future Jaeban Group Companies hereby undertake in favour of Budget not to take any action, omit to act, or sign any documents which might lead to, contribute to, or assist in a breach or violation of the provisions of the New License Agreements and any future license agreements, as amended pursuant to this Agreement.

4.    **MISCELLANEOUS**

4.1    The parties hereto other than Budget undertake in favour of Budget for themselves and to use their reasonable endeavours to procure that all Jaeban Group Companies will not, without the prior written consent of Budget not to be unreasonably withheld, except as required by law or regulations, make any public announcement and, bearing in mind the unique structures approved by Budget in this Agreement, undertake not to disclose except to employees and professional advisers on a "need to know" basis any of the details or content of this Agreement, the Existing License Agreements the. New License Agreements and any and future license agreements and the transactions contemplated hereunder.

4.2    Each of the parties hereto shall bear their own fees costs and expenses incurred by them in connection with the transactions contemplated by and including this Agreement, including lawyers', consultants' and accountants' fees, whether or not the matters referred to herein are completed except as provided otherwise in the Business Sale Agreement.

4.3    The parties to this Agreement other than Budget shall not have the right to assign or otherwise dispose of this Agreement or their interest in this Agreement without the prior written consent of Budget.

JA1126

4.4     Jaeban and Mr Jaeban undertake to procure that the word "Budget" does not appear in the registered company names of any Jaeban Group Company at any time.

4.5     The terms of this Agreement and the other agreements referred to herein and any other correspondence relating to the subject matter of this Agreement supersede all prior discussions, correspondence or agreements of the parties, and constitute the entire agreement of the parties on the subject matter hereof provided that this shall not exclude any liability of any party in respect of statements made fraudulently by that party prior to the date of this Agreement.

4.6     This Agreement is governed by the laws of England without regard to the conflict of laws provisions of either England or of any other jurisdictions.

4.7     Without prejudice to the provisions of Clause 3.2.2 any dispute arising out of or in connection with the assessment of damages under Schedule 2 shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference to this Clause provided always that any dispute regarding the failure to pay an Initial Compensation Payment or any application by Budget to enforce the payment thereof shall not be referred to arbitration but shall be heard by any court of competent jurisdiction.

4.7.1     The number of arbitrators shall be one;

4.7.2     The place of arbitration shall be London.

4.8     Any notice required or permitted under this Agreement shall be in writing and delivered personally, by registered post or by airmail (postage prepaid), by commercial courier, or by telecopy addressed as follows or to such other address as the Parties shall have given notice of pursuant to this Clause:

Budget at 41 Marlowes, Hemel Hempstead, Hertfordshire HP1 1XJ, England or to such address as Budget may from time to time notify to Jaeban, marked for the attention of the Managing Director and the Vice President of Franchising, with a copy, similarly served, to Mr R Aprati, Senior Vice President and Chief Counsel, Budget Group, Inc., 4225 Naperville Road, Lisle, Illinois 60532-3662, U.S.A.

Jaeban for all Jaeban Group Companies at the latest current business address for Jaeban of which Budget has received written confirmation currently

JA1127

confirmed as Welcome House, 999 Wolverhampton Road, Oldbury, West Midlands B69 4JR marked for the attention of Mr I M Jaeban or the current Managing Director of Jaeban

and to the other parties at their addresses stated above.

4.9     The parties agree to execute such other documents or agreements and do such other things as may be necessary or desirable for the implementation of this Agreement and the consummation of the transactions contemplated by this Agreement.

4.10    Amendment to and waivers of the provisions hereof shall be valid only if in writing and signed by a duly authorised signatory of the party against whom enforcement of any such amendment or waiver is sought. The words "this Agreement" as used herein shall mean as so modified in the future unless otherwise indicated by the context.

4.11    References to Budget shall, where the context so admits throughout this Agreement, include any present and future direct and indirect affiliates, subsidiaries and parent companies of Budget.

4.12    If any term or provision or any part thereof (in this paragraph called the "Offending Provision") of this Agreement shall be declared or become unenforceable, invalid or illegal for any reason whatsoever including a decision by any competent domestic court, the European Court of Justice, the Commission of the European Union, an Act of Parliament, European Union legislation or any statutory or other by-laws or regulations or any other requirements having the force of law, the other terms and provisions of this Agreement shall remain in full force and effect as if this Agreement had been entered into without the inclusion of the Offending Provision. For the purposes of interpretation clause headings shall be disregarded.

4.13    This Agreement shall, unless terminated, continue for so long as any New License Agreements or future license agreements or non-disclosure and/or non-competition and/or confidentiality agreement or obligation entered into in accordance with the requirements of this Agreement including any amendment or extension thereto continues in force, notwithstanding the termination of any of the other agreements contemplated or referred to herein. Rights and obligations which expressly or by their nature or reasonable implication should survive termination shall do so.

JA1128

4.14    This Agreement and the and the other agreements referred to herein may at the time of signature be validly entered into by the execution of multiple counterparts together duly executed by or on behalf of the Parties hereto.

JA1129

In witness whereof the parties have executed this Umbrella Agreement the 5 day of March 2001

For and on behalf of

BUDGET RENT A CAR

INTERNATIONAL INC.

By JACK FRAZEE

Duly Authorised Signatory



For and on behalf of

JAEBAN (U.K.) LIMITED

By I.M. JAEBAN

Duly Authorised Signatory



MR I.M. JAEBAN

N:\paulm\Umbrella.doc477132_3                    12

JA1130

# SCHEDULE 1

### Agreed Amendments to New License Agreements for the Locations

1.    The following provisions shall be inserted in place of or in addition to the relevant provisions in the New License Agreements and any future license agreements to be entered into pursuant to the terms of this Agreement without prejudice to the provisions of Clause 2.4.

2.    The following to be inserted as a new Paragraph 8.3:

8.3    **Existing Concession Agreement.** In relation to the concession agreement entered into by Budget with [Birmingham International Airport Limited/Manchester Airport] ("the Airport") dated [11 March 1999/22 September 1997] for the operation of car rental services at [Birmingham Airport/Manchester Airport] and annexed to this Agreement ("the Concession Agreement") the Licensee shall comply with the following requirements:

(a)    *Licensee covenants and undertakes to comply with Budget's obligations set out in the Concession Agreement.  Budget confirms that up until the date of this Agreement Budget shall be responsible for compliance with the terms of the Concession Agreement;*

(b)    Licensee agrees to indemnify, keep indemnified and hold harmless Budget and its Related Entities from and against all costs (including the costs of enforcement), expenses, liabilities (including any tax liability), injuries, losses, damages, claims, demands, proceedings or legal costs (on a full indemnity basis) which Budget or its Related Entities incur or suffer as a consequence of a direct or indirect breach or negligent performance or failure in performance by Licensee of the terms of the Concession Agreement including a failure to pay any amounts due to the Airport;

(c)    Licensee undertakes to notify Budget immediately upon receipt of notices of default, breach or termination or of alleged breach of the Concession Agreement.  Such notices shall be sent to Budget by fax marked 'VERY URGENT' and marked for the attention of the Vice President of Franchising at Budget at fax number 01442 276047 or to such other number as Budget may from time to time notify to Jaeban;

N:\paul\m\Umbrella.doc477132_3

(d)  Licensee shall be responsible for paying all fees and other amounts due under the Concession Agreement to the Airport at the times stated therein and shall declare to Budget the amounts of such payments.

Notwithstanding the provisions of Paragraph 8.3 (b) above, Budget shall remain liable as primary obligor under the Concession Agreement until such time as the Concession Agreement is assigned to Licensee.

No relationship of landlord and tenant will be created between Licensee and the Airport and Licensee shall acquire no rights from the Airport as a result of these provisions.

3.    The following to be inserted as a new Paragraphs 11.4 (r) and 11.4 (s):

(r)  it shall come to Budget's attention that Licensee has neglected or failed to perform or observe any of the obligations or requirements set out in the Concession Agreement and has failed to remedy the same (assuming it is capable of remedy) within 7 days or such shorter period as may reasonably have been specified by Budget, taking account of the nature of the breach so as reasonably still to permit Budget to cure the default or breach complained of notwithstanding Licensee's obligation to do so hereunder;

(s)  the Concession Agreement is terminated for any reason other than expiry by effluxion of time.

4.    The following to be inserted as a new Paragraph 8.4:

8.4   Retendering of Concession Agreements.  If a concession agreement falls to be renewed the parties shall agree a competitive joint bid based on the parties' market research for the relevant concession.  If the parties are unable to agree a joint competitive bid, Budget shall have the right to submit its own bid.  If a joint bid or a bid by Budget alone is unsuccessful and there are further opportunities to bid for the concession at a later date, on each occasion the parties shall once again try to agree a joint competitive bid and failing such agreement Budget shall have the right to submit its own bid provided that in the event that a sole bid by Budget is successful Licensee shall not have the right to make joint bids on future renewals.

## SCHEDULE 2

### Compensation Provisions

1.    **Definitions** (additional to other defined terms)

"**Termination**"         shall mean the date upon which a termination notice is served on Jaeban or on a Jaeban Group Company.

"**Terminated Territory**"    means the territory or territories in respect of which a termination notice has been served by Budget.

2.    **Immediate Compensation Payment**

2.1    Jaeban shall, upon Termination (and not expiry) of any New License Agreements and any future license agreements in accordance with their terms, pay to Budget an amount in relation to each Terminated Territory representing the Service Fees and/or Royalties and any Marketing Fund Fees or contributions payable which Budget will no longer collect over the 365 days following termination, such amount to be estimated by applying the rate of such Service Fees/Royalties/Marketing Fund Fees/contributions applicable to each Terminated Territory to an amount representing the estimated discounted future Gross Revenues (as defined in the New License Agreement and any future license agreement) for each Terminated Territory over the period of 365 days following the end of the month in which the termination notice is served but deducting any such Service Fees, Royalties, Marketing Fund Fees and contributions that are actually paid. The payment of such amount shall suspend any obligation of the relevant Licensee to continue to pay such Service Fees, Royalties, Marketing Fund Fees and contributions without prejudice to the finding by an arbitrator as provided below that Budget should be entitled to a greater compensation in respect of Service Fees, Royalties, Marketing Fund Fees and contributions than it received as the Immediate Compensation Payment. The above liability of Jaeban and any Jaeban Group Companies shall be joint and several. Budget shall be under a general duty to mitigate its losses arising from such termination.

2.2    The amount of estimated discounted future Gross Revenues ("**Estimated Sales**") shall be calculated by applying to the average monthly Gross

JA1133

Revenues of the Terminated Territory(ies) during the period of 365 days (or lesser period if early termination occurs) prior to the month in which the Termination occurs the average rate of growth (or reduction) in Gross Revenues achieved in the same period and projecting this forward over the 365 days following the end of the month of Termination.

2.3    The aggregate of estimated future Gross Revenues so calculated shall then be discounted by 10% percent to reflect the parties' agreement that this discount would allow for future market uncertainty ("**Discounted Future 1-year Sales**").

2.4    The Immediate Compensation Payment shall be an amount equal to the multiple of Discounted Future 1-year Sales and the rate of Service Fees/Royalties/Marketing Fund Fees/contributions applicable in the Terminated Territory.

2.5    The determination of the Immediate Compensation Payment(s) so calculated by Budget in accordance with the above formula and notified to Jaeban and any Jaeban Group Company shall be binding on Jaeban, and shall in the absence of manifest and substantial error in the arithmetic of the calculation be paid to Budget not later than 21 days after the date of such notice.

2.6    If the arbitrator assesses the actual losses suffered by Budget to be less than the Immediate Compensation Payment made by Jaeban, or the applicable Jaeban Group Companies (as the case may be) to Budget and so orders, Budget shall reimburse the relevant amount of Immediate Compensation Payments so received together with any applicable legal interest.

3.    **Award of Additional Damages**

3.1    The parties acknowledge, bearing in mind the provisions of Clause 3.2 of the Agreement, that:

3.1.1    in order to mitigate its losses following Termination and to re-establish the Budget brand and System in the Terminated Territories Budget will have to either introduce new licensee(s), establish corporate operations, or enter into other arrangements with third parties

3.1.2    the approach, the cost, and the speed of re-establishment of the Budget brand and System in the market is likely to differ from territory to territory

JA1134

3.1.3    Budget shall be free in its discretion to determine which approach is most appropriate but will act reasonably in implementing its approach.

3.2    The parties agree that, in addition to compensation for loss of Service Fees and/or Royalties and any Marketing Fund Fees or contributions, Budget's costs, if any, of re-establishment and redevelopment of its brand and System and BRAC businesses in each Terminated Territory and other losses, costs and expenses which will be incurred by Budget, its related companies and licensees directly or indirectly as a consequence of Termination (subject always to legal duties to mitigate loss) shall separately be compensated by (as the case may be) Jaeban and/or the applicable Jaeban Group Company in the manner described herein as additional compensation ("**Additional Costs Compensation**") and if the arbitrator so orders all or part of the Initial Compensation Payment may be applied towards the Additional Costs Compensation.

3.3    Such Additional Costs Compensation which the parties foresee may fall to be compensated include without limitation (and without prejudice to Budget's right to claim other damages and those connected with the mitigation of losses):

- costs of recruiting, identifying, qualifying and training replacement licensees and their personnel;

- costs in investing, in establishing, promoting and developing corporate operations (either Budget itself, a related company, or in another structure with a third party);

- costs reasonably incurred in re-establishing important relationships with third parties such as suppliers, and in re-securing airport concessions; and

- costs reasonably incurred in promoting the Trademarks in order to re-establish the brand profile in the Terminated Territories.

It is confirmed for avoidance of doubt that the principles set out above shall apply mutatis mutandis in the event of a termination in relation to one or more Terminated Territories.

N:\paulm\Umbrella.doc477132_3

## SCHEDULE 3

### Group Structure of Jaeban

The current direct beneficial owners of Jaeban are as follows:

#### Jaeban (UK) Limited

| Shareholders | Ordinary Shares | Preference Shares |
|---|---|---|
| I M Jaeban | 99 | 50,000 |
| S M Jaeban | 1 | - |

At the date of this Agreement all other Jaeban Group Companies are dormant.

JA1136

## SCHEDULE 4

### Existing License Agreements

| Date of Agreement | Parties | Territory |
|---|---|---|
| 28 February 1986 | Budget Rent A Car International Inc<br>Ibrahim M Jaeban | Wolverhampton |
| 1 July 1989 | Budget Rent A Car International Inc<br>Jaeban UK Ltd | West Bromwich and Walsall |
| 30 July 1991 | Budget Rent A Car International Inc<br>Jaeban UK Ltd | Telford and Shrewsbury |
| 1 July 1995 | Budget Rent A Car International Inc<br>Jaeban UK Ltd | Leicester |
| 2 August 1995 | Budget Rent A Car International Inc<br>Jaeban UK Ltd | Stoke on Trent |
| 2 August 1995 | Budget Rent A Car International Inc<br>Jaeban UK Ltd | Kidderminster |
| 1 March 1997 | Budget Rent A Car International Inc<br>Jaeban UK Ltd | Nottingham |

# SCHEDULE 5

## International Prime License Agreement

N:\paulm\Umbrella.doc477132_3

JA1138

BUDGET RENT A CAR

INTERNATIONAL INC.

## INTERNATIONAL PRIME LICENSE AGREEMENT

*for*

Master

JA1139

## TABLE OF CONTENTS

Page

I    EXCLUSIVE LICENSE ................................................................................3
    1.1    Exclusive License ...........................................................................3
    1.2    Reservation of Rights .....................................................................3
    1.3    Prohibition Against Sublicensing/Agencies ...................................5
    1.4    Licensed Territory ..........................................................................5
II    BUDGET TRADEMARKS AND SYSTEM ...............................................6
    2.1    BRACC's Exclusive Ownership .....................................................6
    2.2    Notification of Infringement/Claim .................................................7
    2.3    Limitation On Use ............................................................................8
    2.4    Nondisclosure .................................................................................9
    2.5    System Ideas ...................................................................................12
    2.6    Modifications to System .................................................................12
III    OPERATING MANUAL .............................................................................13
IV    INSTRUCTION AND OPERATING ASSISTANCE ..................................14
    4.1    Pre-opening Instruction .................................................................14
    4.2    Post-opening Instruction ...............................................................15
    4.3    Operating Assistance and Training ..............................................15
    4.4    Attendance at Conventions Seminars and Meetings ....................15
V    MARKETING AND IDENTIFICATION .....................................................16
    5.1    Centralized Marketing Fund ..........................................................16
    5.2    Budget Direction of Funds .............................................................16
    5.3    Local Advertising and Promotion ..................................................17
    5.4    Required Local Expenditures ........................................................17
VI    PROGRAMS ...............................................................................................18
    6.1    Key Account Programs ..................................................................18
    6.2    International Reservation System ..................................................19
    6.3    Customer Complaint Programs .....................................................20
    6.4    Payment Programs ........................................................................20
    6.5    Marketing/Customer Service Programs ........................................20
VII    FEES AND OTHER PAYMENTS ...............................................................21
    7.1    License Purchase Fee ...................................................................21
    7.2    Centralized Marketing Fund Fees .................................................21
    7.3    Service Fees and Royalty Fees .....................................................21
    7.4    Minimum Service Fees ...................................................................23
    7.5    Withholding Taxes .........................................................................23
    7.6    Definition of "Gross Revenue\ ......................................................24
    7.7    Electronic Funds Transfer .............................................................25
    7.8    Currency of Payment and Rate Of Exchange ...............................25
    7.9    Exchange Controls .........................................................................26
    7.10    Interest on Monies Past Due ..........................................................27

i

JA1140