Execution Draft

cash, stock or property with respect to any shares of any class or series of its Equity Securities (except to another Seller Entity), (iv) split, combine or reclassify any shares of any class or series of the Equity Securities of any Acquired Company, (v) redeem, purchase or otherwise acquire directly or indirectly any shares of any class or series of its or their Equity Securities, or any instrument or security which consists of or includes a right to acquire such securities (except, in each case, from another Seller Entity) or (vi) form or establish any new Subsidiaries or Affiliates;

(c) not permit, other than in the ordinary course of business consistent with past practice, any of the Acquired Assets (or in Budget Austria's case, its assets) to be sold, mortgaged, leased, subleased, licensed, transferred or subjected to any Liability or Encumbrance (other than Permitted Encumbrances);

(d) not terminate, release, assign any rights under or discharge any other party thereunder of any of their obligations under any Assumed Contract (or in Budget Austria's case, the material contracts to which it is a party) and not amend any of the terms and conditions thereof, in each case without the prior consent of the Purchaser not to be unreasonably withheld;

(e) save as required by law or any national or industry wide collective bargaining agreement, not increase the compensation or benefits provided to, or change payroll periods or vacation accrual policies in respect of, any employee of the Acquired Business or establish, increase or make any retention, severance, deferred compensation, pension retirement, profit sharing or sales bonus arrangement with any employee of the Acquired Business without the prior consent of the Purchaser (not to be unreasonably withheld);

(f) save as required by law or any national or industry wide collective bargaining agreement, not establish any new Benefit Plan or amend or modify any existing Benefit Plan, to the extent such action would affect any employee of the Acquired Business, or make any sales bonus payments to any employee of the Acquired Business without the prior consent of the Purchaser (not to be unreasonably withheld);

(g) not create any new franchises in the EMEA Territory (except that this will not prevent the Seller Parties from taking any action to facilitate the renewal of existing franchises);

(h) not, without the prior consent of the Purchaser, (i) grant any new franchise, licence or sub-licence pursuant to which a Person will operate a vehicle rental or sales operation pursuant to a grant from a Seller Entity or Budget Austria (a "Licence"); (ii) make any statements to any Person relating to the validity or subsistence of any Licence; or (iii) make any amendment to the terms of any existing Licence. For the avoidance of doubt, the term "Licence" includes any implied licence;

(i) not without the prior consent of the Purchaser (not to be unreasonably withheld) enter any Licence or other material agreement relating to the EMEA Territory (or any part of it) (whether implied, written, oral, formal or informal), or materially alter the Licences which are in place on July 28, 2002 with respect to such countries (except that this will not prevent the Seller Parties from taking any action to facilitate the renewal of existing franchises);

32

JA345

(j) in the case of Société Financière et de Participation, not to proceed with any tax loss carry back;

(k) not seek to recharge or pass on to Licensees any amounts charged to Seller Parties or Budget Austria by Cherokee which are paid out of funds advanced under the DIP Financing Agreement; and

(l) The Seller Parties acknowledge that, as a result of the Purchaser's continuing due diligence in relation to its election referred to in section 2.3(l) whether or not to acquire the Acquired Companies and regarding the methods by which it would want to acquire the Acquired Companies, the Purchaser may wish to request that the Seller Parties perform certain acts (including transferring a limited number of shares to a party unrelated to the Purchaser) or refrain from taking certain action in relation to the Acquired Companies or the Acquired Companies' subsidiaries. The Seller Parties agree that until the Final Closing they will each use reasonable endeavours to cooperate with the Purchaser's reasonable requests in this regard provided that the Seller Parties shall not be required to comply with any such requests which could be reasonably expected to result in any of the Seller Parties or the UK Administrators incurring directly or indirectly any material additional actual or contingent costs, expenses or liabilities (including in respect of tax) and if, notwithstanding the foregoing, any Seller Party or the UK Administrators do incur any such expenses, costs or liabilities as a result of its compliance with any request made by the Purchaser under this Section 5.1(l) the Purchaser shall indemnify the relevant Seller Party or the UK Administrators (on an after tax basis) to the full extent thereof. If for any reason a Seller Party does not wish to comply with any request made to it by the Purchaser under this Section 5.1(l) it shall consult with the Purchaser prior to refusing to act in accordance with or acting contrary to the expressed wishes of the Purchaser.

Section 5.2 Access and Information

(a) Seller Parties and Budget Austria shall, and shall cause their accountants, auditors, counsel and other representatives to, give Purchaser and its Affiliates and to their respective directors, officers, employees, accountants, agents, counsel, insurance brokers, insurance companies, lenders and other financing sources and other representatives (collectively, "Representatives") reasonable access during Seller Parties' and Budget Austria's normal business hours throughout the period prior to the Final Closing Date to all of Seller Parties' and Budget Austria's properties, books, Contracts, commitments, financial and operating data, Tax Returns and materials related to Taxes, accounting work papers, reports of examination and records relating to the Acquired Business, the Acquired Assets or the Assumed Liabilities. Without limiting the generality of the foregoing, Purchaser and its Affiliates shall be entitled to make (or cause to be made) such other investigations of the Acquired Business, the Acquired Assets (including the Acquired Companies), the Encumbrances and the condition (financial or otherwise) of such businesses, assets and liabilities as Purchaser deems necessary or advisable in connection with the transactions contemplated by this Agreement.

(b) During the period prior to the Final Closing Date, Purchaser and Seller Parties shall provide each other or each other's respective counsel the opportunity to review in advance and comment on all filings required under Competition Laws or otherwise with any Governmental Body pertaining to the transactions contemplated in this Agreement and the

33

UK! 5840576.9

Execution Draft

Trademark License Assignment and will keep each other informed of the status of matters pertaining thereto. It is expressly understood by the parties that the representatives of each of the parties shall have the right to attend and participate in any hearing, proceeding, meeting, conference or similar event before or with a Governmental Body or rating agency or other organization relating to this Agreement and the Trademark License Assignment or the transactions contemplated hereby or thereby. In furtherance of the foregoing, the parties shall provide each other reasonable advance notice of any such hearing, proceeding, meeting, conference or similar event.

Section 5.3Efforts to Effect Transaction; Certain Filings.

(a) Seller Parties and Purchaser shall (i) use commercially reasonable efforts to cooperate with each other in determining which other filings are required or advisable to be made prior to the Closing Date with, and which Permits are required to be obtained prior to the Final Closing Date from, any Governmental Body in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated in this Agreement, (ii) use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper, advisable or appropriate to consummate and make effective the transactions contemplated by this Agreement, as soon as practicable, including using all commercially reasonable efforts to obtain all necessary or advisable Permits in connection with the requirements of all Governmental Bodies in respect of the transactions contemplated in this Agreement and to effect all necessary registrations and filings and (iii) cooperate with each other in determining which Permits are required to be obtained by Purchaser in connection with the operation of the Acquired Business by Purchaser following the relevant Closing. In connection with the foregoing, Seller Parties will provide Purchaser, and Purchaser will provide Seller Parties, with copies of all correspondence, filings, or communications (or memoranda setting forth the substance thereof) between such party or any of its representatives, on the one hand, and any Governmental Body, on the other hand, with respect to this Agreement and the transactions contemplated hereby and thereby, save that neither party shall be obliged to disclose information which is confidential.

(b) In furtherance of the foregoing, each Seller Party and Purchaser shall: (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the applicable Competition Laws with respect to the transactions contemplated by this Agreement as promptly as practicable , (ii) comply at the earliest practicable date with any request under any applicable Competition Laws for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or such transactions, (iii) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Competition Laws with respect to any such filing or any such transaction and (iv) advise the other parties promptly of any material communication received by such party from any other Governmental Body regarding any of the transactions contemplated in this Agreement, and of any understandings, undertakings or agreements (oral or written) such party proposes to make or enter into with any Governmental Body in connection with the transactions contemplated in this Agreement and the Trademark License Assignment.

34

UK1 584057v9

JA347

(c) Each of Purchaser and Seller Parties shall use reasonable endeavors to provide to the other copies of correspondence to any Government Body in respect of Competition Laws in relation to this Agreement in draft at least 3 business days prior to dispatch to the relevant Government Body (save that this shall not apply to the initial filings to be made by Purchaser before or soon after the date hereof) all of which correspondence and filings will be copied on a confidential lawyer to lawyer basis to the lawyers instructed by the Seller Parties for this purpose.

(d) If any Action is instituted (or threatened to be instituted) challenging any transaction contemplated in this Agreement and the Trademark License Assignment as violative of any applicable Competition Laws (a "Regulatory Challenge"), each Seller Party and Purchaser shall cooperate in all respects with each other insofar as legally permitted and use its respective commercially reasonable efforts in order to contest and resist any such Regulatory Challenge and have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts the consummation of the transactions contemplated by this Agreement.

Section 5.4 Bankruptcy Filings.

(a) Seller Parties shall provide Purchaser with copies of all motions, applications and supporting papers prepared by or on behalf of Seller Parties (including forms of orders and notices to interested parties), which shall be in substance and form reasonably satisfactory to the Purchaser, relating in any way to Purchaser, the Acquired Assets (including the Acquired Companies), the Assumed Liabilities, the Acquired Business, or the transactions contemplated by this Agreement and the Trademark License Assignment prior to the filing thereof in the Chapter 11 Cases or the UK Administration. Notwithstanding the foregoing, the Sale Order shall be submitted to the Bankruptcy Court in the form attached hereto as Exhibit B, with such changes as the Purchaser and Seller Parties may agree. Seller Parties shall not request that the Bankruptcy Court make any modifications to the Sale Procedures Order in the form filed with the Bankruptcy Court on January 9, 2003 or to the form of Sale Order that is submitted to the Bankruptcy Court without the express written consent of Purchaser.

(b) Seller Parties shall give appropriate notice, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings relating to this Agreement and the Trademark License Agreement or the transactions contemplated hereby and thereby.

Section 5.5 Bidding Procedures.

(a) Seller Parties shall comply with the bidding procedures set forth in the Sale Procedures Order.

(b) Purchaser and Seller Parties acknowledge that this Agreement is the culmination of an extensive process undertaken by Seller Parties to identify and negotiate a transaction with a bidder who was prepared to pay the highest and best purchase price for the assets of Seller Parties while assuming or otherwise satisfying specified liabilities in order to maximize value for each Seller Party's constituents. The parties also acknowledge that under the

35

UK1 384057-9

JA348

Execution Draft

Bankruptcy Code, Seller Parties must take reasonable steps to demonstrate that they have sought to obtain the highest and best price possible for the assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Acquired Business and Acquired Assets to responsible bidders subject to appropriate confidentiality agreements, entertaining higher and better offers from responsible bidders, and, if ordered by the US Bankruptcy Court, conducting an auction.

(c) Seller Parties shall give notice of the transactions contemplated by this Agreement and the Trademark License Assignment to such Persons and in such manner as the Bankruptcy Court shall direct, and to such additional Persons as Purchaser requests.

(d) Seller Parties shall promptly notify and provide a copy to Purchaser of any expression of interest or bids and any modifications or amendments thereto received, in each case, in writing by Seller Parties from any Person to purchase any asset or equity interest held by Seller Parties or their affiliates whether in a separate transaction or as part of a plan of reorganization of Seller Parties or their affiliates.

Section 5.6Intercompany Amounts; Other Agreements. At or prior to and with effect from the relevant Closing, all intercompany receivables or payables and loans then existing between any of Seller Parties or any of their Affiliates (including Budget Germany), on the one hand; and any of the Acquired Companies that are acquired under this Agreement, on the other hand, shall be discharged by being waived and/or released in their entirety, and no such entity shall have any obligation as between them.

Section 5.7Tax Returns; Tax Sharing Agreements.

(a) Each Seller Party (other than BRACII and BRAC) shall prepare (or cause to be prepared) all Tax Returns required to be filed by such Seller Party and shall pay (or cause to be paid) all Taxes required to be paid by it. As of the relevant Closing, All Tax sharing agreements, Tax indemnification agreements or similar Contracts, with respect to or involving any of the Acquired Companies (other than in the case of Societe Financière et de Participation ("SFP") and Financière Milton II only, any tax grouping arrangements) shall be terminated as of the date of the relevant Closing and, after the date of the relevant Closing, none of the Acquired Companies shall have any further rights or obligations under any such agreement or contract.

(b) Until the relevant closing, the Seller Parties undertake to take reasonable steps to ensure that SFP and Financière Milton II remain members of the existing French Tax Group as defined under Article 223A and following of the French Tax Code and that such tax group will not be broken on or before the relevant Closing and that SFP's shares will not be acquired by a French Company provided that this covenant will not be breached by any act or omission required by the UK Administration or the French Acquisition Offer or French Acquisition Approval and nothing in this Section 5.7(b) shall oblige any Seller Party or the UK Administrators to carry out any act or omission which could be reasonably expected to result in any of the Seller Parties or the UK Administrators incurring directly or indirectly any material additional actual or contingent costs, expenses or liabilities (including in respect of tax) and if, notwithstanding the foregoing, any Seller Party or the UK Administrators does incur any such

36

UK1 384257v9

Execution Draft

expenses, costs or liabilities as a result of its compliance with any request made by the Purchaser under this Section 5.7(b) the Purchaser shall indemnify the relevant Seller Party or the UK Administrators (on an after tax basis) to the full extent thereof.

Section 5.8 Purchase Price Allocation.

(a)    As promptly as practicable after the date hereof, Purchaser and BRAC (on behalf of it, and as agent for each other Seller Party) together with the UK Administrators and BRACII shall use reasonable endeavours to agree to an allocation of the aggregate consideration that will be paid among the Acquired Assets attributable to each such Seller Party, which allocations shall be reasonable.

Section 5.9 Transfer and Other Taxes.

(a)    All amounts expressed in this Agreement as being payable by the Purchaser are expressed exclusive of any VAT which may be chargeable thereon.

(b)    It is the intention of the Seller Parties and the Purchaser that the transfer of the Acquired Assets in each relevant jurisdiction (except in Spain and in relation to the Equity Securities) should for VAT purposes constitute the transfer to the Purchaser of all or part of the business of the Seller Parties as a going concern and should accordingly fall within Article 5 of the Value Added Tax (Special Provisions) Order 1995 (SI 1995/1268) ("Article 5") in the UK and any equivalent provision in any other relevant jurisdiction so as to be treated as neither a supply of goods nor a supply of services for the purposes of VAT.

(c)    The Seller Parties and the Purchaser shall cooperate and do all such acts and things, at the Purchaser's expense, as may be reasonably necessary to ensure that and ascertain whether the transfer of the Acquired Assets under this Agreement is treated as neither a supply of goods or a supply of services for the purposes of VAT.

(d)    If not done so prior to the date hereof, the Seller Parties or the UK Administrators (or their advisers) may send to H.M. Customs and Excise (or the equivalent authority in any other jurisdiction) a letter seeking a direction that the Seller Parties be permitted to keep and preserve following Closing the records referred to in section 49(1)(b) of the Value Added Tax Act 1994, as amended (or any equivalent provision in any other relevant jurisdiction), so far as they relate to the carrying on of the business prior to Closing. If such direction is given (subject to what is said below), the Seller Parties shall preserve such records in good order and in such manner and for such period as shall be required by law and shall give the Purchaser reasonable access to such records during normal business hours. If, however, such direction is given but the relevant Seller Party is dissolved, wound-up or the equivalent occurrence in the relevant jurisdiction occurs before the end of the period for which such records must be maintained, then on the dissolution, winding-up or equivalent occurrence the relevant Seller Party shall deliver the relevant records to the Purchaser. If such direction is not given, but a determination is made that the transfer of the Acquired Assets falls within Article 5 (or any equivalent provision in any other jurisdiction), the Seller Parties shall deliver such records to the Purchaser as soon as possible after Completion and the Purchaser shall preserve such records in

37

UKI 5940971-9

Execution Draft

good order and in such manner and for such period as shall be required by law and shall give the Seller Parties reasonable access to such records during normal business hours.

(e)        If it is determined that VAT is chargeable in respect of the transfer of all or any part of the Acquired Assets pursuant to this Agreement, the Purchaser shall, in addition to any other amounts due pay to the Seller Parties on Closing or, if later, 10 Business Days after receipt of notice from the Seller Parties of that determination and against delivery of a valid VAT invoice the amount of any VAT which is chargeable in respect of the transfer of any of the Acquired Assets.

(f)        The Purchaser shall be responsible for all and any registration and notarial fees and transfer taxes and stamp duty payable in relation to the transfer of the Acquired Assets under this Agreement.

Section 5.10    _Confidentiality_.

(a)  During the Initial Covenant Period, and subject to Sections 5.10(b), 5.10(c) and 5.10(d), Purchaser shall keep, and shall cause its Affiliates and its Representatives to keep, all the Seller Evaluation Material confidential and will not, without the prior written consent of BRAC and BRACII disclose any Seller Evaluation Material, in whole or in part, and will not use the Seller Evaluation Material, directly or indirectly, for any purpose other than in connection with this Agreement and the transactions contemplated hereby and thereby.

(b)  Purchaser agrees to disclose Seller Evaluation Material to its Representatives only if and to the extent that such Representatives need to know the Seller Evaluation Material for the purpose of the transactions contemplated by this Agreement and are informed by Purchaser of the confidential nature of the Seller Evaluation Material.  Purchaser agrees to be responsible for any breach of this Section 5.10 by its Representatives.

(c)  Notwithstanding the foregoing, Purchaser or any of its Representatives may disclose any of Seller Evaluation Materials (to the extent such disclosure is reasonably related to the purpose of approving or consummating the transactions contemplated by this Agreement) to the creditors' committee formed in connection with the Chapter 11 Cases and in connection with appearances by Purchaser or any Affiliate thereof in the Bankruptcy Court to the extent the Seller Evaluation Materials so disclosed reasonably relate to the purpose of such appearances provided that in relation to BRACII no such disclosure shall be made by the Purchaser without the prior written consent of the UK Administrators save where such disclosure may be compelled by Law.

(d)  Notwithstanding any confidentiality or other provisions to the contrary in this Agreement, Purchaser and Seller Parties are entitled to submit any information received from Seller Parties and Purchaser (as the case may be) to a Governmental Body in relation to submissions when required by any applicable Competition Law.

(e)  If Purchaser or any of its Representatives, or any Person to whom any of the foregoing have, directly or indirectly, transmitted Seller Evaluation Material, are requested or required by Law (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation demand, any informal or formal investigation by any Governmental

38

UKI 5940974-9

JA351

Execution Draft

Body, stock exchange regulation or otherwise) to disclose any Seller Evaluation Material, Purchaser agrees; (x) to promptly notify the Seller Parties of the existence, terms and circumstances surrounding such request, (y) to consult with the Seller Parties on the advisability of taking legally available steps to resist or narrow such request and (z) if disclosure of any Seller Evaluation Material is required, to furnish only that portion of Seller Evaluation Material, which is required to be disclosed and to use reasonable efforts to cooperate with any reasonable action by Seller Parties to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to Seller Evaluation Material.

(f) If the transactions contemplated by this Agreement are not consummated and this Agreement is terminated in accordance with the terms hereof, Purchaser will redeliver to the relevant Seller Party or destroy all tangible Seller Evaluation Material and any other tangible material containing any information in the Seller Evaluation Material (whether prepared by a Seller Party, their Representatives or otherwise), and will not retain any copies, extracts or other reproductions in whole or in part of such tangible material. The chief executive officer or president of Purchaser will certify to Seller Parties that all such Seller Evaluation Material has been so redelivered or destroyed. Notwithstanding the delivery or destruction of the Seller Evaluation Material required by this Section 5.10(f), all duties and obligations existing under this Section 5.10 (including with respect to any oral Seller Evaluation Material) will remain in full force and effect.

Section 5.11   No Solicitation of Employees.  Without the consent of Seller Parties, until the earlier of the Final Closing Date and the termination of this Agreement, Purchaser, and its Representatives who have knowledge of the transactions contemplated by this Agreement and the Trademark License Agreement will not take any action to solicit any officer or key employee of a Seller Party to terminate his or her employment with such Seller Party, except for employment as contemplated by Section 2.14 after the relevant Closing.

Section 5.12   Partial Closing Covenants.  During the period (if any) between the first Partial Closing Date and the Final Closing Date, the following provisions shall apply:

(a) To the extent permitted by law (including any applicable Competition Law), the Purchaser hereby agrees to manage on the relevant Seller Parties' (other than BRAC's) behalf, and in accordance with the relevant Seller Parties' (other than BRAC's) directions, the business and operations of any Seller Party (other than BRAC) and Budget Austria in relation to a Delayed Jurisdiction (the "Management Services").  In connection with the provision of the Management Services, the Purchaser will invoice the relevant Seller Party (other than BRAC) on a monthly basis for the reasonable direct and indirect costs incurred by the Purchaser in providing the Management Services (plus any applicable VAT or similar use, sales or value added Tax) (the "Management Fee")  The Purchaser undertakes to the Seller Parties that it will perform the Management Services promptly and with reasonable care and skill.

(b) To the extent permitted by law (including any applicable Competition Law), each of the Seller Parties (other than BRAC) hereby appoints the Purchaser to act as its manager to perform the Management Services in the Delayed Jurisdictions. The Seller Parties (other than BRAC) each undertake to provide any necessary instructions and assistance to the Purchaser to enable the Purchaser to provide the Management Services

39

JA352

Execution Draft

(c) Each Seller Party (other than BRAC) and Budget Austria shall conduct any business or operations it may have in a Delayed Jurisdiction in the ordinary course and consistent with past practice. Without limiting the foregoing, except as contemplated by the Agreement, the Seller Parties and Budget Austria shall each conduct any business or operations it may have in a Delayed Jurisdiction in accordance with the restrictions set out in Section 5.1 (a) to (l). The Seller Parties (other than BRAC) hereby irrevocably instruct the Purchaser to provide the Management Service in accordance with those restrictions.

(d) The Purchaser undertakes that until the Closing Date it shall in respect of all Seller Evaluation Material that relates to the business or operations of any Seller Party or Budget Austria in a Delayed Jurisdiction comply in all respects with the covenants set out in Section 5.10(a) to (c).

ARTICLE 6
ADDITIONAL POST-CLOSING COVENANTS

Section 6.1 Books and Records; Personnel. For a period of six years after the Final Closing Date, Purchaser shall maintain all Business Records that are transferred to Purchaser hereunder. At all times during which Purchaser maintains such Business Records (including electronic access to the extent such Business Records are in electronic form and the information can be provided separate and apart from all other information relating to Purchaser, any of its Affiliates or their respective businesses), Purchaser shall allow Seller Parties and their accountants and counsel access to all such Business Records, properties and personnel that are reasonably required in the administration of the Chapter 11 Cases or in the course of the duties and obligations of the UK Administrators or in anticipation of, or preparation for, any existing or future Action involving a Seller Party, Tax Return preparation or defense, litigation or Excluded Liability. Such access shall be afforded during regular business hours and upon reasonable written notice at Purchaser's principal place of business or at any location where such Business Records are stored; provided, however, that any such access shall not unreasonably interfere with the normal conduct of the business or operations of Purchaser and its Affiliates. Seller Parties (other than BRACII) shall be responsible for any actual out-of-pocket costs and expenses incurred by Purchaser and its Affiliates in connection with granting Seller Parties access to such Business Records, properties and personnel pursuant to this Section 6.1. If, prior to the expiration of such six-year period, Purchaser proposes to dispose of any such Business Records, Purchaser shall provide Seller Entity with written notice and, if requested, shall deliver the same to Seller Entity at Purchaser's expense.

Section 6.2 Tax Cooperation. Seller Parties and Purchaser agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Acquired Assets as is reasonably requested for the filing of any Tax Returns, for the preparation of any audit and for the prosecution or defense of any Action or other matter related to Taxes or any Tax Return provided that in the case of BRAC, such obligation shall be limited to furnishing such information and assistance solely in relation to the Trademark Licence Agreement. Any information obtained under this Section 6.2 shall be kept confidential except (i) as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting an audit or other proceeding or (ii) as may be consented to by Seller Parties or Purchaser, as applicable.

40

UK1 5540575•9

JA353

Execution Draft

Section 6.3 Remittance of Funds.

(a) Any fees and other payments, including payments in respect of Excluded Accounts Receivable, received by Purchaser in any capacity in respect of any Excluded Asset (whether because a Closing has not yet occurred or otherwise) shall be received by Purchaser in trust for Seller Parties and Purchaser will promptly pay such amounts to an account designated by Seller Entity upon receipt thereof less a reasonable processing fee reflecting direct and indirect costs.

Section 6.4 French and Austrian Trademarks

(a) The Purchaser shall use its reasonable endeavours to acquire by the Final Closing Date or as soon as possible thereafter all such right, title and/or interest as Budget France may have in and to the French Trademarks. Should the French Trademarks be acquired by the Purchaser it shall immediately thereafter assign all of its right, title and interest in such trademarks to Cherokee subject to Cherokee including the French Trademarks among the trademarks licensed under the Trademark License Agreement.

(b) If following the acquisition of the Equity Securities in Budget Austria by the Purchaser, Budget Austria retains any right, title and/or interest in or to the Austrian Trademark the Purchaser shall procure that all of such right, title or interest are promptly assigned by Budget Austria to Cherokee subject to Cherokee including the Austrian Trademark among the trademarks licensed under the Trademark License Agreement. For the avoidance of doubt nothing in this Agreement shall limit the right and power of Budget Austria to transfer or of the Sellers to procure the transfer of the Austrian Trademark to Cherokee prior to Closing subject to Cherokee including the Austrian Trademark among the trademarks licensed under the Trademark License.

Section 6.5 Further Assurances.

(a) At any time and from time to time after each Closing Date, Seller Parties and the UK Administrators shall execute and deliver to Purchaser, at the Purchaser's expense, such instruments of transfer, conveyance, assignment and confirmation, in addition to those executed and delivered by Seller Parties at that Closing, and take such action as Purchaser may reasonably deem necessary or desirable in order to more effectively transfer, convey and assign to Purchaser and to confirm Purchaser's title to all of the Acquired Assets, to put Purchaser in actual possession and operating control thereof and to permit Purchaser to exercise all rights with respect thereto and otherwise to give full effect to the provisions of this Agreement.

(b) In relation to BRACII and the UK Administrators, any document executed and delivered under sub-section (a) above shall contain an exclusion of liability on the UK Administrators' part satisfactory to the UK Administrators.

(c) Seller Parties shall take reasonable steps to avoid taking any steps that result in any harm to the Acquired Assets after they have been acquired by Purchaser;

41

UK1 584057v9

Execution Draft

(d) Budget Spain agrees that, within 30 days after the relevant Closing for Spain, it shall have passed irrevocable resolutions for its dissolution and liquidation and it shall have commenced an orderly voluntary winding-up. BRACII, as the sole shareholder of Budget Spain, agrees that, within 30 days after the relevant Closing for Spain, it shall have passed the resolutions mentioned above and shall have taken any other steps reasonably available to it to ensure the commencement of an orderly voluntary winding up of Budget Spain.

(e) If at any time after the date of this Agreement there shall be discovered any contract not listed in Schedule 2.3(e) to which a Seller Party is party under which any person has the right to use any of the trademarks licensed under the Trademark License Agreement within the EMEA Territory then, at Purchaser's request, such contract may be treated for all purposes of this Agreement as an Adopted Contract and this Agreement shall be applied accordingly, but absent such request within 30 days after Purchaser has notice of the existence of such contract, such contract shall be treated as an Excluded Contract;

(f) Seller Parties shall not seek to recharge or pass on to Licensees any amounts charged to Seller Parties or Budget Austria by Cherokee which are paid out of funds advanced under the DIP Financing Agreement.

## ARTICLE 7

## CONDITIONS PRECEDENT TO CLOSING

Section 7.1    General Conditions. The respective obligations of Purchaser and Seller Parties to effect the first Closing are subject to the fulfillment or waiver, prior to or at the first Closing, of each of the following conditions:

(a) No statute, rule, regulation, executive order, decree, decision, ruling or preliminary or permanent injunction shall have been enacted, entered, promulgated or enforced by any Governmental Body, that enjoins, prevents or prohibits confirmation of the transactions contemplated by this Agreement or the Trademark License Assignment;

(b) the Sale Approval Order shall have been entered and shall not have been stayed or vacated;

(c) No Action shall have been taken or remain pending and unstayed by any Governmental Body seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement;

(d) If the Agreed Jurisdictions include the European Commission pursuant to the ECMR, the Purchaser shall have obtained such approval as is required from the European Union or any agency thereof in respect of the arrangements contemplated by this Agreement; and

(e) Purchaser shall have agreed to the terms of, and Seller Parties and Purchaser shall have entered into, the Cherokee Support Agreement on terms mutually agreeable to the Seller Parties and the Purchaser

42

UK1 584057v9

(f)  Seller Parties shall have received from each Employee having a contractual entitlement to a payment upon termination of his or her employment following a change in ownership of his or her employer or transfer of his or her employment an unconditional and absolute release and waiver in terms satisfactory to Seller Parties and Purchaser of all rights in relation to such entitlement (including confirmation that such release and waiver is effective as a matter of English or Austrian law as applicable).

Section 7.2Conditions Precedent to Purchaser's Obligations.  The obligations of Purchaser to effect the first Closing are subject to the fulfillment, prior to or at the first Closing, of each of the following additional conditions, any of which may be waived in writing by Purchaser:

(a)  there shall have been no Material Adverse Effect;

(b)  Seller Parties and Budget Austria shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them prior to or at the first Closing;

(c)  all approvals under applicable Competition Law, in or with the Agreed Jurisdictions in  or with which filings relating to the transactions contemplated by this Agreement have been made, have been obtained or waived by the Purchaser;

(d)  Purchaser shall have received from the Seller Parties signed Licensee Confirmation Letters from Licensees representing 80% of the royalties derived from the Assumed Contracts for the 10 month period ended 31 October 2002;

(e)  the French Acquisition Approval shall have been received and the Purchaser shall have acquired the part of the EMEA Business that is the subject of the French Acquisition Offer; and

(f)  Seller Parties shall have delivered (unless deemed to have delivered under Section 2.11) all other documents specified in Section 2.11 to Purchaser;

(g)  all intellectual property rights included in the Acquired Assets shall be valid and effective and able to be transferred to the Purchaser at the first Closing;

(h)  Purchaser shall have negotiated transition services agreements for up to one year with BT Ignite, GE Capital, Ntellisys, Microsoft,  Avaya Financial Service, the Landlord and BMS International;

(i)  Cherokee and Purchaser shall have agreed an amendment of the Trademark Licence Agreement;

(j)  Purchaser and Seller Parties shall have received a duly executed assignment and assumption of the Trademark License Agreement substantially in the form set out in Exhibit C; and

43

UK) 5840575v9

JA356

Execution Draft

(k) the Sale Approval Order and the Sale Procedures Order shall have been entered in a form exhibited hereto or otherwise acceptable to the Purchaser and shall not have been stayed or vacated.

Section 7.3 Conditions Precedent to Seller Parties' Obligations. The obligations of Seller Parties to effect the first Closing of the transactions contemplated hereby are subject to the fulfillment, prior to or at the first Closing, of each of the following additional conditions, any of which may be waived in writing by Seller Parties:

(a) the representations and warranties of the Purchaser contained in this Agreement or in any certificate or document delivered pursuant to the provisions hereof or in connection with the transactions contemplated hereby shall be true and correct in all material respects at and as of the date hereof and at and as of the first Closing, except to the extent that such representations and warranties are made as of a specified date, in which case such representations and warranties shall be true and correct in all material respects as of such date;

(b) Purchaser shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or at the first Closing;

(c) Purchaser shall have effected all deliveries specified in Section 2 to Seller Parties.

ARTICLE 8
TERMINATION; TERMINATION AMOUNT

Section 8.1 Termination by Mutual Consent. This Agreement may be terminated at any time prior to the first Closing by mutual written agreement of Purchaser and Seller Parties.

Section 8.2 Automatic Termination. This Agreement shall terminate automatically if (i) the DIP Financing Agreement terminates, (ii) the Purchaser exercises its security under the DIP Financing Agreement or the Purchaser fails to provide any funding payable in accordance with the DIP Financing Agreement.

Section 8.3 Termination by Either Purchaser or Seller Parties. This Agreement may be terminated at any time prior to the first Closing by either Purchaser or Seller Parties if a Governmental Body shall have taken any non-appealable final action having the effect of restraining, enjoining or otherwise prohibiting the transactions contemplated hereby.

Section 8.4 Termination by Purchaser. This Agreement may be terminated at any time prior to the first Closing by Purchaser if:

(a) there has been a breach by any of Seller Parties of any representation, warranty or covenant contained in this Agreement, which breach could reasonably be expected to have a material adverse effect and is not curable or, if curable, is not cured within 10 Business Days after written notice of such breach given by Purchaser to Seller Parties;

44

UK3 5340374/9

JA357

(b) prior to five (5) days before a sale hearing Seller Parties support an Alternative Transaction or the Bankruptcy Court enters an order approving an Alternative Transaction;

(c) the Sale Procedures Order shall not have (i) been entered on or prior to January 21, 2003 (or shall be vacated or stayed as of such date); or (ii) become a final, non-appealable order within 11 days of the entry of such Sale Procedures Order; and

(d) the Sale Approval Order shall not have been entered on or prior to February 18, 2003 (or shall be vacated or stayed as of such date) or if the first Closing Date is later than February 18, 2003, shall have been vacated or stayed as of such later date.

Section 8.5 Termination by Seller Parties. This Agreement may be terminated prior to the first Closing by Seller Parties if:

(a) there has been a material breach by Purchaser of any representation, warranty or covenant contained in this Agreement which breach is not curable or, if curable, is not cured within 10 Business Days after written notice of such breach given by Seller Parties to Purchaser;

(b) any Seller Party enters into a binding commitment with respect to, or consummates, an Alternative Transaction; and

(c) Seller Parties elect to terminate this Agreement in accordance with Section 2.15(b) following service of a Cure Warning Notice under Section 2.15(b) unless Purchaser has served an Exclusion Notice as provided in Section 2.15(c).

Section 8 6 Effect of Termination. In the event of termination of the Agreement pursuant to this Article 8, written notice thereof shall as promptly as practicable be given to the other parties to this Agreement, and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein (a) there shall be no liability or obligation on the part of Seller Parties, Purchaser or their respective officers and directors, and all obligations of the parties shall terminate, except for the obligations of the parties pursuant to this Section 8.6 and Sections 5.10, 8.7, 10.2, 10.4, 10.8, 10.9, 10.10, 10.11, 10 13 and 10.14; provided for the avoidance of doubt that none of BRACII, its UK Administrators and each of their respective estates, servants, agents and advisers shall incur any such liability; provided, further, that notwithstanding the foregoing or any other provision of this Agreement (save with respect to Section 8.7(b) and, if the first Closing is a Partial Closing, the Indemnity Agreement), the sole and exclusive remedy (other than the equitable remedy of specific performance which may be granted by a court) available to any party for a breach of representation, warranty, covenant or other obligation under this Agreement shall be termination of this Agreement pursuant to this Section 8 and no party shall be entitled to claim any further damages whatsoever and (b) all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the Governmental Body or Person to which made.

Section 8.7 Expenses; Termination Amount.

Execution Draft

(a) Costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such cost or expense.

(b) If this Agreement is terminated pursuant to Section 8.4(b) or 8.5(b) and the Alternative Transaction which led to such termination is consummated or another Alternative Transaction is consummated within 6 months after such termination, Seller Parties shall pay in cash to Purchaser, as a termination fee and/or as liquidated damages, an amount equal to $500,000 plus reimbursement of documented expenses up to $750,000 incurred in connection with the transactions contemplated by this Agreement (the "Termination Amount"), which Termination Amount shall be payable, upon the date of closing of an Alternative Transaction. For these purposes 'documented expenses' means out of pocket expenses including professional fees reasonably incurred by Purchaser in investigating the Acquired Business and negotiating and documenting this transaction and the DIP Facility, which are supported by invoices and descriptions of services rendered sufficient to enable those services to be identified as falling within this definition.

(c) No portion of the Termination Amount shall be payable to Purchaser if this Agreement is terminated other than pursuant to Section 8.4(b) or 8.5(b).

## ARTICLE 9
## UK ADMINISTRATION AND BRACII

Section 9.1 Exclusion of Personal Liability. The UK Administrators enter into this Agreement as agents of BRACII and without personal liability (whether arising under the Insolvency Act or otherwise) and join in this Agreement in their personal capacities solely for the purpose of receiving the benefit of the exclusions of liability and acknowledgments in their favor contained in this Agreement.

Section 9.2 No Reliance on UK Administration Statements. The Purchaser acknowledges that it places and has placed no reliance whatsoever on any representations, agreements, statements or undertakings (oral or in writing) made or alleged to have been made on or prior to first Closing by the UK Administrators or any member of the UK Administrators firm or the UK Administrators' solicitors or any agents or advisers of the UK Administrators.

Section 9.3 Customary Limited UK Administrator Warranties. The UK Administrators represent and warrant that:

(a) they are duly qualified to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act; and

(b) they have been duly appointed by the High Court of England and Wales as set out in the Court Order for the UK Administration and such appointments have not been resigned or terminated

Section 9.4 Survival of Certain Provisions.

46

UK1 584467v9

JA359

Execution Draft

Case 1:05-cv-00259-KAJ     Document 17-8     Filed 07/05/2005     Page 16 of 50

Execution Draft

(a) The exclusions of liability, acknowledgements and waivers in this Section shall have effect and continue to have effect, whether the UK Administrators' capacity as administrators of BRACII continues or has been terminated prior to signing this Agreement or is terminated at any time thereafter. Such exclusions acknowledgements and waivers shall continue notwithstanding Final Closing Date, shall be in addition to and not qualified by or in substitution for, any right of indemnity, recovery or relief otherwise available to the UK Administrators and apply to claims formed in contract, tort or otherwise howsoever.

(b) Failure by any party to require performance of any term or condition of this Agreement shall not prevent the subsequent enforcement of such term or conditions nor shall such failure be deemed to be a waiver of any or any subsequent breach of this Agreement or of any right or remedy granted by this Agreement or by the general law.

Section 9.5No Set-Off. Save in respect of the payment of the DIP Consideration (which shall be set off against sums owed by the Seller Parties under the DIP Financing Agreement), any payments to be made under this Agreement shall be made in full without any set-off or deduction or any counterclaim or claim to a lien whether any such set-off deduction, counterclaim or lien arises under this Agreement or otherwise.

Section 9.6 Termination of Certain Provisions.

(a) In relation to BRACII or the UK Administrators, any obligation on any of them set forth in the Agreement shall terminate upon the earlier of (i) the date which is 8 months after the First Closing Date and (ii) the date of discharge of the UK Administration (which shall not be before 6 months after the First Closing Date), and thereafter neither BRACII nor the UK Administrators shall have any continuing obligation under this Agreement.

(b) Nothing in this Agreement shall oblige BRACII or the UK Administrators to carry out any act or omission in any jurisdiction after the relevant Closing Date for that jurisdiction that could be reasonably expected to result in BRACII or the UK Administrators incurring directly or indirectly any additional actual or contingent costs, expenses or liabilities (including in respect of tax)

ARTICLE 10
MISCELLANEOUS PROVISIONS

Section 10.1  Non-Survival of Representations, Warranties and Certain Covenants. Subject to the provisions to the contrary in this Agreement, the representations and warranties of and covenants to be performed on or prior to the first Closing by Seller Parties set forth in this Agreement or any document or instrument delivered pursuant hereto shall not survive the first Closing.

Section 10.2  Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given upon receipt if (i) mailed by certified or registered mail, return receipt requested, postage prepaid (ii) sent by express carrier, fee prepaid, (iii) sent via facsimile with receipt confirmed or (iv) delivered personally, addressed as follows or to such other address or addresses of which the respective party shall have notified the other.

47

UK1 5140357v9

JA360

Execution Draft

(a) If to Seller Parties, to:


BRAC Rent a Car Corporation
4225 Naperville Road
Lisle, IL 60532
Fax: (630) 955-7517
Attention: General Counsel

BRACII
41 Marlowes Hemel
Hempstead Hertfordshire HP1 1XJ
United Kingdom
Attention: James Cohen


UK Administrators
4 Temple Row
Birmingham B2 5HG
United Kingdom
Attention: Gurpal Singh Johal

and

10 Fleet Place
London EC4M 7RB
United Kingdom
Attention: Simon Freakley


with a copy to

Sidley Austin Brown & Wood
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603
Fax: (312) 853-7036
Attention: Larry J. Nyhan, Esq.

Eversheds
Senator House
85 Queen Victoria St.
London EC4V 4JL
United Kingdom
Attention: Jeff Drew

48

UK1 584057v9

JA361

Execution Draft

The Official Creditors' Committee
c/o Brown Rudnick Berlack Israels P.C.
One Financial Place
Boston
Massachusetts 02111
Attention: Peter J. Antoszyk, Esq. and Harold Marcus, Esq
(Telecopy No. 617-856-8182; Telephone No. 617-856-8513).

If to Purchaser, to:

Avis Europe plc
Avis House
Park Road
Bracknell
Berkshire RG12 2EW
United Kingdom
Attention:  company secretary

with a copy to

Freshfields Bruckhaus Deringer
65 Fleet Street
London EC4Y 1HS
United Kingdom
Attention:  Christopher Bown
(Telecopy No. +44 20 7832 7001; Telephone No. +44 20 7936 4000)

Section 10.3    Amendment of Agreement.  This Agreement may be amended with respect to any provision contained herein at any time by action of the parties hereto; provided, however, that such amendment shall be evidenced by a written instrument duly executed on behalf of each party by its duly authorized officer or employee.

Section 10.4    Entire Agreement.  The agreement of the parties, which consists of this Agreement, the Schedules and Exhibits hereto and the documents referred to herein, sets forth the entire agreement and understanding between the parties and supersedes any prior agreement or understanding, written or oral, relating to the subject matter of this Agreement.

Section 10.5    Financing Documents.  The Purchaser and Seller Parties are parties to the DIP Financing Agreement. In the event of any inconsistency between this Agreement and the DIP Financing Agreement, the terms of this Agreement shall apply.

Section 10.6    Assignment.  This Agreement and the rights and obligations of the parties hereunder may not be assigned by any party hereto without the other parties' written consent. Any assignment in violation of this Section 10.6 shall be null and void.

Section 10.7    Parties in Interest; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and

49

UK1 5848579

JA362

Execution Draft

permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than Purchaser and Seller Parties, and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement provided that creditors of BRAC and BRACII and its UK Administrators are third party beneficiaries under this Agreement.

Section 10.8    Severability. The provisions of this Agreement are severable, and if any one or more provisions are deemed illegal or unenforceable the remaining provisions shall remain in full force and effect unless the deletion of such provision shall cause this Agreement to become materially adverse to Purchaser, on the one hand, or Seller Parties, on the other hand, in which event the parties shall use reasonable best efforts to arrive at an accommodation that best preserves for the parties the benefits and obligations of the offending provision.

Section 10.9    Governing Law; Consent to Jurisdiction. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto. The parties agree that, except as provided herein without limitation of any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated herein; and (b) any and all Actions or causes of action relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the jurisdiction of the Bankruptcy Court.

Section 10.10    Waiver of Jury Trial. The parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to the Agreement and the agreements entered into in connection herewith and any amendment, waiver, consent or other document that amends, waives, supplements or otherwise modifies the Agreement or any of the agreements entered into in connection herewith and therewith.

Section 10.11    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.12    Public Announcement. Prior to the signing of this Agreement, Seller Parties and Purchaser shall prepare a mutually agreeable release announcing the transaction contemplated hereby. Except for such press release, prior to the Closing, none of Seller Parties or Purchaser shall, without the approval of the other, make any press release or other announcement concerning the existence of this Agreement or the terms of the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by Law and in which case the other parties shall be advised and the parties shall use their reasonable best efforts to cause a mutually agreeable release or announcement to be issued; provided, however, that the foregoing shall not preclude communications or disclosures necessary to comply with accounting, stock exchange or federal securities Law disclosure obligations or any such announcement in the case of the UK Administrators in pursuance of their duties and obligations under the Insolvency Act 1986 and current insolvency practice.

50

UKI 584057v9

Execution Draft

Section 10.13  No Strict Construction.  The parties have participated jointly in the negotiation and drafting of this Agreement.  Consequently, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall each be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

Section 10.14  Joint and Several Liability.  The obligations of Avis Europe plc and Zodiac Europe Limited under this Agreement shall be joint and several.

UK1 584067v9

JA364

Execution Draft

IN WITNESS WHEREOF, each party has caused this Asset and Stock Purchase Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:

Signed by [        ] *Simon Vincent Freakley*
Administrator on his own behalf
and on behalf of [        ] *Gurpal Singh Johal*
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name: *Simon Freakley*
Title: *President Kroll Corporate Advisory*
       *and Restructuring Group*

BRAC RENT-A- CAR INTERNATIONAL INC.
(as debtor in possession under Chapter II and in Administration)
By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:
Title:

ZODIAC EUROPE LTD

D-1

UK1 5840374v9

**JA365**

IN WITNESS WHEREOF, each party has caused this Asset and Stock Purchase Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _Robert L. Aprati_
Name: Robert L. Aprati
Title: Executive Vice President


Signed by [              ]   .
Administrator on his own behalf
and on behalf of [              ]
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name:
Title:


BRAC RENT-A- CAR INTERNATIONAL
INC.
(as debtor in possession under Chapter II and in
Administration)

By: _Robert L. Aprati_
Name: Robear L. Aprari
Title: Executive Vice President


AVIS EUROPE plc

By: _____
Name:
Title:


ZODIAC EUROPE LTD

By: _____
Name:
Title:


BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:   JAMES  L M.  COHEN
Title:   DIRECTOR


BUDGET DEUTSCHLAND GmbH

By: _____
Name:   JAMES  L M  COHEN
Title:   DIRECTOR


BUSINESS RENT a CAR GmbH

By: _____
Name:
Title:

2

JA367

JAN 29 2003 16:39 FR AFFNTI NAPLES        9419533620 TO 01144207586T937  P.04/08

By: _____
Name:
Title:


BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:
Title:


BUDGET DEUTSCHLAND GmbH

By: _____
Name:
Title:


BUSINESS RENT a CAR GmbH

By: _Robert L. Apaari_
Name: Robert L. Apaari
Title: General Manager

2

JA368

Execution Draft

IN WITNESS WHEREOF, each party has caused this Asset and Stock Purchase Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:

Signed by [          ]
Administrator on his own behalf
and on behalf of [          ]
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name:
Title:

BRAC RENT-A- CAR INTERNATIONAL INC.
(as debtor in possession under Chapter II and in Administration)
By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:
Title:

ZODIAC EUROPE LTD

D-1

JA369

Execution Draft

By: _____
Name:
Title:


BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:
Title:


BUDGET DEUTSCHLAND GmbH

By: _____
Name:
Title:


BUSINESS RENT a CAR GmbH

By: _____
Name:
Title:


D-2

21-JAN-2003  21:55  FROM AVIS EUROPE HQ         TO  01xxxxxxxxxxx  P.83

SUPPLEMENTAL AND VARIATION AGREEMENT

by and among

BRAC Rent a Car Corporation
(as Chapter 11 Debtor in Possession)

BRAC Rent-A-Car International, Inc.
(as Chapter 11 Debtor in Possession and in UK Administration)

Simon Vincent Freakley and Gurpal Singh Johal

Budget Rent a Car Espana S.A.

Business Rent a Car GmbH

Budget Deutschland GmbH

and

Avis Europe plc

Zodiac Europe Ltd

dated as of February 18, 2003

WP3:860260.1

59519 1001

JA371

SUPPLEMENTAL AND VARIATION AGREEMENT (the "Agreement"), dated as of February 18, 2003, by and among BRAC Rent a Car Corporation, a Delaware corporation ("BRAC") as Chapter 11 Debtor in Possession, BRAC Rent-A-Car International, Inc , a Delaware Corporation ("BRACII") as Chapter 11 Debtor in Possession and in Administration acting by its joint administrators Simon Vincent Freakley of 10 Fleet Place, London EC4M 7RB, United Kingdom and Gurpal Singh Johal of Aspect Court 4 Temple Row, Birmingham B2 5HG, United Kingdom (together, the "UK Administrators"), Budget Rent a Car Espana S.A., a corporation organized under the laws of Spain ("Budget Spain") (collectively with BRAC and BRACII, the "Seller Parties") and the UK Administrators and Avis Europe plc and Zodiac Europe Limited, both companies organized under the laws of England and Wales (together, the "Purchaser") and Business Rent a Car GmbH, a corporation organized under the laws of Austria ("Budget Austria") and Budget Deutschland GmbH, a corporation organized under the laws of Germany ("Budget Germany").

### WITNESSETH:

WHEREAS on January 21, 2003 each of the parties hereto entered into an Asset Purchase Agreement (the "APA") whereby Purchaser agreed to purchase and assume from Seller Parties, and Seller Parties agreed to sell, convey, assign and transfer to Purchaser, certain assets of Seller Parties relating to the EMBA Business excluding that part of the business operated by Budget France in France, together with certain specified obligations and liabilities relating thereto, all in the manner and subject to the terms and conditions set forth in the APA and in accordance with sections 105, 363 and 365 of the US Bankruptcy Code and pursuant to Schedule 1 of the UK Insolvency Act 1986 (as amended).

WHEREAS the Parties desire to extend the duration and to supplement and vary certain terms of the APA in the manner set out in this Agreement.

WHEREAS, subject to agreeing the documentation and the necessary Court Order, Purchaser has agreed to extend the Existing Maturity Date (as defined in the DIP Credit Agreement dated January 21, 2003 ) to March 15, 2003 and to provide certain additional funding after February 18, 2003 ("Additional Funding") on terms consistent with the DIP Credit Agreement, DIP Security Agreement and DIP Order all dated January 21, 2003.

NOW, THEREFORE, in consideration of the mutual agreements and covenants herein contained and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1    Capitalised terms used but not defined herein shall have the meaning set forth in the APA

2    This Agreement is supplemental to the APA; all provisions of this Agreement shall be deemed to be incorporated in, and made a part of the APA; and the APA, as amended and supplemented by this Agreement, is hereby affirmed by the parties and shall remain in full force and effect.

3    Subject to the terms of this Agreement, the parties agree to delay Closing and extend the APA until 11 59pm EST on March 15, 2003 and the maturity of any and all amounts due under the DIP Credit Agreement shall be extended accordingly.

4.    The Seller Parties agree that, subject to Sections 5 to 7 below, the amount of any such

W73:86\nz49 1

2

59519 1001

JA372

Additional Funding shall reduce the consideration payable at Closing on a dollar-for-dollar basis, provided that interest on the amounts outstanding under the DIP Financing Agreement shall only decrease the consideration to the extent that such interest accrued more than 30 days after the date of this Agreement

5     References in this Agreement to "only the Purchaser's Conditions are Outstanding" mean that the only conditions outstanding in Section 7 of the APA are one or more of the conditions listed in (i) to (iv) below:

(i)     Section 7.2(c) - Competition approvals;

(ii)     Section 7.2(h) - transitional services agreements;

(iii)     Section 7.2(i) – amendment to the Trademark Licence Agreement; and

(iv)     When Budget Rent A Car System Inc (f/k/a Cherokee Acquisition Corporation) ("BRACSI") has provided written confirmation to Purchaser that the issue regarding the payments due to it from BRACII for services from late November 2002 has been resolved to BRACSI's satisfaction (and not before such confirmation has been provided), Section 7.1(e) - the Cherokee Support Agreement

6     When Seller Parties have provided written confirmation to the reasonable satisfaction of Purchaser that only the Purchaser's Conditions are Outstanding, then (whilst that remains the case) funds advanced thereafter by the Purchaser will be added to the consideration payable at Closing

7     If at 5pm (EST) February 19, 2003 only the condition set out in Section 7.2(e) of the APA and only the Purchaser's Conditions are Outstanding, then (whilst that remains the case) only 50% of any Additional Funding advanced by Avis Europe will reduce the consideration payable at Closing

8     In respect of any conditions in Section 7 of the APA which are not referred to in Section 5 above, Purchaser shall use its, and shall instruct its counsel to use their, reasonable endeavours to assist the Seller Parties to fulfill those conditions. For the avoidance of doubt and by way of confirmation, such endeavours shall not require the Purchaser or its counsel to make any payments or enter into any binding agreements or commitments with any person

9     The APA is hereby amended by replacing all references to "February 18, 2003" wherever such references appear (other than in Section 8.4(d) of the APA, which is provided for below) with "March 15, 2003"

10     The first reference in Section 8.4(d) of the APA to "February 18, 2003" shall be replaced with "the first available hearing date after February 18, 2003 for the consideration of the Sale Approval Order or, if no hearing is required, the entry of the Sale Approval Order, in either event, before February 25, 2003 ("the Extended Sale Order Hearing Date")" The second reference in Section 8.4(d) of the APA to "February 18, 2003" shall be replaced with "the Extended Sale Order Hearing Date".

11     Subject to the amendments in Sections 9 and 10 above, nothing in this Agreement shall prevent Closing or termination of the APA in accordance with its terms before March 15, 2003.

JA373

12.  The UK Administrators enter into this Agreement as agents of BRACII and without personal liability (whether arising under the Insolvency Act or otherwise) and join in this Agreement in their personal capacities solely for the purpose of receiving the benefit of the exclusions of liability and acknowledgments in their favor contained in this Agreement

13   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto. The parties agree that, except as provided herein without limitation of any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated herein; and (b) any and all Actions or causes of action relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the jurisdiction of the Bankruptcy Court.

14.  The parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to the Agreement and the agreements entered into in connection herewith and any amendment, waiver, consent or other document that amends, waives, supplements or otherwise modifies the Agreement or any of the agreements entered into in connection herewith and therewith

15   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument

02/18/2003   17:15   *STOCTU5   23:27   PAGE 00274   REGISTRAR   NO.238   P02

IN WITNESS WHEREOF, each party has caused this Supplemental and Variation Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By:
Name:
Title:

Signed by Simon Vincent Freakley
Administrator on his own behalf
and on behalf of Gurpal Singh Johal
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name:
Title:

BRAC RENT-A-CAR INTERNATIONAL INC.
(as debtor in possession under Chapter 11 and in
Administration)

By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:
Title:

ZODIAC EUROPE LTD

By: _____
Name:
Title:

BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:
Title:

5

JA375

IN WITNESS WHEREOF, each party has caused this Supplemental and Variation Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By:
Name:
Title:

Signed by Simon Vincent Freakley
Administrator on his own behalf
and on behalf of Gurpal Singh Sohal
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By:
Name:
Title:

BRAC RENT-A-CAR CORPORATION INC
(as debtor in possession under Chapter 11)

By:
Name:
Title:

AVIS EUROPE plc

By:
Name:
Title:

ZODIAC EUROPE LTD

By:
Name:
Title:

BUDGET RENT A CAR ESPAÑA, S.A.

By:
Name:   SAMIR H COHEN
Title:   DIRECTOR

5

BUSINESS RENT A CAR GMBH

By: _____
Name:
Title:


BUDGET DEUTSCHLAND GMBH

By: _____
Name:    UMA G COHEN
Title:    DIRECTOR

6

FEB 19 '03 16:53 FR BUDGET RENT A CARENG4630 955 7809 TO 9011442070267037 P.02/03

IN WITNESS WHEREOF, each party has caused this Supplemental and Variation Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above..

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:

Signed by Simon Vincent Freakley
Administrator on his own behalf
and on behalf of Gurpal Singh Johal
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name:
Title:

BRAC RENT-A-CAR INTERNATIONAL INC.
(as debtor in possession under Chapter 11 and in
Administration)

By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:
Title:

ZODIAC EUROPE LTD

By: _____
Name:
Title:

BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:
Title:

5

JA378

FEB 18 '03 16:13 FR BUDGET RENT A CARSN54630 955 7889 TO 901144207625837 P.01/03

BUSINESS RENT A CAR GMBH

By: _Robert L. Quint_
Name:
Title:


BUDGET DEUTSCHLAND GMBH

By: _____
Name:
Title:

6

** TOTAL PAGE.01 **

JA379

IN WITNESS WHEREOF, each party has caused this Supplemental and Variation Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:

Signed by Simon Vincent Freakley
Administrator on his own behalf
and on behalf of Gurpal Singh Johal
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC
as its agent, without personal liability

By: _____
Name:
Title:

BRAC RENT-A-CAR INTERNATIONAL INC
(as debtor in possession under Chapter 11 and in Administration)

By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:
Title:

ZODIAC EUROPE LTD

By: *John McNicholson*
Name: JOHN MC NICHOLS
Title: V.R. LICENCE DEVELOPMENT.

BUDGET RENT A CAR ESPANA, S A

By: _____
Name:
Title:

19-FEB-2003  00:10  FROM  AVIS EUROPE HQ          TO          982070327081  P.03

⑧

IN WITNESS WHEREOF, each party has caused this Supplemental and Variation
Agreement to be duly executed on its behalf by its duly authorized officer as of the date first
written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:

Signed by Simon Vincent Freakley
Administrator on his own behalf
and on behalf of Gurpal Singh Johal
his joint administrator and on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name:
Title:

BRAC RENT-A-CAR CORPORATION INC
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:  MALIN  ROBERTS SMITH
Title:  Group CFO

ZODIAC EUROPE LTD

By: _____
Name:
Title:

BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:
Title:

TOTAL P.03

JA381

SECOND SUPPLEMENTAL AND VARIATION AGREEMENT

by and among

BRAC Rent a Car Corporation
(as Chapter 11 Debtor in Possession)

BRAC Rent-A-Car International, Inc.
(as Chapter 11 Debtor in Possession and in UK Administration)

Simon Vincent Freakley and Gurpal Singh Johal

Budget Rent a Car Espana S.A.

Business Rent a Car GmbH

Budget Deutschland GmbH

and

Avis Europe plc

Zodiac Europe Ltd

dated as of February ●, 2003

(108963-0044)
UR1 592109v5

FURTHER SUPPLEMENTAL AND VARIATION AGREEMENT (the "Agreement"), dated as of February 24, 2003, by and among BRAC Rent a Car Corporation, a Delaware corporation ("BRAC") as Chapter 11 Debtor in Possession, BRAC Rent-A-Car International, Inc., a Delaware Corporation ("BRACII") as Chapter 11 Debtor in Possession and in Administration acting by its joint administrators Simon Vincent Freakley of 10 Fleet Place, London EC4M 7RB, United Kingdom and Gurpal Singh Johal of Aspect Court 4 Temple Row, Birmingham B2 5HG, United Kingdom (together, the "UK Administrators"), Budget Rent a Car Espana S.A., a corporation organized under the laws of Spain ("Budget Spain") (collectively with BRAC and BRACII, the "Seller Parties") and the UK Administrators and Avis Europe plc and Zodiac Europe Limited, both companies organized under the laws of England and Wales (together, the "Purchaser") and Business Rent a Car GmbH, a corporation organized under the laws of Austria ("Budget Austria") and Budget Deutschland GmbH, a corporation organized under the laws of Germany ("Budget Germany").

## WITNESSETH:

WHEREAS on January 21, 2003 each of the parties hereto entered into an Asset Purchase Agreement (the "APA") whereby Purchaser agreed to purchase and assume from Seller Parties, and Seller Parties agreed to sell, convey, assign and transfer to Purchaser, certain assets of Seller Parties relating to the EMEA Business excluding that part of the business operated by Budget France in France, together with certain specified obligations and liabilities relating thereto, all in the manner and subject to the terms and conditions set forth in the APA and in accordance with sections 105, 363 and 365 of the US Bankruptcy Code and pursuant to Schedule 1 of the UK Insolvency Act 1986 (as amended).

WHEREAS on February 18, 2003 each of the parties hereto entered into a Supplemental and Variation Agreement (the "SVA") whereby the parties extended the duration and supplemented and varied certain terms of the APA in the manner set out in the SVA.

WHEREAS the parties desire to resolve certain conditions to Closing in advance of the Sale Hearing and further to supplement and vary the APA, as amended by the SVA, in the manner set out in this Agreement.

WHEREAS Purchaser has consented to this Agreement expressly in reliance upon and on condition of the support of the statutory unsecured creditors' committee appointed pursuant to 11 U.S.C. § 1102 to serve in the chapter 11 cases of the Seller Parties (the "Committee").

NOW, THEREFORE, in consideration of the mutual agreements and covenants herein contained and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.   Capitalised terms used but not defined herein shall have the meaning set forth in the APA and the SVA.

2.   This Agreement is supplemental to the APA, as amended by the SVA; all provisions of this Agreement shall be deemed to be incorporated in, and made a part of the APA, as amended by the SVA; and the APA, as amended and supplemented by the SVA and this Agreement, is hereby affirmed by the parties and shall remain in full force

(108963-0044)                                         2
UK1 392109v5

and effect.

3.   In order that the contracts listed in Schedule 2.3(e) of the APA with Jaeban (UK) Limited (formerly known as Jaeban Limited) ("Jaeban" and the "Jaeban Contracts") may be assumed and assigned to the Purchaser under section 365 of the US Bankruptcy Code, if the Cure Costs required to achieve assumption and assignment of the Jaeban Contracts remain unresolved at the commencement of the hearing to consider the Sale Approval Order, then Seller Parties shall agree, in accordance with Section 2.15(a) of the APA, to place from the Cash Consideration an amount into escrow of up to $4,500,000 (or such lesser amount as Jaeban may subsequently confirm in the US Bankruptcy proceedings), and in any event Seller Parties shall not be required to pay in Cure Costs on account of assumption and assignment of the Jaeban Contracts more than $4,500,000) from which the Cure Costs in respect of the Jaeban Contracts shall be satisfied, which sum represents the maximum net amount claimed by Jaeban in a writing delivered to Seller Parties and Purchaser.   Seller Parties reserve the right to litigate or resolve the amount of such Cure Costs in accordance with any procedures set forth in the Sale Approval Order.

4.   The APA is hereby amended by:

   (a)   inserting at the conclusion of Section 7.2(d) immediately prior to the semi-colon ", provided, however, that by 5pm (EST) on the Business Day following entry of the Sale Approval Order Purchaser shall elect either (i) to consent to Holland Car Leasing BV's (the "Dutch Licensee") request to transfer the Licence granted to Holland Car Leasing Finland OY in respect of Finland to the sub-licensee of Holland Car Leasing Finland OY, or (ii) for the purposes of this condition, to deem the Dutch Licensee's Licensee Confirmation Letter as having been signed and received";

   (b)   deleting the condition in Section 7.1(f);

   (c)   replacing the text in Section 2.14(c) after the words "bonus schemes" with ", severance plans and similar plans that were agreed after or in relation to the Chapter 11 Petitions."

   (d)   inserting the following as a new Section 2.14(f):

   BRACII agrees to indemnify on an after tax basis the Purchaser against all actions, claims, damages, proceedings, demands, liabilities, costs and expenses of whatsoever nature including properly incurred legal costs by the Purchaser in connection with any claim made by or in respect of an employee under a Parachute Agreement.   For purposes of this Agreement, a "Parachute Agreement" shall mean any agreement between one of Seller Parties or Budget Austria and an employee giving the employee a contractual entitlement to a payment upon termination of his or her employment following a change in ownership of his or her employer or its Affiliate or transfer of his or her employment or repatriation of the employee, each such employee being referred to herein as a "Parachute Employee".   Seller Parties confirm that to the best of their knowledge the only Parachute Employees are James Cohen, Terry Clark, Derek Harris, Steve O'Brien, Melanie Williams, Frank Cortez and Andreas Oppitz.   Notwithstanding anything contained herein to the

(108963-0044)                                    3
UK1 5921096.5

contrary, Purchaser hereby agrees that, in the event that (x) a Parachute Employee's employment is terminated with Purchaser within the period during which a payment may be due to the Parachute Employee under the Parachute Agreement and (y) following such termination, Purchaser or any of its Affiliates has on or before the anniversary of the first Closing Date employed or re-employed or otherwise has engaged the relevant Parachute Employee to provide services to Purchaser or any of its Affiliates, Purchaser shall not be entitled to the indemnification referred to in this Section 2.14(l). In the event of such employment, re-employment or other engagement within such time period, Purchaser shall pay over to and reimburse BRACII an amount equal to any amounts paid by BRACII (i) to such Parachute Employee in respect of such termination under a Parachute Agreement or (ii) to Purchaser under this Section 2.14(l). Notwithstanding anything contained herein to the contrary, the indemnity in this Section 2.14(l) shall not apply to that part of a claim under a Parachute Agreement arising due to Purchaser increasing the salary of the relevant Parachute Employee after Closing.

(e)     inserting the following section as a new Section 2.14(m):

On the First Closing Date, the Purchaser shall place $2,218,000 ("the Parachute Escrow Amount") (to come out of the Cash Consideration) in a separately designated interest bearing account ("the Parachute Escrow Account") to be maintained and operated by the Purchaser's Solicitors and the Seller Parties' Solicitors. Any bank or other charges arising on the Parachute Escrow Account and any out-of-pocket expenses incurred in connection with the operation, maintenance and closure of the Parachute Escrow Account shall be charged to the Parachute Escrow Account. If the Purchaser has not notified BRACII in writing of any claim under the indemnity contained in Section 2.14(l) (a "Parachute Qualifying Claim") before the date which is 12 months after the First Closing Date or, if Austria is a Delayed Jurisdiction as of the First Closing Date, then with respect to Andreas Oppitz, the date which is 12 months after the Closing for the shares of Budget Austria ("the Parachute Escrow Account Closing Date"), all monies (including all interest accrued thereon) standing to the credit of the Parachute Escrow Account at that date shall be paid as soon as possible thereafter to BRACII (whose receipt shall be a full discharge on behalf of all Seller Parties and Budget Germany for the same). Following such payment, the Parachute Escrow Account shall be closed.

(f)     inserting the following section as a new Section 2.14(n):

If the Purchaser serves one or more written notices on BRACII on or before the Parachute Escrow Account Closing Date stating that it has a Parachute Qualifying Claim (or Parachute Qualifying Claims) against BRACII or the Purchaser (such notices to contain reasonable details of the Parachute Qualifying Claims together with a good faith estimate by the Purchaser (on a without prejudice basis) of the Parachute Qualifying Claims), there shall be retained in the Parachute Escrow Account such aggregate sum as the notices may reasonably specify as a provision for the amount of each such Parachute Qualifying Claim plus interest and costs. The Seller Parties agree that Purchaser shall be entitled to satisfy each Parachute Qualifying Claim out of

the Parachute Escrow Amount by withdrawing the amount of the provision from the Parachute Escrow Account, subject to compliance by the Purchaser with Section 2.14(p) (below) and the provision of a written statement setting out in reasonable detail the computation of the Parachute Qualifying Claim plus interest and costs.

(g)    inserting the following section as a new Section 2.14(o):

The retention of monies by the Purchaser pursuant to Section 2.14(n) shall not in any way prevent the Purchaser from pursuing BRACII under the indemnity in Section 2.14(l) for any outstanding sums owing in respect of such a Parachute Qualifying Claim(s), or otherwise making any additional Parachute Qualifying Claim(s) in accordance with the APA and the value of the Parachute Escrow Amount shall in no way be regarded as imposing a limit on the amount of any such Parachute Qualifying Claim(s). Notwithstanding anything in this paragraph, BRACII shall not be liable in respect of any Parachute Qualifying Claim to the extent the amount of such Parachute Qualifying Claim is fully recovered or otherwise fully satisfied on the terms set out in the APA. The provisions of Sections 2.14(m), (n) and (o) shall terminate within 6 Business Days after the Parachute Escrow Account Closing Date save in respect of Parachute Qualifying Claims that are the subject of outstanding notices under Section 2.14(n). Thereafter, any balance then held that has not been retained in respect of unresolved Parachute Qualifying Claims under Section 2.14(n) (including any interest generated on the Parachute Escrow Amount in the Parachute Escrow Account) shall be accounted to BRACII (whose receipt shall be full discharge on behalf of the Seller Parties and Budget Germany for the same). Within 5 Business Days after the date when the last Parachute Qualifying Claim is finally resolved, any unutilised balance in the Parachute Escrow Account together with interest thereon shall be accounted to BRACII (whose receipt shall be a good discharge for the same) and the Parachute Escrow Account shall be closed.

(h)    inserting the following section as a new Section 2.14(p):

In this Section 2.14(p) the "Indemnified Party" means the party with the benefit of an indemnity and the "Indemnifying Party" means the party giving the indemnity under Section 2.14(l). If an Indemnified Party becomes aware that a claim has or is about to arise it shall give notice of this as soon as possible to the Indemnifying Party setting out all reasonable details of the matter in respect of which a claim has or is being made. No admission of liability shall be made by or on behalf of the Indemnified Party and no claim shall be compromised disposed of or settled without the consent of the Indemnifying Party (such consent not reasonably withheld or delayed). The Indemnifying Party shall be entitled at its own expense and in its absolute discretion to take such action as it shall deem necessary to avoid, dispute, deny, defend, resist, appeal, compromise or contest such claim including without limitation making counter claims or other claims against third parties in the name of and on behalf of the Indemnified Party and to have the conduct of any related proceedings negotiations or appeals provided that it acts reasonably in so doing and promptly notifies Purchaser in respect of developments in relation to any such claims. Subject to the reimbursement of

(108963-0044)
UK1 592109v5

5

JA386

costs (including properly incurred legal costs), the Indemnified Party will give and procure where necessary that any affiliate gives such information or assistance (including access to premises and personnel and the right to examine, copy or photograph any documents and records) for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any such claim as the Indemnifying Party or their professional advisors reasonably request of the Indemnified Party.

5.    For the avoidance of doubt, and in accordance with Section 3.7(b), Seller Parties acknowledge and agree that they have not since November 30, 2002 and shall not (and shall cause their Subsidiaries not to) declare, distribute or make any dividend with respect to amounts held by Budget Austria.

6.    The Seller Parties hereby amend the Disclosure Schedule to include the royalty relief granted up to December 31, 2003 by Seller Parties under the License Agreement with Dormicar Limited in Israel, and Purchaser hereby acknowledges such disclosure and agrees that such disclosure shall be treated as if made on the date of the APA and included in the Disclosure Schedule as of the execution of the APA.

7.    For the avoidance of doubt and without prejudice to the APA, Seller Parties and the UK Administrators shall be entitled to re-charge and collect from the Licensees amounts charged by Cherokee to BRACII for services contemplated by the Cherokee Support Agreement that relate to periods prior to Closing.

8.    Purchaser and Seller Parties agree that the position in Switzerland shall be resolved prior to the Closing by the execution of documentation substantially in the form attached hereto and reasonably acceptable to the parties evidencing the consent of the relevant counterparties to the transfer to Purchaser of each of the contracts listed in Schedule A hereto on the basis that no pre-Closing liabilities can be asserted against the Purchaser.

9.    For the avoidance of doubt, the parties hereby acknowledge and agree that the provisions of Sections 4 to 6 of the SVA shall continue to apply, provided that if at any time after the date hereof Seller Parties provide written confirmation to the reasonable satisfaction of Purchaser that only (a) the condition set out in Section 7.2(e) of the APA and (b) the Purchaser's Conditions are Outstanding, then (whilst that remains the case) 50% of any Additional Funding advanced by Avis Europe will reduce the consideration payable at Closing.

10.   Reference is made to the contracts listed in Schedule 2.3(e) of the APA with Boutagys Ltd, Informdeal Ltd, and Yarnfleet Ltd. (the "Hold-Over Contracts"). In respect of the Hold-Over Contracts, the relevant Licensee thereunder has, in addition to claiming Cure Costs under section 365 of the US Bankruptcy Code, asserted certain unliquidated and non-monetary objections in the US bankruptcy court proceeding. The parties agree that if these objections remain unresolved at the commencement of the hearing to consider the Sale Approval Order and BRACII is unable to assume and assign the Hold-Over Contracts at the first Closing Date, then the Hold-Over Contracts shall be removed from the Assumed Contracts schedule and such Hold-Over Contracts shall not be assumed and assigned to Purchaser at the first Closing. In that event, BRACII undertakes and agrees with Purchaser that BRACII shall use all reasonable efforts to seek to resolve any and all claims under the Hold-Over Contracts

(108963-0044)                                          6
UK1 592109v5

JA387

through the US bankruptcy court and, to the extent permitted by the US bankruptcy court, to assume and assign such Hold-Over Contracts to Purchaser as promptly as practicable after the first Closing. Subject to the fact that amounts paid on account of Cure Costs is limited to the Hold-Over Escrow Amount.

11. The parties have agreed that, for the protection of the Purchaser in connection with the Hold-Over Contracts, the Seller Parties shall set aside in escrow an amount (the "Hold-Over Escrow Amount") set forth in a confidential schedule to this Agreement. If the Cure Costs associated with the Hold-Over Contracts are less than the Hold-Over Escrow Amount, then Seller Parties shall assume and assign the Hold-Over Contracts and discharge any Cure Costs with respect to such Hold-Over Contract(s) out of the escrow, and the escrow amounts in excess of the aggregate Cure Costs with respect to the Hold-Over Contracts shall forthwith be released to the Seller Parties. If the Cure Costs associated with the Hold-Over Contracts exceed the Hold-Over Escrow Amount, then Seller Parties shall provide notice to Purchaser and Purchaser may

11.1 elect to exclude one or more Hold-Over Contracts to reduce the Cure Costs to an amount below the Hold-Over Escrow Amount, in which case (a) the Seller Parties shall assume and assign the remaining Hold-Over Contract(s), if any, (b) the Seller Parties shall discharge any Cure Costs out of the Hold-Over Escrow Amount, and (c) the Hold-Over Escrow Amount in excess of the discharged Cure Costs shall be released to the Seller Parties, or

11.2 elect to cause any or all of the Hold-Over Contract(s) to be assigned to Purchaser, notwithstanding that the Cure Costs of such Hold-Over Contracts exceed the Hold-Over Escrow Amount, provided that Purchaser acknowledges and agrees that such assignment will be made subject to and conditional upon such Cure Costs being paid by Purchaser, and the Hold-Over Escrow Amount shall in connection therewith be released to Purchaser.

12. The UK Administrators enter into this Agreement as agents of BRACII and without personal liability (whether arising under the Insolvency Act or otherwise) and join in this Agreement in their personal capacities solely for the purpose of receiving the benefit of the exclusions of liability and acknowledgments in their favor contained in this Agreement.

13. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto. The parties agree that, except as provided herein without limitation of any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated herein; and (b) any and all Actions or causes of action relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the jurisdiction of the Bankruptcy Court.

14. The parties hereto hereby irrevocably and unconditionally waive trial by jury in any

(108963-0044)
UKI 592109v5

7

JA388

legal action or proceeding relating to the Agreement and the agreements entered into in connection herewith and any amendment, waiver, consent or other document that amends, waives, supplements or otherwise modifies the Agreement or any of the agreements entered into in connection herewith and therewith.

15.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall not be binding on any Party unless and until executed by all parties listed below.

16.    Nothing in this Agreement shall be deemed a waiver of any right or remedy that may exist today or in the future under the APA, the SVA or DIP Financing Agreement, except to the extent expressly set forth herein.

17.    The APA, as amended by the SVA and this Agreement, may be amended with respect to any provision contained therein at any time by action of the parties; provided, however, that such amendment shall be evidenced by a written instrument duly executed on behalf of each party by its duly authorized officer or employee.

18.    The agreement of the parties, which consists of the APA, as amended by the SVA and this Agreement, the Schedules and Exhibits thereto and the documents referred to therein and herein, sets forth the entire agreement and understanding between the parties and supersedes any prior agreement or understanding, written or oral, relating to the subject matter of the APA, SVA and this Agreement.

IN WITNESS WHEREOF, each party has caused this Further Supplemental and Variation Agreement to be duly executed on its behalf by its duly authorized officer as of the date first written above.

BRAC RENT A CAR CORPORATION
(as debtor in possession under Chapter 11)

By: _____
Name:
Title:


Signed by Gurpal Johal
Administrator on behalf of
BRAC RENT-A-CAR INTERNATIONAL INC.
as its agent, without personal liability

By: _____
Name:
Title:


BRAC RENT-A-CAR INTERNATIONAL INC.
(as debtor in possession under Chapter 11 and in Administration)

(108963-0044)                    8
UKI 592109v5

**JA389**

By: _____
Name:
Title:

AVIS EUROPE plc

By: _____
Name:
Title:

ZODIAC EUROPE LTD

By: _____
Name:
Title:

BUDGET RENT A CAR ESPANA, S.A.

By: _____
Name:
Title:

BUSINESS RENT A CAR GMBH

By: _____
Name:
Title:

BUDGET DEUTSCHLAND GMBH

By: _____
Name:
Title:

JA390

# EXHIBIT B

JA391

## Objections to Assumption and Assignment and Cure Amounts

| Objecting Party | Nature of Objection | Asserted Cure Amount | Resolution |
|---|---|---|---|
| Budget Rent A Car (Blackpool)<br>Mr. Paul Ellis<br>434 Waterloo Road<br>Blackpool<br>Lancashire<br>United Kingdom | Cure Amount,<br>Reservation of Rights | £ 27,267.00 | Resolved: £ 27,267.00 Net Cure Amount balance due from BRACII |
| Budget Rent A Car (Cambridge)<br>Buttress & Buttress<br>Mr. Martin Buttress<br>303-305 Newmarket Road<br>Cambridge CB5 8JE<br>United Kingdom | Cure Amount | £ 3,332.78 | Unresolved |
| Budget Rent A Car<br>(Exeter/Plymouth Totnes)<br>Informed Limited<br>Mr. D. Dart<br>Marsh Green Road West<br>Marsh Barton Trading Estate<br>Exeter<br>Devon EX2 8PN<br>United Kingdom | Cure Amount;<br>Assumption and Assignment-<br>Unresolved Breaches under<br>IPLA | Net Cure Amount of<br>£ 12,727.91 | Unresolved |
| Budget Rent A Car (Maidenhead)<br>Shamboss Limited<br>Parmod Sharma<br>18 Forlease Road<br>Maidenhead SL6 1RU<br>United Kingdom | Cure Amount | Net Cure Amount of<br>£ 35,671.49 | Unresolved |

JA392

| Objecting Party | Nature of Objection | Asserted Cure Amount | Resolution |
|---|---|---|---|
| Budget Rent A Car (Milton Keynes)<br>Yarnfleet Limited<br>Mr. Richard Jeeves<br>Bradbourne House,<br>Bradbourne Drive<br>Tilbrook,<br>Milton Keynes MK7 8AT<br>United Kingdom | Cure Amount,<br>Assumption and Assignment-<br>(i) Unresolved Breaches under<br>License Agreement,<br>(ii) Recognition of Royalty<br>Free Holiday by Avis Europe<br>plc and (iii) Avis Europe plc<br>Competition Issues | Net Cure Amount of<br>£ 37,687.64 | Unresolved |
| Budget Rent A Car (Putney)<br>Bouagy's Limited<br>Mr. Joe Cory<br>152 Upper Richmond Road<br>Putney<br>London SW 15 2SW<br>United Kingdom | Cure Amount,<br>Assumption and Assignment-<br>(i) Recognition of Royalty<br>Free Holiday by Avis Europe<br>plc (ii) and Avis Europe plc<br>Competition Issues | Net Cure Amount of<br>£ 8,739.30 | Unresolved |
| Budget Rent a Car Belux<br>Holland Car Leasing Belgium NV<br>Frank Van Gool<br>Avenue Louise 327<br>1050 Brussels<br>Belgium | Cure Amount<br>Currency of Cure Amount | £ 33,879.55,<br>US $55,540.25 | Resolved: £ 32,711.10 Net<br>Cure Amount balance due from<br>BRACII |
| Budget Rent a Car Denmark<br>H.C.L. Denmark ApS<br>Claus Hansen<br>Helgolandsgade 2<br>1653 Kobenhavn V<br>Denmark | Cure Amount | DKK 227,054.36 | Resolved: £17,488.29 Net Cure<br>Amount balance due from<br>BRACII |

2

| Objecting Party | Nature of Objection | Asserted Cure Amount | Resolution |
|---|---|---|---|
| Budget Rent a Car Finland<br>Holland Car Leasing Finland Oy<br>Lennard von Knorring<br>Malminkatu 24<br>00100 Helsinki<br>Finland | Cure Amount;<br>Currency of Cure Amount | Net Cure Amount of<br>US $6,799.05,<br>€ 24,839.24 | Resolved: £ 6,281.65 Net Cure<br>Amount balance due from<br>BRACII |
| Budget Rent A Car Norway<br>Ernst-Harald Hjelseth<br>S.H. Lundhs vei 17<br>0287 Oslo<br>Norway | Currency of Cure Amount | Not Applicable | Resolved: £ 68,292.42 Net<br>Cure Amount balance due from<br>BRACII |
| Jaebaan Limited<br>Mr. Andrew Rees<br>Welcome House<br>999 Wolverhampton Road<br>Oldbury West Midlands B69 4RJ<br>United Kingdom | Cure Amount;<br>Assumption and Assignment-<br>Unresolved Breaches under<br>International Prime License<br>Agreements ("IPLAs") | Net Cure Amount not to<br>exceed US $ 4,500,000 | Unresolved |

CH1 26,586043

3

JA394