IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | |
| Plaintiffs and Counterclaim Defendants, | 03-A-54271 |
| v. | |
| Jaeban (U.K.) Limited, | |
| Defendant and Counterclaim Plaintiff. | |

## PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S COUNTERCLAIMS DUE TO DEFENDANT'S REFUSAL TO PARTICIPATE IN THIS PROCEEDING

Plaintiffs, including Debtor Budget Rent-A-Car International, Inc. ("BRACII"), by their undersigned attorneys, hereby respectfully request that the Court strike Defendant's Answer, Affirmative Defenses and Counterclaims in order to release from escrow the $4,500,000 of Plaintiffs' funds held hostage by misconduct of Defendant Jaeban (U.K.) Limited ("Jaeban") in failing to obtain Delaware counsel, comply with the Court's scheduling order, or advance this proceeding.[1]  In support of their Motion, Plaintiffs state as follows:

---

[1] Due to Jaeban's pervasive refusal to participate in this adversary proceeding, Plaintiffs bring this Motion under the following: Fed. R. Civ. P. 16(f), 37(b)(2)(C), and 41(b); D. Del. R. 1.3(a), 1.3(b), and 85.3(d); Bankr. D. Del. R.

WP3:969407 1                                                        59519 1001

JA739

## INTRODUCTION

### The Adversary Proceeding and Jaeban's Receivership[2]

1.      Plaintiffs filed this action on July 9, 2003 to recover at least £3,006,090 owed by Jaeban (U.K.) Limited ("Jaeban") to Budget Rent A Car International, Inc. ("BRACII"), an amount shown as due and owing on BRACII's books and records. At all relevant times, Jaeban was a BRACII licensee headquartered near Birmingham, England.

2.      On August 22, 2003, Jaeban voluntarily submitted to the jurisdiction of this Court by answering the Complaint and asserting counterclaims.[3] Thomas Briggs, Esq. and the Wilmington, Delaware firm of Morris, Nichols, Arsht & Tunnell ("Mor Nichols") filed an appearance on behalf of Jaeban.

3.      On September 23, 2003, BRACII and Plaintiff-Intervenor Official Committee of Unsecured Creditors filed an Answer denying Jaeban's counterclaims in all material respects.

4.      On October 20, 2003, Jaeban went into receivership in England. John Whitfield and Gerald Smith (the "Jaeban Receivers") were appointed as administrative receivers in a nonjudicial receivership under the Insolvency Act 1986 by Jaeban's secured creditor, Close Invoice Finance Limited.

---

1001-1(b) and 9010-1(a); 11 U.S.C. § Section 105(a); and the provisions of the February 26, 2003 Order (the "Avis Sale Order") approving the sale of certain assets of BRAC Rent-A-Car Corporation and BRACII to Avis Europe plc.

[2] Unless otherwise noted, the facts stated in this Motion have been adopted from Plaintiffs' Motion for Partial Summary Judgment and exhibits, which set forth the basis for these assertions.

[3] Jaeban, through its principal, I.M. Jaeban, had previously expressed its desire to participate in the cure process established in connection with the Avis Sale Order. Mr. Jaeban's February 19, 2003 fax to counsel seeking to have Jaeban's claims "dealt with through the Cure Process" is attached *infra* as Exhibit A.

WP3:969407 1

*59519 1001*

5.      Following the appointment of the Jaeban Receivers, Plaintiffs agreed to allow Jaeban a two-week period until November 3, 2003 to consider its position in this proceeding without having to participate in discovery.

**Jaeban's Failure to Prosecute:  Refusal to Retain U.S. Counsel**

6.      Between November 3, 2003 and December 17, 2003, on three occasions, Plaintiffs' counsel asked Mr. Briggs of Morris, Nichols whether he and his firm would continue to represent Jaeban in this proceeding.  Affidavit of Kenneth E. Wile, ¶ 2.[4]

7.      On December 17, 2003, during a telephonic hearing, the Court directed Jaeban's English solicitors from Wragge & Co. and Delaware counsel from Morris Nichols to resolve the identity of Jaeban's Delaware counsel.

8.      Jaeban never complied with that direction.  Instead, on January 7, 2004, Morris Nichols moved to withdraw from its representation of Defendant due to Jaeban's non-payment of the firm's fees.[5]

9.      The Court considered Morris Nichols' Motion to Withdraw at a hearing on January 12, 2004.  Jaeban's solicitors at Wragge & Co. did not to participate in this hearing by telephone, although they were invited to do so by Plaintiffs' counsel.  *See* Wile Aff., ¶ 3.

10.     During the hearing, Thomas Briggs of Morris Nichols stated to the Court that the Jaeban Receivers and their counsel had repeatedly refused to return Mr. Briggs' phone calls regarding payment of fees and retention of new counsel.[6]  At the hearing, the Court granted

---

[4] A copy of Mr. Wile's Affidavit is attached as Exhibit B.
[5] A copy of the Morris Nichols Motion to Withdraw is attached as Exhibit C.
[6] January 12, 2004 Hearing Transcript at 35.  A copy of the transcript is attached as Exhibit D

WP3:969407 1                                                            59519 1001

the motion to withdraw and determined that Jaeban had not arranged for substitute counsel to be present in the courtroom.

11.    In discussing Plaintiffs' Motion for Partial Summary Judgment, the Court ordered that "substitute counsel has to be obtained in time to file the response [to the Motion] by the 30th" – i.e., by January 30, 2004. Ex D at p. 36.

12.    In violation of the Court's Order, Jaeban has not retained new Delaware counsel and did not file a response by January 30, 2004 to Plaintiffs' Motion.

**Jaeban's Refusal to Provide Witnesses and Documents**

13.    On December 17, 2003, the Court granted Plaintiffs' Motion to revise the Scheduling Order in this adversary proceeding. The revised Order directed that all fact discovery be completed by January 30, 2004. Jaeban has never sought an extension of this date – an extension that Plaintiffs would vigorously oppose.

14.    Since December 17th, Jaeban has disregarded the Court-ordered January 30, 2004 discovery cutoff. In particular, Jaeban has failed to:

   a.    Provide any documents in response to Plaintiffs' Second Requests for Production of Documents (served on November 26, 2003);

   b.    Respond to concerns raised by Plaintiffs in a letter dated December 12, 2003 regarding apparent gaps in Jaeban's November production of documents;[7] and

   c.    Schedule depositions of any Jaeban personnel and the Jaeban Receivers, despite the repeated requests of Plaintiffs' counsel and Plaintiffs' offer to hold the depositions in London. *See* Ex. E.

Wile Aff., ¶ 4.

---

[7] A copy of Mr. Wile's December 12, 2003 letter is attached as Exhibit E.

4

JA742

15.    In disregarding the discovery cutoff, Jaeban was fully aware of its obligations to Plaintiffs. On December 30, 2003, Jaeban's prior Delaware counsel, Thomas Briggs, wrote Plaintiffs' counsel *promising* to produce documents in response to Plaintiffs' Second Requests for Production of Documents during the week of January 5, 2004 and "hoping" to provide Plaintiffs with deposition dates and a response to Plaintiffs' concerns about the prior document production during that same week.[8] Mr. Wile and Mr. Briggs had repeatedly discussed the scheduling of depositions in England since October 2003. Wile Aff., ¶ 8.

16.    As noted, Jaeban failed to honor any of the undertakings set forth in Mr. Briggs's letter and instead forced Mr. Briggs and his firm to withdraw.

17.    Following the withdrawal of Jaeban's Delaware counsel on January 12, 2004, Plaintiffs' counsel faxed a letter on January 14, 2004 to Mr. Weatherall, Jaeban's Birmingham solicitor urging Jaeban to retain new Delaware counsel as soon as possible and provide the promised witnesses and documents in advance of the January 30, 2004 fact discovery cutoff.[9] The letter informed Mr. Weatherall that Plaintiffs would seek sanctions if the witnesses and documents were not produced in a timely manner. Mr. Weatherall did not respond to this letter. Wile Aff., ¶ 10.

18.    As of the close of fact discovery under the Revised Scheduling Order, Jaeban has produced *no* witnesses, a single, seemingly incomplete set of documents, a one-sentence non-responsive statement of damages under D. Del. R. 9.4,[10] and a set of pre-receivership Rule 26(a) disclosures listing the witnesses that Jaeban has refused to produce.

---

[8] A copy of Mr. Briggs's letter is attached as Exhibit F.

[9] A copy of Mr. Wile's letter to Mr. Weatherall is attached as Exhibit G.

[10] A copy of Jaeban's Rule 9.4 statement is attached as Exhibit H. In reality, Jaeban did not comply with D Del. R.

WP3:969407 1                                                                          59519 1001

### The $4,500,000 Cure Amount Held in Escrow Due to Jaeban's Counterclaims

19.    On February 24, 2003, Judge Walrath entered the Avis Sale Order under Sections 105(a), 363, and 365 of the Code. The Order approved a sale of most of BRACII's assets to Avis Europe plc.[11]

20.    Under the asset purchase agreement, Avis Europe agreed to assume BRACII's agreements with Jaeban. In return, pursuant to Paragraph 13(b) of the Sale Order, Debtors agreed to escrow $4,500,000 as the amount claimed by Jaeban as necessary to cure BRACII's alleged breaches of its agreements with Jaeban in excess of any setoff rights of Debtors.[12] As noted in Plaintiffs' Motion for Partial Summary Judgment, Debtors placed $4,500,000 in an escrow account, where it remains until further action of this Court.

21.    Paragraph 13(b) of the Sale Order provides that, if the parties to an "Unresolved Cure Objection" (such as Debtors and Jaeban) are unable to resolve the objection, the Debtors or "the non-debtor objecting party may request that the Court establish a schedule to resolve such objection." By filing this adversary proceeding to recover the £3,000,000 owed by Jaeban, Plaintiffs invoked this provision.

### ARGUMENT

22.    Jaeban is engaged in a transparent effort to hold the $4,500,000 escrow hostage. Its actions (and inaction) show neither a belief in its claims nor a willingness to obey its

---

9.4, which required Jaeban to itemize the unliquidated damages claimed in its pleading. Exhibit H instead merely repeats Mr. Jaeban's claim in Exhibit A, *infra*, that Jaeban's damages do not exceed the $4,500,000 cure amount. Jaeban did serve a document request on December 30, 2003 -- prior to Morris Nichols' withdrawal. Plaintiffs have served a written response on and produced documents to Jaeban's English solicitors at Wragge & Co.

[11] A copy of the Avis Sale Order is attached as Exhibit I.

WP3:969407 1                                                                59519 1001

obligations in this Court.  The goals of the Bankruptcy Code do not include affording a foreign

litigant leverage against the Debtors' estates and their creditors when that litigant repudiates its

obligations.  Given Jaeban's unwillingness to pay for Delaware counsel, it is safe to assume that

monetary sanctions – to be enforced in England – will serve no purpose.

I.    **Sanctions for Failure to Maintain Delaware Counsel**

          23.    Rule 85.3(d) of the District of Delaware Local Rules requires Jaeban to

have Delaware counsel in this proceeding.[13]  Failure to obtain Delaware counsel subjects the

offending party to sanctions under D. Del. R. 1.3(a).  Rule 1.3(a) sanctions include, but are

explicitly not limited to, attorney's fees (which would be useless here).

          24.    The requirement of Delaware counsel is not only mandatory, but

especially important where, as here, the litigant and its counsel are located outside of the United

States and are unfamiliar with the Court's rules.  Moreover, as this case demonstrates, an

overseas litigant with assets beyond the reach of this Court is more likely to be indifferent to its

obligations to the Court and the other litigants.

          25.    In keeping with the applicable rules and customary practice, this Court

twice directed Jaeban to ensure that it had retained Delaware counsel that would participate in

this proceeding.  During the December 17, 2003 telephonic status hearing, the Court directed

Jaeban to confirm its retention of Delaware counsel by no later than the January 12, 2004 status

---

[12] These agreements were submitted to the Court as exhibits to *Plaintiffs' Motion for Partial Summary Judgment*
[13] Under Bankr. D. Del. Rule 1001-1(b), the Rules of the District of Delaware apply to proceedings in this Court
unless they conflict with the provisions of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure  D.
Del. R. 85.3(d), however, is explicitly made applicable to this proceeding by Bankr. D. Del. R. 9010-1(a).

WP3:969407 1                                                          59519 1001

JA745

hearing. At the January 12, 2004 status hearing, the Court directed Jaeban to obtain Delaware counsel by January 30, 2004.[14]

26.     Jaeban's indifference to its obligations can be seen it its treatment of Morris Nichols. Jaeban failed to pay the firm's fees and, according to Mr. Briggs' statements at the January 12th hearing, refused even to return phone calls regarding fees or the retention of substitute counsel. *See also* Ex. C. (Motion to Withdraw). Moreover, Jaeban's Birmingham solicitors did not attend the January 12th hearing by telephone, even though Jaeban knew that Delaware counsel had moved to withdraw. This conduct also demonstrates why an award of attorney's fees as a lesser sanction would be pointless.

27.     Jaeban's conduct can only be understood as a recognition that its claims are not worth even a minimal investment. To recover an amount in excess of Plaintiffs' claims for £3,000,000 based on BRACII's books and records, Jaeban must show that Debtors could have, but did not, "adequately market the Budget brand" from March 2001 through February 2003 so that Jaeban would have earned over $4,000,000 in additional profits. *See* Answer, Affirmative Defenses and Counterclaims, ¶¶ 37, 44. Given the September 11, 2001 attacks and their effect on airline, car rental, and other travel-related companies, the claim is frivolous.

28.     In addition to the awarding sanctions under Del. R. 1.3(a), federal trial courts have "broad authority to . . . dismiss a case for failure to obey pre-trial orders." *Robson v. Hallenbeck*, 81 F.3d 1, 2 (1st Cir. 1996). That authority arises under Rule 41(b) of the Federal Rules of Civil Procedure, but also under the Court's sanctioning powers under Section 105(a) of

---

[14] In serving Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs notified Jaeban's English solicitors of the Court's direction

8

the Code, 11 U.S.C. §105(a). *See, e.g., In re Rainbow Magazine, Inc.*, 77 F.3d 278, 284 (9th Cir. 1996); *In re Courtesy Inns, Ltd.*, 40 F.3d 1084, 1089-90 (10th Cir. 1994).

      29.    By failing either to maintain its existing Delaware counsel or retain substitute counsel, Jaeban has disobeyed the Court and Rule 85.3(d).[15] Jaeban has also violated the Revised Scheduling Order, which certainly presumed that Jaeban would maintain Delaware counsel who would advance the case and attend depositions.

      30.    There is no remedy for these violations short of dismissing Jaeban's counterclaims. Any sanction (including attorney's fees) that has the practical effect of preserving Jaeban's claims would merely further Jaeban's strategy of delaying distribution of the $4,500,000 escrow to the Debtors' estates and *bona fide* creditors -- without having to expend funds to litigate those claims. Jaeban's counterclaims should be dismissed due to its failure to maintain counsel.[16]

## II.   Jaeban's Repudiation of the Revised Scheduling Order

      31.    While Jaeban's failure to maintain Delaware counsel is reason enough for sanctions, its complete disregard of the fact discovery cutoff provides equally ample grounds under Rules 16(f) and 41 of the Federal Rules of Civil Procedure and District of Delaware Local Rule 1.3(a).

      32.    Under Rule 16(f) of the Federal Rules of Civil Procedure (made applicable to this proceeding by Fed. R. Bankr. P. 7016), failure to obey a discovery scheduling order may,

---

[15] In *Courtesy Inns*, the Court of Appeals noted that the bankruptcy court "could have applied its local rule to dismiss Courtesy's petition because it had no attorney representative." 40 F.3d at 1090.

[16] Jaeban's misconduct amply justifies an order striking its answer and affirmative defenses as well. If the Motions for Sanctions and Partial Summary Judgment are granted, Plaintiffs *may* be able to protect their rights against Jaeban in England without any need to proceed further in this Court. Plaintiffs reserve all of their rights in his regard.

WP3:969407 1                                                           59519 1001

JA747

in the Court's discretion, result in a sanctions order under Fed. R. Civ. P. 37(b)(2)(C) striking the disobedient party's pleadings or entering a judgment by default. District of Delaware Local Rule 1.3(a) sets forth an equally applicable provision authorizing sanctions if a party fails to abide by an order of the Court.

33.    Judge Walrath originally set a fact discovery cutoff of December 12, 2003. As a courtesy to Jaeban (and its then-Delaware counsel) in light of the appointment of the Jaeban Receivers on October 20, 2003, Plaintiffs agreed to a six-week extension to January 30, 2004.

34.    The discovery deadline has now passed; Jaeban's repudiation of its obligations is now a matter of record. Despite repeated requests by Plaintiffs before and after the withdrawal of Morris Nichols (*see* Wile Aff., ¶ 8 & Exs. E and G), Jaeban has failed to produce a single witness for deposition. It has not produced a single document in response to Plaintiffs' Second Request for Production of Documents. It has not responded to Plaintiffs' concerns that Jaeban's first production of documents was incomplete.

35.    The striking of Jaeban's counterclaims is fully consistent with the Third Circuit's six-factor test for striking pleadings as a sanction under Rule 37(b)(2)(C). As first set forth in *Poulis v. State Farm Fire & Cas. Co*., 747 F.2d 863 (3d Cir. 1984), these factors are:

    a.    The noncomplying "*party's* personal *responsibility*."

    b.    The "*prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery;"

    c.    A "*history* of dilatoriness;"

    d.    Conduct that was "*willful* or in *bad faith*;"

    e.    The "effectiveness of . . . *alternative sanctions*;"

10

f.     The "*meritoriousness* of the claim or defense."

*Id.* at 868 (italics in the original).

36.   In *Poulis*, the Third Circuit affirmed the dismissal of a case in which plaintiffs had failed to respond to interrogatories or file a pre-trial statement. Similarly, in *Subar, Inc. v. Precision Plastics, Inc.*, 1997 U.S. Dist. LEXIS 12352 (E.D. Pa. August 14, 1997), the District Court applied the *Poulis* factors to dismiss a counterclaim where, *inter alia*, a corporate defendant failed to obtain new counsel after dismissing its initial counsel.

37.   In this instance, all of the *Poulis* factors support striking Jaeban's counterclaims. (a) Jaeban's failure to comply with discovery is its fault and certainly not the fault of its former Delaware counsel. (b) Plaintiffs are prejudiced by the continuing segregation of $4,500,000 of their funds in escrow. (c) Apart from the one, probably incomplete, production of documents, Jaeban has been dilatory in all meaningful respects since the appointment of the Receivers. (d) Jaeban's conduct in refusing to maintain Delaware counsel and cooperate is a bad faith attempt to obtain leverage from the escrow account without any evident belief in its claims or intent to prosecute the action. (e) As noted above, an award of monetary sanctions (or any other sanction that leaves the escrow in place) will be ignored by Jaeban. (f) Jaeban's claim to monies in excess of what it owes to BRACII is utterly implausible; the claim assumes that Jaeban would have enjoyed extraordinary profits during the period in which the September 11th attacks devastated the travel industry.

III.   **Sanctions Are Necessary to Implement the Terms of the Sale Order**

38.   Under Paragraph 23 of the Avis Sale Order, the Court retained jurisdiction to "interpret, implement, and enforce the provisions of this Order." *See* Ex. I.

11

JA749

39.    By agreeing to participate in the cure process (*see* Exhibit A, *infra*) and by voluntarily submitting to the jurisdiction of this Court when it answered the Complaint, Jaeban warranted that it would cooperate in the cure process and abide by the Court's orders regarding retention of counsel and discovery.  By repeatedly violating its obligations, Jaeban has forfeited its right to proceed with its claim to the cure amount held in escrow.  This Court has ample authority under Section 105(a) of the Code to take note of these violations, protect the Debtors' estates, and redress Jaeban's abuse of the protections provided by the Sale Order.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order striking Jaeban's Answer, Affirmative Defenses and Counterclaims and granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  February 3, 2004

                                                                Respectfully submitted,

**SIDLEY AUSTIN BROWN & WOOD LLP**        **YOUNG CONAWAY STARGATT &**
                                                                **TAYLOR, LLP**

Larry J. Nyhan
Kenneth E. Wile                                               Robert S. Brady (Bar No. 2847)
Bank One Plaza                                               Edmon L. Morton (No. 3856)
10 South Dearborn Street                                 Joseph A. Malfitano (No. 4020)
Chicago, IL 60603                                          Matthew B. Lunn (No. 4119)
                                                                The Brandywine Building, 17th Floor
                                                                1000 West Street, P.O. Box 391
                                                                Wilmington, Delaware  19899-0391
                                                                (302) 571-6600

Counsel for Debtors and Debtors-in-Possession
BRAC Group, Inc., et al.

12

WP3:969407 1                                                                    59519 1001

**JA750**

**Exhibit A**

JA751

Welcome House
999 Wolverhampton Road
Oldbury West Midlands B69 4RJ
Phone: 0121 544 2219
Fax: 0121 544 8817



**jaeban**
Self Drive, Contract
Hire, Direct Auto Sales

# Fax

| To: | Robert S Brady - Young Conaway Stargatt & Taylor |
|---|---|
| Fax: | 001 302 576 3283 |
| To: | Larry J Nyhan – Sidley Austin Brown & Wood |
| Fax: | 001 312 853 7036 |
| To: | Susheel Kirpalani – Milbank, Tweed, Hadley & McCloy |
| Fax: | 001 212 530 5219 |
| To: | Office of the United States Trustee for the District of Delaware |
| Fax: | 001 302 573 5497 |
| To: | Harold Marcus - Brown Rudnick Berlack Israels |
| Fax: | 001 617 856 8201 |
| To: | Simon Freakley – Kroll, Buchler, Phillips |
| Fax: | 0207 029 5001 |

| From: | I M Jaeban (Director) – Jaeban UK Limited |
|---|---|
| Date: | 19th February 2003 |
| Subject: | BRAC GROUP, INC (f/k/a Budget Group, Inc.) et al |
|  | Case No 02-12152 (MFW) |

X Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Dear Sirs,

We refer to our Notice of Objection dated 13th February 2003. It has been suggested by a recipient that our claim could be interpreted as amounting to more than US $4.5 million. We wish to make clear that after set-off we do not consider that our claim amounts to more than US $4.5 million and we therefore seek to have it dealt with through the Cure Process.

Yours faithfully,

I M Jaeban
Director

JA752

**Exhibit B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered) |
| BRAC GROUP, INC. (f/k/a Budget Group, Inc.), et al., | |
| Plaintiffs and Counterclaim Defendants, v. | 03-A-54271 |
| Jaeban (U.K.) Limited, | |
| Defendant and Counterclaim Plaintiff. | |

COUNTY OF COOK        )
                      ) ss.
STATE OF ILLINOIS     )

**AFFIDAVIT OF KENNETH E. WILE**

KENNETH E WILE, being duly sworn, deposes and says:

1.    I am a member of the Illinois and New York bars and a counsel in the Chicago office of Sidley Austin Brown & Wood LLP. I am one of the attorneys representing the Debtors in the above-captioned adversary proceeding against Jaeban (UK) Limited ("Jaeban").

2.    Between November 3, 2003 and December 17, 2003, on at least three separate occasions, I asked Jaeban's counsel, Thomas Briggs of Morris, Nichols, Arsht & Tunnell, whether he and his firm would continue to represent Jaeban in this proceeding.

JA754

3.      Prior to the January 12, 2004 status hearing in this proceeding, I asked my Delaware co-counsel at Young, Conaway, Stargatt & Taylor to contact Jaeban's principal solicitor at Wragge & Co., Ian Weatherall, to invite him to participate by telephone at the January 12th hearing.

4.      As of the close of fact discovery in this proceeding on January 30, 2004 and as of the date of this affidavit, Jaeban has failed to:

        a.      Provide any of the documents sought by Plaintiffs' November 26, 2003 Second Requests for Production of Documents;

        b.      Respond to concerns raised by Plaintiffs in my December 12, 2003 letter regarding gaps in Jaeban's November 2003 production of documents; and

        c.      Schedule depositions of any Jaeban personnel and the Jaeban Receivers, despite my repeated requests to Plaintiffs' counsel requesting these depositions.

5.      Exhibit A to Plaintiffs' Motion for Sanctions (the "Motion") is a true and correct copy of I.M. Jaeban's February 19, 2003 fax to counsel in this Chapter 11 proceeding declaring Jaeban's intention to participate in the cure process.

6.      Exhibit C to the Motion is a true and correct copy of the Motion to Withdraw of Morris Nichols Arsht & Tunnel that the Court granted on January 12, 2004.

7.      Exhibit D to the Motion is a copy of the transcript of January 12, 2004 hearing.

8.      Exhibit E to the Motion is a true and correct copy of my December 12, 2003 letter to Mr. Briggs. As this letter reflects, after discovery commenced, I repeatedly discussed with Mr. Briggs holding the depositions of Jaeban personnel in England.

9.      Exhibit F to the Motion is a true and correct copy of Mr. Briggs's December 30, 2003 letter to me.

2

10.    Exhibit G to the Motion is a true and correct copy of a letter that I wrote and caused to be faxed to Ian Weatherall, Jaeban's Birmingham, England solicitor, on January 14, 2004. Mr. Weatherall has not responded to this letter.

11.    Exhibit H to the Motion is a true and correct copy of Jaeban's D. Del. R. 9.4 statement which was enclosed with Mr. Briggs's December 30, 2003 letter.

12.    Exhibit I to the Motion is a true and correct copy of the Court's February 24, 2003 Order approving the sale of certain of Debtors' assets to Avis Europe plc.

_____
Kenneth E. Wile

Sworn to before me this
2nd day of February, 2004

_____
Notary Public

```
"OFFICIAL SEAL"
MICHELE ILENE RUIZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/1/2007
```

3

**Exhibit C**

JA757

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) )  ) | Chapter 11 |
| Debtors. | ) ) | Case No. 02-12152 (MFW) |
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | (Jointly Administered) |
| Plaintiffs, | ) ) | |
| v. | ) ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, | ) ) | |
| Defendant. | ) ) ) | |

## MOTION TO WITHDRAW

The law firm of Morris, Nichols, Arsht & Tunnell ("Morris Nichols") hereby moves the Court for an Order permitting it to withdraw as counsel for defendant, Jaeban (UK), Ltd. (the "Defendant"). In support of this motion, Morris Nichols states as follows:

1.    The grounds for this motion are that the Defendant has failed substantially to fulfill its obligations regarding the firm's services, and has been given reasonable warning that the firm would withdraw unless Defendant's obligations were fulfilled.

2.    Morris Nichols has agreed to take all steps necessary to the extent reasonably practicable to protect Defendant's interests, including assisting Defendant in finding other counsel and surrendering papers and property to which the client is entitled.

3.    Defendant is represented by Wragge & Co., its counsel in the United Kingdom. Wragge & Co. intends to continue to represent Defendant in connection with this proceeding.

4.    Morris Nichols has conferred with counsel for plaintiffs and informed plaintiffs that it will be filing the instant motion.

For the foregoing reasons, Morris Nichols respectfully requests entry of an order in the form attached as Exhibit A permitting it to withdraw as counsel for Defendants.

MORRIS, NICHOLS, ARSHT & TUNNELL

R. Judson Scaggs, Jr. (#2676)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

January 7, 2004

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Case No. 02-12152 (MFW) |
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | (Jointly Administered) |
| Plaintiffs, | ) ) | |
| v. | ) ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, | ) ) | |
| Defendant. | ) ) ) | |

## ORDER GRANTING WITHDRAWAL

The law firm of Morris, Nichols, Arsht & Tunnell ("Morris Nichols") having filed a motion to withdraw as counsel for the defendant, and the Court having found good cause therefor;

IT IS HEREBY ORDERED this __ day of _____, 2004, that:

1. Morris Nichols' motion to withdraw is granted;

2. Morris Nichols' appearance on behalf of Defendant is hereby withdrawn.

_____
United States Bankruptcy Judge

**Exhibit D**

JA761

1

2                       UNITED STATES BANKRUPTCY COURT
                              DISTRICT OF DELAWARE
3

4    IN RE:                         .          Chapter 11

5    Brac Group, Inc.,              .

6          Debtor.                  .          Bankruptcy #02-12152 (CGC)
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
7
                                 Wilmington, DE
8                                January 12, 2004
                                    2:10 p.m.
9
                           TRANSCRIPT OF MOTIONS HEARING
10         BEFORE THE HONORABLE CHARLES G. CASE
                     UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For The Debtor:                    Matthew A. Clemente, Esq.
                                        Sidley Austin Brown & Wood
14                                      Bank One Center
                                        10 South Dearborn Street
15                                      Chicago, IL 60603

16                                      Kenneth Wile, Esq.
                                        Sidley Austin Brown & Wood
17                                      Bank One Center
                                        10 South Dearborn Street
18                                      Chicago, IL 60603

19                                      Larry Nyhan, Esq.
                                        Sidley Austin Brown & Wood
20                                      Bank One Center
                                        10 South Dearborn Street
21                                      Chicago, IL 60603

22                                      Edmon L. Morton, Esq.
                                        Young Conaway Statgatt
23                                      & Taylor, LLP
                                        The Brandywine Bldg.
24                                      1000  West Street-17th Fl.
                                        Wilmington, DE 19801
25

2

```
1   For The Official Committee:   William P. Bowden, Esq.
    of Unsecured Creditors        Ashby & Geddes
2                                 222 Delaware Ave.-17th Fl.
                                  Wilmington, DE 19899
3
                                  Harold J. Marcus, Esq.
4                                 Brown Rudnick Berlack
                                  & Israels
5                                 One Financial Center
                                  Boston, MA 02111
6
    For Cendant Corporation:      Anthony W. Clark, Esq.
7                                 Skadden Arps Slate
                                  Meagher & Flom, LLP
8                                 One Rodney Square
                                  Wilmington, DE 19899
9
    For Ace USA Companies:        Linda M. Carmichael, Esq.
10                                White & Williams, LLP
                                  824 N. Market Street-Ste. 902
11                                Wilmington, DE 19801

12  For Jaeban:                   Thomas Briggs, Esq.
                                  Morris Nichols Arsht
13                                & Tunnell
                                  1201 N. Market st.
14                                Wilmington, DE 19899

15  For U.K. Adminsitrators:      Mark Collins, Esq.
                                  Richards Layton & Finger
16                                One Rodney Square
                                  Wilmington, DE 19801
17
    Audio Operator:               Brandon J. McCarthy
18
    Transcribing Firm:            Writer's Cramp, Inc.
19                                6 Norton Rd.
                                  Monmouth Jct., NJ 08852
20                                732-329-0191

21  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
22

23

24

25
```

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

JA763

3

1    THE CLERK: All rise. The United States Bankruptcy

2  Court for the District of Delaware is now in session, the

3  Honorable Charles G. Case presiding.

4    THE COURT: Good afternoon. Please be seated.

5    MR. MORTON: Good afternoon, Your Honor. Ed Morton

6  from Young Conaway on behalf of the Debtor's, Brac Group, Inc.,

7  et al. We'll be going today, Your Honor, by the Amended Notice

8  of Agenda that was forwarded to your Chambers. I'm not sure if

9  Your Honor has a copy. If not I have an extra that I can --

10    THE COURT: I do.

11    MR. MORTON: Thank you, Your Honor. As Your Honor

12  will see, the -- probably the first matter that comes

13  numerically on the docket is the Notice of Hearing to Consider

14  the Approval of the Disclosure Statement. There is a status

15  presentation that has been prepared for Your Honor, but since

16  several of the matters in that presentation, not the least of

17  which we'll scheduling, relate also to the Jaeban Status

18  Conference that's at the end. What I would propose to do is to

19  go through the brief uncontested matters we have to the extent

20  there even needs to be a presentation and then take up those

21  matters at the end of the hearing, if that's acceptable.

22    THE COURT: All right.

23    MR. MORTON: Thank you, Your Honor. Turning to

24  matters number 10 and 11 on the agenda, these are two motions

25  to which there was no objection and a Certificate of No

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

4

1  Objection had been filed prior to the filing of this agenda.  I

2  certainly have forms of order with me to the extent Your Honor

3  has not already signed those motions.

4      (Pause in proceedings)

5         THE COURT:  You're so far away.

6      (Laughter)

7         THE COURT:  Every time I come I'm in a different

8  courtroom.  I've not signed them.  I'm looking -- what I have

9  here is the Order Approving the Rejection of Certain Unexpired

10 Leases --

11        MR. MORTON:  Your Honor --

12        THE COURT:  -- which is not that one.

13        MR. MORTON:  Sir, that relates to matter number 13.

14 We did file a certification late on that one merely because we

15 had given one party additional time to review the motion.  That

16 party did not object and therefore it is also uncontested.

17        THE COURT:  Well, if you have other -- hold on --

18 here's the C.N.O. -- binder.  We're talking now about Veronica

19 Nichols, correct?

20        MR. MORTON:  That's correct, Your Honor.

21        THE COURT:  Yes, I do have that.

22     (Pause in proceedings)

23        THE COURT:  Okay.

24        MR. MORTON:  Your Honor, the next matter would be our

25 365(d)(4) Extension Motion.  Again, that -- there were no

5

1   objections filed to that motion and it should be contained in

2   the C.N.O. binder that Your Honor is holding.

3       (Pause in proceedings)

4       THE COURT:  I've signed the order.

5       MR. MORTON:  Thank you, Your Honor.  That brings us to

6   matters 12 and 13.  Again, merely because of the objection

7   deadlines related to certain Parties-in-Interest, these matters

8   were the subject of later file certifications.  I believe, Your

9   Honor, as you've mentioned that you have the certification on

10  the matter of number 13.

11      (Pause in proceedings)

12      THE COURT:  Yes, I do.

13      (Pause in proceedings)

14      MR. MORTON:  Your Honor, matter number 12 is a matter

15  by the Committee.  I'll let Mr. Bowden present that.

16      (Pause in proceedings)

17      MR. BOWDEN:  Your Honor, good afternoon.  For the

18  record, Bill Bowden of Ashby & Geddes for the Creditors

19  Committee.  Your Honor, just an introductory matter as well,

20  with me at counsel table is Hal Marcus from the Brown Rudnick

21  Berlack Israels firm, as well.  Your Honor, item 12 was the

22  Committee's Application to Supplement the Engagement of Linda

23  Burch.  No objections were filed and served.  Ms. Harrison on

24  behalf of the United States Trustee had asked for an extension

25  of time, which obviously we had no problem giving her, and has

6

1  not objected.  We filed a Certification of Counsel last

2  Wednesday, I believe.  I don't know if it made it into the

3  C.N.O. binder or not.  If not, Your Honor, assuming Your Honor

4  has no questions, I have a Form of Order with me.

5        THE COURT:  I did not see it in the C.N.O. binder.

6        MR. BOWDEN:  Your Honor, may I approach with the Form

7  of Order?

8        THE COURT:  Yes, please.

9        MR. BOWDEN:  Thank you.

10     (Pause in proceedings)

11        THE COURT:  I've signed the order.

12        MR. BOWDEN:  Thank you, Your Honor.

13     (Pause in proceedings)

14        MR. MORTON:  Your Honor, I believe then this would be

15  an appropriate time to circle back to the disclosure statements

16  portion of the hearing.  Mr. Nyhan of the Sidley Austin Brown &

17  Wood firm is here to present that matter.

18     (Pause in proceedings)

19        MR. NYHAN:  Good afternoon, Your Honor.

20        THE COURT:  Hello Mr. Nyhan.  Nice to see you.

21        MR. NYHAN:  Nice to see you.  It's a pleasure to be in

22  front of Your Honor again, all though I must confess that the

23  ambient climate has deteriorated significantly since the last

24  hearing I attended.

25        THE COURT:  I just assumed that you waited until the

7

1    weather was like Chicago before you came to Delaware.

2         (Laughter)

3         MR. NYHAN:  Your Honor, but for the urgence of the

4    Committee, I'd be more than happy to do that.

5         (Laughter)

6         MR. NYHAN:  Your Honor, what we'd like to do today, if

7    it's acceptable to the Court is provide a brief overview of

8    where we have been and where we are going with this case and

9    then suggest a timetable for getting to disclosure and

10   ultimately confirmation.  And then briefly address -- excuse

11   me, the objections that have been filed, how we intend to

12   address those, recognizing that we are not asking the Court to

13   rule on any objections today, but rather will request that the

14   disclosure statement hearing itself be adjourned and that it be

15   taken up in a -- in a few weeks.

16        (Pause in proceedings)

17        THE COURT:  Please proceed.

18        MR. NYHAN:  Thank you, Your Honor.  This case, Your

19   Honor, was filed on July 29th of 2002.  Shortly -- actually

20   prior to the initiation of the case, the company's -- Budget

21   Rent-A-Car had engaged investment bankers and embarked upon a

22   program to either find a source of capital in order to effect

23   an internal reorganization or alternatively to find a buyer so

24   that the assets could be monetized for the benefit of the

25   Creditors of the company.  Prior to the filing, Budget had

JA768

8

1    progressed significantly in sale negotiations with Cendant
2    Corporation in an acquisition subsidiary called Cherokee.  And
3    after the Petition was filed, and after financing was put in
4    place, pursued essentially an auction based upon a stalking
5    horse bid promoted by Cendant and Cherokee.  Cendant and
6    Cherokee agreed to purchase -- to acquire all of Budget's
7    operations in the United States, Canada, the Caribbean, Latin
8    America and Asia Pacific.  As the deal was ultimately
9    structured, Cherokee and Cendant agreed to assume $2.8 billion
10   of Fleet debt, about $420,000,000 of Secured Pre-Petition bank
11   debt, $75,000,000 in Debtor-in-Possession financing,
12   substantially all trade claims, employee claims, tort claims --
13   there is a dispute, I don't mean to suggest that there isn't a
14   dispute is to the scope of that assumption, but in general,
15   operating liabilities of the company were assumed.  In
16   addition, Cendant agreed to pay and did in fact pay
17   $110,000,000 in cash, plus an additional $40,000,000 in
18   transaction costs, that is, they agreed to help the company
19   defray approximately $40,000,000 in transaction costs.  And
20   they assumed over 7,000 executory contracts.  That transaction,
21   Your Honor, was approved by Judge Walrath and closed on
22   November 22 of '02.  Cendant did not acquire the operations of
23   Budget, which are commonly referred to -- or were referred to
24   as E.M.E.A. or Europe, Middle East, Africa and parts of Asia.
25   Those operations continued subsequent to the closing.  As part

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

9

1  of the transaction with Cendant, a license was negotiated
2  pursuant to which the Budget Estate was entitled to continue
3  using the Budget trademark and trade name in those regions for
4  a significant period of time.  We then embarked upon a program
5  to either devise an internal reorganization for E.M.E.A. or
6  find a buyer.  Creditor pressure in Europe forced us to take
7  the step of initiating in January of 1903 -- 1903 -- 2003, in
8  administration in the High Court in London for BRAC, that's
9  Budget Rent-A-Car International.  BRAC is a U.S. corporation,
10 but was the international holding company for the Budget Group.
11 And as such, owned the stock of the various corporations that
12 carried on business throughout, in the U.K. throughout Europe,
13 throughout E.M.E.A.  Working together with the Administrator,
14 Simon Freekley and Urpul Sind, who were appointed by the High
15 Court as Administrators in the administration of BRAC and with
16 the Creditors Committee, we jointly negotiated a sale of the
17 European operations to Avis Europe.  That transaction was
18 ultimately approved by this Court, by the Administrators.  It
19 called for the acquisition of the operating assets in Europe,
20 as well as the licensing agreement for 20 mile -- excuse me --
21 $20,000,000 cash U.S., plus the assumption of considerable
22 amount of liabilities.  That sale was approved in late February
23 of '02 -- excuse me -- '03, Your Honor.  After closing the Avis
24 Europe sale transaction, the parties focused on bringing a
25 conclusion to the case, and in particular a Plan of

10

1    Reorganization. The principal issue -- there are some

2    litigation issues, for example, there is a significant claim

3    against the Sixth company in Germany, known as the Sixth

4    Litigation. That has been prosecuted in Germany and sustained

5    a judgment against the Sixth and we're in the appeal process at

6    this point. But by and large the assets of the Budget Group --

7    or what was formerly known as the Budget Group, have now been

8    monetized and the principal issues preventing the filing and

9    consummation of a plan, have been the issue of allocating the

10   value that's been received in these transactions as between, on

11   the one hand, the U.S. Creditor Body, and on the other, the

12   Administrators representing the interests of the U.K.

13   Creditors. Settling those issues prove more difficult than

14   people had originally expected. They are complicated, for

15   example, the allocation of purchase price is in dispute, both

16   with respect to the Cendant transaction and in that respect,

17   because the -- part of the operations acquired by Cendant,

18   specifically Latin America and Australia, were owned by BRAC

19   and therefore, the value allocable to those, that portion of

20   the sale is claimed by the BRAC Estate. Conversely, the

21   license which BRAC enjoyed for international operations was

22   owned by the U.S. Budget -- BRAC Estate and therefore, the

23   Creditors in the U.S. laid claim to some portion of the value

24   paid by Avis Europe in respect of the sale of E.M.E.A. There

25   was also significant in our company claims between the Estates,

JA771

11

1  questions about how much of the post-petition financing, which

2  was supported on the backs largely of US Creditors, should have

3  been borne by the UK and the BRAC Estate, and then finally,

4  disputes over who was entitled to whatever value was realized

5  from the Sixth Litigation.  As Your Honor is aware, the

6  Disclosure Statement and Plan that we filed left those issues

7  unresolved with the expectation and hope that there would be a

8  resolution between the Administrator and the US Creditors

9  Committee and I'm happy to report to the Court today that as of

10  the end of last week, an agreement has in fact been reached and

11  at the conclusion of my comments, I will yield the podium to

12  Counsel for the Administrator, Mr. Collins and Counsel for the

13  Committee, Mr. Marcus to brief the Court on the salient

14  features of that settlement.  But suffice it to say that the

15  principal obstacle, at least from our perspective, of moving

16  forward with this Plan has now been resolved.  We will of

17  course, Your Honor, amend the Plan and Disclosure Statement to

18  reflect the terms of the settlement.  It is our understanding

19  that the Committee and the Administrator have agreed or that

20  the settlement should proceed to hearing with dispatch and

21  therefore, before I turn to the objections that have been

22  raised at the Disclosure Statement and put it in context for

23  the Court, what we will request at the conclusion of today's

24  hearing is that we be given a time line along the following

25  lines.  It is our expectation that a Motion to Approve the

JA772

12

1  settlement will be filed on Wednesday or Thursday of this week.

2  We also fully expect that we will be in a position to file an

3  Amended Disclosure Statement with some technical amendments to

4  the Plan by July -- excuse me -- January 25th.  Those

5  amendments, we think, will in substantial part, resolve the

6  objections that are pending against the Disclosure Statement.

7  And we would request, subject obviously to the Court's

8  availability, that we be provided with a hearing in early

9  February, preferably around the 4th or 5th of February, to

10  consider both the adequacy of the disclosure and the propriety

11  of the settlement that has been negotiated involving the

12  allocation issues.  If I may, Your Honor, what I would propose

13  to briefly discuss the nature of the objections that are --

14  have been filed and how we propose to resolve them to help fill

15  in the context for the time line that I've requested.

16       (Pause in proceedings)

17       MR. NYHAN:  Your Honor, we have prepared a brief

18  summary -- that is the Debtors have prepared a brief summary

19  sheet which reflects our summary of what the different

20  objections contained and include as exhibits, all of the

21  objections as well as the Plan and Disclosure Statement.  If I

22  may approach it may be helpful to the Court?

23       THE COURT:  Thank you.

24       (Pause in proceedings)

25       MR. NYHAN:  The summary page, Your Honor, should be

13

1   the first page in the binder and I would propose simply to walk

2   through the principal objections in order. Your Honor will

3   note, we have divided the responses into Roman number I,

4   Objections and then on the second page Roman number II,

5   Responses. I don't intend to spend much time on the second

6   category because those are principally letters that had been

7   received. They have not been filed with the Court. We will --

8   we do propose to file all of them with the Court and we are

9   going to respond with correspondence to these individuals. The

10  vast majority of the letters really identify claims that these

11  individuals are asserting against the Estate, rather than

12  dealing with anything having to do with the objection -- excuse

13  me -- adequacy of disclosure. We intend to determine whether

14  their claims have in fact been scheduled and if not inform

15  them. But if they have been inform them of that, if they have

16  not inform them of that fact, as well as the bar date and the

17  purpose of the Disclosure Statement hearing. I would like to

18  direct my -- but each one of those letters is included in the

19  binder for the Court to review if Your Honor wishes to.

20      (Pause in proceedings)

21      MR. NYHAN: Let me turn then, if I might, to the first

22  objection, which is the objection lodged by the Commonwealth of

23  Pennsylvania and it's a fairly straightforward objection. The

24  Commonwealth asserts what we understand to be a priority tax

25  claim. Their objection challenges the failure to -- or the --

JA774

14

1  their interpretation of the Plan, that the penalty associated

2  with that claim will not be paid under the Plan.  Your Honor,

3  we intend to deal with that objection two ways.  First, it's

4  really a Plan objection, it's not a Disclosure Statement

5  objection.  But second, we are going to clarify the Plan to the

6  extent that they intend to assert a penalty as a non-priority

7  claim.  We are going to make it clear that any objection to the

8  allowability of that claim will be handled in the claim

9  objection process and will be -- not be foreclosed -- excuse me

10  -- by the Plan.

11      (Pause in proceedings)

12      MR. NYHAN:  The second set of objections were lodged

13  by the Insurance Company of North America.  This is an

14  insurance company who believes, we think, that they have

15  insurance policies -- extant insurance policies and have

16  questioned the treatment of their insurance policies under the

17  Plan.  They have also raised general disclosure objections.

18  We're a little bit puzzled about this particular claim, Your

19  Honor.  We have reviewed our records -- or I should say are in

20  the process of reviewing them.  We do know that this is -- we

21  did have policies for calendar years 1987 through 1992 with

22  this insurance company.  These policies were primarily for

23  workman's comp and auto liability claims-made policies.  They

24  involved upfront premiums and retrospective premiums.

25  According to our records, the last policy year expired in 1993

JA775

15

1   and we paid what we understood to be a final retrospective
2   premium in 2002 and obtained a release of a letter of credit.
3   So we do not understand that this insurance company is a
4   Creditor or that we have any continuing relationship with them,
5   but we do intend to get to the bottom of this when their
6   counsel can provide us with additional information.  And if,
7   and to the extent a policy remains live, we will deal with that
8   appropriately through either the schedule of assumed contracts
9   or reflecting the fact that we are not assuming the agreement.
10  We'll simply get to the bottom of it.
11      (Pause in proceedings)
12          MR. NYHAN:  The third objection, Your Honor, is from
13  the Paella Properties Group.  Their objection is fairly
14  straightforward.  Under the Plan, the North American -- the
15  U.S. Estates are to be substantively consolidated and they
16  have, Paella has requested further disclosure concerning facts
17  that are relevant to substantive consolidation.  We do intend
18  to amend the Disclosure Statement to add additional
19  information, but we have also provided to counsel to Paella all
20  the information that he has requested that is in our custody
21  and we will continue to cooperate with them pending the further
22  hearing on this.  Hopefully we can resolve this objection
23  completely.
24          THE COURT:  All right.
25          MR. NYHAN:  The final objection, Your Honor, is filed

16

1    by Cendant and Cherokee.  And that -- there are several
2    components of that.  The first is that the Disclosure Statement
3    fails to adequately address litigation that is pending between
4    the Estate and Cherokee.  That litigation involves a number of
5    issues, one of which is Cendant's claim or -- excuse me --
6    Cherokee's claim that they are owed roughly $3.6 million as an
7    administrative priority claim.  We agree that's an issue.  We
8    will amend our disclosure to fully disclose the fact of the
9    litigation and the issues that are involved.  They've also
10   objected that we have not discussed the litigation in so far as
11   it pertains to the dispute between the Estate and Cherokee over
12   who has responsibility for a number of personal injury claims
13   and a number of employee-related liability claims.  The
14   litigation that -- in that litigation, the Debtors maintain
15   that Cherokee assumed most of these obligations in connection
16   with their acquisition of the North American operations.
17   Cherokee in turn has denied that they've assumed them, or at
18   least assumed all of them and obviously that litigation will
19   proceed in its normal course.  The issue for disclosure, we
20   think, is to number 1, make clear to all the Creditors in the
21   Estate the fact and contours of the litigation and second to
22   make clear to those persons who may be Personal Injury
23   Claimants that there is a dispute, that what their treatment --
24   - their actual treatment at the end of the day will turn or may
25   turn on the resolution of that dispute and that to the extent

JA777

17

```
 1   that Cherokee disputes the assumption of a particular personal
 2   injury claim or employee liability claim, we will make it clear
 3   that those Creditors will be asked to vote in the Class of
 4   General Unsecured Creditors.  So, we believe that we can
 5   adequately resolve these objections -- that portion of the
 6   objections through improved disclosure.  The next point raised
 7   by Cherokee is the suggestion that the Plan as drafted imposes
 8   upon Cherokee a third-party release, that is, imposes upon
 9   Cherokee a release of claims in favor of third-parties.  That
10   was not our intent and we will clarify the Plan accordingly.
11   Similarly, Cherokee has -- contends that the Plan as presently
12   drafted affects a discharge of Cherokee's claims under the
13   Asset Purchase Agreement.  Again, that was not the intent and
14   I'm sure that we can come up with language which will satisfy
15   them that that is not the effect of the Plan.  Cherokee and
16   Cendant also claim that the plan can not be confirmed because
17   they -- their administrative priority claim, 3.6 million may be
18   greater than that.  They assert that the Plan contemplates that
19   that claim will be estimated and that it can not as a matter of
20   law be estimated.  And we would propose to modify the Plan and
21   Disclosure Statement to reflect the fact that their objection
22   to an estimation is preserved, that is confirmation the Plan
23   will not preclude them from arguing that if we ever decide that
24   it is appropriate to try to estimate a claim.  Hopefully we'll
25   never get there.  And finally, Cherokee --
```

JA778

18

1          THE COURT:  What does their proposed or alleged

2    administrative priority claim arise out of?

3          MR. NYHAN:  It arises out of certain obligations under

4    the Asset Purchase Agreement, which Cherokee believes the

5    Estates should have borne and Cherokee paid those obligations.

6    So they believe that in effect it -- without getting technical

7    on the contract itself, I would liken it to -- an adjustment to

8    the purchase price.  Incidentally, Your Honor, the Debtors have

9    asserted in that litigation that Cherokee owes the Estate a

10   number slightly in excess of $2,000,000, I believe.  So that

11   litigation is fairly right, but at least in terms of the

12   identification of the issues.

13         (Pause in proceedings)

14         MR. NYHAN:  The final point raised by Cherokee is a

15   request or demand that their -- the disputed claim reserve for

16   their administrative claim be segregated separately from other

17   disputed claim reserves.  While we don't think they're entitled

18   to that, we don't have any problem providing for that.  So we

19   will amend the Plan accordingly.  Again, Your Honor, I'm not --

20   it's not my expectation that we're going to argue these or that

21   Your Honor will resolve any of these.  We do, though, believe

22   that the vast majority of the objections that have been filed

23   will be resolved by the amendments that I've suggested both to

24   the Plan and the Disclosure Statement.  With that, Your Honor,

25   I would respond to whatever questions the Court might have and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

JA779

19

1    then subject to identifying a schedule, turn the podium over to

2    the Committee and the Administrator and to the extent Your

3    Honor would be interested in the terms of the settlement that

4    they've reached.

5            THE COURT: All right, thank you.

6        (Pause in proceedings)

7            MR. MARCUS: Good afternoon, Your Honor. Harold

8    Marcus from Brown Rudnick Berlack & Israels on behalf of the

9    Creditors Committee. We'd like to summarize, if I could,

10   somewhat general terms of the settlement that has been reached

11   between the U.K. Administrators and the U.S. Creditors

12   Committee of Budget. Basically the terms are as follows: The

13   Cendant sale proceeds will be allocated 100% to the U.S.

14   Estates. The Avis Europe sale proceeds will be allocated 100%

15   to the BRAC Estate. The first million dollars of what we refer

16   to as Jaeban cure proceeds, which return to the Estates will be

17   in fact allocated to the U.S. Estates with a balance of the

18   roughly $4.5 million cure account allocated to the BRAC Estate.

19   The Sixth Litigation proceeds that Mr. Nyhan referred to a few

20   minutes ago will be allocated as follows: The first million

21   dollars to the BRAC Estate, with the balance shared 50/50

22   between the U.S. and BRAC Estates. The U.K. Administrators,

23   however, will have sole authority to settle or resolve the

24   Sixth Litigation. In addition, certain accrued and unpaid

25   professional fees will be shared by the Estates. Roughly

JA780

1  $3,000,000 of U.S. administrative expense and priority claims

2  will be paid by the BRAC Estate. These relate, Your Honor, to

3  the period of time subsequent to the filing of the U.S.

4  bankruptcy case of BRAC and prior to the commencement of the

5  U.K. administration case for BRAC. And finally there is a

6  waiver of claims binding against these Estates -- mutual

7  releases that will be entered into. So, the Creditor's

8  Committee, Your Honor, is indeed pleased that the parties have

9  reached a settlement. We do anticipate filing as quickly as we

10  can this week, a Motion to Approve the settlement. I might

11  add, Mr. Nyhan remarked at the very beginning of the hearing

12  that the Committee is pushing on the Debtor to keep things

13  moving. Indeed the Committee is concerned about the cost of

14  keeping this liquidation case operating, so to speak. There is

15  a huge cost factor. We're very supportive of having as early a

16  disclosure -- substantive Disclosure Statement hearing and Plan

17  confirmation if possible. I hope the Court will keep that in

18  mind as we discuss the specific dates that Mr. Nyhan has

19  proposed. I certainly appreciate and understand the logic of

20  the proposed dates. There is still a few items to deal with

21  before we have that substantive hearing, but nonetheless we do

22  need to move this case on. Thank you.

23          THE COURT: Thank you. Anybody else?

24      (Pause in proceedings)

25      MR. CLARK: Good afternoon, Your Honor. Tony Clark of

21

1  Skadden Arps for Cendant and Cherokee acquisition.  Just

2  briefly, I'm not going to argue, our objection has been filed.

3  I do want to state for the record that the summary, and I

4  understand what Mr. Nyhan was giving was just a summary and not

5  a verbatim explanation of what our objection is, but the

6  summary doesn't include everything that's in our objection, but

7  I assume we'll talk about it more and deal with it further

8  before we come before Your Honor for a substantive hearing on

9  the Disclosure Statement.  So I'm just going to reserve our

10  rights.

11        THE COURT:  Thank you.

12        MR. CLARK:  Thank you, Your Honor.

13     (Pause in proceedings)

14        MS. HARRISON:  Good afternoon, Your Honor.  Margaret

15  Harrison, Office of the United States Trustee.  I had been

16  granted an extension of time to object to the Disclosure

17  Statement until the settlement had been reached and the

18  modifications had been made.  So I just wanted to preserve my

19  rights to object to the Disclosure Statement as modified.

20        THE COURT:  Thank you.

21        MR. NYHAN:  I concur with both of those, Your Honor.

22  Your Honor, I should note that in proposing the date that I

23  did, I recognize that we do have an Omnibus Hearing scheduled

24  for February 17th here and that if we depart from that -- if

25  it's possible to depart from that, it may be necessary to

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

JA782

22

1  proceed with a hearing in a different venue and if the parties

2  are all prepared to do that if that is something that works for

3  Your Honor.

4           THE COURT:  The answer is I don't know.  That's what

5  I've been typing up here while you all have been talking.  I've

6  been making some inquiries.  And frankly, what I would like to

7  understand is what difference the two weeks makes?  I had this

8  conversation with some folks in another case recently and I

9  know their answer was $15,000,000 or something like that and so

10 that had a -- made an impression on me because of the burn rate

11 of that particular debtor.  But, it is -- it is difficult to

12 schedule Delaware cases in Arizona competing with the Delaware

13 -- excuse me, with the Arizona docket, which in the last few

14 months has become more crowded than it has been in a while.

15 Perhaps, since the time that you were in Arizona on a regular

16 basis, Mr. Nyhan, when it was quite crowded.  So, I do want to

17 ask the question every time, to have counsel tell me why is it

18 -- why does the two weeks matter?  Because when I'm here I can

19 give you my full attention and not worry about the fact that

20 you may be bumping up against something else that I've already

21 scheduled or without having to make other kinds of

22 arrangements.

23           MR. NYHAN:  I appreciate that, Your Honor.  Let me

24 turn that over to the Committee, but say that two -- make two

25 comments.  First, certainly it is not our expectation that were

JA783

23

1  we to depart from our normal practice for purposes of this one
2  hearing, which we don't expect to be an evidentiary hearing or
3  a lengthy hearing for that matter, that we would not -- we
4  would depart only for purposes of that hearing in order to move
5  more quickly to confirmation, with every expectation that
6  confirmation would be here when Your Honor is available.
7  Second, I will say that the Committee has endeavored to move
8  this case forward.  Let me state it differently.  All parties
9  have moved -- endeavored to move the case forward.  There have
10  been many issues that people have had to grapple with in order
11  to move it across the goal line.  But the Committee has been
12  sensitive to the delay and has been consistent in their request
13  that things move forward and we will do whatever we can -- we -
14  - the Debtor, to accommodate their desire to get it there.
15        MR. MARCUS:  The specific answer, Your Honor, is that
16  the two weeks could mean, you know, as much as $600,000 or
17  $700,000 just based upon the burn rate of professional fees
18  running roughly 1-2, 1-3 a month.  Now granted some of that
19  consisted of litigation preparation and we now have a proposed
20  settlement with the U.K. Administrators.  However, there's
21  still the Cendant issues that are outstanding including
22  litigation -- potential litigation and certainly negotiations
23  and work on the Cendant matters.  It's not -- I can't tell you
24  it's $15,000,000.  On the other hand, for this Committee, with
25  -- in a case where of course there's no operating business,

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

24

1   just a pot of money that's dissipating, the two weeks strike,

2   the Committee as extremely significant.

3         THE COURT:  But on the other hand, the fact that there

4   are two more weeks doesn't mean that every professional has to

5   write down another 8.0 on their sheet everyday.  Presumably,

6   some of the professionals who are paid on a monthly basis, the

7   financial professionals -- are their financial professionals

8   who are still being paid on a monthly basis in this case?

9         MR. MARCUS:  There have been yes, Your Honor.  I --

10        THE COURT:  Are there still at this point is what I'm

11  saying?

12        MR. NYHAN:  Well not for the Debtor, Your Honor.

13        MR. MARCUS:  Jefferies of -- the financial advisor for

14  the Committee has been paid thusly, but won't be going forward.

15        THE COURT:  So, just to follow up on the analogy of

16  the other case, I mean, there was an actual 3/4 of a million

17  dollars a day operating burn rate that was creating, you know,

18  over 21 days, a $15,000,000 loss.  That was a significant

19  issue.  But, it doesn't sound like that's really happening in

20  this case.

21        MR. MARCUS:  No, this is a different situation, Your

22  Honor.  But, the fees have been -- have been significant in the

23  context -- moreover the context includes, you know, I'd say

24  months of negotiations and it's taken a long and hard road to

25  get to this point, Your Honor.  We certainly would like to do

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

JA785

1  everything we can to, you know, keep up the momentum and get

2  these matters resolved as quickly as we can, subject to your

3  calendar and schedule.  Thank you.

4        THE COURT:  Okay.  Right, so you do have a full

5  fledged schedule proposal, Mr. Nyhan?

6     (Pause in proceedings)

7        MR. NYHAN:  Well, Your Honor, I have one, it's a

8  question of which piece of paper I have it on.  Your Honor, we

9  were not contemplating going beyond the scheduling a hearing

10  for the approval of disclosure and approval of the settlement

11  motion that will be filed within the next couple of days.  So

12  our proposal would be to schedule a hearing during the week

13  around the 4th, 5th or 6th of February with a view towards --

14  we are told by the Committee and the Administrator that the

15  settlement motion can be filed or will be filed by Wednesday or

16  Thursday of this week.  Assuming a 20 day notice period on that

17  motion, a hearing in -- during that first week of February --

18  perhaps the second week of February would be adequate.  We will

19  be in a position to file an Amended Plan and Disclosure

20  Statement addressing the changes that I alluded to earlier by

21  the 25th of January, so parties will have ample opportunity to

22  look at that before the resumed hearing.  With respect to

23  confirmation, we would hold off on any request until we

24  conclude the hearing on the approval of the Disclosure

25  Statement.

1    THE COURT:  Well, I know that the 5th and 6th are not

2  possible.  The 4th may be possible.  I just don't know what my

3  calendar is in Arizona, that's why I've sent an e-mail to see

4  if I can find out.  The 5th I'm traveling and the 6th I'm out

5  of the state.  Then but I'm back the next week, the week of the

6  9th and then the week of the 16th is when I'm here.  I can't

7  commit to give you the 4th until I get a response --

8    MR. NYHAN:  Understood, Your Honor.

9    THE COURT:  -- and if -- I understand that the issue

10  is you'd like to do this as quickly as possible.  That is a

11  fairly aggressive schedule in the sense that -- I take it it

12  assumes that you are going to resolve all of the outstanding

13  objections, the most significant one appears to be the Cendant

14  objection.  But resolve it from the standpoint of disclosure,

15  not from the standpoint of actually resolving the underlying

16  merits.

17    MR. NYHAN:  That is correct, Your Honor.

18    THE COURT:  And then deal with whatever issues may be

19  raised by the United States Trustee once the Amended Disclosure

20  Statement is in place.  So, I wish I could give you a more

21  definitive answer than that.  If we kick over into the next

22  week, the first available time is during the week of the 9th.

23  Should we try to find it during the week of the 9th and come to

24  Arizona or should we just wait until the 16th?  My goal is to

25  be as accommodating as possible, but I must tell you then that

1   I've had a couple of weeks recently where the bulk of my time

2   in Arizona has been spent on Delaware cases and has created a

3   real serious problem in terms of actually doing my real job,

4   which is the 3,000 cases I have in Arizona.

5       (Laughter)

6       THE COURT:  And so I'm sensitive to that and any --

7   and frankly, what that means is that if something goes haywire

8   where I have something that an emergency comes up or if there

9   is a hearing that goes too long, I'll give precedence to that

10  over the Delaware cases and then meanwhile we've had a bunch of

11  counsel who've traveled who are there and if we can't fit it in

12  that day or if we have to wait until the next day, it ends up

13  not necessarily being that good.  This is not an ideal

14  situation, obviously and would be better, as much fun as I have

15  here, for Congress to create some more judgeships so that we

16  don't have to do this.  But it's the reality that we're all

17  dealing with.

18      MR. NYHAN:  Your Honor, if I may have an opportunity

19  to confer with the Committee.

20      THE COURT:  All right.

21      (Pause in proceedings)

22      MR. MARCUS:  Your Honor, we would like to shoot for

23  the 4th, if your schedule permits once you hear back from your

24  Court.  The second choice would be to have the hearing on the

25  9th if your schedule permits.  And we do believe each week is

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

JA788