28

1   significant here.

2        THE COURT:  The 9th or the week of the 9th?

3        MR. MARCUS:  The week of the 9th.  As early as

4   possible in that week, Your Honor.

5        THE COURT:  Right.  Well, we will just have to get

6   back to you on that.

7        MR. MARCUS:  Okay.  Thank you.

8        THE COURT:  But I assume that will not change

9   anybody's efforts to get the amendments and the Motion to

10  Approve done.  The only problem is the question of noticing and

11  what the notice says when it goes out.

12       MR. NYHAN:  That is correct, Your Honor.

13       THE COURT:  Okay.

14       MR. NYHAN:  Your Honor, that is all we had on those

15  matters.  If I may then turn it over -- I believe there are a

16  couple other matters on the agenda.  Thank you.

17     (Pause in proceedings)

18       THE COURT:  Now, let me just -- before we leave that,

19  let me make sure I understand what we're actually looking for

20  here.  What is your expectation in terms of the needed time for

21  a hearing?

22       MR. NYHAN:  Your Honor, I would hope it would be very

23  brief, but candidly I think that we should assume that it is --

24  we should have two hours -- a minimum of two hours booked for

25  it, because if there is going to be argument, if there are

JA789

29

1  going to be objections, I don't think it's prudent to plan on

2  less.

3          THE COURT:  Now, is that both for the settlement and

4  the disclosure hearing?

5          MR. NYHAN:  Yes, Your Honor.  I don't expect, and I

6  look to my colleagues, but I don't expect that the settlement

7  will take long at all.  We really anticipate no objections to

8  that.

9          THE COURT:  So the real issue is going to be the --

10         MR. NYHAN:  The Disclosure Statement.

11         THE COURT:  -- the Disclosure Statement.

12         MR. NYHAN:  That's correct.

13         THE COURT:  All right.

14     (Pause in proceedings)

15         THE COURT:  Okay.

16         MR. WILE:  Good afternoon, Your Honor.  Kenneth Wile

17  on behalf of Brac and the other Debtors to address the Jaeban

18  Adversary Proceeding which we discussed on the phone, back

19  before Christmas.  And sadly, I'm here to tell you we have

20  stepped backwards rather than forwards.  Not only do we still

21  not have any dates for depositions in the U.K. and that's where

22  I believe all the depositions will take place.  And not only do

23  we not have the documents that were promised for last week, but

24  we have just received a motion which the Court may have seen in

25  which counsel for Jaeban here in Delaware, Morris Nichols firm

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  has asked to withdraw because Defendant has failed

2  substantially to fulfill its obligations.  So that leaves us

3  frustrated and fighting off delay as best we can.  We did have

4  a couple of conversations with U.K. counsel.  At first it

5  appeared we were on the same page, that was on the day of our

6  last conference and then last Wednesday in a conference that my

7  English colleague more or less compelled from the other side

8  without discussing -- without disclosing our discussion of the

9  merits, we were furnished with a request for another 30 day

10  standstill, which we obviously declined.  We were told that the

11  principals would meet over in the U.K. today.  They haven't.  I

12  learned just coming into the Courtroom that allegedly there was

13  going to be a meeting on Thursday.  I would hope there would be

14  a meeting on Thursday, but I hope the Court will forgive the

15  little bit of skepticism on our part until that occurs.  That

16  being the case, we have no choice but to move forward as

17  quickly as we possibly can.  We do have a Motion for a Partial

18  Summary Judgment for a turnover order essentially ready to go

19  save only for an affidavit of U.K. law.  The parties have been

20  discussing a settlement -- I'm sorry, a hearing date -- we'd

21  like to make that hearing date also the hearing date for our

22  motion.  It's a very simple, straightforward motion and the

23  motion would be critical because if the Court decides the

24  motion has merit my colleagues in the U.K. and their clients

25  can go in and finally protect Brac's interest over in the U.K.

1  because as we speak, the receivers of Jaeban are fairly close

2  to having sold off most of their assets. So that we plan on

3  filing no later than Friday. And then, we're still left with

4  the outstanding discovery and we would like, at best, an

5  ammunition or worse rather ammunition from the Court that we

6  have deposition dates and that we have the documents disclosed

7  by Friday. Now, ordinarily that would be extraordinary since

8  Delaware counsel has moved to withdraw. But, I think as their

9  motion reflects, all the work has been done by the U.K. We've

10  had some difficulty getting perhaps the solicitors and perhaps

11  their clients to focus in the U.K. and I think rigorous

12  deadlines might help us resolve the case, or at the very least,

13  protect the necessary interest of the Debtor and the Estate.

14      THE COURT:  Well, a proposed date let's say of

15  February 4th, is that what you're saying?

16      MR. WILE:  That would be fine by us, Your Honor.

17      THE COURT:  For a -- for a hearing on a Motion for

18  Summary Judgment that has not yet been filed, certainly would

19  not comport in my District with local rules regarding

20  necessary time periods for motions for summary judgement.

21      MR. WILE:  I'll look to my colleagues, but I think in

22  Delaware all things are possible.

23      (Laughter)

24      THE COURT:  Frankly it does strike me that if we're

25  responding to a Motion for Summary Judgment that's being filed

32

1    against an entity where local counsel is now seeking to

2    withdraw, I understand why that would be desirable from your

3    standpoint, but it seems to me perhaps a bit overreaching.

4         MR. WILE:  Well the problem we face, Your Honor, we

5    face the same, I think, even graver exigency then the other

6    aspects of the case present because assets are being sold off

7    and if we can be delayed long enough then the receivers of the

8    Defendant will have one less set of problems with which to

9    deal.  Obviously, we'd be grateful for whatever the earliest

10   date the Court considers to be appropriate.  We're well aware

11   that there needs to be a change of counsel and there will be,

12   you know, some limited amount of U.S. law issues under the Code

13   to be addressed.  Perhaps the best thing is simply for us to

14   get the motion on file and then find out what opposing counsel

15   thinks he, she or they need.  But, we really are facing some

16   distress here in protecting our rights over in the U.K.  And it

17   may well have been that our December conference call -- we were

18   -- we may have misinterpreted what we were told.  But in any

19   event we have it ready to go.  I have in fact -- my portion is

20   already drafted and we want to get it on file and perhaps it

21   would only be fair for me to have a conference -- conversation

22   with substitute counsel and then we can perhaps bring that to

23   the Court's attention --

24        THE COURT:  Do we know where the Defendant is with

25   regard to substitute counsel?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

JA793

1    MR. WILE:  No, Your Honor.

2    THE COURT:  I think I'm going to find out right now.

3    (Laughter)

4    MR. WILE:  Absolutely.

5    MR. BRIGGS:  Tom Briggs of -- Tom Briggs of Morris,

6    Nichols, Arsht & Tunnell, Your Honor.  Unfortunately I don't

7    have much more to add in terms of where we are with substitute

8    counsel.  Our efforts to contact Jaeban and Jaeban receivers

9    have been largely unsuccessful over the last couple of weeks,

10   especially since we filed our motion last Wednesday.  So, I'm

11   not sure where they stand in terms of getting substitute

12   counsel.

13   THE COURT:  Well perhaps one way to deal with this is

14   not to grant your motion.  And that's a serious comment.

15   MR. BRIGGS:  I would suggest, Your Honor, we undertook

16   the representation of Jaeban last August.  Since then, our firm

17   has not been paid one single dollar.  We have sent them

18   numerous e-mails and telephone calls trying to get this issue

19   resolved.  And in fact we have not formally been retained by

20   the Jaeban receivers, which I believe is a different animal

21   than Jaeban itself.  So, I'm not sure that we even represent

22   the receivers at this point.  And we would like to withdraw

23   from representing Jaeban because it is becoming a burden,

24   especially if Budget intends to file a Motion for Summary

25   Judgment or Partial Summary Judgment or if discovery gets moved

34

1   forward, obviously this is going to increase the cost

2   significantly, which would increase burdens of Morris Nichols.

3        THE COURT:  Okay.  Now, refresh my recollection, I

4   don't believe there is a pending judicial procedure here.  Is

5   that correct or am I wrong about that?

6        MR. WILE:  I'm sorry, pending --

7        THE COURT:  In England, in U.K.?

8        MR. WILE:  Receivers have been appointed as such, but

9   no there's no actual law suit or adversary filed.

10       THE COURT:  These are the classic U.K. --

11       MR. WILE:  Administrative receivers under the

12   Insolvency Act, Your Honor.

13       THE COURT:  So there is no Court to Court

14   communication that could take place that might put a little

15   fear of God in the folks on the other side through a U.K. Judge

16   because it sounds like there's no UK Judge who's assigned over

17   this receivership?

18       MR. WILE:  Sadly no, Your Honor.

19       THE COURT:  Okay.  Anybody else wish to weigh in in

20   connection with this matter?  Tell me what your Motion for

21   Summary Judgment will look like.

22       MR. WILE:  Glad to, Your Honor.  During extensive

23   discussions -- I'm sorry, Your Honor, let me back up half a

24   step to what the claim is.  Our claim is for 3,000,000 pounds,

25   which is based entirely on what the books at Brac showed where

JA795

35

1    due and owing from Jaeban, which is a franchisee that covered

2    the north of England and certain parts of Scotland and there

3    are books.  In the course of the discussions, many of which

4    were settlement discussions, but in the course of those

5    discussions, counsel for Jaeban, who are still the U.K.

6    solicitors in the case, sent us a calculation.  It's not marked

7    without prejudice or anything else, and it listed at the end of

8    the day taking some fairly wild discounts, that even after

9    taking those discounts, 328,000 pounds were due and owing to

10   Brac.  At this point we'd like to come in and move for partial

11   summary judgement and a turnover order.  And that's in an

12   amount which would in turn transform Brac into a proper

13   Creditor of Jaeban and they can deal with the receivers

14   accordingly.  Their interest would then have to be considered

15   along with everyone else's.

16        THE COURT:  Is there any procedure you are aware of in

17   the U.K. for any kind of an effective prejudgment remedy being

18   asserted in the U.K. that can be used to freeze assets or

19   prevent the dissipation of assets?

20        MR. WILE:  I hesitate to commit malpractice beyond

21   mentioning the Insolvency Act, but I have colleagues who know

22   the answer to that.  I believe the answer is no because we've

23   been asking ourselves over and over as the delay has become

24   more manifest, is there anything we can do in the U.K.?  So far

25   this has been the best, but I will certainly ask my colleagues

36

```
 1  again.
 2          THE COURT:  Okay, anybody else?
 3          ALL:  (No verbal response).
 4          THE COURT:  When do you think you can get this filed
 5  by?
 6          MR. WILE:  Friday, Your Honor.
 7          THE COURT:  Friday is -- let me look here, 16th?
 8          THE CLERK:  The 16th.  The 16th, Your Honor.
 9          THE COURT:  The 16th.
10      (Pause in proceedings)
11          THE COURT:  Okay.  I'll assume that you're going to
12  file this by Friday the 16th.  I'll set the response date for
13  two weeks later, January 30.  In the event we set the hearing
14  for the 4th, I will make a reply due noon on the 3rd.  I'll
15  require that the 30th -- well, I'll put it this way.  I'll
16  grant the Motion to Withdraw of the current counsel.  The
17  notice will be -- that will be sent out will indicate that
18  substitute Delaware counsel has to be obtained in time to file
19  the response by the 30th.  Failure to file a response by the
20  30th will be taken as consent to the entry of a motion -- of
21  the order granting the partial summary judgement.  And that a
22  response filed only by U.K. counsel will not be considered.  In
23  the event the hearing is set for the week of the 9th, we'll
24  make the reply date instead the 5th of February and will have
25  the hearing at the same time that we're currently scheduled.
```

*Writer's Cramp, Ina.*
Certified Court Transcribers
732-329-0191

JA797

37

1   And I should say there's always the possibility that the

2   hearing will be here in Delaware during the week of the 16th

3   because I don't have current access to my Court calendar, for

4   either the 4th or the week of the 9th and I just don't know

5   whether or not there's time set aside for that -- time I can

6   set aside for it.  But that's sort of the working arrangement

7   and staff here in Delaware will be in contact with you with

8   regard to what the exact date is.

9         MR. WILE:  Your Honor --

10        THE COURT:  It does seem to be that that's number one,

11  an aggressive schedule, but number two, I'm taking -- counsels

12  vows here to me at face value that there is an emergency

13  created here by the fact that apparently there is no incentive

14  on the side of Jaeban to move this along.  And that there's no

15  adequate basis for creating an incentive under applicable U.K.

16  law.  Other than getting a judgment, which you can presumably

17  domesticate in the U.K. and if -- and then seek to enforce as a

18  judgment-Creditor rather than as a Prejudgment Creditor.  So

19  based upon all of that, I've set that schedule.

20        MR. WILE:  Your Honor, if I may return to discovery

21  for just one second.  Should we proceed by a Motion to Compel

22  at this point with respect to documents and deposition dates?

23        THE COURT:  It seems to me yes that one of two things

24  will happen:  Either the documents and the depositions will

25  take place or you will be able to ask for a sanction that would

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

JA798

38

1  render that not necessary.  But you can only do that, I think,

2  get that kind of a sanction in the context of a -- of a Motion

3  to Compel as opposed to -- or in the context of disobeying an

4  Order to compel, frankly.  So, you should proceed on that same

5  basis.  Now I take it that what you're talking about is not

6  necessary to the Motion for Partial Summary Judgment --

7          MR. WILE:  Correct, Your Honor.

8          THE COURT:  -- because what you're relying upon,

9  basically, is their admission that they owe at least that

10  amount of money --

11          MR. WILE:  Exactly.

12          THE COURT:  -- and you're motion is going to be,

13  "Grant us judgment at least for that amount of money without

14  prejudice, the fact that we think we can prove you owe us

15  more."

16          MR. WILE:  And it will less than ten pages, Your

17  Honor.

18          THE COURT:  Okay.  So I think -- they're still

19  entitled to their due process that comes from the motion

20  practicing and discovery disputes and I think that would be the

21  best way to proceed.  Okay?

22          MR. WILE:  Thank you, Your Honor.

23          THE COURT:  Anything else on that?

24          MR. BRIGGS:  Your Honor, I do have here a Proposed

25  Form of Order.

39

1    THE COURT:  I'm not surprised.

2    (Laughter)

3    (Pause in proceedings)

4    MR. BRIGGS:  Thank you, Your Honor.

5    (Pause in proceedings)

6    THE COURT:  I just want to ask for the record, I want

7    to make sure that there is nobody else in the Courtroom

8    representing -- or on the telephone representing the interests

9    of Jaeban, other than the Morris Nichols firm, whom I've just

10   signed the order?  In other words, there's no proposed new

11   counsel who is here who has been asked by the client to be at

12   this hearing?

13   ALL:  (No verbal response).

14   THE COURT:  I'll note the non-appearance of any

15   additional counsel.

16   MR. MORTON:  I believe those were all the matters that

17   were scheduled by the Debtor's today.

18   THE COURT:  All right.  Thank you.  We'll be in touch

19   with regard to scheduling the other matter.

20   ALL:  Thank you, Your Honor.

21   (Court adjourned)

22

23

24

25

**JA800**



40

1    CERTIFICATION
     I certify that the foregoing is a correct transcript from the
2    electronic sound recording of the proceedings in the above-
     entitled matter.
3
4    _____        _____
     Signature of Transcriber            Date
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

JA801

**Exhibit E**

JA802

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | **BANK ONE PLAZA** | LOS ANGELES |
| BRUSSELS | **10 S DEARBORN STREET** | NEW YORK |
| CHICAGO | **CHICAGO, ILLINOIS 60603** | SAN FRANCISCO |
| DALLAS | **TELEPHONE 312 853 7000** | SHANGHAI |
| GENEVA | **FACSIMILE 312 853 7036** | SINGAPORE |
| | www.sidley.com | |
| HONG KONG | **FOUNDED 1866** | TOKYO |
| LONDON | | WASHINGTON, D C |

WRITER'S DIRECT NUMBER
(312) 853-2081

WRITER'S E-MAIL ADDRESS
kwile@sidley.com

December 12, 2003

**VIA FAX (302-658-3989)**

Thomas W. Briggs, Esq.
Morris, Nichols, Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
Wilmington, DE 19899-1347

> Re:   **BRAC Group, Inc., et al., v. Jaeban (U.K.), Ltd.,**
>       **Adv. No. 03-A-54271 (Bankr. D. Del.)**

Dear Tom:

Since Morris Nichols remains (and, we hope, will continue as) Jaeban's Delaware counsel of record, I am writing to raise two separate discovery topics.

1.    **UK Depositions:**    We are likely to depose most or all of the following witnesses associated with Jaeban in addition to the two Receivers:

I. M. Jaeban
Paul Champken
Steve Downing
Anthony Guest
Simon Poyner
Andrew Rees
Trevor Sutherland

Please check on their availability during the weeks of January 12th and 19th. We would like these depositions to occur at our offices in London; there are likely to be London depositions as well.

2.    *Jaeban Documents Produced To Date.*    While Wragges has already produced a moderate number of (mostly responsive) documents to date, we are concerned that the production is not complete. In particular, Wragges sent only a minimal number of e-mails

SIDLEY AUSTIN BROWN & WOOD LLP IS AN ILLINOIS LIMITED LIABILITY PARTNERSHIP PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

SIDLEY AUSTIN BROWN & WOOD LLP                                    CHICAGO

Thomas W. Briggs, Esq.
December 12, 2003
Page 2

and internal memoranda related to the specifications in our document requests. Because Jaeban did not object to any of the requests in a timely manner, it has no grounds under the Federal Rules for withholding documents that we have sought. Please note that, consistent with the Federal Rules, we have sought documents within Jaeban's possession, custody, or control; these include documents in the possession of Wragges and PwC, who are agents of Jaeban (and, now, of the Receivers).

Turning to the specific requests, please note the following apparent deficiencies. This is not an exhaustive list, and it remains Jaeban's responsibility to comply in full.

No. 1:    The document production includes a set of the 2002 financial statements, but this request is broader in requiring documents and drafts of documents that reflect on the overall value of Jaeban, including current and prior financial statements dating back to January 1, 2000.

No. 2:    The Wragges production does not include any responsive documents (e.g., minutes and Board resolutions).

No. 3:    This request sought, *inter alia*, documents discussing Mr. Jaeban's views of the demands and counterdemands that have now been brought in the adversary proceeding. Experience suggests that there will usually be e-mails and internal memoranda that discuss these claims. Some documents might arguably be privileged; if so, we are entitled to a privilege list.

No. 4:    We expected to see more documents referring to the *Orders of Administration*. At the risk of understatement, the altered status of BRACII and BTI were not insignificant matters to Jaeban.

No. 5:    Wragges has produced some responsive documents, but we would have expected to have seen much more.

Nos. 7-8:    We do not seem to have any of the background documents (emails, memoranda, and the like) that Jaeban used in deciding to enter into the IPLA, the Umbrella Agreement, or other agreements.

Nos. 12-20:    These requests seek documents that relate to Jaeban's contentions. Needless to say, any documents that have not been produced are unlikely to be admitted at trial. We want to be certain, however, that Jaeban has produced all documents that relate to these claims, whether or not these are documents on which Jaeban intends to rely at trial.

Many thanks for your help. Please call with any questions.

SIDLEY AUSTIN BROWN & WOOD LLP                              CHICAGO

Thomas W. Briggs, Esq.
December 12, 2003
Page 3


                                          Sincerely yours,

                                          Kenneth E. Wile


cc:    Martin Siegel

       Patrick Corr
       Phillip Taylor

**Exhibit F**

JA806

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

THOMAS W. BRIGGS, JR.
302 498 6631
302 498 6225 FAX
tbriggs@mnat.com

December 30, 2003

**VIA TELECOPY**
**AND FIRST CLASS MAIL**

Kenneth E. Wile, Esquire
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603

Re:     BRAC Group, Inc., *et al.* v. Jaeban (U.K.), Limited
Adv. Pro. No. 03-A-54271

Dear Ken:

Enclosed are Jaeban's responses to the Joint Second Request for Production of Documents and its Statement Pursuant to Rule 9.4. Jaeban will produce documents as identified in its responses next week.

Additionally, Jaeban is currently reviewing your letter of December 12, 2003 to determine whether any supplemental production is warranted. We hope to be in a position to respond to that letter by the middle of next week, as well as provide dates for depositions.

Sincerely,

Thomas W. Briggs, Jr.

Enclosure

cc:     Steven Allen (By Email w/ enc.)
Edmon Morton, Esquire (By Hand w/enc.)
William P. Bowden, Esquire (By Hand w/enc.)

JA807

**Exhibit G**

JA808

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | BANK ONE PLAZA | LOS ANGELES |
| BRUSSELS | 10 S DEARBORN STREET | NEW YORK |
| CHICAGO | CHICAGO, ILLINOIS 60603 | SAN FRANCISCO |
| DALLAS | TELEPHONE 312 853 7000 | SHANGHAI |
| GENEVA | FACSIMILE 312 853 7036 | SINGAPORE |
| HONG KONG | www.sidley.com | TOKYO |
| LONDON | FOUNDED 1866 | WASHINGTON, D C |

WRITER'S DIRECT NUMBER
(312) 853-2081

WRITER'S E-MAIL ADDRESS
kwile@sidley com

January 14, 2004

**By Facsimile (011-44-870-904-1099) and Overseas Mail**

Ian Weatherall, Esq.
Wragge & Co.
55 Colmore Row
Birmingham B3 2AS
United Kingdom

Re:     **BRAC Group, Inc., et al., v. Jaeban (U.K.), Ltd. ("Jaeban"),
Adv. No. 03-A-54271 (Bankr. D. Del.)**

Dear Mr. Weatherall:

I thought it appropriate to write to you regarding the hearing in the *Jaeban* adversary proceeding that took place in Wilmington on Monday before Judge Case. I note that your firm was invited to participate by telephone, but did not do so.

I'm confident that Tom Briggs of Morris Nichols has informed you that Judge Case granted that firm's motion to withdraw as Jaeban's counsel after Mr. Brigg's represented that Defendant "had not paid a dollar" of his firm's fees.[1] My concern, of course, is with the future direction of the proceeding and Jaeban's continuing failure to abide by its obligations as a (voluntary) litigant.

**<u>Representation Regarding a Meeting Among Receivers</u>**

Mr. Briggs represented to me that the Jaeban Receiver(s) were going to meet with the BRACII Receivers tomorrow, January 15th. I reported this representation to the Court, as well as the Receiver's failure to meet with Gurpal Johal on Monday, January 12th, as promised.

As of this morning, the Jaeban Receivers had not contacted the BRACII Receivers regarding a meeting on Thursday or otherwise. I have no reason to believe that Mr.

---

[1] I encourage you to verify my rendition of the hearing with Mr. Briggs and urge you to retain Delaware counsel as soon as possible.

SIDLEY AUSTIN BROWN & WOOD LLP IS AN ILLINOIS LIMITED LIABILITY PARTNERSHIP PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

SIDLEY AUSTIN BROWN & WOOD LLP                CHICAGO

Ian Weatherall, Esq.
January 14, 2004
Page 2

Briggs invented the idea of a Thursday meeting. If we have been misled, it is a serious matter
that I will report to the Court.

### Outstanding Discovery

**1.    Deposition Dates.**    We have been waiting since October 2003 for
deposition dates for the Jaeban Administrative Receivers and the witnesses identified in Jaeban's
Rule 26(a) disclosure statement. In his December 30, 2003 letter to me, Tom Briggs promised to
disclose dates to us last week. At the hearing, I raised with Judge Case Jaeban's continuing
failure to provide dates. We discussed a motion to compel Jaeban (and the Court raised the
possibility of sanctions for noncompliance), but it equally serves the purpose to remind you that
Jaeban agreed with us to a January 30, 2004 fact discovery deadline. If we are not provided
deposition dates in sufficient time to complete the depositions, we believe that sanctions for
Jaeban's willful noncompliance will be appropriate. I will leave it to your new Delaware counsel
to advise you on the availability and likely form of sanctions.

**2.    Documents.**    Mr. Briggs' December 30th letter promised that Jaeban
would produce documents responsive to our second set of document requests last week.
Consistent with Jaeban's conduct, these documents were not produced. If they are not produced
forthwith, we will proceed with appropriate motion practice to obtain sanctions.

In my prior correspondence, I noted that Jaeban's production of documents in
response to our first set of requests seemed to be incomplete. Jaeban did not file a set of
objections, and Debtors are therefore entitled to every document sought. Mr. Briggs' December
30th letter also promised that Jaeban would respond to this concern last week. The depositions in
this proceeding will fully explore Jaeban's compliance; any failure to comply may be a matter
for the Court.

### Motion Practice

I explained to Judge Case that we plan to file, no later than Friday, a motion for
partial summary relief seeking a judgment in the amount of £327,944.09, the amount that Jaeban
has previously admitted is due and owing to BRACII. Judge Case inquired whether this was
"the only way to put the fear of God" into Jaeban so as to protect BRACII's interests in the
Jaeban assets. (I answered yes.) At my request, Judge Case agreed to set a prompt briefing
schedule. Jaeban's response is due on **January 30, 2004.** Our reply is due on February 3, 2004.
The hearing is scheduled for **February 4, 2004** at 10:00 am (Mountain Standard Time) in Judge
Case's regular courtroom in Phoenix, Arizona.

Please note that Judge Case stated he would *not* accept an opposition signed only
by English counsel. Under the circumstances, we will not agree to any extension of time due to
Jaeban' search for new Delaware counsel. If the Court grants the relief sought, BRACII will

**JA810**

SIDLEY AUSTIN BROWN & WOOD LLP                    CHICAGO

Ian Weatherall, Esq.
January 14, 2004
Page 3

(through my English colleagues) promptly assert its rights and remedies in the Jaeban
Administrative Receivership and any subsequent proceedings.

* * *

Given the weakness of Jaeban's claims and the poor impression created by its
failure to make discovery and pay Delaware counsel, please carefully consider whether it is
appropriate to continue this proceeding.

Sincerely yours,

Kenneth E. Wile

cc:    Patrick Corr
       Gurpal Johal

**Exhibit H**

JA812

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Case No. 02-12152 (MFW) |
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) ) | (Jointly Administered) |
| Plaintiffs, | ) ) | |
| v. | ) ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, | ) ) | |
| Defendant. | ) ) ) | |

**STATEMENT PURSUANT TO RULE 9.4**

Pursuant to Rule 9.4 of the Rules of Civil Practice and Procedure of the United

States District Court for the District of Delaware, defendant, Jaeban (U.K.) Limited hereby states

that the amount of damages claimed under Count I of Defendant's Counterclaims shall not

exceed $4.5 million.

MORRIS, NICHOLS, ARSHT & TUNNELL

R. Judson Scaggs, Jr. (#2676)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Attorneys for Jaeban (U.K.) Limited

December 30, 2003
386018

**Exhibit I**

JA814

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BRAC GROUP, INC. f/k/a BUDGET GROUP, INC., et al.,[1] | Case No. 02-12152 (MFW) |
| Debtors. | (Jointly Administered)<br>RE: 2413 |

ORDER, UNDER 11 U.S.C. §§ 105(a) 363, 365, AND FED. R. BANKR. P. 2002 AND 6004,
(A) APPROVING ASSET PURCHASE AGREEMENT; (B) AUTHORIZING SALE OF
ASSETS OF BRAC RENT-A-CAR CORPORATION AND BRAC RENT-A-CAR
INTERNATIONAL, INC. TO AVIS EUROPE PLC AND (C) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO AVIS
EUROPE PLC

Upon the motion dated January 10, 2003 (the "Motion")[2] of BRAC Rent-A-Car

Corporation ("BRACC") and BRAC Rent-A-Car International, Inc. ("BRACII" and, together

with BRACC, the "Debtors"), debtors and debtors-in-possession in the above captioned cases

for, *inter alia*, entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United

States Code, 11 U.S.C. §§ 101 – 1330 (as amended, the "Bankruptcy Code") and Fed. R. Bankr.

P. 2002, 6004 and 6006 (A) approving the asset purchase agreement (including all exhibits,

schedules and agreements attached thereto) by and among, *inter alia*, the Debtors and Avis

---

[1] The Debtors are the following entities: BRAC Group, Inc., Auto Rental Systems, Inc., BGI Airport Parking, Inc.,
BGI Shared Services, LLC, BRAC Credit Corporation, BRAC Car Sales, Inc., BRAC Fleet Finance Corporation,
BRAC Rent A Car Asia-Pacific, Inc., BRAC Rent A Car Caribe Corporation, BRAC Rent A Car Corporation,
BRAC Rent-A-Car International, Inc., BRAC Rent A Car of Japan, Inc., BRAC Rent-A-Car of St. Louis, Inc.,
BRAC Rent-A-Car of the Midwest, Inc., BRAC Rent-A-Car Systems, Inc., BRAC Sales Corporation, BRAC
Storage Corporation, BRAT Move Management, Inc., BRAT Relocation Services, Inc., BRAT TRS, Inc., BVM,
Inc., Carson Chrysler Plymouth Dodge Jeep Eagle, Inc., Control Risk Corporation, Dayton Auto Lease Company,
Inc., Directors Row Management Company, LLC, IN Motors VI, LLC, Mastering The Move Realty, Inc., Mosient
Car Sales, Inc., NYRAC Inc., Paul West Ford, Inc., Philips Jacobs Insurance Agency, Inc., Premier Car Rental LLC,
Reservation Services, Inc., TCS Properties, LLC, Team Car Sales of Charlotte, Inc., Team Car Sales of Dayton, Inc.,
Team Car Sales of Philadelphia, Inc., Team Car Sales of Richmond, Inc., Team Car Sales of San Diego, Inc., Team
Car Sales of Southern California, Inc., Team Fleet Services Corporation, Team Holdings Corp., Team Realty
Services, Inc., The Move Shop, Inc., Transportation and Storage Associates, ValCar Rental Car Sales, Inc., Vehicle
Rental Access Company, LLC, and Warren Wooten Ford, Inc.
[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion or
Agreement, as applicable.

NY2:#4491060v2
WP3:861004.3

59519.1001

Europe plc (the "Purchaser"), dated as of January 21, 2003, as supplemented and modified by that certain Supplemental and Variation Agreement dated as of February 18, 2003 by and among, inter alia, the Debtors and the Purchaser (as so supplemented and modified, the "Agreement"); (B) authorizing the sale by the Debtors of the Acquired Assets to the Purchaser; and (C) authorizing the assumption and assignment of certain executory contracts by the Debtors to the Purchaser; this Court having determined that the relief requested in the Motion is in the best interests of the Debtors and their respective estates; and it further appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[3]

A.   The Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter constitutes a core proceeding within the meaning of 28 U.S.C. 157(b)(2)(A) and (N).  Venue of the Debtors' Chapter 11 cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409(a).

B.   The Debtors have soundly exercised their business judgment in determining to enter into the Agreement and to sell the Acquired Assets to Purchaser pursuant to sections 105(a), 363(b) and (f), and 365 of the Bankruptcy Code free and clear of all mortgages, pledges, security interests, liabilities, claims (as that term is defined in the Bankruptcy Code, "Claims"), liens, charges or other encumbrances or restrictions of any kind, other than the Assumed Liabilities (collectively, "Encumbrances"), outside of a plan of reorganization.  The relief

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr  P. 7052.

WP3:861004.3                                                      2                                                      59519.1001

requested in the Motion is in the best interests of the Debtors' respective businesses and in the best interests of their respective estates.

C.    The Debtors have full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby and have delivered or shall deliver at Closing proper evidence that the Agreement has been approved and authorized by the UK and French Administrators; no consents or approvals other than those expressly provided for in the Agreement are required for the Debtors to consummate the foregoing transactions.

D    The Debtors, through their investment banker, Lazard Frères & Co. LLC ("Lazard") diligently and in good faith marketed the Acquired Assets to secure the highest and best offer or offers therefor by, among other things, delivering offering materials to potential purchasers and inviting the potential purchasers to meet with management, Lazard, and other professionals of the Debtors, and providing them each with the opportunity to conduct extensive due diligence. In addition, the Debtors timely delivered the Sale Procedures Order and the Motion to each of the entities that had previously expressed an interest in the Acquired Assets. The terms and conditions set forth in the Agreement, and the transactions contemplated thereby, represent a fair and reasonable purchase price and constitute the highest and best offer obtainable for the Acquired Assets.

E.    Proper, timely, adequate and sufficient notice of the Motion, Qualified Bid procedures and the hearing hereon and thereon has been provided in accordance with sections 102(a), 363, and 365 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, and 6006 and in accordance with the Sale Procedures Order and no other or further notice of the Motion, the hearing thereon or the entry of this Order is required.

WP3:861004.3                                 3                              59519.1001

F.     The Qualified Bid procedures described in the Sale Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Acquired Assets and no higher or otherwise better offer has been made.

G.     A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein, and the rights of third parties to submit higher or otherwise better offers for the Acquired Assets, has been afforded to all interested persons and entities including, without limitation, the following: (i) Purchaser; (ii) all entities known by the Debtors to claim an Encumbrance on the Acquired Assets, (iii) the Office of the United States Trustee; (iv) the Committee; (v) all entities known by the Debtors to have expressed an interest in a transaction with respect to the purchase of the Acquired Assets; (vi) all counterparties to the Assumed Contracts, (vii) all governmental taxing authorities who have, or as a result of the sale and transfer of the Acquired Assets may have, claims, contingent or otherwise, against BRACC or BRACII in connection with their ownership of the Acquired Assets; (viii) the UK Administrator; (ix) the French Administrator; and (x) all entities that requested notice pursuant to Fed. R. Bankr. P. 2002 as of January 10, 2003.

H.     With respect to any and all entities asserting an Encumbrance on the Acquired Assets, either (i) such entity has consented to the sale and transfer, license and assignment, as applicable, free and clear of its Encumbrance, with such Encumbrance to attach to the proceeds of such sale and transfer, or license and assignment, as applicable, in the same order of priority, force and effect as existed prior to such sale, transfer, license or assignment or (ii) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Encumbrance, so that the conditions of section 363(f) of the Bankruptcy Code have been met.

4

WP3-8610043                                                   59519.1001

JA818

I.    The Qualified Bid procedures allowed the Debtors to obtain the maximum value for the Acquired Assets for their respective estates.

J.    Upon the Closing, or a Partial Closing as applicable, the sale of the Acquired Assets shall be legal, valid and effective transfers of the Acquired Assets to Purchaser, and shall vest in Purchaser all right, title and interest in the Acquired Assets and in accordance with the terms and conditions of the Agreement, free and clear of all Encumbrances, under sections 105(a), 363(f), and 365 of the Bankruptcy Code.

K.    The Agreement was negotiated, proposed and entered into by the Debtors and Purchaser without collusion, in good faith, and from arm's-length bargaining positions. None of the Debtors or the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code. Purchaser is not an "insider" or "affiliate" of the Debtors (as such terms are defined in the Bankruptcy Code). Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby in consummating the transactions contemplated by the Agreement.

L.    The consideration to be provided by Purchaser for the Acquired Assets (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

M.    The Debtors may assume and assign the Assumed Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the Agreement and is in the

WP3:861004.3                                                                                   59519.1001

best interests of the Debtors and their respective estates, and represents the exercise of sound and prudent business judgment by the Debtors.

N.     Except with respect to the objections listed in the chart attached hereto as Exhibit B (the "Cure Objections"), the amounts on the column titled "Net Cure Amounts" on the schedule filed with the Court on January 24, 2003, as an exhibit to the Assumption/Assignment Notice (the "Cure Amounts Schedule") reflect net cure amounts (after the Debtors have exercised any rights of set off or recoupment they may possess) necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code (each, a "Cure Amount") to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts. The Cure Amounts Schedule was properly served on the counterparties to the Assumed Contracts.

O.     As of the Closing or a Partial Closing, the Debtors who are assuming and assigning the Assumed Contracts have provided adequate assurance that they will pay or otherwise satisfy (including by exercise of any rights of set off or recoupment) the Cure Amounts for the Assumed Contracts within a reasonable period of time after Closing as set forth in this Order as required by section 365 of the Bankruptcy Code and Purchaser has provided the non-debtor counterparties to the Assumed Contracts with adequate assurance of future performance. As of Closing or a Partial Closing, each Assumed Contract shall constitute a valid and existing interest in the property subject to such Assumed Contract and no default exists under any Assumed Contract, nor shall there exist any event or condition which, with the passage of time or the giving of notice, or both, would constitute a default under any Assumed Contract prior to Closing or a Partial Closing not satisfied or otherwise addressed pursuant to this Order.

Therefore, it is ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is granted in its entirety.

6

WP3:861004.1                                                                 59519.1001

2. Except the Cure Objections, which are addressed in this Order, all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

3. The Agreement, including all of the terms and conditions thereof, is hereby approved in all respects.

4. Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized to consummate the transactions contemplated by, pursuant to and in accordance with the terms and conditions of the Agreement.

5. The Debtors are authorized to execute and deliver, and empowered to fully perform under, consummate and implement, the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be reasonably requested by Purchaser for the purpose of transferring the Acquired Assets to Purchaser, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Agreement including, without limitation, the establishment of one or more escrow accounts or reserves (in addition to any escrow accounts or reserves specifically contemplated by the Agreement) from the Sale Proceeds (x) to satisfy any liabilities, (y) to fulfill any conditions, and/or (z) as the Purchaser may reasonably require in return for waiving any conditions, in each case for with the Debtors are responsible.

6. The Debtors' respective obligations under the Agreement shall constitute administrative expenses of their respective estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

JA821

7.      All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to Purchaser in accordance with the terms of this Order.

8.      All persons and entities are hereby enjoined from asserting, prosecuting or otherwise pursuing any claim against Purchaser to recover any claim such person or entity had, has or may have against Purchaser in connection with the negotiation of the Agreement.

9.      Except as provided in the Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing or a Partial Closing, as applicable, the Acquired Assets shall be transferred, licensed and assigned to Purchaser, free and clear of all Encumbrances, arising prior to the Closing Date or the Closing Date related to a Partial Closing, as applicable, with all such Encumbrances, if any, to attach to the net proceeds of the transactions contemplated by the Agreement in the same order of priority and with the same validity, force and effect, if any, which they now have as against the Acquired Assets, subject to the rights, claims, defenses and objections, if any, of the Debtors and all interested parties with respect to such Encumbrances.

10.     Effective upon the Closing or a Partial Closing, as applicable, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any act on or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding, against Purchaser and its successors and assigns with respect to any Encumbrance. Without limiting the generality of the foregoing, Purchaser shall have no liability for any Claim against the Debtors except to the extent such Claim is an Assumed Liability.

11.     If any person or entity that has filed a financing statement or other documents or agreements evidencing Encumbrances on the Acquired Assets shall not have delivered to the

WP3:861004.3

8

59359.1001

Debtors prior to the applicable Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances which the person or entity has with respect to such Acquired Assets, Purchaser hereby is authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Acquired Assets. The foregoing notwithstanding, the provisions of this Order authorizing the sale and assignment of the Acquired Assets free and clear of Encumbrances shall be self-executing, and notwithstanding the failure of Purchaser, the Debtors, or any other party to execute, file or obtain releases, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof or the Agreements with respect to the sale and assignment of the Acquired Assets, all Encumbrances on the Acquired Assets shall be deemed divested.

12.    The Debtors are hereby authorized and directed, in accordance with section 365 of the Bankruptcy Code, at the Closing or a Partial Closing, as applicable, to assume and assign to Purchaser each of the Assumed Contracts free and clear of all Encumbrances as provided in the Agreement.

13.    With respect to each Assumed Contract (a) for which no Assumption/Assignment Objection was received, or for which a Cure Objection was received but was resolved prior to the Closing, each Assumed Contract shall be assigned to the Purchaser subject to and in accordance with the Agreement and this Order effective as of the Closing or Partial Closing, as applicable, and the Debtors shall, within three (3) Business Days from Closing or Partial Closing, as applicable, pay to the non-Debtor party to each such Assumed Contract the Cure Amount (such amount, the "Cure Amount Payable"); and (b) for which a Cure Objection relating to an executory contract not removed from the list of Assumed Contracts upon agreement by the

9

WP3:841004.3                                                                    59519.1001

Purchaser, the Debtors and the Committee remains unresolved as of the Closing or Partial
Closing, as applicable, (an "Unresolved Cure Objection"), such Assumed Contract shall be
assigned to the Purchaser subject to and in accordance with the Agreement and this Order
effective as of the Closing or Partial Closing, as applicable and the Debtors, the Committee and
each party to such Assumption/Assignment Objection shall negotiate in good faith for a period of
thirty (30) days after the Closing or Partial Closing, as applicable, in an attempt to resolve such
objection, provided, however, that upon the expiration of such thirty (30) day period, the
Debtors, the Committee or the non-debtor objecting party may request that the Court establish a
schedule to resolve such objection. Except to the extent that an executory contract that is the
subject of an Unresolved Cure Objection has been removed from the list of Assumed Contracts
prior to Closing or Partial Closing, as applicable, consistent with paragraph 15 below, the
Debtors shall place Sale Proceeds equal to the Cure Amount Payable and the maximum amounts
asserted in each Unresolved Cure Objection in a segregated interest bearing bank account from
which account the Cure Amounts shall be payable consistent with the terms of this Order,
provided however, in the case of the Hold-Over Contracts, the Debtors shall establish the Hold-
Over Escrow Amounts in accordance with the Second Supplemental and Variation Agreement.
For avoidance of doubt, exercise of any rights of set off or recoupment by the Debtors shall
constitute satisfaction of the Debtors' cure obligations to the extent of any such right of set off or
recoupment. Other than the Cure Amount relating to each Assumed Contract, there are no other
amounts due on any of the Assumed Contracts required to be paid and no other action needs to
be taken with respect to any of the Assumed Contracts in order to assume the Assumed Contracts
under sections 365(b) and 365(f)(2) of the Bankruptcy Code. Notwithstanding anything to the
contrary herein, the Debtors shall have no obligation to pay any Cure Amount unless a Closing

WT3:861004.3

10

59519 1001

or a Partial Closing and assumption and assignment pursuant to the terms of the Agreement and this Order have occurred.

14.     The consideration provided by Purchaser for the Acquired Assets, all as negotiated by Purchaser for its benefit under the Agreement, is fair and reasonable, and the result of open and competitive bidding, and may not be avoided under section 363(n) of the Bankruptcy Code.

15.     The Debtors, upon agreement with the Committee and the UK Administrator, shall invest the Sale Proceeds in the United States pursuant to the Debtors' investment and cash management guidelines to be approved by the Court by separate order. The Court shall retain jurisdiction to determine the allocation of the Sale Proceeds among the Debtors and the UK Administrator shall have the right to participate fully in any and all such allocation proceedings.

16.     The transactions contemplated by the Agreement are undertaken by Purchaser in good faith as that term is used in section 363(m) of the Bankruptcy Code and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to Purchaser, unless such authorization is duly stayed pending such appeal. Purchaser is a purchaser in good faith, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

17.     The terms and provisions of the Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their affiliates, their respective estates, Purchaser and its affiliates, and the successors and assigns of each of the foregoing, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any Chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

WP3:8610004.3                                    11                                    59519.1001

18. The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety. To the extent any terms of this Order are in conflict with any provisions of the Agreement, the terms of the Order shall control.

19. The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties; and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' respective estates.

20. The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and conditions of the Agreement and the provisions of this Order. The Debtors irrevocably waive any right to seek any modification of this Order without the prior written consent of the Purchaser, and no such consent shall be implied by any other action, inaction or acquiescence by the Purchaser.

21. As provided by Fed. R. Bankr. P. 7062, this Order shall be effective and enforceable immediately upon entry. The provisions of Fed. R. Bankr. P. 6004(d) and 6004(g) staying the effectiveness of this Order for 10 days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Agreement, immediately upon entry. Time is of the essence in closing the transaction and parties to the Agreement shall be authorized to close the sale as soon as possible consistent with the terms of the Agreement. Any parties objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

12

WP3:861004.3                                                          59519.1001

**JA826**

22.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

23.     This Court retains jurisdiction to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, (b) interpret, implement, and enforce the provisions of this Order, and (c) consistent with paragraph 15 of this Order, determine the allocation of Sale Proceeds among the Debtors.

24.     Nothing contained in any plan of reorganization without regard to whether it is a liquidating plan of reorganization confirmed in these cases or the order of confirmation confirming any plan of reorganization without regard to whether it is a liquidating plan of reorganization shall conflict with or derogate from the provisions of this Order.  Further, the provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of an

13

WP3:861004.3                                                                 59319:1001

JA827

order confirming any plan of reorganization of the Debtors or converting the Debtors' cases from

Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

Dated: Wilmington, Delaware
February 24, 2003

_____
United States Bankruptcy Judge

14

WP3 861004.3

39519.1001

# EXHIBIT A

Execution Draft

ASSET PURCHASE AGREEMENT

by and among

BRAC Rent a Car Corporation
(as Chapter 11 Debtor in Possession)

BRAC Rent-A-Car International, Inc.
(as Chapter 11 Debtor in Possession and in UK Administration)

Simon Vincent Freakley and Gurpal Singh Johal

Budget Rent a Car Espana S.A.

Budget Deutschland GmbH

Business Rent a Car GmbH

and

Avis Europe plc

Zodiac Europe Ltd

dated as of January 21, 2003

DE1 3448796

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| Section 1.1 | Defined Terms | 1 |
| Section 1.2 | Other Definitions and Interpretive Matters. | 10 |
| ARTICLE 2 | PURCHASE AND SALE OF THE ACQUIRED ASSETS | 10 |
| Section 2.1 | Purchase and Sale of Acquired Assets. | 10 |
| Section 2.2 | Consideration. | 11 |
| Section 2.3 | Acquired Assets | 11 |
| Section 2.4 | Excluded Assets | 12 |
| Section 2.5 | Assumed Liabilities | 13 |
| Section 2.6 | Excluded Liabilities | 14 |
| Section 2.7 | Closing | 14 |
| Section 2.8 | Delayed Closing | 15 |
| Section 2.9 | Partial Closing. | 15 |
| Section 2.10 | Mutual Delay | 16 |
| Section 2.11 | Deliveries by Seller Parties | 17 |
| Section 2.12 | Deliveries by Purchaser | 18 |
| Section 2.13 | Administrator Facilities | 19 |
| Section 2.14 | Employees | 19 |
| Section 2.15 | Cure Costs | 22 |
| ARTICLE 3 | LIMITED REPRESENTATIONS AND WARRANTIES OF BUDGET RENT A CAR ESPANA S.A.; EXCLUSIONS OF FURTHER REPRESENTATIONS AND WARRANTIES AND LIABILITY OF SELLER PARTIES | 24 |
| Section 3.1 | Organization and Qualification | 24 |
| Section 3.2 | Capitalization of the Acquired Companies. | 24 |
| Section 3.3 | Corporate Power and Authority. | 25 |
| Section 3.4 | Conflicts; Consents and Approvals. | 25 |
| Section 3.5 | Title to Property; Adequacy of Assets | 26 |
| Section 3.6 | Seller Financial Statements | 27 |
| Section 3.7 | Licensee Confirmation Letters | 27 |
| Section 3.8 | No material alteration since October 31, 2002 | 28 |
| Section 3.9 | Exclusion of Further Representations and Warranties. | 28 |
| Section 3.10 | Brokers | 28 |
| Section 3.11 | Disclaimer of Liability | 28 |
| Section 3.12 | Reasonableness of Provisions | 29 |
| Section 3.13 | Title to Assets | 29 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 29 |
| Section 4.1 | Organization and Qualification | 29 |
| Section 4.2 | Corporate Power and Authority; Authorization. | 30 |
| Section 4.3 | Conflicts; Consents and Approvals. | 30 |
| Section 4.4 | Brokers | 31 |
| Section 4.5 | Sufficiency of Funds | 31 |
| Section 4.6 | Investment Experience; Due Diligence | 31 |

UKI 3849794

i

Execution Draft

ARTICLE 5   CERTAIN COVENANTS ................................................................31
   Section 5.1   Conduct of Business ........................................................31
   Section 5.2   Access and Information ....................................................33
   Section 5.3   Efforts to Effect Transaction; Certain Filings ........................34
   Section 5.4   Bankruptcy Filings ..........................................................35
   Section 5.5   Bidding Procedures ..........................................................35
   Section 5.6   Intercompany Amounts; Other Agreements .............................36
   Section 5.7   Tax Returns; Tax Sharing Agreements ................................36
   Section 5.8   Purchase Price Allocation .................................................37
   Section 5.9   Transfer and Other Taxes ..................................................37
   Section 5.10  Confidentiality ..................................................................38
   Section 5.11  No Solicitation of Employees ..............................................39
   Section 5.12  Partial Closing Covenants ...................................................39
ARTICLE 6   ADDITIONAL POST-CLOSING COVENANTS ......................40
   Section 6.1   Books and Records; Personnel ............................................40
   Section 6.2   Tax Cooperation ...............................................................40
   Section 6.3   Remittance of Funds .........................................................41
   Section 6.4   French and Austrian Trademarks .........................................41
   Section 6.5   Further Assurances ...........................................................41
ARTICLE 7   CONDITIONS PRECEDENT TO CLOSING .......................42
   Section 7.1   General Conditions ...........................................................42
   Section 7.2   Conditions Precedent to Purchaser's Obligations .....................43
   Section 7.3   Conditions Precedent to Seller Parties' Obligations ..................44
ARTICLE 8   TERMINATION; TERMINATION AMOUNT .....................44
   Section 8.1   Termination by Mutual Consent ...........................................44
   Section 8.2   Automatic Termination ......................................................44
   Section 8.3   Termination by Either Purchaser or Seller Parties ...................44
   Section 8.4   Termination by Purchaser ..................................................44
   Section 8.5   Termination by Seller Parties ..............................................45
   Section 8.6   Effect of Termination .........................................................45
   Section 8.7   Expenses; Termination Amount ...........................................45
ARTICLE 9   UK ADMINISTRATION AND BRACII ...............................46
   Section 9.1   Exclusion of Personal Liability .............................................46
   Section 9.2   No Reliance on UK Administration Statements ........................46
   Section 9.3   Customary Limited UK Administrator Warranties .....................46
   Section 9.4   Survival of Certain Provisions .............................................46
   Section 9.5   No Set-Off ......................................................................47
   Section 9.6   Termination of Certain Provisions .......................................47
ARTICLE 10  MISCELLANEOUS PROVISIONS .....................................47
   Section 10.1  Non-Survival of Representations, Warranties and Certain Covenants .....47
   Section 10.2  Notices ..........................................................................47
   Section 10.3  Amendment of Agreement ..................................................49
   Section 10.4  Entire Agreement .............................................................49
   Section 10.5  Financing Documents .......................................................49
   Section 10.6  Assignment .....................................................................49
   Section 10.7  Parties in Interest; No Third Party Beneficiaries .....................49

UKI 584574                                         ii

JA832

Execution Draft

Section 10.8   Severability ...................................................... 50
Section 10.9   Governing Law; Consent to Jurisdiction ...................... 50
Section 10.10  Waiver of Jury Trial............................................ 50
Section 10.11  Execution in Counterparts...................................... 50
Section 10.12  Public Announcement............................................ 50
Section 10.13  No Strict Construction ........................................ 51
Section 10.14  Joint and Several Liability ................................... 51

Schedules
Schedule 2.3 (e) Assumed Contracts........................................... 2, 9
Schedule 2.4 (j) Excluded Contracts .......................................... 10
Schedule 2.9 Delayed Jurisdictions ........................................... 12
Schedule 2.14 Employees ..................................................... 4, 14
Schedule 6.4 Trademarks ......................................................... *

Exhibits
Exhibit A Form of Assumption Agreement ........................................ 3
Exhibit B Form of Licensee Confirmation Letter ............................... 5
Exhibit C Trademark License Agreement......................................... 8
Exhibit D Form of Indemnity Agreement......................................... *

iii

JA833

ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of January 21, 2003, by and among BRAC Rent a Car Corporation, a Delaware corporation ("BRAC") as Chapter 11 Debtor in Possession, BRAC Rent-A-Car International, Inc., a Delaware Corporation ("BRACII") as Chapter 11 Debtor in Possession and in Administration acting by its joint administrators Simon Vincent Freakley of 10 Fleet Place, London EC4M 7RB, United Kingdom and Gurpal Singh Johal of Aspect Court 4 Temple Row, Birmingham B2 5HG United Kingdom together (the "UK Administrators"), Budget Rent a Car Espana S A., a corporation organized under the laws of Spain ("Budget Spain") (collectively with BRAC and BRACII, the "Seller Parties") and the UK Administrators and Avis Europe plc and Zodiac Europe Limited, both companies organized under the laws of England and Wales (together the "Purchaser") and for the purposes of Sections 5.1, 5.2, 5.6 and 5.12(c) only, Business Rent a Car GmbH, a corporation organized under the laws of Austria ("Budget Austria") and Budget Deutschland GmbH, a corporation organized under the laws of Germany ("Budget Germany").

## WITNESSETH:

WHEREAS, the Seller Parties conduct automotive rental businesses and operations throughout Europe, the Middle East and Africa (the "EMEA Territory"), directly or through various franchisees (together the "Franchisees"), dealers, licences and sub-licensees under the brand name "Budget", including the rental of automobiles, trucks and other vehicles in the daily rental market (collectively, the "EMEA Business");

WHEREAS, on July 29, 2002, BRAC and BRACII filed voluntary petitions (the "Petitions") for relief commencing cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. sections 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, on January 14, 2003, the UK Administrators were appointed joint administrators of BRACII by an order of the court dated January 14, 2003.

WHEREAS, Purchaser desires to purchase and assume from Seller Parties, and Seller Parties desire to sell, convey, assign and transfer to Purchaser, certain assets of Seller Parties relating to the EMEA Business excluding that part of the business operated by Budget France in France (the "Acquired Business"), as specified herein, together with certain specified obligations and liabilities relating thereto, all in the manner and subject to the terms and conditions set forth herein and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and pursuant to Schedule 1 of the Insolvency Act 1986 (as amended).

NOW, THEREFORE, in consideration of the mutual agreements and covenants herein contained and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1 Defined Terms  For the purposes of this Agreement, the following terms shall have the following meanings:

1

UK1 2345748

Execution Draft

"Acquired Assets" shall have the meaning specified in Section 2.3.

"Acquired Companies" means each of Budget Austria, Société Financière et de Participation and (by virtue of being a subsidiary) Financière Milton II.

"Adopted Contracts" means those contracts with Licensees designated as such in an Exclusion Notice under Section 2.15(c).

"Affiliate" of any Person means any Person that controls, is controlled by, or is under common control with such Person. As used herein, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, and individually or together with any other Person, of the power to direct or to cause the direction of the management and policies of a Person, whether through ownership of voting securities or other interests, by contract or otherwise.

"Agreed Jurisdictions" means the Delayed Jurisdictions and either (i) if the Purchaser reasonably determines, or the European Commission agrees, that this transaction does not constitute a concentration with a Community dimension within the scope of the ECMR, the UK; or (ii) if the conditions of sub-paragraph (i) of this definition are not satisfied, the European Commission pursuant to the ECMR.

"Aggregate Net Cure Payment" means the amount determined in accordance with Section 2.15(e);

"Alternative Transaction" means (i) the sale, lease or other disposition of (x) a substantial proportion of the Acquired Business or (y) a substantial proportion of the assets or properties of the Acquired Assets, (ii) the sale of an equity interest in any of Seller Parties, (iii) any business combination of any of Seller Parties (including, without limitation, a merger or consolidation and/or sale, lease or other disposition of all or substantially all of its assets and properties and/or Subsidiaries thereof) with one or more Persons other than Purchaser or one or more of its Affiliates, (iv) the restructuring, recapitalization, reorganization (whether on a stand-alone basis, or otherwise) or liquidation or administration (other than pursuant to Chapter 7 of the Bankruptcy Code or pursuant to Chapter 11 of the Bankruptcy Code or the provisions of the Insolvency Act) of any of Seller Parties involving a substantial portion of the Acquired Assets; provided, however, that any transaction contemplated by clauses (ii) or (iii) shall not constitute an Alternative Transaction for purposes of this Agreement unless it results, directly or indirectly, and individually or together with any other transactions (whether related or not), in the transfer of ownership or control of all or substantially all of the Acquired Business or of all or substantially all of the Acquired Assets, or (v) the transfer, directly or indirectly, of BRAC's right, title and interest in, to and under the Trademark License Agreement to a party other than the Purchaser or an affiliate of the Purchaser.

"Ancillary Agreements" means the Assumption Agreements and the Trademark License Assignment.

"Assumed Contracts" shall be those contracts set forth on Schedule 2.3(e), excluding any such contract which is designated in an Exclusion Notice under Section 2.15(c) as either an Excluded Contract or an Adopted Contract.

2

Execution Draft

"Assumed Liabilities" shall have the meaning specified in Section 2.5.

"Assumption Agreement" means in relation to each Seller Entity and each relevant jurisdiction (other than BRAC) an Assumption Agreement in substantially the form set forth as Exhibit A with such changes as may be reasonably requested by Purchaser but only to the extent that such changes that are necessary to ensure that such agreement has full force and effect under local laws

"Austrian Trademark" shall mean the trademark identified as being owned by Budget Austria on Schedule 6 4

"Benefit Plan" means each welfare plan, employment, consulting, bonus, profit sharing, deferred compensation, incentive compensation, stock ownership, stock option, stock purchase, phantom stock, performance, retirement, thrift, savings, stock bonus, excess benefit, supplemental unemployment, paid time off, perquisite, fringe benefit, vacation, sick leave, severance, termination, disability, death benefit, hospitalization, medical, dental, life insurance, welfare benefit or other plan, program, agreement or arrangement (whether written or unwritten), in each case maintained, entered into or contributed to, or required to be maintained or contributed to, by any Seller Party or by any Affiliate or by any of their respective Subsidiaries for the benefit of any present or former employee of a Seller Party (excluding individuals who are present or former employees of BRAC) in connection with the Acquired Business.

"BRACII UK Administration" means the joint appointment of Simon Vincent Freakley of 10 Fleet Place, London EC4M 7RB, United Kingdom and Gurpal Singh Johal of Aspect Court 4 Temple Row, Birmingham B2 5HG, United Kingdom as the UK Administrators pursuant to an order of the High Court dated January 14, 2003.

"Business Day" means a day, other than a Saturday or Sunday, on which banks are open for business in New York City, New York.

"Business Records" means all books, records, ledgers and files or other similar information used or held for use in the operation or conduct of the Acquired Business by any Seller Entity or Budget Austria, including price lists, customer lists, vendor lists, mailing lists, warranty information, catalogs, sales promotion literature, advertising materials, brochures, records of operation, standard forms of documents, manuals of operations or business procedures, research materials, Tax Returns, contracts, instruments, filings, administrative and pricing manuals, records (including, without limitation, claim records, sales records, underwriting records, financial records, compliance records and tax records), personnel records (subject to compliance with applicable Laws), corporate minute books and other materials to the extent relating, directly or indirectly, to the Acquired Business by any Seller Entity or Budget Austria, whether or not in the possession of Seller Entity or any of its Subsidiaries or their respective representatives, stored in hardcopy form or on magnetic, optical or other media; provided, however, that Business Records shall not include (i) any Tax Returns of any Seller Party other than Tax Returns relating to the Acquired Assets that are of a type that will not be required to be filed by Seller Parties with respect to such Acquired Assets for periods ending after the Closing Date, (ii) books of account and statutory records, security documents, documents relating to the appointment of the UK Administrators and all records created for or in

3

UK1 3585749

JA836

*Execution Draft*

the course of the insolvency of BRACII either by the UK Administrators or their partners, staff or by any other person including the officers or employees of BRACII at their request and (iii) books of account and statutory records, security documents, documents relating to the appointment of the US Trustee and all records created for or in the course of the Chapter 11 bankruptcy of BRAC by the administrators or their partners or staff or any other person including the officers or employees of BRAC at their request (the "Excluded Books and Records")

"Cherokee" means Budget Rent –A - Car System, Inc., formerly known as Cherokee Acquisition Corporation, the licensor under the Trademark License Agreement.

"Cherokee Support Agreement" means an agreement entered or to be entered into by the Seller Parties (other than BRAC) and Cherokee reasonably satisfactory to Purchaser and Seller Parties for support services with respect to the EMEA Territory to be provided by Cherokee to the Seller Parties prior to Closing and, thereafter, to Purchaser as an Assumed Contract.

"Closing" shall have the meaning specified in Section 2.7

"Closing Date" shall mean the date on which a Closing occurs

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Competition Laws" means the Laws of jurisdictions of the Seller Parties and of jurisdictions in which Licensees carry on business designed or intended to prohibit, restrict or regulate mergers or other business combinations, antitrust conducts or competition, or investments by foreign Persons, including the ECMR.

"Contract" means any arrangement, note, bond, commitment, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith

"Cure Costs" shall have the meaning specified in Section 2.15(a).

"Cure Warning Notice" shall have the meaning specified in Section 2.15(b).

"Delay Period" shall have the meaning specified in Section 2.8(a)

"Delayed Jurisdiction" means either (i) if the Purchaser determines, or the European Commission agrees, that this transaction does not constitute a concentration with a Community dimension within the scope of the ECMR, any of Austria, Bulgaria, the Czech Republic, Estonia, Finland, Germany, Kenya, South Africa and Turkey in respect of which the condition precedent in Section 7.2(c) has not been satisfied at the first Partial Closing; or (ii) if the conditions of sub-paragraph (i) of this definition are not satisfied, any of Bulgaria, the Czech Republic, Estonia, Kenya, South Africa and Turkey in respect of which the condition precedent in Section 7.2(c) has not been satisfied at the first Partial Closing.

4

JA837

Execution Draft

"*Delayed Jurisdiction Assets*" *means* those assets identified as such on Schedule 2.1(e);

"*DIP Financing Agreement*" means the agreement between the Purchaser or an Affiliate of Purchaser and the Seller Parties pursuant to which *the Purchaser or an Affiliate of Purchaser shall provide financing to the Seller Parties on terms set out in that agreement*

"*Disclosure Schedule*" means the schedule prepared and signed by each Warranting Party and attached hereto containing disclosures as against *representations and warranties of the Warranting Party contained in* Article 3

"*Documents*" means all agreements, statements, certificates and other documents at any time evidencing or otherwise relating or pertaining to, or executed in connection with, each Assumed Contract or Adopted Contract excluding for the avoidance of doubt the Excluded Books and Records

"*ECMR*" means Council Regulation (EEC) 4064/89 as amended by Council Regulation (EC) 1310/97.

"*Employees*" means the employees of the Acquired Business, as set forth on Schedule 2.14.

"*Encumbrance*" means any lien (including Tax liens), charge, encumbrance, security interest of any kind whatsoever, mortgage, pledge, third party right or interest, lease, loan hire purchase or rental agreement, conditional sale agreement, finance, leasing arrangement or other like agreements, easement, conditional sale or other title retention agreement, covenant or other similar restriction or right affecting the Acquired Assets (including voting rights of the Equity Securities of the Acquired Companies).

"*Equity Security*" means, with respect to any Person, any and all shares, interests, participations, options, warrants, rights in, voting trust certificate, limited partnership interest or other equivalents (however designated, whether voting or non-voting) in the equity or capital of such Person, whether outstanding on the date hereof or issued hereafter.

"*Excluded Assets*" shall have the meaning specified in Section 2.4

"*Excluded Accounts Receivables*" shall have the meaning specified in Section 2.4(f).

"*Excluded Books and Records*" shall have the meaning specified within the definition of "Business Records" above.

"*Excluded Contracts*". shall have the meaning specified in Section 2.4(f)

"*Excluded Liabilities*" shall have the meaning specified in Section 2.6.

"*Exclusion Notice*" means a notice served by Purchaser under Section 2.15(c)

5

UK1 #54094

JA838

Execution Draft

"Extended Closing Date" shall have the meaning specified in Section 2.8(a).

"Extended Partial Closing Period" shall have the meaning specified in Section 2.9(d).

"Final Closing Date" means the earlier of (i) Closing in respect of all the Acquired Assets and Liabilities, and (ii) the expiry of the Extended Partial Closing Period.

"First Closing Date" shall mean the date on which the first Closing occurs

"French Acquisition Approval" means the approval by the French Tribunal of the French Acquisition Offer

"French Tribunal" means Tribunal de Commerce de Créteil

"French Acquisition Offer" means the offer by way of transfer made by the Purchaser for the acquisition of that part of the EMEA Business in operation throughout France as had been proposed by Purchaser in a written offer (as then contemplated) circulated to the Seller Parties prior to January 9, 2003.

"French Trademarks" shall mean the trademarks and registrations identified as being owned or otherwise held by Budget France S.A. in Schedule 6.4

"Governmental Body" means any (i) legislative, executive, political, judicial or administrative unit of any governmental entity, or quasi-governmental agency (foreign, federal, state or local) or any department, commission, board, agency, bureau, official or other regulatory, administrative or judicial authority thereof, (ii) any self-regulatory organization, agency or commission, (iii) any court or arbitral tribunal or (iv) in relation to the ECMR the European Commission.

"Indemnity Agreement" means the indemnity agreement in the form set out in Exhibit D.

"Initial Covenant Period" shall have the meaning set forth in Section 5.1

"Insolvency Act" means the UK Insolvency Act 1986

"IRS" means the United States Internal Revenue Service.

"Law" means any national, foreign, federal, state, provincial or local law, statute, ordinance, rule, regulation, code, order, judgment, injunction or decree of any jurisdiction (whether foreign or domestic)

"Landlord" means Europa Holdings Limited.

"Leased Premises" means all the real property that is leased by any Seller Party or Budget Germany or Budget Spain and used or held for use by of those parties primarily in the operation or conduct of the Acquired Business, including any concession, occupancy, use or

6

JA839

Execution Draft

similar rights of any Seller Entity other than the Assumed Contracts. (For the avoidance of doubt, "Leased Premises" shall exclude any property leased and used or held for use by Budget Austria.)

"Licence" shall have the meaning set forth in Section 5.1(h).

"Licensee" means any franchisee, licensee or sub-licensee counterparty of any Seller Party to an Assumed Contract or Adopted Contract.

"Licensee Claim" shall have the meaning specified in Section 2.15(b).

"Licensee Confirmation Letter" means a letter from a Licensee in the form of Exhibit B hereto.

"Material Adverse Effect" means any change(s), event(s), development(s) or circumstance(s) which, individually or in the aggregate, could be reasonably expected to cause the representations and warranties of the Warranting Party to be adversely untrue or inaccurate in a material respect (or in the case of any representation or warranty qualified by materiality, to be untrue or inaccurate in any respect), provided, however, any adverse effect resulting primarily and directly from the following shall be disregarded in determining whether there has been a Material Adverse Effect: (i) the filing of the Chapter 11 Cases; (ii) the appointment of administrators for BRACII pursuant to the Budget UK Administration; (iii) the announcement of the transactions contemplated hereby and by the Trademark License Agreement; (iv) the announcement or other publication, if any, of the French Acquisition Offer or French Acquisition Approval; (v) changes in the economy generally which do not disproportionately affect the Acquired Business in any material respect; or (vi) changes in the vehicle rental industry generally which do not disproportionately affect the Acquired Business in any material respect.

"Non-Employee" shall have the meaning set forth in Section 2.14(b).

"Notarial Deed Austria" means a share purchase and transfer agreement to be concluded by and between BRACII and Purchaser in the form of an Austrian notarial deed, whereby BRACII sells and transfers to Purchaser and Purchaser purchases and accepts from Seller, the Equity Securities of Budget Austria on the terms set out in this Agreement with the transfer of the Equity Securities of Budget Austria being conditional on (i) a Closing taking place and (ii) the receipt of approval under applicable Competition Laws in relation to the transfer to Purchaser of the Equity Securities of Budget Austria.

"Partial Closing" shall have the meaning set forth in Section 2.9.

"Partial Closing Notice" shall have the meaning set forth in Section 2.9.

"Permits" means all permits, licenses, certificates, franchises and other authorizations, consents, registrations, waivers and approvals of any Governmental Body.

"Permitted Encumbrances" means (a) Encumbrances contained in or arising under the express terms of any Assumed Contract or Adopted Contract after the relevant Closing Date, (b) Encumbrances for current Taxes not yet due and payable and (c) Encumbrances which

7

JA840

Execution Draft

do not, and would not reasonably be expected to, materially impair the continued use, *operation or value of the asset to which it relates*

"Person" means any individual, corporation, partnership, limited liability company, firm, association, joint venture, joint stock company, trust, unincorporated organization or other entity or any Governmental Body.

"Purchaser Delay Notice" shall have the meaning set forth in Section 2.8

"Representatives" shall have the meaning set forth in Section 5.2(a).

"Sale Approval Order" means an order or orders of the Bankruptcy Court approving the transaction contemplated by this Agreement and the assumption by Seller Parties, and assignment by Seller Parties to Purchaser, of any Assumed Contracts, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and not inconsistent *with the terms of this Agreement, unless otherwise agreed among Purchaser and Seller Parties,* to be submitted to the Bankruptcy Court in the form attached as Exhibit E, with such changes as the Purchaser and the Seller Parties may agree

"Sale Procedures Order" means an order or orders of the Bankruptcy Court in the form attached as Exhibit F with such changes as the Purchaser and the Seller Parties may agree

"Seller Evaluation Material" means all information, data, reports, interpretations, forecasts, contracts, agreements and records, whether in oral or written form, electronically stored or otherwise (including any such information furnished prior to the execution of this Agreement), concerning Seller Parties or their Affiliates or Subsidiaries furnished to Purchaser or its representatives by Seller Parties, their Affiliates or Subsidiaries or any of their representatives, and all notes, reports, analyses, compilations, studies and other materials prepared by Purchaser or any of its Representatives (in whatever form maintained, whether documentary, *electronically stored or otherwise*), containing or based upon, in whole or in part, any such information; provided, that the term "Seller Evaluation Material" shall not include information which (i) is or becomes available to the public other than *as a result of a disclosure in breach of this Agreement by Purchaser or any of its Representatives*, or anyone to whom Purchaser or any of its Representatives transmits any Seller Evaluation Materials in breach of this Agreement, (ii) is or becomes known or available to any party on a non-confidential basis from a source (other than the other parties to this Agreement or any of their Representatives) who, insofar as is actually known by Purchaser, is not prohibited *from transmitting the information by a contractual, legal, fiduciary or other obligation* or (iii) is independently developed by Purchaser or any of its Representatives without the use of any information that would itself be deemed Seller Evaluation Material.

"Subsidiaries" of any entity means, at any date, any Person: (i) the accounts of which would be consolidated with those of the applicable entity in such entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date; or (ii) of which securities, membership interests or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general *partnership interests or more than 50% of*

8

UKI 594557-9

Execution Draft

the profits or losses of which are, as of such date, owned, controlled or held by the applicable entity or one or more direct or indirect subsidiaries of such entity

"Subsidiary Licenses" shall have the meaning specified in Section 2.3(e)

"Tangible Property" means all furniture, furnishings, computers and other tangible personal property owned by Seller Parties used or held for use in the Acquired Business and located on the premises from which the Acquired Business operates, including desks, tables, chairs, file cabinets and other storage devices.

"Tax" means: (i) any and all taxes, assessments, customs, duties, levies, fees, tariffs, imposts, deficiencies and other governmental charges of any kind whatsoever (including taxes on or with respect to net or gross income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, real property transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, estimated taxes, rent, excise, occupancy, recordation, bulk transfer, intangibles, gross receipt, personal property, alternative minimum, real property, doing business, withholding, payroll, stamp and capital), together with any interest thereon, penalties, fines, additions to tax or additional amounts with respect thereto, imposed by any governmental authority or applicable jurisdiction; and (ii) any liability for the payment of any amounts described in (i) as a result of being a member of an affiliated, consolidated, combined, unitary or similar group or as a result of transferor or successor liability

"Tax Return" means any return (including any information return), declaration, report, statement, schedule, attachment, notice, form, or other document or information (including any amendment to any of the foregoing) filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax (whether or not such Tax is imposed on the filer thereof) or in connection with the administration, implementation, or enforcement of or compliance with any law relating to any Tax

"Telephone Numbers" means all operating telephone numbers relating to the Acquired Business and controlled (by agreement, lease or otherwise) by any Seller Party on the date hereof and which under existing agreements, regulations and law, may be transferred to Purchaser on the Closing Date

"Third Party" means with respect to any Person, another Person that is not an Affiliate of such Person.

"Third Party Licenses" shall have the meaning set forth in Section 2.3(f).

"Trademark License Agreement" means the agreement dated as of November 22, 2002, between Cherokee, as Licensor, and BRAC, as Licensee.

"Trademark License Assignment" means the trademark license assignment substantially in the form set forth as Exhibit C by BRAC and the assumption by the Purchaser made with respect to the Trademark License Agreement.

9

UK1 1846746

Execution Draft

"TUPE Regulations" shall have the meaning set forth in Section 2.14(a)

"VAT" means value added tax as defined in the UK Value Added Tax Act 1994 and any equivalent sales tax in any other jurisdiction

"Vehicle Manufacturer" means any manufacturer of vehicles used by any of the Seller Parties in connection with the Acquired Business.

"Warranting Parties" shall have the meaning set forth in Section 3.

"Withdrawn Assets" shall have the meaning set forth in Section 2.9.

Section 1.2 Other Definitional and Interpretive Matters

(a) Gender and Number. Any reference in this Agreement to gender shall include all genders, and words importing the singular number only shall include the plural and vice versa.

(b) Headings. The provisions of the Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Article," "Section," "Schedule" or "Exhibit" are to the corresponding Article, Section, Schedule or Exhibit, as applicable, of this Agreement unless otherwise specified

(c) Herein. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(d) Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows or the specific or similar items or matters immediately following it.

(e) Schedules and Exhibits. The Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.

ARTICLE 2
PURCHASE AND SALE OF THE ACQUIRED ASSETS

Section 2.1 Purchase and Sale of Acquired Assets. Upon the terms and subject to the conditions of this Agreement, at the relevant Closing, Seller Parties (including BRACII acting by the UK Administrators) shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller Parties, whatever right, title and interest the respective Seller Parties have in, to and under the Acquired Assets in those jurisdiction(s) subject to the relevant Closing. The Purchaser shall have the right by notice in writing to designate one or more of its Affiliates to purchase, acquire and accept some or all of the Acquired Assets, as such notice may specify, and references in this Agreement to the Purchaser

10

UK1 59454v7

Execution Draft

shall with effect from the giving of such notice be deemed to include each of such Affiliates
Notwithstanding any such designation Avis Europe plc and Zodiac Europe Limited shall remain
jointly and severally liable for all obligations of Purchaser under this Agreement.

Section 2.2 Consideration. In consideration for the sale, transfer, assignment, conveyance
and delivery by Seller Parties of the Acquired Assets (other than Withdrawn Assets, if any)
hereunder, the Purchaser shall: (i) assume the Assumed Liabilities (other than Assumed
Liabilities with respect to Withdrawn Assets, if any) and (ii) pay to Seller Parties an aggregate
cash amount equal to (a) the sum of $20 million (subject to reduction, if any, under Section 2.10)
(the "Cash Consideration") plus (b) any amounts owed by Seller Parties under the DIP Financing
Agreement at any time (the "DIP Consideration"). Seller Parties and Budget Germany hereby
direct Purchaser to apply the consideration due in respect of the DIP Financing Agreement to the
repayment of the amounts owed to Purchaser (as lender) under the DIP Financing Agreement
which amounts shall be set-off against the consideration payable in respect of the DIP Financing
Agreement. Seller Parties and Budget Germany agree with Purchaser that payment by Purchaser
of the consideration at Closing as contemplated by this Agreement shall discharge fully
Purchaser's obligation to each Seller Party and Budget Germany in respect of such payment, and
that the Purchaser shall have no obligation to look to the distribution of the consideration among
the Seller Parties, and Budget Germany or any liability in respect of any such distribution or
sharing of the consideration For the avoidance of doubt, if a Closing occurs (whether or not a
Partial Closing) any and all amounts outstanding at such time or thereafter outstanding under the
DIP Financing Agreement shall be discharged by applying DIP Consideration payable hereunder
against such outstanding amounts

Section 2.3 Acquired Assets. For purposes of this Agreement, the term "Acquired Assets"
means:

(a) the Equity Securities of Budget Austria;

(b) such right, title and interest as BRAC may have under the Trademark License
Agreement or under any written or implied licence between BRAC and BRACII with respect to
the EMEA Territory;

(c) such right, title and interest as the Seller Parties may have (including all
implied rights and interests) under the Trademark License Agreement and the licenses (the
"Subsidiary Licenses") between BRACII and its Subsidiaries or under any written or implied
licence between BRAC and BRACII with respect to the EMEA Territory;

(d) such right, title and interest as the Seller Parties may have (including all
implied rights and interests) (i) under the licenses granted by BRACII to Franchisees (ii) under
the licenses granted by Budget Spain to Franchisees ((i) and (ii) collectively, the "Third Party
Licenses") with respect to the EMEA Territory and (iii) under the Contracts in respect of
Switzerland which are listed on Schedule 2.3(e) (collectively the "Assumed Contracts");

(e) [intentionally deleted];

(f) the rights of the Seller Parties under any Adopted Contracts;

11

UK1 5145794

JA844

*Execution Draft*

(g) the Permits held by or in connection with the Acquired Business, to the extent such Permits are assignable to Purchaser;

(h) the Business Records and the Documents;

(i) the Tangible Property;

(j) subject to necessary consents, such right, title and interest as the Seller Parties may have in and to the Telephone Numbers;

(k) all goodwill relating to the Acquired Business; and

(l) the Equity Securities of Société Financière et de Participation (however, such securities shall only be included in the Acquired Assets if, on or prior to the Final Closing Date, Purchaser serves a written notice electing in its sole discretion to include them in the Acquired Assets. If Purchaser serves such a notice (y) before the First Closing Date, the parties shall transfer such securities on the First Closing Date or, (z) between the First Closing Date and the Final Closing Date, forthwith  In both cases, the transfer shall be at each party's own expense )

Section 2.4 Excluded Assets  It is hereby expressly acknowledged and agreed that the Acquired Assets shall be limited to those set forth in Section 2.3 above other than any Withdrawn Assets and, for the avoidance of doubt, shall not include, and no Seller Party is selling, transferring, assigning, conveying or delivering to Purchaser, and Purchaser is not purchasing, acquiring or accepting from any Seller Party, any of the rights, properties or assets set forth or described in paragraphs (a) through (n) below (the rights, properties and assets expressly excluded by this Section 2.4 from the Acquired Assets being referred to herein as the "Excluded Assets"):

(a) any and all claims, right, title, interest or assets of BRAC other than those rights, title and interest BRAC may have under the Trademark Licence Agreement and any implied licences with BRACD;

(b) all cash of the Seller Parties (subject always to Section 2.9) or any cash or other property delivered by Purchaser to Seller Parties, and all rights of Seller Parties under this Agreement;

(c) the Equity Securities of any Person other than in relation to the Acquired Companies;

(d) the Excluded Books and Records including without limitation all minute books, stock transfer and similar records and corporate seals of all Seller Parties;

(e) the rights of any Seller Party to make any claim against or seek recovery from any Person including without limitation (i) the rights of Seller Parties in respect of any causes of action including the actions instituted by Budget Rent a Car International Inc. against Sixt AG and Sixt GmbH and Co. Autovermietung KG (collectively, "Sixt"), including (A) pursuant to the judgment, dated April 15, 1999, by the Higher Regional Court of Munich (Case No. 29 U 446/98 Higher Regional Court Munich; 4 HKO 8409/97 Regional Court Munich) and (B) under

12

UKI 35437-9

JA845

Case No. 9 HKO 1311/97 Higher Regional Court Munich, 6 U 3752/02 Regional Court Munich, for breach of contract based on the allegedly improper passing of reservations by Sixt, and (ii) avoidance actions under Chapter 5 of the Bankruptcy Code (including actions under section 544, 545, 547, 548, 549 or 550 thereof) and pursuant to the Insolvency Act brought or that could be brought against any Person or any comparable or similar action of avoidance under English Law;

      (f)  all accounts receivable of the Seller Parties, whether or not relating to the Acquired Business, which are outstanding as of the First Closing Date (the "Excluded Accounts Receivable"), including, without limitation, credit card receivables, direct bill receivables, tour receivables, Vehicle Manufacturer receivables, Franchisee receivables (including but not limited to those pursuant to any Subsidiary Licences and/or Third Party Licenses) and subrogation receivables;

      (g)  all Tax refunds attributable to Taxes imposed on any Seller Party;

      (h)  all intercompany accounts receivable due to or from any Seller Party or any of its Affiliates;

      (i)  the insurance or reinsurance Contracts and/or policies and similar arrangements under which any Seller Entity is an insured party; and

      (j)  all executory or other contracts not included in the Assumed Contracts, including without limitation the contracts listed in Schedule 2.4(j), and all contracts designated as such in an Exclusion Notice delivered under Section 2.15(e) (collectively the "Excluded Contracts");

      (k)  Leased Premises;

      (l)  all other assets not specifically mentioned as Acquired Assets;

      (m) in the event that the first Closing is a Partial Closing, the rights of the Seller Parties and UK Administrators pursuant to the Indemnity Agreement;

      (n)  any Withdrawn Assets; and

      (o)  all rights and liabilities under the Excluded Contracts.

    Section 2.5 Assumed Liabilities.  For purposes of this Agreement, the term "Assumed Liabilities" means all liabilities of Seller Parties set forth or described in paragraphs (a) through (d) below (provided that, notwithstanding anything to the contrary contained in this Agreement, the Assumed Liabilities shall not include any of the Excluded Liabilities):

      (a)  all liabilities contained in any Assumed Contract that first accrue or arise on or after the First Closing Date;

      (b)  all liabilities contained in any Adopted Contract that first accrue or arise on or after the First Closing Date

13

JA846

Execution Draft

(c) the liabilities in relation to Seller Parties' Employees as set forth in Sections 2.14(a) and (e);

(d) accounts payable or any other amounts owing or liabilities accruing in relation to the Acquired Business or an Acquired Asset which first arise or accrue on or after the First Closing Date;.

Section 2.6 Excluded Liabilities. As between the Purchaser on the one hand and the Seller Parties on the other hand Purchaser shall not assume or be obligated (and Seller Parties and their Subsidiaries shall retain their respective obligations) to pay, perform or otherwise assume or discharge any liabilities of the Seller Parties, which constitute Excluded Liabilities, for which the Seller Parties shall remain and be solely and exclusively liable. For purposes of this Agreement, the term "Excluded Liabilities" means all liabilities that are not expressly included in the definition of Assumed Liabilities and, for the avoidance of doubt, all liabilities contained in any Assumed Contract or Adopted Contract or accounts payable or other amounts which first accrue or arise prior to the First Closing Date .

Section 2.7 Closing. (a) The closing or closings of the transactions contemplated in this Agreement (each a "Closing") shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP in New York or at such other place as the parties may agree, in each instance in accordance with this Agreement. Upon entry of the Sale Approval Order, a Closing with respect to all the Acquired Assets and Assumed Liabilities shall occur promptly following the conditions set forth in Article 7 having been satisfied or waived. If a Closing with respect to all the Acquired Assets and Assumed Liabilities has not taken place by 11:59pm EST on February 18, 2003, then (a) the Purchaser shall have the right, in its sole discretion, to delay the Closing in accordance with Section 2.8, or (b) the Purchaser may, subject to the conditions of and in accordance with Section 2.9, proceed with a Partial Closing with respect to a portion of the Acquired Assets and Assumed Liabilities (a "Partial Closing") or (c) if the Purchaser shall not have delayed closing or proceeded with a Partial Closing in accordance with clause (a) or (b) the parties may mutually agree to delay closing in accordance with Section 2.10, or (d) if none of the events in clause (a), (b) or (c) occur, this Agreement shall terminate at such time

(b) On the First Closing Date, Purchaser shall: (i) assume the Assumed Liabilities other than those Assumed Liabilities with respect to the Delayed Jurisdiction Assets (if any), and (ii) pay to Seller Parties (a) the Cash Consideration and (b) the DIP Consideration at such date

(c) If the first Closing is a Partial Closing, then on each subsequent Partial Closing (if any) Purchaser shall: (i) assume the Assumed Liabilities with respect to the Delayed Jurisdiction Assets being transferred at such Closing and (ii) pay to Seller Parties all amounts owed by Seller Parties under the DIP Financing Agreement with respect to the Delayed Jurisdiction Assets being transferred at such Closing. In addition, if on the Final Closing Date there remain any amounts due under the DIP Financing Agreement, Purchaser shall pay to Seller Parties all amounts owed by Seller Parties under the DIP Financing Agreement at such date. Seller Parties hereby direct Purchaser to apply any consideration due in respect of the DIP Financing Agreement to the repayment of the amounts owed to Purchaser (as lender) under the DIP Financing Agreement which amounts shall be set-off against the consideration payable in respect of the DIP Financing Agreement

14

UK1 384874-9

Execution Draft

Section 2.8 <u>Delayed Closing</u>. If a Closing with respect to all the Acquired Assets and Assumed Liabilities has not taken place by 11:59pm EST on February 18, 2003, Purchaser may, in its sole discretion, elect to delay closing for up to thirty (30) days from such date and extend this Agreement in accordance with the following terms:

(a) Purchaser shall deliver written notice (a "<u>Purchaser Delay Notice</u>") to the Seller Parties and the UK Administrators, informing such parties of the election and specifying a date (an "<u>Extended Closing Date</u>") on which such delay period (the "<u>Delay Period</u>") shall expire which shall be at least seven (7) days from the date of such notice;

(b) Purchaser shall be deemed to have extended the availability of, and the maturity date of the outstanding amounts under, the DIP Financing Agreement to the Extended Closing Date, in each case in accordance with the terms of the DIP Financing Agreement; and

(c) If a Closing with respect to all the Acquired Assets and Assumed Liabilities has not taken place by 11:59pm EST on an Extended Closing Date, Purchaser be entitled to serve a further Purchaser Delay Notice on the above terms, provided that any such further Extended Closing Date may not be later than March 20, 2003.

Section 2.9 <u>Partial Closing</u>. If (x) a Closing with respect to all the Acquired Assets and Assumed Liabilities has not taken place by either (i) 11:59pm EST on February 18, 2003, or (ii) if Purchaser has delivered a Purchaser Delay Notice, by the latest Extended Closing Date, and (y) all conditions to Closing have been satisfied or waived with the exception of receipt of approval(s) under applicable Competition Laws in relation to one or more Delayed Jurisdictions, then the Purchaser may, in its sole discretion, elect to proceed with a series of Closings (each a "<u>Partial Closing</u>") in accordance with the following terms:

(a) Purchaser shall deliver written notice (a "<u>Partial Closing Notice</u>") to the Seller Parties and the UK Administrators, informing such parties of the election to Close in respect of all Acquired Assets and Assumed Liabilities other than those located in the Delayed Jurisdictions and specifying those Delayed Jurisdictions that are not to be included in the Partial Closing;

(b) The parties shall take all steps set forth in <u>Sections 2.7, 2.11</u> and <u>2.12</u> to effect a Partial Closing in respect of all Acquired Assets and Assumed Liabilities other than those located in the outstanding Delayed Jurisdictions;

(c) Upon receipt of all approvals under applicable Competition Laws in respect of any Delayed Jurisdiction or otherwise at the Purchaser's sole discretion, the Purchaser shall deliver a Partial Closing Notice in accordance with <u>Section 2.9(a)</u> in respect of that Delayed Jurisdiction and the Parties will proceed to a Partial Closing in accordance with Section 2.9(b) in respect of all Acquired Assets and Assumed Liabilities located in that Delayed Jurisdiction;

(d) If ninety (90) days after the date of the first Partial Closing (the "<u>Extended Partial Closing Period</u>") all approvals under applicable Competition Laws in respect of a Delayed Jurisdiction have not been received, the Purchaser may, in its sole discretion, elect to either waive the conditions precedent in respect of that Delayed Jurisdiction and proceed to Closing or terminate this agreement in respect of that Delayed Jurisdiction, in which case the Acquired Assets and Assumed Liabilities located in that Delayed Jurisdiction (the "<u>Withdrawn Assets</u>")

UK1 5485749

15

Execution Draft

will be withdrawn from sale pursuant to this Agreement and this agreement will have no further force and effect with respect thereto. Notwithstanding the termination of this Agreement in respect of one or more Delayed Jurisdictions, the Seller Parties shall not be obligated to return all or any portion of the Cash Consideration nor shall the Seller Parties be obligated to repay all or any portion of the amounts owed by the Seller Parties under the DIP Financing Agreement.

(e) Purchaser shall be deemed to have agreed to provide such further amounts as set forth in the DIP Financing Agreement for the Delayed Jurisdictions that have not been subject to a Partial Closing, which shall also have a maturity date of the Extended Partial Closing Date, in each case in accordance with the terms of the DIP Financing Agreement. Purchaser covenants that it will advance sufficient funds under the DIP Financing Agreement to the Seller Parties to discharge all Assumed Liabilities accrued, arising or becoming due in respect of the Delayed Jurisdictions between the First Closing Date and the Final Closing Date.

(f) At the first Partial Closing, Purchaser shall license back to BRACH (and, if applicable, Budget Austria) such trademarks rights acquired under the Trademark License Assignment necessary to permit the relevant Seller Parties (and, if applicable, Budget Austria) to operate in the Delayed Jurisdictions for which there has not been a Closing;

(g) At the first Partial Closing, Purchaser shall indemnify Seller Parties and the UK Administrator pursuant to an Indemnity Agreement substantially in the form of Exhibit D hereto; and

(h) If a Partial Closing occurs with respect to a Delayed Jurisdiction after the first Partial Closing, the Seller Parties shall be deemed with effect from the First Closing Date to have held the Assumed Contracts, Adopted Contracts and Acquired Assets in or relating to that Delayed Jurisdiction as agent for the Purchaser and accordingly the Purchaser shall be entitled to all revenue derived from the Acquired Business, the Acquired Assets, Adopted Contracts and Assumed Contracts in or relating to such Delayed Jurisdiction between the first Partial Closing Date and the Closing Date with respect to such Delayed Jurisdiction and at the Partial Closing with respect to such Delayed Jurisdiction the Seller Parties shall assign and transfer to the Purchaser all receivables which arose in relation to such Delayed Jurisdiction after the First Closing Date which remain unpaid, and shall pay over to the Purchaser all cash received by them in relation to any such receivables which have been paid, except to the extent used to settle liabilities which first arose or accrued after the First Closing Date.

Section 2.10  Mutual Delay. If a Closing with respect to all of the Acquired Assets and Assumed Liabilities has not taken place (i) by 11:59pm EST on February 18, 2003, (ii) if Purchaser has delivered a Purchaser Delay Notice, by the Extended Closing Date or (iii) if Purchaser has delivered a Partial Closing Notice, by the Extended Partial Closing Date, then the parties may mutually agree to delay closing and extend this Agreement in accordance with the following terms:

(a) The parties shall execute a written agreement (a "Mutual Delay Agreement") setting forth the terms on which the delay shall be implemented (including with respect to the necessary financing of the business) and the agreed period of the delay, during which the maturity of the amounts under the DIP Financing Agreement shall be extended;

16

JA849

Execution Draft

(b) If the delay is due to any reason other than (i) a failure to satisfy or waive the condition in Section 7.2 (c) or (ii) a failure to satisfy the condition in Section 7.2(h) or 7.2(i) due to an action or failure to act by the Purchaser, then to the extent that the Purchaser agrees to provide additional financing during the agreed delay period the amount of such additional financing shall reduce the consideration payable at Closing on a dollar-for-dollar basis, provided that interest on the amounts outstanding under the DIP Financing Agreement shall only decrease the consideration to the extent such interest accrued more than 30 days after the date of the Mutual Delay Agreement.

Section 2.11   Deliveries by Seller Parties.  (a) At the first Closing (whether or not a Partial Closing), Seller Parties shall deliver (or, in the case of clause (iv), make available) to Purchaser the following:

(i)      the Assumption Agreements duly executed by the applicable Seller Parties excluding, in the case of a Partial Closing, Assumption Agreements with respect to the relevant Delayed Jurisdictions;

(ii)     the Trademark License Assignment duly executed by BRAC;

(iii)    stock certificates together with duly executed stock powers (affixed with all required stamps, evidencing payment of transfer duties) evidencing the Equity Securities of the Acquired Companies other than Budget Austria, except that stock powers shall not be required in respect of Equity Securities of Acquired Companies which are held by other Acquired Companies;

(iv)    the Business Records and the Documents;

(v)     the Licensee Confirmation Letters referred to in Section 7.2(d);

(vi)    a certified copy of the Sale Hearing Order;

(vii)   any required consents to assumption received on or before Closing with respect to the Assumed Contracts and the Adopted Contracts;

(viii)  the resignations (effective as of or prior to the Closing Date) of all directors (or in the case of unincorporated entities, managing partners, members or persons of similar role and responsibility), of each Acquired Company, in terms satisfactory in substance and form to Purchaser;

(ix)    all such other bills of sale, assignments and other instruments of sale, assignment, transfer or conveyance (including vehicle registrations) as Purchaser may reasonably request or as may be otherwise necessary to evidence and effect the sale, transfer, assignment, conveyance and delivery of the Acquired Assets to Purchaser and to put Purchaser in actual possession or control of the Acquired Assets; and

(x)     the Notarial Deed Austria duly executed by BRACII.

17

JA850

Execution Draft

(b) In addition, if the first Closing is a Partial Closing, each relevant Seller Party shall execute and deliver to Purchaser as escrow agent Assumption Agreements with respect to the Assumed Contracts and Adopted Contracts together with all such other bills of sale, assignments and other instruments of sale, assignment, transfer or conveyance (including vehicle registrations) as Purchaser may reasonably request or as may be otherwise necessary to evidence and effect the sale, transfer, assignment, conveyance and delivery of the Acquired Assets to Purchaser and to put Purchaser in actual possession or control of the Acquired Assets in each case in respect of the relevant Delayed Jurisdictions;

(c) No Seller Party shall be required to make any further deliveries hereunder at any Closing after the first Closing whether or not such Closing is a Partial Closing, except that Seller Parties shall deliver at each Partial Closing any assignments and cash referred to in Section 2.9(h).

Section 2.12   Deliveries by Purchaser. Purchaser shall deliver to the applicable Seller Party:

(a) in the case of the first Closing only, the Cash Consideration by wire transfer of immediately available funds to an account in the name of BRACII to be designated in writing (signed by each of the Seller Parties) prior to the First Closing Date for it, and on behalf of and as agent for the other Seller Parties, and as approved by the Bankruptcy Court and by the UK Administrators;

(b) in the case of the first Closing only, the Trademark License Assignment duly executed by Purchaser or one of its Affiliates;

(c) in the case of the first Closing only, if it is a Partial Closing, the Indemnity Agreement duly executed by the Purchaser;

(d) in the case of the relevant Closing, the Notarial Deed Austria duly executed by Purchaser (or a nominee of Purchaser nominated in writing);

(e) at each Closing, the DIP Consideration on such date;

(f) at each Closing, the Assumption Agreement(s) duly executed by the Purchaser and all such other documents and instruments as Seller Parties may reasonably request or as may be otherwise necessary or desirable to evidence and effect the assumption by Purchaser of the relevant Assumed Liabilities;

(g) at each Closing, evidence of the obtaining of any Governmental Consents procured by Purchaser required to comply with Competition Laws in the relevant jurisdictions; and

(h) BRACII shall receive all deliveries in this sub-section (including those referred to in sub-sections (a) and (c) above) on trust for the Seller Parties to be shared among them. For the avoidance of doubt, such a delivery by Purchaser to BRACII shall discharge fully Purchaser's obligation to each Seller Party in respect of that delivery, and Purchaser shall have

18

UK3 854657v9

JA851

Execution Draft

no obligation to look to the distribution as between the Seller Parties or liability in respect of that distribution or allocation.

Section 2.13  Administrator Facilities.  For six months after the Final Closing or termination, Purchaser shall provide the UK Administrators with reasonable assistance and access to such information as they may reasonably require in connection with their duties and obligations as administrators of BRACII (such reasonable assistance by Purchaser to be at its own expense).  The UK Administrators and the Seller Parties shall give the Purchaser reasonable access to the Excluded Books and Records at the Purchaser's own expense.

Section 2.14  Employees.

(a) The Employees are listed on *Schedule 2.14*.  Purchaser acknowledges that at the First Closing the Employees listed under the headings 'United Kingdom' and 'Switzerland' will be transferred to Purchaser by virtue of the Transfer of Undertakings (Protection of Employment) Regulations 1981 or the corresponding regulations in a relevant European jurisdiction (the "TUPE Regulations") and, subject to the Seller Parties making the payments referred to in *Section 2.14 (c) and (d)*, Purchaser shall have no recourse against the Seller Parties in respect of any claim made by or in relation to any Employee, whether under the TUPE Regulations or otherwise  Purchaser shall from the First Closing assume the contract of employment of each Employee listed under the headings 'United Kingdom' and 'Switzerland' and procure that benefits broadly equivalent to the benefits provided to the Employees under the Benefit Plans maintained by the Seller Parties immediately prior to the First Closing shall be provided to the Employees from the date of Closing.  Purchaser accepts that where required by law it may be obliged to procure that identical benefits are provided after the Relevant Closing.

(b) For the avoidance of doubt, Purchaser shall have no liability in relation to any pension scheme of which any of the Employees listed under the heading 'United Kingdom' may be members and shall have no liability for any other Benefit Plan providing for the payment to current or former employees of the Seller Parties or members of their families or their estates of benefits after the termination of their employment or their retirement (or early retirement whether by reason of old age or invalidity) (x) save as required by law, in respect of Employees, that first accrues or arises before the First Closing Date, and (y) in respect of all other employees or former employees of the Sellers ("Non-Employees"), at any time whatsoever

(c) BRACII agrees to indemnify on an after tax basis the Purchaser against all actions, claims, damages, proceedings, demands, liabilities, costs and expenses of whatsoever nature including properly incurred legal costs incurred by the Purchaser in connection with any claim made at any time by any Employee or Non-Employee in relation to any retention payments, bonus schemes and similar plans that were agreed after or in relation to the Chapter 11 Petitions.

(d) The Seller Parties (other than BRAC) shall be responsible for the payment of normal wages and salaries due (including related Tax and National Insurance deductions and the Seller Parties (other than BRAC) shall be responsible to account to the relevant Tax or other authority for such deductions) in respect of all individuals employed or formerly employed by them for all periods down to and including the First Closing and shall make payment on the

19

LIK3 384279

Execution Draft

normal date in respect of such payments, but the Seller Parties shall not be responsible for the payment of any accrued holiday pay entitlement and related Tax, withholding and deductions in respect of all individuals employed by them for all periods down to, and including, the First Closing where that accrued holiday pay entitlement becomes payable after the First Closing and:

    (i)    the Seller Parties shall not be responsible for any sum that first accrues or arises in respect of the Employees for periods after the First Closing; and

    (ii)    nothing in this clause shall oblige BRACII to pay any amount in respect of any period prior to the appointment of the UK Administrators or for whatever period to a person whose employment ceased prior to the date of the First Closing.

(e) The Purchaser agrees subject to Section 2.14(c) to indemnify on an after tax basis the Seller Parties and the UK Administrators and each of them against all actions, claims, damages, proceedings, demands, liabilities, costs and expenses of whatsoever nature including properly incurred legal costs incurred by the Seller Parties or the UK Administrators in connection with any claim made by or in respect of any Employee or by any trade union, staff association or employee representative of any such Employee, which relates to redundancy, unfair dismissal, a claim under the TUPE Regulations or other matters within the jurisdiction of any court or any employment tribunal, wrongful dismissal, breach of contract, sex, disability or race discrimination, equal pay, regardless of whether that claim arises at common law or in tort or otherwise.

(f) BRACII agrees to indemnify on an after tax basis the Purchaser against all actions, claims, damages, proceedings, demands, liabilities, costs and expenses of whatsoever nature including properly incurred legal costs incurred by the Purchaser in connection with any claim made or notified within 6 months after the First Closing by or in respect of any Non-Employee or by any trade union, staff association or employee representative of any Non-Employee, which relates to redundancy, unfair dismissal, a claim under the TUPE Regulations or other matters within the jurisdiction of any court or any employment tribunal, wrongful dismissal, breach of contract, sex, disability or race discrimination, equal pay, regardless of whether that claim arises at common law or in tort or otherwise.

(g) In this Section 2.14(g) the "Indemnified Party" means the party with the benefit of an indemnity and the "Indemnifying Party" means the party giving the indemnity under Sections 2.14(c), (e) or (f). If an Indemnified Party becomes aware that a claim has or is about to arise it shall give notice of this as soon as possible to the Indemnifying Party setting out all reasonable details of the matter in respect of which a claim has or is being made. No admission of liability shall be made by or on behalf of the Indemnified Party and no claim shall be compromised disposed of or settled without the consent of the Indemnifying Party (such consent not reasonably withheld or delayed). The Indemnifying Party shall be entitled at its own expense and in its absolute discretion to take such action as it shall deem necessary to avoid, dispute, deny, defend, resist, appeal, compromise or contest such claim including without limitation making counter claims or other claims against third parties in the name of and on behalf of the Indemnified Party and to have the conduct of any related proceedings negotiations

20

JA853

Execution Draft

or appeals provided that it acts reasonably, promptly and consults with the Indemnified Party in so doing. The Indemnified Party will give and procure where necessary that any affiliate gives such information or assistance (including access to premises and personnel and the right to examine, copy or photograph any documents and records) for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any such claim as the Indemnifying Party or their professional advisors reasonably request of the Indemnified Party

(h) On the First Closing Date, the Purchaser shall place $500,000 ("the Escrow Amount") (to come out of the Cash Consideration) in a separately designated interest bearing account ("the Escrow Account") to be maintained and operated by the Purchaser's Solicitors and the Seller Parties' Solicitors. Any bank or other charges arising on the Escrow Account and any out-of-pocket expenses incurred in connection with the operation, maintenance and closure of the Escrow Account shall be charged to the Escrow Account. If the Purchaser has not notified BRACII in writing of any Qualifying Claim (under Section 2.14(x) below) before the date which is 6 months after the First Closing Date ("the Escrow Account Closing Date"), all monies (including all interest accrued thereon) standing to the credit of the Escrow Account at that date shall be paid as soon as possible thereafter to BRACII (whose receipt shall be a full discharge on behalf of all Seller Parties and Budget Germany for the same)  Following such payment, the Escrow Account shall be closed.

(i) If the Purchaser serves one or more written notices on BRACII on or before the Escrow Account Closing Date stating that it has a Qualifying Claim (or Qualifying Claims) against the Seller Parties (such notices to contain reasonable details of the Qualifying Claims together with a good faith estimate by the Purchaser (on a without prejudice basis) of the Qualifying Claims), there shall be retained in the Escrow Account such aggregate sum as the notices may reasonably specify as a provision for the amount of each such Qualifying Claim plus interest and costs. The Seller Parties agree that the Purchaser shall be entitled to satisfy the Qualifying Claim out of the Escrow Amount by withdrawing the amount of the provision from the Escrow Account, subject to compliance by the Purchaser with Section 2.14(g) and the provision of a written statement setting out in reasonable detail the computation of the Qualifying Claim.

(j) The retention of monies by the Purchaser pursuant to Section 2.14(i) shall not in any way prevent the Purchaser from pursuing BRACII under the indemnity in Section 2.14(f) for any outstanding sums owing in respect of such a Qualifying Claim(s), or otherwise making any additional Qualifying Claim(s) in accordance with the Agreement and the value of the Escrow Amount shall in no way be regarded as imposing a limit on the amount of any such Qualifying Claim(s). Notwithstanding anything in this paragraph, BRACII shall not be liable in respect of any Qualifying Claim to the extent the amount of such Qualifying Claim is fully recovered or otherwise fully satisfied on the terms set out in the Agreement. The provisions of Sections 2.14(h), (i) and (j) shall terminate within 6 Business Days after the Escrow Account Closing Date save in respect of Qualifying Claims that are the subject of outstanding notices under Section 2.14(i). Thereafter, any balance then held that has not been retained in respect of unresolved Qualifying Claims under Section 2.14(i) (including any interest generated on the Escrow Amount in the Escrow Account) shall be accounted to BRACII (whose receipt shall be full discharge on behalf of the Seller Parties and Budget Germany for the same)  Within 5 Business Days after the date when the last Qualifying Claim is finally resolved, any unutilised

21

UKI 364376

Execution Draft

     (i)    it is to be treated as an Excluded Contract for all purposes of this Agreement; or

     (ii)    it is to be treated as an Adopted Contract for all purposes of this Agreement.

     (d) Seller Parties will provide to Purchaser promptly upon receipt copies of all Licensee Claims and Licensee Confirmation Letters received from each Licensee, together with any details held in Seller Parties' files with regard to each Licensee submitting a Licensee Claim, and if requested will allow Purchaser access to the Licensee to the extent within Seller Parties' power to do so

     (e) <u>Determination of Aggregate Net Cure Payment</u>. In relation to each Licensee Claim, the Net Amount of that claim is the aggregate amount asserted by the relevant Licensee to be owed to it by all Seller Parties or BRAC as a liquidated sum or as damages, less the aggregate amount which that Licensee acknowledges it owes to all Seller Parties or to BRAC (if a positive number or, if negative, zero)  Any amount stated in a Licensee Confirmation Letter or in any cure notice sent in connection with the Chapter 11 Cases as owing by a Licensee shall be deemed to have been acknowledged for these purposes if Licensee has either expressly agreed to it or not contested it.  For the purposes of Section 2 15(c) the Aggregate Net Cure Payment is the sum of the Net Amounts of all Licensee Claims made in relation to Assumed Contracts, after excluding any Licensee Claims made in relation to any contract which is designated under <u>Section 2.15(c)</u> as an Excluded Contract or Adopted Contract.

     (f) <u>Late-Asserted Licensee Claims</u>.  In the event that a Licensee Claim is asserted prior to the Sale Hearing that causes the Aggregate Net Cure Payment to exceed $4,800,000, but there are insufficient days to comply with the notice procedures set forth in Sections 2 15(b) and 2 15(c), then the Seller shall promptly serve a Cure Warning Notice upon Purchaser and the Parties shall make all reasonable efforts to meet and confer to afford the Purchaser and Seller their respective rights to exclude or adopt and to terminate, as applicable, provided that all such rights shall lapse at the conclusion of the Sale Hearing.

     Section 2.16  <u>Microsoft Licences</u>.  Promptly after signing this Agreement the Parties will work together to negotiate and agree with Microsoft Corporation terms upon which the Acquired Business may continue to use for an indefinite period and including after Completion all copies of Microsoft software used by the Acquired Business or on its behalf and reasonably required in order for the Acquired Business to continue to operate as it has done prior to this Agreement.  It is agreed that Purchaser will have charge of the discussions and the Selling Parties will agree to any arrangement with Microsoft Corporation which Purchaser reasonably deems acceptable. Purchaser on the one hand and Selling Parties jointly and severally on the other hand shall each pay to Microsoft Corporation on production of an invoice one half of the amount, including VAT, of the licence fee charged by Microsoft Corporation on conclusion of this negotiation

23

UK1 3842576

Execution Draft

### ARTICLE 3
### LIMITED REPRESENTATIONS AND WARRANTIES OF BUDGET RENT A CAR ESPANA
S.A.; EXCLUSIONS OF FURTHER REPRESENTATIONS AND WARRANTIES AND
LIABILITY OF SELLER PARTIES

Except as specifically set forth in the Disclosure Schedule, Budget Germany and
Budget Spain (the "Warranting Parties") make the representations and warranties contained in
Sections 3.1 to 3.9 below to Purchaser as of the date hereof and as of the First Closing Date (or if
any are made as of a specified date, as of such date), and such representations and warranties will
not survive first Closing and are only given in respect of, and by reference to, the Acquired
Business. Each exception set forth in the Disclosure Schedule is identified by reference to a
specific Section of this Agreement. Any matter disclosed by Seller Parties in any particular
Section of the Disclosure Schedule shall be deemed disclosed for the purposes of any other
Section of the Disclosure Schedule. In the absence of fraud, the Warranting Parties shall have no
liability to the Purchaser or any other person for any breach of the representations and warranties
contained in this Agreement except to the extent that a Court grants the equitable remedy of
specific performance in relation to any such breach. In the event that there has been a breach of
representation or warranty, the Seller Parties will continue to perform their obligations in
accordance with the Agreement unless the Agreement is terminated in accordance with its terms.

Section 3.1 Organization and Qualification. Each Seller Party is a legal entity duly
organized, validly existing and in good standing under the Laws of the state or jurisdiction of its
organization and has all requisite corporate or other organizational power and authority to own,
lease and operate its assets and to conduct its business. Each Seller Party is duly qualified to do
business and is in good standing in each other jurisdiction where the ownership, lease or
operation of its assets or the nature of the business conducted by it requires such qualification,
except where the failure to be so qualified could not reasonably be expected to have a material
adverse effect. Each Seller Party have made available to Purchaser true, complete and correct
copies of its certificate of incorporation and by-laws (or other comparable organizational
documents), each as currently in effect.

Section 3.2 Capitalization of the Acquired Companies.

(a) A complete and accurate list of the authorized and outstanding Equity
Securities of each of the Acquired Companies is set forth in Section 3.2(a) of the Disclosure
Schedule, together with the identity of each holder of such Equity Securities. The authorized
Equity Securities of each of the Acquired Companies are held either by one or more Seller
Parties or one or more Acquired Companies. Such Person owns all of the outstanding Equity
Securities beneficially and of record and free and clear of any Encumbrances. Upon delivery to
Purchaser of the certificates (or other appropriate evidence thereof) representing the outstanding
Equity Securities of the Acquired Companies other than Budget Austria, then subject to all
relevant filing and registration requirements in respect of the Equity Securities and the payment
of all relevant transfer taxes in respect thereof, at the Closing, Purchaser will acquire good and
valid title to such Equity Securities, free and clear of any Encumbrances. Upon execution and
delivery to Purchaser of the Notarial Deed Austria and subject to all relevant filing and
registration requirements in respect of the Equity Securities of Budget Austria and the payment

24

UK1 5846719

JA857

Execution Draft

of all relevant transfer taxes in respect thereof, at the Closing, Purchaser will acquire good and valid title to such Equity Securities, free and clear of any Encumbrances.

(b) All of the outstanding Equity Securities of each Acquired Company are duly authorized, validly issued, fully paid and nonassessable, and not issued in violation of any preemptive or similar rights. Seller Parties have the sole, absolute and unrestricted right, power and capacity to sell, assign and transfer all of the outstanding Equity Securities of each Acquired Company to Purchaser free and clear of any Encumbrances.

(c) Other than pursuant to this Agreement, there are no outstanding subscriptions, options, warrants, puts, calls, agreements, understandings, claims or other commitments or rights of any type or other securities (i) requiring the issuance, sale, transfer, repurchase, redemption or other acquisition of any Equity Securities of any of the Acquired Companies, (ii) restricting the transfer of any of the Equity Securities of any of the Acquired Companies or (iii) relating to the voting of any of the Equity Securities of any of the Acquired Companies  There are no issued or outstanding bonds, debentures, notes or other indebtedness of any Acquired Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote), upon the happening of a certain event or otherwise, on any matters on which the equity holders of any Acquired Company may vote.

Section 3 3 Corporate Power and Authority  Subject to court approval and any limitations imposed as a result of the Petitions each Seller Party, Budget Austria and Budget Germany has all requisite corporate or other organizational power and authority to enter into and deliver this Agreement and (in the case of BRAC) the Trademark License Assignment, by such entity and any agreements, documents or instruments to be executed and delivered in connection herewith and therewith and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement, the Trademark License Assignment and any agreements, documents or instruments to be executed and delivered in connection herewith and therewith to which it is a party by each Seller Party, Budget Austria and Budget Germany and the consummation by each Seller Party, Budget Austria and Budget Germany of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other organizational action on the part of such Seller Party, Budget Austria and Budget Germany and no other corporate or other organizational proceedings on the part of any Seller Party, Budget Austria or Budget Germany is necessary to authorize this Agreement and the Trademark License Assignment or to consummate the transactions contemplated hereby and thereby  This Agreement, the Trademark License Assignment to which it is a party and any agreements, documents or instruments to be executed and delivered in connection herewith and therewith have been duly executed and delivered by each Seller Party, Budget Austria and Budget Germany and constitute the legal, valid and binding obligation of each Seller Party, Budget Austria and Budget Germany enforceable against such Seller Party, Budget Austria and Budget Germany in accordance with its terms.

Section 3 4 Conflicts; Consents and Approvals.  Subject to any consent or approval necessary as a result of the filing of the Petitions or the BRACII Administration, neither the execution and delivery of this Agreement, the Trademark License Assignment and any other agreements, documents and instruments to be executed and delivered in connection with this Agreement or the Trademark License Assignment, nor, upon the entry of the Sale Approval, the

UK1 35607V9

25

JA858

Execution Draft

consummation of the transactions contemplated hereby and thereby, will (except to the extent excused by or rendered unnecessary as a result of the filing of the Petitions or the applicability of the Bankruptcy Code (but only to the extent such excuse, rendering or application of the Bankruptcy Code will continue to apply in favor of Purchaser and its successors and assigns following the first Closing) or (except in the event that it could not reasonably be expected to have a material adverse effect):

(a) conflict with, or result in a breach of any provision of, the organizational documents of (i) any Seller Party, Budget Austria and Budget Germany or (ii) any other agreements, documents and instruments to be executed and delivered in connection with this Agreement or the Trademark License Agreement;

(b) violate, or conflict with, or result in a breach of any provision of, or constitute a default under, any agreement, indenture, or instrument to which any Seller Party, Budget Austria or Budget Germany is a party or by which such Seller Party, Budget Austria or Budget Germany is bound; other than violations, conflicts or defaults which could not reasonably expected to have a material adverse effect;

(c) violate in any material respect any Law applicable to any Seller Party, Budget Germany or Acquired Company or any of their respective properties or assets (including the Acquired Assets) or to the Acquired Business;

(d) require any action, consent or approval of, or review by, or registration or filing by any Seller Party, Budget Austria or Budget Germany with any Governmental Body, other than consents, approvals, or authorizations or, or declarations or filings (i) in or with the Agreed Jurisdictions; or (ii) excused by or rendered unnecessary as a result of the filing of the Petitions or the applicability of the Bankruptcy Code or the Insolvency Act (but only to the extent such excuse, rendering or application of the Bankruptcy Code or the Insolvency Act will continue to apply in favor of Purchaser and its successors and assigns following the Closing) or (iii) which if not obtained could not reasonably be expected to have a material adverse effect (the "Governmental Consents"); or

(e) put any Seller Party, Budget Austria or Budget Germany in breach of any material outstanding order, writ, injunction, judgement or decree.

Section 3 5Title to Property; Adequacy of Assets; Agreements and Compliance.

(a) Except as set forth in Section 3.5(a) of the Disclosure Schedule, Seller Parties have (and immediately prior to the first Closing will have) good and valid title to, or a valid and binding leasehold interest or license in, all tangible personal property comprising the Acquired Assets and possession thereof, in each case, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b) Subject to entry of the Sale Approval Order and payment of all consideration due at each Closing, Purchaser will have good and valid title, or a valid and binding leasehold interest, concession or license in all tangible personal property comprising the Acquired Assets in the relevant jurisdictions free and clear of all liabilities (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances).

26

JA859

Execution Draft

(c) Subject to the entry of the Sale Approval Order, all Assumed Contracts being sold pursuant to this Agreement are assignable by BRACII and Budget Spain to the Purchaser

(d) None of the Seller Parties nor Budget Austria is party to any material agreement relating to the Acquired Business other than the Assumed Contracts and any other agreements which have been disclosed to Purchaser in writing prior to the date hereof

(e) The Acquired Business is being conducted in compliance with, and in relation to the Acquired Business there is no violation of, any and all applicable laws and regulations except to the extent that any non-compliance or violation would not have a material adverse effect.

Section 3.6 Seller Financial Statements and other Information.

(a) Section 3.6 of the Disclosure Schedule contains the unaudited consolidated profit and loss account of the UK branch of BRACII for the ten months up to 31 October, 2002 and the related consolidated balance sheet of the UK branch of BRACII as at 31 October, 2002 (the "EMEA Financial Statements"), which fairly present in all material respects the financial position of the UK branch of BRACII as at 31 October, 2002 and the consolidated results of operations for the period ended on that date, together with other royalty schedules setting out various details in relation to the Licensees which are accurate and complete.

(b) Seller Parties have provided to Purchaser complete and accurate information regarding all terms of employment of each of the Employees and regarding all Benefit Plans, and complete and accurate details of all remuneration, benefits and other entitlements (whether payable automatically or only on the happening of a contingency) to which any of the Employees has any entitlement.

(c) The turnover information provided by Seller Parties to Purchaser which has been used by Purchaser in determining the jurisdictions and supra-governmental authorities under whose Competition Laws this transaction would require approval is accurate and not misleading

Section 3.7 Budget Austria.

(a) Section 3.6 of the Disclosure Schedule contains the unaudited profit and loss account for Budget Austria for the 11 months up to 30 November, 2002 and the trial balance of Budget Austria as at 30 November, 2002 which fairly present in all material respects the financial position of Budget Austria as at 30 November, 2002

(b) There have been no material payments from Budget Austria to the Seller Parties or its Affiliates since 30 November, 2002 and there will be no such payments prior to the Final Closing.

Section 3.8.  Licensee Confirmation Letters  The statements of sums owing to or from BRACII's licensees or franchisees attached to the Licensee Confirmation Letters accurately reflect the amounts stated for such sums in the books and records of the Company without reference to any dispute or other disagreement a licensee may have in relation to them.

27

UK1 358578

Execution Draft

Section 3.9 No material alteration since October 31, 2002  No license arrangement or franchise agreement relating to the EMEA Territory, whether implied, written, oral, formal or informal, has been entered into or materially altered the agreements that were in place on October 31, 2002 with respect to such territories, unless such agreements or alterations could not reasonably be expected to materially adversely affect the operations of, or the economic benefits to be received from, the business in any country in the EMEA Territory

Section 3.10    Exclusion of Further Representations and Warranties.

(a)  Other than contained elsewhere in this Article 3, all representations, warranties, conditions and stipulations express or implied statutory, customary or otherwise in respect of the Acquired Assets or any of the rights and interests transferred or agreed to be transferred pursuant to this Agreement or the Trademark License Assignment are expressly excluded (including without limitation warranties and conditions as to quiet possession, merchantable or satisfactory quality, fitness for purpose and description).  Purchaser takes each of the Acquired Assets in the location and condition in which it is at Closing and subject to all defects and to any subsisting lien, third party rights or other rights of any kind whatsoever including, the cost of repairing any asset or discharging any such third party rights which shall be borne by Purchaser.  Except to the extent expressly set out in this Agreement, any lists contained in any schedule or annexure are for guidance only and are not exhaustive or complete lists of the items in question and shall not constitute any warranty in respect of the Seller Parties' ownership of the listed items or otherwise

(b)  Purchaser acknowledges that neither Seller Parties nor any of their Affiliates or representatives or the UK Administrators or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any memoranda, charts, summaries or schedules heretofore made available by Seller Parties or their Affiliates or representatives to Purchaser or any other information that is not included in this Agreement, the Exhibits and Schedules attached hereto or the Disclosure Schedule, and neither Seller Parties nor any of their Affiliates or Representatives or the UK Administrators or any other Person will have or be subject to any liability to Purchaser, any Affiliate of Purchaser or any other Person resulting from the distribution of any such information to, or use of any such information by Purchaser, any Affiliate or Purchaser or any of their Representatives.

Section 3.11    Brokers.  Other than Lazard Freres & Co  LLC, any fees and expenses of which will be paid by the Seller Parties, no broker, investment banker, financial advisor or other Person is or will be entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with this Agreement or the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller Parties.

Section 3.12    Disclaimer of Liability.  Unless otherwise required by law (and then only to that extent) no Seller Party shall be liable for any loss or damage of any kind whatsoever consequential or otherwise arising out of or due to or caused by any defect or deficiencies in any of the Acquired Assets.

28

UK1 3640716

**JA861**

Execution Draft

Section 3.13    Reasonableness of Provisions    Purchaser agrees that the terms and conditions of this Agreement or the Trade Mark License Assignment and the exclusions and limitations contained in it are fair and reasonable having regard to the following:-

(a) that this is a sale by an insolvent company in circumstances where it is usual that no representations and warranties can be given by or on behalf of BRACII;

(b) that Purchaser has relied solely upon the Purchaser's own opinion and/or professional advice concerning the Acquired Assets or the Trademark License Assignment their quality, state, condition, description, fitness and/or suitability for any purpose, the possibility that some or all of them may have defects not apparent on inspecting and examination, and the use it intends or proposes to put them to;

(c) that Purchaser has agreed to purchase the Acquired Assets "as seen" in their present state and condition for a consideration which takes into account the risk to the Purchaser represented by the parties' belief that the said exclusions and limitations are or would be recognized by the Courts; and

(d) that Purchaser, its employees, agents, representatives and advisers have been given every opportunity to examine and inspect all or any of the Acquired Assets and all relevant documents relating to them.

Section 3.14    Title to Assets.

(a) Purchaser acknowledges (for the avoidance of doubt (but without prejudice to Purchaser's right to terminate this Agreement in accordance with its terms) that if BRACII does not have title or unencumbered title to any or all of the Acquired Assets or if Purchaser cannot exercise any right conferred or purported to be conferred on it by this Agreement this shall not be a ground or grounds for rescinding, avoiding or varying any or all of the provisions of this Agreement.

(b) Purchaser covenants with and undertakes to the Seller Parties and the UK Administrators that it will not hold itself out as the owner of such assets once it has been notified that the Seller Parties did not have title thereto nor will it sell offer for sale assign or create or permit the creation of any form of encumbrance over such assets but it will deliver such assets to the UK Administrators or as the UK Administrators shall direct forthwith upon demand and pending such delivery it will at its own expense maintain such assets in safe custody and in as good repair and condition as they were in when they first came into the possession of Purchaser

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser jointly and severally represents and warrants to Seller Parties, as of the date hereof and as of each Closing Date that:

Section 4.1 Organization and Qualification    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has

29

UK1 104570

Execution Draft

all requisite corporate power and authority to own, lease and operate its assets and to conduct its business.

Section 4.2 Corporate Power and Authority; Authorization.

(a) Purchaser has all requisite corporate or other organizational power and authority to enter into and deliver this Agreement and/or the Trademark License Agreement to which it is a party and any agreements, documents or instruments to be executed and delivered in connection herewith and therewith and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and/or the Trademark License Agreement to which it is a party and any agreements, documents or instruments to be executed and delivered in connection herewith and therewith by Purchaser and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate and other organizational action on the part of Purchaser. This Agreement and/or the Trademark License Agreement to which it is a party and any agreements, documents or instruments to be executed and delivered in connection herewith and therewith has been duly executed and delivered by Purchaser and constitute the legal, valid and binding obligation of Purchaser, enforceable against them in accordance with their respective terms.

(b) The execution and delivery of this Agreement by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby have been duly authorized by all necessary corporate action of Purchaser.

Section 4.3 Conflicts; Consents and Approvals. Neither the execution and delivery of this Agreement, the Trademark License Assignment and any other agreements, documents and instruments to be executed and delivered in connection with this Agreement or the Trademark License Assignment, nor the consummation of the transactions contemplated hereby and thereby, will:

(a) conflict with, or result in a breach of any provision of, the organizational documents of Purchaser;

(b) violate, or conflict with, or result in a breach of any provision of, or constitute a default (or an event that, with the giving of notice, the passage of time or otherwise, would constitute a default) under, any agreement, indenture or instrument to which Purchaser is a party or to which any of Purchaser's properties or assets may be bound;

(c) violate in any material respect any Law applicable to Purchaser;

(d) require any action, consent or approval of any non-governmental Third Party; or

(e) require any action, consent or approval of, or review by, or registration or filing by Purchaser with, any Governmental Body, other than (i) approvals under Competition Laws in jurisdictions in which notifications are required or advisable and (ii) such Governmental Consents set forth in Section 4.3(e) of the Disclosure Schedule to be procured by Purchaser

30

DIO 5565749