*Simon Mortimore* QC and *Timothy Hill* (instructed by *Foot & Bowden*, Plymouth, Devon) for the third applicant.

*Stephen Davies* (instructed by *Peterkins*, Aberdeen) for the respondents.

ROBERT WALKER LJ (giving the first judgment at the invitation of Mantell LJ). The Practice Direction very recently promulgated by the Master of the Rolls has confirmed, as Mr Mortimore QC in his submissions reminded us, that the general test for granting leave to appeal in this court is that leave will be given unless an appeal would have no realistic prospect of success. That is the paramount test although other factors, such as the importance of the point either to the parties or generally, may also be given some weight.

In this case the issue in the appeal, a stay of proceedings in the Truro County Court for the purpose of arbitration pursuant to s 9 of Arbitration Act 1996, is apparently short and technical but it is plainly of considerable practical importance to the parties and it does on analysis raise legal issues of some difficulty and importance. The background is complicated and fortunately it is not necessary to go into it in great detail. Indeed it would be something of a distraction to do so. It is necessary to focus on the position as it now is.

The force behind the proposed appeal is Mr Terence Lewis, the third defendant in the proceedings. He has in the past had various interests in the first defendant, M C Fabrications Ltd (which I will call 'the company'). That is a shipbuilding company based in Falmouth, which is now in liquidation. Mr Lewis's present relevant interests in the company are as follows.

First, he is assignee (by virtue of an assignment and transfer dated 8 January 1998) from Barclays Bank of a debenture created on 13 October 1997, and he is assignee of the sum (then £293,000 odd) secured by the debenture.

Secondly, Mr Lewis has or claims to have by virtue of a deed dated 2 February 1998 the benefit of a contract by the company (acting through receivers who had by then been appointed), for a consideration moving towards the company of £1 and a 50% share in any eventual net recoveries, by which the company agreed to assign to Mr Lewis the company's right title and interest in liens over three specified ships, in rights under three specified contracts relating to the ships, and in all causes of action between the company and the other parties to the three contracts.

Thirdly, Mr Lewis has or claims to have the benefit of an agreement dated 9 March 1998 between the company, the receivers and himself which recited doubts as to the effect of the deed dated 2 February 1998 and then (without prejudice to that deed) contained an agreement by the company acting through its receivers which was expressed to give irrevocable authority for Mr Lewis to undertake either proceedings or arbitration against Bawejem Ltd and/or the Royal Bank of Scotland (whom together I will call 'the purchasers') in connection with a shipbuilding contract dated 15 February 1996, which was one of the three specified contracts and the only contract relevant today.

That then is the position of Mr Lewis. I must relate that to the proceedings in which the appeal is sought to be brought. They are proceedings in the Truro County Court. The plaintiffs are the purchasers, as I have defined

them. The defendants are the company, Mr Malcolm Crouse and Mr Lewis. I should add that a winding-up petition against the company was presented on 27 February 1998. I am told it was presented by a relatively small creditor. That petition was presented therefore before the agreement of 9 March and a winding-up order was made on the petition on 13 May 1998.

Application was made to the county court to stay the proceedings pending arbitration under s 9 of the Arbitration Act 1996. Judge Anthony Thompson QC, sitting at Truro County Court on 14 October 1998, refused the application for a stay and it is against that that the company and/or (by a proposed amended notice of appeal) Mr Lewis, seek to appeal. Mr Simon Mortimore QC and Mr Timothy Hill for Mr Lewis urge on us that the crucial question is whether Mr Lewis can apply either in the name of the company or, as under the draft amended notice of appeal, on his own for a stay of the proceedings by virtue of his rights as assignee debenture holder and under the agreements of 2 February and 9 March last, which I have mentioned, and moreover can do so notwithstanding the fact that the company is now in compulsory liquidation and that the liquidator appeared in the Truro County Court and said that he did not consent to the stay.

The judge dealt with the point as a preliminary issue. He focused on the crucial point, as counsel have before us today, that the shipbuilding contract had an arbitration clause which would normally, as the judge noted, have resulted in an automatic stay, but it also contained an absolute prohibition on assignment contained in art 16 of the contract and expressed in simple but wide terms, that is that 'the contract is not transferable or assignable by either party without the written consent of the other party'.

The judge then referred to the transfer of the debenture and to various provisions in it which were relied on by the would-be appellants, including in particular various provisions of cl 6(d) relating to the powers exercisable by receivers appointed under the debenture. As to that the judge commented:

> 'The difficulty which I see in all of this is that the subsequent attempt by the receiver whereby he purported to assign the right of action and a lien which the company contended that it had to Mr Lewis was a nullity on account of the total prohibition which was contained in the original contract.'

The judge then referred to the decision of the House of Lords in the well-known case of *Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1993] 3 All ER 417, [1994] 1 AC 85 and to the winding-up order and to the decision of Walton LJ in *Fargro Ltd v Godfroy* [1986] BCLC 370 at 374, [1986] 1 WLR 1134 at 1136. *Fargro v Godfroy* is a rather special case because it was concerned with a minority shareholders' derivative action followed by a company going into liquidation. That case does not therefore afford me any particular help and it appears to me that the significance of the liquidation was not gone into very deeply before the judge. In particular there was no mention in the judgment of the effect of s 130(2) of the Insolvency Act 1986 which provides that, on the making of a compulsory winding-up order, no further proceedings to which a company is a party are to be commenced nor are any existing proceedings to be continued without the sanction of the court.

When Mr Mortimore was preparing his skeleton argument he and those instructing him were under the impression that leave for continuation of the Truro proceedings had already been given under s 130(2). However, it now appears that that is not correct. The question has been ventilated before the Companies Court sitting in Bristol but the Companies Court judge, in the person I think of Judge Weeks QC, has taken the view that no sanction for the continuation of proceedings will be given under s 130(2) until all parties, including Mr Lewis, have been heard on the question. The judge concluded that in the absence of support for the application, or at any rate concurrence in the application by the liquidator, he should dismiss the application and he did so and refused leave to appeal.

I should perhaps add that the main issues in the Truro proceedings as between the purchasers and the company are whether the purchasers validly cancelled the contract under a power contained in art 11 by a notice which they gave on 2 December 1997, or whether the purchasers are in repudiatory breach as a result of giving that notice. That issue and issues connected with it are what would go to arbitration, if anything goes to arbitration. There are in the proceedings also claims by the purchasers against Mr Crouse and Mr Lewis but it is common ground that they would not go to arbitration in any event.

I should also mention that the position is further complicated because on 15 December 1997 the company began Admiralty proceedings in rem against, among other vessels, the vessel with which the Truro proceedings are concerned in order to secure its lien. This court has been told that a further hearing in those proceedings is likely in the fairly near future.

The excellence of the written submissions addressed to us have been matched only by the excellence of the oral submissions which we have heard. It appears to me, and neither counsel dissented from this, that there are essentially three hurdles in the case which Mr Lewis would have to overcome in order to establish that he could, either in his own right or through and in the name of the company, make a successful claim to have the proceedings stayed for the purpose of going to arbitration.

The first hurdle, and that on which Mr Davies for the purchasers has concentrated, arises from the absolute prohibition on assignment contained in art 16 of the relevant contract. It is common ground that the effect of that article is that the benefit of the contract could not be assigned at law without consent. That does not necessarily mean that every prohibition on assignment at law also has the effect of prohibiting any type of subsidiary disposition operating in equity. There is for instance, as noted in many cases, an obvious distinction between an assignment of the right for a party to insist on future performance of a contract which has not yet been fully performed, and an assignment of fruits, especially fruits in liquidated monetary form, which are in the course of arising or may at some future time arise under the contract.

The extent of any prohibition depends on the correct construction of the relevant contract in the light of established doctrine. That point appears very clearly from the speech of Lord Browne-Wilkinson in the *Linden Gardens* case in which he said ([1993] 3 All ER 417 at 429, [1994] 1 AC 85 at 105):

'The question is to what extent does cl 17 [I interpose that that was the prohibition on assignment relevant in that case] on its true construction restrict rights of assignment which would otherwise exist? In the context of a complicated building contract, I find it impossible to construe cl 17 as prohibiting only the assignment of rights to future performance, leaving each party free to assign the fruits of the contract. The reason for including the contractual prohibition viewed from the contractor's point of view must be that the contractor wishes to ensure that he deals, and deals only, with the particular employer with whom he has chosen to enter into a contract. Building contracts are pregnant with disputes: some employers are much more reasonable than others in dealing with such disputes.'

Mr Davies referred us to that passage and indeed read a good deal more in which Lord Browne-Wilkinson elaborates the point. But that is sufficient for present purposes.

The same point was made with particular reference to a right to insist on arbitration in the case of *Yeandle v Wynn Realisations* (1995) 47 Con LR 1; see in particular the observations of Hobhouse LJ (at 8–11) and those of Sir Thomas Bingham MR (at 13). I will come back to that first hurdle on which Mr Davies has, as I say, concentrated his submissions.

The second hurdle which Mr Lewis would have to overcome is as to his practical rights by the joint effect of the original debenture and the three documents which I have already identified, dated 8 January, 2 February and 9 March last. That of 9 March was after the presentation of the winding-up petition but Mr Mortimore submits that that creates no problem under s 127 of the Insolvency Act since it was concerned only with the giving of consent and did not constitute a disposition of property.

So far as Mr Lewis would seek to enforce those rights, not on his own account but through what would amount to powers to control the conduct of the company, he would be relying on the position of the company as remaining the legal owner of those rights. Alternatively, by his suggested amendment Mr Mortimore seeks to contend that the legal owner can be treated as transparent and that Mr Lewis could assert his own rights or those of the receivers directly. This point, which is of some technicality, was very clearly explained by Peter Gibson LJ in an interlocutory appeal in *Three Rivers District Council v Bank of England* [1995] 4 All ER 312 at 326, [1996] QB 292 at 307–308 in a passage which Mr Mortimore has referred to in his skeleton argument.

The third hurdle is as to the effect of the supervening winding-up order. My present view is that of the three hurdles the third is in principle the least formidable, although the presence and attitude of the liquidator, as evinced so far, certainly increases Mr Lewis's practical difficulties. Mr Mortimore's best authority on this point is the very clear explanation of principle in the judgment of Goulding J in *Sowman v David Samuel Trust Ltd (in liq)* [1978] 1 WLR 22.

I must however go back to what I have called the first hurdle. Mr Davies referred us not only to *Linden Gardens* and *Yeandle* but also to two recent decisions of this court, that is *Flood v Shand Construction* (1996) 81 BLR 31, especially the observations of Evans LJ (at 41), and the decision in *R v*

*Chester and North Wales Legal Aid Area Office, ex p Floods of Queensferry Ltd* [1998] 2 BCLC 436, [1998] 1 WLR 1496, especially the observations of Millett LJ ([1998] 2 BCLC 436 at 442, 443 and 444, [1998] 1 WLR 1496 at 1501, 1502 and 1503). Those passages do seem to me to create very real difficulties in the way of Mr Mortimore on the first point.

I should perhaps mention that *Ex p Floods of Queensferry* was in effect a further episode involving the same parties as that which had been before this court in *Flood v Shand Construction* (1996) 81 BLR 31. What had happened by the time it got to *Ex p Floods of Queensferry* was that the managing director of a company had taken an assignment of its cause of action under a contract which was, like the contract in this case, declared not to be assignable. The company had then applied for legal aid in respect of its bare legal ownership of the benefit of the contract and contended that it would therefore be a plaintiff in a 'representative, fiduciary or official capacity'. Millett LJ said ([1998] 2 BCLC 436 at 442, [1998] 1 WLR 1496 at 1501):

> 'It was submitted before us that the assignment was effective in equity to transfer the beneficial interest in the company's cause of action, so that it was effective as an equitable but not a legal assignment. I do not accept this. The subcontract expressly prohibits any assignment of the claim, not merely any legal assignment, and in my opinion an equitable assignment is as much within the prohibition as a legal assignment. It is not necessary to consider whether the company could have declared itself a trustee of its claim, for it has not done so. But it could not have assigned the benefit interest to Mr Flood by contracting to do so, since equity will not enforce the performance of an obligation which constitutes a breach of a prior contract with a third party.'

Then Millett LJ tested the position by considering ([1998] 2 BCLC 436 at 443, [1998] 1 WLR 1496 at 1502) the consequences of an offer to compromise the action which commended itself to a liquidator who would have the carriage of the action, but which did not commend itself to Mr Flood, the ex-managing director. Millett LJ said ([1998] 2 BCLC 436 at 443-444, [1998] 1 WLR 1496 at 1503):

> 'The assignment is wholly ineffective to vest any interest now in existence in Mr Flood. Accordingly, the company remains an ordinary plaintiff suing on its own behalf.'

Mr Mortimore in reply met these powerful authorities by contending that there is a major difference between the situation in those cases and the situation in the present case because in all of them, he said, it was another person who was trying to enforce the right—whether that right was to go to arbitration or whatever it was—whereas in this case, he said, it would be the company itself, albeit at Mr Lewis's instigation, which would be enforcing the right.

However, I have in the end come to the clear conclusion that Mr Mortimore and those whom he represents are in effect faced with this dilemma. If and so far as the real issue is 'Who is to speak for the company?', the most appropriate tribunal, and indeed in my view the only appropriate

tribunal, to decide that question is not the Truro County Court but the Companies Court sitting in Bristol. That is where the question of who is entitled to give directions as to how the company should conduct itself in the litigation in Truro can most appropriately be dealt with by judicial resources expert in company law and in questions involving receivers and so on.

If on the other hand Mr Lewis wishes, as he wishes by the draft amended notice of appeal, to be recognised as himself having rights which are directly enforceable under the contract (by virtue of the complicated derivative title which he seeks to trace), it seems to me that that contention is simply not arguable as a result of the decision of the House of Lords in *Linden Gardens* and the other decisions of this court to which Mr Davies has referred us, including in particular *Ex p Floods of Queensferry*.

Mr Mortimore has urged on us that further litigation in the Companies Court in Bristol would be expensive and no doubt that is so. The whole of this litigation has, I have no doubt, incurred expense of an amount which is most regrettable. But it seems to me that, rather than those questions being litigated (with, as I see it, only one possible outcome in the Court of Appeal), the more appropriate recourse, if Mr Lewis wishes to take this matter further, would be in the Companies Court in Bristol.

There is at present, as I have noted, a stay of the Truro proceedings as a result of the statutory provisions in the Insolvency Act. The next time that any application is made in Bristol to get the Truro claim back on the road, whether by a continuation of those proceedings or by arbitration, would be the appropriate occasion for these matters to be determined.

For those reasons, which I am afraid I have set out at excessive length (but that is a tribute to the advocacy that we have heard), I would refuse this application for leave.

MANTELL LJ. So would I.

*Application refused.*

Kenneth Dow Esq Barrister.

*1999 U.S. Dist. LEXIS 6, **

THOMAS P.B. FRATER, Plaintiff, v. TIGERPACK CAPITAL, LTD., LAM NGUYEN PHUONG, TING YU SENG and RICHARD C.L. YAN, Defendants.

98 Civ. 3306 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1999 U.S. Dist. LEXIS 6

January 3, 1999, Decided
January 5, 1999, Filed

**DISPOSITION:** **[*1]** Plaintiff's motion for reconsideration granted and plaintiff's motion for judgment on pleadings with respect to his claim for indemnification denied. Plaintiff's request for separate trial under Fed. R. Civ. P. 42(b) denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff former employee made a motion for reconsideration requesting that the court interpret defendant employer's corporate bylaws under applicable foreign law because the court had previously held that the stricter American rule did not apply to the parties' agreement for indemnification of attorney fees. Plaintiff made a motion for judgment on the pleadings with respect to his claim for indemnification.

**OVERVIEW:** Plaintiff's motion for reconsideration was granted, and upon reconsideration, his motion for judgment on the pleadings with respect to his claim for indemnification was denied. In reconsidering plaintiff's claim for indemnification of attorney fees in his action against defendant for breach of contract, defamation, and breach of fiduciary duty, the court held that defendant, a foreign corporation, was not required to indemnify plaintiff for attorney fees. The court did not allow for indemnification because it held that the corporate bylaws were silent regarding the indemnification of directors or officers, such as plaintiff, who themselves bring actions against defendant. Because the bylaws were silent regarding indemnification as to the rights of an officer or director who no longer worked for defendant, the court refused to expand upon the intent of the parties. Plaintiff was not entitled to indemnification of attorney fees to defend himself against defendant's fraud counterclaim because relevant corporate bylaws stated that indemnity did not extend to any matter in respect of fraud.

**OUTCOME:** Plaintiff's motion for reconsideration was granted and his motion for judgment on the pleadings with respect to his claim for indemnification was denied because the parties' agreement was silent on the issue of the indemnification of former corporate officers. Plaintiff was not entitled to indemnification for defendant's fraud counterclaim because corporate bylaws stated that indemnity did not extend to any matter in respect of fraud.

**CORE TERMS:** indemnification, by-law, shareholder, intra-corporate, reconsideration, Business Judgment Rule, indemnify, third parties, third party, counterclaim, reargument, breach of duty, Local Rule, indemnified, legal fees, breach of fiduciary duty, minority shareholder, partial judgment, public policy, derivative, omission, duty, default, breach of

contract, grossly negligent, furtherance, Bermuda Act, employment contract, unmistakably clear, negligent breach

**LexisNexis (TM) HEADNOTES - Core Concepts - ♦ Hide Concepts**

Civil Procedure > Relief From Judgment > Motions to Alter & Amend

*HN1* Pursuant to U.S. Dist. Ct., S.D.N.Y., R. 6.3, a party seeking reargument must demonstrate that the court overlooked controlling decisions or factual matters that might materially have influenced its earlier decision. Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully considered by the court. Parties may not use a motion for reargument to advance new facts, issues or arguments not previously presented to the court. The decision to grant or deny a motion for reargument is within the sound discretion of the district court. More Like This Headnote

Civil Procedure > State & Federal Interrelationships > Choice of Law

*HN2* In the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied. More Like This Headnote

Business & Corporate Entities > Agency > Duties & Liabilities > Indemnity

*HN3* The Bermuda Companies Act § 98(1) provides in part that a company may, in its by-laws, exempt an officer or indemnify him in respect of any loss arising or liability attaching to him by virtue of any rule of law in respect of any negligence, default, breach of duty or breach of trust of which the officer or person may be guilty in relation to the company or any subsidiary thereof. More Like This Headnote

Civil Procedure > Costs & Attorney Fees > Attorney Fees

*HN4* Bermuda rejects the American rule regarding indemnification for attorneys' fees and favors the English rule. More Like This Headnote

Civil Procedure > Costs & Attorney Fees > Attorney Fees

*HN5* English courts heed the principle that the costs of litigation, including attorneys' fees, should be shifted to the loser. The English rule gives the judge discretion, at the completion of the litigation, to award costs to either party. Although the successful litigant usually recovers some costs, the full amount is rarely awarded. More Like This Headnote

Business & Corporate Entities > Agency > Duties & Liabilities > Indemnity

*HN6* The Bermuda Companies Act § 98 is permissive, providing that a corporation may agree to indemnify its officers or directors. Nothing in the Bermuda Act requires a corporation to indemnify an individual for any loss arising out of a breach of duty. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN7* The business judgment rule bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

*HN8* The business judgment rule does not pertain to third party disputes, but only to cases in which a director is sued in an action by the corporation on its own behalf, by shareholders acting derivatively on behalf of the corporation, by shareholders suing individually on their own behalf or as a class, or by a regulatory body that has assumed control of the corporation. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN9 The business judgment rule does not constitute an absolute bar against liability by directors for their misconduct. More Like This Headnote

Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
HN10 There are a number of situations in which the business judgment rule does not apply. An example is a case involving conduct substantially worse than ordinary negligence. If a director's decision-making process was grossly negligent or reckless, the business judgment rule will not protect him from liability. Nor does the rule apply where a board violates its duty of disclosure, or where it interferes with a shareholder vote. The rule does not provide protection for directors who have made an unintelligent or unadvised judgment. Moreover, the rule does not protect directors in "omission" cases where an injury results from the inaction of a director. More Like This Headnote

Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws
Contracts Law > Contract Interpretation > Interpretation Generally
HN11 Normal rules of contract construction apply to an indemnification provision under a bylaw. The courts will only construe a bylaw as it is written, and will give language which is clear, simple and unambiguous the force and effect required. More Like This Headnote

**COUNSEL:** For Plaintiff: Nicholas W. Lobenthal, Esq., Teitler & Teitler, New York, New York.

For Defendants: Jamie M. Brickell, Esq., Pryor, Cashman, Sherman & Flynn, L.L.P., New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINIONBY:** Shira A. Scheindlin

**OPINION:** OPINION AND ORDER

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

On August 14, 1998, plaintiff filed an Amended Complaint ("Complaint") alleging claims for breach of contract, defamation, breach of fiduciary duties, and indemnification for attorneys' fees incurred in this action. Defendants filed an Answer to the Amended Complaint and Counterclaim on August 14, 1998, alleging fraud, breach of fiduciary duty, breach of contract, and gross negligence. On August 28, 1998, plaintiff moved for partial judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") with respect to his indemnification claim. In an opinion issued on December 8, 1998, this Court denied plaintiff's **[*2]** motion. See Frater v. Tigerpack Capital, Ltd., 1998 U.S. Dist. LEXIS 19128, No. 98 Civ. 3306, 1998 WL 851591, at *11 (S.D.N.Y. December 9, 1998).

Plaintiff submitted two letters to the Court, dated December 11 and 18, 1998, requesting reargument and reconsideration pursuant to Fed. R. Civ. P. 52(b) and 59(e). Defendants responded in letters dated December 14 and 18. Defendants also provided the Court with a letter, dated December 18, from Conyers, Dill & Pearman, a Bermuda law firm. These submissions are construed as a motion for reconsideration pursuant to Local Rule 6.3. Oral argument was held on December 21, after which defendant submitted three additional letters dated December 23, 28 and 29, and plaintiff submitted two additional letters dated December 28 and 29. These submissions have all been considered. For the reasons stated

below, plaintiff's motion for reconsideration is granted, and upon reconsideration, plaintiff's motion for judgment on the pleadings with respect to his claim for indemnification is denied.

**I. Legal Standard**

The legal standards by which a Rule 6.3 Motion for Reconsideration is decided are the same as those governing former Local Rule 3(j). See Wishner v. Continental **[*3]** Airlines, 1997 U.S. Dist. LEXIS 15302, 94 Civ. 8239, 1997 WL 615401, at *1 (S.D.N.Y. Oct.6, 1997) (citing Jones v. Trump, 971 F. Supp. 783, 785 n. 2 (S.D.N.Y. 1997)). *HN1*Pursuant to Local Rule 6.3, a party seeking reargument must demonstrate that the Court overlooked controlling decisions or factual matters "that might materially have influenced its earlier decision." Anglo American Ins. Co. v. Calfed, Inc., 940 F. Supp. 554, 557 (S.D.N.Y. 1996) (quoting Morser v. AT&T Info. Sys., 715 F. Supp. 516, 517 (S.D.N.Y. 1989)); see also Frankel v. ICD Holdings S.A., 939 F. Supp. 1124, 1126 (S.D.N.Y. 1996). Local Rule 6.3 "is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully considered by the court." Wishner, 1997 WL 615401, at *1 (citing Calfed, 940 F. Supp. at 557); Ades v. Deloitte & Touche, 843 F. Supp. 888, 892 (S.D.N.Y. 1994). Parties may not use a motion for reargument to "advance new facts, issues or arguments not previously presented to the court." Great American Ins. Co. v. J. Aron & Co., 1996 U.S. Dist. LEXIS 310, 94 Civ. 4420, 1996 WL 14455, at *2 (S.D.N.Y. Jan. 16, 1996) (quoting Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 1989 U.S. Dist. LEXIS 9145, 86 Civ. **[*4]** 6447, 1989 WL 162315, at *4 (S.D.N.Y. Aug.4, 1989)). The decision to grant or deny a motion for reargument is within the sound discretion of the district court. See Gyadu v. Workers' Compensation Comm'n, 159 F.3d 1346 (2d Cir. 1998); Cohen v. Koenig, 932 F. Supp. 505, 507 (S.D.N.Y. 1996).

**II. Plaintiff's Indemnification Claim**

**A. TCL's By-Laws**

Plaintiff Thomas P.B. Frater ("Frater") was an officer and director of defendant Tigerpack Capital, Ltd. ("TCL"). Frater and TCL entered into an Employment Agreement on April 1, 1996, pursuant to which Frater became the President and Chief Executive Officer ("CEO") of TCL. Frater alleges that on March 1, 1998, he was terminated by the TCL Board of Directors without cause in violation of the Employment Agreement. TCL contends that Frater improperly resigned from the corporation in violation of the Employment Agreement. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The pertinent facts were set forth in the December 8, 1998 Opinion and Order. See Frater, 1998 WL 851591, at *1.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In his **[*5]** motion for partial judgment on the pleadings, plaintiff asserted that certain clauses in the Employment Agreement, a separate Shareholders' Agreement and the TCL corporate by-laws provide for indemnification and the advance payment of the costs of prosecuting and defending this action. All of plaintiff's arguments were rejected in the December 8, 1998 Opinion and Order.

Plaintiff now asks the Court to reconsider that portion of the Opinion addressing TCL's corporate by-laws. On December 8th, I held that PP 10 and 11 of the by-laws did not reflect TCL's "unmistakably clear" intent to indemnify its officers and directors in intra-corporate disputes. n2 See Frater at *4. Frater's demand for the advancement of attorneys' fees was

requested under both Bermuda and New York law. Id. at 4.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 These paragraphs were quoted in full in the previous opinion. See Frater at *3.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**B. Legal Standard for Indemnification**

TCL is a Bermuda Corporation, organized pursuant to the Bermuda Companies Act. Both parties **[*6]** now agree that Bermuda law must be applied when interpreting TCL's by-laws. "*HN2*In the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir. 1984).

*HN3*The Bermuda Companies Act provides in relevant part

> [A] company *may* in its bye-laws [sic] . . . exempt [an] officer . . . or indemnify him in respect of, any loss arising or liability attaching to him by virtue of any rule of law in respect of any negligence, default, breach of duty or breach of trust of which the officer or person may be guilty in relation to the company or any subsidiary thereof.

Bermuda Companies Act § 98(1), Reprinted in 2 Commercial Laws of the World (1996) (emphasis added). Plaintiff claims that this Act is modeled on the English Companies Act.

The parties agree that *HN4*Bermuda rejects the "American-rule" regarding indemnification for attorneys' fees and favors the "English rule". *HN5*English courts heed the principle that the costs of litigation, including attorneys' fees, should be shifted to the loser. The English rule gives the judge discretion, **[*7]** at the completion of the litigation, to award costs to either party. Although the successful litigant usually recovers some costs, the full amount is rarely awarded. See, e.g., Anglo American Ins. Group, p.l.c. v. Calfed, Inc., 899 F. Supp. 1070, 1078 (S.D.N.Y. 1995) (citing 37 Halsbury's Laws of England P 717 (Lord Hailsham of St. Marylebone ed., 4th ed. 1982); R.J. Walker & M.G. Walker, The English Legal System 298 (1972)).

**C. Discussion**

In his request for reargument, plaintiff asks the Court to interpret the by-laws under Bermuda law rather than under the stricter New York "unmistakably clear" standard applicable to indemnification agreements. n3 Because I did not previously analyze Bermuda law in construing the governing provisions of the by-laws, I am granting plaintiff's motion for reconsideration.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Although both parties have acknowledged that the by-laws should be interpreted under Bermuda law, Frater insists that even under the stricter New York standard, the by-laws require defendants to advance his legal fees in this litigation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*8]

Plaintiff argues that the by-laws, as interpreted under the laws of England and Bermuda, require indemnification. Applying generally accepted principles of corporate governance, plaintiff maintains that the only reasonable interpretation of P 10 of the by-laws with respect to actions involving corporate directors is that they are entitled to indemnification in intra-corporate disputes. If plaintiff is correct, then TCL must indemnify Frater.

**1. English Case Law**

Plaintiff cites two British cases for this proposition: Wallersteiner v. Moir, 1 All E.R. 849, 858-59 (1975) and Burgoine v. Waltham Fores London Council, 2 BCLC 612, 95 LGR 520 (November 7, 1996). Neither case, however, supports plaintiff's argument. First, Frater has offered no authority for his claim that English law is binding on, or in harmony with, Bermuda law. Second, even if Wallersteiner and Burgoine were to be applied by analogy in Bermuda, they do not stand for the proposition that a corporation is *required* to pay its adverse party's attorneys' fees in an intra-corporate dispute.

In Wallersteiner, the British Court of Appeal held that a minority *shareholder* bringing a derivative **[*9]** action on behalf of a corporation "is entitled to be indemnified by the company against all costs and expenses reasonably incurred by him in the course of the agency." Id. at 858-59. In that case, the minority shareholder applied to the court for attorneys' fees after prosecuting the action for over ten years at his own expense and receiving a money judgment against the defendant. Several issues remained in the litigation, including the defendant's counterclaim and the cost of enforcing the judgment. Plaintiff had exhausted his funds, and the money from the judgment would go to the company on whose behalf he sued, not to pay his own legal expenses. The court found that his right to indemnification did not arise "out of a contract express or implied, but it arises on the plainest principles of equity." Id. at 858. Here, the equities are quite different. Frater brings only two of his six claims as a minority shareholder. His other four claims are not brought on behalf of the company. Frater has not yet successfully litigated his action, or incurred the substantial legal fees that the plaintiff in Wallersteiner must have incurred in ten years of litigation.

In Burgoine, **[*10]** an English chancery court held that pursuant to an indemnity agreement in an employment contract, corporate directors would be entitled to indemnification for legal costs incurred in defense of wrongful trading and breach of fiduciary duty claims brought by liquidators following the company's insolvency. However, the court held that because the directors had been appointed by a body without authority, the directors were not acting within the scope of their duties, and therefore were not entitled to indemnification. See Burgoine, 2 BCLC 612 at *11. In that case, of course, the language of the employment contract expressly indemnified the directors. In addition, the directors were sued by third party liquidators, not the corporation or its shareholders.

**2. The Bermuda Act**

*HN6*Section 98 of the Bermuda Companies Act is permissive, providing that a corporation *may* agree to indemnify its officers or directors. As stated in the Court's December 8th opinion, nothing in the Bermuda Act *requires* a corporation to indemnify an individual for any loss arising out of a breach of duty. As a result, the Court must look to the actual by-laws for specific language providing for indemnification. **[*11]**

**3. Construction of the By-Laws**

Plaintiff argues that the Court's construction of PP 10 and 11 of the by-laws makes no sense. Plaintiff's view is based on a simple and straightforward series of logical propositions:

(1) the indemnification clause covers actions against directors; (2) actions for "wilfull negligence, wilfull default, fraud or dishonesty" are not covered; and (3) third parties cannot sue directors for negligent breach of a duty of care because the Business Judgment Rule bars such claims. The inevitable conclusion, according to plaintiff, is that a director must be indemnified for intra-corporate disputes, typically including breaches of fiduciary duties. The first two propositions are undisputed. Only the third proposition requires further discussion.

Plaintiff contends that under the Business Judgment Rule, directors cannot ordinarily be sued for negligent breach of the duty of care, but can be sued when their conduct is "grossly negligent." HN7 The rule bars "judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." Hanson Trust P.L.C. v. ML **[*12]** SCM Acquisition, Inc., 781 F.2d 264 (2d Cir. 1986) (citing Auerbach v. Bennett, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979)). However, Frater's reliance on this rule as a bar to certain types of third party claims is misplaced. First, neither party has pointed out that HN8 the Business Judgment Rule does not pertain to third party disputes, but only to cases in which a director is sued "in an action by the corporation on its own behalf, by shareholders acting derivatively on behalf of the corporation, by shareholders suing individually on their own behalf or as a class, or by a regulatory body that has assumed control of the corporation". Block, Bartin & Radin, The Business Judgment Rule (5th ed. Vol. I) at 5. n4 Second, even assuming that the Business Judgment Rule did bar causes of action brought by third parties against directors for ordinary negligence, HN9 the rule does not constitute an *absolute* bar against liability by directors for their misconduct.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Plaintiff claims that this litigation is "a classic intra-corporate dispute between rival camps of shareholders with personal agendas." Memorandum of Law in Support of Plaintiff's Motion for Partial Judgment on the Pleadings at 2. Thus, plaintiff does not characterize a shareholder action as a third-party action.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*13]** HN10

There are a number of situations in which the Business Judgment Rule does not apply, such as in cases involving "conduct substantially worse than ordinary negligence." Fletcher Cyc. Corp. § 1031 (Perm. Ed.) at 17. If a director's decision-making process was grossly negligent or reckless, the Business Judgment Rule will not protect him from liability. See Chew, Directors' and Officers' Liability, (P.L.I. 1995) at 30-31. "Nor does the rule apply where a board violates its duty of disclosure, or where it interferes with a shareholder vote." Fletcher § 1040 at 51. The rule does not provide protection "for directors who have made an unintelligent or unadvised judgment." Brodsky & Adamski, Corp. Officers & Dir. (1998) § 3.10 at 53; see also Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985). Moreover, the rule does not protect directors in "omission" cases where an injury results from the inaction of a director. Fletcher § 1036 at 37. Thus, plaintiff is unable to show that the only possible interpretation of P10's reference to the indemnification of directors is with respect to intra-corporate disputes.

Plaintiff raises a new argument in his December 29 letter **[*14]** supporting his contention that the by-laws provide indemnification in intra-corporate disputes. Plaintiff points out that the by-laws indemnify directors for negligent omissions, which could constitute a breach of

fiduciary duty to a shareholder if the director has an affirmative duty to act in furtherance of corporate business. According to plaintiff, third parties cannot sue a director for such negligent omissions. Again, plaintiff is mistaken. There may be instances in which a director is liable for a breach of duty to a third party for a negligent omission. See 14A N.Y. Jur. 2d, Business Relationships, § 765 at 438 (director's nonliability to third parties for nonfeasance pertaining to the duties owed to the corporation "does not apply where there is a breach of duty by the corporate agent himself to third persons.").

Moreover, defendants point out that the language of the by-laws does not provide, or even suggest, that its scope is limited to breach of duty actions brought against TCL directors. Thus, defendants maintain that if a TCL director is sued personally by a third party for any claim alleging breach of a duty owed by that director to the third party, he would **[*15]** be entitled to indemnification. In addition, defendants argue that the by-law indemnification provision would also indemnify a director for legal fees incurred when claims asserted against him by third parties are frivolous. Because corporate directors may indeed be sued by third parties, the indemnification of directors established by TCL in its by-laws is not a nullity, even in the absence of coverage for suits involving intra-corporate disputes.

**4. Public Policy**

Plaintiff argues that public policy favors corporate indemnification and mandates a fair, not strict, construction of corporate indemnification agreements. However, even a fair construction of the plain language of P 10 does not provide for the relief plaintiff seeks. The by-laws provide in part

> The Directors . . . and other Officers for the time being of the company . . . shall be indemnified and secured harmless . . . *from and against* all actions, costs, charges, losses, damages, and expenses which they or any of them . . . shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty . . . .

TCL By-Law P 10 (emphasis added). The **[*16]** plain language of the indemnification clause provides for indemnification "from and against" all actions. It is silent regarding the indemnification of directors or officers who *themselves bring actions* against the company. *HN11*Normal rules of contract construction apply to an indemnification provision under a bylaw. Brodsky & Adamski, Corp. Officers & Dir. (1998) § 7.05.50 at 11. "The courts will only construe the bylaw as it is written, and will give language which is clear, simple and unambiguous the force and effect required." Id. To interpret P 10 to provide for the indemnification of Frater in an action brought by him rather than against him would expand the rights and responsibilities agreed upon by the parties.

In addition, the by-laws are silent as to the rights of a litigant, like Frater, who is *no longer* an officer or director of the company and as to the rights of a director of officer who sues the company as an individual, not as a shareholder on behalf of the company (only two of Frater's six claims are brought as derivative shareholder suits). The Court will not expand upon the intent of the parties to an agreement in order to find the relief Frater seeks. **[*17]**

**5. Fraud**

Finally, defendants contend that even if the by-laws did provide for Frater's legal fees in intra-corporate disputes, indemnification should not be awarded in the instant litigation because the claim sounds in fraud. Plaintiff simultaneously brings four claims as an individual

and two derivative shareholder claims. TCL has asserted counterclaims against Frater arising from claims of misrepresentation and fraud. Frater's two derivative shareholder claims arise out of the same facts as TCL's fraud counterclaim. The by-laws specifically state, "Indemnity shall not extend to any matter in respect of any wilful negligence, wilful default, fraud or dishonesty which may attach to any of said persons." TCL Bye-Law P 10. Thus, Frater is not entitled to attorneys' fees to defend himself against the fraud counterclaim.

**III. Conclusion**

For the foregoing reasons, plaintiff's motion for reconsideration is granted, and upon reconsideration, plaintiff's motion for judgment on the pleadings with respect to his claim for indemnification is denied. Plaintiff's request for a separate trial under Fed. R. Civ. P. 42(b) is also denied. Plaintiff is trying to obtain a piecemeal **[*18]** appeal via the back door. Federal courts discourage interlocutory appeals. There is no ground here to order a severance, and I decline to do so. A conference is scheduled for January 15, 1999 at 3:30 p.m. in Courtroom 12C.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

January 3, 1999

Service: **Get by LEXSEE®**
Citation: **1999 U.S. Dist. LEXIS 6**
View: Full
Date/Time: Tuesday, June 8, 2004 - 2:50 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

I have no doubt whatsoever that if those who are tempted to come to this court to invoke the jurisdiction of this court bear in mind the clear limits on the authority of this court stated by Cockburn CJ in *R v Carden*[1] to which reference has already been made no such dangerous prospects should arise in the future.

*Application refused.*

Solicitors: *David Howard & Co* (for the applicant); *Director of Public Prosecutions*; *T V Edwards & Co* (for the two other defendants); *Treasury Solicitor*.

Lea Josse Barrister.

# Helstan Securities Ltd v Hertfordshire County Council

QUEEN'S BENCH DIVISION
CROOM-JOHNSON J
9th, 15th MAY 1978

*Chose in action – Assignment – Debt – Contract forbidding assignment of benefit or interest therein or thereunder without consent of debtor – Creditor assigning debt to third party without consent – Third party claiming payment from debtor – Debtor refusing payment – Whether contract forbidding assignment of debt – Whether assignment of debt by creditor to third party valid.*

A county council entered into a contract with a contractor to carry out road-works. The contract contained a stipulation that the contractor was not to 'assign the contract or any part thereof or any benefit or interest therein or thereunder without the written consent' of the council. The contractor got into financial difficulties and, without obtaining the council's consent, assigned to the plaintiff the amount alleged to be owing by the council. When the plaintiff attempted to obtain payment of the debt from the council it refused to pay. The plaintiff brought an action against the council to recover payment contending that, while the contract prohibited the assignment of the contract and certain choses in action arising under it, it did not prohibit the asignment of debts which arose under it.

**Held** – If the parties to a contract, the subject-matter of which was a chose in action, agreed that the chose in action was not to be assigned, any purported assignment was invalid. The debt from the council to the contractor was both a chose in action and a 'benefit or interest' under the contract and accordingly the contractor could not validly assign it without the council's consent. The council was therefore entitled to refuse payment (see p 265 *h* to p 266 *b* and *f*, post).

**Notes**

For prohibition of assignment of choses in action, see 6 Halsbury's Laws (4th Edn) para 89.

For cases on the assignment of debts, see 8(2) Digest (Reissue) 500–502, 76–88.

**Cases referred to in judgment**

*Brice v Bannister* (1878) 3 QBD 569, 47 LJQB 722, 38 LT 739, 8(2) Digest (Reissue) 501, 82.

*Griffin, Re, Griffin v Griffin* [1899] 1 Ch 408, 68 LJ Ch 220, 79 LT 442, 8(2) Digest (Reissue) 529, 273.

*Shaw & Co v Moss Empires Ltd and Bastow* (1908) 25 TLR 190, 8(2) Digest (Reissue) 534, 312.

1 (1879) 5 QBD 1

All England Law

QBD

*Spellman v S*
*Turcan, Re (*
*United Domi*
1 WLR 7
*Wickham Hc*
CA, Dige
*Williams v E*
Digest (R
*Young v Kitc*

**Action**
By a writ is
action again
legal assign
Renhold Rc
withheld by

*John Hamilto*
*Andrew Coll*

15th May.
the effect, w
contract wh
The Hertf
Surfacing Lt
agreements.
Contract (k
severe finan
owed, in on
sold these d
county coun
debts have s
The coun
first is that
It read as fol
or any part
consent of t
forbids subl
works The
Renholds sv
others to che
under the cc
The mast
contractual
condition 3)
antecedent f
the plaintiff
I need no
but they ha
validity of t
at least extin
deal with th
issue 1 in
valid as betw

:ourt to invoke
y of this court
made no such

secutions; T V

osse Barrister.

hire

r interest therein
without consent –
hether contract
rty valid.

id-works. The
ontract or any
ritten consent'
obtaining the
by the council.
il it refused to
nt contending
tain choses in
se under it.

action, agreed
s invalid. The
efit or interest'
it without the
see p 265 h to

Edn) para 89.
6–88.

issue) 501, 82.
igest (Reissue)

sue) 534, 312.

*Spellman v Spellman* [1961] 2 All ER 498, [1961] 1 WLR 921, Digest (Cont Vol A) *649, 43c.*
*Turcan, Re* (1889) 40 ChD 5, 58 LJ Ch 101, 59 LT 712, 40 Digest (Repl) 557, *640.*
*United Dominions Trust (Commercial) Ltd v Parkway Motors Ltd* [1955] 2 All ER 557, [1955] 1 WLR 719, 26 Digest (Repl) 670, *53.*
*Wickham Holdings Ltd v Brooke House Motors Ltd* [1967] 1 All ER 117, [1967] 1 WLR 295, CA, Digest (Cont Vol C) 419, *81d.*
*Williams v Earle* (1868) LR 3 QB 739, 9 B & S 740, 37 LJQB 231, 19 LT 238, 33 JP 86, 31(2) Digest (Reissue) 612, *4984.*
*Young v Kitchin* (1878) 3 Ex D 127, 47 LJQB 579, 8(2) Digest (Reissue) 579, *656.*

**Action**

By a writ issued on 16th February 1976 the plaintiffs, Helstan Securities Ltd, brought an action against the defendants, the Hertfordshire County Council, claiming (i) £37,837 as legal assignees of the benefit of the debt or debts due for the like sum from the council to Renhold Road Surfacing Ltd ('Renholds') and (ii) £8,600 in respect of retention money withheld by the council and due to the plaintiffs. The facts are set out in the judgment.

*John Hamilton* for the plaintiffs.
*Andrew Collins* for the county council.

*Cur adv vult*

15th May. **CROOM-JOHNSON J** read the following judgment: This case asks what is the effect, where there is a purported assignment of a chose in action, of a condition in the contract which forbids assignment without consent?

The Hertfordshire County Council ('the county council') contracted with Renhold Road Surfacing Ltd ('Renholds') for road-works to be carried out. There were a number of these agreements. They were all in the form of the Institution of Civil Engineers Conditions of Contract (known as the ICE Conditions of Contract) (4th Edn). Renholds got into very severe financial difficulties. They are now as good as penniless. They said that they were owed, in one way or another, £46,437 by the county council under the contracts. They sold these debts to the plaintiffs. The plaintiffs gave notice of these assignments to the county council, who did not consent to the assignments. The plaintiffs as assignees of the debts have sued the county council claiming that sum of £46,437.

The county council say that they are under no obligation to pay, for two reasons. The first is that each contract contained a condition prohibiting the assignment of the debts. It read as follows: '(3) The contractor [that is to say Renholds] shall not assign the contract or any part thereof or any benefit or interest therein or thereunder without the written consent of the employer [that is to say the county council].' Condition 4 of the contract forbids subletting the whole of the works and deals with subcontracting parts of the works. The county council's second defence is that they say that in carrying out the works Renholds swindled them and conspired with one of the highway superintendents and others to cheat and defraud the county council in respect of the works allegedly carried out under the contracts.

The master ordered that two preliminary issues should be tried. First, does the contractual restriction on assignment alleged in para 14 of the defence (that is to say condition 3) affect the validity of the alleged assignment to the plaintiffs? Secondly, would antecedent fraud of Renholds alleged in the defence affect the validity of the assignment to the plaintiffs? ('Antecedent' here means antecedent to the assignment.)

I need not deal with issue 2. The county council say they were defrauded of £85,000, but they have pleaded it as a set-off and counterclaim, and not as affecting directly the validity of the assignment. It is conceded by both sides that if this fraud is proved it would at least extinguish the plaintiffs' claim for £46,437, and by consent they do not ask me to deal with this as a preliminary point. I am asked to decide only issue 1.

Issue 1 incorporates an ambiguity. There are two points here. One, is the transaction valid as between assignor and assignee on the one hand, but void as between assignee and

debtor on the other? Two, is it valid at all, even between the assignor and the assignee? Both points are taken in the defence.

Both counsel have put before me every authority they can find which touches, however remotely, on these points. They are matters which are dealt with in textbooks. Most remarkably, they have never been directly decided. Chitty on Contracts[1] points out that, where there is such a prohibition which would prevent the assignee from recovering from the debtor, the frustrated assignee will always have his purely contractual remedy against the assignor.

The way in which the plaintiffs put their case is this, that there is a distinction to be drawn between debts and other choses in action, and they say the decided cases lean towards that distinction. On the basis that there is such a distinction, the plaintiffs go on to say that condition 3 prohibits the assignment of the contract and certain choses in action arising from it, but on its construction does not prohibit the assignment of debts. Is there any such general distinction? In my view, No. A debt is but one instance of a chose in action, though it may be a common one. Do the authorities support such an argument?

The earliest case is *Brice v Bannister*[2], decided soon after the Supreme Court of Judicature Act 1873 established statutory assignments. In the contract in that case there was no prohibition against assignment. The Court of Appeal was divided whether the assignee could recover. Bramwell LJ, a member of the majority, said[3]:

> '... it does seem to me a strange thing and hard on a man, that he should enter into a contract with another and then find that because the other has entered into some contract with a third, he, the first man, is unable to do that which it is reasonable and just he should do for his own good. But the law seems to be so; and any one who enters into a contract with A. must do so with the understanding that B. may be the person with whom he will have to reckon. Whether this can be avoided, I know not; may be, if in the contract with A. it was expressly stipulated that an assignment to B. should give no rights to him, such a stipulation would be binding. I hope it would be.'

The next case is *Re Turcan*[4]. In that case there was a marriage settlement of property including after-acquired property. The husband took out a life policy expressed to be 'not assignable in any case whatever'. The insured husband died. The trustees of the marriage settlement and the husband's executor both claimed the policy money. There was, however, a clause in the policy which did contemplate that the insured might part with his interest short of actually assigning it. The court solved the problem by saying that even if the insured could not have assigned the policy, there was nothing to have stopped him from making a declaration of trust of the policy money in favour of the trustees of the marriage settlement. So the marriage settlement won the day, but it is implicit in that case that the solution to the impasse depended on the prohibition against assignment in the policy being effective. The plaintiffs in the present action say that *Re Turcan*[4] shows that even if the policy could not be assigned the debt which arose on death could. I do not read that case in that way. Nor do I think the result would have been different if the policy, instead of being on a life, had been payable at the age of 65, or if the matter had been brought before the court to be decided before the policy money became payable. It is a case where the court would not go against the plain words in the policy but solved the problem in a different way.

*Re Griffin*[5] was about a bank deposit receipt which carried the words 'this receipt is not transferable, and will be required to be produced on each occasion of any withdrawal'.

1 23rd Edn (1968) para 1032
2 [1878] 3 QB 569
3 [1878] 3 QB 569 at 580, 581
4 (1889) 40 Ch D 5
5 [1899] 1 Ch 408

d the assignee? ıches, however ıtbooks. Most ɪoints out that, covering from emedy against stinction to be ded cases lean ılaintiffs go on hoses in action debts. Is there e of a chose in ın argument? t of Judicature there was no r the assignee ıuld enter into red into some easonable and any one who B. may be the d, I know not; ignment to B. hope it would ıt of property ssed to be 'not the marriage There was, t part with his ıg that even if stopped him rustees of the cit in that case nment in the n[4] shows that I do not read if the policy, tter had been ıle. It is a case l the problem receipt is not withdrawal'.

There was held to be an equitable assignment of the fund in the bank, and that subsequently there was actually a completed gift. It was argued on behalf of the assignee that it was the document and not the fund (that is to say the chose in action) which was caught by the prohibition. In such circumstances, *Re Griffin*[1] was simply a decision on the meaning of the prohibition.

*Shaw & Co v Moss Empires and Bastow*[2] is not entirely satisfactory as a report. An actor, Mr Bastow, had assigned part of his future salary to his agent by an equitable assignment. When the assignees wished to sue the debtors (that is the employers) he would not join as a plaintiff, so he was joined as a defendant. In the contract of employment there was a prohibition against assignment of the salary. The debtors relied on this prohibition. Darling J, who decided the case, said[3]:

> 'The strongest ground for the defence was in the contract of December 21, clause 13. But, though Moss Empires (Limited) might bring an action for breach of that contract, if they could show any damage . . . it could no more operate to invalidate the assignment than it could to interfere with the laws of gravitation. It could not prevent that being an equitable assignment which would be one apart from it.'

But having said that, he then gave judgment directly against the defendant actor who owed the money to the assignee in any event. What he said gives support to the view that such an assignment is a good assignment as between assignor and assignee, notwithstanding the prohibition, but what was said seems to be obiter. The judgment certainly does not support a claim in such circumstances by the assignee against the debtor.

The next two cases are *United Dominions Trust (Commercial) Ltd v Parkway Motors Ltd*[4] and *Wickham Holdings Ltd v Brooke House Motors Ltd*[5]. Both concerned hire-purchase agreements of motor cars which were tortiously converted (technically at least) by the hirers and where the finance house sued in damages for detinue or conversion against the later purchasers of the motor cars. In *United Trust's* case[4], McNair J, in assessing the damages, took into account the prohibition against assignment in the hire-purchase agreement and because of it refused to reduce the damages. In *Wickham Holdings'* case[5] the majority of the Court of Appeal said that was an unnecessary complication, and assessed the damages on simpler lines. The third member of the Court of Appeal came to the same result by a different route, which involved upholding the prohibition clause but saying that it had been waived. In the result, I do not get much help from either of those cases on the issue which I have to decide.

I have also been referred to *Spellman v Spellman*[6]. There two Lords Justices expressed, obiter, conflicting views.

The plaintiffs submit that there is here a good assignment of the debts, notwithstanding the prohibition in condition 3, even if it purports to bar the assignment of debts. They cite *Williams v Earle*[7] which dealt with a covenant by a lessee not to assign the lease. There was an assignment in breach of that covenant, which Blackburn J held to be a good assignment so as to entitle the lessor to sue the 'assignee' on other covenants. The plaintiffs say that by parity of reasoning the same should apply here, and that the assignment of these debts to them should be held a good assignment. But the law concerning covenants running with the land is not something which is readily adaptable to choses in action.

If the reported cases are not a sure guide, one is thrown back in this case on the agreement. There are certain kinds of choses in action which, for one reason or another,

1 [1899] 1 Ch 408
2 (1908) 25 TLR 190
3 25 TLR 190 at 191
4 [1955] 2 All ER 557, [1955] 1 WLR 719
5 [1967] 1 All ER 117, [1967] 1 WLR 295
6 [1961] 2 All ER 498, [1961] 1 WLR 921
7 (1868) LR 3 QB 739

are not assignable and there is no reason why the parties to an agreement may not contract to give its subject-matter the quality of unassignability. In these circumstances, one has to look at the clause itself. The words 'benefit or interest therein or thereunder' do cover the debts which result from the performance of the contract. I cannot draw the distinction which the plaintiffs' counsel asked me to draw, namely that there is a difference between a right to payment on an engineer's certificate and the resulting debt. If there is such a difference, both are caught by this clause. It is the contract which creates the entitlement to be paid, and that is a benefit or interest under the contract.

I find no ambiguity such as would lead me to consider the background against which the contract was made as an aid to interpretation. If I did, the background would not help the plaintiffs. The clause is obviously there to let the employer retain control of who does the work. Condition 4, which deals with subletting, has the same object. But closely associated with the right to control who does the work, is the right at the end of the day to balance claims for money due on the one hand against counterclaims, for example, for bad workmanship on the other. The plaintiffs say that such a counterclaim may be made against the assignees instead of against the assignors. But the debtors may only use it as a shield by way of set-off and cannot enforce it against the assignees if it is greater than the amount of the debt: *Young v Kitchin*[1]. And why should they have to make it against people whom they may not want to make it against, in circumstances not of their choosing, when they have contracted that they shall not?

Although arguments showing potential hardship cannot prevail over the construction of the clause, I should mention two which have been advanced. It is said by the plaintiffs that if the assignment is void, the debtor can take the benefit of the work done by the assignor and avoid paying the assignee. The defendants reply that the assignee must make proper enquiries before he buys a debt, and these enquiries may go to the likelihood of the debtor having the money with which to pay, or the prospect of a counterclaim which would extinguish the debt, or the existence of a prohibitory condition such as the present. On all of these things depends the price he is prepared to pay. There is no injustice in expecting the purchasers of debts to make these enquiries.

My decision on issue 1 is that condition 3 does in this case make the assignment invalid, and in those circumstances the defendants are entitled to judgment against the plaintiffs and this action fails.

*Action dismissed.*

Solicitors: *Gouldens* (for the plaintiffs); *Sharpe Pritchard & Co*, agents for *M J le Fleming*, Hertford (for the county council).

K Mydeen Barrister.

1 (1878) 3 Ex D 127

B

CHANCERY D
GOULDING J
1st, 2nd, 22

*Capital gains in fund to tr Consideratio trustees acqu transfer of fu 17(2), 21(3).*

In March 19 fund') in R expressed to Guernsey c Jersey comp on trust to p absolutely. interest in r terms was e Jersey comp Crown proc and the exec of the Finar disposed of f a gift or be persons', wh transaction 17(2)[d] of Sc remainder t Act, since th making of t and that, a Special Com property to for a conside did not oper trustees and

**Held** – The

(i) An asse 1965 Act, co market valu way of gift', 'by way of bargain mad the taxpayer, the taxpayer

a Section 25
b Section 22
c Paragraph
d Paragraph

JA1019

## Hendry v Chartsearch Ltd.

Court of Appeal (Civil Division).
Evans, Henry and Millett L JJ.
Judgment delivered 23 July 1998.

*Contract – Assignment – Effect of clause restricting assignment of contract without prior written consent of other party not to be unreasonably withheld – Whether statement of claim could be amended to rely on assignment after date of writ.*

This was an appeal and cross-appeal following the judge's striking out of the plaintiff's contractual claims on the ground that they disclosed no cause of action.

The plaintiff with his wife owned a company called Interface. The plaintiff took proceedings against the defendants alleging breaches of three agreements entered into by Interface with the defendants relating to data processing and computer services. Two of the agreements contained provisions preventing assignment by Interface without the defendants' prior written consent not to be unreasonably withheld. The plaintiff also alleged that the defendants had induced Interface's employees to break their contracts of employment with Interface. The plaintiff relied in relation to the two agreements on an assignment to him of Interface's causes of action under the agreements. The defendants relied on the fact that no prior written consent for the assignment had been sought or given. The plaintiff's solicitors did then seek consent. The defendants replied to the effect that there could and would be no consent since the parties' commercial relationship was at an end and they were in dispute.

The defendants applied to strike out the statement of claim. The plaintiff applied to amend it to rely on a further assignment, after the date of the writ, in relation to the third agreement which contained no provision restricting assignment. He also applied to amend to add Interface as a plaintiff to seek a declaration that the defendants had unreasonably withheld their consent and should now give it. The judge struck out the claims under the two agreements on the ground that the assignments were ineffective because prior written consent had not been obtained. Leave to amend the statement of claim to plead the assignment of the other agreement was refused because the assignment was after the date of the writ. The claim for inducing breaches of the employees' contracts was not struck out. The plaintiff appealed and the defendants cross-appealed against the judge's refusal to strike out the claim for inducing breaches of contract.

*Held*, allowing the appeal in relation to the third agreement and otherwise dismissing the appeal and cross-appeal:

1. It was not necessary to add Interface as second plaintiff. The plaintiff's right of action did not depend on the assignor being co-plaintiff with him and he had a sufficient interest to enable him to seek a declaration that the assignments were valid.

2. The subsequent request for consent to the assignments added nothing to the plaintiff's claim and it did not matter that the defendants had not objected to the assignment when notice of it was allegedly given.

3. The clause restricting assignment continued to operate after the parties' trading relationship ended. (Rock Refrigeration v Jones [1997] ICR 938; [1997] 1 All ER 1 and Hurst v Bryk [1998] 2 WLR 269 considered.)

4. (Per Henry LJ and Millett LJ) Where an assignment of contractual rights was prohibited without the prior written consent of the other party there could be no valid assignment where the consent was not sought before the assignment was made.

5. (Per Evans LJ) The defendants could reasonably have refused consent to the assignment because the company could have been required to give security for costs whereas the plaintiff could not so the question whether the assignment was invalid on the ground that

© 1998 CCH Editions Limited


CA

no prio not ari 6. T even at most g entitle remain There Applia Bank 7. T employ The *Barr East Eshe Hur Inte Lind Norg Old Rob Rock Trel Vax Year* Decl Clive

Evan 30 Jan strike o upheld, judge r and in *Rains I* 2. Th r. 19(1) action further out as placed light of under r should 3. Th ('Interf stateme defenda

CCH Co

**no prior request was made, even though consent could not reasonably have been refused, did not arise.**

**6. The judge should have given leave to rely on the assignment of the other agreement even after the issue of the writ. Order 18, r. 9 and O. 20, r. 5 conferred a discretion in the most general terms. The purpose of the amendment was to specify why the plaintiff was entitled to bring a claim on a contract made in the name of Interface. The cause of action remained the same and there was no contractual basis for objecting to the amendment. There was no ground for refusing leave and to that extent the appeal was allowed. (Vax Appliances Ltd v Hoover plc [1990] RPC 656 approved; Eshelby v Federated European Bank [1932] 1 KB 254 disapproved.)**

**7. There were no grounds for striking out the claim for inducing breaches of the employees' contracts.**

The following cases were referred to in the judgments:

*Barrow v Isaacs & Son* [1891] 1 QB 417.
*Eastern Telegraph Co Ltd v Dent* [1899] 1 QB 835.
*Eshelby v Federated European Bank Ltd* [1932] 1 KB 254.
*Hurst v Bryk* [1998] 2 WLR 269.
*International Drilling Fluids Ltd v Louisville Investments (Uxbridge) Ltd* [1986] Ch 513.
*Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85.
*Norglen Ltd v Reeds Rains Prudential Ltd* [1997] 3 WLR 1177; [1998] BCC 44.
*Old Grovebury Manor Farm v Seymour Plant Sales & Hire (No. 2)* [1979] 1 WLR 1397.
*Roban Jig and Tool Co Ltd v Taylor* [1979] FSR 130.
*Rock Refrigeration v Jones* [1997] ICR 938; [1997] 1 All ER 1.
*Treloar v Bigge* (1874) 9 Exch 151.
*Vax Appliances Ltd v Hoover Plc* [1990] RPC 656.
*Yeandle v Wynn Realisations Ltd* (1995) 47 ConLR 1.

Declan O'Mahony (instructed by Richard Welsh & Co, Bristol) for the appellant.

Clive Freedman QC (instructed by Swycher & Co) for the respondent.

## JUDGMENT

**Evans LJ:** 1. This appeal is from a judgment given by Judge Raymond Jack QC on 30 January 1995 in the Bristol Mercantile Court. The defendants applied by summons to strike out what was then an amended statement of claim on grounds, which were largely upheld, that the pleading disclosed no reasonable cause of action. On the other hand, the judge rejected an alternative submission that the proceedings were an abuse of process, and in the light of the subsequent decision of the House of Lords in *Norglen Ltd v Reeds Rains Prudential Ltd* [1997] 3 WLR 1177; [1998] BCC 44 he was right to do so.

2. The rules of the Supreme Court require that on an application under O. 18, r. 19(1)(a) to strike out a pleading on the ground that it discloses no reasonable course of action the pleading alone shall be considered: no evidence is admissible (r. 19(2)). The further submissions that the pleading was an abuse of process and that it should be struck out as frivolous or vexatious (r. 19(1)(b)) were not so restricted, and some evidence was placed before the judge. But the abuse of process application is not now pursued, in the light of the House of Lords decision, and the judge made no finding on the application under r. 19(1)(b), so it is important that for the purposes of the plaintiff's appeal we should confine ourselves to the pleaded allegations.

3. The plaintiff was chairman and shareholder of Interface Data Centres Ltd ('Interface'). He held one share and his wife the other of two issued shares. The original statement of claim relied upon two written agreements between Interface and the defendants which were known as the Samms agreement dated 2 February 1991 and the

Namebank agreement dated 10 November 1992. These were described as facilities management agreements under which Interface undertook in return for payment by the defendants to provide certain data processing facilities and services on computer hardware and software. It was alleged that the defendants were in breach of these agreements. In particular, on 25 June 1993:

> '15 . . . the defendant company by itself or its servants or agents attended at the Interface's place of business . . . and removed the computer hardware and software and manuals together with the data tapes and various other consumable which equipment, consumable and data Interface used and maintained under the Samms and Namebank Agreements.
>
> 16 . . . In addition the defendant . . . wrongfully and without reasonable cause or justification induced Interface's employees [five are named] to break their contracts of employment with Interface whereby Interface suffered loss and damage . . .'

The plaintiff was not a party to those agreements. However, he alleged that on 9 September 1993 Interface passed a special resolution,

> 'whereby it was agreed that the company would transfer and assign to the Plaintiff its causes of action against the defendant arising from the defendant's failure to pay contractual sums to Interface and from the defendant's wrongful inducement of Interface's employees to break their contracts with Interface'.

4. On 29 November 1993 the plaintiff gave notice to the defendants that the right to receive sums due under the Namebank and Samms agreements had been assigned to him.

5. The writ was issued on 21 April 1994. The statement of claim was amended on 6 September 1994, the effect of the amendments being to allege that in or soon after November 1988 the plaintiff wrote the specification for a computer program to be called Namebank and that he had entered into an oral agreement on behalf of Interface with the defendants, under which he would develop the program and a handbook and the defendants, in short, would market it. Copyright was to be with Interface. This oral agreement was evidenced, at least in part, in a written agreement dated 3 April 1990. The amended pleading alleged that the plaintiff developed the program and handbook and gave them to the defendants.

6. The oral agreement thus alleged and the written agreement dated 3 April 1990 came to be called the 'exploitation agreement'. That description of the allegations in para. 13-20 of the amended statement of claim can stand. The claims made were as follows:

> '(1) £169,075.61 being sums presently due under the Namebank and Samms Agreements;
>
> (2) Damages for breach of the Namebank and Samms Agreements;
>
> (3) Damages for wrongfully inducing employees of Interface to breach their contracts of employment;
>
> (4) . . .
>
> (5) An enquiry into the Sums due to the Plaintiff (sic) under the terms of the "Exploitation Agreement" and an order for payment of all sums found to be due upon such enquiry and alternatively, damages.'

7. There was no allegation in this pleading of any assignment by Interface to the plaintiff of any of its rights under the 'exploitation agreement'. Nor was it alleged that the plaintiff was a party to that agreement. It followed that the pleading omitted a vital ingredient in the plaintiff's claim under this head. The claims under para. (1)-(4) but not (5) were made in his capacity as assignee.

© 1998 CCH Editions Limited

8. On 17 October 1994 the defendants served their defence. This raised the issues which led to the strike-out application heard on 28 November 1994. The two main grounds were, first, that the two written agreements – the Namebank and Samms agreements – each contained an assignment clause in the following terms:

> '26 *Assignment*
>
> The Client [Defendants] shall not be entitled to assign licence or otherwise transfer the benefit of this Agreement whether in whole or in part without the prior written consent of the Interface . . . Interface shall not be entitled to assign or otherwise transfer this Agreement in whole or in part or to sub-contract any of obligations hereafter without the prior written consent of the Client which shall not be unreasonably withheld.'

9. Interface had not obtained the prior written consent of the defendants to the special resolution of 9 September 1993 which the plaintiff relied upon as an assignment to him of Interface's causes of action under the Samms and Namebank agreements. Nor had any request been made for such consent, and it followed that consent had not been refused; whether reasonably or not. When the defendants were given notice of the assignment in November 1993, as the plaintiff alleges that they were, it is not suggested that either party made any reference to the need for consent, or to the fact that it had not been given. Nor, when the summons was issued on 19 October 1994, had they been asked to give their consent retrospectively.

10. Before the hearing date, however, the plaintiff's solicitors did request consent, by a letter dated 24 November 1993, in the following terms:

> 'Having considered Interface's position in this matter, we are instructed to ask your company to give Interface permission to assign the rights to payments under the Samms and Namebank Data Processing Agreements to Ross Hendry a director of Interface. These rights are those which are referred to the Statement of Claim in the action against you by Mr Hendry.'

There followed an express concession that:

> 'in so far as the contractual term prevents the assignment of contract, the court is bound to follow *Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85 and hold that the assignment is not effective as against [the Defendants] at the moment'.

The letter continued by reminding the defendants that their approval was not to be unreasonably withheld, and asking them to approve 'the assignment of [Interface's] right to payment under the terms of the Samms and Namebank Data Processing Agreements which it entered [into] with you'.

11. The defendant's solicitor replied by letter on the following day (25 November):

> 'We have advised our clients that the intended assignment is an abuse of process and/or void. We refer you to paragraph 31 – of the draft Amended Defence. In any event it cannot have been the intention of the parties to expect a consent to the assignment when their commercial relationship is at an end and when they are in dispute.
>
> Without prejudice to our contention that your client cannot seek consent in the circumstances, no consent is given. Further we wish to make it clear that this letter is not intended to be a comprehensive list of our clients reasons for not giving consent.'

12. Before the *Norglen* judgment, which was given on 27 November 1997, there was Court of Appeal authority for the view that an assignment of a cause of action by a company to an individual, who unlike the company could obtain legal aid and was not

subject to a potential liability to an order to provide security for the defendant's costs, was invalid, but the contrary decision of the Court of Appeal in *Norglen* itself was upheld by the House of Lords. Hence the 'abuse of process' application in the present case, which is no longer pursued. It was in relation to that application, however, that a certain amount of background evidence was placed before the judge. The evidence made it clear what the reason for the assignment was. Interface was insolvent as at 30 June 1993, according to audited accounts, subject to its claims against the defendants. The plaintiff was a significant creditor. The plaintiff's evidence showed that it was his belief that the defendants had set out to destroy his, namely Interface's, business, so that they could enjoy the full fruits of his software development. He says that they starved him of cash – the outstanding debt at 30 June 1993, according to the accounts, was about £16,000 – and that they moved in on 25 June and took the computer equipment from him and induced five of his (Interface's) six employees who operated the equipment to leave and join the defendants, as they did shortly afterwards. The defendants' version of events is shown by the terms of the defence. They say, in summary, that they were justified in retrieving the equipment on 25 June because, prior to that date, Interface was in breach of its obligations towards them with regard to confidentially and use of the equipment and software. They deny that they induced the Interface employees to break their contracts of employment. Rather, the employees resigned, with or without the agreement of Interface, and they were interviewed and subsequently employed by the defendants on or after 28 June.

13. This was the basis on which the defendants made their application on 28 November 1994 to the judge. But before the hearing the plaintiff's solicitors served on the defendants and on the court a proposed re-amended statement of claim. No summons was issued applying for leave to make this re-amendment, but clearly the hearing proceeded as if such an application was being made. There were two significant proposed amendments. The first was to plead an assignment to the plaintiff of Interface's claims for money due under and breaches of the exploitation agreement. The assignment relied upon was a further special resolution said to have been passed on 20 November 1994, a few days earlier, together with a previous special resolution relating to copyright on 6 June 1994, which was also after the date of the writ. There was no term of the exploitation agreement, written or oral, which barred or restricted the right of assignment. The defendants submitted that this re-amendment should be disallowed because the assignment or assignments relied upon took place after the issue of the writ. It followed from this, they submitted, that the plaintiff had no cause of action under the exploitation agreement at the date when the writ was issued.

14. The second proposed re-amendment was an application to add Interface as second plaintiff, but only for a limited purpose, which was to claim, together with Mr Hendry as first plaintiff, a declaration that the defendants had unreasonably withheld their consent to Interface to assign the benefit of the Samms and Namebank agreements to Mr Hendry, together with an order that the defendants should give their written consent to such an assignment and that any sums founds to be due from the defendants under the said contract should be paid to Mr Hendry. The remaining heads of claim were expressly limited to claims by Mr Hendry, and in each case he was claiming as assignee from Interface.

15. The judge gave judgment on 30 January 1995 after receiving certain further written submissions on behalf of the plaintiff in relation to the defendants' objection to the amendments which relied upon a post-writ assignment. The judgment deals clearly and concisely with the issues that were raised before him. The outcome was as follows. The claims made by the plaintiff as assignee under the Samms and Namebank agreements were struck out on the ground that the assignments relied upon were ineffective as against the defendants because their prior written consent was not obtained. The claims under

© 1998 CCH Editions Limited

the exploitation agreement were likewise struck out because the plaintiff was not entitled to bring them in his own name. Leave to re-amend the statement of claim in order to plead the post-writ assignment was refused, on the grounds that there was no power to allow such an amendment and as a matter of discretion in any event. The claim for damages for inducing breaches of the employees' contracts of employment, which was 'based in tort and not subject to any restrictions or assignment', was not struck out, but the judge expressed doubts as to its 'viability and substance'.

Issues

16. Counsel agreed the following three main issues before us:

(1) Should the claims made by the plaintiff as assignee of the Samms and Namebank agreements be struck out? The judge did strike them out. The basic ground for doing so was that the defendants did not give their 'prior written consent' to the assignment by Interface upon which the plaintiff relies. A further question is whether the plaintiff should be given leave to re-amend the statement of claim in order to refer to the letter dated 25 November 1994, quoted above, by which the defendants refused their consent to any assignment to the plaintiff, and to add Interface as second plaintiff in order to claim the declaration and order referred to above.

(2) Should the plaintiff be given leave to re-amend the statement of claim so as to plead the special resolution of 20 November 1994 which is relied upon as an assignment of Interface's claims under the exploitation agreement? The judge refused leave on the ground that the alleged assignment post-dated the writ.

(3) The defendants cross-appeal against the judge's refusal to strike out the plaintiff's claim as assignee of Interface's claim for damages for the tort of inducing breaches of the five employees' contracts of employment.

I shall deal with these issues in reverse order.

(A) Inducing breaches of contract

17. The judge said:

> 'The damages which are claimed is the additional charge which Interface would have made when costing out the employees, namely 100 per cent of salary. If Interface's business effectively came to a halt when Chartsearch removed the equipment, it may be that the loss of Interface's employees caused it no additional loss because there would have been no work for them. Thus it could be that the outcome of any inducing breach of contract was simply to relieve Interface of the salary burden rather than to cause loss. I was not, however, addressed on this basis, and so I say no more about it. The facts may establish otherwise.'

and later, in a different context:

> 'For reasons which I have indicated but not elaborated I regard this as a claim which is probably lacking real substance. I do not consider that it should be permitted to be used as a peg on which to hang the rest of the action.'

The defendants cross-appeal on the specific ground (respondent's notice under O. 59, r. 6(1)(a)) that damages are claimed in the sum of £6,344 whereas the assignment dated 7 September 1993 upon which the plaintiff relies provides that the first £10,000 of any received shall be paid to Interface. 'Accordingly, there was no effective assignment in that the whole of the benefit thereof was retained and maintained for the Company'.

18. In my judgment, this contention does not provide a basis for striking out the claim. There may or may not be reasons for regarding the plaintiff as a nominal plaintiff only,

the substantial plaintiff being Interface, with whatever consequences might follow from that. But the claim should not be struck out on this ground. In addition, Mr O'Mahony indicated that the damages claims may be more substantial than at presently pleaded, though why, if that is the case, the pleading is worded as it is I do not understand. In a separate ground of cross-appeal, the defendants say that the assignment was a 'sham, device or stratagem'. Mr Freedman did not pursue this aspect in any detail and in my judgment he was precluded from doing so by the House of Lords judgment in *Norglen*. For these reasons, I would dismiss the cross-appeal against this part of the judge's order.

**(B) Re-amendment: assignment after the date of the writ**

19. The judge refused leave on the ground that *Eshelby v Federated European Bank Ltd* [1932] 1 KB 254 should be applied. After the hearing but before judgment was given (and after seeing a draft judgment) Mr O'Mahony made a further submission in writing, relying upon *Vax Appliances Ltd v Hoover Plc* [1990] RPC 656 and referring also to *Roban Jig and Tool Co Ltd v Taylor* [1979] FSR 130. The judge said:

> 'I consider that the principle set out in *Eshelby* and *Roban* is applicable to the circumstances before me. It follows that there should not be leave to amend, or, if it is to be expressed as an exercise of discretion, that my discretion should be exercised to refuse leave.'

20. The plaintiff appeals on the ground that the judge was wrong to rely upon *Eshelby* and wrong to exercise his discretion as he did. Mr Freedman QC for the respondents accepted that the judge had a discretion and submitted that it was exercised correctly. His eventual reason is simply that the plaintiff had no cause of action or no related or analogous cause of action at the date of the writ.

21. In my judgment, the judge was wrong not to adopt the approach spelled out in *Vax Appliances Ltd*. There, Mummery J considered the earlier judgments both in *Eshelby* and in *Roban Jig and Tool Co Ltd* and he took account also of the provisions of RSC, O. 18, r. 9:

> 'Subject to [certain rules which are not material for present purposes] a party may in any pleading plead any matter which has arisen at any time, whether before or since the issue of the writ.'

This rule, which was introduced post-*Eshelby* in 1962, is in the most general terms, as is the court's general power to grant leave to amend a pleading under O. 20, r. 5(1). Mummery J so observed (p. 661). He effectively distinguished *Roban Jig and Tool Co*, where leave to amend was refused, because 'the plaintiff had no cause of action at all at the date of the writ' and 'there was no cause of action to add to or be the subject of substitution', In *Vax Appliances*, on the other hand, the defendant (seeking leave to amend the counterclaim) did have a cause of action at the date of the service of the counterclaim (p. 661).

22. Mr Freedman submits in effect that it follows from this passage and from the judgments in *Roban Jig and Tool Co* that leave to amend cannot or should not be given unless the party seeking leave to add a fresh cause of action had some cause of action at the date of the writ (or counterclaim). This would amount to a significant restriction on the apparently general discretion given by O. 20, r.5(1) and O. 18, r. 9.

23. I would reject this submission. The scope of the Rules of the Supreme Court has been extended since the days when *Eshelby* was decided in 1932. In accordance with modern practice generally, the court has a general discretion which should not be restricted by hard-and-fast rules of practice, if not of law, such as that which is suggested here. The judge therefore was wrong to consider that the court had no power to give leave to make the re-amendment. In my view, he was wrong also to consider that the

© 1998 CCH Editions Limited
boom98 bcom 10Mp 1388 —bcom1095

discretion was somehow restricted by what he called 'the principle set out in *Eshelby* and in *Roban*'. It is a general power which in modern parlance has to be exercised in accordance with the justice of the case.

24. I therefore proceed to consider whether leave should be granted in the present case. The statement of claim in its original and amended forms contains a clear statement of the causes of action relied upon under the exploitation agreement. The claims are made in the name of the plaintiff although it is also pleaded that the contracting party was Interface. The purpose of the re-amendment is to specify the reason why the plaintiff alleges that he is entitled to bring the claim. The cause of action remains the same: the additional facts cause no prejudice or embarrassment to the defendants. I cannot see any ground for refusing leave to make the re-amendment, and as the exploitation agreement does not contain an assignment clause there is no contractual basis for objecting to the amendment. In any event, I do not consider that the tort claim so lacks 'viability and substance' that the case is equivalent to *Roban Jig*, where the plaintiff had no existing cause of action at the date of the writ.

25. For these reasons, I would allow the appeal and give leave to re-amend the statement of claim in this respect. A time bar defence was raised in argument but Mr O'Mahony agreed on behalf of the plaintiff that the claim would be limited accordingly.

**(C) Claims under the Samms and Namebank agreements**

26. Here, the central issue is whether the plaintiff can sue as assignee from Interface when the defendants did not give their prior written consent to the assignment upon which the plaintiff relies. They did not do so in fact, and when they were asked to consent, they refused. The defendants say that they cannot be sued under or for breaches of these agreements except by Interface, or by an assignee from Interface to whom they cannot reasonably object. They say that they are entitled reasonably to object to an assignee (1) who cannot be ordered or does not offer to provide security for their costs, this being an order which they would seek against Interface under s. 726 of the *Companies Act* 1985, and (2) who being an individual is eligible for legal aid. The plaintiff, they say, is objectionable on both grounds.

27. The central issue, however, is surrounded by a number of other issues, both procedural and substantive, which are raised by the defendants' application to strike out the existing amended pleading and by the plaintiff's assumed application to re-amend the statement of claim. These other issues are not easy to disentangle, and it is helpful to set them out here.

28. First, is it fatal to the plaintiff's claim as assignee from Interface that the defendants were not asked to consent to the assignment, so as to give them the opportunity to give or withhold their consent, before it was made? Is it relevant in this context (1) that at the relevant date Interface was no longer carrying on business and the agreements for practical purposes were at an end, and (2) that the defendants did not object to the assignment, or to the failure to give them prior notice, when they were notified of it, as the plaintiff alleges, before the writ was issued?

29. Second, are the letters in which consent was asked for and refused in November 1994 relevant to the plaintiff's claim? If so, should leave to re-amend in order to rely upon them be given? The fact that the correspondence took place after the writ was issued does not prevent this (*Vax Appliances*, above).

30. Third, is it necessary for Interface to be joined as a party to the proceedings for the plaintiff to rely upon the assignment and to claim the declaration and order which he seeks in paragraph (1) and (2) of the proposed re-amended statement of claim? If so,

there are considerable problems. Interface has been struck off the Register of Companies, although if necessary it could, Mr Hendry asserts, be restored.

31. Again, I will take these three matters in reverse order.

(1) *Interface as second plaintiff*

If it was necessary for the validity of the plaintiff's claim as assignee that Interface should become a party to the action, then I would refuse leave to re-amend because of the impracticability of doing this without further cost and delay. But I do not think that it is necessary. The plaintiff claims as an equitable assignee, and the established practice is that the assignor should be made a party to the proceedings whether as co-plaintiff or as co-defendant with the alleged debtor. The reason for this is to ensure that the assignor is bound by the court's judgment and that the debtor will not be sued for the same debt a second time. That practical consideration does not arise here; if it is raised by the defendants, then whatever order is appropriate can be made. But the inference is clear. The plaintiff's right of action does not depend upon the assignee being co-plaintiff with him.

Moreover, in my judgment a plaintiff who claims as assignee has a sufficient interest to enable him to seek a declaration that the assignment to him was valid.

(2) *The letters dated 24–25 November 1994*

These were post-assignment as well as post-writ. The plaintiff does not allege that there was a subsequent assignment, or purported assignment, in relation to which he can assert that there was a request for prior consent, which was unreasonably refused. There was no request for retrospective consent to the assignment which, it is alleged, had already been made on 9 September 1993. In these circumstances, it seems to me, the letters add nothing to the plaintiff's existing claim. He either is or is not entitled to rely upon the earlier assignment for which consent was never sought, given or refused. If the assignment was invalid or ineffective as regards the defendants for want of their prior written consent, then their subsequent refusal does not establish a cause of action. At most, it provides evidence, if evidence is needed, of what the defendants' attitude would have been; and in this respect the reason given for their refusal (though not their only reason) may be relevant – 'it cannot have been the intention of the parties to expect a consent to an assignment when their commercial relationship is at an end and when they are in dispute'. But, as evidence, this need not be pleaded.

(3) *No prior request, no objection when notice given*

These issues arise on the defendant's strike-out application rather than the plaintiff's application for leave to re-amend. The material facts are already pleaded. I do not think that the defendant's failure to object, when notice (as it is alleged) of the assignment was given, can make the assignment valid or effective if it was not so before. The plaintiff's failure to make a pre-assignment request is bound up with what I have called the central issue, namely, whether there could be a valid and effective assignment without the defendant's prior written consent. To this central issue I now return.

**Prior written consent 'not to be unreasonably withheld'**

32. This is a striking-out application which should not succeed unless it is clear from the pleaded facts that the plaintiff's claim must fail, as a matter of law.

33. The pleaded facts are straightforward. There was an assignment, it is alleged, of contractual rights under a contract which contains a bar on assignments in qualified rather than absolute terms.

34. The distinction between 'absolute' and 'qualified' is important, because Mr O'Mahony for the plaintiff accepts that, if the bar on assignments was absolute, then

© 1998 CCH Editions Limited

a purported assignment in breach of the claims would be ineffective as regards the debtor: *Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85 per Lord Browne-Wilkinson at p. 108F. Lord Browne-Wilkinson made it clear that the clause could bar assignments not only of the contractual rights to require performance by the other party, the primary obligations under the contract, but also claims or causes of action (secondary rights) arising out of breaches of contract (pp. 103–106).

35. The judge relied upon the *Linden Gardens* judgment in holding that the plaintiff's claims under the Samms and Namebank agreements should be struck out. Mr O'Mahony submits that he was wrong to do so: Where the bar is qualified, so that consent is required but may not be unreasonably withheld, then the reasonableness or otherwise of the other party's refusal, or right to refuse, must be considered in the light of all the circumstances of the case, taking both parties' interests into account. He submits that this is the correct approach by analogy with landlord and tenant cases, citing *International Drilling Fluids Ltd v Louisville Investments (Uxbridge) Ltd* [1986] Ch 513, and that since these matters require investigation the claim should not be struck out at the interlocutory stage. He relies in particular upon what he alleges is the fact, namely, that the defendants deliberately sought to destroy the company's business so as to starve it of funds and thereby prevent it from bringing proceedings on its own account.

36. Mr Freedman QC responds that, without consent, the assignment was a nullity, and alternatively that the defendants were entitled reasonably to withhold their consent, if they had been asked to give it. The trading relationship was at an end; and the proposed assignment was for the purpose of enabling litigation against the defendants, by a legally-aided plaintiff who would not be liable to be ordered to give security for the defendants costs (respondents' skeleton argument, para. 20).

37. In my judgment, there are three separate issues which have to be considered. The first is whether the bar on assignment without consent continues to operate when, as Mr Freedman puts it, the trading relationship has come to an end. I note that the defendants' solicitors in their letter dated 25 November 1994 refusing consent, quoted above, may have suggested that the clause cannot have been intended to operate in these circumstances, whereas the plaintiff's solicitors, in their letter which was under reply, expressly conceded that the *Linden Gardens* decision applied and that the assignment which was pleaded was not effective against the defendants 'at the moment'. Putting both these letters to one side, it seems to me that the clause can and does continue to operate, notwithstanding that the parties are no longer trading with each other and their relationship continues only for the purpose of resolving disputes governed by the terms of the agreement. But the change in the nature of their relationship means that the circumstances which are relevant to the reasonableness or otherwise of refusing consent have changed also. In principle, the party who is entitled to refuse consent may have a legitimate interest in the identity of the other party in litigation or arbitration – see *Yeandle v Wynn Realisations Ltd* (1995) 47 ConLR 1, per Sir Thomas Bingham MR at p. 13:

> 'The party to whom a contractor pays a sum which he is bound to pay may well be a matter of indifference to him. The same is not necessarily true of the party against whom he finds himself defending a claim in arbitration.'

38. In this connection, we were referred to two recent decisions of this court which were concerned with the extent to which contractual undertakings may continue to be binding notwithstanding that the contract has 'come to an end', as it is sometimes put, by reason of a repudiatory breach 'accepted' by the other party. These authorities are *Rock Refrigeration v Jones* [1997] ICR 938; [1997] 1 All ER 1 and *Hurst v Bryk* [1998] 2 WLR 269 (we were told that an appeal to the House of Lords is pending in the latter). This led to submissions as to whether or not the agreements were terminated in this way

in the present case, and if so, when. In my judgment, the question whether a particular undertaking 'survives' repudiation and acceptance depends always on the true construction of the contract in the particular case, and for the reasons given above cl. 26 is capable of doing so.

39. The second issue is whether the grounds on which consent was or would have been refused in the present case were clearly reasonable, so much so that the plaintiff's claim as assignee should be struck out. The grounds put forward are that the plaintiff as an individual is entitled to seek legal aid and is not liable to an order to provide security for the defendants' costs. Apart from these specific matters, it is difficult to see that the defendant can be affected in any way by the fact that the plaintiff is Mr Hendry personally, rather than Interface Ltd, which on any view was his company. A response to this argument is that Mr Hendry having sought the advantages of incorporation for his trading venture should not be permitted to resile from the specific disadvantage, namely, the liability under s. 726 of the *Companies Act* 1985 to provide security for costs, which that corporate status also brings (see *Norglen* [1997] 3 WLR 1177; [1998] BCC 44 per Lord Hoffmann at p. 1188H; 53B). Nevertheless, this could be regarded as 'a harsh and unrealistic judgment' (ibid., p. 1187H; 52B).

40. In *Norglen* the House of Lords held that the assignment to an individual was not unlawful or contrary to public policy (though the issue was regarded as one of statutory interpretation: see p. 1186C; 50H) merely because the assignee was entitled to seek legal aid (p. 1189; 53); nor because he could not be ordered to provide security for costs under s. 726 (p. 1188H; 53B). It does not follow from this, however, that the debtor is acting unreasonably if he refuses his consent to an assignment on these grounds.

41. If the eligibility for legal aid objection stood alone, then I should be reluctant to hold that it was reasonable for the debtor to refuse his consent on this ground. The essence of Lord Hoffmann's speech in *Norglen*, with which the other members of the House of Lords agreed, is that legal aid is available to impoverished litigants who would otherwise be deprived of access to the courts. Even though legal aid is not available to companies, Parliament had not intended to restrict the rights of companies to assign their property to individuals who could be granted legal aid and thereby enabled to pursue their claims. I doubt whether a debtor should rely upon the existence of the legal aid scheme as a reason for objecting to an assignment and thereby ensuring that no proceedings or no effective proceedings could be brought against him.

42. The position with regard to security for costs is, however, different. The debtor has a statutory right, 'for better or worse' (p. 1188H; 53B), which protects him from being in the unenviable position of being sued by an impecunious plaintiff (p. 1181C; 46E). However great the disadvantages to the creditor, company or individual, I do not see how it could be regarded as unreasonable for the debtor to insist upon this statutory right.

43. For this reason, I would hold that the defendants were entitled to refuse consent in the present case, as they did after the assignment in November 1994 and as they doubtless would have done if asked before 9 September 1993. The third issue, namely, whether the assignment was invalid or ineffective on the ground that no prior request was made, even though consent could not reasonably have been refused, therefore does not arise. Although I have read the judgment of Millett LJ in draft, I prefer to leave open the question whether the established law concerning leases necessarily applies to assignments of contractual rights. There appears to be no authority on this issue (see e.g. *Chitty on Contracts* (27th edn), para. 19-025 where none is cited) and it may be arguable that the debtor cannot object to the validity of an assignment on the ground that he was not asked for his consent, when he could not reasonably have refused it. The distinction between leases and contractual obligations simpliciter may be relevant here, and I note

© 1998 CCH Editions Limited

that in *Eastern Telegraph Co Ltd v Dent* [1899] 1 QB 835 the purported assignee in fact had moved into occupation of the premises. I must emphasise, however, that I do not dissent in any way from his analysis of the lease assignment cases.

44. I would add just this. If the individual assignee was willing and able to provide security in accordance with s. 726 on the same terms as if he was the company, then it seems to me as at present advised that the debtor could not reasonably refuse his consent on this ground. Moreover, since s. 726 gives a discretionary power, the factors urged on us by Mr O'Mahony would be relevant to any such application, for example, his allegations that the company's impecuniosity may have been deliberately brought about by the defendants. If therefore a plaintiff was prepared to undertake and could demonstrate that he was willing and able to provide such security as might have been ordered against the company if it was the claimant, then it might be that the claims by him as assignee should be permitted to stand. But that as I understand it is not the position here.

45. I therefore would allow the appeal as regards the exploitation agreement, but not otherwise, and dismiss the cross-appeal.

**Henry LJ:** On the point which separates Evans LJ and Millett LJ, I am of opinion that where an assignment of contractual rights (such as a chose in action) is prohibited without the prior written consent of the other contracting party (such consent not to be unreasonably refused) then there can be no valid assignment until after (1) written consent has been granted, or (2) the court has declared that the consent has been unnecessarily refused. That 'prohibition on assignment normally only invalidates the assignment as against the other party to the contract so as to prevent a transfer of a chose in action' (*Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd* [1994] 1 AC 85 at p. 108, per Lord Browne-Wilkinson).

The suggestion that the assignor can validly assign in breach of his contract without ever seeking prior consent by asserting that, as such consent could not reasonably be refused, so it is unnecessary, seems to me to be a recipe to promote uncertainty and speculative litigation. I prefer the simple certainty that prior consent never applied for is never withheld or refused (whether reasonably or otherwise). The burden of suing should be on the party who asserts that he is not obliged to ask for prior consent as his contract required him to because it could not reasonably be refused.

That apart, I agree entirely with the judgment of Evans LJ, and the order he proposes.

**Millett LJ:** I have had the advantage of reading in draft the judgment of Evans LJ. Save in one respect I agree with it and with the orders which he proposes. The one respect in which I venture to differ from him is that I regard it as fatal to the validity of the assignment on which the plaintiff relies that the defendants' consent was not sought before the assignment was made. The hypothetical question whether if their consent had been sought it could reasonably have been refused is in my opinion irrelevant and is not a proper subject of inquiry.

The law is settled to this effect in relation to the assignment of leasehold land; and while there are significant differences between the assignment of an interest in land and an assignment of the benefit of a contract, they do not bear on this question.

A lease creates a legal estate in land. One of the incidents of ownership is the right to dispose of the property. A condition against alienation which is directly attached to the estate is repugnant to this right and void. It is, therefore, not possible to deprive a lessee of his ability to make an effective assignment of the lease. But it is possible for the lessor to take a covenant against assignment and to reserve a power of re-entry for breach of the covenant. An assignment in breach of covenant is effective to vest the legal estate in the assignee: *Old Grovebury Manor Farm v Seymour Plant Sales & Hire (No. 2)* [1979] 1

WLR 1397; but the assignee takes a defeasible interest only which is liable to forfeiture for breach of covenant.

A covenant against assignment may be in absolute terms or conditional on obtaining the lessor's prior consent; and such a condition may be qualified by a proviso that the lessor's consent shall not be unreasonably withheld. Where the condition is qualified in this way the lessor does not undertake not unreasonably to refuse his consent, but an unreasonable refusal of consent leaves the lessee at liberty to assign without it: *Treloar v Bigge* (1874) 9 Exch 151.

But it is essential that the lessor's consent is sought before the assignment is made. Consent cannot be said to be withheld or refused if it is not asked for: *Barrow v Isaacs & Son* [1891] 1 QB 417; *Eastern Telegraph Co Ltd v Dent* [1899] 1 QB 835. It is no answer that no reasonable objection could have been made if consent had been sought; the proviso has no application unless it is.

As between the parties to it, an ordinary commercial contract is not property but obligation. There is therefore no objection to making the benefit of the contract non-assignable. There is no need to take a covenant against assignment or reserve a power to treat assignment without consent as a repudiatory breach of contract, neither of which would provide an adequate or appropriate remedy to the other party. It is sufficient to provide, as the present contract does, that a party should not be entitled to assign the benefit of the agreement without the prior written consent of the other.

Such a clause takes effect according to its tenor. The assignment which was made without the prior written consent of the defendants was effective as between assignor and assignee, but was ineffective as between the assignor and the defendants. The making of such an assignment did not put the assignor in breach of contract, let alone in repudiatory breach; it simply did not affect the defendants' legal position and could be disregarded by them with impunity.

But these differences cannot affect the meaning of the proviso. Whether the subject-matter of the proposed assignment is a term of years or the benefit of a commercial contract, the effect of the proviso is the same. Consent is not withheld if it is not asked for; and if it is not withheld it cannot be said to be unreasonably withheld.

In the case of a lease, the fact that an assignment in breach of covenant is effective to vest the term in the assignee means that it is too late to seek consent; the breach of covenant is complete and the lease is liable to forfeiture. That is not so in the case of the benefit of a contract. The assignment does not constitute a breach of contract and is without legal effect so far as the other party to the contract is concerned. It is not too late for the assignor to ask for consent. But the contract requires the assignor to obtain the prior consent of the other party; retrospective consent, if given, may operate as a waiver, but cannot amount to the consent required by the contract. The proper course is for the assignor, to ask for consent to a new assignment and to wait until it is given or unreasonably refused before proceeding to make it.

In my judgment it is wrong in principle to entertain the hypothetical question whether the defendants could have objected to the assignment if they had been asked for it. I would refuse to give the assignment any effect without entering upon this question.

(*Order accordingly*)

© 1998 CCH Editions Limited
bcom98bcom 10Mp 1394 —bcom1096

LINDEN GARDENS TRUST Ltd v LENESTA SLUDGE DISPOSALS Ltd and Others; ST MARTINS CORPORATION Ltd and Another v SIR ROBERT MCALPINE & SONS Ltd

Court of Appeal (Civil Division)

30 Con LR 1, 57 Build LR 57

HEARING-DATES: 13 February, 17 June 1992

17 June 1992

**CATCHWORDS:**

Contract -- Assignment -- JCT Conditions 1963 Edition, 1972 and 1975 revisions, clause 17(1) -- JCT Minor Works-Form, 1980-Edition, clause 3.1 -- Effect of prohibition on assignment without consent of contractor -- Whether assignor's action for substantial damages for breach of contract maintainable -- Measure of damages of assignor

**HEADNOTE:**

The Linden Gardens case

(Please note that this case contains the 13 February 1992 decision in the first three judgments and the 17 June 1992 decision in the last three judgments)

Stock Conversion Ltd was the lessee of the third to sixth floors of 130 Jermyn Street, London. In June 1979 it made a contract with the first defendants ("Lenesta"), as prospective sub-contractors, for the removal of asbestos. In July 1979 it engaged the second defendants, McLaughlin & Harvey plc ("McLaughlin") as main contractors for such work. The contract incorporated the JCT Standard form, 1963 Edition, July 1975 Revision, clause 17 of which stated:

"(1) The Employer shall not without the written consent of the Contractor assign this contract.

(2) The Contractor shall not without the written consent of the Employer assign this contract, and shall not without the written consent of the Architect (which consent shall not be unreasonably withheld to the prejudice of the Contractor), sub-let any portion of the Works . . ."

Practical completion took place in March 1980. In February 1985 Stock Conversion entered into an agreement with the third defendant, Ashwell Construction Ltd ("Ashwell"), to remove further asbestos. The contract was in the JCT Minor Works form, 1980, clause 3.1 of which stated:

"Neither the Employer nor the Contractor shall, without the written consent of the owner, assign this contract."

Practical completion of this contract took place on 16 August 1985. On 3

July 1985 Stock Conversion issued a writ against Lenesta claiming damages for breach of contract.

By an assignment dated 1 August 1985, Stock Conversion assigned to the plaintiffs, Linden Gardens, its interest in the third, fifth and sixth floors and its interest in the fourth floor by an assignment of 2 December 1986.

By an assignment on 14 January 1987 Stock Conversion assigned to Linden Gardens all rights of action under the contracts with McLaughlin and Ashwell. Linden Gardens became plaintiffs in the existing action and in March 1989 McLaughlin & Harvey and Ashwell were added as second and third defendants. The proceedings against Lenesta were not pursued to judgment.

Linden Garden's claim against McLaughlin and Ashwell was for the cost of remedial works carried out by Stock Conversion in 1985 (£22,205.02) and the cost of the further remedial works carried out by it (£236,000). The defendants challenged the right of Linden Gardens to sue at all. Preliminary issues were ordered (set out at pages 74-75 below). His Honour Judge Lloyd QC answered the questions in favour of the defendants ((1990) 52 BLR 93). Linden Gardens appealed.

*The St Martins case*

St Martin's Corporation Ltd ("Corporation") engaged Sir Robert McAlpine & Sons Ltd ("McAlpine") by a contract dated 29 October 1974 to carry out a development in Hammersith comprising shops, offices and local authority housing. The contract was in the JCT standard from 1963 Edition, July 1972 Revision. Clause 17 was in the same terms as in the Linden Gardens case. On 25 March 1976 Corporation transferred the property and assigned the benefit of the contract with McAlpine to St Martin's Property Investments Ltd ("Investments") for its market value. Practical completion of the relevant part, the Podium Deck, took place on 1 November 1979. Subsequently, defects were discovered in it which require remedial works at a cost in excess of £800,000. Corporation and Investments were both plaintiffs in an action against McAlpine seeking damages for breach of the contract dated 29 October 1974. McAlpine challenged the right of Investments to recover against it at all and contended that Corporation having disposed of the property at market value had suffered no damage and therefore was entitled only to nominal damages. Preliminary issues were ordered (see page 75 below).

His Honour Judge Bowsher QC, held that the prohibition upon assignment disentitled Investments from succeeding against McAlpine He further held that since there had been a disposal of the relevant property for market value Corporation could not recover more than nominal damages. Corporation and Investments appealed.

HELD: allowing the appeals of Linden Gardens and Corporation but dismissing the appeal of Investments:

(1) (Staughton LJ dissenting in part) Although the effect of clause 17 of the JCT Standard form and clause 3.1 of JCT Minor Works form was to prevent the assignment of the benefit of the contract without consent so that in the absence of the contractor's consent an assignee could not sue upon the contract, neither precluded the assignment of benefits arising under the contracts such as accrued

causes of action for damages. Therefore since in the Linden Gardens case (but not St Martins) breaches of contract had accrued before the assignment the rights of action for damages (being claims only for the *fruits of performance*) were validly *assigned*.

Per Staughton LJ, dissenting, (at page 83), the words *"assign this contract"* in clause 17(2) *do indeed refer* to the delegation of the contractor's obligation by sub-contracting them all. They do not include assignment (in its legal sense) of the benefit of the contract or part of it . . . The words "assign this contract" in clause 17(1) *must be given* the same meaning. They prohibit vicarious performance by the employer without consent and do not prohibit assignment by the employer of the benefit of the contract or part of it.

(2) An assignee cannot recover more damages than the assignor could have recovered if there had been no assignment and the building had not been transferred to the assignee. *The assignee* could recover damages whether or not the loss was suffered before or after the date of assignment because the right to claim damages in contract accrued not upon the occurrence of damage but upon breach. Dawson v *Great Northern & City Railway Co* [1905] 1 KB 260 followed: GUS v Littlewood Mail Order Stores [1982] *SLT* 533 considered.

(3) Corporation could, *however, recover* the loss suffered by Investments because it was liable to Investments for the consequences of the invalidity of the assignment.

**COUNSEL:**

A Speaight appeared *for Linden Gardens; J* Fenwick appeared for McLaughlin; E Meyer appeared for Ashwell; Lloyed QC and D Westcott appeared for Corporation and Investments; R Fernyhough QC and M Taverner appeared for McAlpine.

**PANEL:** Nourse, Staughton LJJ, Sir Michael Kerr

**JUDGMENTBY-1:** NOURSE LJ

**JUDGMENT-1:**

NOURSE LJ: (This is the commencement of the 13 February 1992 decision). I have had the advantage of reading draft in the judgments of Staughton LJ and Sir Michael Kerr. *On the one* point *of difference between them,* an important point, *I prefer* the view of Sir Michael Kerr. In all other respects I agree with the reasoning of Staughton LJ and do not wish to add to it.

The difference of opinion is of no practical consequence in the Linden Gardens case. In the St Martins case its consequence is that whereas Staughton LJ would allow the appeal of Investments, *Sir Michael Kerr* and I are agreed that it must be dismissed. That does not, however, lead to the further and unacceptable consequence that McAlpines, if they are in breach of contract, are absolved from paying substantial damages to *either of* the St Martins companies. *For the reasons* given in the judgment of Sir Michael Kerr, with which I agree and to which I do not wish to add, I too would allow the appeal of Corporation.

The point of difference arises out of the provisions of the three contracts which forbade the employer, without the written consent of the contractor, to

"assign this contract". Two of them (the McLaughlin & Harvey contract in the Linden Gardens case and Corporations's contract with McAlpines in the St Martins case) were in the standard JCT form, clause 17 of which provided as follows:

"(1) The Employer shall not without the written consent of the Contractor assign this Contract.

(2) The Contractor shall not without the written consent of the Employer assign this Contract, and shall not without the written consent of the Architect (which consent shall not be *unreasonably* withheld to the prejudice of the Contractor) sub-let any portion of the Works . . ."

With regard to clause 17(2), I think it clear that the presence of a prohibition against sub-letting "any portion" of the works, coupled with the absence of a prohibition against sub-letting the whole of them requires the words "shall . . . not assign this Contract" to be construed as meaning "shall not sub-let the whole of the works" or, which comes to the same thing, "shall not sub-contract all his obligations under this contract". This view of clause 17(2) is strongly reinforced by the distinction which is made between the consents required in each case. So far I am in broad agreement with Staughton LJ. Where, with Sir Michael Kerr, I differ from him is in my inability to construe clause 17(1) in such a way that it does not prohibit the employer from assigning to a third party the right to require the performance of the contract by the contractor.

The question can be approached by considering what would have been the position if clause 17 had been omitted. The general principle is stated by Bingham LJ in Southway Group Ltd v Wolff (1991) 57 BLR 33, at page 52, above:

"It is in general permissible for A, who has entered into a contract with B, to assign the benefit of that contract to C. This does not require the consent of B, since in the ordinary way it does not matter to B whether the benefit of the contract is enjoyed by A or by a third party of A's choice such as C."

The benefit of a contract, while it is unperformed, is the right to require its performance by the other party. Where a building contract contains no provision to the contrary I see no reason why the employer should not ordinarily be able to assign to a third party the right to require its performance by the contractor. To adopt the words of Bingham LJ, in the ordinary way it does not matter to the contractor whether the benefit of the contract is enjoyed by the employer or by a third party of his choice.

The employer's ability, in the ordinary way and where there is no provision to the contrary, to assign to a third party the right to require performance of a building contract by the contractor is not specifically established by any authority which has been cited to us. It is, however, effectively recognised by the decision of the House of Lords in Tolhurst v The Associated Portland Cement Manufacturers (1900) Ltd [1903] AC 414; and in the comparable cases where the decision has gone the other way, *eg* Kemp v Baerselman [1906] 2 KB 604 and Cooper v Micklefield Coal and Lime Co Ltd (1912) 107 LT 457, the terms of the contract or the circumstances of the case have been such as to make performance personal to the assignor. The obligations of the employer under a building contract are to make the site available to the contractor and to pay him the price. Neither obligation, the first as a matter of commonsense and the second on the

authorities (see, eg, Tolhurst), is in itself capable of making the performance of the contract personal to the employer. It will only become so if the other terms of the contract or the circumstances of the case show that that was what the parties intended.

Against that background what is the effect of clause 17(1) of the JCT contract? Once it is established that without that provision the employer would very likely have been able to assign to a third party the right to require its performance by the contractor, it can in my view only be construed so as to prohibit him from doing just that. The word "assign" is apt to describe the fullest disposal of rights which can be made and the words "this contract" independently suggest that what is in view is the contract as a whole. While I recognise that so to construe clause 17(1) is to give it a wider effect that I have given to clause 17(2), I do not think that it can be intended to do no more than prohibit the employer from subcontracting his obligations under the contract. It is important to emphasise that clause 17(1) does not have the internal context which I have identified in clause 17(2). I therefore conclude that the effect of clause 17(1) is to prohibit the employer from assigning to a third party the right to require the performance of the contract by the contractor.

By the deed of assignment made on 25 March 1976 Corporation purported to assign to Investments (inter alia) the full benefit of its contract with McAlpines. It is agreed that at that date there had been no breach of contract by McAlpines, so that Corporation had no cause of action against them. The only possible subject of the assignment was the right to require performance of the contract by McAlpines. But since such an assignment was prohibited, the deed was ineffective for that purpose. Thus it is that Investments has no claims against Mcalpines.

The Ashwell Construction contract in the Linden Gardens case was in another standard form, whose provisions relating to assignment and sub-contracting have been quoted by Staughton LJ. As he accepts, the wording of those provisions points even more strongly to the correctness of the view which is shared by Sir Michael Kerr and myself. It is therefore unnecessary for me to consider them. Moreover, the point is of no practical consequence in the Linden Gardens case That is because by 14 January 1987, the date of the deed of assignment between Stock Conversion and Linden Gardens, both the McLaughlin & Harvey and the Ashwell Construction contracts had long been completed. Any breaches of contract must have been committed, and the corresponding causes of action must have arisen, before the assignment was made.

At this point it is pleasing to happen again upon ground where we are all agreed. For the reasons given in the judgments of Staughton LJ and Sir Michael Kerr, to which I do not wish to add, I agree that neither clause 17(1) of the JCT contract nor the corresponding provision of the Ashwell Construction contract prohibited Stock Conversion from assigning to Linden Gardens its accrued causes of action for substantial damages against the two contractors.

The result of our judgments is that the appeal of Linden Gardens is allowed and, in the St Martins case, that the appeal of Corporation is allowed and that of Investments dismissed.

JUDGMENTBY-2: STAUGHTON LJ

JUDGMENT-2:

STAUGHTON LJ: These appeals were heard consecutively, because they raise two important questions of law on facts which are broadly similar, although there are some significant differences. This is a combined judgment on both (or more accurately all three) appeals. The main issues are:

(1) whether a term in a contract that it shall not be assigned without consent has the result that a purported assignee may not sue upon the contract, if he has not obtained consent;

(2) whether the contracts in this case had that result;

(3) whether an original contracting party, or his assignee, can recover substantial damages for breach of contract, when the original party's loss has subsequently been made good to him by somebody other than the defendant; and

(4) whether an assignee of the benefit of a contract can recover damages for loss which he has suffered as a result of a breach occurring after the assignment.

So far as the present appeals are concerned, I have treated the claims as based wholly in contract. No separate argument has been addressed to us about claims based on tort, save as to one point raised by Ashwell Construction Co Ltd, which will be mentioned towards the end of this judgment.

In both cases building works were carried out, under a contract with somebody who had a proprietary interest in the building when the contract was made. The contractors are said to have failed to achieve proper performance. The original employers transferred their interest in the building to others, and also purported to assign the building contract. But it is said to have contained a term that the employers would not assign the contract without the consent of the contractors; the need for consent was overlooked, and it was never obtained.

One important difference between the two cases lies in who are plaintiffs. In the Linden Gardens case, only Linden Gardens Trust Ltd, the assignees, sue. Their assignors were a company which has been referred to as Stock Conversion, although it changed its name from time to time. Stock Conversion were at one time plaintiffs in the action, but are no longer.

By contrast, in the St Martins case both the assignors (St Martins Corporation) and the assignees (St Martins Investments) are parties as plaintiffs. They are associated companies, owned by the state of Kuwait. We were told that the motive for the transfer from one to the other was the avoidance of tax, since St Martins Investments was not a trading company. But we were also told that there was nothing reprehensible in that, because it represented a welcome investment of overseas capital in the United Kingdom. We were reminded (and I hope to be forgiven for saying that this was scarcely necessary) that they are separate legal entities; just as some profit by the corporate veil, others may find it a hindrance.

With that introduction I set out a summary of the relevant facts, substantially drawn from the judgments of the two official referees who tried these issues. Naturally many of the facts were assumed rather than proved,

since the trial in each case was of preliminary issues. Having said that, I shall not hereafter attempt to distinguish between what was admitted or proved, and what was merely assumed at this stage.

The facts in the Linden Gardens case

Stock Conversion were the lessees of the third, fourth and sixth floors of a building at 130 Jermyn Street in London. There was a problem about the presence in the building of blue asbestos, which had to be removed On 11 June 1979 Stock Conversion entered into a contract with Lenesta Sludge Disposals Ltd, the first defendants. It was an agreement between Stock Conversion as employers and Lenesta Sludge as prospective sub-contractors. But now it is only of historic interest, to explain the presence of Lenesta Sludge in the title to the action. For one reason or another, they do not now participate.

On 19 July 1979 Stock Conversion entered into an agreement with McLaughlin & Harvey plc, the second defendants, as main contractors. It was on the standard form of the Joint Contracts Tribunal, for use with approximate quantities -- private edition, being the 1963 version revised to July 1975. In clause 17 there were these important terms:

"(1) The Employer shall not without the written consent of the Contractor assign this Contract.

(2) The Contractor shall not without the written consent of the Employer assign this Contract, and shall not without the written consent of the Architect (which consent shall not be unreasonably withheld to the prejudice of the Contractor) sub-let any portion of the Works.

Provided that it shall be a condition in any sub-letting which may occur that the employment of the sub-contractor under the sub-contract shall determine immediately upon the determination (for any reason) of the Contractor's employment under this Contract."

One should also notice clause 25(1):

"(1) Without prejudice to any other rights or remedies which the employer may possess, if the contractor shall make default in any one or more of the following respects, that is to say:

(a) If he without reasonable cause wholly suspends the carrying out of the Works before completion thereof, or

(b) If he fails to proceed regularly and diligently with the Works, or

(c) If he refuses or persistently neglects to comply with a written notice from the Architect requiring him to remove defective work or improper material or goods and by such refusal or neglect the Works are materially affected, or

(d) If he fails to comply with the provisions of clause 17 of these Conditions,

then the Architect may give to him a notice by registered post or recorded delivery specifying the default, and if the Contractor either shall continue

such default for fourteen days after receipt of such notice or shall at any time thereafter repeat such default (whether previously repeated or not), then the Employer may within ten days after such continuance or repetition by notice by registered post or recorded delivery forthwith determine the employment of the Contractor under this Contract, provided that such notice shall not be given unreasonably or vexatiously."

In clause 26, which deals with determination by the contractors, there is no similar reference to clause 17.

The work proceeded, and the architect certified practical completion on 25 March 1980. I do not know whether and if so what other work was involved, but the relevant task for present purposes was the removal of asbestos. It is said that this was not achieved.

By January 1985 further asbestos had been found in the building, and Stock Conversion entered into a contract for its removal with Ashwell Construction Company Ltd, the third defendants, on 6 February 1985 This was also on a standard form, and contained these terms:

"3.0 Control of the works

Assignment

3.1 Neither the Employer nor the Contractor shall, without the written consent of the other, assign this Contract.

Sub-contracting

3.2 The Contractor shall not sub-contract the works or any part thereof without the written consent of the Architect/Supervising Officer whose consent shall not unreasonably be withheld."

Practical completion of Ashwell Construction's works was certified on 16 August 1985.

Meanwhile there had started on 1 April 1985 a series of transactions by which Stock Conversion assigned all their proprietary interest in the third to sixth floors of the building. This was completed on 12 December 1986. It is not suggested that Stock Conversion received anything less than the full market value of their interest in the building, or that any allowance was made for the possibility that asbestos might still remain in the building after practical completion by Ashwell Construction. Also meanwhile, the writ in this action was issued on 3 July 1985; at that stage it was between Stock Conversion as plaintiffs and Lenesta Sludge Disposals as defendants.

A little later, on 14 January 1987, Stock Conversion executed a deed of assignment in favour of Linden Gardens Trust. This recited the High Court proceedings and an agreement to assign, and continued:

"NOW THIS DEED WITNESSETH as follows:

1. In pursuance of the said agreements and in consideration of the sum of One pound (£1) (the receipt of which sum the Assignors hereby acknowledge) the

Assignors hereby assign to the Assignees,

(a) all their rights of action as pleaded in the said proceedings or otherwise against Lenesta Sludge Disposals Limitd;

(b) all other right of action currently vested in the Assignors which are or were incidental to their leasehold interest in the said premises."

In due course Linden Gardens Trust were substituted for Stock Conversion as plaintiffs. Further asbestos was found remaining in the building, which is said to have resulted from breach of contract by McLaughlin & Harvey or Ashwell Construction. Extensive and expensive works were necessary to remove it, and were paid for by Linden Gardens Trust. There was also loss of rent for all or part of the building for a period. For present purposes, their claim can be divided into two parts:

(i) Against McLaughlin & Harvey only, for the cost of remedial works in 1985, £22,205.02

(ii) Against McLaughlin & Harvey or Ashwell Construction, for the cost of remedial works in 1987 and 1988, together with associated loss and expense, £236,000 or thereabouts.

In due course McLaughlin & Harvey and Ashwell Construction were added as defendants.

It is to be noticed that any breach of contract by McLaughlin & Harvey occurred, and any cause of action against them accrued, at the latest in March 1980. That was long before any assignment by Stock Conversion of their proprietary interest or their contractual rights. In the case of Ashwell Construction the position is not so clear, since part of the proprietary interest was transferred to Linden Gardens Trust while their work was in progress.

The expense in part (i) of the claim was wholly incurred by Stock Conversion; that in part (ii), by Linden Gardens Trust.

The facts in the St Martins case

In 1968 St Martins Corporation entered into a contract with the London Borough of Hammersmith for the redevelopment of a very large site at King's Mall in the borough. There were to be shops, offices and local authority flats. It was agreed that on completion St Martins Corporation would be entitled to a lease of the building for 150 years.

On 29 October 1974 a building contract was concluded between St Martin's Corporation and the defendants in this action, Sir Robert McAlpine & Sons Ltd. It was on the standard form of the Joint Contracts Tribunal, private edition with quantities 1963, revised to July 1972. Clause 17 was in exactly the same terms as clause 17 in the McLaughlin & Harvey contract, which I have already quoted. So, I imagine, were clauses 25 and 26, although we do not have copies of them. The price was over 18 million.

By a deed of assignment dated 25 march 1976 St Martins Corporation

transferred to St Martins Investments first, their proprietary interest in the development at King's Mall (which amounted to an equitable interest in a future lease for 150 years). Secondly, there was also assigned

"the full benefit of all contracts and engagements whatsoever entered into by the Assignor and existing at the date hereof for the construction of and completion of the Development "

The deed had recited that St Martins Corporation had agreed with St Martins Investments to execute this assignment. As in the Linden Gardens case, it is not suggested that the proprietary right was transferred for anything other than its market value. There could not in this case, as will shortly appear, be any discount for defects which might already exist.

By an exchange of letters in November 1976 St Martins Investments appointed St Martins Corporation their agents to manage properties including, presumably, the King's Mall development.

The building works of McAlpines are said to have continued from 1973 to 1980. An important part of them was something called the podium deck, which separated the shops and offices from the flats and open space above them. The architect certified this as complete on 1 November 1979. But in 1981 it was discovered to be leaking. It is agreed that any breach of contract by McAlpines in the construction of the podium deck, and consequently any cause of action against them, arose after 25 March 1976, the date of the deed of assignment. This is a major point of distinction from the Linden Gardens case.

In December 1987 St Martins Investments entered into a contract for remedial works with Tarmac Construction Ltd. The cost of that work was paid in the first instance by St Martins Corporation, but recovered by them from St Martins Investments. The claim is for about £800,000. There are numerous third parties in the action, contribution notices are to be expected, and the trial was estimated for forty days this summer.

I have not mentioned when notice of assignment was first given, in either case, as nothing turns on that. Nor is there any need to consider limitation periods, since the relevant building contracts were made by deed.

The proceedings

In both cases preliminary issues were ordered to be tried. In the Linden Gardens case they were as follows:

"(1) Are the Plaintiffs entitled by virtue of the Deed of Assignment pleaded at paragraph 1F of the Amended Statement of Claim to recover damages against the Defendants in respect of the various causes of action and heads of loss pleaded

(a) where the loss was incurred by Stock Conversion prior to the said Deed of Assignment,

(b) where the loss was incurred by the Plaintiffs subsequent thereto?

(2) Were Stock Conversion precluded from lawfully assigning rights of action to the Plaintiffs against the Second Defendants by Clause 17(1) of the Contract

dated 19th July 1979 made between Stock Conversion and the Second Defendants?"

Issue (2) was later enlarged so as to include the contract between Linden Gardens Trust and Ashwell Construction.

By a judgment delivered on 9 October 1990 Judge John Loyd QC (reported at 52 BLR 93) answered the questions as follows:

"(1)(a) Yes

(1)(b) No

(2) Yes."

At first sight there is some inconsistency between answers (1a) and (2), resulting from the way the questions were framed. What the judge meant, and decided, was that Linden Gardens Trust would have been entitled to recover in respect of Stock Conversion's loss prior to the deed of assignment -- Answer (1)(a) -- but for the fact that assignment was prohibited, Answer (2). That applied to item (1) in the claim; as to item (2), the judge decided that Stock Conversion suffered no loss, and that Linden Gardens Trust have no cause of action against McLaughlin & Harvey or Ashwell Construction in contract.

The judge went on to hold that a claim by Linden Gardens Trust as assignees against Ashwell Construcion in tort, if such a claim existed, was not precluded by the prohibition on assignment in the Ashwell Construction contract.

In the St Martins case the preliminary issues were these:

"1. Was the benefit of the contract dated 29th October, 1974 between the first plaintiffs and the defendants validly assigned by the first plaintiffs to the second plaintiffs?

2. Was there an implied term of the deed of assignment dated 25th March, 1976 and of the Agency Agreement dated 1976 and 1983 as pleaded in paragraphs 7 and 7A of the Amended Statement of Claim?

3. On the assumption that the matters pleaded in the paragraph 8 of the Statement of Claim are correct then:

(a) Does the second plaintiff have a valid claim against the defendants for damages, other than nominal damages, for breach of the contract dated 29th October, 1974 as pleaded in paragraph 10 of the Statement of Claim?

(b) Does the first plaintiff have a valid claim against the defendants for damages, other than nominal damages, for breach of the contract dated 29th October, 1974 as pleaded in paragraph 11 of the Statement of Claim?

(c) Does the first plaintiff have a valid claim for damages, other than nominal damages, for breach of the contract dated 29th October, 1974 as pleaded in paragraph 12 of the Statement of Claim?

To elucidate those issues somewhat, I should add that paragraph 7 and 7A of the statement of claim alleged an implied term of the assignment that St Martins

Corporation had obtained or would obtain consent; and an implied term of the agency agreement that they would enforce rights for the benefit of St Martins Investments. In paragraph 10, St Martins Investments claimed damages as assignees. In paragraph 11, St Martins Corporation claimed damages. And in paragraph 12 they claimed damages as trustees for St Martins Investments, or because they were contractually liable to indemnify St Martins Investments

Judge Bowsher QC on 29 January 1991 answered the questions "No, No, No". He gave judgment for McAlpines against St Martins Investments; and, on 4 February 1991, he ordered that the claim of St Martins Corporation be stayed, presumably because only nominal damages would be recoverable.

Notice of appeal was duly given in respect of the order of 29 January, but there was no appeal in time in respect of the order of 4 February. Leggatt LJ granted an extension. The point has not been canvassed before us, but it seems to me regrettable that a judge of this court was troubled with such a trivial matter. Obviously, if there was an appeal against the first order, there would be an appeal against the second.

The assignment of contractual rights

It is necessary, although somewhat elementary for lawyers, to distinguish between three concepts: novation, assignment and sub-contracting. (These form the heading of part 6 of the title "Building Contracts, Architects and Engineers" of Halsbury's Laws of England (4th Edn) Vol 4 page 637.)

*(a) Novation*

This is the process by which a contract between A and B is transformed into a contract between A and C. It can only be achieved by agreement between all three of them, A, B and C. Unless there is such an agreement, and therefore a novation, neither A nor B can rid himself of any obligation which he owes to the other under the contract. This is commonly expressed in the proposition that the burden of a contract cannot be assigned, unilaterally. If A is entitled to look to B for payment under the contract, he cannot be compelled to look to C instead, unless there is a novation. Otherwise B remains liable, even if he has assigned his rights under the contract to C.

Similarly, the nature and content of the contractual obligations cannot be altered unilaterally If a tailor (A) has contracted to make a suite for B, he cannot by an assignment be placed under an obligation to make a suite for C, whose dimensions may be quite different. It may be that C by an assignment would become entitled to enforce the contract -- although specific performance seems somewhat implausible -- or to claim damages for its breach. But it would still be a contract to make a suit that fitted B, and B would still be liable to A for the price.

A contract that A will build a house for B, and follow his instructions on such variations as the contract may allow, cannot be converted by assignment into an obligation to follow the instructions of C. In Kemp v Baerselman [1906] 2 KB 604 it was held that a contract to supply as many eggs as K might require for his manufacturing business could not require further performance when K had transferred his business to a company.