(b) Assignment

This consists in the transfer from B to C of the benefit of one or more obligations that A owes to B. These may be obligations to pay money, or to perform other contractual promises, or to pay damages for a breach of contract, subject of course to the common law prohibition on the assignment of a bare cause of action.

But the nature and content of the obligation, as I have said, may not be changed by an assignment. It is this concept which lies, in my view, behind the doctrine that personal contracts are not assignable: see Chitty on Contracts (26th Edn) Vol 1 paragraph 1416, citing Tolhurst v The Associated Portland Cement Manufacturers (1900) Ltd [1902] 2 KB 660 at page 668:

"The benefit of a contract is only assignable in 'cases where it can make no difference to the person on whom the obligation lies to which of two persons he is to discharge it'."

Thus if A agrees to serve B as chauffeur, gardener or valet, his obligation cannot by an assignment make him liable to serve C, who may have different tastes in cars, or plants, or the care of his clothes.

But as Professor Goode points out in the Modern Law Review (1979) Vol 42 at page 555:

"what is non-transferable is the duty to perform, not the fruits of performance."

There is no reason in principle why a party who has earned his fee for performing a personal contract should not assign the right to receive it; nor, so far as I can see, why B for whom the tailor has completed a suit should not assign to C the right to receive it.

The contractors in the present appeals argue that the personality of the employer for whom a contractor works may make a substantial difference. There are frequently claims and negotiations after the completion of building works, and some employers are easier to deal with than others. I can readily believe this to be true. It is a common experience of life that there are some people with whom one would not make a contract, unless one was prepared to sup with a long spoon. However, it seems that the law does not take this into account: see Chitty on Contracts, 26th Edn paragraph 1416:

"It may in some circumstances make a great deal of difference to a debtor whether his creditor is of an indulgent character, or whether he is likely to enforce his legal rights ruthlessly, but considerations of this kind are ignored by the courts in determining whether a right is assignable or not."

For that very reason, it may be wise for a building contractor to prohibit assignment of the benefit of the contract by the employer, if he can lawfully do so.

It is to that topic that I now turn. If it were free from authority, I should be inclined to think that a prohibition on assignment in a contract was ineffective. Seeing that assignment cannot increase the obligation or alter it

JA1045

30 Con LR 1, 57 Build LR 57

in any way, but only change the person who is to benefit from it, there are no
very powerful reasons for allowing it to be prohibited. I have just mentioned
the point that the original creditor may be indulgent, and his assignee
ruthless. There is also something in the effect of set-off against an assignee
As I understand it the debtor may set off any claim which he would have had
against the assignor at the date when he received notice of the assignment, or
which arose from the same contract or was closely connected with that contract.
But if the debtor's claim exceeds that of the assignee, he may be put to the
trouble of bringing separate proceedings against the assignor to recover the
balance.

These points do not seem to me, either separately or together, sufficient
reason to allow the assignment of a benefit under a contract to be prohibited.
After all, the benefit is a piece of property, a chose in action; and in general
it is desirable that property should be transferable. In Old Grovebury Manor
Farm Ltd v W Seymour Plant Sales & Hire Ltd [1979] 1 WLR 1397 it was held that
an assignment of a lease in breach of covenant is nevertheless effective to vest
the remainder of the term in the assignee. However, the authorities, in this
court at any rate, require a different conclusion when one comes to assignment
of choses in action.

In Tom Shaw & Co v Moss Empires Ltd (1908) 25 TLR 190 Mr Bastow had agreed
with his employers, Moss Empires, that he would not assign his salary, but did
in fact assign it to the plaintiffs. There was held to be a valid equitable
assignment. Although the report is compressed, it seems to me that the judge
would have been prepared to give judgment in favour of the plaintiffs against
Moss Empires, if they had not declared themselves to be willing to pay the money
as directed by the court. Darling J expressed the view that the prohibition:

"could no more operate to invalidate the assignment than it could interfere
with the laws of gravitation".

That robust sentiment did not appeal to Croom-Johnson J in Helstan Securities
Ltd v Hertfordshire CC [1978] 3 All ER 262. There, a contractor for road works
had purported to assign to the plaintiffs the amount due for the works from the
defendants. It was held that the plaintiffs could not recover, since the
defendants' contract provided that the contractor should not "assign the
contract or any part thereof or any benefit or interest therein or thereunder
without the written consent of the employer".

The point is in my judgment concluded so far as this court is concerned by
the decision of Dunn and Purchas LJJ in Reed Publishing Holdings Ltd v Kings
Reach Investments Ltd, unreported, 25 May 1983. In that case the defendants
agreed to erect an office block on land which they owned, and to grant a lease
for ninety-nine years to the first plaintiffs. After the building was completed
and the lease had been granted, the first plaintiffs claimed to have assigned
the lease and the building contract to an associated company. But it had been
provided in the building contract that the first plaintiffs should not "assign
underlet share part with or otherwise in any way whatsoever (whether directly or
indirectly) deal (except by way of mortgage or charge) with its interest under
this Agreement or any part thereof or share therein". There was, however, a
limited right to assign the lease.

The problem arose upon an application to amend the statement of claim, by

JA1046

adding a claim by the second plaintiffs, as assignees of the lease and of the building contract, for damages for breach of contract. This court held that there were two grounds upon which the application failed. First, it added a new party after the limitation period had expired, when the new claim did not arise out of the same or substantially the same facts; secondly, the prohibition on assignment of the building contract was effective, as had been held in the Helstan Securities case. Both reasons were part of the ratio decidendi. It cannot conceivably be said that the second ground was reached per incuriam since the decision in the Tom Shaw case had not been cited, if only because that decision was referred to in the Helstan Securities case.

I therefore am bound to hold that a prohibition in a contract on the assignment of a chose in action arising under it is effective to prevent an assignee claiming either a debt due under the contract or damages for breach, from the other party to the contract

That makes it unnecessary to consider in detail the other authorities cited in relation to this point, that is to say Young v Kitchin (1878) 3 Ex D 127, Re Turcan (1888) 40 Ch D 5, United Dominions Trust (Commercial) Ltd v Parkway Motors Ltd [1955] 1 WLR 719 (overruled on another point in Wickham Holdings Ltd v Brooke House Motors Ltd [1967] 1 WLR 295), Spellman v Spellman [1961] 1 WLR 921, Chitty paragraph 1413, Halsbury's Laws of England vol 6 paragraph 90, Hudson on Building Contracts (10th Edn) page 734.

There has been no contest in this case as to whether a prohibited assignment is nevertheless valid as between assignor and assignee. Mr Fernyhough, for McAlpines, disclaimed any argument that it is not. As Professor Goode points out in the Modern Law Review (at page 555):

"The prohibition is for the benefit of the debtor, not the assignor or his trustee in bankruptcy; and if the debtor does not seek to invoke it, or has no legitimate interest in so doing, it is not for the assignor or those claiming in right of the assignor to do so."

So in a case where assignor and assignee are both parties in an action to recover a debt, arising under a contract which prohibits the assignment of the benefit of it, the court can only give judgment against the debtor in favour of the assignor. But why should it not, by an appropriate order, give effect to the proprietary right of the assignee, and ensure that the money reaches him? That, however, is not this case. Stock Conversion (the assignors) are not parties in the Linden Gardens action; and the right of St Martins Corporation, the assignors in the St Martins action, to recover damages is resisted on another ground, viz that they suffered no loss.

That brings me to the last point to be considered in connection with assignment of choses in action. Where the assignment is of a cause of action for damages, the assignee must of course have a sufficient proprietary right, or a genuine commercial interest, if the assignment is not to be invalid. It is no longer in issue in these appeals that the assignees had such a right in each case; we heard no argument to the contrary from the contractors. But it is said that in such a case the assignee can recover no more as damages than the assignor could have recovered.

That proposition seems to me well founded. It stems from the principle

already discussed, that the debtor is not to be put in any worse position by
reason of the assignment. And it is established by Dawson v Great Northern &
City Railway Co [1905] 1 KB 260; see also GUS Property Management Ltd v
Littlewoods Mail Order Stores Ltd [1982] SLT 533 by Lord Keith of Kinkel at page
538, cited later in this judgment. But in a case such as the present one must
elucidate the proposition slightly; the assignee can recover no more damages
than the assignor could have recovered if there had been no assignment, and if
the building had not been transferred to the assignee.

   (c) Sub-contracting

   I turn now to the topic of sub-contracting, or what has been called in this
and other cases vicarious performance. In many types of contract it is
immaterial whether a party performs his obligation personally, or by somebody
else. Thus a contract to sell soya beans, by shipping them from a United States
port and tendering the bill of lading to the buyer, can be and frequently is
performed by the seller tendering a bill of lading for soya beans that somebody
else has shipped. On the other hand a contract to sing the part of Hans Sachs
at Covent Garden Opera House will not be fulfilled by procuring someone else to
do so. That is no because the burden of a contract may not be assigned
unilaterally; in each case the original contractor would still be liable if the
obligation were not performed or were performed badly. It is because some
contractual obligations are personal; they must be performed by the party who
has contracted to perform them and nobody else.

   The topic of sub-contracting, or vicarious performance, was recently
considered by this court in Southway Group Ltd v Wolff (1991) 57 BLR 33 [above].
I do not need to examine in detail the test there discussed for determining
whether obligations under a contract may or may not be sub-contracted. Parker
LJ at pages 45-6 considered that a building contract "is one which itself
suggests that there is at least some selection, the more particularly when the
works to be carried out are extensive and ill defined". On the other hand, very
large building contracts commonly involve specialist sub-contractors. The
problem in such a case is usually addressed by the contract itself; and as will
appear, in my judgment it is in these cases too.

   The interpretation of the contracts

   In two out of the three contracts with which we are concerned, clause 17(1)
provides that "the Employer shall not without the written consent of the
Contractor assign this contract". At once a doubt arises as to what is meant.
Lawyers know that one cannot assign a contract as a whole, if by that is meant
both the benefit and the burden, without the consent of the other party and the
assignee. So what was the point of saying that consent of the contractor would
be required? If the intention was merely to prevent the employer assigning
benefits under the contract without consent, why not say so? Or may it have
been the intention to prevent the employer sub-contracting his obligations under
the contract without consent? These would include the obligation to make the
site available, to give any directions which the contract requires to be given,
to pay monies which become due, and to respond to claims which the contractor
has when the work is completed.

   At first sight it is not obvious that a contractor would wish to prevent
sub-contracting of these obligations without consent, or that this was the

meaning of clause 17(1) viewed on its own. But one must also consider clause 17(2). This provides that the contractor (i) shall not without the written consent of the employer "assign this contract", and (ii) shall not without the written consent of the architect (which consent shall not be unreasonably withheld to the prejudice of the contractor) "sub-let any portion of the Works". But what if the contractor wishes to sub-contract the whole of the works? Is this included in part (ii), in which case the architect must not unreasonably withhold consent? Or is it within part (i), so that the employer may refuse consent, unreasonably if he wishes? It seems improbable that sub-contracting of the whole of the works was not to be covered either by the first part of the clause 17(2) or by the second, with the result that it was unaffected by any restriction.

There is authority that the word "assign" may not always be used in its correct legal sense, in such a context. In Nokes v Doncaster Amalgamated Collieries Ltd [1940] AC 1014 at page 1019 Viscount Simon LC said:

"*I may add that a possible confusion may arise from the use of the word 'assignability' in discussing some of the cases usually cited on this subject.*"

He went on to distinguish between assignment and vicarious performance.

In Keating on Building Contracts (4th Edn) page 331 it is said of clause 17(2) in an earlier version of the form:

"It is arguable that 'assign' is here used not in its strict sense of *assigning the benefit of the contract, but in the sense of securing the vicarious performance by another contractor of the whole of the contractor's duties. If this is the case no consent is required to an assignment by the contractor of monies to be received under the contract, but probably the words are to be construed so as to restrict the contractor's rights to deal with payments received from the employer.*"

By the time of the fifth edition (page 536) the standard form had changed, and that passage does not appear.

Hudson on Building and Engineering Contracts (10th Edn, 1979, ed Wallace) page 734 has this passage:

"In building contracts there is frequently a provision prohibiting 'assignment' of the contract or 'sub-letting' of a portion of the works by the builder without the consent of the building owner. In nearly all cases, such provisions on examination appear to be aimed at prohibiting assignment of liabilities rather than rights, and since the law does not in any event permit the assignment of liabilities, it is in most cases also fairly clear that what is being sought to be prohibited is vicarious performance of the liabilities rather than their actual assignment."

In Wallace on Building and Civil Engineering Standard Forms page 81, it is said in relation to the earlier version of clause 17(2):

"English law does not permit the assignment of contractual liabilities, so that a contractor would never by a purported *assignment escape his personal contractual and financial responsibility for completing the work. It does,*

JA1049

however, in general permit vicarious performance of a contractual liability, and it is this rather than assignment in the legal sense at which the prohibitions contained in this clause are presumably aimed."

Wallace goes on to explain the effect of that conclusion. Referring to another form of contract in a later passage (at page 309), Wallace says:

"In the present clauses the words 'assign the Contract' in clause 3 and 'sub-let the whole of the Works' in clause 4 are probably synonymous, or very nearly so, as meaning vicarious performance of the whole of the works."

Finally on this topic, Halsbury's Laws of England (4th Edn) vol 4 says in paragraph 1255 n (2):

"In many building contracts and some of the authorities 'assignment' is used when 'vicarious performance' is being discussed."

There is then a reference to Viscount Simon LC in Nokes's case.

Faced with this impressive near consensus of opinion, I conclude that the words "assign this contract" in clause 17(2) do indeed refer to the delegation of the contractor's obligations by sub-contracting them all. They do not include assignment (in its legal sense) of the benefit of the contract or any part of it. Although there is less reason for the employer to wish to sub-contract his obligations, or for the contractor to prohibit him from doing so, in my judgment the words "assign this contract" in clause 17(1) must be given the same meaning. They prohibit vicarious performance by the employer without consent, and do not prohibit assignment by the employer of the benefit of the contract or any part of it.

The contract of Stock Conversion with Ashwell Construction was in different terms. Instead of clause 17(1) and (2) it provided:

"Assignment

3.1 Neither the Employer nor the Contractor shall, without the written consent of the other, assign this Contract.

Sub-contracting

3.2 The Contractor shall not sub-contract the works or any part thereof without the written consent of the Architect . . ."

Some of the reasoning which I have accepted in relation to clause 17(1) and (2) does not apply in this case. There is an express distinction in the heading between assignment and sub-contracting; and there is a prohibition on sub-contracting the works or any part thereof. But the form, headed "Agreement for Minor Building Works", is issued by the Joint Contracts Tribunal and is part of the same family of contracts as the other form used in these cases. Much of the authority that I have quoted is equally applicable to the Ashwell Construction form of contract. Indeed the relevant provisions of that form are very similar to the contract under consideration in Wallace at page 309. I therefore reach the same conclusion, although with some hesitation, on the Ashwell Construction contract as I have reached on clause 17(1) in the other two

JA1050

30 Con LR 1, 57 Build LR 37

contracts.

### Substantial damages for loss that has been made good

There was a great deal of argument on this topic. It arises in both cases. Stock Conversion in the Linden Gardens case disposed of their proprietary rights in the building between 1 April 1985 and 12 December 1986. It is not suggested that they received anything less than the full market value of their interest, since nobody knew that there was still asbestos in the building. It was only on 14 January 1987 that they assigned their contractual rights to Linden Garden Trust. It is argued that they could on that date only recover £22,205.02, the cost of the remedial works in 1985, and that they had suffered no other loss. In consequence it is said that Linden Gardens Trust can recover only that sum, and not the £236,000 loss which they themselves suffered in 1987 and 1988.

In the St Martins case, no breach of contract occurred, and no cause of action arose, before the assignment on 25 March 1976. The expenses subsequently incurred in putting right later defective work was borne by St Martins Investments. Therefore it is said that St Martins Corporation are not entitled to more than nominal damages; nor are St Martins Investments, since they can recover no more than their assignors could have recovered.

For practical purposes this issue is of more importance in the Linden Gardens case, as will later appear. But in point of form it is necessary to reach a conclusion upon it in both cases.

When a plaintiff's initial loss has subsequently been made good by someone other than himself, the general rule is that he can recover only nominal damages. But there are certainly exceptions. An obvious example, which occurs every day, is when a plaintiff has been compensated by his insurers; nevertheless he may sue in his own name and recover substantial damages, although he may be bound to pay them over to the insurers. Another example is to be found in the case of Design 5 v Keniston Housing Association Ltd (1986) 34 BLR 92. There the loss of the counter-claiming defendants had been or would be made good by a grant from the Department of the Environment. It was held that the defendants could nevertheless recover substantial damages. Judge Smout QC regarded the test as being whether the recovery was relevant to the harm suffered (page 111), or whether it was res inter alios acta; money received by way of insurance or benevolence was merely an example of a recovery that was not relevant.

We were referred to three cases about the sale of goods in support of the general rule. The first was Wertheim v Chicoutimi Pulp Co [1911] AC 301, a decision of the Privy Council. There goods were delivered late, and the buyer sought to recover the difference (of 27s 6d per ton), between the market price when the goods should have been delivered and the market price at the date of actual delivery. But he had in fact used the goods for the performance of sub-contracts.

"some anterior in date to the contract sued upon, the others anterior in date to the actual delivery"

at a price which was only 5s per ton less than the market price when the goods should have been delivered. He recovered damages on the basis of that

difference only.

Like Scrutton LJ in a later case, I do not find that decision easy to understand. Presumably the sub-contracts had more flexible delivery dates than the contract sued on, since the buyer was able to use goods delivered late to him in order to perform them. Might he not have sold the goods in the market if they had been delivered to him on time, and bought other goods later at a lower price to perform his sub-contracts?

Wertheim's case was referred to with approval but distinguished in Williams Brothers v Ed T Agius Ltd [1914] AC 510, which was a case of non-delivery rather than late delivery. An assignment was involved, and Lord Dunedin said (at page 522) that the assignee

"can have no higher rights in respect of that contract than those possessed by his assignor".

That is further support for the principles already discussed. For present purposes what matters is the following passage:

"But when there is no delivery of the goods the position is quite a different one. The buyer never gets them, and he is entitled to be put in the position in which he would have stood if he had got them at the due date. That position is the position of a man who has goods at the market price of the day -- and barring special circumstances, the defaulting seller is neither mulct in damages for the extra profit which the buyer would have got owing to a forward resale at over the market price (Great Western Ry Co v Redmayne), nor can he take benefit of the fact that the buyer has made a forward resale at under the market price."

So there is is said that the seller in default cannot rely on a sub-sale to reduce the damages in a case of non-delivery, although Wertheim's case held that he could in a case of late delivery.

Slater v Hoyle & Smith Ltd [1920] 2 KB 11 was concerned with breach of warranty of quality. The buyers had already agreed to resell the goods under a different description at a higher price, and they successfully appropriated some of the defective goods to their sub-contract. It was held that this was an irrelevant circumstance, and did not diminish their loss. Bankes LJ rested his judgment on the fact that the description of the goods was different, although he also cited Lord Esher MR in Rodocanachi v Milburn (1886) 18 QBD 67 at page 77:

"It is well settled that in an action for non-delivery or non-acceptance of goods under a contract of sale the law does not take into account in estimating the damages anything that is accidental as between the plaintiff and the defendant, as for instance an intermediate contract entered into with a third party for the purchase or sale of the goods."

Warrington LJ followed the same route as Bankes LJ. He thought it immaterial (page 18)

"that by some good fortune, with which the plaintiffs have nothing to do,"

the buyers had been able to recoup themselves what they paid for the goods.

Scrutton LJ said in plain terms that he thought the decision in Wertheim's case erroneous (page 24). At any rate where the claim was for breach of warranty of quality, he considered that the liability under a sub-contract could not increase the loss (page 23), and continued:

"The result seems the same if they are less; it is res inter alios acta: 'circumstances peculiar to the plaintiff', which cannot affect his claim one way or another. If the buyer is lucky enough, for reasons with which the seller has nothing to do, to get his goods through on the sub-contract without a claim against him, this on principle cannot affect his claim against the seller . . ."

The sale of goods cases show, in my opinion, that there is a wider exception to the general rule than recoveries achieved by insurance or benevolence or government grants (as in the Design 5 case). There may be circumstances which are accidental, or peculiar to the plaintiff, or arise from mere good fortune; recoveries to which these give rise do not benefit the party in breach of contract.

I do not find anything inconsistent with that in the speech of Viscount Haldane LC in British Westinghouse Electric & Manufacturing Co Ltd v Underground Electric Railways Co Ltd [1912] AC 673 at pages 690-692. There is a passing reference to Wertheim's case, but it is allowed that there are cases in which the description res inter alios acta will apply.

Before turning to the cases on damage to property, I should mention briefly the situation of a plaintiff who has suffered personal injury. If he needs nursing care, and this is provided free of charge by a near relative, he can still recover the cost of it as damages: Donnelly v Joyce [1974] QB 454. It is an accidental circumstance that he obtains care free of charge, which does not benefit the defendant.

The first of the property cases that we were referred to was Newton Abbot Development Co Ltd v Stockman Brothers (1931) 47 TLR 616. There the defendants had contracted to build houses for the plaintiffs, and had done so badly. But the plaintiffs sold the houses at a profit. When their purchasers complained, the plaintiffs had the defects remedied at their own expense, although they were not obliged to do so. Williams v Agius, Slater v Hoyle and Wertheim's case were cited in argument. Roche J held that the plaintiffs' claim to recover damages from the defendants succeeded. The fact that the plaintiffs had managed to sell the houses at a profit was disregarded.

Sparham-Souter v Town & Country Developments (Essex) Ltd [1976] QB 858 was a case in tort. Lord Denning MR considered the position of successive purchasers of a house which had been built with inadequate foundations, through the negligence of the builder and the local council's surveyor. He said (at page 867):

"A builder negligently makes foundations for a house which are quite insufficient and in breach of the bye-laws. The council's inspector negligently passes them as sufficient. The house is built and is sold by the builder to a purchaser, who sells it to another, and so on down a chain of purchasers. Some time later the house begins to sink and cracks appear in the structure owing to the insufficient foundations. The man who is the owner at that time has a cause of action against the builder and the council under Dutton v Bognor Regis Urban

District Council. The cause of action accrues, not at the time of the negligent making or passing of the foundations nor at the time when the latest owner bought the house, but at the time when the house began to sink and the cracks appeared. That was the first time that any damage was sustained. None of the previous owners had sustained any damage. Each had bought and sold the house at a full price in the belief that the foundations were sound. The only person to sustain the damage was the man who owned the house at the time when the house sank and the cracks appeared. It is only at that time that he can reasonably be expected to know that he may have a cause of action. It would be most unfair that time should run against him before he knows -- or has any possibility of knowing -- that he has a cause of action. Time should not begin to run against him until he knows of the defective foundations, or could, with reasonable diligence have discovered it."

He added at page 868G:

"One word more: the only owner who has a cause of action is the owner in whose time the damage appears. He alone can sue for it--unless,--of--course, he sells the house with its defects and assigns the cause of action to his purchaser."

I do not think that the Master of the Rolls was dealing with breach of contract at all, or intended to say that a right to substantial damages for breach of contract was necessarily lost when the property was sold for its sound market value. The same applies to what was said by Roskill LJ (at page 875) and Geoffrey Lane LJ (at page 880).

There is no assistance on the present problem that I can find in Radford v De Froberville [1977] 1 WLR 1262; 7 BLR 35. So I turn to Pirelli General Cable Wroks Ltd v Oscar Faber & Partners [1983] 2 AC 1; 21 BLR 99. That a claim in tort (per Lord Fraser of Tulleybelton at page 12; 21 BLR 106) by the original owners of a factory against their consulting engineers. There was no question of the property being transferred to anyone else. The House of Lords disagreed with the conclusion in the Sparham-Souter case that the cause of action only arose when the damage was discovered; they held that it arose when the damage came into existence. But Lord Fraser also said this (at page 15; 21 BLR 111):

"The observations as to the date on which the cause of action arose were, strictly speaking, obiter. The main reason for the view of the Court of Appeal was that, until the owner had discovered the defective state of the property, he could resell it at a full price, and, if he did so, he would suffer no damage."

Later he said (at page 16; 21 BLR 111):

"The owner of the house may sell the house before the damage is discovered, and may suffer no financial loss . . . ."

The topic of loss made good subsequently did not feature at all in that case. It was touched on only in two sentences of the argument, which extends over eight pages of the report ([1983] 2 AC 9A-11B). None of the other cases which I have mentioned were cited. I cannot accept that Lord Fraser intended to rule, even obiter, that a plaintiff necessarily loses his right to substantial damages for breach of contract, if he is fortunate enough to sell a defective house for its sound market value.

30 Con LR 1, 57 Build LR 57

GUS Property Management Ltd v Littlewoods Mail Order Stores Ltd [1982] SLT 533 was concerned with a claim in delict. A building in Glasgow belonging to Rest Property Co Ltd was damaged by building operations of the defenders next door. Before any repairs were done Rest, in consequence of group policy, transferred the building to an associated company, the pursuers, at its book value of £259,618; and three months later Rest granted an assignation in favour of the pursuers of all claims competent to Rest arising out of the building operations carried out by the defenders  The pursuers claimed either the difference between the sound value of the building and its damaged value (£650,000 less £300,000), or the cost of repairs which they had carried out.

Lord Keith of Kinkel (at page 538) approved the conclusion of the Lord President that:

"the only relevant loss which, by virtue of the assignation, the pursuers could claim title to recover is loss suffered by their cedent, Rest, for which Rest could at the date of the assignation have sought reparation".

But he rejected the suggestion that the claim to damages had disappeared "into some legal back hole". The pursuers were entitled either to the diminution in value or to the cost of repairs, whichever should prove to be appropriate.

However, in dealing with an argument that Rest had suffered no loss, Lord Keith said this (page 538):

"The price for which, in pursuance of group policy, Rest conveyed the damaged building to the pursuers is entirely irrelevant . . .  The figure of price was fixed, in an internal group transaction and for accounting purposes only, without any reference to the true value of the building.  The transaction cannot in the circumstances lead properly to the inference that Rest suffered no loss through the defenders' negligence, but is for all practical purposes on the same footing as a gratuitous alienation, as regard its significance for the purpose of a claim to damages."

It may well be said that this passage appears to accept that, if Rest had sold the building for its sound market value, they would have suffered no loss, and consequently the pursuers could have recovered only nominal damages.  The claim would then indeed have disappeared into a legal black hole.  However, I do not consider that Lord Keith expressed an opinion to that effect, even obiter and sub silentio.  There was no issue as to what would have happened if Rest had received the full market value of the building in sound condition.

Lastly on this topic there is Jones v Stroud District Council [1986] 1 WLR 1141.  That was another case of a house which had defective foundations as a result of negligence by the local authority.  Mr and Mrs Jones became the owners of the house, and when defects appeared the repairs were carried out by a company called Marlothian Ltd, which was controlled by Mr Jones.  Neill LJ (at page 1150) said this of the argument that Mr and Mrs Jones had suffered no loss:

"The second point I have found more difficult.  The plaintiffs failed to provide any documents relating to the work carried out by Marlothian Ltd and there is no evidence that the plaintiffs have paid or are liable to pay any sum to Marlothian in respect of that work.  It was submitted on behalf of the

~~30 Con LR 1, 57 Build LR 57~~

plaintiffs, however, that if the repairs were necessary and were carried out it was not to the point that the plaintiffs had not proved that they had paid for the repairs themselves. Our attention was drawn to The Endeavour (1890) 6 Asp MC 511 where repairs to a vessel were carried out but before paying for them the plaintiff had gone bankrupt. It was there argued that the plaintiff could not claim the cost of the repairs because the sums recovered would only go to swell the creditors' funds. This argument was rejected and it was said, at page 512:

'If somebody out of kindness were to repair the injury and make no charge for it, the wrongdoer would not be entitled to refuse to pay as part of the damages the cost of the repairs to the owner.'

In my judgment, on the facts of this case this submission is correct.

It is true that as a general principle a plaintiff who seeks to recover damages must prove that he has suffered a loss, but if property belonging to him has been damaged to an extent which is proved and the court is satisfied that the property has been or will be repaired I do not consider that the court is further concerned with the question whether the owner has had to pay for the repairs out of his own pocket or whether the funds have come from some other source."

I have discussed the cases (at some length, I am afraid) in order to discover first, whether there is any general principle which determines when a plaintiff can recover substantial damages although his loss has been made good by somebody else, and secondly whether in the particular case of damage to a building which is later sold for its sound market value the original owner's claim is confined to nominal damages.

As to the first question I find it difficult to suggest a comprehensive definition of the circumstances in which compensation derived from some third party is irrelevant. Besides the proceeds of insurance, or of government grants, or benevolence, there have been cases of good fortune, res inter alios acta, circumstances peculiar to the plaintiff. Plainly there are categories where such compensation is disregarded. It may be that one has to fall back on what Viscount Haldane LC said in the British Westinghouse case (at page 688):

"The quantum of damages is a question of fact, and the only guidance the law can give is to lay down general principles which afford at times but scanty assistance."

In the particular case of damage to a building which is later sold, in my judgment there is no rule of law that the damages must necessarily be nominal. If, however, a subsequent owner also has a claim in his own right in respect of the same damage, the law must find some solution to prevent double recovery. It may be that one should in such a case consider which is the more appropriate plaintiff to recover, on the facts. But the problem does not arise in these appeals.

The effect on these appeals

(1) The Linden Gardens case

Stock Conversion had an accrued cause of action against McLaughlin & Harvey

JA1056

by 25 March 1980, the date of practical completion of that company's works
They subsequently incurred the cost of remedial works in the sum of £22,205.02
That claim was validly assigned to Linden Gardens Trust, who can recover in
respect of it.

Further breaches of contract were later discovered, giving rise to remedial
works in 1987 and 1988, and to expense and loss in the sum of £236,000. Stock
Conversion acquired a cause of action in respect of some of these defects
against McLaughlin & Harvey, dating from 1980, and in respect of others against
Ashwell Construction for defective work in 1985. It is immaterial that during
the Ashwell construction works Stock Conversion disposed of part of their
interest in the building.

In my opinion Stock Conversion acquired a right to substantial damages for
those breaches of contract, and did not lose it when they disposed of the rest
of their interest in the building for its sound market value, on 12 December
1986. After the assignment on 14 January 1987, Linden Gardens Trust as
assignees became entitled to enforce Stock-Conversion's claim. It is immaterial
that Linden Gardens Trust subsequently incurred the expense of remedial work and
suffered loss of rent while it was carried out, although the cost and loss may
assist them in establishing the damaged which would, but for the assignment and
the transfer of property, have been recoverable by Stock Conversion.

Mr Meyer for Ashwell Construction drew attention to clause 1(b) of the deed
of assignment, which referred to

"all other right of action currently vested in the assignors".

He submitted that there was no right of action vested in Stock Conversion on
14 January 1987 against Ashwell Construction, since no remedial work had been
carried out. But in my opinion there was an existing right of action for breach
of contract.

There is also a claim in tort against Ashwell Construction. We are not
called on to decide at this stage whether such a claim would succeed if
negligence were proved. Nor do we have to consider whether, if the claim is
said to have reached Linden Gardens Trust by assignment from Stock Conversion,
it is covered by clause 1(b) of the deed of assignment. The point taken by Mr
Meyer at this stage is that the prohibition on assignment in Ashwell
Construction's contract applied also to the assignment of any claim in tort.
The judge decided otherwise. According to Mr Meyer he was wrong to do so, and
indeed was wrong to decide the point at all since it did not come within the
preliminary issues.

As I have reached the conclusion that the prohibition in the contract refers
to various performance rather than assignment, Mr Meyer's point falls away   I
would allow the appeal of Linden Gardens Trust.

(2) The St Martins case

On 25 March 1976, when St Martins Corporation executed an assignment in
favour of St Martins Investments, there was no existing cause of action; it is
agreed that no breach of contract had yet occurred. Consequently it is not
surprising that St Martins Corporation received the sound market value on

JA1057

30 Con LR 1, 57 Build LR 57

transferring their interest in the building.

In my judgment St Martins Corporation by the *assignment* transferred to St Martins *Investments* the contractual right to have the building properly constructed. St Martins Investments can sue for breach of the obligation, and recover substantial damages -- which they in fact incurred. *The damages must be no more than St Martins Corporation would have suffered if there had been no assignment and no transfer of the property, since McAlpines must not be put in any worse position by reason of the assignment.* That is established by *Dawson's* case. But it seems unlikely that the cost of remedial work in the present case would have been any different if there had been no assignment.

In the course of the hearing I did not understand it to be *disputed* that an assignee of the benefit of a contractual right could, in principle, recover damages if it is not performed after the date of the assignment. That appears to follow from the decision of the House of Lords in Tolhurst's case. It may be that the assignor ought normally to be a party to any action in which it is sought to enforce the right. But there has been no complaint in this case that Stock Conversion are no longer a party. There are of course exceptions, as where the contract contains a true prohibition on *assignment*, or when the right to require performance is, by reason of the nature of the contract, personal to the assignor. Otherwise what is assigned is, in effect, the right to recover damages for breach if one should occur and, in rare cases, the right to claim specific performance. I see nothing to distinguish such a case from the *assignment* of a debt to become due in the future. In neither case is there an accrued cause of action at the date of the assignment. Nor would I draw a distinction between the Linden Gardens case, where the breach of contract had already occurred at the time of the assignment, and the St Martins case where it had not.

The exceptions that I have mentioned *do not apply*. The contract in the St Martin case, as I have already held, did not contain a true prohibition on assignment. And I do not think that it was personal to St Martins Corporation as the company to whom McAlpines owed obligations. As I have already said, if McAlpines were by the contract obliged to follow the instructions of St Martins Corporation in some respect, the assignment would not oblige them to follow the instructions of St Martins Investments. But that does not mean that St Martins Investments cannot recover damages for any breach of contract. Nourse LJ and Sir Michael Kerr accept that in principle there can be an assignment of the benefit of a contract such as would allow the assignee to recover damages for a breach occurring after the assignment. However, they take the view that clause 17(1) prevents that happening in the St Martins case: an assignee of such a contract can recover in respect of any accrued cause of action for damages (as in the Linden Gardens case), but he cannot recover *damages in respect of* subsequent breaches. I am afraid that I do not share that view. But I turn to consider an alternative claim by St Martins Corporation, on the hypothesis that the claim by St Martins Investment fails.

This claim was argued in a number of different ways before us. One was that the assignment contained an implied term that St Martins Corporation had obtained or would obtain the consent of McAlpines. *That was not disputed*, but it was argued that loss suffered by St Martins Corporation, if they were held liable to St Martins Investments under such a term, would be too remote to claim from McAlpines or not caused by their breach of contract *in the building works*.

JA1058

~~30 Con LR 1, 57 Build LR 57~~

St Martins Corporation, in purporting to assign their rights to St Martins Investments, did not in my judgment commit any breach of their contract with McAlpines, even if the assignment was partly ineffective. It seems to me to have been fairly within the contemplation of McAlpines that, if they failed to construct the building properly, this would cause loss to St Martins Corporation not as building owners, but by virtue of a contract under which they had made the building available to others. And I agree with the conclusion reached by Sir Michael Kerr on the topic of causation, for the reasons which he gives. It is, as I have already mentioned, unlikely that the remedial work cost any more when done by St Martins Investments than it would have cost if carried out by St Martins Corporation. Consequently by this route substantial damages would be recovered by St Martins Corporation.

The appeal of St Martins Investments should in my opinion be allowed, since my primary conclusion is that they have the right to sue for substantial damages. But it makes no practical difference which of the two companies succeeds; and since Nourse LJ and Sir Michael Ker consider that it is the appeal of St Martins Corporation which should succeed, I do not dissent from an order to that effect.

It is right to acknowledge the very considerable help in preparing this judgment that I have received from Sir Michael Kerr, although the responsibility for its shape is mine. I would suggest that counsel be asked to prepare draft answers to the preliminary issues.

JUDGMENTBY-3: SIR MICHAEL KERR

JUDGMENT-3:

SIR MICHAEL KERR: I have read the judgment of Staughton LJ and am grateful for what he says in the last paragraph. I respectfully agree with his analysis and conclusions with the exception of one point. In my view the appeal of St Martin's Property Investments fails and should be dismissed, but I agree that the appeal of St Martin's Corporation should be allowed. (I refer to them respectively as "Corporation" and "Investments".)

*The assignment of contractual benefits*

Before turning to the appeals in the two cases it is necessary to consider the terminology used in relation to contractual assignments, particularly in the context of the assignability of "benefits", since these can give rise to confusion and have done so in these case.

One speaks colloquially of "assigning a contract" and this phrase features largely in these appeals. But, strictly, this is a misnomer. Since contractual obligations cannot be assigned in the sense of parting with the burden of their performance, without the other party's consent, an "assignment of a contract" can only take effect as a novation. But the colloquial use of this phrase frequently refers to the assignment of contractual "benefits". However, the term "benefit" can also be used in a wider or narrower sense in the context of assignability. In the wider sense one speaks of "assigning the benefit of a contract". The "benefit" is the right to call on the "debtor" to perform the relevant obligations for the benefit of the assignee. Such an assignment is permissible in relation to contracts which involve no obligations of a personal

JA1059

nature which would preclude assignment, and which contain no prohibition against assignment. Tolhurst v Associated Portland Cement Manufacturers Ltd [1902] 2 KB 660 (CA) and [1903] AC 414 provides a notable example. A contract concluded with the plaintiff for the supply of chalk from certain quarries for fifty years was held to be assignable to a successor of the original contracting company, because, on its true construction, there was nothing in the contract which involved a personal element so as to preclude the assignment of the benefit of the contract, in the sense of the supply of chalk, to a different company. There was also nothing in the contract which expressly prohibited assignment, and this is crucial for present purposes. Thus, Lord MacNaughten said at page 420:

   "It seems to me that the contract is to be read and construed as if it contained an interpretation clause saying that the expression 'Tolhurst' should include Tolhurst and his heirs, executors, administrators and assigns, owners and occupiers of the Northfleet Quarries, that the expression 'the company' should include the company and its successors and assigns, owners and occupiers of the Northfleet Cement Works and that the words 'his' and 'their' should have a corresponding meaning. That, I think, was the plain intention of the parties."

   That was a case in which the "benefit of the contract" was assigned. But one may also speak of the assignment of a contractual "benefit" in a narrower sense, even in relation to contracts which are personal in their nature. One is then referring to the assignability of benefits arising under the contract, which are narrower than the benefit of the performance of the contract as a whole. Such benefits will be chosen in action or proprietory rights arising incidentally from the terms of the contract. In his article in the Modern Law Review, from which Staughton LJ has quoted, Professor Goode refers to them as "fruits of performance" which can be assigned, as distinct from the right to the performance of the contract as a whole which cannot. Some illustrations are discussed in paragraph 1416 of Chitty to which Staughton LJ refers. For instance, while contracts between publishers and authors are clearly personal in their nature and therefore unassignable, there would be nothing to preclude an assignment by the author of his right to royalties, or by the publisher of his entitlement to copyright (if he has it) as an item of property. But the benefit of the contract is unassignable if it is a personal contract.

   The present contracts

   Contracts for the construction or alteration of buildings may or may not be personal in their nature, as discussed in the judgment of this court in Southway Group Ltd v Wolff (1991) 57 BLR 33 above. Into which category a particular contract falls depends on the true construction of the terms of the contract: per Bingham LJ at page 53, in line with the principles discussed and applied in Tolhurst. Although the obligations of employers will usually involve a *lesser* personal element than those of contractors, I do not think that one can generalise the answer to the question of proper categorisation. However, in the present cases this question is conclusively resolved by the express provision precluding assignment of "this contract" by the employer and contractor *without* the other's consent. If there had been a similar provision in the Tolhurst contract, then the decision would have had to go the other way. *The benefit of the contracts, in the sense of the benefit of the right to call for their performance, is therefore not assignable in the present cases*, although I agree

30 Con LR 1, 57 Build LR 57

with the analysis in the judgment of Staughton LJ that what was intended to be precluded by the prohibitions against assignment was probably no more than vicarious performance of the contractual obligations on either side, which would be referred to as "sub-contracting" in the case of the contractor. In any event, however, on their true construction the contracts do not preclude the assignment of benefits arising under the contracts. Thus, the contractors were not precluded from entering into factoring agreements which involved the assignment of sums payable to them. Similarly, I do not see why a prohibition against assignment of "this contract" should preclude the assignment of claims for damages under the contract, at any rate when the causes of action have accrued. Both are choses in action, and in neither case would their assignment involve an assignment of "this contract". The present contracts therefore differ from those which fell to be construed in Helstan Securities Ltd v Hertfordshire CC [1978] 3 All ER 262 and in Reed Publishing Holdings Ltd v King's Reach Investments Ltd, unreported, 25 May 1983, where the assignment of any "benefit or interest" under the contracts was also expressly prohibited.

I then turn to the two appeals against this background. Like Staughton LJ, I will simply refer to "breaches" by the defendants, without repetitive adjectives showing that these are merely alleged breaches, since for the present purposes the allegations must be presumed to be true.

Linden Gardens

When Stock Conversion assigned its rights to Linden Gardens on 14 January 1987, both McLaughlin & Harvey and Ashwell had completed their contracts; the respective dates of practical completion were 25 March 1980 and 16 August 1985. The breaches by both defendants had therefore taken place before the assignment; the consequential causes of action had become vested in Stock Conversion; and their right to the appropriate claims for damages had accrued. For the reasons already stated, the prohibitions against assignment did not prevent the assignment to Linden Gardens of Stock Conversion's accrued claims for damages. To that extent the assignment was effective and can be enforced against the defendants. It makes no difference that Stock Conversion had transferred the premises before assigning their rights under the contracts; see GUS (infra), where this was the position. Stock Conversion retained their rights against the defendants and could assign them later, and these were not bare assignments of causes of action, since Linden Gardens had a property interest.

The next point is then that an assignee can recover damages from the debtor to the same extent as his assignor could have done, but he cannot enforce any claims, let alone under new heads of damage, which would not have been available to his assignor. However, his right to damages, limited to that extent, is enforceable by him even though he is not accountable to his assignor. These principles are illustrated by Dawson v Great Northern & City Railway Co [1905] 1 KB 260 at pages 273, 274 and by GUS v Littlewoods Mail Order Stores [1982] SLT 533, as Staughton LJ has pointed out.

There is therefore no problem about Linden Garden's right to recover the £22,205.02 which Stock Conversion had spent in remedying the original breach by McLaughlin & Harvey. But in my view Linden Gardens are also prima facie entitled to recover the £236,000 odd which they themselves expended in remedying the other breaches by these contractors and the further breaches by Ashwell, all of which had also been committed prior to Stock Conversion's assignment to

Linden Gardens. Both are claims for damages which had vested in Stock Conversion and which were validly assigned to Linden Gardens. The fact that, at the time of the assignment, Stock Conversion were aware of the full extent of the breaches, and therefore of the extent of their claims for damages, does not appear to me to make any difference to the validity and effect of the assignment to Linden Gardens. The only limitation upon Linden Gardens' right of recovery is the extent to which the defendants may be able to show that Linden Gardens' claims exceed what would have been recoverable by Stock Conversion if there had been no assignment. But that is merely a question which goes to quantum, like the discussion in the speech of Lord Keith in GUS as to what would be the appropriate measure of damages in the circumstances.

For these reasons I agree that the appeal by Linden Gardens should be allowed.

*St Martins*

One aspect of the facts is in my view crucially different in this case. At the time of the assignment by Corporation to Investments by the deed dated 25 March 1976, no breach of contract had occurred, and no cause of action against McAlpine had vested in Corporation. Indeed, the contract was still largely executory, and practical completion only took place on 1 November 1979. Corporation therefore had nothing to assign on 25 March 1976 other than the benefit of the contract, ie their right to have the contract performed, or -- loosely speaking -- the contract itself. However, for the reasons already explained, the express prohibition against assignment precluded any such assignment without McAlpine's consent.

The point at which I therefore respectfully part company from Staughton LJ is where he says: "In my judgment St Martin's Corporation by the assignment transferred to St Martin's Investments the contractual right to have the building properly constructed". In my view, the effect of the contractual prohibition was that the assignment was invalid and ineffective to transfer anything: the right to have the contract performed could not be assigned without consent, and no assignable claim for damages or other chose in action under the contract had vested in Corporation.

I also find it difficult to equate the purported assignment by the deed of 25 March 1976 with an assignment of a debt to become due in the future, or the assignment of the right to recover damages for a breach if one should occur. Admittedly, a contract to assign a potential future cause of action or expectancy will be enforced if it is supported by consideration: see Chitty, paragraph 1406. But, as it seems to me, it would require express contractual language to produce this effect, identifying the future chose in action or expectancy, in order to overcome the difficulty that an assignee can generally not recover more than could have been recovered by his assignor.

For these reasons I am of the opinion that Investments did not acquire any enforceable rights against McAlpine, and that their appeal should be dismissed

I then turn finally to the appeal of Corporation. This arises on the premise that the assignment to Investments failed to transfer any enforceable rights against McAlpine. It therefore follows, as it does in any event, that Corporation remained the contracting party vis-a-vis McAlpine in all respects,

JA1062

with their rights unimpaired.

But it is then said that Corporation can only recover nominal damages. This defence has succeeded, and Corporation's action has accordingly been stayed. In the same way as Staughton LJ, I do not agree that this result is correct, and I will elaborate my reasons as briefly as I can.

McAlpine's arguments against Corporation's claim proceeds in two main stages.

First, it is pointed out that Corporation had received the full market value when the property was transferred, and that it was Investments, not Corporation, who expended the sum of about £850,000 to have the necessary remedial works carried out after the breach subsequently came to light. McAlpine rely on the passage in the judgment of Lord Denning MR in Sparham-Souter [1976] QB 858 at page 867 which Staughton LJ has quoted and on the apparent acceptance of this principle by Lord Fraser in Pirelli [1983] 2 AC 1 21 BLR at page 16. Corporation's reply is that these were cases in tort, whereas the present claim is in contract, and that the law does not assist contract breakers to avoid the payment of appropriate damages. They point to the decision of Roche J in Newton Abbot Development Co Ltd v Stockman Brothers (1931) 47 TLR 616 and to the decision of this court in Jones v Stroud District Council [1986] 1 WLR 1141, to which Staughton LJ has already referred. However, McAlpine then riposte that the facts in both these cases were crucially different In the Newton Abbot case the plaintiffs had remedied the defendants' breaches at their own cost, even though they had transferred the property at full value and were under no legal liability to the purchasers. And in Jones v Stroud, although it was not the plaintiff but his wholly-owned company which had borne the cost of the repairs, the plaintiff had at all times remained the owner of the property which had been damaged by the defendants' breach. In the present case, on the other hand, Corporation had ceased to be the owners of the property long before the breach and had not borne the cost of the remedial works. McAlpine therefore contend that neither of these cases supports a claim by Corporation for more than nominal damages.

I think that I would accept these arguments on the basis of the dicta in Sparham-Souter and Pirelli. However, Corporation then come back with a rejoinder. They point out that it is wrong to say that they have suffered no loss, because they are in fact liable to indemnify Investments for the amount of about £850,000 which Investments have expended in remedying the damage causes by McAlpine's breach.

This liability on the part of Corporation to Investments is accepted by McAlpine, in my view rightly. By the deed of assignment of 25 March 1976 Corporation have purported to transfer to Investments their rights under their contract with McAlpine, with the clear implication that such rights would thereby become enforceable by Investments. However, due to Corporation's failure to obtain McAlpine's consent, this assignment has turned out to be ineffective, with the result that Investments cannot (in my view) recover from McAlpine the sum which Investments have spent. In these circumstances Investments are clearly entitled to recover an equivalent sum by way of damages from Corporation, as is accepted by all parties. Corporation accordingly say that it is they, not Investments, who have ultimately suffered the loss.

However, the second stage, and final twist, in the argument is then that

30 Con LR 1, 57 Build LR 57

McAlpine counter this by seeking to rely on the principles relating to remoteness and causation. They say that Corporation's loss is too remote and/or that it stems from a transaction between Corporation and Investments which is res inter alios acta   What they say, to put it in plain terms, is that Corporation's loss was not caused by McAlpine's breach of contract, by by Corporation's failure to obtain McAlpine's consent to the assignment. This was effectively the conclusion which Judge Bowsher QC accepted.

I agree with him that it is at this point that issue should be joined with the various stages of the parties' contentions. But I cannot agree with his conclusion that Corporation's claim can simply be dismissed by the formula res inter alios acta. Although the final aspect was not extensively examined in the arguments before us, it seems to me that the answer lies in the correct application of the principles of causation in situations where the court has to choose between two (or more) competing contributory causes of a loss.

These principles have been discussed, in particular, by the House of Lords in the context of a number of war-time cases in which ships were lost by the combined effect of different causes, for some of which, but not others, the defendants were responsible. This line of cases was followed and applied more recently by Lord Denning MR and Salmon LJ in this court in Gray v Barr [1971] 2 QB 554 at pages 566-7 and 579-80. The problem is to identify what is often called the "proximate" cause, but which is really the effective or predominant or substantial cause, and which is to be determined on a common-sense basis.

I refer to the following passages by way of illustration.

In an oft-quoted dictum, Lord Shaw of Dunfermline said in Leyland Shipping Co Ltd v Norwich Union [1918] AC 350 at page 369:

"Causes are spoken of as if they were as distinct from one another as beads in a row or links in a chain, but -- if this latter physical topic has to be referred to -- it is not wholly so. The chain of causation is a handy expression, but the figure is inadequate. Causation is not a chain, but a net . . . The case which is truly proximate is that which is proximate in efficiency."

And Lord Dunedin said at page 362 that the ascertainment of the proximate cause "turns on a pure question of fact to be determined by commonsense principles". In Yorkshire Dale Steamship Co v Minister of War Transport (The Coxwold) [1942] AC 691 Lord Wright echoed these remarks when he said at page 706:

"This choice of the real or efficient cause from out of the whole complex of the facts must be made by applying commonsense standards. Causation is to be understood as the man in the street, and not as either of the scientist or the metaphysician, would understand it. Cause here means what a business or seafaring man would take to be the cause without too microscopic analysis but on a broad view."

And there is a similar discussion in Lord Wright's speech in Monarch Steamship Co Ltd v Karlshamms [1949] AC 196 at page 228.

In the present case the determination of the effective cause of Corporation's

30 Con LR 1, 57 Build LR 57

loss, by the application of common sense, does not present any problem. One does not even have the problem which arose in most of the earlier cases, in which it had to be pointed out that the effective cause is not necessarily the cause which is most proximate in time. In the present case Corporation's failure to obtain McAlpine's consent to the assignment occurred *long before* the breach which had to be remedied by the expenditure which is claimed. Admittedly, the failure to obtain consent to the assignment had been Corporation's own omission, not the act or omission of some third party. But in my view this failure was not a breach of contract vis-a-vis McAlpine, and in any event it was of far less importance in the history than McAlpine's breach in carrying out the work. If that breach had not occurred, no loss would have been suffered by anyone. In determining the effective or predominant cause of Corporation's loss, by the application of *common sense* to the choice between Corporation's failure to obtain consent to the assignment and McAlpine's breach, it seems to me that there can only be one answer.

Finally I would add that one should not too readily invoke the phrase res inter alios acta. It was used in the judgments below, and by the respondents on this appeal, because the purported assignment by Corporation to Investments was a transaction between them alone, without any participation by McAlpine. That is true. But it is not relevant to the sense in which the use of this expression is appropriate. The phrase is useful to counter situations where a plaintiff seeks to increase a claim for damages by relying on some transaction or event with which the defendant had no connection. But this is not the situation here. Corporation do not seek to increase their claim by relying on the purported assignment; indeed, they do not rely upon it at all. They are merely pointing out that they have suffered a loss equal to the cost of remedying the consequences of McAlpine's breach, which they seek to recover. In that context the phrase res inter alios acta is irrelevant.

In agreement with Nourse LJ I would accordingly allow the appeal of Corporation and dismiss that of Investments, and I would otherwise concur in the order proposed by Staughton LJ, to whom I am equally indebted.

17 June 1992

*JUDGMENTBY-4: STAUGHTON LJ*

JUDGMENT-4:

STAUGHTON LJ: After our judgments were delivered on 13 February, the parties in St Martins Property Corporation Ltd v Sir Robert McAlpine & Sons Ltd were unable to agree upon the order which should be made. In consequence we heard further argument, on 21 May.

To explain the dispute, I set out once again extracts from the preliminary issues that were ordered to be tried:

"2. Was there an implied term of the deed of assignment dated 25th March 1976 and of the Agency Agreement dated 1976 and 1983 as pleaded in paragraphs 7 and 7A of the Amended Statement of Claim?

3. On the assumption that the matters pleaded in paragraph 8 of the Statement of Claim are correct then:

30 Con LR 1, 57 Build LR 57

(b) Does the first plaintiff have a valid claim against the *defendants* for damages, other than nominal damages, for breach of the contract dated 29th October 1974 as pleaded in paragraph 11 of the Statement of Claim?

(c) Does the first plaintiff have a valid claim against the *defendants* for damages, other than nominal damages, for breach of the contract dated 29th October 1974 as pleaded in paragraph 12 of the Statement of Claim?"

Paragraph 7(2) of the statement of claim, as amended, alleged an implied term of the assignment that St Martins Corporation had obtained or would obtain the consent of McAlpines to it. Paragraph 8 alleged breaches of the building contract by McAlpines. In paragraph 11, on the assumption that the benefit of the building contract remained vested in St Martins Corporation, damages for breach of contract were claimed on behalf of St Martins Corporation,

"the measure of damage being the costs required to rectify the defects."

Then there is paragraph 12:

"In the further alternative to paragraph 10 above the *First Plaintiff* as trustee of the benefit of the contract (and with the *Second Plaintiff* as beneficiary) claims damages for breach of contract, the *measure* of damage being as set out above. Further or alternatively the Plaintiffs rely on the implied term pleaded in paragraph 7 above."

The emphasis is mine.

In the light of our judgments, all are agreed that the answer to preliminary issue No 2 is:

"There was an *implied term* of the assignment as alleged in paragraph 7 of the Statement of Claim to the effect that the First Plaintiff had obtained or would obtain *consent* to the assignment . . ."

The dispute is as to the answer to preliminary issues 3(b) and (c). The plaintiffs says that the answer should be:

"Yes; because of the liability of the first plaintiff to the second plaintiff for breach of the implied term of the assignment found at (2) above, and provided that the damages recoverable by the *first plaintiff* shall be no greater than those which would have been recoverable had there been no assignment and no transfer of the property by the *first plaintiff* to the second plaintiff."

McAlpines say that there should be added a further condition --

"but only to the extent that the first plaintiffs are held liable to the Second Plaintiffs for breach of the implied term of the Assignment found at [(2)] above."

In other words, McAlpines say that there must be a further issue tried, between St Martins Investments and St Martins Corporation; and that *unless and until* St Martins Corporation are "held liable" to St Martins Investments,

JA1066

30 Con LR 1, 57 Build LR 57

McAlpines are not liable to St Martins Corporation for substantial damages even if the facts pleaded in paragraph 8 of the statement of claim are correct.

At the renewed hearing Mr Fernyhough for McAlpines accepted (i) that we had found an implied term in the contract between St Martins Corporation and St Martins Investments, that St Martins Corporation had obtained or would obtain consent to the assignment, (ii) that St Martins Corporation were in breach of that term as they had not obtained the consent of McAlpines, and (iii) that St Martins Investments had suffered substantial damages, on the assumed fact that McAlpines were in breach of the building contract, and in the light of the conclusion of Nourse LJ and Sir Michael Kerr that St Martins Investments have no direct right of action against McAlpines for that breach.

But, Mr Fernyhough submits, it may be that St Martins Corporation will never be held liable to St Martins Investments, for three reasons. First, there may have been an agreement between them that St Martins Investments would not seek compensation from St Martins Corporation; that might be revealed on discovery, which has not yet taken place. Secondly, it is said to be improbable that St Martins Investments would sue St Martins Corporation, for tax reasons. Thirdly, the Limitation Act would now be a bar to proceedings by St Martins Investments against St Martins Corporation.

It seems to me that McAlpines are in a dilemma. Either those issues were raised before us, or they were not. If they were raised, we have decided them against McAlpines. If they were not, the preliminary issues fell to be decided on such arguments as the parties chose to put before us.

We have been referred to a passage in the judgment of Sir Michael Kerr (above page 100), where he said that the liability of St Martins Corporation to St Martins Investments

"is accepted by McAlpines, in my view rightly."

Sir Michael Kerr went on to consider whether St Martins Corporation's loss might not be recoverable from McAlpines, by reason of a break in the chain of causation or remoteness. He held that it was recoverable. Nourse LJ agreed; and so did I, although my preferred conclusion would have been that St Martins Investments had a direct right of action against McAlpines (in which event, if I may say so, the present problem would not have arisen).

Mr Fernyhough asserts that he did not make the concession which Sir Michael Kerr records, or at any rate did not intend to do so, as that would preclude him from relying on the three points that I have mentioned. I am quite prepared to accept Mr Fernyhough's assertion; in a case of this complexity, misunderstandings can happen. So I do not treat him as having conceded that St Martins Corporation would now be held liable to St Martins Investments.

If one confines the enquiry to the record, I do not consider that Mr Fernyhough's three points were in issue before us or have been raised in the action. The plaintiffs have alleged in paragraph 12 of the Statement of Claim that St Martins Corporation were liable to St Martins Investments. That seems to me the plain implication from the words which I underlined in paragraph 12. The Defence pleaded to paragraphs 11 and 12 was as follows:

JA1067

30 Con LR 1, 57 Build LR 57

"15. As to paragraph 11 of the Amended Statement of Claim, it is denied that
the First Plaintiff has sustained any loss by reason of any breaches of Contract
on the part of the Defendant which may be established at trial. Any loss which
has been sustained, which is denied, has been assumed voluntarily

16. Paragraph 12 of the Amended Statement of Claim is denied."

The defence might have gone on to plead, in the alternative, that any
liability of St Martin's Corporation to St Martins Investments was irrelevant,
because there was an agreement not to enforce that liability, or because it
would in practice never be enforced, or because it was barred by lapse of time.
But the defence said none of those things. Preliminary issues were then
ordered, one of them being whether St Martins Corporation had a claim for
damages, other than nominal damages, against McAlpines. Certain facts were
required to be assumed; but there was no assumption made as to Mr Fernyhough's
three points, nor were they reserved to be tried later. We have answered the
preliminary issue as it was ordered. So far as the record is concerned, that in
my judgment is the end of the three points.

If however one has regard to the course of the trial, there was some evidence
touching on one of the three points from Mr O'Hagan, called on behalf of the
plaintiffs. The only passage in his evidence which I consider of possible
relevance is this:

"Q. Has there ever been any legal proceeding between these two companies --
Property Corporation and Investments?

A. Not to my knowledge.

Q. Is it conceivable that there ever would be?

A. Not in any circumstances that I can envisage.

No specific instance of how such a claim might arise was put to Mr O'Hagan,
and in particular not the case where St Martins Investments would claim from St
Martins Corporation and the latter would then claim from McAlpines.

That evidence was referred to, briefly, in this court. It does not begin to
persuade me that there was any agreement by St Martins Investments not to make a
claim upon St Martins Corporation, or that St Martins Investments would be
reluctant to do so. They show no such reluctance now; and the liability was
asserted by implication in a pleading served on their behalf, that is to say the
Statement of Claim. As Mr Lloyd for the plaintiffs observes, their witness was
called at the trial of the preliminary issue and was to a very limited extent
asked about one of those points, even though they had not been raised in the
pleadings. He might have been asked further questions, but was not.

As to the point about limitation, in my opinion it does not matter whether a
claim by St Martins Investments against St Martins Corporation would be time
barred now. It was not time barred when the action was commenced, in which the
liability is alleged by both of them. I cannot accept that it is or ever was
necessary for one company to go through the process of suing the other to
judgment, when liability was admitted and asserted by both of them.

JA1068

30 Con LR 1, 57 Build LR 57

So whether one looks at it as a matter of record or examines the course of the trial, in my judgment McAlpines are precluded from raising their three points in any further proceedings.  I would make the declaration which the plaintiffs contend for, in answer to preliminary issues 3(b) and (c).

JUDGMENTBY-5: SIR MICHAEL KERR

JUDGMENT-5:

SIR MICHAEL KERR: I agree.

JUDGMENTBY-6: NOURSE LJ

JUDGMENT-6:

NOURSE LJ: I also agree.

DISPOSITION:

Judgment accordingly.

SOLICITORS:

Jacques & Lewis; Masons; Portner & Jaskel; Stephenson Harwood; Glavers

Service: Get by LEXSEE®
Citation: 2003 U.S. Dist. LEXIS 2556

*2003 U.S. Dist. LEXIS 2556, ***

PROXIM INCORPORATED, Plaintiff, v. 3COM CORPORATION, SYMBOL TECHNOLOGIES, INCORPORATED, WAYPORT INCORPORATED, and SMC NETWORKS, INCORPORATED, Defendants.

C.A. No. 01-155-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 2556

February 21, 2003, Decided

**DISPOSITION: [*1]** Defendants' motions to preclude damages from accruing during stay denied. Plaintiff's motion for reconsideration granted and court's previous order precluding damages from accruing during stay with respect to defendant Symbol vacated in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff patent owner brought suit against defendants, a customer and businesses, alleging infringement of several patents. The court granted intervenor corporation's motion for leave to intervene. The court entered a stay and ordered that the owner was precluded from collecting damages from the customer that accrued during the stay. The businesses moved to preclude damages from accruing during the stay. The owner moved for reconsideration.

**OVERVIEW:** The owner argued that the customer would have suffered no harm as a result of the stay since it was indemnified against any infringement damages by the corporation. Furthermore, the owner argued that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. The customer admitted that it had an indemnification agreement with the corporation but argued that the corporation had not agreed to full indemnification and that the indemnification agreement was only as good as the corporation's ability and willingness to pay for any potential damages. The court found that the fact that the customer was indemnified against potential damages mitigated its claim of harm resulting from the stay. The customer's ability to enforce its agreement with the corporation was separate from the litigation. The businesses merely stated that they were not receiving and had not received any indemnification from the corporation related to the litigation. The court concluded that the businesses failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

**OUTCOME:** The businesses' motion to preclude damages from accruing during the stay was denied. The owner's motion for reconsideration was granted and the court's previous order precluding damages from accruing during the stay with respect to the customer was vacated in part.

**CORE TERMS:** indemnification, accruing, reconsideration, precluding, infringement, chip, potential damages, indemnified, warranty, vacated, accrue

### LexisNexis (TM) HEADNOTES - Core Concepts - ◆ Hide Concepts

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2556

Page 2 of 4

Civil Procedure > Relief From Judgment > Motions to Alter & Amend

HN1 The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. More Like This Headnote

**COUNSEL:** For PROXIM INCORPORATED, plaintiff: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For 3COM CORPORATION, defendant: Dale R. Dube, Blank Rome LLP, Wilmington, DE.

For SYMBOL TECHNOLOGIES, INC., defendant: Andre G. Bouchard, Karen L. Pascale, Bouchard, Margules & Friedlander, Wilmington, DE.

For WAYPORT INCORPORATED, defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

For SMC NETWORKS INCORPORATED, defendant: Richard K. Herrmann, Blank Rome LLP, Wilmington, DE.

For SYMBOL TECHNOLOGIES, INC., counter-claimant: Andre G. Bouchard, Karen L. Pascale, Bouchard, Margules & Friedlander, Wilmington, DE.

For PROXIM INCORPORATED, counter-defendant: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For 3COM CORPORATION, counter-claimant: [*2] Dale R. Dube, Blank Rome LLP, Wilmington, DE.

For WAYPORT INCORPORATED, counter-claimant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION: MEMORANDUM ORDER**

**I. INTRODUCTION**

On March 8, 2001, plaintiff Proxim brought this suit against defendants 3COM, Symbol Technologies ("Symbol"), Wayport and SMC Networks ("SMC") alleging infringement of several patents owned by plaintiff related to wireless networks. (D.I. 1) On December 12, 2001, Intersil Corporation moved for leave to intervene as a co-defendant in the case. (D.I. 78) After finding that the thrust of the present litigation was directed against the Intersil PRISM chip set, the court granted Intersil's motion to intervene. (D.I. 106) Given the fact that Intersil was also a respondent in an action brought before the ITC by plaintiff related to the same technologies, the court was required to stay this action pursuant to 28 U.S.C. § 1659. (Id.)

In addition to entering the stay, the court concluded that it would be unfair to allow damages to accrue against defendant Symbol given that Symbol was merely a customer [*3] and user of Intersil's PRISM chip set and was not a party to the ITC action. Thus, the court

JA1071

Case 1:05-cv-00259-KAJ    Document 19-5    Filed 07/05/2005    Page 28 of 40

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2556                    Page 3 of 4

further ordered that plaintiff would be precluded from collecting damages from Symbol that resulted from any alleged infringing conduct during the stay. (Id.)

Presently before the court are defendants 3COM, SMC and Wayport's motions to preclude damages from accruing during the stay and plaintiff's motion for reconsideration of the court's order precluding damages from accruing with respect to Symbol. (D.I. 107, 108, 110)

## II. STANDARD OF REVIEW

*HN1*The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Cafe ex-rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. See id.

## III. DISCUSSION

In its May 30, 2002 order entering the stay, the [*4] court was mindful of the concerns posed by Symbol in its papers opposing the stay. Namely, Symbol was not a party to the ITC action and, therefore, would not have an opportunity to defend itself in that forum. Furthermore, Symbol would be subjected to the uncertainty of conducting business with the impending litigation hanging over it. Given these concerns, the court concluded that in the interests of equity, damages should not be allowed to accrue against Symbol during the stay and pendency of the ITC action. In their motions, defendants 3COM, Wayport and SMC argue that they are in the same situation as Symbol and should be afforded the same protections.

In its motion for reconsideration, plaintiff argues that Symbol would suffer no harm as a result of the stay since it is indemnified against any infringement damages by Intersil. (D.I. 110 at 5) Furthermore, plaintiff argues that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. Given the indemnification argument, the court ordered the parties to submit briefing regarding any indemnification agreements they had with Intersil related to this litigation. (D.I. 117) [*5]

In response to this order, Symbol admits that it has an indemnification agreement with Intersil but argues that Intersil has not agreed to full indemnification and, furthermore, Intersil's indemnification agreement is only as good as Intersil's ability and willingness to pay for any potential damages. (D.I. 118) The court finds this argument unpersuasive. The terms of Symbol's indemnification agreement with Intersil and its concerns about Intersil's willingness or ability to satisfy its obligations are irrelevant to the inquiry in the present case. The fact that Symbol is indemnified against potential damages in the current case mitigates its claim of harm resulting from the stay. Symbol's ability to enforce its agreement with Intersil is separate from this litigation and, therefore, the court's order precluding damages from occurring during the stay (D.I. 106) is vacated in part.

Defendants 3COM, Wayport and SMC merely state that they are not receiving and have not received any indemnification from Intersil related to this litigation. (D.I. 119) Plaintiff argues that these responses do little to address the indemnification issues. In particular, plaintiff argues that 3COM and SMC [*6] "undoubtedly have contracts with Intersil that address indemnification and warranties applicable to Intersil's PRISM chipset." (Id. at 3) Furthermore, under the U.C.C., 3COM and SMC likely have warranty and indemnification claims. In their responding affidavits, neither 3COM nor SMC discuss whether or not they have demanded indemnification or whether they have a right to seek indemnification under their purchase agreements with Intersil. With respect to Wayport, plaintiff argues that Intersil "has already stated that its counsel is defending Wayport here at the expense of another defendant

JA1072

involved in other litigation against Proxim." (Id. at 4) Given the vagueness of defendants' 3COM, SMC and Wayport's responses, the court concludes that they have failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

### IV. CONCLUSION

At Wilmington, this 21st day of February, 2003, for the reasons stated;

IT IS ORDERED that:

1. Defendants 3COM and SMC's motion to preclude damages from accruing during the stay (D.I. 107) is denied.

2. Defendant Wayport's motion to preclude damages from accruing during the stay (D.I. 108) [*7] is denied.

3. Plaintiff's motion for reconsideration (D.I. 110) is granted and the court's previous order precluding damages from accruing during the stay with respect to defendant Symbol (D.I. 106) is vacated in part.

Sue L. Robinson

United States District Judge

Service: Get by LEXSEE®
Citation: 2003 U.S. Dist. LEXIS 2556
View: Full
Date/Time: Tuesday, June 8, 2004 - 2:50 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved

JA1073

1496

[1998]

[COURT OF APPEAL]

A

\*REGINA v. CHESTER AND NORTH WALES LEGAL AID AREA
OFFICE (No. 12), Ex parte FLOODS OF QUEENSFERRY LTD.

1997  Dec. 18          Hobhouse and Millett L.JJ. and Sir Roger Parker

*Legal Aid—Availability—Company—Assignment of company's cause
of action to director—Assignment ineffective at law and in
equity—Whether company concerned in "representative, fiduciary or
official capacity" for director—Whether eligible for legal aid—Legal
Aid Act 1988 (c. 34), s. 2(10)*

B

The company, a subcontractor engaged in the construction of
a by-pass, brought an action against the defendant main
contractors for damages for breach of contract. After the company
was ordered to provide security for the defendants' costs, it
purported to assign all its assets and liabilities, including its cause
of action against the defendants, to its managing director, who
was the company's principal shareholder and a loan creditor. By
that assignment the director had power, but was not obliged, to
finance the action in return for a share in the proceeds. The
director was granted legal aid to prosecute the action and was
substituted as plaintiff in place of the company. The Court of
Appeal set aside the order for substitution, holding that, since the
company's subcontract contained a prohibition on assignment of
any claim which could not be expressed as a claim for a fixed
amount, the assignment was ineffective to transfer the cause of
action for unliquidated damages. The company provided security
and applied for legal aid on the ground that it was acting in a
fiduciary capacity for the director within section 2(10) of the
Legal Aid Act 1988.[1] The respondent area office granted legal aid
but it was later withdrawn on the ground that as a body corporate
the company was ineligible for legal aid.

On appeal by the company:—
*Held,* (1) that, on the true construction of section 2(10) of the
Legal Aid Act 1988, legal aid was available to bodies corporate
only where the applicant was concerned to obtain legal advice,
assistance or representation in a representative, fiduciary or official
capacity on behalf of an individual; that a company acting on its
own behalf or on behalf of an ineligible company was not so
concerned; that "fiduciary" in section 2(10) did not bear a
technical meaning but, like "representative" and "official,"
qualified the capacity in which the applicant applied for legal aid;
and that section 2(10) was concerned not with the identity of the
person who would benefit if the action were successful but with
the capacity in which the applicant made the application (post,
pp. 1499E–G, 1501B–D, 1503A, F, G–H).

C

D

E

F

G

*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373, C.A. applied.
(2) Dismissing the appeal, that the test to determine whether
the company was eligible for legal aid was whether, at the time
the application was made, it was concerned to obtain legal aid to
bring the action as a nominal plaintiff on behalf of the director;
that, since the prohibition against assignment in the subcontract
operated both at law and in equity, the assignment was wholly
ineffective to vest any existing interest in the director, and, since it
was, as between the company and the director, a purely commercial
arrangement at arm's length, it gave rise to no fiduciary
relationship nor did it result in the company becoming a nominal
plaintiff; and that the company therefore remained an ordinary

H

[1] Legal Aid Act 1988, s. 2(10): see post, p. 1499D.

The Weekly Law Reports 16 October 1998

1497

1 W.L.R.          Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)

A    plaintiff suing on its own behalf and, accordingly, was ineligible
for legal aid (post, pp 1499H, 1501E–F, F–G, 1502B–C, G–1503A, C,
D–E, F, H–1504B, 1505C–E).
Decision of Popplewell J. affirmed.

The following cases are referred to in the judgments:
*Flood v. Shand Construction Ltd.* (1996) 81 B.L.R. 31, C.A.
*Holroyd v. Marshall* (1862) 10 H.L.Cas. 191, H.L.(E.)
B    *Lind, In re* [1915] 2 Ch. 345, C.A.
*Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd* [1994] 1 A.C. 85;
[1993] 3 W.L.R. 408; [1993] 3 All E.R. 417, H.L.(E.)
*Napier and Ettrick (Lord) v. Hunter* [1993] 2 W.L.R. 42;
[1993] 1 All E.R. 385, H.L.(E.)
*Tailby v. Official Receiver* (1888) 13 App.Cas. 523, H.L.(E.)
*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975]
C    1 All E.R. 849, C.A.
*Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
[1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)

The following additional cases were cited in argument:
*Goldcorp Exchange Ltd., In re* [1995] 1 A.C. 74; [1994] 3 W.L.R. 199; [1994]
2 All E.R. 806, P.C.
D    *National Westminster Bank Plc. v. Morgan* [1985] A.C. 686; [1985] 2 W.L.R.
588; [1985] 1 All E.R. 821, H.L.(E.)
*Norglen Ltd. v. Reeds Rains Prudential Ltd* [1997] 3 W.L.R. 1177; [1998] 1 All
E.R. 218, H.L.(E.)

APPEAL from Popplewell J.
By notice of appeal dated 3 November 1997 Floods of Queensferry
E.   Ltd. appealed with leave against the dismissal by Popplewell J. on
16 October 1997 of its application for judicial review of the refusal of the
Chester and North Wales Legal Aid Area Office (No. 12) to grant it a
legal aid certificate to prosecute an action for breach of contract in the
official referee's list. The grounds of the appeal were, inter alia, that in the
circumstances the judge erred in concluding that the company was not
acting in a fiduciary capacity within section 2(10) of the Legal Aid Act
F    1988 and that he erred in holding that a company could not be acting in
a fiduciary capacity within section 2(10) pursuant to a "voluntary"
commercial or contractual arrangement.
The facts are stated in the judgment of Millett L.J.

*Justin Fenwick Q.C.* and *Ben Elkington* for the company.
*Jonathan Harvie Q.C.* and *Tom Weisselberg* for the Legal Aid Board.
G    *Colin Reese Q.C.* and *Chantal-Aimée Doerries* for the defendants in the
main action.

MILLETT L.J.    This is an appeal by Floods of Queensferry Ltd. from
an order of Popplewell J made on 16 October 1997 when he dismissed the
company's application for judicial review of a decision of the respondent
H    Legal Aid Area Office refusing the company legal aid to prosecute an
action pending in the official referee's list. The defendants to the action
have been joined in the present proceedings as interested parties.
The company was a subcontractor engaged in carrying out earth works
in connection with the construction of the A494 Mold by-pass. In March
1994 it commenced the action against the main contractors for damages
for breach of contract. On 9 November 1995 the company was ordered to
provide security for the defendants' costs

Millett L.J.        Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)        [1998]

On 4 December 1995 the company purported to assign all its assets    A
and liabilities, including its cause of action against the defendants, to
Mr. Flood. The defendants had prior to this given notice of their intention
to seek relief against Mr. Flood pursuant to section 51 of the Supreme
Court Act 1981. Mr. Flood is the managing director and principal
shareholder of the company. He is also a loan creditor of the company,
the loan being secured by a fixed and floating charge over the company's    B
assets. The fixed charge extends to book debts and other debts owing to
the company. It contains a common form provision in the following terms:

"Until this charge is discharged the company will:—(a) get in and
realise the debts in the ordinary course of its business ... and hold
the proceeds of such getting in and realisation of the debts (until
payment to the special account as hereinafter provided) upon trust    C
for D. C. Flood; (b) pay the proceeds of such getting in and
realisation of the debts into such separate and denominated account
with D. C. Flood (the 'special account') as D. C. Flood may
require ..."

The assignment recited the facts that Mr. Flood was a loan creditor of
the company, that he had not been paid any director's fees or other
emoluments for acting as a director, and that the company had liabilities    D
to other creditors besides Mr. Flood, principally being liabilities to its
professional advisers. The assignment was made in consideration of: (i) £1;
(ii) the cancellation of the secured debt of £37,800 owed by the company
to Mr. Flood; and (iii) Mr. Flood's undertaking to pay the company's
outstanding liabilities as a charge on the transferred assets to the extent of
but not beyond those assets.
On 2 January 1996 Mr. Flood was granted legal aid to prosecute the    E
action, and on 22 February 1996 he was substituted as plaintiff in place of
the company. The defendants appealed the order for substitution, and on
18 December 1996 the Court of Appeal held that the assignment was
ineffective to transfer the company's cause of action to Mr. Flood: see
Flood v. Shand Construction Ltd. (1996) 81 B.L.R. 31. This was because of
a prohibition on assignment contained in the company's subcontract. This    F
provided:

"The subcontractor shall not assign the whole or any part of the
benefit of this subcontract nor shall he sublet the whole or any part
of the subcontract works without the previous written consent of the
contractor. Provided always that the subcontractor may without such
consent assign either absolutely or by way of charge any sum which is    G
or may become due and payable to him under this subcontract."

It was common ground before the Court of Appeal that the first sentence
constituted an absolute bar against assignment of the benefit of the
subcontract and that the bar extended to all contractual claims.
The Court of Appeal held that the proviso permitted a present
assignment of a future right to recover a fixed and ascertainable sum. In    H
his judgment Evans L.J. said that such an interpretation was entirely
consistent with the commercial purpose of the clause. He explained that a
contractor might be indifferent to the prospect of having to pay a
particular sum to a third party assignee when it became due and payable
under the subcontract, but it could be important to him that he should
operate the contractual machinery and arbitrate or litigate only with the
party with whom he had chosen to contract.

1499

1 W.L.R.          Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)          Millett L.J.

A    The Court of Appeal accordingly held that the clause rendered invalid the assignment by the company to Mr. Flood of any claim which could not be expressed as a claim for a fixed amount. The company's claims in the action, which are for unliquidated damages for breach of contract, do not fall within that exception. Accordingly the order for substitution was set aside. Mr. Flood has since been joined as an additional party in order to pursue other claims not caught by the prohibition on assignment, but

B    these do not concern us.

    On 24 February 1997 the company provided security. On 25 June 1997 it applied for legal aid. This was granted by the respondent area office, but later withdrawn on instructions from the Legal Aid Board. The board considered that as a body corporate the company was ineligible for legal aid and directed that no certificate be issued. The company applied for an

C    order quashing the refusal of the area office to issue the certificate and for an order of mandamus requiring it to do so.

    The ground on which the area office refused the company legal aid was that legal aid is available only to "persons" and that the company is not within the statutory definition of the word "person" contained in section 2(10) of the Legal Aid Act 1988. That section provides:

D        "In this Act 'person' does not include a body of persons corporate or unincorporate which is not concerned in a representative, fiduciary or official capacity so as to authorise advice, assistance or representation to be granted to such a body."

The judge described the object of that subsection as being to limit the circumstances in which a company may be granted legal aid. This has been

E    criticised by the company in its skeleton argument on the ground that from their inception in 1949 the Legal Aid Acts have excluded legal aid to companies. The current definition, which allows legal aid to be granted to companies in special circumstances, was introduced by amendment by the Legal Aid Act 1979. Accordingly the true purpose of the subsection was not to deny companies legal aid, for that was already the position, but to introduce for the first time a power, in strictly limited circumstances, to

F    grant legal aid to them. In my judgment, this does not invalidate the judge's approach. He correctly identified the issue as one which went to the power of the area office to grant legal aid and asked the correct question, whether the company was "concerned in a representative, fiduciary or official capacity." It was not suggested that the company was concerned in a representative or official capacity. Accordingly, as the judge

G    recognised, the sole question was whether it was concerned in a fiduciary capacity within the meaning of section 2(10); if not, the area office had no power to grant it legal aid.

    It is to be observed that the definition is limited by reference to the capacity in which the applicant for legal aid is "concerned." This must be considered at the time the application for legal aid is made. The Legal Aid Acts provide for legal advice and assistance, as well as representation, so

H    that it would have been inappropriate to confine the definition to cases in which the applicant was suing or was being sued. Instead, it is directed to the capacity in which the company is concerned, that is to say the capacity in which it is concerned to seek legal advice, assistance or representation. In the present case the company seeks legal aid in order to prosecute the action. The question therefore depends on whether the company is concerned to obtain legal aid in order to prosecute the action in "a representative, fiduciary or official capacity."

JA1077

1500

Millett L.J.    Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)    [1998]

The area office submits that this is plainly not the case. The company, it says, is seeking to obtain legal aid in order to prosecute an action in the ordinary way in its own name and on its own behalf and that this is so notwithstanding the fact that, if successful, it is obliged to account to Mr. Flood for all or part of the proceeds of the action. The company submits that this fact means that it is pursuing an action in a fiduciary capacity.

The company relies, inter alia, on the charge whereby the company charged its book debts and other debts to Mr. Flood and, in particular, on the clause which requires the company to get in and realise the debts of the company and to hold the proceeds on trust for Mr. Flood. But the clause is expressed to have effect only until the charge is discharged, and manifestly does not confer any rights on Mr. Flood now that the debt which the charge secures has been cancelled. Even if the charge were still subsisting the argument would be misconceived. The clause in question applies to debts, not unliquidated claims for damages, and did not oblige the company to bring or continue the action against the defendants. Now that the action has been brought, no debt will be due to the company from the defendants unless and until the action results in a judgment debt or a compromise. Even then, no trust will arise until the debt is realised and its proceeds are received by the company.

In my judgment, the company's case must stand or fall by the assignment. The submission that this gave rise to any fiduciary obligations on the part of the company is untenable. The obligation on which reliance is placed is the core obligation of a fiduciary to act in the interests of his beneficiary and not his own. Such obligation arises whenever one person (the beneficiary) entrusts the management of a particular matter to another (the fiduciary) to undertake on his behalf. It is immaterial whether the obligation arises contractually or gratuitously. In the company's skeleton it is admitted that: "The essence of a fiduciary relationship is that one person acts for, or on behalf of, or in the interests of, or with the confidence of, another." This is no doubt sufficiently accurate for most purposes, but it is misleading if the concluding words are taken to be an alternative, for confidence is the very essence of the relationship. Unless a relationship is one of trust and confidence, it is not fiduciary. There are many commercial situations in which one man undertakes to act for the benefit of another without any trust or confidence being reposed in him. In such a case there is no fiduciary relationship. An example, not far removed from the present case, is that of a plaintiff who brings proceedings for the benefit of an insurance company which has subrogated rights to his claim. He is accountable to the insurance company for the proceeds of the action, but he is not a fiduciary: see Lord Napier and Ettrick v. Hunter [1993] A.C. 713, 752.

The mere separation of legal and equitable ownership does not without more result in a fiduciary relationship. This has led Lord Browne-Wilkinson to say that it does not necessarily create a trust: see Westdeutsche Landesbank Girozentrale v. Islington London Borough Council [1996] A.C. 669, 706–707. This, perhaps, raises a semantic question which need not detain us, but it is certainly the case that the mere separation of the legal and beneficial ownership does not ipso facto create a fiduciary relationship.

It is in any case fanciful to suppose that the relationship between Mr. Flood and the company brought about by the assignment is a relationship of trust and confidence. Mr. Flood does not trust the company; he controls it. He is not only the managing director (in which

The Weekly Law Reports 16 October 1998

1501

1 W.L.R.        Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)        Millett L.J.

A   capacity he owes fiduciary duties to the company), but its principal
shareholder (in which capacity he is not subject to any fiduciary obligations
to the company). Before the assignment, as after it, and irrespective of the
validity or the scope of the assignment, he has had the carriage of the
action. He does not need the assistance of a court of equity to prevent
the company from exploiting a position of trust or confidence. The
company is not in a position of trust, nor is it in a position to exploit

B   Mr. Flood's vulnerability.

All this, however, assumes that the word "fiduciary" in section 2(10)
bears a technical meaning. I am inclined to think that it does not. The
word takes its meaning from the context. The word "fiduciary" is not used
in relation to the obligations which are owed by the applicant to any other
person, nor to the relationship between the applicant and any other

C   person. Like the words "representative" and "official," it qualifies the
capacity in which the applicant applies for legal aid. I take the expression
"representative, fiduciary or representative capacity" to be a compendious
expression which is not susceptible of close analysis or divisible into its
component parts.

In my judgment the legislative intention is to make legal aid available
to bodies corporate, but only in limited circumstances, where the applicant

D   is concerned, to obtain legal aid in order to act not on its own behalf but
on behalf of another. That other must be an individual and not a company
ineligible for legal aid. This does not appear from the subsection itself, but
it follows from the decision of the Court of Appeal in *Wallersteiner v.
Moir (No. 2)* [1975] Q.B. 373. The question is one of substance rather
than form and is to be approached without undue technicality.

In my judgment, therefore, the correct test in the present case, to be

E   applied at the time of the company's application for legal aid, was: "Is the
company concerned to obtain legal aid in order to bring the action as a
nominal plaintiff on behalf of Mr. Flood, the 'real' plaintiff?" The question
is not: "Who will benefit from the action?" but, "In what capacity is the
company bringing the action?" This depends on an analysis of the effect
of the purported assignment of the company's cause of action to Mr.

F   Flood.

It was submitted before us that the assignment was effective in equity
to transfer the beneficial interest in the company's cause of action, so that
it was effective as an equitable but not a legal assignment. I do not accept
this. The subcontract expressly prohibits any assignment of the claim, not
merely any legal assignment, and in my opinion an equitable assignment is

G   as much within the prohibition as a legal assignment. It is not necessary
to consider whether the company could have declared itself a trustee of its
claim, for it has not done so. But it could not have assigned the beneficial
interest to Mr. Flood by contracting to do so, since equity will not enforce
the performance of an obligation which constitutes a breach of a prior
contract with a third party.

It was however a valid and effective contract between the company and

H   Mr. Flood under which: (i) the company undertook to account to Mr.
Flood for the proceeds of the action; (ii) Mr. Flood undertook to discharge
all the outstanding liabilities of the company up to the amount of proceeds
recovered and as a first charge on those proceeds; (iii) Mr. Flood was
entitled to retain for his own benefit any surplus after discharging the
company's liabilities.

Counsel for the company pointed out that the assignment was only
partially effective. It could not assign the company's cause of action, but it

JA1079

1502

Millett L.J.       Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)       [1998]

could assign the future judgment debt It was, he submitted, a present       A
assignment of a future debt and, as such, is enforceable in equity. I will
assume that that is correct, but I am unable to see how it assists the
company. Such an assignment has immediate effect as a contract and
fastens upon the debt in question as soon as it comes into existence: see
*Tailby v. Official Receiver* (1888) 13 App.Cas. 523 and *In re Lind* [1915]
2 Ch. 345. If the action proceeds to judgment and results in a judgment in       B
favour of the company, the assignment will have immediate effect to vest
the right to enforce the judgment debt in Mr Flood. If the company then
applies for legal aid to execute the judgment (and as at present advised
I see no reason why it should since I think that Mr. Flood could do so)
then arguably it would be acting in a fiduciary capacity and would be
eligible for legal aid. Until then this is not the case. The company is not
prosecuting the claim for damages on behalf of Mr. Flood but on its own       C
behalf, and is not suing in a "representative, fiduciary or official capacity"
within the meaning of section 2(10).

The company submits that, even before the conclusion of the
proceedings in a judgment debt, it is not in a position to deal with the
proceedings for its own benefit. For example, it is said, it could not
abandon the action or neglect it; and it could not compromise it without       D
the approval of Mr. Flood. I do not accept this, even in theory. In practice,
it is no doubt true that the company could do nothing without Mr. Flood's
consent, for he controls the company and has carriage of the action. But
the proposition can be tested by supposing that the company were to go
into liquidation. The liquidator would then have carriage of the action. He
would have no funds to enable him to carry it on, and would be dependent
on Mr. Flood to provide them. Mr. Flood is under no obligation to do so.       E
Suppose that the defendants then paid into court a sum sufficient to
discharge the costs of action to date and most of the company's liabilities
to other creditors. The liquidator, advised by counsel that the action had
limited chances of success, might well wish to take the money out and
discontinue the action. Mr. Flood, on the other hand, with a rosier view
of the prospects of success, might well wish to continue with the action. In       F
practice, no doubt, the parties would have to reach an agreement. But in
the absence of any agreement, I can see no possible basis upon which
Mr. Flood could intervene to prevent the liquidator from taking the money
out of court and discontinuing the action if he thought that it was in the
interests of the company to do so. If there was any doubt about the matter,
he could apply to the Companies Court for directions. The court would
consider exclusively the interests of the company and its creditors.       G
Mr. Flood's views as the prospective assignee of a judgment debt would
have no bearing on the matter.

In my judgment the company is neither a fiduciary nor a nominal
plaintiff. It has no funds with which to prosecute the action, and has
accordingly entered into a purely commercial arrangement with Mr. Flood
under which he may, but is not bound to, finance the action in return for       H
a share of the proceeds. Such an arrangement gives rise to no fiduciary
relationship. It is an arm's length transaction between parties on an equal
footing, each of which is entitled to consult his own interests Nor does it
result in the company becoming in any sense a nominal plaintiff. This
might have been the case if the assignment were valid in equity but not in
law, so that while the cause of action remained vested in the company it
could be said to be suing in order to obtain payment to Mr. Flood. But

1503

1 W.L.R.    Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)    Millett L.J.

A    until the assignment is effective to vest the judgment debt in Mr. Flood, the company remains the real plaintiff acting on its own behalf.

I return to the point I made at the outset of this judgment. Section 2(10) is concerned not with the identity of a person who will benefit if the action is successful, but with the capacity in which the applicant is concerned to obtain legal advice and representation. A plaintiff may dispose of the proceeds of an action, or part of them, in order to finance the action, but

B    this does not affect the capacity in which he pursues it.

Before the assignment, the company was an ordinary plaintiff prosecuting an action on its own behalf. Had the assignment been valid, Mr. Flood would have become the real plaintiff suing on his own behalf. He would not he acting in a fiduciary capacity, nor would he be a nominal plaintiff, even though he was bound to account for all or part of the proceeds of the action to the company. The company conceded that this

C    would not have made Mr. Flood a nominal or fiduciary plaintiff, nor would it have prevented him from consulting his own interests exclusively when taking decisions in the course of proceedings. The assignment is wholly ineffective to vest any interest now in existence in Mr. Flood. Accordingly, the company remains an ordinary plaintiff suing on its own behalf.

D    The company has sought to meet this by arguing that the assignment, though ineffective as between the company and the defendants, is effective as between the company and Mr. Flood. This may be true, but I cannot see that it adds anything. As I have already pointed out, in so far as it purports to assign the cause of action and so make the company eligible for legal aid, it is ineffective. In so far as it is effective by assigning the

E    future judgment debt, it does not make the company presently eligible for legal aid. The fact that a party has disposed of the proceeds of an action does not affect the capacity in which it brings the action; nor does the fact that there has been an effective attempt to assign the cause of action itself.

I would dismiss the appeal.

SIR ROGER PARKER.    I also would dismiss the appeal.

F

HOBHOUSE L.J.    I agree that this appeal should be dismissed for the reasons given by Millett L.J. I would add only a few further words. There were two topics raised by the argument before us. The first related to the correct understanding of section 2(10) of the Legal Aid Act 1988, and the second was as to the relevant effect of the assignment of 4 December 1995,

G    having regard to the fact that it related to a cause of action covered by a qualified prohibition against assignment.

Taking the question of the understanding of the Act first, I agree that the relevant expression should be construed as a whole; in other words the phrase "in a representative, fiduciary or official capacity" is a composite expression which does not gain from being broken down into its constituent parts. If one does so, one immediately runs into difficulties. The word

H    "fiduciary" raises the difficulties to which Millett L.J. has already referred. Similar difficulties arise in relation to the word "official." In my judgment, the phrase should be read as a whole and it is not inappropriate to describe it as relating to a nominee capacity, though in my judgment that does not exhaust its full meaning.

It is clear from the wording used that it does not exclude a personal interest of the relevant body of persons, corporate or unincorporate. For example, a representative action brought by or against a representative is

1504

Hobhouse L.J.    Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)         [1998]

typically brought by or against a person who does have a personal interest    A
in the action as well as representing other persons. Indeed, they are
selected as a representative taking that into account. Similarly, somebody
who is acting in a trust capacity, or as an executor, may themselves have
some personal interest in the outcome of any litigation. Therefore, it does
not exclude the possibility of a personal interest. The regulations that
have been made under this Act contemplate that the person covered by    B
section 2(10) may have a partial interest.

It is also clear that the expression must relate to the capacity of the
body of persons corporate or unincorporate that is referred to in this
subsection. One must decide, at the time that they apply for the legal aid,
whether they are seeking advice, assistance or representation in a capacity
which is covered by the permission given by subsection (10).

In the relevant context, one has to ask whether in the instant action    C
the plaintiff company is suing in a capacity which comes within subsection
(10). I approach that question, like Millett L.J., not having regard to the
technical considerations of a fiduciary relationship, but having regard to
the overall intent of subsection (10). The question, therefore, is whether
the company is suing in a representative or fiduciary capacity. Without
having recourse to technical distinctions I would answer that question by    D
saying that it is not suing in anything which could be described as a
representative or fiduciary capacity. The company is suing unequivocally in
its own capacity.

That leads one to the second topic, namely the effect of the assignment
as it took effect in relation to the relevant matters subject to the restriction
in the subcontract and as determined by the decision given by the Court
of Appeal on 18 December 1996: see *Flood v. Shand Construction Ltd.,*    E
81 B.L.R. 31. It is quite clear in the light of the Court of Appeal decision,
and indeed of other decisions, that it cannot take full effect as intended. It
was intended to be a legal assignment of the legal and beneficial title to
the relevant causes of action. It cannot have that effect.

It was suggested that, nevertheless, it must suffice as an equitable
transfer as between the assignor and the assignee. Like Millett L.J., that is    F
not a submission which I can accept. The passage in the judgment of Lord
Browne-Wilkinson in *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals
Ltd.* [1994] 1 A.C. 85, 108 upon which the company relied does not assist
them in this respect:

"a prohibition on assignment normally only invalidates the assignment
as against the other party to the contract so as to prevent a transfer    G
of the chose in action: in the absence of the clearest words it cannot
operate to invalidate the contract as between the assignor and the
assignee and even then it may be ineffective on the grounds of public
policy."

So the remaining relationship between the assignor and the assignee is a
contractual relationship which does not affect the capacity in which the    H
assignor is suing. I have difficulty in accepting any concept of an equitable
transfer of a cause of action which is not effective in any respect against
the relevant third party, even if that third party is given notice of
the purported assignment. In my judgment the situation, as it existed at
the material time, is merely a contractual obligation by the assignor to the
assignee. It may well be that if the company succeeds in the action, then it
may hold the fruits of its success in trust. It is not necessary to express

1505

1 W.L.R.          Reg. v. Chester Legal Aid Office, Ex p. Floods Ltd. (C.A.)      Hobhouse L.J.

A    any view about that because we are not concerned with that stage in the story.

I am impressed by the analogy that can be drawn with what was said about the assignment of future property by Swinfen Eady L.J. in *In re Lind* [1915] 2 Ch. 345, 359–360 where, quoting Lord Chelmsford in *Holroyd v. Marshall* (1862) 10 H.L.Cas. 191, 220, he said:

B          "'... in equity it is not disputed that the moment the property comes into existence the agreement operates upon it.' ... It is clear from these authorities that an assignment for value of future property actually binds the property itself directly it is acquired—automatically on the happening of the event, and without any further act on the part of the assignor ..."

C    Until the property is acquired, the effect of the purported assignment is simply contractual. It does not create any equity in any proper use of that word.

Having regard to what was said by the Court of Appeal in the judgments delivered in December 1996, as between the relevant parties, the contract relates to what it is anticipated will be the fruits of the success of the litigation. But until those fruits of litigation are realised, then the

D    rights remain simply contractual. This is not a case where there has been any assignment in law or in equity of the cause of action on which the company is suing.

It follows from what I have said that the answer that I indicated earlier must clearly be right, the company is not suing in a representative or fiduciary capacity.

E    I accordingly agree that this appeal must be dismissed.

> *Appeal dismissed with costs not to be*
> *taxed without further leave of court.*
> *Legal aid taxation of company's costs.*

Solicitors. *Winward Fearon; Solicitor, Legal Aid Board; Morrison*
F    *Skirrow.*

[Reported by SUSAN DENNY, Barrister]

G

H

JA1083

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                         )    Chapter 11
                             )
BRAC GROUP, INC., et al.,[1]       )    Case No. 02-12152 (CGC)
(f/k/a Budget Group, Inc.)         )
                             )    (Jointly Administered)
            Debtors.          )

## AFFIDAVIT OF SERVICE

STATE OF DELAWARE     )
                         ) SS
NEW CASTLE COUNTY    )

       Thomas J. Hartzell, being duly sworn according to law, deposes and says that he is employed by the law firm of Young Conaway Stargatt & Taylor, LLP, attorneys for the Debtors in the within captioned matter, and that on the 8th day of June 2004, he caused a copy of the attached pleading to be served, as indicated, to those parties on the attached service list.

Thomas J. Hartzell

SWORN TO AND SUBSCRIBED before me this ___ day of June 2004.

Notary Public

KIMBERLY A. BECK
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Oct. 1, 2006

---

[1] The Debtors are the following entities: BRAC Group, Inc., Auto Rental Systems, Inc., BGI Airport Parking, Inc., BGI Shared Services, LLC, BRAC Credit Corporation, BRAC Car Sales, Inc., BRAC Fleet Finance Corporation, BRAC Rent A Car Asia-Pacific, Inc., BRAC Rent A Car Caribe Corporation, BRAC Rent A Car Corporation, BRAC Rent-A-Car International, Inc., BRAC Rent A Car of Japan, Inc., BRAC Rent-A-Car of St. Louis, Inc., BRAC Rent-A-Car of the Midwest, Inc., BRAC Rent-A-Car Systems, Inc., BRAC Sales Corporation, BRAC Storage Corporation, BRAT Move Management, Inc., BRAT Relocation Services, Inc., BRAT TRS, Inc., BVM, Inc., Carson Chrysler Plymouth Dodge Jeep Eagle, Inc., Control Risk Corporation, Dayton Auto Lease Company, Inc., Directors Row Management Company, LLC, IN Motors VI, LLC, Mastering The Move Realty, Inc., Mosinant Car Sales, Inc., NYRAC Inc., Paul West Ford, Inc., Philips Jacobs Insurance Agency, Inc., Premier Car Rental LLC, Reservation Services, Inc., TCS Properties, LLC, Team Car Sales of Charlotte, Inc., Team Car Sales of Dayton, Inc., Team Car Sales of Philadelphia, Inc., Team Car Sales of Richmond, Inc., Team Car Sales of San Diego, Inc., Team Car Sales of Southern California, Inc., Team Fleet Services Corporation, Team Holdings Corp., Team Realty Services, Inc., The Move Shop, Inc., Transportation and Storage Associates, ValCar Rental Car Sales, Inc., Vehicle Rental Access Company, LLC, and Warren Wooten Ford, Inc.