**ORIGINAL**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:   BRAC GROUP, INC. (f/k/a  ) <br> BUDGET GROUP, INC., *et al*),   ) <br>                                                    ) | Chapter 11 |
| Debtors.                                      ) <br>                                                    ) | Case No. 02-12152 (CJC) |
| IN RE:   BRAC GROUP, INC. (f/k/a  ) <br> BUDGET GROUP, INC., *et al*),   ) <br>                                                    ) | (Jointly Administered) |
| Plaintiffs and Counterclaim Defendants,  ) <br>                                                    ) | |
|            v.                                  ) <br>                                                    ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED,           ) <br>     and                                           ) <br> IBRAHIEM JAEBAN,                  ) <br>                                                    ) | Response Deadline: February 3, 2005@4:00 pm <br> Hearing date:  To be determined |
| Defendants and Counterclaim Plaintiffs.  ) | |

### DEFENDANT/COUNTERCLAIM PLAINTIFF IBRAHIEM JAEBAN'S
### MOTION FOR RECONSIDERATION OF JANUARY 13, 2005 ORDER AND
### MEMORANDUM IN SUPPPORT THEREOF
#### (Docket Item #76)

Comes Now Ibrahiem Jaeban, Defendant, by and through his undersigned counsel,

with this his Motion for Reconsideration of the Court's January 13, 2005 Order and in

support thereof states as follows:

### RELIEF REQUESTED

Ibrahiem Jaeban respectfully submits this Motion asking the Court to reconsider its

January 13, 2005 Order, as it appears that the Court has misinterpreted the facts on which it

based the order. More particularly, Mr. Jaeban respectfully submits that the evidence does not

show the type of misconduct that would support the extreme sanction of dismissal. In

addition, the January 13, 2005 Order mooted Mr. Jaeban's ability to serve discovery by

**JA1479**

reiterating the June 18, 2004 discovery deadline, despite the fact that BRACII did not sue Mr.

Jaeban on the alleged personal guaranty until July 19, 2004 (Docket Item #40).

## MEMORANDUM

Mr. Jaeban believes that factual underpinnings of the December 14, 2004 Memorandum Opinion are incorrect, thereby leading the Court to enter a fundamentally January 13, 2005 Order[1].

Most importantly, it appears that the Court has made erroneous determinations regarding Mr. Jaeban's compliance with the discovery requirements of the May Order. In fact, the evidence shows that Mr. Jaeban substantially complied with, if not completely complied with, those discovery requirements and that his compliance is concrete and demonstrable.

One of the purposes of a motion for reconsideration under Federal Rule of Bankruptcy Procedure 9023 is to correct manifest errors of law or fact. *See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 908 (3d Cir. 1985). A motion for reconsideration must rely on one of three major grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error [of law] or prevent manifest injustice." *See North River Ins. Co v. Cigna Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

The May Order imposed three requirements on Mr. Jaeban to be satisfied by June 18, 2004. Mr. Jaeban was directed to:

1.    Provide documents in response to BRACII's Second Request for Production of Documents.

2.    Respond to concerns raised by BRACII in its letter dated December 12, 2003 alleging gaps in Jaeban UK's November 2003 production of documents.

---

[1] For the purposes of this Motion, Mr. Jaeban adopts the following terms (a) "Order" means the order entered on the docket on January 13, 2005 as docket item #76, (b) "Opinion" means the Memorandum Opinion entered on the docket on December 16, 2004 as docket item #73 (c) "May Order" means the Memorandum Opinion entered on the docket on May 25, 2004 as docket item #32 (d) "Jaeban UK" means Jaeban (U.K.) Limited (e) "Receiver" means the Administrative Receivers appointed for Jaeban UK (f) "Wragge & Co." means Wragge & Co. LLP.

JA1480

3.    Schedule depositions of any Jaeban UK personnel and the Jaeban Receiver.

It is alleged that Mr. Jaeban has failed to comply with (1) & (2). Mr. Jaeban's compliance

with (3) is uncontroversial, as all parties acknowledge the scheduling of the depositions.

### The alleged failure to provide documents in response to BRACII's Second Request for Production of Documents

BRACII's Second Joint Request for Production of Documents related to documents

within the possession of the Receiver, and not Mr. Jaeban. BRACII's First Joint Request did

not contain a request for disclosure of the Receiver's documents. It could not have, given that

the Administrative Receivers were appointed on October 20, 2003 and the First Joint Request

was served on September 29, 2003. The Receiver, acting for Jaeban UK, properly objected to

the Second Joint Request on December 30, 2003 on the grounds that the request was;

"*overly broad, unduly burdensome and seeks documents or information that is neither*

*relevant to the subject matter of this action nor reasonably calculated to lead to the discovery*

*of admissible evidence*".    Jaeban U.K. Limited's Responses to Joint Second Request for

Production of Documents, with December 30, 2003 cover letter, are attached as Exhibit A.

At all times prior to the entry of the May Order, the Objections were in force and

unresolved. Unless the May Order is deemed to have overruled the Objections, and there is

no provision in the May Order that would lead to that conclusion, the Objections were in

force as of the commencement date of the depositions in August, 2004. Significantly, despite

its insistence that Mr. Jaeban was required to convene a discovery conference with regard to

BRACII's objections, BRACII's counsel never sought to address the Jaeban UK Objections.

At the September 21, 2004 hearing, the Court stated that it was not aware of Jaeban UK's

Objections to the Second Request when it handed down the May Order requiring Mr. Jaeban

to produce the documents. Transcript of September 21, 2004 Hearing, page 31, attached as

JA1481

Exhibit B. It was not the understanding of Mr. Jaeban's counsel, or of Mr. Jaeban, that the

Order overruled the Objection. Affidavit of Ibrahiem Jaeban, paragraph 12, attached as

Exhibit C, and Affidavit of Steven David Allen, paragraph 6, attached as Exhibit D. Mr.

Jaeban and his UK attorneys worked on the premise that they were not to produce documents

covered by Jaeban UK's Objection because the Order did not overrule the Objection. Jaeban

Affidavit, paragraph 12. Mr. Jaeban should not be penalized because of this ambiguity.

The actual text of the Second Joint Request is as follows:

1.      Correspondence between Jaeban, the Jaeban Receivers, Robson Rhodes and any

secured creditor of Jaeban relating to (a) the appointment of the Administrative Receivers (b)

the adversary proceedings or any claim or allegation in the adversary proceedings (c) the

financial condition of Jaeban.

2.      All other documents not produced in response to the Joint First Request (or withheld

on the grounds of privilege in response to that Request) that refer or relate to any claim or

allegation made in the Adversary proceedings including, without limitation, all evaluations,

all other references to the allegations in the Adversary Proceeding by the Jaeban Receivers or

any director or officer of Jaeban.

3.      All documents that refer or relate to completed or proposed sales of Jaeban's assets by

the Jaeban Receivers.


Mr. Jaeban ceased to have authority to instruct Wragge & Co. on October 20, 2003, the date

of the appointment of the Administrative Receivers. Although Wragge & Co. continued to be

involved, it was in their capacity as lawyers for the Receiver, and it was in this capacity that

they caused the Objection to be filed. The Court is already aware that the Receiver had taken

the view that lawyers for Jaeban (UK) Limited should undertake the minimum amount of

work necessary in order to preserve the company's position. However, Morris Nicholls Arsht

and Tunnell were instructed by the Receiver to serve a formal objection to the Second Joint

Request. See Exhibit A.

Mr. Jaeban could not address the proceedings further until Jaeban UK's claims were

assigned to him on February 20, 2004. By that date, BRACII had already filed its Motion to

Strike and Jaeban UK's response was required to be served on February 23, 2004. Jaeban

Affidavit, paragraph 4. Mr. Jaeban immediately instructed Wragge & Co. to retain Delaware

counsel and Werb & Sullivan were retained. Id. BRACII's counsel granted Werb & Sullivan

an extension to respond to the Motion to Strike, and Mr. Jaeban filed a timely response to the

Motion to Strike. In the meantime Mr. Jaeban was negotiating with Wragge & Co. regarding

the terms of their retainer. The hearing on BRACII's Motion to Strike took place on March

10, 2004.

When the Court entered its Memorandum Opinion on May 25, 2004 (the "May

Order"), Mr. Jaeban immediately instructed Wragge & Co. to take all necessary steps to

comply with the its terms. Jaeban Affidavit, paragraph 5. Wragge & Co required substantial

funds to continue to act. Id. The requested sum of 45,000 English Pounds was raised by Mr.

Jaeban and paid over to Wragge & Co. on Monday June 7, 2004. Id.

When Mr. Jaeban was in a position to instruct Wragge & Co., and prior to the June 18

deadline, Wragge & Co. revisited the Second Joint Request.[2] Mr. Jaeban had every reason to

believe, and subsequently did believe, that he was in compliance with the May Order with

regard to the Second Joint Request. Jaeban Affidavit, paragraphs 11-14.

---

[2] Since many of the factual issues relate to discussions and written communications, some involving counsel, issues of the scope of litigation privilege are present. Nothing in this Motion, or in any attachment thereto is intended to be a waiver of any privilege, including the attorney client privilege and the attorney work product doctrine. However, because some privileged communications could likely be of use to the Court in deciding the issues, Mr. Jaeban is willing to submit such communications for in camera inspection by the Court, or, as an alternative, submit them under other conditions if it can be assured that such submissions would not be considered a waiver.

JA1483

Mr. Jaeban did not passively leave the matter to his attorneys, and consulted with them extensively prior to June 18, 2004. The record shows that Mr. Jaeban called Wragge & Co. on Wednesday June 9, 2004 because he was concerned about the nearness of the June 18 deadline. Id., paragraph 6. As a result of Mr. Jaeban's instructions, Emma Carr and Keith Gamble from Wragge & Co. spent two days going through Jaeban UK documents in order to identify whether there were any responsive documents. Allen Affidavit, paragraph 13. Emma Carr also spoke to Mick O'Connor, the Receiver's representative, on or about June 9, 2004[3]. Id., paragraph 14.

On Thursday June 10, 2004, Mr. Jaeban attended a meeting with his English lawyers to review the status of the discovery. Id., paragraph 8. He also personally called Werb & Sullivan to discuss the matter. Id., paragraph 7.

On that same date, Mr. Jaeban called Mr. Mick O'Connor, the Receiver's representative, following the Wragge & Co. meeting. Mr. O'Connor informed Mr. Jaeban that the only documents held by the Receiver were either determined to be non-responsive or privileged documents, and that the bulk of the Jaeban UK papers were held at Welcome House. Id., paragraph 9.

On Monday June 14, 2004, Mr. Jaeban contacted Steven Allen and agreed to attend a further meeting on June 15, 2004. Id., paragraph 10.

On June 15, 2004, Mr. Jaeban went to Wragge & Co.'s offices and met for three hours with his attorneys to discuss a Supplemental Schedule of Documents[4] and the responses to the December 12, 2003 letter. Id., paragraphs 11 and 13. Mr. Jaeban's lawyers were confident that they could meet the June 18, 2004 deadline for compliance. Id

---

[3] Ms. Carr's Note of that conversation is available for in camera review.

[4] That Supplemental Schedule of Documents, in the form provided to BRACII and with specific headings corresponding to those in the December 12, 2003 letter, is attached as Exhibit 1 to Mr. Jaeban's Affidavit.

JA1484

On June 18, 2004, acting on Mr. Jaeban's instructions, Emma Carr contacted Mr. O'Connor of the Receiver's office again[5]. Allen Affidavit, paragraph 17.

The Supplemental Schedule of Documents was provided to BRACII on June 18, 2004, along with a phone call from Brian Sullivan, Esquire, to discuss the issues in the December 12, 2003 letter. Affidavit of Brian A. Sullivan, paragraphs 3 and 4, attached hereto as Exhibit E.

These efforts show, without question, why it is not accurate to suggest that Mr. Jaeban did nothing to comply with the provisions of the May Order prior to June 18, 2004. These actions also show why Mr. Jaeban reasonably believed, and believes today, that he did comply.[6]

One part of Mr. Jaeban's efforts is reflected in the Supplemental Schedule of Documents on BRACII on June 18, 2004. It is apparent from the Supplemental Schedule that none of the documents requested in the Joint Second Request were included in the categories. BRACII made no subsequent complaint with regard to the disclosure of the Receiver's papers until after Mr. Wile's arrival in the UK in July, 2004. Jaeban Affidavit, paragraph 14. Allen Affidavit, paragraph 14. Allen Affidavit, paragraph 20. That being the case, and BRACII having made no attempt to address the Objections, BRACII's counsel flew to England at the very least with the knowledge that production of these documents had not yet taken place.[7]

In August, BRACII's counsel raised the issue of the Receiver's documents with Mr. Jaeban's US Attorney, Robert Wilcox and English Counsel, Steven D. Allen. Allen Affidavit, paragraph 22. See also, Affidavit of Robert Wilcox attached as Exhibit A to Mr. Jaeban's

---

[5] Ms. Carr's Note of that conversation is also available for in camera review.

[6] To the extent that his efforts and his belief in his compliance were based upon communications with his counsel, evidence of such communications is available for in camera review.

[7] Mr. Jaeban disputes what is expressed in paragraph 3 page 3 of the BRACII's Motion for Further Sanctions (Docket Item #50). In addition, the Objections were still in place.

JA1485

Response to BRACII's Motion for Additional Sanctions (Docket Item #50). None of Mr.

Jaeban, Mr. Wilcox, or Mr. Allen had been able to obtain access to the Receiver's documents.

Mr. Wilcox then sought to resolve the issue with Mr. Wile by agreeing that Mr.

Wilcox would once again seek access to the Receiver's documents. Allen Affidavit,

paragraph 22. The agreed-upon approach to the Receiver was that Mr. Wilcox would

undertake a review of the papers in order to determine whether the papers were responsive[8].

If the Receiver would consent, it was agreed between Mr. Wilcox and Mr. Wile that Mr.

Wilcox's inspection of the documents would not amount to a waiver of privilege.

On August 6, 2004 Mr. Jaeban directed Mr. Allen to again try to facilitate BRACII's

access to the Receiver's documents. Mr. Allen (who by this time was with Mills & Reeve and

representing Mr. Jaeban in place of Wragge & Co.) sent an e-mail to the Receiver's counsel

at Wragge & Co. to once again demand access to the Receiver's documents and invoking

paragraph 4 of the Deed of Assignment. Id., paragraph 25. The Receiver's counsel responded

on August 6, 2004 by asking who was going to pay the Receiver's fees and costs of the

Receiver's privilege review and the production. Id., paragraph 26. Despite the pendency of the

Objections, Mr. Jaeban instructed Mills & Reeve to find out the costs of paying Wragge &

Co. to undertaking the review process on behalf of the Receiver. Id., paragraph 26. Wragge &

Co advised that the cost would be £4000 plus VAT. The issue was resolved when Mr. Jaeban

acceded to the Receiver's solicitors request for £4000 plus VAT to conduct the review, even

though that fee appeared excessive. Id. paragraph 27.

Mr. Jaeban's efforts to keep the deposition process moving are unquestionable. On

August 9, 2004, Steven Allen of Mills & Reeve wrote to BRACII's counsel, stating as

follows:

---

[8] Mr. Wile belatedly made it clear that he was not prepared to rely on Mr. Wilcox's assessment of the
responsive nature of these documents. Allen Affidavit, paragraph 24.

**JA1486**

*Additionally, our client worked extensively last week to dispel any discovery dispute between*

*the Debtors and the Administrative Receivers of Jaeban UK Limited. Mr. Jaeban initially*

*requested and subsequently demanded, that the Administrative Receivers produce all*

*requested non-privileged documents, even though Mr. Wilcox has advised that the Receiver's*

*files are without question [of] limited [relevance] to Mr. Clark's deposition.*

Correspondence of Steven Allen, attached as Exhibit F, bracketed material added[9].

### The Court may have been under a mistaken impression with regard to the alleged gaps in the Response to the First Request

The May Order also directed Mr. Jaeban to respond to BRACII's letter of December

12, 2003. It appears that the Court may have been under a mistaken impression of fact when

it stated in its Opinion that BRACII's renewed Motion *"stems from Mr. Jaeban's failure to*

*comply with the Court's May 25, 2004 Memorandum Opinion…requiring Mr. Jaeban to*

*respond by June 18, to BRACII's second document request and explain various gaps in his*

*November responses to BRACII's document request". (Opinion p. 3)*

A careful reading of BRACII's Motion confirms that BRACII has not alleged that Jaeban

failed to provide the response to the December 12, 2003 letter. In fact, BRACII cannot so

allege because Mr. Jaeban did respond and address those issues on June 18, 2004. After

Wragge and Co. had provided to Mr. Sullivan an email dated June 17, 2004 which addressed

line by line each of the queries raised by Mr. Wile in his letter of December 12, 2003, Mr.

Sullivan had a conference with Mr. Wile on June 18, 2004. See, Sullivan Affidavit, paragraph

3. Mr. Sullivan explained Mr. Jaeban's response to that letter on a detailed and line by line

basis. Id. BRACII's Counsel was satisfied with the explanations and awaited the

supplemental production of documents. Id. Attached hereto as Exhibit "G" is the e-mail from

Mr. Sullivan to Mr. Wile dated June 18, 2004 which provides the Supplemental Schedule of

JA1487

documents. The actual documents were shipped to Counsel by Wragge and Co., which was

agreeable to Counsel. Sullivan Affidavit, paragraph 4. Accordingly, Mr. Jaeban complied

with the June 18, 2004 deadline with regard to the issues in the December 12, 2003 letter.

Further, it is perplexing to both Mr. Jaeban and his UK lawyers that Mr. Jaeban's

failure to produce documents to which a formal Objection was taken has resulted in his

counterclaim being dismissed, whereas absolutely no sanction has been applied to BRACII in

circumstances where its own document production is lacking. The entirety of BRACII's

disclosure consists of three lever arch files which consist of documents of little or no

assistance in answering the detailed requests submitted by Jaeban UK Limited.[10] In fact of

the 25 requests for documents made by Jaeban UK Limited, BRACII objected to 24 of them.

Mr. Jaeban also respectfully reiterates to the Court that BRACII disclosed a lever arch file of

documents on August 2, 2004, none of which had previously been disclosed to Jaeban UK

Limited or Mr. Jaeban.

BRACII's response to the suggestions that the production of documents has been

fundamentally unbalanced has been that neither the Receiver nor Mr. Jaeban commenced a

formal "discovery conference" to address BRACII's objections. The irony of this situation is

obvious since BRACII never commenced a "discovery conference" to address Jaeban UK's

Objection, yet BRACII has sought sanctions for the documents covered by the Objection.

Mr. Jaeban believes that the Court is also under the mistaken impression that delivery

in August, 2004 of the Welcome House boxes was the first time any of those documents were

disclosed to BRACII. In fact, Mr. Jaeban's Affidavit demonstrates that this was in effect a

"re-disclosure" in an effort by Mr. Jaeban to continue the depositions which were ultimately

unilaterally cancelled by BRACII. Jaeban Affidavit, paragraph 15. These documents had

---

[9] The deposition of Mr. Clark, a former BRACII executive, was especially sensitive because of his
personal travel constraints. See Exhibit F.

JA1488

been <u>already reviewed</u> by Wragge & Co. with the assistance of Price Waterhouse Coopers,

and 11 lever arch files of documents were produced to BRACII. <u>Id</u>., paragraphs 15 and 16.

While BRACII has repeatedly suggested that the previously undisclosed documents

were significant, it has failed to identify anything of real significance. Instead, so far it has

pinned its hopes on Attorney Ian Weatherall's letter which Mr. Weatherall's attached

Affidavit shows was directed to a separate and unrelated operational issue. See Affidavit of

Ian Weatherall, attached as Exhibit H. The Weatherall letter to which BRACII attaches such

significance was sent in response to a request from the Receiver's representative Mr.

O'Connor as to whether it was possible for Mr. Jaeban to trade either under his own name or

through a new limited company from various sites then operated by Jaeban UK Limited. <u>Id</u>.,

paragraph 3. Mr. Jaeban had suggested to Mr. O'Connor that the insolvency of BRACII or

the UK business of BRACII had automatically terminated the restrictive covenants contained

within the IPLA. <u>Id</u>. Mr. Weatherall disagreed with that interpretation for the reasons stated

in his letter. Id. The letter was limited to that single issue and did not address the merits of

either Jaeban UK or Mr. Jaeban's counterclaims in the adversary proceedings. The letter does

not suggest that Wragge & Co advised that Jaeban UK did not have viable claims for breach

of the Umbrella Agreement and the IPLA. <u>Id</u>., paragraphs 2-4.

Further, Mr. Jaeban contests BRACII's allegation that the documents extracted by

Sidley Austin Brown & Wood's London office are "*significant*"[11]. For example BRACII

alleges that "*several documents regarding Jaeban UK's Edinburgh and Glasgow Airport*

*sites, including Jaeban UK's executed contracts that were previously produced in incomplete*

*form*" are significant. <u>Id</u>. By this BRACII refers to the standard form IPLA Agreements that

are identical in each case. A standard form copy was included in Jaeban UK Limited's

---

[10] As opposed to the original 11 lever arch files produced by Jaeban, the supplemental lever arch files and the 85 Welcome House boxes.

[11] See page 5, BRACII's Reply Memorandum dated September 18, 2004 (Docket Item # 66).

Final                                          11

JA1489

response to the First Joint Request. BRACII themselves disclosed a copy of an agreement for the Stoke on Trent site for the first time during the depositions. Jaeban UK had previously disclosed some responsive documents on the Edinburgh and Glasgow concessions in response to the First Joint Request[12].

BRACII makes a similar allegation of significance in relation to a set of Jaeban UK Management accounts and forecasts in 2001. Mr. Jaeban had previously disclosed detailed accounting information as follows: (i) Jaeban UK Profit and Loss Account dated February 28, 2001 (ii) Jaeban UK Profit and Loss Account dated April 30, 2001 and (iii) draft accounts for the year ended December 31, 2001 and audited accounts for the same period. All these documents were disclosed in the Supplemental Schedule of Documents served on June 18, 2004 in compliance with the May Order.

In the light of these incorrect allegations by BRACII and the fact that the letter of Ian Weatherall is unrelated to the issues in this proceeding, the Court should not rely on a determination by BRACII's counsel of the significance of their opponents documents.


## THE POULIS FACTORS

In the Opinion, the Court analyzed the culpability factors set forth in *Poulis v. State Farm Fire & Cas. Co.*, 747 F. 2d 863 (3d.Cir 1984), and interpreted the evidence as justifying the dismissal of Jaeban's claim. Whether intended or not, the resulting Order exposes him to potential personal liability on BRACII's claim under the personal guaranty and precludes him from ever seeking discovery on that claim.[13]

---

[12] These items are contained in the first disclosure list provided to BRACII in November, 2003.

[13] BRACII's claim under Mr. Jaeban's personal guaranty are set forth in Count II of its Amended Complaint, filed July 19, 2004. In referring to it as a personal guaranty claim, Mr. Jaeban is not conceding its validity.

JA1490

Mr. Jaeban again respectfully submits that his actions in these proceedings, and specifically his actions to comply with the Court's May Order, do not demonstrate "flagrant bad faith" justifying dismissal. *See Poulis*, at 868.

As the *Poulis* Court stated, "we reiterate what other Courts have said on numerous occasions: that dismissals with prejudice or defaults are drastic sanctions, termed 'extreme' by the Supreme Court." *Id. at 867-868, citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976 ).*

*Poulis* suggests an analysis of the following factors under the circumstances of the case:

(1) The extent of the party's personal responsibility;

(2) The prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;

(3) A history of dilatoriness;

(4) Whether the conduct of the party or the attorney was willful or in bad faith;

(5) The effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and

(6) The meritoriousness of the claim or defense.

*Id.*

### Mr. Jaeban's Personal Responsibility

Mr. Jaeban submits that the Court misinterpreted the evidence of his personal actions to comply with the May Order. In its Opinion, the Court found that Mr. Jaeban had ignored the deadlines in the May Order. *Opinion, page 8, numbered paragraph 4.* As set forth above, Mr. Jaeban took the following actions between May 25,2004 and June 18, 2004:

JA1491

1.      Personally paid $45,000 British Pounds (approximately $82,000.00 U.S. dollars[14]) to bring Wragge & Co. back into active involvement in the proceeding;

2.      Called Wragge & Co. on June 9, 2004 after not hearing from them about their efforts to meet the June 18, 2004 deadline;

3.      Retained Werb & Sullivan and paid it a retainer fee;

4.      Conducted at least two lengthy international calls (on June 9 and 10) with his American attorneys;

5.      Identified and caused to be produced additional documents as contained in the Supplemental Schedule of Documents in response to the December 12, 2003 letter;

6.      Met with Wragge & Co. attorneys on June 10 and 15 to, inter alia, review specific responses to the December 12, 2003 letter;

7.      Contacted Mr. O'Connor, the Receiver's representative regarding the Second Request;

8.      Reviewed the proposed answers to the December 12, 2003 letter.


Additionally, acting on Mr. Jaeban's directions, his attorneys took the following additional steps to comply:

9.      Responded with an explanation to BRACII's Counsel regarding the questions raised in the December 12, 2003 letter, apparently to the satisfaction of Counsel;

10.      Provided BRACII on June 18, 2004 the Supplemental Schedule of Documents and shipped the Supplemental Documents to BRACII;

11.      Scheduled the depositions in England, traveled to England, prepared for and attempted to conduct the depositions;

---

[14] Calculated at 1.84 US Dollars per British pound on June 7, 2004, as published at "Historical Currency Exchange Rates", www.oanda.com.

Final              14

JA1492

12.         Attempted to resolve the document issues regarding the Receiver, despite the

fact that the Objections he had filed on behalf of Jaeban UK were still pending;

These are not the actions of a recalcitrant or contemptuous litigant and certainly do not

demonstrate "flagrant bad faith". In addition, after undertaking these steps and as of June 18,

2004, Mr. Jaeban believed that:

1.         The Receiver's Objection to the BRACII's Second Joint Request was valid;[15]

2.         After Mr. Jaeban personally contacted the Receiver on June 10, that additional

discussions had been held by his counsel with the Receiver;

3.         After meeting with counsel, that the initial review of the company documents,

including those at Welcome House, was proper and sufficient.

Jaeban Affidavit, paragraphs 8,12,13,15 and 18.

Such factors demonstrate subjective good faith on Mr. Jaeban's part in attempting to comply

and have his attorneys carry through on his compliance with the May Order.

It appears the Court may have misconstrued the reference in the Wilcox Affidavit[16] to

his and Mr. Jaeban's UK counsel's contact with the Receiver on August 5, 2004 as meaning

that was the first attempt Mr. Jaeban made to obtain documents from the Receiver. In fact,

that August 5, 2004 contact was the latest in a series of repeated attempts that began well

before the June 18 deadline. While the Opinion expresses the Court's concern over Mr.

Jaeban's inability to compel the Receiver to (a) conduct his own privilege review, and (b)

produce documents, what cannot be denied is that Mr. Jaeban made identifiable and

substantial efforts to comply with the May Order with regard to the Receiver.

---

[15] There is no evidence that Mr. Jaeban had any idea that the Court may have intended its May Order to effectively overrule the pending objection.

[16] Affidavit of Robert D. Wilcox, attached as Exhibit "A" to the Response (Docket Item 57). The complete reference is: "On or about August 5, 2004, both Mr. Jaeban's English counsel and I contacted the Receiver's counsel and specifically urged the Receiver to make his records available to Plaintiffs' counsel, and secondarily, to Mr. Jaeban. Our efforts were at first rebuffed, as the Receiver

## Prejudice to BRACII

In its Opinion, the Court did not identify specific litigation prejudice to BRACII, but did note the delay and the facts that BRACII is a post-confirmation debtor. *Opinion, page 7, numbered paragraph 2.* While Mr. Jaeban does not take lightly the prejudice issue, he submits that whatever prejudice exists can be addressed through alternatives that do not require dismissal. Mr. Jaeban has previously asked that discovery be reopened, both with regard to the BRACII- Jaeban UK dispute and with regard to BRACII's claim on the personal guaranty.[17] There is no evidence before the Court in this proceeding that the BRAC estates are about to be closed, and that the further conduct of this proceeding will delay closure. On the contrary, BRAC's Plan Administrator filed a Status Report showing that he is Plaintiff in over twenty-five adversary proceedings.[18]

Further, BRACII Counsel has assured Jaeban that the escrowed funds are in an interest bearing account. While these funds are unquestionably important to a liquidating Debtor, these claims are Mr. Jaeban's life and livelihood.

## Mr. Jaeban's History in these Proceedings

*Poulis* contemplates an analysis of whether the party sought to be sanctioned has a history of dilatoriness. There can be no suggestion that prior to Jaeban UK's receivership Mr. Jaeban caused any delay in these proceedings. When his actions between May 25, 2004 and June 18, 2004 are considered, it must be concluded that Mr. Jaeban does not have such a history. Mr. Jaeban has personally and extensively participated in these proceeding, and spent tremendous sums to comply with June 18, 2004 discovery cutoff and the May Order. He urged the Receiver to produce documents and spent additional sums to conduct a privilege

---

took the position that the files contained no relevant documents and would not be disclosed because portions were privileged." Id., paragraph 4.

[17] Mr. Jaeban filed a *Motion for Order Reopening Limited Discovery* (Docket Item 51) on August 27, 2004.

**JA1494**

review that would only benefit the Receiver. He appeared for his own deposition in a timely

manner, and arranged for other deponents to appear for theirs.

### Whether Mr. Jaeban's Conduct was Willful or in Bad Faith

The Court's Opinion found that Mr. Jaeban's conduct was not in bad faith but was

willful. *Opinion, page 7 paragraph 4.* It seems clear that such a finding was based upon a

misinterpretation of Mr. Jaeban's perceived inaction in attempting to comply with the May

Order. Such a finding of "willfulness" must be reconsidered for the multiple reasons set forth

above.

### The Alternative of Lesser Sanctions

The evidentiary record does not support sanctions, especially of the severity imposed

in the Order. If the Court is intent on imposing sanctions, there are alternatives to dismissal,

such as the preclusion of the introduction of information not disclosed. Given the absence of

a fining of "bad faith" by Mr. Jaeban, the devastating sanction of dismissal is not justified.

### The Meritoriousness of Mr. Jaeban's Claim

The Court found that this factor was "at best neutral for Mr. Jaeban and at worst

slightly in favor of BRACII" and identified as relevant "letters from English counsel

questioning the underpinnings of Mr. Jaeban's claims". *Opinion, page 8, numbered*

*paragraph 6.* Mr. Jaeban submits that the Court erred in making that determination. In *Poulis,*

the Court of Appeals did "not purport to use summary judgment standards. A claim, or

defenses, will be deemed meritorious when the allegations if the pleadings, if established at

trial, would support recovery by [the party against whom sanctions are urged] or would

constitute a complete defense. *Id., at 869-870 (bracketing added).* Under that standard, Mr.

Jaeban's Counterclaim, if established at trial, would support a recovery, and BRACII filed no

Motion attacking the merits or legal sufficiency of Mr. Jaeban's Counterclaim.

---

[18] Status Report, filed December 10, 2004 (Docket Item 5326).The Status Report shows that the

JA1495

### THE PREJUDICIAL EFFECT OF THE ORDER ON MR. JAEBAN'S DEFENSE OF THE PERSONAL GUARANTY CLAIM

While neither the Opinion nor Order explicitly so states, the Court has imposed a sanction on Mr. Jaeban over and above the dismissal of his Counterclaim and the dissolution of the escrow account. The additional sanction is that the Order retroactively precludes Mr. Jaeban from ever having the opportunity to take discovery with regard to BRACII's claim on his alleged personal guaranty to certain debts of Jaeban UK. The Opinion and Order emphasize the June 18, 2004 discovery deadline. Since the first pleading containing a claim on the personal guaranty was BRACII's Amended Complaint filed on July 19, 2004, a fact of which Mr. Jaeban asks the Court to take judicial notice, the effect of the Order is to punish Mr. Jaeban with regard to the personal guaranty claim. BRACII's argument at the hearing that the personal guaranty was "attached" to the Complaint is simply wrong. *See Transcript, page 38.* The Complaint named Jaeban UK as the sole defendant, not Mr. Jaeban. The prejudicial effect of the Order is unquestionable and severe, given the fundamental right to discovery and the fact that BRACII's personal guaranty claim is for 500,000 English Pounds. The Court should address the inequity of its effect on Mr. Jaeban's defense of the personal guaranty claim.

### CONCLUSION

Mr. Jaeban asks that the Court reconsider the Order with a keen eye to the arguments of the parties, the *Poulis* factors, and the evidence of his actions to comply with the May Order and to participate properly in these proceedings. Upon doing so, Mr. Jaeban's submits that the vacatur of the Opinion and Order is justified and necessary to avoid manifest injustice. Mr. Jaeban's enumerated actions prior to June 18, 2004, as well as his subjective

---

defendant's answer is not yet due in each of them.

belief as set forth in his Affidavit, demonstrate a litigant who, with regard to the Orders of this Court:

1.        intended to comply;

2.        took steps to comply;

3.        instructed his attorneys to comply; and,

4.        after consulting with counsel on multiple occasions, reasonably believed that he had complied.

As such, Mr. Jaeban is not a party who deserves the "ultimate sanction" of dismissal.

**Wherefore,** based on the foregoing, Mr. Jaeban requests that this Court vacate its December 16, 2004 Memorandum Opinion and January 13, 2005 Order and grant such other and further relief as it deems appropriate.

January  24, 2005                              WERB & SULLIVAN

                                              __/s/ **Brian A. Sullivan**__
                                              Brian A. Sullivan (#2098)
                                              Robert Wilcox (#4321)
                                              Amy D. Brown (#4077)
                                              300 Delaware Ave., 13th Floor
                                              Wilmington, DE 19801
                                              Telephone: (302) 652-1100
                                              Facsimile: (302)652-1111

                                              *Attorneys for Ibrahiem Jaeban*

JA1497

# EXHIBIT A

JA1498

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

THOMAS W. BRIGGS, JR.
302 498 6031
302 498 6226 FAX
tbriggs@mnat.com

RECEIVED DEC 3 1 2003

December 30, 2003

**VIA TELECOPY**
**AND FIRST CLASS MAIL**

Kenneth E. Wile, Esquire
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603

Re:    *BRAC Group, Inc., et al.* v. Jaeban (U.K.), Limited
       Adv. Pro. No. 03-A-54271

Dear Ken:

Enclosed are Jaeban's responses to the Joint Second Request for Production of Documents and its Statement Pursuant to Rule 9.4. Jaeban will produce documents as identified in its responses next week.

Additionally, Jaeban is currently reviewing your letter of December 12, 2003 to determine whether any supplemental production is warranted. We hope to be in a position to respond to that letter by the middle of next week, as well as provide dates for depositions.

Sincerely,

Thomas W. Briggs, Jr.

Enclosure

cc:    Steven Allen (By Email w/ enc.)
       Edmon Morton, Esquire (By Hand w/enc.)
       William P. Bowden, Esquire (By Hand w/enc.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | Chapter 11 |
| Debtors. | Case No. 02-12152 (MFW) |
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | (Jointly Administered) |
| Plaintiffs, | |
| v. | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, | |
| Defendant. | |

## NOTICE OF SERVICE

I, Thomas W. Briggs, Jr., Esquire, hereby certify that copies of JAEBAN (U.K.) LIMITED'S RESPONSES TO JOINT SECOND REQUEST FOR PRODUCTION OF DOCUMENTS were served on December 30, 2003 upon the following counsel in the manner indicated:

### BY HAND

Edmon Morton, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391

William P. Bowden, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899

JA1500

**BY FACSIMILE AND FIRST-CLASS MAIL**

Kenneth E. Wile, Esquire
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603

MORRIS, NICHOLS, ARSHT & TUNNELL

R. Judson Scaggs, Jr. (#2676)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
   Attorneys for Jaeban (U.K.) Limited

December 30, 2003
386159

- 2 -

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Case No. 02-12152 (MFW) |
| IN RE: BRAC GROUP, INC. (F/K/A BUDGET GROUP, INC., ET AL.), | ) ) ) ) | (Jointly Administered) |
| Plaintiffs, | ) ) | |
| v. | ) ) | Adversary No. A-03-54271 |
| JAEBAN (U.K.) LIMITED, | ) ) | |
| Defendant. | ) ) ) | |

### JAEBAN (U.K.) LIMITED'S RESPONSES TO
### JOINT SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure (the "Federal Rules")

and Rule 7034 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

defendant Jaeban (U.K.) Limited ("Defendant" or "Jaeban") hereby responds to the Joint Second

Request For Production of Documents To Jaeban (UK) Limited (the "Requests") as follows:

### GENERAL OBJECTIONS

The following general objections apply to and are hereby incorporated by

reference into each individual response herein, whether or not expressly incorporated in such

individual response:

1.     Jaeban objects to the Requests to the extent that they seek to obtain

information protected from disclosure by the attorney-client privilege, the attorney work product

doctrine, or any other applicable protections or privileges. Jaeban's inadvertent production of

JA1502

any privileged document or information shall not be construed as a general waiver of the privilege.

 2. Jaeban objects to the Requests to the extent that they seek information not in Jaeban's possession, custody or control on the ground that any such request exceeds the obligations imposed by the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure.

 3. Jaeban objects to the Requests to the extent that they seek to impose requirements not otherwise required by the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure or the Local Rules for the United States Bankruptcy Court for the District of Delaware.

 4. Jaeban objects to the Requests to the extent that they seek documents that are publicly available to Plaintiffs.

 5. In providing responses to these Requests, Jaeban does not waive, and expressly reserves, all objections as to competency, relevancy, materiality and admissibility thereof, as well as all objections to any other discovery request.

 6. Pursuant to the applicable provisions of the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, Jaeban reserves the right to supplement or amend these responses and assert additional objections as it completes its review and analysis in response to these Discovery Requests.

## DOCUMENT REQUESTS

### REQUEST NO. 1

All correspondence (including e-mails) and all other documents exchanged at any time between or among Jaeban, the Jaeban Receivers, or Robson Rhodes and any secured creditor of Jaeban (including, without limitation, CIF or HSBC) that refer or relate to (a) the appointment of an Administrative Receiver or Receivers; (b) the Adversary Proceeding or any claim or allegation made in the Adversary Proceeding; or (c) the financial condition of Jaeban.

- 2 -

JA1503

**RESPONSE:**

Jaeban objects to this Request on the grounds that it is overly broad, unduly

burdensome and seeks documents or information that is neither relevant to the subject matter of

this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to

these objections and the General Objections, Jaeban will produce responsive, non-privileged

documents that refer or relate to the Adversary Proceeding or any claim or allegation made in the

Adversary Proceeding.

**REQUEST NO. 2**

All other documents not produced in response to the Joint First Request for
Production of Document to Jaeban (or withheld on grounds of privilege in response to that
Request) that refer or relate to any claim or allegation made in the Adversary Proceeding
including, without limitation, all evaluations or other references to the allegations in the
Adversary Proceeding by the Jaeban Receivers or any director or officer of Jaeban.

**RESPONSE:**

Jaeban objects to this Request on the grounds that it is overly broad, unduly

burdensome and seeks documents or information that is neither relevant to the subject matter of

this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to

these objections and the General Objections, Jaeban will produce responsive, non-privileged

documents.

**REQUEST NO. 3**

All documents that refer or relate to completed or proposed sales of Jaeban assets
by the Jaeban Receivers.

**RESPONSE:**

Jaeban objects to this Request on the grounds that it is overly broad, unduly

burdensome and seeks documents or information that is neither relevant to the subject matter of

this action nor reasonably calculated to lead to the discovery of admissible evidence.

- 3 -

JA1504

MORRIS, NICHOLS, ARSHT & TUNNELL

R. Judson Scaggs, Jr. (#2676)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
   Attorneys for Jaeban (U.K.) Limited

December 30, 2003
385970

- 4 -

JA1505

## CERTIFICATE OF SERVICE

I, Thomas W. Briggs, Jr., Esquire, hereby certify that copies of the foregoing JAEBAN (U.K.) LIMITED'S RESPONSES TO JOINT SECOND REQUEST FOR PRODUCTION OF DOCUMENTS were caused to be served on December 30, 2003 upon the following counsel in the manner indicated:

### BY HAND

Edmon Morton, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391

William P. Bowden, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899

### BY FACSIMILE AND FIRST-CLASS MAIL

Kenneth E. Wile, Esquire
Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603

_____
Thomas W. Briggs, Jr.

JA1506

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:  BRAC GROUP, INC. (F/K/A | ) | Chapter 11 |
| BUDGET GROUP, INC., ET AL.), | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-12152 (MFW) |
| | ) | |
| IN RE:  BRAC GROUP, INC. (F/K/A | ) | (Jointly Administered) |
| BUDGET GROUP, INC., ET AL.), | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. A-03-54271 |
| | ) | |
| JAEBAN (U.K.) LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## STATEMENT PURSUANT TO RULE 9.4

Pursuant to Rule 9.4 of the Rules of Civil Practice and Procedure of the United

States District Court for the District of Delaware, defendant, Jaeban (U.K.) Limited hereby states

that the amount of damages claimed under Count I of Defendant's Counterclaims shall not

exceed $4.5 million.

MORRIS, NICHOLS, ARSHT & TUNNELL

R. Judson Scaggs, Jr. (#2676)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Attorneys for Jaeban (U.K.) Limited

December 30, 2003
386018

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .     Chapter 11
                                    .
BRAC GROUP, INC. (f/k/a Budget      .     Case No. 02-12151 (CGC)
Group, Inc.), et al.,               .     Jointly Administered
                                    .
          Debtors.                  .
. . . . . . . . . . . . . . . .     .

BRAC GROUP, INC. (f/k/a Budget      .
Group, Inc.), et al.,               .
                                    .
          Plaintiffs,               .
                                    .
     v.                             .     Adversary No. 03-A-54271
                                    .
JAEBAN (U.K.) LIMITED, et al.,      .
                                    .     September 21, 2004 (8 a.m.)
          Defendants.               .     (Phoenix, Arizona)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



2

1        THE COURT:  Good morning, please be seated.

2        THE CLERK:  02-12152, BRACII Group, Inc.

3        THE COURT:  All right, good morning.  I note the

4 appearances on the appearance sheet.  Are we ready to

5 proceed?

6        MR. WILE:  Good morning, Your Honor.  I think on

7 behalf of both of us, we thank you for making this time

8 available but I understand it's a somewhat disastrous

9 schedule.

10        THE COURT:  This is my 9 o'clock trial behind you

11 here.

12        MR. WILCOX:  Your Honor, we also have party counsel

13 on the telephone who may want to make appearances.

14        THE COURT:  All right.  Yes, please, I have a

15 number of names, but I don't have representation.  I have Mr.

16 Sullivan, Ms. Booth, Mr. Taylor, Mr. Morton, and Mr. Allen.

17        MR. SULLIVAN (TELEPHONIC):  Good morning, Your

18 Honor.  Thanks for the telephonic.

19        THE COURT:  All right, make sure when you speak

20 that you identify yourself and who you're representing.

21 Let's run through everybody who's on the telephone.

22        MR. MORTON (TELEPHONIC):  Certainly, Your Honor.

23 This is Ed Morton from Young Conaway on behalf of BRACII.

24        MR. ALLEN (TELEPHONIC):  This is Steve Allen on

25 behalf of Mr. Jaeban from Milton Reed in Birmingham, England.

1    MR. SULLIVAN (TELEPHONIC): Brian Sullivan, Werb &

2    Sullivan, also for Mr. Jaeban.

3    MR. TAYLOR (TELEPHONIC): Your Honor, this is

4    Philip Taylor of Sidley Austin Brown & Wood on behalf of

5    BRACII.

6    MS. BOOTH (TELEPHONIC): Your Honor, Rebecca Booth

7    of Richards, Layton & Finger on behalf of the U.K.

8    administrators.

9    THE COURT: Okay, we're ready to proceed? Let's go

10    through the agenda.

11    MR. WILCOX: Thank you, Your Honor, Robert Wilcox

12    on behalf of Ibrahiem Jaeban. First of all, Your Honor, in

13    the Court's opinion regarding the plaintiffs' motion for

14    partial reconsideration, we will be submitting an order under

15    certification of counsel I would expect later today. The

16    first matter on the agenda, Your Honor, is Mr. Jaeban's

17    motion to extend the deadlines in the current scheduling

18    order for the taking of depositions. This is a procedural

19    motion but in many senses it goes to the larger issues that

20    bring us before the Court today. In hindsight, Your Honor,

21    even aside from the discovery dispute, I would submit that

22    the deposition schedule is overly ambitious. The parties

23    plan to take between ten and twelve depositions of various

24    witnesses in England, most of whom are not under the direct

25    control of either party. Subpoenas have not been issued, and

4

1    I think both parties went into it with a cooperative

2    attitude, but there was no set schedule, and I believe that

3    ended up causes some problems.  Of course, the discovery

4    dispute did arise.  We believe that Mr. Jaeban had tried to

5    keep the depositions on course, and I suspect that the

6    plaintiffs would acknowledge that we at least made some

7    efforts in that regard.  We believe that we acted in an

8    attempt to address the concerns raised by Mr. Wile and in

9    large part that was to meet the August 23 deadline in the

10   scheduling order.  We believe that the Court should --

11        MR. WILE:  Your Honor, I hate to interrupt.  I

12   can't recall the last time I've done this, but I think Mr.

13   Wilcox is trying to get a jump on my sanctions motion.  We

14   believe what he seeks is unopposed.  The parties agreed that

15   the depositions would be put off.  I think that's all that's

16   encompassed by the motion, and I think it will be confusing

17   for the Court since we have the more all-encompassing motion,

18   and it is the next agenda item.  To jump from the current --

19        THE COURT:  All right, well, let's just back up

20   then.  What you're saying is that -- I mean, you had filed a

21   partial opposition to this.

22        MR. WILE:  Right, but my opposition was limited to

23   any more relief until the Court rendered a decision on the

24   other pending motions including our motion --

25        THE COURT:  All right, so, your position is if the

JA1512

5

1    sanctions motion is denied, then you don't oppose the

2    extension of the discovery deadlines, but you think that in

3    effect the entry of -- the granting of your sanction motions

4    would moot this particular motion.

5         MR. WILE: It might or might not. I'm in complete

6    agreement with Mr. Wilcox which is why I don't understand why

7    this is taking so long. That deposition should be postponed.

8    The parties should work cooperatively once we know the

9    landscape. The Court's ruling on sanctions might or might

10   not. There are a number of claims that are still out there,

11   and I certainly don't want to prejudge what the Court is

12   going to choose to do.

13        THE COURT: So it's your suggestion maybe that the

14   agenda is in the wrong order?

15        MR. WILE: Yes. I think the agenda will be more

16   helpful for the Court. We have raised the broadest number of

17   issues. Our motion was filed ahead of their motion to reopen

18   discovery as well, and I think beyond simply noting our

19   agreement today that BRACII has no objection to scheduling

20   the depositions at a later date depending on the Court's

21   order indeed that should be with either of the parties once

22   we have the Court's decision that's all that BRACII's

23   position is.

24        MR. WILCOX: Your Honor, there are actually three

25   motions before the Court today. I disagree that they filed

JA1513

6

1    -- They filed their motion for sanctions after we filed our

2    motion to extend the discovery deadlines.

3        THE COURT:  I understand that, but I'm just trying

4    to make sure what makes logical sense here.

5        MR. WILCOX:  Right, I understand that, Your Honor.

6    I would make two quick points:  I think there are compelling

7    reasons to grant the motion aside from whatever happens with

8    the motion for sanctions.  I don't believe under any stretch

9    of the imagination the motion for sanctions is dispositive,

10   and I would add that on the claims against Mr. Jaeban there

11   has been no discovery period whatsoever.

12       THE COURT:  Well --

13       MR. WILCOX:  As he was sued after the discovery

14   period.

15       THE COURT:  Let's do this:  I frankly think it

16   makes more sense to hear the sanctions motion as a prelude to

17   all of this against which to then decide what's the right way

18   to go with regard to these two motions having to do either

19   with extending the deadlines in the revised pretrial

20   scheduling order and the order for reopening limited

21   discovery.  I think, let's do Mr. Wile's motion first, and

22   then we'll come back to yours.

23       MR. WILCOX:  Thank you, Your Honor.

24       MR. WILE:  Thank you, Your Honor, and I'll turn to

25   Mr. Wilcox's last point in . . . (microphone not recording.)

1    MR. SULLIVAN (TELEPHONIC): Excuse me, Your Honor,

2    for interrupting. It's Brian Sullivan. We can hear

3    everybody clearly except for Mr. Wile. Ken, could I ask you

4    please to speak up.

5    MR. WILE: Sorry, Brian, is this better? Can you

6    hear me now?

7    MR. SULLIVAN (TELEPHONIC): Yes.

8    MR. WILE: Okay --

9    THE COURT: All right, just make a point of that,

10    Mr. Wile. That's a tendency I've noticed you have which is

11    to be very conversational with the Judge but not necessarily

12    with the people on the telephone. So you just have to be

13    theatrical and speak up a bit.

14    MR. WILE: I think that's the first time I've ever

15    been encouraged to do that, Your Honor, but I will take the

16    Court's direction, of course, and I also apologize in

17    advance. I want to be very careful here, and I will probably

18    be doing more reading from an argument than I otherwise

19    would. Your Honor, in addition to thanking the Court again

20    for its time, we really are sorry to be here. We went over

21    to England, expecting to tie up discovery as quickly as we

22    could, that didn't happen. We're here on our motion for

23    further sanctions, and the fundamental base of that motion is

24    of course the Court's May 25th opinion, which I'll refer to

25    as the May 25th order because it's the order and provisions

8

1   that are of concern here.  The most significant relief that

2   was afforded to BRACII in the Court's May 25th order was the

3   June 18th deadline so that we could proceed to depositions

4   with complete document discovery.  Specifically, the Court

5   ordered Mr. Jaeban by June 18th to (a) respond to the second

6   document requests and (b) respond to BRACII's concerns about

7   gaps in prior discovery.  That was to occur by June 18th.

8   And so that Mr. Jaeban would not be confused about the

9   importance of the Court's order, the Court stated, quote,

10  "Failure to meet this deadline will result in an order

11  prohibiting Mr. Jaeban from introducing into evidence or

12  using in any other way any documents not so produced.  This

13  is without prejudice to BRAC seeking other sanctions that may

14  be appropriate under the circumstances after the discovery

15  period has lapsed."  Mr. Jaeban's approach, unfortunately,

16  Your Honor, was to do as little as possible and ignore the

17  Court until the likelihood of sanctions became apparent.

18  From his response it was clear that the June 18th date was a

19  matter of little import.  He produced one Lever Arch file of

20  documents with our agreement, three days later, and in his

21  view that was all that was required, and as we probably

22  belabored in our papers, Your Honor, there have in fact been

23  multiple violations.  I'll begin briefly with the Welcome

24  House documents, all 84 boxes, Mr. Jaeban is absolutely

25  correct, not a very large percentage were significant but

1  there were significant documents and they were not produced

2  until August 11th, which obviously is six weeks or so after

3  June 18th.  With respect to the receiver's documents, his

4  reply indicates that U.S. counsel did not contact the

5  receiver until August 5th, 2004, and was able to get

6  documents produced within eight days.  We're not told if Mr.

7  Jaeban or his U.K. counsel contacted the receiver before his

8  U.S. counsel did, but there is nothing to indicate that

9  anyone did anything before June 18th, 2004, and as noted, the

10  receivers were able to produce documents for review once U.S.

11  counsel insisted in a week.  Clearly, those were documents

12  within Mr. Jaeban's control as the deed of assignment

13  provided.  In addition, the night before Mr. Jaeban's

14  deposition, he produced yet another Lever Arch file.  This

15  includes the credit pack document extolling to Jaeban U.K.'s

16  lenders into 2002, Jaeban's great relationship with BRACII

17  and extolling the BMS computer system for which Mr. Jaeban

18  refused to pay.  BRACII was willing to shrug off that bit of

19  production, both because it was only a single Lever Arch file

20  and because we in fact did our own clean-up without needing

21  an order of the Court of a comparable volume of documents.

22  But I note again that BRACII was not under a sanctions order

23  and was not engaging in a pervasive pattern of non-

24  compliance.  And then finally, and most egregiously, we come

25  to the very disturbing question of the November 2003

production, and in fact, it's not a very pleasant topic to
talk about from our point of view.  Reading -- Our concern,
rather, is that Mr. Wilcox told both me and Mr. Taylor, and
in case there's any doubt, Mr. Taylor has submitted his
affidavit as well, that there appeared to be an issue that
PricewaterhouseCoopers in England had been involved in the
November 2003 document productions, and it may -- and I
emphasize "may" -- have called those documents according to
its own notions, perhaps notions of relevance.  But,
understandably, since Mr. Wilcox obviously had not been
brought fully up to date, he wasn't terribly clear nor even
to this day are we and therein lies the beginning but
certainly not the end of the problem.  The concern that comes
from that is heightened by the documents that we still don't
have.  Somewhere we would think is a correspondence file
between Jaeban and U.K. and its lenders in 2002 and 2003 as
both BRACII and later Jaeban U.K. were spiraling towards some
kind of external control, administration or receivership as
the case may be, and we have yet to see documents discussing
that, and maybe those documents didn't exist, but under the
current circumstances, since we don't know what PWC did, we
can't know.  Similarly, for documents discussing the impact
of September 11.  Let us recall that Mr. Jaeban claims that
Jaeban U.K. nearly alone among businesses affiliated with
their -- connected with the travel industry was going to go

1   on to record profits, notwithstanding that catastrophe.  You

2   would expect to see a lot of documents, but they're not

3   there.  And of course we have what someone else has referred

4   to as the "unknown unknowns" as to where are the other

5   documents?  We still don't know.  There is the further vexing

6   problem that in fact Mr. Jaeban has not told the Court and

7   arguably we shouldn't but we were going to let him do it,

8   that he has in fact retained a computer expert, and I don't

9   know if that computer expert has anything to do with PWC or

10  is external but to go after the Jaeban U.K.'s e-mail systems.

11  Now, under other circumstances that might be admirable.

12  Under these circumstances, all it is, is further proof that

13  there is real cause for concern as to what happened in that

14  production leaving aside how this matter has come to the

15  attention of the Court.  If we turn to Mr. Jaeban's response

16  I'm afraid it makes matters worse rather than better, you

17  know, there's simply no dispute on his part that anything was

18  done with respect to either the Welcome House or the receiver

19  documents or anything else that's been belatedly produced

20  prior to June 18th.  That by itself should be disturbing.

21  What he did otherwise with the Welcome House documents was

22  dump 84 boxes on us.  We do not credit the idea that we could

23  somehow go gamboling through 84 boxes and somehow keep

24  depositions on schedule as indeed was offered, and in fact,

25  Mr. Taylor's affidavit addresses the 65 hours it took my

younger colleagues in England to do this properly. You know,
that to us is not what we were looking for in compliance.
Compliance that in fact caused my client to spend an amount
of excess of $10,000 trying to figure out where were the
responsive documents that should have been produced on June
18th as it was required to be the case. Mr. Jaeban takes the
position, Well, it really was an insignificant production.
There weren't really any non-responsive documents. That's a
guess he seems to have taken in the blind on that score, and
yes, it's true he hurried the documents to us, but that's the
kind of thing he should have known and been able to narrow
down for us by June 18th, and we've listed the categories of
responsive documents that my colleagues and I were able to
identify among the boxes. Turning to the receiver's
production, we have really a comparable response which is,
first, well, they weren't really within Mr. Jaeban's power,
and I assume that wasn't a quibbled correct term, of course.
It's control. But the fact of the matter is (a) he was able
to produce them once his U.S. counsel became heavily
involved, and I'm guessing U.S. counsel might -- it's my
speculation, had mentioned the words "likely sanctions" in
attempting to obtain cooperation. But even if he did not,
the cooperation clause couldn't be clearer and as we said in
our reply, "You can't make language change its meaning just
by calling it boiler plate." And the proof here, I think, is

JA1520

13

1    indeed in the proverbial pudding.  And as to the caliber of

2    those documents, I'm reluctant to harp any further on my two

3    favorite documents: one from Mr. Weatherall and the other two

4    Jaeban U.K.'s receivers from Mr. Jaeban, who I assume -- If

5    the Court is familiar with them, I have some concern of

6    harping too much.  One being Mr. Weatherall's rather

7    acknowledgement that Jaeban U.K. is still bound by the

8    agreements it signed with BRACII in October of 2003 and while

9    BRACII was no longer on the scene then, just -- it still

10   establishes a gratification defense because after all these

11   were contracts it signed with BRACII and they obviously

12   continued in full force to that date.  The second document

13   which will be the subject of a motion to compel which we

14   filed, but we do not yet have a briefing schedule, is Mr.

15   Jaeban's angry response to a letter from Mr. Weatherall and

16   if you read Mr. Jaeban's angry response you can see pretty

17   clearly Mr. Weatherall was telling him that his claims -- the

18   lease's claims under the IFLUA (phonetical) and the umbrella

19   agreement didn't have any merit, and Mr. Jaeban writes back

20   to explain why they do.  You know, I mean, those are

21   documents we would have liked to have had back in November

22   with respect to what was written by then and certainly by

23   June 18th with respect to both of them.  There were other

24   significant documents with respect to the financial condition

25   of Jaeban U.K. and the other categories that are listed in

14

1  our reply brief, and we would have liked to have had those by

2  June 18th before I had to get on an airplane as well, and

3  those are the kinds of documents that are routinely produced

4  when there is compliance.  With respect to the November

5  production in PWC's mysterious role, the response is in many

6  respects even worse because it really evades the issue and

7  it's not the kind of issue that I at least as an advocate

8  would feel comfortable evading.  There was quote/unquote,

9  "direction from Morris, Nichols", but we're not told what the

10  direction is.  Morris, Nichols was over in Delaware and not

11  being paid.  If you look back to the response to our first

12  motion to strike, there's a lot of talk about Wragge and PWC.

13  PWC being the consultant and looking at accountancy papers

14  and the like, but there's no mention of Morris, Nichols.  The

15  fact of the matter is not least because of various

16  relationships among counsel here, Mr. Jaeban could tell us

17  what happened.  I firmly believe that.  I also firmly believe

18  that if he had a reason why he couldn't, he would have put

19  that in his papers, and I find it very disturbing that no

20  such explanation is there, and indeed, the overall pattern

21  with the accidentally disclosed to us computer expert, again,

22  suggests someone with a trouble mind on this issue, and I

23  want to avoid harsher rhetoric but while I'm avoiding harsher

24  rhetoric, BRACII's concerns could not be deeper, because I

25  suspect we will go to trial.  If at trial there should ever

15

1  be -- with a firm belief that there are documents missing

2  that for whatever reason, regardless of whose fault or no

3  one's fault, ought to be there.  I'll simply mention what we

4  consider to be another part of the response to our motion,

5  although it's also part of their motion, which are the

6  document requests, and I know I've quoted them over and over

7  on that score, and I'll get to them in detail in a minute,

8  but it really is quite surprising.  Here's someone who has to

9  come into court and explain how he complied with a June 18

10  deadline and he is serving on his adversary requests for four

11  years' worth of decision making papers two years preceding

12  the two agreements at issue, every document that relates to

13  collection efforts by BRACII and by BTI and administration

14  and so forth.  I'll leave it to the Court to draw whatever

15  inferences the Court deems to be appropriate on that score.

16  With that as a factual prelude, the fact of the matter is

17  this kind of would merit serious sanctions even in the

18  absence of the May 25th order.  In its decision, however, in

19  the portion I quote earlier, the Court warned Mr. Jaeban in

20  the most explicit terms about that any failure to comply with

21  the June 18th deadline would in fact lead to automatic

22  sanctions.  In this case the preclusion is not the

23  appropriate sanction here not least because BRACII is

24  probably going to be the one who would want to introduce

25  these documents.  And again, it's worth noting, Mr. Jaeban

JA1523

1    does not even pretend that with respect to the three document

2    productions or the issues with the November 2003rd production

3    that there was any compliance with June 18th.  In addition,

4    and as a result of this, the premise for not holding Mr.

5    Jaeban responsible for Jaeban U.K.'s prior conduct, that is

6    prior to the assignment, has also disappeared.

7              THE COURT:  Mr. Wile, just a second.

8              MR. WILE:  Sure.

9              THE COURT:  The issue on the preclusion is that

10   would run against Mr. Jaeban.  That would not necessarily run

11   against BRACII.

12             MR. WILE:  Right, I understand, Your Honor.

13             THE COURT:  I mean if there's a document that

14   BRACII wants to use, it wouldn't be precluded from using it.

15   It's just that Mr. Jaeban couldn't use it if the preclusion

16   sanction were to be entered against him.

17             MR. WILE:  Right, I'm sorry for any confusion on

18   that score.  I certainly understand that, Your Honor, but the

19   end result is that there would be no sanction at all, and we

20   strongly believe that enough is enough, and that it's time

21   for real sanctions here.

22             THE COURT:  Well, and presumably that's what you're

23   going to argue now because as you say the May 25th order was

24   without prejudice to other sanctions.  It simply mentions

25   specifically the preclusion sanction against Mr. Jaeban if

1   their documents weren't produced.

2       MR. WILE:  That is precisely why I will.  We would

3   probably be here anyway, Your Honor, but we feel even more

4   comfortable because the Court anticipated that perhaps it

5   might see a motion like this.  Again, in considering Mr.

6   Jaeban's conduct, we think that the reasons the Court had in

7   its May 25th order for not considering Jaeban U.K.'s conduct

8   prior to the assignment has now disappeared.  Mr. Jaeban

9   promised us full cooperation and this doesn't strike us as

10  full cooperation.  In fact, if Mr. Jaeban had come in in

11  March of this year in opposing our first motion to strike and

12  said, Well, the Court orders a document discovery deadline.

13  Well, we'll produce a little bit, but we won't make the

14  effort to go find everything, and we won't level with the

15  Court and with BRACII as to problems with the prior

16  production.  I think his arguments would have had a very

17  different sound and in fact would have run hollow.  Against

18  this background, we absolutely believe that striking the

19  counterclaims is now indeed necessary and appropriate.

20  Courts routinely strike pleadings if a litigant shows

21  indifference after being warned to comply and lesser

22  sanctions have not worked, as indeed they did not work here.

23  Its failures to make the document productions according to a

24  deadline he never protested is reason enough.  His treatment

25  of the November issues, as I say, is deeply disturbing, and

1   whether or not Jaeban U.K.'s prior misconduct is also

2   considered we think that it's time to put these counterclaims

3   to an end and as a further consideration, of course, we have

4   the absence of any showing of merit on his side and the

5   additional documents that were finally produced by the

6   receiver in mid-August in Birmingham.  In the alternative,

7   the Court should eliminate the escrow.  If the Court has the

8   power to strike Mr. Jaeban's counterclaims, it has the power

9   to inflict the somewhat -- and we certainly don't want to

10  deceive anyone here, it's certainly a very severe sanction,

11  the somewhat lesser sanction of eliminating the escrow.

12  BRACII continues to believe that when Jaeban U.K. obtained

13  the 4.5 million escrow, it was obligated to move this case

14  forward in good faith, not treat the Court's deadline as a

15  matter of mild interest.  Of course, while we think that

16  striking the counterclaims is the most appropriate sanction,

17  we are very cognizant that of course it's up to the Court's

18  discretion as to what is the appropriate resolution of our

19  motion.  For the reasons stated in my motion, we believe the

20  Court should grant BRACII my travel costs in flying to

21  England when document discovery was and for all we know

22  remains incomplete.  As far as BRACII is concerned, being

23  told the depositions were ready to be scheduled was not an

24  entirely accurate representation, and it's indeed very

25  frustrating to go overseas all ready to go and somebody be

1    told first there's one supplementation the night before, and

2    then there are 84 boxes, and then the receiver has over 20

3    notebooks and, by the way, we don't really know what happened

4    back in November. It also goes without saying, I should

5    think, that Mr. Jaeban should be compelled to inform BRACII

6    within a very short period of time what exactly happened with

7    the November 2003 production including what became of his

8    documents and e-mails that were not found at Welcome House or

9    the receiver's office, and he should specify what directions

10   were in fact followed or promulgated by Wragge and Co. or

11   Morris, Nichols or anyone else, including Mr. Jaeban. Let me

12   now turn much more briefly to the motion for reopening

13   limited discovery. It's very tempting to make a quibble on

14   the title because of course if you --

15           THE COURT: I think this is his motion.

16           MR. WILE: I'm sorry? Okay. Let me proceed --

17           THE COURT: I mean, that's Mr. Wilcox's motion.

18           MR. WILE: You're a hundred percent right, and I

19   apologize to Mr. Wilcox. I do, however, have a conclusion on

20   mine, Your Honor. Our concern, Your Honor, is that any

21   sanctions short of striking Mr. Jaeban's counterclaims will

22   reward his misconduct. So long as the counterclaims are on

23   file or the escrow is intact, no lesser sanction, including

24   an award of costs, for example, will compare with the benefit

25   of keeping Mr. Jaeban's claims and/or his bargaining leverage

1    alive.  BRACII is a company administration in England.  It

2    has indeed been prejudiced by the delay that has already

3    occurred if there's going to be additional delay and we may

4    never know the full story with respect to Jaeban and the case

5    documents.  By the time that Mr. Jaeban makes full discovery

6    of the result on the missing e-mails it presumably will be

7    October, perhaps November, at the earliest.  Scheduling

8    witnesses in England in mid- or late-November of December may

9    indeed be impractical.  The problem that we have and it's

10   already cropped up, is the e-mails may well disclose

11   additional witnesses or entities in England, putting BRACII

12   again to the question of whether it's going to sacrifice its

13   rights and go forward or take the time and get disclosure

14   from witnesses that could have been and should have been

15   identified by June 18th.  We already have that problem with

16   respect to the lenders.  We've made a decision that we should

17   seek discovery from a very limited subpoena to HSBC.  Mr.

18   Jaeban has opposed that discovery notwithstanding that he

19   didn't produce the document that has occasioned it until

20   August 3rd, and that will be part of the motion that needs to

21   be briefed.  In short, the Court's order was clear.  June

22   18th was not an optional date but a date to determine if

23   harsher sanctions were required.  They are.  When the

24   communications regarding Mr. Weatherall's advice are also

25   taken into consideration, it's very difficult in BRACII's

1   view to justify continuing with the counterclaims given the

2   pattern of conduct that we've seen.  Thank you, Your Honor.

3           THE COURT:  Thank you, Mr. Wile.  Mr. Wilcox?

4           MR. WILCOX:  Thank you, Your Honor.  This has been

5   one of the more frustrating litigation experiences that we've

6   had.  From my perspective, it seems like every time we make

7   an attempt to resolve an issue, it seems to generate

8   additional motion practice, additional correspondence, and

9   additional time before the Court.  I vehemently disagree with

10  virtually everything that Mr. Wile said as we've identified

11  in our papers.  First of all, I'd like to address the -- And

12  I guess because it's personal to me, the suggestion that I

13  told Mr. Wile and Mr. Taylor that there was a problem with

14  the initial document production.  That just didn't happen,

15  Your Honor.  We did have a discussion, and I'm not sure we

16  want to parse through who said what, but I can assure -- I

17  put my affidavit in, and I guess the Court's going to have to

18  judge if the Court would like an affidavit from Mr. Allen,

19  who was also present, I think that would be appropriate.

20  With regard to the overall character here, BRACII makes it

21  sound as if Mr. Jaeban has done nothing to move the case

22  along, and that's just not accurate, Your Honor.  In

23  compliance with the June 18 deadline, Mr. Jaeban did produce

24  documents.  He -- BRACII would have the Court apparently

25  believe that the Welcome House documents were an entirely new

1    source of documents. That's not the case. That was the
2    source of the original production of documents. That review
3    was conducted by -- and it's my understanding, and I can only
4    give the Court my understanding, by Wragge and Co. PWC under
5    the direction of Morris, Nichols. So the Welcome House
6    documents are not an entirely new source. Let me just first
7    of all, what Welcome House is. I guess my mental picture of
8    it was a sort of a freestanding semi-colonial looking
9    building that had, you know, elaborate corporate offices.
10   That's not the case. We're talking about a building where
11   there is an active business, that's totally unrelated to Mr.
12   Jaeban. There's a garage associated with it and a small set
13   of offices and a storage room. It's not a situation where
14   there is some tremendously organized system that, you know,
15   Mr. Jaeban has somehow attempted to prevent the plaintiffs
16   from inspecting. The plaintiffs were invited to come to
17   Welcome House to review the documents. Mr. Jaeban -- we have
18   taken a practical approach. At the time of the June 18th
19   deadline, Mr. Jaeban had no reason to believe and was not on
20   notice of the type of concerns that BRACII has now expressed
21   with regard to the November production. Yes, there was a
22   December 12 letter, and it was in an attempt to address the
23   concerns of that December 12 letter that he produced
24   additional documents. As far as the second document request,
25   which BRACII would have you believe that somehow Mr. Jaeban

1   has withheld documents for, in fact there was a pending

2   objection to that document request that was never addressed

3   by BRACII.  BRACII has never held a discovery conference on

4   that issue.  The objections, and I believe they are before

5   the Court, the objections were that they were overbroad and

6   burdensome.  BRACII never did anything to address those

7   concerns.  For them to come back in now and say that somehow

8   Mr. Jaeban even though he spent $8,000 to have the receiver

9   produce those documents, somehow did not comply with the

10   Court's direction in the May 25th order is not correct.

11         THE COURT:  Well, what exactly happened from a

12   timing standpoint prior to June 18th?

13         MR. WILCOX:  Well, I believe Mr. Allen is on the

14   telephone, and he probably --

15         THE COURT:  The suggestion -- Mr. Wile's suggestion

16   is that there was the May 25th order that set a June 18

17   deadline and that it was well after June 18 before Mr. Jaeban

18   or his counsel kind of got geared up to even look for some of

19   the stuff.  I think, you know, that to put a gloss on it,

20   that's really what he's saying, and what's your response to

21   that?

22         MR. WILCOX:  Well, Your Honor, I believe without

23   going into attorney/client privilege issues, Wragge and Co.

24   conducted a document review in response to Mr. Jaeban's

25   request.  I believe that's what was produced in what I will

1   call the supplemental document production. With regard to

2   the receiver, the receiver took the position from the date of

3   the May 25th order up until August 25th -- August 1st, that

4   he had no responsive documents. We were not in a position --

5   Mr. Jaeban was not in a position to overrule the receiver on

6   that particular issue. Mr. Jaeban --

7         THE COURT: Presumably the receiver had the

8   contractual obligation to cooperate with Mr. Jaeban; correct?

9   Under the deed of assignment, that was part of the deal.

10        MR. WILCOX: Well, I think that's open to

11   interpretation, Your Honor. I will say as a practical

12   matter, Mr. Jaeban did not have the ability to compel the

13   receiver to produce documents.

14        THE COURT: I wasn't saying that. I wasn't saying

15   that he had the right to compel him or control him

16   necessarily, but the receiver did have a contractual

17   obligation under the deed of assignment to cooperate. The

18   receiver could not take the position without breach of

19   contract that this is none of my affair, I'm not going to

20   even bother. What you're suggesting is that the receiver's

21   position was, Sure, I'd be glad to cooperate if I had

22   something but I don't have anything.

23        MR. WILCOX: He took that position, and then he

24   also took the position that some of those documents are

25   privileged and could expose the receivers to personal

1  liability.

2        THE COURT:  So, notwithstanding the contractual

3  obligation to cooperate, the receiver nevertheless said,

4  Well, this is too close to home.  I'm not going to give you

5  the documents.

6        MR. WILCOX:  And this was addressed when we

7  traveled there in August.  I mean, we really had -- the

8  receiver really put everybody in an impossible position

9  because he took the position, first of all, that there was a

10  pending objection to the document request.  Secondly, that

11  the documents that he had were not responsive to the document

12  request, and then we said, Well, we would like you to make

13  the documents available just to assuage the plaintiffs and

14  take that issue away so we can continue with the depositions.

15  The receiver's position at that point was, We can't do that

16  without a privilege review and by the way, we have no money

17  to pay for a privilege review, and we saw this with the

18  receiver not only in connection with Mr. Jaeban, but in the

19  actual receiver's files, which I viewed relatively briefly

20  and I believe Mr. Wile also reviewed.  There was

21  correspondence in which the receiver basically said, Under

22  English law, I have no responsibility to produce documents to

23  any third party.  Now, may he have had a purely contractual

24  ability that Mr. Jaeban could enforce, you know, after filing

25  a complaint and a trial?  We're not happy with the receiver's