FILED

2004 FEB 10 AM 10: 20

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .        Chapter 11

Brac Group, Inc.,                   .

        Debtor.                     .        Bankruptcy #02-12152 (CGC)

...............................................................

Wilmington, DE
January 12, 2004
2:10 p.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE CHARLES G. CASE
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor:                     Matthew A. Clemente, Esq.
                                    Sidley Austin Brown & Wood
                                    Bank One Center
                                    10 South Dearborn Street
                                    Chicago, IL 60603

                                    Kenneth Wile, Esq.
                                    Sidley Austin Brown & Wood
                                    Bank One Center
                                    10 South Dearborn Street
                                    Chicago, IL 60603

                                    Larry Nyhan, Esq.
                                    Sidley Austin Brown & Wood
                                    Bank One Center
                                    10 South Dearborn Street
                                    Chicago, IL 60603

                                    Edmon L. Morton, Esq.
                                    Young Conaway Statgatt
                                    & Taylor, LLP
                                    The Brandywine Bldg.
                                    1000  West Street-17th Fl.
                                    Wilmington, DE 19801

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191



2

| | | |
|---|---|---|
| 1 | For The Official Committee: | William P. Bowden, Esq. |
| | of Unsecured Creditors | Ashby & Geddes |
| 2 | | 222 Delaware Ave.-17th Fl. |
| | | Wilmington, DE 19899 |
| 3 | | |
| | | Harold J. Marcus, Esq. |
| 4 | | Brown Rudnick Berlack |
| | | & Israels |
| 5 | | One Financial Center |
| | | Boston, MA 02111 |
| 6 | | |
| | For Cendant Corporation: | Anthony W. Clark, Esq. |
| 7 | | Skadden Arps Slate |
| | | Meagher & Flom, LLP |
| 8 | | One Rodney Square |
| | | Wilmington, DE 19899 |
| 9 | | |
| | For Ace USA Companies: | Linda M. Carmichael, Esq. |
| 10 | | White & Williams, LLP |
| | | 824 N. Market Street-Ste. 902 |
| 11 | | Wilmington, DE 19801 |
| 12 | For Jaeban: | Thomas Briggs, Esq. |
| | | Morris Nichols Arsht |
| 13 | | & Tunnell |
| | | 1201 N. Market st. |
| 14 | | Wilmington, DE 19899 |
| 15 | For U.K. Adminsitrators: | Mark Collins, Esq. |
| | | Richards Layton & Finger |
| 16 | | One Rodney Square |
| | | Wilmington, DE 19801 |
| 17 | | |
| | Audio Operator: | Brandon J. McCarthy |
| 18 | | |
| | Transcribing Firm: | Writer's Cramp, Inc. |
| 19 | | 6 Norton Rd. |
| | | Monmouth Jct., NJ 08852 |
| 20 | | 732-329-0191 |

21   Proceedings recorded by electronic sound recording, transcript
22   produced by transcription service.

23

24

25

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

1    THE CLERK:  All rise.  The United States Bankruptcy

2  Court for the District of Delaware is now in session, the

3  Honorable Charles G. Case presiding.

4    THE COURT:  Good afternoon.  Please be seated.

5    MR. MORTON:  Good afternoon, Your Honor.  Ed Morton

6  from Young Conaway on behalf of the Debtor's, Brac Group, Inc.,

7  et al.  We'll be going today, Your Honor, by the Amended Notice

8  of Agenda that was forwarded to your Chambers.  I'm not sure if

9  Your Honor has a copy.  If not I have an extra that I can --

10    THE COURT:  I do.

11    MR. MORTON:  Thank you, Your Honor.  As Your Honor

12  will see, the -- probably the first matter that comes

13  numerically on the docket is the Notice of Hearing to Consider

14  the Approval of the Disclosure Statement.  There is a status

15  presentation that has been prepared for Your Honor, but since

16  several of the matters in that presentation, not the least of

17  which we'll scheduling, relate also to the Jaeban Status

18  Conference that's at the end.  What I would propose to do is to

19  go through the brief uncontested matters we have to the extent

20  there even needs to be a presentation and then take up those

21  matters at the end of the hearing, if that's acceptable.

22    THE COURT:  All right.

23    MR. MORTON:  Thank you, Your Honor.  Turning to

24  matters number 10 and 11 on the agenda, these are two motions

25  to which there was no objection and a Certificate of No

4

1    Objection had been filed prior to the filing of this agenda.  I

2    certainly have forms of order with me to the extent Your Honor

3    has not already signed those motions.

4        (Pause in proceedings)

5        THE COURT:  You're so far away.

6    (Laughter)

7        THE COURT:  Every time I come I'm in a different

8    courtroom.  I've not signed them.  I'm looking -- what I have

9    here is the Order Approving the Rejection of Certain Unexpired

10   Leases --

11       MR. MORTON:  Your Honor --

12       THE COURT:  -- which is not that one.

13       MR. MORTON:  Sir, that relates to matter number 13.

14   We did file a certification late on that one merely because we

15   had given one party additional time to review the motion.  That

16   party did not object and therefore it is also uncontested.

17       THE COURT:  Well, if you have other -- hold on --

18   here's the C.N.O. -- binder.  We're talking now about Veronica

19   Nichols, correct?

20       MR. MORTON:  That's correct, Your Honor.

21       THE COURT:  Yes, I do have that.

22       (Pause in proceedings)

23       THE COURT:  Okay.

24       MR. MORTON:  Your Honor, the next matter would be our

25   365(d)(4) Extension Motion.  Again, that -- there were no

JA1600

5

1  objections filed to that motion and it should be contained in

2  the C.N.O. binder that Your Honor is holding.

3      (Pause in proceedings)

4      THE COURT: I've signed the order.

5      MR. MORTON: Thank you, Your Honor. That brings us to

6  matters 12 and 13. Again, merely because of the objection

7  deadlines related to certain Parties-in-Interest, these matters

8  were the subject of later file certifications. I believe, Your

9  Honor, as you've mentioned that you have the certification on

10 the matter of number 13.

11     (Pause in proceedings)

12     THE COURT: Yes, I do.

13     (Pause in proceedings)

14     MR. MORTON: Your Honor, matter number 12 is a matter

15 by the Committee. I'll let Mr. Bowden present that.

16     (Pause in proceedings)

17     MR. BOWDEN: Your Honor, good afternoon. For the

18 record, Bill Bowden of Ashby & Geddes for the Creditors

19 Committee. Your Honor, just an introductory matter as well,

20 with me at counsel table is Hal Marcus from the Brown Rudnick

21 Berlack Israels firm, as well. Your Honor, item 12 was the

22 Committee's Application to Supplement the Engagement of Linda

23 Burch. No objections were filed and served. Ms. Harrison on

24 behalf of the United States Trustee had asked for an extension

25 of time, which obviously we had no problem giving her, and has

6

1   not objected.  We filed a Certification of Counsel last

2   Wednesday, I believe.  I don't know if it made it into the

3   C.N.O. binder or not.  If not, Your Honor, assuming Your Honor

4   has no questions, I have a Form of Order with me.

5           THE COURT:  I did not see it in the C.N.O. binder.

6           MR. BOWDEN:  Your Honor, may I approach with the Form

7   of Order?

8           THE COURT:  Yes, please.

9           MR. BOWDEN:  Thank you.

10      (Pause in proceedings)

11          THE COURT:  I've signed the order.

12          MR. BOWDEN:  Thank you, Your Honor.

13      (Pause in proceedings)

14          MR. MORTON:  Your Honor, I believe then this would be

15  an appropriate time to circle back to the disclosure statements

16  portion of the hearing.  Mr. Nyhan of the Sidley Austin Brown &

17  Wood firm is here to present that matter.

18      (Pause in proceedings)

19          MR. NYHAN:  Good afternoon, Your Honor.

20          THE COURT:  Hello Mr. Nyhan.  Nice to see you.

21          MR. NYHAN:  Nice to see you.  It's a pleasure to be in

22  front of Your Honor again, all though I must confess that the

23  ambient climate has deteriorated significantly since the last

24  hearing I attended.

25          THE COURT:  I just assumed that you waited until the

7

1  weather was like Chicago before you came to Delaware.

2      (Laughter)

3          MR. NYHAN:  Your Honor, but for the urgence of the

4  Committee, I'd be more than happy to do that.

5      (Laughter)

6          MR. NYHAN:  Your Honor, what we'd like to do today, if

7  it's acceptable to the Court is provide a brief overview of

8  where we have been and where we are going with this case and

9  then suggest a timetable for getting to disclosure and

10 ultimately confirmation.  And then briefly address -- excuse

11 me, the objections that have been filed, how we intend to

12 address those, recognizing that we are not asking the Court to

13 rule on any objections today, but rather will request that the

14 disclosure statement hearing itself be adjourned and that it be

15 taken up in a -- in a few weeks.

16     (Pause in proceedings)

17         THE COURT:  Please proceed.

18         MR. NYHAN:  Thank you, Your Honor.  This case, Your

19 Honor, was filed on July 29th of 2002.  Shortly -- actually

20 prior to the initiation of the case, the company's -- Budget

21 Rent-A-Car had engaged investment bankers and embarked upon a

22 program to either find a source of capital in order to effect

23 an internal reorganization or alternatively to find a buyer so

24 that the assets could be monetized for the benefit of the

25 Creditors of the company.  Prior to the filing, Budget had

8

1　progressed significantly in sale negotiations with Cendant

2　Corporation in an acquisition subsidiary called Cherokee. And

3　after the Petition was filed, and after financing was put in

4　place, pursued essentially an auction based upon a stalking

5　horse bid promoted by Cendant and Cherokee. Cendant and

6　Cherokee agreed to purchase -- to acquire all of Budget's

7　operations in the United States, Canada, the Caribbean, Latin

8　America and Asia Pacific. As the deal was ultimately

9　structured, Cherokee and Cendant agreed to assume $2.8 billion

10　of Fleet debt, about $420,000,000 of Secured Pre-Petition bank

11　debt, $75,000,000 in Debtor-in-Possession financing,

12　substantially all trade claims, employee claims, tort claims --

13　there is a dispute, I don't mean to suggest that there isn't a

14　dispute is to the scope of that assumption, but in general,

15　operating liabilities of the company were assumed. In

16　addition, Cendant agreed to pay and did in fact pay

17　$110,000,000 in cash, plus an additional $40,000,000 in

18　transaction costs, that is, they agreed to help the company

19　defray approximately $40,000,000 in transaction costs. And

20　they assumed over 7,000 executory contracts. That transaction,

21　Your Honor, was approved by Judge Walrath and closed on

22　November 22 of '02. Cendant did not acquire the operations of

23　Budget, which are commonly referred to -- or were referred to

24　as E.M.E.A. or Europe, Middle East, Africa and parts of Asia.

25　Those operations continued subsequent to the closing. As part

JA1604

1  of the transaction with Cendant, a license was negotiated

2  pursuant to which the Budget Estate was entitled to continue

3  using the Budget trademark and trade name in those regions for

4  a significant period of time.  We then embarked upon a program

5  to either devise an internal reorganization for E.M.E.A. or

6  find a buyer.  Creditor pressure in Europe forced us to take

7  the step of initiating in January of 1903 -- 1903 -- 2003, in

8  administration in the High Court in London for BRAC, that's

9  Budget Rent-A-Car International.  BRAC is a U.S. corporation,

10 but was the international holding company for the Budget Group.

11 And as such, owned the stock of the various corporations that

12 carried on business throughout, in the U.K. throughout Europe,

13 throughout E.M.E.A.  Working together with the Administrator,

14 Simon Freekley and Urpul Sind, who were appointed by the High

15 Court as Administrators in the administration of BRAC and with

16 the Creditors Committee, we jointly negotiated a sale of the

17 European operations to Avis Europe.  That transaction was

18 ultimately-approved by this Court, by the Administrators.  It

19 called for the acquisition of the operating assets in Europe,

20 as well as the licensing agreement for 20 mile -- excuse me --

21 $20,000,000 cash U.S., plus the assumption of considerable

22 amount of liabilities.  That sale was approved in late February

23 of '02 -- excuse me -- '03, Your Honor.  After closing the Avis

24 Europe sale transaction, the parties focused on bringing a

25 conclusion to the case, and in particular a Plan of

JA1605

1  Reorganization.  The principal issue -- there are some

2  litigation issues, for example, there is a significant claim

3  against the Sixth company in Germany, known as the Sixth

4  Litigation.  That has been prosecuted in Germany and sustained

5  a judgment against the Sixth and we're in the appeal process at

6  this point.  But by and large the assets of the Budget Group --

7  or what was formerly known as the Budget Group, have now been

8  monetized and the principal issues preventing the filing and

9  consummation of a plan, have been the issue of allocating the

10  value that's been received in these transactions as between, on

11  the one hand, the U.S. Creditor Body, and on the other, the

12  Administrators representing the interests of the U.K.

13  Creditors.  Settling those issues prove more difficult than

14  people had originally expected.  They are complicated, for

15  example, the allocation of purchase price is in dispute, both

16  with respect to the Cendant transaction and in that respect,

17  because the -- part of the operations acquired by Cendant,

18  specifically Latin America and Australia, were owned by BRAC

19  and therefore, the value allocable to those, that portion of

20  the sale is claimed by the BRAC Estate.  Conversely, the

21  license which BRAC enjoyed for international operations was

22  owned by the U.S. Budget -- BRAC Estate and therefore, the

23  Creditors in the U.S. laid claim to some portion of the value

24  paid by Avis Europe in respect of the sale of E.M.E.A.  There

25  was also significant in our company claims between the Estates,

1  questions about how much of the post-petition financing, which

2  was supported on the backs largely of US Creditors, should have

3  been borne by the UK and the BRAC Estate, and then finally,

4  disputes over who was entitled to whatever value was realized

5  from the <u>Sixth Litigation</u>.  As Your Honor is aware, the

6  Disclosure Statement and Plan that we filed left those issues

7  unresolved with the expectation and hope that there would be a

8  resolution between the Administrator and the US Creditors

9  Committee and I'm happy to report to the Court today that as of

10  the end of last week, an agreement has in fact been reached and

11  at the conclusion of my comments, I will yield the podium to

12  Counsel for the Administrator, Mr. Collins and Counsel for the

13  Committee, Mr. Marcus to brief the Court on the salient

14  features of that settlement.  But suffice it to say that the

15  principal obstacle, at least from our perspective, of moving

16  forward with this Plan has now been resolved.  We will of

17  course, Your Honor, amend the Plan and Disclosure Statement to

18- reflect the terms of the settlement.  It is our understanding

19  that the Committee and the Administrator have agreed or that

20  the settlement should proceed to hearing with dispatch and

21  therefore, before I turn to the objections that have been

22  raised at the Disclosure Statement and put it in context for

23  the Court, what we will request at the conclusion of today's

24  hearing is that we be given a time line along the following

25  lines.  It is our expectation that a Motion to Approve the

JA1607

1   settlement will be filed on Wednesday or Thursday of this week.

2   We also fully expect that we will be in a position to file an

3   Amended Disclosure Statement with some technical amendments to

4   the Plan by July -- excuse me -- January 25th.   Those

5   amendments, we think, will in substantial part, resolve the

6   objections that are pending against the Disclosure Statement.

7   And we would request, subject obviously to the Court's

8   availability, that we be provided with a hearing in early

9   February, preferably around the 4th or 5th of February, to

10  consider both the adequacy of the disclosure and the propriety

11  of the settlement that has been negotiated involving the

12  allocation issues.   If I may, Your Honor, what I would propose

13  to briefly discuss the nature of the objections that are --

14  have been filed and how we propose to resolve them to help fill

15  in the context for the time line that I've requested.

16      (Pause in proceedings)

17          MR. NYHAN:   Your Honor, we have prepared a brief

18  summary -- that is the Debtors have prepared a brief summary

19  sheet which reflects our summary of what the different

20  objections contained and include as exhibits, all of the

21  objections as well as the Plan and Disclosure Statement.   If I

22  may approach it may be helpful to the Court?

23          THE COURT:   Thank you.

24      (Pause in proceedings)

25          MR. NYHAN:   The summary page, Your Honor, should be

1   the first page in the binder and I would propose simply to walk

2   through the principal objections in order. Your Honor will

3   note, we have divided the responses into Roman number I,

4   Objections and then on the second page Roman number II,

5   Responses. I don't intend to spend much time on the second

6   category because those are principally letters that had been

7   received. They have not been filed with the Court. We will --

8   we do propose to file all of them with the Court and we are

9   going to respond with correspondence to these individuals. The

10   vast majority of the letters really identify claims that these

11   individuals are asserting against the Estate, rather than

12   dealing with anything having to do with the objection -- excuse

13   me -- adequacy of disclosure. We intend to determine whether

14   their claims have in fact been scheduled and if not inform

15   them. But if they have been inform them of that, if they have

16   not inform them of that fact, as well as the bar date and the

17   purpose of the Disclosure Statement hearing. I would like to

18   direct my -- but each one of those letters is included in the

19   binder for the Court to review if Your Honor wishes to.

20      (Pause in proceedings)

21      MR. NYHAN: Let me turn then, if I might, to the first

22   objection, which is the objection lodged by the Commonwealth of

23   Pennsylvania and it's a fairly straightforward objection. The

24   Commonwealth asserts what we understand to be a priority tax

25   claim. Their objection challenges the failure to -- or the --

1    their interpretation of the Plan, that the penalty associated

2    with that claim will not be paid under the Plan.  Your Honor,

3    we intend to deal with that objection two ways.  First, it's

4    really a Plan objection, it's not a Disclosure Statement

5    objection.  But second, we are going to clarify the Plan to the

6    extent that they intend to assert a penalty as a non-priority

7    claim.  We are going to make it clear that any objection to the

8    allowability of that claim will be handled in the claim

9    objection process and will be -- not be foreclosed -- excuse me

10   -- by the Plan.

11          (Pause in proceedings)

12          MR. NYHAN:  The second set of objections were lodged

13   by the Insurance Company of North America.  This is an

14   insurance company who believes, we think, that they have

15   insurance policies -- extant insurance policies and have

16   questioned the treatment of their insurance policies under the

17   Plan.  They have also raised general disclosure objections.

18   We're a little bit puzzled about this particular claim, Your

19   Honor.  We have reviewed our records -- or I should say are in

20   the process of reviewing them.  We do know that this is -- we

21   did have policies for calendar years 1987 through 1992 with

22   this insurance company.  These policies were primarily for

23   workman's comp and auto liability claims-made policies.  They

24   involved upfront premiums and retrospective premiums.

25   According to our records, the last policy year expired in 1993

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-929-0191

15

1   and we paid what we understood to be a final retrospective

2   premium in 2002 and obtained a release of a letter of credit.

3   So we do not understand that this insurance company is a

4   Creditor or that we have any continuing relationship with them,

5   but we do intend to get to the bottom of this when their

6   counsel can provide us with additional information.  And if,

7   and to the extent a policy remains live, we will deal with that

8   appropriately through either the schedule of assumed contracts

9   or reflecting the fact that we are not assuming the agreement.

10  We'll simply get to the bottom of it.

11       (Pause in proceedings)

12       MR. NYHAN:  The third objection, Your Honor, is from

13  the Paella Properties Group.  Their objection is fairly

14  straightforward.  Under the Plan, the North American -- the

15  U.S. Estates are to be substantively consolidated and they

16  have, Paella has requested further disclosure concerning facts

17  that are relevant to substantive consolidation.  We do intend

18  to amend the Disclosure Statement to add additional        —

19  information, but we have also provided to counsel to Paella all

20  the information that he has requested that is in our custody

21  and we will continue to cooperate with them pending the further

22  hearing on this.  Hopefully we can resolve this objection

23  completely.

24       THE COURT:  All right.

25       MR. NYHAN:  The final objection, Your Honor, is filed

JA1611

1   by Cendant and Cherokee.  And that -- there are several

2   components of that.  The first is that the Disclosure Statement

3   fails to adequately address litigation that is pending between

4   the Estate and Cherokee.  That litigation involves a number of

5   issues, one of which is Cendant's claim or -- excuse me --

6   Cherokee's claim that they are owed roughly $3.6 million as an

7   administrative priority claim.  We agree that's an issue.  We

8   will amend our disclosure to fully disclose the fact of the

9   litigation and the issues that are involved.  They've also

10  objected that we have not discussed the litigation in so far as

11  it pertains to the dispute between the Estate and Cherokee over

12  who has responsibility for a number of personal injury claims

13  and a number of employee-related liability claims.  The

14  litigation that -- in that litigation, the Debtors maintain

15  that Cherokee assumed most of these obligations in connection

16  with their acquisition of the North American operations.

17  Cherokee in turn has denied that they've assumed them, or at

18  least assumed all of them and obviously that litigation will

19  proceed in its normal course.  The issue for disclosure, we

20  think, is to number 1, make clear to all the Creditors in the

21  Estate the fact and contours of the litigation and second to

22  make clear to those persons who may be Personal Injury

23  Claimants that there is a dispute, that what their treatment --

24  - their actual treatment at the end of the day will turn or may

25  turn on the resolution of that dispute and that to the extent

1    that Cherokee disputes the assumption of a particular personal

2    injury claim or employee liability claim, we will make it clear

3    that those Creditors will be asked to vote in the Class of

4    General Unsecured Creditors.  So, we believe that we can

5    adequately resolve these objections -- that portion of the

6    objections through improved disclosure.  The next point raised

7    by Cherokee is the suggestion that the Plan as drafted imposes

8    upon Cherokee a third-party release, that is, imposes upon

9    Cherokee a release of claims in favor of third-parties.  That

10   was not our intent and we will clarify the Plan accordingly.

11   Similarly, Cherokee has -- contends that the Plan as presently

12   drafted affects a discharge of Cherokee's claims under the

13   Asset Purchase Agreement.  Again, that was not the intent and

14   I'm sure that we can come up with language which will satisfy

15   them that that is not the effect of the Plan.  Cherokee and

16   Cendant also claim that the plan can not be confirmed because

17   they -- their administrative priority claim, 3.6 million may be

18   greater than that.  They assert that the Plan contemplates that

19   that claim will be estimated and that it can not as a matter of

20   law be estimated.  And we would propose to modify the Plan and

21   Disclosure Statement to reflect the fact that their objection

22   to an estimation is preserved, that is confirmation the Plan

23   will not preclude them from arguing that if we ever decide that

24   it is appropriate to try to estimate a claim.  Hopefully we'll

25   never get there.  And finally, Cherokee --

1        THE COURT:  What does their proposed or alleged

2  administrative priority claim arise out of?

3        MR. NYHAN:  It arises out of certain obligations under

4  the Asset Purchase Agreement, which Cherokee believes the

5  Estates should have borne and Cherokee paid those obligations.

6  So they believe that in effect it -- without getting technical

7  on the contract itself, I would liken it to -- an adjustment to

8  the purchase price.  Incidentally, Your Honor, the Debtors have

9  asserted in that litigation that Cherokee owes the Estate a

10  number slightly in excess of $2,000,000, I believe.  So that

11  litigation is fairly right, but at least in terms of the

12  identification of the issues.

13    (Pause in proceedings)

14        MR. NYHAN:  The final point raised by Cherokee is a

15  request or demand that their -- the disputed claim reserve for

16  their administrative claim be segregated separately from other

17  disputed claim reserves.  While we don't think they're entitled

18  to that, we don't have any problem providing for that.  So we

19  will amend the Plan accordingly.  Again, Your Honor, I'm not --

20  it's not my expectation that we're going to argue these or that

21  Your Honor will resolve any of these.  We do, though, believe

22  that the vast majority of the objections that have been filed

23  will be resolved by the amendments that I've suggested both to

24  the Plan and the Disclosure Statement.  With that, Your Honor,

25  I would respond to whatever questions the Court might have and

1  then subject to identifying a schedule, turn the podium over to

2  the Committee and the Administrator and to the extent Your

3  Honor would be interested in the terms of the settlement that

4  they've reached.

5       THE COURT: All right, thank you.

6    (Pause in proceedings)

7       MR. MARCUS: Good afternoon, Your Honor. Harold

8  Marcus from Brown Rudnick Berlack & Israels on behalf of the

9  Creditors Committee. We'd like to summarize, if I could,

10 somewhat general terms of the settlement that has been reached

11 between the U.K. Administrators and the U.S. Creditors

12 Committee of Budget. Basically the terms are as follows: The

13 Cendant sale proceeds will be allocated 100% to the U.S.

14 Estates. The Avis Europe sale proceeds will be allocated 100%

15 to the BRAC Estate. The first million dollars of what we refer

16 to as Jaeban cure proceeds, which return to the Estates will be

17 in fact allocated to the U.S. Estates with a balance of the

18 roughly $4.5 million cure account allocated to the BRAC Estate.

19 The Sixth Litigation proceeds that Mr. Nyhan referred to a few

20 minutes ago will be allocated as follows: The first million

21 dollars to the BRAC Estate, with the balance shared 50/50

22 between the U.S. and BRAC Estates. The U.K. Administrators,

23 however, will have sole authority to settle or resolve the

24 Sixth Litigation. In addition, certain accrued and unpaid

25 professional fees will be shared by the Estates. Roughly

1  $3,000,000 of U.S. administrative expense and priority claims

2  will be paid by the BRAC Estate.  These relate, Your Honor, to

3  the period of time subsequent to the filing of the U.S.

4  bankruptcy case of BRAC and prior to the commencement of the

5  U.K. administration case for BRAC.  And finally there is a

6  waiver of claims binding against these Estates -- mutual

7  releases that will be entered into.  So, the Creditor's

8  Committee, Your Honor, is indeed pleased that the parties have

9  reached a settlement.  We do anticipate filing as quickly as we

10  can this week, a Motion to Approve the settlement.  I might

11  add, Mr. Nyhan remarked at the very beginning of the hearing

12  that the Committee is pushing on the Debtor to keep things

13  moving.  Indeed the Committee is concerned about the cost of

14  keeping this liquidation case operating, so to speak.  There is

15  a huge cost factor.  We're very supportive of having as early a

16  disclosure -- substantive Disclosure Statement hearing and Plan

17  confirmation if possible.  I hope the Court will keep that in

18  mind as we discuss the specific dates that Mr. Nyhan has

19  proposed.  I certainly appreciate and understand the logic of

20  the proposed dates.  There is still a few items to deal with

21  before we have that substantive hearing, but nonetheless we do

22  need to move this case on.  Thank you.

23          THE COURT:  Thank you.  Anybody else?

24      (Pause in proceedings)

25          MR. CLARK:  Good afternoon, Your Honor.  Tony Clark of

JA1616

1    Skadden Arps for Cendant and Cherokee acquisition.  Just

2    briefly, I'm not going to argue, our objection has been filed.

3    I·do want to state for the record that the summary, and I

4    understand what Mr. Nyhan was giving was just a summary and not

5    a verbatim explanation of what our objection is, but the

6    summary doesn't include everything that's in our objection, but

7    I assume we'll talk about it more and deal with it further

8    before we come before Your Honor for a substantive hearing on

9    the Disclosure Statement.  So I'm just going to reserve our

10   rights.

11          THE COURT:  Thank you.

12          MR. CLARK:  Thank you, Your Honor.

13       (Pause in proceedings)

14          MS. HARRISON:  Good afternoon, Your Honor.  Margaret

15   Harrison, Office of the United States Trustee.  I had been

16   granted an extension of time to object to the Disclosure

17   Statement until the settlement had been reached and the

18   modifications had been made.  So I just wanted to preserve my

19   rights to object to the Disclosure Statement as modified.

20          THE COURT:  Thank you.

21          MR. NYHAN:  I concur with both of those, Your Honor.

22   Your Honor, I should note that in proposing the date that I

23   did, I recognize that we do have an Omnibus Hearing scheduled

24   for February 17th here and that if we depart from that -- if

25   it's possible to depart from that, it may be necessary to

1   proceed with a hearing in a different venue and if the parties

2   are all prepared to do that if that is something that works for

3   Your Honor.

4         THE COURT:  The answer is I don't know.  That's what

5   I've been typing up here while you all have been talking.  I've

6   been making some inquiries.  And frankly, what I would like to

7   understand is what difference the two weeks makes?  I had this

8   conversation with some folks in another case recently and I

9   know their answer was $15,000,000 or something like that and so

10   that had a -- made an impression on me because of the burn rate

11   of that particular debtor.  But, it is -- it is difficult to

12   schedule Delaware cases in Arizona competing with the Delaware

13   -- excuse me, with the Arizona docket, which in the last few

14   months has become more crowded than it has been in a while.

15   Perhaps, since the time that you were in Arizona on a regular

16   basis, Mr. Nyhan, when it was quite crowded.  So, I do want to

17   ask the question every time, to have counsel tell me why is it

18   -- why does the two weeks matter?  Because when I'm here I can

19   give you my full attention and not worry about the fact that

20   you may be bumping up against something else that I've already

21   scheduled or without having to make other kinds of

22   arrangements.

23         MR. NYHAN:  I appreciate that, Your Honor.  Let me

24   turn that over to the Committee, but say that two -- make two

25   comments.  First, certainly it is not our expectation that were

1  we to depart from our normal practice for purposes of this one

2  hearing, which we don't expect to be an evidentiary hearing or

3  a lengthy hearing for that matter, that we would not -- we

4  would depart only for purposes of that hearing in order to move

5  more quickly to confirmation, with every expectation that

6  confirmation would be here when Your Honor is available.

7  Second, I will say that the Committee has endeavored to move

8  this case forward.  Let me state it differently.  All parties

9  have moved -- endeavored to move the case forward.  There have

10  been many issues that people have had to grapple with in order

11  to move it across the goal line.  But the Committee has been

12  sensitive to the delay and has been consistent in their request

13  that things move forward and we will do whatever we can -- we -

14  - the Debtor, to accommodate their desire to get it there.

15          MR. MARCUS:  The specific answer, Your Honor, is that

16  the two weeks could mean, you know, as much as $600,000 or

17  $700,000 just based upon the burn rate of professional fees

18  running roughly 1-2, 1-3 a month.  Now granted some of that

19  consisted of litigation preparation and we now have a proposed

20  settlement with the U.K. Administrators.  However, there's

21  still the Cendant issues that are outstanding including

22  litigation -- potential litigation and certainly negotiations

23  and work on the Cendant matters.  It's not -- I can't tell you

24  it's $15,000,000.  On the other hand, for this Committee, with

25  -- in a case where of course there's no operating business,

1  just a pot of money that's dissipating, the two weeks strike,

2  the Committee as extremely significant.

3      THE COURT:  But on the other hand, the fact that there

4  are two more weeks doesn't mean that every professional has to

5  write down another 8.0 on their sheet everyday.  Presumably,

6  some of the professionals who are paid on a monthly basis, the

7  financial professionals -- are their financial professionals

8  who are still being paid on a monthly basis in this case?

9      MR. MARCUS:  There have been yes, Your Honor.  I --

10      THE COURT:  Are there still at this point is what I'm

11  saying?

12      MR. NYHAN:  Well not for the Debtor, Your Honor.

13      MR. MARCUS:  Jefferies of -- the financial advisor for

14  the Committee has been paid thusly, but won't be going forward.

15      THE COURT:  So, just to follow up on the analogy of

16  the other case, I mean, there was an actual 3/4 of a million

17  dollars a day operating burn rate that was creating, you know,

18  over 21 days, a $15,000,000 loss.  That was a significant

19  issue.  But, it doesn't sound like that's really happening in

20  this case.

21      MR. MARCUS:  No, this is a different situation, Your

22  Honor.  But, the fees have been -- have been significant in the

23  context -- moreover the context includes, you know, I'd say

24  months of negotiations and it's taken a long and hard road to

25  get to this point, Your Honor.  We certainly would like to do

1    everything we can to, you know, keep up the momentum and get

2    these matters resolved as quickly as we can, subject to your

3    calendar and schedule.  Thank you.

4            THE COURT:  Okay.  Right, so you do have a full

5    fledged schedule proposal, Mr. Nyhan?

6        (Pause in proceedings)

7            MR. NYHAN:  Well, Your Honor, I have one, it's a

8    question of which piece of paper I have it on.  Your Honor, we

9    were not contemplating going beyond the scheduling a hearing

10   for the approval of disclosure and approval of the settlement

11   motion that will be filed within the next couple of days.  So

12   our proposal would be to schedule a hearing during the week

13   around the 4th, 5th or 6th of February with a view towards --

14   we are told by the Committee and the Administrator that the

15   settlement motion can be filed or will be filed by Wednesday or

16   Thursday of this week.  Assuming a 20 day notice period on that

17   motion, a hearing in -- during that first week of February --

18   perhaps the second week of February would be adequate.  We will

19   be in a position to file an Amended Plan and Disclosure

20   Statement addressing the changes that I alluded to earlier by

21   the 25th of January, so parties will have ample opportunity to

22   look at that before the resumed hearing.  With respect to

23   confirmation, we would hold off on any request until we

24   conclude the hearing on the approval of the Disclosure

25   Statement.

1    THE COURT:  Well, I know that the 5th and 6th are not

2  possible.  The 4th may be possible.  I just don't know what my

3  calendar is in Arizona, that's why I've sent an e-mail to see

4  if I can find out.  The 5th I'm traveling and the 6th I'm out

5  of the state.  Then but I'm back the next week, the week of the

6  9th and then the week of the 16th is when I'm here.  I can't

7  commit to give you the 4th until I get a response --

8    MR. NYHAN:  Understood, Your Honor.

9    THE COURT:  -- and if -- I understand that the issue

10  is you'd like to do this as quickly as possible.  That is a

11  fairly aggressive schedule in the sense that -- I take it it

12  assumes that you are going to resolve all of the outstanding

13  objections, the most significant one appears to be the Cendant

14  objection.  But resolve it from the standpoint of disclosure,

15  not from the standpoint of actually resolving the underlying

16  merits.

17    MR. NYHAN:  That is correct, Your Honor.

18    THE COURT:  And then deal with whatever issues may be

19  raised by the United States Trustee once the Amended Disclosure

20  Statement is in place.  So, I wish I could give you a more

21  definitive answer than that.  If we kick over into the next

22  week, the first available time is during the week of the 9th.

23  Should we try to find it during the week of the 9th and come to

24  Arizona or should we just wait until the 16th?  My goal is to

25  be as accommodating as possible, but I must tell you then that

1  I've had a couple of weeks recently where the bulk of my time

2  in Arizona has been spent on Delaware cases and has created a

3  real serious problem in terms of actually doing my real job,

4  which is the 3,000 cases I have in Arizona.

5      (Laughter)

6      THE COURT:  And so I'm sensitive to that and any --

7  and frankly, what that means is that if something goes haywire

8  where I have something that an emergency comes up or if there

9  is a hearing that goes too long, I'll give precedence to that

10 over the Delaware cases and then meanwhile we've had a bunch of

11 counsel who've traveled who are there and if we can't fit it in

12 that day or if we have to wait until the next day, it ends up

13 not necessarily being that good.  This is not an ideal

14 situation, obviously and would be better, as much fun as I have

15 here, for Congress to create some more judgeships so that we

16 don't have to do this.  But it's the reality that we're all

17 dealing with.

18     MR. NYHAN:  Your Honor, if I may have an opportunity

19 to confer with the Committee.

20     THE COURT:  All right.

21     (Pause in proceedings)

22     MR. MARCUS:  Your Honor, we would like to shoot for

23 the 4th, if your schedule permits once you hear back from your

24 Court.  The second choice would be to have the hearing on the

25 9th if your schedule permits.  And we do believe each week is

JA1623

28

1   significant here.

2          THE COURT:  The 9th or the week of the 9th?

3          MR. MARCUS:  The week of the 9th.  As early as

4   possible in that week, Your Honor.

5          THE COURT:  Right.  Well, we will just have to get

6   back to you on that.

7          MR. MARCUS:  Okay.  Thank you.

8          THE COURT:  But I assume that will not change

9   anybody's efforts to get the amendments and the Motion to

10  Approve done.  The only problem is the question of noticing and

11  what the notice says when it goes out.

12         MR. NYHAN:  That is correct, Your Honor.

13         THE COURT:  Okay.

14         MR. NYHAN:  Your Honor, that is all we had on those

15  matters.  If I may then turn it over -- I believe there are a

16  couple other matters on the agenda.  Thank you.

17     (Pause in proceedings)

18         THE COURT:  Now, let me just -- before we leave that,

19  let me make sure I understand what we're actually looking for

20  here.  What is your expectation in terms of the needed time for

21  a hearing?

22         MR. NYHAN:  Your Honor, I would hope it would be very

23  brief, but candidly I think that we should assume that it is --

24  we should have two hours -- a minimum of two hours booked for

25  it, because if there is going to be argument, if there are

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  going to be objections, I don't think it's prudent to plan on

2  less.

3        THE COURT:  Now, is that both for the settlement and

4  the disclosure hearing?

5        MR. NYHAN:  Yes, Your Honor.  I don't expect, and I

6  look to my colleagues, but I don't expect that the settlement

7  will take long at all.  We really anticipate no objections to

8  that.

9        THE COURT:  So the real issue is going to be the --

10       MR. NYHAN:  The Disclosure Statement.

11       THE COURT:  -- the Disclosure Statement.

12       MR. NYHAN:  That's correct.

13       THE COURT:  All right.

14   (Pause in proceedings)

15       THE COURT:  Okay.

16       MR. WILE:  Good afternoon, Your Honor.  Kenneth Wile

17  on behalf of Brac and the other Debtors to address the Jaeban

18  Adversary Proceeding which we discussed on the phone, back

19  before Christmas.  And sadly, I'm here to tell you we have

20  stepped backwards rather than forwards.  Not only do we still

21  not have any dates for depositions in the U.K. and that's where

22  I believe all the depositions will take place.  And not only do

23  we not have the documents that were promised for last week, but

24  we have just received a motion which the Court may have seen in

25  which counsel for Jaeban here in Delaware, Morris Nichols firm

1  has asked to withdraw because Defendant has failed

2  substantially to fulfill its obligations. So that leaves us

3  frustrated and fighting off delay as best we can. We did have

4  a couple of conversations with U.K. counsel. At first it

5  appeared we were on the same page, that was on the day of our

6  last conference and then last Wednesday in a conference that my

7  English colleague more or less compelled from the other side

8  without discussing -- without disclosing our discussion of the

9  merits, we were furnished with a request for another 30 day

10 standstill, which we obviously declined. We were told that the

11 principals would meet over in the U.K. today. They haven't. I

12 learned just coming into the Courtroom that allegedly there was

13 going to be a meeting on Thursday. I would hope there would be

14 a meeting on Thursday, but I hope the Court will forgive the

15 little bit of skepticism on our part until that occurs. That

16 being the case, we have no choice but to move forward as

17 quickly as we possibly can. We do have a Motion for a Partial

18 Summary Judgment for a turnover order essentially ready to go

19 save only for an affidavit of U.K. law. The parties have been

20 discussing a settlement -- I'm sorry, a hearing date -- we'd

21 like to make that hearing date also the hearing date for our

22 motion. It's a very simple, straightforward motion and the

23 motion would be critical because if the Court decides the

24 motion has merit my colleagues in the U.K. and their clients

25 can go in and finally protect Brac's interest over in the U.K.

31

1  because as we speak, the receivers of Jaeban are fairly close

2  to having sold off most of their assets.  So that we plan on

3  filing no later than Friday.  And then, we're still left with

4  the outstanding discovery and we would like, at best,  an

5  ammunition or worse rather ammunition from the Court that we

6  have deposition dates and that we have the documents disclosed

7  by Friday.  Now, ordinarily that would be extraordinary since

8  Delaware counsel has moved to withdraw.  But, I think as their

9  motion reflects, all the work has been done by the U.K.  We've

10  had some difficulty getting perhaps the solicitors and perhaps

11  their clients to focus in the U.K. and I think rigorous

12  deadlines might help us resolve the case, or at the very least,

13  protect the necessary interest of the Debtor and the Estate.

14      THE COURT:  Well, a proposed date let's say of

15  February 4th, is that what you're saying?

16      MR. WILE:  That would be fine by us, Your Honor.

17      THE COURT:  For a -- for a hearing on a Motion for

18  Summary Judgment that has not yet been filed, certainly would

19  not comport in my District with local rules regarding

20  necessary time periods for motions for summary judgement.

21      MR. WILE:  I'll look to my colleagues, but I think in

22  Delaware all things are possible.

23      (Laughter)

24      THE COURT:  Frankly it does strike me that if we're

25  responding to a Motion for Summary Judgment that's being filed

JA1627

1   against an entity where local counsel is now seeking to

2   withdraw, I understand why that would be desirable from your

3   standpoint, but it seems to me perhaps a bit overreaching.

4          MR. WILE:  Well the problem we face, Your Honor, we

5   face the same, I think, even graver exigency then the other

6   aspects of the case present because assets are being sold off

7   and if we can be delayed long enough then the receivers of the

8   Defendant will have one less set of problems with which to

9   deal.  Obviously, we'd be grateful for whatever the earliest

10  date the Court considers to be appropriate.  We're well aware

11  that there needs to be a change of counsel and there will be,

12  you know, some limited amount of U.S. law issues under the Code

13  to be addressed.  Perhaps the best thing is simply for us to

14  get the motion on file and then find out what opposing counsel

15  thinks he, she or they need,  But, we really are facing some

16  distress here in protecting our rights over in the U.K.  And it

17  may well have been that our December conference call -- we were

18  -- we may have misinterpreted what we were told.  But in any

19  event we have it ready to go.  I have in fact -- my portion is

20  already drafted and we want to get it on file and perhaps it

21  would only be fair for me to have a conference -- conversation

22  with substitute counsel and then we can perhaps bring that to

23  the Court's attention --

24         THE COURT:  Do we know where the Defendant is with

25  regard to substitute counsel?

1    MR. WILE:  No, Your Honor.

2    THE COURT:  I think I'm going to find out right now.

3    (Laughter)

4    MR. WILE:  Absolutely.

5    MR. BRIGGS:  Tom Briggs of -- Tom Briggs of Morris,

6    Nichols, Arsht & Tunnell, Your Honor.  Unfortunately I don't

7    have much more to add in terms of where we are with substitute

8    counsel.  Our efforts to contact Jaeban and Jaeban receivers

9    have been largely unsuccessful over the last couple of weeks,

10   especially since we filed our motion last Wednesday.  So, I'm

11   not sure where they stand in terms of getting substitute

12   counsel.

13   THE COURT:  Well perhaps one way to deal with this is

14   not to grant your motion.  And that's a serious comment.

15   MR. BRIGGS:  I would suggest, Your Honor, we undertook

16   the representation of Jaeban last August.  Since then, our firm

17   has not been paid one single dollar.  We have sent them

18   numerous e-mails and telephone calls trying to get this issue

19   resolved.  And in fact we have not formally been retained by

20   the Jaeban receivers, which I believe is a different animal

21   than Jaeban itself.  So, I'm not sure that we even represent

22   the receivers at this point.  And we would like to withdraw

23   from representing Jaeban because it is becoming a burden,

24   especially if Budget intends to file a Motion for Summary

25   Judgment or Partial Summary Judgment or if discovery gets moved

1   forward, obviously this is going to increase the cost

2   significantly, which would increase burdens of Morris Nichols.

3           THE COURT:  Okay.  Now, refresh my recollection, I

4   don't believe there is a pending judicial procedure here.  Is

5   that correct or am I wrong about that?

6           MR. WILE:  I'm sorry, pending --

7           THE COURT:  In England, in U.K.?

8           MR. WILE:  Receivers have been appointed as such, but

9   no there's no actual law suit or adversary filed.

10          THE COURT:  These are the classic U.K. --

11          MR. WILE:  Administrative receivers under the

12  Insolvency Act, Your Honor.

13          THE COURT:  So there is no Court to Court

14  communication that could take place that might put a little

15  fear of God in the folks on the other side through a U.K. Judge

16  because it sounds like there's no UK Judge who's assigned over

17  this receivership?

18  --      MR. WILE:  Sadly no, Your Honor.

19          THE COURT:  Okay.  Anybody else wish to weigh in in

20  connection with this matter?  Tell me what your Motion for

21  Summary Judgment will look like.

22          MR. WILE:  Glad to, Your Honor.  During extensive

23  discussions -- I'm sorry, Your Honor, let me back up half a

24  step to what the claim is.  Our claim is for 3,000,000 pounds,

25  which is based entirely on what the books at Brac showed where

1   due and owing from Jaeban, which is a franchisee that covered

2   the north of England and certain parts of Scotland and there

3   are books.  In the course of the discussions, many of which

4   were settlement discussions, but in the course of those

5   discussions, counsel for Jaeban, who are still the U.K.

6   solicitors in the case, sent us a calculation.  It's not marked

7   without prejudice or anything else, and it listed at the end of

8   the day taking some fairly wild discounts, that even after

9   taking those discounts, 328,000 pounds were due and owing to

10  Brac.  At this point we'd like to come in and move for partial

11  summary judgement and a turnover order.  And that's in an

12  amount which would in turn transform Brac into a proper

13  Creditor of Jaeban and they can deal with the receivers

14  accordingly.  Their interest would then have to be considered

15  along with everyone else's.

16          THE COURT:  Is there any procedure you are aware of in

17  the U.K. for any kind of an effective prejudgment remedy being

18  asserted in the U.K. that can be used to freeze assets or

19  prevent the dissipation of assets?

20          MR. WILE:  I hesitate to commit malpractice beyond

21  mentioning the Insolvency Act, but I have colleagues who know

22  the answer to that.  I believe the answer is no because we've

23  been asking ourselves over and over as the delay has become

24  more manifest, is there anything we can do in the U.K.?  So far

25  this has been the best, but I will certainly ask my colleagues

36

1  again.

2  THE COURT:  Okay, anybody else?

3  ALL:  (No verbal response).

4  THE COURT:  When do you think you can get this filed

5  by?

6  MR. WILE:  Friday, Your Honor.

7  THE COURT:  Friday is -- let me look here, 16th?

8  THE CLERK:  The 16th.  The 16th, Your Honor.

9  THE COURT:  The 16th.

10  (Pause in proceedings)

11  THE COURT:  Okay.  I'll assume that you're going to

12  file this by Friday the 16th.  I'll set the response date for

13  two weeks later, January 30.  In the event we set the hearing

14  for the 4th, I will make a reply due noon on the 3rd.  I'll

15  require that the 30th -- well, I'll put it this way.  I'll

16  grant the Motion to Withdraw of the current counsel.  The

17  notice will be -- that will be sent out will indicate that

18  substitute Delaware counsel has to be obtained in time to file

19  the response by the 30th.  Failure to file a response by the

20  30th will be taken as consent to the entry of a motion -- of

21  the order granting the partial summary judgement.  And that a

22  response filed only by U.K. counsel will not be considered.  In

23  the event the hearing is set for the week of the 9th, we'll

24  make the reply date instead the 5th of February and will have

25  the hearing at the same time that we're currently scheduled.

JA1632

37

1    And I should say there's always the possibility that the

2    hearing will be here in Delaware during the week of the 16th

3    because I don't have current access to my Court calendar, for

4    either the 4th or the week of the 9th and I just don't know

5    whether or not there's time set aside for that -- time I can

6    set aside for it.  But that's sort of the working arrangement

7    and staff here in Delaware will be in contact with you with

8    regard to what the exact date is.

9            MR. WILE:  Your Honor --

10           THE COURT:  It does seem to be that that's number one,

11   an aggressive schedule, but number two, I'm taking --  counsels

12   vows here to me at face value that there is an emergency

13   created here by the fact that apparently there is no incentive

14   on the side of Jaeban to move this along.  And that there's no

15   adequate basis for creating an incentive under applicable U.K.

16   law.  Other than getting a judgment, which you can presumably

17   domesticate in the U.K. and if -- and then seek to enforce as a

18   judgment Creditor rather than as a Prejudgment Creditor.  So

19   based upon all of that, I've set that schedule.

20           MR. WILE:  Your Honor, if I may return to discovery

21   for just one second.  Should we proceed by a Motion to Compel

22   at this point with respect to documents and deposition dates?

23           THE COURT:  It seems to me yes that one of two things

24   will happen:  Either the documents and the depositions will

25   take place or you will be able to ask for a sanction that would

JA1633

1  render that not necessary. But you can only do that, I think,

2  get that kind of a sanction in the context of a -- of a Motion

3  to Compel as opposed to -- or in the context of disobeying an

4  Order to compel, frankly. So, you should proceed on that same

5  basis. Now I take it that what you're talking about is not

6  necessary to the Motion for Partial Summary Judgment --

7      MR. WILE:  Correct, Your Honor.

8      THE COURT:  -- because what you're relying upon,

9  basically, is their admission that they owe at least that

10  amount of money --

11      MR. WILE:  Exactly.

12      THE COURT:  -- and you're motion is going to be,

13  "Grant us judgment at least for that amount of money without

14  prejudice, the fact that we think we can prove you owe us

15  more."

16      MR. WILE:  And it will less than ten pages, Your

17  Honor.

18      THE COURT:  Okay. So I think -- they're still

19  entitled to their due process that comes from the motion

20  practicing and discovery disputes and I think that would be the

21  best way to proceed. Okay?

22      MR. WILE:  Thank you, Your Honor.

23      THE COURT:  Anything else on that?

24      MR. BRIGGS:  Your Honor, I do have here a Proposed

25  Form of Order.

1    THE COURT:  I'm not surprised.

2  (Laughter)

3  (Pause in proceedings)

4    MR. BRIGGS:  Thank you, Your Honor.

5  (Pause in proceedings)

6    THE COURT:  I just want to ask for the record, I want

7 to make sure that there is nobody else in the Courtroom

8 representing -- or on the telephone representing the interests

9 of Jaeban, other than the Morris Nichols firm, whom I've just

10 signed the order?  In other words, there's no proposed new

11 counsel who is here who has been asked by the client to be at

12 this hearing?

13    ALL:  (No verbal response).

14    THE COURT:  I'll note the non-appearance of any

15 additional counsel.

16    MR. MORTON:  I believe those were all the matters that

17 were scheduled by the Debtor's today.

18    THE COURT:  All right.  Thank you.  We'll be in touch

19 with regard to scheduling the other matter.

20    ALL:  Thank you, Your Honor.

21  (Court adjourned)

22

23

24

25

40

```
1                        CERTIFICATION
    I certify that the foregoing is a correct transcript from the
2   electronic sound recording of the proceedings in the above-
    entitled matter.
3

4   _____              1-29-04
    Signature of Transcriber                  Date
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

JA1636