UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                  .    Chapter 11

BRAC GROUP, INC. (f/k/a Budget .             Case No. 02-12152(CGC)
Group, Inc.), et al.,           .            Jointly Administered

        Debtors.               .
. . . . . . . . . . . . . . .
                               .
BRAC GROUP, INC. (f/k/a Budget .
Group, Inc.), et al.,          .

        Plaintiffs,            .

    v.                         .             Adversary No. 03-A-54271

JAEBAN (U.K.) LIMITED, et al., .
                               .             September 21, 2004 (8 a.m.)
        Defendants.            .             (Phoenix, Arizona)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

JA1637

THE COURT:  Good morning, please be seated.

THE CLERK:  02-12152, BRACII Group, Inc.

THE COURT:  All right, good morning.  I note the appearances on the appearance sheet.  Are we ready to proceed?

MR. WILE:  Good morning, Your Honor.  I think on behalf of both of us, we thank you for making this time available but I understand it's a somewhat disastrous schedule.

THE COURT:  This is my 9 o'clock trial behind you here.

MR. WILCOX:  Your Honor, we also have party counsel on the telephone who may want to make appearances.

THE COURT:  All right.  Yes, please, I have a number of names, but I don't have representation.  I have Mr. Sullivan, Ms. Booth, Mr. Taylor, Mr. Morton, and Mr. Allen.

MR. SULLIVAN (TELEPHONIC):  Good morning, Your Honor.  Thanks for the telephonic.

THE COURT:  All right, make sure when you speak that you identify yourself and who you're representing.  Let's run through everybody who's on the telephone.

MR. MORTON (TELEPHONIC):  Certainly, Your Honor.  This is Ed Morton from Young Conaway on behalf of BRACII.

MR. ALLEN (TELEPHONIC):  This is Steve Allen on

behalf of Mr. Jaeban from Milton Reed in Birmingham, England.

MR. SULLIVAN (TELEPHONIC): Brian Sullivan, Werb & Sullivan, also for Mr. Jaeban.

MR. TAYLOR (TELEPHONIC): Your Honor, this is Philip Taylor of Sidley Austin Brown & Wood on behalf of BRACII.

MS. BOOTH (TELEPHONIC): Your Honor, Rebecca Booth of Richards, Layton & Finger on behalf of the U.K. administrators.

THE COURT: Okay, we're ready to proceed? Let's go through the agenda.

MR. WILCOX: Thank you, Your Honor, Robert Wilcox on behalf of Ibrahiem Jaeban. First of all, Your Honor, in the Court's opinion regarding the plaintiffs' motion for partial reconsideration, we will be submitting an order under certification of counsel I would expect later today. The first matter on the agenda, Your Honor, is Mr. Jaeban's motion to extend the deadlines in the current scheduling order for the taking of depositions. This is a procedural motion but in many senses it goes to the larger issues that bring us before the Court today. In hindsight, Your Honor, even aside from the discovery dispute, I would submit that the deposition schedule is overly ambitious. The parties plan to take between ten and twelve depositions of various

witnesses in England, most of whom are not under the direct control of either party.  Subpoenas have not been issued, and I think both parties went into it with a cooperative attitude, but there was no set schedule, and I believe that ended up causes some problems.  Of course, the discovery dispute did arise.  We believe that Mr. Jaeban had tried to keep the depositions on course, and I suspect that the plaintiffs would acknowledge that we at least made some efforts in that regard.  We believe that we acted in an attempt to address the concerns raised by Mr. Wile and in large part that was to meet the August 23 deadline in the scheduling order.  We believe that the Court should --

MR. WILE:  Your Honor, I hate to interrupt.  I can't recall the last time I've done this, but I think Mr. Wilcox is trying to get a jump on my sanctions motion.  We believe what he seeks is unopposed.  The parties agreed that the depositions would be put off.  I think that's all that's encompassed by the motion, and I think it will be confusing for the Court since we have the more all-encompassing motion, and it is the next agenda item.  To jump from the current --

THE COURT:  All right, well, let's just back up then.  What you're saying is that -- I mean, you had filed a partial opposition to this.

MR. WILE:  Right, but my opposition was limited to

any more relief until the Court rendered a decision on the other pending motions including our motion --

THE COURT: All right, so, your position is if the sanctions motion is denied, then you don't oppose the extension of the discovery deadlines, but you think that in effect the entry of -- the granting of your sanction motions would moot this particular motion.

MR. WILE: It might or might not. I'm in complete agreement with Mr. Wilcox which is why I don't understand why this is taking so long. That deposition should be postponed. The parties should work cooperatively once we know the landscape. The Court's ruling on sanctions might or might not. There are a number of claims that are still out there, and I certainly don't want to prejudge what the Court is going to choose to do.

THE COURT: So it's your suggestion maybe that the agenda is in the wrong order?

MR. WILE: Yes. I think the agenda will be more helpful for the Court. We have raised the broadest number of issues. Our motion was filed ahead of their motion to reopen discovery as well, and I think beyond simply noting our agreement today that BRACII has no objection to scheduling the depositions at a later date depending on the Court's order indeed that should be with either of the parties once we have the Court's decision that's all that

BRACII's position is.

MR. WILCOX:  Your Honor, there are actually three motions before the Court today.  I disagree that they filed -- They filed their motion for sanctions after we filed our motion to extend the discovery deadlines.

THE COURT:  I understand that, but I'm just trying to make sure what makes logical sense here.

MR. WILCOX:  Right, I understand that, Your Honor. I would make two quick points:  I think there are compelling reasons to grant the motion aside from whatever happens with the motion for sanctions.  I don't believe under any stretch of the imagination the motion for sanctions is dispositive, and I would add that on the claims against Mr. Jaeban there has been no discovery period whatsoever.

THE COURT:  Well --

MR. WILCOX:  As he was sued after the discovery period.

THE COURT:  Let's do this:  I frankly think it makes more sense to hear the sanctions motion as a prelude to all of this against which to then decide what's the right way to go with regard to these two motions having to do either with extending the deadlines in the revised pretrial scheduling order and the order for reopening limited discovery.  I think, let's do Mr. Wile's motion first, and

then we'll come back to yours.

       MR. WILCOX:  Thank you, Your Honor.

       MR. WILE:  Thank you, Your Honor, and I'll turn to Mr. Wilcox's last point in . . . (microphone not recording.)

       MR. SULLIVAN (TELEPHONIC):  Excuse me, Your Honor, for interrupting.  It's Brian Sullivan.  We can hear everybody clearly except for Mr. Wile.  Ken, could I ask you please to speak up.

       MR. WILE:  Sorry, Brian, is this better?  Can you hear me now?

       MR. SULLIVAN (TELEPHONIC):  Yes.

       MR. WILE:  Okay --

       THE COURT:  All right, just make a point of that, Mr. Wile.  That's a tendency I've noticed you have which is to be very conversational with the Judge but not necessarily with the people on the telephone.  So you just have to be theatrical and speak up a bit.

       MR. WILE:  I think that's the first time I've ever been encouraged to do that, Your Honor, but I will take the Court's direction, of course, and I also apologize in advance.  I want to be very careful here, and I will probably be doing more reading from an argument than I otherwise would.  Your Honor, in addition to thanking the Court again for its time, we really are sorry to be here.

We went over to England, expecting to tie up discovery as quickly as we could, that didn't happen. We're here on our motion for further sanctions, and the fundamental base of that motion is of course the Court's May 25th opinion, which I'll refer to as the May 25th order because it's the order and provisions that are of concern here. The most significant relief that was afforded to BRACII in the Court's May 25th order was the June 18th deadline so that we could proceed to depositions with complete document discovery. Specifically, the Court ordered Mr. Jaeban by June 18th to (a) respond to the second document requests and (b) respond to BRACII's concerns about gaps in prior discovery. That was to occur by June 18th. And so that Mr. Jaeban would not be confused about the importance of the Court's order, the Court stated, quote, "Failure to meet this deadline will result in an order prohibiting Mr. Jaeban from introducing into evidence or using in any other way any documents not so produced. This is without prejudice to BRAC seeking other sanctions that may be appropriate under the circumstances after the discovery period has lapsed." Mr. Jaeban's approach, unfortunately, Your Honor, was to do as little as possible and ignore the Court until the likelihood of sanctions became apparent. From his response it was clear that the June 18th date was a matter of little import. He produced one Lever Arch file of documents with

our agreement, three days later, and in his view that was
all that was required, and as we probably belabored in our
papers, Your Honor, there have in fact been multiple
violations.  I'll begin briefly with the Welcome House
documents, all 84 boxes, Mr. Jaeban is absolutely correct,
not a very large percentage were significant but there were
significant documents and they were not produced until
August 11th, which obviously is six weeks or so after June
18th.  With respect to the receiver's documents, his reply
indicates that U.S. counsel did not contact the receiver
until August 5th, 2004, and was able to get documents
produced within eight days.  We're not told if Mr. Jaeban or
his U.K. counsel contacted the receiver before his U.S.
counsel did, but there is nothing to indicate that anyone
did anything before June 18th, 2004, and as noted, the
receivers were able to produce documents for review once
U.S. counsel insisted in a week.  Clearly, those were
documents within Mr. Jaeban's control as the deed of
assignment provided.  In addition, the night before Mr.
Jaeban's deposition, he produced yet another Lever Arch
file.  This includes the credit pack document extolling to
Jaeban U.K.'s lenders into 2002, Jaeban's great relationship
with BRACII and extolling the BMS computer system for which
Mr. Jaeban refused to pay.  BRACII was willing to shrug off
that bit of production, both because it was only a single

Lever Arch file and because we in fact did our own clean-up
without needing an order of the Court of a comparable volume
of documents.  But I note again that BRACII was not under a
sanctions order and was not engaging in a pervasive pattern
of non-compliance.  And then finally, and most egregiously,
we come to the very disturbing question of the November 2003
production, and in fact, it's not a very pleasant topic to
talk about from our point of view.  Reading -- Our concern,
rather, is that Mr. Wilcox told both me and Mr. Taylor, and
in case there's any doubt, Mr. Taylor has submitted his
affidavit as well, that there appeared to be an issue that
PricewaterhouseCoopers in England had been involved in the
November 2003 document productions, and it may -- and I
emphasize "may" -- have called those documents according to
its own notions, perhaps notions of relevance.  But,
understandably, since Mr. Wilcox obviously had not been
brought fully up to date, he wasn't terribly clear nor even
to this day are we and therein lies the beginning but
certainly not the end of the problem.  The concern that
comes from that is heightened by the documents that we still
don't have.  Somewhere we would think is a correspondence
file between Jaeban and U.K. and its lenders in 2002 and
2003 as both BRACII and later Jaeban U.K. were spiraling
towards some kind of external control, administration or
receivership as the case may be, and we have yet to see

documents discussing that, and maybe those documents didn't exist, but under the current circumstances, since we don't know what PWC did, we can't know. Similarly, for documents discussing the impact of September 11. Let us recall that Mr. Jaeban claims that Jaeban U.K. nearly alone among businesses affiliated with their -- connected with the travel industry was going to go on to record profits, notwithstanding that catastrophe. You would expect to see a lot of documents, but they're not there. And of course we have what someone else has referred to as the "unknown unknowns" as to where are the other documents? We still don't know. There is the further vexing problem that in fact Mr. Jaeban has not told the Court and arguably we shouldn't but we were going to let him do it, that he has in fact retained a computer expert, and I don't know if that computer expert has anything to do with PWC or is external but to go after the Jaeban U.K.'s e-mail systems. Now, under other circumstances that might be admirable. Under these circumstances, all it is, is further proof that there is real cause for concern as to what happened in that production leaving aside how this matter has come to the attention of the Court. If we turn to Mr. Jaeban's response I'm afraid it makes matters worse rather than better, you know, there's simply no dispute on his part that anything was done with respect to either the Welcome House or the

receiver documents or anything else that's been belatedly
produced prior to June 18th. That by itself should be
disturbing. What he did otherwise with the Welcome House
documents was dump 84 boxes on us. We do not credit the
idea that we could somehow go gambling through 84 boxes and
somehow keep depositions on schedule as indeed was offered,
and in fact, Mr. Taylor's affidavit addresses the 65 hours
it took my younger colleagues in England to do this
properly. You know, that to us is not what we were looking
for in compliance. Compliance that in fact caused my client
to spend an amount of excess of $10,000 trying to figure out
where were the responsive documents that should have been
produced on June 18th as it was required to be the case.
Mr. Jaeban takes the position, Well, it really was an
insignificant production. There weren't really any non-
responsive documents. That's a guess he seems to have taken
in the blind on that score, and yes, it's true he hurried
the documents to us, but that's the kind of thing he should
have known and been able to narrow down for us by June 18th,
and we've listed the categories of responsive documents that
my colleagues and I were able to identify among the boxes.
Turning to the receiver's production, we have really a
comparable response which is, first, well, they weren't
really within Mr. Jaeban's power, and I assume that wasn't a
quibbled correct term, of course. It's control. But the

fact of the matter is (a) he was able to produce them once
his U.S. counsel became heavily involved, and I'm guessing
U.S. counsel might -- it's my speculation, had mentioned the
words "likely sanctions" in attempting to obtain
cooperation.  But even if he did not, the cooperation clause
couldn't be clearer and as we said in our reply, "You can't
make language change its meaning just by calling it boiler
plate."  And the proof here, I think, is indeed in the
proverbial pudding.  And as to the caliber of those
documents, I'm reluctant to harp any further on my two
favorite documents: one from Mr. Weatherall and the other
two Jaeban U.K.'s receivers from Mr. Jaeban, who I assume --
If the Court is familiar with them, I have some concern of
harping too much.  One being Mr. Weatherall's rather
acknowledgement that Jaeban U.K. is still bound by the
agreements it signed with BRACII in October of 2003 and
while BRACII was no longer on the scene then, just -- it
still establishes a gratification defense because after all
these were contracts it signed with BRACII and they
obviously continued in full force to that date.  The second
document which will be the subject of a motion to compel
which we filed, but we do not yet have a briefing schedule,
is Mr. Jaeban's angry response to a letter from Mr.
Weatherall and if you read Mr. Jaeban's angry response you
can see pretty clearly Mr. Weatherall was telling him that

his claims -- the lease's claims under the IFLUA

(phonetical) and the umbrella agreement didn't have any

merit, and Mr. Jaeban writes back to explain why they do.

You know, I mean, those are documents we would have liked to

have had back in November with respect to what was written

by then and certainly by June 18th with respect to both of

them.  There were other significant documents with respect

to the financial condition of Jaeban U.K. and the other

categories that are listed in our reply brief, and we would

have liked to have had those by June 18th before I had to

get on an airplane as well, and those are the kinds of

documents that are routinely produced when there is

compliance.  With respect to the November production in

PWC's mysterious role, the response is in many respects even

worse because it really evades the issue and it's not the

kind of issue that I at least as an advocate would feel

comfortable evading.  There was quote/unquote, "direction

from Morris, Nichols", but we're not told what the

direction is.  Morris, Nichols was over in Delaware and not

being paid.  If you look back to the response to our first

motion to strike, there's a lot of talk about Wragge and

PWC.  PWC being the consultant and looking at accountancy

papers and the like, but there's no mention of Morris,

Nichols.  The fact of the matter is not least because of

various relationships among counsel here, Mr. Jaeban could

tell us what happened.  I firmly believe that.  I also firmly believe that if he had a reason why he couldn't, he would have put that in his papers, and I find it very disturbing that no such explanation is there, and indeed, the overall pattern with the accidentally disclosed to us computer expert, again, suggests someone with a trouble mind on this issue, and I want to avoid harsher rhetoric but while I'm avoiding harsher rhetoric, BRACII's concerns could not be deeper, because I suspect we will go to trial.  If at trial there should ever be -- with a firm belief that there are documents missing that for whatever reason, regardless of whose fault or no one's fault, ought to be there.  I'll simply mention what we consider to be another part of the response to our motion, although it's also part of their motion, which are the document requests, and I know I've quoted them over and over on that score, and I'll get to them in detail in a minute, but it really is quite surprising.  Here's someone who has to come into court and explain how he complied with a June 18 deadline and he is serving on his adversary requests for four years' worth of decision making papers two years preceding the two agreements at issue, every document that relates to collection efforts by BRACII and by BTI and administration and so forth.  I'll leave it to the Court to draw whatever inferences the Court deems to be appropriate on that score.

With that as a factual prelude, the fact of the matter is this kind of would merit serious sanctions even in the absence of the May 25th order.  In its decision, however, in the portion I quote earlier, the Court warned Mr. Jaeban in the most explicit terms about that any failure to comply with the June 18th deadline would in fact lead to automatic sanctions.  In this case the preclusion is not the appropriate sanction here not least because BRACII is probably going to be the one who would want to introduce these documents.  And again, it's worth noting, Mr. Jaeban does not even pretend that with respect to the three document productions or the issues with the November 2003rd production that there was any compliance with June 18th.  In addition, and as a result of this, the premise for not holding Mr. Jaeban responsible for Jaeban U.K.'s prior conduct, that is prior to the assignment, has also disappeared.

   THE COURT:  Mr. Wile, just a second.

   MR. WILE:  Sure.

   THE COURT:  The issue on the preclusion is that would run against Mr. Jaeban.  That would not necessarily run against BRACII.

   MR. WILE:  Right, I understand, Your Honor.

   THE COURT:  I mean if there's a document that BRACII wants to use, it wouldn't be precluded from using it.

JA1652

It's just that Mr. Jaeban couldn't use it if the preclusion sanction were to be entered against him.

MR. WILE:  Right, I'm sorry for any confusion on that score.  I certainly understand that, Your Honor, but the end result is that there would be no sanction at all, and we strongly believe that enough is enough, and that it's time for real sanctions here.

THE COURT:  Well, and presumably that's what you're going to argue now because as you say the May 25th order was without prejudice to other sanctions.  It simply mentions specifically the preclusion sanction against Mr. Jaeban if their documents weren't produced.

MR. WILE:  That is precisely why I will.  We would probably be here anyway, Your Honor, but we feel even more comfortable because the Court anticipated that perhaps it might see a motion like this.  Again, in considering Mr. Jaeban's conduct, we think that the reasons the Court had in its May 25th order for not considering Jaeban U.K.'s conduct prior to the assignment has now disappeared.  Mr. Jaeban promised us full cooperation and this doesn't strike us as full cooperation.  In fact, if Mr. Jaeban had come in in March of this year in opposing our first motion to strike and said, Well, the Court orders a document discovery deadline.  Well, we'll produce a little bit, but we won't make the effort to go find everything, and we won't level

with the Court and with BRACII as to problems with the prior
production.  I think his arguments would have had a very
different sound and in fact would have run hollow.  Against
this background, we absolutely believe that striking the
counterclaims is now indeed necessary and appropriate.
Courts routinely strike pleadings if a litigant shows
indifference after being warned to comply and lesser
sanctions have not worked, as indeed they did not work here.
Its failures to make the document productions according to
a deadline he never protested is reason enough.  His
treatment of the November issues, as I say, is deeply
disturbing, and whether or not Jaeban U.K.'s prior
misconduct is also considered we think that it's time to put
these counterclaims to an end and as a further
consideration, of course, we have the absence of any showing
of merit on his side and the additional documents that were
finally produced by the receiver in mid-August in
Birmingham.  In the alternative, the Court should eliminate
the escrow.  If the Court has the power to strike Mr.
Jaeban's counterclaims, it has the power to inflict the
somewhat -- and we certainly don't want to deceive anyone
here, it's certainly a very severe sanction, the somewhat
lesser sanction of eliminating the escrow.  BRACII continues
to believe that when Jaeban U.K. obtained the 4.5 million
escrow, it was obligated to move this case forward in good

faith, not treat the Court's deadline as a matter of mild
interest.  Of course, while we think that striking the
counterclaims is the most appropriate sanction, we are very
cognizant that of course it's up to the Court's discretion
as to what is the appropriate resolution of our motion.  For
the reasons stated in my motion, we believe the Court should
grant BRACII my travel costs in flying to England when
document discovery was and for all we know remains
incomplete.  As far as BRACII is concerned, being told the
depositions were ready to be scheduled was not an entirely
accurate representation, and it's indeed very frustrating to
go overseas all ready to go and somebody be told first
there's one supplementation the night before, and then there
are 84 boxes, and then the receiver has over 20 notebooks
and, by the way, we don't really know what happened back in
November.  It also goes without saying, I should think, that
Mr. Jaeban should be compelled to inform BRACII within a
very short period of time what exactly happened with the
November 2003 production including what became of his
documents and e-mails that were not found at Welcome House
or the receiver's office, and he should specify what
directions were in fact followed or promulgated by Wragge
and Co. or Morris, Nichols or anyone else, including Mr.
Jaeban.  Let me now turn much more briefly to the motion for
reopening limited discovery.  It's very tempting to make a

quibble on the title because of course if you --

      THE COURT:  I think this is his motion.

      MR. WILE:  I'm sorry?  Okay.  Let me proceed --

      THE COURT:  I mean, that's Mr. Wilcox's motion.

      MR. WILE:  You're a hundred percent right, and I
apologize to Mr. Wilcox.  I do, however, have a conclusion
on mine, Your Honor.  Our concern, Your Honor, is that any
sanctions short of striking Mr. Jaeban's counterclaims will
reward his misconduct.  So long as the counterclaims are on
file or the escrow is intact, no lesser sanction, including
an award of costs, for example, will compare with the
benefit of keeping Mr. Jaeban's claims and/or his bargaining
leverage alive.  BRACII is a company administration in
England.  It has indeed been prejudiced by the delay that
has already occurred if there's going to be additional delay
and we may never know the full story with respect to Jaeban
and the case documents.  By the time that Mr. Jaeban makes
full discovery of the result on the missing e-mails it
presumably will be October, perhaps November, at the
earliest.  Scheduling witnesses in England in mid- or late-
November of December may indeed be impractical.  The problem
that we have and it's already cropped up, is the e-mails may
well disclose additional witnesses or entities in England,
putting BRACII again to the question of whether it's going
to sacrifice its rights and go forward or take the time and

get disclosure from witnesses that could have been and should have been identified by June 18th. We already have that problem with respect to the lenders. We've made a decision that we should seek discovery from a very limited subpoena to HSBC. Mr. Jaeban has opposed that discovery notwithstanding that he didn't produce the document that has occasioned it until August 3rd, and that will be part of the motion that needs to be briefed. In short, the Court's order was clear. June 18th was not an optional date but a date to determine if harsher sanctions were required. They are. When the communications regarding Mr. Weatherall's advice are also taken into consideration, it's very difficult in BRACII's view to justify continuing with the counterclaims given the pattern of conduct that we've seen. Thank you, Your Honor.

THE COURT: Thank you, Mr. Wile. Mr. Wilcox?

MR. WILCOX: Thank you, Your Honor. This has been one of the more frustrating litigation experiences that we've had. From my perspective, it seems like every time we make an attempt to resolve an issue, it seems to generate additional motion practice, additional correspondence, and additional time before the Court. I vehemently disagree with virtually everything that Mr. Wile said as we've identified in our papers. First of all, I'd like to address the -- And I guess because it's personal to me, the

suggestion that I told Mr. Wile and Mr. Taylor that there
was a problem with the initial document production. That
just didn't happen, Your Honor. We did have a discussion,
and I'm not sure we want to parse through who said what, but
I can assure -- I put my affidavit in, and I guess the
Court's going to have to judge if the Court would like an
affidavit from Mr. Allen, who was also present, I think that
would be appropriate. With regard to the overall character
here, BRACII makes it sound as if Mr. Jaeban has done
nothing to move the case along, and that's just not
accurate, Your Honor. In compliance with the June 18
deadline, Mr. Jaeban did produce documents. He -- BRACII
would have the Court apparently believe that the Welcome
House documents were an entirely new source of documents.
That's not the case. That was the source of the original
production of documents. That review was conducted by --
and it's my understanding, and I can only give the Court my
understanding, by Wragge and Co. PWC under the direction of
Morris, Nichols. So the Welcome House documents are not an
entirely new source. Let me just first of all, what Welcome
House is. I guess my mental picture of it was a sort of a
freestanding semi-colonial looking building that had, you
know, elaborate corporate offices. That's not the case.
We're talking about a building where there is an active
business, that's totally unrelated to Mr. Jaeban. There's a

garage associated with it and a small set of offices and a
storage room.  It's not a situation where there is some
tremendously organized system that, you know, Mr. Jaeban has
somehow attempted to prevent the plaintiffs from inspecting.

 The plaintiffs were invited to come to Welcome House to
review the documents.  Mr. Jaeban -- we have taken a
practical approach.  At the time of the June 18th deadline,
Mr. Jaeban had no reason to believe and was not on notice of
the type of concerns that BRACII has now expressed with
regard to the November production.  Yes, there was a
December 12 letter, and it was in an attempt to address the
concerns of that December 12 letter that he produced
additional documents.  As far as the second document
request, which BRACII would have you believe that somehow
Mr. Jaeban has withheld documents for, in fact there was a
pending objection to that document request that was never
addressed by BRACII.  BRACII has never held a discovery
conference on that issue.  The objections, and I believe
they are before the Court, the objections were that they
were overbroad and burdensome.  BRACII never did anything to
address those concerns.  For them to come back in now and
say that somehow Mr. Jaeban even though he spent $8,000 to
have the receiver produce those documents, somehow did not
comply with the Court's direction in the May 25th order is
not correct.

THE COURT:  Well, what exactly happened from a timing standpoint prior to June 18th?

MR. WILCOX:  Well, I believe Mr. Allen is on the telephone, and he probably --

THE COURT:  The suggestion -- Mr. Wile's suggestion is that there was the May 25th order that set a June 18 deadline and that it was well after June 18 before Mr. Jaeban or his counsel kind of got geared up to even look for some of the stuff.  I think, you know, that to put a gloss on it, that's really what he's saying, and what's your response to that?

MR. WILCOX:  Well, Your Honor, I believe without going into attorney/client privilege issues, Wragge and Co. conducted a document review in response to Mr. Jaeban's request.  I believe that's what was produced in what I will call the supplemental document production.  With regard to the receiver, the receiver took the position from the date of the May 25th order up until August 25th -- August 1st, that he had no responsive documents.  We were not in a position -- Mr. Jaeban was not in a position to overrule the receiver on that particular issue.  Mr. Jaeban --

THE COURT:  Presumably the receiver had the contractual obligation to cooperate with Mr. Jaeban; correct?

Under the deed of assignment, that was part of the deal.

MR. WILCOX:  Well, I think that's open to
interpretation, Your Honor.  I will say as a practical
matter, Mr. Jaeban did not have the ability to compel the
receiver to produce documents.

THE COURT:  I wasn't saying that.  I wasn't saying
that he had the right to compel him or control him
necessarily, but the receiver did have a contractual
obligation under the deed of assignment to cooperate.  The
receiver could not take the position without breach of
contract that this is none of my affair, I'm not going to
even bother.  What you're suggesting is that the receiver's
position was, Sure, I'd be glad to cooperate if I had
something but I don't have anything.

MR. WILCOX:  He took that position, and then he
also took the position that some of those documents are
privileged and could expose the receivers to personal
liability.

THE COURT:  So, notwithstanding the contractual
obligation to cooperate, the receiver nevertheless said,
Well, this is too close to home.  I'm not going to give you
the documents.

MR. WILCOX:  And this was addressed when we
traveled there in August.  I mean, we really had -- the
receiver really put everybody in an impossible position
because he took the position, first of all, that there was a

pending objection to the document request.  Secondly, that the documents that he had were not responsive to the document request, and then we said, Well, we would like you to make the documents available just to assuage the plaintiffs and take that issue away so we can continue with the depositions.  The receiver's position at that point was, We can't do that without a privilege review and by the way, we have no money to pay for a privilege review, and we saw this with the receiver not only in connection with Mr. Jaeban, but in the actual receiver's files, which I viewed relatively briefly and I believe Mr. Wile also reviewed. There was correspondence in which the receiver basically said, Under English law, I have no responsibility to produce documents to any third party.  Now, may he have had a purely contractual ability that Mr. Jaeban could enforce, you know, after filing a complaint and a trial?  We're not happy with the receiver's position because my client, Mr. Jaeban, continues to be prejudiced by the receiver's actions in this case.  There is absolutely no doubt about that, and much of what we're trying to do with regard to discovery and otherwise is an attempt to take away that prejudice.  To the extent that there was prejudice to BRACII, we tried to take away that prejudice, Your Honor.  We think that the course that the --

        THE COURT:  Well, is there anybody -- We have

somebody for the estate administrator, that's the BRACII

estate administrator.

        MR. WILCOX:  That's right.

        THE COURT:  We don't have anybody for the receivers

on the phone here.

        MR. WILCOX:  That's right.

        THE COURT:  I guess I don't quite understand how

the receivers can in effect sell this cause of action

through this deed of assignment to Mr. Jaeban, get paid for

it, and have as part of the consideration or part of the

agreement, this contractual obligation to cooperate and then

simply say, Well, sorry, we're not going to do it.

        MR. WILCOX:  Well, let me go back, Your Honor.

First of all he took the position there was a pending

objection to the discovery requests, and it had never been

addressed.  Secondly, he took the position --

        THE COURT:  Hadn't taken an objection by whom?

Where?

        MR. WILCOX:  By the receiver filed by Morris,

Nichols, as one of their relatively -- near the end of their

tenure of the case.  So, if we --

        THE COURT:  Notwithstanding the order that I had

subsequently issued that said, produce the documents.

        MR. WILCOX:  Well, that -- It's not clear to me,

Your Honor, whether you were essentially overruling the

objections that had never been -- that had never been

addressed between counsel.  Mr. Jaeban requested that the

receiver produce documents and conduct a review, the

receiver's response was, I have conducted review.  My

documents are not responsive to the request.  Okay?  Did Mr.

Jaeban potentially have a contractual cause of action that

he could have sued the receiver?  He might, he might have,

and he may have that today.  But that doesn't change the

question of Mr. Jaeban's good faith because as a practical

matter, and I can tell you this from personal experience,

the receiver was incredibly difficult to deal with.

THE COURT:  Well, I have not committed to memory

all of the papers that are in front of me, so, remind me

again the timing of what was done by Mr. Jaeban viz-a-viz

the receiver to get the receiver to produce these documents

prior to the June 18 deadline?

MR. WILCOX:  Perhaps Mr. Allen could address this

in more complete detail.  My understanding is, and I have

been told this, is that Mr. Jaeban went --

THE COURT:  Why don't we do this?  Why don't I ask

Mr. Allen.  Are you there, Mr. Allen?

MR. ALLEN (TELEPHONIC):  I am, Your Honor.

THE COURT:  Is this a matter as to which --

MR. ALLEN (TELEPHONIC):  Mr. Jaeban was . . .

(microphone not recording) --

THE COURT:  Mr. Allen, Mr. Allen, we're having a very difficult time understanding you.  I think you're partially breaking up so like half of a word is missing. Are you on a speaker phone?

MR. ALLEN (TELEPHONIC):  I'm not on a speaker phone, Your Honor . . . (microphone not recording).

THE COURT:  All right.  Sounds a little better. I'm sorry, will you start again, because none of us here were able to understand what you were saying.

MR. ALLEN (TELEPHONIC):  Your Honor, the position was that Mr. Jaeban as asking the receiver's representative within Wragge and Co., John Whitborough (phonetical) who was the representative of the receiver, to advise whether or not any documents within the receiver's papers were responsive documents to the joint second request.  At that stage, certainly, Your Honor, it was not the impression given that we just may have given a wrong impression, but, Your Honor, we were not under the impression certainly either as representatives of Mr. Jaeban, and certainly the receiver was not aware that the order of the 25th of May overruled Jaeban U.K.'s objection at that stage for the disclosure of the receiver's papers.  The receiver, therefore, was saying that they only had an obligation to cooperate insofar as they had any documents pertaining to the responses by Morris, Nichols, which effectively said that no documents

would be produced unless they were non-privileged documents
that referred or related to the adversary proceedings or an
issue in the adversary proceedings.  Your Honor, the
position taken by Wragge and Co. was that there were no
responsive documents, and, Your Honor, that is still the
position taken by them, and indeed, it is contested as far
as the receiver is concerned and there is no representative
from the receiver here, but it's certainly my knowledge from
my discussions with them and indeed Mr. Jaeban contests that
the documents that Mr. Wile says are responsive documents
are not responsive documents because they do not relate to
the adversary proceedings.  The documents that he has
produce relate to an entirely different matter as I
understand Mr. Sullivan has dealt with and Mr. Wilcox has
dealt with in their response.  Those documents relate to an
inquiry by the receiver as to whether or not Mr. Jaeban
should he want to be allowed to set up an independent
company which might possibly compete with Zodiac, not
BRACII.  We're talking here about Zodiac.  After the
assignment of the IPLA agreements and  agreements to Zodiac.
 So, Mr. Jaeban was asking for whether or not there were any
documents that would comply with the responses that were
being put in by Jaeban U.K. Limited, and he was told there
were not and therefore, there was no obligation to comply
with any terms of the agreement.  Your Honor --

THE COURT:  Let me ask you this question -- Mr.
Allen -- Mr. Allen, let me ask you this question:  To what
extent was this issue having to do with the pendency of the
objection to the document request brought to the attention
of BRACII's counsel prior to the June 18 deadline?

MR. ALLEN (TELEPHONIC):  Your Honor, I can't hear
the question.  I'm sorry.

THE COURT:  Well, here's what I'm concerned about.
I set a June 18 deadline in my May 25 order.  I must tell
you I did not address or think about the --

MR. ALLEN (TELEPHONIC):  Your Honor, the line is
terribly bad.  I can't actually hear . . . (microphone not
recording).

THE COURT:  Well, let me try again.  Is that
better?

MR. ALLEN (TELEPHONIC):  No.

THE COURT:  Well, I will say it then for other
counsel and maybe somebody else can answer my question.
When I set the June 18th deadline in my May 25 order for the
production by Mr. Jaeban as in effect a sanction being
imposed at the request or based upon the motion to strike
that had been filed by BRACII, I did not consider that there
may be outstanding objections.  I don't recall that the
papers at that time made that point.  If they did, I didn't
consider it.  I can just tell you that honestly.  So, I

didn't build into my order any mechanism for resolving any
pending objections that may have been put on the table by
Morris, Nichols before it withdrew.  Now, having said that,
the question is, to what extent was that issue brought to
the attention of BRACII's counsel prior to the time of the
expiration of the June 18 deadline?  I would think that if
I'm Mr. Jaeban's counsel and I'm not getting documents from
the receiver because the receiver is not willing to produce
them because of these pending objections that have not yet
been ruled on by the Court, then I'm going to make that
known to BRACII before I find myself up against the June 18
deadline or I would think I'm going to file an emergency
motion with the Court saying I need to have that date
extended because we're trying to get the documents from the
receiver, but the receiver's not cooperating because of
these unresolved objections.  Now, did any of that happen?
Let me ask Mr. Wilcox --

        MR. ALLEN (TELEPHONIC):  Well, Your Honor, no,
because Mr. Jaeban was told by the receiver's
representatives that there were no responsive documents.

        THE COURT:  Well, let me ask this question.
Perhaps I'll ask Mr. Wilcox.  Number one, can you answer my
question, Mr. Wilcox, and number two, at what point prior to
June 18 did Mr. Jaeban's counsel advise BRACII's counsel
that the receiver said there were no responsive documents or

that it would not produce documents until such time as the objection was resolved?

MR. WILCOX: I'm not aware of any discussions in that regard, as a matter of candor with the Court.

THE COURT: And doesn't that just make the situation worse? Doesn't that foster this environment in which we find ourselves now arguing over who has complied and who hasn't complied when there was, I think everybody would agree, a firm deadline that was set in the May 25th order by me. And the reason I set the deadline was as an optional kind of relief that I thought was consistent with what Mr. Jaeban was asking for, which was, give us some more time here to produce these documents. I'm now in the driver's seat. I've taken over. I have the deed of assignment. I can do these things. I have a contractual obligation or contractual arrangement with the receiver where they will produce the documents. So then nothing happens, and then there's radio silence up until June 18th and now surprisingly, BRACII is unhappy.

MR. SULLIVAN (TELEPHONIC): Let me -- This is Brian Sullivan, Your Honor. Let me just try to aid the Court in whatever way I can. I was communicating with both Wragge and Company and Ken Wile with regard to the supplemental document production and trying to communicate what we were expecting and when we were expecting it, and there was a

fair amount of communication between Ken Wile and myself,

and I believe to the best of my recollection, Judge and Ken,

that I was informing Mr. Wile that the receiver would not

produce documents.  I don't believe that anybody at that

point, Your Honor, was focused on the objection as much as

number one, the receiver taking the position that he would

not produce them, and I hope I'm correct, Ken, but I think

we all knew that as both the June 18th date approached and

also the date for the depositions in August and also, Your

Honor, shortly at about that time the receiver's position

that the documents were not responsive so we apologize if we

did not focus on the objection as maybe we should have, and

if the Court believes that we should have come in and

extended the date in the middle of the fur flying we also

apologize for that.  That might have helped, but I will say

that there was a vast amount of communication between the

parties as to what was happening and what wasn't happening.

So we were not aware of the strong position that the

depositions wouldn't go forward.  There's no doubt that

BRACII knew they didn't have the receiver's documents when

they went over to England for the depositions.  There's no

doubt about that.  So I hope that that information helps the

Court.

          THE COURT:  All right.  Well, unfortunately we're

running out of time, so we need to kind of move through this

and wrap it up as quickly as possible.  All right, Mr.
Wilcox?

MR. WILCOX:  Thank you, Your Honor.  We don't
believe that sanctions are appropriate here.  We certainly
don't believe that striking a counterclaim is an appropriate
remedy.  We don't believe that the abolition of the escrow
agreement -- There's really no -- The worst I think that can
be said about Mr. Jaeban is that he was not able to produce
the documents as quickly as the Court would have liked.
There's no -- We think he made a good effort.  We think he
produced -- did the supplemental production in a timely
fashion.  So we do not -- just for the record, let me be
clear, we do not accept that he -- We do not accept the
plaintiffs' position that he failed to comply with the
order.  But what frustrates us is that when we made -- Every
time we've made an attempt to address the concerns, without
taking a hyper-technical approach to discovery, we've ended
up with increased problems, and we believe that we have
produced far more documents than the plaintiffs have in this
case.  That's really not an issue for the motion for
sanctions.  We also feel that the plaintiffs have engaged in
what can only be described as character assassination.  The
inclusion of e-mails from the receiver on totally unrelated
topics have no business in the reply.  The reply also raises
a number of new issues.  Let me address also Mr. Wile's

inclusion of Mr. Allen's e-mail regarding the computer system. That's an attempt to address a discovery issue and resolve a problem. In the plaintiffs' hands it sounds like -- they're trying to make it sound like we're concealing information. We never concealed information. Those are the directions from our client because, quite frankly, we think the merits are in our favor in this case.

THE COURT: All right. Let me just ask you briefly before you sit down, Mr. Wilcox, to address your motion to reopen discovery.

MR. WILCOX: Thank you, Your Honor. We address in our motion that a document request was served upon BRACII a long time ago. They filed an objection. The receiver didn't follow up on it, and, granted, we did not conduct a discovery conference. But basically, if I may characterize the plaintiffs' position, it's that we don't have the documents that were sold to AVIS. The vast majority of the documents were sold to AVIS. The computer system was sold to AVIS. As a result, Your Honor, we have three Lever Arch files -- excuse me, now four due to the supplemental production that occurred in England. I'm trying to take away the prejudice to Mr. Jaeban from the receiver's lack of follow-up on the plaintiffs' position that they don't have the documents. We're just trying to get the documents. Unfortunately the plaintiffs no longer have them. We're

trying to get them from the party that does have them.
Additionally, Your Honor, the plaintiffs filed an amended
complaint in July asserting a new claim against Mr. Jaeban
on a personal guarantee.  That came after the expiration of
the discovery period.  Mr. Jaeban has had no opportunity to
take any discovery, document requests, interrogatories,
depositions, whatever with regard to that.  Obviously we're
extremely concerned about that, and it's crucial that the
Court allow him the opportunity to take discovery to defend
himself on a $900,000 claim.

THE COURT:  Okay, thank you.  Mr. Wile, you have
about two minutes.

MR. WILE:  I know I have to be as quick as
possible.  Let me begin with receiver's documents.  I really
am startled by what I've heard because most of what we
wanted and the most interesting documents produced were in
response to our first document request.  Mr. Jaeban's letter
of 30 January, I do not agree with the Ian Weatherall of
Wragge and Co. with reference to the claim against Budget
International.  And it goes on from there.  That is
responsive to our first set of requests, and by the way, the
receivers are in fact agents of Jaeban U.K.  The prior one
establishes a ratification defense.  There's other financial
information that was responsive to our first document
request, and I just don't understand why they weren't

produced, and it's certainly news to me that they could have

been produced.  I simply don't recall.  I did have a number

of conversations with Brian Sullivan.  I frankly, for better

and for worse, simply recall him telling me that.  I'm

certainly not saying that that's not the case, I just have

to candidly tell the Court, I don't have any recollection of

it, and I know my colleagues have not reminded me of it, but

again, I didn't minute every phone call that was there.

Back to Welcome House for just a second.  In terms of trying

to resolve the credibility dispute between Mr. Wilcox and

Mr. Taylor and -- I like Mr. Wilcox.  I don't like being in

this position. I think the best way to resolve it is to look

at what Mr. Jaeban in fact has done, and I dare say if there

weren't a problem with that November 2003 production then

Mr. Jaeban is a smart entrepreneur, and I strongly doubt he

would be paying for a compute expert unless there was a

problem to be addressed and just to reiterate what we said

was said was in fact said on that score.  Turning to the

motion for quote/unquote "limited discovery", not only do

Mr. Jaeban's document requests, which seek the moon and the

sun, speak for themselves, interestingly only served after

we made very strong challenges to their document production,

but it took Mr. Jaeban until his reply, as opposed to say

for example our discovery conference to bring up the

guarantee.  The guarantee was attached to both the original

complaint and the amended complaint.  He's always known about the guarantee, but the critical point here, Your Honor, is that they're the same facts.  Secondary liability over the same liability.  That's what the discovery's been about, and I can only tell the Court that, you know, Mr. Jaeban and his counsel waited more than six months after the assignment to suddenly discover that our document production was not all that they wanted and they certainly haven't cited a case and in my searches I could not find a case which said you can sleep on your rights for six months, suddenly wake up, after you've already consented to a pleading, but not selected to change the schedule and seek additional documents, and we do believe, not only as a matter of the excusable neglect standard, which they neglected to mention, but as a matter of sanctions as well, that allowing them to reopen discovery now would, as I cautioned in my -- said, rather, excuse me, in my opening remarks would reward them for complete indifference to June 18th, and with respect to our first document request, I think it's clear that there was complete inaction before June 18th with respect to the one Lever Arch file.  I hope I haven't spoken too quickly, Your Honor.

THE COURT:  All right.  I will re-read all of these filings.  I will issue an order as promptly as I can.  I am not comforted that the parties have made every effort in

this case to move along to get to the merits in a thoughtful
way.  I am always suspicious when everybody on both sides
thinks everything is so clear, which means to me that they
are not looking at things at all from the other person's
perspective, and that's true in both cases here, but rather
have a clear and righteous view of the world that may not be
so clear upon inspection.  I will take a close look again at
the pleadings.  I will issue an order.  I will also advise
you that upon issuance of that order, it's my intention to
have this case transferred to a new judge who is Judge Jack
Peterson out of the District of Montana or such other judge
as the Chief Judge of the District of Delaware, Judge
Walrath will designate, and the reason for that is that my
own -- you all know, my own authorization to serve in
Delaware on a resident basis expired this month, and my
ability to -- or my authorization to serve in Delaware on a
non-resident basis will expire in December, and so to get
this case to trial, it will take somebody else.  I tell you
that, because once I issue my ruling on this, and of course
that will all be a matter of record that the new judge can
review, but one never knows what the new judge's opinion may
be or approach to these kinds of issues.  So it's often
better to make sure that they don't get addressed if you
want to actually get to have the matter resolved.  Be that
as it may, that's what I'm going to do in this case.  I'll

issue an order as soon as possible.  As you see, I've got boxes of documents, counsel in the room, I'm in trial all day.  I'm in trial all morning tomorrow.  I'm on an airplane gone for about ten days, so I don't think you'll hear from me until the first week in October at the earliest unless I can find some sleepless time on an airplane to think about this.  I apologize for that delay but it's the best I can do.

MR. WILE:  Your Honor, I think there's one issue on which Mr. Wilcox and I do agree which is we greatly appreciate the Court's effort throughout what has not always been an easy case for any of us.

THE COURT:  All right, so all three matters will be deemed submitted.  Sounds like the first matter is unopposed except to the extent that the ruling on the motion for sanctions may have an impact upon the scheduling of the depositions.  All right.  With that, we're adjourned, thank you.

ALL:  Thank you, Your Honor.

(Whereupon at 9:09 a.m. the hearing in this matter was concluded for this date.)

I, Elaine M. Ryan, approved transcriber for the United States Courts, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
Elaine M. Ryan
2801 Faulkland Road
Wilmington, DE 19808
(302) 683-0221

JA1678

**Amy Brown**

| | |
|---|---|
| **From:** | Elaine Ryan [elaine.ryan@worldnet.att.net] |
| **Sent:** | Monday, January 17, 2005 10:58 AM |
| **To:** | Amy Brown |
| **Subject:** | Brac Transcript (WP5.1) |

*not sure why this was sent to me*

1/17/2005

JA1679