# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| BRACII GROUP, INC. (f/k/a Budget Group, Inc.), | ) | Case No. 02-12152 (CGC) |
| et al., | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| BRACII GROUP, INC. (f/k/a Budget Group, Inc.), | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 03-A-54271 |
| | ) | |
| v. | ) | |
| | ) | |
| Jaeban (U.K.) Limited, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM OF IBRAHIEM JAEBAN IN SUPPORT
## OF MOTION FOR RECONSIDERATION
### (Docket Item Nos. 76, 79, and 80)

Defendant and Counterplaintiff Ibrahiem Jaeban ("Mr. Jaeban"), through his undersigned counsel, respectfully submits this Reply Memorandum in support of his Motion for Reconsideration (the "Motion") and in response to BRACII's Memorandum in Opposition ("BRACII's Memorandum").

## ARGUMENT

1

JA1680

BRACII's Memorandum is noteworthy for what it fails to do. Most importantly, it fails to rebut Mr. Jaeban's presentation that shows the Court's Opinion and the resulting Order were based on fundamental errors in interpreting Mr. Jaeban's actions regarding the May Order.[1] His compliance efforts were concrete and are essentially unchallenged by BRACII. BRACII's Memorandum continues its tactic of belittling and mischaracterizing the merits of Mr. Jaeban's case in the context of a discovery motion, ignoring BRACII's significant pre-litigation admission of liability. Further, BRACII's Memorandum ignores crucial facts of Mr. Jaeban's compliance with the June 18 deadline, by presenting an argument that ridicules Mr. Jaeban's counsel's "one-line e-mail"[2] while failing to mention the telephone conversation between counsel that took place the same day. That conversation is crucial and constituted, without objection from BRACII, Mr. Jaeban's compliance with another of the three requirements in the May Order. Additionally, BRACII's Memorandum tries to further smear Mr. Jaeban by suggesting "post-argument deliberate delay", even though computer records were produced previously to BRACII at Mr. Jaeban's instructions. Finally, BRACII's Memorandum fails to suggest a rationale for stripping Mr. Jaeban's ability to take discovery to defend the personal guaranty claim.

The thrust of Mr. Jaeban's Motion is that the Court erred when it stated in its Opinion that Mr. Jaeban did nothing to comply with the May Order. The Motion sets forth Mr. Jaeban's endeavors to comply with the May 5, 2003 Order. While characterizing the identification of those actions as a "laundry list"[3], BRACII has failed to refute a single fact in this regard. On any fair

---

[1] Mr. Jaeban adopts the defined terms identified in his Motion.

[2] BRACII Memorandum, page 7.

[3] BRACII Memorandum, page 13.

2

reading of his Motion, it cannot be said that Mr. Jaeban ignored or acted willfully with regard to the requirements of the May Order.

### Mr. Jaeban's Motion Does Not Violate the Applicable Standards

The comprehensive standard with regard to motions for reconsideration is set forth in *Max's Seafood Café ex rel. Lou-Ann v. Quinteros*, 176 F.3d 669 (3rd Cir. 1999):

> 'The purpose of a motion for reconsideration,' we have held, 'is to correct manifest errors of law or fact or to present newly discovered evidence.' *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3rd Cir. 1985). Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995). *Id.* at 677.

Given the extensive nature of his actions to comply with the May Order, Mr. Jaeban submits that he complied with D. Del. L.R. 7.1.5 in setting forth these comprehensive facts as briefly and succinctly as possible under the circumstances. Mr. Jaeban has endeavored to set forth the "manifest errors of fact" required under standards adopted in Court's September 14, 2004 Memorandum Opinion.

Further, this Court should consider the affidavits attached to the Motion. The *Max's Seafood* Court further ruled that:

> Although we have pointed out that "[c]ourts often take a dim view of issues raised for the first time in post-judgment motions," *Kiewit E. Co., Inc. v. L&R Constr. Co., Inc.*, 44 F.3d 1194, 1204 (3d. Cir.1995), in this case the issue that Jack-Mack sought to raise as a defense in its motion for reconsideration was so fundamental, i.e., that Jack-Mack had not come into being until more than six months after the last of Miraglia's contumacious acts, that it was not consistent with the wise exercise of discretion for the District Court to have declined even to consider it. As we have previously emphasized, reconsideration is the appropriate means of bringing to the court's attention manifest errors of fact or law. *Max's Seafood, supra,* at 678.

3

More recently, both Judge Walsh in the Delaware Bankruptcy Court and Chief Judge Robinson in the Delaware District Court considered and employed affidavits in connection with orders granting motions for reconsideration. *See Proxim, Inc. v. 3COM Corp.,* et. al., C.A. No. 01-155-SLR (2003 U.S. Dist. LEXIS 2556), dated February 21, 2003, and *In re United Artists Theatre Co.,* et al., Case No. 00-3514 (PJW) (2004 Bankr. LEXIS 1258), dated August 25, 2004, both attached as Exhibit "A" for reference. In *United Artists,* a chapter 11 debtor objected to a proof of claim filed by the Florida Department of Revenue ("FDOR"). The FDOR filed a response, and at oral argument represented that the Debtors did not cooperate in providing books and records to the FDOR during the audit period so that an accurate determination of the tax deficiency could be made. The court denied the objection, and the debtor filed a motion for reconsideration, attaching an affidavit from its director of tax which stated that the debtor provided the FDOR with full access to Debtors' books and records, and produced a letter from a representative of the FDOR that predated the claim objection. The court considered the affidavit and letter as relevant new evidence showing that United Artists cooperated with the FDOR. *United Artists, Supra* at 3.

Like the affidavit Judge Walsh considered in *United Artists,* BRACII has not disputed Mr. Jaeban's supplemental affidavits, which are properly employed by Mr. Jaeban in order to bring to the Court's attention manifest errors of fact. *United Artists* provides more than an ample basis for this Court to consider those affidavits.

### The Record shows Mr. Jaeban complied with the May Order.

BRACII ignores the fact that Jaeban UK <u>did</u> produce computer documents in its response to the First Joint Request. Jaeban U.K.'s Schedule of Documents served in response to the First Joint

4

JA1683

Request includes both e-mails and full print summaries from the Jaeban U.K. computer files. Mr. Jaeban specifically refers to the CD Rom showing spreadsheets with direct invoice comparison between Jaeban ledgers and BRACII ledgers.[4] With regard to the alleged lack of e-mails and internal memoranda, Mr. Jaeban will testify and did testify that he did not make use of many of such internal e-mails or memoranda. Mr. Jaeban was the President, CEO, and Manager of Jaeban U.K. and did not have to answer to any Board of Directors. His management style was verbal; if he needed to communicate with any of his employees, he would discuss the relevant point with them in order to communicate. BRACII is incorrect when it alleges that there is a host of missing internal e-mails.

### BRACII's failure to rebut the June 18 response to the December 12th letter

BRACII tries to make much of the transmittal e-mail from Mr. Sullivan to Mr. Wile, informing BRACII that the supplement production would be made on June 18, 2004, referring to this as the "one-line e-mail". This is a mischaracterization of what happened. The e-mail was simply a transmittal memo confirming that BRACII's counsel could expect to receive the documents from England by overnight delivery on either the following Saturday or Monday. The uncontradicted fact is that the e-mail was preceded by a conference between BRACII's counsel and Mr. Sullivan, whereby Mr. Sullivan addressed all of the issues in the BRACII December 12, 2003 letter, apparently to BRACII's satisfaction. BRACII has not refuted the Mr. Sullivan's affidavit in this regard, nor can it do so. The truth is Mr. Jaeban provided the requested information to "fill in the gaps". The further simple truth is there was not nearly as much documentation to fill in the gaps as BRACII anticipated, or may have hoped for. This simply confirms the propriety of the initial review conducted by

---

[4] See Page 3 of Jaeban U. K.'s Schedule of Documents, attached as Exhibit "B".

JA1684

Wragge & Co. and Price Waterhouse, and manifestly does not support BRACII's view that Mr. Jaeban has something to hide.

### Jaeban U.K. documents held by the Administrative Receivers

BRACII continues to ignore the fact that a timely objection was served in response to the Second Joint Request. Further, BRACII also ignores that it took no issue with regard to the alleged failure to disclose Receiver's documents until August, 2004 during the deposition process.[5]

It is overly simplistic and self-serving for BRACII to allege that "all it took was an email"[6] to cause the production of the Receiver's documents. Both Mr. Jaeban and his U.K. counsel demanded access before June 18, 2004. Those who have dealt with the Receiver can state with absolute certainty that it took threats, multiple conferences, and ultimately £ 4,000 UK / 7,200 US dollars for Mr. Jaeban's attorneys to see those documents in August, 2004. Even then, the Receiver put severe restrictions on access, not allowing Mr. Jaeban's counsel to make copies, and preventing Mr. Jaeban from personally attending the review.

Mr. Jaeban's hands were tied until the transfer of his files from Wragge & Co. to Mills and Reeve in early August, 2004. This was because Wragge & Co. during this time represented both Mr.

---

5 At page 8 of its Memorandum, BRACII also mischaracterizes the record at the September 21, 2004 hearing on the underlying motion. When arguing that Mr. Jaeban's counsel "admitted" that there had been no discussion among counsel about the Receiver's recalcitrance, BRACII suggests that the two quoted comments are those of Mr. Jaeban's counsel. In fact the second, more substantive comment is the Court's. The discussion at the hearing, as reflected at pages 32 and 33 cannot fairly be read to say that counsel "admitted" there was no such discussion with BRACII. In fact, Brian Sullivan, Esquire, clarifies at page 33 of the transcript that *"to the best of my recollection, Judge and Ken, that I was informing Mr. Wile that the receiver would not produce documents"*. Transcript (Exhibit B to Motion for Reconsideration), page 33, lines 10-12. The Court directed the question to Mr. Wilcox, and Mr. Wilcox answered from his personal knowledge that he was not aware of such a conversation. Mr. Sullivan clarified that answer, based upon his own more extensive knowledge of his June conversations with BRACII's counsel.

6 BRACII Memorandum, page 9.

6

Jaeban and the Receiver. The e-mail demand which eventually lead to the disclosure of the Receiver's documents did not entitle Mr. Jaeban to access the documents himself. Further, BRACII fails to address the fact that Mr. Jaeban, among his and his attorneys' other efforts, personally called the Receiver's representative on June 10, 2004 to press for disclosure of the documents.

### The Welcome House Documents

As noted at the outset, BRACII continues to incorrectly allege that Mr. Jaeban "failed to produce documents from Welcome House even though this was the largest repository of Jaeban UK documents"[7]. **This statement is unequivocally false.** As made clear in the Motion and in Mr. Jaeban's previously filings, the original production of documents by Jaeban U.K. in response to the First Joint Request contained documents deemed responsive by Wragge & Co. and Price Waterhouse after their review of more than 85 boxes of Welcome House documents.

The allegation that the documents subsequently found by the BRACII review following their availability in August 2004 were "significant" is also strenuously denied by Mr. Jaeban.[8] The Welcome House Documents are few in number and BRACII has conceded that most of these documents were routine business records of limited relevance.[9]

The review of such a large number of documents (more than 85 boxes) would inevitably result in a discrepancy as to whether a few of the documents are responsive or not. Mr. Jaeban's good faith was certainly evidenced by making available all of the documents and boxes to BRACII.

---

[7] BRACII Memorandum, page 2.
[8] Jaeban's Motion for Reconsideration, Page 11
[9] BRACII's Motion for Further Sanctions, p. 6. & 12.

7

Obviously, Mr. Jaeban believed he had nothing to hide. Mr. Jaeban is confident that this Court is not merely accepting BRACII's inflated allegations that the few additional Welcome House documents which BRACII pulled are significant, especially in light of their admission that they were "routine."

### The Credit Pack Document

BRACII also inflates the significance of the Credit Pack Document. Mr. Jaeban has testified under oath that (i) he believes that it was prepared by an ex-BRACII employee, (ii) that it was never approved by him, and (iii) for that reason it was never sent to a third party. It was a draft document and remained as such. It is clear that there will be a factual dispute over the importance of the document, and the Court should evaluate that importance in the context of that conflicting testimony. In all of the searches of the Welcome House documents, neither Mr. Jaeban nor BRACII has found any evidence that this document was ever submitted to any third party. Its real significance is that it is insignificant.

### The Merits of the Claims

BRACII continues to try to paint an inaccurate picture of the relative merits of the parties' claims, apparently in an effort to persuade the Court that Mr. Jaeban could not succeed at trial, and that the Court might as well summarily dismiss Mr. Jaeban's claims. BRACII continues to misinterpret Mr. Weatherall's letter, which Mr. Weatherall himself has explained through affidavit. BRACII simply chooses to ignore that Mr. Weatherall has established a far different reality than BRACII is trying to spin.

8

JA1687

Mr. Jaeban has not previously characterized BRACII's liability, but submits that BRACII has admitted owing a payable of £1.16 million UK (approximately 2 million U.S. dollars) to Jaeban UK, as reflected in the reconciliation spreadsheet BRACII prepared and sent to Jaeban U.K. Exhibit "C". Mr. Jaeban disputes BRACII's claims of offsets against that amount.

By mischaracterizing the Weatherall letter, and in numerous other ways, BRACII has invited the Court to prejudge the merits of the case in the context of a discovery motion. BRACII's arguments are selective fragments out of the much larger picture of its business relationship with Jaeban UK. Despite the picture BRACII has painted about alleged problems in Mr. Jaeban's case, prior to this lawsuit BRACII had admitted its £1.16 million UK / $2 million U.S. liability on a significant portion of Mr. Jaeban's claim. Mr. Jaeban has also testified and will testify that BRACII's asserted claims include (1) improper attempts to charge royalties on the unpaid £1.16 million UK; (2) percentage royalty charges to Jaeban UK on BRACII system revenue that was never generated; (3) royalty charges for periods during which BRACII had declared in writing a "royalty holiday"; and (4) numerous reservation charges for nonexistent customers. The primary concurring witness on these issues would be Terry Clark, the former BRACII executive whose scheduled deposition BRACII cancelled when the attorneys were in England in August, 2004. It was to preserve the scheduling of Mr. Clark's deposition, which could only be set for limited and specific days because of his travel schedule, that Mr. Jaeban agreed to produce for the second time documents from Welcome House.

### The Personal Guaranty

9

Even BRACII must recognize the unfairness of its attempts to deprive Mr. Jaeban of all rights to discovery on its personal guaranty claim against him. As a matter of law and logic, Mr. Jaeban could not defend the personal guaranty claim until such time as it was actually asserted against him. This assertion required two events: (1) the making of a demand on the personal guaranty, as unequivocally required by the IPLA, and (2) the pleading of the guaranty claim. The fact is that BRACII filed its Amended Complaint asserting the personal guaranty claim on July 19, 2004, before its demand on the guaranty on August 5, 2004. The expiration of the discovery period on June 18, 2004 predates either the guaranty demand or the legal assertion of the guaranty claim. Additional discovery is needed to determine whether there is any liability on Mr. Jaeban's part, and without the evidence that will flow from such discovery the Court would need to decide the issue in a factual vacuum. It is fundamentally unfair for Mr. Jaeban to be deprived of discovery on a complex claim of over $900,000.00, brought after the discovery cutoff, without the ability to discover the underlying facts.

### Jaeban UK's Emails and Computer System

It is crucial that the Court is aware that Jaeban UK's response to the Joint First Requests contained responsive documents from Jaeban UK's computers. The computer review that enabled the discovery response was undertaken at Mr. Jaeban's direction by Wragge & Co. After Jaeban UK's operations ceased and the Receiver took over, the Jaeban UK computers were shut down. In another good faith effort to satisfy BRACII, Mr. Jaeban undertook to have the main restarted by a UK consultant and all emails and documents retrieved and re-reviewed by Mills. Far from trying to hide that process, Mr. Jaeban made BRACII aware of the process. This was finally accomplished in

10

JA1689

November, 2004 (again at personal expense to Mr. Jaeban) and reviewed by Mills and Reeve in early December, 2004. Mills and Reeve then had a disk prepared and forwarded to Werb & Sullivan on about December 15, 2004. Werb & Sullivan was about to initiate its back-up review of the computer disk when the Court's decision on the motion for sanctions was entered. Again, Mr. Jaeban emphasizes to the Court that this is yet another re-review of files that were already previously reviewed and documents already previously produced.

### *Poulis* **Revisted**

Mr. Jaeban urges the Court to reexamine his specific actions to comply with the May Order[10] and to reconsider its conclusions in light of those actions and the *Poulis* factors. The facts will show that Mr. Jaeban has made every effort to comply with his discovery obligations and the Court's orders, that he is not a contumacious or contemptuous litigant, and that he does not deserve the ultimate sanction of dismissal of his claims. This Court has the power to correct a "manifest injustice" to Mr. Jaeban by granting his motion for reconsideration.

**Wherefore,** based on the foregoing, Mr. Jaeban requests that the Court (1) vacate its December 16, 2004 Memorandum Opinion and January 13, 2005 Order, (2) reconsider its dismissal of Mr. Jaeban's Counterclaims and the dissolution of the BRAC escrow fund, and (3) grant such other and further relief as it deems appropriate.

Dated: February 15, 2005

---

10 Those actions are summarized most succinctly at pages 13 to 15 of the Motion.

11

JA1690

WERB & SULLIVAN


   /s/ **Brian A. Sullivan**
Brian A. Sullivan (#2098)
Robert Wilcox (#4321)
Amy D. Brown (#4077)
300 Delaware Ave., 13th Floor
Wilmington, DE 19801
Telephone: (302) 652-1100
Facsimile: (302)652-1111

*Attorneys for Ibrahiem Jaeban*

12

JA1691

EXHIBIT A

JA1692

LEXSEE 2003 U.S. DIST. LEXIS 2556

**PROXIM INCORPORATED, Plaintiff, v. 3COM CORPORATION, SYMBOL TECHNOLOGIES, INCORPORATED, WAYPORT INCORPORATED, and SMC NETWORKS, INCORPORATED, Defendants.**

**C.A. No. 01-155-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 2556*

**February 21, 2003, Decided**

**DISPOSITION:** [*1] Defendants' motions to preclude damages from accruing during stay denied. Plaintiff's motion for reconsideration granted and court's previous order precluding damages from accruing during stay with respect to defendant Symbol vacated in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner brought suit against defendants, a customer and businesses, alleging infringement of several patents. The court granted intervenor corporation's motion for leave to intervene. The court entered a stay and ordered that the owner was precluded from collecting damages from the customer that accrued during the stay. The businesses moved to preclude damages from accruing during the stay. The owner moved for reconsideration.

**OVERVIEW:** The owner argued that the customer would have suffered no harm as a result of the stay since it was indemnified against any infringement damages by the corporation. Furthermore, the owner argued that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. The customer admitted that it had an indemnification agreement with the corporation but argued that the corporation had not agreed to full indemnification and that the indemnification agreement was only as good as the corporation's ability and willingness to pay for any potential damages. The court found that the fact that the customer was indemnified against potential damages mitigated its claim of harm resulting from the stay. The customer's ability to enforce its agreement with the corporation was separate from the

litigation. The businesses merely stated that they were not receiving and had not received any indemnification from the corporation related to the litigation. The court concluded that the businesses failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

**OUTCOME:** The businesses' motion to preclude damages from accruing during the stay was denied. The owner's motion for reconsideration was granted and the court's previous order precluding damages from accruing during the stay with respect to the customer was vacated in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN1] The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice.

**COUNSEL:** For PROXIM INCORPORATED, plaintiff: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For 3COM CORPORATION, defendant: Dale R. Dube, Blank Rome LLP, Wilmington, DE.

For SYMBOL TECHNOLOGIES, INC., defendant: Andre G. Bouchard, Karen L. Pascale, Bouchard, Margules & Friedlander, Wilmington, DE.

For WAYPORT INCORPORATED, defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

For SMC NETWORKS INCORPORATED, defendant: Richard K. Herrmann, Blank Rome LLP, Wilmington, DE.

For SYMBOL TECHNOLOGIES, INC., counter-claimant: Andre G. Bouchard, Karen L. Pascale, Bouchard, Margules & Friedlander, Wilmington, DE.

For PROXIM INCORPORATED, counter-defendant: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For 3COM CORPORATION, counter-claimant: [*2] Dale R. Dube, Blank Rome LLP, Wilmington, DE.

For WAYPORT INCORPORATED, counter-claimant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

### I. INTRODUCTION

On March 8, 2001, plaintiff Proxim brought this suit against defendants 3COM, Symbol Technologies ("Symbol"), Wayport and SMC Networks ("SMC") alleging infringement of several patents owned by plaintiff related to wireless networks. (D.I. 1) On December 12, 2001, Intersil Corporation moved for leave to intervene as a co-defendant in the case. (D.I. 78) After finding that the thrust of the present litigation was directed against the Intersil PRISM chip set, the court granted Intersil's motion to intervene. (D.I. 106) Given the fact that Intersil was also a respondent in an action brought before the ITC by plaintiff related to the same technologies, the court was required to stay this action pursuant to *28 U.S.C. § 1659.* (Id.)

In addition to entering the stay, the court concluded that it would be unfair to allow damages to accrue against defendant Symbol given that Symbol was merely a customer [*3] and user of Intersil's PRISM chip set and was not a party to the ITC action. Thus, the court further ordered that plaintiff would be precluded from

collecting damages from Symbol that resulted from any alleged infringing conduct during the stay. (Id.)

Presently before the court are defendants 3COM, SMC and Wayport's motions to preclude damages from accruing during the stay and plaintiff's motion for reconsideration of the court's order precluding damages from accruing with respect to Symbol. (D.I. 107, 108, 110)

### II. STANDARD OF REVIEW

[HN1] The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Cafe ex-rel. *Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).* Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. See id.

### III. DISCUSSION

In its May 30, 2002 order entering the stay, the [*4] court was mindful of the concerns posed by Symbol in its papers opposing the stay. Namely, Symbol was not a party to the ITC action and, therefore, would not have an opportunity to defend itself in that forum. Furthermore, Symbol would be subjected to the uncertainty of conducting business with the impending litigation hanging over it. Given these concerns, the court concluded that in the interests of equity, damages should not be allowed to accrue against Symbol during the stay and pendency of the ITC action. In their motions, defendants 3COM, Wayport and SMC argue that they are in the same situation as Symbol and should be afforded the same protections.

In its motion for reconsideration, plaintiff argues that Symbol would suffer no harm as a result of the stay since it is indemnified against any infringement damages by Intersil. (D.I. 110 at 5) Furthermore, plaintiff argues that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. Given the indemnification argument, the court ordered the parties to submit briefing regarding any indemnification agreements they had with Intersil related to this litigation. (D.I. 117) [*5]

In response to this order, Symbol admits that it has an indemnification agreement with Intersil but argues that Intersil has not agreed to full indemnification and, furthermore, Intersil's indemnification agreement is only as good as Intersil's ability and willingness to pay for any potential damages. (D.I. 118) The court finds this

2003 U.S. Dist. LEXIS 2556, *

argument unpersuasive. The terms of Symbol's indemnification agreement with Intersil and its concerns about Intersil's willingness or ability to satisfy its obligations are irrelevant to the inquiry in the present case. The fact that Symbol is indemnified against potential damages in the current case mitigates its claim of harm resulting from the stay. Symbol's ability to enforce its agreement with Intersil is separate from this litigation and, therefore, the court's order precluding damages from occurring during the stay (D.I. 106) is vacated in part.

Defendants 3COM, Wayport and SMC merely state that they are not receiving and have not received any indemnification from Intersil related to this litigation. (D.I. 119) Plaintiff argues that these responses do little to address the indemnification issues. In particular, plaintiff argues that 3COM and SMC [*6] "undoubtedly have contracts with Intersil that address indemnification and warranties applicable to Intersil's PRISM chipset." (Id. at 3) Furthermore, under the U.C.C., 3COM and SMC likely have warranty and indemnification claims. In their responding affidavits, neither 3COM nor SMC discuss whether or not they have demanded indemnification or whether they have a right to seek indemnification under their purchase agreements with Intersil. With respect to Wayport, plaintiff argues that Intersil "has already stated that its counsel is defending Wayport here at the expense of another defendant involved in other litigation against Proxim." (Id. at 4) Given the vagueness of defendants 3COM, SMC and Wayport's responses, the court concludes that they have failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

## IV. CONCLUSION

At Wilmington, this 21st day of February, 2003, for the reasons stated;

IT IS ORDERED that:

1. Defendants 3COM and SMC's motion to preclude damages from accruing during the stay (D.I. 107) is denied.

2. Defendant Wayport's motion to preclude damages from accruing during the stay (D.I. 108) [*7] is denied.

3. Plaintiff's motion for reconsideration (D.I. 110) is granted and the court's previous order precluding damages from accruing during the stay with respect to defendant Symbol (D.I. 106) is vacated in part.

Sue L. Robinson

United States District Judge

1 of 100 DOCUMENTS

**Re: United Artists Theatre Company, et al.**

**Case No. 00-3514 (PJW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2004 Bankr. LEXIS 1258*

**August 25, 2004, Decided**

**DISPOSITION:** United Artists Theater Company's motion for reconsideration was granted and claim of Florida Department of Revenue was disallowed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A chapter 11 debtor objected to the proof claim filed by the Florida Department of Revenue (FDOR), arguing that the statute of limitations for filing an assessment had elapsed. The court denied the objection; the debtor filed a motion for reconsideration.

**OVERVIEW:** The debtor argued the FDOR's claim was time-barred under Fla. Stat. Ann. § (95.0913)(a) (2004). The FDOR asserted that the timely filed proof of claim, based on an estimate of taxes owed, constituted an assessment and was therefore filed within the statutory period. Pursuant to *Fla. Stat. Ann. § 212.12(5)(b)*, an estimate could serve as an assessment if the taxpayer failed or refused to make its records available for inspection so that no audit or examination could be made. The court had initially held that the debtor failed to cooperate in the LDOR's tax audit. However, in support of its motion for reconsideration, the debtor provided proof that it had in fact cooperated with the FDOR. Therefore, the FDOR's proof of claim did not fall within the exception of § 212.12(5)(b) that permitted an estimate to serve as an assessment.

**OUTCOME:** The motion for reconsideration was granted and the FDOR's claim was disallowed.

**CORE TERMS:** audit, proof of claim, reconsideration, estimate, deadline, dealer, statutory period, unsecured

claim, reasons discussed, timely filed, notice, objected, protest

**LexisNexis(R) Headnotes**

*Tax Law > State & Local Tax > Administration & Proceedings*
[HN1] See *Fla. Stat. Ann. § 95.091(3)(a)* (2004).

*Tax Law > State & Local Tax > Administration & Proceedings*
[HN2] In Florida, the statutory time period for assessment of taxes can be extended by consensual written agreement. Under *Fla. Stat. Ann. § 213.23*, the executive director of the Florida Department of Revenue may enter into agreements with taxpayers which extend the period during which an assessment may be issued.

*Tax Law > State & Local Tax > Administration & Proceedings*
[HN3] See *Fla. Stat. Ann. § 212.12(5)(b)*.

**COUNSEL: [*1]** Co-Counsel to Reorganized Debtors: James H.M. Sprayregen, James W. Kaph, III, Ryan S. Natick, Kirkland & Ellis LP, Chicago, IL. Laura Davis Jones, Christopher J. Lhulier, Wilmington, DE.

Counsel for the State of Florida Department of Revenue: Frederick F. Rudzik, Assistant General Counsel, Florida Department of Revenue, Tallahassee, FL.

**JUDGES:** Peter J. Walsh, United States Bankruptcy Judge.

**OPINIONBY:** Peter J. Walsh

**OPINION:** Dear Counsel:

This ruling is with respect to the motion for reconsideration (Doc. # 1724) filed by debtor United Artists Theatre Company ("United Artists"). United Artists objected to the proof of claim filed by the Florida Department of Revenue (the "FDOR"). On March 23, 2004 I issued a letter indicating my inclination to permit the claim. Furthermore, I asked for additional briefing regarding the classification of the claim, if allowed. In response, United Artists filed a "Notice of Debtors' Response and Motion for Reconsideration of the Court's Ruling Regarding Claim Number 1686 Filed by the Florida Department of Revenue." For the reasons discussed below, the Court will grant United Artists motion and disallow the FDOR's claim.

## BACKGROUND

On January 8, 1998 the **[\*2]** FDOR issued a "Notification of Intent to Audit Books and Records" of United Artists. The audit period was December 1992 to June 1998. The audit commenced on October 19, 1998. The FDOR was unable to complete the audit within the statutory period and, as a result, several voluntary extensions were granted resulting in a December 31, 2001 audit deadline by which the FDOR had to issue a final assessment.

On September 5, 2000, United Artists filed voluntary petitions for relief in this Court under chapter 11 of title 11 of the United States Code, *11 U.S.C. § § 101 et seq.* The deadline for a governmental entity to file a proof of claim was March 5, 2001. The FDOR filed a claim on January 23, 2001, within the period of the first extension deadline, in the amount $ 12,208,241.40, representing use taxes. The total consisted of an unsecured claim of $ 2,923,513.79 and a priority claim of $ 9,284,727.61. The claim clearly stated at the top under the heading "claim comment text": "AUDIT BASED ON ESTIMATE PENDING REVIEW OF BOOKS AND RECORDS".

United Artists objected to the claim on March 16, 2001 and the FDOR filed a response on April 12, 2001. On November 8, 2002, the **[\*3]** FDOR filed an amended proof of claim, whereby the claim was reduced to $ 2,497,591.57 (the unsecured claim being $ 581,523.84 and the priority claim being $ 1,916,067.73). A "Notice of Proposed Assessment" was issued on November 25, 2002. United Artists filed a protest to the assessment on December 19, 2002 based on the statute of limitations for assessment, claiming that the notice was served after the deadline. The protest was rejected by the FDOR on May 23, 2003. The FDOR asserts that the timely filed proof of claim in this Court constituted an assessment and was therefore filed within the statutory period.

## DISCUSSION

*Section 95.091(3)(a)* of the Florida Statutes states in relevant part:

> [HN1] The Department of Revenue may determine and assess the amount of any tax, penalty, or interest due under any tax . . . which it has the authority to administer:
>
> > 1.a. Within 3 years after the date the tax is due, any return with respect to the tax is due, or such return is filed, whichever occurs later.

*Fla. Stat. Ann. § 95.091(3)(a)* (West 2004).

[HN2] The statutory time period for assessment can be extended **[\*4]** by consensual written agreement. See *Fla. Stat. Ann. § 213.23* ("The executive director of the department . . . may enter into agreements with taxpayers which extend the period during which an assessment may be issued. . . ."). Here, the statutory period was extended on three separate occasions, whereby the final expiration date was set for December 31, 2001.

The issue raised in this case is whether the proof of claim constituted an assessment. n1 Pursuant to Florida statute *section 212.12(5)(b)* an estimate can serve as an assessment

> n1 According to *Florida Statute section 213.015*, Florida taxpayers are entitled to certain rights. With regard to an audit and assessment, that section states in relevant part:
>
> > The right to obtain simple, nontechnical statements which explain the reason for audit selection and the procedures, remedies, and rights available during audit, appeals, and collection proceedings, including, but not limited to, the rights pursuant to this Taxpayer's *Bill of Rights* and the right to be provided with a narrative description which explains the basis of audit changes, proposed assessments, assessments, and denials of refunds; identifies any amount of tax, interest, or penalty due; and

JA1697

states the consequences of the taxpayer's failure to comply with the notice.

*Fla. Stat. Ann. § 213.015(5).*

**[*5]  [HN3]**

In the event any dealer or other person charged herein fails or refuses to make his or her records available for inspection so that no audit or examination has been made of the books and records of such dealer or person, . . . then, in such event, it shall be the duty of the department to make an assessment from an estimate based upon the best information then available to it. . . . Then the department shall proceed to collect such taxes, interest, and penalty on the basis of such assessment which shall be considered prima facie correct, and the burden to show the contrary shall rest upon the dealer, seller, owner, or lessor, as the case may be.

*Fl.a. Stat. Ann. § 212.12 (5)(b).*

In my March 23, 2004 letter, I concluded, based on the representations made by the FDOR's counsel at the September 11, 2003 oral argument, that since "the Debtors were not cooperating in providing books and records, so [] an accurate determination of the tax deficiency could not be established." (Doc. # 1722 at 3.) Therefore, I found that the proof of claim was sufficient to satisfy the standards of an assessment and, consequently the assessment was timely.

The **[*6]** motion for reconsideration filed by United Artists, however, presented new evidence showing that United Artists cooperated with the FDOR and therefore the estimate should not serve as an assessment under *section 212.12(5)(b)*. United Artists included an affidavit from Debra S. Liller, Director of Tax and subsequently

Vice President of Tax for United Artists, which stated that "Debtors provided these Department of Revenue representatives with full access to Debtors' books and records." (Doc. # 1724, Aff. at 2.) Furthermore, United Artists provided a letter, dated July 10, 2001, from a representative of the FDOR to Ms. Liller, that states: "If further information is needed, I will contact you at that time." (Doc. # 1724, Aff., Ex. C.)

This evidence is directly contrary to the FDOR counsel's representations at the September 11, 2003 hearing. In its response to the motion for reconsideration, the FDOR did not dispute United Artists contention that they complied with the FDOR's requests during the audit period. Moreover, when presented with the issue at a June 9, 2004 hearing, the FDOR's counsel could not provide any specific facts regarding United Artists' alleged failure to cooperate. **[*7]** As a result, I find that the FDOR's proof of claim does not fall within the exception of *section 212.12(5)(b)* that permits an estimate to serve as an assessment. Therefore, the assessment was not timely filed and as a result the claim Will be disallowed.

**CONCLUSION**

For the reasons discussed above, the Court will grant United Artists' reconsideration motion and deny the claim of the FDOR.

Very truly yours,

Peter J. Walsh

**ORDER**

For the reasons set forth in the Court's letter ruling of this date, United Artists Theater Company's motion for reconsideration (Doc. # 1724) is **GRANTED** and the claim of the Florida Department of Revenue is **DISALLOWED** by reason of the objections (Doc. # 1036 and 1704) by United Artists Theater Company.

Peter J. Walsh

United States Bankruptcy Judge

Dated: August 25, 2004

**JA1698**

117V5Z

********** Print Completed **********

Time of Request:  February 13, 2005  11:37 AM EST

Print Number:    1841:31569090
Number of Lines:  135
Number of Pages:

Send To:  BROWN, AMY
          WERB & SULLIVAN
          300 DELAWARE AVE FL 10
          WILMINGTON, DE 19803-2594

JA1699

EXHIBIT B

JA1700

**Schedule of Documents held by Jaeban UK Limited in relation to proceedings in the US
Bankruptcy Court for the District of Delaware – Case No. 02-12152 (MFW)**

| | | | | |
|---|---|---|---|---|
| **Receivable per Jaeban UK Ledgers** | | | | |
| 1 | Summary of Agreed and Disputed sums | Copy | Undated | 1-6 |
| 1 | Summary of the dispute from Jaeban Limited (has been revised) | Copy | Undated | 7 |
| 1 | Jaeban Receivable Calculation (has been revised) | Copy | Undated | 8 |
| 1 | General Response to Sidley Brown's Comments | Copy | Undated | 9-10 |
| 1 | General response to Sidley Brown's Comments | Fax copy | Undated | 11-12 |
| 1 | Email from David Handley of Budget to Simon Poyner of Jaeban re Jaeban position 2002 | Copy | 20/01/03 | 13 |
| 1 | Email and attachment from David Handley of Budget to Simon Poyner of Jaeban re Jaeban Summary as at 31 Dec 2002.xls | Copy | 20/01/03 | 14-15 |
| 1 | Email and attachment from Budget to Jaeban re Jaeban AR new accounts 31 Dec 2002.xls | Copy | 20/01/03 | 16-17 |
| 1 | Email and attachment from David Handley of Budget to Simon Poyner of Jaeban re Jaeban AR old accounts 31 Dec 2002.xls | Copy | 20/01/03 | 18-19 |
| 1 | Email and attachment from Budget to Jaeban re Jaeban AP Jan 1- 31 Dec 02.xls | Copy | 20/01/03 | 20-21 |
| 1 | Email and attachment from Matt Bond of Kroll to Paul Champken of Jaeban re Jaeban rejected invoices | Copy | 07/02/03 | 22-31 |
| 1 | Summary of Agreed and Disputed Sums (has been revised) | Copy | Undated | 32-33 |

**JA1701**

| | | | | |
|---|---|---|---|---|
| 1 | Summary of the Dispute from Jaeban Limited (has been revised) | Copy | Undated | 34 |
| 1 | Jaeban Receivable Summary | Copy | Undated | 35 |
| 1 | Jaeban Receivable Analysis | Copy | Undated | 36 |
| 1 | Jaeban Ledger Summary 2001 & 2002 | Copy | Undated | 37 |
| 1 | Confirmation from Matt Bond of Kroll of Request for Copy Documents | Copy | 01/04/03 | 38 |
| 1 | Summary of Copies Required –Old Accounts (has been revised) | Copy | Undated | 39-77 |
| 1 | Summary of Copies Required –New Accounts | Copy | Undated | 78-87 |
| 1 | Email and attachment from Simon Poyner of Jaeban to David Handley of Budget re 2001 Final Records | Copy | 07/08/02 | 88-89 |
| 1 | Email and Attachment from David Handley of Budget to Simon Poyner of Jaeban re Final Records 2001 per Jaeban Aug 8.xlsner | Copy | 08/08/02 | 90-91 |
| 1 | Email and Attachments from Michelle Byron of Wragge & Co LLP to Patrick Corr of Sidley, Austin, Brown and Wood | Copy | 6/17/03 | 92-122 |
| 1 | Letter to Patrick Corr of Sidley, Austin, Brown and Wood from Steven Allen of Wragge & Co LLP re Dispute | Copy | 4/06/03 | 123-127 |
| 1 | Computation of Gross Losses on Disposal of Vehicles 2002 prepared by Jaeban. | Copy | 26/09/03 | 128 |
| 1 | Summary of Gross Amounts Owed By Jaeban to Bracii | Copy | Undated | 129 |
| 1 | Email and attachment from Matt Bond of Kroll to Jaeban re Bracii (In administration) –Jaeban Account for 01.01.03 to 11.03 | Copy | 23/03/03 | 130-131 |
| 1 | Email from Paul Champken of Jaeban to Matt Bond of Kroll re Bracii (In | Copy | 23/03/03 | 132-133 |

JA1702

| | | | | |
|---|---|---|---|---|
| | administration) –Jaeban Account for 01.01.03 to 11.03 | | | |
| 1 | Email from Matt Bond of Kroll to Jaeban re Bracii (In administration) –Jaeban Account for 01.01.03 to 11.03 | Copy | 23/03/03 | 134-135 |
| 1 | Email from Matt Bond of Kroll to Jaeban re Bracii (In administration) –Jaeban Account for 01.01.03 to 11.03 | Copy | 23/03/03 | 136-138 |
| 1 | Jaeban Management Accounts as at 31 December 2002 | Original | December 2002 | 139-143 |
| 1 | Jaeban Report and Financial Statements – Year Ended 31 December 2001 | Copy | December 2001 | 144-166 |
| 1 | CD Rom showing spreadsheets with direct invoice comparison between Jaeban Ledgers and Budget Ledgers | Copy | Undated | 167 |
| 1 | Original e-mail header from D Handley to Simon Poyner of Jaeban highlighting balance payable by Jaeban. | Copy | 20/01/03 | 168 |
| 1 | E-mail from Dave Handley of Budget to Simon Poyner of Jaeban attaching Jaeban summary as at 31 Dec 2002. xis | Copy | 20/01/03 | 169-170 |
| 1 | E-mail from David Handley of Budget to Simon Poyner of Jaeban attaching Jaeban AR Old accounts. | Copy | 20/01/03 | 171 |
| 1 | Payable by Jaeban (Hemel Ledger) - Old Accounts | Copy | Undated | 172 |
| 1 | E-mail from David Handley of Budget to Simon Poyner of Jaeban attaching Jaeban AR new accounts 31 Dec 2002. xis | Copy | 20/01/03 | 173 |
| 1 | Payable by Jaeban (Hemel Ledger) - New Accounts | Copy | Undated | 174 |
| 1 | E-mail from David Handley of Budget to Simon Poyner of Jaeban attaching Jaeban AP Jan 1 – 31 Dec 02. xis | Copy | 20/01/03 | 175 |

JA1703

| | | | | |
|---|---|---|---|---|
| 1 | Payable by Hemel (per Hemel Ledger as provided by D Handley) – Jaeban AP Downloads. | Copy | Undated | 176 |
| 1 | D Handley e-mail forwarding detail of processed transactions ("Book 2") | Copy | 23/01/03 | 177-208 |
| 1 | D Handley e-mail forwarding detail of processed transactions ("Book 3") | Copy | 23/01/03 | 209-287 |
| 1 | D Handley e-mail forwarding detail of processed transactions ("Book 4") | Copy | 23/01/03 | 288-366 |
| 1 | D Handley e-mail forwarding detail of processed transactions ("Book 5") | Copy | 23/01/03 | 367-431 |
| 1 | D Handley e-mail forwarding detail of processed transactions ("Book 6") | Copy | 23/01/03 | 432-533 |
| 1 | D Handley e-mail forwarding detail of processed transactions ("Book 7") | Copy | 23/01/03 | 534-546 |
| 1 | E-mail from P Champken of Jaeban to D Handley of Budget re duplication of account within "payable by Jaeban" | Copy | 28/01/03 | 547 |
| 1 | E-mail response from D Handley of Budget to Paul Champken of Jaeban acknowledging error | Copy | 29/01/03 | 548 |
| 1 | Revision of D Handley Summary (B) correcting errors (showing revised balance "payable by Jaeban" of £802,013.17 as opposed to D Handley original figure of £840,902.10 | Copy | Undated | 549 |
| 1 | Re-analysis of "Payable by Hemel" prepared by D Handley of Budget (£1,161,961.00) into varying constituent parts, identifying 2001 transactions, 2002 disputed transactions, including Interface Charges and Credit/Resubs 2002 which are not accepted and items unprocessed by Hemel | Copy | Undated | 550 |
| 1 | Summary of Re-analysis by Jaeban location. Additional I/1 and I/2 - two | Copy | Undated | 551-553 |

WRAGGE2 #4124764 v2 [ELC1)][SAS]

4

JA1704

| | page larger print version | | | |
|---|---|---|---|---|
| 1 | Summary (by Jaeban location) per Jaeban ledgers (£1,431,623.87) | Copy | Undated | 554 |
| 1 | Full print - ZBUD1001 - Wolverhampton | Copy | Undated | 555-556 |
| 1 | Full Print - ZBUD1101 - Oldbury | Copy | Undated | 557-559 |
| 1 | Full Print - ZBUD1201 - Telford | Copy | Undated | 560-562 |
| 1 | Full Print - ZBUD1301 - Leicester | Copy | Undated | 563-567 |
| 1 | Full Print - ZBUD1401 - Birmingham City | Copy | Undated | 568-574 |
| 1 | Full Print - ZBUD1501 - Birmingham Airport | Copy | Undated | 575-593 |
| 1 | Full Print - ZBUD1601 - Birmingham/Solihull | Copy | Undated | 594-605 |
| 1 | Full Print - ZBUD1701 - Nottingham | Copy | Undated | 606-610 |
| 1 | Full Print - ZBUD1801 - Kidderminster | Copy | Undated | 611-612 |
| 1 | Full Print – ZBUD1901 - Manchester City | Copy | Undated | 613-622 |
| 1 | Full Print – ZBUD2001 - Manchester Airport | Copy | Undated | 623-649 |
| 1 | Full Print – ZBUD2101 - Workington | Copy | Undated | 650-661 |
| 1 | Full Print – ZBUD2201 - Manchester D & C | Copy | Undated | 662-669 |
| 1 | Full Print – ZBUD2301 - Dewsbury | Copy | Undated | 670-673 |
| 1 | Full Print – ZBUD2401 - Huddersfield | Copy | Undated | 674-675 |
| 1 | Full Print – ZBUD2501 - Edinburgh City | Copy | Undated | 676-680 |
| 1 | Full Print – ZBUD2601 - Edinburgh Airport | Copy | Undated | 681-696 |
| 1 | Full Print – ZBUD2701 - Glasgow City | Copy | Undated | 697-701 |
| 1 | Full Print – ZBUD2801 - Glasgow | Copy | Undated | 702-711 |

JA1705

| | | | | |
|---|---|---|---|---|
| | Airport | | | |
| 1 | Full Print – ZBUD2901 - East Midlands Airport | Copy | Undated | 712-714 |
| 1 | Full Print – ZMAN0001 - Manual Invoices (all sites) | Copy | Undated | 715-721 |
| 1 | E-mail request from Dee Sturman (acting upon instructions from M Bond of Kroll for details of Jaeban Receivables amounting to £1.43 million in order to reconcile to Hemel's payable ledgers. | Copy | 21/02/03 | 722 |
| 1 | E-mail from Paul Champken of Jaeban to Dee Styrman of Budget re confirmation of sending detailed download to Dee Sturman of Jaeban ledgers | Copy | 21/02/03 | 723 |
| 1 | E-mail from Paul Champken to Dee Sturman and Matt Bond requesting confirmation that they do not dispute Jaeban Receivables of £1.43 million | Copy | 13/03/03 | 724 |
| 1 | Jaeban produced detailed analysis of "net" £66,672.56 of items identified as "Hemel Unprocessed" (please note page numbers state... of 128, should read... of 64) | Copy | Undated | 725-788 |
| 1 | Sublease vehicles -  e-mail and attachment from Paul Champken  of Jaeban to Dave Handley of Budget re BTI Damage and Mileages | Copy | 31/01/03 | 789-791 |
| 1 | E-mail and attachment from Paul Champken of Jaeban to Dave Handley of Budget re refurb costs. | Copy | 31/01/03 | 792 |
| 1 | E-mail and attachment from Paul Champken of Jaeban to Dave Handley of Budget re refurb costs and BTI collection charges (Part 2) | Copy | 31/01/03 | 793 |
| 1 | E-mail and attachment from Paul Champken of Jaeban to Dave Handley of Budget re excess miles, extra days & refurb costs (Part 3) | Copy | 31/01/03 | 794 |

JA1706

| | | | | |
|---|---|---|---|---|
| | E-mail and attachment from Paul Champken of Jaeban to Dave Handley of Budget re transport costs, excess miles and extra days (Part 4) | Copy | 31/01/03 | 795 |
| 1 | E-mail and attachment from Paul Champken of Jaeban to Dave Handley of Budget re LE270.017 (Final) | Copy | 31/01/03 | 796 |
| 1 | Various Jaeban invoices and xls spreadsheets for refurbishment and excess mileage of sublet vehicles. | Copy | Various | 797-880 |
| 1 | Budget/Jaeban – sublease agreements | Copy | Various | 881-974 |
| 1 | Umbrella Agreement | Original | 05/03/01 | 975-1122 |
| 1 | International Prime License Agreement | Original | 05/03/01 | 1123-1262 |
| 1 | Operating Manual EMEA - Volume 1 | Original | July 2002 | 1263-1685 |
| 1 | Operating Manual EMEA – Volume 2 | Original | December 2001 | 1686-1895 |
| **Paid to Hemel** | | | | |
| 2 | Summary of Jaeban Payable –agreed and disputed | Copy | Undated | 1896 |
| 2 | Fax to Budget from Jaeban re GKN Invoices Paid to Hemel | Copy | 29/07/03 | 1897-1909 |
| 2 | Fax to Jaeban from Budget re GKN invoices | Copy | 30/07/03 | 1910-1911 |
| 2 | Sales Ledger –Cash Paid to Hemel | Copy | Undated | 1912-1930 |
| 2 | Remittance Advice Bombadier re Hemel | Copy | Undated | 1931-1938 |
| 2 | Letter to Walgrove International Limited from Jaeban re Monies paid to Chris Meeks, Budget | Copy | 11/03/03 | 1939-1941 |
| 2 | Email and attachment to Simon Poyner at Jaeban from Andrew Doncaster at Budget re Emirates outstanding Invoices | Copy | 27/01/03 | 1942-1945 |
| 2 | Email and attachment to Simon Poyner at Jaeban from Ashwini Chitnis at Emirates | Copy | 09/03/03 | 1946-1948 |
| 2 | Fax to Steve Wells at Jaeban from June | Copy | 14/04/03 | 1949-1950 |

JA1707

| | | | | |
|---|---|---|---|---|
| | Hamilton of GKN –re invoices | | | |
| 2 | Email to Jaeban re Emirates from Alessandro Musso. | Copy | 15/07/03 | 1951-1952 |
| 2 | Email from Paul Champken of Jaeban to Dave Handley of Budget re Your receivables (our payables) | Copy | 28/01/03 | 1953 |
| 2 | Email from Dave Handley of Budget to Paul Champken of Jaeban re AR-Your receivables (our payables) | Copy | 29/01/03 | 1954 |
| 2 | Paid to Hemel (has been revised) | Copy | Undated | 1955 |
| 2 | Jaeban Payable Summary | Copy | Undated | 1956 |
| 2 | Paid to Hemel Original | Copy | Undated | 1957 |
| **Sublease Vehicles, damage and Mileage charges** | | | | |
| 3 | Order for 1000 Vehicles from BTI | Copy | W/o 25/03/02 | 1958 |
| 3 | Damage-BTI Sublease | Copy | Undated | 1959-1960 |
| **Ford Bonus** | | | | |
| 4 | Letter from Ford to Budget re Ford Daily Rental 2002 supply proposal | Copy | 13/12/01 | 1961-1968 |
| 4 | Email from Adrian Sarwar of Budget to IM Jaeban re Bonus Payment | Copy | 07/02/02 | 1969 |
| 4 | Invoice 61140 | Copy | 12/02/02 | 1970 |
| 4 | Bonuses paid for with Credit Notes | Copy | 01/04/02 | 1971-1976 |
| 4 | Unpaid Bonuses | Copy | Jan-May 2002 | 1977-1998 |
| **US reservations** | | | | |
| 5 | Examples of US Reservations and TARP disputes (attachment 1) | Copy | Various | 1999-2029 |
| 5 | Rented/No Show Cancelled Reservation Statistics (attachment 1) | Copy | Various | 2030 |
| **Frequent Flyer** | | | | |

JA1708

| 6 | Email from Kerry Brooks of Budget to Jaeban and others re Singapore Airlines (attachment 2) | Copy | 16/04/02 | 2031-2039 |
|---|---|---|---|---|
| **Inter office** | | | | |
| 7 | Examples of One-Way Charge Errors (attachment 3) | Copy | 19/01/02 | 2040-2053 |
| **RAC subscriptions** | | | | |
| 8 | Fax to Jaeban from Gerard Mann Mercedes-Benz re Service 24 Hour Recovery | Copy | 09/04/03 | 2054 |
| 8 | Land Rover Service Portfolio –Service Your Dealer | Copy | Undated | 2055-2060 |
| 8 | Rover Owner's Handbook | Copy | Undated | 2061-2063 |
| 8 | LDV Van Aid | Copy | Undated | 2064 |
| 8 | Nissan Roadside Assistance | Copy | Undated | 2065 |
| 8 | Toyota Accident Assistance | Copy | Undated | 2066-2067 |
| 8 | Volkswagen Assistance in Europe | Copy | Undated | 2068-2074 |
| 8 | Volvo Assistance –Peace of mind when you are on the move | Copy | Undated | 2075-2081 |
| 8 | Fax to Jaeban from Land Rover Assistance re Land Rover Assistance Policy Wording | Copy | 10/04/03 | 2082-2090 |
| 8 | Confirmation of Manufacturer Cover for Breakdown | Copy | Undated | 2091-2093 |
| **BMS** | | | | |
| 9 | Letter to Jaeban from Budget re BMS use | Copy | 4/10/02 | 2094-2095 |
| 9 | Letter to Jaeban from Budget re BMS Charges (attachment 4) | Copy | 04/10/02 | 2096-2097 |
| 9 | Email and attachment from Budget to Jaeban re BMS still not supplied | Copy | 21/06/01 | 2098-2100 |

**JA1709**

| 9 | Email from Jaeban to Budget re Accruals –BMS still needs correcting | Copy | 18/06/01 | 2101 |
|---|---|---|---|---|
| 9 | Email from Jaeban to Budget re BMS Access –BMS problems | Copy | 20/04/01 | 2102 |

**2001 Concessions**

| 10 | Email and attachment from Dave Handley of Budget to Simon Poyner of Jaeban re Final Reconciliation 2001 per Jaeban Aug 8.xls | Copy | 15/08/02 | 2103-2113 |
|---|---|---|---|---|
| 10 | Email from Matt Bond of Kroll to Paul Champken of Jaeban re BRACH (In administration) | Copy | 05/02/03 | 2114 |
| 10 | Total Agreed and Disputed Concessions (attachment 5) | Copy | Undated | 2115 |
| 10 | Letter to Jaeban from T. Sutherland formerly of Budget | Copy | Undated | 2116 |

**Birmingham Airport**

| 11 | HSBC Bank Statement re Concession to Birmingham Airport (attachment 6) | Copy | 7/09/02 - 3/09/02 | 2117 |
|---|---|---|---|---|
| 11 | Birmingham Airport Concession – Invoice Budget | Copy | 19/07/02 | 2118 |
| 11 | Birmingham Airport – Invoice NI26053 | Copy | 04/07/02 | 2119 |

**Edinburgh and Glasgow Airport Concessions**

| 12 | Fax from BAA Retail to Jaeban re Glasgow Airport- Car rental concession | Copy | 25/10/02 | 2120 |
|---|---|---|---|---|
| 12 | Fax form BAA Retail to Jaeban re Edinburgh Airport –Car Rental Concession | Copy | 11/10/02 | 2121 |
| 12 | Note re Concession fees for Edinburgh and Glasgow Airports | Copy | 24/09/03 | 2122 |
| 12 | Letter from Budget to Jaeban re Change in Concession Conditions Edinburgh & Glasgow Airports | Copy | 19/04/02 | 2123 |

**JA1710**

| | | | | |
|---|---|---|---|---|
| 12 | Email from Terry Clark of Budget to IM Jaeban re Edinburgh and Glasgow Airports | Copy | 04/02/03 | 2124-2125 |
| 12 | Email from Budget to Jaeban re Edinburgh and Glasgow Airports (attachment 7) | Copy | 04/02/03 | 2126-2127 |
| 12 | Glasgow Airport and Edinburgh Airport Computation (attachment 8) | Copy | Undated | 2128 |
| **Other Location Rents** | | | | |
| 13 | Summary of other location rents (attachment 9) | Copy | Undated | 2129 |
| **Miscellaneous Utilities** | | | | |
| 14 | Summary of Miscellaneous Utilities (attachment 10) | Copy | Undated | 2130 |
| **Telephone charges** | | | | |
| 15 | Extract from Budget Downloaded Statement of 'Jaeban Payables' re Telephone Charges (attachment 11) | Copy | Undated | 2131 |
| **Royalties** | | | | |
| 16 | Email From Budget to Jaeban re Royalties | Copy | 29/04/03 | 2132 |
| 16 | Adjusted Royalty Computation (attachment 12) | Copy | Undated | 2133 |
| 16 | Royalty Adjustment Computation (attachment 12) | Copy | Undated | 2134 |
| **Yellow pages** | | | | |
| 17 | Fax to all UK branches from Roddy Graham of Budget re Yellow Pages (attachment 13 & 14) | Copy | 23/12/98 | 2135-2141 |
| 17 | Letter from Yell to Jaeban –Confirmation of Yellow Pages Direct | Copy | 02/04/03 | 2142-2145 |
| 17 | Yellow pages old accounts | Copy | Undated | 2146-2148 |

JA1711

| | | | | |
|---|---|---|---|---|
| **Money to Jaeban** | | | | |
| 18 | Email to Matt Bond at Kroll from Paul Champken at Jaeban re INV 4167700, 31/12/02 | Copy | 07/02/03 | 2149 |
| **Avis** | | | | |
| 19 | Letter to Jaeban from Budget re Avis | Original | 23/01/03 | 2150-2158 |
| **Miscellaneous** | | | | |
| 20 | One Way UK - Operating Procedures and Participation Agreement | Copy | Undated | 2159-2180 |
| 20 | Memo on centrally billing vouchers being temporarily suspended | Copy | 18/7/02 | 2181-2182 |
| 20 | Budget Organisation Chart | Copy | Undated | 2183-2195 |
| 20 | Jaeban UK Locations | Copy | Undated | 2196 |
| 20 | Budget Marketing Information | Copy | 20/2/01 | 2197-2199 |
| 20 | Budget Marketing Information | Copy | 5/7/01 | 2200-2204 |
| 20 | Email on telephone charges | Copy | 25/3/02 | 2205-2206 |
| 20 | Email from Budget re proposed acquisition by Jaeban of Budget UK | Copy | 15/12/00 | 2207-2212 |
| 20 | Email from Budget re proposed acquisition by Jaeban of Budget UK | Copy | 12/12/00 | 2213-2214 |
| 20 | Draft heads of agreement (16/04/02) | Copy | Undated | 2215-2220 |
| 20 | UK Sales Procedures | Copy | Undated | 2221-2148 |
| 20 | Minutes of UK Franchise Sales & Marketing Meeting (27/09/01) | Copy | Undated | 2249-2260 |
| 20 | Participants Guide 1994 - CorpRate and Marketing Programs information | Copy | 3/7/94 | 2261-2267 |
| 20 | Extracts from sales presentation and proposal for customer - 1991 | Copy | Nov '91 | 2268-2275 |
| 20 | Budget CorpRate presentation | Copy | 5/8/02 | 2276-2277 |

WRAGGE2 #4124764 v2 [BLC1Y][SAS]

**JA1712**

| 20 | Information bulletin on Yellow Pages | Copy | 23/12/98 | 2278-2285 |
|----|-------------------------------------|------|----------|-----------|
| 20 | Letter from Budget on Franchise Fee Reviews and Letter from Budget on proposed restructuring | Copy | 29/4/02 | 2286-2293 |
| 20 | Memo on closures of branches at Heathrow, Gatwick and Stanstead | Copy | 21/8/02 | 2294 |
| 20 | Budget promotional material dated 1984 and information which forms part of the Franchise Agreement | Copy | Dec '84 | 2295-2305 |
| 20 | Letter from T Sutherland re 2001 reconciliation | Copy | Undated | 2306 |
| 20 | Operating Manual EMEA: Sales and Marketing - Centralised Billing | Copy | Undated | 2307 |
| 20 | Operating Manual EMEA: Sales and Marketing - The Corporate Rate Service | Copy | Undated | 2308-2318 |
| 20 | Operating Manual - EMEA: Sales and Marketing - Promotions | Copy | Undated | 2319-2320 |
| 20 | Operating Manual EMEA: Sales and Marketing - One Way Rentals | Copy | Undated | 2321 |
| 20 | Operating Manual EMEA - Billing Procedures | Copy | July '01 | 2322 |
| 20 | Budget Rent A Car - UK Sales Team and Responsibilities | Copy | 13/5/03 | 2323-2326 |
| 20 | Operating Manual EMEA - Franchise Management | Copy | Undated | 2327-2333 |
| 20 | Promotional literature on Budget's corporate profile | Copy | Undated | 2334-2343 |
| 20 | Letter from Budget to Mr I Jaeban dated 13 May 2003 | Copy | 13/5/03 | 2344-2354 |
| 20 | Operating Manual EMEA: Sales and Marketing - Travel Industry Car Rentals | Copy | Undated | 2355 |
| 20 | Operating Manual EMEA: Sales and Marketing - Partnerships and Frequent | Copy | Undated | 2356-2357 |

JA1713

| | | | | |
|---|---|---|---|---|
| | Flyer Programmes | | | |
| 20 | Operating Manual EMEA: Sales and Marketing - International Marketing | Copy | Undated | 2358 |
| 20 | Operating Manual EMEA: Sales and Marketing - Advertising | Copy | Undated | 2359-2360 |
| 20 | Operating Manual EMEA - Budget Standards of Performance and the Voucher System | Copy | Undated | 2361 |
| 20 | Operating Manual EMEA: Sales and Marketing - Corporate Rates | Copy | July '01 | 2362 |
| 20 | Correspondence and copy correspondence (including electronic communications) passing between Wragge & Co LLP Solicitors for Jaeban and Sidley Austin Brown & Wood Solicitors for BRACI (Krolls). | Both | Various | 2363 Onwards |
| 20 | Correspondence and copy correspondence (including electronic communications) correspondence) passing between Wragge & Co LLP Solicitors for Jaeban and Kroll. | Both | Various | 2363 Onwards |

JA1714

EXHIBIT C

JA1715

Steven Allen - Jaeban

| | |
|---|---|
| From: | Brian A. Sullivan |
| To: | kwile@sidley.com |
| Date: | Fri, Jun 18, 2004 7:46 pm |
| Subject: | Jaeban |

Ken,

Attached are documents related to Accounts Receivables. Some are from the original batch and some are from the supplemental batch. Please find attached:

(1) E-mail from David Handley at Budget to IMJ attaching a document headed " Jaeban AP Downloads 1/1 - 31/12 2002". We are told by IMJ that he would submit a detailed account to Budget which would be negotiated to an agreed figure. Jaeban UK would receive confirmation in the form of the attachment and payment would follow. The attached confirms therefore that £1,161,961.00 was agreed.
(2) E-mail from Vicky Waterfield at Jaeban (scroll down) see e-mail to Trevor Sutherland referencing recieveable downloaded to 28/6/02 showing £1.150m payable to Jaeban.
(3) E-mail from Matt Bond at Kroll (BRAC's Receiver) confirminh that they would be starting from the £150K opening balance as a minimum when reviewing 2001.
(4) Another e-mail from Matt Bond attaching Jaeban Account Reconciliation
(5) Letter from Budget dated 23 January 2004 confirming "balance due to Licensee of £1,162,103.49".
(6) Letter from Trevor Sutherland formerly of Budget confirming that 2001 reconciliation was agreed.
We submit these documents clearly verify the 1.16M U.K. Pounds owed by Budget to Jaeban. More about Linden Garden on Monday. Have a good week-end.

Brian A. Sullivan, Esquire
WERB & SULLIVAN
300 Delaware Avenue, 10th Floor
P.O. Box 25046
Wilmington, Delaware 19899
For Courier: 19801
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
E-Mail: bsullivan@werbsullivan.com

CONFIDENTIALITY NOTICE
UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW [Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)]

This message is being sent by Werb & Sullivan, a law firm. It is intended exclusively for the individuals and entities to which it is addressed. This communication, including any attachments, may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of this message.

<<Attmt 1 Allen e-maim 6-16 11-43A.pdf>>    <<Attmt 2 Allen e-mail 6-16 11-43A.pdf>>    <<AAmt 3 Allen e-mail 6-16 11-43A.pdf>>    <<Attchmt 4 Allen e-mail 6-16 11-43A.pdf>>    <<Attchmt 5 Allen e-mail 6-16 11-43A.pdf>>    <<Attchmt 6 Allen e-mail 6-16 11-43A.pdf>>

JA1716

**CC:**         Ian Weatherall, Steven Allen, Craig Loweth

JA1717

## Ibrahiem Jaeban

| | |
|---|---|
| **From:** | "Handley David" <David.Handley@budget-emea.com> |
| **To:** | "Simon Poyner (E-mail)" <simonpoyner@jaeban.co.uk>; "Paul Champs (E-mail)" <paulchamps@jaeban.co.uk> |
| **Sent:** | 20 January 2003 10:19 |
| **Attach:** | Jaeban AP Jan 1- 31 Dec 02.xls |
| **Subject:** | Jaeban AP Jan 1- 31 Dec 02.xls |

02/06/2004

### JAEBAN AP DOWNLOADS, 1 JAN - 31 DEC 2002

| | | |
|---|---|---:|
| 7232 | LEICESTER | 25,841.96 |
| 7237 | KIDDERMINSTER | 17,233.91 |
| 7236 | STOKE ON TRENT | (562.35) |
| 7242 | NOTTINGHAM | 34,863.09 |
| 7351 | WOLVERHAMPTON | 23,542.93 |
| 7360 | WEST BROMICH | 25,266.27 |
| 7371 | TELFORD | 30,975.15 |
| 230860 | MANCHESTER AIRPORT | 209,030.21 |
| 230866 | BIRMINGHAM AIRPORT | 118,746.36 |
| 230870 | BIRMINGHAM CITY | 41,749.41 |
| 230877 | BIRMINGHAM SOLIHULL | 75,412.09 |
| 230881 | MANCHESTER CITY | 102,463.84 |
| 461508 | WORKINGTON | 71,070.08 |
| 461512 | WARRINGTON | (652.84) |
| 467429 | HUDDERSFIELD | 9,629.03 |
| 467430 | DEWSBURY/WAKEFIELD | 29,013.18 |
| 470014 | MANCHESTER SOUTH | 54,925.71 |
| 473869 | EDINBURGH AIRPORT | 95,205.09 |
| 473870 | EDINBURGH CITY | 53,260.01 |
| 473871 | GLASGOW APT | 71,762.10 |
| 473873 | GLASGOW CITY | 45,414.26 |
| 492154 | EAST MIDLANDS AIRPORT | 12,162.69 |
| 508045 | LEICESTER | 16,115.80 |
| 477159 | MISC JAEBAN (LIC ACCOUNTS) | (506.98) |
| | | 1,161,961.00 |

CHECKED ALL AGAINST AGED DEBT A/C NOS

JA1719

**Ibrahiem Jaeban**
_____

**From:**      Vicky Waterfield [vickywaterfield@jaeban.co.uk]
**Sent:**      01 July 2002 07:48
**To:**        Ibrahiem Jaeban
**Subject:**   FW:


-----Original Message-----
**From:** Frazee, Jack [mailto:Jack.Frazee@budget-emea.com]
**Sent:** 28 June 2002 16:26
**To:** Vicky Waterfield; Trevor Sutherland
**Cc:** David Handley; James Cohen; Simon Poyner; Jack Frazee; Terry Clark
**Subject:** RE:


This reads as if we have not made any sustained progress on reconciliations
at all? Jack

-----Original Message-----
**From:** Vicky Waterfield [mailto:vickywaterfield@jaeban.co.uk]
**Sent:** 28 June 2002 15:26
**To:** Trevor Sutherland
**Cc:** David Handley; James Cohen; Simon Poyner; Jack Frazee; Terry Clark
**Subject:**
**Importance:** High


Further to our 'tele-conference' and further to previous reconciliation's,
we have conceded for the sake of taking things forward on substantial
issues, leaving a balance of £167K payable to you, subject to the
following:-

·       Us collecting £37K (Old Rent Man) either direct from the customer,
and as
they are pre-BMS we will require full contact details for the customers.
·       £119K credit card cash which has been split billing which we believe
a
substantial amount can be collected through BCI. This will take some time
to analyse and produce invoices. We believe this occurred due to BMS
errors, or incorrect postings.
·       BTI offsets made in March and April 2001 for invoices and services
etc
provided during 2000 (Spreadsheet already provided by Paul Champken, further
analyse to follow).
·       Potential royalty claw back on the revenue we had to write off in
2001.
·       The re-submissions we have sent you which you do not seem to trace.


I find it unacceptable and intolerable to see you demanding a payment of
£167K for what in principle was agreed subject to finalising the above
issues. In my view, in due course, you will see that the outstanding issues
above, which we will prove to you exceed the £167K. Furthermore as per the
last reconciliation's you faxed us, we have left £120,140.00 still for
discussion of which £68K relates to BMS charges! And £48K for inter office
billing, early indicators show 80% have been queried by our offices and we
had no response after the deadline and this will be proved accordingly when
the exercise is complete.

Looking at the current situations with Payable / Receivable, our receivable
downloaded up to the 28th June 2002 shows £1.150M payable to Jaeban. Then

1

JA1720

we have discovered that there are some files that have not been downloaded due to BMS malfunctions, of which, at this stage we are unable to quantify. This causes us a 2-fold problem:-

(a)     Underestimates outstanding from BCI
(b)     Underestimates outstanding from Customers

Therefore we are unable to collect this money direct from our customers.

We have invoices received by you, logged on our system, £1.119M. We could only so far justify £405K.

Looking at all the above I hope you will agree with me gentlemen, that your request for me to pay £167K is unfounded and very unrealistic.

A point to keep in mind, interface charges for 2001 and 2002. BMS future, unreliability, current level of royalty, current level of reservation charges, current level of support, current levels of affairs, current level of cost Jaeban is suffering through one way rentals.

There is a limit to one's tolerance. Jaeban has supported and continues to support the system, but this is causing Jaeban substantial costs, that in normal circumstances would not occur. You acknowledge and I believe accept that your current circumstances are not normal and Jaeban has put it's facility in Jeopardy due to the support and dedication of Jaeban to the system.

We urgently need to meet and think of the future and the current affair.

Regards

Mr I M Jaeban

2

(B) Letter to Debtors

**Exhibit B**

**FORM OF LICENSEE CONFIRMATION LETTER**

The Franchisee Company

Country                                                                    10 February 2003

Dear Franchisee,

We are pleased to announce that we are finalising a transaction with Avis Europe Group to, among other things, transfer BRAC Rent A Car International's ("BRACII") operations to them, including its franchisee relationships throughout Europe, Middle East and Africa (the "EMEA Region"). As you know, BRACII has been under considerable financial strain. Avis Europe Group, however, is committed to investing in the Budget brand with full professional support services, including sales, marketing, database, products and programmes, IT systems, fleet relationships, improving reservation and billing systems, and otherwise growing the Budget network. With the commitment of Avis Europe Group, the franchisees will have tremendous opportunities in the development and expansion of the Budget brand which will be operated separately from the Avis brand.

With a view to assisting ourselves and Avis Europe Group in finalising the above, you will be required to confirm the balance of the account between you and BRACII as at 18 February 2003. A statement of the balance according to BRACII's record is attached, and you should be contacted by a representative of the company in the near future to commence reconciliation of this balance to your records. This exercise must be completed before February 12, 2003.

Please sign and return this letter so that we receive it on or before February 12, 2003, confirming (a) the continuation of your franchise agreement under the Budget brand with Avis Europe Group following completion of the transaction, (b) that, after netting off amounts owed by you to us, we do not owe you any money as at February 18, 2003. As you may know, BRACII is the subject of a US Chapter 11 proceeding and a recently commenced administration proceeding in the UK. Your acknowledgment herein confirms that you will pay all sums which you owe to BRACII within 30 days of the date of this letter and waive all other claims whatsoever which you may have against BRACII and/or which may arise prior to February 18, 2003. Avis Europe Group will not be responsible for any claims and amounts accrued or arising prior to the completion of the transaction.

We fully expect that this transaction with Avis Europe Group will be completed by mid-February and encourage you to return this letter signed on or before February 12, 2003 so that you are properly accounted for. It is essential that you reply as a matter of importance to protect your future position as a franchisee in the network and also not to risk the future existence of the Budget network in the EMEA Region.

UK1 590972v1

JA1722

**PLEASE RETURN THIS LETTER SIGNED BY FAX TO**

_____ **(ON 0044 1442 276047) AND**

**RETURN THE ORIGINAL BY FIRST CLASS POST.**

Yours sincerely

Terry Clark

Vice President Franchising EMEA

**BRAC Rent-A-Car International Inc. (in Administration)**

**(Formerly Budget Rent-A-Car International Inc.)**

**The affairs, business and property of the Company are being managed by G S Johal and S V Freakley of Kroll who were appointed Joint Administrators on 14 January 2003. The Joint Administrators act as agents of the Company and without personal liability. The Company is a Debtor under Chapter 11 of the U.S. Bankruptcy Code.**

We acknowledge and confirm our agreement to the letter above and to the statement attached.

_____

**[Franchisee Company]**                                   Dated: _____ 2003

UK1 590972v1

2

JA1723

Confirmation of Balances due to/from BRACII and Licensee as at 18/02/03

Balances as at 18 February 2003

**Balances DUE TO BRACII**

£

Royalties & Ad Fund
Recharges
Budget Leasing

**Less Balances DUE TO LICENSEE**

£

Central Billing*

**NET BALANCE DUE TO (I FROM) BRACII    £**

\* Central Billing includes the deduction of interface fees & commissions, as well as any charge-backs

(a)    We hereby agree with the amounts due to and from BRACII; or

(b)    We do not agree with the amounts due to and from BRACII and have amended the schedule accordingly for the following reasons:

Please delete (a) or (b).

UK1 590972v1

3

**JA1724**

(A) Letter to Creditors

<u>**Exhibit B**</u>

<u>FORM OF LICENSEE CONFIRMATION LETTER</u>

The Franchisee Company

Country                                                              10 February 2003

Dear Franchisee,

We are pleased to announce that we are finalising a transaction with Avis Europe Group to, among other things, transfer BRAC Rent A Car International's ("BRACII") operations to them, including its franchisee relationships throughout Europe, Middle East and Africa (the "EMEA Region"). As you know, BRACII has been under considerable financial strain. Avis Europe Group, however, is committed to investing in the Budget brand with full professional support services, including sales, marketing, database, products and programmes, IT systems, fleet relationships, improving reservation and billing systems, and otherwise growing the Budget network. With the commitment of Avis Europe Group, the franchisees will have tremendous opportunities in the development and expansion of the Budget brand which will be operated separately from the Avis brand.

With a view to assisting ourselves and Avis Europe Group in finalising the above, you will be required to confirm the balance of the account between you and BRACII as at 18 February 2003. A statement of the balance according to BRACII's record is attached, and you should be contacted by a representative of the company in the near future to commence reconciliation of this balance to your records. This exercise must be completed before February 11, 2003.

Please sign and return this letter so that we receive it on or before February 12, 2003, confirming (a) the continuation of your franchise agreement under the Budget brand with Avis Europe Group following completion of the transaction, (b) that, after netting off amounts owed by you to us, we do not owe you any money as at February 18, 2003 or alternatively indicating the balance owing to you having taken into account the Royalty Free period (August 1, 2002 – February 18, 2003) which subject to you signing this letter and complying with its terms will be agreed by BRACII. As you may know, BRACII is the subject of a US Chapter 11 proceeding and a recently commenced administration proceeding in the UK. Your acknowledgment herein confirms that subject to payment by BRACII of the sums due to you from BRACII and detailed in this letter you waive all other claims whatsoever which you may have against BRACII and/or which may arise prior to February 18, 2003. Subject to the completion of the transaction with Avis Europe Group and acceptance of your claim by the Administrators of BRACII any sums due to you will be paid within 3 business days of the close of the transaction with the Avis Europe Group. If for any reason the Avis Europe Group transaction does not close the Administrators of BRACII will forward details of your claim to any subsequent liquidator of BRACII. Avis Europe will not

UKI 590971v1

**JA1725**

be responsible for any claims and amounts accrued or arising prior to the completion of the transaction.

We fully expect that this transaction with Avis Europe Group will be completed by mid-February and encourage you to return this letter signed on or before February 12, 2003 so that you are properly accounted for. It is essential that you reply as a matter of importance to protect your future position as a franchisee in the network and also not to risk the future existence of the Budget network in the EMEA Region.

**PLEASE RETURN THIS LETTER SIGNED BY FAX TO**

_____ **(ON 0044 1442 276047) AND**

**RETURN THE ORIGINAL BY FIRST CLASS POST.**

Yours sincerely

Terry Clark

Vice President Franchising EMEA

**BRAC Rent-A-Car International Inc. (in Administration)**

**(Formerly Budget Rent-A-Car International Inc.)**

**The affairs, business and property of the Company are being managed by G S Johal and S V Freakley of Kroll who were appointed Joint Administrators on 14 January 2003. The Joint Administrators act as agents of the Company and without personal liability. The Company is a Debtor under Chapter 11 of the U.S. Bankruptcy Code.**

We acknowledge and confirm our agreement to the letter above and to the statement attached.

_____

**[Franchisee Company]**                    Dated: _____ **2003**

UK1 590971v1

2

JA1726

Confirmation of Balances due to/from BRACII and Licensee as at 18/02/03

Balances as at 18 February 2003

**Balances DUE TO BRACII**

£

Royalties & Ad Fund
Recharges
Budget Leasing

**Less Balances DUE TO LICENSEE**

£

Central Billing*

**NET BALANCE DUE TO (I FROM) BRACII   £**

* Central Billing includes the deduction of interface fees & commissions, as well as any charge-backs

(a)     We hereby agree with the amounts due to and from BRACII; or

(b)     We do not agree with the amounts due to and from BRACII and have amended the schedule accordingly for the following reasons:

Please delete (a) or (b).

UK1 590971v1

3

**JA1727**

Jaeban UK Ltd
Welcome House
999 Wolverhampton Road
Oldbury
West Midlands
B69 4RJ

To Whom It May Concern:

**Re: 2001 Reconciliation**

During my employment with Budget Rent a Car International, I chaired a conference call with David Handley (Budget Accounts) and three representatives of Jaeban UK Ltd (Mr I Jaeban, Mr P Champken and Mr S Poyner).

The conference call took place on the 19th June 2002, to which the purpose was to finalise and agree account balances between Jaeban UK Ltd and BRACii.

During the conference call it was firmly agreed that both parties would within seven days complete all 2001 transactions both payable and receivable, whereby no further transactions would be included within this reconciliation.

To my best belief this was achieved and a settlement was agreed.

Yours faithfully

Mr T Sutherland

2116

JA1728

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2005, I caused one copy of the foregoing document to be served upon the persons listed below in the manner indicated:

**VIA ELECTRONIC MAIL
AND PRIORITY MAIL**

Kenneth E. Wile, Esq.
Sidley, Austin, Brown, &
 Wood, LLP
10 South Dearborn Street
Chicago, IL 60603
Facsimile: (312) 853-7036

**VIA ELECTRONIC MAIL
AND HAND DELIVERY**

Edmon L. Morton, Esq.
Joseph A. Malfitano, Esq.
Matthew B. Lunn, Esq.
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street, P. O. Box 391
Wilmington, DE 19899-0391

/s/ Brian A. Sullivan
Brian A. Sullivan